**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| UNITED MINE WORKERS OF AMERICA 1974 PENSION PLAN, *et al.*, |
| *Plaintiffs,* |
| v. |
| ENERGY WEST MINING COMPANY, |
| *Defendant.* |

Civil Action No. 1:18-cv-1905-RJL
(Consolidated with 1:18-cv-2085-RJL)

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT
TO ENFORCE ARBITRATION AWARD**

John R. Mooney
  DC Bar No. 375886
Paul A. Green
  DC Bar No. 383588
Olga M. Thall
  DC Bar No. 1016248
Mooney, Green, Saindon,
  Murphy & Welch, P.C.
1920 L. Street, NW, Suite 400
Washington, DC 20036
(202) 783-0100
(202) 783-6088 facsimile
jmooney@mooneygreen.com
pgreen@mooneygreen.com
omthall@mooneygreen.com

Stanley F. Lechner
  DC Bar No. 370986
Charles P. Groppe
  DC Bar No. 464035
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 739-5079
(202) 739-3001 facsimile
stanley.lechner@morganlewis.com
charles.groppe@morganlewis.com

Glenda S. Finch
  DC Bar No. 418206
Larry D. Newsome
  DC Bar No. 254763
UMWA Health & Retirement Funds
2121 K Street, NW
Washington, DC 20037
gfinch@umwafunds.org
lnewsome@umwafunds.org

Dated: April 11, 2019

*Counsel for the 1974 Pension Plan
and its Trustees*

## TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF POSITION....................................................... 1

STATUTORY AND FACTUAL BACKGROUND ...................................................... 5

    A.   The Parties............................................................................................... 5

        1.   The UMWA 1974 Pension Plan ................................................... 5

        2.   Energy West Mining Company. ................................................... 7

    B.   ERISA, the MPPAA, and the Creation of Withdrawal Liability ............. 7

    C.   Actuarial Standards of Practice.............................................................. 10

    D.   The Assessment of Energy West's Withdrawal Liability....................... 11

    E.   The Arbitration Proceeding.................................................................... 12

    F.   The Arbitrator's Award.......................................................................... 16

STANDARD OF REVIEW ................................................................................... 18

    A.   Summary Judgment Standard of Review................................................ 18

    B.   Arbitration Award Standard of Review .................................................. 18

        1.   Standard of Review Under the Federal Arbitration Act ............... 18

        2.   Standard of Review Under the Multiemployer Pension Plan
           Amendments Act of 1980, Which Amended ERISA ................... 20

ARGUMENT ..................................................................................................... 21

  I.   THE ARBITRATION AWARD IS ENFORCEABLE UNDER
      THE FEDERAL ARBITRATION ACT ........................................................ 21

  II.   THE ARBITRATION AWARD IS ENFORCEABLE UNDER THE
      STANDARDS OF THE MULTIEMPLOYER PENSION PLAN

AMENDMENTS ACT. ................................................................................ 23

A. By Statute, Energy West Must Satisfy a Heavy Burden in Order
to Now Disturb the Arbitrator's Findings That the 1974 Plan's
Calculation of Energy West's Withdrawal Liability Was Reasonable
in the Aggregate. ........................................................................... 24

B. Energy West Cannot Prove That the Arbitrator Committed Clear
Error in Determining That It Was Reasonable for the 1974 Plan
to Select a Discount Rate Assumption That Is in Conformance
with Actuarial Standards of Practice. ............................................ 25

C. The Arbitrator's Decision Is Further Supported by the
Critical and Declining Financial Status of the 1974 Plan. ........... 30

III.   ENERGY WEST IS UNABLE TO PROVE THAT THE ARBITRATOR
COMMITTED CLEAR ERROR IN DECIDING THAT ERISA'S
20-YEAR CAP ON WITHDRAWAL LIABILITY INSTALLMENT
PAYMENTS DOES NOT APPLY TO THE 1974 PLAN............................. 33

A. Statutory Provisions Creating the 20-Year Cap and Exempting
Certain Plans from the 20-Year Cap. ............................................ 34

B. The Arbitrator's Finding That the 1974 Plan Is Exempt from
Application of the 20-Year Payment Cap Should be Reviewed
Only for Clear Error. ..................................................................... 35

C. The Factual Findings Made by the Arbitrator in Determining
That the 1974 Plan Is a Plan Described in Section 404(c) of the IRC,
or a Continuation of Such a Plan, Are Not Clearly Erroneous or the
Result of Clear Error. .................................................................... 36

1. The Unique History of the 1974 Plan. ........................................ 36

2. The Special Provisions in Section 404(c) of the Internal Revenue
Code Apply Only to Plans in the Coal Industry. ......................... 37

3. Creation of the 1974 Plan and IRS Determinations That the 1974
Plan is a Continuation of a Plan Described in IRC Section 404(c). ............ 38

4. The Special Provisions Enacted in the Multiemployer Pension Plan
Amendments Act of 1980 to Exempt the 1974 Plan from the 20-Year
Cap……............................................................................................ 39

5.   Several Courts Have Recognized the 1974 Plan as a Plan Described in or Covered by IRC Section 404(c). ........................................................ 40

6.   The Provisions of the Coal Industry Retiree Health Benefit Act of 1992 Specifically Define the 1974 Plan as a Plan or a Continuation of a Plan Described in IRC Section 404(c)................................................. 41

CONCLUSION.............................................................................................................. 42

# TABLE OF AUTHORITIES

**Cases**                                                **Page(s)**

*Bd. of Trs., Michigan United Food & Commercial Workers Union
v. Eberhard Foods, Inc.,*
831 F.2d 1258 (6th Cir. 1987) ........................................................ 26, 29

*Borden, Inc. v. Bakery & Confectionery Union & Industry Int'l Pension,*
974 F.2d 528 (4th Cir. 1992) ............................................................ 9

*British Motor Car Distrib., Ltd. v. San Francisco Auto. Indus. Welfare Fund,*
882 F.2d 371 (9th Cir. 1989) ............................................................ 30

*Calvert & Youngblood Coal v. UMWA 1950 Pension Trust,*
Civ. A. No. 82–P–1070–S, 1985 WL 9436 (N.D. Al. Feb. 7, 1985) .................... 40

*Cent. States, Se. & Sw. Areas Pension Fund v. Nagy,*
714 F.3d 545 (7th Cir. 2013) ........................................................ 20, 35

*Cent. States, Se. & Sw. Areas Pension Fund v. Nitehawk Express, Inc.,*
223 F.3d 483 (7th Cir. 2000) ............................................................ 35

*Combs v. Adkins & Adkins Coal Co.,*
597 F. Supp. 122 (D.D.C. 1984) ........................................................ 40

*Combs v. Classic Coal Corp.,*
931 F.2d 96 (D.C. Cir. 1991) ...................................................... passim

*Combs v. Western Coal Corp.,*
611 F.Supp. 917 (D.D.C. 1985) ........................................................ 40

*Concrete Pipe & Products v. Construction Laborers Pension Trust,*
508 U.S. 602 (1993)……........................................................ 25, 30, 35

*Connolly v. Pension Ben. Guar. Corp.,*
475 U.S. 211 (1986) .................................................................... 8

*Connors v. B & H Trucking Co.,*
871 F.2d 132 (D.C. Cir. 1989) .......................................................... 8

*Contech Constr. Prod., Inc. v. Heierli,*
764 F. Supp. 2d 96, (D.D.C. 2011) ...................................................... 19

*Dorn's Transp., Inc. v. I.A.M. Nat. Pension Fund, Ben. Plan A,*
578 F. Supp. 1222 (D.D.C. 1984) ...................................................... 20

*Eastern Enterprises v. Apfel,*
    524 U.S. 498 (1998) ................................................................................... 5, 37

*Hall Street Assoc., LLC v. Mattel, Inc.,*
    552 U.S. 576 (2008) ................................................................................. 19, 23

*I.A.M. Nat. Pension Fund Ben. Plan C. v. Stockton TRI Industries,*
    727 F.2d 1204 (D.C. Cir. 1984) ............................................................... 20, 23

*Joseph Schlitz Brewing Co. v. Milwaukee Brewery Workers' Pension Plan,*
    3 F.3d 994 (7th Cir. 1993) ............................................................................ 20

*Manhattan Ford Lincoln, Inc. v. UAW Local 259 Pension Fund,*
    331 F. Supp. 3d 365 (D.N.J. 2018) .......................................................... 10, 25

*Masters, Mates & Pilots Pension Plan v. USX Corp.,*
    900 F.2d 727 (4th Cir. 1990) ........................................................................ 26

*Nat'l Ret. Fund v. Metz Culinary Mgmt., Inc.,*
    Civ. A. No. 16-CV-2408, 2017 WL 1157156 (S.D.N.Y. Mar. 27, 2017) ......... 10, 26

*Parmac, Inc. v. I.A.M. Nat. Pension Fund Ben. Plan A,*
    872 F.2d 1069 (D.C. Cir. 1989) ..................................................................... 20

*Parts and Electr. Motors, Inc. v. Sterling Electr., Inc.,*
    866 F.2d 228 (7th Cir. 1988) ........................................................................ 35

*Pension Benefit Guar. Corp. v. R.A. Gray & Co.,*
    467 U.S. 717 (1984) ................................................................................... 7, 8

*Pollard v. Quest Diagnostics,*
    610 F. Supp. 2d 1 (D.D.C. 2009) ................................................................. 18

*Pullman-Standard v. Swint,*
    456 U.S. 273 (1982) .................................................................................... 35

*Republic Indus., Inc. v. Teamsters Joint Council No. 83 of Virginia Pension Fund,*
    718 F.2d 628 (4th Cir. 1983) ........................................................................ 19

*Spring Branch Mining Co. v. UMWA 1950 Pension Trust,*
    691 F. Supp. 973 (S.D. W.Va. 1987) ............................................................ 40

*Supre v. Ricketts,*
    792 F.2d 958 (10th Cir. 1986) ...................................................................... 35

*The New York Times Company v. Newspaper and Mail Deliverers' Publishers' Pension Fund,*
   303 F. Supp. 3d 236 (S.D.N.Y. 2018) ............................................................. 22, 26

*\*The Washington Star Company v. International Typographical Union Negotiated Pension Plan,*
   729 F.2d 1502 (D.C. Cir. 1984) ......................................................................... 3, 19

*Trs. of Amalgamated Ins. Fund v. McFarlin's, Inc.,*
   789 F.2d 98 (2d Cir. 1986) ....................................................................................... 9

*Trs. of Iron Workers Local 473 Pension Trust v. Allied Products Corp.,*
   872 F.2d 208 (7th Cir. 1989) ................................................................................... 19

*Trs. of the Cent. Pension Fund of the Int'l Union of Operating Eng'rs v. Wolf Crane Serv., Inc.,*
   374 F.3d 1035 (11th Cir. 2004) ............................................................................... 20

*\*UMWA Health and Retirement Funds v. Robinson,*
   455 U.S. 562 (1982) ........................................................................................... 6, 38

*Union Asphalts and Roadoils, Inc. v. Mo-Kan Teamsters Pension Fund,*
   857 F.2d 1230 (8th Cir. 1988) ................................................................................. 19

*United Foods, Inc. v. Western Conference of Teamsters Pension Trust Fund,*
   816 F.Supp. 602 (N.D. Ca. 1993) ............................................................................ 35

*United States v. United States Gypsum Co.,*
   333 U.S. 364 (1948) ................................................................................................. 30

*Warner & Sons, Inc. v. Cent. States, Se. & Sw. Areas Pension Fund,*
   Civ. A. No. 09-C-1406, 2009 WL 5178376 (N.D. Ill. Dec. 29, 2009) .................... 35

**Statutes**

*\*26 U.S.C. § 404(c) .......................................................................................... passim

26 U.S.C. § 418E ........................................................................................................ 15

26 U.S.C. § 9701 .......................................................................................................... 6

29 U.S.C. § 1001 *et seq.*............................................................................................... 1

29 U.S.C. § 1301 .......................................................................................................... 5

29 U.S.C. § 1383 .......................................................................................................... 8

*29 U.S.C. § 1391 ............................................................................................................ passim

*29 U.S.C. § 1393 .................................................................................................... 9, 29, 30, 31

*29 U.S.C. § 1399 ............................................................................................................ passim

*29 U.S.C. § 1401 ............................................................................................................ passim

29 U.S.C. §§ 1381-1453 ............................................................................................................ 1

*9 U.S.C. § 10 ............................................................................................................... 19, 21

9 U.S.C. §§ 1-14 ...................................................................................................... 3, 18, 19

**Other Authorities**

American Arbitration Association, *Multiemployer Pension Plan Arbitration Rules for Withdrawal Liability Disputes* .................................................................................... 2, 13, 21

Fed. R. Civ. P. 56(e) ........................................................................................................ 18

Plaintiffs, the United Mine Workers of America 1974 Pension Plan (the "1974 Plan" or "Plan") and its Trustees, Michael Holland, Micheal Buckner, Michael O. McKown, and Michael D. Loiacono (collectively, "Plaintiffs" or "Trustees"), hereby submit this Memorandum of Points and Authorities in support of their Motion for Summary Judgment to enforce an arbitration award rendered in their favor against Energy West Mining Company ("Energy West" or "Defendant").

## INTRODUCTION AND SUMMARY OF POSITION

This consolidated action involves the 1974 Plan's motion to enforce an arbitration award upholding in full the 1974 Plan's withdrawal liability assessment against Energy West, and Energy West's action to vacate the same award. Under the assessment, the 1974 Plan calculated that Energy West owed the Plan $115,119,099.34 in withdrawal liability (payable either in a lump sum or in installments amounting to $2.9 million per year) by reason of its cessation of participation in the 1974 Plan. Pursuant to federal law, *i.e.,* the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), codified at 29 U.S.C. §§ 1381-1453, the amount of withdrawal liability owed by Energy West consists of the company's allocable share of the unfunded vested benefits of the 1974 Plan – a multiemployer pension plan in which Energy West participated for many years.

The Arbitrator's decision and award at issue in this case (the "Award") is a comprehensive 56-page decision issued on August 7, 2018 and released under the auspices of the American Arbitration Association ("AAA"). The Arbitrator, Mark L. Irvings, Esq., is a neutral arbitrator experienced in resolving disputes under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq*., including withdrawal liability disputes, and was selected by the parties from a list of experienced arbitrators provided by the AAA in accordance with the AAA's Multiemployer Pension Plan Arbitration Rules for Withdrawal Liability Disputes. *See* American Arbitration Association, *Multiemployer Pension Plan Arbitration Rules for Withdrawal*

*Liability Disputes* ("*AAA Rules*") (Feb. 1, 2013), *available at* https://www.adr.org/ sites/default/files/Multiemployer%20Pension%20Plan%20Arbitration%20Rules%20for%20Withdrawal%20Liability%20Disputes.pdf.

The Arbitrator's Award capped a lengthy process that included extensive discovery, two days of hearings, expert testimony introduced by both parties, and thorough post-hearing briefing, including supplemental briefs requested by Energy West.  In the proceeding before the Arbitrator, Energy West raised two specific issues for challenging the Plan's withdrawal liability assessment:

- Whether the actuarial assumptions used by the UMWA 1974 Pension Plan to calculate Energy West's withdrawal liability were unreasonable in the aggregate for a withdrawal that occurred between July 1, 2015 and June 30, 2016? and

- Whether the UMWA 1974 Pension Plan is exempt from the 20-year cap on withdrawal liability installment payments set forth in Section 4219(c)(1)(B) of ERISA?

The Arbitrator carefully reviewed all of the evidence presented, including the expert reports and testimony of actuaries for both parties, and found in favor of the 1974 Plan on both issues.  In his Award, the Arbitrator correctly noted that under Section 4221 of ERISA, 29 U.S.C. § 1401, an employer bears a very substantial burden to overturn a withdrawal liability assessment.  Under ERISA Section 4221(a)(3)(A), 29 U.S.C. § 1401(a)(3)(A), the Plan's determination of Energy West's withdrawal liability is "presumed correct unless the party contesting the determination shows by a preponderance of the evidence that the determination was unreasonable or clearly erroneous."  After reviewing and considering all the evidence, including testimony by the 1974 Plan's nationally recognized expert witness, critical admissions by Energy West's expert witness, and the professional "range of reasonableness" afforded actuaries under the statute and case law, the Arbitrator concluded that Energy West had not satisfied its burden of proof.

In this Court, the Arbitrator's conclusions are subject to an extremely narrow scope of judicial review. Under Section 4221(b)(3) of ERISA, 29 U.S.C. § 1401(b)(3), arbitration decisions regarding multiemployer pension plans are to be "enforced in United States courts as an arbitration proceeding carried out under title 9, United States Code," which refers to the Federal Arbitration Act (sometimes referred to as the "United States Arbitration Act"). The United States Court of Appeals for the District of Columbia Circuit has summarized the standard of judicial review as follows:

> If either party elects arbitration, the MPPAA instructs the Arbitrator to presume that the plan's determinations are correct, unless the employer shows by a preponderance of the evidence that a challenged determination was unreasonable or clearly erroneous. *Id.* § 1404(a)(3)(A). Either party may bring an action in a federal district court 'to enforce, vacate, or modify' the arbitrator's award. *Id.* § 1401(b)(2). The court must enforce the arbitrator's decision in accordance with the United States Arbitration Act, 9 U.S.C. §§ 1-14 (1982), which authorizes only limited review. Furthermore, the court must presume that the arbitrator's findings of fact are correct, unless they are rebutted by a clear preponderance of the evidence. *Id.* § 1401(c).

*The Washington Star Company v. International Typographical Union Negotiated Pension Plan,* 729 F.2d 1502, 1505 (D.C. Cir. 1984).

Energy West may try to avoid this deferential standard of judicial review of the Arbitrator's decision by attempting to paint this case as complicated and technical and requiring intense judicial scrutiny. Any such contention is contrary to the limited scope of judicial review of arbitration decisions in general, and especially inapplicable to withdrawal liability determinations that are presumed correct and based on actuarial assumptions that are within the scope of professional acceptability. As discussed below, Energy West did not come close to satisfying its burden of proof in this case for several reasons cited by the Arbitrator, including the fact that Energy West's expert admitted that the critical actuarial assumption at issue in determining the amount of the company's withdrawal liability (*i.e.,* the discount rate used to calculate the present value of the

Plan's unfunded vested benefits), was based on accepted Actuarial Standards of Practice and was not unreasonable. This admission, combined with other evidence set forth in the Arbitrator's decision, is fatal to Energy West's attempt to vacate the Arbitrator's well-supported decision on issue number 1—*i.e.,* whether the Plan's actuarial assumptions were unreasonable in the aggregate.

With regard to issue number 2—whether the 1974 Plan is exempt from the 20-year cap on installment payments of withdrawal liability—Energy West once again was unable to satisfy its burden of proof during the arbitration and cannot demonstrate that the Arbitrator's decision should be vacated. To the contrary, the Arbitrator carefully analyzed the evidence presented, including the unique history of the 1974 Plan, longstanding determinations by the Internal Revenue Service that the Plan has been accorded special status under Section 404(c) of the Internal Revenue Code ("IRC"), prior arbitration and court cases, and various pronouncements by Congress wherein it specifically defined the 1974 Plan as a Plan "described in section 404(c) [of the IRC] (or a continuation thereof)." As discussed in greater detail below, the Arbitrator's finding that the 1974 Plan is a plan described in section 404(c) of the IRC, or a continuation thereof, is well-supported in the record and dispositive on the issue of whether the Plan is exempt from the 20-year cap on withdrawal liability installment payments. In short, the Arbitrator's finding on issue number 2 is well-supported by evidence of record and there is no basis for Energy West's attempt to have this Court second-guess and vacate the Arbitrator's decision. Accordingly, the Plan respectfully submits that the Court should issue an order enforcing the Arbitrator's Award in favor of the 1974 Plan on both issues presented.

## STATUTORY AND FACTUAL BACKGROUND

### A.  The Parties

#### 1.  The UMWA 1974 Pension Plan

The 1974 Plan is a multiemployer pension plan as defined in Section 4001(a)(3) of ERISA, 29 U.S.C. § 1301(a)(3).  Plaintiffs' Statement of Undisputed Facts ("SUF"), at ¶ 1.  The purpose of the 1974 Plan is to provide pension benefits to retired coal miners, disabled coal miners, and surviving spouses who satisfy the eligibility requirements of the Plan. *Id.*  Due to insufficient funding, the 1974 Plan has been and continues to be certified as being in "critical and declining" status under the Pension Protection Act of 2006 and the Multiemployer Pension Reform Act of 2014. SUF ¶ 5. The Plan is projected to become insolvent during its 2022 plan year. SUF ¶ 6.

The 1974 Plan has a unique history.  As explained below and in the accompanying Statement of Undisputed Facts, the origins of the 1974 Plan date back to 1946 when the federal government seized the nation's privately owned coal mines and negotiated with the President of the United Mine Workers of America ("UMWA") to create a benefit fund that provided health, disability, and retirement benefits for coal miners and their dependents and survivors.  *See Eastern Enterprises v. Apfel*, 524 U.S. 498, 504-06 (1998) (plurality opinion). SUF at ¶¶ 7-10.  The agreement negotiated in 1946 is known as the Krug-Lewis Agreement.  *Eastern Enterprises* at 505.  SUF ¶ 8. Julius A. Krug was the Secretary of the Interior at the time and John L. Lewis was President of the UMWA. *Eastern Enterprises* at 505.  SUF ¶ 8.

 In 1950, after the mines were returned to the private sector, the UMWA and the Bituminous Coal Operators' Association, Inc. ("BCOA") collectively bargained to create the UMWA Welfare and Retirement Fund of 1950 ("1950 W&R Fund").  *Eastern Enterprises* at 505. SUF ¶ 9. The 1950 W&R Fund was modelled after the Krug-Lewis Agreement, and provided

pension and medical benefits to miners and their families. *Eastern Enterprises* at 505. SUF ¶ 9. In 1974, after the enactment of ERISA, the UMWA and BCOA negotiated to divide the 1950 W&R Fund into four separate entities, including the UMWA 1950 Pension Plan and Trust ("1950 Pension Plan") and the 1974 Plan. *UMWA Health and Retirement Funds v. Robinson*, 455 U.S. 562, 566 (1982); SUF ¶¶ 9-10; 19.

As discussed in Part III, *infra*, the issue of whether the 1974 Plan is exempt from the 20-year cap on installment payments depends on whether the 1974 Plan is a plan or a continuation of a plan to which IRC Section 404(c) applies. Section 404(c) of the IRC is a unique provision that applies only to a plan that (a) was established before 1954, (b) as a result of an agreement between the federal government and a union, (c) during a period of government operation, and (d) after the government had seized the industry's major productive facilities. *See* 26 U.S.C. § 404(c). This unique provision applies only to coal industry benefit plans such as the 1974 Plan, and has been recognized as such by the IRS, Congress, and federal courts.

In 1975, the Internal Revenue Service ("IRS") concluded that the UMWA "1950 Pension Plan and Trust, and the 1974 Pension Plan and Trust represent a continuation of the United Mine Workers of America Welfare and Retirement Fund of 1950, and therefore constitute a plan described in section 404(c) of the Code." SUF ¶ 21. In 1992, when Congress enacted the Coal Industry Retiree Health Benefit Act (the "Coal Act"), Congress specifically stated, in its definitions, that "[t]he term '1974 UMWA Pension Plan' means a pension plan described in section 404(c) (or a continuation thereof), participation in which is substantially limited to individuals who retired in 1976 and thereafter." 26 U.S.C. §§ 9701(a)(2), (3). Similarly, as shown in Part III(C)(5), *infra*, several federal courts also have concluded that the 1974 Plan is a plan described by IRC Section 404(c).

6

### 2. Energy West Mining Company.

Energy West Mining Company, formerly Utah Power and Light, operated coal mines in the state of Utah for many years. Energy West was, at all times relevant to this case, a wholly owned subsidiary of PacifiCorp, which in turn was a wholly owned subsidiary of PPW Holdings LLC. PPW Holdings LLC was a wholly owned subsidiary of Berkshire Hathaway Energy Co. SUF ¶ 27.

Energy West, or its former or related entities, were signatories to National Bituminous Coal Wage Agreements or me-too agreements with the UMWA that required Energy West to contribute to the 1974 Plan since 1977. SUF ¶ 23. In return for these contributions, Energy West's miners received pension credits and pensions from the 1974 Plan when they retired. For the five-year period from July 1, 2010 through June 20, 2015, classified employees of Energy West worked 2.1 million hours, on which contributions were made to the 1974 Plan. SUF ¶ 26. Energy West ceased mining coal in 2015 and withdrew from the 1974 Plan during the plan year beginning July 1, 2015 and ending June 30, 2016. SUF ¶ 28. Despite its withdrawal from the 1974 Plan, Energy West has over 500 retirees, disabled miners, and surviving spouses who continue to receive benefits from the 1974 Plan. SUF ¶ 25.

### B. ERISA, the MPPAA, and the Creation of Withdrawal Liability

In enacting ERISA in 1974, Congress sought to guarantee that "if a worker has been promised a defined pension benefit upon retirement—and if he has fulfilled whatever conditions are required to obtain a vested benefit—he actually will receive it." *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 720 (1984) (citing to *Nachman Corp. v. Pension Benefit Guaranty Corp.*, 446 U.S. 359, 375 (1980)). To that end, Congress amended ERISA by enacting the MPPAA, which provides that when a plan is underfunded, an employer that withdraws from

the plan must pay its allocable share of the plan's vested pension benefits that current plan assets do not cover. ERISA Section 4201(a); 29 U.S.C. § 1381(a).  A "complete" withdrawal occurs "when an employer (1) permanently ceases to have an obligation to contribute under the plan, or (2) permanently ceases all covered operations under the plan."  ERISA Section 4203(a); 29 U.S.C. § 1383(a).

Withdrawal liability reflects the withdrawing employer's *pro rata* share of the difference between the level of pension benefits that employers promised their employees and the value of plan assets, which generally consist of contributions made by all participating employers, plus or minus investment gains or losses and administrative expenses. *See R.A. Gray & Co.*, 467 U.S. at 725; *Connors v. B & H Trucking Co.*, 871 F.2d 132, 133 (D.C. Cir. 1989).  The imposition of withdrawal liability protects participating employers as much as it protects employees, for each employer bears the adverse consequences of another employer's withdrawal from a multiemployer pension plan.  *Connolly v. Pension Ben. Guar. Corp.*, 475 U.S. 211, 216 (1986).

The amount of an employer's withdrawal liability is calculated by a formula established by Congress and set forth in ERISA.  A plan first determines the plan's total unfunded vested benefits ("UVBs") by determining the present value of the vested benefits promised by the plan and the value of the plan's assets.  The difference between these two numbers is the UVB.  ERISA Section 4211(b)-(d); 29 U.S.C. § 1391(b)-(d).  Next, the plan calculates the proportionate share of the UVBs allocable to the withdrawing employer.  Although several methodologies may be used to determine an employer's proportionate share, most, including the modified "rolling five" methodology adopted by the Trustees of the 1974 Plan, are based on the employer's contribution share over prior years. *See* ERISA Section 4211; 29 U.S.C. § 1391.  The assessment seeks to capture the amount of "vested but unfunded benefits attributable to work already performed" for

the employer by individuals covered by the plan. *Trs. of Amalgamated Ins. Fund v. McFarlin's, Inc.*, 789 F.2d 98, 103 (2d Cir. 1986). *See also Combs v. Classic Coal Corp.,* 931 F.2d 96, 98 (D.C. Cir. 1991); *Borden, Inc. v. Bakery & Confectionery Union & Industry Int'l Pension*, 974 F.2d 528, 529-30 (4th Cir. 1992).

The UVBs of a plan for the purposes of determining withdrawal liability must be determined based on "actuarial assumptions and methods which, in the aggregate, are reasonable (taking into account the experience of the plan and reasonable expectations) and which, in combination, offer the actuary's best estimate of anticipated experience under the plan." ERISA § 4213(a)(1), 29 U.S.C. § 1393(a)(1). Determining UVBs requires a plan actuary to make several assumptions about the future assets and liabilities of a plan, including assumptions about retirement rates, termination rates, spousal age differences, and mortality rates.

Determining UVBs also requires the actuary to make an assumption about the present value of expected future plan benefits. As explained by the D. C. Circuit, "[b]ecause the Plans will be funded in part by investment earnings on current assets and in part by assets the Plans are expected to acquire in the future, their actuaries must select an interest rate assumption to apply in discounting the liability for future benefit payments." *Classic Coal Corp.*, 931 F.2d at 98. Increasing the discount rate assumption decreases the employer's withdrawal liability, which is why employers often argue that the discount rate assumptions used by plans are too low for withdrawal liability purposes. *See id*.

As part of the MPPAA, Congress also enacted a number of special rules applicable to pension plans described under 26 IRC § 404(c). One new provision introduced under the MPPAA involved the imposition of a 20-year payment cap imposed on withdrawal liability payments where the amortization period for the scheduled payments exceeds 20 years. *See* ERISA § 4219(c)(1)(B),

29 U.S.C. § 1399(c)(1)(B).  Congress explicitly exempted the 1950 Pension Plan and the 1974

Plan from operation of this cap, noting that operation of the cap in ERISA Section 4219(c)(1)(B)

does not apply to a pension plan "to which 404(c) of Title 26, or a continuation of such a plan,

applies . . ." ERISA Section 4211(d)(1) and (d)(2), 29 U.S.C. § 1391(d)(1) and (d)(2).  This

provision remains a part of ERISA and requires the 1974 Plan when making withdrawal liability

determinations to calculate installment payments of withdrawal liability without applying the 20-

year cap.

### C.  Actuarial Standards of Practice

As testified to by actuaries for each side in this case, enrolled actuaries are professionally

guided by Actuarial Standards of Practice ("ASOPs"), which are developed and published by the

Actuarial Standards Board and reflect acceptable actuarial practice. SUF ¶ 44. *See also Manhattan*

*Ford Lincoln, Inc. v. UAW Local 259 Pension Fund*, 331 F. Supp. 3d 365, 397 (D.N.J. 2018)

(applying ASOP requirements); *Nat'l Ret. Fund v. Metz Culinary Mgmt., Inc*., Civ. A. No. 16-CV-

2408 (VEC), 2017 WL 1157156, at *7, n.12 (S.D.N.Y. Mar. 27, 2017) (acknowledging use of

ASOP in withdrawal liability dispute).

ASOP No. 4 was in effect at all times relevant to this case, and addresses "Measuring

Pension Obligations and Determining Pension Plan Costs and Contributions." Section 3.2 of

ASOP 4 states that "[w]hen measuring pension obligations…the actuary should … (a) identify the

purpose of the measurement." SUF ¶ 45.

ASOP No. 27 addresses the "Selection of Economic Assumptions for Measuring Pension

Obligations." Section 3.6 of ASOP 27 explains that economic assumptions are reasonable if,

among other things, they are "appropriate for the purpose of the measurement." SUF ¶ 46. Section

3.9 of ASOP 27 addresses the selection of discount rates used to calculate "the present value of

expected future plan payments," such as the unfunded vested benefits at issue here.  Section 3.9 of ASOP 27, entitled "Selecting a Discount Rate," explains that the "purpose of the measurement" should be a primary factor in selecting the discount rate.  SUF ¶ 47. In providing guidance to actuaries when the purpose of a measurement is defeasance or settlement, Section 3.9(b) of ASOP 27 states as follows regarding the selection of a discount rate that will be used to calculate the present value of future benefits:

> ASOP 27, Section 3.9.  Selecting A Discount Rate
>
> b.  Defeasance or Settlement—An actuary measuring a plan's present value of benefits on a defeasance or settlement basis may use **a discount rate implicit in annuity prices or other defeasance or settlement options**.

SUF ¶ 47. (emphasis added).

In short, the professional actuarial guidance applicable to actuaries provides that the selection of discount rates *should* vary with the purpose of the calculation.   It further provides that when calculating the present value of future plan benefits for the purposes of a settlement, actuaries may use a discount rate "implicit in annuity prices or other defeasance or settlement options."  As discussed below, the actuaries for both parties in this case agreed that withdrawal liability is a settlement of an employer's obligations to the 1974 Plan, and that the discount rates used by the Plan for purposes of withdrawal liability (*i.e.,* the rates published by the Pension Benefit Guaranty Corporation, or "PBGC") are proxies for and based on annuity prices.

### D.  The Assessment of Energy West's Withdrawal Liability

The 1974 Plan has adopted a modified version of what is often referred to as the "rolling five method" for determining the withdrawal liability of contributing employers, as described in ERISA § 4211(c)(3), 29 U.S.C. § 1391(c)(3). SUF ¶ 30. In general, the rolling five method of calculating withdrawal liability is based on the employer's share of contributions to the 1974 Plan

over a specified five-year period that is set forth in ERISA. The employer's share is applied to the Plan's unfunded vested benefits to determine the amount of the employer's withdrawal liability.

William Ruschau, of United Actuarial Services, has served as the 1974 Plan's actuary since 2014. SUF ¶ 31. Mr. Ruschau is an enrolled actuary and experienced in withdrawal liability methodology and calculations. For the plan year beginning July 1, 2015 and ending June 30, 2016, Mr. Ruschau selected PBGC annuity rates as the 1974 Plan's discount rate to determine the present value of the Plan's unfunded vested benefits for withdrawal liability purposes. SUF ¶ 50. PBGC annuity rates are published monthly by the PBGC, and are the interest rates for ERISA Section 4044 Immediate and Deferred Annuities ("PBGC Annuity Rates" or "PBGC discount rates"). As of June 30, 2015, the time relevant to this case, the PBGC Annuity Rates were 2.71% for the first 20 years and 2.78% for periods beyond 20 years. SUF at ¶¶ 49, 75.

Energy West ceased mining coal in 2015 and withdrew from the 1974 Plan during the plan year beginning July 1, 2015 and ending June 30, 2016. SUF ¶ 28. The 1974 Plan calculated that Energy West owed the 1974 Plan withdrawal liability in the amount of $115,119,099.34. SUF ¶ 34. Under the MPPAA, Energy West has the right to pay its withdrawal liability in monthly installments of $247,251.12 (approximately $2.9 million per year). SUF ¶ 35. Absent settlement, Energy West's installment payments will continue indefinitely because, as the Arbitrator found, the 1974 Plan is exempt from the 20-year cap on installment payments as provided under ERISA § 4211(d) because it is a continuation of a plan described in IRC § 404(c). (*See* JA __, Award at 56.)

### E. The Arbitration Proceeding

On February 28, 2017, Energy West filed a timely notice of intent with AAA to arbitrate under the AAA's Multiemployer Pension Plan Arbitration Rules for Withdrawal Liability

Disputes. SUF ¶ 38. Under the Rules, AAA provided the parties with a list of arbitrators experienced in resolving disputes under ERISA, including withdrawal liability disputes. *AAA Rules*, *supra*. Following this agreed-upon process, the AAA appointed Mark L. Irvings, Esq. as the neutral arbitrator to decide this withdrawal liability dispute. SUF ¶ 39. In advance of the arbitration hearing, the parties stipulated to the following statement of the issues:

    i.      Whether the actuarial assumptions used by the UMWA 1974 Pension Plan to calculate Energy West's withdrawal liability were unreasonable in the aggregate for a withdrawal that occurred between July 1, 2015 and June 30, 2016.

    ii.     Whether the UMWA 1974 Pension Plan is exempt from the 20-year cap on withdrawal liability installment payments set forth in Section 4219(c)(1)(B) of ERISA.

SUF ¶ 40.

Arbitrator Irvings subsequently held two days of hearings on December 12 and 13, 2017. At the arbitration proceeding, only two witnesses testified – Dr. Ethan Kra for the 1974 Plan and Scott Hittner for Energy West. Both are enrolled actuaries. Both Dr. Kra and Mr. Hittner produced expert reports which were entered into the arbitration record. SUF ¶ 42. The transcript of the deposition testimony of Mr. Ruschau, a third enrolled actuary and the 1974 Plan's actuary, was entered into the arbitration record. SUF ¶ 43.

In Mr. Ruschau's deposition, he testified that he used a reasonable risk-free discount rate to determine the present value of the 1974 Plan's unfunded vested benefits for withdrawal liability purposes. SUF ¶ 51. Mr. Ruschau testified that using a risk-free discount rate for withdrawal liability purposes is appropriate under established actuarial standards to settle a withdrawing employer's obligations to a multiemployer pension plan. SUF ¶ 50. A risk-free rate protects the 1974 Plan from investment risk. As Mr. Ruschau explained, after an employer withdraws from the 1974 Plan, the 1974 Plan does not have any recourse against the withdrawn employer in the

event the 1974 Plan experiences poor investment performance that is lower than the discount rate used in calculating the employer's withdrawal liability. *Id*. Mr. Ruschau testified that the PBGC Annuity Rates represent a reasonable proxy for risk-free interest rates[1] and he therefore utilized those rates, updated to the current month. SUF ¶ 51.

Energy West retained Mr. Scott Hittner to opine on the reasonableness of Mr. Ruschau's selection of actuarial assumptions used to calculate Energy West's withdrawal liability. SUF ¶ 54. Mr. Hittner admitted at the arbitration hearing that it was not unreasonable for the 1974 Plan's actuary to follow the guidance in ASOP 27, Section 3.9(b), which provides that in selecting a discount rate for purposes of settlement or defeasance, an actuary "may use a discount rate implicit in annuity prices or other defeasance or settlement options." SUF ¶ 58. Significantly, Mr. Hittner admitted at the hearing that "withdrawal liability is a settlement of an employer's obligation to a plan," that PBGC discount rates are "a proxy for annuity prices," and that it was "<u>not unreasonable</u>" for the 1974 Plan to use PBGC discount rates to determine the present value of the Plan's nonforfeitable benefits in calculating Energy West's withdrawal liability. SUF ¶¶ 57-58.

In other words, the only witness for Energy West admitted at the arbitration hearing that it was "not unreasonable" for the 1974 Plan to use PBGC discount rates to calculate Energy West's withdrawal liability. SUF ¶¶ 57-58. Not surprisingly, the Arbitrator found that "Hittner's admissions are dispositive" and given the statutory burden of proof on the employer, "this conclusion by Energy West's own expert is fatal to its claim." (JA __, Award at 49-50).

---

[1] The actuaries and Arbitrator use the terms "risk-free," "riskless," "low risk," "annuity," and "discount rate implicit in annuity prices" interchangeably when referring to the interest rate available when one invests in a low risk investment, such as a government bond. In this Brief, we generally refer to the interest rate assumption used to calculate the present value of the Plan's future benefits as a "discount rate." We refer to the PBGC rates as "PBGC Annuity Rates" or "PBGC discount rates."

The 1974 Plan retained Dr. Ethan Kra to opine on the reasonableness of Mr. Ruschau's selection of actuarial assumptions used to calculate Energy West's withdrawal liability. SUF ¶ 65. Dr. Kra is a nationally recognized expert regarding multiemployer pension plans and was recognized by the Arbitrator as an expert regarding multiemployer pension withdrawal liability. SUF ¶ 68. (JA __, Award at 20-21). Dr. Kra has a Bachelor's degree, Master's degree, and Ph. D., all in mathematics, from Yale University. SUF ¶ 66. From 1977 to 2011, he worked as an actuary at Mercer, Inc., the world's largest employer of actuaries for most of that time. *Id*. For over 35 years, Dr. Kra has provided consulting and actuarial services to multiemployer pension and welfare plans. SUF ¶ 67. Among other things, Dr. Kra has prepared expert reports and expert testimony in approximately 30 court, administrative, or arbitration proceedings, approximately half of which involved multiemployer pension plan withdrawal liability assessments. SUF ¶ 68.

Dr. Kra testified that ASOP 27, Section 3.9(b) guides the selection of discount rates for withdrawal liability purposes because withdrawal liability is a settlement of a withdrawing employer's liability to a multiemployer pension fund. SUF ¶ 70. In his expert report, Dr. Kra explained that selecting a risk-free discount rate is, in his opinion, the most appropriate basis for selecting a discount rate for withdrawal liability purposes because otherwise the pension plan incurs the risk that its investment portfolio will not perform as well as the projected discount rate assumption. SUF ¶ 71. Dr. Kra testified that any shortfall caused by a discount rate higher than a risk-free rate would harm, in addition to the remaining employers in the multiemployer pension plan, plan participants and beneficiaries as well as the PBGC.[2] SUF ¶ 72.

---

[2] Generally, if the plan's assets are insufficient to provide the promised level of benefits, the plan sponsor must reduce benefits to the PBGC-guaranteed level of benefits and apply for financial assistance from the PBGC. 26 U.S.C. § 418E(f)(2).

Dr. Kra testified that he reviewed all the actuarial assumptions selected by Mr. Ruschau for calculating withdrawal liability and concluded they were not unreasonable in the aggregate. SUF ¶ 74. Dr. Kra testified that he determined that the PBGC Annuity Rates used by Mr. Ruschau fell within the range of reasonableness and were fully consistent with accepted actuarial practice. SUF at ¶¶ 70, 74-75.

### F. The Arbitrator's Award

In a Decision and Award dated August 7, 2018, the Arbitrator upheld the 1974 Pension Plan's assessment of withdrawal liability against Energy West. The Award states in relevant part:

i. The actuarial assumptions used by the UMWA 1974 Pension Plan to calculate Energy West's withdrawal liability were not unreasonable in the aggregate for a withdrawal that occurred between July 1, 2015 and June 30, 2016.

ii. The UMWA 1974 Pension Plan is exempt from the 20-year cap on withdrawal liability installment payments set forth in Section 4219(c)(1)(B) of ERISA.

(JA __, Award at 56.)

The Arbitrator's Award is very detailed and thorough. In his 56-page written decision, the Arbitrator identified the issues in dispute; summarized the unique history and origins of the 1974 Plan dating back to the Krug-Lewis Agreement of 1946; noted the creation of Section 404(c) of the Internal Revenue Code that applies only to benefit plans in the coal industry; chronicled the numerous instances in which the 1974 Plan has been recognized as a plan described in IRC Section 404(c) and a continuation of the 1950 W&R Fund; summarized the cases noting that the 1974 Plan is covered by IRC Section 404(c); described the critical and declining financial condition of the Plan; quoted the relevant ERISA provisions involved in the calculation of Energy West's withdrawal liability; highlighted the Actuarial Standard of Practice (ASOP 27, Section 3.9) that guides actuaries in selecting a discount rate for settlement purposes; summarized the testimony of the three actuaries involved in this case; discussed recent case law regarding discount rates used

16

for withdrawal liability settlement purposes as compared to funding purposes; summarized the positions of the parties; set forth the substantial burden of proof imposed by ERISA on employers attempting to overturn a withdrawal liability assessment; and then applied the facts of this case to the statutory framework and statutory burdens of proof.

Regarding the first issue, the Arbitrator found that all three actuaries agreed on a number of facts that are dispositive in this dispute. All three actuaries agreed that their actuarial assumptions are guided by the ASOPs. (JA __, Award at 11). All three actuaries agreed that ASOP No. 27, Section 3.9(b) is of particular relevance to determining the appropriate discount rate assumption for withdrawal liability because withdrawal liability is a settlement of a withdrawing employer's obligation to a plan. (*Id.*) All three actuaries agreed that the PBGC discount rates are a proxy for annuity prices. (*Id.* at 22.) And most critical to the disposition of this case, all three actuaries agreed that it was **not unreasonable** for the 1974 Plan to follow accepted actuarial guidance by using PBGC discount rates to calculate Energy West's withdrawal liability. (*Id.* at 50.)

As noted above and explained by the Arbitrator: "Hittner ultimately conceded that *'[i]t was not unreasonable for the actuary to follow the [ASOP No. 27] guidance . . .'* Given the statutory burden of proof, this conclusion by Energy West's own expert is fatal to its claim." (*Id.*) (italics in original). Based on these admissions by Energy West's expert and other evidence summarized by the Arbitrator in his decision, the Arbitrator determined that "[t]he actuarial assumptions used by the UMWA 1974 Pension Plan to calculate Energy West's withdrawal liability were not unreasonable in the aggregate for a withdrawal that occurred between July 1, 2015 and June 30, 2016." (JA __, Award at 56).

On the second issue, the Arbitrator concluded that the 1974 Plan is exempt from the 20-

17

year cap because it is the "continuation of" a plan to which IRC Section 404(c) applies.  In so finding, the Arbitrator reviewed the factual history of the 1974 Plan stemming from the 1950 W&R Fund and each IRS determination, arbitration, and court decision finding that the 1974 Plan holds special status under Section 404(c). (JA __, Award at 2-9, 54-55).  As noted by the Arbitrator, Energy West conceded that no IRS determination, arbitration, or court decision supports the contention that Section 404(c) was never intended to apply to the 1974 Pension Plan, or that such coverage lapsed once the 1974 Plan qualified under IRC Section 401(a). (JA __, Award at 54).

## STANDARD OF REVIEW

### A.  Summary Judgment Standard of Review

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(e).  To avoid summary judgment, the dispute must be "*genuine*" and the fact must be "*material.*"  *Id.*  "To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier-of-fact could find for the non-moving party."  *Pollard v. Quest Diagnostics*, 610 F. Supp. 2d 1, 16-17 (D.D.C. 2009).  As described below, in this action to enforce an arbitration award, the Court's review of the Arbitrator's Award is further governed and limited by both the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-14, and the MPPAA, 29 U.S.C. §§ 1401 *et seq.*

### B.  Arbitration Award Standard of Review

The Court's review of the Arbitrator's Award in this case is extremely limited under both the Federal Arbitration Act and the Multiemployer Pension Plan Amendments Act of 1980.

#### 1.  Standard of Review Under the Federal Arbitration Act

Section 4221(b)(3) of ERISA, 29 U.S.C. § 1401(b)(3), provides in relevant part that "[a]ny arbitration proceedings" carried out under the MPPAA "shall, to the extent consistent with this

subchapter, be . . . enforced in United State courts as an arbitration proceeding carried out under title 9, United States Code." 9 U.S.C. §§ 1-14 refers to the Federal Arbitration Act, which sometimes is cited as the United States Arbitration Act. As the D.C. Circuit recognized in *Washington Star Co. v. International Typographical Union Negotiated Pension Plan*, this provision requires the Court to enforce the Arbitrator's Award in accordance with the FAA. 729 F.2d at 1505 ("The court must enforce the arbitrator's decision in accordance with the United States Arbitration Act, 9 U.S.C. §§ 1-14, which authorizes only limited review.").[3]

Under the FAA standards, a court "'must confirm' an arbitration award 'unless' it is vacated, modified or corrected 'as prescribed' in §§ 10 and 11" of the FAA. *Hall Street Assoc., LLC v. Mattel, Inc.*, 552 U.S. 576, 582 (2008). As the Court noted, Section 10(a) is the exclusive grounds for vacating an award, the relief Energy West seeks here. *Id*. at 583. Based on the provisions in the FAA, a court may vacate an arbitrator's award only:

- if the award was procured by "corruption, fraud, or undue means;"
- if the court finds "evident partiality or corruption in the arbitrator;"
- if the arbitrator "was guilty of misconduct in refusing to postpone a hearing" or "in refusing to hear evidence pertinent and material to the controversy;" or
- if the arbitrator "exceeded" his or her powers.

9 U.S.C. § 10(a). Accordingly, the Court must confirm the Award in favor of the 1974 Plan unless it finds one of these factors present in this case. *Contech Constr. Prod., Inc. v. Heierli*, 764 F. Supp. 2d 96, 115 (D.D.C. 2011) (citations omitted).

---

[3] The D.C. Circuit's statement regarding the standard of review differs from other courts that view the limited review permitted under the FAA as inconsistent with the MPPAA's mandate allowing courts to "enforce, vacate, or modify" an arbitrator's award. *See*, *e.g.*, *Trs. of Iron Workers Local 473 Pension Trust v. Allied Products Corp*., 872 F.2d 208, 212 (7th Cir. 1989). *See also Union Asphalts and Roadoils, Inc. v. Mo-Kan Teamsters Pension Fund*, 857 F.2d 1230, 1234 (8th Cir. 1988) (same); *Republic Indus., Inc. v. Teamsters Joint Council No. 83 of Virginia Pension Fund*, 718 F.2d 628, 641 (4th Cir. 1983) (same). In this case and without waiving its position on the applicability of the FAA, the Plan submits that the Arbitrator's Award should be enforced under either the FAA or the MPPAA standard of review and the Plan will address both standards.

### 2. Standard of Review Under the Multiemployer Pension Plan Amendments Act of 1980, Which Amended ERISA

Under Section 4221(c) of ERISA, 29 U.S.C. § 1401(c), following a withdrawal liability arbitration, there is a "presumption, rebuttable only by a clear preponderance of the evidence, that the findings of fact made by the arbitrator were correct." This standard is synonymous with "clear error" and is one of deference to the person who hears the evidence. *See I.A.M. Nat. Pension Fund Ben. Plan C. v. Stockton TRI Industries* 727 F.2d 1204, 1207 (D.C. Cir. 1984); *Joseph Schlitz Brewing Co. v. Milwaukee Brewery Workers' Pension Plan*, 3 F.3d 994, 999 (7th Cir. 1993); *Trs. of the Cent. Pension Fund of the Int'l Union of Operating Eng'rs v. Wolf Crane Serv., Inc.*, 374 F.3d 1035, 1037 (11th Cir. 2004). This same standard applies to mixed questions of fact and law. *Cent. States, Se. & Sw. Areas Pension Fund v. Nagy,* 714 F.3d 545, 549 (7th Cir. 2013) ("in these sorts of ERISA cases, we review 'mixed questions of law and fact' under a clearly erroneous standard.").

In contrast, an arbitrator's conclusions of law are "fully reviewable to determine whether applicable statutory law has been correctly applied." *Parmac, Inc. v. I.A.M. Nat. Pension Fund Ben. Plan A*, 872 F.2d 1069, 1071 (D.C. Cir. 1989). *Accord Classic Coal Corp.*, 931 F.2d at 102; *Dorn's Transp., Inc. v. I.A.M. Nat. Pension Fund, Ben. Plan A*, 578 F. Supp. 1222, 1238 (D.D.C. 1984).

In *Combs v. Classic Coal Corporation,* the D.C. Circuit noted the statutory provisions of the MPPAA providing that a plan's determinations of withdrawal liability are presumed correct unless the employer shows by a preponderance of the evidence that the actuarial assumptions and methods used were unreasonable in the aggregate. 931 F.2d at 99. In discussing the employer's burden of proof, the Court stated:

*In meeting this burden, the test is not which withdrawal determination is the most reasonable but rather whether the challenged determination is unreasonable or clearly erroneous*. . . . Actuarial valuations are based upon and reflect the experience of the plan, the professional judgment of the actuary, and the theories and expectations to which the actuary ascribes. Great differences of opinion exist as to actuarial methods. Congress, herefore, created the statutory presumption in favor of withdrawal determinations expressly to forestall endless disputes over technical actuarial matters with respect to which there are often severally equally correct approaches.

*Id*. at 99-100 (citations and internal quotations omitted) (emphasis added).

In sum, Energy West faced a substantial burden of proof in the arbitration and was not able to satisfy its burden, as clearly articulated by the Arbitrator's Award. Under the MPPAA, this Court should review the Arbitration Award with deference to the Arbitrator who heard the evidence, and should not disturb the Award unless it is clearly erroneous or the product of clear error.

## ARGUMENT

## I.    THE ARBITRATION AWARD IS ENFORCEABLE UNDER THE FEDERAL ARBITRATION ACT

Under the Federal Arbitration Act, the Court may vacate an arbitration award only:

- if the award was procured by "corruption, fraud, or undue means:"
- if the court finds "evident partiality or corruption in the arbitrator;"
- if the arbitrator "was guilty of misconduct in refusing to postpone a hearing" or "in refusing to hear evidence pertinent and material to the controversy;" or
- if the arbitrator "exceeded" his or her powers.

9 U.S.C. § 10(a).

No such evidence is even remotely present in this case, and no misconduct or any impropriety in the arbitration process has been alleged. Energy West filed with the American Arbitration Association a request to arbitrate its withdrawal liability dispute with the 1974 Plan, in accordance with the AAA's Multiemployer Pension Plan Arbitration Rules for Withdrawal Liability Disputes. SUF ¶ 38. The AAA Rules are well-established and accepted, and establish

procedures for, among other things, the selection of a neutral arbitrator, prehearing conferences, prehearing discovery, representation by counsel, evidence, the closing and reopening of hearings, the form of the arbitrator's award, and the delivery of the award to the parties. *AAA Rules*, *supra*. The AAA Rules regarding the arbitration of withdrawal liability disputes were followed in this case and there is no allegation to the contrary.

In this case, there is no evidence whatsoever of any impropriety regarding the Arbitrator, the arbitration process, the conduct of the arbitration hearing, the consideration of evidence, or whether the Arbitrator exceeded his powers. Energy West was represented by experienced counsel throughout the arbitration process. Energy West fully participated in the selection of the Arbitrator, conducted prehearing discovery, deposed the Plan's actuaries, submitted an expert report, participated in the arbitration hearing, presented its evidence, cross-examined the Plan's expert witness, and submitted post-hearing briefs.

The Arbitrator went an "extra mile" in providing Energy West with the opportunity to present all of its arguments. Specifically, after the hearing had been concluded and the parties had submitted all of their evidence and briefs, including reply briefs, Energy West requested an opportunity to file a supplemental brief to the Arbitrator based on a March 26, 2018 decision of the United States District Court for the Southern District of New York in *The New York Times Company v. Newspaper and Mail Deliverers' Publishers' Pension Fund*, 303 F. Supp. 3d 236 (S.D.N.Y. 2018) (appeal pending, No. 18-1140, 2d Cir.). This supplemental briefing, to which the Plan did not object, was permitted by the Arbitrator even though the *NY Times* case involves a different fund and completely different arguments and factual evidence from the arguments and factual record in this case.

In short, Energy West was given a full and fair opportunity to present its case, and the Award issued on August 7, 2018 was a culmination of that process.  Under the standards of the FAA, and in the absence of any evidence of impropriety in the arbitration process, the Court "must confirm" and enforce the Arbitration Award issued in favor of the 1974 Pension Plan in this case. *See, e.g., Hall Street Assoc.*, 552 U.S. at 582.

## II.     THE ARBITRATION AWARD IS ENFORCEABLE UNDER THE STANDARDS OF THE MULTIEMPLOYER PENSION PLAN AMENDMENTS ACT.

As noted above, under Section 4221(c) of ERISA, 29 U.S.C. § 1401(c), following a withdrawal liability arbitration, there is a "presumption, rebuttable only by a clear preponderance of the evidence, that the findings of fact made by the arbitrator were correct." This standard is synonymous with "clear error" and is one of deference to the person who hears the evidence. *See Stockton TRI Industries,* 727 F.2d at 1207.

There is no evidence of "clear error" by the Arbitrator in this case.  On issue number 1, the Arbitrator concluded that, after examining all the factual evidence and hearing testimony from expert witnesses for each party, "[t]he actuarial assumptions used by the UMWA 1974 Pension Plan to calculate Energy West's withdrawal liability were not unreasonable in the aggregate for a withdrawal that occurred between July 1, 2015 and June 30, 2016." (JA __, Award at 56.)

The Award should be enforced on issue number 1 because the Arbitrator did not commit clear error and his decision is not clearly erroneous.  Energy West did not satisfy its burden of proving that the actuarial assumptions used by the 1974 Plan to calculate Energy West's withdrawal liability were unreasonable in the aggregate.

The Arbitrator's decision regarding issue number 1 is supported by  three  independent factual bases: (a) actuarial guidance (namely, ASOP 27, Section 3.9) stating that  annuity-based discount rates  are appropriate when measuring a plan's present value of benefits for purposes of

a defeasance or settlement, (b) admissions by Energy West's expert witness that it was not unreasonable for the Plan's actuary to follow the guidance of ASOP 27, Section 3.9 in selecting PBGC annuity rates for withdrawal liability purposes, and (c) the 1974 Plan's maturity and pending insolvency, unique circumstances that make the use of a risk-free discount rate especially appropriate in this case.

### A. By Statute, Energy West Must Satisfy a Heavy Burden in Order to Now Disturb the Arbitrator's Findings That the 1974 Plan's Calculation of Energy West's Withdrawal Liability Was Reasonable in the Aggregate.

ERISA establishes clear burdens of proof and persuasion in withdrawal liability challenges, such as the one Energy West brought here. At arbitration, "any determination" of the 1974 Plan with regard to withdrawal liability "is presumed correct unless the party contesting the determination shows by a preponderance of the evidence that the determination was unreasonable or clearly erroneous." ERISA Section 4221(a)(3)(A), 29 U.S.C. § 1401(a)(3)(A). Further, the 1974 Plan's calculation of Energy West's withdrawal liability is "*presumed correct* unless" Energy West demonstrates, by a preponderance of the evidence, that either "(i) the actuarial assumptions and methods used in the determination were, in the aggregate, unreasonable, or (ii) the plan's actuary made a significant error in applying the actuarial assumptions or methods." ERISA Section 4221(a)(3), 29 U.S.C. § 1401(a)(3) (emphasis added). Thus, at arbitration, Energy West was required to prove that the 1974 Plan's actuarial assumptions were unreasonable in the aggregate, and not simply that a single element involved in making an actuarial assumption arguably was unreasonable.

On review in this Court, the 1974 Pension Plan is entitled to the additional presumption that the Arbitrator's findings of fact and application of the law to the facts are correct. *See* Section 4221(c) of ERISA, 29 U.S.C. § 1401(c). This statutory presumption is rebuttable by Energy West

only if it proves by a preponderance of the evidence that the Arbitrator committed clear error.  As explained in the legislative history of the MPPAA, this series of required presumptions was intended by Congress to "ensure the enforceability of employer liability. In the absence of these presumptions, employers could effectively nullify their obligation by refusing to pay and forcing the plan sponsor to prove every element involved in making an actuarial determination." *Classic Coal Corp.*, 931 F.2d at 100 (citing H.R. Rep. No. 869, pt. I, 96th Cong., 2d Sess. 1, 86, *reprinted in* 1980 U.S. Code Cong. & Admin. News 2918, 2954). Further, absent these presumptions, plans would be subject to "endless disputes 'over technical actuarial matters with respect to which there are often several equally 'correct approaches.''" *Classic Coal Corp.* 931 F.2d at 100 (citing S. 1076, The Multiemployer Pension Plan Amendments Act of 1980: Summary and Analysis of Consideration, 98th Cong., 2d Sess. 21 (1980)). In this case, Energy West is unable to overcome the statutory presumptions and is unable to demonstrate that the Arbitrator's decision is clearly erroneous or the product of clear error.

> **B.    Energy West Cannot Prove That the Arbitrator Committed Clear Error in Determining That It Was Reasonable for the 1974 Plan to Select a Discount Rate Assumption That Is in Conformance with Actuarial Standards of Practice.**

In his Award, the Arbitrator determined that Mr. Ruschau's selection of PBGC discount rates was reasonable and in conformance with governing actuarial guidance, namely ASOP No. 27.   (JA __, Award at 50).   As held by the Supreme Court in *Concrete Pipe & Products v. Construction Laborers Pension Trust*, the reasonableness of the actuary's methods and assumptions is "judge[d] . . . by reference to what the actuarial profession considers to be within the scope of professional acceptability in making an unfunded liability calculation." 508 U.S. 602, 635 (1993). *See also Manhattan Ford Lincoln, Inc.*, 331 F. Supp. 3d at 397 (affirming arbitrator's decision where the plan actuary selected an interest assumption in compliance with ASOP 27,

Section 3.9(b)); *Metz Culinary Mgmt., Inc*., 2017 WL 1157156, at *7, n.12 (vacating arbitration award in part because the arbitrator misunderstood ASOP 27).

Whether the interest rate selected by the plan actuary resulted in a withdrawal liability calculation that is unreasonable in the aggregate is a question of fact, or in the alternative, a mixed question of fact and law, and the Arbitrator's finding on the issue can only be disturbed for clear error. *Masters, Mates & Pilots Pension Plan v. USX Corp.*, 900 F.2d 727, 733 (4th Cir. 1990) (holding the arbitrator's finding of fact that the 6.5% interest rate was not unreasonable was a finding of fact that the employer failed to rebut by clear preponderance of the evidence); *Bd. of Trs., Michigan United Food & Commercial Workers Union v. Eberhard Foods, Inc*. 831 F.2d 1258, 1262 (6th Cir. 1987) (affirming the arbitrator's finding of fact that the employer had not met its burden of proving the difference between the interest rate for withdrawal liability purposes and the interest rate for the plan's minimum funding purposes made the plan's withdrawal liability calculation unreasonable); *New York Times Co.*, 303 F. Supp. 3d at 255 ("arbitrator's decision that the Segal Blend's use was reasonable in the aggregate is a mixed question of fact and law and is reviewed for clear error").[4]

Here, the Arbitrator stated that it is axiomatic that an actuary who "applies the guidance of the actuarial standards of practice is using a combination of methods and assumptions that would be acceptable to a reasonable actuary":

> To be explicit, I find the use of a risk-free interest rate to be a reasonable exercise of actuarial discretion. The other irrefutable starting point is ASOP No. 27 Section 3.9(b). While actuaries may have differing approaches and opinions – a few may use the same rate for funding and withdrawal liability purposes, many may feel a

---

[4] Conversely, whether an interest rate selected by the plan actuary resulted in a withdrawal liability calculation that was unreasonable in the aggregate is a question of law on appeal only where the actuary plainly misread the statutory requirements of ERISA. *Classic Coal Corp.*, 931 F.2d at 102 (holding the arbitrator did not correctly apply the statutory law, specifically, the statutory presumption of correctness due the Trustees' determination in § 1401(a)(3)(B)).

blended rate is more appropriate, and a substantial number may employ the PBGC rates as a proxy for annuity prices – almost by definition an actuary who applies the guidance of the actuarial standards of practice is using a combination of methods and assumptions that would be acceptable to a reasonable actuary.

…

Read as a consistent whole, however, the ASOPs effectively provide that in cases of settlement, plan experience and reasonable expectations allow for the use of the PBGC rate.

(JA ___, Award at 50).

ASOP No. 4, Section 3.2, and ASOP No. 27, Sections 3.6 and 3.9(b) are of particular relevance to this case. ASOP No. 4, Section 3.2 provides that "[w]hen measuring pension obligations . . . the actuary should . . . identify the purpose of the measurement." ASOP No. 27, Sections 3.6 provides that economic assumptions are reasonable if, among other things, they are "appropriate for the purpose of the measurement." SUF ¶ 46. ASOP No. 27 at Section 3.9(b) provides, "[a]n actuary measuring a plan's present value of benefits on a defeasance or settlement basis may use a discount rate implicit in annuity prices or other defeasance or settlement options." SUF ¶ 47.

As explained by Dr. Kra in his Expert Report and arbitration testimony, withdrawal liability is both a defeasance of the employer's ongoing contribution obligation and a one-time settlement of the withdrawing employer's proportional share of unfunded vested benefits. SUF ¶¶ 69-70. Accordingly, it was not unreasonable for the Plan's actuary to use the method described at ASOP No. 27, Section 3.9(b) to calculate the present value of the Plan's future benefits. SUF ¶¶ 69-72. Dr. Kra further opined in his Expert Report that because withdrawal liability is a settlement, only a riskless interest rate can appropriately insulate a plan, its participants, and other contributing employers from the risk that the withdrawal liability amount is insufficient in the event of poor investment performance. As stated in Dr. Kra's expert report:

45. My opinion is that for purposes of withdrawal liability calculations all liabilities

27

should be valued at the riskless rate (e.g., US government bonds). As discussed above, once an employer withdraws, the assessment of withdrawal liability is fixed (frozen) and is no longer affected by the performance of the investment portfolio. The withdrawing employer has a fixed cash flow, with no recourse against it for poor asset performance of the fund. If the assumed interest rate is greater than the riskless interest rate, then the remaining employers are taking all of the risk. They should not have to shoulder the risk for the withdrawing employers. To the extent that the interest rate (used in determining the present value of vested benefits for purposes of withdrawal liability calculations) is greater than the riskless rate, there is a transfer of risk from the withdrawing employers to the remaining employers that is not compensated for.

SUF ¶ 71.

For example, employers who withdrew from a plan during the plan year July 1, 2000 to June 30, 2001 cannot be required to make up any of the investment shortfalls that ensued under the subsequent 2008 economic recession, as the amount of their withdrawal liability would have been determined as of June 30, 2000, with no recognition of any of those subsequent investment shortfalls. SUF ¶ 73. The financial burden of those investment short falls fell to the Plan, its participants, and other contributing employers, who must absorb or cover the original withdrawing employer's failure to pay its full share of the Plan's unfunded vested benefits. The principle behind ASOP 27, Section 3.9(b) – that the settlement of liability inherently involves the transfer of risk – has been recognized by the D.C. Circuit.  In *Combs v. Classic Coal Corporation*, the Court of Appeals explained, "[o]nce a withdrawn employer's liability is fixed, changes in the UVB are irrelevant to the inquiry regarding withdrawal liability. Just as an employer's liability is not increased if the plan suffers losses in the withdrawal year, the employer is not entitled to benefit from actuarial changes subsequent to its withdrawal." 931 F.2d at 102.

Mr. Ruschau testified that he selected the PBGC Annuity Rates as a reasonable risk-free interest rate that would be appropriate to settle a withdrawing employer's obligations.  Even Energy West's expert, Mr. Hittner, admitted at the arbitration hearing that the 1974 Plan's use of PBGC Annuity Rates is consistent with Section 3.9(b) of ASOP 27 because "withdrawal liability

is a settlement of an employer's obligation to a plan." SUF ¶ 57.  Moreover, Mr. Hittner explicitly

conceded that it was not unreasonable for Mr. Ruschau to select a discount rate assumption under

the method set for in Section 3.9(b) of ASOP 27:

> Q  But is it your testimony that this settlement, this 3.9(b) settlement measure does
> not apply to the UMWA '74 Pension Plan?
>
> A  I don't think it is the most appropriate.
> . . .
>
> A  I don't think it was inappropriate for the actuary to follow the guidance of the
> ASOP, but in my expert opinion, it would be more appropriate to consider a market
> consistent measure that is reflective of the 1974 Plan's ability to continue to pay
> benefits relative to the rates that are implicit in the PBGC or the – the rates implicit
> in the annuity prices that are reflected in the PBGC interest rates.
>
> Q  Okay.  When you say you agreed that it was not inappropriate for the plan's
> actuary to follow this guidance, would you agree that it was then not unreasonable
> for the actuary to follow this guidance?
>
> A  It was not unreasonable for the actuary to follow the guidance, but, again, the
> rates implicit in annuity prices I don't think – In my view, are not the most
> appropriate basis for setting the discount rate.

SUF at ¶54.  Mr. Hittner's contention that there was a *more appropriate* discount rate for

withdrawal liability purposes is insufficient grounds to vacate the Arbitrator's Award. ERISA

requires only that a plan's calculations fall within a "range of reasonableness," taking into account

the unique characteristics of the fund.  *Classic Coal Corp.* 931 F.2d at 96 (noting actuary's "wide

latitude" within range of reasonableness in adopting approach to reasonably calculate the unfunded

vested benefits of a plan for purposes of determining withdrawal liability).  Thus, under ERISA §

4213(a)(1), 29 U.S.C. § 1393(a)(1), "*the test is not which withdrawal determination is the most

reasonable* but rather whether the challenged determination is unreasonable or clearly erroneous."

*Classic Coal Corp.*, 931 F.2d at 99 (quoting *Eberhard Foods*, 831 F.2d at 1261) (emphasis added).

Moreover, the general rule of ERISA is a "rule of deference to fiduciary decision-making" because

29

Congress did not intend for courts "to substitute their judgments for the judgments of fiduciaries on decisions involving actuarial rates." *British Motor Car Distrib., Ltd. v. San Francisco Auto. Indus. Welfare Fund*, 882 F.2d 371, 376 (9th Cir. 1989).

In light of the admissions by Energy West's expert witness, Energy West cannot prove that the Arbitrator committed clear error by deciding that it was not unreasonable for the Plan's actuary to select a discount rate that conforms with ASOP No. 27, Section 3.9(b). Mr. Ruschau, Dr. Kra, and Mr. Hittner all agreed with this fundamental point. On this record, Energy West cannot prove that the Arbitrator committed clear error when he determined that Energy West failed to satisfy its burden of proof of demonstrating by a preponderance of evidence that the 1974 Plan's withdrawal liability determination was unreasonable in the aggregate.

As explained by the Supreme Court, "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing [body] on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Concrete Pipe*, 508 U.S. at 622 (citing *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)). That is simply not the case here, where all three actuaries ***agreed*** that the PBGC Annuity Rates were not unreasonable for the 1974 Plan's withdrawal liability determination and the record lacks evidence to the contrary.

### C.  The Arbitrator's Decision Is Further Supported by the Critical and Declining Financial Status of the 1974 Plan.

ERISA § 4213(a)(1), 29 U.S.C. § 1393(a)(1), provides in relevant part that an actuary must determine withdrawal liability using actuarial assumptions and methods which "in combination, offer the actuary's best estimate of anticipated experience under the plan." As explained in his Award, the Arbitrator determined as matter of fact that not only were the PBGC Annuity Rates consistent with Mr. Ruschau's best estimate of the 1974 Plan's anticipated future experience, but that Mr. Ruschau correctly anticipated that the 1974 Plan's approaching insolvency would result

30

in a short-investment horizon comprised of risk-free investments. In his Award, the Arbitrator found as follows:

> Because it is approaching insolvency, the assets of the Plan will have to be liquidated going forward to pay vested benefits. The same corpus of assets as existed in the past will not be available for investment purposes and the Plan will certainly not be able to take the increased risks associated with investments with higher returns. These considerations represented "the experience of the plan and reasonable expectations" that Ruschau properly took into account when he selected the risk-free PBGC rates for withdrawal liability calculations.

(JA __, Award at 50.)

The arbitration record, consistent with ERISA § 4213(a)(1), 29 U.S.C. § 1393(a)(1), demonstrates that the interest rate assumption used to discount the Plan's future benefit liabilities was the 1974 Plan's actuary's best estimate of anticipated experience under the Plan. Mr. Ruschau stated in his Valuation Report for the 1974 Plan for the applicable plan year:

> We have prepared this report in accordance with generally accepted actuarial principles and practices and have performed such tests as we considered necessary to assure the accuracy of the results. The results have been determined on the basis of actuarial assumptions that, in my opinion, are appropriate for the purposes of this report, and individually reasonable and in combination represent my best estimate of anticipated experience under the plan.

SUF ¶ 48.

Mr. Ruschau testified that the PBGC Annuity Rates of 2.71% for the first 20 years and 2.78% for periods beyond 20 years, individually and standing alone, represented his best estimate of anticipated experience under the 1974 Plan for the plan year at issue. SUF ¶ 49. Mr. Ruschau explained that because the 1974 Plan is facing insolvency, he anticipates that its future investment returns would come from risk-free investments: "We set [the discount rate] on current risk free rates as [our] best estimate being the PBGC assumptions..." SUF ¶ 53.

Dr. Kra agreed that the PBGC Annuity Rates of 2.71% for the first 20 years and 2.78% were not unreasonable in this case, in part because of the 1974 Plan's maturity. In determining the

range of reasonableness for the interest rate assumption, Dr. Kra looked to six independent low-risk bond and annuity-related measures for the relevant time period – the 30-year Treasury (approx. 3.10% as of June 30, 2015), the 10-year Treasury (approx. 2.34% as of June 30, 2015), the high-quality composite corporate bond rate published by the Internal Revenue Service ("IRS") (4.45% for June 2015), the IRS interest rates for lump sums (for distributions in 2015 plan years, 1.59% for payments within the first five years, 4.13% for payments to be made between 5 and 20 years from the valuation date, and 5.20% for payments to be made more than 20 years from the valuation date), PBGC Lump Sum Payment interest rates (for June 2015, 0.75% for post-retirement and 4% for pre-retirement), and the PBGC Annuity Rates selected by Mr. Ruschau (for June 2015, 2.71% for the first 20 years and 2.78% for subsequent years). SUF ¶ 75.

Dr. Kra concluded that any interest rate between 2⅓% and 4½% would not have been unreasonable as of June 30, 2015, but given the maturity of the 1974 Plan, an interest rate on the lower end of that range was most appropriate. SUF ¶ 75. As explained by Dr. Kra, because the 1974 Plan has significantly more retirees than active participants, the 1974 Plan is a mature pension plan and "less able to recover from adverse fluctuations in investment returns, less able to withstand risk. This is clearly a plan that has a diminishing capacity to absorb adverse fluctuations. This further justifies any level of increased conservatism in evaluating withdrawal liability." SUF ¶ 76.

Mr. Ruschau's and Dr. Kra's testimonies regarding the reasonableness of a risk-free rate are consistent with the undisputed economic realities facing the 1974 Plan, which were stipulated to by the parties. As mentioned above, the 1974 Plan is in critical and declining status under the Pension Protection Act of 2006 and facing insolvency in a few years. SUF ¶¶ 5-6. Due to its high ratio of retirees to the active participants, the 1974 Plan needs to liquidate its investments in order

to obtain cash to pay benefits. As a result, the 1974 Plan does not have sufficient assets to take long term investment risk because its assets increasingly must be liquidated to pay pension benefits. After 2022, the 1974 Plan cannot expect *any* investment return. Given its limited and declining assets, the Plan is not able to absorb investment losses and is not able to withstand investment risk.

For his part, Mr. Hittner conceded that the PBGC Annuity Rates are "a proxy for annuity prices" and admitted that it was "not unreasonable" for the Plan to follow the guidance of ASOP 27, Section 3.9(b) in selecting the PBGC Annuity Rates as the discount rate for withdrawal liability purposes. SUF ¶ 57. On this uncontradicted record, Energy West cannot prove that the Arbitrator clearly erred in his conclusion of fact that the PBGC Annuity Rates selected by Mr. Ruschau did not make the 1974 Plan's withdrawal liability assumptions unreasonable in the aggregate.

**III.    ENERGY WEST IS UNABLE TO PROVE THAT THE ARBITRATOR COMMITTED CLEAR ERROR IN DECIDING THAT ERISA'S 20-YEAR CAP ON WITHDRAWAL LIABILITY INSTALLMENT PAYMENTS DOES NOT APPLY TO THE 1974 PLAN.**

In his Award, the Arbitrator determined that the 1974 Plan was a continuation of a plan described in IRC Section 404(c) and thus is exempt from the 20-year payment cap that ERISA otherwise applies to employers making installment payments of withdrawal liability to a multiemployer pension fund. The Arbitrator found unavailing and unsupported Energy West's contention that IRC Section 404(c) was enacted as a temporary provision that no longer applies to any pension plan. (JA __, Award at 9). As explained below, the Arbitrator's inquiry into whether the 1974 Plan is exempt from the 20-year cap was "essentially factual" and involves a mixed question of law and fact that should be reviewed for clear error. The relevant facts and statutory provisions are undisputed, and Energy West is unable to prove that the Arbitrator committed clear

error in reaching his decision.  Moreover, even if reviewed *de novo*, there is overwhelming evidence supporting the Arbitrator's decision and it should be enforced.

### A.  Statutory Provisions Creating the 20-Year Cap and Exempting Certain Plans from the 20-Year Cap.

Section 4219(b)(1)(A) of ERISA, 29 U.S.C. § 1399(b)(1)(A), requires a plan to provide a withdrawn employer notice of the amount of withdrawal liability due to the plan and a schedule of withdrawal liability installment payments.  Section 4219(c)(1)(B), 29, U.S.C. § 1399(c)(1)(B), states that if the amortization period for withdrawal liability installment payments exceeds 20 years, "the employer's liability shall be limited to the first 20 annual payments determined under subparagraph (C)."

When enacting the MPPAA in 1980, however, Congress exempted from the 20-year cap, as well as other provisions pertaining to withdrawal liability, certain plans that are described in Section 404(c) of the Internal Revenue Code, or a continuation of such a plan, unless the plan has been amended to state otherwise.  Specifically, in ERISA Sections 4211(d)(2), Congress provided that the 20-year cap under Section 4219(c)(1)(B) does not apply to "a plan described in" Section 4211(d)(1).  Section 4211(d)(1) refers to "a plan to which section 404(c) of title 26 [the Internal Revenue Code], or a continuation of such a plan, applies . . ."  ERISA § 4211(d)(1), (d)(2), 29 U.S.C. § 1391(d)(1), (d)(2).

In light of the above statutory provisions, the answer to the question of whether the 1974 Plan is exempt from the 20-year cap depends on whether the 1974 Plan is a "plan described in" Section 404(c) of the IRC or "a continuation of" such a plan.  As discussed below, this inquiry is "essentially factual" and should be reviewed by the Court only for clear error.

### B. The Arbitrator's Finding That the 1974 Plan Is Exempt from Application of the 20-Year Payment Cap Should be Reviewed Only for Clear Error.

As the Supreme Court has explained, a mixed question of law and fact is present "when the facts are admitted or established and the law is undisputed; the sole issue is whether the law applied to the facts satisfies the statutory standard." *Supre v. Ricketts*, 792 F.2d 958, 961 (10th Cir. 1986) (*citing Pullman-Standard v. Swint*, 456 U.S. 273, 289 n. 19 (1982) (noting the issue turns on "whether the rule of law as applied to the established facts is or is not violated."))

In the context of withdrawal liability under the MPPAA, the Supreme Court has held that whether a withdrawal within the meaning of the statute has occurred presents a mixed question of law and fact. *See Concrete Pipe*, 508 U.S. at 631. Similarly, courts have treated MPPAA's Section 4204 sale-of-assets exception to withdrawal liability using the same approach, *see*, *e.g.*, *Cent. States, Se. & Sw. Areas Pension Fund v. Nitehawk Express, Inc.*, 223 F.3d 483, 488 (7th Cir. 2000) (comparing terms of parties' sales agreement with statutory provisions governing qualified asset sale), as well as whether an employer meets the requirements for the construction industry exception. *See Warner & Sons, Inc. v. Cent. States, Se. & Sw. Areas Pension Fund*, Civ. A. No. 09-C-1406, 2009 WL 5178376, at *3 (N.D. Ill. Dec. 29, 2009).

Significantly, where application of the law to the facts requires conducting an inquiry that is "essentially factual," then the issues raised are mixed questions of law and fact and the standard of review is for clear error. *United Foods, Inc. v. Western Conference of Teamsters Pension Trust Fund*, 816 F.Supp. 602, 607 (N.D. Ca. 1993). Similarly, in ERISA cases, courts "review 'mixed questions of law and fact' under a clearly erroneous standard." *Nagy*, 714 F3d at 549. *Cf. Parts and Electr. Motors, Inc. v. Sterling Electr., Inc.*, 866 F.2d 228, 233 (7th Cir. 1988) ("[U]nder the clearly-erroneous standard, we cannot meddle with a proper decision of this or a lower court simply because we have doubts about its wisdom or think we would have reached a different result . . .

To be clearly erroneous, a decision must strike us as more than just maybe or probably wrong; it must . . . strike us as wrong with the force of a five-week-old, unrefrigerated dead fish.")

In this case, there is overwhelming evidence supporting the Arbitrator's determination that the 1974 Plan is exempt from the 20-year cap, and Energy West is unable to prove that the Arbitrator's determination is clearly erroneous or the result of clear error.

### C. The Factual Findings Made by the Arbitrator in Determining That the 1974 Plan Is a Plan Described in Section 404(c) of the IRC, or a Continuation of Such a Plan, Are Not Clearly Erroneous or the Result of Clear Error.

In evaluating whether the 1974 Plan is a plan described in Section 404(c) of the IRC, or a continuation of such a plan, the Arbitrator considered: (1) the unique history of the 1974 Plan dating back to 1946, (2) the special provisions in Section 404(c) of the IRC that apply only to plans in the coal industry, (3) IRS pronouncements in 1974 and 1975 stating that the 1974 Plan is a continuation of a plan described in 404(c), (4) the special provisions enacted in 1980 to exempt coal industry plans from the 20-year cap, (5) several court cases stating that the 1974 Plan is a plan described in IRC Section 404(c) or a continuation of such a plan, and (6) the provisions in the Coal Industry Retiree Health Benefit Act of 1992 specifically defining the 1974 Plan as a plan or a continuation of a plan described in 404(c).    (JA __, Award at 2-9, 54-56).  In short, as shown below, the evidence is undisputed and compelling, and Energy West is unable to show that the Arbitrator's determinations are clearly erroneous or the product of clear error.

#### 1. The Unique History of the 1974 Plan.

The Arbitrator's analysis of the 1974 Plan's exemption from ERISA's 20-year payment cap begins in the period immediately after the end of World War II when the UMWA and certain bituminous coal operators attempted to negotiate a new labor agreement covering the post-war industrial economy.  (JA __, Award at 2-3).  When negotiations broke down in 1946, the UMWA

called a national strike. In response, President Truman seized the nation's privately-owned bituminous coal mines and his administration, led by Secretary of the Interior Julius Krug, negotiated an agreement with UMWA President John L. Lewis – the so-called Krug-Lewis Agreement – that, among other things, created a benefit fund that provided health, disability, death and retirement benefits for eligible miners and their dependents and survivors. SUF ¶¶ 7-8.

In 1947, the UMWA and several coal companies negotiated what became the National Bituminous Coal Wage Agreement ("NBCWA") of 1947, which established a new benefit plan modelled on Krug-Lewis. Three years later, the negotiating parties reached agreement over what became the NBCWA of 1950, which among other things established the UMWA Welfare and Retirement Fund of 1950 ("1950 W&R Fund"). The 1950 W&R Fund remained in place (with amendments) until the passage of the Employee Retirement Income Security Act ("ERISA") of 1974. Thereafter, the 1974 Plan was created as a continuation of the 1950 W&R Fund.[5] The unique history of the UMWA Funds is undisputed and was summarized by the Supreme Court in *Eastern Enterprises*, 524 U.S. at 504-09. *See also* SUF ¶¶ 9-10.

## 2. The Special Provisions in Section 404(c) of the Internal Revenue Code Apply Only to Plans in the Coal Industry.

After reviewing the history of the 1974 Plan, the Arbitrator reviewed Section 404(c) of the IRC, which was enacted in 1954 and amended in 1974. (JA __, Award at 3-4). Section 404(c) is another unique provision that applies only to plans in the coal industry. As noted by the Arbitrator, Section 404(c), entitled "Certain negotiated plans," was enacted for tax deductibility purposes, and only applies to a plan that (a) was established before 1954, (b) as a result of an agreement between

---

[5] Each National Bituminous Coal Wage Agreement agreed upon by the UMWA and BCOA from 1974 through 2016 has specifically stated that the 1974 Plan is "a continuation of" the 1950 W&R Fund. SUF ¶ 22.

the federal government and a union, (c) during a period of government operation, and (d) after the government had seized the industry's major productive facilities.  (*Id*.).  As the Arbitrator noted, "It was undisputed that from 1954 through 1974, the 1950 W&R Fund was regarded by all as a plan covered by Section 404(c)."  (JA __, Award at 4).

### 3.  Creation of the 1974 Plan and IRS Determinations That the 1974 Plan is a Continuation of a Plan Described in IRC Section 404(c).

After reviewing the provisions in IRC Section 404(c), which apply only to plans in the coal industry, the Arbitrator analyzed the creation of the 1974 Plan and IRS determinations that the 1974 Plan is a continuation of a plan described in IRC Section 404(c).  (JA __, Award at 4-6). Specifically, after the enactment of ERISA in 1974, BCOA and the UMWA bargained over restructuring the industry's benefit plans to bring them into compliance with ERISA's minimum funding standards.   The bargaining parties ultimately divided the 1950 W&R Fund into four separate funds, including the UMWA 1950 Pension Plan and Trust ("1950 Pension Plan") and the UMWA 1974 Pension Plan and Trust ("1974 Pension Plan"). Both the 1950 and 1974 Pension Plans were created under and incorporated into the NBCWA of 1974.   These factual determinations are undisputed and supported by the Supreme Court's summary in *UMWA Health and Retirement Funds v. Robinson*, 455 U.S. 562, 566 (1982).   *See also* SUF ¶¶ 18-19.

Soon thereafter, as the Arbitrator correctly noted, the IRS notified the Trustees of the new plans that both of the plans (*i.e.,* the UMWA 1950 and 1974 Pension Plan) represent a continuation of the 1950 W&R Fund and "therefore constitute a plan described in section 404(c) of the Code." (JA __, Award at 6).  As the IRS noted:

> Based on the information presented, we find that the newly established 1950 and 1974 Pension Plans and Trusts were intended to continue the benefits provided by the UMWA Welfare and Retirement Fund of 1950. This intent is specifically expressed in the plan, and is further evidenced by the provisions relating to coverage, contributions, benefits and succession of assets. In addition, we find

38

support in your contention that Congress amended 404(c) in contemplation of the reorganization of the 1950 Fund. *Accordingly, we conclude that the 1950 Pension Plan and Trust, and the 1974 Pension Plan and Trust represent a continuation of the United Mine Workers of America Welfare and Retirement Fund of 1950, and therefore constitute a plan described in section 404(c) of the Code.*

SUF ¶ 21 (emphasis added.). The above undisputed facts clearly demonstrate that the 1974 Plan is a continuation of a plan described in IRC Section 404(c). In and of itself, this plainly demonstrates that the Arbitrator's decision regarding the Plan's exemption from the 20-year cap is fully supported by the IRS and not clearly erroneous.

### 4. The Special Provisions Enacted in the Multiemployer Pension Plan Amendments Act of 1980 to Exempt the 1974 Plan from the 20-Year Cap.

After discussing the IRS determinations in 1975 and 1976, the Arbitrator discussed the special provisions enacted by Congress in 1980 to specifically exempt the 1974 Plan from various provisions regarding withdrawal liability, including an exemption from the 20-year cap on an employer's annual payments of withdrawal liability. (JA __, Award at 6-7). Once again, the Arbitrator's analysis is unassailable.

The Arbitrator accurately quotes the relevant provisions of ERISA Sections 4211(d)(1) and (d)(2) that apply only to coal industry plans. (JA __, Award at 7). Sections 4211(d)(1) and (d)(2) explicitly exempt any plan described in Section 404(c) of the IRC, or any continuation of such a plan, from, among other provisions, 29 U.S.C. § 1399(c)(1)(B). As noted above, it is well-established that the 1974 Plan is a plan described in IRC Section 404(c), or a continuation of such a plan.

ERISA Section 4219(c)(1)(B), 29 U.S.C. § 1399(c)(1)(B), is the provision that limits an employer's annual installment payments of withdrawal liability to 20 years. That Section states that if the amortization period for withdrawal liability installment payments exceeds 20 years, "the employer's liability shall be limited to the first 20 annual payments . . . ." In sum, by stating that

the provision limiting an employer's withdrawal liability payments to 20 years "shall not apply" to a plan described in Section 404(c) of the Internal Revenue Code, Congress clearly and unequivocally has stated that the 20-year cap does not apply and shall not apply to the 1974 Plan.

### 5. Several Courts Have Recognized the 1974 Plan as a Plan Described in or Covered by IRC Section 404(c).

The Arbitrator's decision notes that there never has been a court decision holding that the 1974 Plan is not a plan described in IRC Section 404(c), or a continuation of such a plan. (JA __, Award at 7). In contrast, at least four federal courts or arbitrators have recognized the 1974 Pension Plan's status as a plan described in or covered by Section 404(c), or a continuation of a plan subject to Section 404(c). Specifically, the following cases were cited and discussed by the Arbitrator:

- In *Combs v. Adkins & Adkins Coal Co.*, 597 F. Supp. 122, 128 (D.D.C. 1984), the Court held that the exemption from the *de minimus* rule set forth in ERISA extends to any plan subject to section 404(c); that the 1950 Pension Plan is covered by section 404(c); and that the 1974 Plan is "a continuation of the earlier plan."

- In *Calvert & Youngblood Coal v. UMWA 1950 Pension Trust,* Civ. A. No. 82–P–1070–S, 1985 WL 9436 (N.D. Al. Feb. 7, 1985), the court was asked by the 1950 and 1974 Plans to enforce an arbitrator's award that held that both plans were continuations of a 404(c) plan and thus exempt from the rules limiting liability in an asset sale.

- In *Combs v. Western Coal Corp.*, 611 F.Supp. 917 (D.D.C. 1985), the court concluded that the 1950 and 1974 Pension Plans were plans covered by Section 404(c). In so holding, the court noted that the coal company had contended that ERISA Section 4225 (which imposes limitations on withdrawal liability obligations under certain circumstances) governed the calculation of withdrawal liability for the employer. The court disagreed, noting that both plans were covered by Section 404(c).

- In *Spring Branch Mining Co. v. UMWA 1950 Pension Trust, et al*., 691 F. Supp. 973 (S.D. W.Va. 1987), the court noted in a footnote, "Apparently, the only 404(c) plans under the Tax Code are the 1950 and 1974 [Pension] Plans and the plan applicable to the anthracite coal industry."

40

The Arbitrator's citation and discussion of these decisions demonstrate that there is judicial recognition of the fact that the 1974 Plan is a plan described in IRC Section 404(c) or a continuation of such a plan.

### 6.  The Provisions of the Coal Industry Retiree Health Benefit Act of 1992 Specifically Define the 1974 Plan as a Plan or a Continuation of a Plan Described in IRC Section 404(c).

Finally, in his Award, the Arbitrator noted that in 1992, Congress defined the 1974 Plan as a "plan described in section 404(c) (or a continuation thereof)." (JA __, Award at 9). Specifically, the Coal Act states in relevant part:

**(2) 1950 UMWA PENSION PLAN**

The term "1950 UMWA Pension Plan" means a pension plan described in section 404(c) (or a continuation thereof), participation in which is substantially limited to individuals who retired before 1976.

**(3) 1974 UMWA PENSION PLAN**

The term "1974 UMWA Pension Plan" means a pension plan described in section 404(c) (or a continuation thereof), participation in which is substantially limited to individuals who retired in 1976 and thereafter.

26 U.S.C. §§9701(a)(2), (3).

In summary, there is overwhelming and undisputed factual evidence showing that the 1974 Plan is a plan described in IRC Section 404(c), or a continuation of such a plan. Applying these facts to the applicable legal provisions (*i.e.,* ERISA Sections 4211(d)(1) and (d)(2), 29 U.S.C. Sections 1391(d)(1) and (d)(2)), the Arbitrator was on solid ground in concluding that the 1974 Plan is exempt from the 20-year cap on withdrawal liability installment payments. Accordingly, Energy West is unable to prove that the Arbitrator's determination is clearly erroneous or the result of clear error. Even under a *de novo* standard of judicial review, the Arbitrator's decision that the 1974 Plan is exempt from the 20-year cap is well-supported and should be enforced.

**CONCLUSION**

For all of the foregoing reasons and the reasons stated by the Arbitrator in his decision, the

UMWA 1974 Pension Plan respectfully submits that the Plan's motion for summary judgment

should be granted and that the Arbitrator's Award should be enforced.

Respectfully submitted,

/s/ Olga M. Thall          .
John R. Mooney
   DC Bar No. 375886
Paul A. Green
   DC Bar No. 383588
Olga M. Thall
   DC Bar No. 1016248
Mooney, Green, Saindon,
Murphy & Welch, P.C.
1920 L. Street, NW, Suite 400
Washington, DC 20036
(202) 783-0100
(202) 783-6088 facsimile
jmooney@mooneygreen.com
pgreen@mooneygreen.com
omthall@mooneygreen.com

Stanley F. Lechner
   DC Bar No. 370986
Charles P. Groppe
   DC Bar No. 464035
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 739-5079
(202) 739-3001 facsimile
stanley.lechner@morganlewis.com
charles.groppe@morganlewis.com

Glenda S. Finch
   DC Bar No. 418206
Larry D. Newsome
   DC Bar No. 254763
UMWA Health & Retirement Funds
2121 K Street, NW
Washington, DC 20037
gfinch@umwafunds.org
lnewsome@umwafunds.org

*Counsel for the 1974 Pension Plan
and its Trustees*

**Dated**: April 11, 2019

42