**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| UNITED MINE WORKERS OF AMERICA 1974 PENSION PLAN, *et al.*<br><br>*Plaintiffs,*<br><br>v.<br><br>ENERGY WEST MINING COMPANY<br><br><br>*Defendant.* |

Civil Action No. 1:18-cv-1905-RJL

## JOINT APPENDIX

Plaintiffs, the United Mine Workers of America 1974 Pension Plan and its Trustees, and Defendant Energy West Mining Company, by their undersigned counsel, respectfully submit this deferred joint appendix pursuant to this Court's Minute Order dated April 24, 2019.


Respectfully submitted,


/s/ Olga M. Thall
John R. Mooney
 DC Bar No. 375886
Paul A. Green
 DC Bar No. 383588
Olga M. Thall
 DC Bar No. 1016248
Mooney, Green, Saindon,
Murphy & Welch, P.C.
1920 L. Street, NW, Suite 400
Washington, DC 20036
(202) 783-0100
(202) 783-6088 facsimile
jmooney@mooneygreen.com
pgreen@mooneygreen.com
omthall@mooneygreen.com

/s/ Chris Williams___
Gregory J. Ossi
Chris Williams
1500 K Street, NW
Suite 1100
Washington, DC  20005-1209
(202) 842-8800
(202) 842-8465 facsimile
christopher.williams@dbr.com
gregory.ossi@dbr.com

*Attorneys for Defendant Energy West Mining Company*

**Dated**: June 10, 2019

Stanley F. Lechner
    DC Bar No. 370986
Charles P. Groppe
    DC Bar No. 464035
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 739-5079
(202) 739-3001 facsimile
slechner@morganlewis.com
cgroppe@morganlewis.com

Glenda S. Finch
    DC Bar No. 418206
Larry D. Newsome
    DC Bar No. 254763
UMWA Health & Retirement Funds
2121 K Street, NW
Washington, DC 20037
gfinch@umwafunds.org
lnewsome@umwafunds.org

*Counsel for the 1974 Pension Plan
and its Trustees*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED MINE WORKERS OF AMERICA 1974 PENSION PLAN, *et al.*<br><br>*Plaintiffs,*<br><br>v.<br><br>ENERGY WEST MINING COMPANY<br><br>*Defendant.* | Civil Action No. 1:18-cv-1905-RJL |

**JOINT APPENDIX
TABLE OF CONTENTS**

| Date | Description | Page No. |
|---|---|---|
| Aug. 7, 2018 | Arbitration Award | 1 |
| Dec. 12, 2017 | Arbitration Transcript – Day 1 | 58 |
| Dec. 13, 2017 | Arbitration Transcript – Day 2 | 279 |
| Dec. 8, 2017 | Parties' Joint Stipulations | 419 |
| Nov. 30, 2017 | Deposition of William Ruschau | 423 |
| Oct. 30, 2017 | Expert Report of Ethan E. Kra, Ph.D. | 470 |
| Sept. 14, 2017 | Expert Report of Scott A. Hittner | 523 |
| Aug. 29, 2016 | UMWA 1974 Pension Plan assessment of withdrawal liability against Energy West Mining Company | 540 |
| July 1, 2015 | UMWA 1974 Pension Plan – Actuarial Valuation Report for Plan Year Commencing July 1, 2015 | 556 |
| July 1, 2015 | UMWA 1974 Pension Plan – Form 5500 for Plan Year 2015 | 631 |
| Sept. 10, 2014 | Letter memorandum from William Ruschau to the UMWA Health and Retirement Funds | 718 |
| July 1, 2014 | Letter memorandum from William Ruschau to the UMWA Health and Retirement Funds | 724 |
| July 1, 2014 | UMWA 1974 Pension Plan – Actuarial Valuation Report for Plan Year Commencing July 1, 2014 | 730 |
| July 1, 2011 | UMWA 1974 Pension Trust Trust Document | 804 |

| Date | Description | Page No. |
|------|-------------|----------|
| Mar. 27, 1978 to July 1, 2011 | Excerpts from UMWA 1974 Pension Plan Plan Documents | 816 |
| Sept. 1977 to Nov. 12, 2015 | Letters from Internal Revenue Service to the Board of Trustees of the UMWA 1974 Pension Plan | 1064 |
| April 6, 1976 | Letter from Internal Revenue Service to the UMWA 1974 Pension Plan | 1113 |
| June 9, 1975 | Letters from Internal Revenue Service, to the Board of Trustees of the 1950 and 1974 Pension Plans | 1114 |
| Dec. 6, 1974 to Aug. 5, 2016 | Excerpts from National Bituminous Coal Wage Agreements | 1125 |
| Nov. 25, 1974 | Letter from Internal Revenue Service to the UMWA Welfare and Retirement Funds | 1166 |

**Additional Sources:**

| Date | Description | Page No. |
|------|-------------|----------|
| Nov. 7, 2018 | Brief of the Pension Benefit Guaranty Corporation ("PBGC") As Amicus Curiae Supporting Cross-Appellants, in Civ. A. No. 18-1140 | 1189 |
| Dec. 2013 | Actuarial Standard of Practice No.4, Measuring Pension Obligations and Determining Pension Plan Costs or Contributions, Revised Ed., adopted by the Actuarial Standards Board | 1230 |
| Sept. 2013 | Actuarial Standard of Practice No. 27, Selection of Economic Assumptions for Measuring Pension Obligations, adopted by the Actuarial Standards Board | 1266 |
| Aug. 19, 1988 | Arbitrator's decision in the *Concrete Pipe* case | 1304 |
| Oct. 31, 1986 | PBGC Opinion Letter 86-24 | 1318 |
| Jul. 29, 1980 | 126 Cong. Rec. 20246 (1980) (statement of Sen. Byrd) | 1320 |
| Jul. 29, 1980 | 126 Cong. Rec. 20177 (1980) (statement of Sen. Williams) | 1322 |
| April 1980 | Staff of S. Comm. on Labor and Human Resources, 96th Cong., Report on Multiemployer Pension Plan Amendments Act of 1980 (Comm. Print 1980), *reprinted in* Arnold & Porter Legislative History: P.L. 96–364 (1980) | 1325 |
| June 26, 1979 | Multiemployer Pension Plan Amendments Act of 1979: Hearing on S. 1076 Before the S. Comm. on Labor and Human Resources, 96th Cong. 497 (United Mine Workers of America Health and Retirement Funds 1978 Annual Report) | 1333 |
| Feb. 5, 1974 | H.R. Rep. No. 93-779, at 2590, 2754 (1974) | 1353 |

| Date | Description | Page No. |
|------|-------------|----------|
| Oct. 2, 1973 | H.R. Rep. No. 93-533 (1973), *reprinted in* 1974 U.S.C.C.A.N. 4639, 4831 | 1357 |
| July 26, 1954 | H.R. Rep. No. 2543 (1954) (Conf. Rep.), *reprinted in* 1954 U.S.C.C.A.N. 5280, 5301 | 1359 |
| April 5, 1954 | S. Rep. No. 83-1622 (1954), *reprinted in* 1954 U.S.C.C.A.N. 4621, 4687 | 1361 |

In the Matter of Arbitration between

**ENERGY WEST MINING COMPANY**

**and**

**THE UNITED MINE WORKERS OF AMERICA
1974 PENSION PLAN**

**AAA Case No. 01-17-0001-2758**

This matter was submitted to arbitration pursuant to Section 4221 of the Employee

Retirement Income Security Act (ERISA) (29 U.S.C. §1401), as amended by the Multiemployer

Pension Plan Amendments Act (MPPAA). Hearings were held on December 12 and 13, 2017.

Gregory J. Ossi, Esq.; and Christopher R. Williams, Esq., appeared on behalf of the Company.

Stanley Lechner, Esq.; Charles P. Groppe, Esq.;  John R. Mooney, Esq.; Olga Thall, Esq.; and

Glenda Finch, Esq.,  appeared on behalf of the Plan.  Post-hearing briefs, reply briefs, and

supplemental briefs, were received from the parties by June 7, 2018.


**STIPULATED ISSUES**

> 1.  Whether the actuarial assumptions used by the UMWA 1974
> Pension Plan to calculate Energy West's withdrawal liability were
> unreasonable in the aggregate for a withdrawal that occurred
> between July 1, 2015 and June 30, 2016?

> 2. Whether the UMWA 1974 Pension Plan is exempt from the 20-
> year cap on withdrawal liability installment payments set forth in
> Section 4219(c)(1)(B) of ERISA?

**BACKGROUND**

**Assessment of Withdrawal Liability.**  The United Mine Workers of America 1974

Pension Plan (the "Plan") is a multiemployer pension plan as defined in Section 4001(a)(3) of

ERISA[1].  The Plan was created in  the  bargaining between the United Mine Workers of America

("UMWA") and the Bituminous Coal Operators' Association, Inc. ("BCOA") that resulted in the

National Bituminous Coal Wage Agreement ("NBCWA") of 1974.  The NBCWA required

signatory employers to make contributions to the Plan on behalf of their employees pursuant to a

specified formula.  Energy West, formerly Utah Power and Light, and its related entities, have

been signatories to NBCWAs or me-too agreements requiring pension contributions since 1977.

The Company was a wholly owned subsidiary of PPW Holdings, LLC, which was a wholly

owned subsidiary of Berkshire Hathaway Energy Co.

      The Company ceased mining coal in 2015 and completely withdrew from the Plan during

the July 1, 2015 June 30, 2016 Plan Year.   On August 29, 2016, the Plan sent the Company a

notice of and demand for withdrawal liability of $115,119,099.34, payable in monthly

installments of $247,251.12, which  would continue indefinitely.  The Plan asserted it was

exempt from the 20 year limitation on payments set forth in Section 4219(c)(1)(B)[2].  The

Company filed a request for review, which the Plan denied on January 26, 2017.  On February

28, 2017, the Company filed its intent to arbitrate the two stipulated issues.

      **History of the Plan.**  Faced with the prospect of a long strike in the bituminous coal

industry that would cripple the post-war economic recovery, President Harry Truman ordered the

seizure of all bituminous coal mines.  He directed Secretary of the Interior Julius Krug to

negotiate appropriate terms of employment with John L. Lewis of the UMWA.  After one week

they reached what is known as the Krug-Lewis Agreement that provided, in part, for the creation

of a fund that was to provide health, disability, death and retirement benefits for eligible miners

---

[1]  The parties have followed the common practice of using the ERISA citations, rather than the 29 U.S.C. citations, and that practice will be adopted in this decision.

[2]   Section 4219(c)(1)(B) states:  In any case in which the amortization period described in subparagraph (A) exceeds 20 years, the employer's liability shall be limited to the first 20 annual payments determined under subparagraph (C).

and their dependents and survivors.

In 1947, the UMWA and a number of coal companies negotiated the NBCWA of 1947. That agreement established the UMWA Welfare and Retirement Fund of 1947. Negotiations for a successor agreement resulted in the NBCWA of 1950, under which the UMWA Welfare and Retirement Fund of 1950 ("1950 W&R Fund") was established.

As part of a major restatement of the Internal Revenue Code in 1954, Congress enacted 26 U.S.C. 404(c). Because the coal industry benefit funds intermingled money for pension benefits with money for medical benefits, they had been determined by the IRS not to be "qualified plans" and so the contributions were not deductible. Congress felt that the lack of deductibility was inequitable, given that the plan was negotiated during a period the Government was a party to the agreement and controlled many of the mines. Section 404(c) enabled employers in the coal industry to deduct their contributions to a multiemployer plan as a trade or business expense under §162 of the Code, rather than under the deferred compensation provisions. Section 404(c), as amended in 1974, states in relevant part:

> **(c) Certain negotiated plans.** --If contributions are paid by an employer--
>
> > **(1)** under a plan under which such contributions are held in trust for the purpose of paying (either from principal or income or both) for the benefit of employees and their families and dependents at least medical or hospital care, or pensions on retirement or death of employees; and
>
> such plan was established prior to January 1, 1954, as a result of an agreement between employee representatives and the Government of the United States during a period of Government operation, under seizure powers, of a major part of the productive facilities of the industry in which such employer is engaged, such contributions shall not be deductible under this section nor be made nondeductible by this section, but the deductibility thereof shall be governed solely by section 162 (relating to trade or business expenses). For purposes of this

chapter and subtitle B, in the case of any individual who before July 1, 1974, was a participant in a plan described in the preceding sentence—

**(A)** such individual, if he is or was an employee within the meaning of section 401(c)(1), shall be treated (with respect to service covered by the plan) as being an employee other than an employee within the meaning of section 401(c)(1) and as being an employee of a participating employer under the plan,

**(B)** earnings derived from service covered by the plan shall be treated as not being earned income within the meaning of section 401(c)(2), and

**(C)** such individual shall be treated as an employee of a participating employer under the plan with respect to service before July 1, 1975, covered by the plan.

Section 277 (relating to deductions incurred by certain membership organizations in transactions with members) does not apply to any trust described in this subsection. The first and third sentences of this subsection shall have no application with respect to amounts contributed to a trust on or after any date on which such trust is qualified for exemption from tax under section 501(a).

It was undisputed that from 1954 through 1974, the 1950 W&R Fund was regarded by all as a plan covered by Section 404(c).

Over the decades since its creation, the 1950 W&R Fund had become seriously underfunded, due to the decreased contributions as a result of the decline in coal production and court decisions that added thousands of beneficiaries. In 1974, Congress enacted ERISA, which included minimum funding standards. The UMWA and the Bituminous Coal Operators' Association (BCOA), the multiemployer bargaining association that since 1951 had been the primary representative of coal operators in negotiations with the Union, restructured the industry benefit plans. To bring the plans into compliance with the new minimum funding standards, they split the 1950 W&R Fund into the UMWA 1950 Pension Plan Trust ("1950 Pension Plan"); the UMWA 1974 Pension Plan and Trust ("1974 Pension Plan"); the 1950 Benefit Plan; and the

1974 Benefit Plan. The four distinct plans were created under and incorporated into the

NBCWA of 1974 by the UMWA and BCOA. The collective bargaining agreement expressly

provided that the 1950 Pension Plan and the 1974 Pension Plan are a continuation of the 1950

W&R Fund. Any miners who retired before January 1, 1976 would be beneficiaries of the 1950

Pension Plan, while miners who retired after December 31, 1975 would be beneficiaries of the

1974 Pension Plan.

On November 25, 1974, the trustees of the 1950 W&R Fund requested a ruling from the

IRS regarding the status of the new plans. They submitted to the IRS a draft of the new

NBCWA and stated the execution of the contract would be delayed without the ruling, creating a

hardship for beneficiaries. That same day Assistant Commissioner Lawrence Gibbs sent a letter

to the trustees that stated in relevant part:

> On the basis of these attached documents and the above-
> mentioned representation and discussions, this is to notify you
> that the Internal Revenue Service is prepared to rule that the
> 1950 Pension Plan and Trust and the 1974 Pension Plan and
> Trust, as more fully described and referred to in the attached
> November 25, 1974, draft of Article XX, Health and
> Retirement Benefits, are a sufficient continuation of the United
> Mine Workers Welfare and Retirement Fund of 1950 to come
> within the provisions of Section 404(c) of the Internal Revenue
> Code of 1954, as amended by the Employee Retirement
> Income Security Act of 1974, Pub. L. No. 93-406. Such a
> ruling, when prepared, will be issued to you.

The promised ruling was issued by Fred Ochs, the director of the IRS Employee Plans

Division, on June 9, 1975. The ruling traced in detail the impact of Section 404(c) on the 1950

W&R Plan, the efforts of the Plan to attain qualified status, the subsequent amendment to Section

404(c), and the restructuring of the 1950 W&R Plan in 1974. Ochs set forth the arguments

advanced by the trustees as to why the restructured pension plans represented continuations of

the 1950 W&R Plan.  He then wrote:

> Based on the information presented, we find that the newly
> established 1950 and 1974 Pension Plans and Trusts were
> intended to continue the benefits provided by the UMWA
> Welfare and Retirement Fund of 1950.  This intent is
> specifically expressed in the plan, and is further evidenced by
> the provisions relating to coverage, contributions, benefits and
> succession of assets.  In addition, we find support in your
> contention that Congress amended 404(c) in contemplation of
> the reorganization of the 1950 Fund.  Accordingly, we conclude
> that the 1950 Pension Plan and Trust, and the 1974 Pension
> Plan and Trust represent a continuation of the United Mine
> Workers of America Welfare and Retirement Fund of 1950,
> and therefore constitute a plan described in section 404(c) of
> the Code.

On April 6, 1976, the IRS notified the 1974 Pension Trust that its application for a
determination that it was a qualified plan under Section 401(a) of the Internal Revenue Code had
been approved.  Similar favorable determination letters were received by the 1974 Pension Trust
in 1977, 1979, and eight other years through 2015.  An identical determination letter was sent to
the 1950 Pension Trust on April 6, 1976.  The record does not establish whether the 1950
Pension Trust also received such letters through 2007, when the 1950 Pension Plan was merged
into the 1974 Pension Plan.

In 1980, Congress passed MPPAA, amending ERISA to address the problems faced by
multiemployer pension plans due to employers withdrawing at a time when plans had substantial
unfunded vested liabilities.  The BCOA and the UMWA jointly lobbied Congress to address the
specific concerns of the coal industry, although the parties in this arbitration differ in their
perspectives as to whether remedial steps were for the 1950 Pension Plan alone, or also for the
1974 Pension Plan; and whether the special rules under Section 404(c) were intended to be
permanent or would expire.[3]  There is no dispute that Congress enacted a series of special rules in

---

[3]  Energy West cited the House Ways and Means Committee Report on Bill H.R. 12481, which stated:

Section 4211(d) (1) and (2), that applied only to the coal industry:

> (1)  The method of calculating an employer's allocable share of unfunded vested benefits set forth in subsection (c)(3) shall be the method for calculating an employer's allocable share of unfunded vested benefits under a plan to which section 404(c) of Title 26, or a continuation of such a plan, applies, unless the plan is amended to adopt another method authorized under subsection (b) or (c).

> (2) Sections 1384, 1389, 1399(c)(1)(B), and 1405 of this title shall not apply with respect to the withdrawal of an employer from a plan described in paragraph (1) unless the plan is amended to provide that any of such sections apply.

The citation in Subsection (2) relevant to this case is Section 1399 [ERISA 4211], (c)(1)(B), the 20 year cap on an employer's annual payments of withdrawal liability.

Since 1980, no one has requested the IRS to determine whether the 1974 Plan is covered by Section 404(c).  It appears that the issue of the status of the 1974 Pension Plan has been referenced in only four court decisions, none of which found that the 1974 Plan was no longer covered by Section 404(c).  *Combs v. Adkins & Adkins Coal Co., Inc.,* 597 F. Supp. 122 (D.D.C. 1984) was an action by the 1974 Plan to collect withdrawal liability from a withdrawn employer. Among the Company's arguments was that its withdrawal liability should be reduced by $50,000 pursuant to the de minimis rule set forth in 29 U.S.C. §1389(a).  The Court rejected the Company's argument, noting that plans covered by Section 404(c) are exempt from the operation of the *de minimis* rule, and stated:

> .  .  . This exemption also extends to any continuation of a plan which was subject to section 404(c).  .  . The 1950 Plan, as a trust established in the coal industry, is covered by section 404(c). HITTNER.R. Representative. No. 2543, 83d Cong., 2d Sess., .  .  .

---

Since the desire of the United Mine Workers is to establish the pension plan as a qualified plan under section 401(a), the bill provides that section 404(c) is not to apply to the pension plan once it becomes a qualified plan except for the purpose of determining which individuals are to be treated as employees of a participating employer under the plan.  H.R. Rep. No. 93-779 at 166 (1974).

The 1974 Plan is a continuation of the earlier plan. . . at 128.

In *Calvert & Youngblood Coal Co. v. UMWA 1950 Pension Trust, et al.,* 1985 WL 9436 (N.D. Ala. 1985), the Court was asked by the 1950 and 1974 Plans to enforce an arbitrator's award that held in part that both plans were continuations of a Section 404(c) plan and were therefore exempt from the rules limiting liability in a sale of asset situation. In rejecting the company's equal protection argument that it was unfairly deprived of the benefit of the rule, the Court found that Congress had a rational basis for denying coal operators the benefit of the limitation on liability rules. There was no discussion about whether the 1974 Plan properly claimed the coverage of Section 404(c).

*Combs v. Western Coal Corp.,* 611 F. Supp. 917 (D.D.C. 1985), was a collection action by the 1950 and 1974 Plans. The Court found the company could not challenge the asserted withdrawal liability because it had failed to initiate arbitration, the predicate step, in a timely fashion. The Court rejected the company's contention that it was entitled to the limitation on withdrawal liability provided for in 29 U.S.C. §1405, finding that "[t]he Plans are covered by section 404(c) of the Internal Revenue Code," at 922. The decision cited the *Adkins & Adkins Coal Co.* decision in support of this conclusion.

The final decision was *Spring Branch Mining Company, Inc. v. UMWA 1950 Pension Trust,* 691 F. Supp. 973 (S.D. W. Va. 1987). The company was assessed withdrawal liability both by the 1950 Plan and the 1974 Plan, but it only challenged the withdrawal liability assessed by the 1950 Plan because it had no former employees who were beneficiaries of the 1950 Plan. Among the constitutional arguments raised by the Company was that §1391(d) treats coal industry employers less favorably than employers in other industries. The court found this argument irrelevant in the application of the statute to this employer because none of the

provisions limiting withdrawal liability, but for the operation of §1391(d), would have applied to Spring Branch.  In a footnote the court quoted 1391(d) and added: "Apparently, the only 404(c) plans under the Tax Code are the 1950 and 1974 Plans and the plan applicable to the anthracite coal industry . . ." at 986.

In 1992, Congress passed the Coal Industry Retiree Health Benefit Act ("Coal Act"), 26 U.S.C. §9701.  Although the focus of the  Coal Act was the provision of health benefits to retired miners and their dependents, the Act included the following definitions:

> **(2)1950 UMWA PENSION PLAN**
> The term "1950 UMWA Pension Plan" means a pension plan described in **section 404(c)** (or a continuation thereof), participation in which is substantially limited to individuals who retired before 1976.
>
> **(3)1974 UMWA PENSION PLAN**
> The term "1974 UMWA Pension Plan" means a pension plan described in **section 404(c)** (or a continuation thereof), participation in which is substantially limited to individuals who retired in 1976 and thereafter.

As part of the Pension Protection Act of 2006, 29 U.S.C. §§1085  *et seq.,* Congress defined a bargaining party to mean "in the case of a plan described in section 404(c) of Title 26, or a continuation of such a plan, the association of employers that is the employer settlor of the plan."

**Current Status of the 1974 Plan.**  The 1974 Plan is regarded as a mature plan, a reflection of the fact that approximately 85% of the participants are retired and receiving benefits in 2015, leaving just 15% engaged in active employment, for which contributions continue to be made.  The low active participant rate is consistent with the depressed state of the coal industry.  The 1974 Plan has  vested benefits of $9.6 billion and $3.8 billion in assets, leaving an unfunded vested benefits balance of $5.8 billion.  Applying the tests set forth in the Pension Protection Act

of 2006, the Plan actuaries have determined the Plan is in critical and declining status.  The actuaries have projected that the Plan will become insolvent by 2022.

**Calculation of Energy West's Withdrawal Liability.**  Section 4213(a) states that when determining the unfunded vested benefits (UVBs) of a plan for computing the withdrawal liability of an employer, a plan actuary may either use the actuarial assumptions and methods established by the Pension Benefit Guarantee Corporation (PBGC) – which the PBGC has never issued – or

> actuarial assumptions and methods which, in the aggregate, are reasonable (taking into account the experience of the plan and reasonable expectations) and which, in combination, offer the actuary's best estimate of anticipated experience under the plan .  .

Subsection (c) of the same section states

> For purposes of this part, the term "unfunded vested benefits: means with respect to a plan, an amount equal to –
> > (A) the value of nonforfeitable benefits under the plan, less
> > (B) the value of the assets of the plan.

Section 4001(a)(8) defines nonforfeitable benefits[4]:

> "nonforfeitable benefit" means, with respect to a **plan**, a benefit for which a **participant** has satisfied the conditions for entitlement under the plan or the requirements of this chapter (other than submission of a formal application, retirement, completion of a required waiting period, or death in the case of a benefit which returns all or a portion of a **participant**'s accumulated mandatory employee contributions upon the **participant**'s death), whether or not the benefit may subsequently be reduced or suspended by a plan amendment, an occurrence of any condition, or operation of this chapter or title 26;

---

[4]  PBGC Regulation 4211.2 includes the following definition:

> *Nonforfeitable benefit* means a benefit described in §4001.2 of this chapter plus, for purposes of this part, any adjustable benefit that has been reduced by the plan sponsor pursuant to section 305(e)(8) of ERISA or section 432(e)(8) of the Code that would otherwise have been includable as a nonforfeitable benefit for purposes of determining an employer's allocable share of unfunded vested benefits.

Section 305, entitled "Additional funding rules for multiemployer plans in endangered status or critical status, provides in relevant part:

> (g)ADJUSTMENTS DISREGARDED IN WITHDRAWAL LIABILITY
> DETERMINATION
>
> (1)BENEFIT REDUCTION
> Any benefit reductions under subsection (e)(8)[5] or (f) or benefit
> reductions or suspensions while in critical and declining status
> under subsection (e)(9)), unless the withdrawal occurs more than
> ten years after the effective date of a benefit suspension by
> a plan in critical and declining status, shall be disregarded in
> determining a plan's unfunded vested benefits for purposes of
> determining an employer's withdrawal liability under section 1381
> of this title.

In cases of mass withdrawal, the PBGC regulations (29 C.F.R. §§4281.12 and 4281.12(a) require that a plan include in the valuation of benefits all benefits, even if they will never be paid, and that such benefits be valued using the PBGC interest rates.

All of the actuaries who either testified in the arbitration, or whose prior deposition testimony was put in the record, agreed that their calculations are guided by the Actuarial Standards of Practice (ASOP) developed by the Pension Committee of the Actuarial Standards

---

[5]  ERISA Section 305(a)(2) states:
> (a)GENERAL RULE For purposes of this part, in the case of a multiemployer
> plan in effect on July 16, 2006—
> .  .  .
> (2)if the plan is in critical status—
> (A) the plan sponsor shall adopt and implement a rehabilitation plan in
> accordance with the requirements of subsection (e), and
> .  .  .
>
> (3) if the plan is in critical and declining status—
> (A) the requirements of paragraph (2) shall apply to the plan; and
> (B) the plan sponsor may, by plan amendment, suspend benefits in accordance
> with the requirements of subsection (e)(9).

Subsection (e) sets forth the requirements of the rehabilitation plan that must be adopted by plan's in critical status, and (e)(8) allows for certain adjustments of benefits.  Subsection (e)(9) pertains to the rules to be followed by a plan in critical and declining status that elects to suspend benefits.

Board.  Of particular relevance was ASOP No. 27, adopted by the Actuarial Standards Board in

September 2013.  Section 3.9 Selecting A Discount Rate read:

>A discount rate is used to calculate the present value of expected
>future plan payments. A discount rate may be a single rate or a
>series of rates, such as a yield curve. The actuary should consider
>the purpose of the measurement as a primary factor in selecting a
>discount rate. Examples of measurement purposes are as follows:
>
>a. Contribution Budgeting – An actuary evaluating the sufficiency
>of a plan's contribution policy may choose among several discount
>rates. The actuary may use a discount rate that reflects the
>anticipated investment return from the pension fund. Alternatively,
>the actuary may use discount rates appropriate for defeasance,
>settlement or market measurements.
>
>b. Defeasance or Settlement – An actuary measuring a plan's
>present value of benefits on a defeasance or settlement basis may
>use a discount rate implicit in annuity prices or other defeasance or
>settlement options.
>
>c.  Market-Consistent Measurements – An actuary making a
>market-consistent measurement may use a discount rate implicit in
>the price at which benefits that are expected to be paid in the future
>would trade in an open market between a knowledgeable seller and
>a knowledgeable buyer.  In some instances, that discount rate may
>be approximated by market yields for a hypothetical bond portfolio
>whose cash flows reasonably match the pattern of benefits
>expected to be paid in the future.  The type and quality of bonds in
>the hypothetical portfolio may depend on the particular type of
>market-consistent measurement.

Further guidance as to the governing standards regarding the calculation of withdrawal

liability is provided in Section 4221(a) of ERISA:

>(A)  For purposes of any proceeding under this section, any
>determination made by a plan sponsor under sections 4210
>through 4225 is presumed correct unless the party contesting the
>determination shows by a preponderance of the evidence that the
>determination was unreasonable or clearly erroneous.
>
>(B) In the case of the determination of a plan's unfunded vested
>benefits for a plan year, the determination is presumed correct

unless a party contesting the determination shows by a
preponderance of evidence that—

    (i)  the actuarial assumptions and methods used in the
determination were, in the aggregate, unreasonable (taking into
account the experience of the plan and reasonable expectations), or

    (ii) the plan's actuary made a significant error in applying
the actuarial assumptions or methods.

William Ruschau of United Actuarial became the Plan's enrolled actuary in 2014, and
therefore the person responsible for calculating Energy West's withdrawal liability, a calculation
that starts with the selection of applicable actuarial assumptions. He had come to United, which
provides actuarial services to seventy-five multiemployer plans, in approximately 2012, having
previously worked as an actuary for Mercer for twenty-seven years. He had been the enrolled
actuary for other multiemployer funds since 1989. Although Mercer had provided actuarial
services to the Plan until 2014, when the entire company left the multiemployer pension plan
consulting business, Ruschau had had very limited involvement with the 1974 Plan while he was
at Mercer.

Ruschau was deposed before the arbitration and the transcript was put into evidence. He
testified that when looking at the actuarial assumptions used to value UVBs, such as retirement
rates, termination rates, disability, percentage married, spouse age difference, expenses, and
mortality, he considers a plan's prior experience because it serves as a guide to future
expectations. He uses the same assumptions when computing both the funding rate and the
withdrawal liability rate, except regarding expenses. For withdrawal liability purposes he uses
the present value for future expenses set forth in Section 4044 of ERISA. The only assumption
for which he does not consider a plan's past experience when calculating the withdrawal liability
is the interest or discount rate. He explained that past experience has no bearing on what a fund

will earn in the future.  Instead, Ruschau said he uses a reasonable risk-free interest rate that would be appropriate to settle a withdrawing employer's obligations.  This would be the equivalent of buying an annuity to settle up the employer's share of the unfunded vested benefits. Ruschau identified the discount rate as the one assumption that will have the greatest impact on the calculation of UVBs. Ruschau recounted that when United responded to a request for proposals from actuarial companies to replace Mercer, and  during his interview, he was not asked questions about United's approach to calculating withdrawal liability.

Before preparing the 1974 Plan's first actuarial valuation for 2014, Ruschau reviewed the five prior valuations that had been prepared by Mercer, including the actuarial assumptions used by that firm.  He found they had used the PBGC rates in effect at the end of the plan year for the discount rate for calculating withdrawal liability in 2013.[6]  Ruschau determined that the PBGC rates represented a reasonable proxy for risk-free interest rates and he therefore utilized those rates, updated to the current month.

Ruschau followed this same process when he prepared the 2015 valuation.  He used all the same assumptions as employed when developing the funding rate, except for the expense load, and he updated the PBGC interest rates.  As of June 30, 2015, those rates were 2.71% for the first twenty years, and 2.78% for subsequent years.  This contrasted with the 7.5% interest rate assumption used by Ruschau for minimum funding purposes, this being the long term investment assumption that gets recalculated every year.  Ruschau stated that in adopting the then current PBGC rates, which he said are essentially a future return assumption, he did not consider the Plan's historical experience, the investment expense assumption, or changes in investment

---

[6]  In 2004, the Mercer actuary used the Segal Blend for the withdrawal liability interest rate assumption. Under the Segal Blend, the actuary uses the PBGC assumption to calculate the portion of the liability that is funded, and the funding assumption rate to value the portion of liability that is unfunded.  The record does not establish when the Mercer actuary first moved from the Segal Blend to the PBGC rate when calculating withdrawal liability.

allocation.  He asserted that using the risk-free interest rate protects the best interests of the Plan participants, is fair to the withdrawing employers, is fair to the remaining employers, and is defensible. Pressed by Energy West's attorney as to whether using the PBGC rates is fair to a withdrawing employer, Ruschau responded:

> It is fair because the withdrawal liability is being calculated on a risk free rate basis and the withdrawing employer has no investment risk after that point in time.  So if the market goes to hell in a handbasket, the remaining employers are on the hook and not [the] terminating employer.  So it doesn't make s[e]nse that the terminating employer would get any kind – would be entitled to any kind of a risk premium in the interest discount assumption.

Ruschau was asked whether all of the plans for which United provides the actuaries utilize the PBGC rates for withdrawal liability calculations.  He stated that he was only aware of the plans for which he is the enrolled actuary.  Those two plans are both in the construction industry and both use the same rate for funding and withdrawal liability.  He said that because of the very different rules governing withdrawals in the construction industry, in his thirty years of working with construction industry funds he has never seen withdrawal liability being assessed.  Ruschau acknowledged that neither ERISA nor ASOP No. 27 prescribed different methods of calculating withdrawal liability based on the particular industry.

**Company's Expert Actuarial Witness.**  Energy West retained Scott Hittner to opine on the reasonableness of Ruschau's selection of actuarial assumptions used to calculate the Company's withdrawal liability.  Hittner is the chief actuary and partner in October Three Consulting LLC, an actuarial and employee benefits consulting firm.  He is a fellow of the Society of Actuaries, an enrolled actuary, a fellow of the Conference of Consulting Actuaries, a member of the Pension Committee of the American Academy of Actuaries, and has been practicing as an actuary for twenty-seven years.  His firm's practice is devoted almost exclusively

to consulting for single-employer pension plans, and 90% of his work has been in this area.  He has never served as a consulting actuary to a multiemployer plan, but on five to ten occasions he has advised companies that were seeking to challenge the correctness of withdrawal liability assessments imposed by multiemployer plans.  Hittner has never made presentations to any of the professional actuary organizations, written papers, nor previously testified in a court or arbitration regarding withdrawal liability.[7]

Hittner opined that Ruschau's use of the PBGC rates for the withdrawal liability interest rate, in contrast to the 7.5% funding rate, was so unreasonable that, despite the reasonableness of all the other actuarial assumptions, Ruschau's assumptions were unreasonable in the aggregate.  The gist of Hittner's analysis was that the calculation of Energy West's withdrawal liability does not reflect the effect of the Plan's projected insolvency in 2022, which will require the trustees to reduce benefits to the greater of the PBGC guaranteed maximum benefit or the benefit level that the Plan's available resources will support.  Additionally, because the payment of the PBGC guaranteed benefits would likely cause the PBGC multiemployer insurance fund, which has just $2 billion in assets,  to become insolvent, benefit levels would have to be reduced further.  Hittner maintained that Energy West's withdrawal liability should be greatly reduced to reflect the reality that the UVBs will not be paid.

In his report, Hittner did not assert that the Plan actuary was obligated to use the same interest rate for withdrawal liability as for funding.  He wrote:

> 23.  Although it is understandable that the Plan's enrolled actuary
> used a lower interest rate to determine Energy West's withdrawal

---

[7]  The Plan, for the first time in its post-hearing brief, asserted that Hittner was not a qualified expert regarding withdrawal liability in a multiemployer plan and should not be allowed to opine on the reasonableness of Ruschau's actuarial assumptions.  Given that this challenge was not raised until well after Hittner was identified by the Company as its expert, submitted what was denoted as an expert report, was deposed, and testified at length at the arbitration, the Plan's argument that Hittner's testimony should essentially be stricken, is rejected.  Hittner's limited experience in the multiemployer arena is one factor that will be considered in deciding on the weight to be accorded to his opinions.

liability than he uses for contribution requirements, the enrolled actuary should consider how the Plan's projected insolvency affects the security of Plan benefits. Using the PBGC interest rates for 2.71% for 20 years and 2.78% thereafter implies virtual certainty that the Plan will have sufficient funds to provide full vested accrued benefits to participants. But it is much more likely that, and, in fact, certified to by the Plan's enrolled actuary, that the Plan is expected not to have enough resources to pay full vested accrued benefits.

Rather, Hittner set forth what he believed was the appropriate method of developing the withdrawal liability interest rate assumption:

26. I estimated the impact of using an interest assumption equal to the PBGC interest rates for the period prior [to] the Plan's projected insolvency in 2022 and the 7.50% interest rate the Plan's actuary used for funding calculations after projected insolvency. I first calculated deferred annuity factors using the 2.71% PBGC interest rate (i.e., the rate effective for the first 20 years) through 2022 and 7.50% thereafter. I compared these annuity factors with annuity factors using a single interest rate of 7.50% to estimate the impact of using the combination of 2.71% PBGC rate for benefits payable through 2022 and 7.50% for payments made after 2022 would have on the Plan's present value of vested benefits. I then calculated annuity factors using various level interest rates to estimate the single rate that would produce the same present value of vested benefits. Based on this analysis, I estimate that a single interest rate of between 6.00% and 6.50% would result in the same present value of vested benefits. Therefore, I believe that using an assumed interest rate of 6.00% to 6.50% to calculate Energy West's withdrawal liability would be more consistent with the enrolled actuary's – certified as reasonable – assumption used for funding purposes.

Hittner stated that Energy West's obligation upon withdrawal is limited to monthly payments of $247,251. Using a 7.50% interest rate to compute present value of future monthly contributions, he determined that figure would be $31,273,364 if payments were subject to the 20 year cap, and $40,902,305 if payments continued in perpetuity. Applying a propriety October Three Yield Curve, which is based on yields of available high-quality fixed income investments, those figures increased to $41,581,017 and $63,316,517. The single-equivalent interest rates that

17

produce these higher present values are 3.87% and 4.81%, respectively.

During his testimony at the arbitration, Hittner confirmed that he was not advocating that a plan must use the same interest rate for funding and withdrawal liability purposes, because the rates are for different purposes. He stated that he was familiar with a number of the national actuarial firms that specialize in servicing multiemployer funds, such as Segal and Horizon, that used lower rates for withdrawal liability than for funding. Many firms use the Segal Blend, while actuaries from at least Horizon and United have employed the PBGC rates. Hittner was not aware of any arbitration or court decision that found the use of such rates was unreasonable, or that PBGC rates should be adjusted upwards to account for the distressed economic position of the plan. Hittner was familiar with the use of the PBGC rate in the National Retirement Fund, a plan that is in critical and declining status and has over $4 billion in UVBs.

Hittner acknowledged the combined effect of Section 4213(c), Section 4001(a)(8), and Section 305(g) is to require a plan actuary to include all vested benefits, whether or not they were reduced within the past ten years or might be reduced in the future, in the computation of nonforfeitable benefits. He asserted, however, that when valuing these benefits the effect of a projected insolvency should be included by adjusting the discount rate upwards, thereby reducing the UVBs and the withdrawing employer's withdrawal liability. His basic premise is that the worse condition a plan is in, the lower the withdrawal liability of employers who leave the plan, because of the uncertainty of the plan being able to pay promised benefits. Although he was aware of no court decision supporting this notion, he stated that the use of the Segal Blend has been upheld and the Segal Blend produces this result. Hittner was then taken through scenarios where the funded status of a plan deteriorated and the Segal Blend was used to calculate the UVBs. Hittner conceded that in this hypothetical, as the funding status of a plan decreased, the

total UVBs, and hence withdrawal liability of a withdrawing employer, increased in absolute terms, although the effective interest rate used to determine the UVBs increased as the funding status decreased. He acknowledged that this conclusion was contrary to his testimony that as the funding status decreases, an employer's withdrawal liability also decreased. Hittner further acknowledged that under ERISA, in the event of a mass withdrawal from a plan, withdrawal liability would have to be calculated using the PBGC rates

Hittner was then taken through ASOP No. 27, Section 3.9. He concurred that the section directs an actuary to consider the purpose of the measurement when selecting a discount rate, and that withdrawal liability is a settlement of the employer's obligation to the plan, because the plan cannot go back to the employer if investment returns are lower than expected. Hittner agreed that 3.9 states an actuary measuring the present value of benefits for defeasance or settlement purposes may use a discount rate implicit in annuity prices, and that the PBGC rates are a proxy for annuity prices. The questioning continued:

> A My recollection is at my deposition, I said a market consistent measurement would be the more appropriate basis for setting the discount rate, as opposed to a settlement with an annuity provider.
>
> Q But is it your testimony that this settlement, this 3.9(b) settlement measure does not apply to the UMWA '74 Pension Plan?
>
> A I don't think it is the most appropriate.
> . . .
>
> A I don't think it was inappropriate for the actuary to follow the guidance of the ASOP, but in my expert opinion, it would be more appropriate to consider a market consistent measure that is reflective of the 1974 Plan's ability to continue to pay benefits relative to the rates that are implicit in the PBGC or the – the rates implicit in the annuity prices that are reflected in the PBGC interest rates.
>
> Q Okay. When you say you agreed that it was not inappropriate for the plan's actuary to follow this guidance, would you agree that

it was then not unreasonable for the actuary to follow this guidance?

A  It was not unreasonable for the actuary to follow the guidance, but, again, the rates implicit in annuity prices I don't think – In my view, are not the most appropriate basis for setting the discount rate.

**Fund's Expert Actuarial Witness.**  The Fund presented Dr. Ethan Kra as its expert witness regarding the reasonableness of the actuarial assumptions used by Ruschau, and the soundness of the opinion of Hittner.  Kra received a Bachelor's, Master's, and Ph.D in mathematics from Yale University. From 1977 through 2011 he worked for Mercer, which was the world's largest employer of actuaries for most of that time.  Between 1979 and 1982 he served as the Number 2 Mercer actuary for the 1974 Plan.  During the last seventeen years of his tenure at Mercer he served as the chief actuary and chaired the firm's Actuarial Resource Network.  After leaving Mercer in 2011, he formed his own actuarial consulting firm.

Throughout his career, Kra has been a member of all relevant professional organizations, often serving in leadership roles.  He was the vice president – pensions of the American Academy of Actuaries and chair of its Pension Practice Council, to which the Multiemployer Plans Subcommittee reported.  He was the vice president of the Society of Actuaries and chair of the Pension Section Council.  He has written and made presentations to professional organizations on literally hundreds of pension-related topics.  For over thirty-five years he has provided consulting and actuarial services to multiemployer pension and welfare funds, including serving as the enrolled actuary for a multiemployer pension plan that terminated due to a mass withdrawal and was projected to become insolvent.  He has prepared expert reports and/or testified in almost thirty court, administrative, or arbitration proceedings, about half of those involving multiemployer plan withdrawal liability assessments.

Kra analyzed each of the actuarial assumptions Ruschau used to compute Energy West's withdrawal liability.  Other than finding that Ruschau understated the allowance for administrative expenses, thereby slightly reducing unfunded liabilities, Kra found that in the aggregate, the actuarial assumptions were reasonable, taking into account the experience of the Plan and reasonable expectations.  Regarding the discount rate employed by Ruschau, Kra referenced a number of ASOP guidelines[8] that state that when measuring pension obligations, including economic assumptions in general, and a discount rate in particular, an actuary should consider, identify, and reflect the purpose of the measurement.  He noted that consistent with this guidance, many actuaries for multiemployer pension plans use different interest rates for minimum funding calculations than for withdrawal liability determinations.  He explained the differing purposes of these two calculations in his report:

> 58.  .  . The **purpose** of the funding valuation is to determine a contribution number for one year, with the understanding that it will be revised for future years. If that valuation reflects a discount for taking risk, those who benefit in the short run will be on the hook for any shortfalls. It is accepted actuarial practice for the funding valuation interest rate to reflect the expected return on the portfolio, reflective of the risk premium for investing in risky assets.

> 59. The purpose of the withdrawal liability valuation is to determine the liability of the withdrawing employer for its share of the unfunded benefits of the plan. This is a onetime calculation, with no opportunity to increase the assessment if the experience of the plan is adverse. Essentially, the withdrawing employer's obligation becomes a fixed bond like obligation, with no variability based on actual market performance.

> .  .  .

> 61. Thus, based on the **purpose of the measurement**, to determine a liability to set up a fixed bond like obligation of the withdrawing employer to the fund, it is a very acceptable actuarial practice to determine the present value of vested benefits for the purpose of determining withdrawal liability by using a bond like interest rate.

---

[8]  ASOP  No. 4 Section 3.2 and 3.3; No. 27 Section 3.2, 3.6, and 3.9 [which is quoted in its entirety earlier] contain the same basic statement.

He then opined on how a withdrawal liability discount rate should be selected:

> 44. Investing pension assets in any fashion other than on the basis of settling the plan's obligations represents the assumption of risk. Under the principles of basic finance, risky investments are expected to yield greater returns than risk free investments. That excess yield is the reward for bearing the risk. However, risk means that there is a possibility that the risky investment could underperform, and possibly even lose money. The higher expected return is the reward for taking the risk. The entity exposed to the risk should benefit from any increase in expected return as the premium it receives in return for accepting the volatility and the responsibility for absorbing the downside potential. In other words, the continuing employers would be exposed to higher contribution requirements if the investments underperformed. There would be no ability to call upon the employers who had withdrawn to increase payments to make up the investment shortfall. The payment schedule for the withdrawn employers is fixed upon withdrawal and does not reflect plan experience (investment, mortality, retirement incidence) after withdrawal. The ongoing employers would have to make up the entire shortfall.[9] Thus, it would not be reasonable to ask the ongoing contributing employers to share with the withdrawing employers any benefit from taking investment risk (i.e., a higher expected return and higher discount rate), as the withdrawing employers would not make up any shortfall from underperformance.

> 45. My opinion is that for purposes of withdrawal liability calculations all liabilities should be valued at the riskless rate (e.g., US government bonds). As discussed above, once an employer withdraws, the assessment of withdrawal liability is fixed (frozen) and is no longer affected by the performance of the investment portfolio. The withdrawing employer has a fixed cash flow, with no recourse against it for poor asset performance of the fund. If the assumed interest rate is greater than the riskless interest rate, then the remaining employers are taking all of the risk. They should not have to shoulder the risk for the withdrawing employers. To the extent that the interest rate (used in determining the present value of vested benefits for purposes of withdrawal liability calculations) is greater than the riskless rate, there is a transfer of risk from the withdrawing employers to the remaining employers that is not compensated for.

Kra agreed with Hittner that PBGC interest rates are a reasonable proxy for contemporaneous

---

[9]  During his testimony Kra noted that in the case of this particular plan, the PBGC and participants would also suffer if the investment return were lower than forecast.

market interest rates of bonds with a similar duration to the liabilities being measured, and is a relatively riskless rate. He reviewed the various bond and IRS lump sum interest rates for short and long term in effect as of June 30, 2015 and concluded that any rate between 2.33% and 4.5% would not have been unreasonable as a market based measure. He noted that the PBGC rates for mass withdrawal liability interest rates were 2.71% for the first twenty years and 2.78% for subsequent years. He further explained that because the UMWA 1974 Plan is very mature with predominantly retired participants, the duration of the Plan's liabilities is shrinking as time passes. Hence, the Plan's projected payment stream would justify using shorter term bond rates, which are lower, meaning a discount rate in the lower of the 2.33% to 4.5% range would be more appropriate.

Kra testified that numbers of multiemployer pension plan actuaries, including those from Horizon, Milliman, and Savitz, use the PBGC rates or rates close to them, for withdrawal liability purposes. He noted that the actuary for the New York State Teamsters Fund, which is in critical and declining status and is projected to become insolvent, uses the PBGC rate.

In contrast, Kra stated that he is aware of no actuary other than Hittner who has used, advocated, or even discussed using a rate that factors in the creditworthiness of a plan, specifically a projected insolvency, when setting the withdrawal liability discount rate. Kra recounted that such an approach has never been written about in the professional literature. Kra attended the October 2017 session of the Conference of Consulting Actuaries, the sole topic of which was the discount rate for withdrawal liability. At that program he asked the assemblage of experienced multiemployer plan actuaries if anyone had ever heard of such an approach and no one said they had ever heard such a theory expounded. Kra asserted that Hittner's theory flies in the face of widely accepted actuarial practice, Kra's reading of the applicable statutes, and logic.

Regarding actuarial practice, Kra stated that no fund in the country uses Hittner's method of establishing a withdrawal liability interest rate assumption. As to his statutory analysis, Kra said

ERISA 4213(c) defines UVBs as the value of nonforfeitable benefits less the value of plan assets. The definition of nonforfeitable benefits in ERISA 4001(a)(8) includes benefits for which participants have satisfied the conditions of entitlement, whether or not the benefits may subsequently be reduced or suspended.  Under ERISA 305(g)(1), where a plan is in critical and declining status, even benefits that have been reduced or suspended within the previous ten years must be disregarded in determining a plan's unfunded vested benefits for purposes of determining an employer's withdrawal liability.  Kra maintained that since the statute specifically directs that all nonforfeitable benefits, even past and potential future benefits that have or might be reduced,  are to be reflected in the determination of the present value of the vested benefits, there is no basis in the statute for employing an interest rate assumption that factors in potential benefit reductions that may arise after insolvency.  He also noted that the PBGC regulations, 29 C.F.R. §4211.2, adopted both the definition of nonforfeitable benefits and the guidance of ERISA 305(g)(1), thereby putting future benefits and past benefit cutbacks on equal footing regarding the calculation of UVBs for withdrawal liability purposes.

Finally, as to logic, Kra stated that it makes no sense that as the financial condition of a plan worsens, the withdrawal liability of departing employers would decline towards zero as a result of increasing the discount rate.  He explained that under Hittner's theory, as the plan neared insolvency, the discount rate would keep climbing to astronomical levels, meaning withdrawing employers would owe little or no withdrawal liability. At the point there was a mass withdrawal, however, the discount rate would by statute decline all the way to the PBGC rate, resulting in very large withdrawal liability assessments for those employers who stayed in the plan until the end.  The obvious incentive under Hittner's theory would be for employers to drop out of a plan when insolvency was forecast, shifting the economic burden onto the employers that

remained.  This effect would be directly in conflict with the purpose of MPPAA, which is to discourage employers to flee a plan in order to avoid liability.

*New York Times* **Case.**  In 2013, the National Mail Deliverers'- Publishers Pension Fund assessed the New York Times withdrawal liability resulting from an alleged partial withdrawal from the Fund.  The withdrawal liability calculation was performed by the Fund's longtime enrolled actuaries from the Segal Consulting Group and they employed the Segal Blend to determine the present value of accrued benefits.  At the time, the PBGC interest rates were approximately 5% and the funding interest rate was 7.5%, yielding an effective withdrawal liability discount rate of 6.5%.

Among the challenges raised by the Times was that the United States Supreme Court decision in *Concrete Pipe & Products of California, Inc. v. Construction Laborers Pension Trust for Southern California,* 508 U.S. 602 (1993) mandated that a plan actuary employ the same discount rate for funding and withdrawal liability calculations.  This claim was based on the following language in the Court's opinion:

> .  .  . As the text plainly indicates, the assumptions and methods used in calculating withdrawal liability are selected in the first instance not by the trustees, but by the plan actuary. For a variety of reasons, this actuary is not, like the trustees, vulnerable to suggestions of bias or its appearance. Although plan sponsors employ them, actuaries are trained professionals subject to regulatory standards. See 29 U. S. C. §§ 1241, 1242; 26 U. S. C. § 7701(a)(35). The technical nature of an actuary's assumptions and methods, and the necessity for applying the same assumptions and methods in more than one context, as a practical matter limit the opportunity an actuary might otherwise have to act unfairly toward the withdrawing employer. The statutory requirement (of "actuarial assumptions and methods-which, in the aggregate, are reasonable ... ") is not unique to the withdrawal liability context, for the statute employs identical language in 29 U. S. C. § 1082(c)(3) to describe the actuarial assumptions and methods to be used in determining whether a plan has satisfied the minimum funding requirements

contained in the statute. The use of the same language to describe the actuarial assumptions and methods to be used in these different contexts tends to check the actuary's discretion in each of them.

"Using different assumptions [for different purposes] could very well be attacked as presumptively unreasonable both in arbitration and on judicial review.

"[This] view that the trustees are required to act in a reasonably consistent manner greatly limits their discretion, because the use of assumptions overly favorable to the fund in one context will tend to have offsetting unfavorable consequences in other contexts. For example, the use of assumptions (such as low interest rates) that would tend to increase the fund's unfunded vested liability for withdrawal liability purposes would also make it more difficult for the plan to meet the minimum funding requirements of § 1082." *United Retail & Wholesale Employees Teamsters Union Local No. 115 Pension Plan* v. *Yahn & McDonnell, Inc.,* 787 F. 2d, at 146-147 (Seitz, J., dissenting in part).

This point is not significantly blunted by the fact that the assumptions used by the Plan in its other calculations may be "supplemented by several actuarial assumptions unique to withdrawal liability." Brief for Respondent 26. Concrete Pipe has not shown that any method or assumption unique to the calculation of withdrawal liability is so manipulable as to create a significant opportunity for bias to operate, and arguably the most important assumption (in fact, the only actuarial assumption or method that Concrete Pipe attacks in terms, see Reply Brief for Petitioner 18-20) is the critical interest rate assumption that must be used for other purposes as well. at 633

The actuarial expert presented by the Times, Darren French, declined to opine on whether the 6.5% discount rate used by the Segal actuaries was in and of itself reasonable, asserting that any variance in the rates was impermissible. The Fund's expert was Kra, who testified consistent with what he stated in this arbitration. He said the actuary must choose a rate specific for the purpose, and that for withdrawal liability calculations, the most appropriate choice would be a risk-free rate, of which the PBGC rate was a fair proxy. Kra stated that while he would have chosen a discount rate lower than the one produced by the Segal Blend, resulting in a greater

withdrawal liability assessment against the Times, the use of the Segal Blend was not unreasonable.  Kra noted that the Segal Blend was utilized by a substantial portion of the multiemployer plans in the country.

The dispute proceeded to arbitration before me.  In a June, 2016 award, I upheld the withdrawal liability assessment.  In particular, I found that the use of the Segal Blend did not make the actuarial assumptions used by Segal, in the aggregate, unreasonable.  I wrote:

> This already lengthy opinion will not be extended with a detailed discussion of why the Segal Blend is not violative of §4312(a) nor ASOP No. 27.  Suffice to say that all the very detailed arguments raised by the Times's very capable counsel are not new.  They have essentially existed since the Supreme Court issued *Concrete Pipe* in 1993.  Despite what can only be described as a 1997 self-protective memorandum from the Client Relationship Manager of Segal to its clients warning that the use of the Segal Blend – which remained Segal's best estimate of the appropriate rate - to calculate withdrawal liability might result in a challenge based on the *Concrete Pipe* language, and suggesting trustees could elect to impose withdrawal liability based on the funding rate, Segal and other actuaries have since 1993 continued to use the Segal Blend as their best estimate of the appropriate interest rate assumption.  Literally thousands of withdrawal liability assessments have been issued using the Segal Blend, yet the Times was able to produce not one arbitration award, District Court, Circuit Court, or Supreme Court decision that ruled that actuaries must, as a matter of law, use the same interest rate assumption for both funding and withdrawal liability purposes.  Not a single case at any level has rejected a withdrawal liability assessment because it was calculated using the Segal Blend.

I then discussed the arbitration awards and court decision issued after *Concrete Pipe* that recognized the legitimacy of using different interest rates for funding and withdrawal liability purposes, and specifically countenanced the adoption of the Segal Blend where it was the actuary's best estimate of the anticipated experience of the plan.

The arbitration award was appealed to the United States District Court for the Southern

District of New York.  Under ERISA, parties can appeal to federal court as a matter of right, and

questions of law are subject to *de novo* review.  On March 26, 2018, Judge Robert Sweet issued

his opinion (17. Civ. 6178) upholding most of the rulings in the award, but reversing the finding

regarding the Segal Blend.  Judge Sweet ruled, in relevant part:

> The conclusion reached from Concrete Pipe is the following. Actuarial bias against withdrawing employers was guarded against because there is no "significant opportunity for bias to operate" when "the most important assumption . . . is the critical interest rate assumption that must be used for other purposes as well." Concrete Pipe, 508 U. S. at 632-33. In the same breath, however, the Court stated that the "assumptions used by [a] Plan in its other calculations may be supplemented by several actuarial assumptions unique to withdrawal liability." Id. at 633 (emphasis added, internal quotation marks omitted). The expectation is that a standard, uniform interest rate is applied in all contexts, and any deviation "could very will be attacked as presumptively unreasonable both in arbitration and on judicial review." Id. at 633 (citation omitted). That does not mean, however, that deviation is, at all times, impermissible by law – were that the case, the Court would not have included the open-ended "could very well be" language rather than something more definitive. While few courts have delved into the murky mists of these particular ERISA provisions, this Court is not the first to read Concrete Pipe in this way. See Chi. Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. CPC Logistics, Inc., 698 F.3d 346, 355 (7th Cir. 2012) (Posner, J.) (discussing Concrete Pipe and observing that "the Court [in Concrete Pipe] had indicated that 'supplemental' assumptions that might cause the rates to diverge were permissible").
>
> However, simply because the use of the Segal Blend uniquely in the context of calculating an employer's withdrawal liability is not prohibited as a matter of law does not mean that its application in the present context was proper. Rather, to the extent that the Times contends that the use of the Segal Blend in this instance violated ERISA law, that claim is merited. The Arbitrator's decision that the Segal Blend's use was reasonable in the aggregate is a mixed question of fact and law and is reviewed for clear error. See 666 Drug, Inc., 2013 WL 4042614, at *5 (collecting cases); accord Plan Bd. of Sunkist Ret. Plan v. Harding & Leggett, Inc., 463 F. App'x 702, 703 (9th Cir. 2011) (reviewing district court's review of withdrawal

liability interest rate assumption for clear error).

As detailed above, ERISA requires that when determining an employer's withdrawal liability, "actuarial assumptions and methods" must, "in the aggregate, [be] reasonable (taking into account the experience of the plan and reasonable expectations) and which, in combination, offer the actuary's best estimate of anticipated experience under the plan." 29 U.S.C. § 1393(a) (1) (emphasis added). Egan's testimony before the Arbitrator was that a 7.5% percent assumption was her "best estimate of how the Pension Fund's assets . . will on average perform over the long term." Arb. Tr. 568:3-8; see Arb. Tr. 600:3-15 (observing that the Segal Blend was "lower" than Egan's best estimate of anticipated plan experience in the long term). If 7.5% was the Fund actuary's "best estimate," it strains reason to see how the Segal Blend, a 6.5% rate derived by blending that 7.5% "best estimate" assumption with lower, no-risk PBGC bond rates, can be accepted as the anticipated plan experience. This is especially when the blend includes interest rates for assets not included in the Fund's portfolio. The Segal Blend's applicability is further undermined by Egan's acknowledgment that she had used the Segal Blend as her "best estimate" when calculating withdraw liability "regardless of the particular pension plan's actual portfolio of assets." Arb. Tr. 585:10-586:5.

In defense of the Segal Blend, the Fund argues that there is less risk facing employers like the Times who withdraw because the liability of those employers becomes fixed; if the Fund underperforms, the withdrawer is not required to pay more, unlike an employer still part of the Fund's plan. See Fund Mem. 28-29. Because of this background, the Fund notes, not only did Egan, but also the Fund's actuarial expert, Kra, testified that the Segal Blend was, in the aggregate, reasonable. See Fund Mem. 33-34 (citing Arb. Tr. 695:12-16). On the other hand, the Times's rejoinder that a withdrawing employer also does not share in any over-performance by the Fund, which would reduce future contribution obligations, effectively nullifies the Fund's argument. See Times' Opp. 11. Accordingly, the inquiry returns to what the statute states it requires for an applicable return rate: what is the best estimate of the "anticipated experience" under the plan." 29 U.S.C. § 1393(a) (1).

The Arbitrator's Interim Opinion did not actively engage with the issue of whether the Segal Blend's rate was a reasonable best estimate. Rather, after concluding that the Segal Blend was not foreclosed as a matter of law, he found that

there was "no evidence to suggest that the decision to use the Segal Blend was part of a scheme to take advantage of the Times" and accepted that, because Egan had been using the "Segal Blend when calculating withdrawal liability the entire time," the Times could not claim the Segal Blend's caused it to be "unfairly penalized." Interim Op. 58-59. 9 That reasoning does not support a finding that the Segal Blend's rate was the "best estimate" of the plan's "anticipated experience." A lack of duplicity does not, by itself, equate with a correct answer. Earlier in the Interim Opinion, the Arbitrator did outline Egan, Kra, and French's testimony as to the Segal Blend, though without opining on the merits of the rate. See Interim Op. 31-33.

In sum, the actuary's testimony, combined with the untethered composition of the Segal Blend and paucity of analysis by the Arbitrator, create "a definite and firm conviction that a mistake has been made" in accepting the Segal Blend; as such, this Court will "set the findings aside even though there is evidence supporting them that, by itself, would be considered substantial." Wu Lin v. Lynch, 813 F.3d 122, 128 (2d Cir. 2016) (quoting 9C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2585 (3d ed. 2007)) . Accordingly, the Arbitrator's decision that the Segal Blend was the appropriate rate to calculate the Times' partial withdrawal is reversed. In the absence of additional evidence sufficient to support a different rate, the Times' liability should be recalculated using the 7.5% assumption testified to as the "best estimate." at 42-47

As will become evident in the recitation of the parties' respective positions, both parties made arguments in their initial and reply briefs regarding the significance of my finding in the arbitration decision. Because the District Court decision was issued after the parties submitted their reply briefs, Energy West requested the opportunity for the parties to file supplemental briefs addressing the court's reversal of portion of the award that upheld the use of the Segal Blend. The Plan did not object to the request and supplemental briefs were received on June 7, 2018.

**POSITIONS OF THE PARTIES**

The decision in this case must be based on the evidentiary record produced during the two days of hearing, including the testimony of the proffered expert witnesses, and findings of law. Because the initial and reply briefs were reflective of that record, the arguments made by the parties will be presented.  To the extent those arguments were augmented or supplanted in the supplemental briefs, those new arguments will be set forth separately.

### ENERGY WEST POSITION IN INITIAL AND REPLY BRIEFS

**The Actuarial Assumptions Used by the Plan Are Unreasonable in the Aggregate.** To successfully challenge a multiemployer plan's assumption, a withdrawn employer must show the fund actuary used a combination of methods and assumptions to calculate withdrawal liability that fell outside the range of reasonable actuarial practice.  Although the test is whether the assumptions were unreasonable in the aggregate, because of the profound impact of the discount rate, an unreasonable discount rate can by itself render the assumptions in the aggregate to be unreasonable.  The maturity of the Plan diminishes the impact the other assumptions – with the possible exception of the mortality assumption –  have on the calculation of withdrawal liability. In making the calculation of Energy West's withdrawal liability, the mortality assumption employed by Ruschau was reasonable, so the other assumptions used by Ruschau did nothing to offset the distorting effect of his use of the PBGC rate.

Pursuant to the Supreme Court's decision *Concrete Pipe*, the actuary must use the same or very similar rate for both withdrawal liability and funding purposes.  The Court said that the use of different rates can be "attacked as presumptively unreasonable both in arbitration and on judicial review."  The premise underlying the Court's finding that the MPPAA withdrawal liability scheme was constitutional was that an actuary, being a professional applying industry

standards, would make an independent judgment after careful analysis free of pressures from

trustees to inflate withdrawal liability.  The Plan offered no justification for why the withdrawal

liability discount rate selected by Ruschau is substantially below the funding rate.

Ruschau's selection of the PBGC rate was unreasonable in part because he did no

analysis before mechanically plugging in that low rate.  The actuarial assumptions are supposed

to represent the best estimate of anticipated experience under the plan, taking into account plan

experience and reasonable expectations.  Ruschau admitted that his firm does not review

historical experience of the Plan, future return assumptions, or changes in the investment

allocation when selecting the discount rate for withdrawal liability.  This failure means the

selection of the PBGC rate is not the "best estimate" required by ERISA. Ruschau is inconsistent

in his approach, since he testified his selection of 7.25% and 6.75% discount rates for other funds

for which he serves as the enrolled actuary was because they were construction funds, subject to

special rules.  Yet he said he did not consider the Special Rules for 404(c) funds, particularly the

lack of a 20 year limitation, when determining the discount rate for the 1974 Plan.  A reasonable

actuary would be consistent in the methodology employed.

Ruschau violated industry standards by not using a market-consistent discount rate and

failing to take into account plan experience and financial health.  ASOP 27, Section 3.6 states

that to be reasonable an assumption must take into account historical and current economic data

and reflect the actuary's best estimate of future experience.  Section 3.9 states that actuaries may

calculate the present value of benefits using market-consistent measurements, the rate implicit in

the price at which benefits would trade in an open market between a knowledgeable seller and

knowledgeable buyer.  That price would take into account the Plan's distressed financial

condition.  ASOP No. 27 does not provide for the use of a risk-free rate, which is not market-

based.  The Plan mischaracterizes withdrawal liability as "defeasance or settlement." ASOP No.

4 Section 3.10 and 3.11[10] in fact direct an actuary to consider the financial health of the plan.

Choosing a risk-free rate is an unreasonable method of selecting a discount rate for the

1974 Plan.  Kra's reliance on statutory sections to justify such a selection is misplaced.  The

definition of nonforfeitable benefits in ERISA 4001(a)(8) precludes the consideration of potential

or anticipated reductions in benefits in the calculation of nonforfeitable benefits, but does not

address the calculation of the present value of the benefits.  A discount rate is not employed to

calculate nonforfeitable benefits, but it is when calculating the present value of UVBs. ERISA

305(g)(1) only says benefit reductions within the past ten years should not be included in the

calculation of UVBs for the withdrawal liability of plans in critical and declining status. That

section is irrelevant to Energy West's claim that the risk of future benefit reductions should be

reflected in the discount rate.  The PBGC regulation does not cite to ERISA 305(g)(1), but to

305(e)(8), which deals with the development of rehabilitation plans by plans in critical, but not

declining, status.  That is irrelevant to the selection of a discount rate for the valuation of UVBs.

Had the PBGC wanted its definition of nonforfeitable benefits to include the present value

---

[10] ASOP No. 4, Section 3.10 states in part:

> Measuring the Value of Accrued or Vested Benefits – Depending on the scope of
> the assignment, the actuary may measure the value of any accrued or vested
> benefits as of a measurement date. The actuary should consider the following
> when making such measurements:
> > .  .  .
> > b.  the status of the plan (for example, whether the plan is assumed to
> continue to exist or be terminated);
> > .  .  .

ASOP No. 4, Section 3.11 states:

> Market-Consistent Present Values – If the actuary calculates a market-consistent
> present value, the actuary should do the following:
> > a. select assumptions based on the actuary's observation of the
> estimates inherent in market data in accordance with the guidance in ASOP Nos.
> 27 and 25, depending on the purpose of the measurement; and
> > .  .  .

calculation of UVBs, it would have said so expressly, or at least cited to 305(g)(1).

Kra's theory of the need for a risk-free rate does not have support among other actuaries. In the 1984 arbitration involving the withdrawal liability assessment by the 1950 and 1974 Pension Plans against Classic Coal Corporation [5 EBC 1449], Steven Rabinowitz, the Plan's enrolled actuary from Mercer, testified that it would be inappropriate to use PBGC or other market rates for calculating withdrawal liability. He instead advocated for the use of a blended rate similar to the Segal Blend.[11]

In contrast to the careful analysis Ruschau undertook in recommending the funding rate, in which he analyzed the investment experience of the Plan and future expectations, as well as the appropriateness of all the other actuarial assumptions, Ruschau did not conduct a similar analysis in deciding on the withdrawal liability discount rate. He merely rotely chose the PBGC rate without making any independent verification of the reasonableness of those rates. This was very different than what was done by Mercer in 2004, when their actuary sent a memorandum to the trustees analyzing various interest rate assumptions before making his recommendation.[12] Such a mechanical application of the PBGC rates violates ERISA. Support for this assertion is found in *Metz Culinary Mgmt., Inc.,* 2017 WL 1157156 at *6, in which the Southern District of New York judge found an actuary failed to fulfil his duties under ERISA when he simply carried over rate assumptions from the prior year, without making an affirmative determination of the

---

[11] At the time withdrawal liability was assessed against Classic Coal, the PBGC interest rates were higher than the discount rates employed for funding purposes. The Employer's experts testified that the PBGC rates should be used for calculating withdrawal liability. The arbitrator found the funding rate used by the Plan was too low, and hence the blended rate was not reasonable, although he also rejected the use of the PBGC rate for withdrawal liability purposes, or any presumption that using the same rate for funding and withdrawal liability purposes is reasonable.

[12] In his letter to the trustees, Actuary James Dexter noted that the 1974 Pension Plan currently used a blended rate for withdrawal liability, whose theoretical basis he rejected. He stated that the three approaches to setting withdrawal liability assumptions are using the funding interest rate; the market interest rate as reflected in the PBGC annuity interest rates, plus 1%; or a blended rate. Dexter concluded that the market interest rate plus 1% best protected participants, and was fair to both withdrawing and remaining employers, but he provided no further justification for his preferred selection.

appropriate rate after reviewing the data from the most recent plan year.

The PBGC rates do not reflect the 1974 Plan experience and reasonable expectations of what will occur in the future. That other plans use the PBGC rate is irrelevant, as is the fact that no other plans use the market-consistent rate advocated by Hittner. A market-consistent rate is expressly permitted by ASOP 27 Section 3.9(c). As explained by Hittner, the risk of insolvency and reduction in benefit payments should be reflected in the discount rate selected, as would happen with an insurance annuity. The PBGC rate implies that the Plan will have sufficient funds to provide full vested benefits to the participants, but since this is not a reasonable assumption, the PBGC rates are far too low. To reflect the probability that the Plan will not be able to meet its vested benefit obligations in the future, the discount rate must be higher. Kra's analysis that the Plan should use a risk-free rate because if the Plan becomes insolvent it would be required by statute to use the PBGC rates for calculating withdrawal liability ignores the fact that currently the Plan is solvent and operating under the normal requirements of ERISA that the actuary consider past experience and reasonable expectations. As determined by Hittner, and consistent with the law and ASOPs, a reasonable discount rate that properly considers plan experience and the reasonable expectation of future insolvency and benefit reductions would be between 6.0% and 6.5%. The Plan should be directed to recalculate Energy West's withdrawal liability using a reasonable discount rate that honors the requirements of ERISA.

The Plan's reference to the findings of this arbitrator in the *New York Times* case does not support Ruschau's use of the PBGC rate. The discount rate in that case was the Segal Blend. Energy West is not contesting whether it would have been reasonable for Ruschau to have used the Segal Blend and in fact has no objection to the use of the Segal Blend. Hittner identified that measurement as one commonly used to determine withdrawal liability and it more closely

resembles the market-consistent method Hittner advocated.

**The Special Rules for 404(c) Plans Do Not Apply to the 1974 Plan.** The 1974 Plan is not a continuation of the Original Plan under MPPAA[13] because Section 404(c) was enacted as a temporary provision that no longer applies to any pension plan. Congress intended to limit the application of 404(c) to the Original Plan and any continuation plan until those plans became a qualified ERISA plan under §401(a). This intent was documented in the House Ways and Means report from 1974. The 1974 Plan attained this qualified status in 1976 and nine more times hereafter, and hence is exempt from federal taxation under Sections 401(a) and 501(a) of the IRC. Section 404(c) is also inapplicable because of the second sentence of the section, which specifies which individuals employed before 1974 were to be treated as employees of a participating employer. That sentence has no current application because there are no active employees in the 1974 Plan who were plan participants prior to July 1, 1974. Since the 1974 Plan is not a continuation to which 404(c) applies, there is no longer a link between the provisions of MPPAA establishing the special rules and 404(c). In the absence of that link, the exemption from the 20 year cap is not available to the 1974 Plan.

The contention that the 1974 Plan is a continuation of the Original Plan, and entitled to the protection of the Special Rules, is based solely on the determination letter requested and obtained in 1974 and 1975. That continuation status was merely a necessary stepping stone to getting 401(a) status, which the 1974 Plan attained in 1976. At that point the Plan surrendered its status as a 404(c) continuation. In subsequent years, arbitrators and courts have mistakenly referred to the 1974 Plan as a continuation plan under 404(c), assuming that to be the case but

---

[13] Energy West is only contending the Special Rules under MPPAA, ERISA and the IRC do not apply to the 1974 Plan, and is not challenging the applicability of special provisions of the Coal Act, the Multiemployer Pension Reform Act, or any other legislation that refers to a continuation of a 404(c) plan.

failing to undertake any actual analysis.

Even assuming the Plan is properly considered a continuation of the Original Fund, it is not entitled to invoke the Special Rules. Those rules were intended to keep the 1950 Plan solvent, because Congress felt the federal government owed a special duty to those participants, and because the possible failure of that very large pension fund threatened to sink the entire multiemployer pension plan termination insurance system. The 1950 Plan had no active miners so current employers felt no incentive to support people who were not their employees. The same considerations did not apply to the 1974 Plan. Further, the MPPAA Special Rules, particularly the exemption from the 20 year cap, will not serve the purpose of helping the plan survive. Absent a major infusion of federal funds, the 1974 Plan will become insolvent in 2022, regardless of any withdrawal liability payments Energy West may make. All that allowing the 1974 Plan to invoke the Special Rules will accomplish is to unduly burden Energy West.

## PLAN POSITION IN INITIAL AND REPLY BRIEFS

**Energy West Did Not Meet Its Burden of Proving the Determination of Withdrawal Liability Was Unreasonable in the Aggregate.** There is no requirement that the actuarial assumptions used to calculate withdrawal liability be the same as those for minimum funding. The PBGC explicitly made such a finding in PBGC Op. 86-24 (October 31, 1986), and this conclusion is entirely consistent with all the relevant ASOP guidelines. This arbitrator's decision in the *New York Times* case specifically upheld the use of different interest rates for funding and for withdrawal liability determinations.

The choice of the interest rate assumption must be specifically related to the purpose of the computation and ASOP No. 27 Section 3.9 expressly states that in cases of defeasance or

settlement, which is what occurs when an employer withdraws, an actuary may use a discount

rate implicit in annuity prices.  All the actuaries who testified in this proceeding concurred that

the PBGC interest rates are a fair proxy for such rates.  Ruschau acted consistent with these

established actuarial principles when he employed the PBGC rates to calculate the withdrawal

liability of Energy West, the same rates used by the Mercer actuaries for years prior to Ruschau

taking over in 2014.  Numerous other actuaries use the same approach in funds across the

country and Kra, one of the foremost actuarial experts in the country, established that the use of a

risk-free rate is the proper approach and Ruschau's selection fell well within the range of

reasonableness under the statutory standard.  Kra cited a number of other pension funds in critical

and declining status and facing insolvency whose actuaries use the PBGC rate for calculating

withdrawal liability, without adjusting for the possibility that benefits might be reduced. Kra

examined each of Ruschau's assumptions and determined that they were reasonable, both

individually and in the aggregate.  Contrary to he Energy West's claims, Ruschau's selection of

the applicable discount rate was not mindless or manipulative, but rather based on sound actuarial

principles, utilizing risk-free rates because this was a settlement transaction. He did not rely on

past investment performance because it has no bearing on what the fund will earn in the future.

In contrast, for the other actuarial assumptions he did analyze and rely on past experience.  The

cases Energy West cites in support of its attacks on Ruschau's determination are inapposite .

  While he argued on behalf of a higher interest rate, which he claimed to be more

appropriate, Energy West's proffered expert effectively acknowledged that Ruschau's choice of

the PBGC rate met the requirements of the law.  He admitted that Energy West's withdrawal and

assessment of withdrawal liability constituted a settlement of its obligation, that the ASOP

envisions the use of a PBGC rate for defeasance or settlement purposes, and that Ruschau's

selection of the PBGC rate was neither inappropriate nor unreasonable.  He also acknowledged that other funds in financial distress and facing insolvency have used the PBGC rate when assessing withdrawal liability.

In contrast, Hittner's theory that the prospect of benefit reductions due to pending insolvency must be factored into the discount rate is without precedent, statutory support,  or logic.  Hittner acknowledged that no court or arbitrator has endorsed this theory, and in fact no fund in the country has ever applied it when assessing withdrawal liability.  Kra noted that the theory has never been suggested in any professional journal or speech.  It is inconsistent with the statutory requirement set forth in §4001(a)(8) that non-forfeitable benefits  include all benefits, whether or not they may subsequently be reduced or suspended; and the guidance in §305(g)(1) that benefit reductions within the previous ten years be disregarded when determining withdrawal liability.  It defies logic that the greater the financial distress of a plan, the greater the discount rate and lower the withdrawal liability of a withdrawing employer.  Rather than discouraging employers from withdrawing as a plan's condition worsens, it would incentivize employers to abandon a plan before a mass withdrawal, at which time the withdrawal liability calculation would, by regulation, be done using the PBGC rate.  It is Hittner's theory, rather than Ruschau's application of the oft-employed PBGC rate, that is unreasonable. Further, there is no certainty that even if the Plan becomes insolvent benefits will necessarily be reduced.  Congress has stepped forward on a number of occasions to rescue the coal industry funds and it may do so again.

**Energy West Is Not Entitled to the 20 Year Cap on Payments.**  The plain language of Section 4211(d) supports the Plan's determination that it is exempt from the  year cap that applies to most other pension funds.  From the time the 1974 Plan was created and continuously since, it

has been recognized as a continuation of the 1950 W&R Fund, which unquestionably satisfied all the criteria for coverage by Section 404(c).  The continuation status has always been identified in the applicable NBCWAs and the Plan documents.  It was verified by the IRS in 1974 and 1975, and has never been questioned since.  Various federal district court decisions have stated that the 1974 Plan is a continuation of a Section 404(c) plan and Congress reaffirmed this when it enacted the Coal Act in 1992 and the Pension Protection Act in 2006.  All of this recognition of the 1974 Plan as a continuation is based on the reality that the 1974 Plan continued the benefits provided by the 1950 Fund.  Energy West has advanced no support for its theory that the IRS, federal courts, and Congress all got it wrong.

Energy West wrongly claims that the exemptions under Section 404(c) lapsed once the 1974 Plan was approved as a Section 401(a)  and 501(a) plan.  First, Section 4211(d) coverage is not tied to whether or not a plan is tax-qualified. Second, Energy West's convoluted construction of Section 404(c) misstates the purpose of the limiting language regarding the treatment of amounts contributed to a trust.  The language does not say Section 404(c) is nullified once a plan becomes tax qualified. It is noteworthy that the 1950 Plan also got approval under Sections 401(a) and 501(a), yet there is no contention that the 1950 Plan was not a continuation of the 1950 W&R Fund.

Energy West advances the unsupported contention that the continuation language in Section 4211(d) was only intended to cover the 1950 Pension Plan.  When it enacted MPPAA, Congress included a special funding provision in Section 4243 that applied only to the 1950 Pension Plan.  This shows that when Congress intended to adopt language only applicable to the 1950 Plan, it was able to do so.  That it did not explicitly restrict Section 4211(d) to the 1950 Plan, but used the broader continuation language, proves Congress did not intend to exclude the

1974 Plan from the coverage of that provision.  Legislative history shows Congress was apprised of and concerned with the financial straits of both the 1950 and 1974 Plans.

In the absence of favorable facts or law, Energy West argues that the equities favor it getting the benefit of the 20 year cap.  Its assertion that given the scale of the Plan's financial deficit, relieving Energy West of the obligation to make full payment of its withdrawal liability will not harm the Plan is fallacious.  While equities are not a relevant factor under MPPAA, if they were, the Plan is a much more worthy recipient of the payments than Energy West, whose corporate parent is Berkshire Hathaway Energy Co., a multi-billion dollar holding company that is owned by the $700 billion Berkshire Hathaway conglomerate.


### ENERGY WEST POSITION IN SUPPLEMENTAL BRIEF[14]

Although not binding authority, the decision of the district court in *New York Times* carries great weight because the opinion is based on the Supreme Court precedent of *Concrete Pipe.*  The fund in *New York Times* made the same arguments in support of its actuary's use of the Segal Blend as Ruschau advanced for using the PBGC rates when calculating Energy West's withdrawal liability.  Judge Sweet rejected the argument that the Plan's past use of the PBGC rate, and the use of that rate by other pension plans, establishes the reasonableness of that rate. The judge also dismissed the assertion that the choice of other than the funding rate can be justified by the fixed nature of withdrawal liability assessments and the need to protect the fund from downside risks.  Rather, he found the actuary must pick a rate based on his or her best estimate of anticipated experience of the plan and reasonable expectations.  Given that Ruschau acknowledged he did not consider the Plan's past and anticipated experience, and made no

---

[14]   In their Supplemental Briefs, the parties reiterated many of the arguments they advanced in its earlier briefs. Those arguments will not be repeated in this section.

independent verification of the PBGC rates, applying the holding of the *New York Times* decision to this case requires a finding that Ruschau's selection of the PBGC rates for withdrawal liability purposes was unreasonable. The Segal Blend used in the *New York Times* case was 6.5%, a mere 1% below the funding rate. The lack of a justification for deviating from the 7.5% funding rate was even more profound in this case, where the PBGC rate was 5% lower, and therefore dramatically and unfairly inflated Energy West's withdrawal liability.

## PLAN POSITION IN SUPPLEMENTAL BRIEF

The *New York Times* decision is of no precedential value because the judge failed to follow the standard of review and burden of proof set forth in Section 4221(A). He required the fund in that case to prove actuarial assumptions were reasonable, rather than requiring the employer to prove by a preponderance of evidence that the assumptions were unreasonable in the aggregate. While Sweet based his decision on what he said was a paucity of analysis by the Arbitrator, in this case there is abundant evidence that supports the conclusion that Ruschau had a reasonable basis for his selection of the PBGC risk-free rate for calculating Energy West's withdrawal liability. Unlike with the fund in the *New York Times* case, which was in the green zone, the Plan is in critical and declining status, and is projected to become insolvent in 2022. That means it will not have assets to invest long term, it will be unable to recover if investment returns are lower than projected, and a conservative discount rate is therefore even more appropriate than in the *New York Times* situation. Further, unlike in the *New York Times* case, Energy West's claim is based on the Hittner theory, which is illogical and has no support in the actuarial community. Of even greater significance is the fact that Hittner himself acknowledged the assessment of withdrawal liability against Energy West was a settlement, that ASOP No. 27

envisions the use of annuity rates in cases of settlement, that the PBGC rates are a fair proxy for annuity rates, and that the use of the PBGC rates by Ruschau was not unreasonable. Ruschau testified that these rates were his best estimate of anticipated experience of the 1974 Plan. With Hittner's admissions, these facts distinguish this arbitration from the *New York Times*. Finally, Sweet's rejection of the entire rationale for a risk-free rate with the observation that the employer would not share in the benefits of possible investment over-performance was a *non sequitir.*

**OPINION**

**Burden of Proof.** As was detailed above, the post-hearing phase of this arbitration was protracted because of the late-breaking issuance of the *New York Times* district court decision, the first decision from an arbitrator or judge to rule against the use of the Segal Blend. What is remarkable is that in the thirty-eight years since the passage of MPPAA, and the many thousands of withdrawal liability calculations and assessments in which actuaries used a discount rate lower than the funding rate of the relevant plan, there have been so few challenges. This has been true despite the language in *Concrete Pipe* cited by Energy West regarding the potential susceptibility to attack of an assessment where the funding and withdrawal liability discount rates are different. Likely this has been because of the very substantial burden of proof imposed on employers seeking to overturn a withdrawal liability assessment by Section 4221. The lack of federal court litigation may also be attributable to the deference given to actuaries as a profession, and the recognition that reasonable actuaries may differ on approach and result. The Supreme Court emphasized this in *Concrete Pipe:*

> . . . Section 1401(a)(3)(B) speaks instead of the aggregate reasonableness of the assumptions and methods employed by the actuary in calculating the dollar liability figure. Because a "method" is not "accurate" or probably "true" within some range, "reasonable" must be understood here to refer to some different

> kind of judgment, one that it would make sense to apply to a review of methodology as well as of assumptions. Since the methodology is a subject of technical judgment within a recognized professional discipline, it would make sense to judge the reasonableness of a method by reference to what the actuarial profession considers to be within the scope of professional acceptability in making an unfunded liability calculation. Accordingly, an employer's burden to overcome the presumption in question (by proof by a preponderance that the actuarial assumptions and methods were in the aggregate unreasonable) is simply a burden to show that the combination of methods and assumptions employed in the calculation would not have been acceptable to a reasonable actuary. In practical terms it is a burden to show something about standard actuarial practice, not about the accuracy of a predictive calculation, even though consonance with professional standards in making the calculation might justify confidence that its results are sound. at 634

Energy West does not dispute the applicable burden of proof. The statutory burden is being stressed at the outset of this opinion, however, because it is a fundamental part of a MPPAA arbitration, and it is highly relevant when reviewing the significance of the *New York Times* arbitration and district court decisions, and in deciding this case.

**The *New York Times* and the *Manhattan Ford Lincoln* Decisions.** Besides the fairly unusual circumstance of an arbitration pending while relevant, although not technically precedential, caselaw is being issued, there is the unique coincidence that I was also the arbitrator in the *New York Times* matter. I recognize my special responsibility not to react defensively to Judge Sweet's opinion overturning my ruling regarding the use of the Segal Blend, but to focus on an objective legal analysis.

For most of the reasons elucidated in the Plan's Supplemental Brief, I find the Sweet decision to be unpersuasive. In the arbitration in that case, the employer's expert, Darren French, declined to opine on whether the discount rate that resulted from the application of the Segal

Blend was itself unreasonable, or whether it rendered the actuarial assumptions in the aggregate unreasonable.  It was his position that any withdrawal liability interest rate that differed from the funding rate was per se unreasonable.  Finding what was essentially a legal conclusion of French unsupported by existing caselaw, noting that the Segal Blend had been utilized by numerous reputable actuaries for decades, mindful of the statutory burden of proof, and crediting the expert testimony of Kra that utilizing  an even more conservative risk-free rate as part of the calculation of withdrawal liability would be a reasonable exercise of actuarial discretion, I found that the employer had not met its burden of proving the actuarial assumptions were unreasonable in the aggregate. Contrary to Sweet's assertion, there was not a paucity of analysis, but rather an adherence to the statutory dictates.  In contrast, Sweet's simplistic dismissal of the theory behind the utilization of a risk-free rate, which is consistent with ASOP No. 27, represented the judge making a decision based on what made sense to him, rather than whether it was  "within the scope of professional acceptability," the applicable standard articulated by the Supreme Court in *Concrete Pipe.*

Subsequent to the filing of the Supplemental Briefs, Judge Kevin McNulty issued his opinion in *Manhattan Ford Lincoln, Inc. v. UAW Local 259 Pension Fund*, Civ. No. 17-5076 (July, 2018).  In contrast to the 1974 Plan, the pension fund in that case was fully funded. Using a 7.5% funding discount rate, the current market value of the fund's assets, plus future investment earnings and contribution income, were projected to exceed benefit payments and administrative expenses.  If the actuary used 7.5% as the discount rate, the employer would have had no withdrawal  liability.  The Segal actuary, Diane Gleave, instead used the Segal Blend[15] for the

---

[15]  The court noted that the actuary used the PBGC rates as part of the Segal Blend, although the decision does not identify the precise numbers used.  It only states the Segal Blend is the equivalent of an effective discount rate that falls somewhere between the PBGC rates and the funding rate.

withdrawal liability calculation, which produced a lower discount rate and a withdrawal liability assessment of $2.55 million.[16]  The employer filed for arbitration and presented Darren French as its expert witness, who put forth the same doctrinaire argument that he had expressed in the *New York Times* arbitration.  The arbitrator rejected French's theory and found that actuaries were not required to use the same rate for funding and withdrawal liability purposes.  He next found that the employer had not sustained its burden of proving the use of the Segal Blend rendered the actuarial assumptions unreasonable in the aggregate.

McNulty first articulated the Section 4221 presumption of correctness of a plan's determination of UVBs and the burden on an employer to establish, by a preponderance of the evidence, that the actuarial assumptions were unreasonable in the aggregate, taking into account the experience of the plan and reasonable expectations.  He noted that in reviewing an arbitration award, a court must apply a "clearly erroneous standard" to findings of facts, but will consider issues of law *de novo.*  The judge then set forth a detailed explication of the statutory rationale behind the assessment of withdrawal liability under MPPAA, including the central role of the discount rate.  McNulty first ruled that the use of disparate interest rates is not precluded as a matter of statutory law.  Because Energy West has at no point made such a contention, and its expert explicitly rejected such a notion, McNulty's analysis of the statutes and caselaw, including *Concrete Pipe,* will not be spelled out.  Because it  gives insight into his ruling regarding the use of a lower interest rate for withdrawal liability purposes, however, and because he addresses the purpose of ERISA, the following quotation is instructive:

> I consider also that funding and withdrawal invoke some disparate
> concerns, which I discuss further in section IV.B.2, infra. Funding
> is an ongoing process, subject to adjustment for an employer that is

---

[16]  Using the funding interest rate, the actuarial value of vested benefits was $78.7 million and of assets was $87.9 million.  Using the Segal Blend, the present value of vested plan benefits was $117.8 million and the market value of current assets was $86.1 million.  The latter calculation resulted in a UVB total of $31.7 million, of which $2.55 million was allocated to Manhattan Lincoln Ford.

remaining in the plan. The Plan's needs and actuarial projections are reassessed annually, and a participating employer may be required to make additional contributions to make up for any shortfall. Withdrawal liability, however, is calculated once, as of the time of withdrawal. Should the unexpected occur after that employer's departure, the burden may unfairly fall on other plan employers (or ultimately the taxpayer, through PBGC). As discussed in more detail below, a responsible actuary might therefore opt to calculate that withdrawal liability on a more risk-averse or conservative basis. And it must always be remembered, of course, that ERISA is a remedial statute, which must be liberally construed to ensure that workers who were promised pension benefits will actually receive them. at 37

Turning to the reasonableness of the actuary's use of the Segal Blend, the judge discussed caselaw interpreting the phrase "best estimate of anticipated experience under the plan."  He opined:

The "best estimate" provision, then, does not embody a substantive standard so much as it commits the issue to the judgment of the actuary. The Arbitrator thus proceeded correctly in his deferential analysis of the question of whether the actuarial assumptions chosen were reasonable in the aggregate. And I think that the deference owed to the actuary extends to an actuary's determination, in a particular case, that a lower rate may be required at the withdrawal stage than is required at the funding stage. at 42

McNulty then cited the paragraphs from *Concrete Pipe* in which the Supreme Court wrote that an employer has the burden of showing the actuary "based a calculation on a combination of methods and assumptions that falls outside the range of reasonable actuarial practice." [at 635 in *Concrete Pipe*, at 43 in *Manhattan Ford Lincoln*]

McNulty next discussed the testimony of Gleave, the fund's expert witness Thomas Levy, and French.  He provided a fulsome description of the assessment of withdrawal liability as a settlement with that employer, the transfer of risk to the remaining employers in the plan, and the use of the Segal Blend as a "risk-adjusted" method.  McNulty rejected the employer's argument

that the risk-transfer theory is invalid because it bears the symmetrical risk the fund might over-perform and it would not benefit, the analysis Judge Sweet found so persuasive in *New York Times*.[17]  He wrote:

> .  .  . ERISA, a remedial, pro-employee statute, may properly be regarded as *not* considering those risks to be equivalent; an actuary, and arbitrator, or a court might permissibly err on the side  of safety for the plan participants.
>
> At any rate, the Arbitrator could properly rely on the testimony regarding the withdrawn employer's transfer of its risk in a one-time settlement transaction. Viewed in light of the remedial purposes of ERISA, the symmetry is a false one; post-withdrawal, the Pension Fund remains responsible to pay benefits to the withdrawing employer's employees, but the withdrawing employer does not. The Fund must guard against the risk of capital loss, or at least of falling short of a 7.5% return, without the backstop of possible additional contributions from the withdrawing employer. The Fund could offload some or all of that risk—for example by purchasing an annuity or investing in safe corporate or treasury bonds. (This may be referred to as a "risk-free" option, though the risk is not really zero.) That, however, would have a cost, and that hypothetical cost is a proxy for the dollar value of the risk that the Fund is taking on. The risk-free PBGC rate and the "settlement" theory espoused by the actuary here reflect that cost and that dollar value.
>
> The risk-transfer and settlement models of withdrawal liability recognize a more complicated reality than the one embodied in minimum funding levels. The Arbitrator did not have to accept those alternative models, and a different arbitrator could have decided the case differently. This Arbitrator, however, did not clearly err in accepting the risk-transfer theory and settlement-based concept behind the Segal Blend. The testimony of Ms. Gleave and Mr. Levy, their depositions, and Lew's Report, if accepted by the Arbitrator (as they were), provided a sufficient basis for the Arbitrator to find that there was a good faith application of reasonable actuarial assumptions and practices. at 52,53.

For the same reasons the district court opinion in *New York Times* is not binding in this

---

[17] McNulty cited Sweet's ruling only for his finding that MPPAA does not compel the use of the same rate for funding and withdrawal liability purposes.

arbitration, the *Manhattan Ford Lincoln* opinion is also not binding precedent.  That being said, I find Judge McNulty's analysis regarding the purpose of MPPAA, the burden of proof imposed on employers, the range of professional discretion afforded actuaries under the statute and caselaw, the view of the assessment of withdrawal liability as a settlement of the employer's pension obligations, the asymmetry of the risk created by that withdrawal, and the imposition of the premium for that risk on the withdrawing employer to be persuasive.  I affirmatively adopt his reasoning as part of this opinion and award.  That being said, his ruling is not dispositive of all the issues in this arbitration because *Manhattan Ford Lincoln* is not on all fours with the facts regarding Energy West and the 1974 Plan.  In particular, *Manhattan Ford Lincoln* involved a fully funded plan, rather than one facing insolvency in three years; and in *Manhattan Ford Lincoln* the actuary used the Segal Blend to calculate withdrawal liability, in contrast to Ruschau's utilization of the PBGC[18] rates.

**Energy West Is Bound By the Record Evidence.**  While the relevant case law kept evolving while this arbitration was pending, the evidentiary record remained fixed.  Most significantly, the expert testimony proffered by Energy West – the report and testimony of Hittner – could not be altered after the issuance of Judge Sweet's opinion in *New York Times*.  Hittner's admissions are dispositive. They establish that Energy West failed to sustain its burden of proving that the actuarial assumptions employed by Ruschau were unreasonable in the aggregate, in light of the Plan's experience and reasonable expectations.

While Hittner opined that it would have been more appropriate for Ruschau to increase the discount rate used to compute withdrawal liability to account for the impending insolvency of

---

[18]  While the precise rate produced by the Segal Blend in *Manhattan Ford Lincoln* was not stated, it is noteworthy that since that method applies the PBGC rate to the portion of a fund's vested benefits covered by available assets, and the fund in that case was actually over-funded at the time the withdrawal liability calculation was made, it appears that the blended rate would have been heavily weighted towards the PBGC rate.

the Plan, he acknowledged in sworn testimony that the assessment of withdrawal liability is a settlement of an employer's pension obligations.  He said it was proper for an actuary to select different interests rates, depending on the particular purpose.  He stated that it was not inappropriate for Ruschau to have followed the guidance of ASOP No. 27 Section 3.9(b), which states that an actuary may use a discount rate implicit in annuity prices when measuring the present value of benefits for defeasance or settlement purposes.  Hittner also confirmed that the PBGC rates are a reasonable proxy for annuity prices, and he never suggested Ruschau had misstated what the PBGC rates were at the time of Energy West's withdrawal liability calculation.  Finally, while still insisting that a market consistent measure would have been the more appropriate rate, Hittner ultimately conceded that "*It was not unreasonable for the actuary to follow the [ASOP No. 27] guidance. . .*"  Given the statutory burden of proof, this conclusion by Energy West's own expert is fatal to its claim.

### Ruschau's Use of the PBGC Rates Was Reasonable, Hittner's Theory Was Not.

While Hittner's testimony should end the inquiry, having been chastened in Sweet's decision for a paucity of analysis, I will proceed to discuss why Ruschau's calculation would be acceptable to a reasonable actuary and Hittner's might not be.  Again, one starting point is McNulty's discussion of the appropriateness of using different interest rates for funding and withdrawal liability  purposes; a withdrawal liability assessment as a settlement of the employer's obligations; and the correctness of protecting a plan, the other employers, the participants, and the PBGC from the risk of under-performance of investments.  To be explicit, I find the use of a risk-free interest rate to be a reasonable exercise of actuarial discretion.  The other irrefutable starting point is ASOP No. 27 Section 3.9(b).  While actuaries may have differing approaches and opinions – a few may use the same rate for funding and withdrawal liability purposes, many

may feel a blended rate is more appropriate, and a substantial number may employ the PBGC

rates as a proxy for annuity prices – almost by definition an actuary who applies the guidance of

the actuarial standards of practice is using a combination of methods and assumptions that would

be acceptable to a reasonable actuary.  That Ruschau opted for a risk-free rate, rather than the risk-

adjusted rate produced by the Segal Blend, does not change this conclusion.  Kra, a nationally

recognized expert regarding withdrawal liability, persuasively explained why a risk-free rate is

even more theoretically sound than the Segal Blend, and he noted it is used by numerous

actuaries, including for large funds that are in critical and declining status and facing insolvency.

Energy West and Hittner did cite to other sections of various ASOPs that arguably

supported the assertion that plan investment experience and the future expectations should have

an impact on the discount rate selected for withdrawal liability calculations.  Read as a consistent

whole, however, the ASOPs effectively provide that in cases of settlement, plan experience and

reasonable expectations allow for the use of the PBGC rate.  This interpretation is consistent with

the fact that in cases of mass withdrawal from a plan, the PBGC calculates withdrawal liability

using the PBGC rates, not some rate adjusted to account for future benefit reductions or past

investment experience.  If it is not unreasonable for the PBGC to use its rates in computing

withdrawal liability in an analogous situation, it cannot be said it was unreasonable for Ruschau

to have used the PBGC rates when computing Energy West's withdrawal from a fund facing

insolvency.  It must therefore be concluded Ruschau met the statutory standard of

reasonableness.

It is undisputed that the 1974 Plan is in critical and declining status and is projected to

become insolvent if there is no governmental intervention.  In such an eventuality, benefits will

have to be reduced, likely to the PBGC minimum levels.  Nothing in ERISA, however, dictates

that an actuary must adjust the discount rate for the possibility that all vested benefits will not be paid in the future. To the contrary, Section 4001(a)(8) explicitly defines nonforfeitable benefits, one of two elements in the calculation of UVBs, to include all vested benefits "whether or not the benefit may subsequently be reduced or suspended." Hittner did not dispute the directive of this definition, but claimed it was proper to effectively disregard the directive by adjusting the discount rate to account for possible benefit reductions. He could not cite to any section of ERISA or PBGC regulations that countenance such action. Whether or not Section 305(g)(1) technically applies to the 1974 Plan at this point, as Energy West argues, need not be decided at this time. It is instructive, however, that the section states that when determining the withdrawal liability of an employer who leaves a plan in critical and declining status, any benefit reductions or suspensions that occurred in the past ten years should be disregarded. Between the instruction to include possible future benefit reductions or suspensions in calculating nonforfeitable benefits, and to disregard past benefit reductions and suspensions when computing withdrawal liability in the case of an endangered plan, it is impossible to discern some unstated endorsement of a discount rate adjustment based on anticipatory benefit reductions.

Further, there is no certainty that the 1974 Plan will become insolvent and benefits will be reduced. Earlier this year Congress passed the Bipartisan Budget Act of 2018, which provided for the creation of the Joint Select Committee on the Solvency of Multiemployer Pension Plans. The stated purpose of the committee is to produce a bill before the end of calendar 2018 to solve the pension crisis that jeopardizes numerous plans across the country, the PBGC, and untold thousands of participants and employers. Whether the committee will be successful is unknown at this time, but allowing Energy West to permanently avoid a portion of its withdrawal liability, based benefit reductions that might never occur, would be improper.

As acknowledged by Hittner, his theory has never been employed by any fund, and obviously has therefore never been upheld by any arbitrator or court. It has never been presented to and debated by any of the professional actuary organizations. Whether it would satisfy the standard for acceptability articulated in *Concrete Pipe* need not be decided in this arbitration. The fact is Ruschau cannot be faulted for not adopting a novel and unprecedented approach. Besides not being compelled by statute, Hittner's theory is of questionable logic and would produce results directly contrary to the underlying purpose of MPPAA. Under Hittner's theory, the closer a fund got to insolvency, the less an employer's withdrawal liability would be, since the adjusted discount rate would keep rising. It would create a major incentive for employers to abandon a fund in financial trouble, before there was a mass withdrawal and the PBGC imposed withdrawal liability calculated using the PBGC rates. Rather than protecting the viability of plans and the vested benefits of participants, it would shift the funding burden onto the remaining employers, the PBGC, and ultimately the taxpayers.

Lastly, the notion that Ruschau should have increased the discount rate based on past investment results ignores the reality that the 1974 Plan will not likely be able to achieve the long term investment gains of the past. Because it is approaching insolvency, the assets of the Plan will have to be liquidated going forward to pay vested benefits. The same corpus of assets as existed in the past will not be available for investment purposes and the Plan will certainly not be able to take the increased risks associated with investments with higher returns. These considerations represented "the experience of the plan and reasonable expectations" that Ruschau properly took into account when he selected the risk-free PBGC rates for withdrawal liability calculations.

**No Evidence of Impropriety.** The thrust of the *Concrete Pipe* decision is that actuaries

are independent professionals and their good faith exercise of judgment must be given deference. There have been cases, cited by Energy West, where the discount rate ultimately employed by a fund was not the actuary's best estimate of the appropriate rate. There was no evidence to support a claim that Ruschau was improperly influenced by the trustees of the Plan to use the PBGC rate, nor that he selected this rate for the purpose of disadvantaging Energy West. The PBGC rate had been used by the Plan's Mercer actuary for years before Ruschau took over as the Plan actuary. That a Mercer actuary in 2004 elected to use the PBGC rate plus 1% is of no consequence, nor is the fact that Ruschau selected the funding rate as the withdrawal liability rate in construction plans, from which there are no statutory withdrawals. Times change and different plans face unique circumstances. Further, as noted by McNulty in *Manhattan Ford Lincoln*, the fact that the actuary had employed a consistent approach for years in the 1974 Plan meant this employer had benefited from the withdrawal liability payments of previously withdrawn employers that were calculated using the same rate it was now challenging. Finally, Ruschau did not mechanically carry over an identical rate from a prior year, without analysis. He did follow a consistent methodology, using the then current PBGC rates. Those rates float depending on then extant market conditions, so the rates he employed were appropriate and corresponded to the point in time he computed Energy West's withdrawal liability. That he did not independently verify the correctness of the PBGC rates is of no consequence. Reasonable actuaries accept the PBGC rates as a proxy for annuity prices, a reality confirmed by Hittner.

   **The 1974 Plan Is Covered by Section 404(c).** Energy West concedes that no IRS determination, arbitration, or court decision supports a contention that either Section 404(c) was never intended to apply to the 1974 Pension Plan, or that the coverage lapsed once this plan qualified under Section 401(a). Much of its argument is based on the sentence in the 1974 House

54

Ways and Means Committee Report on the House bill that "404(c) is not to apply to the pension plan once it becomes a qualified plan . . ." In 1980, Congress enacted Section 4211(d)(1) and (2) as part of MPPAA which created certain exemptions when computing an employer's allocated share of UVBs for "a plan to which Section 404(c) of Title 26, or a continuation of such a plan, applies." By this time, both the 1950 Pension Plan and the 1974 Pension Plan had become qualified plans under Section 401(a). If it had been Congress's intent that the Section 404(c) coverage would end once a plan became qualified under Section 401(a), it makes no sense that Congress would have used the "continuation of such a plan" language. There were no other plans that could possibly have been characterized as continuations of a plan to which Section 404(c) applied.

If there were any doubt about the intent of Congress when it enacted Sections 4211(d)(1) and (2), that doubt should have been dispelled in 1992 when the Coal Act was passed. Despite the multiple letters from the IRS certifying the 1974 Pension Plan's qualification under Section 401(a), Congress expressly defined the 1974 Pension Plan as one "described in section 404(c) (or a continuation thereof)." While it is correct that the Coal Act related to the provision of health benefits to retired miners and their dependents, rather than pension benefits, the Act sets forth separate and distinct definitions of the various pension and benefit plans. It must therefore be assumed Congress was cognizant of the difference between the pension plans and the benefit plans, and it fully intended its description of the 1974 Pension Plan to accurately state its legal status. Where Congress clearly articulated in 1992 that the 1974 Pension Plan was covered by Section 404(c), and in the absence of a contrary ruling by the IRS or an appellate court in the appropriate circuit, the applicability of Sections 4211(d)(1) and (2) must be accepted. Hence, withdrawal liability assessments by the 1974 Pension Plan are not subject to the 20 year cap in

Section 4211(c)(1)(B).

Energy West's alternative argument that even if the Plan is a continuation of the 1950 W&R Fund it is not entitled to invoke the Section 4211 exemptions is unavailing.  An arbitrator is not empowered to disregard express statutory language on the basis that the factual underpinnings of that language may no longer be valid.  Nor is it the place of an arbitrator to balance equitable arguments about whether Energy West and its corporate parents are more worthy possessors of many millions of dollars than the financially imperiled 1974 Pension Plan. Energy West may be right that the full imposition of the assessed withdrawal liability, without the limitation of the 20 year cap, will not help the Plan survive, but that is irrelevant here.  An arbitrator's jurisdiction is only to apply the statutes as they currently exist, not to judge their wisdom or efficacy.

**AWARD**

1.  The actuarial assumptions used by the UMWA 1974 Pension Plan to calculate Energy West's withdrawal liability were not unreasonable in the aggregate for a withdrawal that occurred between July 1, 2015 and June 30, 2016.

2. The UMWA 1974 Pension Plan is exempt from the 20-year cap on withdrawal liability installment payments set forth in Section 4219(c)(1)(B) of ERISA.

3.  The parties are to equally split the arbitrator's fees and administrative costs of the American Arbitration Association, and shall each bear the costs of their own attorneys.

Mark L. Irvings

Arbitrator

August 7, 2018



# Transcript of Arbitration - Day 1

**Date:** December 12, 2017
**Case:** Energy West Mining Company -v- UMWA 1974 Pension Plan

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

```
1              AMERICAN ARBITRATION ASSOCIATION

2      - - - - - - - - - - - - - -x

3   ENERGY WEST MINING        :

4   CORPORATION               :

5        and                  :   Case No. 01:17-0001-2578

6   UNITED MINE WORKERS OF   :

7   AMERICA 1974 PENSION     :

8   PLAN AND TRUST.          :

9      - - - - - - - - - - - - - -x

10

11                  ARBITRATION DAY 1

12                  Washington, D.C.

13            Tuesday, December 12, 2017

14                  10:05 a.m.

15

16

17

18

19

20    Job No.: 170175

21    Pages: 1 - 172

22    Reported By: Victoria Lynn Wilson, RMR, CRR
```

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    2

1          ARBITRATION DAY 1, held at the offices of:

2

3

4          VENABLE LLP

5          600 Massachusetts Avenue, NW

6          Washington, DC 20001

7          (202) 344-4000

8

9

10

11

12       Pursuant to agreement, before Victoria Lynn

13    Wilson, Registered Merit Reporter, Certified

14    Realtime Reporter, Notary Public in and for the

15    District of Columbia.

16

17

18

19

20

21

22

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                                3

```
1                 A P P E A R A N C E S

2      THE ARBITRATOR:

3           MARK L. IRVINGS, ESQUIRE

4           24 Elba Street

5           Brookline, MA 02446

6           (617) 734-3278

7

8       ON BEHALF OF ENERGY WEST MINING CORPORATION:

9         GREGORY OSSI, ESQUIRE

10         CHRISTOPHER R. WILLIAMS, ESQUIRE

11         VENABLE LLP

12         8010 Towers Crescent Drive

13         Suite 300

14         Tysons Corner, VA 22182

15         (703) 760-1600

16

17

18

19

20

21

22
```

```
 1   A P P E A R A N C E S   C O N T I N U E D

 2   ON BEHALF OF UNITED MINE WORKERS OF AMERICA
     PENSION PLAN AND TRUST:
 3     STANLEY F. LECHNER, ESQUIRE

 4     STEVE SPENCER, ESQUIRE

 5      CHARLES P. GROPPE, ESQUIRE

 6      MORGAN, LEWIS & BOCKIUS LLP

 7      1111 Pennsylvania Avenue, NW

 8      Washington, DC 20004

 9      (202) 739-5079

10

11    JOHN R. MOONEY, ESQUIRE

12      OLGA THALL, ESQUIRE

13      MOONEY, GREEN, SAINDON,

14         MURPHY & WELCH, PC

15      1920 L Street, NW

16      Suite 400

17      Washington, DC 20036

18      (202) 783-0010

19

20      GLENDA FINCH, ESQUIRE

21      UMWA FUNDS, HEALTH AND RETIREMENT

22
```

Transcript of Arbitration - Day 1
Conducted on December 12, 2017          5

```
1   A P P E A R A N C E S   C O N T I N U E D

2   ALSO PRESENT:

3       PAUL B. PRIEST

4       SCOTT A. HITTNER

5       ETHAN E. KRA

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22
```

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    6

```
1                    C O N T E N T S

2    WITNESS              DIRECT    CROSS      RED.    REC.

3    SCOTT A.  HITTNER      35        89       159    167

4                    E X H I B I T S

5    EXHIBIT                   FOR ID.   PAGE ADMITTED

6    Joint Exhibits 1 through 15                      7

7

8    Reference Exhibit 26          166

9

10   Pension Plan No. 7                  133

11   Pension Plan No. 8            141

12

13

14

15

16

17

18

19

20

21

22
```

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    7

1              P R O C E E D I N G S

2         THE ARBITRATOR:  Good morning.  Thank you

3    all for being here.  We're here in the Energy West

4    Mining Corporation and the United Mine Workers of

5    America Health and Retirement Funds.

6         I am Mark Irvings.  The parties have given

7    me a book of Joint Exhibits 1 through 15.

8         I can give you the index of it so you'll

9    have that.

10         And those are admitted into evidence.

11         (Joint Exhibits 1 through 15 were admitted

12    into evidence.)

13         THE ARBITRATOR:  Okay.  Were there any

14    preliminary matters we had to deal with before we

15    started opening statements?

16         MR. MOONEY:  Well, I think we also

17    provided to you a binder that has legal reference

18    materials, so, for your convenience because there

19    will be references to various things and hopefully

20    you have that, as well.

21         THE ARBITRATOR:  I do have that.

22         MR. MOONEY:  As for preliminary matters,

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    8

1   we had objected to the supplemental report by

2   Mr. Hittner.  I don't know when you want to take

3   that up.  I mention it now so that we don't

4   necessarily have to interrupt Mr. Hittner's

5   testimony but that's one issue.

6           And, also, as you will see on Joint

7   Exhibit 1, the first stipulations in paragraph A

8   are the issues presented.  And we agree that those

9   issues are properly before you.

10          Yesterday we had a discussion with counsel

11  for Energy West about a supplemental issue, and I

12  don't know if you still intend to pursue that or

13  not.  If you do, I think we ought to raise it with

14  the arbitrator now.

15          MR. OSSI:  Yes.

16          MR. MOONEY:  If not, we can just get on.

17          MR. OSSI:  Right.  I think we should raise

18  that with the arbitrator now.

19          So, I know -- which order would you like

20  to proceed first?

21          THE ARBITRATOR:  Why don't you do the

22  supplemental issue first.

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                        9

1          MR. OSSI:  Sure.  So, the supplemental

2     issue is what -- you know, we think another issue

3     in this case is what, if any, interest rate does

4     ERISA require or range of rates does ERISA

5     require.  If under 4219(c)(4), and that's the

6     provision of ERISA that provides for payments of

7     withdrawal liability to a multi-employer plan

8     in -- and in (c)(4), it -- the statute allows for

9     an employer to prepay its withdrawal liability

10    without penalty.

11          And in the various expert reports,

12    especially Mr. Hittner's report, as well as

13    Mr. Kra's report, there were some suggestion,

14    especially in Mr. Kra's report, that

15    this prepayment which was addressed should be done

16    at the PBGC rate, in other words, that the

17    discount rate used to value this withdrawal

18    liability stream of payments to be done at the

19    PBGC rate.

20          We are challenging that assumption.  And,

21    so, we think that that is an issue that is in

22    dispute in terms of what -- so, you know, the

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                              10

1    other two issues are in dispute.  We're also

2    concerned that if we don't address it now, that we

3    would lose the opportunity to address it.  Because

4    of the way that the rules work for ERISA, you have

5    to -- you know, you have to challenge and

6    arbitrate the issues.  You don't get -- basically,

7    you don't get a second chance.

8          If you tell us that the issue is not

9    moot -- or is, rather, is not ripe, then we can

10   understand that and we can just preserve that

11   issue for another time.  But we think that,

12   otherwise, we would like the arbitrator to take a

13   look at that and decide whether or not the

14   arbitrator should rule on that issue and whether

15   ERISA does require a range of rates or rates with

16   regard to an employer's prepayment withdrawal

17   liability.

18         THE ARBITRATOR:  You want to respond to

19   that, please.

20         MR. MOONEY:  Yes.  By late Friday

21   afternoon, we had reached agreement with Energy

22   West on the stipulations that are contained in the

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                     11

1    booklet before you.  At that point, we had agreed

2    there were no further additions or revisions to

3    the stipulations.  So, we didn't learn about this

4    until yesterday afternoon when we received an

5    email from counsel for Energy West.  And they

6    informed us that they would like to raise the

7    4219(c)(4) issue.

8           And it may be helpful, Mr. Arbitrator, if

9    you take a look at tab 10 of the legal compendium

10   which has the statute.  And as you'll see, (c)(4)

11   talks about prepaying the outstanding amount.

12          THE ARBITRATOR:  Hold a sec.  Got it.

13          MR. MOONEY:  Energy West has never sought

14   to prepay the outstanding amount and has never

15   asked the 1974 Pension Plan to calculate the

16   prepayment amount.

17          Now, if you'll look at tab 11, that's

18   4221(a)(1), the statute provides that any dispute

19   between the plan sponsor and employer concerning

20   determinations shall be resolved through

21   arbitration.  And then 4221(a)(3)(A) provides that

22   any determination by the plan sponsor is presumed

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    12

1    correct unless it could be shown it's unreasonable

2    or clearly erroneous.  There has been no

3    determination by the 1974 Pension Plan regarding

4    the calculation of the prepayment amount mentioned

5    in 4219(c)(4).

6            You may also want to take a look at the

7    joint exhibit file now.  If you take a look at

8    Joint Exhibit 4, which is the October Three

9    request for review, there's no mention of

10   4219(c)(4) or a request for a number for the

11   prepayment amount.

12           If you take a look at Joint Exhibit 5,

13   which is the January 26th, 2017 response by the

14   '74 Pension Plan to the request for review,

15   there's no mention of this because no one raised

16   the issue.

17           And then, specifically, if you look at

18   Joint Exhibit 6, you will see the notice of intent

19   to arbitrate by Energy West.  Energy West is quite

20   specific as to what it's raising in its notice of

21   intent to arbitrate.

22           In the middle paragraph on page one of

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                13

1    Joint Exhibit 6, Energy West states, quote,

2    "Energy West disputes that the amount of assessed

3    withdrawal liability is correct.  Specifically,

4    the plan did not use reasonable actuarial

5    assumptions, particularly the interest rate to

6    calculate the withdrawal liability, and the plan's

7    not entitled to an exemption under the 20-year cap

8    because of 4211(d)."  We'll be talking about that

9    issue.

10          So, at this point, there's no

11   determination by the 1974 Pension Plan for you to

12   rule upon.  There's nothing for you to review.  In

13   essence, Energy West is asking you to step into

14   the shoes of the plan, and we do not believe

15   that's an appropriate role for the arbitrator in a

16   withdrawal liability proceeding.  Your role is to

17   decide issues that are challenged and have already

18   been determined by the plan.  There has been none

19   on this issue.

20          THE ARBITRATOR:  Do you want to respond?

21          MR. OSSI:  Sure.  I mean if the plan is

22   contending, which I hear, that it has not made a

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                                14

1    determination under the Title IV of ERISA with

2    regard to the interest rate, then we would agree

3    that that issue is not ripe for arbitration at

4    this time.

5              THE ARBITRATOR:  Okay.  Fine.  Thank you.

6              So, the issues before us today that have

7    been stipulated to (1) whether the actuarial

8    assumptions used by the UMWA 1974 Pension Plan to

9    calculate Energy West's withdrawal liability were

10   unreasonable in the aggregate for a withdrawal

11   that occurred between July 1, 2015 and June 30,

12   2016, and (2) whether the UMWA 1974 Pension Plan

13   is exempt from the 20-year cap on withdrawal

14   liability installment payments set forth in

15   Section 4219(c)(1)(B) of ERISA.

16             And I'll exercise editorial prerogative

17   and put question marks at the ends of both of

18   those things.

19             Okay.  Employer want to make an opening

20   statement?

21             MR. OSSI:  Yes, unless we wanted to

22   address the --

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    15

1           THE ARBITRATOR:  Ah, yes --

2           MR. OSSI:  -- the rebuttal.

3           THE ARBITRATOR:  -- the rebuttal.

4           Mr. Mooney?

5           MR. MOONEY:  After originally scheduling

6    this case with you, we had discussions about a

7    scheduling order, and we entered into that, and

8    then, subsequently, that order was extended.  That

9    schedule provided that supplemental expert reports

10   were not contemplated.  There was no contemplation

11   that there would be additional reports.

12          Pursuant to the schedule, Mr. Hittner's

13   report was submitted on September 14th of this

14   year.

15          The report by Dr. Kra, the expert witness

16   that the 1974 Pension Plan will proffer to you,

17   was submitted on October 31.

18          Dr. Kra's report from October was

19   available to Mr. Hittner, and he admitted at his

20   November 7, 2017 deposition that he had already

21   reviewed the report.  At that deposition, and we

22   have the passages available for you, he said that

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    16

1    he was criticizing Dr. Kra because it didn't

2    consider the financial status of the plan.  And we

3    have those pages available from the deposition for

4    you to review.

5         Despite having over a month, Mr. Hittner

6    didn't issue a supplemental report until last week

7    on December 5.  When we learned of this, we

8    objected.  We informed counsel for Energy West

9    that we'd object and we notified you that we

10   registered our objection to the use of that

11   supplemental report.  We view it as an improper

12   attempt to essentially get a second bite at the

13   apple.  The report had long been available to

14   Mr. Hittner and we didn't receive it until last

15   week.  So, we would object to its use in this

16   proceeding.

17        MR. OSSI:  Mr. Arbitrator, the scheduling

18   order did not contemplate the type of expert

19   reports in terms of -- we talked about having an

20   initial expert report.  We talked about

21   scheduling.  You may recall that we, as the moving

22   party in this, asked that because they -- you

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    17

1    know, it was the plan's interest rate that it

2    chose and we are contesting its interest rate,

3    that the plan go first in producing its expert

4    report.

5         Your ruling was no, that we -- that Energy

6    West was to go first, and that after that --

7    following that, the '74 Plan would have its

8    opportunity to produce its expert report.

9         In fairness, then, because the plan had an

10   opportunity to review Mr. Hittner's report and

11   produce an expert report that rebutted and

12   responded to his report, that Energy West should

13   have the same opportunity for its expert to

14   respond to the '74 Plan's expert report.

15        In that expert report of Mr. Kra for the

16   '74 Plan, he dedicates 12 paragraphs to responding

17   to Mr. Hittner's report or about 15 percent of

18   that report.

19        As part of the scheduling, counsel had

20   come to us and asked for a delay in providing

21   Mr. Kra's report because of the various holidays,

22   even though they had plenty of time and knew that

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    18

1    it was going to be due on this day of the

2    scheduling order.  We, of course, agreed as a

3    matter of courtesy.

4            Therefore, to the extent that they -- the

5    way that the arbitration has been scheduled, where

6    we are looking at depositions, reports, all in the

7    pace of about a month-and-a-half, you know, while

8    it may seem somewhat unfair to them to give a

9    report by December 5th, it wasn't -- you know,

10   it's not -- you know, it's little more than a

11   month later after Kra's report, and they have --

12   and it's not -- I don't think -- we would argue

13   it's not unduly prejudicial because we have

14   Mr. Hittner here.  They have every opportunity to

15   cross-examine him.  They've it had it for a week.

16   I count one, two, three, four, five, six lawyers

17   on their side; so, I would think they'd have

18   enough time to digest his very brief report and be

19   able to respond to it accordingly.

20           Therefore, I think, in fairness to Energy

21   West, they should have -- we should admit the

22   supplemental report as our opportunity to respond

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    19

1    to the Kra report.

2            THE ARBITRATOR:  Well, are you suggesting

3    that Mr. Hittner, in his testimony, can't respond

4    to points that Dr. Kra raised?

5            MR. MOONEY:  No, he should be able to

6    respond in his testimony.

7            THE ARBITRATOR:  Okay.  Well, they're here

8    to testify and there will be examination,

9    cross-examination, perhaps rebuttal.  So, I

10   haven't read the report but I assume all the

11   subject matter is going to be covered in exquisite

12   detail during the testimony.  So, let's just move

13   on.

14           MR. MOONEY:  Fair enough.

15           THE ARBITRATOR:  Okay.  Mr. Ossi, would

16   you like to make your opening?

17           MR. OSSI:  Yes.  Thank you,

18   Mr. Arbitrator.

19           As you read into the record, this is a

20   case that is a challenge to withdrawal liability

21   assessed against Energy West by the UMWA 1974

22   Pension Plan.  There are two issues.  Essentially,

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    20

1    one deals with the actuarial assumptions, did they

2    follow the statute, in that, were they reasonable

3    in the aggregate.  And the second issue is the

4    1974 Plan still, what we would call a 404(c) --

5    and by "404(c)," I'm referring to the IRS Code

6    Section 404(c) -- is the 1974 Plan still a 404(c)

7    plan such that Energy West is not entitled to the

8    20-year cap or -- and the special rules regarding

9    404(c) plans applicable under the assessment of

10   withdrawal liability.

11         And, so, looking at the first issue, we're

12   going to demonstrate -- I think the party -- well,

13   look, ERISA requires that actuaries use

14   assumptions that are reasonable in the aggregate,

15   taking into account plan experience and the

16   reasonable expectations of plan.

17         So, we will demonstrate that because the

18   discount rate used by the plan as an actuarial

19   assumption was unreasonable, the impact of that

20   chosen rate caused all the actuarial assumptions

21   to be unreasonable in the aggregate.  And, in

22   fact, the rote application year after year of the

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    21

1    PBGC rates to determine withdrawal liability fails

2    those ERISA requirements that are set forth in the

3    statute.

4         So, while this is partly a battle of the

5    experts, we they think that the deposition

6    testimony will also show that the 1974 Plan's

7    actuary did not follow the requirements of Section

8    4213, which sets out that an actuary needs to use

9    actuarial assumptions in determining withdrawal

10   liability that are reasonable in the aggregate,

11   but, rather, gave, frankly, little or no thought

12   to the assumptions used to determine withdrawal

13   liability.

14        So, while we have our experts here today,

15   we also have entered into the record the

16   deposition testimony of the fund's actuary, and

17   both parties agree that the witness did not need

18   to appear today.

19        That's our first issue.

20        Our second challenge to the '74 Plan is

21   should it still be considered a 404(c) plan or, if

22   not, should Energy West -- and, if not, Energy

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                                22

1    West should be entitled to the one 20-year cap on

2    payments.

3         We're going to put on evidence, not here

4    today because the experts are not going to testify

5    to the 404(c) requirements, the legal requirement,

6    but we're going to put on evidence that shows that

7    the reason 404(c) came about was that at the time

8    when ERISA was just being presented to Congress,

9    passed by Congress in 1974, and the 1950 plan,

10   which was a -- back then it was both a pension and

11   healthcare plan, had to spit apart to become both

12   a pension plan and a health plan, and it couldn't

13   maintain -- the pension plan couldn't maintain its

14   tax qualified status until it qualified under

15   Section 401 of the Internal Revenue Code, which is

16   where all other pension plans qualify as -- for

17   tax purposes, meaning that the employer gets a

18   deduction and the employee on whose behalf the

19   payments are made doesn't have to recognize it to

20   income at that time the payment is made.

21        I believe it is undisputed that both

22   parties -- that the '74 Plan now qualifies under

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    23

1    Section 401 of the code and, in fact, has received

2    multiple determinations to that effect from the

3    IRS.

4         Now, we fully realize and recognize that

5    there's been a lot of litigation and arbitration

6    off the '74 Plan.  There just hasn't been any on

7    this 404(c) issue.  In fact, a couple of triers of

8    fact have merely assumed that this plan is a

9    404(c) plan without any review of the record, of

10   the statute in question, of the reasons for the

11   statute in question, of the reasons why the plan

12   is a 404(c) plan, and we would ask you that, after

13   presenting our evidence, that you make a careful

14   review and determination of whether or not 404(c)

15   still applies.

16        And this is important because, right now,

17   if the plan were to be considered a 404(c) plan,

18   that plan and that plan alone does not have a

19   20-year cap on withdrawal liability payments.

20   That is a significant difference for Energy West.

21   The plan is charging 7-1/2 percent interest on

22   withdrawal liability.

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    24

1           By statute, ERISA has a formula set which

2     determines the payments made to the plan.  Based

3     on that payments -- and you'll see in the exhibit

4     that the payments alone are not enough to amortize

5     the interest.  So, essentially, Energy West has an

6     indefinite payment obligation to the '74 Plan if

7     the 20-year cap does not apply.

8           We don't think that was the intent of

9     Congress, to allow that to happen much later than

10    the initial creation of what was then the 1950

11    pension plan, and we intend to prove to you that

12    the plan should no longer have the ability to use

13    that special rule, which includes the 20-year cap.

14          Thank you, Mr. Arbitrator.

15          THE ARBITRATOR:  Please.

16          MR. MOONEY:  Good morning, Mr. Irvings.

17    Let me introduce you, again, on the record to all

18    of my colleagues here, since we now have the

19    filings of lawyers identified by counsel for

20    Energy West.

21          For the court reporter's benefit, to my

22    right is Mr. Stanley Lechner of the Morgan Lewis

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    25

1    firm.  To my left is Mr. Spencer of the Morgan

2    Lewis firm, Mr. Groppe of the Morgan Lewis firm

3    Dr. Ethan Kra, our expert witness, Ms. Glenda

4    Finch, who is the general counsel of the UMWA

5    Health and Retirement Funds, and Ms. Olga Thall

6    of my office.

7         After hearing Mr. Ossi's opening, I fear

8    that there are some things that we are in violent

9    agreement about.  There are only two issues before

10   you.  One is an actuarial issue.  The second is a

11   straight legal question.

12        Energy West's first contention is that the

13   assessment must be set aside because it is

14   unreasonable.  In order to prevail, however,

15   Energy West, as they've now conceded, must

16   demonstrate that the actuarial assumptions and

17   methods used in the determination were, in the

18   aggregate, unreasonable.  That's the standard

19   established by ERISA and, obviously, we have no

20   quibble with that.

21        Furthermore, it is clear that it is Energy

22   West, not the '74 Pension Plan, that bears the

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    26

1    burden on this issue.  It must establish that the

2    actuarial assumptions and methods are unreasonable

3    in the aggregate.  The language of Sections

4    4221(a)(3)(A) and (B) could not be more clear on

5    this point.

6         The determinations of a plan, including

7    the determination of the unfunded vested benefits,

8    UVBs that are we are all shorthanding, used in the

9    calculation of withdrawal liability are presumed

10   correct unless the contesting party shows by a

11   preponderance of evidence that the assumptions and

12   methods used in the determination were, in the

13   aggregate, unreasonable.

14        In this case, the one and only actuarial

15   assumption challenged by Energy West is the

16   interest rate used for discounting plans'

17   liabilities for purposes of withdrawal liability.

18        The discount rate adopted by the plan's

19   actuary was established by the Pension Benefit

20   Guarantee Corporation for valuing benefits and

21   terminating pension plans.  The PBGC bases these

22   rates on the market price for annuities.

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    27

1          As our expert, Dr. Kra, who is a prominent

2     nationally recognized pension expert with

3     extensive experience in cases involving multi-

4     employer withdrawal matters, and he testifies for

5     both employers and plans, he will testify that the

6     use of the PBGC rates was reasonable.  In fact,

7     Dr. Kra will testify that using a discount rate

8     based on annuity prices is explicitly authorized

9     for settlement or defeasance purposes in the

10     applicable actuarial standards.  You were provided

11     in advance of the hearing with Dr. Kra's report.

12          The only witness who will testify in

13     support of Energy West's challenge is Mr. Hittner,

14     a witness proffered by Energy West as an expert

15     despite his very limited experience in the

16     multi-employer pension field.  You have a copy of

17     his report, as well.

18          According to Mr. Hittner, the use of PBGC

19     interest rates is unreasonable because it does not

20     reflect the projected insolvency of the plan.  In

21     fact, he goes so far as to indicate a truthful

22     novel theory, that is that the 1974 Pension Plan

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                              28

1    should have deeply discounted its withdrawal

2    liability calculation using some sort of junk bond

3    rate based on the 1974 Pension Plan's own

4    creditworthiness.

5         In other words, it is his opinion that,

6    pursuant to the provisions of ERISA and the

7    governing actuarial standards, employers in the

8    coal industry, like Energy West, should get a

9    discount because the 1974 Pension Plan, a mature

10   plan in a troubled industry, is in financial

11   decline.

12        Under the Hittner theory, the worse off a

13   plan is financially, the lower the withdrawal

14   liability of the departing employer.

15        Not only is there no statutory, regulatory

16   or arbitral authority or support for such a novel

17   theory, it simply defies logic and common sense.

18   It also ignores the fact that there are numerous

19   legislative efforts currently pending in Congress

20   designed to address the 1974 Pension Plan's

21   financial problems.

22        Most critically, however, the fact that

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    29

1    Mr. Hittner might have used a different discount
2    rate does not in any way address the
3    reasonableness of the rate used by the plan's
4    actuary, let alone establish that the assumptions
5    used by the plan were unreasonable in the
6    aggregate.
7          In our view, the actuarial dispute is best
8    viewed as a disagreement between the two
9    witnesses.  As the law provides, the burden is on
10   Energy West to establish the unreasonableness of
11   the '74 Plan's assumptions.
12         After you hear from Mr. Hittner and
13   Dr. Kra, there will be no doubt that Energy West
14   has failed to carry its burden, and there will be
15   no doubt that the actuarial assumptions used by
16   the fund's actuary were not reasonable in the
17   aggregate.
18         Now, the second issue presents a fairly
19   idiosyncratic inquiry.  Section 4211(d) bars the
20   application of the number of statutory rules to a
21   pension plan or a continuation of a pension plan
22   described in Section 404(c) of the Internal

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    30

1    Revenue Code.  One of those provisions, as

2    Mr. Ossi mentioned, is the normal 20-year cap

3    found in 4219(c)(1)(B).

4          The 1974 Pension Plan is a continuation of

5    a plan specified in Section 404(c), and, in fact,

6    it may be the only plan within the meaning of the

7    statute.

8          You heard a little bit of the background

9    from Mr. Ossi, and we'll brief that extensively in

10   our papers, and he's correct that the original

11   Mine Workers Plan was created back in 1950 and it

12   had both pension and health benefits provided

13   directly to active and retired minors and their

14   dependents.

15         After the enactment of ERISA, that plan

16   was placed into -- the participants were placed

17   into four new plans.  There was the 1950 Benefit

18   Plan and the 1950 Pension Plan and there was the

19   1974 Pension Plan and the 1974 Benefit Plan.  So,

20   we've had -- we broke them into four buckets.

21   1976 was the demarcation line.

22         Congress has made clear that the 1950

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                                    31

1    Pension Plan and the 1974 Pension Plan fall within

2    the meaning of Section 404(c).  It's a

3    congressional directive.

4          For your information, the '50 Plan was --

5    the 1950 Pension Plan was merged or combined with

6    the 1974 Pension Plan a few years ago, so, we only

7    have one plan now.

8          We want to -- don't want to spend too much

9    time on this so we can get to the testimony, but

10   we want you to know a few important points on the

11   404(c) issue.

12         First, the language of the statute and its

13   specific history support and demonstrate our

14   position.  The statute provides that a plan within

15   the meaning of 404(c) is a plan established prior

16   to 1954, as a result of an agreement between a

17   union and the United States Government, during a

18   period of government operation, after the

19   government had seized the production facilities of

20   the affected industry.  Not surprisingly, that

21   definition uniquely fits the original '50 Plan

22   and, by extension, the 1974 Plan.

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                                    32

1          Second, Congress has repeatedly noted that

2     Section 404(c) covers the 1974 Pension Plan.

3     These references have appeared in numerous

4     statutory enactments, committee reports and so

5     forth, including a statute that was passed just

6     this year.

7          Although we believe there are numerous

8     references, and we'll bring them to your attention

9     in our post-hearing submission, we want to note

10    one statute in particular, The Cole Industry

11    Retiree Health Benefit Act, which in our world is

12    commonly known as "The Coal Act."

13         Section 9701(a) of The Coal Act, by the

14    way, which is part of the Internal Revenue Code,

15    specifically identifies the 1974 Pension Plan, as

16    well as the '50 Pension Plan, as being a pension

17    plan within the meaning of 404(c).

18         Section 9701(a)(2) of the Internal Revenue

19    Code provides as follows:  "1950 UMWA Pension

20    Plan.  The term, quote, '1950 UMWA Pension Plan,'

21    close quote, means a pension plan described in

22    Section 404(c) or a continuation thereof,

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    33

1    participation in which is substantially limited to

2    individuals who retired before '76."  Remember,

3    that's our demarcation line, '76.

4         The next section of the Internal Revenue

5    Code, Section 9701(a)(3), has this definition of

6    the 1974 Plan:  "1974 UMWA Pension Plan.  The

7    term, quote, '1974 UMWA Pension Plan,' close

8    quote, means a pension plan described in Section

9    404(c) or a continuation thereof, participation in

10   which is substantially limited the individuals who

11   retired in '76 or thereafter."

12        In short, Congress has told us that the

13   '74 pension plan is one within the meaning of

14   Section 404(c).

15        In addition to Congress, the Internal

16   Revenue Service has specifically determined that

17   the '74 Pension Plan is a pension plan within the

18   meaning of 404(c).  In June of '75, after the

19   reorganization of the plans -- so, this is

20   subsequent to the breakup of the original '50

21   Plan -- the IRS issued a determination letter that

22   states in relevant part, quote, "We conclude that

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                                34

1    the 1950 Pension Plan and Trust and the 1974

2    Pension Plan and Trust represent a continuation of

3    the United Mine Workers of America Welfare

4    Retirement Fund of 1950 and, therefore, constitute

5    a plan described in Section 404(c) of the code."

6    So, this is after the reorganization.

7         Fourth, after both the employer pension

8    plan provisions of ERISA were enacted, a number of

9    federal courts concluded that the '74 Pension Plan

10   was covered by 404(c).  No federal district court,

11   no federal appellate court or any other tribunal

12   has ever ruled otherwise.  And the 20-year cap on

13   withdrawal liability installment payments has

14   never applied to the 1974 Pension Plan.

15        And I noted this morning that Senator

16   Brown has an another proposal to save pension

17   plans, and that's because a number of the pension

18   plans in the United States are troubled.

19        There are currently pending for the United

20   States eight or nine bills that specifically

21   identify the 1974 Plan as a 404(c) plan.  They use

22   that as the reference for any relief for the '74

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                        35

```
 1   Plan.  Clearly, Congress still believes that the
 2   '74 Pension Plan is one within the meaning of
 3   Section 404(c).
 4        We'll provide more briefing on these and
 5   the other issues after the hearing, but we wanted
 6   to highlight them before we started the testimony.
 7   Thank you.
 8        THE ARBITRATOR:  Okay.  Thank you very
 9   much.
10        You want to call your first witness?
11        MR. OSSI:  Yes.  Energy West would call
12   Mr. Scott Hittner, its expert witness, to the
13   stand.
14              SCOTT ALAN HITTNER,
15   having been duly sworn, testified as follows:
16        THE ARBITRATOR:  Let's just take two
17   minutes.
18        (A recess was taken.)
19        THE ARBITRATOR:  I think we're all set.
20   DIRECT EXAMINATION BY COUNSEL ON BEHALF OF ENERGY
21   WEST MINING CORPORATION
22   BY MR. OSSI:
```

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                                    36

1        Q   What's your name?  Would you please

2   introduce yourself for the record.

3        A   I am Scott Alan Hittner.  I am partner and

4   chief actuary with the firm called October Three.

5   I'm based in our Denver office.

6        Q   And are you based out of the Denver

7   office?

8        A   Yes.

9        Q   And where do you currently reside?

10       A   I reside at 5368 South Havana Court in

11  Englewood, Colorado.

12       Q   And what is October Three?

13       A   October Three is a pension, consulting,

14  actuarial and administration firm.  We provide

15  actuarial and administrative services for several

16  different pension plans, primarily single-employer

17  plans.

18       Q   And what do you do as a chief actuary?

19       A   As chief actuary, I'm -- I lead our

20  technical resource group.  We look into technical

21  issues and research new guidance as it comes out,

22  provide guidance to our consultants on new issues,

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    37

1    new guidance.  We also maintain actuarial

2    templates that our consultants use, things like

3    valuation, funding reports, compliance testing

4    reports, AFTAP certifications, things of that

5    nature.

6          I also ensure that our consultants are

7    meeting the professional standards, so, make sure

8    that all of our consultants meet the qualification

9    standards necessary to be consulting on the things

10   that they do; make sure that all of our work is in

11   compliance with the Actuarial Standards of

12   Practice; and then I occasionally get involved in

13   issues that are, you know, technical or nuanced,

14   not seen a lot.  So, those would come to me for my

15   opinion.

16          I participate in the education program we

17   have to our actuaries and get involved in any kind

18   of error resolution type of issues.

19       Q  And do you work with pension plans?

20       A  Yes, I do.

21       Q  What kind of work do you do for pension

22   plans?

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                38

1        A  Do actuarial funding valuations for

2    pension plans, including PBGC premium

3    determinations, preparing valuations for financial

4    statements, both the pension plan's financial

5    statements, as well as the employer's financial

6    statements; ensure plans are in compliance with

7    all the various qualification standards; get

8    involved in spinoffs, plan mergers, make sure

9    those meet their qualification requirements.

10       Q  And how long have you worked at October

11   Three?

12       A  I've worked at October Three since January

13   of 2011, so, going on seven years.

14       Q  And where did you work before

15   October Three?

16       A  I worked at a firm called Chicago

17   Consulting Actuaries that, through a couple of

18   transactions, ended up becoming part of Aon Hewitt

19   at the time I left to come to October Three.

20       Q  And in your prior work, did you also work

21   on pension plans?

22       A  Yes.  I've worked on pension plans the

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    39

1    entire time I've been working as an actuary, which

2    goes back to 1990.

3        Q  So, how many years have you been an

4    actuary?

5        A  27, almost 28 now.

6        Q  Have you ever worked on multi-employer

7    pension plans?

8        A  I've worked on multi-employer pension

9    plans not for the plan itself but for employers

10   who participate in those plans.

11       Q  And how long -- how many years have you

12   had experience with multi-employer pension plans?

13       A  I've worked on multi-employer pension

14   plans on and off for a long time, but my

15   involvement increased dramatically with getting --

16   or when I moved to October Three.  So, over the

17   last seven years, I think I've worked with about

18   ten different multi-employer plans.

19       Q  And describe your educational background

20   for us.  What sort of education -- what's your

21   background?  What's your educational background?

22       A  Well, I've got a BS degree in actuarial

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    40

1    science from the University of Nebraska, and then

2    I am a fellow of the Society of Actuaries, which

3    means I passed a series of exams to reach the

4    highest level of membership in the Society of

5    Actuaries.  I've also taken the enrolled actuaries

6    exams and I've -- and I am an enrolled actuary,

7    which that involved passing those exams, in

8    addition to continuing education requirements

9    every three years to maintain my enrollment

10   status.

11       Q  So, what does it mean to be an enrolled

12   actuary?

13       A  An enrolled actuary is an actuary who

14   meets the qualification standards prescribed by

15   the Joint Board for the Enrollment of Actuaries,

16   and I've been certified by the Joint Board for the

17   Enrollment of Actuaries as meeting those

18   requirements to provide various actuarial

19   calculations required under ERISA and the Internal

20   Revenue Code.

21       Q  And are all actuaries enrolled actuaries?

22       A  No.  I believe there are roughly 4,000

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    41

1    enrolled actuaries out of a total of 23,000 or so

2    in the U.S.

3        Q   What does it take to become an enrolled

4    actuary?

5        A   To become an enrolled actuary, you have to

6    take two exams.  One of the exams is broken into a

7    couple of different parts.  You also have to have

8    responsible actuarial pension experience, which

9    means that you're involved in the setting of

10   assumptions and doing the calculations that are

11   required to calculate the components that go into

12   the minimum required contribution and the other

13   aspects, other actuarial aspects, of ERISA and the

14   Internal Revenue Code.

15        There's also continuing education

16   requirements every three years.  You have to have

17   36 hours of continuing education to maintain your

18   enrollment status.

19       Q   You mentioned that you have to take an

20   exam to become an enrolled actuary.  Does that

21   exam touch on multi-employer topics?

22       A   It does.

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                42

1      Q  You also mentioned that to maintain your

2  status as an enrolled actuary, you have continuing

3  education requirements.

4      A  That's right.

5      Q  Do those education requirements cover

6  multi-employer plans?

7      A  Yes.

8      Q  Do they cover actuarial assumptions with

9  multi-employer plans?

10     A  Yes.

11     Q  How long have you been an enrolled

12  actuary?

13     A  I've been an enrolled actuary since 1994,

14  so, 23 years, going on 24.

15     Q  You mentioned that you're a fellow in the

16  Society of Actuaries.  Can you describe

17  that certification.  What does that mean?

18     A  The Society of Actuaries -- the fellow of

19  the Society of Actuaries is the highest

20  designation within the Society of Actuaries.

21  There's a series of exams that one must take to be

22  a fellow.  It's, basically, ten exams, although

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    43

1    some of them are broken up into different parts

2    and they've changed over the years.  There are

3    also continuing education requirements to maintain

4    that status as a fellow of the Society of

5    Actuaries.

6        Q  Do you have any other professional

7    certifications?

8        A  I am a fellow of the Conference of

9    Consulting Actuaries.  I'm an enrolled actuary, we

10   talked about.  And I'm also a member of the

11   American Academy of Actuaries.

12       Q  What does it mean to be a fellow of the

13   Conference of Consulting Actuaries?

14       A  Fellow of the Conference of Consulting

15   Actuaries is someone who's attained the highest

16   designation in the Society of Actuaries or any of

17   the other actuarial organizations who works in the

18   field of consulting.

19       Q  And what does it mean to be a member of

20   the American Academy of Actuaries?

21       A  A member of the American Academy of

22   Actuaries, it just -- it means you have to pay --

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    44

1    you have to be an actuary; you have to pay dues;

2    and it means that I follow the professional

3    standards of the profession.

4        Q   Do you hold any leadership positions in

5    any of these professional societies?

6        A   I am on the board of the Conference of

7    Consulting Actuaries and also involved with the

8    American Academy of Actuaries.  I'm on the Pension

9    Practice Council of the American Academy of

10   Actuaries, which leads the policy initiatives of

11   the academy in pension and Social Security related

12   matters.

13       I'm also a member of the pension

14   committee, which is a subcommittee of the Pension

15   Practice Council, and that is a group of experts

16   that informs public policy on pension matters.

17       Q   In those continuing education and

18   leadership positions, do you address interest rate

19   issues, discount rate issues, actuarial

20   assumptions?

21       A   Yes, particularly in the American Academy

22   of Actuaries, we -- American Academy of Actuaries

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    45

1    puts together information regarding the selection

2    of all kinds of different assumptions, including

3    the selection of interest rate assumptions.

4        Q   Okay.  Let's turn to your engagement in

5    the case at hand here.  Were you engaged by Energy

6    West to serve as an expert witness?

7        A   Yes.

8        Q   Do you remember when you were

9    approached --

10       A   Yes, it was --

11       Q   -- to serve as a witness?

12       A   -- it was August this last -- this year,

13   2017.

14       Q   And what were you asked to do?

15       A   I was asked to review the withdrawal

16   liability calculation to determine if the

17   assumptions were reasonable in the aggregate.

18       Q   And is your firm being compensated for

19   your time here today?

20       A   Yes.

21       Q   And what is -- do you have a billing rate?

22       A   Yes.  My billing rate is $505 an hour.

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    46

1      Q  Okay.  And is your firm's fee or your fee

2  at all contingent on the outcome of this

3  arbitration?

4      A  No, it's not.

5      Q  Okay.  I want to talk a little bit about

6  pensions and the role of an enrolled actuary.

7  Could you briefly describe what a pension plan is.

8      A  A pension plan is a retirement plan that

9  provides definitely determinable benefits.

10  Defined benefit plans, such as the 1974 Plan,

11  provide benefits that are a function of some

12  formula that's usually related to service and may

13  include pay, as well.

14      Q  Okay.  And you mentioned defined -- are

15  there multiple types of defined benefit pension

16  plans?

17      A  There are, yes.

18      Q  What types are there?

19      A  Well, there are pension plans in both the

20  public sector and the private sector.  In the

21  private sector, I think there are three main

22  categories.  There are single employer plans;

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    47

1    there are multi-employer plans, which are plans

2    that are maintained pursuant to a collective

3    bargaining agreement that have unrelated employers

4    participating in the plan; and then there are

5    multiple-employer plans, which also have unrelated

6    employers participating in a single plan but

7    there's no collective bargaining agreement

8    involved in those.

9        Q   And do enrolled actuaries work for both

10   single employer and multi-employer plans?

11       A   Yes.

12       Q   Have you worked as an enrolled actuary for

13   a single-employer plan?

14       A   Yes.

15       Q   Have you ever worked as an enrolled

16   actuary for a multi-employer plan?

17       A   I have not worked for a multi-employer

18   plan as an enrolled actuary.

19       Q   Do both types of both a single-employer

20   and a multi-employer plan require an actuary to

21   make certain assumptions with regard to those

22   plans?

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    48

1      A  Yes.

2      Q  What purpose would -- what purpose do

3  actuarial assumptions serve?  What do you use them

4  for?

5      A  Actuarial assumptions are used to both

6  project the benefit payments from a pension plan,

7  as well as discount those -- that projected stream

8  of benefit payments back to a present value today.

9  That -- the total present value of all projected

10  benefits is referred to as the present value of

11  future benefits.

12        And then that amount is allocated between

13  an accrued liability, which represents the

14  benefits earned based on service to date, a normal

15  cost, which is the allocation of those future

16  benefits attributable to the current year's

17  service, and then future benefits.

18      Q  Is there particular uses for actuarial

19  assumptions with multi-employer plans?

20      A  They're the same purpose for projecting

21  those benefits for both determining funding

22  requirements, as well as withdrawal liability.

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    49

1      Q  Okay.  Let's talk about funding

2    requirements.  What do we mean by "funding

3    requirements"?

4      A  Well, the Internal Revenue Code an ERISA

5    have minimum funding requirements for both single-

6    and multi-employer plans.  So, the minimum funding

7    requirement, in general, is equal to the normal

8    cost, that piece of the benefits that's

9    attributable to this year's service, plus an

10   amortization payment on any unfunded liability.

11         For single-employer plans, that's

12   unfunded -- that's funded over a 7-year

13   amortization period, generally.  And for

14   multi-employers, it's, generally, 15 years.

15     Q  And what assumptions would an enrolled

16   actuary use to determine pension funding rate --

17   funding status?

18     A  We use assumptions for the discount rate,

19   for mortality, withdrawal, incidence of

20   disability.  There might be assumptions if the

21   plan is -- is pay related, there would be a salary

22   scale projection.  There would be assumptions

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                           50

1    possibly used to assess how many people are

2    expected to be married at the time they retire and

3    then their spouse's age at retirement.  There

4    would be assumptions made regarding what form of

5    benefit payments participants elect, also.

6        Q  And are funding assumptions the same for

7    single-employer and multi-employer pension plans?

8        A  The assumptions are the same.  For single-

9    employer plans, a couple of the assumptions are

10   prescribed by the Internal Revenue Code.  So, for

11   single-employer plans, the discount rate and the

12   mortality assumptions are prescribed.

13       Q  Okay.  And an actuary, then, part of a

14   pension plan, calculates the vested benefit

15   liability; right?

16       A  That's right.

17       Q  And do both single- and multi-employer

18   plans calculate that liability?

19       A  Yes.  That vested portion of the liability

20   is reported separately on the Schedule SB for a

21   single-employer plan and Schedule MB for a

22   multi-employer plan.

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    51

1       Q   Why do these plans calculate the vested

2   benefit liability?

3       A   Single-employer plans use that for the

4   Schedule SB.   They also use it as the basis for

5   PBGC premiums.   There's a variable portion of the

6   premium that's based on the unfunded vested

7   benefit liability for the plan.

8           The pension financial statements --

9   pension plan's financial statements also report

10  separately the vested portion of the liability

11  apart from the total accumulated benefit

12  liability.

13          Multi-employer plans use vested benefits.

14  Again, those are reported on a Schedule MB for

15  those plans, as well as it's the basis for

16  withdrawal liability assessments.

17      Q   So, you would use the same type of

18  assumptions in calculating vested benefits for

19  both single- and multi-employer pension plans?

20      A   Yes.

21      Q   You mentioned withdrawal liability.   We're

22  here today about withdrawal liability, so, let's

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    52

1    talk about it.  What do you mean -- what is

2    withdrawal liability?

3        A  Withdrawal liability is a portion of a

4    plan's total unfunded vested benefits that's

5    attributable to a particular employer's

6    participation in the plan.  And the withdrawal

7    liability is just -- is that portion of the

8    unfunded attributable to the employer.

9        Q  What triggers withdrawal liability?

10       A  The cessation of contributions to the fund

11   would be a complete withdrawal.  And there could

12   be a partial withdrawal if there's a cessation of

13   operations at one facility or the contribution,

14   the hours the particular company is -- those

15   employees are working, if that drops

16   significantly, or if there's a change in the

17   collective bargaining agreement that affects some

18   of an employer's employees but not all who are

19   participating in the fund.

20       Q  And what is withdrawal liability intended

21   to do?

22       A  Withdrawal liability is intended to assess

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    53

1    a withdrawing employer with an amount equal to the

2    unfunded vested benefits attributable to the

3    employees who they were making contributions for.

4        Q   And how is the withdrawal liability

5    calculated?

6        A   Withdrawal liability is calculated as an

7    allocation of the total unfunded vested benefits.

8    There are a few different ways the statute allows

9    to allocate the liability.

10       Q   Does the '74 Plan use a method -- well,

11   let me ask you this.  What method does the 1974

12   Plan use to calculate withdrawal liability?

13       A   The 1974 Plan uses the -- what's commonly

14   referred to as the "rolling five method."

15       Q   And what is the rolling five method?

16       A   The rolling five method attributes a

17   portion of the unfunded vested benefits in

18   proportion to the employer's contributions over

19   the five years prior to withdrawal over all

20   employers' contributions over that same period.

21       Q   And in determining this withdrawal

22   liability, an enrolled actuary uses certain

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    54

1    assumptions to calculate withdrawal liability.

2    What are those -- what are some of those

3    assumptions?

4        A   Those assumptions are the same ones we

5    discussed before.

6            THE ARBITRATOR:   You don't have to go

7    through them again.

8        A   Okay.

9        Q   And why would a pension plan need these

10    assumptions for determining withdrawal liability?

11        A   To assess what the value of that future

12    stream of payments is and a portion of it is

13    allocated back to the employer.

14        Q   Are there any assumptions in this list of

15    assumptions that have a greater effect on

16    withdrawal liability calculation than others?

17        A   Yes.  The interest and mortality will

18    affect every participant in the plan.  So, those

19    have the greatest impact.  The other assumptions

20    regarding retirement age, disability, withdrawal

21    rates, those affect a -- just the participants who

22    have not yet started receiving payments.

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    55

1      Q   And, so, just in general -- we'll talk

2   about the '74 Plan specifically next.  But, in

3   general, why does the discount rate have the

4   greatest -- have a great effect on the calculation

5   of withdrawal liability?

6      A   Because it affects every participant.  All

7   the future payments for every participant are

8   discounted with the discount rate.

9      Q   Well, let's talk about how an actuary uses

10   assumptions.  Are there laws or regulations or

11   other authority that directs enrolled actuaries in

12   making these assumptions for multi-employer

13   pension plans to determine withdrawal liability?

14      A   Yes.  There are statutory requirements for

15   the assumptions.  The assumptions have to be

16   reasonable in the aggregate and represent the

17   actuary's best estimate of plan experience based

18   on actual plan experience and reasonable

19   expectations.

20          There are Actuarial Standards of Practice

21   that the actuary should follow when setting the

22   assumptions.  There are regulations.  For a mass

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                          56

1    withdrawal, the PBGC prescribes the assumptions

2    that must be used.

3        Q  You mentioned the Actuarial Standards of

4    Procedure.  Who creates those?

5        A  The Actuarial Standards Board creates the

6    Actuarial Standards of Practice.

7        Q  And have those standards been around since

8    you've been an enrolled actuary?

9        A  Yes.  They change over time.  They evolve

10   over time, but they've been around for the entire

11   time I've been an actuary.

12       Q  Is there a specific group of actuaries

13   or -- how do they change?  How are they modified?

14   Who --

15       A  The Actuarial Standards Board has

16   committees that review these things and just --

17   they update them to document acceptable actuarial

18   practice.  So, as actuarial practice evolves, the

19   ASOPs change to reflect the change of practice.

20       Q  Okay.  You also mentioned that there are

21   some laws that -- regarding the actuarial

22   assumptions used for withdrawal liability.

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    57

1    What -- is there something -- when I refer to

2    "ERISA," I'm referring to the Employee Retirement

3    Income Security Act.  Are you familiar with that

4    statute?

5        A  Yes.

6        Q  Does ERISA have particular provision for

7    discussing what an actuary should use when

8    selecting withdrawal liability calculation

9    assumptions?

10       A  Yes, that's in ERISA.

11       Q  Do you know what section of ERISA that is?

12       A  It's 4000.  So, ERISA Section 4001(a)(8),

13   I believe, talks about the benefits which are

14   reflected in withdrawal liability.  And then it's

15   4211 or 13, escapes me right now, where the

16   actuarial assumptions required for those

17   calculations are discussed.

18       Q  And what does ERISA state about those

19   actuarial assumptions?

20       A  Those actuarial assumptions have to be

21   reasonable in the aggregate and represent the

22   actuary's best estimate of future plan experience,

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    58

1    taking into consideration actual plan experience

2    and reasonable expectations.

3        Q   What does it mean by "the assumptions must

4    be reasonable in the aggregate"?

5        A   That means that the assumptions, rather

6    than assessing each one individually, they're

7    assessed in the aggregate, the total impact they

8    have.

9        Q   So, they're assessed as a whole?

10       A   They're assessed as a whole, yes.

11       Q   Okay.  Does that mean that the analysis of

12   each assumption is weighted the same?

13       A   No.  There are assumptions that will have

14   a greater impact on the reason -- on the overall

15   aggregate effect.  As we discussed, interest rate

16   and mortality table are going to have the most

17   influence in most plans.

18       Q   Do enrolled actuaries need to select

19   assumptions for use in determining withdrawal

20   liability that are reasonable individually?

21       A   No, there's no requirement for that.

22       Q   Now, you said that ERISA requires that you

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                59

1    take into account the experience of the plan.

2    What does that mean, the experience of the plan?

3        A   The experience of the plan means, you

4    know, what withdrawal liability -- or I'm sorry --

5    what withdrawal rates the plan has experienced,

6    what the incidence of requirement has been, the

7    ages of retirement, what the plan's mortality

8    experience has been, you know, the incidence of

9    disability, as well.

10       Q   Let's focus on how an actuary goes about

11   selecting a discount rate.  How would an enrolled

12   actuary select a discount rate?  What would the

13   actuary look at to come up with that rate?

14       A   Well, the actuary -- is this in the

15   context of withdrawal liability?

16       Q   Yes.  I'm sorry.  In selecting a discount

17   rate, what factors does an enrolled actuary look

18   at in determining withdrawal liability?

19       A   In my opinion -- although practice varies,

20   in my opinion, the best measure for withdrawal

21   liability is a market consistent discount rate.

22   And by that, what I mean is the rate that would be

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                 60

1    implicit in the price at which expected future

2    benefits under a pension plan would trade between

3    a willing -- a knowledgeable buyer and a

4    knowledgeable seller.

5        Q   Okay.

6        A   And I guess just to expand on that,

7    that really represents a market value of

8    that liability.  It's what the market dictates.

9    There's no market for buying and selling pension

10   obligations, but what one can do is look at bonds.

11   Bonds are very similar to pension obligations, in

12   that they have a series of payments, interest and

13   principal, just like a pension plan has a series

14   of benefit payments that are equal to the benefits

15   paid to participants.

16       So, one can look at bonds because they do

17   trade in the open market and see what they're

18   yielding to get some indication of what the market

19   price for that pension obligation would be, which

20   would inform an analysis of what the discount rate

21   reflected in that price would be.

22       And in terms of actuarial practice varying

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    61

1    there, some actuaries use the funding interest

2    rate for those determinations, which is

3    essentially a reasonable estimate of what the plan

4    investments will earn over the future.  Others use

5    market consistent rates, which in my opinion is

6    the best rate, the best way to do it.  And then

7    there's some approaches that blend those two bases

8    to come up with a blended rate.

9        Q  And, so, you mentioned a market consistent

10   rate, but there's no -- there no market for

11   pension benefits; correct?

12       A  Right.

13       Q  So, how do you go about determining a

14   market consistent rate?

15       A  Well, again, you'd look at bonds that have

16   similar creditworthiness as the pension.  So, you

17   would look at things like the plan's funded

18   status -- in determining the creditworthiness of

19   the plan, you would look at its funding status,

20   you would look at its sources of contributions in

21   assessing how creditworthy that plan would be, and

22   then based on that, you could find bonds that are

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                          62

1    rated similarly to assess what that discount rate

2    could be.

3            So, very, very secure bonds, all other

4    factors being equal, will have a higher price,

5    which means a lower yield, and the more -- less

6    creditworthy the entity is that issues the bond,

7    the lower the price or the higher the yield that

8    it's going to have in the market.

9        Q  All right.  Is there any regulation or law

10   that specifically discusses market rates for use

11   in determining withdrawal liability?

12       A  ASOP 27 discusses discount rates, and it

13   discusses market consistent discount rates.

14   There's no statutory requirement to use a market

15   consistent discount rate, but in my opinion,

16   that's the best basis to use.  It doesn't conflict

17   with the statutory requirements, which are to --

18   for the assumptions to represent the actuary --

19   you know, be reasonable and represent the

20   actuary's best estimate.

21       Q  What is ASOP 27?

22       A  It's Actuarial Standard of Practice 27,

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    63

1    which is regarding the selection of economic

2    assumptions.  It documents acceptable actuarial

3    practice with regard to selecting economic

4    assumptions.

5        Q  Are there any other Actuary Standards of

6    Practice that would apply in this situation when

7    selecting a discount rate for purposes of

8    determining withdrawal liability?

9        A  Yes.  ASOP 4 is regarding pension

10   measurements in general.  ASOP 4 will tie in ASOP

11   27, as well as ASOP 35, which is regarding the

12   selection of demographic assumptions.

13       Q  Does ASOP 4 say anything in particular

14   about looking at, for example, the health of the

15   plan, the solvency of the plan?

16       A  ASOP 4 does discuss that an actuary may

17   consider the creditworthiness of the plan sponsor

18   or the benefit security of the benefits.

19       Q  Would that apply when looking at

20   assumptions for the determination of withdrawal

21   liability?

22       A  Yes, I think it's critical.  Again, I

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    64

1    think a market basis is the most appropriate basis

2    to select a discount rate.

3        Q   Looking at some of the ERISA statutes, are

4    you familiar with ERISA Section 305(g)?

5        A   Yes.

6        Q   And what does that section entail?

7        A   That section discusses withdrawal -- it

8    discusses requirements for plans that are either

9    critical or critical and declining status.  And

10   one of those provisions is that for plans -- for

11   determining withdrawal liability, plans that have

12   suspended or reduced benefits because of being in

13   critical or critical and declining status, the

14   withdrawal liability would ignore any such

15   reductions that have been in place fewer than ten

16   years.

17       Q   And is the 1974 Plan when Energy West

18   withdrew in one of those statuses you just

19   described?

20       A   In 2015, the Schedule MB shows that the

21   plan was in critical and declining status.

22       Q   Even though Section 305, which you just

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                65

1  said you don't take into account benefit

2  reductions or suspensions -- has the plan made any

3  benefit suspensions or reductions that would be

4  taken into account under 305?

5      A   No.   The Schedule MB for 2014, when the

6  plan was in critical status and 2015 when it was

7  critical and declining status, indicate that no

8  benefits have been reduced or suspended because of

9  that.

10     Q   Even if you -- but just reading the

11 statute itself regarding that benefit reductions

12 or suspensions should not be taken into account,

13 would you still -- should an actuary still

14 consider the 1974 Plan's financial health and

15 likely -- insolvency and financial health in

16 calculating withdrawal liability?

17     A   Yes.   Even though the benefit payments

18 themselves will not reflect any potential

19 forfeiture of benefits, that's something that

20 would come in in the assessment of the appropriate

21 discount rate, one that's consistent with the

22 market for such an obligation.

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                              66

1       Q   So, are they two different calculations

2    then?

3       A   So, the projection of benefits is separate

4    from the determination of the discount rate that's

5    appropriate to discount those benefits.

6       Q   Then what is included -- when you say,

7    "projection of benefits," does that include

8    nonforfeitable benefits?

9       A   The projection of benefits for purposes of

10   withdrawal liability is based on nonforfeitable

11   benefits only.

12      Q   And are you familiar with the definition

13   of "nonforfeitable benefit" or do I need to show

14   you the statute to refresh your recollection?

15      A   I'm familiar with it.

16      Q   What's the definition of a nonforfeitable

17   benefit?

18      A   A nonforfeitable benefit is a benefit

19   which a participant is currently entitled to, one

20   that cannot be reduced or cut back.  And it says

21   that those benefits are unaffected by the

22   possibility of future benefit reductions.  I'm

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    67

1    paraphrasing.

2        Q    Now, is that a real issue for the '74

3    Plan?    Is it subject to potential benefit

4    reductions?

5        A    Yes.    The 1974 Pension Plan has a poor

6    funded status, and the enrolled actuary for the

7    plan has projected that it will become insolvent

8    in the 2022 plan year.

9        Q    Okay.    But all of this, does that -- does

10   the section that you just read on nonforfeitable

11   benefits and the financial health of the plan or

12   predicted insolvency, does that preclude an

13   enrolled actuary from determining the discount

14   rate -- using that in determining the discount

15   rate for purposes of withdrawal liability?

16       A    No.    A market consistent discount rate

17   would necessarily have to reflect those factors.

18   Really, the withdrawal liability is the employer

19   purchasing that future stream of payments that

20   it's allocated and the financial health of

21   the seller of that annuity is going to affect the

22   price of it.

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    68

1     Q  Counsel says that's not fair to the plan.

2  It says that if -- you know, that's not -- is that

3  a fair way to do it, in other words, taking that

4  into account, the insolvency and the financial

5  health in determining the market rate?

6     A  It's fair and it's essential to come up

7  with a market consistent measure.

8     Q  So, if I understand you, the lower credit

9  rating makes the discount rate go higher; is that

10  right?

11     A  That's right.  All other factors being

12  equal, the more poorly -- the less creditworthy

13  seller is going to have to provide lower prices,

14  which means a higher yield, to be competitive.

15     Q  Then, the '74 Plan, which needs money,

16  would then, essentially, get less money with a

17  higher discount rate based on the amount of

18  withdrawal payments; is that correct?

19     A  That is correct.

20     Q  How is that fair?

21     A  Well, it reflects the product that's being

22  purchased.  So, this -- if the 1974 -- or if the

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                69

1    withdrawing employer, if Energy West, had the

2    ability to go out and buy annuities from a highly

3    rated insurance company, this price would be fair.

4    Buying this annuity from the 1974 Plan, which has

5    less creditworthiness, has more financial strain,

6    it's not fair for the plan to charge Energy West

7    as if they were buying the secure obligation that

8    they could get from a different provider.

9        Q  You mentioned the funding status of the

10   '74 Plan.  Is there an interest rate low enough

11   that would cover the unfunded vested benefits of

12   the '74 Plan from payments from Energy West's

13   withdrawal liability?

14       A  No.  Energy West's allocation of the

15   unfunded vested benefits is pretty small.  Even at

16   the full assessed value of 115 million, that would

17   pay only about a month or two of benefit payments.

18   The plan is paying 620 million or so a year in

19   benefit payments.

20       Q  So, whether Energy West pays a dollar or

21   $115 million to the '74 Plan in withdrawal

22   liability, it's not going to make a difference to

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    70

```
1   the beneficiary?

2         MR. LECHNER:  Objection.  Leading.

3     Q  Will it make a difference to the

4   beneficiaries?  Whether the plan pays a dollar or

5   115 million, will it make a difference to the

6   financial health of the '74 Plan?

7     A  It would make an immaterial difference.

8     Q  All right.  Let's talk specifically about

9   the discount rate to the '74 Plan used in the

10  calculation of withdrawal liability as assessed

11  against Energy West.  Have you reviewed that

12  calculation?

13    A  I did.

14    Q  And as part of your review, what did you

15  review?

16    A  I reviewed all the assumptions that were

17  used.

18    Q  When you say, "all the assumptions," do

19  you mean actuarial assumptions?

20    A  All the actuarial assumptions, yes.

21    Q  And without having to repeat those

22  assumptions, is it reasonable to state that those
```

1    assumptions that you talked about earlier in your

2    testimony are the same assumptions that you

3    reviewed?

4        A   Yes.

5        Q   Are the assumptions that the 1974 Plan

6    used reasonable in the aggregate?

7        A   No, they're not.

8        Q   Why not?

9        A   Because the discount rate was unreasonably

10   low.

11       Q   And what did that do -- did that affect

12   all the assumptions in the aggregate?

13       A   Yes.

14       Q   Were there any other individual

15   assumptions that you found unreasonable?

16       A   The other assumptions were reasonable.  I

17   reviewed the actuarial valuation reports for about

18   the last ten years.  The assumptions appeared

19   reasonable based just on their face, and as well

20   as looking at the actuarial gains and losses that

21   have emerged over the years, the demographic

22   assumptions have been very, very close.

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                72

1            The actual gain or loss, I think in every

2    year, was less than one percent.  And there were

3    both gains in some years and losses in some years,

4    which indicates to me that the assumptions are

5    very closely based on the actual experience of the

6    plan.

7        Q  And, so, why would the discount rate alone

8    be powerful enough to render all the other -- all

9    of the assumptions unreasonable in the aggregate?

10       A  The interest rate assumption affects all

11   participants.  It has a very powerful impact.

12   Looking at the plan's unfunded vested benefits

13   measured using the funding interest rate of 7-1/2

14   percent compared to the 2.71 and 2.78 that were

15   used in the withdrawal liability assessment

16   increases the liability, the unfunded vested

17   benefit liability, by 3 -- I think $3.4 billion or

18   56 percent, which, obviously, is significant and

19   can throw off the overall reasonableness of the

20   assumptions in aggregate.

21       Q  Do you know about what percentage of the

22   plan's participants are retirees?

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    73

1      A   About 87 percent of the participants are

2   retirees.  85 percent of the liability is

3   attributable to retirees and beneficiaries.

4      Q   Okay.  So, among the assumptions you

5   talked about, you talked about the incidence of

6   disability.  Would that have a big impact -- that

7   assumption have a big impact on -- well, let me

8   ask you this.  Would you describe what you just

9   said as a mature plan?

10     A   Yes, the plan is very mature.

11     Q   So, would incidence of disability have an

12  impact on a mature plan?

13     A   Disability would affect, at most,

14  15 percent of the liability.  So, it's hard to

15  conceive of a scenario where the disability

16  assumption could have any material impact.

17     Q   What about rates of pay?  Would rates of

18  pay have a material impact on the --

19     A   No.

20     Q   -- plan?

21     A   No.

22     Q   What about retirement rates?  Would

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    74

1    retirement rates have a big impact?

2        A   Retirement rates would not, again -- it

3    could affect, at most, 15 percent of the

4    liability.  So, it's a very, very small segment of

5    the liability that that assumption could affect.

6        Q   Okay.  And which assumptions directly

7    affect that 80 -- that percentage of -- in

8    participants who are retirees?

9        A   The retirees are only affected by the

10   interest -- the discount and mortality

11   assumptions.

12       Q   So, those two would have the biggest

13   impact on the funding -- on the determination of

14   withdrawal liability.

15       A   Yes.

16       Q   I think you discussed this but I want to

17   make sure I understand.  What discount rate did

18   the '74 Plan use in assessing Energy West's

19   withdrawal liability?

20       A   They used 2.71 percent for the first

21   20 years and 2.78 percent for years after 20,

22   which were the ERISA 4044 interest rates in effect

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    75

1    as of June 2015.

2        Q   Do these rates also commonly referred to

3    by another name?

4        A   ERISA 4044 or PBGC interest rates, plan

5    termination liability interest rates.

6        Q   What is the PBGC?

7        A   The Pension Benefit Guarantee Corporation.

8        Q   So, when we talk about these rates, is it

9    fair to -- that the plan used in determining

10   withdrawal liability, is it accurate to call them

11   the "PBGC rates"?

12       A   Yes.

13       Q   Okay.  How often do these PBGC rates

14   change?

15       A   PBGC rates are subject to change every

16   month.

17       Q   And who determines what the PBGC rate will

18   be for a certain month?

19       A   The PBGC determines those rates based on

20   the rates implicit in high-quality insurance

21   companies' annuity purchase rates.

22       Q   And did the 1974 Plan determine those

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                          76

1    rates?

2        A   No.

3        Q   And did an enrolled actuary determine

4    those rates for the 1974 Plan?  Did an enrolled

5    actuary for the 1974 Plan determine those rates?

6        A   No.

7        Q   Are the PBGC rates unreasonable to use for

8    the '74 Plan in determining withdrawal liability?

9        A   Yes.  In my opinion, those rates reflect a

10   credit -- level of creditworthiness that's not

11   present in the 1974 Plan because of the financial

12   status of the plan.  Again, those rates reflect

13   the rates that these annuities could be purchased

14   at from a highly rated insurance company.

15       Q   It the -- you said that the '74 Plan was

16   at risk of insolvency as determined by its

17   enrolled actuary.

18       A   Yes.

19       Q   How should that have been taken into

20   account in determining the discount rate

21   assumption for purposes of determining withdrawal

22   liability?

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    77

1      A   That would affect -- when determining a

2    market consistent measure, that would affect the

3    comparable bonds that would be used to assess what

4    this plan's obligations would trade at in an open

5    market between a knowledgeable buyer and a

6    knowledgeable seller.

7          Because the plan has financial stress, the

8    actuary would look at yields on bonds with some

9    similar credit quality.  So, you'd look at bonds

10   that are -- that have some degree of risk of the

11   payments -- the company will not be able to make

12   all the payments.

13     Q   Let's look, also, at some of the plan

14   experience.  In particular, did you look at the

15   1974 Plan's rate of return on its investments?

16     A   I reviewed the actual rate of return for

17   the ten years prior to June 30th, 2015 -- through

18   June 30th, 2015.

19     Q   And how has that experience been?

20     A   I calculated the rate of return over this

21   ten years to be, on average, 6.3 percent.

22     Q   Okay.  And did you look at the rate that

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    78

1    the '74 Plan used to determine its funding rate?

2        A   Yes.  It used 7-1/2 percent.

3        Q   And do you know what the unfunded vested

4    benefits or UVBs are for using the discount rate

5    of 7-1/2 percent?

6            MR. LECHNER:  Objection to the form of the

7    question.  It's assuming the plan -- your question

8    seems to assume that a 7.5 percent rate was used.

9    7.5 percent was not used.

10           THE ARBITRATOR:  I understood the question

11   to be if a 7.5 percent rate were used, what would

12   the UVBs have been.

13           MR. LECHNER:  Okay.  Then I withdraw my

14   objection.

15       A   I did look at that.  The unfunded vested

16   benefits based on the PBGC interest rates was

17   about 5.8 billion in total.  At 7-1/2 percent, it

18   was 3.4 billion less, so, 2.4 billion.

19       Q   And if you know, what's that percentage

20   difference between the PBGC rates and that 7-1/2

21   percent funding rate?

22       A   Well, on the measure of the liability or

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    79

1    the vested benefit liability, that represents a

2    56 percent increase.  On the measure of the

3    unfunded vested benefits, it's over 100 percent

4    difference, 141 percent or so.

5        Q  The 1974 Plan hired an expert witness to

6    testify on its behalf.  His name is Ethan Kra.  He

7    also produced a report.  Did you review that

8    report?

9        A  Yes.

10       Q  I'm going to call that report "the Kra

11   report."  I'm going to refer a number of questions

12   to his report.  So, I'm going to -- and that

13   report is Exhibit 8.  I'm going to ask you to turn

14   to page 9, paragraph 35, in that report.

15       In that paragraph, Mr. Kra asserts that

16   you could not have determined that the withdrawal

17   liability assumptions were unreasonable in the

18   aggregate because you did not produce anything in

19   your report purporting to analyze any of the other

20   assumptions used.  Do you agree with that

21   statement?

22       A  No, I do not.

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    80

1      Q  Why not?

2      A  As I discussed, I did review the other

3  assumptions.  They were reasonable.  The interest

4  assumption used was unreasonable, and it has an

5  effect on the aggregate -- that in the aggregate,

6  the assumptions are unreasonable.

7      Q  In his report, Mr. Kra addressed the

8  maturity of the plan.  What does that mean?

9      A  The maturity of the plan is a measure of

10  how many participants are drawing benefits from

11  the plan relative to the participants who are

12  accruing benefits in the plan.

13       The 1974 Plan is a very mature plan

14  because it's got so many retirees relative to

15  actives.  There's only one active for every 11

16  retirees in the plan.

17      Q  And how does the maturity of the plan

18  affect the calculation of withdrawal liability?

19      A  It affects the calculation, in that, the

20  retirees are only subject to a couple of different

21  assumptions, primarily the discount rate and the

22  mortality table.

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    81

1           THE ARBITRATOR:  I think we've been

2    through this.

3           MR. OSSI:  I appreciate that.  Just since

4    we had the discussion of rebuttal before, I wanted

5    to make sure I was covering everything.  So, thank

6    you, Mr. Arbitrator.

7       Q  In his report -- we'll take a pause to

8    wait until the emergency vehicle goes through so

9    everyone can hear.

10          MR. MOONEY:  You should be over by us and

11   the funds.  We're right next to GW Hospital.

12   Constant.

13   BY MR. OSSI:

14      Q  In his report, Mr. Kra states that the

15   interest rate or the discount rate assumption used

16   by an actuary in determining withdrawal liability

17   should be risk free.  Do you agree with that?

18      A  I don't.

19      Q  Why do you disagree?

20      A  In my opinion, the discount rate should be

21   a market consistent measure and reflect the

22   creditworthiness of the fund.

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    82

1      Q   Is using a risk-free rate consistent with

2   the Actuarial Standards of Procedure?

3      A   Not for withdrawal liability because the

4   benefit -- again, the risk-free rate indicates

5   that it assures that payments will be made.  And

6   the 1974 Plan, because of its financial status,

7   there is a great degree of uncertainty whether or

8   not the fund will be able to pay all benefits.

9      Q   Turn to page 15, paragraph 45, where

10  Mr. Kra discusses the riskless rate.  He states

11  that if the assumed rate is -- you know, used by

12  the actuary in determining withdrawal liability is

13  greater than the riskless rate, then the remaining

14  employers are taking all the risk.

15         First, do you know how many employers are

16  left -- are remaining in the plan?

17     A   I don't.

18     Q   Okay.  Would you agree with that statement

19  that for the 1974 Plan, that if the assumed rate

20  used by the actuary in determining withdrawal

21  liability is greater than the riskless rate, then

22  the remaining employers are taking all of the

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    83

1    risk?

2        A   I don't agree with that.  I think the

3    participants themselves are taking quite a bit of

4    risk that the payments will not be made, and the

5    withdrawal liability assessed against Energy West

6    is so small relative to the cash flow needs of the

7    fund, it's not material.

8        Q   Turning to page 19, paragraph 57, in

9    paragraph 57 of Mr. Kra's report, he states that

10   the PBGC interest rates are a reasonable proxy for

11   contemporaneous market interest rates of bonds.

12   Do you agree with that statement?

13       A   The PBGC interest rates are a reasonable

14   proxy for the market rate of interest inherent in

15   high quality -- the annuity purchase rates for

16   high-quality insurance companies.  They are not

17   the reasonable proxy for a market based interest

18   rate because the market based rates vary quite a

19   bit depending on the creditworthiness of the

20   entities with -- entity issuing the bond.

21       Q   When you talk about high-quality insurance

22   companies, can you describe what you mean by that.

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    84

1      A   High-quality insurance companies would be

2   those that have the highest rating -- high ratings

3   from the credit rating agencies, so, New York

4   Life, Mass Mutual, a number of them that are rated

5   very highly, and there would be a great deal of

6   benefit security in a product provided by them.

7      Q   So, if there were an open market for

8   pensions, would a buyer of annuity from the 1974

9   Plan pay at the PBGC rates?

10     A   No, they would not.  The finances of the

11  1974 Plan are much different from highly rated

12  insurance companies.  So, if the 1974 Plan were to

13  sell annuities, the annuities would have to be

14  priced at a much lower rate than, say, a New York

15  Life or a Mass Mutual to reflect the possibility

16  that the provider could default on those payments.

17       The only reason -- and I think it's unfair

18  that because Energy West is a captive in a captive

19  market, so to speak, that the 1974 Plan should

20  charge the same rates that a high-quality

21  insurance company would charge.  They're not

22  getting the same value.

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    85

1      Q   Turning to the next page, 20, paragraph

2   61, Kra says that it's a very acceptable actuarial

3   practice to determine the present value of vested

4   benefits for the purpose of determining withdrawal

5   liability by using a bond-like interest rate.

6   What is a bond like interest rate?

7      A   A bond-like interest rate is a market

8   consistent interest rates reflected in the yield

9   on bonds of similar quality.

10     Q   And is there a range of different bond

11  rates?

12     A   There is a range, yes.

13     Q   What is that range?

14     A   That range would be anything from the

15  Treasury yields on bonds issued by the United

16  States Treasury that are backed by the full faith

17  and credit of the United States up to -- ranging

18  up to, you know, junk bond status, companies that

19  have issued bonds but they have creditworthiness

20  ratings that are far less than the U.S.

21  Government.

22         So, those rates, I think in 2015, one

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    86

1    index that measures bonds yields for companies

2    that are rated CCC or less, I think at the time

3    were yielding over 11 percent, about

4    11.62 percent.  Treasuries at that time were

5    yielding 2 to 3 percent or so.

6        Q  And if you were to use a bond-like

7    interest rate in determining -- for discounting,

8    using the discount rate for purposes of

9    determining withdrawal liability from the '74

10   Plan, would you use a bond-like rate for a high-

11   quality U.S. Treasury bond?

12       A  No.  I think the creditworthiness of the

13   1974 Plan is not at all comparable to the credit

14   quality of the U.S. Government.

15       Q  Mr. Hittner, do you know the term "mass

16   withdrawal"?

17       A  I do.

18       Q  What is a mass withdrawal?

19       A  A mass withdrawal occurs when all or

20   substantially all of the employers in a fund stop

21   contributing to the fund.

22       Q  When Energy West withdrew, did the 1974

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                87

1    Plan have a mass withdrawal?

2        A  No, it did not.

3        Q  Does the PBGC set forth required actuarial

4    assumptions for a mass withdrawal?

5        A  Yes.

6        Q  And do those assumptions have a specific

7    discount rate to be used?

8        A  They use the PBGC interest rates that

9    we've been discussing.

10       Q  So, they require the same PBGC rates that

11   the plan uses now?

12       A  Yes.

13       Q  And any employer that withdraws in a mass

14   withdrawal, are they subject to the 20-year cap on

15   installment payments?

16       A  No, that's removed for mass withdrawal.

17       Q  So, the 1974 Plan withdrawal liability

18   assessment against Energy West is essentially the

19   same as what it would pay in a mass withdrawal?

20       A  Yes.

21          MR. OSSI:  No further questions at this

22   time, Mr. Irvings.

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                           88

```
1          THE ARBITRATOR:  Thank you.

2          Let's take a few minutes.  How long do you

3    think cross is going to be?  And I guess my

4    question is do you want to start cross and

5    eventually break for lunch if it's going to be

6    lengthy or do you want to break now?

7          MR. LECHNER:  It's going to be lengthy.

8          THE ARBITRATOR:  Okay.

9          MR. LECHNER:  It might be okay to start

10   now --

11         THE ARBITRATOR:  Yeah.

12         MR. LECHNER:  -- because there's a

13   section, I think, that's relatively brief.

14         THE ARBITRATOR:  Okay.

15         MR. LECHNER:  And then we could knock off

16   for lunch.

17         THE ARBITRATOR:  That's fine.  Let's do

18   that.  But I still want a couple minutes to walk.

19   Thank you.

20         MR. OSSI:  Absolutely.

21         (A recess was taken.)

22         THE ARBITRATOR:  Go right ahead.
```

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    89

1    CROSS-EXAMINATION BY COUNSEL ON BEHALF OF UNITED

2    MINE WORKERS OF AMERICA 1974 PENSION PLAN AND

3    TRUST

4    BY MR. LECHNER:

5        Q   Good morning, Mr. Hittner.

6        A   Good morning.

7        Q   I have a number of questions and areas

8    that I'd like to go through this morning and this

9    afternoon, but before I get into the details, I

10   would like to take a look at the big picture and

11   see if I'm accurately characterizing your position

12   and your testimony.

13       Isn't it true that under the approach that

14   you are recommending and under this discount rate,

15   the worse off a pension plan is financially, the

16   lower the employer's discount rate would be -- the

17   lower the employer's withdrawal liability payment

18   would be?  Excuse me.

19       A   That is accurate, yes.

20       Q   Okay.  So, that's the bottom line and the

21   result of your position.

22       A   Yes.

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                              90

1      Q  And in your opinion, are you saying that

2  result and approach is consistent with accepted

3  actuarial practice?

4      A  Yes.  It's certainly consistent with a

5  commonly used method of determining withdrawal

6  liability that -- the Segal method.

7      Q  Okay.  So, you say that result is

8  consistent with the Segal method.  Is that your

9  testimony today?

10     A  Yes.

11     Q  And is it your opinion that the plan's

12  actuary was unreasonable by not following the

13  approach that you're recommending?

14     A  Yes, I think the assumptions that the

15  actuary used were not reasonable in the aggregate.

16     Q  Okay.  I would like to ask you now a few

17  questions about your background.  You spoke on

18  direct about being an enrolled actuary, but you've

19  never been an enrolled actuary for a

20  multi-employer plan; correct?

21     A  That is correct.

22     Q  And you've never been a consulting actuary

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    91

```
1    for a multi-employer plan; correct?

2        A  That's correct.

3        Q  And you've never provided any actuarial

4    services whatsoever to a multi --

5            THE ARBITRATOR:  Just before you do that,

6    could I -- because I don't think we've talked

7    about what a consulting actuary is to a plan,

8    maybe you could just, before we leave that point,

9    if I could ask what are you using or what do you

10   understand a consulting actuary to a

11   multi-employer plan to be.

12       A  So, I consider a consulting actuary to a

13   multi-employer plan to be an actuary who provides

14   calculations of the funding requirements under

15   ERISA and withdrawal liability, among other

16   things.

17       Q  And you provide consulting services to

18   employers; correct?

19       A  Yes.

20       Q  But not to any multi-employer plans.

21       A  That's correct.

22       Q  And when you're providing consulting
```

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    92

1   services to employers, isn't it correct that they

2   want to limit their withdrawal liability?

3       A  In many cases, they just want to ensure

4   that the calculation is accurate and reasonable.

5       Q  So, are you saying they don't want to

6   limit their withdrawal liability?

7       A  They're -- I think it's fair to say that,

8   yes, they would hope that any corrections would

9   result in a reduction in the withdrawal liability.

10      Q  Or any change in methodology would result

11  in a reduction of their withdrawal liability;

12  correct?

13      A  Yes.

14      Q  And with respect to multi-employer plans

15  and withdrawal liability, have you ever given a

16  speech regarding withdrawal liability?

17      A  I have not, no.

18      Q  Have you ever written an article regarding

19  withdrawal liability?

20      A  No.

21      Q  Have you ever testified in a court or an

22  arbitration regarding withdrawal liability?

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    93

1        A   This is my first.

2        Q   And you've never then been accepted as an

3   expert witness in any case regarding withdrawal

4   liability; correct?

5        A   Correct.

6        Q   You mentioned in your direct testimony

7   that you work primarily on single-employer plans.

8   Over the course of your 27 years of an actuary,

9   would you say that you've worked more than

10  90 percent of your time on single-employer plans?

11       A   Well, is that 90 percent of my total

12  time --

13       Q   Yes, total time.

14       A   -- or 90 percent of the time that I'm

15  working on pension plans?  Total time.  Okay.

16       Q   Total time as an actuary over the course

17  of your 27-year career.

18       A   That's not unreasonable, no.

19       Q   When I took your deposition about a month

20  or so ago, I asked you with respect to your

21  consulting services with employers how many of

22  those situations involved withdrawal liability,

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    94

1    and you told me at that time there were only five

2    situations in your past in which you were

3    consulting with employers regarding withdrawal

4    liability.  Was that an accurate statement?

5        A  Well, I don't know if I -- I don't recall

6    giving you the figure five, but I would -- can I

7    review that?

8        Q  I can go over the -- I'll go over the five

9    situations and you tell me whether you disagree

10   with these.  So, one is the National Retirement

11   Fund; correct?

12       A  That is correct.

13       Q  The second is McMurry Ready Mix.

14       A  Yes.

15       Q  The third was an employer with respect to

16   the Western Conference of Teamsters Plan.

17       A  Yes.

18       Q  The fourth was involving the International

19   Painters Plan.

20       A  Yes.

21       Q  And the fifth and last one was the

22   Steelworkers Pension Plan.

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    95

1        A   Those are the ones we discussed, yes.

2        Q   Well, I asked you for each one; isn't that

3    correct?  I can go back and show you the

4    transcript, but I've asked you every situation in

5    which you've ever been involved in consulting

6    for an employer, because you've done no consulting

7    or enrolled actuary work for the plans, but I

8    asked you about employers and those were your

9    answer.

10           Are you saying now that that was incorrect

11   and there were ten or is it just ten, in general,

12   but all of them don't concern withdrawal

13   liability?

14       A   I would say it's ten, in general, not --

15   all of them were related to the review of

16   withdrawal liability, so, yeah.  So, we talked

17   about those five specific situations.  There have

18   been others that I've worked with and, like I

19   said, about ten in total.

20       Q   Now, in terms of your firm, your firm

21   primarily works on single-employer plans, and you

22   primarily work on single-employer plans; correct?

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    96

1        A   That is correct.

2        Q   But some firms and actuaries specialize

3    and have expertise in multi-employer plans;

4    correct?

5        A   That's correct.

6        Q   What firms to your knowledge have

7    specialized expertise in multi-employer plans?

8        A   The Segal Company is one that comes to

9    mind.  The Savitz Organization comes to mind,

10   which is now part of CBIZ.  I've -- one of the

11   cases we discussed involved Chyron.  One of the

12   cases we discussed involved Milliman.  I don't

13   know if I'd categorize those as specializing in

14   multi-employer plans, but those are the firms I've

15   seen.

16       Q   What about Horizon?

17       A   Horizon, yes, comes to mind, and United is

18   another one that now that you say, "Horizon."

19       Q   And would you agree that actuaries on

20   multi-employer plans use a wide variety of

21   discount rates for withdrawal liability purposes?

22       A   Yes.

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                                97

1      Q   And that some of the actuaries and

2   actuarial firms use the PBGC rates, which you've

3   already testified to; correct?

4      A   I've seen that, yes.

5      Q   Some use the Segal blend?

6      A   Yes.

7      Q   Some use the funding rates.

8      A   Yes.

9      Q   Now, in addition to United Actuarial

10  Services -- oh, by the way, I don't think this is

11  on the record yet.  Who was the actuary for the

12  1974 Pension Plan in this case and what firm is he

13  with?

14     A   His name is William Ruschau and he is with

15  United Actuarial Services.

16     Q   Right.  And that's one of the firms you

17  just mentioned, right, that provides a lot of

18  services to multi-employer plans.

19     A   Yes, I've seen their name.

20     Q   Okay.  And United Actuarial Services and

21  Mr. Ruschau selected the PBGC rates for this

22  particular plan, the 1974 Pension Plan, for

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    98

1   withdrawal liability purposes; correct?

2       A   Yes.

3       Q   Now, but United Actuarial Services is not

4   alone, are they, in the area in selecting PBGC

5   rates for multi-employer plans --

6       A   I --

7       Q   -- for withdrawal liability purposes?

8   Obviously, all my questions are going to for the

9   purposes of withdrawal liability, not for funding

10  purposes.

11      A   Yes.

12          MR. OSSI:  I'm going to object,

13  Mr. Arbitrator.  This is a little bit outside the

14  scope of my direct exam.  And we're here talking

15  about the '74 Plan and what its actuaries selected

16  as required by 4213.  What other actuaries use for

17  other plans, I fail to see the relevance in asking

18  Mr. Hittner that question.

19          THE ARBITRATOR:  Do you want to respond?

20          MR. LECHNER:  Well, it's, obviously,

21  relevant.  He's saying that the use of the PBGC

22  rates is unreasonable.  And he's saying it's so

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                99

1    outrageous that it makes all of the assumptions

2    unreasonable in the aggregate.

3            So, I would like to establish through

4    cross-examination that United Actuarial Services

5    is not out alone doing this.  There are a number

6    of firms that follow this practice.  That's simply

7    what I want to establish.

8            THE ARBITRATOR:  Do you have -- does he

9    have a factual basis for testifying to it?

10           MR. LECHNER:  He has some, yes.  I covered

11   some of this in his deposition.

12           THE ARBITRATOR:  Go ahead.

13   BY MR. LECHNER:

14       Q  Well, you know for a fact that Horizon

15   uses the PBGC rates; correct?

16       A  Yeah, I was just going to say that

17   that's -- I have seen the PBGC rates used for

18   withdrawal liability by a Horizon actuary.

19       Q  Right.  And they use them on, in

20   particular, the National Retirement Fund; correct?

21       A  That's correct.

22       Q  And the National Retirement Fund has been

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                              100

1    in critical status, correct, under the Pension

2    Protection Act?

3        A  I believe that's true.

4        Q  And United -- and the National Retirement

5    Fund has over 4 billion in unfunded vested

6    benefits; correct?

7        A  I think that's correct.  I don't have

8    those figures with me.  I do know that that fund

9    recently changed the assumption basis used to

10   calculate withdrawal liability.  It has recently

11   moved to the PBGC basis.

12       Q  Well, when you say, "recently," I mean

13   that was done at least three or four years ago;

14   right?

15       A  I would consider that recent, yes.

16       Q  Okay.  And in addition to the United

17   Actuary -- I mean in addition to Horizon using the

18   PBGC rates on that particular fund, are you aware

19   that Horizon uses the PBGC rates on other funds,

20   as well?

21       A  I'm not aware of that, no.

22       Q  But with respect -- back to the National

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    101

1    Retirement Fund that you are aware of, by using

2    the PBGC rates to a fund that's in critical

3    status, the actuaries there did not adjust the

4    rates, did they, consistent with your theory,

5    based on the creditworthiness of the particular

6    plan?

7          MR. OSSI:  I'm going to object again to

8    the question.  They haven't established the

9    foundation that Mr. Hittner has spoken with the

10   actuaries or known what the actuaries are doing.

11   You know, if the '74 Plan wants to know what the

12   National Retirement Fund is doing, they could have

13   called them as a witness.

14         MR. LECHNER:  He's familiar with the

15   National Retirement Fund.  It's one of five that

16   he's familiar with.

17         THE ARBITRATOR:  Well, maybe you could

18   establish a little greater depth of how he would

19   know what the specific -- the basis of

20   calculations or whether they did or did not adjust

21   for creditworthiness.

22         MR. LECHNER:  Yeah.  I think I've already

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    102

1    established it but --

2        Q  You've already admitted that they were in

3    dire financial states.  They were in critical

4    status; correct?

5        A  I believe that's correct, yes.

6        Q  Because you're advising employers.

7        A  Yes.

8        Q  And they were using the PBGC rates;

9    correct?

10       A  That is true.

11       Q  And they didn't adjust the PBGC rates;

12   correct?

13       A  They did not.

14       Q  Okay.  And you mentioned Milliman.  Do you

15   know whether Milliman uses PBGC rates for

16   withdrawal liability purposes?

17       A  I can't think of any specific cases, no.

18       Q  You mentioned Savitz.  Does The Savitz

19   Organization use PBGC rates for withdrawal

20   liability purposes?

21       A  I don't have any specific knowledge of

22   what they use.

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    103

1       Q  But they might but you just don't know

2   about it; correct?

3       A  Yes.

4          MR. OSSI:  Objection.  Assumes facts not

5   in evidence.

6          MR. LECHNER:  This is cross-examination.

7          THE ARBITRATOR:  He doesn't know about it.

8          MR. OSSI:  Objection.  Speculation.

9          THE ARBITRATOR:  He doesn't know about it.

10  Go ahead.

11  BY MR. LECHNER:

12      Q  There is another prominent multi-employer

13  fund, the New York State Teamsters Fund.  Are you

14  familiar with that?

15      A  I'm not.

16      Q  Okay.  Are you aware of certain funds that

17  have gone to the Treasury Department under the

18  procedures that you mentioned, under 305, in your

19  direct testimony, to get benefits suspended?  Are

20  you familiar with those situations?

21      A  I'm familiar with the fact that a number

22  of plans have, and I know some of those plans that

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    104

1   have.

2       Q   And to get their benefits suspended, the

3   plan first has to be in critical and declining

4   financial status; correct?

5       A   That is my understanding, yes.

6       Q   Okay.  And based on your testimony, a plan

7   in critical and financial status would not be very

8   creditworthy; correct?

9       A   Chances are that they would not be very

10  creditworthy unless they had a very strong

11  contribution basis -- base.

12      Q   Well, if they're critical and declining,

13  by definition, they are subject to insolvency

14  within 15 years; correct?

15      A   That is correct, so --

16      Q   So, a plan that's critical and declining

17  and scheduled to be insolvent within 15 years

18  would not be creditworthy under your definition;

19  correct?

20      A   Correct.

21      Q   But, nevertheless, do you know of whether

22  any of the plans in critical and declining status

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                                    105

1    have used the PBGC rates without adjustment?

2        A  I don't know, no.

3        Q  Okay.  Are you aware of any case in

4    arbitration or in court in which it was found that

5    the use of PBGC rates for withdrawal liability

6    purposes was unreasonable?

7        A  No, I'm not aware of any.

8        Q  In this case, you are not contending, are

9    you, that the discount rates for withdrawal

10   liability purposes and funding purposes should be

11   the same, are you?

12       A  I'm not, no.  As I testified, my view is

13   they should be -- the best basis is a market

14   consistent discount rate.

15       Q  But you agree that they serve different

16   purposes, correct, consistent with your testimony?

17       A  Yes.

18       Q  And you further agree, do you not, that

19   it's reasonable for an actuary to use a lower

20   discount rate for withdrawal liability purposes as

21   compared for funding purposes.

22       A  In certain circumstances, that is

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                      106

1    appropriate, yes.

2        Q  Okay.  And one of the reasons for that is

3    that after an employer withdraws from a plan, the

4    withdrawal liability is assessed and the plan

5    can't come back and ask the employer for more

6    contributions if, say, investment returns aren't

7    comparable to the discount rate; isn't that

8    correct?

9        A  That is correct, nor is there a mechanism

10   to return any excess returns to that withdrawing

11   employer.

12       Q  Right.  It's a one-shot deal.

13       A  Yeah.

14          MR. LECHNER:  This is a good breaking

15   point for me.

16          THE ARBITRATOR:  Okay.  That's fine.

17   Thank you very much.

18          So, what do we need?  Do you want an hour?

19          MR. LECHNER:  Yeah.

20          MR. OSSI:  That's fine.

21          THE ARBITRATOR:  Okay.  So, let's say

22   1:25.

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    107

1              (A recess was taken.)

2              THE ARBITRATOR:  Whenever you're ready.

3              MR. LECHNER:  Ready.

4    CROSS-EXAMINATION (RESUMED) ON BEHALF OF UNITED

5    MINE WORKERS OF AMERICAN 1974 PENSION PLAN AND

6    TRUST

7    BY MR. LECHNER:

8         Q  Good afternoon.

9         A  Good afternoon.

10        Q  Mr. Hittner, I'd like to ask you a number

11   of questions that go into this insolvency issue.

12   And I'm going to first start off, just to make

13   sure that it's perfectly clear what your position

14   is, your position is that the plan's calculation

15   of withdrawal liability is not reasonable because

16   it doesn't take into account the plan's projected

17   insolvency; correct?

18        A  It doesn't take into account the financial

19   status of the plan, which is affected by its

20   projected insolvency.

21        Q  Okay.  And it's your opinion that the

22   projected insolvency is important because if the

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                              108

1    plan becomes insolvent, the plan will not have

2    enough funds to pay the full vested accrued

3    benefits; correct?

4         A   Correct.

5         Q   And I believe you've acknowledged, either

6    earlier today or in your deposition, that if the

7    plan becomes insolvent in the future, benefits

8    would have to be cut back or reduced to the PBGC

9    guarantee; correct?

10        A   To the extent that they exceeded the PBGC

11   max, yes.

12        Q   Right.  And you state in your report that

13   the actuary, the plan's actuary, didn't consider

14   the effect of this projected insolvency and, thus,

15   using the PBGC rates, quote, "without adjustments

16   is not reasonable"; correct?  That's your opinion?

17        A   That's my opinion, yes.

18        Q   And when you say, "without adjustment," am

19   I correct that's your opinion that -- am I correct

20   that your opinion is that the actuary should have

21   increased the discount rate, which would have

22   lowered the UVBs and lowered the employer's

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    109

1   withdrawal liability?

2       A   That's correct.

3       Q   And in your opinion, this is important to

4   Energy West because if the withdrawal liability

5   calculation had reflected these projected benefit

6   reductions, Energy West's withdrawal liability

7   would have been significantly lower; correct?

8       A   If the actuary had used a higher discount

9   rate, the unfunded vested benefits and, therefore,

10  the withdrawal liability would have been reduced

11  for Energy West.

12      Q   Right.  That's the adjustment you're

13  talking about; right?  That's the adjustment to

14  the PBGC rates.  They should have increased them;

15  that's your opinion, right?

16      A   That's my opinion, yes.

17      Q   Now, you mentioned in your direct

18  testimony that the federal statute involved here,

19  ERISA, provides instruction to actuaries on how to

20  calculate the UVBs for withdrawal liability

21  purposes; correct?

22      A   Correct.

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                                110

1        Q   And you cited 4211 and 4213 of ERISA;

2    correct?

3        A   I think so, yes.

4        Q   Okay.  I would like you to turn to

5    Exhibit 9 in the reference book and specifically

6    4213 of ERISA.  It's Exhibit 9 in the reference

7    book and, in particular, on the first page there,

8    Section C, Subsection C.  So, although this is the

9    U.S. Code citation 1393, you would agree that this

10   is Section 4213 of ERISA; correct?

11       A   Yes.

12       Q   Okay.  So, you would also agree, wouldn't

13   you, that the UVB determination is the critical

14   determination with respect to withdrawal liability

15   for virtually all employers; correct?

16       A   Yes.

17       Q   Because employers are just getting their

18   allocable share of the UVBs; right?

19       A   Yes, I agree.

20       Q   That's what withdrawal liability is.

21   So -- but this section of ERISA, Congress is

22   telling the actuaries, correct, how to calculate

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    111

1   the unfunded vested benefits for computing

2   withdrawal liability?

3       A   Correct.

4       Q   Okay.  And this is unique to

5   multi-employer plans and does not apply to single-

6   employer plans; correct?

7       A   Withdrawal liability does not apply to

8   single-employer plans.

9       Q   Now, when Congress instructed actuaries on

10  how to determine the amount of the UVBs, Congress

11  actually sets forth the methodology, right, in

12  4213(c)?

13      A   Yes.  It's the value of the nonforfeitable

14  benefits under the plan less the value of assets.

15      Q   Right.  And then Congress also provided a

16  very specific definition of "nonforfeitable

17  benefits"; right?

18      A   Yes.

19      Q   And could you turn to Exhibit 5 and, in

20  particular, the second page of Exhibit 5.

21      A   Okay.

22      Q   And the second page of Exhibit 5 includes

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    112

1    the definition of a "nonforfeitable benefit";

2    correct?

3        A   Yes.

4        Q   Subpart 8 about in the middle of that

5    page, Exhibit 5, second page --

6            THE ARBITRATOR:  Just for clarification in

7    the record, all these references to exhibit

8    numbers are in the legal reference material, as

9    opposed to the joint exhibits.  So, we'll

10   distinguish between -- anything in the book, the

11   joint exhibits will be joint exhibit whatever, and

12   the others will be just exhibit numbers.

13           MR. LECHNER:  That's fine.

14           THE ARBITRATOR:  Thank you.

15   BY MR. LECHNER:

16       Q   So, in Exhibit 5 of the reference book,

17   Congress provided a specific definition of

18   "nonforfeitable benefit"; correct?

19       A   Yes.

20       Q   And isn't it correct to say that

21   essentially this means vested benefits, whether or

22   not they may subsequently be reduced or suspended?

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    113

1        A   Yes.

2        Q   Okay.  So, the section "whether or not the

3   benefit may subsequently be reduced or suspended"

4   would apply to reductions based on insolvency;

5   correct?

6        A   I would think so, yes.

7        Q   So, Congress is saying here, is it not,

8   that regardless of whether the benefit is going to

9   be paid, it has to be valued in full by the

10  actuary?

11       A   I don't think so.  I think it is

12  clarifying what a nonforfeitable benefit is.

13  There's no similar clarification of how you

14  determine the value of that nonforfeitable

15  benefit.

16       Q   Well, wait a second.  Congress is saying

17  that you have to value it whether or not it may be

18  subsequently reduced or suspended by a plan

19  amendment or any occurrence or operation under

20  this title; correct?

21       A   I don't read it that way.  I read it as

22  that's the definition of "nonforfeitable benefit."

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    114

1    It doesn't restrict how you value the -- this is

2    not talking about the valuation of forfeitable --

3    nonforfeitable benefits.

4         Q  Well, we just went through 4213.

5         A  Yeah.

6         Q  And it, basically -- it says -- I don't

7    think it could be any more clear -- that the value

8    of the nonforfeitable benefit is determined under

9    Subpart 8.  This is the value of the

10   nonforfeitable benefit for the UVB calculation.

11        A  I think the value depends on subparagraph

12   A.

13        Q  Subparagraph A of what?

14        A  Of the 4213.

15        Q  Yeah, but I'm asking you about the

16   specific definition of UVBs in the statute.  I'm

17   not asking for your general interpretation of

18   4213.  Congress was very specific about UVBs, and

19   that's what I'm talking about here.  And my

20   question -- let me rephrase the question one more

21   time, and I'll even make it, I think, even more

22   narrow that I think will make the point.

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    115

1        A  Okay.

2        Q  In the definition of "nonforfeitable

3    benefit," which is, obviously, part of the

4    definition of UVBs, Congress said, regardless of

5    whether the benefits may subsequently be reduced,

6    they've got to be considered part of

7    nonforfeitable benefits; correct?

8        A  That I agree with.

9        Q  Okay.  And, so, this definition doesn't

10   depend on the creditworthiness of the plan;

11   correct?

12       A  Correct.

13       Q  It doesn't depend on -- it doesn't matter

14   whether the plan has good credit or bad credit,

15   you have to value the full amount of the benefit

16   under this provision; correct?

17       A  That I won't agree to because now you're

18   bringing back in value, which brings back 4213(a).

19   You need to use actuarial assumptions to determine

20   a value.

21       Q  Okay.  But this refers to benefits,

22   whether or not they might subsequently be reduced;

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                              116

1    right?

2        A   I agree.  When you calculate that stream

3    of benefits, there's no anticipation of any kind

4    of benefit forfeitures or inability of the plan to

5    pay the benefits.

6        Q   The actuary has to count them; right?

7        A   The actuary has to --

8        Q   Include them.

9        A   -- project -- yes, include them in what

10   they apply the actuarial assumptions to.  That

11   stream of payments is -- regardless of whether or

12   not the actuary feels like they may or may not

13   be -- they may not be paid.

14       Q   Right, but the actuary has to include

15   them.  Okay.

16           And in addition to that, you refer to

17   another provision in your direct testimony, 305(g)

18   of ERISA, which is joint exhibit -- or not joint

19   exhibit, excuse me, just Reference Exhibit 4.  And

20   I'd like you to turn to Reference Exhibit 4.  This

21   is Section 305 of ERISA; correct?

22       A   Yes.

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    117

```
1        Q   Okay.  It's a lengthy provision, so I'm

2    going to ask you to turn to the

3    fifth-from-the-last page.

4            DR. KRA:  Page number is on the bottom.

5            MR. LECHNER:  Yes.  Thank you.

6        Q   It's page number four and, in particular,

7    it's Subpart G.

8        A   Yes.

9        Q   And the title of that, am I correct, is

10   "Adjustments disregarded in the withdrawal

11   liability determination"; isn't that correct?

12       A   There's no "the" in there, but yes, that's

13   correct otherwise.

14       Q   And in the withdrawal liability

15   determination, there's a calculation of the UVBs;

16   correct?

17       A   Yes.

18       Q   And in the withdrawal liability

19   determination, there's also a discount rate

20   applied; correct?

21       A   Yes.

22       Q   And isn't it correct that Congress in this
```

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                              118

1    provision is specifically stating that if a plan

2    is in critical and declining status and it makes

3    certain reductions, those actual reductions, not

4    projected reductions, have to be included in the

5    UVB calculation?

6        A  The benefits that have been reduced or

7    suspended have to be included in the UVB

8    calculation unless the benefits have been

9    suspended for, or reduced for, at least ten years.

10       Q  Right.  So, Congress has said both

11   projected benefit reductions have to be included

12   and actual benefit reductions have to be included

13   in the UVB calculation; correct?

14       A  If the reductions were attributable to the

15   plan being in critical and declining status.

16       Q  Right.  Agreed.

17       A  And those -- and have been in place for at

18   least ten years.

19       Q  Right.  And that would apply to a plan

20   that's in dire financial condition and, in your

21   words, would not be creditworthy; correct?

22       A  Correct.

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                                    119

```
1              MR. OSSI:  Objection.

2              MR. LECHNER:  He's already answered the

3    question.

4              THE ARBITRATOR:  What is the objection?

5              MR. OSSI:  Well, he's -- you know, the

6    statute is specific.  It talks about a critical or

7    critical declining.  And Mr. Lechner did not use

8    those words.  He used something -- used a -- I

9    forget the exact words he used, but it was not the

10   statutory words.  So, I just want to make it --

11   you know, I want to be clear that when we're

12   talking about benefit reductions, we're using the

13   words of the statute because they have a specific

14   meaning, and I want to make sure he's testifying

15   to that and not being mis -- accidentally or

16   otherwise being misled into testifying to

17   something else.

18             THE ARBITRATOR:  Let me say this.  The

19   statute is whatever the statute says it is.

20             MR. LECHNER:  Right.

21             THE COURT:  And much of this is now legal

22   argument, as opposed to factual evidence.  And I'm
```

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    120

1   sure it will all be well articulated in your

2   briefs.

3   BY MR. LECHNER:

4       Q   I'd like you now to look at Joint

5   Exhibit 3, if you would.

6           THE ARBITRATOR:  You promised me you

7   weren't going to do that.

8           MR. LECHNER:  Well, I'm moving away from

9   the legal argument.

10          THE ARBITRATOR:  Okay.  Thank you.  Well,

11  then it's okay.

12  BY MR. LECHNER:

13      Q   And, Mr. Hittner, the Joint Exhibit 3 is

14  the assessment letter, correct, the demand letter,

15  the assessment that the plan made for withdrawal

16  liability against Energy West; correct?

17      A   Yes.

18      Q   And if we go back to the -- I think it's

19  the fifth-to-last page, the plan provided all of

20  the statistics and calculations, isn't that

21  correct, to show you exactly how they arrived at

22  their withdrawal liability calculation?  One,

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    121

1    two -- yeah, the fifth-to-last page.  And just so

2    we're all looking at the same thing, it says,

3    "Attachment page two of two," at the top.  And

4    underneath, it's got a formula for withdrawal

5    liability, and the result of the formula is

6    approximately $115 million, in terms of the

7    assessment.

8          First of all, are we looking at the same

9    page and do you agree with my summary of what this

10   shows?

11     A  It shows Energy West's allocation of the

12   total unfunded vested benefits of the plan.  It

13   doesn't show all the factors that went into

14   calculating the unfunded vested benefits.

15     Q  Right, but we talked about this in your

16   deposition and we might be able to summarize it

17   pretty quickly.  Do you have any quarrel with the

18   formula being used here by the funds?

19     A  I don't, no.

20     Q  So, in terms of the numerator and the

21   denominator, in terms of the employer share, you

22   have no issue with that; correct?

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                             122

1      A  Yeah, I didn't investigate those, but I

2    have no reason to believe that they're inaccurate.

3    Nothing looks inaccurate.

4      Q  Okay.  But your opinion is that the

5    5.68 billion dollar UVB number is too high;

6    correct?

7      A  Yes.

8      Q  Okay.  So, I'd like you now to turn to the

9    second page because there, isn't it correct, the

10   plan shows you how it gets to this $5.7 billion

11   UVB number?

12     A  Yeah.

13     Q  With one exception, and so that no one is

14   confused, the number is a little different but I

15   think we've established in prior depositions that

16   the reason the number is a little different is

17   because on the page that has the UVB number of

18   $5.7 billion, there's an adjustment that's

19   reflected on the next page, and the adjustment is

20   $68 million is subtracted from that number based

21   on withdrawal liability claims that they

22   reasonably expect to be collected.

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    123

1        A  I agree with --

2        Q  And that's part of the statutory

3    requirement; correct?  I mean you don't have any

4    quarrel with that?

5        A  I agree you've summarized it correctly,

6    and I don't have any quarrel with that.

7        Q  Right.  So, just so we're --

8           THE ARBITRATOR:  Thank you.

9        Q  -- not confused about the mathematics

10   here.

11          And on this page that's entitled "Unfunded

12   vested benefits for the 1974 Pension Plan as of

13   June 30, 2015," it's very clear here what the

14   discount rate the plan was using in discounting

15   the vested benefits; correct?

16       A  Correct.  It shows the 2.71 percent for

17   20 years and 2.78 percent thereafter.

18       Q  And that discount rate is part of the UVB

19   calculation; correct?

20       A  Yes.

21       Q  And, so, is it correct that your position

22   is that even though the actuary is required by the

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                              124

1   statutory provisions we discussed to include in

2   this number all the vested benefits, even if

3   they're subject to reduction, your opinion is that

4   you are to take those reductions, plan reductions,

5   into consideration in the discount rate?  Isn't

6   that your position?

7       A  Yes, my position is that the discount rate

8   should reflect the potential reductions to

9   benefits.  The benefit stream that the discount

10  rate is applied to is -- it's appropriate to not

11  reflect any benefit reductions in those projected

12  benefits.

13      Q  Right.  So, just so I've got you correct

14  on this, you've agreed that the actuary is

15  required to ignore the projected insolvency in the

16  part of this definition that concerns

17  nonforfeitable benefits, but then the actuary in

18  the same calculation has to consider the projected

19  insolvency and lower the discount rate -- or

20  increase the discount rate?

21      A  I believe that the benefit -- projected

22  benefits should not reflect any potential

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    125

1    reduction of benefits, but I do think in order to

2    be a market based measure, the discount rate has

3    to reflect the creditworthiness of the fund.

4        Q  But, in effect, you are saying that even

5    though the actuary has to include the benefits

6    here, even if they're subject to reduction, in the

7    same calculation, you reduce the benefits, the

8    value of the benefits, because of the projected

9    insolvency.  Isn't that your position?

10       A  I think they're different calculations.

11   My opinion is that the projection of benefits does

12   not reflect any of the potential reduction in

13   benefits.

14       Q  Right.  They're included.

15       A  All the benefits are included as long as

16   they're nonforfeitable.

17       Q  And they have to be included per -- yeah,

18   they have to be included by federal law.  The

19   statute requires them to be included; correct?

20       A  Yes.  And then --

21       Q  Okay.

22       A  -- the statute does not say anything about

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                                    126

1    the actuarial assumptions used to value this in

2    regards to the potential for benefits being

3    reduced or suspended in the future.  The actuarial

4    assumptions are the actuary's -- are reasonable in

5    the aggregate and represent the actuary's best

6    estimate of future experience under the plan.

7        Q  But in this one calculation here right at

8    the very top, the present value of the vested

9    benefits, aren't you, in effect, saying, "Okay.

10   Congress said you've got to include the benefits

11   even if they're subject to reduction," but on the

12   same time, you're saying, "Oh, we can discount for

13   those," because of your theory with respect to

14   insolvency?

15       MR. OSSI:  Object.  He's asked this

16   question three times now.

17       THE ARBITRATOR:  Okay.

18       MR. LECHNER:  What's the answer?  I think

19   the answer is yes.

20       THE ARBITRATOR:  Yes.  Let's move --

21   BY MR. LECHNER:

22       Q  Okay.  Do you agree the answer is yes?

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    127

1      A  I agree that the actuarial assumptions --

2    there's no other guidance other than to use the

3    actuary's assumptions that are reasonable in the

4    aggregate and represent the best --

5      Q  Okay.  Understood.  Thank you.

6          In the 37 years since the enactment of

7    withdrawal liability, are you aware of any

8    situation, any case, arbitration or court case, in

9    which a decider of fact has ruled that a discount

10   rate for withdrawal liability purposes should be

11   increased and the liability lowered because of a

12   projected insolvency?

13     A  I'm not aware of anything that's that

14   specific.

15     Q  And that's what we're talking about in

16   this case; right?

17     A  I would say that the Segal blended method

18   produces that result that you're talking about.

19   So, to the extent that the Segal method has been

20   approved for use in determining withdrawal

21   liability, then, yeah, I think it has -- that

22   there is some support.

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    128

1      Q  Okay.  You're citing the Segal blended

2    method, but my question was any -- any case that

3    you're aware of, and I think you've answered this,

4    the answer is no, but correct me if I'm wrong --

5    you're not aware of any case where an arbitrator

6    or court has said that the discount rate should be

7    adjusted, like you're suggesting, adjusted upward

8    to lower withdrawal liability because of a

9    projected insolvency.

10     A  That's correct.  I'm not aware of any such

11   case.

12     Q  Okay.  I don't want to mischaracterize

13   you.

14        Is it your opinion that that result is

15   consistent with the intent of Congress in enacting

16   withdrawal liability?

17     A  I can't speak to Congress's intent.

18        THE ARBITRATOR:  Thank you.  Let's move

19   on.  He's hardly going to be in a position to

20   testify to Congress's intent.  If there's some

21   manifestation of Congress's intent, let's put that

22   in, but his interpretation of what Congress's

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    129

1    intent is really his interpretation.

2         MR. LECHNER:  Right, but I think he would

3    agree and I think all of us would agree that an

4    actuary for a plan, in coming up with actuarial

5    assumptions, selecting them, they want to be

6    consistent and they intend to be consistent with

7    the requirements of the statute and the intent of

8    Congress.

9         Do we have any disagreement on that?

10         MR. OSSI:  I think we have a disagreement

11    of what that means.

12         MR. LECHNER:  Okay.

13         MR. OSSI:  That's why we're here.

14         MR. LECHNER:  Fair enough.  We can argue

15    this in the brief because we have, not

16    surprisingly, a position that if you -- the worse

17    off a plan is, if you're lowering the withdrawal

18    liability, it's going to -- it's not going to do

19    anything to discourage withdrawals.  It could

20    encourage them.  And it's clear from the Supreme

21    Court many times --

22         MR. OSSI:  I'm sorry.  Are we

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    130

1    cross-examining my witness or --

2          MR. LECHNER:  I'm making an argument.  I'm

3    making an argument here that a purpose of

4    withdrawal liability is to discourage and prevent

5    withdrawals from the plan.

6          THE ARBITRATOR:  You'll be free to make

7    the argument.

8          MR. LECHNER:  That's why I'm going into

9    this.  Okay.

10   BY MR. LECHNER:

11      Q  Now, Mr. Hittner, a couple times here

12   you've mentioned the Segal blend.  So, the Segal

13   blend is a -- would you agree that it's a common

14   discount rate that's used in withdrawal liability

15   determinations?

16      A  Yes.

17      Q  Okay.  And your testimony is that under

18   the Segal blend, the worse off a plan is

19   financially, the lower the employer's withdrawal

20   liability would be -- under the Segal blend.  I'm

21   sorry.

22      A  Yes.  Assuming the PBGC rates are below

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                              131

1    the plan's funding interest rate, that's the

2    result.

3        Q   Now, have you done calculations regarding

4    the Segal blend?

5        A   No.

6        Q   Well, you've already testified that you're

7    not an enrolled actuary, so you haven't done any

8    of these for the --

9            MR. OSSI:   Objection.

10       Q   -- fund?

11           MR. OSSI:   That's mischaracterizing his

12   testimony.

13       Q   I mean for a multi-employer plan.  Excuse

14   me.  I misstated the question.

15           But have you advised an employer with

16   respect to the calculations under the Segal blend?

17       A   Not specifically with respect to the Segal

18   method.

19       Q   But it's still your testimony, you said it

20   twice, that as a result of the Segal blend, the

21   worse off the financial condition of the plan, the

22   lower the liability; correct?  How do you know

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    132

1    that if you don't know the calculations regarding

2    the Segal blend?

3        A  The Segal blend uses the PBGC rate for the

4    portion of the liability that's funded and the

5    funding interest rate for the portion of the

6    liability that's not funded.  So --

7        Q  And are you -- okay.  I have no issue with

8    that.  But are you saying that that produces a

9    result that the worse off the plan is, the lower

10   the withdrawal liability?

11       A  If by "worse off the plan is" you mean the

12   lower the funded status of the plan --

13       Q  Yes.  Yes.

14       A  -- I agree.

15          MR. LECHNER:  Okay.  I think there's -- I

16   have an issue with that.  I would like to test

17   that because I don't think that's correct, what

18   the witness just said.  And I'd like to give the

19   witness an example, and it's in writing, and I'd

20   like to hand it out and give it to everybody.  Do

21   you have an issue with that?

22          MR. OSSI:  I'm just going to object.

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    133

1    Again, it goes beyond the scope of my direct

2    examination.  So --

3            MR. LECHNER:  Well, the examination

4    touched on the Segal blend, and he's saying the

5    Segal blend is --

6            THE ARBITRATOR:  You can have it.  Go

7    ahead.  Let's do it.  Why don't you first show it

8    to counsel.

9            MR. LECHNER:  Off the record.

10           (A discussion was held off the record.)

11           (Pension Plan Exhibit 7 was marked for

12   identification.)

13           MR. LECHNER:  So, I'd like the record to

14   reflect that I've handed the witness what's been

15   marked as Pension Plan Exhibit 7.

16   BY MR. LECHNER:

17      Q  Mr. Hittner, could you take a moment to

18   look at this worksheet here to see -- and the

19   question is is this an accurate calculation

20   regarding the Segal blend.  Is this how the Segal

21   blend is calculated?

22           So, my question is is this a correct

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    134

1    application of the Segal blend.

2            THE ARBITRATOR:  Do you want a few minutes

3    to go through it?

4            THE WITNESS:  Yeah, that would be helpful.

5            THE ARBITRATOR:  That's fair.  We're off

6    the record.

7            (A discussion was held off the record.)

8            THE ARBITRATOR:  Go ahead.

9            MR. OSSI:  In Pension Plan Exhibit

10   Number 7, you pose three questions, three

11   assumptions.  One is assume that the present value

12   of vested benefits using the PBGC interest rates

13   is 100.  Do you have a -- do we have a rate?  The

14   Segal method uses an actual rate.  So, do you have

15   a rate that you put in there?

16           MR. LECHNER:  It's just an example, but

17   like Mr. Hittner says, this assumes that the PBGC

18   rate is lower than the funding rate.  So, it's

19   consistent with what his testimony is because it

20   produces a higher present value.  So, it's

21   consistent with what he understands the Segal

22   blend does.

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    135

1          MR. OSSI:  So, in this instance, you're

2    using that the PBGC rates would be lower.

3          MR. LECHNER:  Lower than the funding rate,

4    yes.  That's why the funding rate, in the next

5    sentence, produces a lower number.  And, you know,

6    we're using -- this is a very simple 100.  You

7    could put 100 million here.  You could make these

8    90 million.  But this is just an example.  This is

9    as simple as I can make it.

10          MR. OSSI:  If the rates are lower --

11          MR. LECHNER:  It produces a higher present

12    value.  We know -- I think we're all in agreement

13    on that.

14          MR. OSSI:  Right.  Okay.  I don't have any

15    other questions at this time, but I would ask if

16    the witness has any questions.

17       A  Yeah, it would be more intuitive to see

18    the rates, the interest rates.

19    BY MR. LECHNER:

20       Q  But you would agree that the PBGC rates

21    produce a higher present value, just like you said

22    you wanted to make sure that was in this example,

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                          136

1    and they do.  Whatever it is, it's a lower rate

2    than the funding rate.

3        A  Right.

4        MR. OSSI:  I'm going to continue to object

5    to this test because, again, I think we've had a

6    lot of testimony about how actuaries calculate

7    UVBs, and they don't use -- we've got assumptions

8    without those actuarial calculations behind it.

9    So, to me, this is, at most, a false test, and

10   it's definitely -- you know, I find it

11   objectionable.

12       You know, if he's got an example of an

13   actual Segal calculation that he wants to run by

14   my client, that might be one thing, but this, you

15   know, without having all of the actuarial

16   assumptions and knowing the interest rate, we have

17   to continue to object to this test or whatever

18   this exhibit -- whatever you want to call it --

19   worksheet.

20       MR. LECHNER:  May I respond?

21       THE ARBITRATOR:  Yeah, go ahead.

22       MR. LECHNER:  The witness has already

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    137

1    testified that in his opinion, the lower the

2    funding status of the plan, the lower the

3    withdrawal liability.  I think that's a very

4    radical assertion.  But, no, that's his opinion.

5    He's entitled to it.  But he's saying that's the

6    way the Segal blend works and the Segal blend is

7    widely accepted.  So, we, certainly, as the plan,

8    have the right to contest that.

9         MR. OSSI:  Again --

10        THE ARBITRATOR:  Yes, so, what do you say

11   this worksheet is going to demonstrate?

12        MR. LECHNER:  Well, the question is simply

13   is it a correct application of the Segal blend.

14   He's testifying as if he knows about the Segal

15   blend and the effect of it, but if he can't answer

16   this, I think his whole testimony with respect to

17   the Segal blend should be struck because there's

18   no foundation for it.

19        THE ARBITRATOR:  Well, I'm prepared to let

20   you examine him on how the Segal blend is

21   calculated.  I'm just not sure that I'm following

22   particularly C, the confusion.  And I guess one of

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    138

1    the questions I have, to the extent that you're

2    saying the Segal blend applies the PBGC rate to

3    the funded portion and the funding rate to the

4    unfunded portion, how do you determine the funded

5    and unfunded portions without knowing which rate

6    you're using?

7        MR. LECHNER:  I think this specifies

8    exactly the rate.  And as a matter of fact, part C

9    is really the bottom line here.  This tells you

10   under the Segal blend how you get the UVB number.

11   This is it.  This is the Segal blend.  It tells

12   you how to get the UVB number.  It tells you,

13   okay, the funded percentage here in this example,

14   using the PBGC rates, is 80 percent, because the

15   plan's assets are 80, and under the PBGC, you

16   know, the value of the -- present value of the

17   assets is 100.  So --

18       DR. KRA:  Of the liabilities.

19       MR. LECHNER:  Of the liabilities, excuse

20   me, not the assets, the liabilities is 100.  So,

21   is there any dispute about that?

22       A  No.

1    BY MR. LECHNER:

2        Q   Mr. Hittner, do you have any dispute about

3    that?

4        A   I don't dispute that.

5        Q   Okay.  And the very second one is, okay,

6    if the funded percentage is 80 percent, then the

7    unfunded percentage is 20 percent.  Do you have

8    any dispute with that?

9        A   No, I don't.

10       Q   Okay.  And then the unfunded percentage is

11   then applied -- the unfunded percentage of

12   20 percent is applied to the present value using

13   the funding assumptions, funding interest rate,

14   that higher interest rate that you want to use.

15   So, the 20 percent is applied to that rate;

16   correct?

17           MR. OSSI:  We continue to object and ask

18   the witness not to answer until instructed by the

19   arbitrator because you keep talking about higher

20   rates but, again, you've just given us an

21   assumption.  You haven't --

22           MR. LECHNER:  No, it's not an assumption.

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                                    140

1    It's absolutely irrefutable.  And the witness has

2    agreed that the funding rate has to be higher than

3    the PBGC rate because the present value is 90 --

4    in that situation, the present value of the

5    benefits is 90 using the funding rate, and the

6    present value of the benefits using the PBGC rates

7    is 100.  So, it's absolutely irrefutable that

8    that's -- that the PBGC rates are lower and the

9    funding rate is higher.

10   BY MR. LECHNER:

11      Q  So, I think you've agreed with A and B.

12   So, the question now is C.  Do you have an

13   issue -- do you think C is a correct application

14   of the Segal blend to determine the UVBs?

15        MR. OSSI:  Again, I'd like to just --

16   Mr. Arbitrator, are you overruling my objection to

17   continuing to use this form?

18        THE ARBITRATOR:  I'm allowing the

19   examination on how he's viewing the Segal -- how

20   he interprets the Segal blend.  You know, whether

21   this is ultimately helpful or not helpful, I'm not

22   sure but --

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    141

1            MR. OSSI:  Okay.

2            MR. LECHNER:  Okay.

3            THE ARBITRATOR:  Go ahead.

4    BY MR. LECHNER:

5        Q  So, Mr. Hittner, Subpart C of the Pension

6    Plan Exhibit 7, is that a correct application of

7    the Segal blend to your knowledge?

8        A  To my knowledge, it is accurate.

9        Q  Okay.

10            MR. LECHNER:  Now, I would like to show

11    the witness another document, which we'll have

12    marked as Pension Plan Exhibit Number 8.

13            (Pension Plan Exhibit 8 was marked for

14    identification.)

15            MR. LECHNER:  For the record, I'd like it

16    to be shown that I've handed the witness what has

17    been marked as Pension Plan Exhibit Number 8

18    entitled "Worksheet Number 2, Segal Blend."

19        Q  Please take your time to review the

20    exhibit.

21        A  Okay.

22        Q  Would you agree that Exhibit 8 uses the

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                                    142

1    same methodology as Exhibit 7?

2        A   Yes, I would.

3        Q   And that the only difference in the

4    assumptions is the assumption that the assets are

5    60 as opposed to 80; correct?

6        A   Correct.

7        Q   So, it's less well funded; correct?

8        A   Correct.

9        Q   Would you also agree that based on the

10   calculations here, although the funding of the

11   status -- of the plan -- let's just say this is a

12   plan, plan number two, is -- has deteriorated,

13   it's less well funded, the UVBs have increased.

14   They've increased from 18 to 36 --

15       A   Yes.

16       Q   -- correct?

17           So, if the UVBs have increased, the

18   employer's share of the withdrawal liability has

19   also increased; correct?

20       A   The employer's share hasn't increased but

21   the total dollars would increase, yes.

22       Q   Excuse me.  Yes.  Better put.  So, under

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                          143

1    the Segal blend, the worse off the financial

2    condition of the plan, the higher the employer's

3    withdrawal liability, not lower; correct?

4        A  Well, the absolute dollars are higher

5    because the plan is worse off, has a worse funded

6    status, has higher unfunded vested benefits.

7        Q  Right.  And that is directly contrary to

8    your testimony earlier where you said that the

9    worse off a plan would be, the lower the liability

10   would be under the Segal blend; isn't that

11   correct?

12       A  The effective interest rate used in

13   determining the unfunded vested benefits would --

14   moves closer to the funding rate as the funded

15   status decreases.

16       Q  Yeah, but that's not my question.  My

17   question is that the withdrawal liability, like

18   you say, the absolute number -- the withdrawal

19   liability of an employer who's withdrawing is

20   higher, it is greater, the less well funded the

21   plan is, under the Segal blend.

22       A  Well --

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                              144

1        Q   Yes or no?  I mean its right here.

2        A   The point I was making was that if the

3   plan determined the withdrawal liability using the

4   funding interest rate or the PBGC rate -- the

5   point I was making was that the -- well, what I

6   said earlier, the effective interest rate.

7        Q   Are you finished with your answer?

8        A   Give me one moment.  Yeah, I think I'm

9   finished.

10       Q   Okay.  Then, to summarize, under the Segal

11  blend, as the funding status of the plan

12  decreased, the UVBs and the resulting withdrawal

13  liability increased and it was more, not less;

14  correct?

15       A   In this example, yes.

16       Q   Okay.  And that result is directly

17  contrary to your earlier testimony in this case;

18  correct?  We could read it back.

19       A   Yeah, it's --

20       Q   We could read it back.  It's directly

21  contrary; correct?

22       A   It's contrary, yes.

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                                    145

1          MR. LECHNER:  Okay.  I would like to take

2     a break.

3          THE ARBITRATOR:  Okay.

4          (A recess was taken.)

5          MR. LECHNER:  Back on the record.

6     BY MR. LECHNER:

7       Q  Mr. Hittner, I'd like to ask you a number

8     of questions now concerning something you

9     mentioned on direct testimony.  It's regarding

10    Actuarial Standard of Practice 27, ASOP, A-S-O-P

11    27, and it's found in the Reference Exhibit

12    Number 18, in the Reference Exhibit Book, Number

13    18.

14          In particular, I'd like you to look at

15    page 10 of this book and, in particular,

16    Section 3.9.  Am I correct that Section 3.9 refers

17    to selecting a discount rate?

18      A  Yes.

19      Q  And the introduction to 3.9 says that when

20    selecting a discount rate, an actuary should

21    consider the purpose of the measurement; is that

22    correct?

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    146

1       A   That's correct.

2       Q   And that's your understanding of what an

3  actuary should do in selecting a discount rate;

4  correct?

5       A   Correct.

6       Q   Okay.  And that would apply for withdrawal

7  liability, too; correct?

8       A   Correct.

9       Q   Okay.  And would you agree that withdrawal

10  liability is a settlement of an employer's

11  obligation to a plan?

12      A   Yes.

13      Q   And as I believe we discussed before, it's

14  a settlement because, after the employer

15  withdraws, if investment returns are lower than

16  the discount rate, the plan doesn't have recourse

17  against the withdrawal of an employer; correct?

18      A   Correct.

19      Q   Okay.  So, in terms of purposes,

20  Subsection B refers to, among other things,

21  settlement; correct?

22      A   That's correct.

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    147

1       Q   Okay.  And in this guidance from the

2   Actuarial Standards Board, it says when an actuary

3   is measuring the present value of benefits,

4   essentially, on a settlement basis, the actuary

5   may use a discount rate implicit in annuity prices

6   or other defeasment or settlement options.  I want

7   to focus on the phrase "may use a discount rate

8   implicit in annuity prices."

9          So, my question is are the PBGC rates a

10  proxy for annuity prices?

11      A   Yes.

12      Q   And in this case, the plan's actuary used

13  the PBGC rates for the purpose of withdrawal

14  liability, which is to settle the employer's

15  obligation; correct?

16      A   Correct.

17      Q   Now, am I correct that in your deposition,

18  you stated in your opinion that you didn't think

19  Section 3.9(b) applied to the 1974 Pension Plan

20  and its actuary?  Is that correct?  Is that a

21  correct statement of your deposition?

22      A   My recollection is at my deposition, I

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    148

1    said a market consistent measurement would be the

2    more appropriate basis for setting the discount

3    rate, as opposed to a settlement with an annuity

4    provider.

5        Q  But is it your testimony that this

6    settlement, this 3.9(b) settlement measure does

7    not apply to the UMWA '74 Pension Plan?

8        A  I don't think it's the most appropriate.

9        Q  Well, that's not my question, whether it's

10   the most appropriate.  The guidance says that the

11   actuary may consider a rate implicit in annuity

12   prices.  You've already agreed that the PBGC rates

13   are a proxy for annuity prices.  So, are you

14   saying it was unreasonable for the plan's actuary

15   to follow this guidance from the ASOP?

16       A  I don't think it was inappropriate for the

17   actuary to follow the guidance of the ASOP, but in

18   my expert opinion, it would be more appropriate to

19   consider a market consistent measure that is

20   reflective of the 1974 Plan's ability to continue

21   to pay benefits relative to the rates that are

22   implicit in the PBGC or the -- the rates implicit

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    149

1    in the annuity prices that are reflected in the

2    PBGC interest rates.

3        Q   Okay.  When you say you agreed that it was

4    not inappropriate for the plan's actuary to follow

5    this guidance, would you agree that it was then

6    not unreasonable for the actuary to follow this

7    guidance?

8        A   It was not unreasonable for the actuary to

9    follow the guidance, but, again, the rates

10   implicit in annuity prices I don't think -- in my

11   view, are not the most appropriate basis for

12   setting the discount rate.

13       Q   Okay.  Are you aware of any authority from

14   an arbitrator or a court stating that this Subpart

15   3.9(b) of the ASOP does not apply to discount

16   rates in a withdrawal liability determination?

17       A   No, I'm not.

18       Q   Now, several times you referred to market

19   consistent measurements; correct?

20       A   Correct.

21       Q   And you've used the phrase "market

22   consistent measures" involving, essentially, a

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    150

1    trade between a knowledgeable seller and a

2    knowledgeable buyer; correct?

3        A  Correct.

4        Q  And am I correct that in your testimony,

5    you're equating the 1974 Pension Plan as a seller

6    in this so-called marketplace and Energy West as a

7    buyer; is that correct?

8        A  That is correct.

9        Q  But wouldn't you agree that that is a

10   fiction because the plan is not selling bonds or

11   annuities to Energy West or anybody; isn't that

12   correct?

13       A  The plan is providing annuities.

14       Q  How is the -- the plan is not providing

15   annuities.  The plan is assessed withdrawal

16   liability pursuant to statute.

17       A  But the withdrawal liability represents

18   the amount of unfunded vested benefits, the

19   benefits that the plan is going to pay to the

20   allocable share of Energy West participants.

21       Q  But back to your analogy, if the plan were

22   like an insurance company, the state insurance

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                      151

```
1   regulators surely would have declared it insolvent

2   under the state insolvency tests and it would be

3   ineligible to sell annuities in any market; isn't

4   that correct?

5        MR. OSSI:  I'm going to object to that

6   question because what's the foundation?  You have

7   no foundation for it.

8        MR. LECHNER:  The foundation, he says the

9   plan is like a seller of annuities.

10        MR. OSSI:  But you're asking for his

11  opinion.

12        MR. LECHNER:  I think it's ridiculous.

13        MR. OSSI:  If it's going to be -- your

14  question went to whether or not a state insurance

15  regulator would take a certain action.

16        MR. LECHNER:  He may know the answer to

17  that.

18        MR. OSSI:  I'm just -- I'm going to say it

19  calls for speculation, as well.

20  BY MR. LECHNER:

21     Q  Do you know the answer?

22        THE ARBITRATOR:  Do you know the answer?
```

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    152

1        A   I don't know the answer.

2        Q   Okay.  So, you're equating the '74 Pension

3    Plan to a seller of annuities or bonds; correct?

4    Is that what you're equating it to?

5        A   This transaction is analogous to that.

6    Energy West has already contributed whatever

7    they've contributed over the years, and now

8    they're being charged for the remainder of the

9    benefits that have not been paid for in past.

10       Q   Yeah.  But Energy West is really not

11   investing or buying an annuity at all; correct?

12       A   They're paying for the rest of the

13   benefits that have not been funded yet due to

14   their participants.

15       Q   Yeah, but they're paying -- they're not

16   negotiating something on the open market.  You

17   said several times that you think the

18   appropriate -- the most appropriate discount rate

19   should be a market consistent measure based on the

20   price in an open market between a seller --

21   that's, basically, you consider a junk bond

22   seller, like the plan -- and a buyer, like Energy

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    153

1   West.

2         I'm saying that the plan isn't a seller of

3   bonds or anything.  And I'm also saying that what

4   support do you have that Energy West would be

5   buying annuities from the plan, as opposed to

6   simply paying its withdrawal liability as a matter

7   of statute?

8      A  They're paying their withdrawal liability

9   as a matter of the statute, and my opinion is that

10  the best way to value the unfunded vested benefits

11  would be on a market basis.  As you've said

12  before, it's one and done.  What would this

13  similar transaction be if it traded in the open

14  market?

15     Q  Okay.  But once the plan collects

16  withdrawal liability from Energy West, the plan

17  could, could it not, go out and purchase an

18  annuity --

19     A  It could, yes.

20     Q  -- isn't that correct?

21        And the plan wouldn't go to a junk bond

22  dealer if it wanted to preserve the value here, it

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                              154

1    would go to a highly-rated insurance company,

2    assuming a knowledgeable buyer and a knowledgeable

3    seller, again; correct?

4        A   That's correct.  The assets of the plan

5    are insufficient to do that, but at some price,

6    they could purchase the annuities promised by the

7    plan to be provided by an insurance company.

8        Q   Right.  And you would reasonably -- isn't

9    it reasonable to assume that if the plan were to

10   do that, it would go to a highly-rated insurance

11   company?

12       A   Yes.

13       Q   Okay.  And under your theory that equates

14   the plan with a seller of annuities, the worse off

15   the financial condition of the plan, the higher

16   the discount rate; correct?

17       A   Correct.

18       Q   So, as a result of this theory, when it

19   reaches, I think, the same result as your earlier

20   testimony regarding the Segal blend -- under your

21   theory, the worse off the financial condition of

22   the plan, the lower the employer's withdrawal

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    155

1    liability would be under this theory; correct?

2        A  That is correct.

3        Q  Okay.  In the 37 years since the enactment

4    of ERISA and withdrawal liability in 1980, are you

5    aware of any court or arbitrator holding that this

6    analysis that you're talking about applies to

7    withdrawal liability, statutory withdrawal

8    liability, under ERISA?

9        A  No, I'm not.

10       Q  I have a couple of additional questions.

11           You mentioned mass withdrawal before,

12   earlier in your testimony, and I think you've

13   testified, and correct me if I'm wrong, that upon

14   a mass withdrawal, the discount rate for

15   withdrawal liabilities is the PBGC rates by

16   statute.

17       A  Yes.

18       Q  Okay.  Would you agree that a plan facing

19   a mass withdrawal is not creditworthy?

20       A  I would agree.

21       Q  So, Congress has said, even in those

22   situations where a plan, in your view, is not

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    156

1    creditworthy, it is appropriate to use the PBGC

2    discount rates.

3        A   It's appropriate to follow the statute.

4        Q   Okay.  So, under your theory, is it

5    correct that if the plan is facing insolvency,

6    it's got to use a higher discount rate than the

7    PBGC rates, but once there's a mass withdrawal, it

8    can use the PBGC rates.

9        A   Once there's a mass withdrawal, it would

10   have to use the PBGC rates.

11       Q   Right.  But what is the logic -- I'm

12   asking you what is the logic of saying if a plan

13   has a mass withdrawal, it's okay to use the PBGC

14   rates, but as it's approaching such a withdrawal,

15   it's not appropriate to use the PBGC rates?

16       MR. OSSI:  I'm going to object to the

17   extent that the question calls for the witness to

18   apply what Congress, if it -- you know, what

19   Congress has decided or the PBGC has decided as --

20   you know, the logic of Congress can be debated by

21   many, and the PBGC is the PBGC.

22       THE ARBITRATOR:  You're free to argue that

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                           157

1    in your brief.

2            MR. LECHNER:  Okay.

3    BY MR. LECHNER:

4        Q  Mr. Hittner, in your report, you did some

5    calculations regarding what a withdrawal liability

6    assessment would be to Energy West based on

7    various discount rates; correct?

8        A  Correct.

9        Q  And in some of your examples, you assumed

10   that the 20-year cap applied, and in some of your

11   examples, you assumed that it did not apply;

12   correct?

13       A  I calculated it assuming the cap both did

14   apply and that the cap did not apply.

15       Q  All right.  Are you offering any opinion

16   as an expert or otherwise on whether the cap

17   applies?

18       A  No, I'm not.

19       Q  Okay.  So, you simply did the

20   calculations --

21       A  I simply did the calculation, yes.

22       Q  -- which you were asked to do.

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    158

```
1        A   Yes.
2            MR. LECHNER:  Okay.  Mr. Arbitrator, could
3    you give us about five minutes --
4            THE ARBITRATOR:  Absolutely.
5            MR. LECHNER:  -- just to see whether there
6    are any more questions?
7            THE ARBITRATOR:  Thank you.
8            (A recess was taken.)
9            THE ARBITRATOR:  They said they're done
10   with their examination.  Do you need any time?
11           MR. OSSI:  I just need about five more
12   minutes for redirect.
13           THE ARBITRATOR: Go ahead.  Thank you.
14           MR. LECHNER:  I wanted to state on the
15   record I have no further questions on
16   cross-examination at this time.
17           THE ARBITRATOR:  Thank you.
18           Okay.  Take your time.  Thank you.
19           (A recess was taken.)
20           MR. OSSI:  I'm ready.  Thank you,
21   Mr. Arbitrator.
22           THE ARBITRATOR:  Go right ahead.
```

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    159

1    REDIRECT EXAMINATION BY COUNSEL ON BEHALF OF

2    ENERGY WEST MINING CORPORATION

3    BY MR. OSSI:

4        Q  Mr. Hittner, counsel for the '74 Plan

5    asked you a couple of opening questions, and one I

6    want to make sure I understood your answer to.  I

7    believe one of the first questions they asked was

8    under the approach you described where using a

9    higher discount rate for a plan approaching

10   insolvency results in a -- will result in a lower

11   withdrawal liability payment for the employer; is

12   that correct?

13       A  The way I understood the question was that

14   a higher interest rate would lower the unfunded

15   vested benefits and, therefore, the withdrawal

16   liability.  The payment itself is not a function

17   of the withdrawal liability, so, it might not

18   affect the payment.

19       Q  Well, let me go to our Joint Exhibit

20   Number 3, and this is the letter from the plan to

21   Energy West assessing withdrawal liability;

22   correct?

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    160

1        A   Yes.

2        Q   Could you turn to the last page.  Let's

3   turn to the page before the last.  Have you looked

4   at this page before?

5        A   Yes, I have.

6        Q   What does this page calculate in terms of

7   a -- what does this page calculate?

8        A   It calculates the withdrawal liability

9   payment.

10       Q   Okay.  And how much is that payment?

11       A   That's shown on line four, $247,251.12 per

12   month.

13       Q   And would that payment change at all with

14   a change in the discount rate either up or down?

15       A   No, it would not.

16       Q   Okay.  We talked about the status of the

17   plans being in critical -- status of critical and

18   declining status.  What do you understand those

19   statuses to be?  What's the source of how you

20   determine the status of a plan?

21       A   It's the funded status of the plan.

22       Q   What's the law?

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                           161

1       A  The law that -- well, there's PPA, Pension

2  Protection Act, and MEPRA.

3       Q  Okay.  And those laws establish, you know,

4  whether a plan is in -- what are the statuses that

5  those laws establish?

6       A  The statuses are endangered, critical,

7  critical and declining, and seriously endangered.

8       Q  Okay.  For plan year 2015, do you know the

9  status of the 1974 Plan?

10      A  For 2015, it was critical and declining.

11      Q  Do you know the status for 2014?

12      A  It was critical in 2014.

13      Q  Do you happen to know the status ten years

14  ago in -- well, at the initial -- in 2007?

15      A  I don't believe it was in any of those

16  statuses.

17      Q  Section 4213 of ERISA sets out the

18  requirements for determining withdrawal liability

19  for -- for determining UVBs for purposes of

20  calculating withdrawal liability for

21  multi-employer plans.  Are there similar ERISA or

22  IRS laws that set out requirements for single-

1    employer plans?

2        A   No, there are not.

3        Q   Okay.  We talked a little bit about the

4    Segal method.  Under this method, how many

5    interest rates do you use to calculate -- how many

6    discount rates do you use to calculate withdrawal

7    liability?

8        A   The Segal method is a blend of the funding

9    interest rate and the PBGC rate.

10       Q   And how does this blend work?

11       A   The blend is -- for the portion of the

12   vested benefit obligation that's covered by

13   assets, you use the PBGC interest rate, and for

14   the fund portion of the liability not covered by

15   assets, the funding interest rate is used.

16       Q   And, so, as assets go down, the greater

17   weight is given to the funding rate?

18           MR. LECHNER:  Objection to the form of the

19   question.  Leading.

20       Q   As the assets go down, which rate has

21   greater weight in determining withdrawal

22   liability?

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    163

1      A   As the assets go down, the funding

2   interest rate has greater weight.

3      Q   And the 1974 Plan used what rate for its

4   funding rate?

5      A   The 1974 Plan used 7-1/2 percent for its

6   funding rate in 2015.

7      Q   Okay.  I think this was clear.  I just

8   want to make crystal clear.  Can the plan go out

9   today on the open market using its cash on hand

10  and purchase annuities that will cover all of the

11  promised benefits?

12     A   Not the 1974 Plan, no.

13     Q   How often is what we're referring to as

14  the PBGC rate calculated?

15         MR. LECHNER:  Asked and answered.

16         THE ARBITRATOR:  He already said it was

17  monthly, I believe.

18     Q   Okay.  So, the plan is arguing that it

19  doesn't make sense to use a higher rate for an

20  insolvent plan when it might be close to, you

21  know, incurring a mass withdrawal, you know, a

22  higher rate than the PBGC when the plan is close

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                        164

1    to insolvency.  Do you know what the rates were,

2    for example, when -- let me ask you this.  Do you

3    know what the rates were, the PBGC rates were, ten

4    years ago?

5        A  Ten years ago, the PBGC rates were higher.

6    I don't know the specific values.

7        Q  Would you agree that these PBGC rates are

8    set out in Section 4044, Appendix B, of the ERISA

9    statute?

10           MR. LECHNER:  Objection.  Leading.

11           THE ARBITRATOR:  It's just a reference to

12    a statute number.

13        A  Yes, that sounds correct.

14           MR. OSSI:  Mr. Arbitrator, I'm sorry, we

15    didn't anticipate this particular line of

16    questioning, so we have an additional legal

17    reference material to be used.  I guess we would

18    call this number -- I don't know if you want to

19    call it 26, even though it doesn't belong in

20    other.  It's part of 444.  So, I don't know if you

21    want to call it -- what would be helpful for you?

22    Just go in sequential numbering or -- make it part

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                          165

1   of 6, which is ERISA Section 4044?  I'm sorry.

2   Let me give it to counsel.  I apologize.

3           THE ARBITRATOR:  Tell you what, how would

4   you like to tomorrow bring it back punched.

5           MR. OSSI:  Sure.  Yes.  I just have one

6   quick question and we will be done.  So, I will

7   bring it tomorrow punched and everything.  I'm

8   sorry.

9           THE ARBITRATOR:  Thank you.  No problem.

10          MR. LECHNER:  For clarification --

11          MR. OSSI:  My apologies.  I said ERISA

12   statute.  It's actually a regulation.

13          MR. LECHNER:  Okay.  Could we make this a

14   separate exhibit?  I think it might be more clear.

15          MR. OSSI:  Yeah, absolutely.

16          MR. LECHNER:  Why don't we just add this

17   to the end of your exhibits, whatever --

18          THE ARBITRATOR:  Okay.  26.

19          MR. LECHNER:  So, Company Exhibit --

20          THE ARBITRATOR:  No, it's a Reference

21   Exhibit.

22          MR. OSSI:  Reference Exhibit.

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                          166

1          MR. LECHNER:  I'm sorry.  Reference

2    Exhibit 26.  Okay.

3          (Reference Exhibit 26 was marked for

4    identification.)

5          THE ARBITRATOR:  So, is that 29CFR?

6          MR. SPENCER:  Yes.

7          MR. OSSI:  29CFR.

8          MR. SPENCER:  The reg is on the bottom.

9          MR. OSSI:  4044.75.

10         THE ARBITRATOR:  Thank you.

11   BY MR. OSSI:

12      Q  For use of an example, the regulation

13   speaks for itself, but would you tell me the PBGC

14   rates for the first published rate in this

15   regulation for November 1993.

16      A  They were 5.6 percent for the first

17   25 years and 5.25 percent for years after 25.

18      Q  Turning two pages, let's look at February

19   of 2000.  What were the PBGC rates promulgated for

20   that month?

21         MR. LECHNER:  2000; right?

22         MR. OSSI:  March of 2000.

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                         167

1        A   For March of 2000, they were 7.1 percent

2    for the first 25 years, 6.25 percent thereafter.

3        Q   So, when --

4          MR. OSSI:  You know what, that speaks for

5    itself.  We have no further questions.

6          I will get this hole punched.

7          MR. LECHNER:  Can we step outside?

8          (A recess was taken.)

9          THE ARBITRATOR:  On the record.

10   RECROSS-EXAMINATION BY COUNSEL ON BEHALF OF UNITED

11   MINE WORKERS OF AMERICA 1974 PENSION PLAN AND

12   TRUST

13   BY MR. LECHNER:

14       Q   Mr. Hittner, you testified a couple

15   minutes ago about the monthly payment that is owed

16   by Energy West to the '74 Pension Plan, which is

17   described in Joint Exhibit 3, the last page, and

18   you indicated that it is $247,251 per month;

19   correct?

20       A   Correct.

21       Q   My question is am I correct that you're

22   not challenging that calculation of the monthly

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    168

1    payment?

2        A    That is correct, I'm not challenging that.

3        Q    So, you're not saying the plan did

4    anything incorrect in terms of calculating that

5    number.

6        A    I agree with that.

7            MR. LECHNER:  Okay.  No further questions.

8            THE ARBITRATOR:  Thank you.  Very good.

9    Thank you very much.

10            MR. OSSI:  Mr. Irvings --

11            THE ARBITRATOR:  Yes.

12            MR. OSSI:  -- I want to continue my

13    objection to the use of those Pension Plan

14    Exhibit 7 and 8 and I don't know if I should make

15    my objection now or at the end of the hearing.

16    What would be better for you?

17            THE ARBITRATOR:  Go ahead.

18            MR. OSSI:  Only because, per your

19    instruction, we spoke with counsel and we came up

20    with a joint list of exhibits that would be used.

21    We also agreed that we would have separate

22    exhibits that would be cited in our briefs that we

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                                    169

1    would not provide here.  We didn't have any

2    disagreements about the exhibits to be used during

3    the hearing itself.

4         Moreover, the arbitration is unlike a

5    trial.  We're not -- you know, this is not Perry

6    Mason.  It's not a gotcha moment.  So, we

7    hadn't -- at no time were we ever presented with

8    those two pieces of paper.  At no time were they

9    asked -- so, we had no advance warning.  So, I

10   feel it's kind of much like a gotcha moment.  And,

11   so, I would continue to object to those being

12   entered into the record and any testimony on

13   those pieces of paper essentially stricken from

14   the record, as well.

15        THE ARBITRATOR:  Do you want to respond?

16        MR. LECHNER:  In Mr. Hittner's original

17   report, he did not make the assertion that he made

18   here today, that the result of a decline in the

19   funding status of a plan would result in lower

20   withdrawal liability under the Segal method.  That

21   is something that just came up last week in the

22   so-called supplemental report.

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    170

1          So, since we saw the supplemental report,

2    we had to -- we didn't have an opportunity to

3    respond.  It was just thrown on us at the last

4    minute, so, we're responding.  It's an essential

5    part of his testimony.  We certainly have the

6    right to question him about it.  He acknowledged

7    that it's the correct method, but we will have

8    more testimony on that tomorrow by Dr. Kra.

9          If there's any -- I don't think there will

10   be any question after Dr. Kra's testimony as to

11   the accuracy of the methodology in those exhibits.

12   But if you want to reserve judgment until Dr. Kra

13   testifies, that's fine.

14         THE ARBITRATOR:  The exhibits, so far as

15   I'm concerned, were almost like chocks used in the

16   purpose of cross -- of cross-examination

17   responding to this witness's testimony about the

18   Segal blend.  So, I'm allowing it in.  You will be

19   able to deal with it tomorrow if there's something

20   you want to respond to.

21         MR. OSSI:  Okay.

22         THE ARBITRATOR:  Okay.  Thank you.  10:00

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    171

1    tomorrow.  Thank you very much.  Off the record.

2            (Off the record at 3:53 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                      172

1      CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

2          I, Victoria Lynn Wilson, the officer

3      before whom the foregoing proceedings were taken,

4      do hereby certify that the foregoing transcript is

5      a true and correct record of the proceedings; that

6      said proceedings were taken by me stenographically

7      and thereafter reduced to typewriting under my

8      direction; and that I am neither counsel for,

9      related to, nor employed by any of the parties to

10     this case and have no interest, financial or

11     otherwise, in its outcome.

12         IN WITNESS WHEREOF, I have hereunto set my

13     hand and affixed my notarial seal this 17th day of

14     December, 2017.

15     My commission expires January 31, 2019.

16

17

18     _____

19     VICTORIA LYNN WILSON

20     NOTARY PUBLIC IN AND FOR

21     THE COMMONWEALTH OF VIRGINIA

22     Notary Registration Number 269770

Transcript of Arbitration - Day 1
Conducted on December 12, 2017

173

**A**

a) (1
11:18
a) (2
32:18
a) (3
33:5
a) (3) (a
11:21, 26:4
a) (8
57:12
a-s-o-p
145:10
ability
24:12, 69:2,
148:20
able
18:19, 19:5,
77:11, 82:8,
121:16, 170:19
about
8:11, 11:3,
11:11, 13:8,
15:6, 16:19,
16:20, 17:17,
18:7, 22:7,
25:9, 39:17,
43:10, 46:5,
49:1, 51:22,
52:1, 55:2,
55:9, 57:13,
57:18, 59:10,
61:13, 63:14,
69:17, 70:8,
71:1, 71:17,
72:21, 73:1,
73:5, 73:17,
73:22, 75:8,
78:17, 83:21,
86:3, 90:17,
90:18, 91:7,
93:19, 95:8,
95:17, 95:19,
96:16, 98:15,
103:2, 103:7,
103:9, 109:13,
112:4, 114:2,

114:15, 114:18,
114:19, 119:6,
119:12, 121:15,
123:9, 125:22,
127:15, 127:18,
136:6, 137:14,
138:21, 139:2,
139:19, 155:6,
158:3, 158:11,
160:16, 162:3,
167:15, 169:2,
170:6, 170:17
absolute
143:4, 143:18
absolutely
88:20, 140:1,
140:7, 158:4,
165:15
academy
43:11, 43:20,
43:21, 44:8,
44:9, 44:11,
44:21, 44:22
acceptable
56:17, 63:2,
85:2
accepted
90:2, 93:2,
137:7
accidentally
119:15
according
27:18
accordingly
18:19
account
20:15, 59:1,
65:1, 65:4,
65:12, 68:4,
76:20, 107:16,
107:18
accrued
48:13, 108:2
accruing
80:12
accumulated
51:11
accuracy
170:11

accurate
75:10, 89:19,
92:4, 94:4,
133:19, 141:8
accurately
89:11
acknowledged
108:5, 170:6
act
32:11, 32:12,
32:13, 57:3,
100:2, 161:2
action
151:15
active
30:13, 80:15
actives
80:15
actual
55:18, 58:1,
72:1, 72:5,
77:16, 118:3,
118:12, 134:14,
136:13
actually
111:11, 165:12
actuarial
13:4, 14:7,
20:1, 20:18,
20:20, 21:9,
25:10, 25:16,
26:2, 26:14,
27:10, 28:7,
29:7, 29:15,
36:14, 36:15,
37:1, 37:11,
38:1, 39:22,
40:18, 41:8,
41:13, 42:8,
43:17, 44:19,
48:3, 48:5,
48:18, 55:20,
56:3, 56:5,
56:6, 56:15,
56:17, 56:18,
56:21, 57:16,
57:19, 57:20,
60:22, 62:22,

63:2, 70:19,
70:20, 71:17,
71:20, 82:2,
85:2, 87:3,
90:3, 91:3,
97:2, 97:9,
97:15, 97:20,
98:3, 99:4,
115:19, 116:10,
126:1, 126:3,
127:1, 129:4,
136:8, 136:15,
145:10, 147:2
actuaries
20:13, 37:17,
38:17, 40:2,
40:5, 40:15,
40:17, 40:21,
41:1, 42:16,
42:18, 42:19,
42:20, 43:5,
43:9, 43:11,
43:13, 43:15,
43:16, 43:20,
43:22, 44:7,
44:8, 44:10,
44:22, 47:9,
55:11, 56:12,
58:18, 61:1,
96:2, 96:19,
97:1, 98:15,
98:16, 101:3,
101:10, 109:19,
110:22, 111:9,
136:6
actuary
21:7, 21:8,
21:16, 26:19,
29:4, 29:16,
36:4, 36:18,
36:19, 39:1,
39:4, 40:6,
40:12, 40:13,
41:4, 41:5,
41:20, 42:2,
42:12, 42:13,
43:9, 44:1,
46:6, 47:12,

Transcript of Arbitration - Day 1
Conducted on December 12, 2017

174

47:16, 47:18,
47:20, 49:16,
50:13, 53:22,
55:9, 55:21,
56:8, 56:11,
57:7, 59:10,
59:12, 59:13,
59:14, 59:17,
62:18, 63:5,
63:16, 65:13,
67:6, 67:13,
76:3, 76:5,
76:17, 77:8,
81:16, 82:12,
82:20, 90:12,
90:15, 90:18,
90:19, 90:22,
91:7, 91:10,
91:12, 91:13,
93:8, 93:16,
95:7, 97:11,
99:18, 100:17,
105:19, 108:13,
108:20, 109:8,
113:10, 116:6,
116:7, 116:12,
116:14, 123:22,
124:14, 124:17,
125:5, 129:4,
131:7, 145:20,
146:3, 147:2,
147:4, 147:12,
147:20, 148:11,
148:14, 148:17,
149:4, 149:6,
149:8
**actuary's**
55:17, 57:22,
62:20, 126:4,
126:5, 127:3
**add**
165:16
**addition**
33:15, 40:8,
97:9, 100:16,
100:17, 116:16
**additional**
15:11, 155:10,

164:16
**additions**
11:2
**address**
10:2, 10:3,
14:22, 28:20,
29:2, 44:18
**addressed**
9:15, 80:7
**adjust**
101:3, 101:20,
102:11
**adjusted**
128:7
**adjustment**
105:1, 108:18,
109:12, 109:13,
122:18, 122:19
**adjustments**
108:15, 117:10
**administration**
36:14
**administrative**
36:15
**admit**
18:21
**admitted**
6:5, 7:10,
7:11, 15:19,
102:2
**adopted**
26:18
**advance**
27:11, 169:9
**advised**
131:15
**advising**
102:6
**affect**
54:18, 54:21,
67:21, 71:11,
73:13, 74:3,
74:5, 74:7,
77:1, 77:2,
80:18, 159:18
**affected**
31:20, 74:9,
107:19

**affects**
52:17, 55:6,
72:10, 80:19
**affixed**
172:13
**aftap**
37:4
**after**
15:5, 17:6,
18:11, 20:22,
23:12, 25:7,
29:12, 30:15,
31:18, 33:18,
34:6, 34:7,
35:5, 74:21,
106:3, 146:14,
166:17, 170:10
**afternoon**
10:21, 11:4,
89:9, 107:8,
107:9
**again**
24:17, 51:14,
54:7, 61:15,
63:22, 74:2,
76:12, 82:4,
101:7, 133:1,
136:5, 137:9,
139:20, 140:15,
149:9, 154:3
**against**
19:21, 70:11,
83:5, 87:18,
120:16, 146:17
**age**
50:3, 54:20
**agencies**
84:3
**ages**
59:7
**aggregate**
14:10, 20:3,
20:14, 20:21,
21:10, 25:18,
26:3, 26:13,
29:6, 29:17,
45:17, 55:16,
57:21, 58:4,

58:7, 58:15,
71:6, 71:12,
72:9, 72:20,
79:18, 80:5,
90:15, 99:2,
126:5, 127:4
**ago**
31:6, 93:20,
100:13, 161:14,
164:4, 164:5,
167:15
**agree**
8:8, 14:2,
21:17, 79:20,
81:17, 82:18,
83:2, 83:12,
96:19, 105:15,
105:18, 110:9,
110:12, 110:19,
115:8, 115:17,
116:2, 121:9,
123:1, 123:5,
126:22, 127:1,
129:3, 130:13,
132:14, 135:20,
141:22, 142:9,
146:9, 149:5,
150:9, 155:18,
155:20, 164:7,
168:6
**agreed**
11:1, 18:2,
118:16, 124:14,
140:2, 140:11,
148:12, 149:3,
168:21
**agreement**
2:12, 10:21,
25:9, 31:16,
47:3, 47:7,
52:17, 135:12
**ah**
15:1
**ahead**
88:22, 99:12,
103:10, 133:7,
134:8, 136:21,
141:3, 158:13,

Transcript of Arbitration - Day 1
Conducted on December 12, 2017

158:22, 168:17
**alan**
35:14, 36:3
**all**
7:3, 18:6,
19:10, 20:20,
22:16, 24:17,
26:8, 35:19,
37:8, 37:10,
38:7, 40:21,
45:2, 46:2,
48:9, 52:18,
53:19, 55:6,
62:3, 62:9,
67:9, 68:11,
70:8, 70:16,
70:18, 70:20,
71:12, 72:8,
72:10, 77:12,
82:8, 82:14,
82:22, 86:13,
86:19, 86:20,
95:12, 95:15,
98:8, 99:1,
110:15, 112:7,
120:1, 120:19,
121:2, 121:8,
121:13, 124:2,
125:15, 129:3,
135:12, 136:15,
152:11, 157:15,
160:13, 163:10
**allocable**
110:18, 150:20
**allocate**
53:9
**allocated**
48:12, 54:13,
67:20
**allocation**
48:15, 53:7,
69:14, 121:11
**allow**
24:9
**allowing**
140:18, 170:18
**allows**
9:8, 53:8

**almost**
39:5, 170:15
**alone**
23:18, 24:4,
29:4, 72:7,
98:4, 99:5
**already**
13:17, 15:20,
97:3, 101:22,
102:2, 119:2,
131:6, 136:22,
148:12, 152:6,
163:16
**also**
5:2, 7:16, 8:6,
10:1, 12:6,
21:6, 21:15,
28:18, 37:1,
37:6, 38:20,
40:5, 41:7,
41:15, 42:1,
43:3, 43:10,
44:7, 44:13,
47:5, 50:5,
51:4, 51:9,
56:20, 75:2,
77:13, 79:7,
110:12, 111:15,
117:19, 142:9,
142:19, 153:3,
168:21
**although**
32:7, 42:22,
59:19, 110:8,
142:10
**amendment**
113:19
**america**
1:7, 4:2, 7:5,
34:3, 89:2,
167:11
**american**
1:1, 43:11,
43:20, 43:21,
44:8, 44:9,
44:21, 44:22,
107:5
**among**
73:4, 91:15,

146:20
**amortization**
49:10, 49:13
**amortize**
24:4
**amount**
11:11, 11:14,
11:16, 12:4,
12:11, 13:2,
48:12, 53:1,
68:17, 111:10,
115:15, 150:18
**analogous**
152:5
**analogy**
150:21
**analysis**
58:11, 60:20,
155:6
**analyze**
79:19
**annuities**
26:22, 69:2,
76:13, 84:13,
150:11, 150:13,
150:15, 151:3,
151:9, 152:3,
153:5, 154:6,
154:14, 163:10
**annuity**
27:8, 67:21,
69:4, 75:21,
83:15, 84:8,
147:5, 147:8,
147:10, 148:3,
148:11, 148:13,
149:1, 149:10,
152:11, 153:18
**another**
9:2, 10:11,
34:16, 75:3,
96:18, 103:12,
116:17, 141:11
**answer**
95:9, 126:18,
126:19, 126:22,
128:4, 137:15,
139:18, 144:7,

151:16, 151:21,
151:22, 152:1,
159:6
**answered**
119:2, 128:3,
163:15
**anticipate**
164:15
**anticipation**
116:3
**any**
7:13, 9:3,
11:18, 11:22,
23:6, 23:9,
29:2, 34:11,
34:22, 37:17,
43:6, 43:16,
44:4, 44:5,
49:10, 54:14,
62:9, 63:5,
64:14, 65:2,
65:18, 71:14,
73:16, 79:19,
87:13, 91:3,
91:20, 92:8,
92:10, 93:3,
102:17, 102:21,
104:22, 105:3,
105:7, 106:10,
113:19, 114:7,
116:3, 121:17,
123:3, 123:6,
124:11, 124:22,
125:12, 127:7,
127:8, 128:2,
128:5, 128:10,
129:9, 131:7,
135:14, 135:16,
138:21, 139:2,
139:8, 149:13,
151:3, 155:5,
157:15, 158:6,
158:10, 161:15,
169:1, 169:12,
170:9, 170:10,
172:9
**anybody**
150:11

Transcript of Arbitration - Day 1
Conducted on December 12, 2017

176

**anything**
63:13, 79:18,
85:14, 112:10,
125:22, 127:13,
129:19, 153:3,
168:4
**aon**
38:18
**apart**
22:11, 51:11
**apologies**
165:11
**apologize**
165:2
**appear**
21:18
**appeared**
32:3, 71:18
**appellate**
34:11
**appendix**
164:8
**apple**
16:13
**applicable**
20:9, 27:10
**application**
20:22, 29:20,
134:1, 137:13,
140:13, 141:6
**applied**
34:14, 117:20,
124:10, 139:11,
139:12, 139:15,
147:19, 157:10
**applies**
23:15, 138:2,
155:6, 157:17
**apply**
24:7, 63:6,
63:19, 111:5,
111:7, 113:4,
116:10, 118:19,
146:6, 148:7,
149:15, 156:18,
157:11, 157:14
**appreciate**
81:3

**approach**
89:13, 90:2,
90:13, 159:8
**approached**
45:9
**approaches**
61:7
**approaching**
156:14, 159:9
**appropriate**
13:15, 64:1,
65:20, 66:5,
106:1, 124:10,
148:2, 148:8,
148:10, 148:18,
149:11, 152:18,
156:1, 156:3,
156:15
**approved**
127:20
**approximately**
121:6
**arbitral**
28:16
**arbitrate**
10:6, 12:19,
12:21
**arbitration**
1:1, 1:11, 2:1,
11:21, 14:3,
18:5, 23:5,
46:3, 92:22,
105:4, 127:8,
169:4
**arbitrator**
3:2, 7:2, 7:13,
7:21, 8:14,
8:18, 8:21,
10:12, 10:14,
10:18, 11:8,
11:12, 13:15,
13:20, 14:5,
15:1, 15:3,
16:17, 19:2,
19:7, 19:15,
19:18, 24:14,
24:15, 35:8,
35:16, 35:19,

54:6, 78:10,
81:1, 81:6,
88:1, 88:8,
88:11, 88:14,
88:17, 88:22,
91:5, 98:13,
98:19, 99:8,
99:12, 101:17,
103:7, 103:9,
106:16, 106:21,
107:2, 112:6,
112:14, 119:4,
119:18, 120:6,
120:10, 123:8,
126:17, 126:20,
128:5, 128:18,
130:6, 133:6,
134:2, 134:5,
134:8, 136:21,
137:10, 137:19,
139:19, 140:16,
140:18, 141:3,
145:3, 149:14,
151:22, 155:5,
156:22, 158:2,
158:4, 158:7,
158:9, 158:13,
158:17, 158:21,
158:22, 163:16,
164:11, 164:14,
165:3, 165:9,
165:18, 165:20,
166:5, 166:10,
167:9, 168:8,
168:11, 168:17,
169:15, 170:14,
170:22
**area**
98:4
**areas**
89:7
**aren't**
106:6, 126:9
**argue**
18:12, 129:14,
156:22
**arguing**
163:18

**argument**
119:22, 120:9,
130:2, 130:3,
130:7
**around**
56:7, 56:10
**arrived**
120:21
**article**
92:18
**articulated**
120:1
**aside**
25:13
**ask**
23:12, 53:11,
73:8, 79:13,
90:16, 91:9,
106:5, 107:10,
117:2, 135:15,
139:17, 145:7,
164:2
**asked**
11:15, 16:22,
17:20, 45:14,
45:15, 93:20,
95:2, 95:4,
95:8, 126:15,
157:22, 159:5,
159:7, 163:15,
169:9
**asking**
13:13, 98:17,
114:15, 114:17,
151:10, 156:12
**asop**
62:12, 62:21,
63:9, 63:10,
63:11, 63:13,
63:16, 145:10,
148:15, 148:17,
149:15
**asops**
56:19
**aspects**
41:13
**assertion**
137:4, 169:17

Transcript of Arbitration - Day 1
Conducted on December 12, 2017

177

| | | | |
|---|---|---|---|

asserts
79:15
assess
50:1, 52:22,
54:11, 62:1,
77:3
assessed
13:2, 19:21,
58:7, 58:9,
58:10, 69:16,
70:10, 83:5,
106:4, 150:15
assessing
58:6, 61:21,
74:18, 159:21
assessment
20:9, 25:13,
65:20, 72:15,
87:18, 120:14,
120:15, 121:7,
157:6
assessments
51:16
assets
111:14, 138:15,
138:17, 138:20,
142:4, 154:4,
162:13, 162:15,
162:16, 162:20,
163:1
association
1:1
assume
19:10, 78:8,
134:11, 154:9
assumed
23:8, 82:11,
82:19, 157:9,
157:11
assumes
103:4, 134:17
assuming
78:7, 130:22,
154:2, 157:13
assumption
9:20, 20:19,
26:15, 58:12,
72:10, 73:7,

73:16, 74:5,
76:21, 80:4,
81:15, 100:9,
139:21, 139:22,
142:4
assumptions
13:5, 14:8,
20:1, 20:14,
20:20, 21:9,
21:12, 25:16,
26:2, 26:11,
29:4, 29:11,
29:15, 41:10,
42:8, 44:20,
45:2, 45:3,
45:17, 47:21,
48:3, 48:5,
48:19, 49:15,
49:18, 49:20,
49:22, 50:4,
50:6, 50:8,
50:9, 50:12,
51:18, 54:1,
54:3, 54:4,
54:10, 54:14,
54:15, 54:19,
55:10, 55:12,
55:15, 55:22,
56:1, 56:22,
57:9, 57:16,
57:19, 57:20,
58:3, 58:5,
58:13, 58:19,
62:18, 63:2,
63:4, 63:12,
63:20, 70:16,
70:18, 70:19,
70:20, 70:22,
71:1, 71:2,
71:5, 71:12,
71:15, 71:16,
71:18, 71:22,
72:4, 72:9,
72:20, 73:4,
74:6, 74:11,
79:17, 79:20,
80:3, 80:6,
80:21, 87:4,

87:6, 90:14,
99:1, 115:19,
116:10, 126:1,
126:4, 127:1,
127:3, 129:5,
134:11, 136:7,
136:16, 139:13,
142:4
assures
82:5
attachment
121:3
attained
43:15
attempt
16:12
attention
32:8
attributable
48:16, 49:9,
52:5, 52:8,
53:2, 73:3,
118:14
attributes
53:16
august
45:12
authority
28:16, 55:11,
149:13
authorized
27:8
available
15:19, 15:22,
16:3, 16:13
avenue
2:5, 4:8
average
77:21
aware
100:18, 100:21,
101:1, 103:16,
105:3, 105:7,
127:7, 127:13,
128:3, 128:5,
128:10, 149:13,
155:5
away
120:8

| B |
|---|

b
26:4, 147:19,
148:6, 149:15
back
22:10, 30:11,
39:2, 48:8,
54:13, 66:20,
95:3, 100:22,
106:5, 108:8,
115:18, 120:18,
144:18, 144:20,
145:5, 150:21,
165:4
backed
85:16
background
30:8, 39:19,
39:21, 90:17
bad
115:14
bargaining
47:3, 47:7,
52:17
bars
29:19
base
104:11
based
24:2, 27:8,
28:3, 36:5,
36:6, 48:14,
51:6, 55:17,
61:22, 66:10,
68:17, 71:19,
72:5, 75:19,
78:16, 83:17,
83:18, 101:5,
104:6, 113:4,
122:20, 125:2,
142:9, 152:19,
157:6
bases
26:21, 61:7
basically
10:6, 42:22,
114:6, 152:21

Transcript of Arbitration - Day 1
Conducted on December 12, 2017

**basis**
51:4, 51:15,
62:16, 64:1,
99:9, 100:9,
100:11, 101:19,
104:11, 105:13,
147:4, 148:2,
149:11, 153:11
**battle**
21:4
**bears**
25:22
**because**
7:18, 10:3,
12:15, 13:8,
16:1, 16:22,
17:9, 17:21,
18:13, 20:17,
22:4, 23:16,
25:13, 27:19,
28:9, 34:17,
55:6, 60:16,
64:12, 65:8,
71:9, 76:11,
77:7, 79:18,
80:14, 82:3,
82:6, 83:18,
84:18, 88:12,
91:6, 95:6,
102:6, 107:15,
107:22, 109:4,
110:17, 115:17,
119:13, 122:9,
122:17, 125:8,
126:13, 127:11,
128:8, 129:15,
132:17, 134:19,
136:5, 137:17,
138:14, 139:19,
140:3, 143:5,
146:14, 150:10,
151:6, 168:18
**become**
22:11, 41:3,
41:5, 41:20,
67:7
**becomes**
108:1, 108:7

**becoming**
38:18
**been**
12:2, 13:18,
14:7, 16:13,
18:5, 23:5,
23:6, 35:15,
39:1, 39:3,
40:16, 42:11,
42:13, 56:7,
56:8, 56:10,
56:11, 59:6,
59:8, 64:15,
65:8, 71:22,
76:19, 77:19,
78:12, 81:1,
87:9, 90:19,
90:22, 93:2,
95:5, 95:18,
99:22, 109:7,
109:10, 118:6,
118:8, 118:17,
127:19, 133:14,
141:17, 152:9,
152:13
**before**
2:12, 7:14,
8:9, 11:1, 14:6,
25:9, 33:2,
35:6, 38:14,
54:5, 81:4,
89:9, 91:5,
91:8, 146:13,
153:12, 155:11,
160:3, 160:4,
172:3
**behalf**
3:8, 4:2,
22:18, 35:20,
79:6, 89:1,
107:4, 159:1,
167:10
**behind**
136:8
**being**
7:3, 22:8,
32:16, 45:18,
62:4, 64:12,

68:11, 68:21,
90:18, 118:15,
119:15, 119:16,
121:18, 126:2,
152:8, 160:17,
169:11
**believe**
13:14, 22:21,
32:7, 40:22,
57:13, 100:3,
102:5, 108:5,
122:2, 124:21,
146:13, 159:7,
161:15, 163:17
**believes**
35:1
**belong**
164:19
**below**
130:22
**beneficiaries**
70:4, 73:3
**beneficiary**
70:1
**benefit**
24:21, 26:19,
30:17, 30:19,
32:11, 46:10,
46:15, 48:6,
48:8, 50:5,
50:14, 51:2,
51:7, 51:11,
60:14, 63:18,
65:1, 65:3,
65:11, 65:17,
66:13, 66:17,
66:18, 66:22,
67:3, 69:17,
69:19, 72:17,
75:7, 79:1,
82:4, 84:6,
109:5, 113:3,
113:8, 113:12,
113:15, 113:22,
114:8, 114:10,
115:3, 115:15,
116:4, 118:11,
118:12, 119:12,

124:9, 124:11,
124:21, 162:12
**benefit"**
112:1, 112:18
**benefits**
26:7, 26:20,
30:12, 46:9,
46:11, 48:10,
48:11, 48:14,
48:16, 48:17,
48:21, 49:8,
51:13, 51:18,
52:4, 53:2,
53:7, 53:17,
57:13, 60:2,
60:14, 61:11,
63:18, 64:12,
65:8, 65:19,
66:3, 66:5,
66:7, 66:8,
66:9, 66:11,
66:21, 67:11,
69:11, 69:15,
72:12, 78:4,
78:16, 79:3,
80:10, 80:12,
82:8, 85:4,
100:6, 103:19,
104:2, 108:3,
108:7, 109:9,
111:1, 111:14,
112:21, 114:3,
115:5, 115:7,
115:21, 116:3,
116:5, 118:6,
118:8, 121:12,
121:14, 123:12,
123:15, 124:2,
124:9, 124:12,
124:17, 124:22,
125:1, 125:5,
125:7, 125:8,
125:11, 125:13,
125:15, 126:2,
126:9, 126:10,
134:12, 140:5,
140:6, 143:6,
143:13, 147:3,

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                                    179

148:21, 150:18,
150:19, 152:9,
152:13, 153:10,
159:15, 163:11
**benefits"**
111:17
**best**
29:7, 55:17,
57:22, 59:20,
61:6, 62:16,
62:20, 105:13,
126:5, 127:4,
153:10
**better**
142:22, 168:16
**between**
11:19, 14:11,
29:8, 31:16,
48:12, 60:2,
77:5, 78:20,
112:10, 150:1,
152:20
**beyond**
133:1
**big**
73:6, 73:7,
74:1, 89:10
**biggest**
74:12
**billing**
45:21, 45:22
**billion**
72:17, 78:17,
78:18, 100:5,
122:5, 122:10,
122:18
**bills**
34:20
**binder**
7:17
**bit**
30:8, 46:5,
83:3, 83:19,
98:13, 162:3
**bite**
16:12
**blend**
61:7, 97:5,

130:12, 130:13,
130:18, 130:20,
131:4, 131:16,
131:20, 132:2,
132:3, 133:4,
133:5, 133:20,
133:21, 134:1,
134:22, 137:6,
137:13, 137:15,
137:17, 137:20,
138:2, 138:10,
138:11, 140:14,
140:20, 141:7,
141:18, 143:1,
143:10, 143:21,
144:11, 154:20,
162:8, 162:10,
162:11, 170:18
**blended**
61:8, 127:17,
128:1
**board**
40:15, 40:16,
44:6, 56:5,
56:15, 147:2
**bockius**
4:7
**bond**
28:2, 62:6,
83:20, 85:6,
85:10, 85:18,
86:11, 152:21,
153:21
**bond-like**
85:5, 85:7,
86:6, 86:10
**bonds**
60:10, 60:11,
60:16, 61:15,
61:22, 62:3,
77:3, 77:8,
77:9, 83:11,
85:9, 85:15,
85:19, 86:1,
150:10, 152:3,
153:3
**book**
7:7, 110:5,

110:7, 112:10,
112:16, 145:12,
145:15
**booklet**
11:1
**both**
14:17, 21:17,
22:10, 22:11,
22:21, 27:5,
30:12, 34:7,
38:4, 46:19,
47:9, 47:19,
48:5, 48:21,
49:5, 50:17,
51:19, 72:3,
118:10, 157:13
**bottom**
89:20, 117:4,
138:9, 166:8
**break**
88:5, 88:6,
145:2
**breaking**
106:14
**breakup**
33:20
**brief**
18:18, 30:9,
88:13, 129:15,
157:1
**briefing**
35:4
**briefly**
46:7
**briefs**
120:2, 168:22
**bring**
32:8, 165:4,
165:7
**bringing**
115:18
**brings**
115:18
**broke**
30:20
**broken**
41:6, 43:1
**brookline**
3:5

**brown**
34:16
**bs**
39:22
**buckets**
30:20
**burden**
26:1, 29:9,
29:14
**buy**
69:2
**buyer**
60:3, 77:5,
84:8, 150:2,
150:7, 152:22,
154:2
**buying**
60:9, 69:4,
69:7, 152:11,
153:5

---
**C**
---
**c**
20:4, 20:5,
20:6, 20:9,
21:21, 22:5,
22:7, 23:7,
23:9, 23:12,
23:14, 23:17,
29:22, 30:5,
31:2, 31:11,
31:15, 32:2,
32:17, 32:22,
33:9, 33:14,
33:18, 34:5,
34:10, 34:21,
35:3, 111:12
**c)(1)(b**
14:15, 30:3
**c)(4**
9:5, 9:8, 11:7,
11:10, 12:5,
12:10
**calculate**
11:15, 13:6,
14:9, 41:11,
50:18, 51:1,
53:12, 54:1,

Transcript of Arbitration - Day 1
Conducted on December 12, 2017

180

100:10, 109:20,
110:22, 116:2,
136:6, 160:6,
160:7, 162:5,
162:6
**calculated**
53:5, 53:6,
77:20, 133:21,
137:21, 157:13,
163:14
**calculates**
50:14, 160:8
**calculating**
51:18, 65:16,
121:14, 161:20,
168:4
**calculation**
12:4, 26:9,
28:2, 45:16,
54:16, 55:4,
57:8, 70:10,
70:12, 80:18,
80:19, 92:4,
107:14, 109:5,
114:10, 117:15,
118:5, 118:8,
118:13, 120:22,
123:19, 124:18,
125:7, 126:7,
133:19, 136:13,
157:21, 167:22
**calculations**
40:19, 41:10,
57:17, 66:1,
91:14, 101:20,
120:20, 125:10,
131:3, 131:16,
132:1, 136:8,
142:10, 157:5,
157:20
**call**
20:4, 35:10,
35:11, 75:10,
79:10, 136:18,
164:18, 164:19,
164:21
**called**
36:4, 38:16,

101:13
**calls**
151:19, 156:17
**came**
22:7, 168:19,
169:21
**can**
7:8, 8:16,
10:9, 10:10,
31:9, 42:16,
60:10, 60:16,
72:19, 81:9,
83:22, 94:6,
94:8, 95:3,
126:12, 129:14,
133:6, 135:9,
156:8, 156:20,
163:8, 167:7
**can't**
19:3, 102:17,
106:5, 128:17,
137:15
**cannot**
66:20
**cap**
13:7, 14:13,
20:8, 22:1,
23:19, 24:7,
24:13, 30:2,
34:12, 87:14,
157:10, 157:13,
157:14, 157:16
**captive**
84:18
**career**
93:17
**careful**
23:13
**carry**
29:14
**case**
1:5, 9:3, 15:6,
19:20, 26:14,
45:5, 93:3,
97:12, 105:3,
105:8, 127:8,
127:16, 128:2,
128:5, 128:11,

144:17, 147:12,
172:10
**cases**
27:3, 92:3,
96:11, 96:12,
102:17
**cash**
83:6, 163:9
**categories**
46:22
**categorize**
96:13
**caused**
20:20
**cbiz**
96:10
**ccc**
86:2
**certain**
47:21, 53:22,
75:18, 103:16,
105:22, 118:3,
151:15
**certainly**
90:4, 137:7,
170:5
**certificate**
172:1
**certification**
42:17
**certifications**
37:4, 43:7
**certified**
2:13, 40:16
**certify**
172:4
**cessation**
52:10, 52:12
**cfr**
166:5, 166:7
**challenge**
10:5, 19:20,
21:20, 27:13
**challenged**
13:17, 26:15
**challenging**
9:20, 167:22,
168:2

**chance**
10:7
**chances**
104:9
**change**
52:16, 56:9,
56:13, 56:19,
75:14, 75:15,
92:10, 160:13,
160:14
**changed**
43:2, 100:9
**characterizing**
89:11
**charge**
69:6, 84:20,
84:21
**charged**
152:8
**charging**
23:21
**charles**
4:6
**chicago**
38:16
**chief**
36:4, 36:18,
36:19
**chocks**
170:15
**chose**
17:2
**chosen**
20:20
**christopher**
3:10
**chyron**
96:11
**circumstances**
105:22
**citation**
110:9
**cited**
110:1, 168:22
**citing**
128:1
**claims**
122:21

Transcript of Arbitration - Day 1
Conducted on December 12, 2017

**clarification**
112:6, 113:13, 165:10
**clarifying**
113:12
**clear**
25:21, 26:4, 30:22, 107:13, 114:7, 119:11, 123:13, 129:20, 163:7, 163:8, 165:14
**clearly**
12:2, 35:1
**client**
136:14
**close**
32:21, 33:7, 71:22, 163:20, 163:22
**closely**
72:5
**closer**
143:14
**coal**
28:8, 32:12, 32:13
**code**
20:5, 22:15, 23:1, 30:1, 32:14, 32:19, 33:5, 34:5, 40:20, 41:14, 49:4, 50:10, 110:9
**cole**
32:10
**colleagues**
24:18
**collected**
122:22
**collective**
47:2, 47:7, 52:17
**collects**
153:15
**colorado**
36:11

**columbia**
2:15
**combined**
31:5
**come**
17:20, 37:14, 38:19, 59:13, 61:8, 65:20, 68:6, 106:5
**comes**
36:21, 96:8, 96:9, 96:17
**coming**
129:4
**commission**
172:15
**committee**
32:4, 44:14
**committees**
56:16
**common**
28:17, 130:13
**commonly**
32:12, 53:13, 75:2, 90:5
**commonwealth**
172:21
**companies**
75:21, 83:16, 83:22, 84:1, 84:12, 85:18, 86:1
**company**
52:14, 69:3, 76:14, 77:11, 84:21, 96:8, 150:22, 154:1, 154:7, 154:11, 165:19
**comparable**
77:3, 86:13, 106:7
**compared**
72:14, 105:21
**compendium**
11:9
**compensated**
45:18

**competitive**
68:14
**complete**
52:11
**compliance**
37:3, 37:11, 38:6
**components**
41:11
**computing**
111:1
**conceded**
25:15
**conceive**
73:15
**concern**
95:12
**concerned**
10:2, 170:15
**concerning**
11:19, 145:8
**concerns**
124:16
**conclude**
33:22
**concluded**
34:9
**condition**
118:20, 131:21, 143:2, 154:15, 154:21
**conference**
43:8, 43:13, 43:14, 44:6, 94:16
**conflict**
62:16
**confused**
122:14, 123:9
**confusion**
137:22
**congress**
22:8, 22:9, 24:9, 28:19, 30:22, 32:1, 33:12, 33:15, 35:1, 110:21, 111:9, 111:10,

111:15, 112:17, 113:7, 113:16, 114:18, 115:4, 117:22, 118:10, 126:10, 128:15, 129:8, 155:21, 156:18, 156:19, 156:20
**congress's**
128:17, 128:20, 128:21, 128:22
**congressional**
31:3
**consider**
16:2, 63:17, 65:14, 91:12, 100:15, 108:13, 124:18, 145:21, 148:11, 148:19, 152:21
**consideration**
58:1, 124:5
**considered**
21:21, 23:17, 115:6
**consistent**
59:21, 61:5, 61:9, 61:14, 62:13, 62:15, 65:21, 67:16, 68:7, 77:2, 81:21, 82:1, 85:8, 90:2, 90:4, 90:8, 101:4, 105:14, 105:16, 128:15, 129:6, 134:19, 134:21, 148:1, 148:19, 149:19, 149:22, 152:19
**constant**
81:12
**constitute**
34:4
**consultants**
36:22, 37:2, 37:6, 37:8
**consulting**
36:13, 37:9,

Transcript of Arbitration - Day 1
Conducted on December 12, 2017

38:17, 43:9,
43:13, 43:14,
43:18, 44:7,
90:22, 91:7,
91:10, 91:12,
91:17, 91:22,
93:21, 94:3,
95:5, 95:6
**contained**
10:22
**contemplate**
16:18
**contemplated**
15:10
**contemplation**
15:10
**contemporaneous**
83:11
**contending**
13:22, 105:8
**contention**
25:12
**contest**
137:8
**contesting**
17:2, 26:10
**context**
59:15
**contingent**
46:2
**continuation**
29:21, 30:4,
32:22, 33:9,
34:2
**continue**
136:4, 136:17,
139:17, 148:20,
168:12, 169:11
**continuing**
40:8, 41:15,
41:17, 42:2,
43:3, 44:17,
140:17
**contrary**
143:7, 144:17,
144:21, 144:22
**contributed**
152:6, 152:7

**contributing**
86:21
**contribution**
41:12, 52:13,
104:11
**contributions**
52:10, 53:3,
53:18, 53:20,
61:20, 106:6
**convenience**
7:18
**copy**
27:16
**corner**
3:14
**corporation**
1:4, 3:8, 7:4,
26:20, 35:21,
75:7, 159:2
**corrections**
92:8
**correctly**
123:5
**cost**
48:15, 49:8
**could**
12:1, 26:4,
46:7, 52:11,
61:22, 62:2,
69:8, 73:16,
74:3, 74:5,
76:13, 79:16,
84:16, 88:15,
91:6, 91:8,
91:9, 101:12,
101:17, 111:19,
114:7, 129:19,
133:17, 135:7,
144:18, 144:20,
153:17, 153:19,
154:6, 158:2,
160:2, 165:13
**couldn't**
22:12, 22:13
**council**
44:9, 44:15
**counsel**
8:10, 11:5,

16:8, 17:19,
24:19, 25:4,
35:20, 68:1,
89:1, 133:8,
159:1, 159:4,
165:2, 167:10,
168:19, 172:8
**count**
18:16, 116:6
**couple**
23:7, 38:17,
41:7, 50:9,
80:20, 88:18,
130:11, 155:10,
159:5, 167:14
**course**
18:2, 93:8,
93:16
**court**
24:21, 34:10,
34:11, 36:10,
92:21, 105:4,
119:21, 127:8,
128:6, 129:21,
149:14, 155:5
**courtesy**
18:3
**courts**
34:9
**cover**
42:5, 42:8,
69:11, 163:10
**covered**
19:11, 34:10,
99:10, 162:12,
162:14
**covering**
81:5
**covers**
32:2
**created**
30:11
**creates**
56:4, 56:5
**creation**
24:10
**credit**
68:8, 76:10,

77:9, 84:3,
85:17, 86:13,
115:14
**creditworthiness**
28:4, 61:16,
61:18, 63:17,
69:5, 76:10,
81:22, 83:19,
85:19, 86:12,
101:5, 101:21,
115:10, 125:3
**creditworthy**
61:21, 62:6,
68:12, 104:8,
104:10, 104:18,
118:21, 155:19,
156:1
**crescent**
3:12
**critical**
63:22, 64:9,
64:13, 64:21,
65:6, 65:7,
100:1, 101:2,
102:3, 104:3,
104:7, 104:12,
104:16, 104:22,
110:13, 118:2,
118:15, 119:6,
119:7, 160:17,
161:6, 161:7,
161:10, 161:12
**critically**
28:22
**criticizing**
16:1
**cross**
6:2, 88:3,
88:4, 170:16
**cross-examination**
19:9, 89:1,
99:4, 103:6,
107:4, 158:16,
170:16
**cross-examine**
18:15
**cross-examining**
130:1

Transcript of Arbitration - Day 1
Conducted on December 12, 2017

crr
1:22
crystal
163:8
current
48:16
currently
28:19, 34:19,
36:9, 66:19
cut
66:20, 108:8

**D**

d
13:8, 29:19
date
48:14
day
1:11, 2:1,
18:1, 172:13
dc
2:6, 4:9, 4:18
deal
7:14, 84:5,
106:12, 170:19
dealer
153:22
deals
20:1
debated
156:20
december
1:13, 16:7,
18:9, 172:14
decide
10:13, 13:17
decided
156:19
decider
127:9
declared
151:1
decline
28:11, 169:18
declining
64:9, 64:13,
64:21, 65:7,
104:3, 104:12,

104:16, 104:22,
118:2, 118:15,
119:7, 160:18,
161:7, 161:10
decreased
144:12
decreases
143:15
dedicates
17:16
deduction
22:18
deeply
28:1
default
84:16
defeasance
27:9
defeasment
147:6
defies
28:17
defined
46:10, 46:14,
46:15
definitely
46:9, 136:10
definition
31:21, 33:5,
66:12, 66:16,
104:13, 104:18,
111:16, 112:1,
112:17, 113:22,
114:16, 115:2,
115:4, 115:9,
124:16
degree
39:22, 77:10,
82:7
delay
17:20
demand
120:14
demarcation
30:21, 33:3
demographic
63:12, 71:11
demonstrate
20:12, 20:17,

25:16, 31:13,
137:11
denominator
121:21
denver
36:5, 36:6
departing
28:14
department
103:17
depend
115:10, 115:13
dependents
30:14
depending
83:19
depends
114:11
deposition
15:20, 15:21,
16:3, 21:5,
21:16, 93:19,
99:11, 108:6,
121:16, 147:17,
147:21, 147:22
depositions
18:6, 122:15
depth
101:18
describe
39:19, 42:16,
46:7, 73:8,
83:22
described
29:22, 32:21,
33:8, 34:5,
64:19, 159:8,
167:17
designation
42:20, 43:16
designed
28:20
despite
16:5, 27:15
detail
19:12
details
89:9

deteriorated
142:12
determinable
46:9
determination
11:22, 12:3,
13:11, 14:1,
23:14, 25:17,
26:7, 26:12,
33:21, 63:20,
66:4, 74:13,
110:13, 110:14,
117:15, 117:19,
149:16
determination"
117:11
determinations
11:20, 23:2,
26:6, 38:3,
61:2, 130:15
determine
21:1, 21:12,
45:16, 49:16,
55:13, 75:22,
76:3, 76:5,
78:1, 85:3,
111:10, 113:14,
115:19, 138:4,
140:14, 160:20
determined
13:18, 33:16,
76:16, 79:16,
114:8, 144:3
determines
24:2, 75:17,
75:19
determining
21:9, 48:21,
53:21, 54:10,
58:19, 59:18,
61:13, 61:18,
62:11, 63:8,
64:11, 67:13,
67:14, 68:5,
75:9, 76:8,
76:20, 76:21,
77:1, 81:16,
82:12, 82:20,

Transcript of Arbitration - Day 1
Conducted on December 12, 2017

184

85:4, 86:7,
86:9, 90:5,
127:20, 143:13,
161:18, 161:19,
162:21
**dictates**
60:8
**did**
13:4, 16:18,
20:1, 21:7,
21:17, 38:14,
38:20, 70:13,
70:14, 71:11,
74:17, 75:22,
76:3, 76:4,
77:14, 77:22,
78:15, 79:7,
79:18, 80:2,
86:22, 87:2,
101:3, 101:4,
101:20, 102:13,
119:7, 157:4,
157:11, 157:13,
157:14, 157:19,
157:21, 168:3,
169:17
**didn't**
11:3, 16:1,
16:6, 16:14,
102:11, 108:13,
122:1, 147:18,
164:15, 169:1,
170:2
**difference**
23:20, 69:22,
70:3, 70:5,
70:7, 78:20,
79:4, 142:3
**different**
29:1, 36:16,
39:18, 41:7,
43:1, 45:2,
53:8, 66:1,
69:8, 80:20,
84:11, 85:10,
105:15, 122:14,
122:16, 125:10
**digest**
18:18

**dire**
102:3, 118:20
**direct**
6:2, 35:20,
90:18, 93:6,
98:14, 103:19,
109:17, 116:17,
133:1, 145:9
**direction**
172:8
**directive**
31:3
**directly**
30:13, 74:6,
143:7, 144:16,
144:20
**directs**
55:11
**disability**
49:20, 54:20,
59:9, 73:6,
73:11, 73:13,
73:15
**disagree**
81:19, 94:9
**disagreement**
29:8, 129:9,
129:10
**disagreements**
169:2
**discount**
9:17, 20:18,
26:18, 27:7,
28:9, 29:1,
44:19, 48:7,
49:18, 50:11,
55:3, 55:8,
59:11, 59:12,
59:16, 59:21,
60:20, 62:1,
62:12, 62:13,
62:15, 63:7,
64:2, 65:21,
66:4, 66:5,
67:13, 67:14,
67:16, 68:9,
68:17, 70:9,
71:9, 72:7,

74:10, 74:17,
76:20, 78:4,
80:21, 81:15,
81:20, 86:8,
87:7, 89:14,
89:16, 96:21,
105:9, 105:14,
105:20, 106:7,
108:21, 109:8,
117:19, 123:14,
123:18, 124:5,
124:7, 124:9,
124:19, 124:20,
125:2, 126:12,
127:9, 128:6,
130:14, 145:17,
145:20, 146:3,
146:16, 147:5,
147:7, 148:2,
149:12, 149:15,
152:18, 154:16,
155:14, 156:2,
156:6, 157:7,
159:9, 160:14,
162:6
**discounted**
28:1, 55:8
**discounting**
26:16, 86:7,
123:14
**discourage**
129:19, 130:4
**discuss**
63:16
**discussed**
54:5, 57:17,
58:15, 74:16,
80:2, 95:1,
96:11, 96:12,
124:1, 146:13
**discusses**
62:10, 62:12,
62:13, 64:7,
64:8, 82:10
**discussing**
57:7, 87:9
**discussion**
8:10, 81:4,

133:10, 134:7
**discussions**
15:6
**dispute**
9:22, 10:1,
11:18, 29:7,
138:21, 139:2,
139:4, 139:8
**disputes**
13:2
**disregarded**
117:10
**distinguish**
112:10
**district**
2:15, 34:10
**document**
56:17, 141:11
**documents**
63:2
**does**
9:3, 9:4,
10:15, 23:18,
24:7, 27:19,
29:2, 40:11,
41:3, 41:20,
41:22, 42:17,
43:12, 43:19,
53:10, 53:11,
55:3, 57:6,
57:18, 58:3,
58:11, 59:2,
59:17, 63:13,
63:16, 64:6,
66:7, 67:9,
67:12, 80:8,
80:17, 87:3,
99:8, 102:18,
111:5, 111:7,
125:11, 125:22,
134:22, 148:6,
149:15, 160:6,
160:7, 162:10
**doesn't**
22:19, 62:16,
103:7, 103:9,
107:16, 107:18,
114:1, 115:9,

Transcript of Arbitration - Day 1
Conducted on December 12, 2017

185

115:13, 121:13,
146:16, 163:19,
164:19
**doing**
41:10, 99:5,
101:10, 101:12
**dollar**
69:20, 70:4,
122:5
**dollars**
142:21, 143:4
**don't**
8:2, 8:3, 8:12,
8:21, 10:2,
10:6, 10:7,
18:12, 24:8,
31:8, 54:6,
65:1, 81:18,
82:17, 83:2,
91:6, 92:5,
94:5, 95:12,
96:12, 97:10,
100:7, 102:21,
103:1, 105:2,
113:11, 113:21,
114:6, 121:19,
123:3, 123:6,
128:12, 132:1,
132:17, 133:7,
135:14, 136:7,
139:4, 139:9,
148:8, 148:16,
149:10, 152:1,
161:15, 164:6,
164:18, 164:20,
165:16, 168:14,
170:9
**done**
9:15, 9:18,
95:6, 100:13,
131:3, 131:7,
153:12, 158:9,
165:6
**doubt**
29:13, 29:15
**down**
160:14, 162:16,
162:20, 163:1

**dr**
15:15, 15:18,
16:1, 19:4,
25:3, 27:1,
27:7, 27:11,
29:13, 117:4,
138:18, 170:8,
170:10, 170:12
**dramatically**
39:15
**drawing**
80:10
**drive**
3:12
**drops**
52:15
**due**
18:1, 152:13
**dues**
44:1
**duly**
35:15
**during**
19:12, 31:17,
169:2

**E**

**each**
58:6, 58:12,
95:2
**earlier**
71:1, 108:6,
143:8, 144:6,
144:17, 154:19,
155:12
**earn**
61:4
**earned**
48:14
**economic**
63:1, 63:3
**editorial**
14:16
**education**
37:16, 39:20,
40:8, 41:15,
41:17, 42:3,
42:5, 43:3,

44:17
**educational**
39:19, 39:21
**effect**
23:2, 54:15,
55:4, 58:15,
74:22, 80:5,
108:14, 125:4,
126:9, 137:15
**effective**
143:12, 144:6
**efforts**
28:19
**eight**
34:20
**either**
64:8, 108:5,
160:14
**elba**
3:4
**elect**
50:5
**else**
119:17
**email**
11:5
**emerged**
71:21
**emergency**
81:8
**employed**
172:9
**employee**
22:18, 57:2
**employees**
52:15, 52:18,
53:3
**employer**
9:9, 11:19,
14:19, 22:17,
27:4, 28:14,
34:7, 46:22,
47:10, 50:9,
52:8, 53:1,
54:13, 67:18,
69:1, 87:13,
94:15, 95:6,
106:3, 106:5,

106:11, 111:6,
121:21, 131:15,
143:19, 146:14,
146:17, 159:11,
162:1
**employer's**
10:16, 38:5,
52:5, 52:18,
53:18, 89:16,
89:17, 108:22,
130:19, 142:18,
142:20, 143:2,
146:10, 147:14,
154:22
**employers**
27:5, 28:7,
39:9, 47:3,
47:6, 53:20,
82:14, 82:15,
82:22, 86:20,
91:18, 92:1,
93:21, 94:3,
95:8, 102:6,
110:15, 110:17
**enacted**
34:8
**enacting**
128:15
**enactment**
30:15, 127:6,
155:3
**enactments**
32:4
**encourage**
129:20
**end**
165:17, 168:15
**endangered**
161:6, 161:7
**ended**
38:18
**ends**
14:17
**energy**
1:3, 3:8, 7:3,
8:11, 10:21,
11:5, 11:13,
12:19, 13:1,

Transcript of Arbitration - Day 1
Conducted on December 12, 2017

186

13:2, 13:13,
14:9, 16:8,
17:5, 17:12,
18:20, 19:21,
20:7, 21:22,
23:20, 24:5,
24:20, 25:12,
25:15, 25:21,
26:15, 27:13,
27:14, 28:8,
29:10, 29:13,
35:11, 35:20,
45:5, 64:17,
69:1, 69:6,
69:12, 69:14,
69:20, 70:11,
74:18, 83:5,
84:18, 86:22,
87:18, 109:4,
109:6, 109:11,
120:16, 121:11,
150:6, 150:11,
150:20, 152:6,
152:10, 152:22,
153:4, 153:16,
157:6, 159:2,
159:21, 167:16

**engaged**
45:5

**engagement**
45:4

**englewood**
36:11

**enough**
18:18, 19:14,
24:4, 69:10,
72:8, 108:2,
129:14

**enrolled**
40:5, 40:6,
40:11, 40:13,
40:21, 41:1,
41:3, 41:5,
41:20, 42:2,
42:11, 42:13,
43:9, 46:6,
47:9, 47:12,
47:15, 47:18,

49:15, 53:22,
55:11, 56:8,
58:18, 59:11,
59:17, 67:6,
67:13, 76:3,
76:4, 76:17,
90:18, 90:19,
95:7, 131:7

**enrollment**
40:9, 40:15,
40:17, 41:18

**ensure**
37:6, 38:6,
92:3

**entail**
64:6

**entered**
15:7, 21:15,
169:12

**entire**
39:1, 56:10

**entities**
83:20

**entitled**
13:7, 20:7,
22:1, 66:19,
123:11, 137:5,
141:18

**entity**
62:6, 83:20

**equal**
49:7, 53:1,
60:14, 62:4,
68:12

**equates**
154:13

**equating**
150:5, 152:2,
152:4

**erisa**
9:4, 9:6, 10:4,
10:15, 14:1,
14:15, 20:13,
21:2, 22:8,
24:1, 25:19,
28:6, 30:15,
34:8, 40:19,
41:13, 49:4,

57:2, 57:6,
57:10, 57:11,
57:12, 57:18,
58:22, 64:3,
64:4, 74:22,
75:4, 91:15,
109:19, 110:1,
110:6, 110:10,
110:21, 116:18,
116:21, 155:4,
155:8, 161:17,
161:21, 164:8,
165:1, 165:11

**erroneous**
12:2

**error**
37:18

**escapes**
57:15

**especially**
9:12, 9:14

**esquire**
3:3, 3:9, 3:10,
4:4, 4:5, 4:6,
4:12, 4:13, 4:21

**essence**
13:13

**essential**
68:6, 170:4

**essentially**
16:12, 19:22,
24:5, 61:3,
68:16, 87:18,
112:21, 147:4,
149:22, 169:13

**establish**
26:1, 29:4,
29:10, 99:3,
99:7, 101:18,
161:3, 161:5

**established**
25:19, 26:19,
31:15, 101:8,
102:1, 122:15

**estimate**
55:17, 57:22,
61:3, 62:20,
126:6

**ethan**
5:5, 25:3, 79:6

**even**
17:22, 64:22,
65:10, 65:17,
69:15, 114:21,
123:22, 124:2,
125:4, 125:6,
126:11, 155:21,
164:19

**eventually**
88:5

**ever**
34:12, 39:6,
47:15, 92:15,
92:18, 92:21,
95:5, 169:7

**every**
18:14, 40:9,
41:16, 54:18,
55:6, 55:7,
72:1, 75:15,
80:15, 95:4

**everybody**
132:20

**everyone**
81:9

**everything**
81:5, 165:7

**evidence**
7:10, 7:12,
22:3, 22:6,
23:13, 26:11,
103:5, 119:22

**evolve**
56:9

**evolves**
56:18

**exact**
119:9

**exactly**
120:21, 138:8

**exam**
41:20, 41:21,
98:14

**examination**
19:8, 35:20,
133:2, 133:3,

Transcript of Arbitration - Day 1
Conducted on December 12, 2017

187

140:19, 158:10,
159:1
**examine**
137:20
**example**
63:14, 132:19,
134:16, 135:8,
135:22, 136:12,
138:13, 144:15,
164:2, 166:12
**examples**
157:9, 157:11
**exams**
40:3, 40:6,
40:7, 41:6,
42:21, 42:22
**exceeded**
108:10
**exception**
122:13
**excess**
106:10
**excuse**
89:18, 116:19,
131:13, 138:19,
142:22
**exempt**
14:13
**exemption**
13:7
**exercise**
14:16
**exhibit**
6:5, 6:8, 8:7,
12:7, 12:8,
12:12, 12:18,
13:1, 24:3,
79:13, 110:5,
110:6, 111:19,
111:20, 111:22,
112:5, 112:7,
112:11, 112:12,
112:16, 116:18,
116:19, 116:20,
120:5, 120:13,
133:11, 133:15,
134:9, 136:18,
141:6, 141:12,

141:13, 141:17,
141:20, 141:22,
142:1, 145:11,
145:12, 159:19,
165:14, 165:19,
165:21, 165:22,
166:2, 166:3,
167:17, 168:14
**exhibits**
6:6, 7:7, 7:11,
112:9, 112:11,
165:17, 168:20,
168:22, 169:2,
170:11, 170:14
**expand**
60:6
**expect**
122:22
**expectations**
20:16, 55:19,
58:2
**expected**
50:2, 60:1
**experience**
20:15, 27:3,
27:15, 39:12,
41:8, 55:17,
55:18, 57:22,
58:1, 59:1,
59:2, 59:3,
59:8, 72:5,
77:14, 77:19,
126:6
**experienced**
59:5
**expert**
9:11, 15:9,
15:15, 16:18,
16:20, 17:3,
17:8, 17:11,
17:13, 17:14,
17:15, 25:3,
27:1, 27:2,
27:14, 35:12,
45:6, 79:5,
93:3, 148:18,
157:16
**expertise**
96:3, 96:7

**experts**
21:5, 21:14,
22:4, 44:15
**expires**
172:15
**explicitly**
27:8
**exquisite**
19:11
**extended**
15:8
**extension**
31:22
**extensive**
27:3
**extensively**
30:9
**extent**
18:4, 108:10,
127:19, 138:1,
156:17

**F**

**face**
71:19
**facilities**
31:19
**facility**
52:13
**facing**
155:18, 156:5
**fact**
20:22, 23:1,
23:7, 23:8,
27:6, 27:21,
28:18, 28:22,
30:5, 99:14,
103:21, 127:9,
138:8
**factors**
59:17, 62:4,
67:17, 68:11,
121:13
**facts**
103:4
**factual**
99:9, 119:22
**fail**
98:17

**failed**
29:14
**fails**
21:1
**fair**
19:14, 68:1,
68:3, 68:6,
68:20, 69:3,
69:6, 75:9,
92:7, 129:14,
134:5
**fairly**
29:18
**fairness**
17:9, 18:20
**faith**
85:16
**fall**
31:1
**false**
136:9
**familiar**
57:3, 64:4,
66:12, 66:15,
101:14, 101:16,
103:14, 103:20,
103:21
**far**
27:21, 85:20,
170:14
**fear**
25:7
**february**
166:18
**federal**
34:9, 34:10,
34:11, 109:18,
125:18
**fee**
46:1
**feel**
169:10
**feels**
116:12
**fellow**
40:2, 42:15,
42:18, 42:22,
43:4, 43:8,

Transcript of Arbitration - Day 1
Conducted on December 12, 2017

43:12, 43:14
**few**
31:6, 31:10,
53:8, 88:2,
90:16, 134:2
**fewer**
64:15
**fiction**
150:10
**field**
27:16, 43:18
**fifth**
94:21
**fifth-from-the-l-ast**
117:3
**fifth-to-last**
120:19, 121:1
**figure**
94:6
**figures**
100:8
**file**
12:7
**filings**
24:19
**finances**
84:10
**financial**
16:2, 28:10,
28:21, 38:3,
38:4, 38:5,
51:8, 51:9,
65:14, 65:15,
67:11, 67:20,
68:4, 69:5,
70:6, 76:11,
77:7, 82:6,
102:3, 104:4,
104:7, 107:18,
118:20, 131:21,
143:1, 154:15,
154:21, 172:10
**financially**
28:13, 89:15,
130:19
**finch**
4:21, 25:4

**find**
61:22, 136:10
**fine**
14:5, 88:17,
106:16, 106:20,
112:13, 170:13
**finished**
144:7, 144:9
**firm**
25:1, 25:2,
36:4, 36:14,
38:16, 45:18,
95:20, 97:12
**firm's**
46:1
**firms**
96:2, 96:6,
96:14, 97:2,
97:16, 99:6
**first**
8:7, 8:20,
8:22, 17:3,
17:6, 20:11,
21:19, 25:12,
31:12, 35:10,
74:20, 82:15,
93:1, 104:3,
107:12, 110:7,
121:8, 133:7,
159:7, 166:14,
166:16, 167:2
**fits**
31:21
**five**
18:16, 53:14,
53:15, 53:16,
53:19, 94:1,
94:6, 94:8,
95:17, 101:15,
158:3, 158:11
**flow**
83:6
**focus**
59:10, 147:7
**follow**
20:2, 21:7,
44:2, 55:21,
99:6, 148:15,

148:17, 149:4,
149:6, 149:9,
156:3
**following**
17:7, 90:12,
137:21
**follows**
32:19, 35:15
**foregoing**
172:3, 172:4
**forfeitable**
114:2
**forfeiture**
65:19
**forfeitures**
116:4
**forget**
119:9
**form**
50:4, 78:6,
140:17, 162:18
**formula**
24:1, 46:12,
121:4, 121:5,
121:18
**forth**
14:14, 21:2,
32:5, 87:3,
111:11
**found**
30:3, 71:15,
105:4, 145:11
**foundation**
101:9, 137:18,
151:6, 151:7,
151:8
**four**
18:16, 30:17,
30:20, 100:13,
117:6, 160:11
**fourth**
34:7, 94:18
**frankly**
21:11
**free**
81:17, 130:6,
156:22
**friday**
10:20

**from**
11:5, 14:13,
15:18, 16:3,
23:2, 29:12,
30:9, 40:1,
48:6, 51:11,
66:4, 67:13,
69:2, 69:4,
69:8, 69:12,
76:14, 80:10,
84:3, 84:8,
84:11, 85:14,
86:9, 106:3,
120:8, 122:20,
129:20, 130:5,
142:14, 147:1,
148:15, 149:13,
153:5, 153:16,
159:20, 169:13
**full**
69:16, 85:16,
108:2, 113:9,
115:15
**fully**
23:4
**function**
46:11, 159:16
**fund**
34:4, 52:10,
52:19, 81:22,
82:8, 83:7,
86:20, 86:21,
94:11, 99:20,
99:22, 100:5,
100:8, 100:18,
101:1, 101:2,
101:12, 101:15,
103:13, 125:3,
131:10, 162:14
**fund's**
21:16, 29:16
**funded**
49:12, 61:17,
67:6, 132:4,
132:6, 132:12,
138:3, 138:4,
138:13, 139:6,
142:7, 142:13,

Transcript of Arbitration - Day 1
Conducted on December 12, 2017

189

143:5, 143:14,
143:20, 152:13,
160:21
**funding**
37:3, 38:1,
48:21, 49:1,
49:2, 49:5,
49:6, 49:16,
49:17, 50:6,
61:1, 61:19,
69:9, 72:13,
74:13, 78:1,
78:21, 91:14,
97:7, 98:9,
105:10, 105:21,
131:1, 132:5,
134:18, 135:3,
135:4, 136:2,
137:2, 138:3,
139:13, 140:2,
140:5, 140:9,
142:10, 143:14,
144:4, 144:11,
162:8, 162:15,
162:17, 163:1,
163:4, 163:6,
169:19
**funds**
4:22, 7:5,
25:5, 81:11,
100:19, 103:16,
108:2, 121:18
**further**
11:2, 87:21,
105:18, 158:15,
167:5, 168:7
**furthermore**
25:21
**future**
48:11, 48:15,
48:17, 54:11,
55:7, 57:22,
60:1, 61:4,
66:22, 67:19,
108:7, 126:3,
126:6

---
G
---

**g**
64:4, 116:17

**gain**
72:1
**gains**
71:20, 72:3
**gave**
21:11
**general**
25:4, 49:7,
55:1, 55:3,
63:10, 95:11,
95:14, 114:17
**generally**
49:13, 49:14
**get**
8:16, 10:6,
10:7, 16:12,
28:8, 31:9,
37:12, 37:17,
38:7, 60:18,
68:16, 69:8,
89:9, 103:19,
104:2, 138:10,
138:12, 167:6
**gets**
22:17, 122:10
**getting**
39:15, 84:22,
110:17
**give**
7:8, 18:8,
132:18, 132:20,
144:8, 158:3,
165:2
**given**
7:6, 92:15,
139:20, 162:17
**giving**
94:6
**glenda**
4:21, 25:3
**go**
17:3, 17:6,
41:11, 54:6,
61:13, 68:9,
69:2, 88:22,
89:8, 94:8,
95:3, 99:12,
103:10, 107:11,

120:18, 133:6,
134:3, 134:8,
136:21, 141:3,
153:17, 153:21,
154:1, 154:10,
158:13, 158:22,
159:19, 162:16,
162:20, 163:1,
163:8, 164:22,
168:17
**goes**
27:21, 39:2,
59:10, 81:8,
133:1
**going**
18:1, 19:11,
20:12, 22:3,
22:4, 22:6,
38:13, 42:14,
58:16, 62:8,
67:21, 68:13,
69:22, 79:10,
79:11, 79:12,
79:13, 88:3,
88:5, 88:7,
98:8, 98:12,
99:16, 101:7,
107:12, 113:8,
117:2, 120:7,
128:19, 129:18,
130:8, 132:22,
136:4, 137:11,
150:19, 151:5,
151:13, 151:18,
156:16
**gone**
103:17
**good**
7:2, 24:16,
89:5, 89:6,
106:14, 107:8,
107:9, 115:14,
168:8
**got**
11:12, 39:22,
80:14, 115:6,
121:4, 124:13,
126:10, 136:7,

136:12, 156:6
**gotcha**
169:6, 169:10
**governing**
28:7
**government**
31:17, 31:18,
31:19, 85:21,
86:14
**great**
55:4, 82:7,
84:5
**greater**
54:15, 58:14,
82:13, 82:21,
101:18, 143:20,
162:16, 162:21,
163:2
**greatest**
54:19, 55:4
**green**
4:14
**gregory**
3:9
**groppe**
4:6, 25:2
**group**
36:20, 44:15,
56:12
**guarantee**
26:20, 75:7,
108:9
**guess**
60:6, 88:3,
137:22, 164:17
**guidance**
36:21, 36:22,
37:1, 127:2,
147:1, 148:10,
148:15, 148:17,
149:5, 149:7,
149:9
**gw**
81:11

---
H
---

**had**
7:14, 8:1,

Transcript of Arbitration - Day 1
Conducted on December 12, 2017

8:10, 10:21,
11:1, 15:6,
15:20, 16:13,
17:9, 17:19,
17:22, 18:15,
22:11, 30:12,
30:20, 31:19,
39:12, 69:1,
81:4, 104:10,
109:5, 109:8,
136:5, 169:9,
170:2
**hadn't**
169:7
**hand**
45:5, 132:20,
163:9, 172:13
**handed**
133:14, 141:16
**happen**
24:9, 161:13
**hard**
73:14
**hardly**
128:19
**has**
7:17, 11:10,
11:13, 11:14,
12:2, 13:18,
13:22, 18:5,
23:1, 24:1,
24:5, 29:14,
30:22, 32:1,
33:5, 33:12,
33:16, 34:12,
34:13, 34:16,
56:15, 59:5,
59:6, 59:8,
60:13, 65:2,
67:5, 67:7,
69:4, 69:5,
72:11, 77:7,
77:19, 80:4,
99:10, 99:22,
100:5, 100:10,
101:9, 104:3,
113:9, 115:14,
116:6, 116:7,

116:14, 118:10,
122:17, 124:18,
125:2, 125:5,
127:9, 127:19,
127:21, 128:6,
135:16, 136:22,
140:1, 140:2,
141:16, 142:12,
142:18, 143:5,
143:6, 152:6,
155:21, 156:13,
156:19, 162:20,
163:2
**hasn't**
23:6, 142:20
**havana**
36:10
**haven't**
19:10, 101:8,
131:7, 139:21
**having**
16:5, 16:19,
35:15, 70:21,
136:15
**he's**
30:10, 98:21,
98:22, 101:14,
101:16, 119:2,
119:5, 119:14,
126:15, 128:19,
133:4, 136:12,
137:5, 137:14,
140:19
**health**
4:22, 7:5,
22:12, 25:5,
30:12, 32:11,
63:14, 65:14,
65:15, 67:11,
67:20, 68:5,
70:6
**healthcare**
22:11
**hear**
13:22, 29:12,
81:9
**heard**
30:8

**hearing**
25:7, 27:11,
35:5, 168:15,
169:3
**held**
2:1, 133:10,
134:7
**helpful**
11:8, 134:4,
140:21, 164:21
**here**
7:3, 18:14,
19:7, 21:14,
22:3, 24:18,
45:5, 45:19,
51:22, 98:14,
109:18, 113:7,
114:19, 121:18,
123:10, 123:13,
125:6, 126:7,
129:13, 130:3,
130:11, 133:18,
135:7, 138:9,
138:13, 142:10,
144:1, 153:22,
169:1, 169:18
**hereby**
172:4
**hereunto**
172:12
**hewitt**
38:18
**high**
83:15, 84:2,
86:10, 122:5
**high-quality**
75:20, 83:16,
83:21, 84:1,
84:20
**higher**
62:4, 62:7,
68:9, 68:14,
68:17, 109:8,
134:20, 135:11,
135:21, 139:14,
139:19, 140:2,
140:9, 143:2,
143:4, 143:6,

143:20, 154:15,
156:6, 159:9,
159:14, 163:19,
163:22, 164:5
**highest**
40:4, 42:19,
43:15, 84:2
**highlight**
35:6
**highly**
69:2, 76:14,
84:5, 84:11
**highly-rated**
154:1, 154:10
**him**
18:15, 137:20,
170:6
**hired**
79:5
**his**
15:19, 17:12,
18:18, 19:3,
19:6, 27:15,
27:17, 28:5,
79:6, 79:12,
80:7, 81:7,
81:14, 97:14,
99:11, 128:22,
129:1, 131:11,
134:19, 137:1,
137:4, 137:16,
151:10, 170:5
**history**
31:13
**hittner**
5:4, 6:3, 8:2,
15:19, 16:5,
16:14, 18:14,
19:3, 27:13,
27:18, 28:12,
29:1, 29:12,
35:12, 35:14,
36:3, 86:15,
89:5, 98:18,
101:9, 107:10,
120:13, 130:11,
133:17, 134:17,
139:2, 141:5,

Transcript of Arbitration - Day 1
Conducted on December 12, 2017

191

145:7, 157:4,
159:4, 167:14
**hittner's**
8:4, 9:12,
15:12, 17:10,
17:17, 169:16
**hold**
11:12, 44:4
**holding**
155:5
**hole**
167:6
**holidays**
17:21
**hope**
92:8
**hopefully**
7:19
**horizon**
96:16, 96:17,
96:18, 99:14,
99:18, 100:17,
100:19
**hospital**
81:11
**hour**
45:22, 106:18
**hours**
41:17, 52:14
**how**
38:10, 39:3,
39:11, 42:11,
50:1, 53:4,
55:9, 56:13,
59:10, 59:11,
61:13, 61:21,
68:20, 75:13,
76:19, 77:19,
80:10, 80:17,
82:15, 88:2,
93:21, 101:18,
109:19, 110:22,
111:10, 113:13,
114:1, 120:21,
122:10, 131:22,
133:20, 136:6,
137:20, 138:4,
138:10, 138:12,

140:19, 150:14,
160:10, 160:19,
162:4, 162:5,
162:10, 163:13,
165:3
**however**
25:14, 28:22

**I**

**i'll**
14:16, 94:8,
114:21
**i've**
38:12, 38:22,
39:1, 39:8,
39:13, 39:17,
39:22, 40:5,
40:6, 40:16,
42:13, 56:11,
95:4, 95:18,
96:10, 96:14,
97:4, 97:19,
101:22, 124:13,
133:14, 141:16
**id**
6:5
**identification**
133:12, 141:14,
166:4
**identified**
24:19
**identifies**
32:15
**identify**
34:21
**idiosyncratic**
29:19
**ignore**
64:14, 124:15
**ignores**
28:18
**immaterial**
70:7
**impact**
20:19, 54:19,
58:7, 58:14,
72:11, 73:6,
73:7, 73:12,

73:16, 73:18,
74:1, 74:13
**implicit**
60:1, 75:20,
147:5, 147:8,
148:11, 148:22,
149:10
**important**
23:16, 31:10,
107:22, 109:3
**improper**
16:11
**inability**
116:4
**inaccurate**
122:2, 122:3
**inappropriate**
148:16, 149:4
**incidence**
49:19, 59:6,
59:8, 73:5,
73:11
**include**
46:13, 66:7,
116:8, 116:9,
116:14, 124:1,
125:5, 126:10
**included**
66:6, 118:4,
118:7, 118:11,
118:12, 125:14,
125:15, 125:17,
125:18, 125:19
**includes**
24:13, 111:22
**including**
26:6, 32:5,
38:2, 45:2
**income**
22:20, 57:3
**incorrect**
95:10, 168:4
**increase**
79:2, 124:20,
142:21
**increased**
39:15, 108:21,
109:14, 127:11,

142:13, 142:14,
142:17, 142:19,
142:20, 144:13
**increases**
72:16
**incurring**
163:21
**indefinite**
24:6
**index**
7:8, 86:1
**indicate**
27:21, 65:7
**indicated**
167:18
**indicates**
72:4, 82:4
**indication**
60:18
**individual**
71:14
**individually**
58:6, 58:20
**individuals**
33:2, 33:10
**industry**
28:8, 28:10,
31:20, 32:10
**ineligible**
151:3
**influence**
58:17
**inform**
60:20
**information**
31:4, 45:1
**informed**
11:6, 16:8
**informs**
44:16
**inherent**
83:14
**initial**
16:20, 24:10,
161:14
**initiatives**
44:10
**inquiry**
29:19

Transcript of Arbitration - Day 1
Conducted on December 12, 2017

192

**insolvency**
27:20, 65:15, 67:12, 68:4, 76:16, 104:13, 107:11, 107:17, 107:20, 107:22, 108:14, 113:4, 124:15, 124:19, 125:9, 126:14, 127:12, 128:9, 151:2, 156:5, 159:10, 164:1
**insolvent**
67:7, 104:17, 108:1, 108:7, 151:1, 163:20
**installment**
14:14, 34:13, 87:15
**instance**
135:1
**instructed**
111:9, 139:18
**instruction**
109:19, 168:19
**insufficient**
154:5
**insurance**
69:3, 75:20, 76:14, 83:16, 83:21, 84:1, 84:12, 84:21, 150:22, 151:14, 154:1, 154:7, 154:10
**intend**
8:12, 24:11, 129:6
**intended**
52:20, 52:22
**intent**
12:18, 12:21, 24:8, 128:15, 128:17, 128:20, 128:21, 129:1, 129:7
**interest**
9:3, 13:5,

14:2, 17:1, 17:2, 23:21, 24:5, 26:16, 27:19, 44:18, 45:3, 54:17, 58:15, 60:12, 61:1, 69:10, 72:10, 72:13, 74:10, 74:22, 75:4, 75:5, 78:16, 80:3, 81:15, 83:10, 83:11, 83:13, 83:14, 83:17, 85:5, 85:6, 85:7, 85:8, 86:7, 87:8, 131:1, 132:5, 134:12, 135:18, 136:16, 139:13, 139:14, 143:12, 144:4, 144:6, 149:2, 159:14, 162:5, 162:9, 162:13, 162:15, 163:2, 172:10
**internal**
22:15, 29:22, 32:14, 32:18, 33:4, 33:15, 40:19, 41:14, 49:4, 50:10
**international**
94:18
**interpretation**
114:17, 128:22, 129:1
**interprets**
140:20
**interrupt**
8:4
**into**
7:10, 7:12, 13:13, 15:7, 19:19, 20:15, 21:15, 30:16, 30:17, 30:20, 36:20, 41:6,

41:11, 43:1, 58:1, 59:1, 65:1, 65:4, 65:12, 68:4, 76:19, 89:9, 107:11, 107:16, 107:18, 119:16, 121:13, 124:5, 130:8, 169:12
**introduce**
24:17, 36:2
**introduction**
145:19
**intuitive**
135:17
**investigate**
122:1
**investing**
152:11
**investment**
106:6, 146:15
**investments**
61:4, 77:15
**involved**
37:12, 37:17, 38:8, 40:7, 41:9, 44:7, 47:8, 93:22, 95:5, 96:11, 96:12, 109:18
**involvement**
39:15
**involving**
27:3, 94:18, 149:22
**irrefutable**
140:1, 140:7
**irs**
20:5, 23:3, 33:21, 161:22
**irvings**
3:3, 7:6, 24:16, 87:22, 168:10
**isn't**
89:13, 92:1, 95:2, 106:7, 112:20, 117:11,

117:22, 120:20, 122:9, 124:5, 125:9, 143:10, 150:11, 151:3, 153:2, 153:20, 154:8
**issue**
8:5, 8:11, 8:22, 9:2, 9:21, 10:8, 10:11, 10:14, 11:7, 12:16, 13:9, 13:19, 14:3, 16:6, 20:3, 20:11, 21:19, 23:7, 25:10, 26:1, 29:18, 31:11, 67:2, 107:11, 121:22, 132:7, 132:16, 132:21, 140:13
**issued**
33:21, 85:15, 85:19
**issues**
8:8, 8:9, 10:1, 10:6, 13:17, 14:6, 19:22, 25:9, 35:5, 36:21, 36:22, 37:13, 37:18, 44:19, 62:6
**issuing**
83:20
**it's**
12:1, 12:20, 18:10, 18:12, 18:13, 31:2, 42:22, 46:4, 49:14, 51:15, 57:12, 57:14, 60:8, 62:8, 62:22, 63:22, 67:20, 68:6, 69:6, 69:22, 73:14, 74:4, 78:7, 79:3, 80:14, 83:7,

Transcript of Arbitration - Day 1
Conducted on December 12, 2017

193

84:17, 85:2,
88:5, 88:7,
90:4, 92:7,
95:14, 98:20,
98:22, 101:15,
105:19, 106:12,
107:13, 107:21,
110:6, 111:13,
117:1, 117:6,
117:7, 120:11,
120:18, 121:4,
123:13, 124:10,
129:18, 129:20,
130:13, 131:19,
132:19, 134:16,
134:18, 134:20,
136:1, 136:10,
139:22, 140:1,
140:7, 142:7,
142:13, 144:19,
144:20, 144:22,
145:9, 145:11,
146:13, 148:8,
148:9, 151:12,
151:13, 153:12,
156:3, 156:6,
156:13, 156:14,
156:15, 160:21,
164:11, 164:20,
165:12, 165:20,
169:6, 169:10,
170:4, 170:7

**its**
9:9, 12:20,
16:15, 17:2,
17:3, 17:7,
17:8, 17:13,
22:13, 28:1,
29:14, 31:12,
35:12, 61:19,
61:20, 76:16,
77:15, 78:1,
79:6, 82:6,
98:15, 107:19,
144:1, 147:20,
153:6, 163:3,
163:5, 163:9,
172:11

**itself**
39:9, 65:11,
159:16, 166:13,
167:5, 169:3

**iv**
14:1

---
**J**
---

**january**
12:13, 38:12,
172:15

**job**
1:20

**john**
4:12

**joint**
6:6, 7:7, 7:11,
8:6, 12:7, 12:8,
12:12, 12:18,
13:1, 40:15,
40:16, 112:9,
112:11, 116:18,
120:4, 120:13,
159:19, 167:17,
168:20

**judgment**
170:12

**july**
14:11

**june**
14:11, 33:18,
75:1, 77:17,
77:18, 123:13

**junk**
28:2, 85:18,
152:21, 153:21

**just**
8:16, 10:10,
19:12, 22:8,
23:6, 32:5,
35:16, 43:22,
52:7, 54:21,
55:1, 56:16,
60:6, 60:13,
64:18, 64:22,
65:10, 67:10,
71:19, 73:8,
81:3, 91:5,

91:8, 92:3,
95:11, 97:17,
99:16, 103:1,
107:12, 110:17,
112:6, 112:12,
114:4, 116:19,
119:10, 121:1,
123:7, 124:13,
132:18, 132:22,
134:16, 135:8,
135:21, 137:21,
139:20, 140:15,
142:11, 151:18,
158:5, 158:11,
163:7, 164:11,
164:22, 165:5,
165:16, 169:21,
170:3

---
**K**
---

**keep**
139:19

**kind**
37:17, 37:21,
116:3, 169:10

**kinds**
45:2

**knew**
17:22

**knock**
88:15

**know**
8:2, 8:12,
8:19, 9:2, 9:22,
10:5, 17:1,
18:7, 18:9,
18:10, 31:10,
37:13, 57:11,
59:4, 59:8,
62:19, 68:2,
72:21, 78:3,
78:19, 82:11,
82:15, 85:18,
86:15, 94:5,
96:13, 99:14,
100:8, 101:11,
101:19, 102:15,
103:1, 103:7,

103:9, 103:22,
104:21, 105:2,
119:5, 119:11,
131:22, 132:1,
135:5, 135:12,
136:10, 136:12,
136:15, 138:16,
140:20, 151:16,
151:21, 151:22,
152:1, 156:18,
156:20, 161:3,
161:8, 161:11,
161:13, 163:21,
164:1, 164:3,
164:6, 164:18,
164:20, 167:4,
168:14, 169:5

**knowing**
136:16, 138:5

**knowledge**
96:6, 102:21,
141:7, 141:8

**knowledgeable**
60:3, 60:4,
77:5, 77:6,
150:1, 150:2,
154:2

**known**
32:12, 101:10

**knows**
137:14

**kra**
5:5, 15:15,
16:1, 17:15,
19:1, 19:4,
25:3, 27:1,
27:7, 29:13,
79:6, 79:10,
79:15, 80:7,
81:14, 82:10,
85:2, 117:4,
138:18, 170:8,
170:12

**kra's**
9:13, 9:14,
15:18, 17:21,
18:11, 27:11,
83:9, 170:10

Transcript of Arbitration - Day 1
Conducted on December 12, 2017

194

| L | | | |
|---|---|---|---|
| **language** | 88:15, 89:4, | **lengthy** | 89:10, 90:16, |
| 26:3, 31:12 | 98:20, 99:10, | 88:6, 88:7, | 95:18, 99:3, |
| **last** | 99:13, 101:14, | 117:1 | 107:10, 110:4, |
| 16:6, 16:14, | 101:22, 103:6, | **less** | 116:12, 116:20, |
| 39:17, 45:12, | 103:11, 106:14, | 62:5, 68:12, | 120:4, 122:8, |
| 71:18, 94:21, | 106:19, 107:3, | 68:16, 69:5, | 128:7, 132:16, |
| 160:2, 160:3, | 107:7, 112:13, | 72:2, 78:18, | 132:18, 132:20, |
| 167:17, 169:21, | 112:15, 117:5, | 85:20, 86:2, | 133:13, 134:17, |
| 170:3 | 119:2, 119:7, | 111:14, 142:7, | 135:21, 140:15, |
| **late** | 119:20, 120:3, | 142:13, 143:20, | 141:10, 141:15, |
| 10:20 | 120:8, 120:12, | 144:13 | 143:17, 145:1, |
| **later** | 126:18, 126:21, | **let** | 145:7, 145:14, |
| 18:11, 24:9 | 129:2, 129:12, | 24:17, 29:4, | 150:22, 151:9, |
| **law** | 129:14, 130:2, | 53:11, 73:7, | 152:22, 165:4, |
| 29:9, 62:9, | 130:8, 130:10, | 114:20, 119:18, | 169:10, 170:15 |
| 125:18, 160:22, | 132:15, 133:3, | 137:19, 159:19, | **likely** |
| 161:1 | 133:9, 133:13, | 164:2, 165:2 | 65:15 |
| **laws** | 133:16, 134:16, | **let's** | **limit** |
| 55:10, 56:21, | 135:3, 135:11, | 19:12, 35:16, | 92:2, 92:6 |
| 161:3, 161:5, | 135:19, 136:20, | 45:4, 49:1, | **limited** |
| 161:22 | 136:22, 137:12, | 51:22, 55:9, | 27:15, 33:1, |
| **lawyers** | 138:7, 138:19, | 59:10, 70:8, | 33:10 |
| 18:16, 24:19 | 139:1, 139:22, | 77:13, 88:2, | **line** |
| **lead** | 140:10, 141:2, | 88:17, 106:21, | 30:21, 33:3, |
| 36:19 | 141:4, 141:10, | 126:20, 128:18, | 89:20, 138:9, |
| **leadership** | 141:15, 145:1, | 128:21, 133:7, | 160:11, 164:15 |
| 44:4, 44:18 | 145:5, 145:6, | 142:11, 160:2, | **list** |
| **leading** | 151:8, 151:12, | 166:18 | 54:14, 168:20 |
| 70:2, 162:19, | 151:16, 151:20, | **letter** | **litigation** |
| 164:10 | 157:2, 157:3, | 33:21, 120:14, | 23:5 |
| **leads** | 158:2, 158:5, | 159:20 | **little** |
| 44:10 | 158:14, 162:18, | **level** | 18:10, 21:11, |
| **learn** | 163:15, 164:10, | 40:4, 76:10 | 30:8, 46:5, |
| 11:3 | 165:10, 165:13, | **lewis** | 98:13, 101:18, |
| **learned** | 165:16, 165:19, | 4:7, 24:22, | 122:14, 122:16, |
| 16:7 | 166:1, 166:21, | 25:2 | 162:3 |
| **least** | 167:7, 167:13, | **liabilities** | **llp** |
| 100:13, 118:9, | 168:7, 169:16 | 26:17, 138:18, | 2:4, 3:11, 4:7 |
| 118:18 | **left** | 138:19, 138:20, | **logic** |
| **leave** | 25:1, 38:19, | 155:15 | 28:17, 156:11, |
| 91:8 | 82:16 | **life** | 156:12, 156:20 |
| **lechner** | **legal** | 84:4, 84:15 | **long** |
| 4:4, 24:22, | 7:17, 11:9, | **like** | 16:13, 38:10, |
| 70:2, 78:6, | 22:5, 25:11, | 8:19, 10:12, | 39:11, 39:14, |
| 78:13, 88:7, | 112:8, 119:21, | 11:6, 19:16, | 42:11, 88:2, |
| 88:9, 88:12, | 120:9, 164:16 | 28:8, 37:2, | 125:15 |
| | **legislative** | 60:13, 61:17, | **longer** |
| | 28:19 | 85:6, 89:8, | 24:12 |

Transcript of Arbitration - Day 1
Conducted on December 12, 2017

195

**look**
10:13, 11:9,
11:17, 12:6,
12:7, 12:12,
12:17, 20:13,
36:20, 59:13,
59:17, 60:10,
60:16, 61:15,
61:17, 61:19,
61:20, 77:8,
77:9, 77:13,
77:14, 77:22,
78:15, 89:10,
120:4, 133:18,
145:14, 166:18
**looked**
160:3
**looking**
18:6, 20:11,
63:14, 63:19,
64:3, 71:20,
72:12, 121:2,
121:8
**looks**
122:3
**lose**
10:3
**loss**
72:1
**losses**
71:20, 72:3
**lot**
23:5, 37:14,
97:17, 136:6
**low**
69:10, 71:10
**lower**
28:13, 62:5,
62:7, 68:8,
68:13, 84:14,
89:16, 89:17,
105:19, 109:7,
124:19, 128:8,
130:19, 131:22,
132:9, 132:12,
134:18, 135:2,
135:3, 135:5,
135:10, 136:1,

137:1, 137:2,
140:8, 143:3,
143:9, 146:15,
154:22, 159:10,
159:14, 169:19
**lowered**
108:22, 127:11
**lowering**
129:17
**lunch**
88:5, 88:16
**lynn**
1:22, 2:12,
172:2, 172:19

**M**

**ma**
3:5
**made**
13:22, 22:19,
22:20, 24:2,
30:22, 50:4,
65:2, 82:5,
83:4, 120:15,
169:17
**main**
46:21
**maintain**
22:13, 37:1,
40:9, 41:17,
42:1, 43:3
**maintained**
47:2
**make**
14:19, 19:16,
23:13, 37:7,
37:10, 38:8,
47:21, 69:22,
70:3, 70:5,
70:7, 74:17,
77:11, 81:5,
107:12, 114:21,
114:22, 119:10,
119:14, 130:6,
135:7, 135:9,
135:22, 159:6,
163:8, 163:19,
164:22, 165:13,

168:14, 169:17
**makes**
68:9, 99:1,
118:2
**making**
53:3, 55:12,
130:2, 130:3,
144:2, 144:5
**manifestation**
128:21
**many**
39:3, 39:11,
50:1, 80:10,
80:14, 82:15,
92:3, 93:21,
129:21, 156:21,
162:4, 162:5
**march**
166:22, 167:1
**mark**
3:3, 7:6
**marked**
133:11, 133:15,
141:12, 141:13,
141:17, 166:3
**market**
26:22, 59:21,
60:7, 60:8,
60:9, 60:17,
60:18, 61:5,
61:9, 61:10,
61:14, 62:8,
62:10, 62:13,
62:14, 64:1,
65:22, 67:16,
68:5, 68:7,
77:2, 77:5,
81:21, 83:11,
83:14, 83:17,
83:18, 84:7,
84:19, 85:7,
105:13, 125:2,
148:1, 148:19,
149:18, 149:21,
151:3, 152:16,
152:19, 152:20,
153:11, 153:14,
163:9

**marketplace**
150:6
**marks**
14:17
**married**
50:2
**mason**
169:6
**mass**
55:22, 84:4,
84:15, 86:15,
86:18, 86:19,
87:1, 87:4,
87:13, 87:16,
87:19, 155:11,
155:14, 155:19,
156:7, 156:9,
156:13, 163:21
**massachusetts**
2:5
**material**
73:16, 73:18,
83:7, 112:8,
164:17
**materials**
7:18
**mathematics**
123:9
**matter**
18:3, 19:11,
115:13, 138:8,
153:6, 153:9
**matters**
7:14, 7:22,
27:4, 44:12,
44:16
**mature**
28:9, 73:9,
73:10, 73:12,
80:13
**maturity**
80:8, 80:9,
80:17
**max**
108:11
**may**
11:8, 12:6,
16:21, 18:8,

Transcript of Arbitration - Day 1
Conducted on December 12, 2017

30:6, 46:12,
63:16, 112:22,
113:3, 113:17,
115:5, 116:12,
116:13, 136:20,
147:5, 147:7,
148:11, 151:16
**maybe**
91:8, 101:17
**mb**
50:21, 51:14,
64:20, 65:5
**mcmurry**
94:13
**mean**
13:21, 40:11,
42:17, 43:12,
43:19, 49:2,
52:1, 58:3,
58:11, 59:2,
59:22, 70:19,
80:8, 83:22,
100:12, 100:17,
123:3, 131:13,
132:11, 144:1
**meaning**
22:17, 30:6,
31:2, 31:15,
32:17, 33:13,
33:18, 35:2,
119:14
**means**
32:21, 33:8,
40:3, 41:9,
43:22, 44:2,
58:5, 59:3,
62:5, 68:14,
112:21, 129:11
**measure**
59:20, 68:7,
77:2, 78:22,
79:2, 80:9,
81:21, 125:2,
148:6, 148:19,
152:19
**measured**
72:13
**measurement**
145:21, 148:1

**measurements**
63:10, 149:19
**measures**
86:1, 149:22
**measuring**
147:3
**mechanism**
106:9
**meet**
37:8, 38:9
**meeting**
37:7, 40:17
**meets**
40:14
**member**
43:10, 43:19,
43:21, 44:13
**membership**
40:4
**mention**
8:3, 12:9,
12:15
**mentioned**
12:4, 30:2,
41:19, 42:1,
42:15, 46:14,
51:21, 56:3,
56:20, 61:9,
69:9, 93:6,
97:17, 102:14,
102:18, 103:18,
109:17, 130:12,
145:9, 155:11
**mepra**
161:2
**merely**
23:8
**merged**
31:5
**mergers**
38:8
**merit**
2:13
**method**
53:10, 53:11,
53:14, 53:15,
53:16, 90:5,
90:6, 90:8,

127:17, 127:19,
128:2, 131:18,
134:14, 162:4,
162:8, 169:20,
170:7
**methodology**
92:10, 111:11,
142:1, 170:11
**methods**
25:17, 26:2,
26:12
**middle**
12:22, 112:4
**might**
29:1, 49:20,
88:9, 103:1,
115:22, 121:16,
136:14, 159:17,
163:20, 165:14
**milliman**
96:12, 102:14,
102:15
**million**
69:16, 69:18,
69:21, 70:5,
121:6, 122:20,
135:7, 135:8
**mind**
96:9, 96:17
**mine**
1:6, 4:2, 7:4,
30:11, 34:3,
89:2, 107:5,
167:11
**minimum**
41:12, 49:5,
49:6
**mining**
1:3, 3:8, 7:4,
35:21, 159:2
**minors**
30:13
**minute**
170:4
**minutes**
35:17, 88:2,
88:18, 134:2,
158:3, 158:12,

167:15
**mis**
119:15
**mischaracterize**
128:12
**mischaracterizing**
131:11
**misled**
119:16
**misstated**
131:14
**mix**
94:13
**modified**
56:13
**moment**
133:17, 144:8,
169:6, 169:10
**money**
68:15, 68:16
**month**
16:5, 18:11,
69:17, 75:16,
75:18, 93:19,
160:12, 166:20,
167:18
**month-and-a-half**
18:7
**monthly**
163:17, 167:15,
167:22
**mooney**
4:12, 4:14,
7:16, 7:22,
8:16, 10:20,
11:13, 15:4,
15:5, 19:5,
19:14, 24:16,
81:10
**moot**
10:9
**more**
18:10, 26:4,
35:4, 62:5,
68:12, 69:5,
93:9, 106:5,
114:7, 114:20,
114:21, 135:17,

Transcript of Arbitration - Day 1
Conducted on December 12, 2017

144:13, 148:2,
148:18, 158:6,
158:11, 165:14,
170:8
**moreover**
169:4
**morgan**
4:7, 24:22,
25:1, 25:2
**morning**
7:2, 24:16,
34:15, 89:5,
89:6, 89:8
**mortality**
49:19, 50:12,
54:17, 58:16,
59:7, 74:10,
80:22
**most**
28:22, 58:16,
58:17, 64:1,
73:13, 74:3,
136:9, 148:8,
148:10, 149:11,
152:18
**move**
19:12, 126:20,
128:18
**moved**
39:16, 100:11
**moves**
143:14
**moving**
16:21, 120:8
**much**
24:9, 31:8,
35:9, 84:11,
84:14, 106:17,
119:21, 160:10,
168:9, 169:10,
171:1
**multi**
27:3, 91:4
**multi-employer**
9:7, 27:16,
39:6, 39:8,
39:12, 39:13,
39:18, 41:21,

42:6, 42:9,
47:1, 47:10,
47:16, 47:17,
47:20, 48:19,
49:6, 50:7,
50:17, 50:22,
51:13, 51:19,
55:12, 90:20,
91:1, 91:11,
91:13, 91:20,
92:14, 96:3,
96:7, 96:14,
96:20, 97:18,
98:5, 103:12,
111:5, 131:13,
161:21
**multi-employers**
49:14
**multiple**
23:2, 46:15
**multiple-employer**
47:5
**murphy**
4:15
**must**
25:13, 25:15,
26:1, 42:21,
56:2, 58:3
**mutual**
84:4, 84:15

**N**

**name**
36:1, 75:3,
79:6, 97:14,
97:19
**narrow**
114:22
**national**
94:10, 99:20,
99:22, 100:4,
100:22, 101:12,
101:15
**nationally**
27:2
**nature**
37:5
**nebraska**
40:1

**necessarily**
8:4, 67:17
**necessary**
37:9
**need**
21:17, 54:9,
58:18, 66:13,
106:18, 115:19,
158:10, 158:11
**needs**
21:8, 68:15,
83:6
**negotiating**
152:16
**neither**
172:8
**never**
11:13, 11:14,
34:14, 90:19,
90:22, 91:3,
93:2
**nevertheless**
104:21
**new**
30:17, 36:21,
36:22, 37:1,
84:3, 84:14,
103:13
**next**
33:4, 55:2,
81:11, 85:1,
122:19, 135:4
**nine**
34:20
**none**
13:18
**nonforfeitable**
66:8, 66:10,
66:13, 66:16,
66:18, 67:10,
111:13, 111:16,
112:1, 112:18,
113:12, 113:14,
113:22, 114:3,
114:8, 114:10,
115:2, 115:7,
124:17, 125:16
**nor**
106:9, 172:9

**normal**
30:2, 48:14,
49:7
**notarial**
172:13
**notary**
2:14, 172:20,
172:22
**note**
32:9
**noted**
32:1, 34:15
**nothing**
13:12, 122:3
**notice**
12:18, 12:20
**notified**
16:9
**novel**
27:22, 28:16
**november**
15:20, 166:15
**now**
8:3, 8:14,
8:18, 10:2,
11:17, 12:7,
22:22, 23:4,
23:16, 24:18,
25:15, 29:18,
31:7, 39:5,
57:15, 58:22,
67:2, 87:11,
88:6, 88:10,
90:16, 95:10,
95:20, 96:10,
96:18, 97:9,
98:3, 109:17,
111:9, 115:17,
119:21, 120:4,
122:8, 126:16,
130:11, 131:3,
140:12, 141:10,
145:8, 147:17,
149:18, 152:7,
168:15
**nuanced**
37:13
**number**
12:10, 29:20,

Transcript of Arbitration - Day 1
Conducted on December 12, 2017

34:8, 34:17,
79:11, 84:4,
89:7, 99:5,
103:21, 107:10,
117:4, 117:6,
122:5, 122:11,
122:14, 122:16,
122:17, 122:20,
124:2, 134:10,
135:5, 138:10,
138:12, 141:12,
141:17, 141:18,
142:12, 143:18,
145:7, 145:12,
159:20, 164:12,
164:18, 168:5,
172:22
**numbering**
164:22
**numbers**
112:8, 112:12
**numerator**
121:20
**numerous**
28:18, 32:3,
32:7
**nw**
2:5, 4:8, 4:16

**O**

**object**
16:9, 16:15,
98:12, 101:7,
126:15, 132:22,
136:4, 136:17,
139:17, 151:5,
156:16, 169:11
**objected**
8:1, 16:8
**objection**
16:10, 70:2,
78:6, 78:14,
103:4, 103:8,
119:1, 119:4,
131:9, 140:16,
162:18, 164:10,
168:13, 168:15
**objectionable**
136:11

**obligation**
24:6, 60:19,
65:22, 69:7,
146:11, 147:15,
162:12
**obligations**
60:10, 60:11,
77:4
**obviously**
25:19, 72:18,
98:8, 98:20,
115:3
**occasionally**
37:12
**occurred**
14:11
**occurrence**
113:19
**occurs**
86:19
**october**
12:8, 15:17,
15:18, 36:4,
36:12, 36:13,
38:10, 38:12,
38:15, 38:19,
39:16
**off**
23:6, 28:12,
39:14, 72:19,
88:15, 89:15,
107:12, 129:17,
130:18, 131:21,
132:9, 132:11,
133:9, 133:10,
134:5, 134:7,
143:1, 143:5,
143:9, 154:14,
154:21, 171:1,
171:2
**offering**
157:15
**office**
25:6, 36:5,
36:7
**officer**
172:2
**offices**
2:1

**often**
75:13, 163:13
**oh**
97:10, 126:12
**olga**
4:13, 25:5
**once**
153:15, 156:7,
156:9
**one**
8:5, 12:15,
12:22, 18:16,
20:1, 22:1,
25:10, 26:14,
30:1, 31:7,
32:10, 33:13,
35:2, 41:6,
42:14, 52:13,
58:6, 60:10,
60:16, 64:10,
64:18, 65:21,
66:19, 72:2,
80:15, 85:22,
94:10, 94:21,
95:2, 96:8,
96:10, 96:11,
96:18, 97:16,
101:15, 106:2,
114:20, 120:22,
122:13, 126:7,
134:11, 136:14,
137:22, 139:5,
144:8, 153:12,
159:5, 159:7,
165:5
**one-shot**
106:12
**ones**
54:4, 95:1
**only**
25:9, 26:14,
27:12, 28:15,
30:6, 31:6,
66:11, 69:17,
74:9, 80:15,
80:20, 84:17,
94:1, 142:3,
168:18

**open**
60:17, 77:4,
84:7, 152:16,
152:20, 153:13,
163:9
**opening**
7:15, 14:19,
19:16, 25:7,
159:5
**operation**
31:18, 113:19
**operations**
52:13
**opinion**
28:5, 37:15,
59:19, 59:20,
61:5, 62:15,
76:9, 81:20,
90:1, 90:11,
107:21, 108:16,
108:17, 108:19,
108:20, 109:3,
109:15, 109:16,
122:4, 124:3,
125:11, 128:14,
137:1, 137:4,
147:18, 148:18,
151:11, 153:9,
157:15
**opportunity**
10:3, 17:8,
17:10, 17:13,
18:14, 18:22,
170:2
**opposed**
112:9, 119:22,
142:5, 148:3,
153:5
**options**
147:6
**order**
8:19, 15:7,
15:8, 16:18,
18:2, 25:14,
125:1
**organization**
96:9, 102:19
**organizations**
43:17

Transcript of Arbitration - Day 1
Conducted on December 12, 2017

199

original
30:10, 31:21,
33:20, 169:16
originally
15:5
ossi
3:9, 8:15,
8:17, 9:1,
13:21, 14:21,
15:2, 16:17,
19:15, 19:17,
30:2, 30:9,
35:11, 35:22,
81:3, 81:13,
87:21, 88:20,
98:12, 101:7,
103:4, 103:8,
106:20, 119:1,
119:5, 126:15,
129:10, 129:13,
129:22, 131:9,
131:11, 132:22,
134:9, 135:1,
135:10, 135:14,
136:4, 137:9,
139:17, 140:15,
141:1, 151:5,
151:10, 151:13,
151:18, 156:16,
158:11, 158:20,
159:3, 164:14,
165:5, 165:11,
165:15, 165:22,
166:7, 166:9,
166:11, 166:22,
167:4, 168:10,
168:12, 168:18,
170:21
ossi's
25:7
other
9:16, 10:1,
22:16, 28:5,
34:11, 35:5,
41:12, 41:13,
43:6, 43:17,
54:19, 55:11,
62:3, 63:5,

68:3, 68:11,
71:14, 71:16,
72:8, 79:19,
80:2, 91:15,
98:16, 98:17,
100:19, 127:2,
135:15, 146:20,
147:6, 164:20
others
54:16, 61:4,
95:18, 112:12
otherwise
10:12, 34:12,
117:13, 119:16,
157:16, 172:11
ought
8:13
our
16:10, 18:22,
21:14, 21:19,
21:20, 23:13,
25:3, 27:1,
29:7, 30:10,
31:13, 32:9,
32:11, 33:3,
36:5, 36:19,
36:22, 37:2,
37:6, 37:8,
37:10, 37:17,
159:19, 168:22
out
21:8, 36:6,
36:21, 41:1,
69:2, 99:5,
132:20, 153:17,
161:17, 161:22,
163:8, 164:8
outcome
46:2, 172:11
outrageous
99:1
outside
98:13, 167:7
outstanding
11:11, 11:14
over
16:5, 39:16,
43:2, 49:12,

53:18, 53:19,
53:20, 56:9,
56:10, 61:4,
71:21, 77:20,
79:3, 81:10,
86:3, 93:8,
93:16, 94:8,
100:5, 152:7
overall
58:14, 72:19
overruling
140:16
owed
167:15
own
28:3

P

pace
18:7
page
6:5, 12:22,
79:14, 82:9,
83:8, 85:1,
110:7, 111:20,
111:22, 112:5,
117:3, 117:4,
117:6, 120:19,
121:1, 121:3,
121:9, 122:9,
122:17, 122:19,
123:11, 145:15,
160:2, 160:3,
160:4, 160:6,
160:7, 167:17
pages
1:21, 16:3,
166:18
paid
60:15, 113:9,
116:13, 152:9
painters
94:19
paper
169:8, 169:13
papers
30:10
paragraph
8:7, 12:22,

79:14, 79:15,
82:9, 83:8,
83:9, 85:1
paragraphs
17:16
paraphrasing
67:1
part
17:19, 32:14,
33:22, 38:18,
50:13, 70:14,
96:10, 115:3,
115:6, 123:2,
123:18, 124:16,
138:8, 164:20,
164:22, 170:5
partial
52:12
participant
54:18, 55:6,
55:7, 66:19
participants
30:16, 50:5,
54:21, 60:15,
72:11, 72:22,
73:1, 74:8,
80:10, 80:11,
83:3, 150:20,
152:14
participate
37:16, 39:10
participating
47:4, 47:6,
52:19
participation
33:1, 33:9,
52:6
particular
32:10, 48:18,
52:5, 52:14,
57:6, 63:13,
77:14, 97:22,
99:20, 100:18,
101:5, 110:7,
111:20, 117:6,
145:14, 145:15,
164:15
particularly
13:5, 44:21,

Transcript of Arbitration - Day 1
Conducted on December 12, 2017

137:22
**parties**
7:6, 21:17,
22:22, 172:9
**partly**
21:4
**partner**
36:3
**parts**
41:7, 43:1
**party**
16:22, 20:12,
26:10
**passages**
15:22
**passed**
22:9, 32:5,
40:3
**passing**
40:7
**past**
94:2, 152:9
**paul**
5:3
**pause**
81:7
**pay**
43:22, 44:1,
46:13, 49:21,
69:17, 73:17,
73:18, 82:8,
84:9, 87:19,
108:2, 116:5,
148:21, 150:19
**paying**
69:18, 152:12,
152:15, 153:6,
153:8
**payment**
22:20, 24:6,
49:10, 89:17,
159:11, 159:16,
159:18, 160:9,
160:10, 160:13,
167:15, 168:1
**payments**
9:6, 9:18,
14:14, 22:2,

22:19, 23:19,
24:2, 24:3,
24:4, 34:13,
48:6, 48:8,
50:5, 54:12,
54:22, 55:7,
60:12, 60:14,
65:17, 67:19,
68:18, 69:12,
69:17, 69:19,
77:11, 77:12,
82:5, 83:4,
84:16, 87:15,
116:11
**pays**
69:20, 70:4
**pbgc**
9:16, 9:19,
21:1, 26:21,
27:6, 27:18,
38:2, 51:5,
56:1, 75:4,
75:6, 75:11,
75:13, 75:15,
75:17, 75:19,
76:7, 78:16,
78:20, 83:10,
83:13, 84:9,
87:3, 87:8,
87:10, 97:2,
97:21, 98:4,
98:21, 99:15,
99:17, 100:11,
100:18, 100:19,
101:2, 102:8,
102:11, 102:15,
102:19, 105:1,
105:5, 108:8,
108:10, 108:15,
109:14, 130:22,
132:3, 134:12,
134:17, 135:2,
135:20, 138:2,
138:14, 138:15,
140:3, 140:6,
140:8, 144:4,
147:9, 147:13,
148:12, 148:22,

149:2, 155:15,
156:1, 156:7,
156:8, 156:10,
156:13, 156:15,
156:19, 156:21,
162:9, 162:13,
163:14, 163:22,
164:3, 164:5,
164:7, 166:13,
166:19
**pc**
4:15
**penalty**
9:10
**pending**
28:19, 34:19
**pennsylvania**
4:8
**pensions**
46:6, 84:8
**people**
50:1
**per**
125:17, 160:11,
167:18, 168:18
**percent**
17:17, 23:21,
72:2, 72:14,
72:18, 73:1,
73:2, 73:14,
74:3, 74:20,
74:21, 77:21,
78:2, 78:5,
78:8, 78:9,
78:11, 78:17,
78:21, 79:2,
79:3, 79:4,
86:3, 86:4,
86:5, 93:10,
93:11, 93:14,
123:16, 123:17,
138:14, 139:6,
139:7, 139:12,
139:15, 163:5,
166:16, 166:17,
167:1, 167:2
**percentage**
72:21, 74:7,

78:19, 138:13,
139:6, 139:7,
139:10, 139:11
**perfectly**
107:13
**perhaps**
19:9
**period**
31:18, 49:13,
53:20
**perry**
169:5
**phrase**
147:7, 149:21
**picture**
89:10
**piece**
49:8
**pieces**
169:8, 169:13
**place**
64:15, 118:17
**placed**
30:16
**plan's**
13:6, 17:1,
17:14, 21:6,
26:18, 28:3,
28:20, 29:3,
29:11, 38:4,
51:9, 52:4,
59:7, 61:17,
65:14, 72:12,
72:22, 77:4,
77:15, 90:11,
107:14, 107:16,
108:13, 131:1,
138:15, 147:12,
148:14, 148:20,
149:4
**plans**
20:9, 22:16,
26:16, 26:21,
27:5, 30:17,
33:19, 34:17,
34:18, 36:16,
36:17, 37:19,
37:22, 38:2,

Transcript of Arbitration - Day 1
Conducted on December 12, 2017

38:6, 38:21,
38:22, 39:7,
39:9, 39:10,
39:12, 39:14,
39:18, 42:6,
42:9, 46:10,
46:16, 46:19,
46:22, 47:1,
47:5, 47:10,
47:22, 48:19,
49:6, 49:11,
50:7, 50:9,
50:11, 50:18,
51:1, 51:3,
51:13, 51:15,
51:19, 55:13,
58:17, 64:8,
64:10, 64:11,
91:20, 92:14,
93:7, 93:10,
93:15, 95:7,
95:21, 95:22,
96:3, 96:7,
96:14, 96:20,
97:18, 98:5,
98:17, 103:22,
104:22, 111:5,
111:6, 111:8,
160:17, 161:21,
162:1
**please**
10:19, 24:15,
36:1, 141:19
**plenty**
17:22
**plus**
49:9
**point**
11:1, 13:10,
26:5, 91:8,
106:15, 114:22,
144:2, 144:5
**points**
19:4, 31:10
**policy**
44:10, 44:16
**poor**
67:5

**poorly**
68:12
**portion**
50:19, 51:5,
51:10, 52:3,
52:7, 53:17,
54:12, 132:4,
132:5, 138:3,
138:4, 162:11,
162:14
**portions**
138:5
**pose**
134:10
**position**
31:14, 89:11,
89:21, 107:13,
107:14, 123:21,
124:6, 124:7,
125:9, 128:19,
129:16
**positions**
44:4, 44:18
**possibility**
66:22, 84:15
**possibly**
50:1
**post-hearing**
32:9
**potential**
65:18, 67:3,
124:8, 124:22,
125:12, 126:2
**powerful**
72:8, 72:11
**ppa**
161:1
**practice**
37:12, 44:9,
44:15, 55:20,
56:6, 56:18,
56:19, 59:19,
60:22, 62:22,
63:3, 63:6,
85:3, 90:3,
99:6, 145:10
**preclude**
67:12

**predicted**
67:12
**prejudicial**
18:13
**preliminary**
7:14, 7:22
**premium**
38:2, 51:6
**premiums**
51:5
**prepared**
137:19
**preparing**
38:3
**prepay**
9:9, 11:14
**prepaying**
11:11
**prepayment**
9:15, 10:16,
11:16, 12:4,
12:11
**preponderance**
26:11
**prerogative**
14:16
**prescribed**
40:14, 50:10,
50:12
**prescribes**
56:1
**present**
5:2, 48:8,
48:9, 48:10,
76:11, 85:3,
126:8, 134:11,
134:20, 135:11,
135:21, 138:16,
139:12, 140:3,
140:4, 140:6,
147:3
**presented**
8:8, 22:8,
169:7
**presenting**
23:13
**presents**
29:18

**preserve**
10:10, 153:22
**presumed**
11:22, 26:9
**pretty**
69:15, 121:17
**prevail**
25:14
**prevent**
130:4
**price**
26:22, 60:1,
60:19, 60:21,
62:4, 62:7,
67:22, 69:3,
152:20, 154:5
**priced**
84:14
**prices**
27:8, 68:13,
147:5, 147:8,
147:10, 148:12,
148:13, 149:1,
149:10
**priest**
5:3
**primarily**
36:16, 80:21,
93:7, 95:21,
95:22
**principal**
60:13
**prior**
31:15, 38:20,
53:19, 77:17,
122:15
**private**
46:20, 46:21
**problem**
165:9
**problems**
28:21
**procedure**
56:4, 82:2
**procedures**
103:18
**proceed**
8:20

Transcript of Arbitration - Day 1
Conducted on December 12, 2017

202

proceeding
13:16, 16:16
proceedings
172:3, 172:5,
172:6
produce
17:8, 17:11,
79:18, 135:21
produced
79:7
produces
127:18, 132:8,
134:20, 135:5,
135:11
producing
17:3
product
68:21, 84:6
production
31:19
profession
44:3
professional
37:7, 43:6,
44:2, 44:5
proffer
15:16
proffered
27:14
program
37:16
project
48:6, 116:9
projected
27:20, 48:7,
48:9, 67:7,
107:16, 107:20,
107:22, 108:14,
109:5, 118:4,
118:11, 124:11,
124:15, 124:18,
124:21, 125:8,
127:12, 128:9
projecting
48:20
projection
49:22, 66:3,
66:7, 66:9,

125:11
prominent
27:1, 103:12
promised
120:6, 154:6,
163:11
promulgated
166:19
properly
8:9
proportion
53:18
proposal
34:16
protection
100:2, 161:2
prove
24:11
provide
35:4, 36:14,
36:22, 40:18,
46:11, 68:13,
91:17, 169:1
provided
7:17, 15:9,
27:10, 30:12,
84:6, 91:3,
111:15, 112:17,
120:19, 154:7
provider
69:8, 84:16,
148:4
provides
9:6, 11:18,
11:21, 29:9,
31:14, 32:19,
46:9, 91:13,
97:17, 109:19
providing
17:20, 91:22,
150:13, 150:14
provision
9:6, 57:6,
115:16, 116:17,
117:1, 118:1
provisions
28:6, 30:1,
34:8, 64:10,

124:1
proxy
83:10, 83:14,
83:17, 147:10,
148:13
public
2:14, 44:16,
46:20, 172:1,
172:20
published
166:14
punched
165:4, 165:7,
167:6
purchase
75:21, 83:15,
153:17, 154:6,
163:10
purchased
68:22, 76:13
purchasing
67:19
purporting
79:19
purpose
48:2, 48:20,
85:4, 130:3,
145:21, 147:13,
170:16
purposes
22:17, 26:17,
27:9, 63:7,
66:9, 67:15,
76:21, 86:8,
96:21, 98:1,
98:7, 98:9,
98:10, 102:16,
102:20, 105:6,
105:10, 105:16,
105:20, 105:21,
109:21, 127:10,
146:19, 161:19
pursuant
2:12, 15:12,
28:6, 47:2,
150:16
pursue
8:12

put
14:17, 22:3,
22:6, 128:21,
134:15, 135:7,
142:22
puts
45:1

Q

qualification
37:8, 38:7,
38:9, 40:14
qualified
22:14
qualifies
22:22
qualify
22:16
quality
77:9, 83:15,
85:9, 86:11,
86:14
quarrel
121:17, 123:4,
123:6
question
14:17, 23:10,
23:11, 25:11,
78:7, 78:10,
88:4, 98:18,
101:8, 114:20,
119:3, 126:16,
128:2, 131:14,
133:19, 133:22,
137:12, 140:12,
143:16, 143:17,
147:9, 148:9,
151:6, 151:14,
156:17, 159:13,
162:19, 165:6,
167:21, 170:6,
170:10
questioning
164:16
questions
79:11, 87:21,
89:7, 90:17,
98:8, 107:11,

Transcript of Arbitration - Day 1
Conducted on December 12, 2017

134:10, 135:15,
135:16, 138:1,
145:8, 155:10,
158:6, 158:15,
159:5, 159:7,
167:5, 168:7
**quibble**
25:20
**quick**
165:6
**quickly**
121:17
**quite**
12:19, 83:3,
83:18
**quote**
13:1, 32:20,
32:21, 33:7,
33:8, 33:22,
108:15

**R**

**radical**
137:4
**raise**
8:13, 8:17,
11:6
**raised**
12:15, 19:4
**raising**
12:20
**range**
9:4, 10:15,
85:10, 85:12,
85:13, 85:14
**ranging**
85:17
**rated**
62:1, 69:3,
76:14, 84:4,
84:11, 86:2
**rather**
10:9, 21:11,
58:5
**rating**
68:9, 84:2,
84:3
**ratings**
84:2, 85:20

**reach**
40:3
**reached**
10:21
**reaches**
154:19
**read**
19:10, 19:19,
67:10, 113:21,
144:18, 144:20
**reading**
65:10
**ready**
94:13, 107:2,
107:3, 158:20
**real**
67:2
**realize**
23:4
**really**
60:7, 67:18,
129:1, 138:9,
152:10
**realtime**
2:14
**reason**
22:7, 58:14,
84:17, 122:2,
122:16
**reasonable**
13:4, 20:2,
20:14, 20:16,
21:10, 27:6,
29:16, 45:17,
55:16, 55:18,
57:21, 58:2,
58:4, 58:20,
61:3, 62:19,
70:22, 71:6,
71:16, 71:19,
80:3, 83:10,
83:13, 83:17,
90:15, 92:4,
105:19, 107:15,
126:4, 127:3,
154:9
**reasonable"**
108:16

**reasonableness**
29:3, 72:19
**reasonably**
122:22, 154:8
**reasons**
23:10, 23:11,
106:2
**rebuttal**
15:2, 15:3,
19:9, 81:4
**rebutted**
17:11
**rec**
6:2
**recall**
16:21, 94:5
**receive**
16:14
**received**
11:4, 23:1
**receiving**
54:22
**recent**
100:15
**recently**
100:9, 100:10,
100:12
**recess**
35:18, 88:21,
107:1, 145:4,
158:8, 158:19,
167:8
**recognize**
22:19, 23:4
**recognized**
27:2
**recollection**
66:14, 147:22
**recommending**
89:14, 90:13
**record**
19:19, 21:15,
23:9, 24:17,
36:2, 97:11,
112:7, 133:9,
133:10, 133:13,
134:6, 134:7,
141:15, 145:5,

158:15, 167:9,
169:12, 169:14,
171:1, 171:2,
172:5
**recourse**
146:16
**recross-examinat-
ion**
167:10
**red**
6:2
**redirect**
158:12, 159:1
**reduce**
125:7
**reduced**
64:12, 65:8,
66:20, 108:8,
109:10, 112:22,
113:3, 113:18,
115:5, 115:22,
118:6, 118:9,
126:3, 172:7
**reduction**
92:9, 92:11,
124:3, 125:1,
125:6, 125:12,
126:11
**reductions**
64:15, 65:2,
65:3, 65:11,
66:22, 67:4,
109:6, 113:4,
118:3, 118:4,
118:11, 118:12,
118:14, 119:12,
124:4, 124:8,
124:11
**refer**
57:1, 79:11,
116:16
**reference**
6:8, 7:17,
34:22, 110:5,
110:6, 112:8,
112:16, 116:19,
116:20, 145:11,
145:12, 164:11,

Transcript of Arbitration - Day 1
Conducted on December 12, 2017

204

164:17, 165:20,
165:22, 166:1,
166:3
**references**
7:19, 32:3,
32:8, 112:7
**referred**
48:10, 53:14,
75:2, 149:18
**referring**
20:5, 57:2,
163:13
**refers**
115:21, 145:16,
146:20
**reflect**
27:20, 56:19,
65:18, 67:17,
76:9, 76:12,
81:21, 84:15,
124:8, 124:11,
124:22, 125:3,
125:12, 133:14
**reflected**
57:14, 60:21,
85:8, 109:5,
122:19, 149:1
**reflective**
148:20
**reflects**
68:21
**refresh**
66:14
**reg**
166:8
**regard**
10:16, 14:2,
47:21, 63:3
**regarding**
12:3, 20:8,
45:1, 50:4,
54:20, 56:21,
63:1, 63:9,
63:11, 65:11,
92:16, 92:18,
92:22, 93:3,
94:3, 131:3,
132:1, 133:20,

145:9, 154:20,
157:5
**regardless**
113:8, 115:4,
116:11
**regards**
126:2
**registered**
2:13, 16:10
**registration**
172:22
**regulation**
62:9, 165:12,
166:12, 166:15
**regulations**
55:10, 55:22
**regulator**
151:15
**regulators**
151:1
**regulatory**
28:15
**related**
44:11, 46:12,
49:21, 95:15,
172:9
**relative**
80:11, 80:14,
83:6, 148:21
**relatively**
88:13
**relevance**
98:17
**relevant**
33:22, 98:21
**relief**
34:22
**remainder**
152:8
**remaining**
82:13, 82:16,
82:22
**remember**
33:2, 45:8
**removed**
87:16
**render**
72:8

**reorganization**
33:19, 34:6
**repeat**
70:21
**repeatedly**
32:1
**rephrase**
114:20
**report**
8:1, 9:12,
9:13, 9:14,
15:13, 15:15,
15:18, 15:21,
16:6, 16:11,
16:13, 16:20,
17:4, 17:8,
17:10, 17:11,
17:12, 17:14,
17:15, 17:17,
17:18, 17:21,
18:9, 18:11,
18:18, 18:22,
19:1, 19:10,
27:11, 27:17,
51:9, 79:7,
79:8, 79:10,
79:11, 79:12,
79:13, 79:14,
79:19, 80:7,
81:7, 81:14,
83:9, 108:12,
157:4, 169:17,
169:22, 170:1
**reported**
1:22, 50:20,
51:14
**reporter**
2:13, 2:14
**reporter's**
24:21
**reporter-notary**
172:1
**reports**
9:11, 15:9,
15:11, 16:19,
18:6, 32:4,
37:3, 37:4,
71:17

**represent**
34:2, 55:16,
57:21, 62:18,
62:19, 126:5,
127:4
**represents**
48:13, 60:7,
79:1, 150:17
**request**
12:9, 12:10,
12:14
**require**
9:4, 9:5,
10:15, 47:20,
87:10
**required**
40:19, 41:11,
41:12, 57:16,
87:3, 98:16,
123:22, 124:15
**requirement**
22:5, 49:7,
58:21, 59:6,
62:14, 123:3
**requirements**
21:2, 21:7,
22:5, 38:9,
40:8, 40:18,
41:16, 42:3,
42:5, 43:3,
48:22, 49:2,
49:3, 49:5,
55:14, 62:17,
64:8, 91:14,
129:7, 161:18,
161:22
**requires**
20:13, 58:22,
125:19
**research**
36:21
**reserve**
170:12
**reside**
36:9, 36:10
**resolution**
37:18
**resolved**
11:20

Transcript of Arbitration - Day 1
Conducted on December 12, 2017

205

resource
36:20
respect
92:14, 93:20,
94:15, 100:22,
110:14, 126:13,
131:16, 131:17,
137:16
respond
10:18, 13:20,
17:14, 18:19,
18:22, 19:3,
19:6, 98:19,
136:20, 169:15,
170:3, 170:20
responded
17:12
responding
17:16, 170:4,
170:17
response
12:13
responsible
41:8
rest
152:12
restrict
114:1
result
31:16, 89:21,
90:2, 90:7,
92:9, 92:10,
121:5, 127:18,
128:14, 131:2,
131:20, 132:9,
144:16, 154:18,
154:19, 159:10,
169:18, 169:19
resulting
144:12
results
159:10
resumed
107:4
retire
50:2
retired
30:13, 33:2,

33:11
retiree
32:11
retirees
72:22, 73:2,
73:3, 74:8,
74:9, 80:14,
80:16, 80:20
retirement
4:22, 7:5,
25:5, 34:4,
46:8, 50:3,
54:20, 57:2,
59:7, 73:22,
74:1, 74:2,
94:10, 99:20,
99:22, 100:4,
101:1, 101:12,
101:15
return
77:15, 77:16,
77:20, 106:10
returns
106:6, 106:10,
146:15
revenue
22:15, 30:1,
32:14, 32:18,
33:4, 33:16,
40:20, 41:14,
49:4, 50:10
review
12:9, 12:14,
13:12, 16:4,
17:10, 23:9,
23:14, 45:15,
56:16, 70:14,
70:15, 79:7,
80:2, 94:7,
95:15, 141:19
reviewed
15:21, 70:11,
70:16, 71:3,
71:17, 77:16
revisions
11:2
ridiculous
151:12

right
8:17, 23:16,
24:22, 42:4,
50:15, 50:16,
57:15, 61:12,
62:9, 68:10,
68:11, 70:8,
81:11, 88:22,
97:16, 97:17,
99:19, 100:14,
106:12, 108:12,
109:12, 109:13,
109:15, 110:18,
111:11, 111:15,
111:17, 116:1,
116:6, 116:14,
118:10, 118:16,
118:19, 119:20,
121:15, 123:7,
124:13, 125:14,
126:7, 127:16,
129:2, 135:14,
136:3, 137:8,
143:7, 144:1,
154:8, 156:11,
157:15, 158:22,
166:21, 170:6
ripe
10:9, 14:3
risk
76:16, 77:10,
81:17, 82:14,
83:1, 83:4
risk-free
82:1, 82:4
riskless
82:10, 82:13,
82:21
rmr
1:22
role
13:15, 13:16,
46:6
rolling
53:14, 53:15,
53:16
rote
20:22

roughly
40:22
rule
10:14, 13:12,
24:13
ruled
34:12, 127:9
rules
10:4, 20:8,
29:20
ruling
17:5
run
136:13
ruschau
97:14, 97:21

S

said
15:22, 58:22,
65:1, 73:9,
76:15, 95:19,
115:4, 118:10,
126:10, 128:6,
131:19, 132:18,
135:21, 143:8,
144:6, 148:1,
152:17, 153:11,
155:21, 158:9,
163:16, 165:11,
172:6
saindon
4:14
salary
49:21
same
17:13, 48:20,
50:6, 50:8,
51:17, 53:20,
54:4, 58:12,
71:2, 84:20,
84:22, 87:10,
87:19, 105:11,
121:2, 121:8,
124:18, 125:7,
126:12, 142:1,
154:19
save
34:16

Transcript of Arbitration - Day 1
Conducted on December 12, 2017

206

savitz
96:9, 102:18
saw
170:1
say
63:13, 66:6,
70:18, 84:14,
90:7, 92:7,
93:9, 95:14,
96:18, 99:16,
100:12, 106:6,
106:21, 108:18,
112:20, 119:18,
125:22, 127:17,
137:10, 142:11,
143:18, 149:3,
151:18
saying
90:1, 92:5,
95:10, 98:21,
98:22, 113:7,
113:16, 125:4,
126:9, 126:12,
132:8, 133:4,
137:5, 138:2,
148:14, 153:2,
153:3, 156:12,
168:3
says
66:20, 68:1,
68:2, 85:2,
114:6, 119:19,
121:2, 134:17,
145:19, 147:2,
148:10, 151:8
sb
50:20, 51:4
scale
49:22
scenario
73:15
schedule
15:9, 15:12,
50:20, 50:21,
51:4, 51:14,
64:20, 65:5
scheduled
18:5, 104:17

scheduling
15:5, 15:7,
16:17, 16:21,
17:19, 18:2
science
40:1
scope
98:14, 133:1
scott
5:4, 6:3,
35:12, 35:14,
36:3
seal
172:13
sec
11:12
second
10:7, 16:12,
20:3, 21:20,
25:10, 29:18,
32:1, 94:13,
111:20, 111:22,
112:5, 113:16,
122:9, 139:5
section
14:15, 20:6,
21:7, 22:15,
23:1, 29:19,
29:22, 30:5,
31:2, 32:2,
32:13, 32:18,
32:22, 33:4,
33:5, 33:8,
33:14, 34:5,
35:3, 57:11,
57:12, 64:4,
64:6, 64:7,
64:22, 67:10,
88:13, 110:8,
110:10, 110:21,
113:2, 116:21,
145:16, 147:19,
161:17, 164:8,
165:1
sections
26:3
sector
46:20, 46:21

secure
62:3, 69:7
security
44:11, 57:3,
63:18, 84:6
see
8:6, 11:10,
12:18, 24:3,
60:17, 89:11,
98:17, 133:18,
135:17, 158:5
seem
18:8
seems
78:8
seen
37:14, 96:15,
97:4, 97:19,
99:17
segal
90:6, 90:8,
96:8, 97:5,
127:17, 127:19,
128:1, 130:12,
130:18, 130:20,
131:4, 131:16,
131:17, 131:20,
132:2, 132:3,
133:4, 133:5,
133:20, 134:1,
134:14, 134:21,
136:13, 137:6,
137:13, 137:14,
137:17, 137:20,
138:2, 138:10,
138:11, 140:14,
140:19, 140:20,
141:7, 141:18,
143:1, 143:10,
143:21, 144:10,
154:20, 162:4,
162:8, 169:20,
170:18
segment
74:4
seized
31:19
select
58:18, 59:12,

64:2
selected
97:21, 98:15
selecting
57:8, 59:11,
59:16, 63:3,
63:7, 98:4,
129:5, 145:17,
145:20, 146:3
selection
45:1, 45:3,
63:1, 63:12
sell
84:13, 151:3
seller
60:4, 67:21,
68:13, 77:6,
150:1, 150:5,
151:9, 152:3,
152:20, 152:22,
153:2, 154:3,
154:14
selling
60:9, 150:10
senator
34:15
sense
28:17, 163:19
sentence
135:5
separate
66:3, 165:14,
168:21
separately
50:20, 51:10
september
15:13
sequential
164:22
series
40:3, 42:21,
60:12, 60:13
seriously
161:7
serve
45:6, 45:11,
48:3, 105:15
service
33:16, 46:12,

Transcript of Arbitration - Day 1
Conducted on December 12, 2017

48:14, 48:17,
49:9
**services**
36:15, 91:4,
91:17, 92:1,
93:21, 97:10,
97:15, 97:18,
97:20, 98:3,
99:4
**set**
14:14, 21:2,
24:1, 25:13,
35:19, 87:3,
161:22, 164:8,
172:12
**sets**
21:8, 111:11,
161:17
**setting**
41:9, 55:21,
148:2, 149:12
**settle**
147:14
**settlement**
27:9, 146:10,
146:14, 146:21,
147:4, 147:6,
148:3, 148:6
**seven**
38:13, 39:17
**several**
36:15, 149:18,
152:17
**shall**
11:20
**share**
110:18, 121:21,
142:18, 142:20,
150:20
**shoes**
13:14
**short**
33:12
**shorthand**
172:1
**shorthanding**
26:8
**should**
8:17, 9:15,

10:14, 17:12,
18:21, 19:5,
21:21, 21:22,
22:1, 24:12,
28:1, 28:8,
55:21, 57:7,
65:12, 65:13,
76:19, 81:10,
81:17, 81:20,
84:19, 105:10,
105:13, 108:20,
109:14, 124:8,
124:22, 127:10,
128:6, 137:17,
145:20, 146:3,
152:19, 168:14
**show**
21:6, 66:13,
95:3, 120:21,
121:13, 133:7,
141:10
**shown**
12:1, 141:16,
160:11
**shows**
22:6, 26:10,
64:20, 121:10,
121:11, 122:10,
123:16
**side**
18:17
**signature-afzxo**
172:16
**significant**
23:20, 72:18
**significantly**
52:16, 109:7
**similar**
60:11, 61:16,
77:9, 85:9,
113:13, 153:13,
161:21
**similarly**
62:1
**simple**
135:6, 135:9
**simply**
28:17, 99:6,

137:12, 153:6,
157:19, 157:21
**since**
24:18, 38:12,
42:13, 56:7,
81:3, 127:6,
155:3, 170:1
**single**
46:22, 47:6,
47:10, 49:5,
50:8, 50:17,
51:19, 111:5,
161:22
**single-employer**
36:16, 47:13,
47:19, 49:11,
50:7, 50:11,
50:21, 51:3,
93:7, 93:10,
95:21, 95:22,
111:8
**situation**
63:6, 95:4,
127:8, 140:4
**situations**
93:22, 94:2,
94:9, 95:17,
103:20, 155:22
**six**
18:16
**small**
69:15, 74:4,
83:6
**so-called**
150:6, 169:22
**social**
44:11
**societies**
44:5
**society**
40:2, 40:4,
42:16, 42:18,
42:19, 42:20,
43:4, 43:16
**solvency**
63:15
**some**
9:13, 25:8,

28:2, 43:1,
46:11, 52:17,
54:2, 56:21,
60:18, 61:1,
61:7, 64:3,
72:3, 77:8,
77:10, 77:13,
96:2, 97:1,
97:5, 97:7,
99:10, 99:11,
103:22, 127:22,
128:20, 154:5,
157:4, 157:9,
157:10
**someone**
43:15
**something**
57:1, 65:19,
119:8, 119:17,
145:8, 152:16,
169:21, 170:19
**somewhat**
18:8
**sorry**
59:4, 59:16,
129:22, 130:21,
164:14, 165:1,
165:8, 166:1
**sort**
28:2, 39:20
**sought**
11:13
**sounds**
164:13
**source**
160:19
**sources**
61:20
**south**
36:10
**speak**
84:19, 128:17
**speaks**
166:13, 167:4
**special**
20:8, 24:13
**specialize**
96:2

Transcript of Arbitration - Day 1
Conducted on December 12, 2017

208

specialized
96:7
specializing
96:13
specific
12:20, 31:13,
56:12, 87:6,
95:17, 101:19,
102:17, 102:21,
111:16, 112:17,
114:16, 114:18,
119:6, 119:13,
127:14, 164:6
specifically
12:17, 13:3,
32:15, 33:16,
34:20, 55:2,
62:10, 70:8,
110:5, 118:1,
131:17
specified
30:5
specifies
138:7
speculation
103:8, 151:19
speech
92:16
spencer
4:5, 25:1,
166:6, 166:8
spend
31:8
spinoffs
38:8
spit
22:11
spoke
90:17, 168:19
spoken
101:9
sponsor
11:19, 11:22,
63:17
spouse's
50:3
stand
35:13

standard
25:18, 62:22,
145:10
standards
27:10, 28:7,
37:7, 37:9,
37:11, 38:7,
40:14, 44:3,
55:20, 56:3,
56:5, 56:6,
56:7, 56:15,
63:5, 82:2,
147:2
stanley
4:4, 24:22
start
88:4, 88:9,
107:12
started
7:15, 35:6,
54:22
state
57:18, 70:22,
103:13, 108:12,
150:22, 151:2,
151:14, 158:14
stated
147:18
statement
14:20, 79:21,
82:18, 83:12,
94:4, 147:21
statements
7:15, 38:4,
38:5, 38:6,
51:8, 51:9
states
13:1, 31:17,
33:22, 34:18,
34:20, 81:14,
82:10, 83:9,
85:16, 85:17,
102:3
stating
118:1, 149:14
statistics
120:20
status
16:2, 22:14,

40:10, 41:18,
42:2, 43:4,
49:17, 61:18,
61:19, 64:9,
64:13, 64:21,
65:6, 65:7,
67:6, 69:9,
76:12, 82:6,
85:18, 100:1,
101:3, 102:4,
104:4, 104:7,
104:22, 107:19,
118:2, 118:15,
132:12, 137:2,
142:11, 143:6,
143:15, 144:11,
160:16, 160:17,
160:18, 160:20,
160:21, 161:9,
161:11, 161:13,
169:19
statuses
64:18, 160:19,
161:4, 161:6,
161:16
statute
9:8, 11:10,
11:18, 20:2,
21:3, 23:10,
23:11, 24:1,
30:7, 31:12,
31:14, 32:5,
32:10, 53:8,
57:4, 65:11,
66:14, 109:18,
114:16, 119:6,
119:13, 119:19,
125:19, 125:22,
129:7, 150:16,
153:7, 153:9,
155:16, 156:3,
164:9, 164:12,
165:12
statutes
64:3
statutory
28:15, 29:20,
32:4, 55:14,

62:14, 62:17,
119:10, 123:2,
124:1, 155:7
steelworkers
94:22
stenographically
172:6
step
13:13, 167:7
steve
4:5
still
8:12, 20:4,
20:6, 21:21,
23:15, 35:1,
65:13, 88:18,
131:19
stipulated
14:7
stipulations
8:7, 10:22,
11:3
stop
86:20
straight
25:11
strain
69:5
stream
9:18, 48:7,
54:12, 67:19,
116:2, 116:11,
124:9
street
3:4, 4:16
stress
77:7
stricken
169:13
strong
104:10
struck
137:17
subcommittee
44:14
subject
19:11, 67:3,
75:15, 80:20,

Transcript of Arbitration - Day 1
Conducted on December 12, 2017

209

87:14, 104:13,
124:3, 125:6,
126:11
**submission**
32:9
**submitted**
15:13, 15:17
**subparagraph**
114:11, 114:13
**subpart**
112:4, 114:9,
117:7, 141:5,
149:14
**subsection**
110:8, 146:20
**subsequent**
33:20
**subsequently**
15:8, 112:22,
113:3, 113:18,
115:5, 115:22
**substantially**
33:1, 33:10,
86:20
**subtracted**
122:20
**such**
20:7, 28:16,
46:10, 64:14,
65:22, 128:10,
156:14
**suggesting**
19:2, 128:7
**suggestion**
9:13
**suite**
3:13, 4:17
**summarize**
121:16, 144:10
**summarized**
123:5
**summary**
121:9
**supplemental**
8:1, 8:11,
8:22, 9:1, 15:9,
16:6, 16:11,
18:22, 169:22,

170:1
**support**
27:13, 28:16,
31:13, 127:22,
153:4
**supreme**
129:20
**sure**
9:1, 13:21,
37:7, 37:10,
38:8, 74:17,
81:5, 107:13,
119:14, 120:1,
135:22, 137:21,
140:22, 159:6,
165:5
**surely**
151:1
**surprisingly**
31:20, 129:16
**suspended**
64:12, 65:8,
103:19, 104:2,
112:22, 113:3,
113:18, 118:7,
118:9, 126:3
**suspensions**
65:2, 65:3,
65:12
**sworn**
35:15

**T**

**tab**
11:9, 11:17
**table**
58:16, 80:22
**take**
8:2, 10:12,
11:9, 12:6,
12:7, 12:12,
35:16, 41:3,
41:6, 41:19,
42:21, 59:1,
65:1, 81:7,
88:2, 89:10,
107:16, 107:18,
124:4, 133:17,

141:19, 145:1,
151:15, 158:18
**taken**
35:18, 40:5,
65:4, 65:12,
76:19, 88:21,
107:1, 145:4,
158:8, 158:19,
167:8, 172:3,
172:6
**taking**
20:15, 58:1,
68:3, 82:14,
82:22, 83:3
**talk**
46:5, 49:1,
52:1, 55:1,
55:9, 70:8,
75:8, 83:21
**talked**
16:19, 16:20,
43:10, 71:1,
73:5, 91:6,
95:16, 121:15,
160:16, 162:3
**talking**
13:8, 98:14,
109:13, 114:2,
114:19, 119:12,
127:15, 127:18,
139:19, 155:6
**talks**
11:11, 57:13,
119:6
**tax**
22:14, 22:17
**teamsters**
94:16, 103:13
**technical**
36:20, 37:13
**tell**
10:8, 94:9,
165:3, 166:13
**telling**
110:22
**tells**
138:9, 138:11,
138:12

**templates**
37:2
**ten**
39:18, 42:22,
64:15, 71:18,
77:17, 77:21,
95:11, 95:14,
95:19, 118:9,
118:18, 161:13,
164:3, 164:5
**term**
32:20, 33:7,
86:15
**terminating**
26:21
**termination**
75:5
**terms**
9:22, 16:19,
60:22, 95:20,
121:6, 121:20,
121:21, 146:19,
160:6, 168:4
**test**
132:16, 136:5,
136:9, 136:17
**testified**
35:15, 92:21,
97:3, 105:12,
131:6, 137:1,
155:13, 167:14
**testifies**
27:4, 170:13
**testify**
19:8, 22:4,
27:5, 27:7,
27:12, 79:6,
128:20
**testifying**
99:9, 119:14,
119:16, 137:14
**testimony**
8:5, 19:3,
19:6, 19:12,
21:6, 21:16,
31:9, 35:6,
71:2, 89:12,
90:9, 93:6,

Transcript of Arbitration - Day 1
Conducted on December 12, 2017

210

103:19, 104:6,
105:16, 109:18,
116:17, 130:17,
131:12, 131:19,
134:19, 136:6,
137:16, 143:8,
144:17, 145:9,
148:5, 150:4,
154:20, 155:12,
169:12, 170:5,
170:8, 170:10,
170:17
**testing**
37:3
**tests**
151:2
**th**
12:13, 15:13,
77:17, 77:18,
172:13
**thall**
4:13, 25:5
**than**
18:10, 24:9,
54:16, 58:6,
64:15, 72:2,
82:13, 82:21,
84:14, 85:20,
93:9, 127:2,
134:18, 135:3,
136:2, 140:2,
146:15, 156:6,
163:22
**thank**
7:2, 14:5,
19:17, 24:14,
35:7, 35:8,
81:5, 88:1,
88:19, 106:17,
112:14, 117:5,
120:10, 123:8,
127:5, 128:18,
158:7, 158:13,
158:17, 158:18,
158:20, 165:9,
166:10, 168:8,
168:9, 170:22,
171:1

**that's**
8:5, 9:5,
11:17, 13:15,
21:19, 25:18,
33:3, 34:17,
42:4, 46:12,
49:8, 49:11,
49:12, 50:16,
51:6, 52:4,
57:10, 62:16,
65:19, 65:21,
66:4, 68:1,
68:2, 68:11,
68:21, 76:10,
87:16, 88:13,
88:17, 89:20,
91:2, 91:21,
93:18, 96:5,
97:16, 99:6,
99:17, 99:21,
100:3, 100:7,
101:2, 102:5,
104:16, 106:16,
106:20, 108:16,
108:17, 108:19,
109:2, 109:12,
109:13, 109:15,
109:16, 110:20,
112:13, 113:22,
114:19, 117:12,
118:20, 122:18,
123:2, 123:11,
127:13, 127:15,
128:10, 129:13,
130:8, 130:14,
131:1, 131:11,
132:4, 132:6,
132:17, 134:5,
135:4, 137:3,
137:4, 137:5,
140:8, 143:16,
146:1, 146:2,
146:22, 148:9,
152:21, 154:4,
160:11, 162:12,
170:13
**their**
18:17, 30:13,

38:9, 50:3,
71:19, 92:2,
92:6, 92:11,
97:19, 104:2,
110:17, 120:22,
152:14, 153:8,
158:10
**them**
18:8, 30:20,
32:8, 35:6,
43:1, 48:3,
54:7, 56:17,
75:10, 84:4,
84:6, 95:12,
95:15, 99:19,
101:13, 109:14,
116:6, 116:8,
116:9, 116:15,
125:19, 129:5,
129:20
**themselves**
65:18, 83:3
**then**
10:9, 11:21,
12:17, 14:2,
15:8, 17:9,
22:10, 24:10,
37:12, 40:1,
47:4, 48:12,
48:17, 50:3,
50:13, 57:14,
61:6, 61:22,
66:2, 66:6,
68:15, 68:16,
78:13, 82:13,
82:21, 88:15,
93:2, 111:15,
120:11, 124:17,
125:20, 127:21,
139:6, 139:10,
139:11, 144:10,
149:5
**theory**
27:22, 28:12,
28:17, 101:4,
126:13, 154:13,
154:18, 154:21,
155:1, 156:4

**there**
7:13, 7:18,
9:13, 11:2,
12:2, 13:18,
15:10, 15:11,
19:8, 19:22,
23:6, 25:8,
25:9, 28:15,
28:18, 29:13,
29:14, 30:17,
30:18, 32:7,
34:19, 40:22,
43:2, 46:15,
46:17, 46:18,
46:19, 46:21,
46:22, 47:1,
47:4, 48:18,
49:20, 49:21,
49:22, 50:3,
52:11, 53:8,
54:14, 55:10,
55:14, 55:20,
55:22, 56:12,
56:20, 57:1,
58:13, 61:1,
61:10, 62:9,
63:5, 69:10,
71:14, 72:2,
82:7, 84:5,
84:7, 85:10,
85:12, 94:1,
95:11, 95:17,
99:5, 101:3,
103:12, 106:9,
110:7, 117:12,
122:9, 127:22,
134:15, 138:21,
158:5, 161:21,
162:2, 170:9
**there's**
12:9, 12:15,
13:10, 13:12,
23:5, 41:15,
42:21, 47:7,
51:5, 52:12,
52:16, 58:21,
60:9, 61:7,
61:10, 62:14,

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                211

80:15, 88:12,
113:13, 116:3,
117:12, 117:15,
117:19, 122:18,
127:2, 128:20,
132:15, 137:17,
156:7, 156:9,
161:1, 170:9,
170:19
**thereafter**
33:11, 123:17,
167:2, 172:7
**therefore**
18:4, 18:20,
34:4, 109:9,
159:15
**thereof**
32:22, 33:9
**these**
26:21, 32:3,
35:4, 44:5,
51:1, 54:9,
55:12, 56:16,
75:2, 75:8,
75:13, 76:13,
94:10, 109:5,
112:7, 131:8,
135:7, 164:7
**they**
11:5, 11:6,
16:22, 17:22,
18:4, 18:11,
18:14, 18:21,
20:1, 20:2,
21:5, 34:21,
37:10, 42:8,
50:2, 51:4,
53:3, 56:9,
56:13, 56:17,
58:7, 60:12,
60:16, 66:1,
69:7, 69:8,
74:20, 80:3,
83:16, 84:10,
85:19, 87:8,
87:10, 87:14,
92:1, 92:3,
92:5, 92:8,

98:4, 99:19,
101:4, 101:8,
101:12, 101:20,
102:2, 102:3,
102:8, 102:11,
102:13, 102:22,
103:1, 104:9,
104:10, 104:13,
105:13, 105:15,
108:10, 109:14,
112:22, 115:22,
116:10, 116:12,
116:13, 119:13,
120:21, 122:21,
125:17, 125:18,
129:5, 129:6,
136:1, 136:7,
154:6, 158:9,
159:7, 166:16,
167:1, 169:8
**they'd**
18:17
**they're**
19:7, 48:20,
58:6, 58:9,
58:10, 60:17,
71:7, 84:21,
92:7, 104:12,
122:2, 124:3,
125:6, 125:10,
125:14, 125:16,
126:11, 152:8,
152:12, 152:15,
153:8, 158:9
**they've**
18:15, 25:15,
43:2, 56:10,
115:6, 142:14,
152:7
**thing**
121:2, 136:14
**things**
7:19, 14:18,
25:8, 37:2,
37:4, 37:9,
56:16, 61:17,
91:16, 146:20
**think**
7:16, 8:13,

8:17, 9:2, 9:21,
10:11, 18:12,
18:17, 18:20,
20:12, 21:5,
24:8, 35:19,
39:17, 46:21,
63:22, 64:1,
72:1, 72:17,
74:16, 81:1,
83:2, 84:17,
85:22, 86:2,
86:12, 88:3,
88:13, 90:14,
91:6, 92:7,
97:10, 100:7,
101:22, 102:17,
110:3, 113:6,
113:11, 114:7,
114:11, 114:21,
114:22, 120:18,
122:15, 125:1,
125:10, 126:18,
127:21, 128:3,
129:2, 129:3,
129:10, 132:15,
132:17, 135:12,
136:5, 137:3,
137:16, 138:7,
140:11, 140:13,
144:8, 147:18,
148:8, 148:16,
149:10, 151:12,
152:17, 154:19,
155:12, 163:7,
165:14, 170:9
**third**
94:15
**those**
7:10, 8:8,
14:18, 16:3,
21:2, 30:1,
37:14, 38:9,
39:10, 40:7,
40:17, 42:5,
44:17, 47:8,
47:21, 48:7,
48:15, 48:21,
51:14, 51:15,

52:14, 54:2,
54:4, 54:18,
54:21, 56:4,
56:7, 57:16,
57:18, 57:20,
61:2, 61:7,
64:10, 64:18,
66:5, 66:21,
67:17, 70:21,
70:22, 74:12,
75:19, 75:22,
76:4, 76:5,
76:9, 76:12,
84:2, 84:16,
85:22, 87:6,
93:22, 95:1,
95:8, 95:17,
96:13, 96:14,
100:8, 103:20,
103:22, 118:3,
118:17, 119:8,
122:1, 124:4,
124:11, 126:13,
136:8, 155:21,
160:18, 161:3,
161:5, 161:15,
168:13, 169:8,
169:11, 169:13,
170:11
**though**
17:22, 64:22,
65:17, 123:22,
125:5, 164:19
**thought**
21:11
**three**
12:8, 18:16,
36:4, 36:12,
36:13, 38:11,
38:12, 38:15,
38:19, 39:16,
40:9, 41:16,
46:21, 100:13,
126:16, 134:10
**through**
6:6, 7:7, 7:11,
11:20, 38:17,
54:7, 77:17,

Transcript of Arbitration - Day 1
Conducted on December 12, 2017

212

81:2, 81:8,
89:8, 99:3,
114:4, 134:3
**throw**
72:19
**thrown**
170:3
**thus**
108:14
**tie**
63:10
**time**
10:11, 14:4,
17:22, 18:18,
22:7, 22:20,
31:9, 38:19,
39:1, 39:14,
45:19, 50:2,
56:9, 56:10,
56:11, 86:2,
86:4, 87:22,
93:10, 93:12,
93:13, 93:14,
93:15, 93:16,
94:1, 114:21,
126:12, 135:15,
141:19, 158:10,
158:16, 158:18,
169:7, 169:8
**times**
126:16, 129:21,
130:11, 149:18,
152:17
**title**
14:1, 113:20,
117:9
**today**
14:6, 21:14,
21:18, 22:4,
45:19, 48:8,
51:22, 90:9,
108:6, 163:9,
169:18
**together**
45:1
**told**
33:12, 94:1
**tomorrow**
165:4, 165:7,

170:8, 170:19,
171:1
**too**
31:8, 122:5,
146:7
**took**
93:19
**top**
121:3, 126:8
**topics**
41:21
**total**
41:1, 48:9,
51:11, 52:4,
53:7, 58:7,
78:17, 93:11,
93:13, 93:15,
93:16, 95:19,
121:12, 142:21
**touch**
41:21
**touched**
133:4
**towers**
3:12
**trade**
60:2, 60:17,
77:4, 150:1
**traded**
153:13
**transaction**
152:5, 153:13
**transactions**
38:18
**transcript**
95:4, 172:4
**treasuries**
86:4
**treasury**
85:15, 85:16,
86:11, 103:17
**trial**
169:5
**tribunal**
34:11
**triers**
23:7
**triggers**
52:9

**troubled**
28:10, 34:18
**true**
89:13, 100:3,
102:10, 172:5
**trust**
1:8, 4:3, 34:1,
34:2, 89:3,
107:6, 167:12
**truthful**
27:21
**tuesday**
1:13
**turn**
45:4, 79:13,
82:9, 110:4,
111:19, 116:20,
117:2, 122:8,
160:2, 160:3
**turning**
83:8, 85:1,
166:18
**twice**
131:20
**two**
10:1, 18:16,
19:22, 25:9,
29:8, 35:16,
41:6, 61:7,
66:1, 69:17,
74:12, 121:1,
121:3, 142:12,
166:18, 169:8
**type**
16:18, 37:18,
51:17
**types**
46:15, 46:18,
47:19
**typewriting**
172:7
**tysons**
3:14

| U |
| --- |

**ultimately**
140:21
**umwa**
4:22, 14:8,

14:12, 19:21,
25:4, 32:19,
32:20, 33:6,
33:7, 148:7
**unaffected**
66:21
**uncertainty**
82:7
**under**
9:5, 13:7,
14:1, 20:9,
22:14, 22:22,
28:12, 40:19,
60:2, 65:4,
89:13, 89:14,
91:14, 100:1,
103:17, 103:18,
104:18, 111:14,
113:19, 114:8,
115:16, 126:6,
130:17, 130:20,
131:16, 138:10,
138:15, 142:22,
143:10, 143:21,
144:10, 151:2,
154:13, 154:20,
155:1, 155:8,
156:4, 159:8,
162:4, 169:20,
172:7
**underneath**
121:4
**understand**
10:10, 68:8,
74:17, 91:10,
160:18
**understanding**
104:5, 146:2
**understands**
134:21
**understood**
78:10, 127:5,
159:6, 159:13
**undisputed**
22:21
**unduly**
18:13
**unfair**
18:8, 84:17

Transcript of Arbitration - Day 1
Conducted on December 12, 2017

**unfunded**
26:7, 49:10,
49:12, 51:6,
52:4, 52:8,
53:2, 53:7,
53:17, 69:11,
69:15, 72:12,
72:16, 78:3,
78:15, 79:3,
100:5, 109:9,
111:1, 121:12,
121:14, 123:11,
138:4, 138:5,
139:7, 139:10,
139:11, 143:6,
143:13, 150:18,
153:10, 159:14
**union**
31:17
**unique**
111:4
**uniquely**
31:21
**united**
1:6, 4:2, 7:4,
31:17, 34:3,
34:18, 34:19,
85:15, 85:17,
89:1, 96:17,
97:9, 97:15,
97:20, 98:3,
99:4, 100:4,
100:16, 107:4,
167:10
**university**
40:1
**unless**
12:1, 14:21,
26:10, 104:10,
118:8
**unlike**
169:4
**unreasonable**
12:1, 14:10,
20:19, 20:21,
25:14, 25:18,
26:2, 26:13,
27:19, 29:5,

**unreasonableness**
29:10
**unreasonably**
71:9
**unrelated**
47:3, 47:5
**until**
11:4, 16:6,
16:14, 22:14,
81:8, 139:18,
170:12
**update**
56:17
**upon**
13:12, 155:13
**upward**
128:7
**use**
13:4, 16:10,
16:15, 20:13,
21:8, 24:12,
27:6, 27:18,
34:21, 37:2,
48:3, 49:16,
49:18, 51:3,
51:4, 51:13,
51:17, 53:10,
53:12, 57:7,
58:19, 61:1,
61:4, 62:10,
62:14, 62:16,
74:18, 76:7,
86:6, 86:10,
87:8, 96:20,
97:2, 97:5,
97:7, 98:16,
98:21, 99:19,
102:19, 102:22,
105:5, 105:19,
115:19, 119:7,
127:2, 127:20,

71:15, 72:9,
76:7, 79:17,
80:4, 80:6,
90:12, 93:18,
98:22, 99:2,
105:6, 148:14,
149:6, 149:8

136:7, 139:14,
140:17, 147:5,
147:7, 156:1,
156:6, 156:8,
156:10, 156:13,
156:15, 162:5,
162:6, 162:13,
163:19, 166:12,
168:13
**used**
9:17, 14:8,
20:18, 21:12,
25:17, 26:8,
26:12, 26:16,
29:1, 29:3,
29:5, 29:15,
48:5, 50:1,
56:2, 56:22,
70:9, 70:17,
71:6, 72:15,
74:20, 75:9,
77:3, 78:1,
78:2, 78:8,
78:9, 78:11,
79:20, 80:4,
81:15, 82:11,
82:20, 87:7,
90:5, 90:15,
99:17, 100:9,
105:1, 109:8,
119:8, 119:9,
121:18, 126:1,
130:14, 143:12,
147:12, 149:21,
162:15, 163:3,
163:5, 164:17,
168:20, 169:2,
170:15
**uses**
48:18, 53:13,
53:22, 55:9,
87:11, 99:15,
100:19, 102:15,
132:3, 134:14,
141:22
**using**
27:7, 28:2,
67:14, 72:13,

78:4, 82:1,
85:5, 86:8,
91:9, 100:17,
101:1, 102:8,
108:15, 119:12,
123:14, 134:12,
135:2, 135:6,
138:6, 138:14,
139:12, 140:5,
140:6, 144:3,
159:8, 163:9
**usually**
46:12
**uvb**
110:13, 114:10,
118:5, 118:7,
118:13, 122:5,
122:11, 122:17,
123:18, 138:10,
138:12
**uvbs**
26:8, 78:4,
78:12, 108:22,
109:20, 110:18,
111:10, 114:16,
114:18, 115:4,
117:15, 136:7,
140:14, 142:13,
142:17, 144:12,
161:19

**V**

**va**
3:14
**valuation**
37:3, 71:17,
114:2
**valuations**
38:1, 38:3
**value**
9:17, 48:8,
48:9, 48:10,
54:11, 60:7,
69:16, 84:22,
85:3, 111:13,
111:14, 113:14,
113:17, 114:1,
114:7, 114:9,

Transcript of Arbitration - Day 1
Conducted on December 12, 2017

214

114:11, 115:15,
115:18, 115:20,
125:8, 126:1,
126:8, 134:11,
134:20, 135:12,
135:21, 138:16,
139:12, 140:3,
140:4, 140:6,
147:3, 153:10,
153:22
**valued**
113:9
**values**
164:6
**valuing**
26:20
**variable**
51:5
**varies**
59:19
**variety**
96:20
**various**
7:19, 9:11,
17:21, 38:7,
40:18, 157:7
**vary**
83:18
**varying**
60:22
**vehicle**
81:8
**venable**
2:4, 3:11
**very**
18:18, 27:15,
35:8, 60:11,
62:3, 71:22,
72:5, 72:11,
73:10, 74:4,
80:13, 84:5,
85:2, 104:7,
104:9, 104:10,
106:17, 111:16,
114:18, 123:13,
126:8, 135:6,
137:3, 139:5,
168:8, 168:9,

171:1
**vested**
26:7, 50:14,
50:19, 51:1,
51:6, 51:10,
51:13, 51:18,
52:4, 53:2,
53:7, 53:17,
69:11, 69:15,
72:12, 72:16,
78:3, 78:15,
79:1, 79:3,
85:3, 100:5,
108:2, 109:9,
111:1, 112:21,
121:12, 121:14,
123:12, 123:15,
124:2, 126:8,
134:12, 143:6,
143:13, 150:18,
153:10, 159:15,
162:12
**victoria**
1:22, 2:12,
172:2, 172:19
**view**
16:11, 29:7,
105:12, 149:11,
155:22
**viewed**
29:8
**viewing**
140:19
**violent**
25:8
**virginia**
172:21
**virtually**
110:15

---
**W**
---

**wait**
81:8, 113:16
**walk**
88:18
**want**
8:2, 10:18,
12:6, 13:20,

14:19, 31:8,
31:10, 32:9,
35:10, 46:5,
74:16, 88:4,
88:6, 88:18,
92:2, 92:3,
92:5, 98:19,
99:7, 106:18,
119:10, 119:11,
119:14, 128:12,
129:5, 134:2,
136:18, 139:14,
147:6, 159:6,
163:8, 164:18,
164:21, 168:12,
169:15, 170:12,
170:20
**wanted**
14:21, 35:5,
81:4, 135:22,
153:22, 158:14
**wants**
101:11, 136:13
**warning**
169:9
**was**
9:15, 15:8,
15:10, 15:13,
15:17, 15:18,
16:1, 17:1,
17:5, 17:6,
18:1, 20:19,
22:7, 22:8,
22:10, 24:8,
24:10, 26:19,
27:6, 30:11,
30:16, 30:17,
30:18, 30:21,
31:4, 31:5,
32:5, 34:10,
35:18, 45:10,
45:12, 45:15,
64:21, 65:6,
71:9, 72:2,
76:15, 78:8,
78:9, 78:16,
78:18, 80:4,
81:5, 88:21,

90:12, 94:4,
94:15, 94:18,
94:21, 95:10,
97:11, 99:16,
100:13, 105:4,
105:6, 107:1,
114:18, 119:9,
123:14, 128:2,
133:10, 133:11,
134:7, 135:22,
141:13, 144:2,
144:5, 144:13,
145:4, 148:14,
148:16, 149:3,
149:5, 149:8,
158:8, 158:19,
159:7, 159:13,
161:10, 161:12,
161:15, 163:7,
163:16, 166:3,
167:8, 170:3
**washington**
1:12, 2:6, 4:9,
4:18
**wasn't**
18:9
**way**
10:4, 18:5,
29:2, 32:14,
61:6, 68:3,
97:10, 113:21,
137:6, 153:10,
159:13
**ways**
53:8
**we'd**
16:9
**we'll**
13:8, 30:9,
32:8, 35:4,
55:1, 81:7,
112:9, 141:11
**we're**
7:3, 10:1,
20:11, 22:3,
22:6, 35:19,
51:21, 81:11,
98:14, 119:11,

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    215

119:12, 121:2,
123:7, 127:15,
129:13, 134:5,
135:6, 135:12,
163:13, 169:5,
170:4
**we've**
30:20, 81:1,
87:9, 91:6,
122:15, 136:5,
136:7
**week**
16:6, 16:15,
18:15, 169:21
**weight**
162:17, 162:21,
163:2
**weighted**
58:12
**welch**
4:15
**welfare**
34:3
**well**
7:16, 7:20,
9:12, 19:2,
19:7, 20:12,
27:17, 32:16,
38:5, 39:22,
46:13, 46:19,
48:7, 48:22,
49:4, 51:15,
53:10, 55:9,
59:9, 59:14,
61:15, 63:11,
68:21, 71:19,
73:7, 78:22,
93:11, 94:5,
95:2, 98:20,
99:14, 100:12,
100:20, 101:17,
104:12, 113:16,
114:4, 119:5,
120:1, 120:8,
120:10, 131:6,
133:3, 137:12,
137:19, 142:7,
142:13, 143:4,

143:20, 143:22,
144:5, 148:9,
151:19, 159:19,
161:1, 161:14,
169:14
**went**
114:4, 121:13,
151:14
**were**
7:11, 7:13,
9:13, 11:2,
14:9, 15:10,
20:2, 23:17,
25:17, 26:12,
27:10, 29:5,
29:16, 30:16,
34:8, 45:5,
45:8, 45:14,
45:17, 53:3,
69:7, 70:16,
71:14, 71:16,
72:2, 72:14,
74:22, 78:11,
79:17, 80:3,
84:7, 84:12,
86:3, 86:4,
86:6, 90:15,
94:1, 94:2,
95:8, 95:11,
95:15, 102:2,
102:3, 102:8,
118:14, 150:21,
154:9, 157:22,
164:1, 164:3,
164:5, 166:16,
166:19, 167:1,
169:7, 169:8,
170:15, 172:3,
172:6
**weren't**
120:7
**west**
1:3, 3:8, 7:3,
8:11, 10:22,
11:5, 11:13,
12:19, 13:1,
13:2, 13:13,
16:8, 17:6,

17:12, 18:21,
19:21, 20:7,
21:22, 22:1,
23:20, 24:5,
24:20, 25:15,
25:22, 26:15,
27:14, 28:8,
29:10, 29:13,
35:11, 35:21,
45:6, 64:17,
69:1, 69:6,
69:20, 70:11,
83:5, 84:18,
86:22, 87:18,
109:4, 109:11,
120:16, 150:6,
150:11, 150:20,
152:6, 152:10,
153:1, 153:4,
153:16, 157:6,
159:2, 159:21,
167:16
**west's**
14:9, 25:12,
27:13, 69:12,
69:14, 74:18,
109:6, 121:11
**western**
94:16
**what's**
36:1, 39:20,
39:21, 53:13,
66:16, 78:19,
126:18, 133:14,
151:6, 160:19,
160:22
**whatever**
112:11, 119:19,
136:1, 136:17,
136:18, 152:6,
165:17
**whatsoever**
91:4
**when**
8:2, 11:4,
16:7, 22:8,
39:16, 45:8,
55:21, 57:1,

57:7, 63:6,
63:19, 64:17,
65:5, 65:6,
66:6, 70:18,
75:8, 77:1,
83:21, 86:19,
86:22, 91:22,
93:19, 100:12,
108:18, 111:9,
116:2, 119:11,
145:19, 147:2,
149:3, 154:18,
163:20, 163:22,
164:2, 167:3
**whenever**
107:2
**where**
18:5, 22:16,
36:9, 38:14,
57:15, 73:15,
82:9, 128:5,
143:8, 155:22,
159:8
**whereof**
172:12
**whether**
10:13, 10:14,
14:7, 14:12,
23:14, 69:20,
70:4, 82:7,
94:9, 101:20,
102:15, 104:21,
112:21, 113:2,
113:8, 113:17,
115:5, 115:14,
115:22, 116:11,
140:20, 148:9,
151:14, 157:16,
158:5, 161:4
**which**
8:19, 9:15,
11:10, 12:8,
12:13, 13:22,
21:8, 22:10,
22:15, 24:1,
24:13, 32:11,
32:14, 33:1,
33:10, 39:1,

Transcript of Arbitration - Day 1
Conducted on December 12, 2017

216

40:2, 40:7,
41:8, 44:10,
44:14, 47:1,
47:5, 48:13,
48:15, 57:13,
60:1, 60:19,
61:2, 61:5,
62:5, 62:17,
63:1, 63:11,
64:22, 66:19,
68:14, 68:15,
69:4, 72:4,
72:18, 74:6,
74:22, 94:2,
95:5, 96:10,
97:2, 105:4,
107:19, 108:21,
115:3, 115:18,
116:18, 127:9,
138:5, 141:11,
147:14, 157:22,
162:20, 165:1,
167:16
**while**
18:7, 21:4,
21:14
**who**
25:4, 27:1,
27:12, 33:2,
33:10, 39:10,
40:13, 43:17,
52:18, 53:3,
54:21, 56:4,
56:14, 74:8,
75:17, 80:11,
91:13, 97:11
**who's**
43:15, 143:19
**whole**
58:9, 58:10,
137:16
**whom**
172:3
**whose**
22:18
**why**
8:21, 23:11,
51:1, 54:9,

55:3, 71:8,
72:7, 80:1,
81:19, 129:13,
130:8, 133:7,
135:4, 165:16
**wide**
96:20
**widely**
137:7
**will**
7:19, 8:6,
12:18, 15:16,
19:8, 20:17,
21:6, 27:5,
27:7, 27:12,
29:13, 29:14,
54:17, 58:13,
61:4, 62:4,
63:10, 65:18,
67:7, 70:3,
70:5, 75:17,
77:11, 82:5,
82:8, 83:4,
108:1, 112:11,
112:12, 114:22,
120:1, 159:10,
163:10, 165:6,
167:6, 170:7,
170:9, 170:18
**william**
97:14
**williams**
3:10
**willing**
60:3
**wilson**
1:22, 2:13,
172:2, 172:19
**with**
7:14, 8:10,
8:13, 8:18,
10:15, 10:21,
14:1, 15:6,
20:1, 25:20,
27:2, 27:11,
31:5, 36:4,
37:11, 37:19,
38:6, 39:12,

39:15, 39:17,
42:8, 44:7,
47:21, 48:19,
53:1, 55:8,
57:3, 59:13,
61:8, 62:17,
63:3, 64:4,
65:21, 66:12,
66:15, 68:7,
68:16, 77:8,
79:20, 81:17,
82:1, 82:18,
83:2, 83:12,
83:20, 90:2,
90:4, 90:8,
92:14, 93:20,
93:21, 94:3,
94:10, 94:15,
95:18, 97:13,
97:14, 100:8,
100:22, 101:4,
101:9, 101:14,
101:16, 103:14,
103:20, 103:21,
105:16, 110:14,
115:8, 121:9,
121:17, 121:22,
122:13, 123:1,
123:4, 123:6,
126:13, 128:15,
129:4, 129:6,
131:15, 131:17,
132:7, 132:16,
132:21, 134:19,
134:21, 137:16,
139:8, 140:11,
144:7, 148:3,
154:14, 158:10,
160:13, 168:6,
168:19, 168:20,
169:7, 170:19
**withdraw**
78:13
**withdrawals**
129:19, 130:5
**withdrawing**
53:1, 69:1,
106:10, 143:19

**withdraws**
87:13, 106:3,
146:15
**withdrew**
64:18, 86:22
**within**
30:6, 31:1,
31:14, 32:17,
33:13, 33:17,
35:2, 42:20,
104:14, 104:17
**without**
9:10, 23:9,
70:21, 105:1,
108:15, 108:18,
136:8, 136:15,
138:5
**witness**
6:2, 15:15,
21:17, 25:3,
27:12, 27:14,
35:10, 35:12,
45:6, 45:11,
79:5, 93:3,
101:13, 130:1,
132:18, 132:19,
133:14, 134:4,
135:16, 136:22,
139:18, 140:1,
141:11, 141:16,
156:17, 172:12
**witness's**
170:17
**witnesses**
29:9
**won't**
115:17
**words**
9:16, 28:5,
68:3, 118:21,
119:8, 119:9,
119:10, 119:13
**work**
10:4, 37:10,
37:19, 37:21,
38:14, 38:20,
47:9, 93:7,
95:7, 95:22,

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                        217

| | | | |
|---|---|---|---|
| 162:10 | 99:14, 101:22, | 68:14, 85:8 | 35:10, 36:1, |
| **worked** | 106:13, 106:19, | **yielding** | 38:20, 39:19, |
| 38:10, 38:12, | 114:5, 114:15, | 60:18, 86:3, | 39:20, 39:21, |
| 38:16, 38:22, | 121:1, 122:1, | 86:5 | 41:17, 42:1, |
| 39:6, 39:8, | 122:12, 125:17, | **yields** | 45:4, 45:18, |
| 39:13, 39:17, | 127:21, 134:4, | 77:8, 85:15, | 45:19, 46:1, |
| 47:12, 47:15, | 135:17, 136:21, | 86:1 | 66:14, 70:14, |
| 47:17, 93:9, | 143:16, 144:8, | **york** | 71:1, 78:7, |
| 95:18 | 144:19, 152:10, | 84:3, 84:14, | 79:19, 89:11, |
| **workers** | 152:15, 165:15 | 103:13 | 89:12, 89:21, |
| 1:6, 4:2, 7:4, | **year** | **you'd** | 90:1, 90:8, |
| 30:11, 34:3, | 13:7, 14:13, | 61:15, 77:9 | 90:11, 90:17, |
| 89:2, 107:5, | 15:14, 20:8, | **you'll** | 93:6, 93:8, |
| 167:11 | 20:22, 22:1, | 7:8, 11:10, | 93:10, 93:17, |
| **working** | 23:19, 24:7, | 11:17, 24:3, | 93:19, 93:20, |
| 39:1, 52:15, | 24:13, 30:2, | 130:6 | 94:2, 95:8, |
| 93:15 | 32:6, 34:12, | **you're** | 95:20, 96:6, |
| **works** | 45:12, 67:8, | 41:9, 42:15, | 101:4, 103:18, |
| 43:17, 95:21, | 69:18, 72:2, | 90:13, 91:22, | 104:6, 104:18, |
| 137:6 | 87:14, 93:17, | 102:6, 107:2, | 105:16, 107:13, |
| **worksheet** | 157:10, 161:8 | 109:12, 115:17, | 107:14, 107:21, |
| 133:18, 136:19, | **year's** | 126:12, 127:18, | 108:6, 108:12, |
| 137:11, 141:18 | 48:16, 49:9 | 128:1, 128:3, | 108:16, 108:19, |
| **world** | **years** | 128:5, 128:7, | 108:20, 109:3, |
| 32:11 | 31:6, 38:13, | 129:17, 131:6, | 109:15, 109:17, |
| **worse** | 39:3, 39:11, | 135:1, 138:1, | 114:17, 116:17, |
| 28:12, 89:15, | 39:17, 40:9, | 138:6, 150:5, | 118:20, 120:1, |
| 129:16, 130:18, | 41:16, 42:14, | 151:10, 152:2, | 121:15, 122:4, |
| 131:21, 132:9, | 43:2, 49:14, | 152:4, 155:6, | 123:21, 124:3, |
| 132:11, 143:1, | 53:19, 64:16, | 156:22, 167:21, | 124:6, 125:9, |
| 143:5, 143:9, | 71:18, 71:21, | 168:3 | 126:13, 128:14, |
| 154:14, 154:21 | 72:3, 74:21, | **you've** | 130:17, 131:19, |
| **wouldn't** | 77:17, 77:21, | 56:8, 90:18, | 141:7, 141:19, |
| 110:12, 150:9, | 93:8, 100:13, | 90:22, 91:3, | 143:8, 144:7, |
| 153:21 | 104:14, 104:17, | 93:2, 93:9, | 144:17, 146:2, |
| **writing** | 118:9, 118:18, | 95:5, 95:6, | 147:17, 147:18, |
| 132:19 | 123:17, 127:6, | 97:2, 102:2, | 147:21, 148:5, |
| **written** | 152:7, 155:3, | 108:5, 123:5, | 150:4, 150:21, |
| 92:18 | 161:13, 164:4, | 124:14, 126:10, | 151:13, 154:13, |
| **wrong** | 164:5, 166:17, | 128:3, 130:12, | 154:19, 154:20, |
| 128:4, 155:13 | 167:2 | 131:6, 139:20, | 155:12, 155:22, |
| **X** | **yesterday** | 140:11, 148:12, | 156:4, 157:1, |
| **x** | 8:10, 11:4 | 149:21, 153:11, | 157:4, 157:9, |
| 1:2, 1:9 | **yet** | 155:12 | 157:10, 158:18, |
| **Y** | 54:22, 97:11, | **your** | 159:6, 165:17, |
| **yeah** | 152:13 | 7:18, 13:16, | 168:18 |
| 88:11, 95:16, | **yield** | 17:5, 19:16, | **yourself** |
| | 62:5, 62:7, | 31:4, 32:8, | 36:2 |

Transcript of Arbitration - Day 1
Conducted on December 12, 2017

218

**$**

**$115**
69:21, 121:6
**$247,251**
167:18
**$247,251.12**
160:11
**$3.4**
72:17
**$5.7**
122:10, 122:18
**$505**
45:22
**$68**
122:20

**0**

**00**
1:5, 170:22
**0001**
1:5
**0010**
4:19
**01**
1:5
**02446**
3:5
**05**
1:14

**1**

**1**
14:7, 106:22
**10**
1:14, 11:9,
145:15, 170:22
**100**
79:3, 134:13,
135:6, 135:7,
138:17, 138:20,
140:7
**11**
11:17, 80:15,
86:3
**11.62**
86:4
**1111**
4:8

**115**
69:16, 70:5
**12**
1:13, 17:16
**13**
57:15
**133**
6:10
**1393**
110:9
**14**
15:13
**141**
6:11, 79:4
**15**
6:6, 7:7, 7:11,
17:17, 49:14,
73:14, 74:3,
82:9, 104:14,
104:17
**159**
6:3
**1600**
3:15
**166**
6:8
**167**
6:3
**17**
1:5, 172:13
**170175**
1:20
**172**
1:21
**18**
142:14, 145:12,
145:13
**19**
83:8
**1920**
4:16
**1950**
22:9, 24:10,
30:11, 30:17,
30:18, 30:22,
31:5, 32:19,
32:20, 34:1,
34:4

**1954**
31:16
**1974**
1:7, 11:15,
12:3, 13:11,
14:8, 14:12,
15:16, 19:21,
20:4, 20:6,
21:6, 22:9,
27:22, 28:3,
28:9, 28:20,
30:4, 30:19,
31:1, 31:6,
31:22, 32:2,
32:15, 33:6,
33:7, 34:1,
34:14, 34:21,
46:10, 53:11,
53:13, 64:17,
65:14, 67:5,
68:22, 69:4,
71:5, 75:22,
76:4, 76:5,
76:11, 77:15,
79:5, 80:13,
82:6, 82:19,
84:8, 84:11,
84:12, 84:19,
86:13, 86:22,
87:17, 89:2,
97:12, 97:22,
107:5, 123:12,
147:19, 148:20,
150:5, 161:9,
163:3, 163:5,
163:12, 167:11
**1976**
30:21
**1980**
155:4
**1990**
39:2
**1993**
166:15
**1994**
42:13

**2**

**2**
14:12

**2.4**
78:18
**2.71**
72:14, 74:20,
123:16
**2.78**
72:14, 74:21,
123:17
**20**
13:7, 14:13,
20:8, 22:1,
23:19, 24:7,
24:13, 30:2,
34:12, 74:21,
85:1, 87:14,
123:17, 139:7,
139:12, 139:15,
157:10
**2000**
166:19, 166:21,
166:22, 167:1
**20001**
2:6
**20004**
4:9
**20036**
4:18
**2007**
161:14
**2011**
38:13
**2014**
65:5, 161:11,
161:12
**2015**
14:11, 64:20,
65:6, 75:1,
77:17, 77:18,
85:22, 123:13,
161:8, 161:10,
163:6
**2016**
14:12
**2017**
1:13, 12:13,
15:20, 45:13,
172:14
**2019**
172:15

Transcript of Arbitration - Day 1
Conducted on December 12, 2017

219

**202**
2:7, 4:10, 4:19
**2022**
67:8
**22182**
3:14
**23**
42:14
**23,000**
41:1
**24**
3:4, 42:14
**25**
106:22, 166:17,
167:2
**2578**
1:5
**26**
6:8, 12:13,
164:19, 165:18,
166:2, 166:3
**269770**
172:22
**27**
39:5, 62:12,
62:21, 62:22,
63:11, 93:8,
93:17, 145:10,
145:11
**28**
39:5
**29**
166:5, 166:7

---
**3**
---
**3**
171:2
**3.4**
78:18
**3.9**
145:16, 145:19,
147:19, 148:6,
149:15
**30**
14:11, 77:17,
77:18, 123:13
**300**
3:13

**305**
64:4, 64:22,
65:4, 103:18,
116:17, 116:21
**31**
15:17, 172:15
**3278**
3:6
**344**
2:7
**35**
6:3, 63:11,
79:14
**36**
41:17, 142:14
**37**
127:6, 155:3

---
**4**
---
**4,000**
40:22
**400**
4:17
**4000**
2:7, 57:12
**4001**
57:12
**401**
22:15, 23:1
**404**
20:4, 20:5,
20:6, 20:9,
21:21, 22:5,
22:7, 23:7,
23:9, 23:12,
23:14, 23:17,
29:22, 30:5,
31:2, 31:11,
31:15, 32:2,
32:17, 32:22,
33:9, 33:14,
33:18, 34:5,
34:10, 34:21,
35:3
**4044**
74:22, 75:4,
164:8, 165:1
**4044.75**
166:9

**4211**
13:8, 29:19,
57:15, 110:1
**4213**
21:8, 98:16,
110:1, 110:6,
110:10, 111:12,
114:4, 114:14,
114:18, 115:18,
161:17
**4219**
9:5, 11:7,
12:5, 12:10,
14:15, 30:3
**4221**
11:18, 11:21,
26:4
**444**
164:20
**45**
82:9

---
**5**
---
**5.25**
166:17
**5.6**
166:16
**5.68**
122:5
**5.8**
78:17
**50**
31:4, 31:21,
32:16, 33:20
**5079**
4:10
**53**
171:2
**5368**
36:10
**56**
72:18, 79:2
**57**
83:8, 83:9
**5th**
18:9

---
**6**
---
**6.25**
167:2

**6.3**
77:21
**60**
142:5
**600**
2:5
**61**
85:2
**617**
3:6
**620**
69:18

---
**7**
---
**7-1**
23:21, 72:13,
78:2, 78:5,
78:17, 78:20,
163:5
**7-year**
49:12
**7.1**
167:1
**7.5**
78:8, 78:9,
78:11
**703**
3:15
**734**
3:6
**739**
4:10
**74**
12:14, 17:7,
17:14, 17:16,
21:20, 22:22,
23:6, 24:6,
25:22, 29:11,
33:13, 33:17,
34:9, 34:22,
35:2, 53:10,
55:2, 67:2,
68:15, 69:10,
69:12, 69:21,
70:6, 70:9,
74:18, 76:8,
76:15, 78:1,
86:9, 98:15,

Transcript of Arbitration - Day 1
Conducted on December 12, 2017                    220

101:11, 148:7,
152:2, 159:4,
167:16
**75**
33:18
**76**
33:2, 33:3,
33:11
**760**
3:15
**783**
4:19

| **8** |
| :---: |

**80**
74:7, 138:14,
138:15, 139:6,
142:5
**8010**
3:12
**85**
73:2
**87**
73:1
**89**
6:3

| **9** |
| :---: |

**90**
93:10, 93:11,
93:14, 135:8,
140:3, 140:5
**9701**
32:13, 32:18,
33:5



# Transcript of Arbitration - Day 2

**Date:** December 13, 2017

**Case:** Energy West Mining Company -v- UMWA 1974 Pension Plan

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

1                 AMERICAN ARBITRATION ASSOCIATION

2      - - - - - - - - - - - - - -x

3    ENERGY WEST MINING          :

4    CORPORATION                 :

5         and                    :   Case No. 01:17-0001-2578

6    UNITED MINE WORKERS OF  :

7    AMERICA 1974 PENSION    :

8    PLAN AND TRUST.         :

9      - - - - - - - - - - - - - -x

10

11                   ARBITRATION DAY 2

12                   Washington, D.C.

13             Wednesday, December 13, 2017

14                     9:59 a.m.

15

16

17

18

19

20    Job No.: 170176

21    Pages: 173 - 276

22    Reported By: Victoria Lynn Wilson, RMR, CRR

1          ARBITRATION DAY 2, held at the offices of:

2

3

4          VENABLE LLP

5          600 Massachusetts Avenue, NW

6          Washington, DC 20001

7          (202) 344-4000

8

9

10

11

12      Pursuant to agreement, before Victoria Lynn

13   Wilson, Registered Merit Reporter, Certified

14   Realtime Reporter, Notary Public in and for the

15   District of Columbia.

16

17

18

19

20

21

22

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                    175

```
1              A P P E A R A N C E S

2    THE ARBITRATOR:

3         MARK L. IRVINGS, ESQUIRE

4         24 Elba Street

5         Brookline, MA 02446

6         (617) 734-3278

7

8     ON BEHALF OF ENERGY WEST MINING CORPORATION:

9       GREGORY OSSI, ESQUIRE

10        CHRISTOPHER R. WILLIAMS, ESQUIRE

11        VENABLE LLP

12        8010 Towers Crescent Drive

13        Suite 300

14        Tysons Corner, VA 22182

15        (703) 760-1600

16

17

18

19

20

21

22
```

```
1    A P P E A R A N C E S   C O N T I N U E D

2    ON BEHALF OF UNITED MINE WORKERS OF AMERICA
     PENSION PLAN AND TRUST:
3       STANLEY F. LECHNER, ESQUIRE

4       STEVE SPENCER, ESQUIRE

5        CHARLES P. GROPPE, ESQUIRE

6        MORGAN, LEWIS & BOCKIUS LLP

7        1111 Pennsylvania Avenue, NW

8        Washington, DC 20004

9        (202) 739-5079

10

11      JOHN R. MOONEY, ESQUIRE

12       OLGA THALL, ESQUIRE

13       MOONEY, GREEN, SAINDON,

14          MURPHY & WELCH, PC

15       1920 L Street, NW

16       Suite 400

17       Washington, DC 20036

18       (202) 783-0010

19

20       GLENDA FINCH, ESQUIRE

21       UMWA FUNDS, HEALTH AND RETIREMENT

22
```

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                    177

1        A P P E A R A N C E S   C O N T I N U E D

2        ALSO PRESENT:

3            PAUL B. PRIEST

4            SCOTT A. HITTNER

5            ETHAN E. KRA

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                    178

```
1                    C O N T E N T S

2    WITNESS            DIRECT    CROSS     RED.    REC.

3    ETHAN E. KRA          179      234      --      --

4                    E X H I B I T S

5    EXHIBIT                        PAGE ADMITTED

6    Joint Exhibits Nos. 1 through 15        275

7    Reference Material Nos. 1 through 26    275

8    Pension Plan Exhibits Nos. 1 through 8  275

9    Transcript of Dale Stover               275

10   Transcript of William Ruschau           275

11   Employer Exhibits Nos. 1 through 20     275

12

13

14

15

16

17

18

19

20

21

22
```

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                    179

```
1              P R O C E E D I N G S

2                ETHAN EMANUEL KRA,

3   having been duly affirmed, testified as follows:

4         THE ARBITRATOR:  Go right ahead.

5   DIRECT EXAMINATION BY COUNSEL ON BEHALF OF THE

6   UNITED MINE WORKERS OF AMERICA 1974 PENSION PLAN

7   AND TRUST

8   BY MR. LECHNER:

9      Q  Good morning.  Could you please state your

10  name for the record.

11     A  Ethan Emanuel Kra.

12     Q  By whom are you employed?

13     A  Ethan E. Kra Actuarial Services, LLC.

14     Q  And what is your occupation?

15     A  I'm an actuary.

16     Q  Have you been asked to prepare a report in

17  this case?

18     A  Yes, I have.

19     Q  And by whom were you asked?

20     A  By you.

21     Q  And could you explain --

22     A  By Morgan Lewis and its client, the United
```

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                              180

1    Mine Workers of America 1950 -- 1974 Pension Plan.

2         Q   I would like to turn your attention to

3    Joint Exhibit 8, and there will be a number of

4    questions this morning concerning Joint Exhibit 8.

5              MR. LECHNER:  Could we show the witness

6    Joint Exhibit 8.  There's -- it's the white one

7    and -- the arbitrator.

8         Q   Do you recognize that report?

9         A   Yes, I do.

10        Q   Was that report prepared by you?

11        A   Yes.

12        Q   Have you reviewed the report since you

13   prepared it?

14        A   Yes.

15        Q   Do you have any changes in that report?

16        A   Yes.  On page 15, paragraph 44, the

17   penultimate statement -- sentence, it reads in the

18   report, "The ongoing employers would have to make

19   up the entire shortfall."  In this particular

20   situation, that shortfall would also be shared by

21   participants in the Pension Benefit Guarantee

22   Corporation.

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                    181

1          THE ARBITRATOR:  Let me just get there.

2      A  The next-to-the-last sentence.

3      Q  So, this is on page 15 of your report,

4  page 44.

5      A  44.  That the PBGC and the participants

6  would also suffer pain.

7      Q  Does the report contain a summary of your

8  credentials and qualifications?

9      A  Yes, it does.

10     Q  Rather than go through all of those, I'm

11  looking on page three, four and five, is that an

12  accurate summary --

13     A  Yes.

14     Q  -- of your credentials and qualifications?

15     A  Yes, it is.

16     Q  Does it include your educational

17  background?

18     A  Yes, it does.

19     Q  Employment history?

20     A  Yes.

21     Q  Other credentials?

22     A  Yes.

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                           182

1       Q   I notice that there is an Appendix B to

2   this report.  Your report is 40 -- or I'm sorry --

3   28 pages long.

4       A   Yes.

5       Q   Oh, and then there's an Appendix A.  Could

6   you explain what Appendix A is.

7       A   Appendix A is a list of documents that I

8   either used on my own or were provided by counsel

9   to use in preparing this report.

10      Q   Okay.  And that goes on for several pages?

11      A   Yes, it does.

12      Q   And then --

13      A   I must acknowledge that the Bates numbers

14  were provided by counsel.

15      Q   Okay.  There's an Appendix B.  What is in

16  Appendix B?

17      A   Appendix B is a more detailed CV of

18  myself, including all speeches and articles.

19      Q   That goes on for 17 pages, according to my

20  count; is that correct?

21      A   Let's see here.  Yes, it is.

22      Q   And then there's an Appendix C.  Could you

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                    183

1    explain what Appendix C is.

2         A   Appendix C is the list of expert witness

3    cases that I have participated in as of the date

4    that I prepared the report.  There have been a few

5    since.  And it's missing one at the very end, the

6    oldest one, which would be the early 1980s.  I

7    don't even remember the name of the case.  In some

8    of these cases, there have been subsequent

9    depositions or hearings.

10        Q   In these cases, whom do you represent?

11   Whom have you represented in terms of plans,

12   employers?

13        A   I represented both.  The name of the

14   client is the one that's in italics.  I would say

15   approximately one-third of my clients have been

16   plaintiff, two-thirds defense.  That's

17   approximate.

18        Q   Are you familiar with multi-employer

19   pension plans and withdrawal liability?

20        A   Yes, I am.

21        Q   How long have you worked on those issues?

22        A   I started working with multi-employer

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                    184

1    plans in 1979.  I've worked on a number of pension

2    plans while I was at Mercer representing the

3    funds.  I also advised corporations on dealing

4    with multi-employer pension plan liabilities, did

5    some, I'll call it, esoteric projects involving

6    them, including ensuring against the increase in

7    withdrawal liability on account of a competitor

8    going bankrupt, which was a novel issue.

9         Since I've been on my own in my own firm,

10   I've probably been involved with about 13 to

11   14 cases of multi-employer plans, either

12   arbitrations or one is not yet an arbitration but

13   I've done a lot of analysis on a withdrawal of

14   those.

15        So, I'd say about 40 percent of the cases

16   that I've worked on since I've gone on my own as

17   an independent actuary have involved

18   multi-employer plans.  Almost -- with a few

19   exceptions, they've all involved withdrawal

20   liability.

21    Q  Have you served as an expert in any of

22   those cases?

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                    185

```
1        A   Yes, I have.
2        Q   Approximately how many of those cases, the
3   multi-employer withdrawal liability plan cases,
4   approximately how many did you serve as an expert
5   in?
6        A   Since the beginning of 2012, as -- in
7   testimony or as an expert in preparing a report,
8   deposition, testimony?  Where do you draw the
9   line?
10       Q   Well, first, in preparing reports and then
11  I'll ask you testimony in terms of both
12  depositions and trial -- hearing testimony.
13       A   So, for multi-employer plans, I've been
14  involved with seven plans where I've defended the
15  actuary's assumptions.  Of those, I believe this
16  is the fifth one that has actually gone to
17  arbitration hearing.  I've been involved with one
18  where I represented the employer on the definition
19  of "obligation to contribute," did a report and
20  deposition.
21           Let me shut this phone off.  I'm sorry.
22  My apologies.  One second.  Silence.
```

1        So, I had one "obligation to contribute."

2    I'm working on another one where I've done

3    analysis but not technically an expert report on

4    whether or not different entities are within the

5    controlled group for being obliged to pay the

6    withdrawal liability.

7        I did another report on the issue of

8    whether or not, because Company A lost the

9    contract and Company B came in and took over the

10   contract, was there a withdrawal, was there not a

11   withdrawal.  There were issues there, and I don't

12   recall the details of the arguments that were

13   being made and the facts.  That was a few years

14   ago.

15       I had two cases which involved the 10

16   percent surcharge, as to whether or not that got

17   into the contribution schedule.

18       Oh, another one where I represented the

19   Screen Actors Guild in a court proceeding which

20   was on a motion to prevent the vote of the Screen

21   Actors Guild merging with AFTRA, and I was

22   opposing a group of 63 actors that included Ed

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                    187

1    Asner, Valerie Harper and a whole bunch of other

2    famous names.  I didn't get to meet any of them.

3        Q  In these cases in which you've served as

4    an expert on multi-employer plans, including

5    withdrawal liability, are there any -- were you

6    accepted as an expert in those cases?

7        A  I testified in four previous cases and

8    full testimony and no challenge to expertise that

9    I recall.  I mean I fully testified and --

10           MR. LECHNER:  Mr. Arbitrator, I hereby

11   move to have Mr. Kra qualified as an expert on

12   multi-employer pension plan withdrawal liability.

13           MR. OSSI:  No objection.

14           THE ARBITRATOR:  Okay.  Thank you.

15   BY MR. LECHNER:

16       Q  Dr. Kra, before we go through your report,

17   which is in the record as Joint Exhibit 8, I'd

18   like to ask you a few, quote, "big picture

19   questions."  Were you present for Mr. Hittner's

20   testimony yesterday?

21       A  Yes, I was.

22       Q  Were you present for the entirety of the

1    testimony?

2       A  Yes.

3       Q  Did you hear his testimony on the discount

4    rate and its relationship to the projected

5    insolvency of the plan?

6       A  Yes.

7       Q  Did you hear his testimony on the

8    relationship between the discount rate and the

9    creditworthiness of the plan?

10      A  Yes.

11      Q  Did you hear his testimony on the

12   relationship between the discount rate and the

13   likelihood that benefits would not be paid?

14      A  Yes.

15      Q  Are you familiar with the approach that

16   was proffered by Mr. Hittner?

17      A  To be honest with you, I never heard of

18   that approach until I first read his report, and

19   the only times I've heard of that approach is in

20   his report, his deposition and his testimony

21   yesterday.  In fact, I attended a session at the

22   Conference of Consulting Actuaries meeting this

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                    189

1    past October where the sole subject of the session

2    was discount rates for withdrawal liability, and

3    nobody discussed this as one of the options.

4         I asked from the floor whether anybody had

5    ever heard of it.  No one had ever heard of it,

6    and this was a meeting of experienced senior

7    multi-employer practitioners.  In fact, throughout

8    all the literature I've read, studies, reports,

9    marketing materials, proposals, competitors'

10   proposals, analyses that I've seen done for

11   corporations or funds, except for Mr. Hittner,

12   I've never heard anyone breathe this type of

13   theory before.

14       Q  You mentioned actuarial meetings.  Do you

15   attend actuarial meetings?  Is there any kind of

16   continuing education requirement that you fulfill?

17       A  Yes.  Yes.  The continuing education

18   requirements are over -- for the enrolled

19   actuaries, one must have 36 hours over a 3-year

20   period.  However, for the qualification standards

21   of the American Academy of Actuaries and the

22   Society of Actuaries, I have to have 30 hours of

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                    190

1    continuing professional development credits each

2    year, some of which can be done by reading and

3    others attending meetings.

4         I tend to get all of my credits by

5    attending meetings or webinars to be able to keep

6    current on subject matter.  That would be

7    attending the meetings of the Enrolled Actuaries

8    meeting in the spring in Washington, the

9    Conference of Consulting Actuaries annual meeting

10   in the fall, except for 2016 when it conflicted

11   with the Jewish holidays, the -- sometimes I will

12   even attend the ASPAA meetings, American Society

13   of Pension Professionals and Actuaries, if it

14   doesn't conflict with anything else -- that's in

15   Washington -- as well as the American Academy of

16   Actuaries annual meeting in Washington.

17   Q  In the last few years, at those meetings

18   have you attended any sessions regarding

19   multi-employer issues?

20   A  Yes, between 2015, '16 and '17, I looked

21   at my continuing professional development

22   certificates from attending meetings and I've

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                    191

1    attended about 12 sessions on multi-employer plan

2    issues where that was the sole topic of

3    discussion.

4        Q   Do you recall seeing Mr. Hittner at any of

5    those sessions?

6        A   I do not recall.  He may have attended

7    one.  I'm not sure.

8        Q   In your 37 years -- or in the 37 years

9    since the enactment of withdrawal liability, just

10   to clarify, have you ever heard the theory

11   proposed by Mr. Hittner?

12       A   Other than from Mr. Hittner or in his

13   report, no.

14       Q   Again, in the 37 years, has it ever been

15   considered to your knowledge?

16       A   I've never heard of it nor seen it

17   considered anywhere.

18       Q   Has it ever been adopted by any court or

19   arbitrator?

20       A   Not to my knowledge.

21       Q   What is your opinion of his theory?

22       A   I think it is incorrect.  It flies in the

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                          192

1  face of widely accepted actuarial practice.  It is

2  not in the literature.  It flies in the face of

3  logic, and I can explain that.  And I believe it

4  is inconsistent with the statutes, and I can

5  explain that.

6      Q  Okay.  Let's start with actuarial

7  practice.  "Flies in the face of actuarial

8  practice," what do you mean by that?

9      A  I don't believe any fund in the United

10 States, and this law only applies in the United

11 States, uses this method.  I have not heard of

12 anyone proposing it.  I've not heard it discussed

13 at any actuarial meetings.  In committees, task

14 forces, I was vice president of pensions of the

15 American Academy of Actuaries in the

16 multi-employer pension subcommittee, which is now

17 a full-fledged committee, reported up through the

18 pension committee to the pension practice council,

19 and this approach was never broached, never came

20 up in any of the discussions at the practice

21 council or at the pension committee in all the

22 years that I sat on that, and I was chair of that

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                          193

1    council for 2 years and vice chair for 7 years and

2    a member of it for about approximately 18 years.

3        Q  When you say it's not in the literature,

4    what do you mean by that?

5        A  In the actuarial literature, there are a

6    number of publications.  The Pension Forum, the

7    Society of Actuaries has a number of publications.

8    The Conference of Consulting Actuaries produces

9    some materials each year.  And the American

10   Academy of Actuaries produces some materials each

11   year, and I read them, and I've never seen or come

12   across this approach in any of the materials.

13       Q  How about its relationship to the legal

14   framework set forth in ERISA?  And you may refer

15   to your report.

16       A  Sure.  Thank you.  First of all, on page

17   six of my report, I start with determination of

18   amount of unfunded vested benefits, ERISA 4213(c),

19   and it defines the add value vested benefits to be

20   the value of the nonforfeitable benefits under the

21   plan less the value of the assets under the plan.

22            So, in order to apply that, an actuary has

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                    194

1    to find out what this nonforfeitable benefit

2    means.  And "nonforfeitable benefit" is defined in

3    ERISA 4001(a)(8), as I describe in paragraph 23 of

4    my report.  And it goes on to describe a benefit

5    for which a participant has satisfied the

6    condition for entitlement under the plan, the

7    requirements of this chapter, other than

8    submission of formal application, retirement,

9    completion of waiting period, death, et cetera,

10   whether or not the benefit may subsequently be

11   reduced or suspended by a plan amendment, an

12   occurrence of any condition or operation of this

13   chapter in Title 26.

14        So, "nonforfeitable benefit" includes

15   benefits that might subsequently be eliminated.

16   Yet, they have to be reflected.

17        And then the PBGC regulations go on to

18   describe a "nonforfeitable benefit" to mean one

19   described in Section 4001(a)(8) of ERISA, and it

20   goes on in another regulation to be a benefit

21   described in Section 4001.2 of this chapter, which

22   is a regulation.

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                                    195

1           Plus, for purposes of this part, any

2     adjustable benefit that has been reduced by the

3     plan sponsor pursuant to Section 305(e)(8) of

4     ERISA or Section 432(e)(8) of the code that

5     otherwise -- would otherwise have been includable

6     as a nonforfeitable benefit for purposes of

7     determining an employer's allocable share of

8     unfunded vested benefits.

9           So, here, the PBGC regulation is putting

10    benefits that have been reduced already and

11    benefits that might be reduced in the future on

12    par, equally footing, between the two.  Same rules

13    will apply to those that have been cut back as to

14    those that will be cut back in the future.

15          "Unfunded vested benefits" means an amount

16    by which the value of nonforfeitable benefits

17    under the plan is defined by purposes of this

18    section exceed the value of the assets under the

19    plan.

20          Then we go to ERISA 305(g)(1).  Now, ERISA

21    305(g) starts, "Adjustments disregarded in

22    withdrawal liability determination."  It does not

1    read, "Adjustments disregarded in determining the

2    amount of the nonforfeitable benefits."  It says,

3    "Adjustments disregarded in all aspects of the

4    withdrawal liability determination."

5         The withdrawal liability determination

6    includes determining the projected benefit stream,

7    how much the benefits are projected to be every

8    year based on the definition of "nonforfeitable

9    benefits," as well as all of the assumptions used

10   to project those benefits, the benefit amounts, as

11   well as any assumptions used in order to determine

12   the present value of those.  Includes mortality.

13   Includes discount rates.

14        So, it says, "Adjustments disregarded in

15   withdrawal liability determination," not in

16   determination of the payments projection but in

17   all aspects of the withdrawal liability

18   determination.

19        And there it specifically says, "benefit

20   reduction," "any benefit reductions under

21   Subsection E8 or F or benefit reductions or

22   suspensions while in critical and declining status

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                          197

1    under Subsection E9, unless the withdrawal occurs

2    more than 10 years after the effective date of a

3    benefit suspension by a plan in critical and

4    declining status, shall be disregarded in

5    determining a plan's unfunded vested benefits for

6    the purposes of determining an employer's

7    withdrawal liability under Section 1381 of this

8    title."  1381 is ERISA 4201.

9          So, here it says that benefits that have

10   already been eliminated, which we know will never

11   be paid, are to be reflected in the determination

12   of the present value of the vested benefits in the

13   benefit stream and in the present value.

14         And in the PBGC regulations, those

15   benefits are put on par with benefits that may be

16   cut back in the future.  So --

17   Q  Just not to interrupt you, but the

18   benefits that may be cut back in the future, you

19   referred to that in paragraphs 22 and 23 of your

20   report.

21   A  22, 23, and paragraphs 24 and 25 take it

22   from the PBGC regulations.

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                           198

1      Q   Okay.

2      A   The PBGC regulations put the future

3   benefit cutbacks and the past benefit cutbacks on

4   an equal footing.

5      Q   My question on those is does that include

6   the -- this determination, does that include the

7   present value, the discount rate?

8      A   It has to because 305(g) says,

9   "adjustments disregarded in withdrawal liability

10  determination."  In order to determine withdrawal

11  liability, you need the assumptions.

12     Q   Okay.  Is that --

13     A   You don't have the assumptions, you don't

14  have a determination of withdrawal liability.  So,

15  it says you must disregard the cutbacks in the

16  determination.  That includes the discount rate.

17     Q   And when you say, "the determination of

18  the" -- UVBs, is that what you're talking about?

19     A   Withdrawal liability is an allocation of

20  unfunded vested benefits.  So, in order to get

21  withdrawal liability, you first must determine

22  unfunded vested benefits.

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                          199

1       So, it's saying in determining the amount

2   of the unfunded vested benefits, you must ignore

3   these benefit cutbacks.

4       Q  Okay.  You mentioned that in your opinion,

5   another problem with the theory proffered here by

6   Mr. Hittner is logic.  Could you explain what you

7   mean by "logic."

8       A  Let me take a hypothetical example

9   because, in mathematics, we always can -- start

10  with the premise that if you have a theory, you

11  have to test it at the extremes.  If it doesn't

12  work at the extremes, it proves the theory is

13  wrong.  You've got to now come up with a different

14  theory.

15      We say assume we have -- for simplicity,

16  I'm going to skip this plain and just take a plan

17  that has a calendar plan year, so it's easier to

18  discuss and understand.  As a result, withdrawal

19  liability is determined each December 31st for the

20  ensuing year.  That's the statute.

21      Now assume we have a plan that on

22  December 31st is paying all the benefits.

1    January 1, every benefit check will go out.

2    They've already been cut.  There's money in the

3    bank.  And the actuary's projecting by the end of

4    January, this plan is insolvent.  By the time it

5    pays its expenses and everything else in January,

6    it's insolvent, and as a result, by February 1,

7    the benefits will be cut back.

8          How do you value those benefits?  How do

9    you come up with a present value of the unfunded

10   vested benefits?

11      Q  If you include the cutbacks, is that --

12      A  If you -- well, let's say if you include

13   all the cutbacks and you use the regular discount

14   rate, you'll include all the benefits, as I've

15   said the law requires.

16          If, on the other hand, you follow the

17   Hittner theory that you have to reflect the

18   creditworthiness of the fact that those payments

19   will not be paid and discount -- adjust the

20   discount rate to reflect the fact that those

21   benefits will not be paid.

22          Well, if the insolvency would be 30 years

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                    201

1    from now, it would have very little effect on the

2    discount rate because 30 years of benefits would

3    be paid.  If the insolvency were 10 years from

4    now, it would have some effect under the Hittner

5    theory.

6         If the insolvency were going to be by

7    February 1, we would have to adjust the discount

8    rate to give virtually no value to all the

9    benefits starting February 1 forever.  That would

10   require increasing the discount rate to such a

11   high number that I don't know if my calculator has

12   enough digits.  We'd have to have a humongous

13   discount rate and it's just not -- it just defies

14   all logic.

15        Also, the other problem is if I had a mass

16   withdrawal, if the insolvency had occurred

17   December 29th and there was a mass withdrawal,

18   under the mass withdrawal rules, I would have to

19   use the PBGC assumptions.

20        So, it would -- the Hittner theory says if

21   the insolvency is 30 years out, you can use PBGC

22   assumptions or something pretty close.  If the

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                          202

1    insolvency is 10 years out, you've got to raise

2    the discount rate.  If it's a month out, you've

3    got to raise the discount right out of -- beyond

4    the sky.  But if the insolvency and mass

5    withdrawal were two months ago, you're back to the

6    PBGC rates.  So, you go all the way up, in

7    discontinuity, come down, and that makes

8    absolutely no sense.

9         If Congress wanted these benefits to be

10   disregarded effectively and by raising the

11   discount rate to such a high level, effectively,

12   you're not recognizing these benefits as having

13   any value, Congress could have said it directly.

14   It wouldn't say, "Include all the benefits but

15   play games with your actuarial assumptions so that

16   they're effectively disregarded."  It says, "Don't

17   disregard them.  Include them."

18      Q  What is the result of the Hittner theory,

19   and how does that apply with respect to logic

20   here?

21      A  The result of the Hittner theory is that

22   in certain situations, your discount rate would go

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                    203

1    higher and higher and higher, starting at going

2    10, 20, 30, 50, 100 percent, could go higher.  I

3    mean if the insolvency is a month out, it would be

4    astronomical, and that makes absolutely no sense.

5       Q  What about the relationship to the amount

6    of withdrawal liability in relation to the health

7    of the fund?

8       A  Under the Hittner theory, the sicker a

9    fund gets, the lower the withdrawal liability,

10    that the discount rate keeps going up and up and,

11    effectively, ignore most of the benefits.  In the

12    example I gave where insolvency were a month out,

13    the withdrawal liability would be virtually nil,

14    and that is not what the law says.

15         The law is that if you withdraw, you've

16    got to chip in to pay a chunk of the benefits

17    that -- the liability for those benefit amounts,

18    ignoring any cutbacks, because the law says even

19    if the benefits have been cut back and are not

20    being paid, you still have to pay for them.  I

21    don't make up the law.  Congress does.

22       Q  What about the testimony you heard about

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                                         204

1    market based measures and annuities and the fund

2    being a seller or equivalent to a seller of

3    annuities, could you comment on that?

4        A   First let me go to the comment about the

5    fund being an insurer selling annuities.  Number

6    one, I took the actuarial exams.  Part of it dealt

7    with insurance, life insurance and life insurance

8    companies.  And I know that insurance companies

9    are regulated by the states.  Under a 1942 law,

10   the federal government devolved the regulation for

11   most aspects of insurance companies to the states

12   and not to the fed.

13         And if you're an insurance company, the

14   state regulators -- when I was at Prudential, I

15   know the regulators came in and reviewed the

16   results of the yearend calculations of reserves.

17   The insurance commissioner of each state where the

18   insurance company is domiciled, and very often

19   other states, will review the financials of an

20   insurance company.  They have certain rules they

21   have to follow.  They have to file certain reports

22   with insurance commissioners, usually by

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                           205

1    February 28th of the ensuing year.  And if an

2    insurance -- and the requirements to value their

3    liabilities are very conservative.

4        And if an insurance company does not have

5    an adequate margin above their liabilities, in

6    other words, a solvency margin, a reserve, a

7    cushion, they are prohibited from selling any

8    additional insurance product, life insurance or

9    annuity.  If it's bad enough, they get seized by

10   the state.  But at some point, they're no longer

11   allowed to sell any additional product.

12       If this fund were an insurance company, it

13   would have been long ago banned from selling any

14   annuities.  It may very well have been seized.

15       But, secondly, if this fund were an

16   insurance company, it would have charged a much

17   higher contribution rate for the benefits it was

18   allegedly selling.

19   Q  Why is that?

20   A  Because the insurance companies charge

21   premiums based on conservative bond rates and

22   projections of mortality improvements.  They

1    are -- in selling annuities to the public, they

2    have to charge what would be on a fixed income

3    portfolio, generally.  And the contribution rates

4    for this fund annually were based on looking at

5    equities, as well, in setting the contribution

6    rates.

7        So, had Energy West been, quote, "buying

8    annuities," unquote, from a United Mine Workers of

9    America insurance company, it would have been

10   contributing a much higher rate for the benefits

11   being promised to its employees and it would have

12   been paying much more.

13       Q  Dr. Kra, in your opinion, is it a valid

14   analogy to compare the plan to an annuity

15   provider?

16       A  No.

17       Q  Why not, please?

18       A  The plan does not sell annuities.  The

19   plan is not charging annuity premiums.  The plan's

20   income comes from contractual labor contracts,

21   contractual required contributions from

22   participating employers pursuant to collective

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                    207

1   bargaining, plus it receives income from

2   withdrawal liability payments which are statutory.

3        Congress passed a law saying if you stop

4   contributing under a labor agreement and you no

5   longer contribute, you owe some withdraw

6   liability.  And Congress set up rules for how you

7   determine it.  And the fund receives investment

8   income.  Those are the three main sources of this

9   pension fund.

10       It is not selling annuities.  It is

11  collecting contract contributions and legally

12  mandated withdrawal liability payments.  They are

13  not tied to the benefits being provided to Energy

14  West employees.

15     Q  And what about on the Energy West side, is

16  it, in essence, investing in the plan --

17     A  No.

18     Q  -- in terms of withdrawal liability?

19     A  No.  Energy West, before it withdrew, was

20  making payments to the fund pursuant to a labor

21  agreement, just like it paid money into a large

22  welfare fund which covered retirees from defunct

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                                    208

1    companies.  It still does.  I'm not familiar with

2    the health funds anymore.  I worked on them many

3    years ago.

4          But this pension fund, it was making

5    contract payments and now withdrawal liability

6    will be making payments pursuant to statute.  It

7    is not buying any individual person's annuity

8    benefit.

9    Q  You've commented on the effect -- or your

10   opinion regarding the Hittner theory regarding the

11   projected insolvency of the plan.  Could you

12   comment regarding his opinion on the

13   creditworthiness of the plan.  How does that

14   factor in?

15   A  The creditworthiness of the plan is

16   irrelevant.

17   Q  Irrelevant to withdrawal liability?

18   A  To withdrawal liability.

19   Q  Okay.

20   A  Withdrawal liability is defined by

21   statute, and it describes what benefits, and it

22   says that even if the benefits won't be paid or

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                          209

1    aren't being paid, you still reflect those

2    benefits in the calculation and you disregard that

3    factor in the calculation.  So, it's a red

4    herring.

5         Q  Dr. Hittner, I'd like to --

6            THE ARBITRATOR:  Dr. Kra.

7            MR. LECHNER:  Could you please strike that

8    from the record.  Double strike it so that it

9    never appears.

10        Q  Dr. Kra, could you look at your report,

11   and do you have a summary in your report of your

12   conclusions?  And could you go through those

13   briefly for us.

14        A  Sure.  Summary starts on page two of the

15   report.  Number one, the assumption selected by

16   the plan's actuary and used in valuing the plan's

17   unfunded vested benefits as of June 30th, 2015

18   that were used in determining the withdrawal

19   liability for Energy West were not unreasonable in

20   the aggregate, taking into account the experience

21   of the plan and reasonable expectations.

22            Number two, the withdrawing employer and

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                    210

1    its expert --

2          MR. OSSI:  Mr. Arbitrator, I'm going to

3    object if he's just going to read his opinion.

4    It's in the record.

5          THE ARBITRATOR:  I agree.

6          MR. OSSI:  We don't need him to read it.

7          MR. LECHNER:  Yes.

8      Q  Could you just highlight what are the

9    important aspects of your findings --

10     A  Sure.

11     Q  -- and whether they were affected by any

12   of the testimony yesterday from Mr. Hittner.

13     A  Mr. Hittner did not demonstrate that the

14   assumptions were unreasonable in the aggregate and

15   did not contain the required proof required under

16   ERISA 4221.

17         The actuary included all of the

18   nonforfeitable benefits and valued them

19   appropriately.  And ERISA requires that he reflect

20   all the benefits, including those that may be cut

21   back in the future, as well as those that may have

22   been cut back in the past if it's within the past

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                           211

1    10 years.

2         Q  Did you review all of the actuarial

3    assumptions?

4         A  Yes.

5         Q  Although the burden is on Energy West to

6    show that they're unreasonable in the aggregate,

7    did you review the reasonableness of them on an

8    individual basis?

9         A  Yes, I did.

10        Q  Did you find any of them individually

11   unreasonable?

12        A  None of them were individually

13   unreasonable.  There were fewer, I felt, what I

14   would call a little light, maybe understating the

15   liability slightly, but not enough to result in

16   anything unreasonable.

17        Q  And could you highlight those for us.

18        A  There was an assumption for administrative

19   expenses.

20            MR. OSSI:  I'm going to object on --

21   what's the relevance?  We've agreed the issue is.

22            MR. LECHNER:  Well, he's saying these

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                    212

1    understate the liability and the aggregate is the

2    important criteria.  So, we can go into it a

3    little bit further, the relevance, but that's the

4    relevance, because the aggregate is the test.

5        MR. OSSI:  I don't disagree that the

6    aggregate is the test.  I just -- you know, I

7    don't -- we didn't -- you know, the issue that we

8    had framed for the arbitrator was whether the

9    interest rate, in particular, you know -- well,

10   look, if you want to ask him questions, fine.

11       THE ARBITRATOR:  Go ahead.

12     A  The administrative expenses, as I outline

13   on pages 21 going onto 22, I believe is below

14   where the administrative expenses for the plan

15   will be and, therefore, that would increase the

16   withdrawal liability.

17       The percent married, covered on page 23, I

18   believe understates the percentage that are

19   probably married based on general survey data with

20   most plans that we've dealt -- I've dealt with

21   over the years.  And, again, that would slightly

22   understate the withdrawal liability.  The rest of

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                    213

1    the assumptions, I felt, were quite good, and I

2    felt, in the aggregate, that these assumptions

3    were reasonable.

4        Q  Just briefly, on the mortality assumption,

5    is that an important assumption?

6        A  It is a very important assumption because

7    it goes to how long benefits will be paid.

8        Q  Is this a typical mortality assumption

9    that the plan used here or is it somehow different

10   from a typical one?

11       A  It is very atypical.  This mortality

12   assumption assumes that participants will die at

13   younger ages than is typical in most pension plans

14   in this country.  It reflects studies that have

15   been done by the actuary and the actuary's

16   predecessor on the mortality experience of the

17   participants in this plan which show that they die

18   at younger ages.  They've worked in underground

19   coal mines and have related diseases.

20           In fact, it assumes that the participants

21   will have mortality experience comparable to blue-

22   collar workers, which, again, is higher than

1    average, that were experienced by other blue-

2    collar workers some 20 to 30 years earlier,

3    ignoring mortality improvements for about a 20- to

4    30-year period.  That increased plan

5    liabilities -- I'm sorry -- that decreased the

6    plan liabilities by about 5-1/2 to 8 percent by

7    ignoring those mortality improvements.

8         And the blue-collar adjustment also

9    decreased the liabilities against standard tables,

10   and the actuary reflected these adjustments in

11   determining the plan liabilities.  If the actuary

12   had used just a standard vanilla mortality table,

13   the plan liabilities would be reported at

14   something in the range of 9 to about 13 percent

15   higher.

16       Q  You mentioned a few minutes ago the legal

17   statutory provisions in 4213, 4001 of ERISA,

18   regulations.  Are those important to an actuary?

19       A  Yes.  An actuary -- an enrolled actuary is

20   someone who has received the designation of

21   enrolled actuary from the Joint Board for the

22   Enrollment of Actuaries, which sits in the U.S.

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                    215

1    Department of Treasury.

2          An actuary who's an enrolled actuary has

3    been examined on pension law and passed the

4    examinations and is subject to continuing

5    education requirements and is required, in order

6    to fulfill the role of an enrolled actuary, to

7    deal with the Internal Revenue Code and ERISA,

8    read them, and apply them.

9          And, in fact, an enrolled actuary is a

10   category of individuals who can have a

11   power-of-attorney to practice before the Internal

12   Revenue Service on certain parts of the law,

13   namely, parts of the Internal Revenue Code dealing

14   with pensions.

15      Q   These provisions that you cite here in

16   your report, 4231 of ERISA, 4001 of ERISA, 305(g)

17   of ERISA, do those apply to single-employer plans?

18      A   ERISA 4200s deal with multi-employer

19   plans' withdrawal liability.  ERISA 4001 would

20   apply to single- and multi-employer plans because

21   that's the definition of nonforfeitable benefit at

22   the beginning of the PBGC section, Title 4 of

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                    216

1    ERISA, which is applicable to all PBGC covered

2    plans.  But ERISA 305(g) only deals with

3    withdrawal liability, and ERISA 4201 through

4    4220-something deals only with withdrawal

5    liability from multi-employer pension plans.

6        Q  In your report, do you mention and discuss

7    the PBGC rates to value withdrawal liability?  In

8    your opinion, is that appropriate and why?

9        A  That is very reasonable set of

10   assumptions.  The PBGC surveys insurance companies

11   and gathers annuity pricing information from the

12   insurance companies.  The insurance companies

13   provide the PBGC annuity quotes for preset

14   populations of participants.  And the PBGC has a

15   set mortality table and expense assumption and

16   effectively backs into the interest rate that, in

17   conjunction with that mortality table and expense

18   assumption, would produce the annuity quotes

19   provided by the insurance companies.

20       I believe they gather a number of annuity

21   quotes.  They may eliminate the high and the low,

22   average the remaining ones, and then develop their

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                    217

1    interest rates.  They update that periodically.

2        Q  Was it reasonable in your opinion for the

3    actuary of the '74 Pension Plan to use the PBGC

4    rates for withdrawal liability purposes?

5        A  Yes, it was.  In fact, I did an analysis

6    of interest rates, and it's in my report, starting

7    on paragraph 39 on page 13, where I give a number

8    of other benchmark interest rates that, in looking

9    at the range of reasonable assumptions, because

10   the test is not is this assumption Ethan Kra would

11   have picked, is this assumption picked by the

12   enrolled actuary for the plan reasonable or

13   unreasonable.

14        And I determined that as of June 30th,

15   2015, for market based measure, a rate between

16   2-1/3 and 4-1/2 percent would have not been

17   unreasonable depending on the duration of the

18   liability and a few other factors that I describe

19   in paragraph 40.

20        In paragraph 41, I go on to describe why

21   the factors of this plan, the demographics of this

22   plan, would call for a use of a discount rate at

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                    218

1   the lower end of that 2-1/3 to 4-1/2 percent

2   range, because it's such a mature plan, benefit

3   stream is relatively short-term, virtually all of

4   the participants are retired, most of the -- and

5   they tend to be older retirees than the typical

6   pension plan.

7          As a result, I would have picked something

8   in the lower end of the range.  The 2.71, 2.78

9   picked by the plan's actuary is right in that

10  range.  Whether I would have picked 2.7 or 2.8 or

11  something in that range is irrelevant.  It's what

12  he did.  Is it unreasonable?  No, it's very

13  reasonable.

14     Q  Are you aware of other actuaries that use

15  the PBGC rates for withdrawal liability purposes?

16     A  Yes.

17     Q  What actuarial firms?

18     A  Horizon; Stan Goldfarb; I think there's

19  another gentleman, Feltstein, I may be butchering

20  his name; there are a number of people at Horizon;

21  The Milliman Company, quite a few of the actuaries

22  use PBGC rates there; I'm -- I believe that some

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                          219

1   people at The Savitz Company may be using PBGC

2   rates; and there are a number of other firms where

3   they use other rates that are close to PBGC but

4   may be based on Treasuries or some other market

5   related benchmark.

6          I defended a plan in arbitration a few

7   years ago where the actuary was using not the PBGC

8   but something else that was close to PBGC.

9      Q  Are you aware -- we had testimony

10  yesterday about the National Retirement Fund.

11  There's no need, I don't think, to go into that

12  one again.  But are you aware of the New York

13  State Teamsters Pension Fund?

14     A  Yes, the New York State Teamsters Fund is

15  in critical and declining status.  It uses PBGC

16  discount rates.

17         MR. OSSI:  I object on hearsay.  We don't

18  have any evidence in --

19     A  I read the report.

20         MR. OSSI:  We don't have the report in

21  evidence.

22         MR. LECHNER:  We've established

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                    220

1    foundation.  Is he aware of it.  Does he know it.

2    He's now testifying as to the basis.

3          MR. OSSI:  What's the basis?

4          MR. LECHNER:  If you're questioning the

5    foundation, I think he'll give it to you.

6          THE ARBITRATOR:  Okay.  Let's hear the

7    foundation first.

8    BY MR. LECHNER:

9      Q  Could you provide the foundation -- what

10   is the basis for your knowledge about the New York

11   State Teamsters Pension Plan?

12     A  I reviewed the report.  I had a copy of

13   the recent report placed in front of me.  I looked

14   at it; I read it; and I looked at what it had.

15         MR. OSSI:  It's still an out-of-court

16   statement.

17         What are you using the rate for?  To -- I

18   want to understand what --

19         MR. LECHNER:  Well, first of all, it is a

20   public document.  It's a public document, and

21   there's no prohibition for any of us using public

22   documents.  This was a -- this is a plan, like

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                    221

1    Dr. Kra says, that is in critical and declining

2    status.  Under the new law, the pension --

3        A  MEPRA.

4        MR. LECHNER:  -- Multi-Employer Pension

5    Reform Act, they went to the Treasury Department

6    to get a suspension of benefits.  Do you want me

7    to go on?  Because what it shows is, and Dr. Kra

8    knows this and will testify to it, that the plan

9    is in critical status --

10       A  Critical and declining.

11       MR. LECHNER:  -- critical and declining.

12   It's facing insolvency, which is, by definition,

13   under critical and declining, you have to be

14   facing insolvency.  It uses the PBGC discount

15   rates.

16       MR. OSSI:  Is that in the public document?

17       MR. LECHNER:  Yes, it's in the public

18   document.

19       A  Yes.

20       MR. LECHNER:  It also shows that for

21   funding purposes, they use a rate of 8.5 percent

22   and for withdrawal liability purposes, they use a

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                          222

1    rate of --

2        A   PBGC rate.

3            MR. LECHNER:  -- PBGC rate --

4            MR. OSSI:  Okay.  Well --

5            MR. LECHNER:  -- and it's been approved by

6    the Treasury Department.  So, do you want -- I

7    think --

8            MR. OSSI:  No, I think you've

9    established -- I was not aware that they put the

10   PBGC rate in the public document.  So, you're

11   right.

12           MR. LECHNER:  Pardon me?

13           MR. OSSI:  I didn't know that was in the

14   public document.  So, that's where I was going.

15   So, you've answered my objection.  Thank you.

16           MR. LECHNER:  But I'm not a witness.

17   BY MR. LECHNER:

18       Q   So, Dr. Kra, could you --

19           THE ARBITRATOR:  Was anything he said

20   inaccurate?

21       Q   -- summarize --

22       A   He summarized it as I read the report.  It

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                                  223

1    was accurate based on the report that was provided

2    to me.

3        Q  Was the insolvency -- was the discount

4    rate affected by the insolvency?

5        A  No.

6        Q  Okay.  "The projected insolvency," I

7    should say.

8        A  No.

9        Q  Okay.  Dr. Kra, yesterday there was

10   testimony about the ASOPs, the actuarial

11   standards, and, in particular, ASOP 27.  Is

12   that significant to this case?

13       A  Yes, ASOP -- Actuarial Standards of

14   Practice are issued by the Actuarial Standards

15   Board.  They are critical to the work of

16   actuaries.  Actuaries in the United States must

17   follow ASOPs.  The reason I limit it to the United

18   States, its work in the United States, because

19   each country's actuarial bodies have different

20   standards of practice.  So, I'm only addressing

21   those in the United States, people working in the

22   States.

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                          224

1          The ASOPs have a statement in them that
2     the actuary -- if the actuary deviates from the
3     ASOPs, they have to explain why and justify and
4     put it all out there and have good reason.  One
5     exception is to the extent a law, statute or
6     regulation of a government body requires use of an
7     assumption or a method, the actuary is required to
8     follow that law, rule, regulation, pronouncement
9     unless the plan is a plan sponsored by the entity
10    that promulgates the regulation.
11          So, for example, New York State cannot
12    promulgate that the actuary for the New York State
13    Pension Plan must use 10 percent interest and then
14    the actuary uses 10 percent interest without
15    disclaiming the results because there is a
16    conflict of interest in a state mandating the use
17    of an interest rate for the state's own plan.
18          However, if New York State were to say
19    that every village in the state use a particular
20    interest rate, that would be required by the
21    actuary.
22          So, Actuarial Standards of Practice give

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                    225

1    guidance to actuaries except where overruled by

2    statute, law, regulation or government

3    promulgation, in general.

4        Q   There was testimony yesterday about

5    Section 3.9 of ASOP 27.  Do you recall that

6    testimony?

7        A   Yes.

8        Q   And if you'd like to see the ASOP, we can

9    put it in front of you, but if you know it very

10   well or if it's in your report --

11       A   I have it in my report on page 18, 19.  On

12   page 18, 19, paragraph 56, I start by -- I did not

13   retype it, I just did a cut and paste and then had

14   to reformat.  That's all.

15           So, that's cut right out of ASOP 27, the

16   current version, effective with date of

17   September 30th, 2014.  And it's entitled

18   "Selecting a Discount Rate."  And it gives three

19   examples.  So, the actuary should consider the

20   purpose of the measurement, some examples are

21   provided in A, B, and C.  "A" is selecting a

22   discount rate for determining contributions to a

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                    226

1    plan.  B --

2        Q  Is that -- excuse me.  Just to clarify

3    that, does that refer to the funding assumption or

4    what is it referring to?

5        A  That would be, in our context, the

6    assumptions used to determine minimum required

7    contributions or funding for the plan, which would

8    be reported on Schedule SB, Samuel Barry, of Form

9    5500.

10           Part B is defeasance or settlement, and

11   that talks about how you measure what it is to

12   effectively settle what -- an obligation or a

13   defeasant, effectively immunize yourself from any

14   issues in the benefit amount due to changes in the

15   external environment and --

16       Q  In our context.  So, you said, in our

17   context -- applied to our context, "A" refers to

18   minimum funding.  In our context, withdrawal

19   liability, what is the relevance of "B"?

20       A  Withdrawal liability in many respects is a

21   "B" measure.  It is a settlement of -- it's

22   looking at it as the withdrawing employer is

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                                    227

1    settling its obligation to make any future

2    contributions to the pension plan based on that

3    present value of the vested benefit obligation of

4    the pension plan.

5         And, so, I measure it on a settlement

6    basis.  And that would be a discount rate, very

7    often may use -- the actuary may use a discount

8    rate implicit in annuity prices or other

9    defeasance or settlement options.  It lists what

10   the actuary may do.  So, that is a reasonable

11   measure.  Doesn't say the actuary has to but may.

12   And if the actuary may do it, that means it's not

13   unreasonable to do it.

14        Q  How about Subpart C here?

15        A  Subpart C is market consistent measures.

16   That talks about a willing buyer and --

17   knowledgeable seller and knowledgeable buyer in

18   the open market.  There are people who buy and

19   sell pension obligations in the open market.

20   Companies like The Prudential, MetLife, Principal

21   Financial, New York life, Mass Mutual, all of them

22   are very happy to engage in transactions with

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                          228

1    pension plans in settling obligations.  And

2    that's, effectively, they settle the obligation

3    for the pension plan or the employer and provide

4    the benefits in the future.

5            And it goes on to say, "The present value

6    of expected future pension payments may be

7    calculated from a perspective of different

8    parties, recognizing that different parties may

9    have different measurement purposes."

10   Q  When you testified a few minutes ago, you

11   referenced Schedule SB.  Did you mean Schedule MB?

12   A  Correct.  I'm sorry.  My apologies.  It

13   was Schedule MB.  SB is a single-employer form.

14   MB is the multi-employer form.  My apologies for

15   citing the wrong schedule.

16           MR. LECHNER:  Could we take a short break?

17           THE ARBITRATOR:  Yes.  I was --

18           MR. OSSI:  Read his mind.

19           (A recess was taken.)

20           THE ARBITRATOR:  Go right ahead.

21   BY MR. LECHNER:

22   Q  Dr. Kra, could you look at page 25,

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                    229

1    paragraph 81, of your report.

2        A   Yes.

3        Q   There has been testimony yesterday about

4    this, and you testified this morning about it.

5    First, I'm going to ask you a question about the

6    Segal blend, but, first, what point are you making

7    here in paragraph 81, and then I'm going to go

8    into the Segal blend.

9        A   I tried to make the point that under the

10   Hittner theory, as a fund's financial situation

11   deteriorates, the withdrawal liability decreases.

12   I believe he testified to that yesterday.  And I'm

13   saying it's inconceivable that Congress has

14   anticipated that the withdrawal liability would

15   get reduced as a fund's situation deteriorated and

16   its needs increased.

17       The whole purpose of withdrawal liability

18   was to keep these funds going by replacing the

19   contributions that they would have gotten to help

20   fund the unfunded liability.

21       Under the Hittner theory, as a fund's

22   unfunded liability got greater, its withdrawal

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                                    230

1    liability would go down.

2       Q  Mr. Hittner testified yesterday that that

3    result, as a plan is going insolvent, its

4    withdrawal liability would be reduced, the

5    employer's withdrawal liability would be reduced.

6    Is the result of the Segal method, is that

7    correct?

8       A  If the PBGC interest rates are below the

9    funding interest rate, under the Segal blend, as

10   the assets go down and the funding situation

11   deteriorates, the withdrawal liability increases,

12   the present value of unfunded vested benefits

13   increase -- I'm sorry -- the unfunded -- let me

14   correct that.  The unfunded present value of

15   vested benefits increases and the withdrawal

16   liability increases as the assets decrease under

17   the Segal blend, provided PBGC interest rates are

18   below the funding rate.

19      Q  What's your basis for your opinions with

20   respect to the Segal blend?

21      A  First of all, I've been familiar with the

22   Segal blend for many, many years.  I've reviewed

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                    231

1    reports where the Segal blend has been included in

2    those reports.  I have defended the Segal blend at

3    withdrawal liability arbitrations.  And I did

4    calculations on the Segal blend method and

5    demonstrated to myself that that is, in fact, the

6    result.

7        Q  Were you present yesterday when two

8    exhibits were entered into evidence as Plan

9    Exhibits 7 and 8 --

10       A  Yes, I was.

11       Q  -- regarding -- as examples of how the

12   Segal blend works?

13       A  Yes, I was.

14       Q  Have you reviewed those examples?

15       A  Yes, I did.

16       Q  Do those correctly identify the

17   application of the Segal blend?

18       A  Given the facts at the top of each of

19   those pages, the presumptions, the two present

20   values of the vested benefit amounts under two

21   different sets of assumptions and the value of the

22   assets, the resulting calculation reduces the

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                    232

1    correct present value of unfunded vested benefits.

2        Q   So, as the funding level goes down, what

3    happens to the UVBs?

4        A   As the assets go down, the funding level

5    deteriorates, the present value of unfunded vested

6    benefits increases.

7        Q   And as a result of withdrawal -- what

8    would be the effect on withdrawal liability?

9        A   Withdrawal liability would increase.

10       Q   Okay.  Now, you said this is all premised

11   on the PBGC rates being below the funding rates;

12   is that correct?

13       A   Correct.

14       Q   In the last several years, what's been the

15   relationship between the PBGC rates and the

16   funding rate here of 7-1/2 percent?

17       A   With a few exceptions, such as December

18   of 2008, there were about two or three -- one to

19   two or three months in the past 15 years where the

20   interest rates may have been -- PBGC interest

21   rates may have been above the funding rate.  One

22   was December 2008 when there was a tremendous

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                    233

1    financial crisis in the United States and interest

2    rates skyrocketed.  And that was there for one

3    month.  November and January, interest rates again

4    were down.  But that one December measurement

5    point, they were high.

6          And there may have been another one or two

7    months in the early 2000s.  Other than that, you'd

8    have to go back into the early 1990s.

9      Q   Right.  But other than that, which rates

10   are the lower?  The PBGC rate is lower; is that

11   your testimony?

12     A   PBGC rates -- other than those few

13   anomalous instances, the PBGC rates have been

14   lower than the funding rate for about the past

15   20 years, plus, 20-plus years.

16          MR. LECHNER:  I have no further questions.

17          THE ARBITRATOR:  Thank you.

18          Greg, would you prefer that he stay here

19   or --

20          THE WITNESS:  Do you want me to go on this

21   side?

22          MR. OSSI:  What would be easier for -- I

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                    234

1    mean I don't have a preference.  Do you have a

2    preference?

3          THE WITNESS:  I do whatever you guys tell

4    me to do.

5          THE ARBITRATOR:  If you don't mind, you

6    can leave him there.  It'll be fine if he keeps

7    his voice up.

8          MR. OSSI:  Yes, that's fine.  I would,

9    though, just like maybe five to ten minutes to

10   review and --

11         THE ARBITRATOR:  That's fine.

12         MR. OSSI:  -- before we get started.  I

13   don't anticipate us going so long as that I think

14   we will need a lunch break.

15         THE ARBITRATOR:  Okay.  That's great.

16         (A recess was taken.)

17         THE ARBITRATOR:  Take it away.

18         MR. OSSI:  Thank you.

19   CROSS-EXAMINATION BY COUNSEL ON BEHALF OF ENERGY

20   WEST MINING CORPORATION

21   BY MR. OSSI:

22      Q  Mr. Kra, at the beginning of your direct

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                    235

1    examination, you corrected a mistake in your

2    expert report; right?

3        A   Yes.

4        Q   Okay.  Is that the only thing that was

5    wrong in your report?

6        A   I don't recall if I identified anything

7    else at my deposition.  I mean you have the

8    transcript of the deposition.  I don't recall.

9        Q   You were here for Mr. Hittner's testimony;

10   correct?

11       A   Yes.

12       Q   And do you recall that that testimony was

13   under oath?

14       A   Yes.

15       Q   And you recall that Mr. Hittner testified

16   that he reviewed all of the actuarial assumptions

17   for the '74 Plan in making his determination that

18   they were unreasonable in the accurate; correct?

19       A   Yes.

20       Q   So, on page 35 of your -- or, rather, page

21   9, paragraph 35, of your expert report, you state

22   that the expert for Energy West, Mr. Hittner, did

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                    236

1    not review these assumptions and, therefore, his

2    assertion cannot be the basis for a challenge to

3    the reasonableness of the withdrawal liability

4    assumptions in the aggregate.  Do you still

5    maintain that?

6         A   What I did is this report was produced in

7    October, not today, and I state there that as of

8    that date, they have not produced anything that

9    indicates that there was no evidence and the

10   assertion could not be at that time.  He now

11   claims that he has done that type of evidence

12   analysis.  His testimony stands as he's testified.

13   My report is not erroneous.  It was produced in

14   October and based on what was produced to me in

15   October.

16        Q   Well, your report clearly says that he

17   didn't review that and, therefore, he can't --

18   your conclusion is that his report can't be a

19   basis for challenge because he didn't review the

20   assumptions in the aggregate.  Now that you know

21   that he did review those assumptions in the

22   aggregate, that's not a correct statement; right?

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                               237

1      A   I don't know if he reviewed those

2   assumptions in the aggregate before or after he

3   produced his report.  He may have done that review

4   after he produced his report when he saw my

5   report.  It was not clear from the testimony as to

6   the timing of when he did that review and,

7   therefore, his report does not reflect that he did

8   it, and I don't know that he did it before he did

9   the report or after.

10     Q   That's an interesting answer, but that's

11  not the question I asked, whether it was before or

12  after.

13     A   Then I misunderstood your question.

14     Q   You're self-employed; right?

15     A   Yes.

16     Q   And you're being paid for your expert

17  report and testimony; right?

18     A   Yes.

19     Q   And I count about, I don't know, eight or

20  nine cases that you have been asked to -- based on

21  the list you produced in your expert report, that

22  there's at least eight or so cases that you've

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                    238

1    worked on in the years 2016 or 2017 either as an

2    expert or providing some analysis either to a plan

3    or to an employer; is that correct?

4        A  I didn't count the 2016, 2017, but sounds

5    reasonable.

6        Q  Does that sound about right?

7        A  Sounds reasonable.

8        Q  And are you currently serving as an

9    enrolled actuary for a plan in your capacity as

10   being self-employed?

11       A  I do not provide services as the enrolled

12   actuary to any plans.

13       Q  So, it's fair to say that a portion of

14   your income is derived from your being an expert

15   witness; is that correct?

16       A  Correct.

17       Q  Okay.  Also, in the past, you've had a

18   lot -- you've had some experience with this '74

19   Plan, haven't you?

20       A  Yes.

21       Q  In fact, you were the, as you describe it,

22   the number two actuary for the '74 Plan for a

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                                239

1    number of years; correct?

2        A  I was the -- there was a very senior

3    actuary at Mercer who, basically, just reviewed

4    the reports and signed them, but in practice, the

5    number one actuary was Steve Rabinowitz, I was the

6    number two actuary, from sometime in 1979 until

7    around November of 1982 --

8        Q  Okay.

9        A  -- some 35 years ago.

10       Q  You also list a number of speeches and

11   publications that you have written in your resume,

12   but in the last five years, you haven't actually

13   given any speeches on choosing a discount rate for

14   withdrawal liability, have you?

15       A  No.

16       Q  In fact, you haven't published anything in

17   the last five years addressing the discount rate

18   for withdrawal liability, have you?

19       A  No.

20       Q  Now, you do mention that you have attended

21   a number of meetings for continuing education for

22   enrolled actuaries; right?

1    A  I have attended meetings of the Enrolled

2    Actuaries meeting, the conference of Consulting

3    Actuaries meeting, as well as the American Academy

4    of Actuaries annual meeting.

5    Q  And aren't some of those meetings

6    conducted by webinar?

7    A  The ones that I was citing were in-person

8    meetings.  I've attended a few webinars, but the

9    ones I've just cited were the ones where I

10   physically traveled to the location and attended

11   them live in person.

12   Q  And for webinars, though, you have no idea

13   if Mr. Hittner was attending or not.

14   A  I do not know.

15   Q  In your report, you contend that the 1974

16   Plan is a 404(c) plan.  I just want to make sure

17   you're not -- you didn't do any analysis on

18   whether it was a 404(c) plan; correct?

19   A  I'm not expressing a legal opinion.  I'm

20   expressing an opinion based on the knowledge I

21   have from having worked on the plan in the late

22   1970s, early 1980s, plus what I would call the

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                    241

1    information I gathered by talking to colleagues at

2    Mercer who were working on the plan over the

3    ensuing years and information from counsel.  But I

4    did not investigate the documents and trace the

5    documents.

6        I do note that Congress enacted laws

7    regarding 404(c) plans in 1980 and in subsequent

8    time frames.  In fact, in the 1980 multiple -- I'm

9    sorry -- Multi-Employer Pension Plan Amendments

10   Act of 1980, the statute introduced sections to

11   the Internal Revenue Code that had specific

12   provisions dealing with 404(c) plans, which was

13   after this plan had received a determination

14   letter as it had separated from the previous trust

15   that had been established back during the Korean

16   War.

17       Q   But you're not taking an expert opinion on

18   whether the plan is 404(c) qualified or not.

19       A   I'm leaving that for the lawyers to brief.

20       Q   So, I take it your answer is no.

21       A   I'm not expressing a legal opinion.

22       Q   Now, in your report, it appears it's your

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                              242

1     opinion that for purposes of withdrawal liability

2     calculations, all liabilities should be valued at

3     the riskless rate.  Is that a fair assumption?

4         A  A relatively riskless rate, yes.

5         Q  And the PBGC rate represents a riskless

6     rate; right?

7         A  PBGC is in that range of riskless rates.

8         Q  But the Segal blend or Segal method,

9     however you want to call it, is not a riskless

10    rate, is it?

11        A  No.

12        Q  And you've served as an actuarial -- as an

13    expert in a withdrawal liability case where you

14    have defended the use of the Segal rate in

15    determining withdrawal liability; correct?

16        A  Yes.

17        Q  And you argued in that case that the Segal

18    blend method was not unreasonable; correct?

19        A  I argued in that case that the Segal blend

20    was not unreasonable.  It would not have been the

21    assumptions I would have selected, but the test

22    was not what were the selections that Ethan Kra

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                                    243

1    would select but were the assumptions selected by

2    the plan's actuary unreasonable in the aggregate.

3    And in that case, I opined that while they would

4    not have been the assumptions I would have

5    selected, that they were not unreasonable in the

6    aggregate.

7        Q  Right.  Let's talk about the Segal method

8    for a second.  You're very familiar with the

9    method, you said.  So, it's my understanding

10   that -- isn't it the fact that the lower the -- if

11   you're using the Segal method or blend, that the

12   lower the assets, the greater the weight -- in

13   determining withdrawal liability, the greater the

14   weight is of the funding rate has on the value of

15   those unfunded vested benefits; is that correct?

16       A  Yes, it is.

17       Q  And, in fact, when the greater the assets

18   are, the less weight of the funding rate applies;

19   is that correct?

20       A  Yes, it is.

21       Q  So, this example of where -- if a plan

22   is -- the greater the insolvency of the plan, the

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                          244

1    lower the discount rate that is used in

2    determining the unfunded vested benefits?

3         A   That is correct.

4         Q   I want to talk about Section 4213 for a

5    second.  So, if you want to look at that

6    statute --

7         A   Do I have it here?

8              THE ARBITRATOR:  Six.  Page six.

9    BY MR. OSSI:

10        Q   Do you have the right binder?

11        A   Page 6, 4213, yes.  Okay.  Got it,

12   paragraph 22.

13        Q   So, I think we're all in agreement that

14   this is the statute that requires -- you know,

15   that describes what an actuary has to use in terms

16   of making his or her assumptions when determining

17   withdrawal liability for a multi-employer pension

18   plan; is that correct?

19        A   4213(c) defines unfunded vested benefits,

20   and it is not read in isolation.  It's read in

21   conjunction with the rest of the 4200 -- 4201

22   through 42-whatever-it-is for determining the

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                    245

1    present value or the amount of the unfunded vested

2    benefits.  This is the starting point, but you

3    have to look at other sections to find the

4    definition of "nonforfeitable benefits," and you

5    look at other sections of ERISA to determine what

6    items you disregard in the determination of the

7    unfunded vested benefits.

8        Q  Well, that's a definitely interesting

9    answer, but it's not the question I asked.  The

10   question I asked is is 4213 the right statute to

11   use when setting forth the standards for which the

12   actuary must determine withdrawal liability on the

13   basis of actuarial assumptions and methods?  In

14   other words, this sets the requirement that the

15   actuarial assumptions and methods must be

16   reasonable in the aggregate; correct?

17       A  That's on page nine.  That's 4213(a).  We

18   were looking before at 4213(c).

19       Q  Well, I was asking about 4213 in general.

20       A  Okay.  4213, in general, which includes a

21   number of sections, the first -- the "A" part

22   talks about the assumptions that the actuary must

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                                    246

1    select in determining the unfunded vested benefits

2    for plan.

3        Q   So, you're in agreement with me?

4        A   Yes.

5        Q   In 4213(a), it sets out the requirement

6    that the actuarial assumptions be reasonable in

7    the aggregate; correct?

8        A   Yes.

9        Q   In 4213(c), it talks about using --

10   determining the amount of unfunded benefits;

11   correct?

12       A   Yes.

13       Q   And there in that section, it says that

14   the value of the nonforfeitable benefits under the

15   plan -- well, it turns out -- it defines the term

16   "unfunded vested benefits" as the value of the

17   nonforfeitable benefits under the plan less the

18   value of the assets of the plan; correct?

19       A   Yes.

20       Q   And, so, let me ask you this.  In terms of

21   a nonforfeitable benefit, do you weigh the plan

22   experience when determining a nonforfeitable

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                    247

1    benefit?

2        A   In determining the amounts of the

3    benefits, I have to use assumptions.  Some of the

4    assumptions --

5        Q   That's not my question.

6        A   I don't understand the question then.

7        Q   Okay.  My question is when you're looking

8    at -- the definition of "unfunded vested benefits"

9    says you take the value of the nonforfeitable

10   benefits under the plan less the value of the

11   assets.  So, I'm going to break that down.  We

12   have a definition of "nonforfeitable benefits";

13   correct?

14       A   Yes.

15       Q   And where is that located?

16       A   ERISA 4001(a)(8).

17       Q   In 4001(a)(8), does it tell you to measure

18   the nonforfeitable benefits by taking into account

19   a plan's experience?

20       A   It doesn't talk about how to value them.

21   It just defines them.  There the nonforfeitable

22   benefits are defined as to which benefits you

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                    248

1    reflect and which benefits you don't reflect.  It

2    doesn't define what assumptions you use to value

3    them.

4        Q  So, then, you would agree with me that you

5    don't take into account the plan's experience when

6    defining a nonforfeitable benefit; correct?

7        A  Nonforfeitable benefit, you don't take

8    into account the experience, but you do look at

9    whether or not it could be subsequently reduced or

10   suspended.  And then in 305(g), it says you even

11   include benefits that have been -- that have

12   disappeared that are not there anymore.

13       Q  So, you do take into account plan

14   experience.

15       A  You take into account -- I wouldn't call

16   that plan experience.  I would call that events,

17   such as amendments -- I guess you could call that

18   experience if you want to talk about in 305(g),

19   and also in 4001(a)(8), which talks about

20   subsequently reduced or suspended, but in 305(g),

21   it talks about things that have occurred in the

22   past.

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                    249

1          To me, experience deals with retirement,

2     mortality, turnover, disability, things that have

3     occurred that are not plan amendments or what

4     benefits the plan will pay.  But I guess we

5     could -- it depends how you define "experience."

6     If you want to talk about experience being

7     insolvency and the kind of elimination of

8     benefits, then experience to that extent is

9     reflected.

10         Q  What about in -- there's no reasonable

11    expectation assumption with regard to a

12    nonforfeitable benefit; right?  That's the

13    definition.  It's a nonforfeitable benefit.  What

14    you're telling me is that if the plan is not

15    reasonably expected to pay benefits, like this

16    plan because it's projected to be insolvency, you

17    don't take that into account when determining

18    nonforfeitable benefits; correct?

19         A  Correct, you include those benefits in

20    nonforfeitable benefits even though the actuary

21    projects that they eventually will not be paid.

22         Q  Okay.  You mentioned 305(g), so, let's

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                          250

1  talk about 305(g) here.  When you gave your

2  testimony earlier on direct, you said that the

3  plan doesn't take into account benefits that we

4  know will never be paid.  And when you were

5  talking about that, you were talking about the

6  benefit suspensions or reductions in 305(g); is

7  that correct?

8      A  That's correct that you do not take into

9  account benefits that we know will not be paid

10 because they've already been reduced under 305(g),

11 that you still must include them in the withdrawal

12 liability determination.

13     Q  But we actually don't know if those

14 benefits will never be paid because the statute

15 requires that those benefits be restored in

16 certain circumstances; correct?

17     A  They could be restored way out in the

18 future, could be restored short term.  But we

19 know, for example, if you have a plan that has cut

20 back these benefits and it is in horrible shape,

21 it is a reasonable expectation that they will not

22 be paid for the next 12 months, for example.

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                    251

1        You might have an expectation that perhaps

2    they could be restored in five years, ten years,

3    the actuary could give a probability distribution

4    of when they might be restored, but there could be

5    a virtual certainty that they won't be paid for

6    the next six months, eight months and, yet, you

7    must include them.

8        So, the benefits that are due next

9    month -- let's say we're doing a December 31st

10   determination for calendar plan year and there's

11   no money in the bank to pay the January 1

12   benefits, you still include those January 1 checks

13   that are not going to be paid.

14       Q  Again, but we don't know that they'll

15   never be paid.

16       A  They might be paid at some distant date.

17   You include them for all years in the future even

18   though we know some of them definitely won't be

19   paid and others probably won't be paid or might be

20   paid, it doesn't matter, but even those that we

21   know will not be paid are included.

22       Q  In your testimony, you made a big deal

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                                    252

1   about saying that there's a difference between

2   withdrawal liability and determination of unfunded

3   vested benefits for purposes of 305(g) and why

4   Mr. Hittner is incorrect in the fact that the plan

5   should be taking into account the insolvency;

6   right?

7       A  I don't follow the question.  The

8   beginning -- there's something in your preliminary

9   question I didn't quite follow.  Can you please

10  repeat it back or --

11      Q  Sure.  You said that -- you made a big

12  deal of -- in terms of looking at statute 305(g)

13  for the purposes of arguing against taking into

14  account the insolvency of the plan when

15  determining a discount rate; correct?

16      A  Correct.

17      Q  And part of that was because you said

18  Congress knows how to define withdrawal liability

19  different from unfunded vested benefits; is that

20  correct?

21      A  I didn't say it was different from

22  unfunded vested benefits.  I said that in

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                    253

1    determining the unfunded vested benefits which are

2    used in withdrawal liability, you must ignore

3    certain reductions and suspensions, and Congress

4    has declared that; therefore, the entire

5    calculation, including the selection of the

6    assumptions, must ignore that reduction or

7    suspension.

8         And then I put that in conjunction with

9    the definition of "nonforfeitable benefit" and say

10   it doesn't matter whether it was cut back last

11   month or it will be cut back in two months.

12   Q  Just to be clear, this Section 305(g)

13   doesn't reference the use of actuarial assumptions

14   at all, does it?

15   A  It references determinations of withdrawal

16   liability.  That, by definition, has to include

17   the determination of the nonforfeitable benefits

18   and all of the actuarial assumptions that go into

19   determining the present value of those benefits.

20   Withdrawal liability is based on a determination

21   of the amount of unfunded vested benefits, which

22   is the value of the nonforfeitable benefits, not

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                          254

1    the amount of the projected benefit payment

2    stream.

3        Q  That's what we're really arguing about

4    here is what the value of those unfunded vested

5    benefits should be; right?

6        A  We're arguing and saying that withdrawal

7    liability determination includes all of the

8    assumptions, as well as the benefit provisions and

9    what benefits are included; otherwise, you don't

10   have a determination of withdrawal liability.

11   Absent the assumptions, you don't have a

12   determination of withdrawal liability.

13       Q  But that's Ethan Kra's interpretation of

14   the statute.

15       A  No, that's the plain reading.  You can't

16   determine withdrawal liability without having

17   assumptions.  It is mathematically impossible.

18       Q  Well, are you aware of statutory

19   interpretation that says that the headings don't

20   control when the statute is unambiguous?

21       A  I don't -- I see no ambiguity in that.

22       Q  Right, there's no ambiguity.  And the

1    statute clearly says -- it doesn't say -- when you

2    say, "adjustments disregarding withdrawal

3    liability," it says that those adjustments -- the

4    statute, and I shall quote, "shall be" -- in

5    Section 305(g)(1), "shall be disregarded in

6    determining a plan's unfunded vested benefits";

7    right?  Doesn't say, "shall be disregarded in

8    determining withdrawal liability determination";

9    right?

10           MR. LECHNER:  Let me object.  Let me

11   object for a second here.  What document are you

12   referring to?  And it seems like maybe we've got

13   two different documents.  Are you referring to

14   something in Dr. Kra's report or are you referring

15   to something in the statute with certain headings

16   that we don't have in front of us?

17           MR. OSSI:  I thought I made it clear that

18   I was referring to Section 305(g) of the statute.

19           MR. LECHNER:  You did make that clear

20   but --

21           MR. OSSI:  So, what --

22           MR. LECHNER:  -- we have exhibits in this

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                    256

1    case, and 305(g) is described, in part, in

2    Dr. Kra's report, but it's also described in the

3    statute book.  So, I just want to know --

4          MR. OSSI:  Fair enough.  Let's --

5          MR. LECHNER:  Make sure we're on the same

6    page here.  That's all I'm saying.

7          MR. OSSI:  Let's all turn back in the

8    legal reference materials, Exhibit 4.

9          MR. LECHNER:  Could you give me a second.

10   The witness needs the book, as well.  And could

11   you wait until the arbitrator and all of us get

12   this book.  Where is this now?

13         MR. OSSI:  If you look on the -- it's page

14   34 in the bottom right-hand corner.

15         THE WITNESS:  Could I just read this now

16   and read it aloud?

17         THE ARBITRATOR:  No.

18         THE WITNESS:  Wait for a question?

19         THE ARBITRATOR:  Yes.

20         Okay.  Thank you.  Go ahead.

21   BY MR. OSSI:

22      Q  So, under Section 305(g) of ERISA, the

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                    257

1   heading says, "Adjustments disregarded in

2   withdrawal liability determination"; correct?

3        A  Yes.

4        Q  And you were referring to that in your

5   testimony; correct?

6        A  Yes.

7        Q  In Section 305(g)(1), in that sentence

8   there, it doesn't say those adjustments shall be

9   disregarded in withdrawal liability determination,

10  it says, and I quote, "shall be disregarded in

11  determining a plan's unfunded vested benefits";

12  correct?

13       A  You're not reading the whole section.  It

14  says, "shall be disregarded in determining a

15  plan's unfunded vested benefits for purposes of

16  determining an employer's withdrawal liability."

17           In order to determine a plan's unfunded

18  vested benefits, you have to go to ERISA 4213(c),

19  which defines the amount of the unfunded vested

20  benefits as equal to the value of the -- the value

21  of the nonforfeitable benefits under the plan less

22  the value of the assets of the plan.  "In order

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                    258

1  to determine the value of the nonforfeitable

2  benefits under the plan," so, you can determine

3  the amount of the unfunded vested benefits, which

4  are referred to in 305(g)(1), you need to have

5  actuarial assumptions.  If you don't have

6  actuarial assumptions, you cannot determine the

7  value of the nonforfeitable benefits under the

8  plan, which means you cannot determine the amount

9  of unfunded vested benefits, and that goes right

10  into this section.

11      Q  You're reading a lot -- I don't have those

12  words in my section.  I have words that say,

13  "shall be disregarded in determining a plan's

14  unfunded vested benefits for purposes of

15  determining an employer's withdrawal liability

16  under Section 1381 of this title."  That's what --

17  I'm asking that's what the statute says; correct?

18      A  The statute says, and uses the term --

19          THE ARBITRATOR:  We have the statute.

20  Let's move on.

21          MR. LECHNER:  I'm objecting.  I'm

22  objection.  This is a legal argument you're

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                            259

1    making.  You're arguing with the witness.

2            THE ARBITRATOR:  I already ruled.  Thanks.

3    Let's move on.

4    BY MR. OSSI:

5        Q  Mr. Kra, I want to make sure I understand

6    your testimony and your expert opinion.  So, I

7    just want to make sure we're -- that based on what

8    I heard, if an interest rate is -- an interest

9    rate can be so unreasonable, it can make the

10   actuarial assumptions unreasonable in the

11   aggregate; is that correct?

12       A  If you had a thousand percent discount

13   rate, I can't imagine any other offsetting

14   assumptions that would make the package reasonable

15   in the aggregate.  It's just virtually impossible.

16   So, I agree that that's a true statement, that you

17   can have an interest rate that is so unreasonable

18   that just throws the whole package out.

19       Q  Well, let's talk about that because -- is

20   there -- I mean there's -- you'd say there's a

21   range of reasonableness; correct?

22       A  There's a range of reasonable assumptions

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                    260

1   for a particular assumption in the isolation.  The

2   range for aggregate gives a wider berth because

3   you can have offsetting assumptions.

4          So, for example, in the abstract, I would

5   think that a zero percent discount rate is

6   unreasonable.  However, if you combined a

7   zero percent discount rate with the 1938

8   commissioner's standard ordinary mortality table,

9   the result might be reasonable in the aggregate

10  because, while you have too low a discount rate,

11  you have the people dying off so rapidly that they

12  offset each other.

13     Q  You've testified that all -- that in your

14  opinion, all of the assumptions in the aggregate

15  and individually are reasonable; correct?

16     A  I said that the assumptions in the

17  aggregate are reasonable.  A few of them are a

18  little light, but not so far as that I would call

19  them unreasonable, but they were, like, a little

20  bit light.  I think the expense assumption was

21  light.  But when you put it in a package, the

22  whole thing is reasonable in the aggregate.

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                    261

1     Q   Okay.  But you're not saying that the

2  mortality table was unreasonable; correct?

3     A   The mortality table was reasonable.

4     Q   Okay.

5     A   The interest rate was reasonable.

6     Q   And, in fact, in your report, you said

7  that any rate -- and I'll refer you to your report

8  on page 40, just so we're all clear on what I'm

9  referring to.

10    A   I think it's paragraph 40.

11    Q   Paragraph 40, you're right.  You say that

12  the use of any rate between 2-1/3 percent and

13  4-1/2 percent would not have been unreasonable; is

14  that correct?

15    A   I didn't say that in the context of this

16  plan.  I said it would not have been unreasonable

17  as a market based measure depending on the

18  duration of the liability.  And in paragraph 41, I

19  go on to describe the duration of the liability

20  and the maturity of the plan and then comment on

21  the top of page 40 -- 14, the end of paragraph 41,

22  that my view is that the most appropriate rate

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                    262

1    would have been towards the lower end of that

2    range.

3        Q  But that is the range that is not

4    unreasonable in your report; correct?

5        A  That is the -- not unreasonable if we're

6    going to use a market based measure, as

7    Mr. Hittner has -- also testified as being what he

8    views as reasonable.

9        Q  What about a rate of -- so, you have the

10   outer range is 4-1/2 percent.  What about 4-3/4

11   percent, would that be -- if the fund used that

12   rate, would that be unreasonable?

13       A  If you were going to say is 4-3/4 a market

14   based measure, that it is not.  Would 4-3/4 have

15   been unreasonable in the aggregate in combination

16   with the other assumptions?  I would have had to

17   do the analysis.  I have not undertaken that

18   analysis.

19       Q  So, you're not saying -- so, you didn't

20   undertake the analysis.  So, this range of rates

21   that you provided, you're not saying that would be

22   appropriate for this fund then.

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                    263

1      A   What I said was 2-1/3 to 4-1/2 would be --

2   would not be unreasonable as a market based

3   measure, in general, and then for this particular

4   fund, that the market based measure for this fund

5   by itself because of its nature would probably be

6   in the lower end of that range.

7      Q   Understood that.  But you're not -- so,

8   what you're telling me is you're not saying that

9   that's the range that would be reasonable for the

10  '74 Plan.

11         MR. LECHNER:  Objection.  Asked and

12  answered.

13         THE ARBITRATOR:  Go ahead.  One more time.

14     A   Basically, what I'm saying is that there's

15  a range of reasonable assumptions --

16         MR. OSSI:  I think yes or no is called for

17  here.  That's why we have to keep asking these

18  questions because I -- you know, if he would say

19  yes or no, it would be helpful.  It's a simple

20  question.

21         THE ARBITRATOR:  Okay.  The question

22  again.

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                    264

1      Q  So, in your report, you're not saying that

2   the range of 2-1/3 percent and 4-1/2 percent

3   particularly applies directly to the '74 Plan;

4   correct?

5      A  I did not directly apply that to this plan

6   in this paragraph, no, you're right.

7      Q  But you do talk about market based rate;

8   right?

9      A  Yes.

10     Q  So, let's talk a little bit about that.  A

11   bond is -- you testified a little bit about bonds.

12   They're investment instruments; right?

13     A  Yes.

14     Q  And they represent an obligation of the

15   debtor to pay a stream of payments; correct?

16     A  Yes.

17     Q  And the price of this instrument is

18   dictated by the interest rate set for that

19   debtor's ability to pay that stream of payments;

20   right?

21     A  In the open marketplace, yes.

22     Q  So, in the open marketplace, if the credit

1    rating or creditworthiness of the debtor is low,

2    the interest rate will be higher; right?

3        A  If they're -- if they were selling a bond

4    in the marketplace, yes.

5        Q  And as you say, that price is set by the

6    free market; right?

7        A  Yes.

8        Q  And, for example, a U.S. Treasury has a

9    low rate because, you know, it's very

10   creditworthy; correct?

11       A  It has a low rate because it's very

12   creditworthy, it's exempt from state income tax,

13   it's very liquid and there's a large market for

14   it.  So, it has a liquidity premium.

15       Q  Sure.  And like a high-quality corporate

16   bond, what might have a slightly higher rate, but

17   it's still judged relatively safe; right?

18       A  Yes.

19       Q  And as you point out, there are other

20   factors like taxes and the like that go into

21   determining an interest rate; right?

22       A  Yes.

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                          266

1      Q   Okay.  And, in fact, there are bonds that

2   have an even higher rate, you know, such as a junk

3   bond; right?

4      A   Yes.

5      Q   And you say that the rate selected for

6   withdrawal liability assumptions should be market

7   based; correct?

8      A   It should be based on a market measure of

9   a relatively risk-free nature to reflect the

10  benefit stream, not the riskiness of the fund.

11     Q   But that's still -- you're still

12  contending it should be market rate based;

13  correct?

14     A   Market -- risk-free market.

15     Q   Now, as I understand your report, you're

16  saying that anything less than this riskless rate,

17  for example, using a higher rate, would require

18  remaining employers to make up any shortfall;

19  correct?

20     A   As I corrected before, the shortfall would

21  be made up by the remaining employers and

22  potentially participants who would have benefits

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                              267

1   come back at earlier date with a PBGC that would

2   have to contribute more to the fund.

3       Q   And, so, I want to make sure that we're

4   clear that ERISA, in requiring actuaries to

5   determine a discount rate, has to look at a

6   specific plan's experience and reasonable

7   expectations; correct?

8       A   It says to look at the plan's experience

9   and reasonable expectations for some assumptions.

10  Past experience is no indication of the future, as

11  we hear from all the investment sales pitches on

12  the radio.

13      Q   So, that's plan specific then.

14      A   The mortality would be plan specific to

15  the extent there's adequate experience to be

16  credible.  I've got plans that don't have enough

17  people in them, so, you can't look at the plan

18  experience.  If you have 300 people in a plan, you

19  don't have enough information to pick a mortality

20  table other than a standard table.

21      Q   But that's not the case with the '74 Plan.

22  They've got a lot more than 300 people, don't

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                    268

1    they?

2        A   This plan, they've done mortality studies.

3    At various times historically, they use their own

4    individualized mortality table.  More recently,

5    they've been taking standard tables and adjusting

6    them to reflect higher than average mortality.

7        Q   And in producing your report, you looked

8    specifically at the '74 Plan; correct?

9        A   I looked at this plan.  I analyzed the

10   experience from the reports of the actuarial gains

11   and losses of this plan from demographics variance

12   and I've outlined it in my report.

13       Q   Are you aware of how many contributing

14   employers looking at the ERISA definition of

15   "employer" -- do you understand what I mean by

16   "ERISA definition of employer"?

17       A   I would assume it means controlled group.

18   Only controlled groups contribute to the fund.

19       Q   Correct.  Do you know how many employers

20   remain in the plan as of today as contributing

21   employers?

22       A   No.

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                    269

1      Q  Okay.  So, did you look at determining

2    whether or not Energy West's payment of any amount

3    of withdrawal liability has any bearing on the

4    risk of the remaining employers?

5      A  No.

6         MR. OSSI:  Sir, if we could just take a

7    two-minute break, I think I'm about wrapped up,

8    but I just want to make sure, if that's okay.

9         THE ARBITRATOR:  That's fine.  Thank you.

10        (A recess was taken.)

11        MR. OSSI:  We have no further questions of

12    the witness at this time.

13        THE ARBITRATOR:  Great.

14        MR. LECHNER:  The 1974 Plan has no

15    redirect.

16        Thank you, Dr. Kra.

17        THE ARBITRATOR:  Thank you very much.

18        MR. OSSI:  Thank you, Dr. Kra.

19        THE ARBITRATOR:  Does that conclude the

20    hearing?

21        MR. OSSI:  I think just a couple

22    housekeeping issues.

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                                    270

```
 1          THE ARBITRATOR:  Sure.
 2          MR. OSSI:  I don't think we actually -- we
 3   had some joint exhibits.  We have some separate
 4   exhibits that we've agreed to enter in.  I don't
 5   know anyone's made a motion or we need to, but we
 6   have -- so, the employer has its exhibits and then
 7   we have some transcripts to put in the record.
 8   So, I would move to put those into the record.
 9          MR. LECHNER:  Have we seen all of those?
10          MR. MOONEY:  Yes.  We haven't seen the
11   designations that I'm aware of, but the
12   documents --
13          MR. OSSI:  I think we agreed to put in the
14   entire --
15          MR. MOONEY:  The transcripts, we agreed to
16   put those in.
17          MR. GROPPE:  The documents were listed on
18   the joint exhibit --
19          MR. OSSI:  Yes.
20          MR. MOONEY:  Give us a second to go
21   through these and make sure we don't have any
22   issue on the exhibits.  So, I don't think we'll --
```

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                           271

1   just give us a minute to walk through those.

2           MR. LECHNER:  The record should reflect

3   that the counsel for the employer just handed

4   counsel for the Plan a book of exhibits, and we're

5   taking a few minutes to look at them.

6           MR. MOONEY:  Anything else?  Just so

7   we're -- rather than shuttling things --

8           MR. OSSI:  We have nothing else.  You had

9   some exhibits, too, I thought, but I don't know

10  that you moved those into the record.  So, I don't

11  know if you want to move those.

12          MR. GROPPE:  The ones in the yellow

13  binders that we handed up yesterday.

14          MR. OSSI:  You handed them out but --

15          MR. MOONEY:  Well, we would move for our

16  exhibits, too.

17          THE ARBITRATOR:  Okay.  That's fine.  I

18  may have read -- at the outset, I may have

19  identified the different exhibit books, but in any

20  case, we'll have a global moving of exhibits once

21  you make your --

22          MR. MOONEY:  The omnibus provisions that

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                    272

1    we're here in Washington, the continuing

2    resolution.

3         MR. GROPPE:  Do you have another copy of

4    that just to take a look at?

5         MR. OSSI:  Oh, yeah.  Absolutely.

6         MR. MOONEY:  Give us a second.  We'll be

7    right back.

8         THE ARBITRATOR:  Thank you.

9         MR. MOONEY:  Do you all have any -- and I

10   guess you can do the same thing with ours and that

11   way we can sort of move it along.

12        MR. OSSI:  Okay.

13        DR. KRA:  I know it's not my role, but I

14   think the court reporter asked about transcript

15   issues.  So, you want to cover that, as well.

16        THE ARBITRATOR:  Yes.  Everybody getting

17   transcripts?

18        MR. LECHNER:  Yes.

19        MR. MOONEY:  Yes.

20        MR. OSSI:  Yes.

21        THE COURT REPORTER:  So, is there an

22   agreement to split the cost of the transcript

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                         273

1    among the parties equally?

2           MR. OSSI:  That is the rules of AAA, which

3    the Plan uses, so that would -- unless you guys

4    are telling me differently, that's the rules.

5           MR. MOONEY:  We're not going to quibble

6    with that.

7           MR. LECHNER:  Sounds fair.

8           THE COURT REPORTER:  Okay.  Thank you very

9    much.

10          (A discussion was held off the record.)

11          THE ARBITRATOR:  On the record, please.

12          Initial briefs will be due February 2nd.

13   Reply briefs, March 2nd.  I only ask if you are

14   going to be citing cases that are not, you know,

15   regular publication -- if it's Westlaw -- I don't

16   have easy access to Westlaw or LEXIS.  So, if

17   you're going to be citing things like that or

18   unpublished opinions, please provide them to me.

19          MR. MOONEY:  Sure.

20          MR. OSSI:  Absolutely.

21          THE ARBITRATOR:  And I would ask that you

22   send me both a hard copy and electronic.

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                           274

1          MR. MOONEY:  In any particular format in

2     the electronic version?  Just that my recent

3     experience has been I've had it requested in both

4     PDF and in Word format from arbitrators.  We're

5     happy to do whatever you'd like.

6          THE ARBITRATOR:  It doesn't matter.  I

7     don't lift sections from parties' briefs, so --

8     off the record.

9          (A discussion was held off the record.)

10          (A recess was taken.)

11          THE ARBITRATOR:  On the record.  Just in

12     case it has not already been done, we have

13     admitted Joint Exhibits 1 through 15.  We have

14     admitted a binder of legal reference material that

15     goes to 26, referred to as Reference 1 through 26.

16     We have a binder of Pension Plan Exhibits 1

17     through 8.  We have fact witness deposition

18     transcripts, two transcripts, Dale Stover and

19     William Ruschau, R-u-s-c-h-a-u.  And we have

20     Employer Exhibit 1 through --

21          MR. MOONEY:  I have 20.  Is that what you

22     have?

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                    275

1            THE ARBITRATOR:  I think so.  Yes, 20.

2            MR. OSSI:  Mr. Arbitrator, I just want to

3    make sure; I think you said Pension Plan, the '74

4    Plan, Exhibits 1 through 8.  I have 1 through 6.

5    Is that --

6            MR. GROPPE:  The two Segal documents.

7            MR. OSSI:  You're right.  There you go.

8            (Joint Exhibits 1 through 15, Legal

9    Reference Material 1 through 26, Pension Plan

10   Exhibits 1 through 8, transcripts of Dale Stover

11   and William Ruschau, and Employer Exhibits 1

12   through 20 were admitted into evidence.)

13           THE ARBITRATOR:  Okay.  I thank you all

14   very much.  I appreciate all the cooperation.

15           MR. MOONEY:  Thank you.

16           MR. LECHNER:  Thank you.

17           THE ARBITRATOR:  Have a good holiday.

18           (Off the record at 12:44 p.m.)

19

20

21

22

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                                276

1    CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

2         I, Victoria Lynn Wilson, the officer

3    before whom the foregoing proceedings were taken,

4    do hereby certify that the foregoing transcript is

5    a true and correct record of the proceedings; that

6    said proceedings were taken by me stenographically

7    and thereafter reduced to typewriting under my

8    direction; and that I am neither counsel for,

9    related to, nor employed by any of the parties to

10   this case and have no interest, financial or

11   otherwise, in its outcome.

12        IN WITNESS WHEREOF, I have hereunto set my

13   hand and affixed my notarial seal this 19th day of

14   December, 2017.

15   My commission expires May 31, 2019.

16

17

18   _____

19   VICTORIA LYNN WILSON

20   NOTARY PUBLIC IN AND FOR

21   THE COMMONWEALTH OF VIRGINIA

22   Notary Registration Number 269770

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                                    277

| A |
|---|

**a) (8**
194:3, 194:19,
247:16, 247:17,
248:19
**aaa**
273:2
**ability**
264:19
**able**
190:5
**about**
184:10, 184:15,
191:1, 193:2,
193:13, 198:18,
203:5, 203:22,
204:4, 207:15,
214:3, 214:6,
214:14, 219:10,
220:10, 223:10,
225:4, 226:11,
227:14, 227:16,
229:3, 229:4,
229:5, 232:18,
233:14, 237:19,
238:6, 243:7,
244:4, 245:19,
245:22, 246:9,
247:20, 248:18,
248:19, 248:21,
249:6, 249:10,
250:1, 250:5,
252:1, 254:3,
259:19, 262:9,
262:10, 264:7,
264:10, 264:11,
269:7, 272:14
**above**
205:5, 232:21
**absent**
254:11
**absolutely**
202:8, 203:4,
272:5, 273:20
**abstract**
260:4
**academy**
189:21, 190:15,

192:15, 193:10,
240:3
**accepted**
187:6, 192:1
**access**
273:16
**according**
182:19
**account**
184:7, 209:20,
247:18, 248:5,
248:8, 248:13,
248:15, 249:17,
250:3, 250:9,
252:5, 252:14
**accurate**
181:12, 223:1,
235:18
**acknowledge**
182:13
**across**
193:12
**act**
221:5, 241:10
**actors**
186:19, 186:21,
186:22
**actually**
185:16, 239:12,
250:13, 270:2
**actuarial**
179:13, 189:14,
189:15, 192:1,
192:6, 192:7,
192:13, 193:5,
202:15, 204:6,
211:2, 218:17,
223:10, 223:13,
223:14, 223:19,
224:22, 235:16,
242:12, 245:13,
245:15, 246:6,
253:13, 253:18,
258:5, 258:6,
259:10, 268:10
**actuaries**
188:22, 189:19,
189:21, 189:22,

190:7, 190:9,
190:13, 190:16,
192:15, 193:7,
193:8, 193:10,
214:22, 218:14,
218:21, 223:16,
225:1, 239:22,
240:2, 240:3,
240:4, 267:4
**actuary**
179:15, 184:17,
193:22, 209:16,
210:17, 213:15,
214:10, 214:11,
214:18, 214:19,
214:21, 215:2,
215:6, 215:9,
217:3, 217:12,
218:9, 219:7,
224:2, 224:7,
224:12, 224:14,
224:21, 225:19,
227:7, 227:10,
227:11, 227:12,
238:9, 238:12,
238:22, 239:3,
239:5, 239:6,
243:2, 244:15,
245:12, 245:22,
249:20, 251:3
**actuary's**
185:15, 200:3,
213:15
**add**
193:19
**additional**
205:8, 205:11
**addressing**
223:20, 239:17
**adequate**
205:5, 267:15
**adjust**
200:19, 201:7
**adjustable**
195:2
**adjusting**
268:5
**adjustment**
214:8

**adjustments**
195:21, 196:1,
196:3, 196:14,
198:9, 214:10,
255:2, 255:3,
257:1, 257:8
**administrative**
211:18, 212:12,
212:14
**admitted**
178:5, 274:13,
274:14, 275:12
**adopted**
191:18
**advised**
184:3
**affected**
210:11, 223:4
**affirmed**
179:3
**affixed**
276:13
**after**
197:2, 237:2,
237:4, 237:9,
237:12, 241:13
**aftra**
186:21
**again**
191:14, 212:21,
213:22, 219:12,
233:3, 251:14,
263:22
**against**
184:6, 214:9,
252:13
**ages**
213:13, 213:18
**aggregate**
209:20, 210:14,
211:6, 212:1,
212:4, 212:6,
213:2, 236:4,
236:20, 236:22,
237:2, 243:2,
243:6, 245:16,
246:7, 259:11,
259:15, 260:2,

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                    278

260:9, 260:14,
260:17, 260:22,
262:15
**ago**
186:14, 202:5,
205:13, 208:3,
214:16, 219:7,
228:10, 239:9
**agree**
210:5, 248:4,
259:16
**agreed**
211:21, 270:4,
270:13, 270:15
**agreement**
174:12, 207:4,
207:21, 244:13,
246:3, 272:22
**ahead**
179:4, 212:11,
228:20, 256:20,
263:13
**all**
181:10, 182:18,
184:19, 189:8,
190:4, 192:21,
193:16, 196:3,
196:9, 196:17,
199:22, 200:13,
200:14, 201:8,
201:14, 202:6,
202:14, 210:17,
210:20, 211:2,
216:1, 218:3,
220:19, 224:4,
225:14, 227:21,
230:21, 232:10,
235:16, 242:2,
244:13, 251:17,
253:14, 253:18,
254:7, 256:6,
256:7, 256:11,
260:13, 260:14,
261:8, 267:11,
270:9, 272:9,
275:13, 275:14
**allegedly**
205:18

**allocable**
195:7
**allocation**
198:19
**allowed**
205:11
**almost**
184:18
**along**
272:11
**aloud**
256:16
**already**
195:10, 197:10,
200:2, 250:10,
259:2, 274:12
**also**
177:2, 180:20,
181:6, 184:3,
201:15, 214:8,
221:20, 238:17,
239:10, 248:19,
256:2, 262:7
**although**
211:5
**always**
199:9
**ambiguity**
254:21, 254:22
**amendment**
194:11
**amendments**
241:9, 248:17,
249:3
**america**
173:7, 176:2,
179:6, 180:1,
206:9
**american**
173:1, 189:21,
190:12, 190:15,
192:15, 193:9,
240:3
**among**
273:1
**amount**
193:18, 195:15,
196:2, 199:1,

203:5, 226:14,
245:1, 246:10,
253:21, 254:1,
257:19, 258:3,
258:8, 269:2
**amounts**
196:10, 203:17,
231:20, 247:2
**analogy**
206:14
**analyses**
189:10
**analysis**
184:13, 186:3,
217:5, 236:12,
238:2, 240:17,
262:17, 262:18,
262:20
**analyzed**
268:9
**annual**
190:9, 190:16,
240:4
**annually**
206:4
**annuities**
204:1, 204:3,
204:5, 205:14,
206:1, 206:8,
206:18, 207:10
**annuity**
205:9, 206:14,
206:19, 208:7,
216:11, 216:13,
216:18, 216:20,
227:8
**anomalous**
233:13
**another**
186:2, 186:7,
186:18, 194:20,
199:5, 218:19,
233:6, 272:3
**answer**
237:10, 241:20,
245:9
**answered**
222:15, 263:12

**anticipate**
234:13
**anticipated**
229:14
**any**
180:15, 184:21,
187:2, 187:5,
189:15, 190:18,
191:4, 191:18,
192:9, 192:13,
192:20, 193:12,
194:12, 195:1,
196:11, 196:20,
202:13, 203:18,
205:7, 205:11,
205:13, 208:7,
210:11, 211:10,
219:18, 220:21,
226:13, 227:1,
238:12, 239:13,
240:17, 259:13,
261:7, 261:12,
266:18, 269:2,
269:3, 270:21,
271:19, 272:9,
274:1, 276:9
**anybody**
189:4
**anymore**
208:2, 248:12
**anyone**
189:12, 192:12
**anyone's**
270:5
**anything**
190:14, 211:16,
222:19, 235:6,
236:8, 239:16,
266:16, 271:6
**anywhere**
191:17
**apologies**
185:22, 228:12,
228:14
**appears**
209:9, 241:22
**appendix**
182:1, 182:5,

Transcript of Arbitration - Day 2
Conducted on December 13, 2017

279

182:6, 182:7,
182:15, 182:16,
182:17, 182:22,
183:1, 183:2
**applicable**
216:1
**application**
194:8, 231:17
**applied**
226:17
**applies**
192:10, 243:18,
264:3
**apply**
193:22, 195:13,
202:19, 215:8,
215:17, 215:20,
264:5
**appreciate**
275:14
**approach**
188:15, 188:18,
188:19, 192:19,
193:12
**appropriate**
216:8, 261:22,
262:22
**appropriately**
210:19
**approved**
222:5
**approximate**
183:17
**approximately**
183:15, 185:2,
185:4, 193:2
**arbitration**
173:1, 173:11,
174:1, 184:12,
185:17, 219:6
**arbitrations**
184:12, 231:3
**arbitrator**
175:2, 179:4,
180:7, 181:1,
187:10, 187:14,
191:19, 209:6,
210:2, 210:5,

212:8, 212:11,
220:6, 222:19,
228:17, 228:20,
233:17, 234:5,
234:11, 234:15,
234:17, 244:8,
256:11, 256:17,
256:19, 258:19,
259:2, 263:13,
263:21, 269:9,
269:13, 269:17,
269:19, 270:1,
271:17, 272:8,
272:16, 273:11,
273:21, 274:6,
274:11, 275:1,
275:2, 275:13,
275:17
**arbitrators**
274:4
**aren't**
209:1, 240:5
**argued**
242:17, 242:19
**arguing**
252:13, 254:3,
254:6, 259:1
**argument**
258:22
**arguments**
186:12
**around**
239:7
**articles**
182:18
**ask**
185:11, 187:18,
212:10, 229:5,
246:20, 273:13,
273:21
**asked**
179:16, 179:19,
189:4, 237:11,
237:20, 245:9,
245:10, 263:11,
272:14
**asking**
245:19, 258:17,

263:17
**asner**
187:1
**asop**
223:11, 223:13,
225:5, 225:8,
225:15
**asops**
223:10, 223:17,
224:1, 224:3
**aspaa**
190:12
**aspects**
196:3, 196:17,
204:11, 210:9
**assertion**
236:2, 236:10
**assets**
193:21, 195:18,
230:10, 230:16,
231:22, 232:4,
243:12, 243:17,
246:18, 247:11,
257:22
**association**
173:1
**assume**
199:15, 199:21,
268:17
**assumes**
213:12, 213:20
**assumption**
209:15, 211:18,
213:4, 213:5,
213:6, 213:8,
213:12, 216:15,
216:18, 217:10,
217:11, 224:7,
226:3, 242:3,
249:11, 260:1,
260:20
**assumptions**
185:15, 196:9,
196:11, 198:11,
198:13, 201:19,
201:22, 202:15,
210:14, 211:3,
213:1, 213:2,

216:10, 217:9,
226:6, 231:21,
235:16, 236:1,
236:4, 236:20,
236:21, 237:2,
242:21, 243:1,
243:4, 244:16,
245:13, 245:15,
245:22, 246:6,
247:3, 247:4,
248:2, 253:6,
253:13, 253:18,
254:8, 254:11,
254:17, 258:5,
258:6, 259:10,
259:14, 259:22,
260:3, 260:14,
260:16, 262:16,
263:15, 266:6,
267:9
**astronomical**
203:4
**attend**
189:15, 190:12
**attended**
188:21, 190:18,
191:1, 191:6,
239:20, 240:1,
240:8, 240:10
**attending**
190:3, 190:5,
190:7, 190:22,
240:13
**attention**
180:2
**atypical**
213:11
**avenue**
174:5, 176:8
**average**
214:1, 216:22,
268:6
**aware**
218:14, 219:9,
219:12, 220:1,
222:9, 254:18,
268:13, 270:11
**away**
234:17

Transcript of Arbitration - Day 2
Conducted on December 13, 2017

280

| B |
|---|

**b**
226:19, 226:21
**back**
195:13, 195:14,
197:16, 197:18,
200:7, 202:5,
203:19, 210:21,
210:22, 233:8,
241:15, 250:20,
252:10, 253:10,
253:11, 256:7,
267:1, 272:7
**background**
181:17
**backs**
216:16
**bad**
205:9
**bank**
200:3, 251:11
**bankrupt**
184:8
**banned**
205:13
**bargaining**
207:1
**barry**
226:8
**based**
196:8, 204:1,
205:21, 206:4,
212:19, 217:15,
219:4, 223:1,
227:2, 236:14,
237:20, 240:20,
253:20, 259:7,
261:17, 262:6,
262:14, 263:2,
263:4, 264:7,
266:7, 266:8,
266:12
**basically**
239:3, 263:14
**basis**
211:8, 220:2,
220:3, 220:10,

227:6, 230:19,
236:2, 236:19,
245:13
**bates**
182:13
**bearing**
269:3
**because**
186:8, 198:8,
199:9, 201:2,
203:18, 205:20,
212:4, 213:6,
215:20, 217:9,
218:2, 221:7,
223:18, 224:15,
236:19, 249:16,
250:10, 250:14,
252:17, 259:19,
260:2, 260:10,
263:5, 263:18,
265:9, 265:11
**been**
179:13, 179:16,
183:4, 183:8,
183:15, 184:9,
184:10, 185:13,
185:17, 191:14,
191:18, 195:2,
195:5, 195:10,
195:13, 197:10,
200:2, 203:19,
205:13, 205:14,
206:7, 206:9,
206:12, 210:22,
213:15, 215:3,
217:16, 222:5,
229:3, 230:21,
231:1, 232:14,
232:20, 232:21,
233:6, 233:13,
237:20, 241:15,
242:20, 243:4,
248:11, 250:10,
261:13, 261:16,
262:1, 262:15,
268:5, 274:3,
274:12
**before**
174:12, 187:16,

189:13, 207:19,
215:11, 234:12,
237:2, 237:8,
237:11, 245:18,
266:20, 276:3
**beginning**
185:6, 215:22,
234:22, 252:8
**behalf**
175:8, 176:2,
179:5, 234:19
**being**
186:5, 186:13,
203:20, 204:2,
204:5, 206:11,
207:13, 209:1,
232:11, 237:16,
238:10, 238:14,
249:6, 262:7
**believe**
185:15, 192:3,
192:9, 212:13,
212:18, 216:20,
218:22, 229:12
**below**
212:13, 230:8,
230:18, 232:11
**benchmark**
217:8, 219:5
**benefit**
180:21, 194:1,
194:2, 194:4,
194:10, 194:14,
194:18, 194:20,
195:2, 195:6,
196:6, 196:10,
196:19, 196:20,
196:21, 197:3,
197:13, 198:3,
199:3, 200:1,
203:17, 208:8,
215:21, 218:2,
226:14, 227:3,
231:20, 246:21,
247:1, 248:6,
248:7, 249:12,
249:13, 250:6,
253:9, 254:1,

254:8, 266:10
**benefits"**
247:12, 255:6,
257:11
**berth**
260:2
**between**
188:8, 188:12,
190:20, 195:12,
217:15, 232:15,
252:1, 261:12
**beyond**
202:3
**big**
187:18, 251:22,
252:11
**binder**
244:10, 274:14,
274:16
**binders**
271:13
**bit**
212:3, 260:20,
264:10, 264:11
**blend**
229:6, 229:8,
230:9, 230:17,
230:20, 230:22,
231:1, 231:2,
231:4, 231:12,
231:17, 242:8,
242:18, 242:19,
243:11
**blue**
213:21, 214:1
**blue-collar**
214:8
**board**
214:21, 223:15
**bockius**
176:7
**bodies**
223:19
**body**
224:6
**bond**
205:21, 264:11,
265:3, 265:16,

Transcript of Arbitration - Day 2
Conducted on December 13, 2017

281

**266:3**
**bonds**
264:11, 266:1
**book**
256:3, 256:10,
256:12, 271:4
**books**
271:19
**both**
183:13, 185:11,
273:22, 274:3
**bottom**
256:14
**break**
228:16, 234:14,
247:11, 269:7
**breathe**
189:12
**brief**
241:19
**briefly**
209:13, 213:4
**briefs**
273:12, 273:13,
274:7
**broached**
192:19
**brookline**
175:5
**bunch**
187:1
**burden**
211:5
**butchering**
218:19
**buy**
227:18
**buyer**
227:16, 227:17
**buying**
206:7, 208:7

**C**

**c**
193:18, 240:16,
240:18, 241:7,
241:12, 241:18,
244:19, 245:18,

246:9, 257:18
**calculated**
228:7
**calculation**
209:2, 209:3,
231:22, 253:5
**calculations**
204:16, 231:4,
242:2
**calculator**
201:11
**calendar**
199:17, 251:10
**call**
184:5, 211:14,
217:22, 240:22,
242:9, 248:15,
248:16, 248:17,
260:18
**called**
263:16
**came**
186:9, 192:19,
204:15
**can**
190:2, 192:3,
192:4, 199:9,
201:21, 212:2,
215:10, 225:8,
234:6, 252:9,
258:2, 259:9,
259:17, 260:3,
272:10, 272:11
**can't**
236:17, 236:18,
254:15, 259:13,
267:17
**cannot**
224:11, 236:2,
258:6, 258:8
**capacity**
238:9
**case**
173:5, 179:17,
183:7, 223:12,
242:13, 242:17,
242:19, 243:3,
256:1, 267:21,

271:20, 274:12,
276:10
**cases**
183:3, 183:8,
183:10, 184:11,
184:15, 184:22,
185:2, 185:3,
186:15, 187:3,
187:6, 187:7,
237:20, 237:22,
273:14
**category**
215:10
**certain**
202:22, 204:20,
204:21, 215:12,
250:16, 253:3,
255:15
**certainty**
251:5
**certificate**
276:1
**certificates**
190:22
**certified**
174:13
**certify**
276:4
**cetera**
194:9
**chair**
192:22, 193:1
**challenge**
187:8, 236:2,
236:19
**changes**
180:15, 226:14
**chapter**
194:7, 194:13,
194:21
**charge**
205:20, 206:2
**charged**
205:16
**charging**
206:19
**charles**
176:6

**check**
200:1
**checks**
251:12
**chip**
203:16
**choosing**
239:13
**christopher**
175:10
**chunk**
203:16
**circumstances**
250:16
**cite**
215:15
**cited**
240:9
**citing**
228:15, 240:7,
273:14, 273:17
**claims**
236:11
**clarify**
191:10, 226:2
**clear**
237:5, 253:12,
255:17, 255:19,
261:8, 267:4
**clearly**
236:16, 255:1
**client**
179:22, 183:14
**clients**
183:15
**close**
201:22, 219:3,
219:8
**coal**
213:19
**code**
195:4, 215:7,
215:13, 241:11
**collar**
213:22, 214:2
**colleagues**
241:1
**collecting**
207:11

Transcript of Arbitration - Day 2
Conducted on December 13, 2017

282

collective
206:22
columbia
174:15
combination
262:15
combined
260:6
come
193:11, 199:13,
200:9, 202:7,
267:1
comes
206:20
comment
204:3, 204:4,
208:12, 261:20
commented
208:9
commission
276:15
commissioner
204:17
commissioner's
260:8
commissioners
204:22
committee
192:17, 192:18,
192:21
committees
192:13
commonwealth
276:21
companies
204:8, 204:11,
205:20, 208:1,
216:10, 216:12,
216:19, 227:20
company
186:8, 186:9,
204:13, 204:18,
204:20, 205:4,
205:12, 205:16,
206:9, 218:21,
219:1
comparable
213:21

compare
206:14
competitor
184:7
competitors
189:9
completion
194:9
concerning
180:4
conclude
269:19
conclusion
236:18
conclusions
209:12
condition
194:6, 194:12
conducted
240:6
conference
188:22, 190:9,
193:8, 240:2
conflict
190:14, 224:16
conflicted
190:10
congress
202:9, 202:13,
203:21, 207:3,
207:6, 229:13,
241:6, 252:18,
253:3
conjunction
216:17, 244:21,
253:8
conservative
205:3, 205:21
consider
225:19
considered
191:15, 191:17
consistent
227:15
consulting
188:22, 190:9,
193:8, 240:2
contain
181:7, 210:15

contend
240:15
contending
266:12
context
226:5, 226:16,
226:17, 226:18,
261:15
continuing
189:16, 189:17,
190:1, 190:21,
215:4, 239:21,
272:1
contract
186:9, 186:10,
207:11, 208:5
contracts
206:20
contractual
206:20, 206:21
contribute
185:19, 186:1,
207:5, 267:2,
268:18
contributing
206:10, 207:4,
268:13, 268:20
contribution
186:17, 205:17,
206:3, 206:5
contributions
206:21, 207:11,
225:22, 226:7,
227:2, 229:19
control
254:20
controlled
186:5, 268:17,
268:18
cooperation
275:14
copy
220:12, 272:3,
273:22
corner
175:14, 256:14
corporate
265:15

corporation
173:4, 175:8,
180:22, 234:20
corporations
184:3, 189:11
correct
182:20, 228:12,
230:7, 230:14,
232:1, 232:12,
232:13, 235:10,
235:18, 236:22,
238:3, 238:15,
238:16, 239:1,
240:18, 242:15,
242:18, 243:15,
243:19, 244:3,
244:18, 245:16,
246:7, 246:11,
246:18, 247:13,
248:6, 249:18,
249:19, 250:7,
250:8, 250:16,
252:15, 252:16,
252:20, 257:2,
257:5, 257:12,
258:17, 259:11,
259:21, 260:15,
261:2, 261:14,
262:4, 264:4,
264:15, 265:10,
266:7, 266:13,
266:19, 267:7,
268:8, 268:19,
276:5
corrected
235:1, 266:20
correctly
231:16
cost
272:22
could
179:9, 179:21,
180:5, 182:5,
182:22, 199:6,
202:13, 203:2,
204:3, 208:11,
209:7, 209:10,
209:12, 210:8,

Transcript of Arbitration - Day 2
Conducted on December 13, 2017

283

211:17, 220:9,
222:18, 228:16,
228:22, 236:10,
248:9, 248:17,
249:5, 250:17,
250:18, 251:2,
251:3, 251:4,
256:9, 256:10,
256:15, 269:6
**council**
192:18, 192:21,
193:1
**counsel**
179:5, 182:8,
182:14, 234:19,
241:3, 271:3,
271:4, 276:8
**count**
182:20, 237:19,
238:4
**country**
213:14
**country's**
223:19
**couple**
269:21
**court**
186:19, 191:18,
272:14, 272:21,
273:8
**cover**
272:15
**covered**
207:22, 212:17,
216:1
**credentials**
181:8, 181:14,
181:21
**credible**
267:16
**credit**
264:22
**credits**
190:1, 190:4
**creditworthiness**
188:9, 200:18,
208:13, 208:15,
265:1

**creditworthy**
265:10, 265:12
**crescent**
175:12
**crisis**
233:1
**criteria**
212:2
**critical**
196:22, 197:3,
219:15, 221:1,
221:9, 221:10,
221:11, 221:13,
223:15
**cross**
178:2
**cross-examination**
234:19
**crr**
173:22
**current**
190:6, 225:16
**currently**
238:8
**cushion**
205:7
**cut**
195:13, 195:14,
197:16, 197:18,
200:2, 200:7,
203:19, 210:20,
210:22, 225:13,
225:15, 250:19,
253:10, 253:11
**cutbacks**
198:3, 198:15,
199:3, 200:11,
200:13, 203:18
**cv**
182:17

**D**

**dale**
178:9, 274:18,
275:10
**data**
212:19
**date**
183:3, 197:2,

225:16, 236:8,
251:16, 267:1
**day**
173:11, 174:1,
276:13
**dc**
174:6, 176:9,
176:18
**deal**
215:7, 215:18,
251:22, 252:12
**dealing**
184:3, 215:13,
241:12
**deals**
216:2, 216:4,
249:1
**dealt**
204:6, 212:20
**death**
194:9
**debtor**
264:15, 265:1
**debtor's**
264:19
**december**
173:13, 199:19,
199:22, 201:17,
232:17, 232:22,
233:4, 251:9,
276:14
**declared**
253:4
**declining**
196:22, 197:4,
219:15, 221:1,
221:10, 221:11,
221:13
**decrease**
230:16
**decreased**
214:5, 214:9
**decreases**
229:11
**defeasance**
226:10, 227:9
**defeasant**
226:13

**defended**
185:14, 219:6,
231:2, 242:14
**defense**
183:16
**defies**
201:13
**define**
248:2, 249:5,
252:18
**defined**
194:2, 195:17,
208:20, 247:22
**defines**
193:19, 244:19,
246:15, 247:21,
257:19
**defining**
248:6
**definitely**
245:8, 251:18
**definition**
185:18, 196:8,
215:21, 221:12,
245:4, 247:8,
247:12, 249:13,
253:9, 253:16,
268:14, 268:16
**defunct**
207:22
**demographics**
217:21, 268:11
**demonstrate**
210:13
**demonstrated**
231:5
**department**
215:1, 221:5,
222:6
**depending**
217:17, 261:17
**depends**
249:5
**deposition**
185:8, 185:20,
188:20, 235:7,
235:8, 274:17
**depositions**
183:9, 185:12

Transcript of Arbitration - Day 2
Conducted on December 13, 2017

284

derived
238:14
describe
194:3, 194:4,
194:18, 217:18,
217:20, 238:21,
261:19
described
194:19, 194:21,
256:1, 256:2
describes
208:21, 244:15
designation
214:20
designations
270:11
detailed
182:17
details
186:12
deteriorated
229:15
deteriorates
229:11, 230:11,
232:5
determination
193:17, 195:22,
196:4, 196:5,
196:15, 196:16,
196:18, 197:11,
198:6, 198:10,
198:14, 198:16,
198:17, 235:17,
241:13, 245:6,
250:12, 251:10,
252:2, 253:17,
253:20, 254:7,
254:10, 254:12,
257:9
determination"
255:8, 257:2
determinations
253:15
determine
196:11, 198:10,
198:21, 207:7,
226:6, 245:5,
245:12, 254:16,

257:17, 258:1,
258:2, 258:6,
258:8, 267:5
determined
199:19, 217:14
determining
195:7, 196:1,
196:6, 197:5,
197:6, 199:1,
209:18, 214:11,
225:22, 242:15,
243:13, 244:2,
244:16, 244:22,
246:1, 246:10,
246:22, 247:2,
249:17, 252:15,
253:1, 253:19,
255:6, 255:8,
257:11, 257:14,
257:16, 258:13,
258:15, 265:21,
269:1
develop
216:22
development
190:1, 190:21
deviates
224:2
devolved
204:10
dictated
264:18
did
184:4, 185:4,
185:19, 186:7,
188:3, 188:7,
188:11, 210:13,
210:15, 211:2,
211:7, 211:9,
211:10, 217:5,
218:12, 225:12,
225:13, 228:11,
231:3, 231:15,
235:22, 236:6,
236:21, 237:6,
237:7, 237:8,
241:4, 255:19,
264:5, 269:1

didn't
187:2, 212:7,
222:13, 236:17,
236:19, 238:4,
240:17, 252:9,
252:21, 261:15,
262:19
die
213:12, 213:17
difference
252:1
different
186:4, 199:13,
213:9, 223:19,
228:7, 228:8,
228:9, 231:21,
252:19, 252:21,
255:13, 271:19
differently
273:4
digits
201:12
direct
178:2, 179:5,
234:22, 250:2
direction
276:8
directly
202:13, 264:3,
264:5
disability
249:2
disagree
212:5
disappeared
248:12
disclaiming
224:15
discontinuity
202:7
discount
188:3, 188:8,
188:12, 189:2,
196:13, 198:7,
198:16, 200:13,
200:19, 200:20,
201:2, 201:7,
201:10, 201:13,

202:2, 202:3,
202:11, 202:22,
203:10, 217:22,
219:16, 221:14,
223:3, 225:18,
225:22, 227:6,
227:7, 239:13,
239:17, 244:1,
252:15, 259:12,
260:5, 260:7,
260:10, 267:5
discuss
199:18, 216:6
discussed
189:3, 192:12
discussion
191:3, 273:10,
274:9
discussions
192:20
diseases
213:19
disregard
198:15, 202:17,
209:2, 245:6
disregarded
195:21, 196:1,
196:3, 196:14,
197:4, 198:9,
202:10, 202:16,
255:5, 255:7,
257:1, 257:9,
257:10, 257:14,
258:13
disregarding
255:2
distant
251:16
distribution
251:3
district
174:15
document
220:20, 221:16,
221:18, 222:10,
222:14, 255:11
documents
182:7, 220:22,

Transcript of Arbitration - Day 2
Conducted on December 13, 2017

285

241:4, 241:5,
255:13, 270:12,
270:17, 275:6
**does**
181:7, 181:9,
181:16, 181:18,
182:11, 195:22,
198:5, 198:6,
202:19, 203:21,
205:4, 206:18,
208:1, 208:13,
220:1, 226:3,
237:7, 238:6,
247:17, 253:14,
269:19
**doesn't**
190:14, 199:11,
227:11, 247:20,
248:2, 250:3,
251:20, 253:10,
253:13, 255:1,
255:7, 257:8,
274:6
**doing**
251:9
**domiciled**
204:18
**don't**
183:7, 186:11,
192:9, 198:13,
201:11, 202:16,
203:21, 210:6,
212:5, 212:7,
219:11, 219:17,
219:20, 234:1,
234:5, 234:13,
235:6, 235:8,
237:1, 237:8,
237:19, 247:6,
248:1, 248:5,
248:7, 249:17,
250:13, 251:14,
252:7, 254:9,
254:11, 254:19,
254:21, 255:16,
258:5, 258:11,
267:16, 267:19,
267:22, 270:2,

270:4, 270:21,
270:22, 271:9,
271:10, 273:15,
274:7
**done**
184:13, 186:2,
189:10, 190:2,
213:15, 236:11,
237:3, 268:2,
274:12
**double**
209:8
**down**
202:7, 230:1,
230:10, 232:2,
232:4, 233:4,
247:11
**dr**
187:16, 206:13,
209:5, 209:6,
209:10, 221:1,
221:7, 222:18,
223:9, 228:22,
255:14, 256:2,
269:16, 269:18,
272:13
**draw**
185:8
**drive**
175:12
**due**
226:14, 251:8,
273:12
**duly**
179:3
**duration**
217:17, 261:18,
261:19
**during**
241:15
**dying**
260:11

---
**E**
---

**e) (8**
195:3, 195:4
**e8**
196:21

**e9**
197:1
**each**
190:1, 193:9,
193:10, 199:19,
204:17, 223:19,
231:18, 260:12
**earlier**
214:2, 250:2,
267:1
**early**
183:6, 233:7,
233:8, 240:22
**easier**
199:17, 233:22
**easy**
273:16
**ed**
186:22
**education**
189:16, 189:17,
215:5, 239:21
**educational**
181:16
**effect**
201:1, 201:4,
208:9, 232:8
**effective**
197:2, 225:16
**effectively**
202:10, 202:11,
202:16, 203:11,
216:16, 226:12,
226:13, 228:2
**eight**
237:19, 237:22,
251:6
**either**
182:8, 184:11,
238:1, 238:2
**elba**
175:4
**electronic**
273:22, 274:2
**eliminate**
216:21
**eliminated**
194:15, 197:10

**elimination**
249:7
**else**
190:14, 200:5,
219:8, 235:7,
271:6, 271:8
**emanuel**
179:2, 179:11
**employed**
179:12, 276:9
**employees**
206:11, 207:14
**employer**
178:11, 185:18,
209:22, 226:22,
228:3, 238:3,
268:15, 268:16,
270:6, 271:3,
274:20, 275:11
**employer's**
195:7, 197:6,
230:5, 257:16,
258:15
**employers**
180:18, 183:12,
206:22, 266:18,
266:21, 268:14,
268:19, 268:21,
269:4
**employment**
181:19
**enacted**
241:6
**enactment**
191:9
**end**
183:5, 200:3,
218:1, 218:8,
261:21, 262:1,
263:6
**energy**
173:3, 175:8,
206:7, 207:13,
207:15, 207:19,
209:19, 211:5,
234:19, 235:22,
269:2
**engage**
227:22

Transcript of Arbitration - Day 2
Conducted on December 13, 2017

286

enough
201:12, 205:9,
211:15, 256:4,
267:16, 267:19
enrolled
189:18, 190:7,
214:19, 214:21,
215:2, 215:6,
215:9, 217:12,
238:9, 238:11,
239:22, 240:1
enrollment
214:22
ensuing
199:20, 205:1,
241:3
ensuring
184:6
enter
270:4
entered
231:8
entire
180:19, 253:4,
270:14
entirety
187:22
entities
186:4
entitled
225:17
entitlement
194:6
entity
224:9
environment
226:15
equal
198:4, 257:20
equally
195:12, 273:1
equities
206:5
equivalent
204:2
erisa
193:14, 193:18,
194:3, 194:19,

195:4, 195:20,
197:8, 210:16,
210:19, 214:17,
215:7, 215:16,
215:17, 215:18,
215:19, 216:1,
216:2, 216:3,
245:5, 247:16,
256:22, 257:18,
267:4, 268:14,
268:16
erroneous
236:13
esoteric
184:5
esquire
175:3, 175:9,
175:10, 176:4,
176:5, 176:6,
176:12, 176:13,
176:21
essence
207:16
established
219:22, 222:9,
241:15
et
194:9
ethan
177:5, 178:3,
179:2, 179:11,
179:13, 217:10,
242:22, 254:13
even
183:7, 190:12,
203:18, 208:22,
248:10, 249:20,
251:17, 251:20,
266:2
events
248:16
eventually
249:21
ever
189:5, 191:10,
191:14, 191:18
every
196:7, 200:1,

224:19
everybody
272:16
everything
200:5
evidence
219:18, 219:21,
231:8, 236:9,
236:11, 275:12
examination
179:5, 235:1
examinations
215:4
examined
215:3
example
199:8, 203:12,
224:11, 243:21,
250:19, 250:22,
260:4, 265:8,
266:17
examples
225:19, 225:20,
231:11, 231:14
exams
204:6
exceed
195:18
except
189:11, 190:10,
225:1
exception
224:5
exceptions
184:19, 232:17
excuse
226:2
exempt
265:12
exhibit
178:5, 180:3,
180:4, 180:6,
187:17, 256:8,
270:18, 271:19,
274:20
exhibits
178:6, 178:8,
178:11, 231:8,

231:9, 255:22,
270:3, 270:4,
270:6, 270:22,
271:4, 271:9,
271:16, 271:20,
274:13, 274:16,
275:4, 275:8,
275:10, 275:11
expectation
249:11, 250:21,
251:1
expectations
209:21, 267:7,
267:9
expected
228:6, 249:15
expense
216:15, 216:17,
260:20
expenses
200:5, 211:19,
212:12, 212:14
experience
209:20, 213:16,
213:21, 238:18,
246:22, 247:19,
248:5, 248:8,
248:14, 248:16,
248:18, 249:1,
249:5, 249:6,
249:8, 267:6,
267:8, 267:10,
267:15, 267:18,
268:10, 274:3
experienced
189:6, 214:1
expert
183:2, 184:21,
185:4, 185:7,
186:3, 187:4,
187:6, 187:11,
210:1, 235:2,
235:21, 235:22,
237:16, 237:21,
238:2, 238:14,
241:17, 242:13,
259:6
expertise
187:8

Transcript of Arbitration - Day 2
Conducted on December 13, 2017

287

expires
276:15
explain
179:21, 182:6,
183:1, 192:3,
192:5, 199:6,
224:3
expressing
240:19, 240:20,
241:21
extent
224:5, 249:8,
267:15
external
226:15
extremes
199:11, 199:12

**F**

face
192:1, 192:2,
192:7
facing
221:12, 221:14
fact
188:21, 189:7,
200:18, 200:20,
213:20, 215:9,
217:5, 231:5,
238:21, 239:16,
241:8, 243:10,
243:17, 252:4,
261:6, 266:1,
274:17
factor
208:14, 209:3
factors
217:18, 217:21,
265:20
facts
186:13, 231:18
fair
238:13, 242:3,
256:4, 273:7
fall
190:10
familiar
183:18, 188:15,

208:1, 230:21,
243:8
famous
187:2
far
260:18
february
200:6, 201:7,
201:9, 205:1,
273:12
fed
204:12
federal
204:10
felt
211:13, 213:1,
213:2
feltstein
218:19
few
183:4, 184:18,
186:13, 187:18,
190:17, 214:16,
217:18, 218:21,
219:6, 228:10,
232:17, 233:12,
240:8, 260:17,
271:5
fewer
211:13
fifth
185:16
file
204:21
financial
227:21, 229:10,
233:1, 276:10
financials
204:19
finch
176:21
find
194:1, 211:10,
245:3
findings
210:9
fine
212:10, 234:6,

234:8, 234:11,
269:9, 271:17
firm
184:9
firms
218:17, 219:2
first
185:10, 188:18,
193:16, 198:21,
204:4, 220:7,
220:19, 229:5,
229:6, 230:21,
245:21
five
181:11, 234:9,
239:12, 239:17,
251:2
fixed
206:2
flies
191:22, 192:2,
192:7
floor
189:4
follow
200:16, 204:21,
223:17, 224:8,
252:7, 252:9
follows
179:3
footing
195:12, 198:4
forces
192:14
foregoing
276:3, 276:4
forever
201:9
form
226:8, 228:13,
228:14
formal
194:8
format
274:1, 274:4
forth
193:14, 245:11
forum
193:6

foundation
220:1, 220:5,
220:7, 220:9
four
181:11, 187:7
framed
212:8
frames
241:8
framework
193:14
free
265:6
from
189:4, 190:22,
191:12, 197:22,
201:1, 201:3,
205:7, 205:13,
206:8, 206:20,
206:21, 207:1,
207:22, 209:8,
210:12, 213:10,
214:21, 216:5,
216:11, 224:2,
226:13, 224:7,
237:5, 238:14,
239:6, 240:21,
241:3, 241:14,
252:19, 252:21,
265:12, 267:11,
268:10, 268:11,
274:4, 274:7
front
220:13, 225:9,
255:16
fulfill
189:16, 215:6
full
187:8
full-fledged
192:17
fully
187:9
fund
192:9, 203:7,
203:9, 204:1,
204:5, 205:12,
205:15, 206:4,

Transcript of Arbitration - Day 2
Conducted on December 13, 2017

288

207:7, 207:9,
207:20, 207:22,
208:4, 219:10,
219:13, 219:14,
229:20, 262:11,
262:22, 263:4,
266:10, 267:2,
268:18
**fund's**
229:10, 229:15,
229:21
**funding**
221:21, 226:3,
226:7, 226:18,
230:9, 230:10,
230:18, 232:2,
232:4, 232:11,
232:16, 232:21,
233:14, 243:14,
243:18
**funds**
176:22, 184:3,
189:11, 208:2,
229:18
**further**
212:4, 233:16,
269:11
**future**
195:11, 195:14,
197:16, 197:18,
198:2, 210:21,
227:1, 228:4,
228:6, 250:18,
251:17, 267:10

**G**

**g**
195:21, 198:8,
215:16, 216:2,
248:10, 248:18,
248:20, 249:22,
250:1, 250:10,
252:3, 252:12,
253:12, 255:18,
256:1, 256:22
**g)**
250:6
**g)(1**
195:20, 255:5,

257:7, 258:4
**gains**
268:10
**games**
202:15
**gather**
216:20
**gathered**
241:1
**gathers**
216:11
**gave**
203:12, 250:1
**general**
212:19, 225:3,
245:19, 245:20,
263:3
**generally**
206:3
**gentleman**
218:19
**get**
181:1, 187:2,
190:4, 198:20,
205:9, 221:6,
229:15, 234:12,
256:11
**gets**
203:9
**getting**
272:16
**give**
201:8, 217:7,
220:5, 224:22,
251:3, 256:9,
270:20, 271:1,
272:6
**given**
231:18, 239:13
**gives**
225:18, 260:2
**glenda**
176:21
**global**
271:20
**go**
179:4, 181:10,
187:16, 194:17,

195:20, 200:1,
202:6, 202:22,
203:2, 204:4,
209:12, 212:2,
212:11, 217:20,
219:11, 221:7,
228:20, 229:7,
230:1, 230:10,
232:4, 233:8,
233:20, 253:18,
256:20, 257:18,
261:19, 263:13,
265:20, 270:20,
275:7
**goes**
182:10, 182:19,
194:4, 194:20,
213:7, 228:5,
232:2, 258:9,
274:15
**going**
184:8, 199:16,
201:6, 203:1,
203:10, 210:2,
210:3, 211:20,
212:13, 222:14,
229:5, 229:7,
229:18, 230:3,
234:13, 247:11,
251:13, 262:6,
262:13, 273:5,
273:14, 273:17
**goldfarb**
218:18
**gone**
184:16, 185:16
**good**
179:9, 213:1,
224:4, 275:17
**got**
186:16, 199:13,
202:1, 202:3,
203:16, 229:22,
244:11, 255:12,
267:16, 267:22
**gotten**
229:19
**government**
204:10, 224:6,

225:2
**great**
234:15, 269:13
**greater**
229:22, 243:12,
243:13, 243:17,
243:22
**green**
176:14
**greg**
233:18
**gregory**
175:9
**groppe**
176:6, 270:17,
271:12, 272:3,
275:6
**group**
186:5, 186:22,
268:17
**groups**
268:18
**guarantee**
180:21
**guess**
248:17, 249:4,
272:10
**guidance**
225:1
**guild**
186:19, 186:21
**guys**
234:3, 273:3

**H**

**had**
186:1, 186:15,
189:4, 189:5,
201:15, 201:16,
206:7, 212:8,
214:12, 219:9,
220:12, 220:14,
225:13, 238:17,
238:18, 241:11,
241:13, 241:14,
241:15, 259:12,
262:16, 270:3,
271:8, 274:3

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                289

hand
200:16, 276:13
handed
271:3, 271:13,
271:14
happens
232:3
happy
227:22, 274:5
hard
273:22
harper
187:1
has
185:16, 191:14,
191:18, 193:7,
193:22, 194:5,
195:2, 198:8,
199:17, 201:11,
214:20, 215:2,
216:14, 227:11,
229:3, 229:13,
231:1, 236:11,
243:14, 244:15,
250:19, 253:4,
253:16, 262:7,
265:8, 265:11,
265:14, 267:5,
269:3, 269:14,
270:6, 274:3,
274:12
haven't
238:19, 239:12,
239:16, 270:10
having
179:3, 202:12,
240:21, 254:16
he'll
220:5
he's
210:3, 211:22,
220:2, 236:12
heading
257:1
headings
254:19, 255:15
health
176:22, 203:6,

208:2
hear
188:3, 188:7,
188:11, 220:6,
267:11
heard
188:17, 188:19,
189:5, 189:12,
191:10, 191:16,
192:11, 192:12,
203:22, 259:8
hearing
185:12, 185:17,
269:20
hearings
183:9
hearsay
219:17
held
174:1, 273:10,
274:9
help
229:19
helpful
263:19
her
244:16
here
182:21, 195:9,
197:9, 199:5,
202:20, 213:9,
215:15, 227:14,
229:7, 232:16,
233:18, 235:9,
244:7, 250:1,
254:4, 255:11,
256:6, 263:17,
272:1
hereby
187:10, 276:4
hereunto
276:12
herring
209:4
high
201:11, 202:11,
216:21, 233:5
high-quality
265:15

higher
203:1, 203:2,
205:17, 206:10,
213:22, 214:15,
265:2, 265:16,
266:2, 266:17,
268:6
highlight
210:8, 211:17
him
210:6, 212:10,
234:6
his
188:3, 188:7,
188:11, 188:18,
188:20, 191:12,
191:21, 208:12,
210:3, 218:20,
228:18, 234:7,
235:17, 236:1,
236:12, 236:18,
237:3, 237:4,
237:7, 244:16
historically
268:3
history
181:19
hittner
177:4, 188:16,
189:11, 191:4,
191:11, 191:12,
199:6, 200:17,
201:4, 201:20,
202:18, 202:21,
203:8, 208:10,
209:5, 210:12,
210:13, 229:10,
229:21, 230:2,
235:15, 235:22,
240:13, 252:4,
262:7
hittner's
187:19, 235:9
holiday
275:17
holidays
190:11
honest
188:17

horizon
218:18, 218:20
horrible
250:20
hours
189:19, 189:22
housekeeping
269:22
how
183:21, 185:2,
185:4, 193:13,
196:7, 200:8,
202:19, 207:6,
208:13, 213:7,
226:11, 227:14,
231:11, 247:20,
249:5, 252:18,
268:13, 268:19
however
189:20, 224:18,
242:9, 260:6
humongous
201:12
hypothetical
199:8

                I
i'll
184:5, 185:11,
261:7
i've
184:1, 184:9,
184:10, 184:13,
184:16, 185:13,
185:14, 185:17,
186:2, 188:19,
189:8, 189:10,
189:12, 190:22,
191:16, 192:12,
193:11, 200:14,
212:20, 230:21,
230:22, 240:8,
240:9, 267:16,
268:12, 274:3
idea
240:12
identified
235:6, 271:19

Transcript of Arbitration - Day 2
Conducted on December 13, 2017

290

identify
231:16
ignore
199:2, 203:11,
253:2, 253:6
ignoring
203:18, 214:3,
214:7
imagine
259:13
immunize
226:13
implicit
227:8
important
210:9, 212:2,
213:5, 213:6,
214:18
impossible
254:17, 259:15
improvements
205:22, 214:3,
214:7
in-person
240:7
inaccurate
222:20
includable
195:5
include
181:16, 198:5,
198:6, 200:11,
200:12, 200:14,
202:14, 202:17,
248:11, 249:19,
250:11, 251:7,
251:12, 251:17,
253:16
included
186:22, 210:17,
231:1, 251:21,
254:9
includes
194:14, 196:6,
196:12, 196:13,
198:16, 245:20,
254:7
including
182:18, 184:6,

187:4, 210:20,
253:5
income
206:2, 206:20,
207:1, 207:8,
238:14, 265:12
inconceivable
229:13
inconsistent
192:4
incorrect
191:22, 252:4
increase
184:6, 212:15,
230:13, 232:9
increased
214:4, 229:16
increases
230:11, 230:15,
230:16, 232:6
increasing
201:10
independent
184:17
indicates
236:9
indication
267:10
individual
208:7, 211:8
individualized
268:4
individually
211:10, 211:12,
260:15
individuals
215:10
information
216:11, 241:1,
241:3, 267:19
initial
273:12
insolvency
188:5, 200:22,
201:3, 201:6,
201:16, 201:21,
202:1, 202:4,
203:3, 203:12,

208:11, 221:12,
221:14, 223:3,
223:4, 223:6,
243:22, 249:7,
249:16, 252:5,
252:14
insolvent
200:4, 200:6,
230:3
instances
233:13
instrument
264:17
instruments
264:12
insurance
204:7, 204:8,
204:11, 204:13,
204:17, 204:18,
204:20, 204:22,
205:2, 205:4,
205:8, 205:12,
205:16, 205:20,
206:9, 216:10,
216:12, 216:19
insurer
204:5
interest
212:9, 216:16,
217:1, 217:6,
217:8, 224:13,
224:14, 224:16,
224:17, 224:20,
230:8, 230:9,
230:17, 232:20,
233:1, 233:3,
259:8, 259:17,
261:5, 264:18,
265:2, 265:21,
276:10
interesting
237:10, 245:8
internal
215:7, 215:11,
215:13, 241:11
interpretation
254:13, 254:19
interrupt
197:17

into
186:17, 207:21,
209:20, 212:2,
216:16, 219:11,
229:8, 231:8,
233:8, 247:18,
248:5, 248:8,
248:13, 248:15,
249:17, 250:3,
250:8, 252:5,
252:13, 253:18,
258:10, 265:20,
270:8, 271:10,
275:12
introduced
241:10
investigate
241:4
investing
207:16
investment
207:7, 264:12,
267:11
involved
184:10, 184:17,
184:19, 185:14,
185:17, 186:15
involving
184:5
irrelevant
208:16, 208:17,
218:11
irvings
175:3
isn't
243:10
isolation
244:20, 260:1
issue
184:8, 186:7,
211:21, 212:7,
270:22
issued
223:14
issues
183:21, 186:11,
190:19, 191:2,
226:14, 269:22,

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                                291

272:15
**it'll**
234:6
**it's**
180:6, 183:5,
193:3, 199:1,
199:17, 200:6,
201:13, 202:2,
205:9, 209:3,
210:4, 210:22,
217:6, 218:2,
218:11, 218:12,
220:15, 220:20,
221:12, 221:17,
222:5, 225:10,
225:17, 226:21,
227:12, 229:13,
238:13, 241:22,
243:9, 244:20,
245:9, 249:13,
249:16, 256:2,
256:13, 259:15,
261:10, 263:19,
265:9, 265:11,
265:12, 265:13,
265:17, 272:13,
273:15
**italics**
183:14
**items**
245:6
**its**
179:22, 188:4,
193:13, 200:5,
206:11, 210:1,
223:18, 227:1,
229:16, 229:22,
230:3, 263:5,
270:6, 276:11
**itself**
263:5

**J**
**january**
200:1, 200:4,
200:5, 233:3,
251:11, 251:12
**jewish**
190:11

**job**
173:20
**john**
176:12
**joint**
178:6, 180:3,
180:4, 180:6,
187:17, 214:21,
270:3, 270:18,
274:13, 275:8
**judged**
265:17
**june**
209:17, 217:14
**junk**
266:2
**just**
181:1, 191:9,
197:17, 199:16,
201:13, 207:21,
210:3, 210:8,
212:6, 213:4,
214:12, 225:13,
226:2, 234:9,
239:3, 240:9,
240:16, 247:21,
253:12, 256:3,
256:15, 259:7,
259:15, 259:18,
261:8, 269:6,
269:8, 269:21,
271:1, 271:3,
271:6, 272:4,
274:2, 274:11,
275:2
**justify**
224:3

**K**
**keep**
190:5, 229:18,
263:17
**keeps**
203:10, 234:6
**kind**
189:15, 249:7
**know**
197:10, 201:11,

204:8, 204:15,
212:6, 212:7,
212:9, 220:1,
222:13, 225:9,
236:20, 237:1,
237:8, 237:19,
240:14, 244:14,
250:4, 250:9,
250:13, 250:19,
251:14, 251:18,
251:21, 256:3,
263:18, 265:9,
266:2, 268:19,
270:5, 271:9,
271:11, 272:13,
273:14
**knowledge**
191:15, 191:20,
220:10, 240:20
**knowledgeable**
227:17
**knows**
221:8, 252:18
**korean**
241:15
**kra**
177:5, 178:3,
179:2, 179:11,
179:13, 187:11,
187:16, 206:13,
209:6, 209:10,
217:10, 221:1,
221:7, 222:18,
223:9, 228:22,
234:22, 242:22,
259:5, 269:16,
269:18, 272:13
**kra's**
254:13, 255:14,
256:2

**L**
**labor**
206:20, 207:4,
207:20
**large**
207:21, 265:13
**last**
190:17, 232:14,

239:12, 239:17,
253:10
**late**
240:21
**law**
192:10, 200:15,
203:14, 203:15,
203:18, 203:21,
204:9, 207:3,
215:3, 215:12,
221:2, 224:5,
224:8, 225:2
**laws**
241:6
**lawyers**
241:19
**least**
237:22
**leave**
234:6
**leaving**
241:19
**lechner**
176:4, 179:8,
180:5, 187:10,
187:15, 209:7,
210:7, 211:22,
219:22, 220:4,
220:8, 220:19,
221:4, 221:11,
221:17, 221:20,
222:3, 222:5,
222:12, 222:16,
222:17, 228:16,
228:21, 233:16,
255:10, 255:19,
255:22, 256:5,
256:9, 258:21,
263:11, 269:14,
270:9, 271:2,
272:18, 273:7,
275:16
**legal**
193:13, 214:16,
240:19, 241:21,
256:8, 258:22,
274:14, 275:8
**legally**
207:11

Transcript of Arbitration - Day 2
Conducted on December 13, 2017

**less**
193:21, 243:18,
246:17, 247:10,
257:21, 266:16
**let**
181:1, 185:21,
199:8, 204:4,
230:13, 246:20,
255:10
**let's**
182:21, 192:6,
200:12, 220:6,
243:7, 249:22,
251:9, 256:4,
256:7, 258:20,
259:3, 259:19,
264:10
**letter**
241:14
**level**
202:11, 232:2,
232:4
**lewis**
176:7, 179:22
**lexis**
273:16
**liabilities**
184:4, 205:3,
205:5, 214:5,
214:6, 214:9,
214:11, 214:13,
242:2
**liability**
183:19, 184:7,
184:20, 185:3,
186:6, 187:5,
187:12, 189:2,
191:9, 195:22,
196:4, 196:5,
196:15, 196:17,
197:7, 198:9,
198:11, 198:14,
198:19, 198:21,
199:19, 203:6,
203:9, 203:13,
203:17, 207:2,
207:6, 207:12,
207:18, 208:5,

208:17, 208:18,
208:20, 209:19,
211:15, 212:1,
212:16, 212:22,
215:19, 216:3,
216:5, 216:7,
217:4, 217:18,
218:15, 221:22,
226:19, 226:20,
229:11, 229:14,
229:17, 229:20,
229:22, 230:1,
230:4, 230:5,
230:11, 230:16,
231:3, 232:8,
232:9, 236:3,
239:14, 239:18,
242:1, 242:13,
242:15, 243:13,
244:17, 245:12,
250:12, 252:2,
252:18, 253:2,
253:16, 253:20,
254:7, 254:10,
254:12, 254:16,
255:3, 255:8,
257:2, 257:9,
257:16, 258:15,
261:18, 261:19,
266:6, 269:3
**life**
204:7, 205:8,
227:21
**lift**
274:7
**light**
211:14, 260:18,
260:20, 260:21
**like**
180:2, 187:18,
207:21, 209:5,
220:22, 225:8,
227:20, 234:9,
249:15, 255:12,
260:19, 265:15,
265:20, 273:17,
274:5
**likelihood**
188:13

**limit**
223:17
**line**
185:9
**liquid**
265:13
**liquidity**
265:14
**list**
182:7, 183:2,
237:21, 239:10
**listed**
270:17
**lists**
227:9
**literature**
189:8, 192:2,
193:3, 193:5
**little**
201:1, 211:14,
212:3, 260:18,
260:19, 264:10,
264:11
**live**
240:11
**llc**
179:13
**llp**
174:4, 175:11,
176:7
**located**
247:15
**location**
240:10
**logic**
192:3, 199:6,
199:7, 201:14,
202:19
**long**
182:3, 183:21,
205:13, 213:7,
234:13
**longer**
205:10, 207:5
**look**
209:10, 212:10,
228:22, 244:5,
245:3, 245:5,

248:8, 256:13,
267:5, 267:8,
267:17, 269:1,
271:5, 272:4
**looked**
190:20, 220:13,
220:14, 268:7,
268:9
**looking**
181:11, 206:4,
217:8, 226:22,
245:18, 247:7,
252:12, 268:14
**losses**
268:11
**lost**
186:8
**lot**
184:13, 238:18,
258:11, 267:22
**low**
216:21, 260:10,
265:1, 265:9,
265:11
**lower**
203:9, 218:1,
218:8, 233:10,
233:14, 243:10,
243:12, 244:1,
262:1, 263:6
**lunch**
234:14
**lynn**
173:22, 174:12,
276:2, 276:19

**M**

**ma**
175:5
**made**
186:13, 251:22,
252:11, 255:17,
266:21, 270:5
**main**
207:8
**maintain**
236:5
**make**
180:18, 203:21,

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                     293

227:1, 229:9,
240:16, 255:19,
256:5, 259:5,
259:7, 259:9,
259:14, 266:18,
267:3, 269:8,
270:21, 271:21,
275:3
**makes**
202:7, 203:4
**making**
207:20, 208:4,
208:6, 229:6,
235:17, 244:16,
259:1
**mandated**
207:12
**mandating**
224:16
**many**
185:2, 185:4,
208:2, 226:20,
230:22, 268:13,
268:19
**march**
273:13
**margin**
205:5, 205:6
**mark**
175:3
**market**
204:1, 217:15,
219:4, 227:15,
227:18, 227:19,
261:17, 262:6,
262:13, 263:2,
263:4, 264:7,
265:6, 265:13,
266:6, 266:8,
266:12, 266:14
**marketing**
189:9
**marketplace**
264:21, 264:22,
265:4
**married**
212:17, 212:19
**mass**
201:15, 201:17,

201:18, 202:4,
227:21
**massachusetts**
174:5
**material**
178:7, 274:14,
275:9
**materials**
189:9, 193:9,
193:10, 193:12,
256:8
**mathematically**
254:17
**mathematics**
199:9
**matter**
190:6, 251:20,
253:10, 274:6
**mature**
218:2
**maturity**
261:20
**may**
191:6, 193:14,
194:10, 197:15,
197:18, 205:14,
210:20, 210:21,
216:21, 218:19,
219:1, 219:4,
227:7, 227:10,
227:11, 227:12,
228:6, 228:8,
232:20, 232:21,
233:6, 237:3,
271:18, 276:15
**maybe**
211:14, 234:9,
255:12
**mb**
228:11, 228:13,
228:14
**mean**
187:9, 192:8,
193:4, 194:18,
199:7, 203:3,
228:11, 234:1,
235:7, 259:20,
268:15

**means**
194:2, 195:15,
227:12, 258:8,
268:17
**measure**
217:15, 226:11,
226:21, 227:5,
227:11, 247:17,
261:17, 262:6,
262:14, 263:3,
263:4, 266:8
**measurement**
225:20, 228:9,
233:4
**measures**
204:1, 227:15
**meet**
187:2
**meeting**
188:22, 189:6,
190:8, 190:9,
190:16, 240:2,
240:3, 240:4
**meetings**
189:14, 189:15,
190:3, 190:5,
190:7, 190:12,
190:17, 190:22,
192:13, 239:21,
240:1, 240:5,
240:8
**member**
193:2
**mention**
216:6, 239:20
**mentioned**
189:14, 199:4,
214:16, 249:22
**mepra**
221:3
**mercer**
184:2, 239:3,
241:2
**merging**
186:21
**merit**
174:13
**method**
192:11, 224:7,

230:6, 231:4,
242:8, 242:18,
243:7, 243:9,
243:11
**methods**
245:13, 245:15
**metlife**
227:20
**might**
194:15, 195:11,
251:1, 251:4,
251:16, 251:19,
260:9, 265:16
**milliman**
218:21
**mind**
228:18, 234:5
**mine**
173:6, 176:2,
179:6, 180:1,
206:8
**mines**
213:19
**minimum**
226:6, 226:18
**mining**
173:3, 175:8,
234:20
**minute**
271:1
**minutes**
214:16, 228:10,
234:9, 271:5
**missing**
183:5
**mistake**
235:1
**misunderstood**
237:13
**money**
200:2, 207:21,
251:11
**month**
202:2, 203:3,
203:12, 233:3,
251:9, 253:11
**months**
202:5, 232:19,

Transcript of Arbitration - Day 2
Conducted on December 13, 2017

294

233:7, 250:22,
251:6, 253:11
**mooney**
176:12, 176:14,
270:10, 270:15,
270:20, 271:6,
271:15, 271:22,
272:6, 272:9,
272:19, 273:5,
273:19, 274:1,
274:21, 275:15
**more**
182:17, 197:2,
206:12, 263:13,
267:2, 267:22,
268:4
**morgan**
176:7, 179:22
**morning**
179:9, 180:4,
229:4
**mortality**
196:12, 205:22,
213:4, 213:8,
213:11, 213:16,
213:21, 214:3,
214:7, 214:12,
216:15, 216:17,
249:2, 260:8,
261:2, 261:3,
267:14, 267:19,
268:2, 268:4,
268:6
**most**
203:11, 204:11,
212:20, 213:13,
218:4, 261:22
**motion**
186:20, 270:5
**move**
187:11, 258:20,
259:3, 270:8,
271:11, 271:15,
272:11
**moved**
271:10
**moving**
271:20

**much**
196:7, 205:16,
206:10, 206:12,
269:17, 273:9,
275:14
**multi-employer**
183:18, 183:22,
184:4, 184:11,
184:18, 185:3,
185:13, 187:4,
187:12, 189:7,
190:19, 191:1,
192:16, 215:18,
215:20, 216:5,
221:4, 228:14,
241:9, 244:17
**multiple**
241:8
**murphy**
176:15
**must**
182:13, 189:19,
198:15, 198:21,
199:2, 223:16,
224:13, 245:12,
245:15, 245:22,
250:11, 251:7,
253:2, 253:6
**mutual**
227:21
**myself**
182:18, 231:5

**N**

**name**
179:10, 183:7,
183:13, 218:20
**namely**
215:13
**names**
187:2
**national**
219:10
**nature**
263:5, 266:9
**need**
198:11, 210:6,
219:11, 234:14,

258:4, 270:5
**needs**
229:16, 256:10
**neither**
276:8
**never**
188:17, 189:12,
191:16, 192:19,
193:11, 197:10,
209:9, 250:4,
250:14, 251:15
**new**
219:12, 219:14,
220:10, 221:2,
224:11, 224:12,
224:18, 227:21
**next**
250:22, 251:6,
251:8
**next-to-the-last**
181:2
**nil**
203:13
**nine**
237:20, 245:17
**nobody**
189:3
**none**
211:12
**nonforfeitable**
193:20, 194:1,
194:2, 194:14,
194:18, 195:6,
195:16, 196:2,
196:8, 210:18,
215:21, 245:4,
246:14, 246:17,
246:21, 246:22,
247:9, 247:12,
247:18, 247:21,
248:6, 248:7,
249:12, 249:13,
249:18, 249:20,
253:9, 253:17,
253:22, 257:21,
258:1, 258:7
**nor**
191:16, 276:9

**nos**
178:6, 178:7,
178:8, 178:11
**notarial**
276:13
**notary**
174:14, 276:20,
276:22
**note**
241:6
**nothing**
271:8
**notice**
182:1
**novel**
184:8
**november**
233:3, 239:7
**now**
192:16, 195:20,
199:13, 199:21,
201:1, 201:4,
208:5, 220:2,
232:10, 236:10,
236:20, 239:20,
241:22, 256:12,
256:15, 266:15
**number**
180:3, 184:1,
193:6, 193:7,
201:11, 204:5,
209:15, 209:22,
216:20, 217:7,
218:20, 219:2,
238:22, 239:1,
239:5, 239:6,
239:10, 239:21,
245:21, 276:22
**numbers**
182:13
**nw**
174:5, 176:8,
176:16

**O**

**oath**
235:13
**object**
210:3, 211:20,

Transcript of Arbitration - Day 2
Conducted on December 13, 2017

295

219:17, 255:10,
255:11
**objecting**
258:21
**objection**
187:13, 222:15,
258:22, 263:11
**obligation**
185:19, 186:1,
226:12, 227:1,
227:3, 228:2,
264:14
**obligations**
227:19, 228:1
**obliged**
186:5
**occupation**
179:14
**occurred**
201:16, 248:21,
249:3
**occurrence**
194:12
**occurs**
197:1
**october**
189:1, 236:7,
236:14, 236:15
**off**
185:21, 260:11,
273:10, 274:8,
274:9, 275:18
**officer**
276:2
**offices**
174:1
**offset**
260:12
**offsetting**
259:13, 260:3
**often**
204:18, 227:7
**oh**
182:5, 186:18,
272:5
**okay**
182:10, 182:15,
187:14, 192:6,

198:1, 198:12,
199:4, 208:19,
220:6, 222:4,
223:6, 223:9,
232:10, 234:15,
235:4, 238:17,
239:8, 244:11,
245:20, 247:7,
249:22, 256:20,
261:1, 261:4,
263:21, 266:1,
269:1, 269:8,
271:17, 272:12,
273:8, 275:13
**older**
218:5
**oldest**
183:6
**olga**
176:13
**omnibus**
271:22
**once**
271:20
**one**
180:6, 183:5,
183:6, 183:14,
184:12, 185:16,
185:17, 185:22,
186:1, 186:2,
186:18, 189:3,
189:5, 189:19,
191:7, 194:18,
204:6, 209:15,
213:10, 219:12,
224:4, 232:18,
232:21, 233:2,
233:4, 233:6,
239:5, 263:13
**one-third**
183:15
**ones**
216:22, 240:7,
240:9, 271:12
**ongoing**
180:18
**only**
188:19, 192:10,

216:2, 216:4,
223:20, 235:4,
268:18, 273:13
**onto**
212:13
**open**
227:18, 227:19,
264:21, 264:22
**operation**
194:12
**opined**
243:3
**opinion**
191:21, 199:4,
206:13, 208:10,
208:12, 210:3,
216:8, 217:2,
240:19, 240:20,
241:17, 241:21,
242:1, 259:6,
260:14
**opinions**
230:13, 273:18
**opposing**
186:22
**options**
189:3, 227:9
**order**
193:22, 196:11,
198:10, 198:20,
215:5, 257:17,
257:22
**ordinary**
260:8
**ossi**
175:9, 187:13,
210:2, 210:6,
211:20, 212:5,
219:17, 219:20,
220:3, 220:15,
221:16, 222:4,
222:8, 222:13,
228:18, 233:22,
234:8, 234:12,
234:18, 234:21,
244:9, 255:17,
255:21, 256:4,
256:7, 256:13,

256:21, 259:4,
263:16, 269:6,
269:11, 269:18,
269:21, 270:2,
270:13, 270:19,
271:8, 271:14,
272:5, 272:12,
272:20, 273:2,
273:20, 275:2,
275:7
**other**
181:21, 187:1,
191:12, 194:7,
200:16, 201:15,
204:19, 205:6,
214:1, 217:8,
217:18, 218:14,
219:2, 219:3,
219:4, 227:8,
233:7, 233:9,
233:12, 245:3,
245:5, 245:14,
259:13, 260:12,
262:16, 265:19,
267:20
**others**
190:3, 251:19
**otherwise**
195:5, 254:9,
276:11
**our**
226:5, 226:16,
226:17, 226:18,
271:15
**ours**
272:10
**out**
194:1, 200:1,
201:21, 202:1,
202:2, 202:3,
203:3, 203:12,
224:4, 225:15,
246:5, 246:15,
250:17, 259:18,
265:19, 271:14
**out-of-court**
220:15
**outcome**
276:11

Transcript of Arbitration - Day 2
Conducted on December 13, 2017

296

**outer**
262:10
**outline**
212:12
**outlined**
268:12
**outset**
271:18
**over**
186:9, 189:18,
189:19, 212:21,
241:2
**overruled**
225:1
**owe**
207:5
**own**
182:8, 184:9,
184:16, 224:17,
268:3

**P**

**package**
259:14, 259:18,
260:21
**page**
178:5, 180:16,
181:3, 181:4,
181:11, 193:16,
209:14, 212:17,
217:7, 225:11,
225:12, 228:22,
235:20, 244:8,
244:11, 245:17,
256:6, 256:13,
261:8, 261:21
**pages**
173:21, 182:3,
182:10, 182:19,
212:13, 231:19
**paid**
188:13, 197:11,
200:19, 200:21,
201:3, 203:20,
207:21, 208:22,
209:1, 213:7,
237:16, 249:21,
250:4, 250:9,

250:14, 250:22,
251:5, 251:13,
251:15, 251:16,
251:19, 251:20,
251:21
**pain**
181:6
**par**
195:12, 197:15
**paragraph**
180:16, 194:3,
217:7, 217:19,
217:20, 225:12,
229:1, 229:7,
235:21, 244:12,
261:10, 261:11,
261:18, 261:21,
264:6
**paragraphs**
197:19, 197:21
**pardon**
222:12
**part**
195:1, 204:6,
226:10, 245:21,
252:17, 256:1
**participant**
194:5
**participants**
180:21, 181:5,
213:12, 213:17,
213:20, 216:14,
218:4, 266:22
**participated**
183:3
**participating**
206:22
**particular**
180:19, 212:9,
223:11, 224:19,
260:1, 263:3,
274:1
**particularly**
264:3
**parties**
228:8, 273:1,
274:7, 276:9
**parts**
215:12, 215:13

**passed**
207:3, 215:3
**past**
189:1, 198:3,
210:22, 232:19,
233:14, 238:17,
248:22, 267:10
**paste**
225:13
**paul**
177:3
**pay**
186:5, 203:16,
203:20, 249:4,
249:15, 251:11,
264:15, 264:19
**paying**
199:22, 206:12
**payment**
254:1, 269:2
**payments**
196:16, 200:18,
207:2, 207:12,
207:20, 208:5,
208:6, 228:6,
264:15, 264:19
**pays**
200:5
**pbgc**
181:5, 194:17,
195:9, 197:14,
197:22, 198:2,
201:19, 201:21,
202:6, 215:22,
216:1, 216:7,
216:10, 216:13,
216:14, 217:3,
218:15, 218:22,
219:1, 219:3,
219:7, 219:8,
219:15, 221:14,
222:2, 222:3,
222:10, 230:8,
230:17, 232:11,
232:15, 232:20,
233:10, 233:12,
233:13, 242:5,
242:7, 267:1

**pc**
176:15
**pdf**
274:4
**pennsylvania**
176:8
**pension**
173:7, 176:3,
178:8, 179:6,
180:1, 180:21,
183:19, 184:1,
184:4, 187:12,
190:13, 192:16,
192:18, 192:21,
193:6, 207:9,
208:4, 213:13,
215:3, 216:5,
217:3, 218:6,
219:13, 220:11,
221:2, 221:4,
224:13, 227:2,
227:4, 227:19,
228:1, 228:3,
228:6, 241:9,
244:17, 274:16,
275:3, 275:9
**pensions**
192:14, 215:14
**penultimate**
180:17
**people**
218:20, 219:1,
223:21, 227:18,
260:11, 267:17,
267:18, 267:22
**percent**
184:15, 186:16,
203:2, 212:17,
214:6, 214:14,
217:16, 218:1,
221:21, 224:13,
224:14, 232:16,
259:12, 260:5,
260:7, 261:12,
261:13, 262:10,
262:11, 264:2
**percentage**
212:18

Transcript of Arbitration - Day 2
Conducted on December 13, 2017

297

**perhaps**
251:1
**period**
189:20, 194:9,
214:4
**periodically**
217:1
**person**
240:11
**person's**
208:7
**perspective**
228:7
**phone**
185:21
**physically**
240:10
**pick**
267:19
**picked**
217:11, 218:7,
218:9, 218:10
**picture**
187:18
**pitches**
267:11
**placed**
220:13
**plain**
199:16, 254:15
**plaintiff**
183:16
**plan's**
197:5, 206:19,
209:16, 218:9,
243:2, 247:19,
248:5, 255:6,
257:11, 257:15,
257:17, 258:13,
267:6, 267:8
**plans**
183:11, 183:19,
184:1, 184:2,
184:11, 184:18,
185:13, 185:14,
187:4, 212:20,
213:13, 215:17,
215:19, 215:20,

216:2, 216:5,
228:1, 238:12,
241:7, 241:12,
267:16
**play**
202:15
**please**
179:9, 206:17,
209:7, 252:9,
273:11, 273:18
**plus**
195:1, 207:1,
233:15, 240:22
**point**
205:10, 229:6,
229:9, 233:5,
245:2, 265:19
**populations**
216:14
**portfolio**
206:3
**portion**
238:13
**potentially**
266:22
**power-of-attorney**
215:11
**practice**
192:1, 192:7,
192:8, 192:18,
192:20, 215:11,
223:14, 223:20,
224:22, 239:4
**practitioners**
189:7
**predecessor**
213:16
**prefer**
233:18
**preference**
234:1, 234:2
**preliminary**
252:8
**premise**
199:10
**premised**
232:10
**premium**
265:14

**premiums**
205:21, 206:19
**prepare**
179:16
**prepared**
180:10, 180:13,
183:4
**preparing**
182:9, 185:7,
185:10
**present**
177:2, 187:19,
187:22, 196:12,
197:12, 197:13,
198:7, 200:9,
227:3, 228:5,
230:12, 230:14,
231:7, 231:19,
232:1, 232:5,
245:1, 253:19
**preset**
216:13
**president**
192:14
**presumptions**
231:19
**pretty**
201:22
**prevent**
186:20
**previous**
187:7, 241:14
**price**
264:17, 265:5
**prices**
227:8
**pricing**
216:11
**priest**
177:3
**principal**
227:20
**probability**
251:3
**probably**
184:10, 212:19,
251:19, 263:5
**problem**
199:5, 201:15

**proceeding**
186:19
**proceedings**
276:3, 276:5,
276:6
**produce**
216:18
**produced**
236:6, 236:8,
236:13, 236:14,
237:3, 237:4,
237:21
**produces**
193:8, 193:10
**producing**
268:7
**product**
205:8, 205:11
**professional**
190:1, 190:21
**professionals**
190:13
**proffered**
188:16, 199:5
**prohibited**
205:7
**prohibition**
220:21
**project**
196:10
**projected**
188:4, 196:6,
196:7, 208:11,
223:6, 249:16,
254:1
**projecting**
200:3
**projection**
196:16
**projections**
205:22
**projects**
184:5, 249:21
**promised**
206:11
**promulgate**
224:12
**promulgates**
224:10

Transcript of Arbitration - Day 2
Conducted on December 13, 2017

298

**promulgation**
225:3
**pronouncement**
224:8
**proof**
210:15
**proposals**
189:9, 189:10
**proposed**
191:11
**proposing**
192:12
**proves**
199:12
**provide**
216:13, 220:9,
228:3, 238:11,
273:18
**provided**
182:8, 182:14,
207:13, 216:19,
223:1, 225:21,
230:17, 262:21
**provider**
206:15
**providing**
238:2
**provisions**
214:17, 215:15,
241:12, 254:8,
271:22
**prudential**
204:14, 227:20
**public**
174:14, 206:1,
220:20, 220:21,
221:16, 221:17,
222:10, 222:14,
276:1, 276:20
**publication**
273:15
**publications**
193:6, 193:7,
239:11
**published**
239:16
**purpose**
225:20, 229:17

**purposes**
195:1, 195:6,
195:17, 197:6,
217:4, 218:15,
221:21, 221:22,
228:9, 242:1,
252:3, 252:13,
257:15, 258:14
**pursuant**
174:12, 195:3,
206:22, 207:20,
208:6
**put**
197:15, 198:2,
222:9, 224:4,
225:9, 253:8,
260:21, 270:7,
270:8, 270:13,
270:16
**putting**
195:9

**Q**

**qualification**
189:20
**qualifications**
181:8, 181:14
**qualified**
187:11, 241:18
**question**
198:5, 229:5,
237:11, 237:13,
245:9, 245:10,
247:5, 247:6,
247:7, 252:7,
252:9, 256:18,
263:20, 263:21
**questioning**
220:4
**questions**
180:4, 187:19,
212:10, 233:16,
263:18, 269:11
**quibble**
273:5
**quite**
213:1, 218:21,
252:9

**quote**
187:18, 206:7,
255:4, 257:10
**quotes**
216:13, 216:18,
216:21

**R**

**r-u-s-c-h-h-a-u**
274:19
**rabinowitz**
239:5
**radio**
267:12
**raise**
202:1, 202:3
**raising**
202:10
**range**
214:14, 217:9,
218:2, 218:8,
218:10, 218:11,
242:7, 259:21,
259:22, 260:2,
262:2, 262:3,
262:10, 262:20,
263:6, 263:9,
263:15, 264:2
**rapidly**
260:11
**rate**
188:4, 188:8,
188:12, 198:7,
198:16, 200:14,
200:20, 201:2,
201:8, 201:10,
201:13, 202:2,
202:11, 202:22,
203:10, 205:17,
206:10, 212:9,
216:16, 217:15,
217:22, 220:17,
221:21, 222:1,
222:2, 222:3,
222:10, 223:4,
224:17, 224:20,
225:18, 225:22,
227:6, 227:8,

230:9, 230:18,
232:16, 232:21,
233:10, 233:14,
239:13, 239:17,
242:3, 242:4,
242:5, 242:6,
242:10, 242:14,
243:14, 243:18,
244:1, 252:15,
259:8, 259:9,
259:13, 259:17,
260:5, 260:7,
260:10, 261:5,
261:7, 261:12,
261:22, 262:9,
262:12, 264:7,
264:18, 265:2,
265:9, 265:11,
265:16, 265:21,
266:2, 266:5,
266:12, 266:16,
266:17, 267:5
**rates**
189:2, 196:13,
202:6, 205:21,
206:3, 206:6,
216:7, 217:1,
217:4, 217:6,
217:8, 218:15,
218:22, 219:2,
219:3, 219:16,
221:15, 230:8,
230:17, 232:11,
232:15, 232:20,
232:21, 233:2,
233:3, 233:9,
233:12, 233:13,
242:7, 262:20
**rather**
181:10, 235:20,
271:7
**rating**
265:1
**read**
188:18, 189:8,
193:11, 196:1,
210:3, 210:6,
215:8, 219:19,

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                299

220:14, 222:22,
228:18, 244:20,
256:15, 256:16,
271:18
**reading**
190:2, 254:15,
257:13, 258:11
**reads**
180:17
**really**
254:3
**realtime**
174:14
**reason**
223:17, 224:4
**reasonable**
209:21, 213:3,
216:9, 217:2,
217:9, 217:12,
218:13, 227:10,
238:5, 238:7,
245:16, 246:6,
249:10, 250:21,
259:14, 259:22,
260:9, 260:15,
260:17, 260:22,
261:3, 261:5,
262:8, 263:9,
263:15, 267:6,
267:9
**reasonableness**
211:7, 236:3,
259:21
**reasonably**
249:15
**rec**
178:2
**recall**
186:12, 187:9,
191:4, 191:6,
225:5, 235:6,
235:8, 235:12,
235:15
**received**
214:20, 241:13
**receives**
207:1, 207:7
**recent**
220:13, 274:2

**recently**
268:4
**recess**
228:19, 234:16,
269:10, 274:10
**recognize**
180:8
**recognizing**
202:12, 228:8
**record**
179:10, 187:17,
209:8, 210:4,
270:7, 270:8,
271:2, 271:10,
273:10, 273:11,
274:8, 274:9,
274:11, 275:18,
276:5
**red**
178:2, 209:3
**redirect**
269:15
**reduced**
194:11, 195:2,
195:10, 195:11,
229:15, 230:4,
230:5, 248:9,
248:20, 250:10,
276:7
**reduces**
231:22
**reduction**
196:20, 253:6
**reductions**
196:20, 196:21,
250:6, 253:3
**refer**
193:14, 226:3,
261:7
**reference**
178:7, 253:13,
256:8, 274:14,
274:15, 275:9
**referenced**
228:11
**references**
253:15
**referred**
197:19, 258:4,

274:15
**referring**
226:4, 255:12,
255:13, 255:14,
255:18, 257:4,
261:9
**refers**
226:17
**reflect**
200:17, 200:20,
209:1, 210:19,
237:7, 248:1,
266:9, 268:6,
271:2
**reflected**
194:16, 197:11,
214:10, 249:9
**reflects**
213:14
**reform**
221:5
**reformat**
225:14
**regard**
249:11
**regarding**
190:18, 208:10,
208:12, 231:11,
241:7
**registered**
174:13
**registration**
276:22
**regular**
200:13, 273:15
**regulated**
204:9
**regulation**
194:20, 194:22,
195:9, 204:10,
224:6, 224:8,
224:10, 225:2
**regulations**
194:17, 197:14,
197:22, 198:2,
214:18
**regulators**
204:14, 204:15

**related**
213:19, 219:5,
276:9
**relation**
203:6
**relationship**
188:4, 188:8,
188:12, 193:13,
203:5, 232:15
**relatively**
218:3, 242:4,
265:17, 266:9
**relevance**
211:21, 212:3,
212:4, 226:19
**remain**
268:20
**remaining**
216:22, 266:18,
266:21, 269:4
**remember**
183:7
**repeat**
252:10
**replacing**
229:18
**reply**
273:13
**report**
179:16, 180:8,
180:10, 180:12,
180:15, 180:18,
181:3, 181:7,
182:2, 182:9,
183:4, 185:7,
185:19, 186:3,
186:7, 187:16,
188:18, 188:20,
191:13, 193:15,
193:17, 194:4,
197:20, 209:10,
209:11, 209:15,
215:16, 216:6,
217:6, 219:19,
219:20, 220:12,
220:13, 222:22,
223:1, 225:10,
225:11, 229:1,

Transcript of Arbitration - Day 2
Conducted on December 13, 2017

300

235:2, 235:5,
235:21, 236:6,
236:13, 236:16,
236:18, 237:3,
237:4, 237:5,
237:7, 237:9,
237:17, 237:21,
240:15, 241:22,
255:14, 256:2,
261:6, 261:7,
262:4, 264:1,
266:15, 268:7,
268:12
**reported**
173:22, 192:17,
214:13, 226:8
**reporter**
174:13, 174:14,
272:14, 272:21,
273:8
**reporter-notary**
276:1
**reports**
185:10, 189:8,
204:21, 231:1,
231:2, 239:4,
268:10
**represent**
183:10, 264:14
**represented**
183:11, 183:13,
185:18, 186:18
**representing**
184:2
**represents**
242:5
**requested**
274:3
**require**
201:10, 266:17
**required**
206:21, 210:15,
215:5, 224:7,
224:20, 226:6
**requirement**
189:16, 245:14,
246:5
**requirements**
189:18, 194:7,

205:2, 215:5
**requires**
200:15, 210:19,
224:6, 244:14,
250:15
**requiring**
267:4
**reserve**
205:6
**reserves**
204:16
**resolution**
272:2
**respect**
202:19, 230:20
**respects**
226:20
**rest**
212:22, 244:21
**restored**
250:15, 250:17,
250:18, 251:2,
251:4
**result**
199:18, 200:6,
202:18, 202:21,
211:15, 218:7,
230:3, 230:6,
231:6, 232:7,
260:9
**resulting**
231:22
**results**
204:16, 224:15
**resume**
239:11
**retired**
218:4
**retirees**
207:22, 218:5
**retirement**
176:22, 194:8,
219:10, 249:1
**retype**
225:13
**revenue**
215:7, 215:12,
215:13, 241:11

**review**
204:19, 211:2,
211:7, 234:10,
236:1, 236:17,
236:19, 236:21,
237:3, 237:6
**reviewed**
180:12, 204:15,
220:12, 230:22,
231:14, 235:16,
237:1, 239:3
**right**
179:4, 202:3,
218:9, 222:11,
225:15, 228:20,
233:9, 235:2,
236:22, 237:14,
237:17, 238:6,
239:22, 242:6,
243:7, 244:10,
245:10, 249:12,
252:6, 254:5,
254:22, 255:7,
255:9, 258:9,
261:11, 264:6,
264:8, 264:12,
264:20, 265:2,
265:6, 265:17,
265:21, 266:3,
272:7, 275:7
**right-hand**
256:14
**risk**
269:4
**risk-free**
266:9, 266:14
**riskiness**
266:10
**riskless**
242:3, 242:4,
242:5, 242:7,
242:9, 266:16
**rmr**
173:22
**role**
215:6, 272:13
**rule**
224:8

**ruled**
259:2
**rules**
195:12, 201:18,
204:20, 207:6,
273:2, 273:4
**ruschau**
178:10, 274:19,
275:11

**S**

**safe**
265:17
**said**
200:15, 202:13,
222:19, 226:16,
232:10, 243:9,
250:2, 252:11,
252:17, 252:22,
260:16, 261:6,
261:16, 263:1,
275:3, 276:6
**saindon**
176:14
**sales**
267:11
**same**
195:12, 256:5,
272:10
**samuel**
226:8
**sat**
192:22
**satisfied**
194:5
**savitz**
219:1
**saw**
237:4
**say**
183:14, 184:15,
193:3, 198:17,
199:15, 200:12,
202:14, 223:7,
224:18, 227:11,
228:5, 238:13,
251:9, 252:21,
253:9, 255:1,

Transcript of Arbitration - Day 2
Conducted on December 13, 2017

301

255:2, 255:7,
257:8, 258:12,
259:20, 261:11,
261:15, 262:13,
263:18, 265:5,
266:5
**saying**
199:1, 207:3,
211:22, 229:13,
252:1, 254:6,
256:6, 261:1,
262:19, 262:21,
263:8, 263:14,
264:1, 266:16
**says**
196:2, 196:14,
196:19, 197:9,
198:8, 198:15,
201:20, 202:16,
203:14, 203:18,
208:22, 221:1,
236:16, 246:13,
247:9, 248:10,
254:19, 255:1,
255:3, 257:1,
257:10, 257:14,
258:17, 258:18,
267:8
**sb**
226:8, 228:11,
228:13
**schedule**
186:17, 226:8,
228:11, 228:13,
228:15
**scott**
177:4
**screen**
186:19, 186:20
**seal**
276:13
**second**
185:22, 243:8,
244:5, 255:11,
256:9, 270:20,
272:6
**secondly**
205:15

**section**
194:19, 194:21,
195:3, 195:4,
195:18, 197:7,
215:22, 225:5,
244:4, 246:13,
253:12, 255:5,
255:18, 256:22,
257:7, 257:13,
258:10, 258:12,
258:16
**sections**
241:10, 245:3,
245:5, 245:21,
274:7
**see**
182:21, 225:8,
254:21
**seeing**
191:4
**seems**
255:12
**seen**
189:10, 191:16,
193:11, 270:9,
270:10
**segal**
229:6, 229:8,
230:6, 230:9,
230:17, 230:20,
230:22, 231:1,
231:2, 231:4,
231:12, 231:17,
242:8, 242:14,
242:17, 242:19,
243:7, 243:11,
275:6
**seized**
205:9, 205:14
**select**
243:1, 246:1
**selected**
209:15, 242:21,
243:1, 243:5,
266:5
**selecting**
225:18, 225:21
**selection**
253:5

**selections**
242:22
**self-employed**
237:14, 238:10
**sell**
205:11, 206:18,
227:19
**seller**
204:2, 227:17
**selling**
204:5, 205:7,
205:13, 205:18,
206:1, 207:10,
265:3
**send**
273:22
**senior**
189:6, 239:2
**sense**
202:8, 203:4
**sentence**
180:17, 181:2,
257:7
**separate**
270:3
**separated**
241:14
**september**
225:17
**serve**
185:4
**served**
184:21, 187:3,
242:12
**service**
215:12
**services**
179:13, 238:11
**serving**
238:8
**session**
188:21, 189:1
**sessions**
190:18, 191:1,
191:5
**set**
193:14, 207:6,
216:9, 216:15,

264:18, 265:5,
276:12
**sets**
231:21, 245:14,
246:5
**setting**
206:5, 245:11
**settle**
226:12, 228:2
**settlement**
226:10, 226:21,
227:5, 227:9
**settling**
227:1, 228:1
**seven**
185:14
**several**
182:10, 232:14
**shall**
197:4, 255:4,
255:5, 255:7,
257:8, 257:10,
257:14, 258:13
**shape**
250:20
**share**
195:7
**shared**
180:20
**short**
228:16, 250:18
**short-term**
218:3
**shortfall**
180:19, 180:20,
266:18, 266:20
**shorthand**
276:1
**should**
223:7, 225:19,
242:2, 252:5,
254:5, 266:6,
266:8, 266:12,
271:2
**show**
180:5, 211:6,
213:17
**shows**
221:7, 221:20

Transcript of Arbitration - Day 2
Conducted on December 13, 2017

302

shut
185:21
shuttling
271:7
sicker
203:8
side
207:15, 233:21
signature-o5gbl
276:16
signed
239:4
significant
223:12
silence
185:22
simple
263:19
simplicity
199:15
since
180:12, 183:5,
184:9, 184:16,
185:6, 191:9
single
215:20
single-employer
215:17, 228:13
sir
269:6
sits
214:22
situation
180:20, 229:10,
229:15, 230:10
situations
202:22
six
193:17, 244:8,
251:6
skip
199:16
sky
202:4
skyrocketed
233:2
slightly
211:15, 212:21,

265:16
society
189:22, 190:12,
193:7
sole
189:1, 191:2
solvency
205:6
some
183:7, 184:5,
190:2, 193:9,
193:10, 201:4,
205:10, 207:5,
214:2, 218:22,
219:4, 225:20,
238:2, 238:18,
239:9, 240:5,
247:3, 251:16,
251:18, 267:9,
270:3, 270:7,
271:9
somehow
213:9
someone
214:20
something
201:22, 214:14,
216:4, 218:7,
218:11, 219:8,
252:8, 255:14,
255:15
sometime
239:6
sometimes
190:11
sorry
182:2, 185:21,
214:5, 228:12,
230:13, 241:9
sort
272:11
sound
238:6
sounds
238:4, 238:7,
273:7
sources
207:8

specific
241:11, 267:6,
267:13, 267:14
specifically
196:19, 268:8
speeches
182:18, 239:10,
239:13
spencer
176:5
split
272:22
sponsor
195:3
sponsored
224:9
spring
190:8
st
199:19, 199:22,
251:9
stan
218:18
standard
214:9, 214:12,
260:8, 267:20,
268:5
standards
189:20, 223:11,
223:13, 223:14,
223:20, 224:22,
245:11
stands
236:12
stanley
176:4
start
192:6, 193:17,
199:9, 225:12
started
183:22, 234:12
starting
201:9, 203:1,
217:6, 245:2
starts
195:21, 209:14
state
179:9, 204:14,

204:17, 205:10,
219:13, 219:14,
220:11, 224:11,
224:12, 224:16,
224:18, 224:19,
235:21, 236:7,
265:12
state's
224:17
statement
180:17, 220:16,
224:1, 236:22,
259:16
states
192:10, 192:11,
204:9, 204:11,
204:19, 223:16,
223:18, 223:21,
223:22, 233:1
status
196:22, 197:4,
219:15, 221:2,
221:9
statute
199:20, 208:6,
208:21, 224:5,
225:2, 241:10,
244:6, 244:14,
245:10, 250:14,
252:12, 254:14,
254:20, 255:1,
255:4, 255:15,
255:18, 256:3,
258:17, 258:18,
258:19
statutes
192:4
statutory
207:2, 214:17,
254:18
stay
233:18
stenographically
276:6
steve
176:5, 239:5
still
203:20, 208:1,

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                303

209:1, 220:15,
236:4, 250:11,
251:12, 265:17,
266:11
**stop**
207:3
**stover**
178:9, 274:18,
275:10
**stream**
196:6, 197:13,
218:3, 254:2,
264:15, 264:19,
266:10
**street**
175:4, 176:16
**strike**
209:7, 209:8
**studies**
189:8, 213:14,
268:2
**subcommittee**
192:16
**subject**
189:1, 190:6,
215:4
**submission**
194:8
**subpart**
227:14, 227:15
**subsection**
196:21, 197:1
**subsequent**
183:8, 241:7
**subsequently**
194:10, 194:15,
248:9, 248:20
**such**
201:10, 202:11,
218:2, 232:17,
248:17, 266:2
**suffer**
181:6
**suite**
175:13, 176:17
**summarize**
222:21
**summarized**
222:22

**summary**
181:7, 181:12,
209:11, 209:14
**surcharge**
186:16
**sure**
191:7, 193:16,
209:14, 210:10,
240:16, 252:11,
256:5, 259:5,
259:7, 265:15,
267:3, 269:8,
270:1, 270:21,
273:19, 275:3
**survey**
212:19
**surveys**
216:10
**suspended**
194:11, 248:10,
248:20
**suspension**
197:3, 221:6,
253:7
**suspensions**
196:22, 250:6,
253:3

**T**

**table**
214:12, 216:15,
216:17, 260:8,
261:2, 261:3,
267:20, 268:4
**tables**
214:9, 268:5
**take**
197:21, 199:8,
199:16, 228:16,
234:17, 241:20,
247:9, 248:5,
248:7, 248:13,
248:15, 249:17,
250:3, 250:8,
269:6, 272:4
**taken**
228:19, 234:16,
269:10, 274:10,

276:3, 276:6
**taking**
209:20, 241:17,
247:18, 252:5,
252:13, 268:5,
271:5
**talk**
243:7, 244:4,
247:20, 248:18,
249:6, 250:1,
259:19, 264:7,
264:10
**talking**
198:18, 241:1,
250:5
**talks**
226:11, 227:16,
245:22, 246:9,
248:19, 248:21
**task**
192:13
**tax**
265:12
**taxes**
265:20
**teamsters**
219:13, 219:14,
220:11
**technically**
186:3
**tell**
234:3, 247:17
**telling**
249:14, 263:8,
273:4
**ten**
234:9, 251:2
**tend**
190:4, 218:5
**term**
246:15, 250:18,
258:18
**terms**
183:11, 185:11,
207:18, 244:15,
246:20, 252:12
**test**
199:11, 212:4,

212:6, 217:10,
242:21
**testified**
179:3, 187:7,
187:9, 228:10,
229:4, 229:12,
230:2, 235:15,
236:12, 260:13,
262:7, 264:11
**testify**
221:8
**testifying**
220:2
**testimony**
185:7, 185:8,
185:11, 185:12,
187:8, 187:20,
188:1, 188:3,
188:7, 188:11,
188:20, 203:22,
210:12, 219:9,
223:10, 225:4,
225:6, 229:3,
233:11, 235:9,
235:12, 236:12,
237:5, 237:17,
250:2, 251:22,
257:5, 259:6
**th**
201:17, 205:1,
209:17, 217:14,
225:17, 276:13
**thall**
176:13
**than**
181:10, 191:12,
194:7, 197:2,
213:13, 213:22,
218:5, 233:7,
233:9, 233:12,
233:14, 266:16,
267:20, 267:22,
268:6, 271:7
**thank**
187:14, 193:16,
222:15, 233:17,
234:18, 256:20,
269:9, 269:16,

Transcript of Arbitration - Day 2
Conducted on December 13, 2017

304

269:17, 269:18,
272:8, 273:8,
275:13, 275:15,
275:16
**thanks**
259:2
**that's**
183:14, 183:16,
190:14, 199:20,
212:3, 215:21,
222:14, 225:14,
225:15, 228:2,
234:8, 234:11,
234:15, 236:22,
237:10, 245:8,
245:17, 247:5,
249:12, 250:8,
254:3, 254:13,
254:15, 256:6,
258:16, 258:17,
259:16, 263:9,
263:17, 266:11,
267:13, 267:21,
269:8, 269:9,
271:17, 273:4
**their**
205:2, 205:5,
216:22, 268:3
**them**
184:6, 187:2,
193:11, 202:17,
203:20, 208:2,
210:18, 211:7,
211:10, 211:12,
215:8, 224:1,
227:21, 239:4,
240:11, 247:20,
247:21, 248:3,
250:11, 251:7,
251:17, 251:18,
260:17, 260:19,
267:17, 268:6,
271:5, 271:14,
273:18
**then**
182:5, 182:12,
182:22, 185:10,
194:17, 195:20,

216:22, 224:13,
225:13, 229:7,
237:13, 247:6,
248:4, 248:10,
249:8, 253:8,
261:20, 262:22,
263:3, 267:13,
270:6
**theory**
189:13, 191:10,
191:21, 199:5,
199:10, 199:12,
199:14, 200:17,
201:5, 201:20,
202:18, 202:21,
203:8, 208:10,
229:10, 229:21
**there**
180:3, 181:1,
182:1, 183:4,
183:8, 186:10,
186:11, 187:5,
189:15, 193:5,
196:19, 201:17,
211:13, 211:18,
218:20, 218:22,
219:2, 223:9,
224:4, 224:15,
225:4, 227:18,
229:3, 232:18,
232:22, 233:2,
233:6, 234:6,
236:7, 236:9,
239:2, 246:13,
247:21, 248:12,
251:4, 257:8,
259:20, 265:19,
266:1, 272:21,
275:7
**there's**
180:6, 182:5,
182:15, 182:22,
200:2, 218:18,
219:11, 220:21,
237:22, 249:10,
251:10, 252:1,
252:8, 254:22,
259:20, 259:22,

263:14, 265:13,
267:15
**thereafter**
276:7
**therefore**
212:15, 236:1,
236:17, 237:7,
253:4
**these**
183:8, 183:10,
187:3, 199:3,
202:9, 202:12,
211:22, 213:2,
214:10, 215:15,
229:18, 236:1,
250:20, 263:17,
270:21
**they**
194:16, 204:20,
204:21, 205:7,
205:9, 205:22,
206:1, 207:12,
210:11, 213:17,
216:20, 216:21,
217:1, 218:5,
219:3, 221:5,
221:21, 221:22,
222:9, 223:15,
224:3, 228:2,
229:19, 233:5,
235:18, 236:8,
243:3, 243:5,
249:21, 250:17,
250:21, 251:2,
251:4, 251:5,
251:16, 260:11,
260:19, 264:14,
265:3, 268:1,
268:3
**they'll**
251:14
**they're**
202:16, 205:10,
211:6, 264:12,
265:3
**they've**
184:19, 200:2,
213:18, 250:10,

267:22, 268:2,
268:5
**thing**
235:4, 260:22,
272:10
**things**
248:21, 249:2,
271:7, 273:17
**think**
191:22, 218:18,
219:11, 220:5,
222:7, 222:8,
234:13, 244:13,
260:5, 260:20,
261:10, 263:16,
269:7, 269:21,
270:2, 270:13,
270:22, 272:14,
275:1, 275:3
**this**
179:17, 180:4,
180:19, 181:3,
182:2, 182:9,
185:15, 185:21,
188:22, 189:3,
189:6, 189:12,
192:10, 192:11,
192:19, 193:12,
194:1, 194:7,
194:12, 194:21,
195:1, 195:17,
197:7, 198:6,
199:16, 200:4,
205:12, 205:15,
206:4, 207:8,
208:4, 213:8,
213:11, 213:14,
213:17, 217:10,
217:11, 217:21,
220:22, 221:8,
223:12, 229:4,
232:10, 233:20,
236:6, 238:18,
241:13, 243:21,
244:14, 245:2,
245:14, 246:20,
249:15, 253:12,
255:22, 256:12,

Transcript of Arbitration - Day 2
Conducted on December 13, 2017

305

256:15, 258:10,
258:16, 258:22,
261:15, 262:20,
262:22, 263:3,
263:4, 264:5,
264:6, 264:17,
266:16, 268:2,
268:9, 268:11,
269:12, 276:10,
276:13
**those**
181:10, 183:21,
184:14, 184:22,
185:2, 185:15,
187:6, 190:17,
191:5, 195:13,
195:14, 196:10,
196:12, 197:14,
198:5, 200:8,
200:18, 200:20,
203:17, 207:8,
209:1, 209:12,
210:20, 210:21,
211:17, 214:7,
214:18, 215:17,
223:21, 231:2,
231:14, 231:16,
231:19, 233:12,
236:21, 237:1,
240:5, 243:15,
249:19, 250:13,
250:15, 251:12,
251:20, 253:19,
254:4, 255:3,
257:8, 258:11,
270:8, 270:9,
270:16, 271:1,
271:10, 271:11
**though**
234:9, 240:12,
249:20, 251:18
**thought**
255:17, 271:9
**thousand**
259:12
**three**
181:11, 207:8,
225:18, 232:18,

232:19
**through**
178:6, 178:7,
178:8, 178:11,
181:10, 187:16,
192:17, 209:12,
216:3, 244:22,
270:21, 271:1,
274:13, 274:15,
274:17, 274:20,
275:4, 275:8,
275:9, 275:10,
275:12
**throughout**
189:7
**throws**
259:18
**tied**
207:13
**time**
200:4, 236:10,
241:8, 263:13,
269:12
**times**
188:19, 268:3
**timing**
237:6
**title**
194:13, 197:8,
215:22, 258:16
**today**
236:7, 268:20
**too**
260:10, 271:9,
271:16
**took**
186:9, 204:6
**top**
231:18, 261:21
**topic**
191:2
**towards**
262:1
**towers**
175:12
**trace**
241:4
**transactions**
227:22

**transcript**
178:9, 178:10,
235:8, 272:14,
272:22, 276:4
**transcripts**
270:7, 270:15,
272:17, 274:18,
275:10
**traveled**
240:10
**treasuries**
219:4
**treasury**
215:1, 221:5,
222:6, 265:8
**tremendous**
232:22
**trial**
185:12
**tried**
229:9
**true**
259:16, 276:5
**trust**
173:8, 176:3,
179:7, 241:14
**turn**
180:2, 256:7
**turnover**
249:2
**turns**
246:15
**two**
186:15, 195:12,
202:5, 209:14,
209:22, 231:7,
231:19, 231:20,
232:18, 232:19,
233:6, 238:22,
239:6, 253:11,
255:13, 274:18,
275:6
**two-minute**
269:7
**two-thirds**
183:16
**type**
189:12, 236:11

**typewriting**
276:7
**typical**
213:8, 213:10,
213:13, 218:5
**tysons**
175:14

**U**

**umwa**
176:22
**unambiguous**
254:20
**under**
193:20, 193:21,
194:6, 195:17,
195:18, 196:20,
197:1, 197:7,
201:4, 201:18,
203:8, 204:9,
207:4, 210:15,
221:2, 221:13,
229:9, 229:21,
230:9, 230:16,
231:20, 235:13,
246:14, 246:17,
247:10, 250:10,
256:22, 257:21,
258:2, 258:7,
258:16, 276:7
**underground**
213:18
**understand**
199:18, 220:18,
247:6, 259:5,
266:15, 268:15
**understanding**
243:9
**understate**
212:1, 212:22
**understates**
212:18
**understating**
211:14
**understood**
263:7
**undertake**
262:20

Transcript of Arbitration - Day 2
Conducted on December 13, 2017

306

**undertaken**
262:17
**unfunded**
193:18, 195:8,
195:15, 197:5,
198:20, 198:22,
199:2, 200:9,
209:17, 229:20,
229:22, 230:12,
230:13, 230:14,
232:1, 232:5,
243:15, 244:2,
244:19, 245:1,
245:7, 246:1,
246:10, 246:16,
247:8, 252:2,
252:19, 252:22,
253:1, 253:21,
254:4, 255:6,
257:11, 257:15,
257:17, 257:19,
258:3, 258:9,
258:14
**united**
173:6, 176:2,
179:6, 179:22,
192:9, 192:10,
206:8, 223:16,
223:17, 223:18,
223:21, 233:1
**unless**
197:1, 224:9,
273:3
**unpublished**
273:18
**unquote**
206:8
**unreasonable**
209:19, 210:14,
211:6, 211:11,
211:13, 211:16,
217:13, 217:17,
218:12, 227:13,
235:18, 242:18,
242:20, 243:2,
243:5, 259:9,
259:10, 259:17,
260:6, 260:19,

261:2, 261:13,
261:16, 262:4,
262:5, 262:12,
262:15, 263:2
**until**
188:18, 239:6,
256:11
**update**
217:1
**use**
182:9, 200:13,
201:19, 201:21,
217:3, 217:22,
218:14, 218:22,
219:3, 221:21,
221:22, 224:6,
224:13, 224:16,
224:19, 227:7,
242:14, 244:15,
245:11, 247:3,
248:2, 253:13,
261:12, 262:6,
268:3
**used**
182:8, 196:9,
196:11, 209:16,
209:18, 213:9,
214:12, 226:6,
244:1, 253:2,
262:11
**uses**
192:11, 219:15,
221:14, 224:14,
258:18, 273:3
**using**
219:1, 219:7,
220:17, 220:21,
243:11, 246:9,
266:17
**usually**
204:22
**uvbs**
198:18, 232:3

**V**

**va**
175:14
**valerie**
187:1

**valid**
206:13
**value**
193:19, 193:20,
193:21, 195:16,
195:18, 196:12,
197:12, 197:13,
198:7, 200:8,
200:9, 201:8,
202:13, 205:2,
216:7, 227:3,
228:5, 230:12,
230:14, 231:21,
232:1, 232:5,
243:14, 245:1,
246:14, 246:16,
246:18, 247:9,
247:10, 247:20,
248:2, 253:19,
253:22, 254:4,
257:20, 257:22,
258:1, 258:7
**valued**
210:18, 242:2
**values**
231:20
**valuing**
209:16
**vanilla**
214:12
**variance**
268:11
**various**
268:3
**venable**
174:4, 175:11
**version**
225:16, 274:2
**very**
183:5, 201:1,
204:18, 205:3,
205:14, 213:6,
213:11, 216:9,
218:12, 225:9,
227:6, 227:22,
239:2, 243:8,
265:9, 265:11,
265:13, 269:17,

273:8, 275:14
**vested**
193:18, 193:19,
195:8, 195:15,
197:5, 197:12,
198:20, 198:22,
199:2, 200:10,
209:17, 227:3,
230:12, 230:15,
231:20, 232:1,
232:5, 243:15,
244:2, 244:19,
245:1, 245:7,
246:1, 246:16,
247:8, 252:3,
252:19, 252:22,
253:1, 253:21,
254:4, 255:6,
257:11, 257:15,
257:18, 257:19,
258:3, 258:9,
258:14
**vice**
192:14, 193:1
**victoria**
173:22, 174:12,
276:2, 276:19
**view**
261:22
**views**
262:8
**village**
224:19
**virginia**
276:21
**virtual**
251:5
**virtually**
201:8, 203:13,
218:3, 259:15
**voice**
234:7
**vote**
186:20

**W**

**wait**
256:11, 256:18

Transcript of Arbitration - Day 2
Conducted on December 13, 2017

**waiting**
194:9
**walk**
271:1
**want**
212:10, 220:18,
221:6, 222:6,
233:20, 240:16,
242:9, 244:4,
244:5, 248:18,
249:6, 256:3,
259:5, 259:7,
267:3, 269:8,
271:11, 272:15,
275:2
**wanted**
202:9
**war**
241:16
**was**
180:10, 184:2,
184:8, 186:10,
186:13, 186:20,
186:21, 187:21,
188:16, 189:2,
189:6, 191:2,
192:14, 192:19,
192:22, 201:17,
204:14, 205:17,
207:19, 208:4,
211:18, 212:8,
217:2, 217:5,
219:7, 219:8,
220:22, 222:9,
222:13, 222:14,
222:19, 223:1,
223:3, 223:9,
225:4, 228:13,
228:17, 228:19,
229:18, 231:10,
231:13, 232:22,
233:2, 234:16,
235:4, 235:12,
236:6, 236:9,
236:13, 236:14,
237:5, 237:11,
239:2, 239:5,
240:7, 240:13,

240:18, 241:12,
242:18, 242:20,
242:22, 245:19,
252:17, 252:21,
253:10, 255:18,
260:20, 261:2,
261:3, 261:5,
263:1, 269:10,
273:10, 274:9,
274:10
**washington**
173:12, 174:6,
176:9, 176:18,
190:8, 190:15,
190:16, 272:1
**way**
202:6, 250:17,
272:11
**we'd**
201:12
**we'll**
270:22, 271:20,
272:6
**we're**
244:13, 251:9,
254:3, 254:6,
256:5, 259:7,
261:8, 262:5,
267:3, 271:4,
271:7, 272:1,
273:5, 274:4
**we've**
211:21, 212:20,
219:22, 255:12,
270:4
**webinar**
240:6
**webinars**
190:5, 240:8,
240:12
**wednesday**
173:13
**weigh**
246:21
**weight**
243:12, 243:14,
243:18
**welch**
176:15

**welfare**
207:22
**well**
185:10, 190:15,
196:9, 196:11,
200:12, 200:22,
205:14, 206:5,
210:21, 211:22,
212:9, 220:19,
222:4, 225:10,
236:16, 240:3,
245:8, 245:19,
246:15, 254:8,
254:18, 256:10,
259:19, 271:15,
272:15
**went**
221:5
**were**
179:19, 182:8,
182:14, 186:11,
186:12, 187:5,
187:19, 187:22,
201:3, 201:6,
202:5, 203:12,
205:12, 205:15,
206:4, 209:18,
209:19, 210:11,
210:14, 211:12,
211:13, 213:1,
213:3, 214:1,
224:18, 231:7,
231:8, 232:18,
233:4, 233:5,
235:9, 235:18,
238:21, 240:7,
240:9, 241:2,
242:22, 243:1,
243:5, 245:18,
250:4, 250:5,
257:4, 260:19,
262:13, 265:3,
270:17, 275:12,
276:3, 276:6
**west**
173:3, 175:8,
206:7, 207:14,
207:15, 207:19,

209:19, 211:5,
234:20, 235:22
**west's**
269:2
**westlaw**
273:15, 273:16
**what**
179:14, 182:6,
182:15, 183:1,
191:21, 192:8,
193:4, 194:1,
198:18, 199:6,
202:18, 203:5,
203:14, 203:22,
206:2, 207:15,
208:21, 210:8,
211:13, 218:11,
218:17, 220:9,
220:14, 220:17,
220:18, 221:7,
226:4, 226:11,
226:12, 226:19,
227:9, 229:6,
232:2, 232:7,
233:22, 236:6,
236:14, 240:22,
242:22, 244:15,
245:5, 248:2,
249:3, 249:10,
249:13, 254:3,
254:4, 254:9,
255:11, 255:21,
258:16, 258:17,
259:7, 261:8,
262:7, 262:9,
262:10, 263:1,
263:8, 263:14,
265:16, 268:15,
274:21
**what's**
211:21, 220:3,
230:19, 232:14
**whatever**
234:3, 274:5
**whatever-it-is**
244:22
**when**
190:10, 193:3,

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                    308

198:17, 204:14,
228:10, 231:7,
232:22, 237:4,
237:6, 243:17,
244:16, 245:11,
246:22, 247:7,
248:5, 249:17,
250:1, 250:4,
251:4, 252:14,
254:20, 255:1,
260:21
**where**
185:8, 185:14,
185:18, 186:2,
186:18, 189:1,
191:2, 203:12,
204:17, 212:14,
217:7, 219:2,
219:7, 222:14,
225:1, 231:1,
232:19, 240:9,
242:13, 243:21,
247:15, 256:12
**whereof**
276:12
**whether**
186:4, 186:8,
186:16, 189:4,
194:10, 210:11,
212:8, 218:10,
237:11, 240:18,
241:18, 248:9,
253:10, 269:2
**which**
183:6, 184:8,
186:15, 186:19,
187:3, 187:17,
190:2, 192:16,
194:5, 194:21,
195:16, 197:10,
207:2, 207:22,
213:17, 213:22,
214:22, 216:1,
221:12, 226:7,
233:9, 241:12,
245:11, 245:20,
247:22, 248:1,
248:19, 253:1,

253:21, 257:19,
258:3, 258:8,
273:2
**while**
184:2, 196:22,
243:3, 260:10
**white**
180:6
**who**
214:20, 215:10,
227:18, 239:3,
241:2, 266:22
**who's**
215:2
**whole**
187:1, 229:17,
257:13, 259:18,
260:22
**whom**
179:12, 179:19,
183:10, 183:11,
276:3
**why**
205:19, 206:17,
216:8, 217:20,
224:3, 252:3,
263:17
**widely**
192:1
**wider**
260:2
**will**
180:3, 190:11,
195:13, 195:14,
197:10, 200:1,
200:7, 200:19,
200:21, 204:19,
208:6, 212:15,
213:7, 213:12,
213:21, 221:8,
234:14, 249:4,
249:21, 250:4,
250:9, 250:14,
250:21, 251:21,
253:11, 265:2,
273:12
**william**
178:10, 274:19,

275:11
**williams**
175:10
**willing**
227:16
**wilson**
173:22, 174:13,
276:2, 276:19
**with**
183:18, 183:22,
184:4, 184:10,
184:18, 185:14,
185:17, 186:21,
188:15, 188:17,
190:11, 190:14,
192:4, 192:6,
193:17, 197:15,
199:5, 199:10,
199:13, 200:9,
202:15, 202:19,
204:7, 204:22,
208:1, 212:19,
212:20, 215:7,
215:14, 215:18,
216:2, 216:4,
216:17, 225:16,
227:22, 230:19,
230:21, 232:17,
238:18, 241:12,
243:8, 244:21,
246:3, 248:4,
249:1, 249:11,
253:8, 255:15,
259:1, 260:7,
262:16, 267:1,
267:21, 272:10,
273:6
**withdraw**
203:15, 207:5
**withdrawal**
183:19, 184:7,
184:13, 184:19,
185:3, 186:6,
186:10, 186:11,
187:5, 187:12,
189:2, 191:9,
195:22, 196:4,
196:5, 196:15,

196:17, 197:1,
197:7, 198:9,
198:10, 198:14,
198:19, 198:21,
199:18, 201:16,
201:17, 201:18,
202:5, 203:6,
203:9, 203:13,
207:2, 207:12,
207:18, 208:5,
208:17, 208:18,
208:20, 209:18,
212:16, 212:22,
215:19, 216:3,
216:4, 216:7,
217:4, 218:15,
221:22, 226:18,
226:20, 229:11,
229:14, 229:17,
229:22, 230:4,
230:5, 230:11,
230:15, 231:3,
232:7, 232:8,
232:9, 236:3,
239:14, 239:18,
242:1, 242:13,
242:15, 243:13,
244:17, 245:12,
250:11, 252:2,
252:18, 253:2,
253:15, 253:20,
254:6, 254:10,
254:12, 254:16,
255:2, 255:8,
257:2, 257:9,
257:16, 258:15,
266:6, 269:3
**withdrawing**
209:22, 226:22
**withdrew**
207:19
**within**
186:4, 210:22
**without**
224:14, 254:16
**witness**
178:2, 180:5,
183:2, 222:16,

Transcript of Arbitration - Day 2
Conducted on December 13, 2017

309

233:20, 234:3,
238:15, 256:10,
256:15, 256:18,
259:1, 269:12,
274:17, 276:12
**won't**
208:22, 251:5,
251:18, 251:19
**word**
274:4
**words**
205:6, 245:14,
258:12
**work**
199:12, 223:15,
223:18
**worked**
183:21, 184:1,
184:16, 208:2,
213:18, 238:1,
240:21
**workers**
173:6, 176:2,
179:6, 180:1,
206:8, 213:22,
214:2
**working**
183:22, 186:2,
223:21, 241:2
**works**
231:12
**would**
180:2, 180:18,
180:20, 181:6,
183:6, 183:14,
188:13, 190:6,
195:5, 200:22,
201:1, 201:2,
201:4, 201:7,
201:9, 201:18,
201:20, 202:22,
203:3, 203:13,
205:13, 205:16,
206:2, 206:9,
206:11, 211:14,
212:15, 212:21,
214:13, 215:19,
216:18, 217:10,

217:16, 217:22,
218:7, 218:10,
224:20, 226:5,
226:7, 227:6,
229:14, 229:19,
230:1, 230:4,
230:5, 232:8,
232:9, 233:18,
233:22, 234:8,
240:22, 242:20,
242:21, 243:1,
243:3, 243:4,
248:4, 248:16,
259:14, 260:4,
260:18, 261:13,
261:16, 262:1,
262:11, 262:12,
262:14, 262:16,
262:21, 263:1,
263:2, 263:5,
263:9, 263:18,
263:19, 266:17,
266:20, 266:22,
267:1, 267:14,
268:17, 270:8,
271:15, 273:3,
273:21
**wouldn't**
202:14, 248:15
**wrapped**
269:7
**written**
239:11
**wrong**
199:13, 228:15,
235:5

| X |
| --- |

**x**
173:2, 173:9

| Y |
| --- |

**yeah**
272:5
**year**
190:2, 193:9,
193:11, 196:8,
199:17, 199:20,

205:1, 214:4,
251:10
**yearend**
204:16
**years**
186:13, 190:17,
191:8, 191:14,
192:22, 193:1,
193:2, 197:2,
200:22, 201:2,
201:3, 201:21,
202:1, 208:3,
211:1, 212:21,
214:2, 219:7,
230:22, 232:14,
232:19, 233:15,
238:1, 239:1,
239:9, 239:12,
239:17, 241:3,
251:2, 251:17
**yellow**
271:12
**yes**
179:18, 180:9,
180:11, 180:14,
180:16, 181:9,
181:13, 181:15,
181:18, 181:20,
181:22, 182:4,
182:11, 182:21,
183:20, 185:1,
187:21, 188:2,
188:6, 188:10,
188:14, 189:17,
190:20, 210:7,
211:4, 211:9,
214:19, 217:5,
218:16, 219:14,
221:17, 221:19,
223:13, 225:7,
228:17, 229:2,
231:10, 231:13,
231:15, 234:8,
235:3, 235:11,
235:14, 235:19,
237:15, 237:18,
238:20, 242:4,
242:16, 243:16,

243:20, 244:11,
246:4, 246:8,
246:12, 246:19,
247:14, 256:19,
257:3, 257:6,
263:16, 263:19,
264:9, 264:13,
264:16, 264:21,
265:4, 265:7,
265:18, 265:22,
266:4, 270:10,
270:19, 272:16,
272:18, 272:19,
272:20, 275:1
**yesterday**
187:20, 188:21,
210:12, 219:10,
223:9, 225:4,
229:3, 229:12,
230:2, 231:7,
271:13
**yet**
184:12, 194:16,
251:6
**york**
219:12, 219:14,
220:10, 224:11,
224:12, 224:18,
227:21
**you'd**
225:8, 233:7,
259:20, 274:5
**you'll**
200:14
**you're**
198:18, 202:5,
202:12, 204:13,
220:4, 222:10,
237:14, 237:16,
240:17, 241:17,
243:8, 243:11,
246:3, 247:7,
249:14, 257:13,
258:11, 258:22,
259:1, 261:1,
261:11, 262:19,
262:21, 263:7,
263:8, 264:1,

Transcript of Arbitration - Day 2
Conducted on December 13, 2017

310

264:6, 266:11,
266:15, 273:17,
275:7
**you've**
187:3, 199:13,
202:1, 202:2,
203:15, 208:9,
222:8, 222:15,
237:22, 238:17,
238:18, 242:12,
260:13
**younger**
213:13, 213:18
**your**
179:9, 179:14,
180:2, 181:3,
181:7, 181:14,
181:16, 182:2,
187:16, 191:8,
191:15, 191:21,
193:15, 197:19,
199:4, 202:15,
202:22, 206:13,
208:9, 209:10,
209:11, 210:9,
215:16, 216:6,
216:8, 217:2,
220:10, 225:10,
229:1, 230:19,
233:11, 234:22,
235:1, 235:5,
235:20, 235:21,
236:16, 236:18,
237:13, 237:16,
237:21, 238:9,
238:14, 239:11,
240:15, 241:20,
241:22, 250:1,
251:22, 252:8,
257:4, 259:6,
260:13, 261:6,
261:7, 262:4,
264:1, 266:15,
268:7, 271:21
**yourself**
226:13

**Z**

**zero**
260:5, 260:7

**0**

**00**
173:5
**0001**
173:5
**0010**
176:19
**01**
173:5
**02446**
175:5

**1**

**10**
186:15, 197:2,
201:3, 202:1,
203:2, 211:1,
224:13, 224:14
**100**
203:2
**1111**
176:8
**12**
191:1, 250:22,
275:18
**13**
173:13, 184:10,
214:14, 217:7
**1381**
197:7, 197:8,
258:16
**14**
184:11, 261:21
**15**
178:6, 180:16,
181:3, 232:19,
274:13, 275:8
**16**
190:20
**1600**
175:15
**17**
173:5, 182:19,
190:20
**170176**
173:20
**173**
173:21

**179**
178:3
**18**
193:2, 225:11,
225:12
**19**
225:11, 225:12,
276:13
**1920**
176:16
**1938**
260:7
**1942**
204:9
**1950**
180:1
**1970**
240:22
**1974**
173:7, 179:6,
180:1, 240:15,
269:14
**1979**
184:1, 239:6
**1980**
183:6, 240:22,
241:7, 241:8,
241:10
**1982**
239:7
**1990**
233:8

**2**

**2-1**
217:16, 218:1,
261:12, 263:1,
264:2
**2.7**
218:10
**2.71**
218:8
**2.78**
218:8
**2.8**
218:10
**20**
178:11, 203:2,

**214:2, 214:3,**
233:15, 274:21,
275:1, 275:12
**2000**
233:7
**20001**
174:6
**20004**
176:9
**20036**
176:18
**2008**
232:18, 232:22
**2012**
185:6
**2014**
225:17
**2015**
190:20, 209:17,
217:15
**2016**
190:10, 238:1,
238:4
**2017**
173:13, 238:1,
238:4, 276:14
**2019**
276:15
**202**
174:7, 176:10,
176:19
**21**
212:13
**22**
197:19, 197:21,
212:13, 244:12
**22182**
175:14
**23**
194:3, 197:19,
197:21, 212:17
**234**
178:3
**24**
175:4, 197:21
**25**
197:21, 228:22
**2578**
173:5

Transcript of Arbitration - Day 2
Conducted on December 13, 2017                    311

**26**
178:7, 194:13,
274:15, 275:9
**269770**
276:22
**27**
223:11, 225:5,
225:15
**275**
178:6, 178:7,
178:8, 178:9,
178:10, 178:11
**276**
173:21
**28**
182:3, 205:1
**29**
201:17
**2nd**
273:12, 273:13

**3**

**3-year**
189:19
**3.9**
225:5
**30**
189:22, 200:22,
201:2, 201:21,
203:2, 209:17,
214:2, 214:4,
217:14, 225:17
**300**
175:13, 267:18,
267:22
**305**
195:3, 195:20,
195:21, 198:8,
215:16, 216:2,
248:10, 248:18,
248:20, 249:22,
250:1, 250:6,
250:10, 252:3,
252:12, 253:12,
255:5, 255:18,
256:1, 256:22,
257:7, 258:4
**31**
199:19, 199:22,

251:9, 276:15
**3278**
175:6
**34**
256:14
**344**
174:7
**35**
235:20, 235:21,
239:9
**36**
189:19
**37**
191:8, 191:14
**39**
217:7

**4**

**4-1**
217:16, 218:1,
261:13, 262:10,
263:1, 264:2
**4-3**
262:10, 262:13,
262:14
**40**
182:2, 184:15,
217:19, 261:8,
261:10, 261:11,
261:21
**400**
176:17
**4000**
174:7
**4001**
194:3, 194:19,
214:17, 215:16,
215:19, 247:16,
247:17, 248:19
**4001.2**
194:21
**404**
240:16, 240:18,
241:7, 241:12,
241:18
**41**
217:20, 261:18,
261:21

**42**
244:22
**4200**
215:18, 244:21
**4201**
197:8, 216:3,
244:21
**4213**
193:18, 214:17,
244:4, 244:11,
244:19, 245:10,
245:17, 245:18,
245:19, 245:20,
246:5, 246:9,
257:18
**4220**
216:4
**4221**
210:16
**4231**
215:16
**432**
195:4
**44**
180:16, 181:4,
181:5, 275:18

**5**

**5-1**
214:6
**50**
203:2
**5079**
176:10
**5500**
226:9
**56**
225:12
**59**
173:14

**6**

**600**
174:5
**617**
175:6
**63**
186:22

**7**

**7-1**
232:16
**703**
175:15
**734**
175:6
**739**
176:10
**74**
217:3, 235:17,
238:18, 238:22,
263:10, 264:3,
267:21, 268:8,
275:3
**760**
175:15
**783**
176:19

**8**

**8.5**
221:21
**8010**
175:12
**81**
229:1, 229:7

**9**

**9**
173:14

## IN THE MATTER OF ARBITRATION

| | |
|---|---|
| ENERGY WEST MINING CORPORATION | AAA Case No. 01-17-0001-2758 |
| and | |
| UNITED MINE WORKERS OF AMERICA HEALTH AND RETIREMENT FUNDS | |

## JOINT STIPULATIONS OF FACT

**A.      The Issues.**

1.      Whether the actuarial assumptions used by the UMWA 1974 Pension Plan to calculate Energy West's withdrawal liability were unreasonable in the aggregate for a withdrawal that occurred between July 1, 2015 and June 30, 2016.

2.      Whether the UMWA 1974 Pension Plan is exempt from the 20-year cap on withdrawal liability installment payments set forth in Section 4219(c)(1)(B) of ERISA.


**B.      The UMWA 1974 Pension Plan.**

1.      The United Mine Workers of America 1974 Pension Plan ("UMWA 1974 Plan, "1974 Plan," or "Plan") is a multiemployer pension plan as defined in Section 4001(a)(3) of ERISA.

2.      The UMWA 1974 Plan was created in collective bargaining between the United Mine Workers of America ("UMWA") and the Bituminous Coal Operators' Association, Inc. ("BCOA").

3.      The UMWA and BCOA created the 1974 Plan in negotiations for the National Bituminous Coal Wage Agreement ("NBCWA") of 1974,  and the 1974 Plan has been continued in each NBCWA negotiated since that time, including the most recent NBCWAs of 2011 and 2016.

4.      The general purpose of the 1974 Plan is to provide pension benefits to retired coal miners, disabled coal miners, and surviving spouses who satisfy the eligibility requirements of the Plan.

5.    As of the actuarial valuation report of the 1974 Plan for the plan year commencing July 1, 2015, the Plan had 104,258 participants and provided pension benefits to 89,737 individuals.

6.    As reported in the actuarial valuation report of the 1974 Plan for the plan year commencing July 1, 2015, the Plan was certified as being in "critical and declining" status under the Pension Protection Act of 2006 and the Multiemployer Pension Reform Act of 2014.

7.    According to Schedule MB of the Plan's 5500 report to the Department of Labor for the plan year beginning July 1, 2015, the Plan is projected to become insolvent during its 2022 plan year.

8.    The actuarial valuation report of the 1974 Plan for the plan year commencing July 1, 2015, prepared by the Plan's enrolled actuaries from United Actuarial Services, Inc., states the following for withdrawal liability purposes: the Plan's vested benefits were $9.6 billion, the market value of the Plan's assets was $3.8 billion, and the Plan's unfunded vested benefits were $5.8 billion prior to adjustment for estimated withdrawal liability collections.

9.    The Plan has adopted a modified version of what is often referred to as the "rolling five method" for determining the withdrawal liability of contributing employers, as described in ERISA § 4211(c)(3).

10.    The Plan's current enrolled actuary is William Ruschau of United Actuarial Services. He has been the Plan's enrolled actuary since Plan Year 2014.

11.    Immediately prior to Plan Year 2014, enrolled actuaries at Mercer, Inc. served as the Plan's enrolled actuary.

12.    Dale Stover is the Director of Finance and General Services at the UMWA Health and Retirement Funds. He has worked for the Funds since 1980.

13. The United Mine Workers of America Health and Retirement Funds is the collective reference to the UMWA 1974 Pension Plan and Trust, the UMWA Cash Deferred Savings Plan of 1988, the UMWA Combined Benefit Fund, the UMWA 1992 Benefit Plan, the UMWA 1993 Benefit Plan, and the UMWA Prefunded Benefit Plan.  Each is an employee benefit plan and a multiemployer plan as defined by Section 3(3), (37)(A) of the Employee Retirement Income Security Act of 1974, *as amended* ("ERISA"), 29 U.S.C. § 1002(3), (37)(A). These employee benefit plans are collectively administered.

**C.      Energy West Mining Company.**

1.      Energy West Mining Company, formerly Utah Power and Light, and its related entities, ("Energy West") have been signatory to NBCWAs or me-too agreements requiring contributions to the 1974 Plan since 1977.

2.      At all times relevant to this case, Energy West operated coal mines in the state of Utah.

3.      Energy West currently has approximately 551 retired coal miners, disabled miners, and surviving spouses receiving pensions from the 1974 Plan.

4.      For the five-year period from July 1, 2010 through June 20, 2015, classified employees of Energy West worked 2.1 million hours on which contributions were made to the 1974 Plan.

5.      At all times relevant to this case, Energy West was a wholly owned subsidiary of PacifiCorp, which in turn was a wholly owned subsidiary of PPW Holdings LLC.  PPW Holdings LLC was a wholly owned subsidiary of Berkshire Hathaway Energy Co.

6.      Energy West ceased mining coal in 2015 and withdrew from the 1974 Plan during the plan year beginning July 1, 2015 and ending June 30, 2016.

**D. Assessment of Withdrawal Liability.**

1.      On August 29, 2016, the 1974 Plan issued an "Employer Withdrawal Liability Notice and Demand, and Request for Information" (the "Assessment" or "Demand Letter") to Energy West.

2.      In the Demand Letter, signed by Director of Finance and General Services Dale Stover, the 1974 Plan calculated that Energy West owed the Plan $115,119,099.34 in withdrawal liability.

3.      In the Demand Letter, the 1974 Plan calculated that Energy West was required to make annual payments of its withdrawal liability to the Plan, in monthly installments of $247,251.12, and that the monthly payment schedule would continue indefinitely.

4.      On October 3, 2016, Energy West timely filed a request for review of the Plan's withdrawal liability assessment.

5.      On January 26, 2017, the 1974 Plan timely responded to and denied Energy West's request for review.

6.      On February 28, 2017, Energy West filed a timely notice of intent to arbitrate.  In its notice of intent, Energy West contended that "the Plan did not use reasonable actuarial assumptions, particularly the interest rate assumption, to calculate the withdrawal liability;" and "the Plan is not entitled to an exemption to the 20-year cap on total installment payments as provided under ERISA §4211(d) because it is neither a plan nor a continuation of a plan described in IRC §404(c)."

7.      On March 21, 2017, the American Arbitration Association appointed Mark L. Irvings as the arbitrator to decide this withdrawal liability dispute.

JA 000423



# Transcript of William Ruschau

**Date:** November 30, 2017

**Case:** Energy West Mining Company -v- UMWA 1974 Pension Plan

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING | INTERPRETATION | TRIAL SERVICES

Transcript of William Ruschau
Conducted on November 30, 2017

**Page 1**

1    AMERICAN ARBITRATION ASSOCIATION

2

3    ------------------------------x

4                                 )

5    ENERGY WEST MINING CORPORATION )

6                                 )

7         and          ) Case No.:

8                      ) 01:17-0001-2578

9    UNITED MINE WORKERS OF AMERICA )

10   1974 PENSION PLAN AND TRUST   )

11                                 )

12   ------------------------------x

13

14        Deposition of WILLIAM RUSCHAU

15             Washington, DC

16        Thursday, November 30, 2017

17              1:05 p.m.

18

19

20   Job No.: 165497

21   Pages: 1 - 87

22   Reported by: Donna Marie Lewis, RPR, CSR

**Page 2**

1    AMERICAN ARBITRATION ASSOCIATION

2

3    ------------------------------x

4                                 )

5    ENERGY WEST MINING CORPORATION )

6                                 )

7         and          ) Case No.:

8                      ) 01:17-0001-2578

9    UNITED MINE WORKERS OF AMERICA )

10   1974 PENSION PLAN AND TRUST   )

11                                 )

12   ------------------------------x

13

14

15        Deposition of William Ruschau, held at

16   Venable, LLP, 600 Massachusetts Avenue, NW,

17   Washington D C 20001 pursuant to Notice, before

18   Donna Marie Lewis, Registered Professional

19   Reporter and Notary Public of and for the District

20   of Columbia.

21

22

**Page 3**

1         A P P E A R A N C E S

2    ON BEHALF OF ENERGY WEST MINING CORPORATION:

3        VENABLE, LLP

4        BY:  GREGORY J. OSSI, ESQUIRE

5        8010 Towers Crescent Drive

6        Suite 300

7        Tysons Corner, Virginia 22182

8        Telephone: (703) 760-1957

9        Facsimile: (703) 821-8949

10       Email: gossi@venable.com

11

12       VENABLE, LLP

13       BY:  CHRISTOPHER R. WILLIAMS, ESQUIRE

14       8010 Towers Crescent Drive

15       Suite 300

16       Tysons Corner, Virginia 22182

17       Telephone: (703) 905-1414

18       Facsimile: (703) 821-8949

19       Email: crwilliams@venable.com

20

21

22

**Page 4**

1    APPEARANCES: (Continued)

2    ON BEHALF OF UMWA 1974 PENSION PLAN:

3        MORGAN, LEWIS & BOCKUS, LLP

4        BY:  STANLEY F. LECHNER, ESQUIRE

5        1111 Pennsylvania Avenue, N.W.

6        Washington, D C 20004

7        Telephone: (202) 739-5079

8        Facsimile: (202) 739-3001

9        Email: slechner@morganlewis.com

10

11       MORGAN, LEWIS & BOCKUS, LLP

12       BY:  CHARLES P. GROPPE, ESQUIRE

13       1111 Pennsylvania Avenue, NW

14       Washington, D C 20004-2541

15       Email: charles.groppe@morganlewis.com

16

17

18

19

20

21

22

5

```
1   APPEARANCES: (Continued)
2   ON BEHALF OF UMWA 1974 PENSION PLAN:
3        MOONEY, GREEN, SAINDON, MURPHY & WELCH, P.C.
4        BY: PAUL A. GREEN, ESQUIRE
5        1920 L Street, N.W.
6        Suite 400
7        Washington, D C 20036
8        Telephone: (202) 783-0010
9        Facsimile: (202) 783-6088
10       Email: pgreen@@mooneygreen.com
11
12
13       MOONEY, GREEN, SAINDON, MURPHY & WELCH, P.C.
14       BY: JOHN R. MOONEY, ESQUIRE
15       1920 L Street, N.W.
16       Suite 400
17       Washington, D C 20036
18       Telephone: (202) 783-0010
19       Facsimile: (202) 783-6088
20       Email: jmooney@mooneygreen.com
21
22
```

6

```
1              I N D E X
2   WITNESS:
3        William Ruschau
4   EXAMINATION BY:                        PAGE
5        Mr. Ossi                           7
6
7              E X H I B I T S
    RUSCHAU
8   EXHIBITS:        DESCRIPTION          PAGE
9   No. 1   Initial Analysis of Interest
10          Assumption for UMWA1974 Pension Plan   49
11  No. 2   Actuarial Valuation Assumptions for
12          UMWA 1974 Plan                  56
13  No. 3   Letter stating Withdrawal Liability
14          Assumptions                     59
15  No. 4   717th Meeting of the Board of
16          Trustees United Mine Workers of America 69
17
18
19
20
21
22
```

7

1        P-R-O-C-E-E-D-I-N-G-S
2   Whereupon,
3        W I L L I A M   R U S C H A U
4   after having been first duly sworn by the Notary
5   Public was examined and testified as follows:
6        EXAMINATION ON BEHALF OF ENERGY
7              WEST MINING COMPANY
8   BY MR. OSSI:
9        Q    Good afternoon, Mr. Ruschau.  My name is
10  Greg Ossi.  I'm an attorney with Venable.  I'm
11  representing Energy West?
12       A    Okay.
13       Q    I'm going to ask you a few questions at
14  your deposition today.  And the first question I'm
15  going to start with will maybe be the easiest.  If
16  you can state your full name for the record,
17  please?
18       A    William Ruschau.
19       Q    And Mr. Ruschau, where do you live?
20       A    Columbus, Ohio.
21       Q    And have you ever been deposed before?
22       A    Yes.

8

1        Q    About how many times?
2        A    Twice.
3        Q    Twice.  When was the last time you were
4   deposed?
5        A    Last time was a year ago.
6        Q    And do you recall for what matter you
7   were being deposed?
8        A    That was a withdrawal liability.
9        Q    Did that case involve the '74 Plan?
10       A    Yes.
11       Q    Was that case involving Peabody Energy?
12       A    Yes.
13       Q    Prior to that, you mentioned that you
14  may have been deposed one other time.  Is that
15  correct?
16       A    Yes.
17       Q    About how long ago was that?
18       A    That was probably the early 2000s.
19       Q    I won't ask you about that one.
20       A    Okay.
21       Q    Well as you may recall in those prior
22  depositions the attorneys set some ground rules.

**9**

1 And this one will be no different. Because we
2 have a reporter here and she is taking down what
3 we say, we would like to have your responses
4 verbally. She can't take down head nods or
5 raising your head or anything like that. At any
6 point in time if you'd like to take a break just
7 ask for one. You know, we are pretty easy here.
8     And I'm going to ask you questions.
9 Your counsel may object. And so I would like you
10 to -- after your counsel objects I would like you
11 to answer the question unless your counsel
12 instructs you not to do so. I remind you you are
13 under oath and ask you are you under the influence
14 of any medications, drugs, alcohol or anything
15 that could make it difficult for you to understand
16 or answer accurately and completely?
17     A   No.
18     Q   Are you sick today?
19     A   No.
20     Q   Is there any reason why you wouldn't be
21 able to testify truthfully today?
22     A   No.

**10**

1     Q   So I am going to just start off with
2 asking you some questions about today's
3 deposition. When did you learn that you were
4 going to be deposed today in this case?
5     A   It would have been probably October.
6     Q   And did you prepare for this deposition?
7     A   Yes.
8     Q   How did you prepare for this deposition?
9     A   I read through the actuary -- the expert
10 testimony reports of Mr. Hittner and Mr. Kra. I
11 also reviewed the demand letter and I reviewed
12 certain sections of ERISA.
13     Q   Do you recall what sections of ERISA you
14 reviewed?
15     A   4211, 4001, 4219, that's basically it I
16 think.
17     Q   There will not any quiz on these.
18     A   Okay.
19     Q   Did you meet with anyone in preparation
20 for this deposition?
21     A   Yes.
22     Q   And who did you meet with?

**11**

1     A   The other gentlemen at the table here.
2     Q   Okay. And did you speak to any non
3 attorneys about your deposition?
4     A   No.
5     Q   And did you bring anything with you
6 today?
7     A   Nope.
8     Q   Okay. I would like to ask a few
9 questions about your professional background?
10     A   Okay.
11     Q   What is your current occupation?
12     A   I'm an actuary.
13     Q   And are you employed as an actuary?
14     A   I'm employed by United Actuarial
15 Services.
16     Q   And how long have you been at United
17 Actuary Services?
18     A   I think it is about five years.
19     Q   And where were you before -- can we
20 refer to United Actuarial Services as United for
21 short?
22     A   Yes, or UAS.

**12**

1     Q   Before you worked for UAS where did you
2 work?
3     A   Mercer.
4     Q   And were you an actuary at Mercer?
5     A   Yes.
6     Q   Okay. And how long did you work for
7 Mercer?
8     A   Twenty-seven years.
9     Q   And did you have a job before working at
10 Mercer?
11     A   Yes.
12     Q   Where did you work before Mercer?
13     A   CNA Insurance.
14     Q   How long did you work for CNA Insurance?
15     A   Eleven years.
16     Q   And at CNA Insurance were you an
17 actuary?
18     A   Yes.
19     Q   Were you an enrolled actuary?
20     A   Yes.
21     Q   I'm not going to ask you about any more
22 jobs. Today are you currently an enrolled

Transcript of William Ruschau
Conducted on November 30, 2017

---

13

1 actuary?
2 **A  Yes.**
3    Q    Can you describe for me what it means to
4 be an enrolled actuary?
5 **A  I'm not sure I'm following.  What do you**
6 **mean what does it mean?**
7    Q    Are there actuaries who are not enrolled
8 actuaries?
9 **A  Yes.**
10    Q    So what does it mean to be an enrolled
11 actuary versus an actuary who is not enrolled?
12 **A  It means you are qualified to work with**
13 **pension plans, qualified by the Internal Revenue**
14 **Service to work with pension plans and design**
15 **forms for the plan.**
16    Q    Okay.  Are there any special
17 requirements to work with a multi employer plan as
18 opposed a single employer pension plan for
19 purposes of being an enrolled actuary?
20 **A  For purposes of being enrolled, no.**
21    Q    Does the IRS have any special
22 requirements for actuary to perform work on a

---

14

1 multi employer pension plan as opposed to a single
2 employer pension plan?
3 **A  No.**
4    Q    In your career have you ever given any
5 speeches regarding withdrawal liability?
6 **A  No.**
7    Q    Have you ever published any articles
8 regarding withdrawal liability?
9 **A  No.**
10    Q    Have you ever written any books about
11 withdrawal liability?
12 **A  No.**
13    Q    Have you ever served as an expert
14 witness in a multiemployer arbitration case?
15 **A  No.**
16    Q    Have you ever served as an expert
17 witness in any other arbitration case or any other
18 case?
19 **A  No.**
20    Q    Okay.  When you were at CNA Insurance
21 did you work with multiemployer plans?
22 **A  No.**

---

15

1    Q    Okay.  When you began your work with
2 Mercer did you work with multiemployer plans?
3 **A  When I began, no.**
4    Q    When did you start, when was the first
5 time you started working with multiemployer
6 pension plans?
7 **A  1989, I believe.**
8    Q    How did you get started working with
9 multiemployer pension plans, if you can remember?
10 **A  It was responding to a request for a**
11 **proposal from a plan.**
12    Q    Do you recall what plan it was?
13 **A  Yes.  It was the Plumbers and**
14 **Pipefitters Local 189.**
15    Q    And did you serve as the enrolled
16 actuary for that plan?
17 **A  Yes.**
18    Q    Do you still serve as enrolled actuary
19 for that plan?
20 **A  No.**
21    Q    Is that plan still in existent?
22 **A  Yes.**

---

16

1    Q    As far as --
2 **A  Yes.**
3    Q    So, I'm going to go back to UAS for a
4 second here and ask you, at UAS other than the
5 1974 pension have you worked with other
6 multiemployer pension plans?
7 **A  Yes.**
8    Q    Can you tell me the one -- the
9 multiemployer pension plans that you can recall
10 that you have worked on while at UAS?
11 **A  I worked on the West Virginia Carpenters**
12 **and the Kansas City Pipefitters.**
13    Q    Any others?
14 **A  That's all.**
15    Q    And you do work on the 1974 Plan?
16 **A  Yes.**
17    Q    And when I say 1974 Plan, you understand
18 I'm referring to the UMWA 1974 Pension Plan?
19 **A  Yes.**
20    Q    Prior to UAS you said you were at
21 Mercer.  Correct?
22 **A  Yes.**

---

Transcript of William Ruschau
Conducted on November 30, 2017

17

1    Q    And at Mercer you functioned as an
2  enrolled actuary for some portion of your career
3  there?
4    A    Yes.
5    Q    Did you work on multiemployer plans at
6  Mercer?
7    A    Yes.
8    Q    You mentioned that you worked on the
9  Plumbers and Pipefitters Local 189.  Is that
10 correct?
11   A    Yes.
12   Q    What other multiemployer plans -- did
13 you work on other multiemployer plans besides that
14 plan?
15   A    Yes.
16   Q    For those that you can recall, can you
17 tell me the names of the other plans you worked
18 on?
19   A    I worked with the Ohio laborers.  I also
20 worked with the Kansas City Pipefitters while I
21 was at Mercer.  I worked with the National
22 Asbestos Workers.  And I'm sure there were a few

18

1  more that I don't recall.
2    Q    Okay.  How many -- I want to talk about
3  Mercer for a second.  Prior to you leaving Mercer
4  about how many enrolled actuaries did they have
5  that worked on multiemployer pension plans?
6    A    At Mercer?
7    Q    Yes, at Mercer?
8    A    I don't know.
9    Q    Okay.  How about at UAS?
10   A    At UAS I believe the answer is 6.
11   Q    Do you know about how many multiemployer
12 plans use UAS as their actuary?
13   A    Yes.  We have about 75 plans.
14   Q    And have you ever done work or do you
15 have knowledge of any of those 75 plans other than
16 the ones which you've described to me that you
17 work on directly?
18   A    No.
19   Q    What about -- let's talk a little about
20 single employer defined pension plans.  At UAS
21 have you ever worked on single employer defined
22 pension plans?

19

1    A    No.
2    Q    While at Mercer have you ever worked at
3  single employer defined pension plans?
4    A    Yes.
5    Q    And for your work done for single
6  employer defined pension plans did you analyze and
7  select assumptions used by those plans in
8  determining the funding?
9    A    Yes.
10   Q    What are the factors that would go into
11 funding for a single employer pension plan?
12   A    Now or in the past?
13   Q    Well, let's talk about now.
14   A    Okay.  The interest or discount rate is
15 set using a corporate bond yield curve specified
16 by the IRS.  There are very minor variation that
17 can be made on it but not a lot.
18   Q    Okay.
19   A    The mortality table is also specified by
20 the IRS.  And all of the other assumptions are the
21 actuary's best estimate.
22   Q    Okay.  What other assumptions would you

20

1  use in determining funding status for a single
2  employer plan?
3    A    Retirement rate; turn over rate;
4  disability rate; salary increase if applicable;
5  percentage of married; form of distribution;
6  spouse age differences.
7    Q    Are these some of the same assumptions
8  and factors that you would look at for determining
9  funding status of a multiemployer plan?
10   A    Some of them are, yes.
11   Q    Are some of them the same that you would
12 use for looking at the unfunded vested benefits
13 for purposes of withdrawal liability in a
14 multiemployer plan?
15   A    A few of them are, yes.
16   Q    We are going to talk about a few of
17 them?
18   A    Okay.
19   Q    So what -- have you, for multiemployer
20 pension plans have you selected actuarial
21 assumptions to use when computer withdrawal
22 liability?

21

1    A    Yes.
2    Q    And is there a statute that sets out a
3 standard that actuaries must follow when
4 computing -- when selecting the actuarial
5 assumptions for withdrawal liability?
6    **A    There is a statute that says it must be**
7 **the actuary's reasonable best estimate and**
8 **aggregate.**
9    Q    Does the statute say anything else about
10 the assumptions?
11    **A    Not that I recall.**
12    Q    Okay.  Do you recall if the statute says
13 that the actuary can either use methods set forth
14 in the PBGC regulations or through basically using
15 actuary assumptions and methods that are
16 reasonable in the aggregate?
17    **A    Yes.**
18    Q    It's their choice?
19    **A    Yes.**
20    Q    Are you aware that the PBGC has never
21 promulgated regulations regarding withdrawal
22 liabilities?

22

1    **A    That is why I ignored that in your**
2 **earlier question.**
3    Q    Fair enough.  In determining the
4 actuarial assumptions to use, does the actuary
5 take into account the experience of the plan?
6    **A    Which actuarial assumptions?**
7    Q    So I'm going to talk about withdrawal
8 liability.  So thank you for that clarification.
9 So in determining -- so we're talking about the
10 law that sets out the standard for actuarial
11 assumptions to be used in computing withdrawal
12 liability.  So we are talking about how you
13 determine the unfunded vested benefits for
14 withdrawal liability.  So are you required or does
15 the statute say that the actuary must take into
16 account the experience of the plan?
17    **A    No.**
18    Q    In making -- does it talk about the
19 reasonable expectations of the plan in determining
20 again, computing withdrawal liability?
21    **A    Yes.**
22    Q    And do -- what factors do you use in

23

1 determining the reasonable expectations of the
2 plan?  What does that mean?
3    **A    Depends on the assumption.**
4    Q    Well let's -- so what are the
5 assumptions that would go into determining
6 withdrawal liability?
7    **A    Retirement rates; termination rates;**
8 **percentage married; spouse age difference; of**
9 **course, interest or discount rate; mortality;**
10 **expenses.**
11    Q    Okay.  So let's talk about retirement
12 rate, what are the reasonable expectations do you
13 use for retirement rate in determining withdrawal
14 liability?
15    **A    Typically we would use past experience**
16 **to help estimate the future.**
17    Q    What about termination rates?
18    **A    Same thing, we look to past experience**
19 **first.**
20    Q    Spouse age differences?
21    **A    We actually look at plan data.**
22    Q    Mortality?

24

1    **A    The mortality assumption that we use for**
2 **this plan, for '74 Plan is, in fact, based on past**
3 **plan experience in part.**
4    Q    And the interest or discount rate, what
5 reasonable expectations do you use?
6    **A    There we're looking at a reasonable risk**
7 **free interest rate that would be appropriate to**
8 **settle the obligations.**
9    Q    What does the term mean, when you use to
10 settle the obligations, what does that mean?
11    **A    Effectively to annuitize, if you will,**
12 **if you were to buy an annuity to fully settle up**
13 **the plan's obligations.**
14    Q    And to buy an annuity you would, if I
15 understand it, like you would go -- you would buy
16 that from an insurance company for example or who
17 would you buy an annuity from?
18    **A    Well the fund would buy it from an**
19 **insurance company, yes.**
20    Q    Is there any assumption made to
21 investment return of the plan in terms of
22 determining what the withdrawal liability

Transcript of William Ruschau
Conducted on November 30, 2017

25

1  assumptions to be used?
2  **A   Yes.  I said we use the risk free**
3  **interest assumption.**
4     Q   Okay.  Do you look at how the plan has
5  earned or invested either it earnings rates or --
6  you know, its history of earnings when you are
7  looking at any of the assumptions you have
8  described?
9  **A   We do not look at historical returns for**
10 **the fund.**
11    Q   So for the 1974 Plan itself you just --
12 is it fair to say you've just described to me the
13 assumptions that you use to determine the
14 reasonable expectations of the plan.  Is that fair
15 to say or am I mischaracterizing what you are
16 saying?
17 **A   I'm not sure I quite follow you.**
18    Q   Sure.  So we talked a little in general
19 and some specific about what the 1974 Plan, how
20 you determine the withdrawal liability or the
21 UVBs, unfunded vested benefits for the withdrawal
22 liability for the 1974 plans.  So the factors that

26

1  we've just went through, the retirement rates,
2  termination rates, spouse age differences, all of
3  those different factors are used to determine --
4  do you use to determine the reasonable
5  expectations of the '74 Plan?
6  **A   Yes.**
7     Q   But you do not look at the experience of
8  the '74 Plan when determining the assumptions to
9  use in your computing withdrawal liability.
10 Correct?
11    MR. LECHNER:  Objection.  It is a little
12 bit unclear because I think you asked that but you
13 asked it before in the context of investment
14 returns, the experience.  But are you asking
15 something different now, just to clarify?
16    MR. OSSI:  Yes.  I'm asking something
17 different now.
18    MR. LECHNER:  Okay.  Excuse me.  Go
19 ahead.
20    THE WITNESS:  Now you need to repeat the
21 question.
22    MR. OSSI:  Sure, sure.

27

1     THE WITNESS:  I have short term memory.
2  BY MR. OSSI:
3     Q   We talked before about -- you know, are
4  actuaries required to take into account reasonable
5  expectations of the plan.  And you said yes and so
6  we went through that.  Before that, we talked
7  about are actuaries required to look at the
8  experience of the plan.  And you said, no.  And I
9  said I just want to maybe sure you are also saying
10 no to the 1974 Plan.  Is that correct?
11 **A   I am saying we're not required to look**
12 **at the plan experience, yes.**
13    Q   Have you looked at the plan experience
14 for the '74 Plan when determining withdrawal
15 liability, when determining assumptions for
16 computing withdrawal liability?
17 **A   Again, for retirement and termination of**
18 **those types of assumptions, yes.**
19    Q   So which -- so certain assumptions you
20 are looking at plan experience?
21 **A   Yes.**
22    Q   Okay.  And which assumptions are those

28

1  again?
2  **A   Largely everything other than the**
3  **investment return or the discount rate.**
4     Q   Okay.  And why is it that you don't look
5  at plan experience for the discount rate?
6  **A   We look at plan experience for the other**
7  **assumptions because that helps give us an**
8  **indication of what we might expect in the future.**
9  **For interest rates, past experience has no bearing**
10 **on what the fund will earn in the future.**
11    Q   And why does -- why do past experiences
12 have no bearing on what the fund will do in the
13 future?
14 **A   Investment conditions change over time;**
15 **the investment policy, investment mix changes over**
16 **time.  So those conditions in the past that**
17 **generated the earnings may well not represent what**
18 **you will have in the future.**
19    Q   Okay.  When determining withdrawal
20 liability do you look at the investment mix of the
21 plan?
22 **A   Yes.**

Transcript of William Ruschau
Conducted on November 30, 2017

---

29

1    Q    And why do you look at the investment
2    mix?
3    **A    Well, let me back off.**
4    Q    Okay.
5    **A    To answer that, for withdrawal**
6    **liability, no.  I'm sorry.**
7    Q    No worries.  No problem.  So yes for
8    valuation purposes, is that fair to say?
9    **A    Yes.**
10   Q    But no for --
11   **A    Withdrawal liability.**
12   Q    Withdrawal liability.  Okay.  While you
13   were at Mercer did you work on the 1974 Plan at
14   all?
15   **A    I provided peer review for a couple of**
16   **years.**
17   Q    And what does it mean to provide peer
18   review?
19   **A    Review the correspondence and consulting**
20   **advice being provided to make sure that it is**
21   **appropriate.**
22   Q    Okay.  And do you remember for what

---

30

1    years you provided peer review for the '74 Plan?
2    **A    It was around 2010 to 2011.**
3    Q    Okay.  Prior to that, had you had any
4    experience in working on or consulting for or with
5    any of the actuaries that worked on the -- let
6    me -- that is a little too broad.  Let me start
7    over I think we have captured too many people in
8    there.
9        Prior to 2010 had you ever worked on the
10   1974 Plan in any capacity?
11   **A    No.**
12   Q    While you were at Mercer, were you
13   generally aware that the Mercer -- prior to 2010,
14   were you generally aware that the firm, the Mercer
15   firm worked on the '74 Plan?
16   **A    Yes.**
17   Q    Okay.  Do you know any of the enrolled
18   actuaries who were the -- who signed either the
19   actuarial valuation form, the '74 Plan while at
20   Mercer?
21   **A    I had no — since I had never worked on**
22   **the plan I have no knowledge of who signed**

---

31

1    **anything or did what.**
2    Q    Okay.  Did -- while you were at Mercer
3    was there an actuary name James Dexter?
4    **A    Yes.**
5    Q    Did you know Mr. Dexter?
6    **A    Yes.**
7    Q    Did you ever talk to Mr. Dexter about
8    actuarial issues involving withdrawal liability?
9    **A    Yes.**
10   Q    I'm going to stretch things.  Do you
11   recall any of the topics of conversation?
12   **A    No.**
13   Q    How long has UAS provided actuarial
14   services for the 1974 Plan?
15   **A    Since 2014.**
16   Q    And have you worked on this 1974 Plan
17   for UAS since 2014?
18   **A    Yes.**
19   Q    And do you know how the -- were you
20   aware that the -- how do I ask you this easily?
21   How about this?  Were you involved in any of the
22   decision for UAS to work with the 1974 Plan?

---

32

1    **A    Of the decision to work for it?  No.**
2    Q    Were you aware of -- was there an RFP
3    put out by the 1974 Plan for new actuaries?
4    **A    Yes.**
5    Q    Did you see that RFP?
6    **A    Yes.**
7    Q    Did you work on that RFP?
8    **A    Yes.**
9    Q    And do you know why the 1974 Plan, did
10   the 1974 Plan tell you why they put out an RFP to
11   look for a new actuary?
12   **A    Yes, because Mercer was exiting the**
13   **business.**
14   Q    Did -- as part of the RFP, if you
15   recall, did the '74 Plan ask any questions about
16   withdrawal liability?
17   **A    Not that I can recall.**
18   Q    What if any questions can you recall
19   that was asked of UAS as part of that RFP?
20   **A    I don't recall now.**
21   Q    Did the '74 Plan tell UAS why they were
22   successful in getting their business?

---

Transcript of William Ruschau
Conducted on November 30, 2017

---

33

1    A    Not that I know of.
2    Q    As part of the process of being hired by
3 the 1974 Plan were there any meetings held between
4 UAS and the '74 Plan that you are aware of?
5    A    Prior to when?
6    Q    Prior to being -- excuse me, prior to be
7 hired by the '74 Plan.  In other words, were there
8 pitches or were there meetings?
9    A    We had one meeting to present our
10 proposal.
11    Q    And did you work on that proposal?
12    A    Yes.
13    Q    And did that proposal address in any way
14 withdrawal liability?
15    A    No.
16    Q    Did that proposal address any actuarial
17 assumptions that UAS might use in providing a
18 report?
19    A    No.
20    Q    Prior to -- so the first actuarial
21 valuation that UAS did for the 1974 Plan was for
22 the plan year beginning July 1, 2014.  Is that

---

34

1 correct?
2    A    Yes.
3    Q    Did you prepare that report?
4    A    Along with ours, yes.
5    Q    Did you review any of Mercer's prior
6 actuary evaluations before preparing the -- what
7 we will call plan year 2014 valuation?
8    A    Yes.
9    Q    Do you recall about how many you
10 reviewed or how long you went back?
11    A    I believe we may have had five years of
12 reports.
13    Q    In the process of preparing this 2014
14 report did you review the funding history of the
15 '74 Plan?
16    A    What do you mean by funding history?
17    Q    In terms of how well funded it was over
18 a period of years?
19    A    Not specifically, no.
20    Q    Did you review it in the actuarial
21 valuations that you reviewed that Mercer had
22 prepared?

---

35

1    A    It was part of the reports so I read it
2 in the report.  And we used some of those values
3 because we provide a five year history in our
4 reports typically so we used their value, the
5 prior values to create that five year history.
6    Q    And do you recall reviewing any of the
7 assumptions that Mercer used for determining the
8 unfunded vested benefits for purposes of
9 withdrawal liability?
10    A    I reviewed all of the assumptions.
11    Q    If you can recall, did you -- were there
12 any assumptions that you felt were wrong?
13    A    No.
14    Q    Do you know if the 1974 Plan has ever
15 been fully funded for purposes of withdrawal
16 liability?
17    A    I do not know.
18    Q    Okay.  So let's talk about that first
19 valuation that was prepared by UAS.  What was your
20 role in creating that valuation?
21    A    I was in charge, if you will, as the
22 enrolled actuary of setting all of the actuarial

---

36

1 assumptions, reviewing the experience and stuff
2 that we generated and also reviewing reports and
3 making comments as needed and to adjust -- to
4 finalize the report.
5    Q    Okay.  Do you recall setting the
6 actuarial assumptions for the determination of
7 unfunded vested benefits for the purposes of
8 withdrawal liability for that report?
9    A    Yes.
10    Q    And was that report the first year that
11 united had determined the amount of unfunded
12 vested benefits for the purposes of assessing
13 withdrawal liability for the '74 Plan?
14    A    Determined, yes.  In the process of
15 taking on a new plan we always try to recreate the
16 prior actuary's work in the prior year.  So we
17 have done some calculations using their
18 assumptions and methods and stuff to make sure
19 that their starting point matches with where they
20 are at.
21    Q    Do you recall doing this with the
22 Mercer, I guess, it would have been the plan year

---

**37**

1  2013 valuation?
2  **A   Yes.**
3  Q   And do you recall any -- did you have a
4  different result for withdrawal liability than
5  Mercer had in its 2013 report?
6  **A   My recollection is that when we fully**
7  **understood what Mercer was doing we were**
8  **reasonably close in the determination of the**
9  **withdrawal liability.**
10  Q   And when you say what Mercer was doing,
11  can you describe what Mercer was doing?
12  **A   In terms of all of their assumptions**
13  **that went into the calculation.**
14  Q   So which -- it sounds like for what you
15  are saying that there may have been some different
16  judgments that you -- that UAS might have had.
17  Can you recall what those might have been?
18  **A   Not different judgments, just**
19  **uncertainty.**
20  Q   And uncertainty about what?
21  **A   About exactly what assumptions were**
22  **being used because the Mercer report wasn't clear**

**38**

1  **enough for us to be able to identify some of those**
2  **assumptions.**
3  Q   And did you ask them about -- were you
4  able to ask Mercer about some of the assumptions
5  they used?
6  **A   Yes.**
7  Q   Did they provide an answer?
8  **A   Yes.**
9  Q   And was there -- do you recall if there
10  was any uncertainty about the interest rate
11  assumption used for withdrawal liability?
12  **A   No, there was not.**
13  Q   And do you recall what Mercer used as
14  the discount rate for 2013?
15  **A   Discount rate for?**
16  Q   Withdrawal liability.
17  **A   It was the PBGC rates in effect as of**
18  **the end of the plan year.**
19  Q   So for the -- now moving forward to the
20  plan year 2014.  How did UAS determine the 2014
21  unfunded vested benefits for the purposes of
22  computing withdrawal liability?

**39**

1  **A   We first of all determined that the PBGC**
2  **interest assumptions were a reasonable proxy for**
3  **risk free interest rates.  We used the value -- we**
4  **used the vested benefit stream that we generated**
5  **from the data and discounted those future benefits**
6  **at those PBGC assumptions.**
7  Q   Okay.  Did you review the mortality
8  table or rather did you select mortality
9  assumption for purposes of determining withdrawal
10  liability?
11  **A   We used the same mortality table for**
12  **funding and withdrawal liability.**
13  Q   And what about the retirement rate
14  assumption?  Did you use the same?
15  **A   It was the same assumptions, yes.**
16  Q   What about the spouse age difference
17  assumption?
18  **A   It is the same as well.**
19  Q   What about the termination rate
20  assumption?
21  **A   Yes, that would be the same.**
22  Q   What about the expense, the plan expense

**40**

1  assumption?
2  **A   We used the expense.  The expense is**
3  **different for withdrawal liability versus the**
4  **ultimate valuation.  So for withdrawal liability**
5  **we used the expense load provided, following the,**
6  **I believe it is 4044 of the statute.**
7  Q   And why did you use 4044 of the statute?
8  **A   Well, in again determining withdrawal**
9  **liability we are looking at a settlement rate.  So**
10  **we are looking at, if you will, a present value of**
11  **future expenses.  Whereas for the funding purposes**
12  **it is an ongoing calculation and we look at each**
13  **year's expense in each valuation.**
14  Q   Other than the discount rate assumption
15  and the expense assumption used for the
16  determination of withdrawal liability, are there
17  any other assumptions used for the determination
18  of withdrawal liability that were different from
19  the funding or funding rate -- funding
20  assumptions?
21  **A   Not that I recall.**
22  Q   So in determining the plan expense

41

1  assumption for withdrawal liability for plan year
2  2014, did you look at the plan experience with
3  regard to expenses?
4      **A    For withdrawal liability?**
5      Q    Yes.
6      **A    No.**
7      Q    Did you look at the plan experience for
8  mortality, for withdrawal liability?
9      **A    The mortality table that we used for
10 withdrawal liability which is the same one that we
11 used for the funding calculation is based upon
12 historical plan experience.**
13     Q    Did you do any separate evaluation for
14 withdrawal liability purposes?
15     **A    No.**
16     Q    For the spouse age difference, did you
17 do any -- did you look at plan experience?
18     **A    We asked the administrative office to
19 provide it from the data.**
20     Q    Okay.  For termination rates for purpose
21 of withdrawal liability, for termination rates do
22 you look at -- you look at past plan experience.

42

1  Correct?
2      **A    Yes.**
3      Q    And did you look at that, the plan
4  experience of termination rates separately for the
5  purposes of determining withdrawal liability?
6      **A    No.**
7      Q    Okay.  When you're creating an actuarial
8  evaluation do you have working papers that you use
9  to create this report?
10     **A    There are work papers, yes.**
11     Q    And what are -- did those work papers
12 list out the assumptions that you selected?
13     **A    I don't know exactly what's in those
14 work papers.  It's is done in the UAS office and
15 not in my office.**
16     Q    Okay.  In determining withdrawal
17 liability do you look at the ratio of active
18 participants to retirees?
19     **A    No.**
20     Q    Are there -- other than retirement
21 rates, termination rates, spouse age difference,
22 discount rate, mortality table and expense, are

43

1  there other actuarial assumptions that go into the
2  determination of withdrawal liability?
3          MR. LECHNER:  Objection to the form
4  because I think he listed more than that.  I don't
5  think you are trying to trick him by just listing
6  some.  But I think he provided a longer list
7  initially then just those that I think you just
8  listed four or five.
9          MR. OSSI:  That might be true.  I just
10 want to know what they are.  There is no trick
11 here.
12         MR. LECHNER:  I didn't think you were,
13 but I just want to make the record complete.
14 BY MR. OSSI:
15     Q    I want to make sure I'm complete.  I
16 apologize.  I'm not an actuary and I know you are
17 not an attorney.  So I won't ask you to practice
18 law if you don't ask me to sign any actuarial
19 evaluations.
20     **A    All right.  I will go back through the
21 assumptions.**
22     Q    Okay.

44

1      **A    That I can recall, which is discount
2  rate, mortality, retirement rate, termination
3  rate, disability rate, spouse age difference,
4  there are also some minor assumptions about
5  missing data and how those are filled in.  There
6  are assumptions made about participants who are
7  deferred vested and beyond the age at which
8  benefits should have started.  I don't recall any
9  others.**
10     Q    So, you're right I did miss the
11 disability rate in my questions to you.  That is
12 why I asked that question.
13         MR. LECHNER:  Just for the record,
14 before he also said percent marriage was relevant
15 is an assumption and expenses were an assumption?
16         THE WITNESS:  Yes.  You're right.  I
17 forgot those two.
18         MR. OSSI:  Thank you.
19         MR. LECHNER:  That is always the danger
20 of trying to go over a list.  It is no big deal
21 but just so it is clear.
22

**45**

1  BY MR. OSSI:
2     Q    So for percent married is that based on
3  plan data or plan experience?
4     A    Is there a difference?
5     Q    You tell me.  Is there a difference
6  between historical data and plan experience?
7     A    It is based on plan data.
8     Q    And for the disability rate is that
9  based on plan experience?
10    A    Yes.
11    Q    And did you do -- is the disability rate
12 assumption different for the purposes of computing
13 withdrawal liability than it is for the funding
14 purposes?
15    A    No.
16    Q    Now, how do you -- how does an actuary
17 determine that assumptions are reasonable in the
18 aggregate for purposes of computing withdrawal
19 liability?
20    A    I'm not sure I follow the question
21 there.
22    Q    Okay.

**47**

1     Q    And of those two assumptions is it
2  interest that have a greater effect than
3  mortality, than mortality assumption?
4     A    Do you mean changes in?
5     Q    Yes.  Changes in the interest rate
6  versus changes in mortality table?
7     A    Usually, yes.
8     Q    I just have asked you questions about
9  the plan year 2014.  I would like to now talk
10 about plan year 2015?
11    A    Okay.
12    Q    For plan year 2015 did UAS compute the
13 unfunded vested benefits for purposes of
14 determining withdrawal liability?
15    A    We calculate the value of vested
16 benefits.  To get unfunded you have to subtract
17 assets, we don't calculate the assets.
18    Q    Fair enough.
19    A    The auditor does.
20    Q    So to determine -- but it was UAS that
21 computed the amount of withdrawal liability that
22 appears in the actuarial evaluation?

**46**

1     A    It is an actuary's best estimate.
2     Q    When you are trying to make this best
3  estimate for the '74 Plan, did you -- is there a
4  model that you plug in all of these assumptions
5  and you see what the result is?
6     A    No.
7     Q    So do you look at -- so you consider
8  each assumption individually.  Is that correct?
9     A    Yes.  We try to make each assumption an
10 individual best estimate.
11    Q    Okay.  And based on if each individual
12 assumption is the best estimate does that in turn
13 make the assumptions reasonable in the aggregate?
14    A    I believe it does.
15    Q    Okay.  Are there any assumptions that
16 have more of an affect on the amount of unfunded
17 vested benefits than other assumptions that go
18 into making that --
19    A    Yes.
20    Q    And which assumptions are those?
21    A    Interest and mortality have the most
22 effect.

**48**

1     A    The unfunded -- yes.
2     Q    Okay.  Was there any -- let me ask this.
3  How did UAS compute the withdrawal liability, the
4  amount of withdrawal liability for the amount of
5  unfunded vested benefits for purposes of computing
6  withdrawal liability for plan year 2015?
7     A    How did we do it?
8     Q    Yes.
9     A    The methodology is the same.  The
10 interest assumption was updated to the current
11 PBGC assumptions.  There could have been a couple
12 of other minor assumption changes there that would
13 have had a very small immaterial effect on it but
14 I don't recall exactly what assumption changes
15 occurred.
16    Q    Okay.  But would it be fair to say that
17 the process that you just described for 2014 was
18 the same for plan year 2015?
19    A    Yes.
20    Q    Okay.  And for the following plan year
21 2016 were there any changes to the process that
22 you have just described for the previous plan

49

1  years in determining the unfunded vested benefits
2  for withdrawal liability purposes for plan year
3  2016?
4      A    **No change to the process.**
5      Q    Okay.
6      A    **Assumptions could change.**
7      Q    Fair enough.  Do you know if any of the
8  assumptions did change for plan year 2016?
9      A    **Well the PBGC interest rates change**
10 **monthly I believe and they would have changed from**
11 **the June of 2014 to June of 2015.**
12          MR. LECHNER:  Excuse me.  Can we go off
13 of the record.
14          (The proceeding recessed from 2:07 p.m.
15 until 2:21 p.m.)
16 BY MR. OSSI:
17     Q    We will go back on the record?
18     A    **Okay.**
19     Q    I'm going to hand you what we are
20 marking as Exhibit 1.
21          (Whereupon, Exhibit No. 1 was marked for
22 identification)

50

1  BY MR. OSSI:
2      Q    And I'll ask you a couple of questions
3  about this document.
4      A    **Okay.**
5      Q    Do you --
6          MR. LECHNER:  Could you wait until --
7          MR. OSSI:  Sure.  I'm so sorry.  I
8  didn't realize you had not gotten yours yet.
9  BY MR. OSSI:
10     Q    Take a moment to look at it please.  Let
11 me know when you are ready to continue?
12     A    **Okay.**
13     Q    Do you recognize this document in front
14 of you?
15     A    **Yes.**
16     Q    And how would you describe it?
17     A    **It is my initial look at the funding**
18 **discount rate to be used in our 2014 actuarial**
19 **evaluation.**
20     Q    And is the funding discount rate an
21 actuarial assumption used in the determination of
22 a plan funding?

51

1      A    **Yes.**
2      Q    And in fact, it is one of the many
3  assumptions that you -- the actuarial assumptions
4  that you make in determining plan funding.  Is
5  that correct?
6      A    **Yes.**
7      Q    Did you send a similar letter with
8  regard to the discount rate -- let me start back
9  here.
10          Did you send a similar letter with
11 regard to any other actuarial assumption for the
12 '74 Plan, for funding purposes?
13     A    **I sent a letter that went through all of**
14 **the assumptions and as to the ones that we**
15 **intended to use for the 2014 actuarial valuation.**
16     Q    Did you send that letter later, after
17 you sent this letter?
18     A    **As I recall, yes.**
19     Q    We have that letter and we are going to
20 talk about that letter next?
21     A    **Okay.**
22     Q    I think we have it.  You will have to

52

1  tell me.
2      A    **It will have a date on it.**
3      Q    Did you send a similar letter with
4  regard to any of the assumptions for purposes of
5  computing unfunded vested benefits and withdrawal
6  liability for the 1974 Plan?
7      A    **No.**
8      Q    Okay.  I just kind of want to understand
9  the letter a little bit.  So you address several
10 issues in this letter, the first of which is what
11 we will call ASOP number 27.  And what is ASOP
12 stand for?
13     A    **Actuarial Standard of Practice.**
14     Q    Do you follow those standards when
15 making actuarial assumptions for funding purposes.
16     A    **Yes.**
17     Q    Do you follow -- in particular to the
18 best of your recollection which ASOPs are
19 important in determining actuarial assumptions for
20 funding purposes?
21     A    **Well ASOP 27.  There is another ASOP**
22 **that deals with non economic assumptions.  I don't**

Transcript of William Ruschau
Conducted on November 30, 2017

53

1  recall the number of that.  I believe there is a
2  more general one of ASOP 4 that is out there as
3  well.  This sort of feeds into ASOP 4.
4      Q    And does ASOP 27 also provide for --
5  well, what does ASOP 27 require with regard to
6  actuarial assumptions?
7      A    Well there is a lot of stuff in there
8  that it requires.  So can't really nail it down to
9  a thing.
10     Q    Does ASOP 27 also apply to actuarial
11 assumptions used for the purposes of computing
12 withdrawal liability?
13     A    It applies to any economic assumptions
14 related to pension obligations.
15     Q    So if I understand your answer, that
16 would be a more elaborate way of saying yes?
17     A    Yes.
18     Q    So in terms of determining what discount
19 rate to use for computing withdrawal liability for
20 the '74 Plan, do you follow ASOP 27?
21     A    Yes, we follow ASOP 27.
22     Q    In determining the discount rate for the

54

1  1974 Pension Plan, again for purposes of
2  withdrawal liability, do you review the investment
3  expense assumption?
4      A    No.
5      Q    For purposes of determining withdrawal
6  liability for the '74 Plan, do you review future
7  return assumptions?
8      A    We set it based on current risk free
9  rates as best estimate being the PBGC assumptions.
10     Q    Do you make any independent verification
11 of the PBGC rates?
12     A    No.
13     Q    Do you compare the PBGC rates to any of
14 the future -- any of the future return assumptions
15 for the '74 Plan?
16     A    I'm not sure I follow what you mean.
17     Q    Sure.  In your letter you say that, you
18 list out number of issues that I think address the
19 interest assumption for the '74 Plan for purposes
20 of funding.  Let me direct you to page one.  These
21 bullet point items on page 1 that start with
22 American Academy of Actuaries ASOP #27?

55

1      A    Uh-huh.
2      Q    It is fair to say these issues impact
3  the interest rate assumption for the '74 Plan for
4  valuation purposes?
5      A    Yes.
6      Q    And do you go through the same issues
7  with regard to the interest rate, the discount
8  rate selected for the purposes of withdrawal
9  liability?  And so I'm just going to go through
10 each one individually.  We talked about 27.
11     A    Uh huh.
12     Q    Do you consider or reviewed the
13 investment expense assumption?
14     A    We do not.
15     Q    Do you consider or review the future
16 return assumptions?
17     A    The PBGC rates effectively are future
18 return assumptions.
19     Q    Okay.  Do you review the historical
20 experience?
21     A    No.
22     Q    Do you review any plan changes in the

56

1  investment allocation?
2      A    No.
3      Q    And do you review the portfolio alpha?
4      A    No.
5      Q    You can put that one aside.  And we will
6  go to the other letter we talked about.
7          (Whereupon, Exhibit No. 2 was marked for
8  identification)
9          MR. OSSI:  I'm handing you what we are
10 marking as Exhibit Number 2?
11         MR. LECHNER:  Can we have a copy?
12         MR. OSSI:  Yes.
13 BY MR. OSSI:
14     Q    Take your time and review the letter and
15 let me know when you are ready to answer questions
16 about it.
17     A    Okay.
18     Q    All right.  Do you recognize this
19 document I put in front of you?
20     A    Yes.
21     Q    And can you describe it for me?
22     A    This was a summary of my review of the

57

1 actuarial assumptions used in the prior years --
2 prior year by the prior plan actuary and what I
3 thought was appropriate for the current years
4 valuation, funding valuation.
5    Q    Did you send a similar letter to the '74
6 Plan about the actuarial valuation assumptions
7 for withdrawal -- I'm sorry.  A similar letter to
8 the 1974 Plan about actuarial assumptions for
9 computing withdrawal liability?
10    A    No.
11    Q    And this letter goes through a number of
12 assumptions.  So you have an interest rate
13 assumption.  Is that correct?
14    A    Yes.
15    Q    And mortality assumption?
16    A    Uh huh.
17    Q    A retirement assumption?
18    A    Yes.
19    Q    And so forth and so on.  And so is it
20 fair to say that the assumptions listed in this
21 letter are most of the major assumptions in
22 determining the actuarial valuation funding rate?

58

1    A    For funding, yes.
2    Q    Of these assumptions which would also be
3 used for the purposes of determining withdrawal
4 liability?
5    A    Well, as we discussed previously I
6 believe all of them are used, the same assumption
7 is used for withdrawal liability purposes except
8 for expenses and the interest rate.
9    Q    Okay.  Have you sent any letters to the
10 '74 Plan that address assumptions for the purposes
11 of determining withdrawal liability while you were
12 at UAS?
13    A    I don't recall any.
14    Q    You mentioned that I think you had done
15 some peer review work while at Mercer for
16 colleagues that were working on the 1974 Plan.  Is
17 that correct?
18    A    Yes.
19    Q    Did you review any of the withdrawal
20 liability assumptions of the '74 Plan for that
21 peer review?
22    A    I do not recall reviewing assumptions.

59

1    Q    I'm handing you what we are marking as
2 Exhibit 3.
3        (Whereupon, Exhibit No. 3 was marked for
4 identification)
5 BY MR. OSSI:
6    Q    Take a moment to look at it and let me
7 know when you are ready to proceed.
8    A    Okay.
9    Q    In 2004 Mercer sent a letter to the '74
10 Plan regarding withdrawal liability assumptions
11 that I have just given to you.  Have you ever seen
12 this document before today?
13    A    No.
14    Q    Has UAS, to the best of your knowledge,
15 ever sent a similar document to the '74 Plan?
16    A    No.
17    Q    In this communication from Mercer to '74
18 Plan it lists out four objectives that I would
19 like to go through those with you.  The first it
20 says that Mercer believed that the trustee should
21 consider the following objective.  The first of
22 which was that actuarial assumptions, we're

60

1 talking here about withdrawal liability
2 assumptions.  The assumptions should protect the
3 interest of participants.  Do you agree with that
4 objective?
5    A    Yes.
6    Q    And is that an objective that you would
7 consider as part of -- or did you consider that
8 objective in the determination of withdrawal
9 liability for the '74 Plan?
10    A    I believe that using the risk free rates
11 is protecting the best interest of the
12 participants.
13    Q    Okay.  The next objective was that the
14 assumptions should be fair to the withdrawing
15 employer.  Do you agree with that objective?
16    A    Yes.
17    Q    And is that something you considered in
18 determining withdrawal liability for the '74 plan?
19    A    Yes.  I think this letter indicates that
20 you are looking at rates that would be appropriate
21 and then current annuity marketplace as being fair
22 basis for providing the obligation.

Transcript of William Ruschau
Conducted on November 30, 2017

61

1    Q    Okay.  But I want to know is -- you
2  know, is that something you considered when you
3  were determining withdrawal liability for -- you
4  know, the amount of withdrawal liability for the
5  '74 Plan?
6    A    I would not say explicitly considered,
7  but it is the ending assumptions that we use I
8  believe to be fair to the terminating employer.
9    Q    The next objective is that the
10 assumption should be fair to the remaining
11 employers.  Is that something that you agree with?
12   A    Yes.
13   Q    And is that something you considered in
14 determining the assumptions for the '74 Plan?
15   A    Yes.
16   Q    Okay.  And the final objective, the
17 fourth objective, fourth and final was that;
18 These assumptions should be defensible if
19 challenged.  Do you agree with that objective?
20   A    I believe that that is a by product, if
21 you will, if you are using reasonable assumptions
22 by definition they should be defensible.

62

1    Q    So is it fair to say you would agree
2  with that objective then?
3    A    Yes.
4    Q    The letter goes on to explain that; The
5  '74 Pension Plan currently calculates withdrawal
6  liability using a blended rate.  Do you know what
7  that means?
8    A    It is what is commonly called the Segal
9  method.
10   Q    Okay.  Can you -- do you know what the
11 Segal method is?
12   A    I'm familiar with it, yes.
13   Q    Are you familiar enough with it to
14 describe it to me?
15   A    They use the PBGC assumptions to
16 calculate the portion of the liability that is
17 funded and they use the plan assumption to value
18 the portion of the obligation that is not funded.
19   Q    Okay.  And would you agree with Mercer
20 that -- or I'm sorry.  Would you agree that using
21 that Segal method meets the objectives laid out
22 that we just discussed, the four objectives?

63

1    A    Not particularly.  It is -- I have
2  always had concerns about the Segal method.
3    Q    What are your concerns about the Segal
4  method?
5    A    My concern is that it doesn't set an
6  assumption, it sets a blending of two different
7  assumptions which to me doesn't reflect -- can't
8  both reflect the actuary's best estimate.
9    Q    And why is that?
10   A    Well there is -- I don't think you can
11 have two different best estimates for the same
12 calculation.
13   Q    The letter goes on to talk about some
14 basic approaches to withdrawal liability
15 assumptions and lists three approaches.
16   A    Uh huh.
17   Q    The valuation funding assumption, market
18 interest rate and blended interest rate.  In your
19 experience are those three approaches commonly use
20 by multiemployer pension plans?
21   A    Yes.  Market rate as defined in this
22 letter which is effectively the PBGC rates.

64

1    Q    Okay.  In Mercer's recommendation to the
2  '74 Plan they set out that they recommend a rate
3  that is both fair to the withdrawing and to
4  remaining employers.  Do you agree with that
5  statement?
6    A    Yes.
7    Q    Okay.  And do you think it is fair that
8  the current '74 Plan withdrawal liability is
9  determined using the PBGC rates.  When I say fair,
10 is that fair to withdrawing employers.
11   A    Yes.
12   Q    And why is that fair?
13   A    It is fair because the withdrawal
14 liability is being calculated on a risk free rate
15 basis and the withdrawing employer has no
16 investment risk after that point in time.  So if
17 the market goes to hell in a handbasket, the
18 remaining employers are on the hook and not
19 terminating employer.  So it doesn't make since
20 that the terminating employer would get any
21 kind -- would be entitled to any kind of a risk
22 premium in the interest discount assumption.

65

1    Q    Okay.  So are you aware of the amount of
2  withdrawal liability that has been assessed
3  against Energy West in this case?
4    A    Yes.
5    Q    And how much is that?
6    A    It was $115 million, I believe.
7    Q    And do you think it is fair to assess
8  $115 million to a single employer?  Do you think
9  it is fair to assess $115 million withdrawal
10 liability to Energy West?
11   A    Yes.
12   Q    And why is that?
13   A    They are being assigned a portion of the
14 unfunded vested benefits based upon their
15 contribution, their hours to the plan as a total.
16 And they're getting their appropriate share.
17   Q    Okay.  In the last paragraph of this
18 letter Mercer makes a statement that -- and I
19 would like you to read that last paragraph and I
20 will ask you a single question about it.
21   A    Okay.
22   Q    Is that an accurate statement that short

66

1  term interest rates were much higher than the
2  funding assumptions used in the early 1980s than
3  now?
4    A    I have no idea.
5    Q    Okay.  And do you know if the current
6  rates, the current rates used for withdrawal --
7  the current discount rates used for withdrawal
8  liability result in much higher withdrawal
9  liability now than in the earlier 80s?
10   A    Yes .
11   Q    And how do you know that?
12   A    Because interest rates are at somewhat
13 historical lows, have been over the last ten
14 years.  And the rates were higher in the 1980s.
15   Q    Okay.  Thank you.  I want to talk a
16 little bit about your communications with
17 individuals at the '74 Plan.  In creating any of
18 the actuarial valuations used in determining
19 withdrawal liability, did you communicate with
20 anyone employed by the '74 Plan?
21   A    Well, first the withdrawal liability
22 calculation is done in conjunction with the

67

1  funding valuation.
2    Q    Okay.
3    A    It is not separate communication on the
4  two.
5    Q    Okay.
6    A    We certainly request data from the fund
7  office in various areas.
8    Q    Did you ever talk about the actuarial
9  assumptions with anybody employed by the fund --
10 rather, let me step back.
11       Did you ever communicate with anyone at
12 the fund, employed at the fund about the actuarial
13 assumptions used by UAS?
14   A    Yes.  You just gave me two exhibits
15 where I have.
16   Q    Is there any other recollection of
17 communications with -- for example, did you speak
18 with anyone at the fund?
19   A    Not that I recall.
20   Q    Okay.  Can you recall ever having
21 discussed the use of -- so you never discussed the
22 actuarial assumptions used by UAS with any

68

1  employee of the fund?
2    A    I present the assumptions that we're
3  going to use and why because I don't want to
4  surprise clients.  I want them to know what we are
5  doing and why we are doing it.
6    Q    And do you make those presentations at
7  the fund offices or in your office?
8    A    It's emails or letters like this.
9    Q    Have you ever specifically discussed the
10 interest rate assumption with any employee of the
11 '74 Plan?
12       MR. LECHNER:  Clarification.  Interest
13 rate for what purpose?
14 BY MR. OSSI:
15   Q    Withdrawal liability.
16   A    No.
17   Q    Have you ever communicated directly with
18 a trustee of the 1974 Plan with regard to the
19 actuarial assumptions, either used for valuation
20 or for withdrawal liability?
21   A    No.
22   Q    Do you recall ever being -- have you

69
1  ever been at a trustee meeting of the '74 Plan?
2      A   I have a meeting with them every year to
3  present the results of our actuarial valuation?
4      Q   Where does that meeting occur?
5      A   In D C at the fund's office.
6          (Whereupon, Exhibit No. 4 was marked for
7  identification)
8  BY MR. OSSI:
9      Q   I'm presenting you with what has been
10 titled the 717th Meeting of the Board of Trustees
11 United Mine Workers of America 1974 Pension Trust
12 dated September 23, 2014.  And I just need you to
13 -- tell me when you are ready but I am going to
14 just direct your attention basically to the first
15 paragraph that begins with the bottom of page one
16 and concludes at the top of page 2.
17     A   Okay.
18     Q   The first question is, who is Paul
19 Bullock?
20     A   Paul Bullock is another actuary at UAS?
21     Q   Does he also work on the '74 Plan?
22     A   Yes.

70
1      Q   What role does he play for the '74 Plan
2  valuation?
3      A   He also consults.  He attends the same
4  meetings I do.  And he oversees, directly oversees
5  the valuation of the plan.
6      Q   Okay.  The trustee meeting minutes which
7  I have just handed you from September 23, 2014
8  describe a conference call from August 2014 that
9  you had with the trustees.  Do you recall this?
10     A   I do not.
11     Q   Do you recall having a conference call
12 with the trustees on any other occasions?
13     A   No.
14     Q   I'm going to go back to just talking
15 about discount rates?
16     A   Uh huh.
17     Q   So since you have been the enrolled
18 actuary for the '74 Plan have you selected
19 anything other than the PBGC rates for the
20 determination of withdrawal liability?
21     A   No.
22     Q   Does UAS have any sort of edict or

71
1  policy or template with regard to actuarial
2  assumptions for determining withdrawal liability?
3      A   No.
4      Q   Is there any policy or guidelines
5  regarding the calculation of unfunded vested
6  benefits for multiemployer pension plans that UAS
7  has?
8      A   Not separate from the ASOPs.
9      Q   Okay.  And you told me that UAS has
10 about 75 or so multiemployer pension plans for
11 which it provides actuarial services?
12     A   Yes.
13     Q   Do you know, to the extent that you
14 know, are there any multiemployer plans that use a
15 discount rate for purposes of computing withdrawal
16 liability that do not use the PBGC rates?  And I'm
17 only talking about those plans for which UAS
18 serves as actuary?
19     A   Yes.
20     Q   And do you know what plans those are?
21     A   I know the two that I do.  I don't know
22 what others do.

72
1      Q   Okay.  And so which two of the plans
2  that you work on use discount rates other than the
3  PBGC rates?
4      A   The West Virginia Carpenters and the
5  Kansas City Pipefitters.
6      Q   So let's talk about the West Virginia
7  Carpenters.  What rate does the West Virginia
8  Carpenter's plan use for it's discount rate,
9  determining withdrawal liability?
10     A   As of when?
11     Q   Are they on a plan year or a calendar
12 year?
13     A   Well the plan year is the calendar year.
14     Q   Okay, sorry.  But the physical year,
15 calendar year.
16     A   Yeah.
17     Q   So as of today?
18     A   As of today I believe it is 7.25
19 percent.
20     Q   And what is that and what is that rate,
21 discount rate based on?
22     A   It is the same rate that is used in the

**73**

1  funding valuation.
2      Q    And as the actuary did you select that
3  rate?
4      A    Yes.
5      Q    And why did you select that rate?
6      A    Because the West Virginia plan and this
7  would also apply to Kansas City, the Pipefitters.
8  They are in the building trades.  The rules are
9  much different for the building trades.  The
10 definition of what a withdrawal is is different.
11 The definition -- or the methodology that you must
12 use to calculate withdrawal liability is
13 prescribed.  So, you know, it is a different world
14 than funds like this.
15     Q    Different in -- I just want to
16 understand, so you have to bear with me.  So what
17 do you mean by different world than the '74 Plan?
18     A    Because the rules are different as I
19 mentioned.  The industry is different.  I have
20 worked with building trades funds for almost 30
21 years and have never had a withdrawal liability.
22 They very rarely occur because of the different

**74**

1  definition of what a withdrawal is.  Also the
2  constitution of the employers, building trades
3  funds generally have a lot of small employers as
4  opposed to having a smaller number of large
5  employers.  And as a result should something
6  happen that you would have a withdrawal liability
7  to be imposed from a withdrawing employer in a
8  building trades funds, it's likely to have a very
9  small impact on the fund because each employer is
10 a very small piece of the total.
11     Q    When you say the rules are different,
12 are you talking about the rules with regard to
13 when a withdrawal happens or are you talking about
14 the rules with regard to the actuarial assumptions
15 you use?
16     A    As to what constitutes a withdrawal.
17     Q    Okay.  Is there anything in ERISA that
18 you are aware of that says that you treat
19 multiemployer pension plans differently based on
20 the industry that they are in or the industry that
21 the employers who participate in the plan are in?
22     A    Nothing that I'm aware of.

**75**

1      Q    Is there anything in the ASOP that
2  describes different rules or procedures to use for
3  different industries when determining the
4  appropriate actuarial assumptions for
5  multiemployer pension plans?
6      A    Could you repeat that again?
7      Q    Sure.  So in the ASOPs is there anything
8  in the ASOPs that would instruct an actuary that a
9  particular industry should use different -- follow
10 a different standard than any other industry when
11 determining the appropriate actuarial assumption?
12     A    To the extent -- I believe that to the
13 extent there are differences I don't know if it
14 specifically says industry, but differences in
15 conditions and the like and it does require you to
16 take into account those differences.
17     Q    Now when we talked about the discount
18 rate selected for the '74 Plan you mentioned
19 looking at a risk free interest rate to settle the
20 obligation.  Is that the same assumption you are
21 using for these -- for the carpenters West
22 Virginia plan in determining the interest rate?

**76**

1      A    No.
2      Q    And what about the Kansas City -- is it,
3  sorry I have to go back and look, Kansas City
4  Pipefitters?
5      A    What about them?
6      Q    What rate does the Kansas City
7  Pipefitters use?  What is the discount rate you
8  use for the Kansas City Pipefitters assumption for
9  withdrawal liability purposes?
10     A    Currently 6.75.
11     Q    And how did you determine that rate?
12     A    It is the rate used for funding purposes
13 and we use the same process to develop it as we do
14 to develop the funding rate for '74.
15     Q    Okay.  So you mentioned that the
16 withdrawal liability rules are different for the
17 construction industry.
18     A    Yes.
19     Q    Are they also different for the coal
20 industry?
21     A    The only difference that I'm aware of is
22 the 404(c) designation of the 1974 Plan.

77

1    Q    And what does that mean to be a 404(c)
2    plan?
3    **A    What generates a 404(c) plan?**
4    Q    You mentioned that -- I want to know
5    what rules are different for a 404(c) plan,
6    withdrawal liability rules?
7    **A    The de minimis rules do not apply and**
8    **the 20 year cap on payments does not apply.**
9    Q    And do you take those two rules into
10   account when determining the interest rate
11   assumption for purposes of withdrawal liability
12   for the '74 Plan?
13   **A    No, they have nothing to do with my**
14   **determination of the vested benefits.  I don't do**
15   **the actual withdrawal liability calculation for**
16   **the plan, for the withdrawing employers.**
17   Q    Okay.  And just to understand, you say
18   the '74 Plan is a 404(c) plan, what does that
19   mean?
20   **A    It means it met the requirements of the**
21   **Internal Revenue code to be qualified under**
22   **Section 404(c).**

78

1    Q    And is that something that was told to
2    you or did you do -- was that something that was
3    told to you that this plan was a 404(c) plan?
4    **A    Yes.**
5    Q    And who instructed you that this plan
6    was a 404(c) plan?
7    **A    I believe by counsel.**
8    Q    And did you do any independent
9    investigation of whether or not the plan qualified
10   as a 404(c) plan?
11   **A    For the work that I do it has no bearing**
12   **on what I do.**
13   Q    Okay.  So is that -- is it fair to say
14   that you did no independent investigation of
15   whether the plan qualifies as a 404(c) plan?
16   **A    That is correct.**
17   Q    When you were at Mercer, if you can
18   remember what was -- and we are talking about the
19   most recent date that you can remember, did the
20   National's Asbestos Workers use the PBGC rates in
21   determining unfunded vested benefits for purposes
22   of withdrawal liability?

79

1    **A    No.**
2    Q    Did the Kansas City --
3    **A    It's the same plan.**
4    Q    Yeah, it is the same plan.  How about
5    the Ohio Laborers?
6    **A    No.**
7    Q    And the Pipefitters Local 189?
8    **A    They did not -- I don't recall for sure**
9    **on that one.**
10   Q    Okay.  In your experience at UAS are you
11   aware of any other plans that used the PBGC rates
12   as the discount rate for purposes of computing
13   withdrawal liability?
14   **A    I'm not aware of what the other plans**
15   **used.**
16   Q    So you don't know either way?
17   **A    Nope.**
18   Q    In your analysis of the assumptions
19   used, the actuarial assumptions used to determine
20   unfunded vested benefits, did you consider how, if
21   at all, benefit payment default risk of the
22   financial health of the '74 Plan would effect

80

1    assumptions?
2    **A    No.**
3    **BY MR. OSSI:**
4    Q    You mentioned that you reviewed both
5    Mr. Hittner's and Mr. Kra's expert reports.  Is
6    that correct?
7    **A    Yes.**
8    Q    And just to be clear, is there anything
9    that you disagreed with in Mr. Kra's report?
10   **A    I do not recall anything in there that I**
11   **had disagreements with.**
12   Q    In Mr. Kra's report he states that; It
13   is not reasonable to ask ongoing employers to foot
14   the bill for administrative expenses associated
15   with participants who had been employees of the
16   withdrawing employer.  Do you agree with that
17   statement?
18   **A    Yes.**
19   Q    Okay.  And why is that?
20   **A    The purpose of the withdrawal liability**
21   **is to settle the employer's obligation to the plan**
22   **to cover his share of the plan.  And expenses are**

**81**

1  part of the outgo, if you will, that you should
2  considered.
3     Q   Okay.  He also proposed that; The PBGC
4  rate should be used to calculate the present value
5  of the monthly withdrawal liability payments.  Do
6  you agree that that is the appropriate rate to use
7  when determining withdrawal liability --
8        MR. LECHNER:  I object to the form of
9  that question.  I don't know that that is in the
10 report.  Are you saying that that is in his
11 report?
12       MR. OSSI:  Off of the record one second.
13 Let me check.
14       (Pause)
15 BY MR. OSSI:
16    Q   Does ERISA allow an employer to prepay
17 its withdrawal liability to the best of your
18 knowledge?
19    A   Yes.
20    Q   And how is that prepayment typically
21 made by looking at the present value of the stream
22 of required monthly payments to the multiemployer

**82**

1  plan?
2     A   I believe it says that they can prepay
3  the scheduled payments plus any interest, accrued
4  interest without any penalties.
5     Q   And in your experience, what does that
6  mean without any penalties?
7     A   I would equate it to prepaying a
8  mortgage and having a penalty for prepaying, that
9  is what I think it is getting at.
10    Q   Okay.  In your experience have you -- if
11 you were to -- have you ever been involved in a
12 settlement of a withdrawal liability obligation
13 regarding the -- have you ever been involved in a
14 settlement of withdrawal liability obligation?
15    A   Settlement?
16    Q   Between a plan and an employer?
17    A   No.
18    Q   Okay.  You were deposed, as you
19 mentioned, in a dispute between the plan and
20 Peabody.  Correct?
21    A   Yes.
22    Q   At any time were you asked to calculate

**83**

1  any withdrawal liability amounts of Peabody?
2     A   No.
3     Q   And are you aware that Peabody settled
4  with the '74 Plan, its withdrawal liability?
5     A   Yes.
6     Q   And do you know any details of that
7  settlement?
8        MR. LECHNER:  I object to the question.
9  The settlement agreement is confidential, covered
10 by a confidential agreement.  And just to clarify
11 here, we might be able to cut through this; Are
12 you aware of the terms of the settlement?
13       THE WITNESS:  I am aware of the
14 contributions or the payments and the dates that
15 Peabody has agreed to pay to the fund because they
16 have a bearing on my financial projection.  That
17 is all that I know about it.
18       MR. LECHNER:  As you are here today, do
19 you know the amounts of the payments?
20       THE WITNESS:  No.
21       MR. LECHNER:  Okay.
22

**84**

1  BY MR. OSSI:
2     Q   Are you instructing your witness not to
3  answer the question?
4        MR. LECHNER:  I'm instructing him not to
5  answer to the extent that it goes to -- to the
6  extent that he has information which he doesn't
7  seem the have concerning the settlement agreement
8  other than what he has already said, the fact that
9  there are payments.  So I'm instructing him to
10 answer to the extent you know anything else.
11       THE WITNESS:  I know nothing else
12 regarding the settlement.
13 BY MR. OSSI:
14    Q   But you do know the number of payments
15 made?
16    A   I was provided with a schedule of the
17 payments and the dates.
18    Q   Okay.  And did you know the basis of
19 that of those payments or that settlement?
20    A   No.
21    Q   And did you know the amounts?  If I
22 understand correctly, you don't know the amounts

85

1  of the settlement?
2  **A   Not off of the top of my head, no.**
3  Q   Do you know -- do you know an estimate
4  of about how much the settlement was?
5  **A   I do not recall.**
6  Q   Let's go off of the record one second.
7  (Whereupon, a recess occurred from
8  3:22 p.m. until 3:41 p.m.)
9  MR. OSSI:  We have no further questions
10  of the witness.
11  MR. LECHNER:  1974 Plan does not have
12  any questions.
13  MR. OSSI:  Thank you very much.
14  THE WITNESS:  Thank you.
15  (Whereupon, at 3:41 p.m. the above
16  proceedings was adjourned.)
17
18
19
20
21
22

87

1  CERTIFICATE OF SHORTHAND REPORTER
2  I, DONNA M. LEWIS, RPR, the officer
3  before whom the foregoing deposition was taken, do
4  hereby certify that the foregoing transcript is a
5  true and correct record of the testimony given;
6  that said testimony was taken by me
7  stenographically and thereafter reduced to
8  typewriting under my direction; that reading and
9  signing was requested; and that I am neither
10  counsel for, related to, nor employed by any of
11  the parties to this case and have no interest,
12  financial or otherwise, in its outcome.
13  IN WITNESS WHEREOF, I have hereunto set
14  my hand and affixed my notarial seal this 3rd day
15  of November, 2017.
16
17  My commission expires: March 14, 2018
18
19
20  *Donna M Lewis*
21  _____
22  DONNA M. LEWIS, RPR

86

1  ACKNOWLEDGMENT OF DEPONENT
2  I, WILLIAM RUSCHAU, do hereby
3  acknowledge that I have read and examined the
4  foregoing testimony, and the same is a true, correct
5  and complete transcription of the testimony given by
6  me and any corrections appear on the attached Errata
7  sheet signed by me.
8
9
10  _____  _____
11  (DATE)          (SIGNATURE)
12
13
14
15
16
17
18
19
20
21
22

Transcript of William Ruschau
Conducted on November 30, 2017

| A |
| --- |

**able**
9:21, 38:1,
38:4, 83:11
**about**
8:1, 8:17,
8:19, 10:2,
11:3, 11:9,
11:18, 12:21,
14:10, 18:2,
18:4, 18:9,
18:11, 18:13,
18:19, 19:13,
20:16, 21:9,
22:7, 22:9,
22:12, 22:18,
23:11, 23:17,
25:19, 27:3,
27:7, 31:7,
31:21, 32:15,
34:9, 35:18,
37:20, 37:21,
38:3, 38:4,
38:10, 39:13,
39:16, 39:19,
39:22, 44:4,
44:6, 47:8,
47:10, 50:3,
51:20, 55:10,
56:6, 56:16,
57:6, 57:8,
60:1, 63:2,
63:3, 63:13,
65:20, 66:16,
67:8, 67:12,
70:15, 71:10,
71:17, 72:6,
74:12, 74:13,
75:17, 76:2,
76:5, 78:18,
79:4, 83:17,
85:4
**above**
85:15
**academy**
54:22
**account**
22:5, 22:16,

27:4, 75:16,
77:10
**accrued**
82:3
**accurate**
65:22
**accurately**
9:16
**acknowledge**
86:3
**acknowledgment**
86:1
**active**
42:17
**actual**
77:15
**actually**
23:21
**actuarial**
6:12, 11:14,
11:20, 20:20,
21:4, 22:4,
22:6, 22:10,
30:19, 31:8,
31:13, 33:16,
33:20, 34:20,
35:22, 36:6,
42:7, 43:1,
43:18, 47:22,
50:18, 50:21,
51:3, 51:11,
51:15, 52:13,
52:15, 52:19,
53:6, 53:10,
57:1, 57:6,
57:8, 57:22,
59:22, 66:18,
67:8, 67:12,
67:22, 68:19,
69:3, 71:1,
71:11, 74:14,
75:4, 75:11,
79:19
**actuaries**
13:7, 13:8,
18:4, 21:3,
27:4, 27:7,
30:5, 30:18,

32:3, 54:22
**actuary**
10:9, 11:12,
11:13, 11:17,
12:4, 12:17,
12:19, 13:1,
13:4, 13:11,
13:19, 13:22,
15:16, 15:18,
17:2, 18:12,
21:13, 21:15,
22:4, 22:15,
31:3, 32:11,
34:6, 35:22,
43:16, 45:16,
57:2, 69:20,
70:18, 71:18,
73:2, 75:8
**actuary's**
19:21, 21:7,
36:16, 46:1,
63:8
**address**
33:13, 33:16,
52:9, 54:18,
58:10
**adjourned**
85:16
**adjust**
36:3
**administrative**
41:18, 80:14
**advice**
29:20
**affect**
46:16
**affixed**
87:14
**after**
7:4, 9:10,
51:16, 64:16
**afternoon**
7:9
**again**
22:20, 27:17,
28:1, 40:8,
54:1, 75:6
**against**
65:3

**age**
20:6, 23:8,
23:20, 26:2,
39:16, 41:16,
42:21, 44:3,
44:7
**aggregate**
21:8, 21:16,
45:18, 46:13
**ago**
8:5, 8:17
**agree**
60:3, 60:15,
61:11, 61:19,
62:1, 62:19,
62:20, 64:4,
80:16, 81:6
**agreed**
83:15
**agreement**
83:9, 83:10,
84:7
**ahead**
26:19
**alcohol**
9:14
**all**
16:14, 19:20,
26:2, 29:14,
35:10, 35:22,
37:12, 39:1,
43:20, 46:4,
51:13, 56:18,
58:6, 79:21,
83:17
**allocation**
56:1
**allow**
81:16
**almost**
73:20
**along**
34:4
**alpha**
56:3
**already**
84:8
**also**
10:11, 17:19,

Transcript of William Ruschau
Conducted on November 30, 2017

19:19, 27:9,
36:2, 44:4,
44:14, 53:4,
53:10, 58:2,
69:21, 70:3,
73:7, 74:1,
76:19, 81:3
**always**
36:15, 44:19,
63:2
**america**
1:9, 2:9, 6:17,
69:11
**american**
1:1, 2:1, 54:22
**amount**
36:11, 46:16,
47:21, 48:4,
61:4, 65:1
**amounts**
83:1, 83:19,
84:21, 84:22
**analysis**
6:10, 79:18
**analyze**
19:6
**annuitize**
24:11
**annuity**
24:12, 24:14,
24:17, 60:21
**another**
52:21, 69:20
**answer**
9:11, 9:16,
18:10, 29:5,
38:7, 53:15,
56:15, 84:3,
84:5, 84:10
**any**
9:5, 9:14,
9:20, 10:17,
11:2, 12:21,
13:16, 13:21,
14:4, 14:7,
14:10, 14:17,
16:13, 18:15,
24:20, 25:7,

30:3, 30:5,
30:10, 30:17,
31:11, 31:21,
32:15, 32:18,
33:3, 33:13,
33:16, 34:5,
35:6, 35:12,
37:3, 38:10,
40:17, 41:13,
41:17, 43:18,
44:8, 46:15,
48:2, 48:21,
49:7, 51:11,
52:4, 53:13,
54:10, 54:13,
54:14, 55:22,
58:9, 58:13,
58:19, 64:20,
64:21, 66:17,
67:16, 67:22,
68:10, 70:12,
70:22, 71:4,
71:14, 75:10,
78:8, 79:11,
82:3, 82:4,
82:6, 82:22,
83:1, 83:6,
85:12, 86:6,
87:10
**anybody**
67:9
**anyone**
10:19, 66:20,
67:11, 67:18
**anything**
9:5, 9:14,
11:5, 21:9,
31:1, 70:19,
74:17, 75:1,
75:7, 80:8,
80:10, 84:10
**apologize**
43:16
**appear**
86:6
**appearances**
4:1, 5:1
**appears**
47:22

**applicable**
20:4
**applies**
53:13
**apply**
53:10, 73:7,
77:7, 77:8
**approaches**
63:14, 63:15,
63:19
**appropriate**
24:7, 29:21,
57:3, 60:20,
65:16, 75:4,
75:11, 81:6
**arbitration**
1:1, 2:1,
14:14, 14:17
**areas**
67:7
**around**
30:2
**articles**
14:7
**asbestos**
17:22, 78:20
**aside**
56:5
**ask**
7:13, 8:19,
9:7, 9:8, 9:13,
11:8, 12:21,
16:4, 31:20,
32:15, 38:3,
38:4, 43:17,
43:18, 48:2,
50:2, 65:20,
80:13
**asked**
26:12, 26:13,
32:19, 41:18,
44:12, 47:8,
82:22
**asking**
10:2, 26:14,
26:16
**asop**
52:11, 52:21,

53:2, 53:3,
53:4, 53:5,
53:10, 53:20,
53:21, 54:22,
75:1
**asops**
52:18, 71:8,
75:7, 75:8
**assess**
65:7, 65:9
**assessed**
65:2
**assessing**
36:12
**assets**
47:17
**assigned**
65:13
**associated**
80:14
**association**
1:1, 2:1
**assumption**
6:11, 23:3,
24:1, 24:20,
25:3, 38:11,
39:9, 39:14,
39:17, 39:20,
40:1, 40:14,
40:15, 41:1,
44:15, 45:12,
46:8, 46:9,
46:12, 47:3,
48:10, 48:12,
48:14, 50:21,
51:11, 54:3,
54:19, 55:3,
55:13, 57:13,
57:15, 57:17,
58:6, 61:10,
62:17, 63:6,
63:17, 64:22,
68:10, 75:11,
75:20, 76:8,
77:11
**attached**
86:6
**attends**
70:3

attention
69:14
attorney
7:10, 43:17
attorneys
8:22, 11:3
auditor
47:19
august
70:8
avenue
2:16, 4:5, 4:13
aware
21:20, 30:13,
30:14, 31:20,
32:2, 33:4,
65:1, 74:18,
74:22, 76:21,
79:11, 79:14,
83:3, 83:12,
83:13

**B**

back
16:3, 29:3,
34:10, 43:20,
49:17, 51:8,
67:10, 70:14,
76:3
background
11:9
based
24:2, 41:11,
45:2, 45:7,
45:9, 46:11,
54:8, 65:14,
72:21, 74:19
basic
63:14
basically
10:15, 21:14,
69:14
basis
60:22, 64:15,
84:18
bear
73:16
bearing
28:9, 28:12,

78:11, 83:16
because
9:1, 26:12,
28:7, 32:12,
35:3, 37:22,
43:4, 64:13,
66:12, 68:3,
73:6, 73:18,
73:22, 74:9,
83:15
been
7:4, 7:21,
8:14, 10:5,
11:16, 35:15,
36:22, 37:15,
37:17, 48:11,
65:2, 66:13,
69:1, 69:9,
70:17, 80:15,
82:11, 82:13
before
2:17, 7:21,
11:19, 12:1,
12:9, 12:12,
26:13, 27:3,
27:6, 34:6,
44:14, 59:12,
87:3
began
15:1, 15:3
beginning
33:22
begins
69:15
behalf
3:2, 4:2, 5:2,
7:6
being
8:7, 13:19,
13:20, 29:20,
33:2, 33:6,
37:22, 54:9,
60:21, 64:14,
65:13, 68:22
believe
15:7, 18:10,
34:11, 40:6,
46:14, 49:10,

53:1, 58:6,
60:10, 61:8,
61:20, 65:6,
72:18, 75:12,
78:7, 82:2
believed
59:20
benefit
39:4, 79:21
benefits
20:12, 22:13,
25:21, 35:8,
36:7, 36:12,
38:21, 39:5,
44:8, 46:17,
47:13, 47:16,
48:5, 49:1,
52:5, 65:14,
71:6, 77:14,
78:21, 79:20
besides
17:13
best
19:21, 21:7,
46:1, 46:2,
46:10, 46:12,
52:18, 54:9,
59:14, 60:11,
63:8, 63:11,
81:17
between
33:3, 45:6,
82:16, 82:19
beyond
44:7
big
44:20
bill
80:14
bit
26:12, 52:9,
66:16
blended
62:6, 63:18
blending
63:6
board
6:16, 69:10

bockus
4:3, 4:11
bond
19:15
books
14:10
both
63:8, 64:3,
80:4
bottom
69:15
break
9:6
bring
11:5
broad
30:6
building
73:8, 73:9,
73:20, 74:2,
74:8
bullet
54:21
bullock
69:19, 69:20
business
32:13, 32:22
buy
24:12, 24:14,
24:15, 24:17,
24:18

**C**

c
76:22, 77:1,
77:3, 77:5,
77:18, 77:22,
78:3, 78:6,
78:10, 78:15
calculate
47:15, 47:17,
62:16, 73:12,
81:4, 82:22
calculated
64:14
calculates
62:5
calculation
37:13, 40:12,

Transcript of William Ruschau
Conducted on November 30, 2017

41:11, 63:12,
66:22, 71:5,
77:15
**calculations**
36:17
**calendar**
72:11, 72:13,
72:15
**call**
34:7, 52:11,
70:8, 70:11
**called**
62:8
**can**
7:16, 11:19,
13:3, 15:9,
16:8, 16:9,
17:16, 19:17,
21:13, 32:17,
32:18, 35:11,
37:11, 37:17,
44:1, 49:12,
56:5, 56:11,
56:21, 62:10,
63:10, 67:20,
78:17, 78:19,
82:2
**can't**
9:4, 53:8, 63:7
**cap**
77:8
**capacity**
30:10
**captured**
30:7
**career**
14:4, 17:2
**carpenter's**
72:8
**carpenters**
16:11, 72:4,
72:7, 75:21
**case**
1:7, 2:7, 8:9,
8:11, 10:4,
14:14, 14:17,
14:18, 65:3,
87:11

**certain**
10:12, 27:19
**certainly**
67:6
**certificate**
87:1
**certify**
87:4
**challenged**
61:19
**change**
28:14, 49:4,
49:6, 49:8, 49:9
**changed**
49:10
**changes**
28:15, 47:4,
47:5, 47:6,
48:12, 48:14,
48:21, 55:22
**charge**
35:21
**charles**
4:12, 4:15
**check**
81:13
**choice**
21:18
**christopher**
3:13
**city**
16:12, 17:20,
72:5, 73:7,
76:2, 76:3,
76:6, 76:8, 79:2
**clarification**
22:8, 68:12
**clarify**
26:15, 83:10
**clear**
37:22, 44:21,
80:8
**clients**
68:4
**close**
37:8
**cna**
12:13, 12:14,

12:16, 14:20
**coal**
76:19
**code**
77:21
**colleagues**
58:16
**columbia**
2:20
**columbus**
7:20
**com**
3:10, 3:19,
4:9, 4:15, 5:10,
5:20
**comments**
36:3
**commission**
87:17
**commonly**
62:8, 63:19
**communicate**
66:19, 67:11
**communicated**
68:17
**communication**
59:17, 67:3
**communications**
66:16, 67:17
**company**
7:7, 24:16,
24:19
**compare**
54:13
**complete**
43:13, 43:15,
86:5
**completely**
9:16
**compute**
47:12, 48:3
**computed**
47:21
**computer**
20:21
**computing**
21:4, 22:11,
22:20, 26:9,

27:16, 38:22,
45:12, 45:18,
48:5, 52:5,
53:11, 53:19,
57:9, 71:15,
79:12
**concern**
63:5
**concerning**
84:7
**concerns**
63:2, 63:3
**concludes**
69:16
**conditions**
28:14, 28:16,
75:15
**conference**
70:8, 70:11
**confidential**
83:9, 83:10
**conjunction**
66:22
**consider**
46:7, 55:12,
55:15, 59:21,
60:7, 79:20
**considered**
60:17, 61:2,
61:6, 61:13,
81:2
**constitutes**
74:16
**constitution**
74:2
**construction**
76:17
**consulting**
29:19, 30:4
**consults**
70:3
**context**
26:13
**continue**
50:11
**continued**
4:1, 5:1
**contribution**
65:15

contributions
83:14
conversation
31:11
copy
56:11
corner
3:7, 3:16
corporate
19:15
corporation
1:5, 2:5, 3:2
correct
8:15, 16:21,
17:10, 26:10,
27:10, 34:1,
42:1, 46:8,
51:5, 57:13,
58:17, 78:16,
80:6, 82:20,
86:4, 87:5
corrections
86:6
correctly
84:22
correspondence
29:19
could
9:15, 48:11,
49:6, 50:6, 75:6
counsel
9:9, 9:10,
9:11, 78:7,
87:10
couple
29:15, 48:11,
50:2
course
23:9
cover
80:22
covered
83:9
create
35:5, 42:9
creating
35:20, 42:7,
66:17

crescent
3:5, 3:14
crwilliams@venab-
le
3:19
csr
1:22
current
11:11, 48:10,
54:8, 57:3,
60:21, 64:8,
66:5, 66:6, 66:7
currently
12:22, 62:5,
76:10
curve
19:15
cut
83:11

### D

danger
44:19
data
23:21, 39:5,
41:19, 44:5,
45:3, 45:6,
45:7, 67:6
date
52:2, 78:19,
86:11
dated
69:12
dates
83:14, 84:17
day
87:14
dc
1:15
de
77:7
deal
44:20
deals
52:22
decision
31:22, 32:1
default
79:21

defensible
61:18, 61:22
deferred
44:7
defined
18:20, 18:21,
19:3, 19:6,
63:21
definition
61:22, 73:10,
73:11, 74:1
demand
10:11
depends
23:3
deponent
86:1
deposed
7:21, 8:4, 8:7,
8:14, 10:4,
82:18
deposition
1:14, 2:15,
7:14, 10:3,
10:6, 10:8,
10:20, 11:3,
87:3
depositions
8:22
describe
13:3, 37:11,
50:16, 56:21,
62:14, 70:8
described
18:16, 25:8,
25:12, 48:17,
48:22
describes
75:2
description
6:9
design
13:14
designation
76:22
details
83:6
determination
36:6, 37:8,

40:16, 40:17,
43:2, 50:21,
60:8, 70:20,
77:14
determine
22:13, 25:13,
25:20, 26:3,
26:4, 38:20,
45:17, 47:20,
76:11, 79:19
determined
36:11, 36:14,
39:1, 64:9
determining
19:8, 20:1,
20:8, 22:3,
22:9, 22:19,
23:1, 23:5,
23:13, 24:22,
26:8, 27:14,
27:15, 28:19,
35:7, 39:9,
40:8, 40:22,
42:5, 42:16,
47:14, 49:1,
51:4, 52:19,
53:18, 53:22,
54:5, 57:22,
58:3, 58:11,
60:18, 61:3,
61:14, 66:18,
71:2, 72:9,
75:3, 75:11,
75:22, 77:10,
78:21, 81:7
develop
76:13, 76:14
dexter
31:3, 31:5,
31:7
did
8:9, 10:3,
10:6, 10:8,
10:19, 10:22,
11:2, 11:5,
12:1, 12:6,
12:9, 12:12,
12:14, 14:21,

15:2, 15:4,
15:8, 15:15,
17:5, 17:12,
18:4, 19:6,
29:13, 31:1,
31:2, 31:5,
31:7, 32:5,
32:7, 32:9,
32:14, 32:15,
32:21, 33:11,
33:13, 33:16,
33:21, 34:3,
34:5, 34:14,
34:20, 35:11,
37:3, 38:3,
38:7, 38:20,
39:7, 39:8,
39:14, 40:7,
41:2, 41:7,
41:13, 41:16,
41:17, 42:3,
42:11, 44:10,
45:11, 46:3,
47:12, 48:3,
48:7, 49:8,
51:7, 51:10,
51:16, 52:3,
57:5, 58:19,
60:7, 66:19,
67:8, 67:11,
67:17, 73:2,
73:5, 76:11,
78:2, 78:8,
78:14, 78:19,
79:2, 79:8,
79:20, 84:18,
84:21
**didn't**
43:12, 50:8
**difference**
23:8, 39:16,
41:16, 42:21,
44:3, 45:4,
45:5, 76:21
**differences**
20:6, 23:20,
26:2, 75:13,
75:14, 75:16

**different**
9:1, 26:3,
26:15, 26:17,
37:4, 37:15,
37:18, 40:3,
40:18, 45:12,
63:6, 63:11,
73:9, 73:10,
73:13, 73:15,
73:17, 73:18,
73:19, 73:22,
74:11, 75:2,
75:3, 75:9,
75:10, 76:16,
76:19, 77:5
**differently**
74:19
**difficult**
9:15
**direct**
54:20, 69:14
**direction**
87:8
**directly**
18:17, 68:17,
70:4
**disability**
20:4, 44:3,
44:11, 45:8,
45:11
**disagreed**
80:9
**disagreements**
80:11
**discount**
19:14, 23:9,
24:4, 28:3,
28:5, 38:14,
38:15, 40:14,
42:22, 44:1,
50:18, 50:20,
51:8, 53:18,
53:22, 55:7,
64:22, 66:7,
70:15, 71:15,
72:2, 72:8,
72:21, 75:17,
76:7, 79:12

**discounted**
39:5
**discussed**
58:5, 62:22,
67:21, 68:9
**dispute**
82:19
**distribution**
20:5
**district**
2:19
**document**
50:3, 50:13,
56:19, 59:12,
59:15
**does**
13:6, 13:10,
13:21, 21:9,
22:4, 22:14,
22:18, 23:2,
24:9, 24:10,
28:11, 29:17,
45:16, 46:12,
46:14, 47:19,
53:4, 53:5,
53:10, 69:4,
69:21, 70:1,
70:22, 72:7,
75:15, 76:6,
77:1, 77:8,
77:18, 81:16,
82:5, 85:11
**doesn't**
63:5, 63:7,
64:19, 84:6
**doing**
36:21, 37:7,
37:10, 37:11,
68:5
**don't**
18:1, 18:8,
28:4, 32:20,
42:13, 43:4,
43:18, 44:8,
47:17, 48:14,
52:22, 58:13,
63:10, 68:3,
71:21, 75:13,

77:14, 79:8,
79:16, 81:9,
84:22
**done**
18:14, 19:5,
36:17, 42:14,
58:14, 66:22
**donna**
1:22, 2:18,
87:2, 87:22
**down**
9:2, 9:4, 53:8
**drive**
3:5, 3:14
**drugs**
9:14
**duly**
7:4

**E**

**each**
40:12, 40:13,
46:8, 46:9,
46:11, 55:10,
74:9
**earlier**
22:2, 66:9
**early**
8:18, 66:2
**earn**
28:10
**earned**
25:5
**earnings**
25:5, 25:6,
28:17
**easiest**
7:15
**easily**
31:20
**easy**
9:7
**economic**
52:22, 53:13
**edict**
70:22
**effect**
38:17, 46:22,

47:2, 48:13,
79:22
**effectively**
24:11, 55:17,
63:22
**either**
21:13, 25:5,
30:18, 68:19,
79:16
**elaborate**
53:16
**eleven**
12:15
**else**
21:9, 84:10,
84:11
**email**
3:10, 3:19,
4:9, 4:15, 5:10,
5:20
**emails**
68:8
**employed**
11:13, 11:14,
66:20, 67:9,
67:12, 87:10
**employee**
68:1, 68:10
**employees**
80:15
**employer**
13:17, 13:18,
14:1, 14:2,
18:20, 18:21,
19:3, 19:6,
19:11, 20:2,
60:15, 61:8,
64:15, 64:19,
64:20, 65:8,
74:7, 74:9,
80:16, 81:16,
82:16
**employer's**
80:21
**employers**
61:11, 64:4,
64:10, 64:18,
74:2, 74:3,

74:5, 74:21,
77:16, 80:13
**end**
38:18
**ending**
61:7
**energy**
1:5, 2:5, 3:2,
7:6, 7:11, 8:11,
65:3, 65:10
**enough**
22:3, 38:1,
47:18, 49:7,
62:13
**enrolled**
12:19, 12:22,
13:4, 13:7,
13:10, 13:11,
13:19, 13:20,
15:15, 15:18,
17:2, 18:4,
30:17, 35:22,
70:17
**entitled**
64:21
**equate**
82:7
**erisa**
10:12, 10:13,
74:17, 81:16
**errata**
86:6
**esquire**
3:4, 3:13, 4:4,
4:12, 5:4, 5:14
**estimate**
19:21, 21:7,
23:16, 46:1,
46:3, 46:10,
46:12, 54:9,
63:8, 85:3
**estimates**
63:11
**evaluation**
41:13, 42:8,
47:22, 50:19
**evaluations**
34:6, 43:19

**ever**
7:21, 14:4,
14:7, 14:10,
14:13, 14:16,
18:14, 18:21,
19:2, 30:9,
31:7, 35:14,
59:11, 59:15,
67:8, 67:11,
67:20, 68:9,
68:17, 68:22,
69:1, 82:11,
82:13
**every**
69:2
**everything**
28:2
**exactly**
37:21, 42:13,
48:14
**examination**
6:4, 7:6
**examined**
7:5, 86:3
**example**
24:16, 67:17
**except**
58:7
**excuse**
26:18, 33:6,
49:12
**exhibit**
49:20, 49:21,
56:7, 56:10,
59:2, 59:3, 69:6
**exhibits**
6:9, 67:14
**existent**
15:21
**exiting**
32:12
**expect**
28:8
**expectations**
22:19, 23:1,
23:12, 24:5,
25:14, 26:5,
27:5

**expense**
39:22, 40:2,
40:5, 40:13,
40:15, 40:22,
42:22, 54:3,
55:13
**expenses**
23:10, 40:11,
41:3, 44:15,
58:8, 80:14,
80:22
**experience**
22:5, 22:16,
23:15, 23:18,
24:3, 26:7,
26:14, 27:8,
27:12, 27:13,
27:20, 28:5,
28:6, 28:9,
30:4, 36:1,
41:2, 41:7,
41:12, 41:17,
41:22, 42:4,
45:3, 45:6,
45:9, 55:20,
63:19, 79:10,
82:5, 82:10
**experiences**
28:11
**expert**
10:9, 14:13,
14:16, 80:5
**expires**
87:17
**explain**
62:4
**explicitly**
61:6
**extent**
71:13, 75:12,
75:13, 84:5,
84:6, 84:10

**F**

**facsimile**
3:9, 3:18, 4:8,
5:9, 5:19
**fact**
24:2, 51:2,

Transcript of William Ruschau
Conducted on November 30, 2017

84:8

**factors**
19:10, 20:8,
22:22, 25:22,
26:3

**fair**
22:3, 25:12,
25:14, 29:8,
47:18, 48:16,
49:7, 55:2,
57:20, 60:14,
60:21, 61:8,
61:10, 62:1,
64:3, 64:7,
64:9, 64:10,
64:12, 64:13,
65:7, 65:9,
78:13

**familiar**
62:12, 62:13

**far**
16:1

**feeds**
53:3

**felt**
35:12

**few**
7:13, 11:8,
17:22, 20:15,
20:16

**filled**
44:5

**final**
61:16, 61:17

**finalize**
36:4

**financial**
79:22, 83:16,
87:12

**firm**
30:14, 30:15

**first**
7:4, 7:14,
15:4, 23:19,
33:20, 35:18,
36:10, 39:1,
52:10, 59:19,
59:21, 66:21,

69:14, 69:18

**five**
11:18, 34:11,
35:3, 35:5, 43:8

**follow**
21:3, 25:17,
45:20, 52:14,
52:17, 53:20,
53:21, 54:16,
75:9

**following**
13:5, 40:5,
48:20, 59:21

**follows**
7:5

**foot**
80:13

**foregoing**
86:4, 87:3,
87:4

**forgot**
44:17

**form**
20:5, 30:19,
43:3, 81:8

**forms**
13:15

**forth**
21:13, 57:19

**forward**
38:19

**four**
43:8, 59:18,
62:22

**fourth**
61:17

**free**
24:7, 25:2,
39:3, 54:8,
60:10, 64:14,
75:19

**from**
15:11, 24:16,
24:17, 24:18,
39:5, 40:18,
41:19, 49:10,
49:14, 59:17,
67:6, 70:7,

70:8, 71:8,
74:7, 85:7

**front**
50:13, 56:19

**full**
7:16

**fully**
24:12, 35:15,
37:6

**functioned**
17:1

**fund**
24:18, 25:10,
28:10, 28:12,
67:6, 67:9,
67:12, 67:18,
68:1, 68:7,
74:9, 83:15

**fund's**
69:5

**funded**
34:17, 35:15,
62:17, 62:18

**funding**
19:8, 19:11,
20:1, 20:9,
34:14, 34:16,
39:12, 40:11,
40:19, 41:11,
45:13, 50:17,
50:20, 50:22,
51:4, 51:12,
52:15, 52:20,
54:20, 57:4,
57:22, 58:1,
63:17, 66:2,
67:1, 73:1,
76:12, 76:14

**funds**
73:14, 73:20,
74:3, 74:8

**further**
85:9

**future**
23:16, 28:8,
28:10, 28:13,
28:18, 39:5,
40:11, 54:6,

54:14, 55:15,
55:17

**G**

**gave**
67:14

**general**
25:18, 53:2

**generally**
30:13, 30:14,
74:3

**generated**
28:17, 36:2,
39:4

**generates**
77:3

**gentlemen**
11:1

**get**
15:8, 47:16,
64:20

**getting**
32:22, 65:16,
82:9

**give**
28:7

**given**
14:4, 59:11,
86:5, 87:5

**go**
16:3, 19:10,
23:5, 24:15,
26:18, 43:1,
43:20, 44:20,
46:17, 49:12,
49:17, 55:6,
55:9, 56:6,
59:19, 70:14,
76:3, 85:6

**goes**
57:11, 62:4,
63:13, 64:17,
84:5

**going**
7:13, 7:15,
9:8, 10:1, 10:4,
12:21, 16:3,
20:16, 22:7,

31:10, 49:19,
51:19, 55:9,
68:3, 69:13,
70:14
**good**
7:9
**gossi@venable**
3:10
**gotten**
50:8
**greater**
47:2
**green**
5:3, 5:4, 5:13
**greg**
7:10
**gregory**
3:4
**groppe**
4:12
**groppe@morganlew-
is**
4:15
**ground**
8:22
**guess**
36:22
**guidelines**
71:4

**H**

**had**
30:3, 30:9,
30:21, 33:9,
34:11, 34:21,
36:11, 37:5,
37:16, 48:13,
50:8, 58:14,
63:2, 70:9,
73:21, 80:11,
80:15
**hand**
49:19, 87:14
**handbasket**
64:17
**handed**
70:7
**handing**
56:9, 59:1

**happen**
74:6
**happens**
74:13
**has**
21:20, 25:4,
28:9, 31:13,
35:14, 59:14,
64:15, 65:2,
69:9, 71:7,
71:9, 78:11,
83:15, 84:6,
84:8
**have**
7:21, 8:14,
9:2, 9:3, 10:5,
11:16, 12:9,
13:21, 14:4,
14:7, 14:10,
14:13, 14:16,
16:5, 16:10,
18:4, 18:13,
18:14, 18:15,
18:21, 19:2,
20:19, 20:20,
25:7, 27:1,
27:13, 28:12,
28:18, 30:7,
30:22, 31:16,
34:11, 36:17,
36:22, 37:3,
37:15, 37:16,
37:17, 42:8,
44:8, 46:16,
46:21, 47:2,
47:8, 47:16,
48:11, 48:13,
48:22, 49:10,
51:19, 51:22,
52:2, 56:11,
57:12, 58:9,
59:11, 63:1,
63:11, 66:4,
66:13, 67:15,
68:9, 68:17,
68:22, 69:2,
70:7, 70:17,
70:18, 70:22,

73:16, 73:19,
73:21, 74:3,
74:6, 74:8,
76:3, 77:13,
82:10, 82:11,
82:13, 83:16,
84:7, 85:9,
85:11, 86:3,
87:11, 87:13
**having**
7:4, 67:20,
70:11, 74:4,
82:8
**head**
9:4, 9:5, 85:2
**health**
79:22
**held**
2:15, 33:3
**hell**
64:17
**help**
23:16
**helps**
28:7
**here**
9:2, 9:7, 11:1,
16:4, 43:11,
51:9, 60:1,
83:11, 83:18
**hereby**
86:2, 87:4
**hereunto**
87:13
**higher**
66:1, 66:8,
66:14
**him**
43:5, 84:4,
84:9
**hired**
33:2, 33:7
**his**
80:22, 81:10
**historical**
25:9, 41:12,
45:6, 55:19,
66:13

**history**
25:6, 34:14,
34:16, 35:3,
35:5
**hittner**
10:10
**hittner's**
80:5
**hook**
64:18
**hours**
65:15
**how**
8:1, 8:17,
10:8, 11:16,
12:6, 12:14,
15:8, 18:2,
18:4, 18:9,
18:11, 22:12,
25:4, 25:19,
31:13, 31:19,
31:20, 31:21,
34:9, 34:10,
34:17, 38:20,
44:5, 45:16,
48:3, 48:7,
50:16, 65:5,
66:11, 76:11,
79:4, 79:20,
81:20, 85:4
**huh**
55:11, 57:16,
63:16, 70:16

**I**

**i'll**
50:2
**idea**
66:4
**identification**
49:22, 56:8,
59:4, 69:7
**identify**
38:1
**ignored**
22:1
**immaterial**
48:13

impact
55:2, 74:9
important
52:19
imposed
74:7
increase
20:4
independent
54:10, 78:8,
78:14
indicates
60:19
indication
28:8
individual
46:10, 46:11
individually
46:8, 55:10
individuals
66:17
industries
75:3
industry
73:19, 74:20,
75:9, 75:10,
75:14, 76:17,
76:20
influence
9:13
information
84:6
initial
6:10, 50:17
initially
43:7
instruct
75:8
instructed
78:5
instructing
84:2, 84:4,
84:9
instructs
9:12
insurance
12:13, 12:14,
12:16, 14:20,

24:16, 24:19
intended
51:15
interest
6:10, 19:14,
23:9, 24:4,
24:7, 25:3,
28:9, 38:10,
39:2, 39:3,
46:21, 47:2,
47:5, 48:10,
49:9, 54:19,
55:3, 55:7,
57:12, 58:8,
60:3, 60:11,
63:18, 64:22,
66:1, 66:12,
68:10, 68:12,
75:19, 75:22,
77:10, 82:3,
82:4, 87:11
internal
13:13, 77:21
into
19:10, 22:5,
22:15, 23:5,
27:4, 37:13,
43:1, 46:18,
53:3, 75:16,
77:9
invested
25:5
investigation
78:9, 78:14
investment
24:21, 26:13,
28:3, 28:14,
28:15, 28:20,
29:1, 54:2,
55:13, 56:1,
64:16
involve
8:9
involved
31:21, 82:11,
82:13
involving
8:11, 31:8

irs
13:21, 19:16,
19:20
issues
31:8, 52:10,
54:18, 55:2,
55:6
it's
21:18, 42:14,
68:8, 72:8,
74:8, 79:3
items
54:21
its
25:6, 37:5,
81:17, 83:4,
87:12
itself
25:11

**J**

james
31:3
jmooney@mooneygr-
een
5:20
job
1:20, 12:9
jobs
12:22
john
5:14
judgments
37:16, 37:18
july
33:22
june
49:11
just
9:6, 10:1,
25:11, 25:12,
26:1, 26:15,
27:9, 37:18,
43:5, 43:7,
43:9, 43:13,
44:13, 44:21,
47:8, 48:17,
48:22, 52:8,

55:9, 59:11,
62:22, 67:14,
69:12, 69:14,
70:7, 70:14,
73:15, 77:17,
80:8, 83:10

**K**

kansas
16:12, 17:20,
72:5, 73:7,
76:2, 76:3,
76:6, 76:8, 79:2
kind
52:8, 64:21
know
9:7, 18:8,
18:11, 25:6,
27:3, 30:17,
31:5, 31:19,
32:9, 33:1,
35:14, 35:17,
42:13, 43:10,
43:16, 49:7,
50:11, 56:15,
59:7, 61:1,
61:2, 61:4,
62:6, 62:10,
66:5, 66:11,
68:4, 71:13,
71:14, 71:20,
71:21, 73:13,
75:13, 77:4,
79:16, 81:9,
83:6, 83:17,
83:19, 84:10,
84:11, 84:14,
84:18, 84:21,
84:22, 85:3
knowledge
18:15, 30:22,
59:14, 81:18
kra
10:10
kra's
80:5, 80:9,
80:12

**L**

laborers
17:19, 79:5

laid
62:21
large
74:4
largely
28:2
last
8:3, 8:5,
65:17, 65:19,
66:13
later
51:16
law
22:10, 43:18
learn
10:3
leaving
18:3
lechner
4:4, 26:11,
26:18, 43:3,
43:12, 44:13,
44:19, 49:12,
50:6, 56:11,
68:12, 81:8,
83:8, 83:18,
83:21, 84:4,
85:11
let
29:3, 30:5,
30:6, 48:2,
50:10, 51:8,
54:20, 56:15,
59:6, 67:10,
81:13
let's
18:19, 19:13,
23:4, 23:11,
35:18, 72:6,
85:6
letter
6:14, 10:11,
51:7, 51:10,
51:13, 51:16,
51:17, 51:19,
51:20, 52:3,
52:9, 52:10,
54:17, 56:6,

56:14, 57:5,
57:7, 57:11,
57:21, 59:9,
60:19, 62:4,
63:13, 63:22,
65:18
letters
58:9, 68:8
lewis
1:22, 2:18,
4:3, 4:11, 87:2,
87:22
liabilities
21:22
like
9:3, 9:5, 9:6,
9:9, 9:10, 11:8,
24:15, 37:14,
47:9, 59:19,
65:19, 68:8,
73:14, 75:15
likely
74:8
list
42:12, 43:6,
44:20, 54:18
listed
43:4, 43:8,
57:20
listing
43:5
lists
59:18, 63:15
little
18:19, 25:18,
26:11, 30:6,
52:9, 66:16
live
7:19
llp
2:16, 3:3,
3:12, 4:3, 4:11
load
40:5
local
15:14, 17:9,
79:7
long
8:17, 11:16,

12:6, 12:14,
31:13, 34:10
longer
43:6
look
20:8, 23:18,
23:21, 25:4,
25:9, 26:7,
27:7, 27:11,
28:4, 28:6,
28:20, 29:1,
32:11, 40:12,
41:2, 41:7,
41:17, 41:22,
42:3, 42:17,
46:7, 50:10,
50:17, 59:6,
76:3
looked
27:13
looking
20:12, 24:6,
25:7, 27:20,
40:9, 40:10,
60:20, 75:19,
81:21
lot
19:17, 53:7,
74:3
lows
66:13

**M**

made
19:17, 24:20,
44:6, 81:21,
84:15
major
57:21
make
9:15, 29:20,
36:18, 43:13,
43:15, 46:2,
46:9, 46:13,
51:4, 54:10,
64:19, 68:6
makes
65:18

making
22:18, 36:3,
46:18, 52:15
many
8:1, 18:2,
18:4, 18:11,
30:7, 34:9, 51:2
march
87:17
marie
1:22, 2:18
marked
49:21, 56:7,
59:3, 69:6
market
63:17, 63:21,
64:17
marketplace
60:21
marking
49:20, 56:10,
59:1
marriage
44:14
married
20:5, 23:8,
45:2
massachusetts
2:16
matches
36:19
matter
8:6
may
8:14, 8:21,
9:9, 28:17,
34:11, 37:15
maybe
7:15, 27:9
mean
13:6, 13:10,
23:2, 24:9,
24:10, 29:17,
34:16, 47:4,
54:16, 73:17,
77:1, 77:19,
82:6
means
13:3, 13:12,

Transcript of William Ruschau
Conducted on November 30, 2017

**medications**
9:14
**meet**
10:19, 10:22
**meeting**
6:16, 33:9,
69:1, 69:2,
69:4, 69:10,
70:6
**meetings**
33:3, 33:8,
70:4
**meets**
62:21
**memory**
27:1
**mentioned**
8:13, 17:8,
58:14, 73:19,
75:18, 76:15,
77:4, 80:4,
82:19
**mercer**
12:3, 12:4,
12:7, 12:10,
12:12, 15:2,
16:21, 17:1,
17:6, 17:21,
18:3, 18:6,
18:7, 19:2,
29:13, 30:12,
30:13, 30:14,
30:20, 31:2,
32:12, 34:21,
35:7, 36:22,
37:5, 37:7,
37:10, 37:11,
37:22, 38:4,
38:13, 58:15,
59:9, 59:17,
59:20, 62:19,
65:18, 78:17
**mercer's**
34:5, 64:1
**met**
77:20
**method**
62:9, 62:11,

62:21, 63:2,
63:4
**methodology**
48:9, 73:11
**methods**
21:13, 21:15,
36:18
**might**
28:8, 33:17,
37:16, 37:17,
43:9, 83:11
**million**
65:6, 65:8,
65:9
**mine**
1:9, 2:9, 6:17,
69:11
**minimis**
77:7
**mining**
1:5, 2:5, 3:2,
7:7
**minor**
19:16, 44:4,
48:12
**minutes**
70:6
**mischaracterizing**
25:15
**miss**
44:10
**missing**
44:5
**mix**
28:15, 28:20,
29:2
**model**
46:4
**moment**
50:10, 59:6
**monthly**
49:10, 81:5,
81:22
**mooney**
5:3, 5:13, 5:14
**more**
12:21, 18:1,
43:4, 46:16,

53:2, 53:16
**morgan**
4:3, 4:11
**mortality**
19:19, 23:9,
23:22, 24:1,
39:7, 39:8,
39:11, 41:8,
41:9, 42:22,
44:2, 46:21,
47:3, 47:6,
57:15
**mortgage**
82:8
**most**
46:21, 57:21,
78:19
**moving**
38:19
**much**
65:5, 66:1,
66:8, 73:9,
85:4, 85:13
**multi**
13:17, 14:1
**multiemployer**
14:14, 14:21,
15:2, 15:5,
15:9, 16:6,
16:9, 17:5,
17:12, 17:13,
18:5, 18:11,
20:9, 20:14,
20:19, 63:20,
71:6, 71:10,
71:14, 74:19,
75:5, 81:22
**murphy**
5:3, 5:13
**must**
21:3, 21:6,
22:15, 73:11

**N**

**nail**
53:8
**name**
7:9, 7:16, 31:3

**names**
17:17
**national**
17:21
**national's**
78:20
**need**
26:20, 69:12
**needed**
36:3
**neither**
87:9
**never**
21:20, 30:21,
67:21, 73:21
**new**
32:3, 32:11,
36:15
**next**
51:20, 60:13,
61:9
**nods**
9:4
**non**
11:2, 52:22
**nope**
11:7, 79:17
**nor**
87:10
**not**
9:12, 10:17,
12:21, 13:5,
13:7, 13:11,
19:17, 21:11,
25:9, 25:17,
26:7, 27:11,
28:17, 32:17,
33:1, 34:19,
35:17, 37:18,
38:12, 40:21,
42:15, 43:16,
43:17, 45:20,
50:8, 54:16,
55:14, 58:22,
61:6, 62:18,
63:1, 64:18,
67:3, 67:19,
70:10, 71:8,

Transcript of William Ruschau
Conducted on November 30, 2017

35

71:16, 77:7,
77:8, 78:9,
79:8, 79:14,
80:10, 80:13,
84:2, 84:4,
85:2, 85:5,
85:11
**notarial**
87:14
**notary**
2:19, 7:4
**nothing**
74:22, 77:13,
84:11
**notice**
2:17
**november**
1:16, 87:15
**now**
19:12, 19:13,
26:15, 26:17,
26:20, 32:20,
38:19, 45:16,
47:9, 66:3,
66:9, 75:17
**number**
52:11, 53:1,
54:18, 56:10,
57:11, 74:4,
84:14
**nw**
2:16, 4:13

**O**

**oath**
9:13
**object**
9:9, 81:8, 83:8
**objection**
26:11, 43:3
**objective**
59:21, 60:4,
60:6, 60:8,
60:13, 60:15,
61:9, 61:16,
61:17, 61:19,
62:2
**objectives**
59:18, 62:21,

62:22
**objects**
9:10
**obligation**
60:22, 62:18,
75:20, 80:21,
82:12, 82:14
**obligations**
24:8, 24:10,
24:13, 53:14
**occasions**
70:12
**occupation**
11:11
**occur**
69:4, 73:22
**occurred**
48:15, 85:7
**october**
10:5
**off**
10:1, 29:3,
49:12, 81:12,
85:2, 85:6
**office**
41:18, 42:14,
42:15, 67:7,
68:7, 69:5
**officer**
87:2
**offices**
68:7
**ohio**
7:20, 17:19,
79:5
**okay**
7:12, 8:20,
10:18, 11:2,
11:8, 11:10,
12:6, 13:16,
14:20, 15:1,
18:2, 18:9,
19:14, 19:18,
19:22, 20:18,
21:12, 23:11,
25:4, 26:18,
27:22, 28:4,
28:19, 29:4,

29:12, 29:22,
30:3, 30:17,
31:2, 35:18,
36:5, 39:7,
41:20, 42:7,
42:16, 43:22,
45:22, 46:11,
46:15, 47:11,
48:2, 48:16,
48:20, 49:5,
49:18, 50:4,
50:12, 51:21,
52:8, 55:19,
56:17, 58:9,
59:8, 60:13,
61:1, 61:16,
62:10, 62:19,
64:1, 64:7,
65:1, 65:17,
65:21, 66:5,
66:15, 67:2,
67:5, 67:20,
69:17, 70:6,
71:9, 72:1,
72:14, 74:17,
76:15, 77:17,
78:13, 79:10,
80:19, 81:3,
82:10, 82:18,
83:21, 84:18
**one**
8:14, 8:19,
9:1, 9:7, 16:8,
33:9, 41:10,
51:2, 53:2,
54:20, 55:10,
56:5, 69:15,
79:9, 81:12,
85:6
**ones**
18:16, 51:14
**ongoing**
40:12, 80:13
**only**
71:17, 76:21
**opposed**
13:18, 14:1,
74:4

**ossi**
3:4, 6:5, 7:8,
7:10, 26:16,
26:22, 27:2,
43:9, 43:14,
44:18, 45:1,
49:16, 50:1,
50:7, 50:9,
56:9, 56:12,
56:13, 59:5,
68:14, 69:8,
80:3, 81:12,
81:15, 84:1,
84:13, 85:9,
85:13
**other**
8:14, 11:1,
14:17, 16:4,
16:5, 17:12,
17:13, 17:17,
18:15, 19:20,
19:22, 28:2,
28:6, 33:7,
40:14, 40:17,
42:20, 43:1,
46:17, 48:12,
51:11, 56:6,
67:16, 70:12,
70:19, 72:2,
75:10, 79:11,
79:14, 84:8
**others**
16:13, 44:9,
71:22
**otherwise**
87:12
**our**
33:9, 35:3,
50:18, 69:3
**ours**
34:4
**out**
21:2, 22:10,
32:3, 32:10,
42:12, 53:2,
54:18, 59:18,
62:21, 64:2
**outcome**
87:12

Transcript of William Ruschau
Conducted on November 30, 2017

outgo
81:1
over
20:3, 28:14,
28:15, 30:7,
34:17, 44:20,
66:13
oversees
70:4

**P**

p-r-o-c-e-e-d-i--
n-g-s
7:1
page
6:4, 6:9,
54:20, 54:21,
69:15, 69:16
pages
1:21
papers
42:8, 42:10,
42:11, 42:14
paragraph
65:17, 65:19,
69:15
part
24:3, 32:14,
32:19, 33:2,
35:1, 60:7, 81:1
participants
42:18, 44:6,
60:3, 60:12,
80:15
participate
74:21
particular
52:17, 75:9
particularly
63:1
parties
87:11
past
19:12, 23:15,
23:18, 24:2,
28:9, 28:11,
28:16, 41:22
paul
5:4, 69:18,

69:20
pause
81:14
pay
83:15
payment
79:21
payments
77:8, 81:5,
81:22, 82:3,
83:14, 83:19,
84:9, 84:14,
84:17, 84:19
pbgc
21:14, 21:20,
38:17, 39:1,
39:6, 48:11,
49:9, 54:9,
54:11, 54:13,
55:17, 62:15,
63:22, 64:9,
70:19, 71:16,
72:3, 78:20,
79:11, 81:3
peabody
8:11, 82:20,
83:1, 83:3,
83:15
peer
29:15, 29:17,
30:1, 58:15,
58:21
penalties
82:4, 82:6
penalty
82:8
pennsylvania
4:5, 4:13
pension
1:10, 2:10,
4:2, 5:2, 6:11,
13:13, 13:14,
13:18, 14:1,
14:2, 15:6,
15:9, 16:5,
16:6, 16:9,
16:18, 18:5,
18:20, 18:22,

19:3, 19:6,
19:11, 20:20,
53:14, 54:1,
62:5, 63:20,
69:11, 71:6,
71:10, 74:19,
75:5
people
30:7
percent
44:14, 45:2,
72:19
percentage
20:5, 23:8
perform
13:22
period
34:18
pgreen@@mooneygr-
een
5:10
physical
72:14
piece
74:10
pipefitters
15:14, 16:12,
17:9, 17:20,
72:5, 73:7,
76:4, 76:7,
76:8, 79:7
pitches
33:8
plan's
24:13
plans
13:13, 13:14,
14:21, 15:2,
15:6, 15:9,
16:6, 16:9,
17:5, 17:12,
17:13, 17:17,
18:5, 18:12,
18:13, 18:15,
18:20, 18:22,
19:3, 19:6,
19:7, 20:20,
25:22, 63:20,

71:6, 71:10,
71:14, 71:17,
71:20, 72:1,
74:19, 75:5,
79:11, 79:14
play
70:1
please
7:17, 50:10
plug
46:4
plumbers
15:13, 17:9
plus
82:3
point
9:6, 36:19,
54:21, 64:16
policy
28:15, 71:1,
71:4
portfolio
56:3
portion
17:2, 62:16,
62:18, 65:13
practice
43:17, 52:13
premium
64:22
preparation
10:19
prepare
10:6, 10:8,
34:3
prepared
34:22, 35:19
preparing
34:6, 34:13
prepay
81:16, 82:2
prepaying
82:7, 82:8
prepayment
81:20
prescribed
73:13
present
33:9, 40:10,

68:2, 69:3,
81:4, 81:21
**presentations**
68:6
**presenting**
69:9
**pretty**
9:7
**previous**
48:22
**previously**
58:5
**prior**
8:13, 8:21,
16:20, 18:3,
30:3, 30:9,
30:13, 33:5,
33:6, 33:20,
34:5, 35:5,
36:16, 57:1,
57:2
**probably**
8:18, 10:5
**problem**
29:7
**procedures**
75:2
**proceed**
59:7
**proceeding**
49:14
**proceedings**
85:16
**process**
33:2, 34:13,
36:14, 48:17,
48:21, 49:4,
76:13
**product**
61:20
**professional**
2:18, 11:9
**projection**
83:16
**promulgated**
21:21
**proposal**
15:11, 33:10,

33:11, 33:13,
33:16
**proposed**
81:3
**protect**
60:2
**protecting**
60:11
**provide**
29:17, 35:3,
38:7, 41:19,
53:4
**provided**
29:15, 29:20,
30:1, 31:13,
40:5, 43:6,
84:16
**provides**
71:11
**providing**
33:17, 60:22
**proxy**
39:2
**public**
2:19, 7:5
**published**
14:7
**purpose**
41:20, 68:13,
80:20
**purposes**
13:19, 13:20,
20:13, 29:8,
35:8, 35:15,
36:7, 36:12,
38:21, 39:9,
40:11, 41:14,
42:5, 45:12,
45:14, 45:18,
47:13, 48:5,
49:2, 51:12,
52:4, 52:15,
52:20, 53:11,
54:1, 54:5,
54:19, 55:4,
55:8, 58:3,
58:7, 58:10,
71:15, 76:9,

76:12, 77:11,
78:21, 79:12
**pursuant**
2:17
**put**
32:3, 32:10,
56:5, 56:19

**Q**

**qualified**
13:12, 13:13,
77:21, 78:9
**qualifies**
78:15
**question**
7:14, 9:11,
22:2, 26:21,
44:12, 45:20,
65:20, 69:18,
81:9, 83:8, 84:3
**questions**
7:13, 9:8,
10:2, 11:9,
32:15, 32:18,
44:11, 47:8,
50:2, 56:15,
85:9, 85:12
**quite**
25:17
**quiz**
10:17

**R**

**raising**
9:5
**rarely**
73:22
**rate**
19:14, 20:3,
20:4, 23:9,
23:12, 23:13,
24:4, 24:7,
28:3, 28:5,
38:10, 38:14,
38:15, 39:13,
39:19, 40:9,
40:14, 40:19,
42:22, 44:2,

44:3, 44:11,
45:8, 45:11,
47:5, 50:18,
50:20, 51:8,
53:19, 53:22,
55:3, 55:7,
55:8, 57:12,
57:22, 58:8,
62:6, 63:18,
63:21, 64:2,
64:14, 68:10,
68:13, 71:15,
72:7, 72:8,
72:20, 72:21,
72:22, 73:3,
73:5, 75:18,
75:19, 75:22,
76:6, 76:7,
76:11, 76:12,
76:14, 77:10,
79:12, 81:4,
81:6
**rates**
23:7, 23:17,
25:5, 26:1,
26:2, 28:9,
38:17, 39:3,
41:20, 41:21,
42:4, 42:21,
49:9, 54:9,
54:11, 54:13,
55:17, 60:10,
60:20, 63:22,
64:9, 66:1,
66:6, 66:7,
66:12, 66:14,
70:15, 70:19,
71:16, 72:2,
72:3, 78:20,
79:11
**rather**
39:8, 67:10
**ratio**
42:17
**read**
10:9, 35:1,
65:19, 86:3
**reading**
87:8

**ready**
50:11, 56:15,
59:7, 69:13
**realize**
50:8
**really**
53:8
**reason**
9:20
**reasonable**
21:7, 21:16,
22:19, 23:1,
23:12, 24:5,
24:6, 25:14,
26:4, 27:4,
39:2, 45:17,
46:13, 61:21,
80:13
**reasonably**
37:8
**recall**
8:6, 8:21,
10:13, 15:12,
16:9, 17:16,
18:1, 21:11,
21:12, 31:11,
32:15, 32:17,
32:18, 32:20,
34:9, 35:6,
35:11, 36:5,
36:21, 37:3,
37:17, 38:9,
38:13, 40:21,
44:1, 44:8,
48:14, 51:18,
53:1, 58:13,
58:22, 67:19,
67:20, 68:22,
70:9, 70:11,
79:8, 80:10,
85:5
**recent**
78:19
**recess**
85:7
**recessed**
49:14
**recognize**
50:13, 56:18

**recollection**
37:6, 52:18,
67:16
**recommend**
64:2
**recommendation**
64:1
**record**
7:16, 43:13,
44:13, 49:13,
49:17, 81:12,
85:6, 87:5
**recreate**
36:15
**reduced**
87:7
**refer**
11:20
**referring**
16:18
**reflect**
63:7, 63:8
**regard**
41:3, 51:8,
51:11, 52:4,
53:5, 55:7,
68:18, 71:1,
74:12, 74:14
**regarding**
14:5, 14:8,
21:21, 59:10,
71:5, 82:13,
84:12
**registered**
2:18
**regulations**
21:14, 21:21
**related**
53:14, 87:10
**relevant**
44:14
**remaining**
61:10, 64:4,
64:18
**remember**
15:9, 29:22,
78:18, 78:19
**remind**
9:12

**repeat**
26:20, 75:6
**report**
33:18, 34:3,
34:14, 35:2,
36:4, 36:8,
36:10, 37:5,
37:22, 42:9,
80:9, 80:12,
81:10, 81:11
**reported**
1:22
**reporter**
2:19, 9:2, 87:1
**reports**
10:10, 34:12,
35:1, 35:4,
36:2, 80:5
**represent**
28:17
**representing**
7:11
**request**
15:10, 67:6
**requested**
87:9
**require**
53:5, 75:15
**required**
22:14, 27:4,
27:7, 27:11,
81:22
**requirements**
13:17, 13:22,
77:20
**requires**
53:8
**responding**
15:10
**responses**
9:3
**result**
37:4, 46:5,
66:8, 74:5
**results**
69:3
**retirees**
42:18

**retirement**
20:3, 23:7,
23:11, 23:13,
26:1, 27:17,
39:13, 42:20,
44:2, 57:17
**return**
24:21, 28:3,
54:7, 54:14,
55:16, 55:18
**returns**
25:9, 26:14
**revenue**
13:13, 77:21
**review**
29:15, 29:18,
29:19, 30:1,
34:5, 34:14,
34:20, 39:7,
54:2, 54:6,
55:15, 55:19,
55:22, 56:3,
56:14, 56:22,
58:15, 58:19,
58:21
**reviewed**
10:11, 10:14,
34:10, 34:21,
35:10, 55:12,
80:4
**reviewing**
35:6, 36:1,
36:2, 58:22
**rfp**
32:2, 32:5,
32:7, 32:10,
32:14, 32:19
**right**
43:20, 44:10,
44:16, 56:18
**risk**
24:6, 25:2,
39:3, 54:8,
60:10, 64:14,
64:16, 64:21,
75:19, 79:21
**role**
35:20, 70:1

Transcript of William Ruschau
Conducted on November 30, 2017

**rpr**
1:22, 87:2,
87:22
**rules**
8:22, 73:8,
73:18, 74:11,
74:12, 74:14,
75:2, 76:16,
77:5, 77:6,
77:7, 77:9
**ruschau**
1:14, 2:15,
6:3, 6:8, 7:9,
7:18, 7:19, 86:2

**S**

**said**
16:20, 25:2,
27:5, 27:8,
27:9, 44:14,
84:8, 87:6
**saindon**
5:3, 5:13
**salary**
20:4
**same**
20:7, 20:11,
23:18, 39:11,
39:14, 39:15,
39:18, 39:21,
41:10, 48:9,
48:18, 55:6,
58:6, 63:11,
70:3, 72:22,
75:20, 76:13,
79:3, 79:4, 86:4
**say**
9:3, 16:17,
21:9, 22:15,
25:12, 25:15,
29:8, 37:10,
48:16, 54:17,
55:2, 57:20,
61:6, 62:1,
64:9, 74:11,
77:17, 78:13
**saying**
25:16, 27:9,

27:11, 37:15,
53:16, 81:10
**says**
21:6, 21:12,
59:20, 74:18,
75:14, 82:2
**schedule**
84:16
**scheduled**
82:3
**seal**
87:14
**second**
16:4, 18:3,
81:12, 85:6
**section**
77:22
**sections**
10:12, 10:13
**see**
32:5, 46:5
**seem**
84:7
**seen**
59:11
**segal**
62:8, 62:11,
62:21, 63:2,
63:3
**select**
19:7, 39:8,
73:2, 73:5
**selected**
20:20, 42:12,
55:8, 70:18,
75:18
**selecting**
21:4
**send**
51:7, 51:10,
51:16, 52:3,
57:5
**sent**
51:13, 51:17,
58:9, 59:9,
59:15
**separate**
41:13, 67:3,

71:8
**separately**
42:4
**september**
69:12, 70:7
**serve**
15:15, 15:18
**served**
14:13, 14:16
**serves**
71:18
**service**
13:14
**services**
11:15, 11:17,
11:20, 31:14,
71:11
**set**
8:22, 19:15,
21:13, 54:8,
63:5, 64:2,
87:13
**sets**
21:2, 22:10,
63:6
**setting**
35:22, 36:5
**settle**
24:8, 24:10,
24:12, 75:19,
80:21
**settled**
83:3
**settlement**
40:9, 82:12,
82:14, 82:15,
83:7, 83:9,
83:12, 84:7,
84:12, 84:19,
85:1, 85:4
**several**
52:9
**share**
65:16, 80:22
**she**
9:2, 9:4
**sheet**
86:7

**short**
11:21, 27:1,
65:22
**shorthand**
87:1
**should**
44:8, 59:20,
60:2, 60:14,
61:10, 61:18,
61:22, 74:5,
75:9, 81:1, 81:4
**sick**
9:18
**sign**
43:18
**signature**
86:11
**signature-eodmr**
87:19
**signed**
30:18, 30:22,
86:7
**signing**
87:9
**similar**
51:7, 51:10,
52:3, 57:5,
57:7, 59:15
**since**
30:21, 31:15,
31:17, 64:19,
70:17
**single**
13:18, 14:1,
18:20, 18:21,
19:3, 19:5,
19:11, 20:1,
65:8, 65:20
**slechner@morganl-
ewis**
4:9
**small**
48:13, 74:3,
74:9, 74:10
**smaller**
74:4
**some**
8:22, 10:2,

17:2, 20:7,
20:10, 20:11,
25:19, 35:2,
36:17, 37:15,
38:1, 38:4,
43:6, 44:4,
58:15, 63:13
**something**
26:15, 26:16,
60:17, 61:2,
61:11, 61:13,
74:5, 78:1, 78:2
**somewhat**
66:12
**sorry**
29:6, 50:7,
57:7, 62:20,
72:14, 76:3
**sort**
53:3, 70:22
**sounds**
37:14
**speak**
11:2, 67:17
**special**
13:16, 13:21
**specific**
25:19
**specifically**
34:19, 68:9,
75:14
**specified**
19:15, 19:19
**speeches**
14:5
**spouse**
20:6, 23:8,
23:20, 26:2,
39:16, 41:16,
42:21, 44:3
**stand**
52:12
**standard**
21:3, 22:10,
52:13, 75:10
**standards**
52:14
**stanley**
4:4

**start**
7:15, 10:1,
15:4, 30:6,
51:8, 54:21
**started**
15:5, 15:8,
44:8
**starting**
36:19
**state**
7:16
**statement**
64:5, 65:18,
65:22, 80:17
**states**
80:12
**stating**
6:14
**status**
20:1, 20:9
**statute**
21:2, 21:6,
21:9, 21:12,
22:15, 40:6,
40:7
**stenographically**
87:7
**step**
67:10
**still**
15:18, 15:21
**stream**
39:4, 81:21
**street**
5:5, 5:15
**stretch**
31:10
**stuff**
36:1, 36:18,
53:7
**subtract**
47:16
**successful**
32:22
**suite**
3:6, 3:15, 5:6,
5:16
**summary**
56:22

**sure**
13:5, 17:22,
25:17, 25:18,
26:22, 27:9,
29:20, 36:18,
43:15, 45:20,
50:7, 54:16,
54:17, 75:7,
79:8
**surprise**
68:4
**sworn**
7:4

**T**

**table**
11:1, 19:19,
39:8, 39:11,
41:9, 42:22,
47:6
**take**
9:4, 9:6, 22:5,
22:15, 27:4,
50:10, 56:14,
59:6, 75:16,
77:9
**taken**
87:3, 87:6
**taking**
9:2, 36:15
**talk**
18:2, 18:19,
19:13, 20:16,
22:7, 22:18,
23:11, 31:7,
35:18, 47:9,
51:20, 63:13,
66:15, 67:8,
72:6
**talked**
25:18, 27:3,
27:6, 55:10,
56:6, 75:17
**talking**
22:9, 22:12,
60:1, 70:14,
71:17, 74:12,
74:13, 78:18

**telephone**
3:8, 3:17, 4:7,
5:8, 5:18
**tell**
16:8, 17:17,
32:10, 32:21,
45:5, 52:1,
69:13
**template**
71:1
**ten**
66:13
**term**
24:9, 27:1,
66:1
**terminating**
61:8, 64:19,
64:20
**termination**
23:7, 23:17,
26:2, 27:17,
39:19, 41:20,
41:21, 42:4,
42:21, 44:2
**terms**
24:21, 34:17,
37:12, 53:18,
83:12
**testified**
7:5
**testify**
9:21
**testimony**
10:10, 86:4,
86:5, 87:5, 87:6
**th**
6:16, 69:10
**than**
16:4, 18:15,
28:2, 37:4,
40:14, 42:20,
43:4, 45:13,
46:17, 47:2,
47:3, 66:1,
66:2, 66:9,
70:19, 72:2,
73:14, 73:17,
75:10, 84:8

Transcript of William Ruschau
Conducted on November 30, 2017

**thank**
22:8, 44:18,
66:15, 85:13,
85:14
**that's**
10:15, 16:14
**their**
18:12, 21:18,
32:22, 35:4,
36:17, 36:19,
37:12, 65:14,
65:15, 65:16
**them**
20:10, 20:11,
20:15, 20:17,
38:3, 58:6,
68:4, 69:2, 76:5
**then**
43:7, 60:21,
62:2
**there**
9:20, 10:17,
13:7, 13:16,
17:3, 17:22,
19:16, 21:2,
21:6, 24:6,
24:20, 30:8,
31:3, 32:2,
33:3, 33:7,
33:8, 35:11,
37:15, 38:9,
38:12, 40:16,
42:10, 42:20,
43:1, 43:10,
44:4, 44:5,
45:4, 45:5,
45:21, 46:3,
46:15, 48:2,
48:11, 48:12,
48:21, 52:21,
53:1, 53:2,
53:7, 63:10,
67:16, 71:4,
71:14, 74:17,
75:1, 75:7,
75:13, 80:8,
80:10, 84:9
**thereafter**
87:7

**these**
10:17, 20:7,
46:4, 54:20,
55:2, 58:2,
61:18, 75:21
**they**
18:4, 32:10,
32:21, 36:19,
38:5, 38:7,
43:10, 49:10,
61:22, 62:15,
62:17, 64:2,
65:13, 72:11,
73:8, 73:22,
74:20, 76:19,
77:13, 79:8,
82:2, 83:15
**they're**
65:16
**thing**
23:18, 53:9
**things**
31:10
**think**
10:16, 11:18,
26:12, 30:7,
43:4, 43:5,
43:6, 43:7,
43:12, 51:22,
54:18, 58:14,
60:19, 63:10,
64:7, 65:7,
65:8, 82:9
**this**
9:1, 10:4,
10:6, 10:8,
10:20, 24:2,
31:16, 31:20,
31:21, 34:13,
36:21, 42:9,
46:2, 48:2,
50:3, 50:13,
51:17, 52:10,
53:3, 56:18,
56:22, 57:11,
57:20, 59:12,
59:17, 60:19,
63:21, 65:3,

65:17, 68:8,
70:9, 73:6,
73:14, 78:3,
78:5, 83:11,
87:11, 87:14
**those**
8:21, 17:16,
18:15, 19:7,
26:3, 27:18,
27:22, 28:16,
35:2, 37:17,
38:1, 39:5,
39:6, 42:11,
42:13, 43:7,
44:5, 44:17,
46:20, 47:1,
52:14, 59:19,
63:19, 68:6,
71:17, 71:20,
75:16, 77:9,
84:19
**thought**
57:3
**three**
63:15, 63:19
**through**
10:9, 21:14,
26:1, 27:6,
43:20, 51:13,
55:6, 55:9,
57:11, 59:19,
83:11
**thursday**
1:16
**time**
8:3, 8:5, 8:14,
9:6, 15:5,
28:14, 28:16,
56:14, 64:16,
82:22
**times**
8:1
**titled**
69:10
**today**
7:14, 9:18,
9:21, 10:4,
11:6, 12:22,

59:12, 72:17,
72:18, 83:18
**today's**
10:2
**told**
71:9, 78:1,
78:3
**too**
30:6, 30:7
**top**
69:16, 85:2
**topics**
31:11
**total**
65:15, 74:10
**towers**
3:5, 3:14
**trades**
73:8, 73:9,
73:20, 74:2,
74:8
**transcript**
87:4
**transcription**
86:5
**treat**
74:18
**trick**
43:5, 43:10
**true**
43:9, 86:4,
87:5
**trust**
1:10, 2:10,
69:11
**trustee**
59:20, 68:18,
69:1, 70:6
**trustees**
6:17, 69:10,
70:9, 70:12
**truthfully**
9:21
**try**
36:15, 46:9
**trying**
43:5, 44:20,
46:2

turn
20:3, 46:12
twenty-seven
12:8
twice
8:2, 8:3
two
44:17, 47:1,
63:6, 63:11,
67:4, 67:14,
71:21, 72:1,
77:9
types
27:18
typewriting
87:8
typically
23:15, 35:4,
81:20
tysons
3:7, 3:16

**U**

uas
11:22, 12:1,
16:3, 16:4,
16:10, 16:20,
18:9, 18:10,
18:12, 18:20,
31:13, 31:17,
31:22, 32:19,
32:21, 33:4,
33:17, 33:21,
35:19, 37:16,
38:20, 42:14,
47:12, 47:20,
48:3, 58:12,
59:14, 67:13,
67:22, 69:20,
70:22, 71:6,
71:9, 71:17,
79:10
uh
55:11, 57:16,
63:16, 70:16
uh-huh
55:1
ultimate
40:4

umwa
4:2, 5:2, 6:11,
6:13, 16:18
uncertainty
37:19, 37:20,
38:10
unclear
26:12
under
9:13, 77:21,
87:8
understand
9:15, 16:17,
24:15, 52:8,
53:15, 73:16,
77:17, 84:22
understood
37:7
unfunded
20:12, 22:13,
25:21, 35:8,
36:7, 36:11,
38:21, 46:16,
47:13, 47:16,
48:1, 48:5,
49:1, 52:5,
65:14, 71:5,
78:21, 79:20
united
1:9, 2:9, 6:17,
11:14, 11:16,
11:20, 36:11,
69:11
unless
9:11
until
49:15, 50:6,
85:8
updated
48:10
upon
41:11, 65:14
use
18:12, 20:1,
20:12, 20:21,
21:13, 22:4,
22:22, 23:13,
23:15, 24:1,

24:5, 24:9,
25:2, 25:13,
26:4, 26:9,
33:17, 39:14,
40:7, 42:8,
51:15, 53:19,
61:7, 62:15,
62:17, 63:19,
67:21, 68:3,
71:14, 71:16,
72:2, 72:8,
73:12, 74:15,
75:2, 75:9,
76:7, 76:8,
76:13, 78:20,
81:6
used
19:7, 22:11,
25:1, 26:3,
35:2, 35:4,
35:7, 37:22,
38:5, 38:11,
38:13, 39:3,
39:4, 39:11,
40:2, 40:5,
40:15, 40:17,
41:9, 41:11,
50:18, 50:21,
53:11, 57:1,
58:3, 58:6,
58:7, 66:2,
66:6, 66:7,
66:18, 67:13,
67:22, 68:19,
72:22, 76:12,
79:11, 79:15,
79:19, 81:4
using
19:15, 21:14,
36:17, 60:10,
61:21, 62:6,
62:20, 64:9,
75:21
usually
47:7
uvbs
25:21

**V**

valuation
6:12, 29:8,

30:19, 33:21,
34:7, 35:19,
35:20, 37:1,
40:4, 40:13,
51:15, 55:4,
57:4, 57:6,
57:22, 63:17,
67:1, 68:19,
69:3, 70:2,
70:5, 73:1
valuations
34:21, 66:18
value
35:4, 39:3,
40:10, 47:15,
62:17, 81:4,
81:21
values
35:2, 35:5
variation
19:16
various
67:7
venable
2:16, 3:3,
3:12, 7:10
verbally
9:4
verification
54:10
versus
13:11, 40:3,
47:6
very
19:16, 48:13,
73:22, 74:8,
74:10, 85:13
vested
20:12, 22:13,
25:21, 35:8,
36:7, 36:12,
38:21, 39:4,
44:7, 46:17,
47:13, 47:15,
48:5, 49:1,
52:5, 65:14,
71:5, 77:14,
78:21, 79:20

Transcript of William Ruschau
Conducted on November 30, 2017

43

**virginia**
3:7, 3:16,
16:11, 72:4,
72:6, 72:7,
73:6, 75:22

**W**

**wait**
50:6
**want**
18:2, 27:9,
43:10, 43:13,
43:15, 52:8,
61:1, 66:15,
68:3, 68:4,
73:15, 77:4
**was**
7:5, 8:3, 8:5,
8:8, 8:11, 8:17,
8:18, 15:4,
15:10, 15:12,
15:13, 17:21,
30:2, 31:3,
32:2, 32:12,
32:19, 33:21,
34:17, 35:1,
35:19, 35:21,
36:10, 37:7,
37:10, 37:11,
38:9, 38:10,
38:12, 38:17,
39:15, 44:14,
47:20, 48:2,
48:10, 48:17,
49:21, 56:7,
56:22, 57:3,
59:3, 59:22,
60:13, 61:17,
65:6, 69:6,
78:1, 78:2,
78:3, 78:6,
78:18, 84:16,
85:4, 85:16,
87:3, 87:6, 87:9
**washington**
1:15, 2:17,
4:6, 4:14, 5:7,
5:17

**wasn't**
37:22
**way**
33:13, 53:16,
79:16
**we're**
22:9, 24:6,
27:11, 59:22,
68:2
**we've**
26:1
**welch**
5:3, 5:13
**well**
8:21, 19:13,
23:4, 24:18,
28:17, 29:3,
34:17, 39:18,
40:8, 49:9,
52:21, 53:3,
53:5, 53:7,
58:5, 63:10,
66:21, 72:13
**went**
26:1, 27:6,
34:10, 37:13,
51:13
**were**
8:3, 8:7, 10:3,
11:19, 12:4,
12:16, 12:19,
14:20, 16:20,
17:22, 24:12,
29:13, 30:12,
30:14, 30:18,
31:2, 31:19,
31:21, 32:2,
32:21, 33:3,
33:7, 33:8,
35:11, 35:12,
37:7, 37:21,
38:3, 39:2,
40:18, 43:12,
44:15, 48:21,
58:11, 58:16,
61:3, 66:1,
66:14, 78:17,
82:11, 82:18,

82:22
**west**
1:5, 2:5, 3:2,
7:7, 7:11,
16:11, 65:3,
65:10, 72:4,
72:6, 72:7,
73:6, 75:21
**what**
8:6, 9:2,
10:13, 11:11,
13:3, 13:5,
13:6, 13:10,
15:12, 17:12,
18:19, 19:10,
19:22, 20:19,
22:22, 23:2,
23:4, 23:12,
23:17, 24:4,
24:9, 24:10,
24:22, 25:15,
25:19, 28:8,
28:10, 28:12,
28:17, 29:17,
29:22, 31:1,
32:18, 34:6,
34:16, 35:19,
37:7, 37:10,
37:11, 37:14,
37:17, 37:20,
37:21, 38:13,
39:13, 39:16,
39:19, 39:22,
42:11, 43:10,
46:5, 48:14,
49:19, 52:10,
52:11, 53:5,
53:18, 54:16,
56:9, 57:2,
59:1, 62:6,
62:8, 62:10,
63:3, 68:4,
68:13, 69:9,
70:1, 71:20,
71:22, 72:7,
72:20, 73:10,
73:16, 74:1,
74:16, 76:2,

76:5, 76:6,
76:7, 77:1,
77:3, 77:5,
77:18, 78:12,
78:18, 79:14,
82:5, 82:9, 84:8
**what's**
42:13
**when**
8:3, 10:3,
14:20, 15:1,
15:3, 15:4,
16:17, 20:21,
21:3, 21:4,
24:9, 25:6,
26:8, 27:14,
27:15, 28:19,
33:5, 37:6,
37:10, 42:7,
46:2, 50:11,
52:14, 56:15,
59:7, 61:2,
64:9, 69:13,
72:10, 74:11,
74:13, 75:3,
75:10, 75:17,
77:10, 78:17,
81:7
**where**
7:19, 11:19,
12:1, 12:12,
36:19, 67:15,
69:4
**whereas**
40:11
**whereof**
87:13
**whereupon**
7:2, 49:21,
56:7, 59:3,
69:6, 85:7,
85:15
**whether**
78:9, 78:15
**which**
18:16, 22:6,
27:19, 27:22,
37:14, 41:10,

Transcript of William Ruschau
Conducted on November 30, 2017

44

44:1, 44:7,
46:20, 52:10,
52:18, 58:2,
59:22, 63:7,
63:22, 70:6,
71:11, 71:17,
72:1, 84:6
**while**
16:10, 17:20,
19:2, 29:12,
30:12, 30:19,
31:2, 58:11,
58:15
**who**
10:22, 13:7,
13:11, 24:16,
30:18, 30:22,
44:6, 69:18,
74:21, 78:5,
80:15
**whom**
87:3
**why**
9:20, 22:1,
28:4, 28:11,
29:1, 32:9,
32:10, 32:21,
40:7, 44:12,
63:9, 64:12,
65:12, 68:3,
68:5, 73:5,
80:19
**will**
7:15, 9:1,
10:17, 24:11,
28:10, 28:12,
28:18, 34:7,
35:21, 40:10,
43:20, 49:17,
51:22, 52:2,
52:11, 56:5,
61:21, 65:20,
81:1
**william**
1:14, 2:15,
6:3, 7:18, 86:2
**williams**
3:13

**with**
7:10, 7:15,
10:1, 10:19,
10:22, 11:5,
13:12, 13:14,
13:17, 14:21,
15:1, 15:2,
15:5, 15:8,
16:5, 17:19,
17:20, 17:21,
30:4, 31:22,
34:4, 36:19,
36:21, 41:2,
51:7, 51:10,
52:3, 52:22,
53:5, 54:21,
55:7, 59:19,
60:3, 60:15,
61:11, 61:19,
62:2, 62:12,
62:13, 62:19,
64:4, 66:16,
66:19, 66:22,
67:9, 67:11,
67:17, 67:18,
67:22, 68:10,
68:17, 68:18,
69:2, 69:9,
69:15, 70:9,
70:12, 71:1,
73:16, 73:20,
74:12, 74:14,
77:13, 80:9,
80:11, 80:15,
80:16, 83:4,
84:16
**withdrawing**
60:14, 64:3,
64:10, 64:15,
74:7, 77:16,
80:16
**without**
82:4, 82:6
**witness**
6:2, 14:14,
14:17, 26:20,
27:1, 44:16,
83:13, 83:20,

84:2, 84:11,
85:10, 85:14,
87:13
**won't**
8:19, 43:17
**words**
33:7
**work**
12:2, 12:6,
12:12, 12:14,
13:12, 13:14,
13:17, 13:22,
14:21, 15:1,
15:2, 16:15,
17:5, 17:13,
18:14, 18:17,
19:5, 29:13,
31:22, 32:1,
32:7, 33:11,
36:16, 42:10,
42:11, 42:14,
58:15, 69:21,
72:2, 78:11
**worked**
12:1, 16:5,
16:10, 16:11,
17:8, 17:17,
17:19, 17:20,
17:21, 18:5,
18:21, 19:2,
30:5, 30:9,
30:15, 30:21,
31:16, 73:20
**workers**
1:9, 2:9, 6:17,
17:22, 69:11,
78:20
**working**
12:9, 15:5,
15:8, 30:4,
42:8, 58:16
**world**
73:13, 73:17
**worries**
29:7
**would**
9:3, 9:9, 9:10,
10:5, 11:8,

19:10, 19:22,
20:8, 20:11,
23:5, 23:15,
24:7, 24:14,
24:15, 24:17,
24:18, 36:22,
39:21, 47:9,
48:12, 48:16,
49:10, 50:16,
53:16, 58:2,
59:18, 60:6,
60:20, 61:6,
62:1, 62:19,
62:20, 64:20,
64:21, 65:19,
73:7, 74:6,
75:8, 79:22,
82:7
**wouldn't**
9:20
**written**
14:10
**wrong**
35:12

| Y |
| --- |

**yeah**
72:16, 79:4
**year**
8:5, 33:22,
34:7, 35:3,
35:5, 36:10,
36:16, 36:22,
38:18, 38:20,
41:1, 47:9,
47:10, 47:12,
48:6, 48:18,
48:20, 49:2,
49:8, 57:2,
69:2, 72:11,
72:12, 72:13,
72:14, 72:15,
77:8
**year's**
40:13
**years**
11:18, 12:8,
12:15, 29:16,

Transcript of William Ruschau
Conducted on November 30, 2017
45

30:1, 34:11,
34:18, 49:1,
57:1, 57:3,
66:14, 73:21
**yet**
50:8
**yield**
19:15
**you'd**
9:6
**you're**
42:7, 44:10,
44:16
**you've**
18:16, 25:12
**your**
7:14, 7:16,
9:3, 9:5, 9:9,
9:10, 9:11,
11:3, 11:9,
11:11, 14:4,
15:1, 17:2,
19:5, 22:1,
26:9, 35:19,
52:18, 53:15,
54:17, 56:14,
59:14, 63:3,
63:18, 66:16,
68:7, 69:14,
79:10, 79:18,
81:17, 82:5,
82:10, 84:2
**yours**
50:8

**$**
**$115**
65:6, 65:8,
65:9

**0**
**00**
1:8, 2:8
**0001**
1:8, 2:8
**0010**
5:8, 5:18
**01**
1:8, 2:8

**05**
1:17
**07**
49:14

**1**
**1**
1:17
**1111**
4:5, 4:13
**14**
87:17
**1414**
3:17
**165497**
1:20
**17**
1:8, 2:8
**189**
15:14, 17:9,
79:7
**1920**
5:5, 5:15
**1957**
3:8
**1974**
1:10, 2:10,
4:2, 5:2, 6:11,
6:13, 16:5,
16:15, 16:17,
16:18, 25:11,
25:19, 25:22,
27:10, 29:13,
30:10, 31:14,
31:16, 31:22,
32:3, 32:9,
32:10, 33:3,
33:21, 35:14,
52:6, 54:1,
57:8, 58:16,
68:18, 69:11,
76:22, 85:11
**1980**
66:2, 66:14
**1989**
15:7

**2**
**2**
49:14, 49:15

**20**
77:8
**2000**
8:18
**20001**
2:17
**20004**
4:6, 4:14
**20036**
5:7, 5:17
**2004**
59:9
**2010**
30:2, 30:9,
30:13
**2011**
30:2
**2013**
37:1, 37:5,
38:14
**2014**
31:15, 31:17,
33:22, 34:7,
34:13, 38:20,
41:2, 47:9,
48:17, 49:11,
50:18, 51:15,
69:12, 70:7,
70:8
**2015**
47:10, 47:12,
48:6, 48:18,
49:11
**2016**
48:21, 49:3,
49:8
**2017**
1:16, 87:15
**2018**
87:17
**202**
4:7, 4:8, 5:8,
5:9, 5:18, 5:19
**21**
49:15
**22**
85:8
**22182**
3:7, 3:16

**23**
69:12, 70:7
**2541**
4:14
**2578**
1:8, 2:8
**27**
52:11, 52:21,
53:4, 53:5,
53:10, 53:20,
53:21, 54:22,
55:10

**3**
**3**
85:8, 85:15
**30**
1:16, 73:20
**300**
3:6, 3:15
**3001**
4:8
**3rd**
87:14

**4**
**400**
5:6, 5:16
**4001**
10:15
**404**
76:22, 77:1,
77:3, 77:5,
77:18, 77:22,
78:3, 78:6,
78:10, 78:15
**4044**
40:6, 40:7
**41**
85:8, 85:15
**4211**
10:15
**4219**
10:15
**49**
6:11

**5**
**5079**
4:7

Transcript of William Ruschau
Conducted on November 30, 2017

46

**56**
6:13
**59**
6:15

**6**

**6.75**
76:10
**600**
2:16
**6088**
5:9, 5:19
**69**
6:17

**7**

**7.25**
72:18
**703**
3:8, 3:9, 3:17,
3:18
**717**
6:16, 69:10
**739**
4:7, 4:8
**74**
8:9, 24:2,
26:5, 26:8,
27:14, 30:1,
30:15, 30:19,
32:15, 32:21,
33:4, 33:7,
34:15, 36:13,
46:3, 51:12,
53:20, 54:6,
54:15, 54:19,
55:3, 57:5,
58:10, 58:20,
59:9, 59:15,
59:17, 60:9,
60:18, 61:5,
61:14, 62:5,
64:2, 64:8,
66:17, 66:20,
68:11, 69:1,
69:21, 70:1,
70:18, 73:17,
75:18, 76:14,

77:12, 77:18,
79:22, 83:4
**75**
18:13, 18:15,
71:10
**760**
3:8
**783**
5:8, 5:9, 5:18,
5:19

**8**

**80**
66:9
**8010**
3:5, 3:14
**821**
3:9, 3:18
**87**
1:21
**8949**
3:9, 3:18

**9**

**905**
3:17

ARBITRATION


Energy West Mining Corporation


VS.


United Mine Workers of America 1974 Pension Plan


American Arbitration Case number: 01-17-0001-2578


EXPERT REPORT OF
ETHAN E. KRA, Ph.D., F.S.A., E.A.

October 2017

<u>ASSIGNMENT</u>

1. I have been asked to:

- Discuss the actuarial assumptions used in the determination of the withdrawal liability assessed against Energy West Mining Corporation ("Energy West") by the United Mine Workers of America 1974 Pension Plan ("Plan") and opine on whether or not they are unreasonable in the aggregate.

- Review and comment on the report of Energy West's expert, Scott A. Hittner ("Hittner"), in which he criticizes the fact that in determining the present value of vested benefits for purposes of calculating the unfunded vested benefits in the withdrawal liability assessment: the actuary for the Plan selected the PBGC interest rates for the purpose of measuring the vested liability obligation of the Plan; and the actuary for the Plan ignored the projection that the Plan is projected to become insolvent around the year 2022, with any resulting benefit reductions. Mr. Hittner also opined that the present value of the stream of withdrawal liability payments should be discounted at a rate that he developed from the interest rate yield curve used by his firm primarily for developing discount rates for corporate financial accounting under ASC 715 for single employer pension and other post retirement and post-employment benefit programs.

<u>SUMMARY OF OPINIONS</u>

2. In my professional opinion, the assumptions selected by the Plan's actuary and used in valuing the Plan's unfunded vested benefits as of June 30, 2015 were not unreasonable in the aggregate (taking into account the experience of the Plan and reasonable expectations).

3. The withdrawing employer has provided no substantiation to its assertion that the withdrawal liability assessment was incorrectly determined because the actuary used the PBGC's interest rate assumptions instead of using some other set of assumptions. Any assertion that the assumptions used by the Plan's actuary are not reasonable in

the aggregate does not contain the required proof mandated by ERISA §4221(a)(3)(B)(i) and thus is statutorily null and void.

4. ERISA §§4213(c) and 4001(a)(8) require that the actuary determine the unfunded vested benefits of a plan based on the non-forfeitable benefits under the plan, where the non-forfeitable benefits are defined to be the benefits that the participant has become entitled to receive based on service rendered to date, based on the plan in effect on the determination date, even if they could be subsequently reduced or suspended as outlined in ERISA §4001(a)(8).

5. ERISA requires that the actuary determine the withdrawal liability based on the Plan's current provisions and that the assessment even include benefits that are no longer being paid by the plan if they represent benefits that were reduced pursuant to ERISA 305(e)(8) or 305(f) within the prior 10 years.

6. While ERISA specifically allows an employer to prepay its outstanding withdrawal liability payments, nothing in the statute or regulations prescribe the use of a specific interest rate for the determination of that lump sum amount.

7. It should be noted that this report and the opinions contained herein are provided in the context of an ongoing plan and not in the context of a plan termination or a mass withdrawal.

## QUALIFICATIONS

8. I am a Fellow of the Society of Actuaries, an Enrolled Actuary under the Employee Retirement Income Security Act of 1974 ("ERISA"), a Fellow of the Conference of Consulting Actuaries, a Member of the American Academy of Actuaries, a Fellow of the American Society of Pension Professionals and Actuaries--College of Pension Actuaries, and a Charter Enterprise Risk Analyst. Since September 2011 I have been the Principal of Ethan E. Kra Actuarial Services, LLC.

9. From May 1977 through August 2011, I was employed by Mercer (US) Inc. From February 1994 through August 2011, I was Mercer's Chief Actuary – US Retirement. I was also a Senior Partner at Mercer. For over 17 years I chaired Mercer's Actuarial

Resource Network, a committee of senior technical actuaries throughout the United States.  For most of that time Mercer was the world's largest employer of actuaries.

10. From October 2009 through October 2011, I served as Vice President – Pensions for the American Academy of Actuaries and as Chair of its Pension Practice Council. The Academy's Multiemployer Plans Subcommittee reported to that council.  I have also served as Vice President of the Society of Actuaries, where I had oversight responsibilities for Education and Examination.  I also formerly chaired the Society's Pension Section Council and was the first Chair of both its FAS 106 Task Force and its Pension Finance Task Force.

11. I have given over 170 speeches on employee benefits issues over the past 30 plus years at various professional meetings and seminars, and have authored or co-authored over 40 articles on employee benefits issues.  I have also been quoted in publications such as New York Times, Wall Street Journal, Time, Newsweek, and other financial publications.

12. I am an actuarial expert with extensive experience in the financial and compliance aspects of qualified and non-qualified pension and profit sharing plans.  I graduated summa cum laude from Yale University with a bachelor's degree in mathematics.  I also hold masters and Ph.D. degrees in mathematics from Yale University, where I was a Woodrow Wilson Fellow.

13. My responsibilities at Mercer (US) included advising clients on the design, government compliance, funding, and expense allocation of employee and executive benefits, including retirement, death, disability, and health benefits.  I advised public and private corporations in a wide spectrum of industries, as well as multiemployer pension and welfare funds and governmental entities.  For over 35 years, I have provided consulting and actuarial services to multiemployer pension and welfare funds and advised contributing corporations on issues arising from their participation in those funds. I was the Enrolled Actuary for a multiemployer pension plan that terminated due to a mass withdrawal and was projected to become insovent.

14. Part of my responsibilities at Mercer (US) included conducting quality control audits of the delivery of retirement consulting and actuarial services provided by all of the Mercer (US) offices in the United States that had retirement practices. As such, I reviewed the files of a selection of Mercer retirement clients in these offices, including the provision of services to multiemployer pension plans, multiple employer pension plans, single employer pension plans, public sector pension plans, and church plans. I conducted over 170 such on site audits over a 16+ year period.

15. Appendix B attached contains my curriculum vitae, (including a full list of publications over the past 10 years). Appendix C lists those cases where I have provided deposition testimony, arbitration testimony or trial testimony as an expert witness in the last 10 years. During that period, I also participated in mediation in the matter of IRS v. Peabody Coal Corporation.

16. In preparing this report, I have reviewed the documents that are listed on Appendix A to this report.

17. This report has been prepared for counsel for the United Mine Workers of America 1974 Pension Plan. I am being compensated by the Plan based on my standard hourly billing rate, plus expenses. My billing rate is $675 per hour.

<u>ASSESSMENT OF WITHDRAWAL LIABILITY</u>

18. On August 29, 2016, Dale R. Stover, Director of Finance and General Services of the Plan sent a letter to Mr. Stan Jensen, Manager, Accounting and Finance, Energy West Mining Corp., providing a determination of the withdrawal liability incurred by Energy West on account of the withdrawal of Energy West Mining Corp. (formerly Utah Power and Light) from the Plan on or about July 31, 2015 (i.e., during the Plan Year ending June 30, 2016). That letter based the determination of the amount of Energy West's withdrawal liability on the unfunded vested benefits of the Plan as of June 30, 2015.

19. The Plan has adopted what is often referred to as the rolling five method for determining the withdrawal liability of contributing employers, as described in ERISA §4211(c)(3).

20. Under this method, the amount of the withdrawal liability is based on a calculation using the amount of the unfunded vested benefits as of the end of the plan year immediately preceding the plan year of withdrawal.

21. The unfunded vested liability, reduced by the present value of amounts expected to be collected from employers which had withdrawn in prior years, is allocated among contributing employers based on the ratio of (i) a given employer's total contribution hours to the plan over the five years ending with the last day of that year to (ii) the total contribution hours made over such five year period by all employers still contributing to the plan during that year.

22. ERISA §4213(c) defines the term "unfunded vested benefits", as follows:

> (c) **Determination of amount of unfunded vested benefits.** For purposes of this part, the term "unfunded vested benefits" means with respect to a plan, an amount equal to –
>
> > (A) the value of non-forfeitable benefits under the plan, less
> >
> > (B) the value of the assets of the plan.

23. ERISA §4001(a)(8) reads:

> "nonforfeitable benefit" means, with respect to a plan, a benefit for which a participant has satisfied the conditions for entitlement under the plan or the requirements of this chapter (other than submission of a formal application, retirement, completion of a required waiting period, or death in the case of a benefit which returns all or a portion of a participant's accumulated mandatory employee contributions upon the participant's death), whether or not the benefit may subsequently be reduced or suspended by a plan amendment, an occurrence of any condition, or operation of this chapter or title 26.

24. PBGC Regulation 4001.2 reads, in part:

> *Nonforfeitable benefit* means a benefit described in section 4001(a)(8) of ERISA.

25. PBGC Regulation 4211.2 reads, in part:

*Nonforfeitable benefit* means a benefit described in §4001.2 of this chapter plus, for purposes of this part, any adjustable benefit that has been reduced by the plan sponsor pursuant to section 305(e)(8) of ERISA or section 432(e)(8) of the Code that would otherwise have been includable as a nonforfeitable benefit for purposes of determining an employer's allocable share of unfunded vested benefits.

.
.
.

*Unfunded vested benefits* means an amount by which the value of nonforfeitable benefits under the plan, as defined for purposes of this section, exceeds the value of the assets of the plan.

26. ERISA 305(g)(1) reads:

> (g) ADJUSTMENTS DISREGARDED IN WITHDRAWAL LIABILITY DETERMINATION

> (1) BENEFIT REDUCTION
> Any benefit reductions under subsection (e)(8) or (f) or benefit reductions or suspensions while in critical and declining status under subsection (e)(9), unless the withdrawal occurs more than ten years after the effective date of a benefit suspension by a plan in critical and declining status, shall be disregarded in determining a plan's unfunded vested benefits for purposes of determining an employer's withdrawal liability under section 1381 of this title.

29 USC 1381 is ERISA 4201.

27. The August 29, 2016 letter provides the calculation of the amount of the withdrawal liability.

28. Based on my review of the various issues raised in the documents that I have been provided, the only issues that I am addressing are: (i) the assumptions used to determine the amount of the value of the Plan's vested benefits; and (ii) whether or not the actuary should have reflected the projected insolvency of the Plan in determining the present value of the unfunded vested benefits of the Plan. In addition, I provide a calculation of a lump sum value for the stream of future withdrawal liability payments.

29. I have not been advised of any challenges to the value of plan assets or the contribution data. Accordingly, I have made no investigations into these matters.

ACTUARIAL ASSUMPTIONS

30. Energy West, and its expert Hittner, appear to be challenging the Plan's actuary's determination of the value of unfunded vested benefits as of June 30, 2015 on the basis that the Plan's actuary used a particular set of market based interest rates (namely, the PBGC interest rates) to determine the discount rates for determining the present value of vested benefits instead of using some other undefined interest rate and on the basis that the actuary did not reflect the projected insolvency of the Fund in that determination. Mr. Hittner also posits that the present value of the withdrawal liability payments should be determined using a particular set of alternative rates that he developed.

31. As of June 30, 2015, the Plan's actuary used a contemporaneous market based interest rate determined by the Pension Benefit Guaranty Corporation ("PBGC") of 2.71% for the first 20 years and 2.78% for periods beyond 20 years. Those PBGC rates represented the select and ultimate interest rates used by the PBGC for valuing annuity benefits in both single employer defined benefit pension plans and multiemployer defined benefit pension plans for the months of April 2015, May 2015 and June 2015.

32. There is no requirement that funding assumptions be used in withdrawal liability calculations. In fact, many plans use different assumptions. The purposes of those two measurements are different.

33. Energy West and its expert appear to be challenging the use of the PBGC interest rates for determining the present value of unfunded vested benefits and for any determination of the present value of the stream of the periodic withdrawal liability payments.

REASONABLENESS OF ACTUARIAL ASSUMPTIONS

34. Section (a) of ERISA §4213 Actuarial Assumptions reads:

(a) **Use by plan actuary in determining unfunded vested benefits of a plan for computing withdrawal liability of employer.** The corporation may prescribe by regulation actuarial assumptions which may be used by a plan actuary in determining the unfunded vested benefits of a plan for purposes of determining an employer's withdrawal liability under this part. Withdrawal liability under this part shall be determined by each plan on the basis of –

(1) Actuarial assumptions and methods which in the aggregate, are reasonable (taking into account the experience of the plan and reasonable expectations) and which, in combination offer the actuary's best estimate of anticipated experience under the plan, or

(2) Actuarial assumptions and methods set forth in the corporation's regulations for purposes of determining an employer's withdrawal liability.

Thus, the actuary, in selecting assumptions (when not relying on PBGC promulgated assumptions), must select **assumptions** and methods which, **in the aggregate, are reasonable** (taking into account the experience of the plan and reasonable expectations) and which, in combination, offer the actuary's best estimate of anticipated experience under the plan.

It should be noted that the PBGC has never promulgated withdrawal liability assumptions (other than in the case of a mass withdrawal) under ERISA §4213(a)(2).

35. Energy West and its expert are attacking only the selection of the discount rate assumption used by the Plan's actuary. Nowhere have they produced anything purporting to analyze any of the other actuarial assumptions and to analyze whether or not they, in the aggregate, are reasonable. There is no evidence that they have reviewed any of the other actuarial assumptions, including, but not limited to mortality, turnover, timing of retirement, disability, etc. Thus, their assertion cannot be the basis for a challenge to the reasonableness of the withdrawal liability assumptions **in the aggregate**.

36. Section §4221 of ERISA is entitled "Resolution of Disputes". Subsection (a)(3) of 4221 reads as follows:

(3)(A) For purposes of any proceeding under this section, any determination made by a plan sponsor under sections 4210 through 4219 and section 4225 [29 USC §§1381-1399 and 1405] is presumed correct unless the party

contesting the determination shows by a preponderance of the evidence that the determination was unreasonable or clearly erroneous.

(B)   In the case of the determination of a plan's unfunded vested benefits for a plan year, the determination is presumed correct unless a party contesting the determination shows by a preponderance of evidence that –

(i)   the actuarial assumptions and methods used in the determination were, in the aggregate, unreasonable (taking into account the experience of the plan and reasonable expectations), or

(ii) the plan's actuary made a significant error in applying the actuarial assumptions or methods.

Thus, the issue is not whether or not Energy West (or their expert) views an individual assumption to be unreasonable or if they believe that they can propose a better assumption.  Rather, the issue is whether or not they have demonstrated by a preponderance of evidence that the actuarial assumptions and methods used in the determination of the Plan's unfunded vested benefits were, in the aggregate, unreasonable.  Nowhere have they produced any such demonstration.  (In fact, they have presented no analysis of certain key assumptions, mainly mortality and incidence of retirement.)  Thus, they have failed to meet the bar needed to raise a challenge to the selection of the actuarial assumptions used in determining the value of the Plan's unfunded vested benefits for purposes of assessing withdrawal liability.

37. Nevertheless, I will address the actuarial assumptions used by the Plan's actuary in developing the value of unfunded vested benefits as of June 30, 2015.

38. In determining the present value of vested benefits as of June 30, 2015, the Plan's actuary used the following assumptions:

- Interest:  the PBGC interest rates for the month of June 2015 of 2.71% for the first 20 years and 2.78% thereafter

- Mortality tables:

  ➢ Pre-retirement: RP-2000 Mortality Table for Blue Collar Male Employees, set forward 2 years and projected using scale MP-2015 (beginning 2012)

> ➢ Post-retirement: RP-2000 Mortality Table for Blue Collar Healthy Male Annuitants, set forward 1 year and projected using scale MP-2015 (beginning in 2012)

> ➢ Spouse/Widow: Unisex Pension 1984 Mortality Table, set back 3 years and projected using scale MP-2015 (beginning 2012)

> ➢ Post-disablement: RP-2000 Mortality Table for Healthy Male Annuitants, set forward 4 years and projected using scale MP-2015 (beginning 2012)

- Retirement age from active service: according to three schedules: one for active participants with less than 30 years of service (with rates from age 55 to 65); another for active participants with 30 or more years of service (with rates from age 50 to 65); and another one for vested terminated participants (with rates from age 55 to 65). The average expected retirement age is 60.9.

- Withdrawal rates: 125% of the Vaughn Table ultimate rates plus 4%. Participants terminating before age 55 with at least 20 years of signatory service are assumed to be permanently laid off.

- Incidence of future disability: 1.5% per year for ages 20 to 64

- Spouse age:  Females are four years younger than their spouses

- Percent married: 75%

- Gender: all participants, other than surviving spouses, are assumed to be male

- Loading for non-reported vested terminated participants (1950 Plan): 0.6% of terminated vested liabilities

- Entry age:

> ➢ Participants with credible past service data: actual entry age. Category includes participants whose first service occurred in 1979 or later at age 45 or younger.

- ➢ Participants without complete past service data: assumed to enter at age 24, or present age, if younger

- Past service:

  - ➢ Participants with credible past service data: actual service earned to end of calendar year preceding valuation date plus ½ of the assumed future service for the six-month period ending on the valuation date

  - ➢ Participants without complete past service data: the sum of the following three items:

    - ✓ ½ of the assumed future service for the six-month period ending on the valuation date

    - ✓ Actual signatory service credits for calendar years 1977 and later

    - ✓ For periods of assumed service prior to 1977, according to the following:

      - ❖ Active participants who earned a full year of service every calendar year since entry, during the period since 1977: 1.00 years

      - ❖ All other active and terminated participants: 0.85 year

    - ✓ Past service is not imputed for New Inexperienced Miners

- Rehire: Retired, disabled and terminated participants are assumed to be permanently retired or terminated and are assumed not to be rehired

- Attained age: All participants are assumed to be at least 18 years old and less than 80 years old. Any reported ages outside of this range were adjusted to the end points of the range. If no age was reported, they were assumed to be the average age for other participants in the same category.

- Inactive vested lives over age 65: all inactive vested members over age 65 are assumed to be dead, with no surviving spouse and will not collect a benefit

- Benefits not valued: pre-retirement death benefits following withdrawal and disability for active participants

- Allowance for future administrative expenses:  as outlined in ERISA §4281

- Asset value: Market value

<u>Interest</u>

39. As of June 30, 2015, the risk free long term interest rate was approximately 3.10%, based on the 30 year Treasury, while the risk free intermediate term interest rate was 2.34% based on the 10 year Treasury. The high-quality composite corporate bond rate published by the IRS for June 2015 was 4.45%. IRS June 2015 interest rates for lump sums (for distributions in 2015 plan years) were 1.59% for payments within the first five years, 4.13% for payments to be made between 5 and 20 years from the valuation date, and 5.20% for payments to be made more than 20 years from the valuation date. These IRS lump sum interest rates in 2015 were based on corporate bond rates. The old PBGC basis lump sum interest rates for June 2015 were 0.75% post retirement and 4% pre-retirement. As noted earlier, the PBGC mass withdrawal liability interest rates for June 2015 were 2.71% for the first 20 years and 2.78% for subsequent years.

40. Thus, the use of any rate between 2⅓% and 4½% would not have been unreasonable as a market based measure as of June 30, 2015, depending on the duration of the liability, with much of the variance due to the great spread between the yields on Treasuries and the yields on a blend of corporate bonds. The choice would have been a function of the duration of the liability and the level of the security of the underlying securities (i.e., the desired level of protection against default), as well as the desired level of smoothing of fluctuations in interest rates and liabilities.

41. The Plan is a very mature plan. The liabilities are heavily weighted to retirees. The duration of the Plan's liabilities is shorter than the typical pension plan. Page 10 of the July 1, 2015 actuarial valuation shows that the present value of benefits with respect to participants in pay status represents over 87% of the present value of accumulated benefits of all plan participants, up from 82.7% the year before (and less

than 70% as of July 1, 2007). Thus, the duration of the Plan's liabilities is shrinking as time goes along. Accordingly, the market interest rate, based on the Plan's projected benefit payment stream, would tend to be at the lower end of the range, making the lower end of the 2⅓% and 4½% range more appropriate.

42. The Plan's actuary provided an allowance for administrative expenses when determining plan liabilities based on the PBGC assumptions. Any measure of plan obligations should reflect an allowance for administrative expenses. The Plan will have to expend additional funds annually to administer itself for the benefit of the employees of withdrawing employers.  For example, it will have to provide monthly checks, annual tax information (e.g., 1099-R or W-2P), summary annual reports, as well as a benefit calculation at benefit commencement, along with the associated costs of processing a retirement. It is not reasonable to ask the ongoing employers to foot the bill for administrative expenses associated with participants who had been employees of the withdrawing employer.

43. The interest rate assumption used by the actuary in determining the present value of benefits for purposes of calculating the withdrawal liability makes no explicit allowance for investment expenses. Even if a plan invests passively in index funds, the investment expenses tend to total about 10-20 basis points, allowing for trustee fees, passive investment management, transaction costs, buy/sell spread etc.  Many of these expenses are hidden, in that they appear as reductions in capital gains and not as explicit expenses.  If a plan invests with an active investment manager, then investment related expenses will be higher.  The expectation is that the benefit of active management will offset the higher expenses, notwithstanding many studies showing that not to be the case.  Thus, whatever the expectation of plan investment earnings, that expectation must be lowered by a minimum of 10-20 basis points to reflect basic investment related expenses.

I inspected the Schedule H from the Plan's Form 5500 filings for the plan years 2011, 2012, 2013 and 2014. These schedules showed that the investment advisory and management fees were 30.3 basis points, 28.1 basis points, 19.0 basis points, and 19.5

basis points for the respective years, when measured against the average of the beginning of year and end of year market value of assets.

No allowance was made for these annual expenses, which are a subtraction from the investment return earned by the Plan, in the determination, by the Plan's actuary, of the interest rate used for determining the present value of vested benefits, except to the extent that it was embedded in the PBGC's development of the interest rate.

44. Investing pension assets in any fashion other than on the basis of settling the plan's obligations represents the assumption of risk. Under the principles of basic finance, risky investments are expected to yield greater returns than risk free investments. That excess yield is the reward for bearing the risk. However, risk means that there is a possibility that the risky investment could underperform, and possibly even lose money. The higher **expected** return is the reward for taking the risk. The entity exposed to the risk should benefit from any increase in expected return as the premium it receives in return for accepting the volatility and the responsibility for absorbing the downside potential. In other words, the continuing employers would be exposed to higher contribution requirements if the investments underperformed. There would be no ability to call upon the employers who had withdrawn to increase payments to make up the investment shortfall. The payment schedule for the withdrawn employers is fixed upon withdrawal and does not reflect plan experience (investment, mortality, retirement incidence) after withdrawal. The ongoing employers would have to make up the entire shortfall. Thus, it would not be reasonable to ask the ongoing contributing employers to share with the withdrawing employers any benefit from taking investment risk (i.e., a higher expected return and higher discount rate), as the withdrawing employers would not make up any shortfall from underperformance.

45. My opinion is that for purposes of withdrawal liability calculations all liabilities should be valued at the riskless rate (e.g., US government bonds). As discussed above, once an employer withdraws, the assessment of withdrawal liability is fixed (frozen) and is no longer affected by the performance of the investment portfolio. The withdrawing employer has a fixed cash flow, with no recourse against it for poor

15

asset performance of the fund. If the assumed interest rate is greater than the riskless interest rate, then the remaining employers are taking all of the risk. They should not have to shoulder the risk for the withdrawing employers. To the extent that the interest rate (used in determining the present value of vested benefits for purposes of withdrawal liability calculations) is greater than the riskless rate, there is a transfer of risk from the withdrawing employers to the remaining employers that is not compensated for.

46. As of July 1, 2007, there were 11,496 active participants in the Plan out of a total of 133,620 participants. There were 100,187 retirees and surviving spouses and 21,937 inactive vested participants and non-retired disabled. Thus, there were 10.62 non-active participants (retirees and inactive vesteds) per active participant. By July 1, 2015, that ratio had further increased to 11.62, as the number of active participants had decreased to 8,259 out of a total plan population of 104,258. Thus, 8% of the participants were left to carry the burden of providing the basis for adequate contributions to fund adverse fluctuations in plan experience.

47. Accordingly, the Plan has continued to became more mature and less able to recover from adverse fluctuations in investment return, less able to withstand risk. This is clearly a plan that has a diminishing capacity to absorb adverse fluctuations. This further justifies any level of increased conservatism in evaluating withdrawal liability.

48. For the fifteen plan years ending June 30, 2015, the Plan's geometric mean rate of return was approximately 6.4% (based on an analysis of the information in 1974PLAN_004064 to 004068). At June 30, 2000, the yield on the 30 year Treasury was 5.88%, while, as noted above, on June 30, 2015 it was 3.10%. Similarly, the yield on the 10 year Treasury declined from 6.02% to 2.34%. A significant portion of the return during that 15 year period was the result of declining interest rates, which is not expected to be replicated over the next 15 years. Thus, reasonable expectations for investment returns post June 30, 2015 would be less than the actual returns over the previous 15 year period.

49. The following is extracted from PBGC Opinion Letter 86-24:

16

You indicate that the plan has been computing unfunded vested benefits for withdrawal liability purposes using the PBGC's interest assumption for terminated trusteed single-employer plans and question whether this is appropriate, since these assumptions "are not for multiemployer plans and . . . generate lower liabilities," and since the assumptions are not the same as those used for purposes of section 412 of the Internal Revenue Code of 1954 (the Code).

There is no requirement that the actuarial assumptions used to determine withdrawal liability be the same as those used for purposes of section 412 of the Code. Section 4213(b) of ERISA states merely that [i]n determining the unfunded vested benefits of a plan for purposes of determining an employer's withdrawal liability . . ., the plan actuary may . . . rely on the most recent complete actuarial valuation used for purposes of section 412 of the . . . Code . . . .

This is a permissive, not a mandatory, provision. Thus, the fact that the assumptions used to compute withdrawal liability are not the same as those used under section 412 of the Code does not of itself make those assumptions improper.

50. Thus, it is clear from PBGC guidance, that the assumptions used for withdrawal liability may differ from those used for minimum funding.

51. Actuarial Standard of Practice No. 4 ("ASOP 4") in effect for a measurement date of June 30, 2015 would have been the standard adopted in December 2013, with an effective date of December 31, 2014. (Doc No. 173)

52. Section 3.2 of ASOP 4 reads, in part:

When measuring pension obligations…the actuary should …

(a) identify the purpose of the measurement

53. Section 3.3 of ASOP 4 reads, in part:

Purpose of the Measurement—When measuring pension obligations and determining **periodic costs** or **actuarially determined contributions**, the actuary should reflect the purpose of the measurement. Examples of measurement purposes are **periodic costs**, **actuarially determined contribution** requirements, benefit provision pricing, comparability assessments, withdrawal liabilities, benefit plan settlements, **funded status** assessments, market value assessments, and plan sponsor mergers and acquisitions.

(emphasis in the original)

Note that the ASOP directly identifies withdrawal liability determinations as having a different purpose than determining contribution requirements.

54. Actuarial Standard of Practice No. 27 ("ASOP 27") in effect for a measurement date of June 30, 2015 would have been the standard adopted in September 2013, with an effective date of September 30, 2014. (Doc. No. 172)

The text of Section 3.2 of that ASOP starts out as follows:

> 3.2 <u>Identification of Economic Assumptions Used in the Measurement</u>-The actuary should consider the following factors when identifying the types of economic assumptions to use for a specific measurement:
>
> > a. the purpose of the measurement;
> >
> > b. the characteristics of the obligation to be measured (**measurement period**, pattern of plan payments over time, open/closed group, materiality, volatility, etc.);

(emphasis in the original)

Note the consideration of volatility as a key characteristic to be considered by the actuary.

55. The text of Section 3.6 of that ASOP starts out as follows:

> 3.6 Selecting a Reasonable Assumption—Each economic assumption selected by the actuary should be reasonable. For this purpose, an assumption is reasonable if it has the following characteristics:
>
> > a. It is appropriate for the purpose of the measurement;

56. Section 3.9 of the ASOP goes on to read:

> Selecting a Discount Rate—A discount rate is used to calculate the present value of expected future plan payments. A discount rate may be a single rate or a series of rates, such as a yield curve. The actuary should consider the purpose of the measurement as a primary factor in selecting a discount rate. Some examples of measurement purposes are as follows:
>
> > a. Contribution Budgeting—An actuary evaluating the sufficiency of a plan's contribution policy may choose among several discount rates. The actuary may use a discount rate that reflects the anticipated investment return from the pension fund. Alternatively, the actuary

may use a discount rate appropriate for defeasance, settlement or market-consistent measurements.

b. Defeasance or Settlement—An actuary measuring a plan's present value of benefits on a defeasance or settlement basis may use a discount rate implicit in annuity prices or other defeasance or settlement options.

c. Market-Consistent Measurements—An actuary making a market-consistent measurement may use a discount rate implicit in the price at which benefits that are expected to be paid in the future would trade in an open market between a knowledgeable seller and a knowledgeable buyer. In some instances, that discount rate may be approximated by market yields for a hypothetical bond portfolio whose cash flows reasonably match the pattern of benefits expected to be paid in the future. The type and quality of bonds in the hypothetical portfolio may depend on the particular type of market-consistent measurement. The present value of expected future pension payments may be calculated from the perspective of different parties, recognizing that different parties may have different measurement purposes. For example, the present value of expected future payments could be calculated from the perspective of an outside creditor or the entity responsible for funding the plan. The outside creditor may desire a discount rate consistent with other measurements of importance to the creditor even though those other measurements may have little or no importance to the entity funding the plan.

57. Thus, the ASOP clearly anticipates that there will be instances where the actuary will select a discount rate based on contemporaneous market interest rates of bonds with a similar duration to the liabilities being measured. The PBGC interest rates are a reasonable proxy for those market interest rates.

58. The purpose of the valuation of a plan's liabilities for minimum funding is to determine an amount to contribute to the plan with respect to the ensuing year. The valuation establishes a budgeted minimum number. Each year the valuation is updated to reflect emerging experience and the budgeted contribution number is adjusted upward or downward, depending on plan experience and other factors. In the multiemployer context, absent a withdrawal of an employer from the fund, those employers who contribute in one year will then enjoy the benefits of positive actuarial experience and suffer the pain of negative actuarial experience. If the initial assumptions anticipate a premium in the return as a reflection of the riskiness of the

portfolio, then the contributing employers effectively contribute less currently, anticipating the benefits of earning the equity risk premium. If in fact experience is such that they do not earn the equity risk premium, and possibly actually lose money on their investments, they will be called upon to make up the shortfall via increased contribution requirements over the ensuing years. In fact, that is what happened during the 7/1/2000 to 6/30/2003 period. The funding valuation was prepared using a funding valuation interest rate that was not earned in actuality, thereby generating actuarial losses that increased contributions over the ensuing years and are still being reflected in required contributions. The **purpose** of the funding valuation is to determine a contribution number for one year, with the understanding that it will be revised for future years. If that valuation reflects a discount for taking risk, those who benefit in the short run will be on the hook for any shortfalls. It is accepted actuarial practice for the funding valuation interest rate to reflect the expected return on the portfolio, reflective of the risk premium for investing in risky assets.

59. The purpose of the withdrawal liability valuation is to determine the liability of the withdrawing employer for its share of the unfunded benefits of the plan. This is a onetime calculation, with no opportunity to increase the assessment if the experience of the plan is adverse. Essentially, the withdrawing employer's obligation becomes a fixed bond like obligation, with no variability based on actual market performance.

60. Employers who withdrew during the plan year 7/1/2000 to 6/30/2001 would never be asked to make up any of the investment shortfalls that ensued, as the amount of their withdrawal liability would have been determined as of June 30, 2000, with no recognition of any of those subsequent investment shortfalls. Those investment shortfalls (on the assets attributable to the obligations relating to the employees of the withdrawn employer) would become the responsibility of the remaining employers.

61. Thus, based on the **purpose of the measurement**, to determine a liability to set up a fixed bond like obligation of the withdrawing employer to the fund, it is a very acceptable actuarial practice to determine the present value of vested benefits for the purpose of determining withdrawal liability by using a bond like interest rate.

Administrative Expenses

62. The Plan's actuary has included in the liability for vested benefits an allowance for the future administrative expenses needed to provide for the operation of the plan in order to pay those benefits. Thus, the Plan's actuary provided an allowance for administrative expenses when determining plan liabilities using the PBGC interest rates. This is because any measure of plan obligations should reflect an allowance for administrative expenses. The Plan will have to expend additional funds annually to administer itself for the benefit of the employees of withdrawing employers.  For example, it will have to provide monthly checks, annual tax information (e.g., 1099-R or W-2P), summary annual reports, as well as a benefit calculation at benefit commencement, along with the associated costs of processing a retirement.

63. It is not reasonable to ask the ongoing employers to foot the bill for administrative expenses associated with participants who had been employees of the withdrawing employer. Based on employee census information contained in the July 1, 2015 actuarial report, I would estimate the allowance for future administrative expenses provided for under Appendix C, 29 CFR Part 4044 to be approximately a $69.75 million allowance for future administrative expenses. This was based on a total headcount of 101,377, an initial interest rate of 2.71% and a total liability, including the expense allowance, of $9.564 billion, as shown in the July 1, 2015 actuarial valuation report.

I inspected the Plan's 5500 filings for the years ending 6/30/2015, 6/30/2014 and 6/30/2013, as well as the auditor's reports for those years. These 5500 filings report non-investment related expenses ranging from $22.3 million per year to $24.5 million per year. The auditor's reports show non-investment related expenses between $24 million and $28 million per year.  Thus, if anything, it would be reasonable to anticipate that the present value of administrative expenses for this fund will easily exceed $70 million over the remaining lifetimes of the plan participants. Accordingly, I would believe that the allowance for administrative expenses understates the true liability for administering the plan benefits into the future.

64. In fact, the PBGC allowance for administrative expenses is predicated on the assumption that all participants' benefit amounts have already been determined and finalized. That is not the case with respect to the UMWA 1974 Pension Plan.

Mortality

65. The Plan's actuary has adopted mortality tables based on experience studies covering multiple years. The participants in this Plan have substandard mortality, significantly due to illnesses associated with the nature of the work. The actuary has clearly recognized this by selecting blue collar mortality tables, setting them forward one to two years (which is the equivalent of ignoring about 10 to 20 years' worth of mortality improvements and medical advances), and explicitly ignoring 12 years of mortality improvements. Thus, the participants are expected to experience rates of death that were experienced by blue collar workers some 22 to 32 years ago, before many of the current medical advances had affected mortality experience.

66. Note, there is an actuarial rule of thumb that each year of mortality improvement under the mortality improvement scales underlying RP-2000 is worth about ¼ of 1% of the liabilities. Thus, ignoring about 22 to 32 years of mortality improvements is the equivalent of decreasing plan liabilities by about 5½% to 8%.

67. However, the employees covered by this Plan are blue collar workers. Blue collar employees tend to have higher mortality than white collar employees. The mortality table used by the Plan's actuary does reflect this blue collar adjustment. The blue collar adjustment is approximately a reduction of 5% of liabilities for male active participants and approximately 3% for male retirees. The Plan's actuary has reflected this adjustment in determining Plan liabilities.

Spouse Age

68. Most actuaries use an assumption that wives are three to four years younger than their husbands. A few actuaries assume a two year differential. This assumption is relevant for valuing the cost of the Plan's pre-retirement surviving spouse benefit as well as any subsidiaries embedded in the optional form factors.

The assumption selected by the Plan's actuary, a four year differential, is in line with the assumptions used by most pension actuaries.

<u>Percent Married</u>

69. Absent plan specific data, my experience is that approximately 85% of pre-retirement males are married when considering those covered by defined benefit pension plans and who are vested. The similar percentage for female participants is approximately 65%. This assumption is used in calculating the present value of the liabilities associated with the qualified pre-retirement surviving spouse benefit for vested non-retired participants. The Plan's actuary assumed 75% for all plan participants. This was based on a review of Plan experience. By using 75% instead of 85%, the Plan's vested liabilities were slightly reduced.

<u>Other Demographic Assumptions</u>

70. I have not evaluated the assumptions for employee turnover, incidence of retirement, incidence of disability or the remaining demographic assumptions.

71. However, the Plan's actuary has periodically prepared studies of the demographic experience and updated the assumptions to reflect emerging experience under the Plan.

72. Page 6 of the Plan's Actuarial Valuation as of July 1, 2015 notes that demographic *loss* experienced by the Plan during year ending June 20, 2015 was $49,580,274, or about 0.81% of the July 1, 2014 actuarial liability. Thus, the July 1, 2014 actuarial assumptions underestimated the projected July 1, 2015 actuarial liability.

73. For the year ending June 30, 2014, the July 1, 2014 actuarial valuation report shows a net loss of about from non-financial (i.e., demographic) experience of about $37 million.

74. For the year ending June 30, 2013, the July 1, 2013 actuarial valuation report shows a net loss from non-financial (i.e., demographic) experience of over $18 million. Similarly, the July 1, 2012 actuarial valuation report shows a net loss from demographic experience in the year ending June 30, 2012 of approximately $13

million. The July 1, 2011 actuarial valuation report shows a demographic gain in the prior year of approximately $10 million, while the July 1, 2010 actuarial valuation report shows a demographic gain for the prior year of approximately $5 million. The July 1, 2009 actuarial valuation report showed a demographic gain of about $43 million. The July 1, 2008 actuarial valuation report showed a demographic loss of about $21 million.

75. In the eight years ending June 30, 2015, the average of the demographic gains and losses was $10 million per year, or an average demographic loss of about ¼ of 1% of plan liabilities per year, an exceedingly small number. Three years had gains while five years had losses. Thus we have no indication that the demographic assumptions are unreasonable in the aggregate. However, this does indicate that the selection of demographic assumptions that more precisely matched the demographic experience over this period would have resulted in a slightly higher withdrawal liability.

<u>Assumptions in the Aggregate</u>

76. In my professional opinion, the assumptions selected by the Plan's actuary and used in valuing the Plan's unfunded vested benefits as of June 30, 2015 were not unreasonable in the aggregate (taking into account the experience of the Plan and reasonable expectations).

<u>BENEFITS TO BE CONSIDERED IN THE DETERMINATION OF
THE PLAN'S PRESENT VALUE OF VESTED BENEFITS AND
OTHER CONCERNS WITH MR. HITTNER'S REPORT</u>

77. In determining the present value of vested benefits under the plan, the actuary included all benefits payable pursuant to the terms of the Plan as written as of the valuation date, June 30, 2015. He did not reflect any potential reductions in benefits that might ensue from plan insolvency, even though the actuary had projected plan insolvency approximately seven years after the valuation date.

78. Quoted above are certain portions of ERISA and the regulations thereunder. Specifically, ERISA §4213(c) mandates that the amount of the unfunded vested

24

benefits used in the determination of the withdrawal liability be based on the value of non-forfeitable benefits under the plan. ERISA §4001(a)(8) defines the term nonforfeitable to be a benefit that the participant could claim, either immediately or at a later date, "whether or not the benefit may subsequently be reduced or suspended by a plan amendment, an occurrence of any condition, or operation of this chapter or title 26". It does not condition the benefit on the plan's financial status. It is defined to be nonforfeitable even if it could be reduced by a future plan amendment. This is further confirmed in the PBGC regulations cited above (§§4001.2 and 4211.2). ERISA §305(g)(1) further specifies that if a nonforfeitable benefit has been reduced pursuant to a benefit suspension under a plan that is in critical status, pursuant to ERISA §305(e)(8) or (9), and or in critical and declining status, pursuant to ERISA §305(f), then the present value of nonforfeitable benefits is determined based on the provisions of the plan without reflecting the benefit cutbacks, at least if the benefit cutbacks have been in force for less than 10 years with respect to benefit cutbacks pursuant to ERISA §305(f).

79. Thus, withdrawal liability is determined ignoring any future potential benefit reductions and must even reflect certain benefits that have already been eliminated and are not being paid.

80. Furthermore, in determining withdrawal liability under a mass withdrawal, the calculations are based on the plan provisions in place and provide for no discount for any benefit cutbacks to PBGC guaranteed levels that are projected based on the plan's future insolvency.

81. In fact, when a plan is going insolvent, its financial needs are the greatest. It is inconceivable that Congress anticipated that the withdrawal liability would be reduced, or required payments for withdrawal liability would be reduced, just because the plan was projected to become insolvent.

82. Mr. Hittner points out that the investment horizon for the Plan's assets are relatively short. That might call out for use of even a lower discount rate, reflective of shorter

duration bonds, resulting in even a larger withdrawal liability assessment. Nevertheless, the Plan's actuary did not do so.

83. In footnote 4 of his report, Mr. Hittner notes that if he excluded the year with the worst return from his analysis, then the geometric rate of return would have increased to 7.0%. However, this is a ludicrous calculation. A significant portion of the very favorable returns for 2009 and 2010 were likely the result of a bounce back from the losses of 2008, a reversion to the mean. Instead of excluding the return for 2008, Mr. Hittner might equally have excluded the return for 2009, the year of the bounce back, resulting in a geometric return of 5.2%. Furthermore, his analysis ignored the great market crash of 2000-2002, the worst performance of the US markets since before World War II. By cherry-picking the time period, one could almost prove anything.

84. In paragraphs 22 and 25, is Mr. Hittner arguing that the Plan's funding rate of 7.5% is unreasonably high? How would that have any effect on the reasonableness of the withdrawal liability calculations?

85. In paragraph 10 of his report, Mr. Hittner determines the present value of the stream of monthly withdrawal liability payments under two alternative interest rates and two lengths of payment (20 years or in perpetuity). I determined the present value of the stream of the monthly withdrawal liability payments of $247,251.12, using the same PBGC select and ultimate interest rates used in determining the withdrawal liability (i.e., 2.71% for the first 20 years and 2.78% thereafter). As of the due date of the first payment, that present value was $109,469,447.66. That amount would decrease slightly over the ensuing 20 years, as the applicable period for the lower 2.71% discount rate would be decreasing, until the present value leveled out at $108,327,501.83 for all times after 20 years, when determined immediately prior to the payment of a monthly installment. (If determined immediately after the payment of a monthly installment, the present value would be reduced by $247,251.12 to reflect said payment.)

86. Use of the PBGC interest rates for determining the present value of the monthly withdrawal liability payments is quite reasonable and is consistent with the interest

rates used in determining the amount of the withdrawal liability. This is in consonance with §3.12 of ASOP 27, which reads:

> Consistency among Economic Assumptions Selected by the Actuary for a Particular Measurement—With respect to any particular measurement, each economic assumption selected by the actuary should be consistent with every other economic assumption selected by the actuary for the **measurement period** … (emphasis in the original)

87. To the extent that Mr. Hittner is presenting the present values in paragraph 10 of his report for use in a potential lump sum settlement of the withdrawal liability assessment, my opinion is that the present value should be determined using the same interest rate(s) as was (were) used in the determination of the withdrawal liability itself. Thus, the lump sum amount would be between $108,327,501.83 and $109,469,447.66, possibly reduced by the amount of up to one monthly payment ($247,251.12), depending on when the lump sum was to be paid and assuming that all prior monthly amounts due had been paid in a timely fashion. The choice of the discount rate for determining the lump sum amount is driven by the same principles of risk free investment discussed above.

88. Mr. Hittner also determined the present value of the monthly withdrawal liability payments assuming a 20 year cap on the payments. However, ERISA §4211(d) states that ERISA §4219(c)(1)(B) (the 20 year cap generally applicable to withdrawal liability payments absent a mass withdrawal) does not apply in the context of an IRC §404(c) plan. ERISA §4211(d)(1) specifically states that it applies to "…a plan to which section 404(c) of the Internal Revenue Code of 1986 [26 USC §404(c)], or a continuation of such a plan, applies…" IRC §404(c) defines the plans that it applies to as "…a plan under which such contributions are held in trust for the purpose of paying (either from principal or income or both) for the benefit of employees and their families and dependents at least medical or hospital care, or pensions on retirement or death of employees; and (**2**) such plan was established prior to January 1, 1954, as a result of an agreement between employee representatives and the Government of the United States during a period of Government operation, under seizure powers, of a major part of the productive facilities of the industry in which

such employer is engaged…" The United Mine Workers of America Welfare and Retirement Fund of 1950 was the plan so described. The United Mine Workers of America 1974 Pension Plan is a continuation of that plan. Thus, the 20 year cap on withdrawal liability payments does not apply to it.

<u>ACTUARIAL CERTIFICATION</u>

89. This report is based on the documents listed in Exhibit A attached hereto.  As I examine additional materials and perform further analysis, I reserve the right to revise and supplement my opinions.  In the event that there are errors or omission in any of the information upon which I relied in preparing this report, I reserve the right to correct and/or modify this report, as appropriate.  This report has been prepared for the purpose of the arbitration between Energy West and the United Mine Workers of America 1974 Pension Fund.  Absent consent of the undersigned, this report is not to be provided to any parties outside the context of this arbitration (and any possible ensuing litigation) and may not be relied upon outside the content of the arbitration or any ensuing litigation.

90. The undersigned credentialed actuary meets the Qualification Standards of the American Academy of Actuaries to render the actuarial opinions contained in this report.  I am not aware of any direct or material indirect financial interest or relationship, including investments or other services, that could create a conflict of interest or that would impair the objectivity of my work.

_____

Ethan E. Kra, Ph.D., F.S.A., E.A.

APPENDIX A

1. ERISA
2. Internal Revenue Code
3. IRS and PBGC Regulations, including preambles
4. IRS Revenue Notice 2009-56
5. Actuarial Standard of Practice No. 4, Measuring Pension Obligations and Determining Pension Plan Costs or Contributions, Revised Edition, Adopted by the Actuarial Standards Board December 2013, Document No. 173
6. Actuarial Standard of Practice No. 41, Actuarial Communications, Revised Edition, Adopted by the Actuarial Standards Board December 2010, Document No. 120
7. Actuarial Standard of Practice No. 27, Selection of Economic Assumptions for Measuring Pension Obligations, Adopted by the Actuarial Standards Board September 2013, Document No. 172
8. Actuarial Standard of Practice No. 17, Expert Testimony by Actuaries, Revised Edition, Adopted by the Actuarial Standards Board March 2002, Updated for Deviation Language Effective May 1, 2011, Document No. 135
9. Code of Professional Conduct
10. Qualification Standards for Actuaries Issuing Statements of Actuarial Opinion in the United States, Including Continuing Education Requirements, Effective January 21, 2008, Approved by the Board of Directors, American Academy of Actuaries
11. Historical CBOE Interest Rate 10-year T-No (^TNX) from finance.yahoo.com
12. Historical Treasury Yield 30 Years (^TYX) from finance.yahoo.com
13. http://www.pbgc.gov/news/other/res/pbgc-procedure-interest-factors.html (viewed 10/8/2015)
14. http://www.pbgc.gov/documents/LiabilityValuation-20130906.pdf (viewed 10/8/2015)
15. PBGC Technical Update 10-3
16. PBGC Opinion Letter 86-24 (https://www.pbgc.gov/documents/oplet/86-24.pdf viewed on 10/24/2017)

17. http://www.pbgc.gov/prac/interest/monthly/miru032315.html (viewed 11/21/2016)

18. http://www.pbgc.gov/prac/interest/monthly/miru041515.html (viewed 11/21/2016)

19. http://www.pbgc.gov/prac/interest/monthly/miru051515.html (viewed 11/21/2016)

20. https://www.irs.gov/retirement-plans/minimum-present-value-segment-rates (viewed 11/22/2016)

21. https://www.irs.gov/retirement-plans/composite-corporate-bond-rate-table (viewed 11/22/2016)

22. Energy West Mining Corp. and United Mine Workers of America 1974 Pension Plan Withdrawal Liability Dispute, Expert Report of Scott A. Hittner, FSA, EA, FCA, MAAA, dated September 14,2017

23. Energy West Mining Company's Response to the United Mine Workers of America 1974 Pension Plan's First Set of Interrogatories and First Set of Document Requests

24. Letter dated August 29, 2016, from Dale R. Stover to Energy West Mining Corp., (formerly) Utah Power & Light, Stan Jensen, Manager, Accounting & Finance, Re.: United Mine Workers of America 1974 Pension Plan—Employer Withdrawal Liability Notice and Demand, and Request for Information, under 29 U.S.C. §1399

25. Letter dated October 3, 2016, from Gregory J. Ossi to Mr. Dale Stover, Re: Energy West Mining Company, Review of Withdrawal Liability from United Mine Workers of America 1974 Pension Plan

26. United Mine Workers of America 1974 Pension Plan, Washington DC, Actuarial Valuation Report For Plan Year Commencing July 1, 2015

27. United Mine Workers of America 1974 Pension Plan, Washington DC, Actuarial Valuation Report For Plan Year Commencing July 1, 2014, Revised January 2016

28. United Mine Workers of America 1974 Pension Plan, Washington DC, Actuarial Valuation Report For Plan Year Commencing July 1, 2014

29. December 2012, United Mine Workers of America 1974 Pension Plan, Actuarial Valuation Report as of July 1, 2012

30. January 2011, United Mine Workers of America 1974 Pension Plan, Actuarial Valuation Report as of July 1, 2010

31. January 2012, United Mine Workers of America 1974 Pension Plan, Actuarial Valuation Report as of July 1, 2011

32. December 2008, United Mine Workers of America 1974 Pension Plan, Actuarial Valuation Report as of July 1, 2008

33. April 2008, United Mine Workers of America 1974 Pension Plan, Actuarial Valuation Report as of July 1, 2007

34. January 2007, United Mine Workers of America 1974 Pension Plan, Actuarial Valuation Report as of July 1, 2006

35. Actuarial Valuation Report as of July 1, 2013, United Mine Workers of America 1974 Pension Plan, December 20, 2013

36. December 2010, United Mine Workers of America 1974 Pension Plan, Actuarial Valuation Report as of July 1, 2009, Revised

37. Settler Meeting Handout—Mortality Study by Mercer, dated October 16, 2013

38. Letter dated September 10, 2014, from William J. Ruschau, FSA, EA, MAAA, to Mr. John Adams, Director of Investments, UMWA Health and Retirement Funds, RE: 2014 Actuarial Valuation Assumptions for UMWA 1974 Plan

39. Form 5500 for the 2014 Plan Year for the United Mine Workers of America 1974 Pension Plan

40. Form 5500 for the 2013 Plan Year for the United Mine Workers of America 1974 Pension Plan

41. Form 5500 for the 2012 Plan Year for the United Mine Workers of America 1974 Pension Plan

42. Form 5500 for the 2011 Plan Year for the United Mine Workers of America 1974 Pension Plan

43. Documents with the following Bates numbers:

    a.   1974PLAN_004047-4048

    b.   1974PLAN_004040-4046

    c.   1974PLAN_004049-4053

    d.   1974PLAN_004071-4076

    e.   1974PLAN_004054-4070

    f.   1974PLAN_004035-4039

    g.   1974PLAN_004032-4034

    h.   1974PLAN_004010-4016

i.  1974PLAN_004017-4030

j.  1974PLAN_004031

k.  1974PLAN_004007-4009

l.  1974PLAN_004002-4006

m. 1974PLAN_004000-4001

n.  1974PLAN_003982-3999

o.  1974PLAN_004077-4079

p.  1974PLAN_004080-4085

q.  1974PLAN_004086-4102

r.  1974PLAN_004361-4382

s.  1974PLAN_004287-4322

t.  1974PLAN_004323-4360

## APPENDIX B
## Ethan E. Kra

**Ethan E. Kra Actuarial Services, LLC**
26 Swayze Street
West Orange, NJ 07052
Phone: 201-294-0649
actuary.kra@gmail.com
www.TheExpertActuary.com

Education:

B.A., Yale University, summa cum laude, honors with exceptional distinction in mathematics, 1969

M.A., Yale University, mathematics, 1969

M.Phil., Yale University, mathematics, 1973

Ph.D., Yale University, mathematics, 1974

Thesis:  Infinitary Forcing for Languages with the Q-Quantifier:  Fefferman Vaught Theorems for Infinitary Forcing

Academic Honors:      Woodrow Wilson Fellow

National Science Foundation Fellow

Prize Teaching Fellowship (Yale University)

Phi Beta Kappa

Professional Organization and Credentials:

Fellow, Society of Actuaries (1976--)

Chartered Risk Enterprise Analyst (CERA) (2009--)

Vice President, Education & Examination (2007–08)

Vice President, Pensions (2006–07)

Board of Governors (1997–2000); Operations Committee (1997–2000)

Pension Section Council (1991-94), Vice-Chair (1992-93), Chair (1993–94)

FAS 106 Task Force (1993-99), Co-chair (1993–99)

Pension Finance Task Force (jointly sponsored with the American Academy of Actuaries) (2002–11), Chair (2002–04)

Discipline Committee (2000–05)

Retirement Practice Advancement Committee (1992–2004), Chair (1997–2000)

Non-Mortality Decrement Task Force (2000–04)

Jointly Administered Examinations for Enrollment of Actuaries Committee (1978–79)

Part 4 Examination Committee (1979–80)

Fellow, Conference of Consulting Actuaries (1985--)

    Intersector Committee (1992–94)

Member, American Academy of Actuaries (1979--)

    Vice President, Pensions (2009-11)

    Board of Directors (2003–2006)

    Pension Practice Council (1993–94, 1997–2011), Vice Chair (2000–03, 2005–09), Chair (2009-11)

    Pension Committee (1994–2010)

    Defined Benefit Revitalization Task Force (2003–04)

    Washington Forum Planning Committee (2002)

    Strategic Planning Task Force (1997–98)

    Tax Reform Work Group (2006–09)

    Executive Committee (2009-11)

    Personnel and Compensation Committee (2009-11)

    Recipient 2013 Jarvis Farley Award for lifetime service to the profession

Member, State of New Jersey Pension and Health Benefits Commission (2014-17)

Member, Funding Reform Advisory Task Force (2006-2008)

Member, American Society of Pension Professionals and Actuaries (1996--)

    Fellow (2014--)

Joint Discipline Council of US actuarial profession

    Member of pool of potential members for discipline hearings and appeal panels (2013--)

    Discipline panel member (2013)

Member, National Academy of Social Insurance (2009--)

American Benefits Council (formerly known as Association of Private Pension and Welfare Plans)

    Retirement Savings Committee (1991-1997)

    Retirement and Investment Policy Committee (1999–2011)

    Retirement Income Task Force (1997–2011)

ERISA Industry Committee

    Pension Funding Task Force (2004–06)

    Retirement Security Committee (2003–11)

    Board of Delegates (2008–11)

Enrolled Actuary (1979--)

Chartered Life Underwriter (1977)

Insurance Licenses in New York and New Jersey

Actuarial Standards Board General Committee (2002–04)

Employment:

Ethan E. Kra Actuarial Services, LLC, 2011—

Litigation support and expert witness; strategic advice with respect to multiemployer plan liabilities; evaluation of liabilities and assets of benefit programs in mergers and acquisitions; analysis of financing strategies for executive and long term benefit obligations; consulting with respect to employee benefits in captive insurance companies; advice to executives on benefit elections; valuation of benefits in change of employment and in divorce

Mercer, 1977--2011

1994-2011: Chief Actuary-Retirement, with responsibilities in the areas of design and funding of pension and group insurance benefits, structuring and funding of non-qualified pension benefits years and the proper accounting for expense of employee benefits

Internal positions included:

- Chair, Actuarial Resource Network
- Former Chair, New York Region Professional Standards Committee
- Former member, Global Retirement Professional Affairs Committee

Principal (1984-1989); Managing Director (1989--2011); designation subsequently changed from Managing Director to Senior Partner

Prudential Insurance Company of America, 1973-77

Actuarial program, including assignments in long and short term disability insurance (3/76–4/77); group pensions (8/74–2/76); group insurance systems and aviation reinsurance

Yale University, 1971-73

Prize Teaching Fellow, 1972-73

Teaching Fellow, 1971-72

Speeches and Lectures:

"Professionalism in Theory and Practice", panelist at the 2017 Conference of Consulting Actuaries Annual Meeting.

"Determination Letters – A New Era", panelist at the 2016 Enrolled Actuaries Meeting.

"Ethics in Action", panelist at the 2014 Conference of Consulting Actuaries Annual Meeting.

"Professionalism: Ethics", speaker on audiocast of the Conference of Consulting Actuaries.

"The Consulting Actuary as Expert Witness", instructor at Conference of Consulting Actuaries Seminar.

"Unwelcomed Media Attention: Sensationalism or Substance?", panelist at the 2012 Conference of Consulting Actuaries Annual Meeting.

"Growing Older, Working Longer: Legal and Actuarial Issues of Phased Retirement", panelist on Bloomberg BNA Webinar.

"Potential Approaches for Making Defined Benefit Plans More Appealing", speaker at the 2012 ABA Joint Committee on Employee Benefits, Treasury/IRS Technical Session.

"Rules governing Employee Benefits: What is Working & What Can Be Done to Improve the System? Defined Benefit Plan Focus (PBGC Rules, Funding Rules, Hybrid Plan Rules)", speaker at the 2012 Joint Committee on Employee Benefits, ABA, AICPA, ACEBC and the Section of International Law Employment Committee Government Invitational.

"Ethics", panelist at the 2012 Enrolled Actuaries Meeting.

"Late Breaking Developments", panelist at the 2011 Conference of Consulting Actuaries Annual Meeting.

"2011 Pension Symposium – A Call To Action", panelist at symposium.

"Late Breaking Developments", panelist at the 2011 Enrolled Actuaries Meeting.

"Late Breaking Developments", panelist at the 2010 Conference of Consulting Actuaries Annual Meeting.

"PPA – Where are We Now?", panelist at the 2010 Enrolled Actuaries Meeting.

"Late Breaking Developments", panelist at the 2009 Conference of Consulting Actuaries Annual Meeting.

"Hot Topics for Hybrid Plans", speaker at the 2009 ASPPA Advanced Actuarial Conference.

"General Session 2: Ask the Experts", panelist at the 2009 ASPPA Advanced Actuarial Conference.

"Measuring Public Pension Liabilities – The Contrasting Views Discussion", panelist at the 2009 Society of Actuaries Public Pension Finance Symposium.

"Annual Check-up and Late Breaking Developments", panelist at the 2009 Enrolled Actuaries Meeting.

"Funding Policy: Beyond Minimum", panelist at the 2009 Enrolled Actuaries Meeting.

"PPA - Practical Plan Application", panelist at the 2008 Conference of Consulting Actuaries Annual Meeting.

"Late Breaking Developments", panelist at the 2008 Conference of Consulting Actuaries Annual Meeting.

"Cash Balance Plan Litigation – What's Been Settled & What's Up in the Air", panelist at the ERISA Fiduciary ExecuSummit.

"Variable Annuity Plans", panelist at the 2008 ASPPA Advanced Actuarial Conference.

"The Future of the Defined Benefit System: Are Defined Benefit Plans an Endangered Species", panelist at the 2008 ASPPA Advanced Actuarial Conference.

"PPA 3 – So Close and Yet So Far", panelist at the CCA/SOA 2008 Employee Benefits Spring Meeting.

"Late Breaking Developments", panelist at the CCA/SOA 2008 Employee Benefits Spring Meeting.

"Pension Volatility", panelist at General Session at the 2008 Enrolled Actuaries Meeting.

"PPA: Benefit Restrictions", panelist before the Employee Benefits Committee, Association of the Bar of the City of New York

"Late Breaking Developments", panelist at the 2007 Conference of Consulting Actuaries Annual Meeting.

"General Session 2: Future of the Defined Benefit System", speaker at the 2007 ASPPA Advanced Actuarial Conference.

"Variable Annuity Plans", speaker at the 2007 ASPPA Advanced Actuarial Conference.

"Financial Economics Part 2: Making it Real", moderator at the jointly sponsored 2007 SOA/CCA Employee Benefits Spring Meeting.

"Financial Economics Part 1: Learning the Ropes" panelist and moderator at the jointly sponsored 2007 SOA/CCA Employee Benefits Spring Meeting.

"Pension Symposium: The Future is Here – So What Does That Mean?", panelist at the 2007 Enrolled Actuaries Meeting.

"Late Breaking Developments", panelist at the 2007 Enrolled Actuaries Meeting.

"General Session 1: PPA Pension Funding Rules", panelist at the 2007 Enrolled Actuaries Meeting.

"Pension Reform: What You Need to Know and What You Need to Do", panelist on Corporate Treasurers Council webcast.

"Late Breaking Developments", panelist at the 2006 Conference of Consulting Actuaries Annual Meeting.

"Pension Funds in Crisis – Next Generation Plan Design: What Will It Look Like for Generation X and Y?", panelist at the Strategic Research Institute Conference.

"Pension Reform: What You Need to Know and What You Need to Do", panelist at the Association of Financial Professionals Annual Conference.

"Are Defined Benefit Plans an Endangered Species?, panelist at the OPERS 5th Annual Investment Forum.

"Pension Accounting Reform & the Future of Defined Benefit Plans – Did the Markets, the Accounting or the Funding Rules Cause the Pension Crisis?", panelist at the Strategic Research Institute Conference.

"General Session 1 – Pension Funding Reform", panelist at the 2006 Enrolled Actuaries Meeting.

"Late Breaking Developments", panelist at the 2005 Conference of Consulting Actuaries Annual Meeting.

"Addressing the Financial Risks from Retirement Systems Seminar: Changing Our Focus: Consulting About Risk", panelist at the 2005 Society of Actuaries Spring Meeting.

"2005 Pension Symposium – Pension Funding Reform", speaker at the symposium co-sponsored by the American Academy of Actuaries, the American Society of Pension Professionals & Actuaries and the Society of Actuaries.

"Practicing Professionalism", panelist at the 2005 Enrolled Actuaries Meeting.

"Education 2005: Update from the Pension Perspective", panelist at the 2004 Society of Actuaries Annual Meeting.

"Pension Funding Proposals", panelist at the 2004 Conference of Consulting Actuaries Annual Meeting.

"Late Breaking Developments", panelist at the 2004 Conference of Consulting Actuaries Annual Meeting.

"Late Breaking Developments", panelist at the 2004 Society of Actuaries Annual Spring Meeting.

"The Great Unknown: Q & N/A's", panelist at the 2004 Enrolled Actuaries Meeting.

"Late Breaking Developments", panelist at the 2003 Conference of Consulting Actuaries Annual Meeting.

"The Great Controversy Symposium: Employer Perspective (Part 1)", moderator and panelist at the SOA Symposium, "The Great Controversy: Current Pension Actuarial Practice in Light of Financial Economics".

"Late Breaking Developments", panelist at the 2003 Society of Actuaries Annual Spring Meeting.

"Rulings and Regulations Update", panelist at the 2003 Enrolled Actuaries Meeting.

"Q and N/A", panelist at the 2002 Conference of Consulting Actuaries Annual Meeting.

"Late Breaking Developments", panelist at the 2002 Conference of Consulting Actuaries Annual Meeting.

"Late Breaking Developments", panelist at the 2002 Society of Actuaries Annual Meeting.

"Does the Syllabus Prepare Us for the Jobs of the Future?", panelist at the 2002 Society of Actuaries Annual Meeting.

"Rulings and Regulations Update", panelist at the 2002 Society of Actuaries Annual Spring Meeting.

"New Mortality Tables on Pension Plans", panelist at the 2002 Enrolled Actuaries Meeting.

"Rulings and Regulations Update", panelist at the 2002 Enrolled Actuaries Meeting.

"Is That Your Final Answer?", panelist at the 2001 Conference of Consulting Actuaries Annual Meeting.

"Late Breaking Developments – Wass Up!", panelist at the 2001 Conference of Consulting Actuaries Annual Meeting.

"Does ERISA Bias Lead to Equity Investment?", panelist at the Society of Actuaries 2001 Annual Spring Meeting.

"Late Breaking Developments Part 2: Court Cases", moderator at the Society of Actuaries 2001 Annual Spring Meeting

"Effective Use of Pension Surplus", panelist at the 2001 Enrolled Actuaries Meeting.

"Funding Retiree Welfare Benefits", panelist at the 2001 Enrolled Actuaries Meeting.

"Rulings and Regulation Update", panelist at the 2001 Enrolled Actuaries Meeting.

"Late Breaking Developments", panelist at the Conference of Consulting Actuaries 2000 Annual Meeting.

"Déjà vu All Over Again – Q&N/A's", panelist at the Conference of Consulting Actuaries 2000 Annual Meeting.

"Financing Voluntary Nonqualified Deferred Compensation Plans", presenter at the Financial Executives Institute National teleconference.

"Late Breaking Developments and Rulings", panelist at the Society of Actuaries 2000 Annual Spring Meeting.

"Discussion of IRS Gray Book and PBGC Blue Book", panelist at the 2000 Enrolled Actuaries Meeting.

"Rulings and Regulations Update", panelist at the 2000 Enrolled Actuaries Meeting.

"Q&NA's – Gray Areas", panelist at the 2000 Enrolled Actuaries Meeting.

"Reopening the Great Debate: ERISA Funding", panelist at the Society of Actuaries 1999 Annual Meeting.

"Dial 10-10-GATT for Pension Plan Mortality", panelist at the Society of Actuaries 1999 Annual Meeting.

"Q&NA's", panelist at the Conference of Consulting Actuaries 1999 Annual Meeting.

"Late Breaking Developments", panelist at the Conference of Consulting Actuaries 1999 Annual Meeting.

"Overview of Deferred Compensation Plans", panelist at the 1999 Non-Qualified Executive Retirement Programs Conference sponsored by International Business Communications.

"Pension Rulings and Regulations Update", panelist at the Society of Actuaries 1999 Annual Spring Meeting.

"Discussion of Gray Book Questions and Answers", panelist at the 1999 Enrolled Actuaries Meeting.

"Rulings and Regulations Update", panelist at the 1999 Enrolled Actuaries Meeting.

"Tales of Terror – Ethics, Actuaries, the ABCD and the Law", speaker at the Conference of Consulting Actuaries 1998 Annual Meeting.

"Pension Rulings and Regulations Update", panelist at the Society of Actuaries 1998 Annual Meeting.

"Technical Concerns:  Late-Breaking Pension Developments", panelist at the Society of Actuaries 1998 Annual Spring Meeting.

"Discussion of Gray Book Questions and Answers", panelist at the 1998 Enrolled Actuaries Meeting.

"Postretirement Welfare Benefits", panelist at the 1998 Enrolled Actuaries Meeting.

"Exercising Professional Judgment – An Exercise in Futility", panelist of General Session #1 of the 1998 Enrolled Actuaries Meeting.

"Questions and Answers with the Experts", panelist at the Conference of Consulting Actuaries 1997 Annual Meeting.

"So What's New?—Late Breaking Developments", panelist at the Conference of Consulting Actuaries 1997 Annual Meeting.

"Financing Executive Deferred Compensation with Life Insurance—Does It Make Economic Sense When the Insurance Company Doesn't Run the Numbers?", panelist at the American Bar Association's 1997 Annual Meeting.

"Split Dollar Life Insurance – The True Economics (Pre TAM/PLR)", panelist at the American Bar Association's 1997 Annual Meeting.

"Trends & Issues in Non-Qualified Pension Plans", speaker at the Financial Executives Institute sponsored by the Committee on Investment of Employee Benefit Assets.

"Pension Simplification – Defined Benefit Issues", panelist at the Society of Actuaries 1997 Annual Spring Meeting.

"Approaching the Decision Making Process:  How to Compare the Alternatives", panelist at the 1997 Non-Qualified Executive Retirement Programs Conference sponsored by International Business Communications.

"Employee Benefits in Captives", panelist at the 1997 Captives Insurance Operations Conference.

"Post-Retirement Welfare Benefits", panelist at the 1997 Enrolled Actuaries Meeting.

"Exercising Professional Judgment – An Exercise in Futility?", panelist at the 1997 Enrolled Actuaries Meeting.

"Gray Book Questions and Answers", speaker at the 1997 Enrolled Actuaries Meeting.

"Small Business Job Protection Act of 1996 (Pension Simplification???)", panelist of General Session #1 at the 1997 Enrolled Actuaries Meeting.

"Basics of Funding Retiree Medical", panelist at the Conference of Consulting Actuaries 1996 Annual Meeting.

"Plan Qualification/Registration Issues for Multinational Sponsors", moderator and panelist at the Society of Actuaries 1996 Spring Meeting.

"SFAS 106/112 For the 'Know it All'", co-chair and speaker at the Society of Actuaries May 1996 seminar.

"Employee Benefit in Captives" speaker at the 1996 Captive Insurance Operations Conference sponsored by the Hartford Institute on Insurance Taxation.

"Non-Qualified Executive Compensation" chair and moderator for the Center for Business Intelligence seminar; spoke on "Integrating Non-qualified Plan Objectives to Attract & Retain Key Employees" and "Funding and Securing Non-Qualified Supplemental Executive Benefit Programs".

"Gray Book Questions and Answers", speaker at the 1996 Enrolled Actuaries Meeting.

"Pick your iq", speaker at the 1996 Enrolled Actuaries Meeting.

"415 Limitations After GATT - Revenue Ruling 95-29" speaker at the 1996 Enrolled Actuaries Meeting.

"How to Calculate Federal Insurance Contributions Act Tax on Supplemental Executive Retirement Plans", moderator and speaker at the Society of Actuaries 1995 Spring Meeting.

"Employee Benefits and U.S. Captives", speaker at the 33rd RIMS Annual Conference.

"Employee Benefits in Captives" speaker at the Tenth Anniversary Captive Insurance Operations Conference.

"Pick Your i", speaker at the 1995 Enrolled Actuaries Meeting.

"Pension Aspects of GATT", speaker at the Employee Benefits Group Inc.

"Financing Corporate Liabilities", speaker at Benefit and Financial Strategies after OBRA, seminars sponsored by CIGNA.

"Why Aren't More Captives Writing Employee Benefit Coverage?", speaker at the 21st Annual Captive Insurance Companies Association, Inc. Conference.

"Post-Retirement Welfare Benefits", speaker at the 1994 Enrolled Actuaries meeting.

"Employee Benefits", speaker at the 1994 Conference on Offshore Captive Insurance Operations sponsored by the Center for Tax Education and Research.

"Employee Benefits in a Captive Insurance Company?", speaker at joint Mercer/Marsh & McLennan client seminars.

"Retirement Programs for Law Firm Partners", speaker, Symposium on Employee Benefits.

"FAS 106 Technical Issues", speaker and co-chair at the Society of Actuaries Seminar.

"FAS 106 Consulting Issues", speaker and co-chair at the Society of Actuaries Seminar.

"Post Retirement Welfare Benefits - Funding", panelist at the 1993 Enrolled Actuaries Meeting.

"Cash Balance Plans" moderator at Society of Actuaries Seminars.

"FAS 106 Strategies and the Impact on Executive Compensation", speech at the Healthcare Issues Confronting Corporate America, Client Forum sponsored by Chase Manhattan Bank.

"Funding and Financing Retiree Health: Who Should Pay and How?", speech at the Post-Retirement Health Care Benefits sponsored by Institute for International Research.

"Post Retirement Health Benefit Funding", moderator and speaker at the Society of Actuaries 1992 Spring Meeting.

"Post-Employment Welfare Benefits - Funding", moderator and speaker at the 1992 Enrolled Actuaries Meeting.

"Permitted Disparity", presentation to the Practising Law Institute.

"Funding & Insured Funding Vehicles for Retiree Health", speech at The First Annual Pension and Employee Benefits Conference sponsored by Pensions and Investments.

"Funding and Financing Retiree Medical Benefits: Cost Effective Strategies", speech at the Post-Retirement Health Care Benefits seminar sponsored by Institute for International Research.

"Audience Dialogue with the IRS", moderator at the Society of Actuaries 1991 Spring Meeting.

"Message from the IRS", moderator at the Society of Actuaries 1991 Spring Meeting.

"Funding Alternatives for Post-Employment Welfare Benefits", speeches at Post Retirement Health Care seminars sponsored by Fidelity Investments Institutional Services.

"Funding Alternatives for Post Employment Benefits", speaker and moderator at the 1991 Enrolled Actuaries Meeting.

"Integrating Retirement Plans into Estate Planning", speech to the Tax & Estate Planning Council of Nassau County.

"Post-Retirement Medical Benefits: A Look at FASB Requirements and New Strategies for Controlling Costs", speaker at Mercer seminars.

"Post-Retirement Medical Benefits vs. Pension Benefits: Contrast in Asset/Liability Issues", speech at Asset Liability Management for Pension Funds sponsored by the Institute for International Research.

"What's New in Retiree Medical Funding Vehicles", speech at the Post Retirement Medical seminar sponsored by Institute for International Research.

"Mergers and Acquisitions", speech to the New York County Lawyers Association.

"Mergers and Acquisitions, Employee Benefit Issues", speech to the New York Metro Area Chapter - ISCEBS.

"The Funding and Financing of Retiree Medical Benefits", speech at the Benefits News Analysis seminar on Managing Post-Retirement Medical Benefits.

"Applications for Post Retirement Medical Obligations", speech at the Morgan Stanley seminar on ESOP Strategies and Implementation Issues.

"Pre-funding vs. Pay-as-you-go: Viable & Innovative Financing Options", speech at the Institute for International Research seminar on Designing & Funding Cost-effective Employee Benefit Plans.

"Changing Perspectives Which Motivate Asset - Liability Management:  What Are the True Liabilities and How Do They Affect Matching?", speech at the second Annual Meeting on Asset/ Liability Management for Pension Funds sponsored by the Institute for International Research.

"Funding Executive Benefits", discussion leader for the Financial Executives Institute Financial Policy Peer Group Series.

"Highly Compensated Employees... Controlled Groups... Lines of Business...Aggregation Techniques", workshop speaker at a Section 89 seminar sponsored by William M. Mercer, Inc.

"Omnibus Reconciliation Act of 1987 - Effects on Employee Benefit Plans", speech at a William M. Mercer, Inc. seminar.

"Managing Future Liabilities – Investment Strategies for Funding Retiree Health Care Benefits", speech at the first Annual Symposium on Funding Post-employment Health Care Benefits sponsored by the Institute for International Research.

"Actuarial Considerations for Self-funded Benefit Plans", panel seminar speaker at the New York State Public Sector Coalition on Health Benefits Annual Conference.

"The Actuary and Post-retirement Welfare Benefits", speech to the Actuaries Club of New York.

"The Effects of Tax Reform on Welfare Plans", lecture at the 1987 Accounting Conference sponsored by the Foundation for Accounting.

"Coping with COBRA", speech to the Cultural Institutions Personnel Group.

"Defined Contribution Plans - Impact of 1986 Tax Reform Act", panel speaker at a Mercer-Meidinger seminar.

"Tax Reform Legislation - Whither Goest Thou?", panel speaker at the annual meeting of Conference of Actuaries in Public Practice.

"An Advanced Course in Employee Benefits", course leader/teacher for the American Management Association.

"Select and Ultimate Financial Assumptions in Pension Plan Valuations", workshop chairperson at the Society of Actuaries 1985 Annual meeting.

"Coping with REACT Regulations", workshop panelist for the American Pension Conference.

"The Effect of the Treasury Tax Reform Proposals on Educational Institutions", speech to the Eastern Association of College and University Officers.

"Post Retirement Medical and Death Benefits", speech to the American Management Association Annual Compensation/Employee Benefits Briefing.

"Using Insurance as a Capital Accumulation Device", course teacher for the Practising Law Institute.

"Fundamentals of Employee Benefits", course leader/teacher for the American Management Association.

"Retirement Equity Act", speech to the New York Personnel Management Association.

"Post-retirement Medical and Death Benefits: The Unrecognized Liability", speaker at a Mercer-Meidinger seminar.

"Funding Vehicles for Pension Plans", workshop chairperson at the Society of Actuaries 1983 Spring Meeting.

"Hidden Pension Liabilities in an Acquisition", speaker at a Mercer-Meidinger seminar.

"New Challenges and Opportunities for Welfare Plans", panelist at a Mercer workshop.

"Opting Out of Social Security", speaker at a Mercer sponsored seminar for hospital personnel executives.

"Executive Benefits Funded Through Life Insurance", speech at a Mercer sponsored seminar for hospital personnel executives.

"Response to the Multiemployer Pension Plan Amendments Act of 1980", workshop chairperson at the Society of Actuaries 1981 Spring Meeting.

"Considerations in Selection of Actuarial Assumptions/Methods for Larger Plans", teacher at the Enrolled Actuaries' Annual Meeting.

"Plan Sponsor Responses To The "Age Discrimination in Employment Act" (ADEA) – Employee Benefits", workshop chairperson at the Society of Actuaries 1980 Spring Meeting.

"Coordination of Social Security with...", workshop co-chairperson at the Society of Actuaries 1979 Annual Meeting.

Publications:

"A Proposal for Pension Funding Reform", The Future of Pension Plan Funding and Disclosure Monograph, July 2005, the Society of Actuaries, co-authored with Donald E. Fuerst.

"Durational (Select and Ultimate) Discount Rates for FAS 87 and 106 Valuations", The Pension Forum, December 2004, the Society of Actuaries, co-authored with Ron Iverson, Heidi Rackley and Steve Alpert.

"Late Breaking Developments", transcript, 2004 Conference of Consulting Actuaries Annual Meeting.

"Late Breaking Developments", transcript, 2003 Conference of Consulting Actuaries Annual Meeting.

"Late Breaking Developments", transcript, 2002 Conference of Consulting Actuaries Annual Meeting.

"Q & N/A", transcript, 2002 Conference of Consulting Actuaries Annual Meeting.

"Late Breaking Developments", transcript, 2002 Conference of Consulting Actuaries Annual Meeting.

"New Mortality Tables for Pension Plans", transcript, 2002 Enrolled Actuaries Meeting.

"Rulings and Regulations Update", transcript, 2002 Enrolled Actuaries Meeting.

"Is That Your Final Answer?", transcript, 2001 Conference of Consulting Actuaries Annual Meeting.

"Late Breaking Developments - Wass Up!", transcript, 2001 Conference of Consulting Actuaries Annual Meeting.

"Déjà vu All Over Again – Q & N/A!", transcript, 2000 Conference of Consulting Actuaries Annual Meeting.

"Late Breaking Developments", transcript, 2000 Conference of Consulting Actuaries Annual Meeting.

"Q&N/A", transcript, 1999 Conference of Consulting Actuaries Annual Meeting.

"Late Breaking Developments", transcript, 1999 Conference of Consulting Actuaries Annual Meeting.

"So What's New? Late Breaking Developments", transcript, 1997 Conference of Consulting Actuaries Annual Meeting.

"Post-Retirement Welfare Benefits", transcript, 1997 Enrolled Actuaries Meeting.

"Exercising Professional Judgment—An Exercise in Futility?", transcript, 1997 Enrolled Actuaries Meeting.

"Small Business Job Protection Act of 1996 (Pension Simplification???)", transcript, 1997 Enrolled Actuaries Meeting.

"Basics of Funding Retiree Medical Funding", transcript, 1996 Conference of Consulting Actuaries Meeting.

"Pick your iq", transcript, 1996 Enrolled Actuaries Meeting.

"415 Limitations After GATT—Revenue Ruling 95-29" transcript, 1996 Enrolled Actuaries Meeting.

"Pick Your i", transcript, 1995 Enrolled Actuaries Meeting.

"New Rules for Underfunded Pension Plans, The Retirement Protection Act of 1994", a William M. Mercer, Inc. commentary, co-author.

"Post-Retirement Welfare Benefits", Transcript, 1994 Enrolled Actuaries Meeting.

"Post-Retirement Welfare Benefits - Funding", Transcript, 1993 Enrolled Actuaries Meeting.

"Employee Benefits in a Captive Insurance Company?", Mercer Bulletin, July, 1993.

"Decisions - FAS 106", Mercer Bulletin, September 1992.

"Postretirement Health Benefits Funding", Record of the Society of Actuaries 1992, Vol. 18, No. 1A.

"Post-Retirement Health Benefit Funding", Transcript, 1992 Enrolled Actuaries Meeting.

"Retiree Medical Benefits: Making the Fund or Finance Decision", co-author with William A. Bader, The Journal of Corporate Accounting and Finance, Spring 1992.

"Audience Dialogue with the IRS", Record of the Society of Actuaries 1991, Vol. 17, No. 3.

"Message from the IRS", Record of the Society of Actuaries 1991, Vol. 17, No. 3.

"Funding Alternatives for Post Employment Benefits", Transcript, 1991 Enrolled Actuaries Meeting.

"New Directions in Retirement Planning," a William M. Mercer, Inc. series of commentaries, co-author.

"Miscellaneous 401(a)(4) and Related Issues; a Discussion of Various Issues", in Complying With the New Nondiscrimination and Minimum Coverage Regulations, Practising Law Institute, 1991.

"Funding and Financing Retiree Medical Benefits", Mercer Bulletin, September 1991.

"Retiree Health Benefits in the 1990's", a William M. Mercer, Inc. commentary, co-author.

"Permitted Disparity" in Complying With the New Nondiscrimination and Minimum Coverage Regulations, Practising Law Institute, 1991.

"Secular Trusts and Annuities - Securing Executive Benefits After Tax Reform", a William M. Mercer, Inc. commentary, co-author.

"Omnibus Budget Reconciliation Act of 1987: What it Means to Pensions and Employee Benefits", a William M. Mercer, Inc. commentary, co-author.

"Tax Reform: What It Will Mean to Benefits and Compensation - A Mercer-Meidinger Commentary", co-author.

"Using Insurance as a Capital Accumulation Device", in Executive Compensation, Practising Law Institute.

"How to Protect Yourself Against Medical Insurance Gaps", Bottom Line Personnel.

"How to Identify Gaps In Life and Disability Insurance", Bottom Line Personnel.


Internal Mercer Communiqués - author/co-author of the following:

"Credit recordkeeping and document retention for US actuarial professional continuing education requirements", co-authored with Jess McGrath.

"US actuarial professional continuing education requirements", co-authored with Aquil Ahmed, Carol Gramer, and Shelly Raad.

"Retirement Studio conversion standards", co-authored with Ron Iverson.

"FAS 158 and Multiemployer Plans", co-authored with James Dexter.

"Computation of Actuarial Value of Assets: Corridor Limit Application", co-authored with Carol Gramer.

"Selecting Cross-Border Accounting Assumptions", co-authored with Bruce Cadenhead, Wendy McFee and Phil Turner.

"Retiree medical Pre-funding in 401(h) accounts and VEBAs", co-authored with Heidi Rackley, Judy Bauserman, Barbara McGeoch, Scott Tucker and Derek Guyton.

"International Accounting Changes Target Multiemployer Plans", co-authored with James Dexter.

"Tax Effects of the New Medicare Prescription Drug Subsidy", co-authored with Fran Bruno and Mark Hamelburg.

"Employee Benefits in a Captive Insurance Company", co authored with Rich Fuerstenberg, Mark Hamelburg and Henry Saveth.

"DOL Benefits-in-a-Captive Ruling Imminent" co-authored with Henry Saveth, and Mark Hamelburg.

"Peer Review of Cross-Border Actuarial Work", co-authored with Bruce Cadenhead.

"Professional Standard – Signing and Peer Reviewing Actuarial Reports", co-authored with Derek Guyton.

"Guidelines for Selecting Certain Assumptions", co-authored with Paul Zeisler and Bruce Cadenhead.

"Spin-off Assumptions", co-authored with Bruce Cadenhead.

"Pension Valuation Checklist for Multiemployer Plans: Updated to Reflect Changes Included in the Economic Growth and Tax Relief Reconciliation Act of 2001", co-authored with Carol Gramer.

"Reorganization Status for Multiemployer Plans", co-authored with Carol Gramer.

"Aggregate Entry Age Normal Funding Method Violates IRS Reasonable Funding Regulations".

"Section 414(k) Plans – Actuarial Issues", co-authored with Ron Iverson.

"Captive Insurance Companies and Employee Benefits", co-authored with Henry Saveth.

"Select and Ultimate Discount Rates for FAS 87 & 106 Valuations", co-authored with Ron Iverson and Heidi Dexter.

"Tax Gross Up Calculations for Executive Benefits", co-authored with Frank Burianek, Gary Thomas.

"Professional Standard – Signing/Peer Reviewing Actuarial Reports".

"Mergers and Acquisitions", co-authored with Bert Bernier, Edgar Friedman, Kevin Minor and Scott Tucker.

"Automatic approval for change in funding method for plans with negative unfunded liability".

"E-54—International Accounting Standards", co-authored with Ron Iverson, Wendy McFee, Larry Bader and Frank Todisco.

"Pension Valuation Checklist for Multiemployer Plans", co-authored with Carol Gramer.

"Change in SFAS 87/106 Measurement Date", co-authored with Kevin Minor and Bob Behar.

"1996 Schedule B", co-authored with Bruce Cadenhead and Ed Greene.

"Consulting Issues Relating to Repeal of IRC Section 415(e)", co-authored with Carol Gramer.

"PBGC Variable Premium Calculations", co-authored with Bob Behar and Steven Gagel.

"Document Retention".

"Plan Spinoffs".

"FAS 87 & 106 Discount Rates".

"Multiple Employer Plans:  Do I have one and what do I do now?", co-authored with Joy Theobald.

"Technical Actuarial Questions on Bulletin Board".

"Peer Review for Actuarial Reports".

"Continuing Education for Actuaries".

"Negative Unfunded Accrued Liabilities", co-authored with David Jarrett.

"Separate Line of Business".

"Testimony on 401(a)(4) Regulation Package".

"Schedule B - Deficit Reduction Contribution".

"Required Distributions Under Section 401(a)(9) - Qualified Plans".

"Business Combination Accounting".

"Retroactively Changing the Amortization Period for Gains and Losses Recognized as of 1/1/88".

"Meeting With IRS".

"Meeting With IRS".

"U.S. Controlled Group Benefit Issue for Foreign Parent Companies".

"Meeting With IRS".

"Revenue Notice 89-70 Warning on Early Retirement Using 1/15, 1/30".

"Calculating Benefits for Employees Who Attain age 70½".

"Taxation of Long Term Care Insurance".

"Bank Ownership of Individual Policies".

"Proposed Section 89 and 125 Regulations".

"Required Distributions From Qualified Plans: One Year Deferral of Effective Date".

"Determination of FAS 87 Pension Expense for Secular Trusts".

"Analysis of Social Security Integration Requirements".

"Integration Under Tax Reform '86 - A White Paper".

"Market Crash of October 19, 1987".

"DOL Guidelines for Benefit Plans under ADEA", co-authored with Solomon Weinberger.

**Quoted frequently by New York Times, Wall Street Journal, Business Week, Newsweek, Time, Fortune, etc.**

# Appendix C: Expert Witness Cases

Ethan E. Kra

| Case Name and Court Citations (client name in italics) | |
| --- | --- |
| *Severstal Columbus Holdings, LLC, Plaintiffs*, v. Willis of Wisconsin, LLC, Defendants | Expert report prepared (May 2017) |
| Harsco Corp. vs. *Operating Engineers' Local 324 Pension Fund* | Expert report prepared (March 2017), deposed (August 2017), testified at arbitration hearing (October 2017) |
| Titan Equipment East, Inc. vs. *Operating Engineers' Local 324 Pension Fund* | Expert report prepared (December 2016) |
| *United Mine Workers of America 1974 Pension Plan and Trust* v. Peabody Energy Corporation and Peabody Holding Company | Expert report prepared (December 2016); settled before arbitration decision rendered |
| *Vivian Shinberg Plaintiff/Counter-Defendant* v. Richard Shinberg Defendant/Counter-Plaintiff | Expert report prepared (May 2016), updated (June 2016), testified in court (July 2016) |
| *Meriter Health Services, Inc., Plaintiff* v. Godfrey & Kahn, S.C., et.al., Defendants | Affidavit filed (March 2016), expert report prepared (September 2016), supplemental expert report prepared (September 2016), deposed (October 2016), updated report prepared (October 2016), deposed (November and December 2016), affidavit filed (February 2017), updated report prepared (May 2017); settled out of court |
| Service Employees International Union National Industry Pension Fund, et. al. Plaintiffs/Counter-Defendants v. *Scientific and Commercial Systems Corporation Defendant/Counter/Cross-Plaintiff* and Tessada & Associates, Inc. Cross-Defendant | Expert report prepared (January 2016) |
| R. J. Stacey LTD vs. *Operating Engineers' Local 324 Pension Fund* | Expert report prepared (December 2015) |
| Kevin Dolan and a class of similarly situated individuals, Plaintiffs, vs. *King County, a political subdivision of the State of Washington, Defendant*, and Department of Retirement Systems, Intervenor | Expert report prepared (December 2015), deposed (January 2016), testified in court (May 2016); court decision on appeal |
| International Brotherhood of Teamsters Local No. 710 Health and Welfare Fund, and International Brotherhood of Teamsters Local No. 710 Pension Fund, v. *ABF Freight System, Inc., a Delaware Corporation* (1:14-cv-3915) | Expert report prepared (June 2015), settled out of court |
| *Vista Del Mar Child and Family Services* vs. Jewish Federation Council of Greater Los Angeles, as Plan Administrator for the Basic Pension Plan for Employees of Jewish Federation Council of Greater Los Angeles | Expert report prepared (February 2015), deposed (March 2015), settled before commencement of arbitration |

| Case Name and Court Citations (client name in italics) | |
|---|---|
| *The Village of Old Brookville, the Village of Brookville, the Village of Upper Brookville, the Village of Matinecock, the Village of Mill Neck and the Village of Cove Neck, Plaintiff* against the Village of Muttontown, Defendant | Expert reports prepared (January 2015) |
| The New York Times Company vs. *Newspaper and Mail Deliverers'-Publishers' Pension Fund* | Expert report prepared (November 2014), deposed (December 2014), testified at arbitration hearings (February 2015, March 2015), decision in favor of Pension Fund |
| *Phipps Houses Services, Inc.,* v. New York Presbyterian Hospital, as Successor to the Presbyterian Hospital in the City of New York, Royal Charter Properties, Inc. and Royal Charter Properties East, Inc. | Affidavit filed (August 2014), expert report prepared (August 2016), deposed (October 2016), affidavit filed (January 2017); testified at jury trial (June 2017) |
| *Jaclyn Santomenno, et. al.,* v. Transamerica Life Insurance Company, et. al. | Expert report prepared (March 2014), rebuttal report prepared (May 2014), deposed (May 2014), declaration prepared (February 2015), declaration prepared (March 2016) |
| Waste Management of New Jersey, Inc. v. *Teamsters – Employers Local 945 Pension Fund* | Expert report prepared (February 2014), deposed (July 2014), testified at arbitration hearing (April 2015), settled before arbitrator's ruling |
| United Steelworkers v. *Specialty Bar Products Company* | Testified at arbitration hearing (January 2014), decision in favor of Specialty Bar Products Company |
| *Gary McGuire, a Named Fiduciary, on Behalf of the Union Carbide Employees' Pension Plan,* v. Metropolitan Life Insurance Company | Expert report prepared (October 2013), deposed (December 2013), supplemental expert report prepared (March 2014), settled out of court |
| *Jeffrey E. Perelman, as a Participant in the General Refractories Company Pension Plan for Salaried Employees,* v. Raymond G. Perelman, Ronald O. Perelman, Jason Guzek and General Refractories Company | Expert report prepared (July 2013), deposed (August 2013) |
| In the Matter of Arbitration between Local No. 863 International Brotherhood of Teamsters Pension Plan and *American B. D. Company* | Expert report prepared (March 2013), testified at arbitration hearing (April 2013), U.S. District Court overruled arbitrator and ruled in favor of American B. D. Company |
| In the Matter of Arbitration between Teamsters Trucking Employees of North Jersey Welfare Fund, Inc. – Pension Fund and *Sanitary Coat Apron Towel Supply, Inc.* | Expert report prepared (January 2013) |
| *Boris Goldenberg, et al.* v. Indel, et.al. | Expert report prepared (December 2012), settled out of court |

Page 3

| Case Name and Court Citations (client name in italics) | |
|---|---|
| Official Committee of Long Term Disability Plan Participants, on behalf of and as agent for a class of Individual participants and beneficiaries under various Nortel Networks Health and Welfare Benefit Plans, Plaintiffs, v. *Nortel Networks Inc., et al., Defendants* | Expert report prepared (November 2012), settlement approved by court (May 2013) |
| Sharon K. Philpott, an individual, vs. *Ernst & Young LLP, a Delaware limited liability partnership, and the Ernst & Young U.S. LLP Members' Top Hat Plan* | Expert report prepared (September 2012), deposed (February 2013), testified at arbitration hearing (March 2013) |
| Allen S. Glushakow, M.D., Individually and on Behalf of the Allen S. Glushakow Defined Benefit Pension Plan vs. *Joel Boyarsky, Improved Funding Techniques Inc., and Aviva Life and Annuity Company, as successor in Interest to the Indianapolis Life Insurance Company* | Expert report prepared (August 2012), settled out of court |
| *Laboratory Medical Consultants* vs. Actuaries Unlimited, Inc., et al | Expert report prepared (March 2012), settled out of court |
| Martin Sheen, et al. vs. *Screen Actors Guild, et al.* | Declaration prepared and filed with court (March 2012), ruling in favor of Screen Actors Guild |
| IRS vs. *Peabody Energy Corporation* | Testified at IRS hearing, won by Peabody (April 2010) |
| *Conkright, Nazemetz, Becker and Xerox Corporation Retirement Income Guarantee Plan*, vs. Frommert, et al. (2010 U.S. LEXIS 3479 (Apr. 21, 2010)) | Amicus brief to Supreme Court of United States (2009), decision for Xerox Corporation Retirement Income Guarantee Plan |
| Hurlic, et al. vs. *Southern California Gas Company, et al.* (Case No.: 05-CV-5027 R (MANx)) | Expert report prepared (2009), settled out of court |
| Charles, et al. vs. *PepCo Holdings, Inc., et al.* (314 Fed. App. 450 (3d Cir. 2008)) | Expert report prepared, deposed (June 2007), summary judgment for PepCo |
| Kroop, et al. vs. *Duane Reade NY NY*, et al. 00 CIV 9841 (AKH) | Expert report prepared (March 2004) |
| The American Federation of Musicians and Employers' Pension Fund | Expert report prepared, testified at multiemployer arbitration (2001-2002) representing management Trustees |
| *Weyerhaeuser* vs. MetLife | Expert report prepared and submitted to binding arbitration (Summer 1999), decision in favor of Weyerhaeuser |
| Edward Gitlitz v. *Compagnie Nationale Air France*, U.S. District Ct., Southern District of Florida, Case No. 93-2247-CIV-MOORE, 129 F. 4d 554; 1997 U.S. App. LEXIS 32946 | Expert report supplied, depositions at earlier dates, testified at trial (January 1999), decision in favor of Air France |
| Joe F. Collins v. *Compagnie Nationale Air France*, U.S. District Ct., Southern District of Florida, Case No. 94-0734-CIV-MOORE, 129 F. 4d 554; 1997 U.S. App. LEXIS 32946 | Expert report supplied, depositions at earlier dates, testified at trial (January 1999), decision in favor of Air France |
| Leonard F., et al., v. *Israel Discount Bank of New York*, C.A. No. 95-CV-6964 (CLB), 199 F.3d 99; 1999 U.S. App. LEXIS 32096 | Expert report prepared, deposed (February 1998), settled prior to trial |

Page 4

| Case Name and Court Citations (client name in italics) | |
|---|---|
| Fred L. Tepperman v. *MacAndrews & Forbes Group, Incorporated*, Sup. Ct. of New York, County of Westchester, Index No. 2481/92 | Expert report supplied, no deposition, case settled during trial (July 1995) |
| Max Garelick v. *Rodier Corporation* | Expert report prepared (August 1994), settled prior to commencement of arbitration |
| Alexander v. *Primerica Holdings Inc.,* Civil Action No. 89-5151 (AJL) U.S. Dist. Ct. for the District of New Jersey, 822 F. Supp. 1099, 1993 U.S. Dist. LEXIS 7144 | Expert report supplied, deposed, testified at trial (June 1994), settled prior to decision |
| Jacqueline and Crescent Fresca v. *Federal Deposit Insurance Company, receiver for the Seamen's Bank for Savings*, U.S. Dist Ct., Southern District of New York, 91 Civ. 3624 (LBS), 818 F. Supp. 554; 1997 U.S. Dist. LEXIS 5072; 16 E.B.C. 2584 | Expert report supplied, testified at trial (March 1994) |
| *City of Philadelphia* v. Public Employees Benefit Services Corporation, 1994 U.S. Dist. LEXIS 3210, Civil Action No. 93-0048 | Expert report supplied (1992-January 1994), no deposition, case settled prior to trial |
| Frank Landry, et al. v. *A.L.P.A.,* U.S. Dist. Ct. E.D. Louisiana, #86-3196 Section "N" (5), 1994 U.S. Dist. LEXIS 16780 | Expert report supplied (August 1993), deposed, testified at trial. Expert report used as basis for court directed allocation of trust fund |
| AIP, Inc. v. *CIGNA* | Advised client regarding settlement negotiations (early 1990's) |
| Vornado v. *Trustees,* 826 F.2d 416 (3d Cir. 1987), 1987 U.S. App. LEXIS 12524 | Affidavits and depositions taken, case decided on motion for summary judgment in favor of Trustees (mid 1980's) |

**ENERGY WEST MINING CORP. AND UNITED MINE WORKERS OF AMERICA 1974
PENSION PLAN WITHDRAWAL LIABILITY DISPUTE**

EXPERT REPORT OF SCOTT A. HITTNER, FSA, EA, FCA, MAAA

October Three Consulting LLC
7951 E. Maplewood Ave., Suite 330
Greenwood Village, CO 80111
303.351.5083
sahittner@octoberthree.com

September 14, 2017

## I.  Introduction

1.      I am a partner and chief actuary of October Three Consulting LLC, an actuarial and employee benefits consulting firm.  I am a Fellow of the Society of Actuaries, an Enrolled Actuary, a Fellow of the Conference of Consulting Actuaries, and a member of the American Academy of Actuaries.  I am a Director of the Conference of Consulting Actuaries and a member of the Pension Committee of the American Academy of Actuaries.

2.      I have practiced as an actuary since 1990, primarily in pension benefits.  I have extensive experience in designing, interpreting, administering and consulting with respect to defined benefit pension plans.  Appendix I provides more information on my professional background.

3.      Appendix II contains a full list of the documents I considered in preparing this Report.

4.      My firm is being compensated for my time at an hourly rate of $505.

5.      Energy West Mining Corporation's counsel asked me to opine on:

- Whether the actuarial assumptions and methods used in the determination of withdrawal liability for Energy West were, in aggregate, reasonable,

- Whether and how the projected inability of the United Mine Workers of America 1974 Pension Plan to continue to pay full monthly accrued benefit payments should be taken into account, and

- The amount of lump sum settlement that would be necessary to satisfy Energy West Mining Corporation's withdrawal liability assessment using appropriate actuarial assumptions.

6.     The analyses presented in this Report were prepared by me or under my supervision.  Such analyses should not be used or relied upon for purposes other than as specifically addressed herein.  In my opinion, this Report conforms to generally accepted actuarial principles and practices, and is in accordance with applicable Actuarial Standards of Practice.

7.     My comments and opinions in this Report are based on my review of the pertinent documents listed in Appendix II, bringing to bear my considerable experience as a consulting actuary with defined benefit pension plans.

## II.  Summary of Opinions

8.     The interest rate assumption used by the actuary for the United Mine Workers of America 1974 Pension Plan ("UMWA 1974 Pension Plan" or "Plan") to determine withdrawal liability for Energy West Mining Corp. ("Energy West") is irreconcilably lower than the interest rate used by the actuary to determine the Plan's minimum funding requirements.  The interest rates used for calculating withdrawal liability—PBGC annuity interest rates of 2.71% for the first 20 years and 2.78% thereafter—significantly conflict with the actuary's assumed 7.50% used for funding purposes.  Because the Plan is projected to have investable assets only until the 2022 plan year,[1] the withdrawal liability and funding liability calculations are more similar than for plans that are not projected to become insolvent in the near term.

---

[1] 2015 Schedule MB (Form 5500), line 4f.

2

9.      The calculation of Energy's West's withdrawal liability does not reflect the effect of the Plan's projected insolvency on the Plan's monthly benefit payments.  If the Plan becomes insolvent, as the Plan's enrolled actuary projects, the Trustees will be required to reduce benefits to the greater of the Pension Benefit Guaranty Corporation ("PBGC") guaranteed maximum benefit or the benefit level that the Plan's available resources will support.  Due to the size of the Plan, the payment of PBGC guaranteed benefits would be expected to result in the PBGC multiemployer insurance fund becoming insolvent, which would result in further benefit reductions.[2]  Reflecting the projected PBGC maximum benefit and possible larger cuts due to PBGC insolvency would reduce Energy West's withdrawal liability significantly.

10.      Energy West's assessed withdrawal liability does not reflect Energy West's maximum obligation of monthly contributions of $247,251.12.  These payments may be limited to 20 years or continue indefinitely.  If the 20-year limit does not apply, the present value of monthly contributions of $247,251.12 in perpetuity using a reasonable interest assumption[3] is between $40,902,305 and $63,316,517.  Limiting the payments to 20 years results in a present value of between $31,273,364 and $41,581,017.  In either case, the present value of monthly contributions is significantly less than the assessed withdrawal liability of $115,119,099.34.

---

[2] The PBGC's *FY 2016 Projections Report* shows that the insurance program for multiemployer pension plans has just below $2.0 billion in assets and the UMWA 1974 Pension Plan had over $5.7 billion unfunded vested benefits as of June 30, 2015.

[3] Discussed in paragraph 30 et seq

### III. Foundational Information

11.    The role of the "enrolled actuary" for a qualified multiemployer defined benefit pension plan like the UMWA 1974 Pension Plan includes calculation of the minimum required contribution under Internal Revenue Code ("IRC") sections 412 and 431 and preparing and signing the Schedule MB to Form 5500 that documents whether contributions to the plan are sufficient to satisfy the minimum required contribution. The plan's enrolled actuary also calculates withdrawal liability under ERISA section 4211 for withdrawing employers.

12.    I am an enrolled actuary, having been enrolled by the Joint Board for the Enrollment of Actuaries in 1994.

13.    As a consulting actuary for 27 years, I have extensive experience working with many aspects of pension plans, including plan design, benefits administration, employee communication, and financial determinations.

14.    The issues I deal with as a consulting actuary often involve highly technical and specialized areas that are rooted in the law. To do my job, I must have thorough working knowledge of many aspects of IRC section 401(a) and related sections pertaining to plan qualification requirements. The analysis and opinions I provide in this Report are offered to the Arbitrator based on my knowledge and experience and should not be construed as legal opinions.

### IV. Analysis and Findings

15.    The Trustees of the United Mine Workers of America 1974 Pension Plan and the Plan's enrolled actuary determined withdrawal liability for Energy West by

4

allocating to Energy West a portion of the Plan's total unfunded vested benefit liability as of June 30, 2015. ERISA section 4213(a)(1) requires withdrawal liability be determined using:

- actuarial assumptions and methods which, in the aggregate, are reasonable (taking into account the experience of the plan and reasonable expectations) and which, in combination, offer the actuary's best estimate of anticipated experience under the plan, or

- actuarial assumptions and methods set forth in the [PBGC's] regulations for purposes of determining an employer's withdrawal liability.

The PBGC has not issued regulations with assumptions and methods to calculate withdrawal liability.

16.    The requirements for assumptions and methods for purposes of minimum funding calculations are nearly identical to those for withdrawal liability. The requirements for minimum funding purposes are in ERISA section 304(c)(3), which requires the plan's enrolled actuary to use assumptions and methods:

- each of which is reasonable (taking into account the experience of the plan and reasonable expectations), and

- which, in combination, offer the actuary's best estimate of anticipated experience under the plan.

The key difference is that the assumptions and methods to calculate minimum funding requirements must be individually reasonable, while the methods and assumptions for withdrawal liability must be reasonable in aggregate. But in either case, the combination

of assumptions and methods must offer the actuary's best estimate of anticipated experience under the plan.

17.     The Plan's actuary used an interest rate assumption of 7.50% for minimum funding calculations for the plan year ended June 30, 2015.

18.     The following table shows the rate of return on Plan assets reported on the Plan's Schedule MB (Form 5500) filings for the 2007 through 2014 plan years and estimated rates of return for the 2006 and 2015 plan years that I calculated using the asset information provided in the actuarial valuation reports for 2007 and 2016, respectively.

| Plan Year | Rate of Return | Plan Year | Rate of Return |
|-----------|----------------|-----------|----------------|
| 2006 | 18.7% | 2011 | 9.0% |
| 2007 | -4.7% | 2012 | 9.5% |
| 2008 | -18.2% | 2013 | 15.7% |
| 2009 | 15.7% | 2014 | 5.0% |
| 2010 | 18.2% | 2015 | -0.3% |

19.     From the above investment return values, I calculate the average annual rate of return over the ten plan years 2006 through 2015 was approximately 6.3%.[4] This average rate of return reflects the "great recession" in the U.S. from December 2007 through June 2009, which most significantly affected the 2008 plan year (i.e., July 1, 2008 through June 30, 2009).[5]

---

[4] This is the geometric average return, which is determined by taking the 10th root of the total amount that would have accumulated over the ten years with an initial investment of $1 (i.e., $((1 + 18.7\%) \times (1 + -4.7\%) \times (1 + -18.2\%) \ldots)^{1/10} - 1 = 6.3\%$)

[5] Excluding the 2008 plan year, I calculate a nine-year geometric average return of 7.0%. (continued)

20.    The Plan is projected to be insolvent by the 2022 plan year.[6]  Accrued benefits are payable over the lifetime of participants with 75% of the benefit continuing for the lifetimes of spouses of married participants if participants predecease them.  The 2015 Actuarial Valuation Report shows the expected benefit payments based on the participant census as of July 1, 2015.  Approximately one-third of the total expected benefits will occur by the end of the 2022 plan year.[7]  Therefore, the great majority—approximately two-thirds—of payments are expected to be paid to participants or their surviving spouses after the Plan is projected to be insolvent.  The Plan's enrolled actuary assumed a 7.50% interest rate for purposes of determining minimum funding requirements in the context of projecting the Plan's insolvency long before the payment of all accrued benefits.

21.    The Plan's enrolled actuary used a much lower interest rate assumption for calculating Energy West's withdrawal liability.  The actuary used the PBGC annuity interest rates of 2.71% for the first 20 years and 2.78% thereafter in effect for June 2015.  These rates significantly conflict with the 7.50% interest rate assumption for funding.

22.    Energy West requested a recalculation of the withdrawal liability using the same 7.50% interest rate used for minimum funding purposes.  The Plan's General Counsel replied that under Actuarial Standard of Practice No. 27 ("ASOP 27"), the reasonableness of actuarial assumptions depends on the purpose of the measurement.  Counsel pointed out that ASOP 27 provides that an "actuary may use a discount rate

---

[6] 2015 Schedule MB (Form 5500), line 4f

[7] By adding the expected benefits shown on p. 35 of the 2015 Actuarial Valuation Report, I calculated an expected $4,575,401,488 for the 2015 through 2022 plan years and an expected $13,960,845,121 for all plan years beginning with the 2015 plan year.

that reflects the anticipated investment return from the pension fund" when determining the appropriate level of employer contributions. This mention of anticipated investment return suggests that some of the difference between the 7.50% interest assumption for funding at the 2.71% and 2.78% used for withdrawal liability is attributable to anticipated investment return. But the enrolled actuary cannot expect investment return on Plan assets after 2022—the projected date of Plan insolvency. In other words, since the Plan is projected by its own enrolled actuary to have no assets after 2022, there can be no return on those assets. I conclude that the 7.50% interest rate used by the enrolled actuary must result from a combination of an interest assumption that reflects anticipated investment earnings through 2022 and an interest rate that reflects no investment earnings after 2022. Because the Plan's enrolled actuary used the PBGC annuity interest rates without adjustment, it appears that he didn't consider the effect of the Plan's projected insolvency on the benefit security. Thus, using the PBGC rates without adjustment is not reasonable.

23.    Another difference between the interest assumption for funding purposes and withdrawal liability purposes is that withdrawal represents a settlement of Energy West's liability. The Plan can no longer adjust contribution requirements for any employer after it withdraws. The Plan's enrolled actuary can compensate for this by using a lower rate of interest. The lower interest rate produces a higher withdrawal liability that contains a margin for adverse experience after withdrawal.

24.    Although it is understandable that the Plan's enrolled actuary used a lower interest rate to determine Energy West's withdrawal liability than he uses for contribution requirements, the enrolled actuary should consider how the Plan's projected insolvency

affects the security of Plan benefits.  Using the PBGC interest rates of 2.71% for 20 years and 2.78% thereafter implies virtual certainty that the Plan will have sufficient funds to provide full vested accrued benefits to participants.  But it is much more likely that, and, in fact, certified to by the Plan's enrolled actuary, that the Plan is expected not to have enough resources to pay full vested accrued benefits.

25.    Considering the Plan's projected insolvency by 2022, it seems inconceivable that both the 7.50% interest rate used for funding and the 2.71% and 2.78% rates—rates that are about 4.75 percentage points, or about 63%, lower—for withdrawal could both be appropriate.  The Plan's enrolled actuary has certified on the Schedule MB (Form 5500) that the 7.50% interest rate is a reasonable assumption for funding purposes.  For the withdrawal liability calculation to be consistent with the funding liability calculations, the interest rate would have to be substantially closer to the 7.50% used for funding.

26.    I estimated the impact of using an interest assumption equal to the PBGC interest rates for the period prior the Plan's projected insolvency in 2022 and the 7.50% interest rate the Plan's actuary used for funding calculations after projected insolvency. I first calculated deferred annuity factors[8] using the 2.71% PBGC interest rate (i.e., the rate effective for the first 20 years) through 2022 and 7.50% thereafter.  I compared these annuity factors with annuity factors using a single interest rate of 7.50% to estimate the impact of using the combination of the 2.71% PBGC rate for benefits

---

[8] In developing the annuity factors, I used the RP-2000 Mortality Table for Blue Collar Male Employees, set forward two years and projected using scale MP-2015 and an assumed benefit commencement date of age 61, which match the mortality assumption and average expected retirement age (rounded to the nearest year) used by the Plan's enrolled actuary for the 2015 Actuarial Valuation Report.

payable through 2022 and 7.50% for payments made after 2022 would have on the Plan's present value of vested benefits. I then calculated annuity factors using various level interest rates to estimate the single rate that would produce the same present value of vested benefits. Based on this analysis, I estimate that a single interest rate of between 6.00% and 6.50% would result in the same present value of vested benefits. Therefore, I believe that using an assumed interest rate of 6.00% to 6.50% to calculate Energy West's withdrawal liability would be more consistent with the enrolled actuary's—certified as reasonable—assumption used for funding purposes.

27.    The Plan's actuary determined the withdrawal liability for Energy West based on the value of participants' full accrued benefits. However, upon the Plan's insolvency, benefits will be subject to reduction at least to the PBGC guaranteed benefit amount. The withdrawal liability would be significantly lower if it reflected projected benefit reductions based on the PBGC maximum guaranteed benefit.

28.    The PBGC's *FY 2016 Projections Report*[9] shows that the insurance program for multiemployer pension plans is likely to run out of money by the end of 2025. The report also indicates that the PBGC multiemployer insurance fund had just below $2.0 billion in assets in 2016 and it is not expected to have more than $3.0 billion at its peak in 2022. The withdrawal liability assessment for Energy West shows that the UMWA 1974 Pension Plan had $5,755,919,300 unfunded vested benefits as of June 30, 2015. Therefore, the payment of PBGC guaranteed benefits for the UMWA 1974 Pension Plan alone would likely entirely drain the PBGC multiemployer insurance program. Without a change in law or additional resources, PBGC's insolvency would

---

[9] https://www.pbgc.gov/sites/default/files/fy-2016-projections-report-final-signed.pdf

result in benefit reductions for UMWA 1974 Pension Plan participants beyond those based on the PBGC guaranteed benefit amount. Reflecting benefit cuts to less than the PBGC guaranteed benefit would further decrease Energy West's withdrawal liability.

29.    Energy West's obligation upon withdrawal is limited to monthly payments of $247,251.12. Therefore, practically speaking, the withdrawal liability—the allocated portion of the Plan's unfunded vested benefit liability—cannot exceed the present value of continued monthly contributions at this $247,251.12 level. I analyzed the present value of continued monthly payments to compare with Energy West's assessed withdrawal liability. ERISA section 4219(c)(1)(B) limits payments to 20 years, but I understand that whether this limit applies to the UMWA 1974 Pension Plan is being disputed. Because of the dispute over applicability of the 20-year limit, I did the calculations assuming both a 20-year payment period and an indefinite payment period. I also performed the calculations using two different interest rate assumptions.

30.    The first interest rate assumption I used was 7.50%. This is the "net inherent interest rate" used by the Plan's actuary in developing the withdrawal liability payment schedule. The present value of future monthly contributions as of June 30, 2015 using 7.50% interest is $31,273,364 if payments are limited to 20 years and $40,902,305 if payments continue in perpetuity.

31.    The second interest rate assumption I used to calculate the present value of continued monthly contributions was the October Three yield curve as of June 30, 2015. The October Three yield curve reflects the yields of high-quality fixed income investments available, in this case, as of June 30, 2015. The yield curve reflects spot (i.e., zero coupon) rates appropriate for payments to be made in the future. Discounting

projected payments using the appropriate spot rates from the yield curve results in the amount that would be necessary to invest in a hypothetical bond fund to produce the desired cash flow in the future.  The October Three yield curve as of June 30, 2015 is shown below:



October Three Yield Curve as of June 30, 2015

32.    The October Three yield curve contains rates for maturities of 0.5 to 100 years.  I used the year 100 rate for all payments projected after 100 years.[10]  The present value of future monthly contributions as of June 30, 2015 using the October Three yield curve[11] is $41,581,017 if payments are limited to 20 years and $63,316,517 if payments continue in perpetuity.  The single-equivalent interest rates that produce these same present values are 3.87% and 4.81% assuming payments are limited to 20 years or continued in perpetuity, respectively.

---

[10] Payments over 100 years in the future comprise less than 2.5% of the total present value and, therefore, deviations in those rates are immaterial.

[11] As of June 30, 2015.

12

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: September 14, 2017

Scott A. Hittner, FSA, EA, FCA, MAAA

## APPENDIX I:  Professional Background

I am a Fellow of the Society of Actuaries, a Fellow of the Conference of Consulting Actuaries, a Member of the American Academy of Actuaries and an Enrolled Actuary.  I am also a partner and chief actuary of October Three Consulting LLC.

I have worked as a pension actuary for 27 years, specializing in defined benefit plans.  I received my bachelor's degree in actuarial science from the University of Nebraska, Lincoln, in 1989.  I joined Hewitt Associates after graduation and attained my fellowship in the Society of Actuaries in 1993.   In January 1995, I joined BMC Consultants, Inc.  In April 2001, I joined CCA Strategies LLC, which at the time was called Chicago Consulting Actuaries, where I was part of the national technical leadership team.  In 2006, JPMorgan purchased CCA Strategies, and in 2010 Aon acquired the compensation and benefits consulting business from JPMorgan.  In 2010, Aon acquired Hewitt, and the compensation and benefits consulting business became Aon Hewitt, where I was a member of the national technical leadership team.  In January 2011, I joined October Three Consulting LLC as a partner and chief actuary.

Beginning with my time with CCA Strategies, I have devoted a significant portion of my time to issues relating to creative defined benefit plan designs, including providing technical assistance and advice to my firms' consultants and clients on all aspects of these plans.  I also have regularly spoken at professional conferences since 2003.

I have given many speeches on defined benefit subjects at actuarial and benefits conferences, including: 2006 Colorado Bar Association Continuing Legal Education seminar on the Pension Protection Act of 2006, 2006 Western Pension & Benefits Council Denver Chapter monthly event on the topic of the Pension Protection Act of

2006; and numerous sessions at Enrolled Actuaries Meetings and the Conference of Consulting Actuaries Annual Meetings.

I have been active in the actuarial profession, including: as a Director of the Conference of Consulting Actuaries since 2013; a member (and chairman) of the Conference of Consulting Actuaries Annual Meeting Program Committee; and a member of the Pension Committee of the American Academy of Actuaries.

**APPENDIX II:  Documents considered in forming the opinions in my report**

1. August 29, 2016 assessment of Energy West Mining Corp.'s withdrawal liability from the United Mine Workers of American 1974 Pension Plan.

2. October 3, 2016 Energy West Mining Company's request for review of August 29, 2016 withdrawal liability assessment.

3. January 26, 2017 United Mine Workers of America 1974 Pension Plan response to request for review of withdrawal liability assessment.

4. Actuarial Valuation Reports for 2007 through 2016.

5. Form 5500 filings for United Mine Workers of American 1974 Pension Plan for 2009 through 2015.

6. Schedule MB (Form 5500) for 2008

7. PBGC's FY 2016 Projections Report

**UMWA  HEALTH AND RETIREMENT FUNDS**

2121 K Street, NW  Washington, DC 20037  *Telephone:* (202) 521-2200

August 29, 2016

ENERGY WEST MINING CORP.
(formerly) UTAH POWER & LIGHT
STAN JENSEN, MANAGER, ACCOUNTING & FINANCE
P O BOX 310
HUNTINGTON, UT 84528

Re:   United Mine Workers of America 1974 Pension Plan--Employer Withdrawal
      Liability Notice and Demand, and Request for Information, under 29 U.S.C.
      § 1399

Dear Mr. Jensen:

This letter regards the withdrawal of ENERGY WEST MINING CORP. (formerly)
UTAH POWER & LIGHT from the United Mine Workers of America 1974 Pension
Plan (the "Plan").

The Multiemployer Pension Plan Amendments Act of 1980 (the "MPPAA"), became
law on September 26, 1980 and amended the Employee Retirement Income
Security Act of 1974 ("ERISA").  As a result of the MPPAA, an employer that
withdraws from a multiemployer pension plan covered under Title IV of ERISA is
liable to the plan for a portion of the plan's unfunded vested benefits.   ERISA,
Sections 4201, 4202 and 4402, 29 U.S.C. §§ 1381, 1382, and 1461.

Under Section 4203 of ERISA, 29 U.S.C. § 1383, a complete withdrawal from a plan
occurs when an employer (1) permanently ceases to have an obligation to contribute
under the plan, or (2) permanently ceases all covered operations under the plan.
Based upon the information available to us, we have determined that ENERGY
WEST MINING CORP. (formerly) UTAH POWER & LIGHT permanently ceased
classified work after July 1, 2015.  Accordingly, based on the information available to
us, we have determined that  ENERGY WEST MINING CORP.
(formerly) UTAH POWER & LIGHT withdrew from the Plan on or about July 31,
2015.

### Special Status of UMWA 1974 Pension Plan

Section 4211(d) of ERISA, 29 U.S.C. § 1391(d), sets forth a number of special
statutory rules that apply to a pension plan, or a continuation of a pension plan,
described in Section 404(c) of the Internal Revenue Code of 1954, as amended.  In
a letter ruling issued on June 9, 1975, the Internal Revenue Service determined that
the 1974 Plan is both a plan described in 404(c) of the Code and a continuation of
the UMWA Welfare & Retirement Fund of 1950, which was also a plan described in
Section 404(c) of the Code.  See Treas. Reg. § 1.404(c)(1) (1960).

JA 000541

ENERGY WEST MINING CORP.
(formerly) UTAH POWER & LIGHT
August 29, 2016
Page 2

Accordingly, you should note that, pursuant to Section 4211(d) of ERISA, the de minimis rule in Section 4209 of ERISA, 29 U.S.C. § 1389, does not apply to Employers that withdraw from the 1974 Plan. In light of the Internal Revenue Service ruling, the 1974 Plan cannot grant a favorable ruling to any appeal or objection (see below, Request for Review) that the Plan is not subject to Section 4211(d) of ERISA.

Withdrawal Liability Allocation Method

Section 4211(d)(1) of ERISA provides that a plan, or a continuation of a plan, described in Section 404(c) of the Internal Revenue Code of 1954 must determine the amount of unfunded vested benefits allocable to a withdrawn employer in accordance with the "rolling-five" allocation method described in Section 4211(c)(3) of ERISA, unless the plan has adopted another allocation method by a plan amendment. As noted in the previous section, the Internal Revenue Service has ruled that the UMWA 1974 Plan is a plan described in Section 404(c) of the Internal Revenue Code of 1954. On July 20, 1983, the 1974 Plan was amended in accordance with Section 4211(c)(5) of ERISA, and again amended, on June 27, 2003, in accordance with 4211 of ERISA and 29 C.F.R. § 4211.21-24 to adopt a new allocation method. The amendments dated July 20, 1983 and June 27, 2003 apply to any employer that withdraws from the 1974 Plan on or after July 1, 1981 and July 1, 2003, respectively. Furthermore, effective June 30, 2007, the 1974 Plan merged with the UMWA 1950 Pension Plan. Consistent with 29 C.F.R. § § 4211.31, 4211.32(b), (c), 4211.34 and 4211.36(c)(2), the Plan adopted a withdrawal liability allocation method for the period subsequent to the merger. The merged Plan document applies to any employer that withdraws from the 1974 Plan on or after June 30, 2007. A copy of the text of the amendments dated July 20, 1983[1] and June 27, 2003[2] and of the relevant portions of the merged Plan document are available upon written request.

As stated on the first page of this letter, the 1974 Plan has determined that ENERGY WEST MINING CORP. (formerly) UTAH POWER & LIGHT incurred a complete withdrawal after June 30, 2015. Consistent with Section 4214(a) of ERISA, therefore, the 1974 Plan has applied the new allocation amendment in determining ENERGY WEST MINING CORP. (formerly) UTAH POWER & LIGHT's withdrawal liability.

Amount of Withdrawal Liability

In accordance with the provisions of Section 4201(b) of ERISA, 29 U.S.C. § 1381(b), the Trustees have determined that your withdrawal liability is $115,119,099.34.[3] Pursuant to

---

[1] The PBGC approved the allocation amendment in a ruling letter dated October 17, 1983.

[2] The PBGC approved the allocation amendment in a ruling letter dated June 20, 2003.

[3] Attached for your examination is a description of how your withdrawal liability and payment schedule were calculated.

JA 000542

ENERGY WEST MINING CORP.
(formerly) UTAH POWER & LIGHT
August 29, 2016
Page 3

Section 4219 of ERISA, 29 U.S.C. § 1399, this letter is a formal Notice and Demand for payment of withdrawal liability according to the schedule of payments set forth below.

## Payment Schedule

Pursuant to Section 4219(c) of ERISA, 29 U.S.C. § 1399(c), you are required to amortize your total withdrawal liability of $115,119,099.34 by making annual payments, in monthly installments of $247,251.12, to the Plan. Payment of your withdrawal liability plus interest at the interest rate used in the Plan's July 01, 2015 actuarial valuation [see Section 4219(c)(1)(A)(i)] will require you to make monthly payments indefinitely because the minimum monthly payment permitted under Section 4219 (c) ($247,251.12) is insufficient to pay the monthly interest accruing on the withdrawal liability ($719,494.37). If you nevertheless choose to follow this payment schedule, your first monthly payment is due on November 7, 2016.  Your second monthly payment is due on December 10, 2016. Thereafter, each monthly payment is due on the 10th day of each following calendar month.

In lieu of monthly payments you may elect to prepay the full amount of your withdrawal liability of $115,119,099.34 in a lump sum.  If you make monthly payments according to the schedule in the preceding paragraph, your payments will continue indefinitely and your withdrawal liability will increase over time as unpaid interest accrues.  The attached schedule shows the first 32 such payments and demonstrates the accruing unpaid interest.

## Where to Mail Payments

Please make all withdrawal liability payments by check, made payable to the "UMWA 1974 Pension Plan," and mail them by First Class Mail to the following address:

  UMWA Health and Retirement Funds
  75 Remittance Drive, Suite 1203
  Chicago, IL  60675-1203

Or

Please use the instructions below for electronic transfer of your payments.

  Northern Trust
  ABA# 071000152
  Account Title: UMWA 1974 Pension Trust
  Account# 35121048

JA 000543

ENERGY WEST MINING CORP.
(formerly) UTAH POWER & LIGHT
August 29, 2016
Page 4

## Request For Review

Please note that, as a withdrawn employer, you have important procedural and substantive rights under ERISA.  <u>Failure to exercise your rights within the period prescribed under ERISA will cause you to waive any defense or objection to the Plan's determination of your withdrawal liability</u>.

Under Section 4219 (b)(2)(A) of ERISA, 29 U.S.C. § 1399 (b)(2)(A), you may, within 90 days after receipt of this demand letter,

(1)     request the Plan to review any inaccuracy in the determination of ENERGY WEST MINING CORP.(formerly) UTAH POWER & LIGHT's withdrawal liability, or the schedule of payments;

(2)     identify any inaccuracy in the determination of the unfunded vested benefits allocable to ENERGY WEST MINING CORP. (formerly) UTAH POWER & LIGHT; or

(3)     furnish any additional relevant information to the Plan.

Your request for review must be sent to the Plan at the address listed above.  If you file a timely request for review, the Plan will, after thorough consideration of any matter raised, notify you in writing of its decision, the basis for that decision, and the reasons for any change in your withdrawal liability or schedule of monthly payments.  Even if a request for review is filed, however, a withdrawn employer <u>must</u> make its withdrawal liability payments in accordance with the payment schedule.

## Arbitration

Section 4221 of ERISA, 29 U.S.C. § 1401, provides that any dispute you may have with the Plan concerning the determination of your withdrawal liability shall initially be resolved through arbitration.  A copy of the Plan's arbitration procedures is enclosed. Please note that the current address for the American Arbitration Association's Washington, D.C. office is 1776 Eye Street, NW, Suite 850, Washington, D.C. 20006.

Your right to arbitrate any determination made by the Plan concerning your withdrawal liability <u>will be lost</u> unless you initiate arbitration within the 60 day period after <u>the earlier of</u> (a) 120 days after the date of your request for review, or (b) the date the Plan notifies you of its decision on the matters raised in your request for review.  You should note that, in the absence of a timely initiation of arbitration, failure to pay periodic withdrawal liability payments in accordance with this Notice and Demand may lead to default (see below). Even if arbitration is initiated, however, a withdrawn employer <u>must</u> make its withdrawal liability payments, in accordance with the payment schedule, during the pendency of the arbitration.

ENERGY WEST MINING CORP.
(formerly) UTAH POWER & LIGHT
August 29, 2016
Page 5

<u>Interest on Delinquent Payments</u>

If you fail to make any withdrawal liability payment when due, interest on the unpaid amount shall accrue from the due date until the date that payment is made. Interest on delinquent payments shall be set at the rate established under Section 4219 (c) (6) of ERISA, 29 U.S.C. § 1399(c)(6). See 29 C.F.R. § 2644.3.

<u>Default</u>

Amounts determined to be in default will be referred to our attorneys for collection. In the event of your default, the Plan, at its option, may require immediate payment of the entire outstanding amount of your liability, plus accrued interest on the total outstanding liability, from the due date of the first payment which was not timely made. Default will occur if, in the absence of a timely request for review or initiation of arbitration, you fail to make any withdrawal liability payment when due, and then fail to make payment within 60 days after receiving written notification from the Plan of such failure. In addition, default occurs on the basis of "any other event defined in rules adopted by the plan which indicates a substantial likelihood that an employer will be unable to pay its withdrawal liability." ERISA, Section 4219 (c) (5) (B) 29 U.S.C. § 1399 (c) (5)(B). The Plan has adopted rules defining such default events, a copy of which is enclosed. If one of those events occurs, the Plan may demand full payment of the outstanding balance of withdrawal liability immediately.

<u>Persons Liable</u>

Under ERISA, all trades or businesses under common control are treated as one employer. ERISA, Section 4001 (b) 29 U.S.C. § 1301 (b). Thus, all members of a commonly-controlled group of trades and businesses are jointly and severally liable to the Plan for payment of withdrawal liability. Generally, two or more partnerships, trusts, unincorporated companies, or corporations are under common control if the same five or fewer individuals hold an interest of 80% or more in such entities and their interests total 50% or more using the lowest percentage owned. For example, if two individuals own 40% and 60% of corporation A, and 60% and 40% of corporation B, respectively, corporations A and B are under common control. In determining ownership, interests held by related parties are attributed to each other. For more complete information on the controlled group rules, you should consult your attorney. Under the law, this Notice and Demand constitutes a notice and demand for payment of withdrawal liability to all trades and businesses under common control with ENERGY WEST MINING CORP. (formerly) UTAH POWER & LIGHT. See 49 Fed. Reg. §§ 26642, 26643 (May 31, 1984).

<u>Request for Information</u>

Pursuant to Section 4219 (a) of ERISA 29 U.S.C. § 1399(a), the plan sponsor hereby requests that you furnish it with the following information within 30 days after receipt of this letter so that the plan sponsor may discharge its obligations under ERISA:

ENERGY WEST MINING CORP.
(formerly) UTAH POWER & LIGHT
August 29, 2016
Page 6

JA 000545

1)   A copy of all Federal Tax Returns of ENERGY WEST MINING CORP. (formerly) UTAH POWER & LIGHT for its last two complete fiscal years;

2)   A copy of the year end income statements, including audited statements, of ENERGY WEST MINING CORP. (formerly) UTAH POWER & LIGHT for the last two complete fiscal years, along with a detailed description of the sources of income;

3)   A copy of any year end statements of changes in financial position of ENERGY WEST MINING CORP. (formerly) UTAH POWER & LIGHT for the last two complete fiscal years;

4)   A copy of the year end balance sheets of ENERGY WEST MINING CORP. (formerly) UTAH POWER & LIGHT for the last two complete fiscal years, including any audited balance sheets;

5)   The names of all persons holding any interest ENERGY WEST MINING CORP. (formerly) UTAH POWER & LIGHT;

6)   The percentage of total ownership or voting interest held by each person identified in your response to item 5;

7)   The names of any other non-publicly traded corporations, partnerships, trusts, or unincorporated companies in which the persons named in response to item 5 hold any interest;

8)   The percentage of interest held by each person named in response to item 5 in the entities named in response to item 7;

9)   For each entity named in response to item 7, copies of all statements and information described in items 1 through 4; and

10)  In any case where ENERGY WEST MINING CORP. (formerly) UTAH POWER & LIGHT is a parent or subsidiary of another corporation, copies of the statements and information described in items 2 through 4 on both a consolidated and individual basis.

Failure to furnish this information within 30 days constitutes a default under the Plan's default rules.

ENERGY WEST MINING CORP.
(formerly) UTAH POWER & LIGHT
August 29, 2016
Page 7

<u>Bankruptcy</u>

In the event ENERGY WEST MINING CORP. (formerly) UTAH POWER & LIGHT is
in liquidation or reorganization under any provision of Title 11 of the United States
Code, this Notice and Demand is limited to a notice of withdrawal liability, as
provided under 29 U.S.C. § 1399, and does not constitute a demand for payment as
to such person.  It does, nonetheless, constitute a Notice and Demand for Payment,
pursuant to 29 U.S.C. § 1399, on all general partners, if any, of ENERGY WEST
MINING CORP. (formerly) UTAH POWER & LIGHT and all trades and business
under common control with ENERGY WEST MINING CORP. (formerly) UTAH
POWER & LIGHT that are not themselves debtors in a proceeding under Title 11 of
the United States Code.

Any inquiries regarding this Notice should be directed to my attention at (202) 521-2294.

Sincerely,

Dale R. Stover, Director of Finance and General Services
Enclosures

INC74N16_9079_4848

UNITED MINE WORKERS OF AMERICA 1974 PENSION PLAN
ADOPTION OF ALTERNATIVE ARBITRATION PROCEDURE
FOR WITHDRAWAL LIABILITY DISPUTES

Pursuant to the authority of Sections 4214(b) and 4221(a)
(2) of the Employee Retirement Income Security Act as amended
("ERISA") (29 U.S.C. §§ 1394(b) and 1401(a)(2)), 29 C.F.R.
Part 2641, and the Notice of Approval by the Pension Benefit
Guaranty Corporation of an alternative procedure for arbitra-
tion of withdrawal liability disputes appearing at 50 Fed.
Reg. 38046 (September 19, 1985), the Trustees hereby resolve
as follows:

1.  Any dispute between an employer and the Plan
concerning a determination of the Plan made under Sections
4201 through 4219 and 4225 of ERISA which is properly the
subject of arbitration  shall be resolved under the American
Arbitration Association ("AAA") Multiemployer Pension Plan
Rules (June 1, 1981) ("AAA Rules"), which are hereby incor-
porated by reference.

2.  For purposes of Section 7(b) of the AAA Rules,
the appropriate Regional Office of the AAA is as follows: 1730
Rhode Island Avenue, N.W., Suite 509, Washington, D.C. 20036.

3.   In accordance with Section 4214(b) of ERISA, a copy of this Resolution shall be sent to all withdrawn employers, all employers who have an obligation to contribute under the Plan, and all employee organizations representing employees covered under the Plan.

Dated:

October 16    , 1985     _____
                         JOSEPH P. CONNORS, TRUSTEE

October 16    , 1985     _____
                         DONALD E. PIERCE, JR., TRUSTEE

October 16    , 1985     _____
                         WILLIAM MILLER, TRUSTEE

October 16    , 1985     _____
                         WILLIAM B. JORDAN, TRUSTEE

October 16    , 1985     _____
                         PAUL R. DEAN, TRUSTEE

- 2 -

ADDITIONAL DEFINITIONS OF DEFAULT
UNITED MINE WORKERS OF AMERICA 1974 PENSION PLAN JA 000549

Pursuant to Article X, Section I of the United Mine Workers of America 1974 Pension Plan, as amended, (the "Plan"), and section 4219 (c) (5) (B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), the Trustees have adopted the rule set out below defining events that constitute default by an employer on the employer's withdrawal liability obligation. This rule supplements Article X, section H of the Plan by adding to the definition of default set out in that Article the events described below, each of which the Trustees have determined indicates a substantial likelihood that an Employer will be unable to pay its withdrawal liability.

In addition to the event described in Article X, section H of the Plan, the term "default" means:

(a)  the employer's insolvency, or any assignment by the employer for the benefit of creditors, or the employer's calling of a meeting of creditors for the purpose of offering a composition or extension to such creditors, or the employer's appointment of a committee of creditors or liquidating agent, or the employer's offer of a composition or extension to creditors, or

(b)  the employer's dissolution, or

(c)  the making (or sending notice of) an intended bulk sale by the employer, or

(d)  the assignment, pledge, mortgage or hypothecation by the employer of property to an extent which the Trustees determine to be material in relation to the financial condition of the employer, or

(e)  the filing or commencement by the employer, or the filing or commencement against the employer or any of its property, of any proceeding, suit or action, at law or in equity, under or relating to any bankruptcy, reorganization, arrangement-of-debt, receivership, liquidation, or dissolution law or statute or amendments thereto, unless such proceeding, suit, or action against the employer or its property is set aside, withdrawn, or dismissed within ten days after the date of the filing or commencement, or

(f)  the entry of any judgment or the issuance of any warrant, attachment, or injunction or governmental tax lien or levy against the employer or against any of its property, unless such judgment, attachment, injunction, lien, or levy is discharged, set aside, or removed within ten days after the date such judgment is entered or such attachment, injunction, lien, or levy is issued, or

(g)  the failure of the employer to maintain current assets in an amount at least equal to current liabilities, current assets and current liabilities to be determined in accordance with generally accepted accounting principles and practices consistently followed, or

(h)  the employer's failure to provide information demanded by the Plans pursuant to section 4219 (a) of ERISA regarding its ability to pay withdrawal liability, or as to whether it has engaged in a transaction which has as a principal purpose the evasion or avoidance of withdrawal liability, or

(i)  the employer's engaging in a transaction which has as a principal purpose the evasion or avoidance of withdrawal liability demanded by the Plan, or

(j)  such other event as the Trustees may determine indicates a substantial likelihood that the employer will be unable to pay its withdrawal liability provided the employer is given written notice of such determination and a reasonable opportunity to demonstrate to the Trustees that such determination was in error.

Case 1:18-cv-01085 Document 28    Filed 06/10/19    Page 555 of 1367

ATTACHMENT (PAGE 1 OF 2)
SUMMARY EXPLANATION CALCULATION OF WITHDRAWAL LIABILITY UNDER
UMWA 1974 PENSION PLAN

JA 000550

Article XIV.M. of the United Mine Workers of America 1974 Pension Plan Provides:

a.   Liability for a withdrawal occurring on June 30, 2015 will be calculated under the terms of the 1950 Pension Plan and the 1974 Pension Plan as they existed prior to that date, consistent with 29 C.F.R. § § 4211.31(d), 4211.32.

b.   Notwithstanding the foregoing, the amount of unfunded vested benefits allocable to an Employer that withdraws from the Plan on or after July 1, 2015 is the sum of the Employer's proportional share, if any, of the unamortized amount of the Plan's unfunded vested benefits for the plan year ending June 30, 2015 (determined under 29 C.F.R. § 4211.34(b)) and the Employer's proportional share, if any, of the unamortized amount of the unfunded vested benefits arising after the plan year ending June 30, 2014 (as determined under 29 C.F.R. § 4211.34(c), except using "hours worked for which amounts were required to be contributed" instead of amount of contributions or amounts required to be contributed in determining the employer's proportional share, and using a fifteen year amortization period, as permitted in 29 C.F.R. § 4211.36(c)(2)).

1974 Plan, Art. XIV.M. Based on the information currently available to us, there were no withdrawals from the Plan on June 30, 2015.

Consequently, the amount of unfunded vested benefits allocable to an Employer that withdraws from the merged Plan during the Plan year beginning July 1, 2015 is the product of

(1) the unfunded vested benefits of the merged Plan as of June 30, 2015 less the value as of the end of such year of all outstanding claims for withdrawal liability which can reasonably be expected to be collected from the Employers withdrawing before such year; multiplied by

(2) a fraction –

(a) the numerator of which is the total number of hours worked for which amounts were required to be contributed by the Employer under the Plan for the last 5 plan years ending before the withdrawal, and

(b) the denominator of which is the total number of hours worked for which amounts were required to be contributed under the Plan by all of the Plan's Employers for the last 5 plan years ending before the withdrawal, decreased by the number of any hours worked for which amounts were required to be contributed to the Plan during those Plan years by Employers who withdrew from the Plan during those Plan years.

Thus, each withdrawn Employer is allocated a share of the 1974 Pension Plan's unfunded vested benefits in accordance with the following fraction:

| Withdrawal Liability | = | Withdrawn Employer's required number of hours worked for the period 7/1/10 – 6/30/15, divided by Total required number of hours worked under the Plan by all Employers for the 5 Plan years ending 6/30/15, less the number of any hours worked for which amounts were required to be contributed to the plan during those Plan years by Employers who withdrew from the Plan during those Plan years. | X | Plan total unfunded vested benefits as of 6/30/15, less, the value of all outstanding claims for withdrawal liability which can reasonably be expected to be collected from Employers withdrawing on or before 6/30/15. |

$$\$115,119,099.34 = \frac{2,108,863.88}{104,186,000.00} \times \$5,687,327,000.00$$

WDL2016

This figure includes the required contributions of AMERICAN COAL COMPANY, EMERY MINING CORPORATION as well as the required contributions of ENERGY WEST MINING CORP. (formerly) UTAH POWER & LIGHT.

ENERGY WEST MINING CORP. (formerly) UTAH POWER & LIGHT

## UNFUNDED VESTED BENEFITS
## FOR THE 1974 PENSION PLAN
## AS OF JUNE 30, 2015

The percentage of unfunded vested benefits is determined using interest assumptions used by the Pension Benefit Guaranty Corporation ("PBGC"). This percentage is then applied to the actuarial interest assumption used to value minimum funding requirements. The unfunded vested benefits as of June 30, 2015 of the merged Plan are as follows.

| | | |
|---|---|---|
| 1. | Actuarial present value of vested benefits on PBGC basis – Annuity Rate Interest Assumption (2.71% for 20 years and 2.78% thereafter) | $9,564,089,300 |
| 2. | Market value of Plan assets, June 30, 2015 | $3,808,170,000 |
| 3. | Percentage funded on PBGC basis = (2) / (1) | 0.3981% |
| 4. | Unfunded vested benefits, June 30, 2015 = (1)-(2) | $5,755,919,300 |

JA 000553

## CALCULATION OF UNFUNDED VESTED BENEFITS

| | | |
|---|---|---|
| (1) | Total unfunded vested benefits of the 1974 Pension Plan as of 6/30/15 | $5,755,919,000 |
| (2) | Value of all outstanding claims for withdrawal liability with respect to the segment which can reasonably be expected to be collected from Employers withdrawing on or before 6/30/14 | $68,592,000 |
| (3) | (1) - (2) | $5,687,327,000 |

## CALCULATION OF NUMERATOR OF ALLOCATION FRACTION

ENERGY WEST MINING CORP. (formerly) UTAH POWER & LIGHT's required number of hours worked to 1974 Pension Plan for the period 7/1/10 through 6/30/15     2,108,863.88

## CALCULATION OF DENOMINATOR OF ALLOCATION FRACTION

| | | |
|---|---|---|
| (1) | Total required number of hours under the Plan by all Employers for the five plan years ending on 6/30/15 <br> minus | 104,887,000 |
| (2) | The required number of any hours worked to the Plan during those plan years by employers who withdrew from the Plan during those plan years | 701,000 |
| | Denominator Total | 104,186,000 |

**ENERGY WEST MINING CORP.** (formerly) UTAH POWER & LIGHT
## CALCULATION OF ANNUAL PAYMENT SCHEDULE
## 1974 PENSION PLAN

Tons produced and/or purchased and hours worked by plan year for which the withdrawn employer has an obligation to contribute.

| PLAN YEARS | PRODUCED TONS | PURCHASED TONS | HOURS |
|---|---|---|---|
| 7/01/05 - 6/30/06 | 0.00 | 0.00 | 549,639.00 |
| 7/01/06 - 6/30/07 | 0.00 | 0.00 | 537,757.00 |
| 7/01/07 - 6/30/08 | 0.00 | 0.00 | 530,974.25 |
| 7/01/08 - 6/30/09 | 0.00 | 0.00 | 533,867.50 |
| 7/01/09 - 6/30/10 | 0.00 | 0.00 | 494,374.75 |
| 7/01/10 - 6/30/11 | 0.00 | 0.00 | 519,975.15 |
| 7/01/11 - 6/30/12 | 0.00 | 0.00 | 528,477.55 |
| 7/01/12 - 6/30/13 | 0.00 | 0.00 | 504,910.75 |
| 7/01/13 - 6/30/14 | 0.00 | 0.00 | 370,349.68 |
| 7/01/14 - 6/30/15 | 0.00 | 0.00 | 185,150.75 |

(1)  Average annual number of contribution base units for the period of 3 consecutive plan years during the period of 10 consecutive plan years ending before the plan year in which the withdrawal occurs in which the number of contribution base units for which ENERGY WEST MINING CORP. (formerly) UTAH POWER & LIGHT has an obligation to contribute under the Plan is the highest

| | 0.00 | 0.00 | 539,457.00 |
|---|---|---|---|

(2)  Highest royalty rate between  07/01/2006 and 06/30/2016 for which the employer has an obligation to contribute unless the highest royalty rate during this period was zero in which case the most recent contribution royalty rate greater than zero for which any Employer had an obligation to contribute is used.

| | 0.0000 | 0.0000 | 5.5000 |
|---|---|---|---|

(3)  Annual payment amount (1) x (2)

| | $0.00 | $0.00 | $2,967,013.50 |
|---|---|---|---|

Total Annual Payment

| | $2,967,013.50 |
|---|---|

(4)  (3)/ 12 = Monthly payment amount

| | $247,251.12 |
|---|---|

(5)  Amortization period assuming a 7.50% net inherent interest rate, a principal of  $115,119,099.34 (withdrawal liability), and an annual payment amount of $2,967,013.50

| | INDEFINITE * |
|---|---|

(6)  Number of full monthly payments

| | INDEFINITE * |
|---|---|

(7)  Amount of last payment to complete obligation, including interest for the term.

| | N/A |
|---|---|

*The schedule continues indefinitely with monthly payments of $247,251.12 and rising unpaid interest with no reduction in the principal debt.

UMWA 1974 PENSION TRUST
WITHDRAWAL LIABILITY PAYMENT SCHEDULE *
ENERGY WEST MINING CORP. (formerly) UTAH POWER & LIGHT

| DUE DATE | MONTHLY INTEREST | MONTHLY PAYMENT | UNPAID INTEREST | WDL PRINCIPAL |
|---|---|---|---|---|
| | | | | $115,119,099.34 |
| 11/07/2016 | $719,494.37 | $247,251.12 | $966,745.49 | $115,119,099.34 |
| 12/10/2016 | $719,494.37 | $247,251.12 | $1,438,988.74 | $115,119,099.34 |
| 1/10/2017 | $719,494.37 | $247,251.12 | $1,911,231.99 | $115,119,099.34 |
| 2/10/2017 | $719,494.37 | $247,251.12 | $2,383,475.24 | $115,119,099.34 |
| 3/10/2017 | $719,494.37 | $247,251.12 | $2,855,718.49 | $115,119,099.34 |
| 4/10/2017 | $719,494.37 | $247,251.12 | $3,327,961.75 | $115,119,099.34 |
| 5/10/2017 | $719,494.37 | $247,251.12 | $3,800,205.00 | $115,119,099.34 |
| 6/10/2017 | $719,494.37 | $247,251.12 | $4,272,448.25 | $115,119,099.34 |
| 7/10/2017 | $719,494.37 | $247,251.12 | $4,744,691.50 | $115,119,099.34 |
| 8/10/2017 | $719,494.37 | $247,251.12 | $5,216,934.75 | $115,119,099.34 |
| 9/10/2017 | $719,494.37 | $247,251.12 | $5,689,178.00 | $115,119,099.34 |
| 10/10/2017 | $719,494.37 | $247,251.12 | $6,161,421.25 | $115,119,099.34 |
| 11/10/2017 | $719,494.37 | $247,251.12 | $6,633,664.50 | $115,119,099.34 |
| 12/10/2017 | $719,494.37 | $247,251.12 | $7,105,907.75 | $115,119,099.34 |
| 1/10/2018 | $719,494.37 | $247,251.12 | $7,578,151.00 | $115,119,099.34 |
| 2/10/2018 | $719,494.37 | $247,251.12 | $8,050,394.25 | $115,119,099.34 |
| 3/10/2018 | $719,494.37 | $247,251.12 | $8,522,637.50 | $115,119,099.34 |
| 4/10/2018 | $719,494.37 | $247,251.12 | $8,994,880.76 | $115,119,099.34 |
| 5/10/2018 | $719,494.37 | $247,251.12 | $9,467,124.01 | $115,119,099.34 |
| 6/10/2018 | $719,494.37 | $247,251.12 | $9,939,367.26 | $115,119,099.34 |
| 7/10/2018 | $719,494.37 | $247,251.12 | $10,411,610.51 | $115,119,099.34 |
| 8/10/2018 | $719,494.37 | $247,251.12 | $10,883,853.76 | $115,119,099.34 |
| 9/10/2018 | $719,494.37 | $247,251.12 | $11,356,097.01 | $115,119,099.34 |
| 10/10/2018 | $719,494.37 | $247,251.12 | $11,828,340.26 | $115,119,099.34 |
| 11/10/2018 | $719,494.37 | $247,251.12 | $12,300,583.51 | $115,119,099.34 |
| 12/10/2018 | $719,494.37 | $247,251.12 | $12,772,826.76 | $115,119,099.34 |
| 1/10/2019 | $719,494.37 | $247,251.12 | $13,245,070.01 | $115,119,099.34 |
| 2/10/2019 | $719,494.37 | $247,251.12 | $13,717,313.26 | $115,119,099.34 |
| 3/10/2019 | $719,494.37 | $247,251.12 | $14,189,556.52 | $115,119,099.34 |
| 4/10/2019 | $719,494.37 | $247,251.12 | $14,661,799.77 | $115,119,099.34 |
| 5/10/2019 | $719,494.37 | $247,251.12 | $15,134,043.02 | $115,119,099.34 |
| 6/10/2019 | $719,494.37 | $247,251.12 | $15,606,286.27 | $115,119,099.34 |

*The schedule continues indefinitely with monthly payments of $247,251.12 and rising unpaid
  interest with no reduction in the principal debt.

*UNITED MINE WORKERS OF AMERICA*
*1974 PENSION PLAN*
*WASHINGTON, DC*

*Actuarial Valuation Report*
*For Plan Year Commencing*
*July 1, 2015*

January 29, 2016

Board of Trustees
United Mine Workers of America 1974 Pension Plan
Washington, DC

Dear Trustees:

We have been retained by the Board of Trustees of the United Mine Workers of America 1974 Pension Plan to perform annual actuarial valuations of the pension plan. This report presents the results of our actuarial valuation for the plan year beginning July 1, 2015. The valuation results contained herein are based on current plan provisions summarized in Appendix A, the actuarial assumptions and methods listed in Appendix B and on unaudited financial statements provided by the Fund Office. Participant data was provided by the Fund Office. While we have reviewed the data for reasonableness in accordance with Actuarial Standards of Practice No. 23, we have not audited it. The data was relied on as being both accurate and comprehensive.

This report has been prepared in order to (1) assist the Trustees in evaluating the current actuarial position of the plan, (2) determine the minimum required and maximum deductible contribution amounts under Internal Revenue Code §431 and §404, (3) provide the fund's auditor with information necessary to comply with Accounting Standards Codification 960, and (4) document the plan's certified status under Internal Revenue Code §432 for the current year and provide the basis to certify such status for the subsequent year. In addition, information contained in this report will be used to prepare Schedule MB of Form 5500 that is filed annually with the IRS and could be used to calculate employer withdrawal liability. We are not responsible, for the use of, or reliance upon this report for any other purpose.

We have prepared this report in accordance with generally accepted actuarial principles and practices and have performed such tests as we considered necessary to assure the accuracy of the results. The results have been determined on the basis of actuarial assumptions that, in my opinion, are appropriate for the purposes of this report, are individually reasonable and in combination represent my best estimate of anticipated experience under the plan. Actuarial assumptions may be changed from previous valuations due to changes in mandated requirements, plan experience resulting in changes in expectations about the future, and/or other factors. An assumption change does not indicate that prior assumptions were unreasonable when made. For purposes of current liability calculations, assumptions are prescribed by regulation or statute. By relying on this valuation report, the Trustees confirm they have accepted the assumptions contained in the report.

The report was prepared using the most recent estimate of plan assets available. The audited financial report was not available at this time. However, differences between these estimated assets and those in the final audit report are not material to the Plan's actuarial status.

The results are based on our best interpretation of existing laws and regulations and are subject to revision based on future regulatory or other guidance.

JA 000558

Board of Trustees                    -2-                    January 29, 2016

Future actuarial measurements may differ significantly from the current measurements presented in this report due to such factors as the following:  plan experience differing from that anticipated by the economic or demographic assumptions, changes in economic or demographic assumptions, increases or decreases expected as part of the natural operation of the methodology used for these measurements (such as the end of an amortization period or additional cost or contribution requirements based on the plan's funded status), and changes in plan provisions or applicable law.

United Actuarial Services, Inc. does not provide, nor charge for, investment, tax or legal advice.  None of the comments made herein should be construed as constituting such advice.  We are not aware of any direct or material indirect financial interest or relationship that could create a conflict of interest that would impair the objectivity of our work.

The undersigned actuaries meet the Qualification Standards of the American Academy of Actuaries to render the actuarial opinion contained in this report.

We are available to respond to any questions you may have about this report.

**UNITED ACTUARIAL SERVICES, INC.**

William J. Ruschau, FSA, EA, MAAA          Paul Bullock, ASA, EA, MAAA
Consulting Actuary                          Vice President

en

## TABLE OF CONTENTS

### PART I: SUMMARY OF RESULTS — 1

| | |
|---|---|
| 5 - Year Summary of Valuation Results | 2 |
| 5 - Year Summary of Demographics | 3 |
| Changes From Prior Study | 4 |
| History of Major Assumptions | 5 |
| Experience vs. Assumptions | 6 |
| Rate of Return on Fund Assets | 7 |
| Unfunded Vested Benefits/Employer Withdrawal Liability | 8 |
| Contribution Allocation | 9 |
| Funded Ratios | 10 |
| Funding Standard Account | 11 |
| PPA Funding Status Report | 12 |
| Ultimate Funded Status | 13 |
| Sensitivity Analysis | 14 |

### PART II: SUPPLEMENTAL STATISTICS — 15

| | |
|---|---|
| Participant Data Reconciliation | 16 |
| Active Information | 17 |
| Inactive Vested Information | 19 |
| Retiree Information | 20 |

### PART III: ASSET INFORMATION — 23

| | |
|---|---|
| Market and Actuarial Fund Values | 24 |
| Flow of Funds | 25 |
| Investment Gain and Loss | 26 |

### PART IV: ENROLLED ACTUARY'S REPORT — 27

| | |
|---|---|
| Normal Cost/Actuarial Liability | 28 |
| Actuarial Liability Reconciliation/Projection | 29 |
| Current Liability | 30 |
| Full Funding Limit | 31 |
| Minimum Required Contribution and Full Funding Credit | 32 |
| Maximum Deductible Contribution | 33 |
| History of Unfunded Vested Benefits | 34 |
| ASC 960 Information | 35 |
| Benefit Payout Projection | 36 |

### APPENDICES

| | |
|---|---|
| Plan Provisions | Appendix A |
| Actuarial Assumptions and Methods | Appendix B |
| Minimum Funding Amortization Bases | Appendix C |
| Summary of Endangered and Critical Status Rules | Appendix D |
| Glossary of Common Pension Terms | Appendix E |

## *PART I:  SUMMARY OF RESULTS*

**United Actuarial Services, Inc.**

**CONFIDENTIAL**                    **1974PLAN_002377**

## 5 - YEAR SUMMARY OF VALUATION RESULTS

| Actuarial Study as of July 1, | 2015 | 2014 | 2013 | 2012 | 2011 |
|---|---|---|---|---|---|
| PPA funded status | Crit. & Decl. | Critical | Ser Endg | Ser Endg | Ser Endg |
| Progress under FIP/RP | n/a | n/a | n/a | n/a | n/a |
| | | | | | |
| Funded ratio | | | | | |
| *PPA certification* | 0.69 | 0.71 | 0.71 | 0.73 | 0.77 |
| *Valuation report* | 0.67 | 0.71 | 0.71 | 0.72 | 0.77 |
| | | | | | |
| Date of first projected funding deficiency | | | | | |
| *PPA certification* | 6/30/19 | 6/30/19 | 6/30/19 | 6/30/19 | 6/30/18 |
| *Valuation report* | 6/30/18 | 6/30/19 | | | |
| | | | | | |
| Asset values ($ 000,000) | | | | | |
| *Market* | 3,808 | 4,165 | 4,093 | 4,202 | 4,421 |
| *Actuarial* | 4,112 | 4,363 | 4,508 | 4,658 | 5,077 |
| | | | | | |
| Accumulated ben. ($ 000,000) | 6,167 | 6,153 | 6,325 | 6,439 | 6,619 |

**United Actuarial Services, Inc.**

**CONFIDENTIAL**    1974PLAN_002378

### 5 - YEAR SUMMARY OF DEMOGRAPHICS

| Actuarial Study as of July 1, | 2015 | 2014 | 2013 | 2012 | 2011 |
|---|---|---|---|---|---|
| Active | 8,259 | 9,218 | 10,103 | 10,825 | 10,427 |
| Inactive vested | 6,262 | 6,676 | 7,503 | 10,570 | 12,231 |
| Receiving benefits | 89,737 | 90,754 | 92,218 | 93,662 | 95,353 |
| Total | 104,258 | 106,648 | 109,824 | 115,057 | 118,011 |
| | | | | | |
| Active/retiree ratio | 0.09 | 0.10 | 0.11 | 0.12 | 0.11 |
| Active/inactive ratio | 0.09 | 0.09 | 0.10 | 0.10 | 0.10 |
| | | | | | |
| Unrecorded dates of birth | 2 | 5 | | | |
| | | | | | |
| Average entry/hire age* | 30.0 | 29.3 | | | |
| Average attained age* | 42.7 | 44.4 | | | |



\*    Averages are on all actives on the applicable valuation date.

**History of Hours**

**United Actuarial Services, Inc.**

**CONFIDENTIAL**                    1974PLAN_002379

## CHANGES FROM PRIOR STUDY

### Changes in Plan Provisions

The plan provisions underlying this valuation differ from those underlying the prior valuation in the following respects:

- All lump sum death benefits were reduced to $5,000 effective October 28, 2014.

### Changes in Actuarial Assumptions, Methods, and Other Changes

The actuarial assumptions and methods used in this valuation differ from those used in the prior valuation in the following respects:

- The assumed hourly contribution rate was increased from $5.50 to $6.05 effective July 1, 2015.

- The rate for purchased tons of coal was increased from $1.10 to $1.21 effective July 1, 2015.

- The assumed yearly future service credit, for active participants without a full year of service in all prior years, was increased from 0.75 per year to 0.90 per year to represent our best estimate of future service based on recent plan experience.

- The assumed spouse age difference was changed from 3 years to 4 years to reflect our best estimate of the spouse age difference based on recent plan experience.

- The assumed future hours assumption for the 2015-16 plan year was decreased to 13,350,308 based on the estimated hours provided by the Fund Office.  The normal cost was also reduced to reflect this drop in work hours.

- The assumed projections to the mortality rates were changed from an improvement of 0.75% per year for 15 years at each age between 55 and 99 to the MP-2015 projection scale beginning in 2012 at all ages.  This change was made in order to better reflect anticipated improvements in mortality rates for each future year due to medical advances and lifestyle changes.

- The age at which continuing inactive vested participants are assumed to be deceased was increased from age 63 to age 65.

- The current liability interest rate was changed from 3.59% to 3.34%.  The new rate is within established statutory guidelines.

**United Actuarial Services, Inc.**

**CONFIDENTIAL**                                                                      1974PLAN_002380

JA-000564

*Summary of Results*
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2015 Actuarial Valuation*

## HISTORY OF MAJOR ASSUMPTIONS

| Assumption | Actuarial Study as of July 1, | | | | |
|---|---|---|---|---|---|
| | *2015* | *2014* | *2013* | *2012* | *2011* |
| Future rate of net investment return | 7.80% gross 7.50% net | 7.80% gross 7.50% net | 8.00% gross 7.80% net | 8.00% gross 7.80% net | 8.00% gross 7.80% net |
| Post-retirement Mortality table | RP-2000 Male EE w/BCA +1 (improve 0.75%/yr for 4 yrs beg 7/1/08 for ages 55-99 then MP-2015 thereafter for all ages) | RP-2000 Male EE w/BCA +1 (improve 0.75%/yr for 15 yrs beg 7/1/08 for ages 55-99) | RP-2000 Male EE w/BCA +1 (improve 0.75%/yr for 15 yrs beg 7/1/08 for ages 55-99) | RP-2000 Male EE w/BCA +1 (improve 0.75%/yr for 15 yrs beg 7/1/08 for ages 55-99) | RP-2000 Male EE w/BCA +1 (improve 0.75%/yr for 15 yrs beg 7/1/08 for ages 55-99) |
| Future expenses | $ 25,500,000 | $ 25,500,000 | 3.5% of benefit payments | 3.5% of benefit payments | 3.5% of benefit payments |
| Average future hourly contribution rate | $6.05 | $5.50 | $5.50 | $5.50 | $5.50 |
| Average expected retirement age* | | | | | |
| Actives | 60.7 | 60.9 | | | |
| Inactive vested | 62.2 | 62.0 | | | |

\*    Resulting from the application of the retirement probabilities shown in Appendix B to active participants.

**United Actuarial Services, Inc.**

**CONFIDENTIAL**

1974PLAN_002381

*Summary of Results*
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2015 Actuarial Valuation*

### EXPERIENCE VS. ASSUMPTIONS

*Comparing the prior year's experience to assumptions provides indications as to why overall results may differ from those expected*

Actuarial assumptions are used to project certain future plan events related to the pension plan (e.g. deaths, withdrawals, investment income, expenses, etc.). While actual results for a single plan year will rarely match expected experience, it is intended that the assumptions will provide a reasonable long term estimate of developing experience.

The following table provides a comparison of expected outcomes for the prior plan year with the actual experience observed during the same period. This display may provide insight as to why the plan's overall actuarial position may be different from expected.

| Plan Year Ending June 30, 2015 | Expected | Actual |
|---|---|---|
| Decrements | | |
| Terminations | | 810 |
| less: Rehires | | 103 |
| Terminations (net of rehires) | 885 | 707 |
| | | |
| Retirements and disabilities | 688 | 1058 |
| Deaths - pre-retirement | 83 | 91 |
| Deaths - post-retirement | 4,717 | 4,737 |
| | | |
| Asset assumptions | | |
| Rate of net investment return on actuarial value | 7.50% | 7.31% |
| Net expenses | $ 25,500,000 | $ 30,063,000 |
| | | |
| Other demographic assumptions | | |
| Average retirement age from active (new retirees) | 61.2 | 59.8 |
| Average retirement age from inactive (new retirees)* | 62.0 | 61.1 |
| Average entry/hire age (new entrants) | 29.3 | 30.4 |
| Total hours worked (valuation assumption) | 18,491,110 | 17,537,000 |
| Total hours worked (PPA certification assumption) | 18,491,110 | 17,537,000 |
| | | |
| Unfunded liability (gain)/loss | | |
| (Gain)/loss due to asset experience | | $ 17,221,064 |
| (Gain)/loss due to liability experience | | 49,580,274 |
| Total (gain)/loss | | $ 66,801,338 |

\*    Expected average based on the average for the total group of participants.

**United Actuarial Services, Inc.**

**CONFIDENTIAL**                                                      **1974PLAN_002382**

## RATE OF RETURN ON FUND ASSETS

*Historical Rates of Net Investment Return*



*Average Rates of Net Investment Return (dollar weighted)*

|  | Return on Market Value | | Return on Actuarial Value | |
| --- | --- | --- | --- | --- |
|  | Period Ending June 30, | | Period Ending June 30, | |
| Period | 2015 | 2014 | 2015 | 2014 |
| One year | 4.95% | 15.74% | 7.31% | 9.07% |
| 5 years | 11.91% | 13.85% | 7.74% | 9.10% |
| 10 years | 6.99% | 7.72% | n/a | n/a |
| 15 years | 5.39% | 6.06% | n/a | n/a |

**United Actuarial Services, Inc.**

**CONFIDENTIAL**

1974PLAN_002383

*Summary of Results*
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2015 Actuarial Valuation*

## UNFUNDED VESTED BENEFITS/EMPLOYER WITHDRAWAL LIABILITY

*An employer withdrawing during the coming year may have withdrawal liability*

The following table shows a history of the plan's unfunded vested benefits required to compute a specific employer withdrawal liability under the rolling 5 method.

*Rolling 5 Method ($ 000,000)*

| June 30, | 2015 | 2014 | 2013 | 2012 | 2011 |
|---|---|---|---|---|---|
| Vested benefits interest | PBGC* | PBGC* | PBGC* | PBGC* | PBGC* |
| Vested benefits** | 9,564 | 8,557 | 9,571 | 9,310 | 8,792 |
| *less*: Asset value*** | 3,808 | 4,165 | 4,093 | 4,202 | 4,421 |
| UVB | 5,756 | 4,392 | 5,478 | 5,108 | 4,371 |



* The Value of Vested Benefits was computed using the Pension Benefit Guaranty Corporation's valuation assumptions for multiemployer plans terminating as of the first day of the Plan Year following the date shown.

** Includes expenses as outlined under Section 4281 of ERISA.

*** Market Value

**United Actuarial Services, Inc.**

**CONFIDENTIAL**

1974PLAN_002384

## CONTRIBUTION ALLOCATION

*These graphs show how the contributions are being spent*

The following allocation charts illustrate how the expected contribution rate for the coming plan year will be "spent" to pay for benefits being earned in the current year, plan expenses, and funding of past unfunded liabilities.

*Contribution Allocation as of July 1, 2015*



*Contribution Allocation as of July 1, 2014*



**United Actuarial Services, Inc.**

**CONFIDENTIAL**                                    **1974PLAN_002385**

*Summary of Results*
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2015 Actuarial Valuation*

## FUNDED RATIOS

> *The funded ratio can be used as an indication of ongoing funding progress*

The present value of vested accumulated benefits is the amount that would have to be invested as of the valuation date in order to pay, when due, the benefits accrued and vested as of the valuation date. This calculation assumes fund assets will earn interest at the assumed rate and all other aspects of the fund's experience will follow the actuarial assumptions. Similarly, the present value of all accumulated benefits is the amount necessary to fund all benefits accrued as of the valuation date.

The extent to which the value of vested, accumulated benefits and total accumulated benefits are funded provides a "snapshot" measure of the plan's funded status as of the valuation date.

*Present Value of Accumulated Benefits/*
*Funded Ratios\**

| Actuarial Study as of July 1, | | 2015 | | 2014 |
|---|---|---|---|---|
| Present value of vested accumulated benefits | | | | |
| *Participants currently receiving benefits* | $ | 5,365,381,028 | $ | 5,091,764,210 |
| *Inactive vested participants* | | 284,799,616 | | 296,791,410 |
| *Active participants* | | 437,288,780 | | 597,713,951 |
| Total | | 6,087,469,424 | | 5,986,269,571 |
| Nonvested accumulated benefits | | 79,191,054 | | 166,980,340 |
| Present value of all accumulated benefits | $ | 6,166,660,478 | $ | 6,153,249,911 |
| Actuarial value of assets | $ | 4,111,939,936 | $ | 4,362,514,000 |
| Market value of assets | $ | 3,808,170,000 | $ | 4,164,994,000 |
| Funded ratios (Actuarial value used for PPA) | | | | |
| *Vested benefits* | | 0.68 | | 0.73 |
| *All accumulated benefits* | | 0.67 | | 0.71 |
| Funded ratios (Market value) | | | | |
| *Vested benefits* | | 0.63 | | 0.70 |
| *All accumulated benefits* | | 0.62 | | 0.68 |
| Interest rate used to value benefits | | 7.50% | | 7.50% |

\*   These liability values are based upon the long-term actuarial assumptions selected by the Plan's enrolled actuary and may not match the ASC 960 values that are prepared based on the plan sponsor's assumptions

**United Actuarial Services, Inc.**

**CONFIDENTIAL**                                          **1974PLAN_002386**

## FUNDING STANDARD ACCOUNT

*The minimum funding requirements have been met for the most recent plan year*

The Funding Standard Account is used to determine whether the plan meets the minimum funding requirements established by ERISA.   Such a determination is done by subtracting the year's charges from the credits.  A positive result establishes a credit balance that represents the amount the plan is in excess of the minimum required contribution on a cumulative basis.  A negative result represents a funding deficiency which could produce excise taxes (except under certain circumstances when the plan is following a rehabilitation plan).  The projected values use the assumptions summarized on page B-7 of the appendix.

| Funding Standard Account Plan Year Ending June 30, | 2016 (Projected) | 2015 (Final) |
|---|---:|---:|
| **Charges** | | |
| Prior year funding deficiency | $            - | $            - |
| Normal cost (including expenses) | 41,545,816 | 46,527,168 |
| Amortization charges (see Appendix C) | 859,833,968 | 847,004,151 |
| Interest on above | 67,603,486 | 67,014,851 |
| Total charges | 968,983,270 | 960,546,170 |
| | | |
| **Credits** | | |
| Prior year credit balance | 1,102,344,156 | 1,444,510,000 |
| Employer contributions | 83,217,733 | 97,051,000 |
| Amortization credits (see Appendix C) | 360,506,880 | 381,223,370 |
| Interest on above | 112,336,056 | 140,105,956 |
| ERISA full funding credit | - | - |
| Total credits | 1,658,404,825 | 2,062,890,326 |
| | | |
| Credit balance (credits less charges) | $   689,421,555 | $ 1,102,344,156 |

**United Actuarial Services, Inc.**

**CONFIDENTIAL**                                    1974PLAN_002387

*Summary of Results*
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2015 Actuarial Valuation*

## *PPA FUNDING STATUS REPORT*

| The plan is in Critical and Declining status for 2015 |
|---|

The Pension Protection Act of 2006 (PPA), as amended by the Multiemployer Pension Reform Act of 2014 ("MPRA"), requires all multiemployer pension plans to obtain an annual status certification. The possible statuses are: "Endangered", "Seriously Endangered", "Critical", "Critical and Declining" or none of these. As the plan's actuary, we must complete the status certification within 90 days of the beginning of the plan year, and we must also certify whether or not the plan has made scheduled progress if its funding improvement or rehabilitation period has begun. The criteria for these determinations are outlined in Appendix D. Due to the timing requirement affecting PPA certifications, they are performed based on data different from that used in this report (see certification letter for additional details). The 2015 PPA certification is based on assumptions as stated in the July 1, 2014 valuation report and modified as noted in the July 1, 2015 PPA certification and does not include the assumptions changes stated on page 4 of this report. The 2014 PPA certification is based on assumptions as stated in the July 1, 2013 valuation report and modified as noted in the July 1, 2014 PPA certification. The results are summarized below.

| Description | Values Used for PPA Certification | |
|---|---|---|
| | *2015* | *2014* |
| Funded ratio | 0.69 | 0.71 |
| Date of first projected funding deficiency | 6/30/2019 | 6/30/2019 |
| Projected insolvency year | 2025-26 plan year | n/a |
| Plan year contributions | n/a | $  104,599,946 |
| Normal cost | n/a | $    20,636,864 |
| Interest on unfunded liabilities, last PY | n/a | 132,291,587 |
| Normal cost plus unfunded liability interest | n/a | $  152,928,451 |
| PV of vested benefits, nonactive | n/a | $ 5,452,426,090 |
| PV of vested benefits, active | n/a | $  591,929,274 |
| Years of benefit payments in assets | n/a | n/a |
| Certified PPA status | Critical and Declining | Critical |
| Making progress under FIP/RP | n/a | n/a |

**United Actuarial Services, Inc.**

## ULTIMATE FUNDED STATUS

*Ultimate funded status is a snapshot measure of contribution sufficiency*

The ultimate funded status is a measure used to see how well funded the current population is. It compares the present value of benefits for both past and future service to the current market value of assets plus the present value of future contributions. The ultimate funded status for the three most recent plan years is shown in the graph below. The present values of benefits and contributions include only current participants and assume no future contribution rate increases. The number above each bar is the assets and future contributions less the value of benefits. The percentage above the bars is the ratio of assets and future contributions to the value of total benefits.



**United Actuarial Services, Inc.**

**CONFIDENTIAL**                                    **1974PLAN_002389**

## SENSITIVITY ANALYSIS

| *The table below illustrates the impact on the plan when experience varies from key assumptions* |
|---|

Currently, the plan is projected to become insolvent in the 2024-25 plan year or about 9 years out. Considering that experience rarely matches our assumptions exactly, we developed the table below to demonstrate the impact that variations in certain key assumptions would have on the plan's projected insolvency date. We examined future hours assumptions equal to the baseline (as stated on page B-7 of the report), 10% lower, and 10% higher. We examined asset returns for the 2015-16 plan year of 10.00%, 7.50%, 4.00%, and 0.00%.

| *Hours Assumption* | | *Return for the 2015-16 PY (7.50% Thereafter)* | | | |
|---|---|---|---|---|---|
| | | *10.00%* | *7.50%* | *4.00%* | *0.00%* |
| 10% Lower<br>12,015,277 in 2015-16<br>Decreasing by 3.0%<br>per year thereafter | First insolvent plan year | 2024-25<br>(9 years out) | 2024-25<br>(9 years out) | 2024-25<br>(9 years out) | 2023-24<br>(8 years out) |
| Baseline<br>13,350,308 in 2015-16<br>Decreasing by 3.0%<br>per year thereafter | First insolvent plan year | 2025-26<br>(10 years out) | **2024-25**<br>**(9 years out)** | 2024-25<br>(9 years out) | 2023-24<br>(8 years out) |
| 10% Higher<br>14,685,339 in 2015-16<br>Decreasing by 3.0%<br>per year thereafter | First insolvent plan year | 2025-26<br>(10 years out) | 2025-26<br>(10 years out) | 2024-25<br>(9 years out) | 2024-25<br>(9 years out) |

**United Actuarial Services, Inc.**

**CONFIDENTIAL**

## *PART II:  SUPPLEMENTAL STATISTICS*

**CONFIDENTIAL**                    **1974PLAN_002391**

JA 000575

*Supplement No. 2*
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2015 Actuarial Valuation*

## PARTICIPANT DATA RECONCILIATION

The participant data reconciliation table below provides information as to how the plan's covered population changed since the prior actuarial study. Such factors as the number of participants retiring, withdrawing and returning to work have an impact on the actuarial position of the pension fund.

| Participants Valued As | Active | Active Electing Miners | New Inexperienced Miners | Terminated* Miners & Truckers | Terminated* Non-Retired Disabled | Pensioners Retired and Disabled | Pensioners Surviving Spouses | Total |
|---|---|---|---|---|---|---|---|---|
| Total as of 7/1/2014 | 8,711 | 32 | 475 | 105,418 | 42 | 61,928 | 28,826 | 205,432 |
| Change due to: | | | | | | | | |
| New hire | 332 | 1 | 493 | 0 | 0 | 0 | 0 | 826 |
| Rehire | 98 | 0 | 5 | -103 | 0 | 0 | 0 | 0 |
| Electing Miners | -4 | 4 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Inexperienced Miners | -12 | 0 | 12 | 0 | 0 | 0 | 0 | 0 |
| Termination | -727 | -8 | -75 | 810 | 0 | 0 | 0 | 0 |
| Retirement | -1,054 | -3 | -1 | -1,246 | 0 | 2,304 | 0 | 0 |
| New beneficiary | 0 | 0 | 0 | 0 | 0 | 0 | 1,207 | 1,207 |
| Death | -20 | 0 | 0 | -135 | 0 | -2,417 | -2,320 | -4,892 |
| Data adjustment | 0 | 0 | 0 | 28 | 0 | 3 | 206 | 237 |
| Net change: | -1,387 | -6 | 434 | -646 | 0 | -110 | -907 | -2,622 |
| Total as of 7/1/2015 | 7,324 | 26 | 909 | 104,772 | 42 | 61,818 | 27,919 | 202,810** |

* Based upon entry age and service assumptions it was assumed that 6,262 terminated miners and truckers and no non-retired disabled have vested rights. All continuing non-retired terminated participants over age 65 are assumed to be either dead or ineligible to collect a pension and have thus been excluded from the count of participants with vested rights. Those assumed to be nonvested are excluded from plan costs and liabilities. Terminated counts shown do not include the 0.6% load for unreported prior 1950 Pension Plan vested terminated participants.

** In addition, there are 847 spouses of prior 1950 Pension Plan pensioners who are not currently eligible for benefits, but can become eligible when the pensioner dies.

**United Actuarial Services, Inc.**

**CONFIDENTIAL**                                                    **1974PLAN_002392**

*Supplemental Information*
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2015 Actuarial Valuation*

## ACTIVE INFORMATION

| Age | Number of Participants | | |
|---|---|---|---|
| | Actives | Electing Miners | New Inexperienced Miners |
| < 25 | 193 | 0 | 239 |
| 25-29 | 733 | 0 | 227 |
| 30-34 | 967 | 3 | 141 |
| 35-39 | 1,038 | 7 | 113 |
| 40-44 | 997 | 6 | 79 |
| 45-49 | 790 | 0 | 59 |
| 50-54 | 626 | 5 | 36 |
| 55-59 | 1,046 | 2 | 14 |
| 60-64 | 839 | 2 | 1 |
| 65+ | 95 | 1 | 0 |
| Totals | 7,324* | 26 | 909 |

- The average age and credited service for active employees are 44.1 and 11.9, respectively.
- The average age and combined credited/supplemental service for electing miners are 45.3 and 11.6, respectively.
- The average age and supplemental service for new inexperienced miners are 31.8 and 2.1, respectively.

* Of this number, 5,355 were assumed to have vested rights.

**United Actuarial Services, Inc.**

**CONFIDENTIAL**                                        1974PLAN_002393

JA000577

*Supplemental Analysis*
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2015 Actuarial Valuation*

## ACTIVE INFORMATION (CONT.)

*Active Participants\* by Age and Service as of July 1, 2015*

| Age | <1 | 1-4 | 5-9 | 10-14 | 15-19 | 20-24 | 25-29 | 30-34 | 35-39 | 40+ | Total |
|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| < 25 | 26 | 389 | 17 | - | - | - | - | - | - | - | 432 |
| 25-29 | 37 | 595 | 327 | 1 | - | - | - | - | - | - | 960 |
| 30-34 | 37 | 495 | 512 | 67 | - | - | - | - | - | - | 1,111 |
| 35-39 | 37 | 425 | 524 | 168 | 4 | - | - | - | - | - | 1,158 |
| 40-44 | 27 | 332 | 507 | 193 | 19 | 3 | 1 | - | - | - | 1,082 |
| 45-49 | 8 | 238 | 399 | 163 | 30 | 9 | 2 | - | - | - | 849 |
| 50-54 | 2 | 148 | 236 | 107 | 25 | 76 | 66 | 2 | 5 | - | 667 |
| 55-59 | 2 | 67 | 106 | 47 | 45 | 237 | 435 | 15 | 108 | - | 1,062 |
| 60-64 | - | 16 | 32 | 22 | 18 | 41 | 524 | 24 | 155 | 10 | 842 |
| 65-69 | - | - | 7 | 4 | 2 | 2 | 32 | 6 | 18 | 19 | 90 |
| 70+ | - | - | - | 1 | - | - | - | - | 1 | 4 | 6 |
| Totals | 176 | 2,705 | 2,667 | 773 | 143 | 368 | 1,060 | 47 | 287 | 33 | 8,259 |
| Unrecorded DOB | - | - | - | - | - | - | - | - | - | - | - |
| Total Active Lives | 176 | 2,705 | 2,667 | 773 | 143 | 368 | 1,060 | 47 | 287 | 33 | 8,259 |

\*    Includes 26 active electing miners and 909 new inexperienced miners.

**United Actuarial Services, Inc.**

CONFIDENTIAL

1974PLAN_002394

JA 000578

*Supplemental Analysis*
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2015 Actuarial Valuation*

## INACTIVE VESTED INFORMATION

*Inactive Vested Participants\* by Age as of July 1, 2015*

| Age Group** | Number | Estimated Deferred Vested Benefits* | |
|---|---|---|---|
| < 30 | 30 | $ | 11,859 |
| 30-34 | 123 | | 53,137 |
| 35-39 | 193 | | 89,786 |
| 40-44 | 247 | | 118,082 |
| 45-49 | 289 | | 150,157 |
| 50-54 | 667 | | 385,791 |
| 55-59 | 2,620 | | 1,409,834 |
| 60-64 | 1,897 | | 953,984 |
| 65-69 | 190 | | 87,150 |
| 70+ | 6 | | 2,285 |
| Total inactive vested lives | 6,262 | $ | 3,262,065 |

\*    Amount payable at assumed retirement age as used in the valuation process. Amount payable and inactive counts include the 0.6% load to inactive vesteds.

\*\*   Age was assumed based on the average age of those with the same status code for 5 participants whose age was missing.

**United Actuarial Services, Inc.**

**CONFIDENTIAL**                                    **1974PLAN_002395**

JA 000579

*Supplemental Valuation*
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2015 Actuarial Valuation*

## RETIREE INFORMATION

| Age | Number of Participants | | |
|---|---|---|---|
| | Regular Retirees | Disabled Retirees | Surviving Spouses |
| < 55 | 83 | 174 | 477 |
| 55-59 | 4,309 | 932 | 997 |
| 60-64 | 12,038 | 1,970 | 2,022 |
| 65-69 | 13,840 | 2,259 | 3,222 |
| 70-74 | 9,207 | 1,603 | 3,547 |
| 75-79 | 6,205 | 983 | 3,993 |
| 80-84 | 3,743 | 378 | 4,425 |
| 85+ | 3,929 | 165 | 9,236 |
| Totals | 53,354 | 8,464 | 27,919 |

- The average monthly benefit for regular retirees is $674.
- The average monthly benefit for disabled retirees is $568.
- The average monthly benefit for surviving spouses is $340.

**United Actuarial Services, Inc.**

**CONFIDENTIAL**                                    1974PLAN_002396

JA 000580

*Supplemental Analysis*
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2015 Actuarial Valuation*

## RETIREE INFORMATION (CONT.)

*Benefits Being Paid by Form of Payment as of July 1, 2015*

| Form of Payment | Number | Monthly Benefits Being Paid | | | | |
|---|---|---|---|---|---|---|
| | | Total | Average | Smallest | Largest | |
| 1950 Pensioners | 2,022 | $ 543,573 | $ 269 | $ 121 | $ 425 | |
| 1974 Pensioners | 51,332 | 35,434,485 | 690 | 110 | 2,935 | |
| Disability | 8,464 | 4,805,766 | 568 | 249 | 1,889 | |
| Surviving spouses | 27,919 | 9,499,698 | 340 | 74 | 1,832 | |
| Totals | 89,737 | $ 50,283,522 | $ 560 | $ 74 | $ 2,935 | |

*Retirees by Age and Form of Payment as of July 1, 2015*

| Age Group | Form of Benefits Being Paid | | | |
|---|---|---|---|---|
| | 1950 Pensioners | 1974 Pensioners | Disability | Total |
| < 40 | - | - | 5 | 5 |
| 40-44 | - | 1 | 10 | 11 |
| 45-49 | - | 4 | 34 | 38 |
| 50-54 | - | 78 | 125 | 203 |
| 55-59 | - | 4,309 | 932 | 5,241 |
| 60-64 | 40 | 11,998 | 1,970 | 14,008 |
| 65-69 | 259 | 13,581 | 2,259 | 16,099 |
| 70-74 | 332 | 8,875 | 1,603 | 10,810 |
| 75-79 | 324 | 5,881 | 983 | 7,188 |
| 80-84 | 303 | 3,440 | 378 | 4,121 |
| 85-89 | 410 | 2,149 | 142 | 2,701 |
| 90-94 | 252 | 874 | 21 | 1,147 |
| 95+ | 102 | 142 | 2 | 246 |
| Totals | 2,022 | 51,332 | 8,464 | 61,818 |
| *plus*: Surviving spouses | | | | 27,919 |
| Total receiving benefits | | | | 89,737 |

**United Actuarial Services, Inc.**

**CONFIDENTIAL**

1974PLAN_002397

JA 000581

*Supplemental Actuarial*
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2015 Actuarial Valuation*

## RETIREE INFORMATION (CONT.)

*Age of Participants Retiring from Active or Inactive Vested Status During Prior Plan Years (excludes beneficiaries and disability retirements)*

| Age at Retirement | Plan Year Ending June 30, | |
|---|---|---|
| | 2015 | 2014 |
| < 45 | - | 1 |
| 45 | - | - |
| 46 | - | - |
| 47 | 2 | - |
| 48 | - | - |
| 49 | - | - |
| 50 | 3 | - |
| 51 | 1 | - |
| 52 | 5 | 4 |
| 53 | 9 | 5 |
| 54 | 13 | 8 |
| 55 | 87 | 113 |
| 56 | 247 | 309 |
| 57 | 189 | 169 |
| 58 | 202 | 148 |
| 59 | 213 | 127 |
| 60 | 213 | 132 |
| 61 | 176 | 129 |
| 62 | 190 | 181 |
| 63 | 303 | 289 |
| 64 | 146 | 102 |
| 65 | 85 | 79 |
| 66+ | 201 | 161 |
| Totals | 2,285 | 1,957 |
| | | |
| Average retirement age (from active status) | 59.8 | 60.7 |
| Average retirement age (from inactive vested status) | 61.1 | 60.1 |

**United Actuarial Services, Inc.**

**CONFIDENTIAL**

1974PLAN_002398

## *PART III: ASSET INFORMATION*

United Actuarial Services, Inc.

CONFIDENTIAL                    1974PLAN_002399

JA 000583

*Asset Information*
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2015 Actuarial Valuation*

## MARKET AND ACTUARIAL FUND VALUES

Asset information extracted from the fund's June 30, 2015 unaudited financial statements, restated as of September 30, 2015, provided by the Fund Office.

| *Market/Actuarial Value of Fund Investments as of June 30,* | *2015* | *2014* | *2013* |
|---|---|---|---|
| Invested assets | | | |
| *Corporate stocks - common* | $ 702,090,000 | $ 744,339,000 | $ 774,456,000 |
| *Corporate stock - preferred* | 1,364,000 | 3,143,000 | 3,326,000 |
| *Registered inv. companies* | 474,807,000 | 663,090,000 | 562,872,000 |
| *Common/collective trusts* | 1,235,268,000 | 1,406,195,000 | 1,355,286,000 |
| *Partnership/joint venture* | 430,594,000 | 458,560,000 | 484,651,000 |
| *Real estate* | 191,857,000 | 170,326,000 | 184,612,000 |
| *Corporate bonds* | 64,881,000 | 67,319,000 | 68,119,000 |
| *US government securities* | - | 8,334,000 | - |
| *Short-term & foreign currency* | 1,908,000 | 3,275,000 | 2,187,000 |
| *Cash and cash equivalents* | 345,904,000 | 212,293,000 | 334,527,000 |
| *Securities held as collateral* | - | 101,824,000 | 61,749,000 |
| *Office furniture & equipment* | 507,000 | 637,000 | 783,000 |
| *Other* | 389,525,000 | 392,695,000 | 349,420,000 |
| | 3,838,705,000 | 4,232,030,000 | 4,181,988,000 |
| Net receivables* | (30,535,000) | (67,036,000) | (88,611,000) |
| Market value | $ 3,808,170,000 | $ 4,164,994,000 | $ 4,093,377,000 |
| | | | |
| Fund assets - Actuarial value | | | |
| *Market value* | $ 3,808,170,000 | $ 4,164,994,000 | $ 4,093,377,000 |
| less*: Deferred investment gains and (losses)* | (303,769,936) | (197,520,000) | (415,091,000) |
| Actuarial value | $ 4,111,939,936 | $ 4,362,514,000 | $ 4,508,467,800 |
| | | | |
| Actuarial value as a percentage of market value | 107.98% | 104.74% | 110.14% |

* Equals receivables, less any liabilities

**United Actuarial Services, Inc.**

**CONFIDENTIAL**                    **1974PLAN_002400**

JA 000584

*Asset Information*
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2015 Actuarial Valuation*

### FLOW OF FUNDS

Asset information extracted from the fund's June 30, 2015 unaudited financial statements, restated as of September 30, 2015, provided by the Fund Office.

| Plan Year Ending June 30, | 2015 | 2014 | 2013 |
|---|---|---|---|
| Market value at beginning of plan year | $ 4,164,994,000 | $ 4,093,377,000 | $ 4,202,245,000 |
| **Additions** | | | |
| *Employer contributions* | 97,051,000 | 105,527,000 | 115,418,000 |
| *Net investment income* | 192,757,000 | 602,634,000 | 377,054,000 |
| *Other income* | 1,899,000 | 1,962,000 | 1,997,000 |
| | 291,707,000 | 710,123,000 | 494,469,000 |
| **Deductions** | | | |
| *Benefits paid* | 618,468,000 | 609,838,000 | 573,261,000 |
| *Net expenses* | 30,063,000 | 32,393,000 | 36,316,000 |
| | 648,531,000 | 642,231,000 | 609,577,000 |
| Net increase (decrease) | (356,824,000) | 67,892,000 | (115,108,000) |
| Adjustment | - | 3,725,000 | 6,240,000 |
| Market value at end of plan year | $ 3,808,170,000 | $ 4,164,994,000 | $ 4,093,377,000 |
| **Cashflow** | | | |
| *Contr.-ben.-exp.* | (551,480,000) | (536,704,000) | (494,159,000) |
| *Percent of assets* | -14.48% | -12.89% | -12.07% |
| **Estimated net investment return** | | | |
| *On market value* | 4.95% | 15.74% | 9.52% |
| *On actuarial value* | 7.31% | 9.07% | 7.61% |

**United Actuarial Services, Inc.**

**CONFIDENTIAL**

1974PLAN_002401

JA 000585

*Asset Information*
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2015 Actuarial Valuation*

## INVESTMENT GAIN AND LOSS

*Investment Gain or Loss*
*Plan Year Ending June 30, 2015*

| | | |
|---|---|---|
| Expected market value at end of plan year | | |
| *Market value at beginning of plan year* | $ | 4,164,994,000 |
| *Employer contributions and non-investment income* | | 98,950,000 |
| *Benefits and expenses paid* | | (648,531,000) |
| *Expected investment income (at 7.80% rate of return)* | | 300,821,305 |
| | | 3,916,234,305 |
| Actual market value at end of plan year | | 3,808,170,000 |
| *less*: Expected market value | | 3,916,234,305 |
| Investment gain or (loss) | $ | (108,064,305) |

*History of Gains and (Losses)*

| Plan Year Ending June 30, | Investment Gain or (Loss) |
|---|---|
| 2015 | $    (108,064,305) |
| 2014 | 298,962,514 |
| 2013 | 62,448,000 |
| 2012 | 47,196,000 |
| 2011 | 408,910,000 |
| 2010 | 307,966,000 |
| 2009 | (1,437,048,000) |
| Total | $    (419,629,791) |

*Deferred Investment Gains and (Losses)\**

| Plan Year Ending June 30, | Amount of Gain or (Loss) Deferred as of June 30, | | | |
|---|---|---|---|---|
| | *2015* | *2016* | *2017* | *2018* |
| 2015 | $    (86,451,444) | $    (64,838,583) | $    (43,225,722) | $    (21,612,861) |
| 2014 | 179,377,508 | 119,585,006 | 59,792,503 | - |
| 2013 | 24,979,200 | 12,489,600 | - | - |
| 2012 | 9,439,200 | - | - | - |
| 2009 | (431,114,400) | (287,409,600) | (143,704,800) | - |
| Totals | $    (303,769,936) | $    (220,173,577) | $    (127,138,019) | $    (21,612,861) |

\*    10-year smoothing was elected with respect to the loss incurred during plan year ending 2009.

Page 26

**United Actuarial Services, Inc.**

JA 000586

## *PART IV: ENROLLED ACTUARY'S REPORT*

United Actuarial Services, Inc.

**CONFIDENTIAL**

**1974PLAN_002403**

### NORMAL COST/ACTUARIAL LIABILITY

| Normal Cost as of July 1, | | 2015 | | 2014 |
|---|---|---|---|---|
| Active participants - service prior to valuation date | $ | - | $ | - |
| Active participants - service after valuation date | | 16,967,503 | | 21,948,855 |
| Anticipated administrative expenses (beg. of year) | | 24,578,313 | | 24,578,313 |
| Total normal cost | $ | 41,545,816 | $ | 46,527,168 |

| Unfunded Actuarial Liability as of July 1, | | 2015 | | 2014 |
|---|---|---|---|---|
| Actuarial liability | | | | |
| *Participants currently receiving benefits* | $ | 5,365,381,028 | $ | 5,091,764,210 |
| *Inactive vested participants* | | 349,173,965 | | 435,975,219 |
| *Active participants - service prior to val. date* | | 452,105,485 | | 625,510,482 |
| *Active participants - service after val. date* | | - | | - |
| | | 6,166,660,478 | | 6,153,249,911 |
| *less*: Fund assets (actuarial value) | | 4,111,939,936 | | 4,362,514,000 |
| Unfunded actuarial liability (not less than 0) | $ | 2,054,720,542 | $ | 1,790,735,911 |

**United Actuarial Services, Inc.**

**CONFIDENTIAL**                    1974PLAN_002404

JA 000588

*Enrolled Actuary Report*
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2015 Actuarial Valuation*

## ACTUARIAL LIABILITY RECONCILIATION/PROJECTION

### Reconciliation of Unfunded Actuarial Liability

| | | |
|---|---|---:|
| Expected unfunded actuarial liability as of June 30, 2015 | | |
| *Unfunded actuarial liability as of July 1, 2014* | $ | 1,790,735,911 |
| *Normal cost (including expenses)* | | 46,527,168 |
| *Actual contributions* | | (97,051,000) |
| *Interest to end of plan year* | | 134,618,783 |
| | | 1,874,830,862 |
| | | |
| Increase (decrease) due to: | | |
| *Experience (gain) or loss* | | 66,801,338 |
| *Statutory limit on lump sum payments* | | (59,437,160) |
| *Change in actuarial assumptions* | | 172,525,502 |
| *Change in actuarial method* | | - |
| Net increase (decrease) | | 179,889,680 |
| | | |
| Unfunded actuarial liability as of July 1, 2015 | $ | 2,054,720,542 |

### Projection of Actuarial Liability to Year End

| | | |
|---|---|---:|
| Actuarial liability as of July 1, 2015 | $ | 6,166,660,478 |
| | | |
| Expected increase (decrease) due to: | | |
| *Normal cost (excluding expenses)* | | 16,967,503 |
| *Benefits paid* | | (617,619,324) |
| *Interest on above* | | (23,818,222) |
| *Interest on actuarial liability* | | 462,499,536 |
| Net expected increase (decrease) | | (161,970,507) |
| | | |
| Expected actuarial liability as of June 30, 2016 | $ | 6,004,689,971 |

**United Actuarial Services, Inc.**

**CONFIDENTIAL**

**1974PLAN_002405**

*Enrolled Actuary Report*
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2015 Actuarial Valuation*

## CURRENT LIABILITY

Current liability is developed for the purpose of determining the full funding limitation under Section 431(c)(6) of the Internal Revenue Code and the maximum deductible contribution under Section 404(a)(1)(D) of the Internal Revenue Code. As prescribed under Section 431(c)(6), the current liability uses a different interest rate and mortality table than regular plan funding under ERISA.

### Current Liability as of July 1, 2015

| | | |
|---|---|---:|
| Vested current liability | | |
| *Participants currently receiving benefits* | $ | 8,103,574,429 |
| *Inactive vested participants* | | 504,780,775 |
| *Active participants* | | 841,442,311 |
| | | 9,449,797,515 |
| | | |
| Nonvested current liability | | |
| *Inactive vested participants* | | 89,967,326 |
| *Active participants* | | 35,945,441 |
| | | 125,912,767 |
| | | |
| Total current liability | $ | 9,575,710,282 |

### Projection of Current Liability to Year End

| | | |
|---|---|---:|
| Current liability as of July 1, 2015 | $ | 9,575,710,282 |
| | | |
| Expected increase (decrease) due to: | | |
| *Benefits accruing* | | 40,112,865 |
| *Benefits paid* | | (617,619,324) |
| *Interest on above* | | (9,833,993) |
| *Interest on current  liability* | | 319,828,723 |
| Net expected increase (decrease) | | (267,511,729) |
| | | |
| Expected current liability as of June 30, 2016 | $ | 9,308,198,553 |

**United Actuarial Services, Inc.**

**CONFIDENTIAL**

**1974PLAN_002406**

## FULL FUNDING LIMIT

The full funding limit, as required under Section 431(c)(6) and Section 404(a)(1) of the Internal Revenue Code, provides a limitation to both the minimum required contribution and the maximum deductible contribution. Both results are limited to be no greater than the unfunded liability (plus the ERISA credit balance for the minimum required contribution only). This limitation amount is overridden if 90% of the current liability minus the actuarial value of assets is greater or, for the maximum deductible contribution only, if 140% of the vested current liability minus the actuarial value of assets is greater.

| *Projection of Assets for Full Funding Limit* | *Market Value* | | *Actuarial Value* |
|---|---|---|---|
| Asset value as of July 1, 2015 | $ | 3,808,170,000 | $ 4,111,939,936 |
| Expected increase (decrease) due to: | | | |
| *Investment income* | | 261,495,775 | 284,278,521 |
| *Benefits paid* | | (617,619,324) | (617,619,324) |
| *Expenses* | | (25,500,000) | (25,500,000) |
| Net expected increase (decrease) | | (381,623,549) | (358,840,803) |
| Expected value as of June 30, 2016* | $ | 3,426,546,451 | $ 3,753,099,133 |

\*     Ignoring expected employer contributions (as required by regulation).

| *Full Funding Limit as of June 30, 2016* | *For Minimum Required* | | *For Maximum Deductible* |
|---|---|---|---|
| ERISA full funding limit (not less than 0) | | | |
| *Actuarial liability* | $ | 6,004,689,971 | $ 6,004,689,971 |
| less: *Assets (lesser of market or actuarial)* | | 3,426,546,451 | 3,426,546,451 |
| plus: *Credit balance (w/interest to year end)* | | 1,185,019,968 | n/a |
| | | 3,763,163,488 | 2,578,143,520 |
| Full funding limit override (not less than 0) | | | |
| *90% of current liability* | | 8,377,378,698 | 8,377,378,698 |
| less: *Assets (actuarial value)* | | 3,753,099,133 | 3,753,099,133 |
| | | 4,624,279,565 | 4,624,279,565 |
| Full funding limit (greater of ERISA limit and full funding override) | $ | 4,624,279,565 | $ 4,624,279,565 |

**United Actuarial Services, Inc.**

**CONFIDENTIAL**                                    **1974PLAN_002407**

*Enrolled Actuary Report*
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2015 Actuarial Valuation*

## MINIMUM REQUIRED CONTRIBUTION AND FULL FUNDING CREDIT

*Minimum Required Contribution*
*Plan Year Beginning July 1, 2015*

| | | |
|---|---|---:|
| Minimum funding cost | | |
| *Normal cost (including expenses)* | $ | 41,545,816 |
| *Net amortization of unfunded liabilities* | | 499,327,088 |
| *Interest to end of plan year* | | 40,565,467 |
| | | 581,438,371 |
| | | |
| Full funding limit | | 4,624,279,565 |
| | | |
| Net charge to funding std. acct. (lesser of above) | | 581,438,371 |
| less:  *Credit balance with interest to year end* | | 1,185,019,968 |
| | | |
| Minimum Required Contribution (not less than 0) | $ | - |

*Full Funding Credit to Funding Standard*
*Account Plan Year Ending June 30, 2016*

| | | |
|---|---|---:|
| Full funding credit (not less than 0) | | |
| *Minimum funding cost (n.c., amort., int.)* | $ | 581,438,371 |
| less*:  full funding limit* | | 4,624,279,565 |
| | | |
| | $ | - |

**United Actuarial Services, Inc.**

**CONFIDENTIAL**                                                    **1974PLAN_002408**

*Enrolled Actuary Report*
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2015 Actuarial Valuation*

## MAXIMUM DEDUCTIBLE CONTRIBUTION

The maximum amount of tax-deductible employer contributions made to a pension plan is determined in accordance with Section 404(a) of the Internal Revenue Code.  For a multiemployer pension plan, Section 413(b)(7) of the Internal Revenue Code and IRS Announcement 98-1 provide that, if <u>anticipated</u> employer contributions are less than the deductible limit for a plan year, then all employer contributions paid during the year are guaranteed to be deductible.  If anticipated employer contributions exceed the deductible limit, the Trustees have two years from the close of the plan year in question to retroactively improve benefits to alleviate the problem.

*Maximum Deductible Contribution*
*Plan Year Beginning July 1, 2015*

| | | |
|---|---|---:|
| Preliminary deductible limit | | |
| *Normal cost (including expenses)* | $ | 41,545,816 |
| *10-year limit adjustment (using "fresh start" alternative)* | | 278,459,412 |
| *Interest to end of plan year* | | 24,000,392 |
| | | 344,005,620 |
| | | |
| Full funding limit | | 4,624,279,565 |
| | | |
| Maximum deductible contribution override | | |
| *140% of vested current liability projected to June 30, 2016* | | |
| | | 12,860,124,685 |
| less*:  Actuarial value of assets projected to June 30, 2016* | | 3,753,099,133 |
| | | 9,107,025,552 |
| | | |
| Maximum deductible contribution* | $ | 9,107,025,552 |
| | | |
| Anticipated employer contributions | $ | 83,217,733 |

---

*    Equals the lesser of the preliminary deductible limit and the full funding limit, but not less than the
     maximum deductible contribution override.

**United Actuarial Services, Inc.**

**CONFIDENTIAL**                                    **1974PLAN_002409**

## HISTORY OF UNFUNDED VESTED BENEFITS

*Rolling 5 Method*

| June 30, | Vested Benefits Interest Rate | Value of Vested Benefits* | Asset Value** | Unfunded Vested Benefits |
|---|---|---|---|---|
| 2010 | PBGC*** | 8,406,314,000 | 4,253,508,000 | 4,152,806,000 |
| 2011 | PBGC*** | 8,792,378,000 | 4,421,136,000 | 4,371,242,000 |
| 2012 | PBGC*** | 9,309,607,000 | 4,202,245,000 | 5,107,362,000 |
| 2013 | PBGC*** | 9,571,196,000 | 4,093,377,000 | 5,477,819,000 |
| 2014 | PBGC*** | 8,557,439,428 | 4,164,994,000 | 4,392,445,428 |
| 2015 | PBGC*** | 9,564,089,300 | 3,808,170,000 | 5,755,919,300 |

\*    Includes expenses as outlined under Section 4281 of ERISA.
\*\*   Market Value
\*\*\*  The Value of Vested Benefits was computed using the Pension Benefit Guaranty Corporation's valuation assumptions for multiemployer plans terminating as of the first day of the Plan Year following the date shown.

**United Actuarial Services, Inc.**

**CONFIDENTIAL**    1974PLAN_002410

### ASC 960 INFORMATION

The following displays are intended to assist the fund's auditor in complying with Accounting Standards Codification 960.  The results shown are not necessarily indicative of the plan's potential liability upon termination.

| *Present Value of Accumulated Benefits Actuarial Study as of July 1,* | | 2015 | | 2014 |
|---|---|---|---|---|
| Present value of vested accumulated benefits | | | | |
| *Participants currently receiving benefits* | $ | 8,069,087,974 | $ | 7,002,094,897 |
| *Other participants* | | 1,425,251,460 | | 1,484,022,604 |
| | | 9,494,339,434 | | 8,486,117,501 |
| Nonvested accumulated benefits | | 150,283,840 | | 307,301,402 |
| Present value of all accumulated benefits | $ | 9,644,623,274 | $ | 8,793,418,903 |
| Market value of plan assets | $ | 3,808,170,000 | $ | 4,164,994,000 |
| Interest rate used to value benefits | | | | |
| *First 20 years* | | 2.71% | | 3.47% |
| *Thereafter* | | 2.78% | | 3.64% |

| *Changes in Present Value of Accumulated Benefits* | | |
|---|---|---|
| Present value of accumulated benefits as of July 1, 2014 | $ | 8,793,418,903 |
| Increase (decrease) due to: | | |
| *Statutory limit on lump sum payments* | | (99,273,284) |
| *Change in actuarial assumptions* | | 464,039,085 |
| *Benefits accumulated and experience gain or loss* | | 799,774,934 |
| *Interest due to decrease in discount period* | | 305,131,636 |
| *Benefits paid* | | (618,468,000) |
| Net increase (decrease) | | 851,204,371 |
| Present value of accumulated benefits as of July 1, 2015 | $ | 9,644,623,274 |

**United Actuarial Services, Inc.**

**CONFIDENTIAL**                                          **1974PLAN_002411**

## BENEFIT PAYOUT PROJECTION

Estimated benefit payments for the next forty years, based upon the actuarial assumptions used in the valuation and benefit levels scheduled to take effect during the term of the collective bargaining agreement applicable to the plan (and reflecting expected future accruals for actives), are shown. Future benefit payments will vary from the projections as actual experience differs from the assumed experience for mortality, turnover, retirement, etc.

| Plan Year Beginning July 1, | Expected Benefit Payments | Plan Year Beginning July 1, | Expected Benefit Payments |
|---|---|---|---|
| 2015 | $597,094,210 | 2035 | $ 324,310,419 |
| 2016 | 592,794,562 | 2036 | 307,128,535 |
| 2017 | 586,970,885 | 2037 | 289,791,036 |
| 2018 | 580,285,181 | 2038 | 272,578,301 |
| 2019 | 571,734,601 | 2039 | 255,499,684 |
| 2020 | 561,476,130 | 2040 | 238,824,797 |
| 2021 | 549,375,330 | 2041 | 222,352,679 |
| 2022 | 535,670,589 | 2042 | 206,318,446 |
| 2023 | 521,088,810 | 2043 | 190,813,791 |
| 2024 | 505,621,199 | 2044 | 175,920,778 |
| 2025 | 489,904,512 | 2045 | 161,482,274 |
| 2026 | 473,865,641 | 2046 | 147,788,947 |
| 2027 | 457,596,508 | 2047 | 134,848,319 |
| 2028 | 441,354,149 | 2048 | 122,678,089 |
| 2029 | 424,986,166 | 2049 | 111,343,325 |
| 2030 | 408,678,322 | 2050 | 100,778,836 |
| 2031 | 392,272,089 | 2051 | 91,041,474 |
| 2032 | 375,526,303 | 2052 | 82,014,420 |
| 2033 | 358,576,680 | 2053 | 73,744,712 |
| 2034 | 341,465,398 | 2054 & beyond | 685,248,994 |

**United Actuarial Services, Inc.**

**CONFIDENTIAL**                    1974PLAN_002412

*APPENDICES*

## PLAN HISTORY

### Origins/Purpose

The United Mine Workers of America 1974 Pension Plan was established by the UMWA and the Bituminous Coal Operators' Association, Inc. (BCOA) during the negotiation of the National Bituminous Coal Wage Agreement of 1974. It became effective December 6, 1974 and is the continuation of the benefit program established under the UMWA Welfare and Retirement Fund of 1950. Effective June 30, 2007, it is also the surviving plan following the merger with the United Mine Workers of America 1950 Pension Plan.

The Pension Plan is managed under the provisions of Article XX of the National Bituminous Coal Wage Agreement of 2011, as amended from time to time, by a Board of Trustees consisting of two representatives from the Union and two representatives from the Employers.

The purpose of the Pension Plan is to provide Normal and Early Retirement Benefits, Surviving Spouse Benefits, Disability Benefits, Deferred Vested Benefits, Widow Benefits, and Death Benefits.

### Employer Contributions

The Pension Plan is financed entirely by contributions from the employers as specified in the Collective Bargaining Agreement. Following is a partial listing of hourly pension contribution rates.

| Date | Hourly Contribution Rate |
|------|--------------------------|
| 1/1/2007 | $2.00 |
| 1/1/2008 | $3.50 |
| 1/1/2009 | $4.25 |
| 1/1/2010 | $5.00 |
| 1/1/2011 | $5.50 |
| 12/1/2014 | $5.775 |
| 7/1/2015 | $6.05 |

The employers must also pay a contribution based on tons of "purchased coal". The current rate is $1.21 per ton of "purchased coal".

**United Actuarial Services, Inc.**

## PLAN HISTORY (CONT.)

### Normal Retirement Benefit and Disability Benefit 1974 Pension Plan

Following are the monthly historical normal retirement benefit amounts earned for each year of service for retirements or terminations prior to February 1, 1988:

| Retirement or Termination During: | Credited Non-Signatory Service | Credited Signatory Service | | | |
|---|---|---|---|---|---|
| | | 1st 10 Years | 2nd 10 Years | 3rd 10 Years | In Excess of 30 Years |
| 1/1/1976 to 12/31/1976 | $7.50 | $12.00 | $12.50 | $13.00 | $13.50 |
| 1/1/1977 to  3/26/1978 | $7.50 | $12.50 | $13.00 | $13.50 | $14.00 |
| 3/27/1978 to  6/6/1981 | $7.50 | $13.50 | $14.00 | $14.50 | $15.00 |
| 6/7/1981 to    6/6/1983 | $7.50 | $14.50 | $15.00 | $15.50 | $16.00 |
| 6/7/1983 to  9/30/1984 | $7.50 | $15.50 | $16.00 | $16.50 | $17.00 |
| 10/1/1984 to 9/30/1987 | $7.50 | $16.50 | $17.00 | $17.50 | $18.00 |
| 10/1/1987 to 1/31/1988 | $7.50 | $17.00 | $17.50 | $18.00 | $18.50 |

Following are the monthly historical normal retirement benefit amounts earned for each year of service for retirements or terminations on or after February 1, 1988 (the sum of (a) plus (b) plus (c) plus (d) plus (e)):

| Retirement or Termination During: | Credited Non-Signatory Service (a) | Credited Signatory Service (earned prior to 2/1/1989) (b) | | | |
|---|---|---|---|---|---|
| | | 1st 10 Years | 2nd 10 Years | 3rd 10 Years | In Excess of 30 Years |
| 2/1/1988 to  1/31/1991 | $7.50 | $20.00 | $20.50 | $21.00 | $21.50 |
| 2/1/1991 to 12/15/1993 | $10.00 | $22.50 | $23.00 | $23.50 | $24.00 |
| 12/16/1993 to 8/16/1996* | $10.00 | $26.50 | $27.00 | $27.50 | $28.00 |
| 8/17/1996 to 12/31/1997* | $12.00 | $28.50 | $29.00 | $29.50 | $30.00 |
| 1/1/1998 to 12/31/1999 | $12.00 | $32.50 | $33.00 | $33.50 | $34.00 |
| 1/1/2000 to 12/31/2001 | $14.00 | $34.50 | $35.00 | $35.50 | $36.00 |
| 1/1/2002 to 12/31/2003 | $18.00 | $38.50 | $39.00 | $39.50 | $40.00 |
| 1/1/2004 to 12/31/2005 | $20.00 | $40.50 | $41.00 | $41.50 | $42.00 |
| 1/1/2006 to 12/31/2006 | $24.00 | $44.50 | $45.00 | $45.50 | $46.00 |
| 1/1/2007 to 12/31/2008 | $28.00 | $48.50 | $49.00 | $49.50 | $50.00 |
| 1/1/2009 to 12/31/2010 | $32.00 | $52.50 | $53.00 | $53.50 | $54.00 |
| On or after 1/1/2011 | $34.00 | $54.50 | $55.00 | $55.50 | $56.00 |

\*    Pension application authorized.

**United Actuarial Services, Inc.**

## PLAN HISTORY (CONT.)

| Retirement or Termination During: | Credited Signatory Service (earned from 2/1/1989 through 1/31/1990) (c) | Credited Signatory Service (earned from 2/1/1990 through 12/15/1993) (d) | Credited Signatory Service (earned on or after 12/16/1993) (e) |
|---|---|---|---|
| 2/1/1988 to 1/31/1991 | $27.50 | $32.00 | N/A |
| 2/1/1991 to 12/15/1993 | $30.00 | $34.50 | N/A |
| 12/16/1993 to 8/16/1996* | $34.00 | $38.50 | $41.50 |
| 8/17/1996 to 12/31/1997* | $36.00 | $40.50 | $43.50 |
| 1/1/1998 to 12/31/1999 | $40.00 | $44.50 | $47.50 |
| 1/1/2000 to 12/31/2001 | $42.00 | $46.50 | $49.50 |
| 1/1/2002 to 12/31/2003 | $46.00 | $50.50 | $53.50 |
| 1/1/2004 to 12/31/2005 | $48.00 | $52.50 | $55.50 |
| 1/1/2006 to 12/31/2006 | $52.00 | $56.50 | $59.50 |
| 1/1/2007 to 12/31/2008 | $56.00 | $60.50 | $63.50 |
| 1/1/2009 to 12/31/2010 | $60.00 | $64.50 | $67.50 |
| On or after 1/1/2011 | $62.00 | $66.50 | $69.50 |

\*    Pension application authorized

### Minimum Disability Benefit 1974 Pension Plan

Following are the monthly historical minimum disability retirement benefit amounts, based on date of retirement:

| Retirement Date | Benefit Amount |
|---|---|
| Prior to 3/27/1978 | $125.00 |
| 3/27/1978 to 6/6/1981 | $135.00 |
| 6/7/1981 to 6/6/1983 | $145.00 |
| 6/7/1983 to 9/30/1984 | $155.00 |
| 10/1/1984 to 9/30/1987 | $165.00 |
| 10/1/1987 to 1/31/1988 | $170.00 |
| 2/1/1988 to 1/31/1990 | $190.00 |
| 2/1/1990 to 12/31/1997 | $200.00 |
| 1/1/1998 to 12/31/2001 | $215.00 |
| 1/1/2002 to 12/31/2006 | $230.00 |
| 1/1/2007 to 12/31/2008 | $245.00 |
| On or after 1/1/2009 | $250.00 |

**United Actuarial Services, Inc.**

## PLAN HISTORY (CONT.)

### Pension Benefit Increases 1974 Pension Plan

Following are the monthly benefit increases applied to prior retirements:

A.  Pension increases for participants who retired prior to 2/1/1988, excluding those with a Minimum Disability Retirement pension or those with a Deferred Vested Retirement pension prior to 2/1/1988:

| Effective Date of Increase | Increase Applicable to Retirements Prior to | Amount of Monthly Pension Increase |
|---|---|---|
| 1/1/1977 | 12/31/1976 | $10.00 |
| 4/1/1978 | 3/27/1978 | $10.00 |
| 4/1/1979 | 3/27/1978 | $10.00 |
| 4/1/1980 | 3/27/1978 | $5.00 |
| 7/1/1981 | 6/7/1981 | $10.00 |
| 7/1/1982 | 6/7/1981 | $10.00 |
| 7/1/1983 | 6/7/1981 | $5.00 |
| 10/1/1984 | 10/1/1984 | $10.00 |
| 10/1/1987 | 10/1/1984 | $10.00 |
| 2/1/1988 | 2/1/1988 | $20.00 |
| 2/1/1990 | 2/1/1988 | $10.00 |

B.  Pension increases for participants with a Minimum Disability Retirement pension who retired prior to 2/1/1988:

| Effective Date of Increase | Increase Applicable to Retirements Prior to | Amount of Monthly Pension Increase |
|---|---|---|
| 4/1/1978 | 3/27/1978 | $5.00 |
| 4/1/1979 | 3/27/1978 | $5.00 |
| 4/1/1980 | 3/27/1978 | $2.50 |
| 7/1/1981 | 6/7/1981 | $5.00 |
| 7/1/1982 | 6/7/1981 | $5.00 |
| 7/1/1983 | 6/7/1981 | $2.50 |

| Effective Date of Increase | Increase Applicable to Retirements Prior to | Amount of Monthly Pension |
|---|---|---|
| 10/1/1984 | 10/1/1984 | 160.00 |
| 10/1/1987 | 10/1/1984 | 170.00 * |
| 2/1/1988 | 2/1/1988 | 190.00 |
| 2/1/1990 | 2/1/1988 | 200.00 |
| 1/1/1998 | 1/1/1998 | 215.00 |
| 1/1/2002 | 1/1/2002 | 230.00 |
| 1/1/2007 | 1/1/2007 | 245.00 |
| 1/1/2009 | 1/1/2009 | 250.00 |

*     $165 if approved after October 1, 1984.

United Actuarial Services, Inc.

**CONFIDENTIAL**

Case 1:18-cv-01905-CJN    Document 28    Filed 06/10/19    Page 606 of 1367

JA000601
Appendix A - Plan Provisions
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2015 Actuarial Valuation*

## PLAN HISTORY (CONT.)

C.  Pension increases for pensions for surviving spouses of pensioners (other than deferred vested pensioners not eligible for the Deferred Vested Retirement – Special benefit for increases prior to February 1, 1988) who died prior to February 1, 1988:

| Effective Date of Increase | Increase Applicable to Retirements Prior to | Amount of Monthly Pension Increase |
|---|---|---|
| 10/1/1984 | 10/1/1984 | $5.00 |
| 10/1/1987 | 10/1/1984 | $5.00 |
| 2/1/1988 | 2/1/1988 | (1/31/1988 amount + $10.00) x 1.5 |
| 2/1/1990 | 2/1/1988 | (1/31/1988 amount + $15.00) x 1.5 |

D.  Pensions of participants eligible for a Deferred Vested Retirement – Regular pension who ceased work prior to June 7, 1981, and satisfy the criteria for a Deferred Vested Retirement – Special pension are recomputed (prospectively only) using the ¼% reduction and the Normal Retirement benefit schedule in effect on the last day of credited service. Pension of such participants are increased by any increases applicable to Early Retirement pensioners which occurred after the date of retirement and application for pension.

E.  A monthly benefit increase of $15.00 is provided to all pensioners and surviving spouses in pay status, and to all terminated vested participants (not yet in pay status), on January 1, 1998.

F.  A monthly benefit increase of $15.00 is provided to all pensioners and surviving spouses in pay status, and to all terminated vested participants (not yet in pay status), on January 1, 2002.

G.  A monthly benefit increase of $15.00 is provided to all pensioners and surviving spouses in pay status, and to all terminated vested participants (not yet in pay status), on January 1, 2007.

H.  A monthly benefit increase of $5.00 is provided to all pensioners and surviving spouses in pay status, and to all terminated vested participants (not yet in pay status), on January 1, 2009.

**United Actuarial Services, Inc.**

**CONFIDENTIAL**

**1974PLAN_002418**

Case 1:18-cv-01905-CJN    Document 28    Filed 06/10/19    Page 607 of 1367

JA 000602
Appendix A - Plan Provisions
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2015 Actuarial Valuation*

## PLAN HISTORY (CONT.)

### Normal and 1950 Partial Benefits: 1950 Pension Plan

Following are the monthly historical normal retirement benefit amounts paid:

A. For pensioners with at least 20 years of credited service:

| Period Beginning: | Monthly Benefit | |
|---|---|---|
| | Without Black Lung Benefit | With Black Lung Benefit |
| 1/1/1975 | $200.00 | $200.00 |
| 1/1/1976 | $225.00 | $215.00 |
| 1/1/1977 | $250.00 | $225.00 |
| 4/1/1978 | $275.00 | $275.00 |
| 7/1/1981 | $290.00 | $290.00 |
| 7/1/1982 | $305.00 | $305.00 |
| 7/1/1983 | $315.00 | $315.00 |
| 10/1/1984 | $325.00 | $325.00 |
| 10/1/1987 | $335.00 | $335.00 |
| 2/1/1988 | $365.00 | $365.00 |
| 2/1/1990 | $375.00 | $375.00 |
| 1/1/1998 | $390.00 | $390.00 |
| 1/1/2002 | $405.00 | $405.00 |
| 1/1/2007 | $420.00 | $420.00 |
| 1/1/2009 | $425.00 | $425.00 |

B. For 1950 Partial pensioners with less than 20 years of credited service and terminated vested (need 10 years of signatory service, 3 years of which are after 12/31/1970):

| Period Beginning: | Monthly Benefit Amount to be Multiplied by the Ratio of Years of Credited Signatory Service to 20 Years | |
|---|---|---|
| | Without Black Lung Benefit | With Black Lung Benefit |
| 1/1/1975 | $200.00 | $200.00 |
| 1/1/1976 | $225.00 | $215.00 |
| 1/1/1977 | $250.00 | $225.00 |
| 7/1/1981 | $250.00 | $250.00 |

**United Actuarial Services, Inc.**

**CONFIDENTIAL**

JA 000603

## PLAN HISTORY (CONT.)

### Pension Benefit Increases 1950 Pension Plan

The amounts determined in B. above were increased according to the following schedule:

| Effective Date of Increase | Amount of Monthly Pension Increase |
|---|---|
| 2/1/1988 | $30.00 |
| 2/1/1990 | $10.00 |
| 1/1/1998 | $15.00 |
| 1/1/2002 | $15.00 |
| 1/1/2007 | $15.00 |
| 1/1/2009 | $5.00 |

### Disability Benefit 1950 Pension Plan

Following are the monthly historical Disability Retirement benefit amounts:

| Period Beginning | Monthly Benefit |
|---|---|
| 1/1/1975 | $125.00 |
| 4/1/1978 | $130.00 |
| 4/1/1979 | $135.00 |
| 4/1/1980 | $137.50 |
| 7/1/1981 | $147.50 |
| 7/1/1982 | $152.50 |
| 7/1/1983 | $157.50 |
| 10/1/1984 | $167.50 |
| 10/1/1987 | $177.50 |
| 2/1/1988 | $207.50 |
| 2/1/1990 | $217.50 |
| 1/1/1998 | $232.50 |
| 1/1/2002 | $247.50 |
| 1/1/2007 | $262.50 |
| 1/1/2009 | $267.50 |

CONFIDENTIAL

## PLAN HISTORY (CONT.)

*Widow's Benefit 1950 Pension Plan*

Following are the monthly historical Widow's benefit amounts:

| Period Beginning | Monthly Benefit |
|---|---|
| 3/1/1982 | $95.00 |
| 10/1/1984 | $100.00 |
| 10/1/1987 | $105.00 |
| 2/1/1988 | $120.00 |
| 2/1/1990 | $125.00 |
| 1/1/1998 | $140.00 |
| 1/1/2002 | $155.00 |
| 1/1/2007 | $170.00 |
| 1/1/2009 | $175.00 |

**United Actuarial Services, Inc.**

CONFIDENTIAL

## SUMMARY OF PLAN PROVISIONS 1974 PENSION PLAN

| | |
|---|---|
| **Participation** | Completion of at least 1,000 hours of credited service (or 800 hours of credited service for weekend/holiday crew of a signatory Employer) within a 12-month period after the effective date. |
| **Class of Employee Covered** | All eligible persons retiring on or after December 31, 1975, or becoming totally disabled due to a mine accident on or after December 6, 1974.  New Inexperienced Miners first hired on or after January 1, 2012 (NIMs) will not earn any vesting, signatory, or credited service.  Also, miners who are active participants may opt out of the plan on or after January 1, 2012 (Electing Miners).  After the opt-out date, Electing Miners will earn service credit for vesting and "any early retirement adjustments based on the type of pension benefit," but not signatory or credited service.  NIMs and Electing Miners will be eligible for disability benefits and, if they meet the eligibility requirements, lump sum death benefits. |
| **Year of credited service** | For non weekend and holiday employees (non-signatory and signatory service): |

For non weekend and holiday employees (non-signatory and signatory service):

| Hours Worked | Service |
|---|---|
| 249 or less | 0.00 |
| 250-499 | 0.25 |
| 500-749 | 0.50 |
| 750-999 | 0.75 |
| 1,000 + | 1.00 |

For weekend and holiday employees (signatory service):

| Hours Worked | Service |
|---|---|
| 200 or less | 0.00 |
| 200-399 | 0.25 |
| 400-599 | 0.50 |
| 600-799 | 0.75 |
| 800 + | 1.00 |

**United Actuarial Services, Inc.**

## SUMMARY OF PLAN PROVISIONS 1974 PENSION PLAN (CONT.)

| | |
|---|---|
| **Normal retirement benefit** | |
| *Eligibility* | Earlier of (1) later of age 65 or the 5th anniversary employed in signatory service, (2) age 62 and 10 years of signatory service, or (3) age 62 and at least 20 years of credited service including the required signatory service |
| *Monthly amount* | $34.00 per year of credited non-signatory service, plus $54.50 per year for the 1st 10 years of credited signatory service earned prior to February 1, 1989, plus $55.00 per year for the 2nd 10 years of credited signatory service earned prior to February 1, 1989, plus $55.50 per year for the 3rd 10 years of credited signatory service earned prior to February 1, 1989, plus $56.00 per year for any further years of credited signatory service earned prior to February 1, 1989, plus $62.00 per year of credited signatory service earned from February 1, 1989 through January 31, 1990, plus $66.50 per year of credited signatory service earned from February 1, 1990 through December 15, 1993, plus $69.50 per year of credited signatory service earned on or after December 16, 1993. Payable for life if not married. If married, benefits are payable for life, without reduction, with 75% of the benefit continuing to an eligible spouse after the participant's death. |
| **Age 55 retirement benefit** | |
| *Eligibility* | Age 55 and 10 years of signatory service or 20 years of credited service including the required amount of signatory service |
| *Monthly amount* | Normal reduced by 1/4% for each month prior to age 62. Form of payment same as for Normal Retirement. |

**United Actuarial Services, Inc.**

**CONFIDENTIAL**    **1974PLAN_002423**

## SUMMARY OF PLAN PROVISIONS 1974 PENSION PLAN (CONT.)

**Disability benefit**

*Eligibility*

1974 Participants, NIMs and Electing Miners who have at least 10 years of service. Service is credited service plus, for NIMs and Electing Miners, years of Supplemental Pension Contributions.

*Monthly amount*

Same as normal retirement benefit.

**Minimum disability benefit**

*Eligibility*

1974 Participants, NIMs and Electing Miners who have less than 10 years of service. Service is credited service plus, for NIMs and Electing Miners, years of Supplemental Pension Contributions.

*Monthly amount*

$250 per month.

**Deferred vested benefit - normal**

*Eligibility*

Termination of employee prior to age 55 plus either 5 years of signatory service or 20 years of credited service.

*Monthly amount*

Normal payable at age 62, or actuarially reduced payable at early retirement between age 55 and 62. With 20 years of credited service, there is a minimum monthly benefit of $200. If unmarried, the benefit is payable for the participant's lifetime. If married with at least 20 years of credited service, benefits are payable for life, without reduction, with 75% of the benefit continuing to an eligible spouse after the participant's death. If married with less than 20 years of credited service, a 50% joint and survivor benefit actuarially equivalent to a life annuity is payable.

**United Actuarial Services, Inc.**

**CONFIDENTIAL**

## SUMMARY OF PLAN PROVISIONS 1974 PENSION PLAN (CONT.)

**Deferred vested benefit – enhanced 1996**

*Eligibility*

20 years of signatory service, termination of employment prior to attaining age 55, benefits were not in pay status on or before August 16, 1996, and either had not refused recall to the mine from which he or she was laid off or had been terminated under Article III, Section (j) of the Wage Agreement (or physically unable to perform work) and was not employed in the coal industry thereafter.

*Monthly amount*

Amount and form of payment same as Age 55 retirement benefit.

**Deferred vested benefit – special permanent layoff**

*Eligibility*

20 years of signatory service, termination of employment prior to attaining age 55, and participant was permanently laid off.

*Monthly amount*

Normal payable as if age 55, with 21% reduction payable at any age under 55.  If unmarried, benefit is payable during participant's lifetime.  If married, benefits are payable during participant's lifetime (early retirement reduction only) with 75% of the participant's benefit continuing to an eligible spouse after the participant's death.

**30 and out benefit**

*Eligibility*

30 years of credited service and termination is on or after January 1, 2003.

*Monthly amount*

Amount and form of payment same as Normal retirement benefit.

**Pre-retirement surviving spouse benefit**

*Eligibility*

Death of participant eligible for an immediate pension at time of death, except Deferred Vested participants with less than 20 years of credited service

*Monthly amount*

75% of the pension that the participant would have received had he elected a pension on the day preceding his death.  Payable for life of eligible spouse.

**United Actuarial Services, Inc.**

**CONFIDENTIAL**

**1974PLAN_002425**

Case 1:18-cv-01905-CJN    Document 28    Filed 06/10/19    Page 614 of 1367

JA 000609
*Appendix A - Plan Provisions*
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2015 Actuarial Valuation*

## SUMMARY OF PLAN PROVISIONS 1974 PENSION PLAN (CONT.)

**Pre-retirement joint and survivor annuity**

*Eligibility* — Not eligible for a pre-retirement surviving spouse benefit, but qualifies for a pension under the plan or has 5 years of signatory service

*Monthly amount* — 75% of the pension that the participant would have received had he separated from service on the day of his actual death, and survived to retire at age 55 (or current age at death, if later) and died on the next day. Payable for life of eligible spouse, starting at the later of the first of the month following the date of death or the first of the month following the date the participant would have attained age 55.

**Lump sum death benefit**

*Eligibility* — Death of a regular or disabled pensioner (excluding anyone receiving a deferred vested pension based on less than 20 years of credited service or anyone who is an eligible beneficiary of the UMWA Combined Benefit Fund), an eligible inactive NIM, or an eligible inactive Electing Miner. Last service must have been with an employer signatory to an agreement.

*Lump sum amount* — $5,000

**Special surviving spouse benefit**

*Eligibility* — January 1, 1998, surviving spouse who 1) was married to a miner who died as a result of a mine accident during the term of the 1978 or 1981 Wage Agreement (with 10 years of credited service) and who was not in Construction Industry Service at time of death, 2) never remarried, and 3) never received a monthly surviving spouse benefit.

*Benefit* — Lump sum of $10,000 on February 1, 1998, plus monthly benefit of $100 beginning February 1, 1998, and continuing until remarriage or death.

**CONFIDENTIAL**                                                    **1974PLAN_002426**

## SUMMARY OF PLAN PROVISIONS FORMER 1950 PENSION PLAN

| | |
|---|---|
| **Participation** | Persons who terminated classified work prior to December 31, 1975 or became disabled between May 29, 1946 and December 6, 1974 as a result of a mine accident. |
| **Normal retirement benefit** *Eligibility* | Age 55 with 20 years of credited service including the required signatory service |
| *Monthly amount* | $425 payable for life |
| **Disability benefit** *Eligibility* | Disabled as the result of a mine accident which occurred after May 29, 1946 while in a classified job and eligible for Social Security disability benefits as a result of such accident. |
| *Monthly amount* | $267.50 payable for life |
| **1950 partial pension** *Eligibility* | 10 years of signatory service including at least 3 years after December 31, 1970 |
| *Monthly amount* | $250 multiplied by ratio of years of credited signatory service (to the nearest ¼ year) to 20 years. Payable for life. |
| **Widow's benefit** *Eligibility* | Widow of pensioner receiving benefits under this plan at time of death, who was married to the pensioner throughout nine-month period ending on date of pensioner's death. |
| *Monthly amount* | $175 payable for life, except payment ceases upon remarriage (Note: In limited circumstances, surviving spouses may be entitled to other survivor benefits in lieu of the above. See next section.) |

**United Actuarial Services, Inc.**

## SUMMARY OF PLAN PROVISIONS 1950 PENSION PLAN (CONT.)

| | |
|---|---|
| **Pre-retirement surviving spouse benefit** | |
| *Eligibility* | One hour of service under the 1950 Pension Plan on or after September 2, 1974 and dies on or after July 1, 2011, but prior to receiving his pension. |
| *Monthly amount* | 50% of the pension that the participant would have received had he elected a pension on the day preceding his death.  Payable for life of eligible spouse. |
| **Joint and survivor benefit** | |
| *Eligibility* | One hour of service under the 1950 Pension Plan on or after September 2, 1974 and begins receiving his pension on or after July 1, 2011. |
| *Monthly amount* | In lieu of the Widow's Benefit, an actuarially reduced benefit of which 50% is payable to the eligible spouse. |
| **Lump sum death benefit** | |
| *Eligibility* | Death of a regular or disabled pensioner on or after February 1, 1991, excluding anyone receiving a deferred vested pension based on less than 20 years of credited service and anyone who is an eligible beneficiary of the UMWA Combined Benefit Fund.  Regular pensioners with less than 20 years of credited service who used non-classified service for vesting purposes are not eligible for lump sum death benefits. |
| *Lump sum amount* | $5,000 |

## HISTORICAL PLAN MODIFICATIONS

**Deferred vested benefit – special**
 *Provisions*

This benefit was removed for participants who retire under the 2007 or later Agreements because the benefit had become redundant.

**Special 30-and-out layoff pension**
 *Provisions*

This benefit was removed for participants who retire under the 2007 or later Agreements because the benefit had become redundant.

**Social security supplement**
 *Provisions*

This benefit was deleted for participants who retire under the 2007 or later Agreements because the benefit had expired by its own terms.

**Electing Miners**
 *Provisions*

Miners who are active participants may opt out of the plan on or after January 1, 2012. After the opt-out date, Electing Miners will earn service credit for vesting and any early retirement adjustments based on the type of pension benefit, but not signatory or credited service. Electing Miners will be eligible for normal and minimum disability benefits and, if they meet the eligibility requirements, lump sum death benefits.

**New Inexperienced Miners**
 *Provisions*

New Inexperienced Miners first hired on or after January 1, 2012 will not earn any vesting, signatory, or credited service. New Inexperienced Miners will be eligible for normal and minimum disability benefits and, if they meet the eligibility requirements, lump sum death benefits.

**Lump Sum Death Benefit**

All lump sum death benefits were reduced to $5,000 effective October 28, 2014. **This is the only change which was first recognized in this year's report.**

JA 000613

## ACTUARIAL ASSUMPTIONS

The following assumptions are used throughout this report except as specifically noted herein.

| | |
|---|---|
| **Valuation date** | July 1, 2015 |
| **Interest rates** | |
| *ERISA rate of return used to value liabilities* | 7.8% per year gross of investment expenses and 7.5% per year net of investment expenses |
| *Unfunded vested benefits and ASC 960 accounting* | 2.71% for 20 years, then 2.78% thereafter |
| *Current liability* | 3.34% (in accordance with Section 431(c)(6) of the Internal Revenue Code) |
| **Administrative expenses** | $25,500,000 per year excluding investment expenses |
| **Loading for non-reported vested terminated participants (1950 Plan)** | Terminated vested liabilities increased by 0.6% |
| **Mortality** | |
| *Assumed plan mortality-pre-retirement* | RP-2000 Mortality Table for Blue Collar Male Employees, set forward 2 years and projected using scale MP-2015 (beginning 2012) |
| *Assumed plan mortality-post-retirement* | RP-2000 Mortality Table for Blue Collar Healthy Male Annuitants, set forward 1 year and projected using scale MP-2015 (beginning 2012) |
| *Assumed plan mortality-post-disablement* | RP-2000 Mortality Table for Blue Collar Healthy Male Annuitants, set forward 4 years and projected using scale MP-2015 (beginning 2012) |
| *Assumed plan mortality-spouse/widow* | Unisex Pension 1984 Mortality Table, set back 3 years and projected using scale MP-2015 (beginning 2012) |

**United Actuarial Services, Inc.**

**CONFIDENTIAL**

Case 1:18-cv-01905-CJN    Document 28    Filed 06/10/19    Page 619 of 1367

*Appendix B - Actuarial Assumptions and Methods*
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2015 Actuarial Valuation*

JA 000614

## ACTUARIAL ASSUMPTIONS (CONT.)

| | |
|---|---|
| *Current liability* | Separate annuitant and non-annuitant rates based on the RP-2000 Mortality Tables Report developed for males and females as prescribed by Section 431(c)(6) of the Internal Revenue Code. |
| **Withdrawal** | 125% of the Vaughn Table ultimate rates plus 4% |

| Age | Withdrawal Rate |
|-----|-----------------|
| 20 | .273 |
| 30 | .166 |
| 40 | .121 |
| 50 | .096 |
| 55 | .000 |

Participants terminating before age 55 with at least 20 years of signatory service are assumed to be permanently laid off.

**Disability**     1.5% per year for ages 20 through 64

**Retirement**
*Active lives*     According to the following schedule:

| | Active Participants | | |
|-----|-----|-----|-----|
| Age | Service <30 Years | Service ≥30 Years | Vested Terminations |
| 50-53 | .00 | .13 | .00 |
| 54 | .00 | .20 | .00 |
| 55 | .10 | .38 | .45 |
| 56 | .07 | .34 | .19 |
| 57 | .07 | .30 | .12 |
| 58 | .08 | .30 | .09 |
| 59 | .09 | .30 | .06 |
| 60 | .10 | .30 | .06 |
| 61 | .14 | .35 | .06 |
| 62 | .40 | .70 | 1.00 |
| 63 | .30 | .45 | 1.00 |
| 64 | .60 | .30 | 1.00 |
| 65 | 1.00 | 1.00 | 1.00 |

Resulting in an average expected retirement age of 60.9.

**United Actuarial Services, Inc.**

**CONFIDENTIAL**                                      **1974PLAN_002431**

*Appendix B - Actuarial Assumptions and Methods*
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2015 Actuarial Valuation*

JA 000615

## ACTUARIAL ASSUMPTIONS (CONT.)

**Future service**

| Participant Category | Future Service |
|---|---|
| Active participants who earned a full year of service every calendar year since entry, during the period starting in 1997 | 1.00 year |
| All other active participants | 0.90 year |

Active Electing Miner and NIMs will earn one Year of Supplemental Pension Contributions for each future calendar year until they enter terminated or retired status.

**Entry Age**

Participants with credible past service data: Actual entry age. Category includes participants whose first service credit occurred in 1979 or later at age 45 or younger.

Participants without complete past service data: Assumed to enter at age 24 or present age, if younger.

**Past service**

Participants with credible past service data: Actual service earned to end of calendar year preceding valuation date plus ½ of the assumed future service for the six-month period ending on the valuation date.

Participants without complete past service data: The sum of (a) plus (b) plus (c).
- (a) ½ of the assumed future service for the six-month period ending on the valuation date.
- (b) Actual signatory service credits for calendar years 1977 and later.
- (c) For periods of assumed service prior to 1977, according to the following chart:

| Participant Category | Service |
|---|---|
| Active participants who earned a full year of service every calendar year since entry, during the period starting in 1977 | 1.00 year |
| All other active and terminated participants | 0.85 year |

Past service is not imputed for New Inexperienced Miners

## ACTUARIAL ASSUMPTIONS (CONT.)

| | |
|---|---|
| **Rehire** | Retired, disabled and terminated participants are assumed to be permanently retired or terminated and not assumed to be rehired. |
| **Future hours worked** | 13,350,308 total hours, decreasing 3% each year beginning with the 2016-17 plan year. |
| | The normal cost (excluding expenses) for the current year, which is not directly tied to total hours, was reduced by 15.034% to reflect the anticipated drop in hours worked in the current plan year. |
| **Tons of purchased coal** | 500,000 tons per year |
| **Attained age** | All participants are assumed to be at least 18 years old. All active participants are assumed to be less than 80 years old. Adjustments were made to the data if participants were reported outside those ranges. (If an active participant is reported younger than 18 years old they are adjusted so that their entry age was 18.) |
| **Age of participants with unrecorded birth dates** | Based on average age of the other participants in the same status category |
| **Gender** | All participants, other than surviving spouses, are assumed to be male |
| **Marriage** | 75% assumed married with the male spouse 4 years older than his wife |
| **Inactive vested lives over age 65** | Continuing inactive vested participants over age 65 are assumed deceased and are not valued. |
| **Section 415 limit assumptions** | |
| *Dollar limit* | $210,000 per year |
| *Assumed form of payment for those limited by Section 415* | Qualified joint and 50% survivor annuity |
| **Benefits not valued** | Pre-retirement death benefits following withdrawal and disability for active participants. |

**United Actuarial Services, Inc.**

**CONFIDENTIAL**                    **1974PLAN_002433**

*Appendix B - Actuarial Assumptions and Methods*
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2015 Actuarial Valuation*

JA 000617

## RATIONALE FOR SELECTION OF ACTUARIAL ASSUMPTIONS

The non prescribed actuarial assumptions were selected to provide a reasonable long term estimate of developing experience. The assumptions are reviewed annually, including a comparison to actual experience. The following describes our rationale for the selection of each non-prescribed assumption that has a significant effect on the valuation results.

**ERISA rate of return used to value liabilities**

Future rates of return were modeled based on the Plan's current investment policy asset allocation and composite, long-term capital market assumptions taken from Horizon Actuarial's 2015 survey of investment consultants.

Based on this analysis, we selected a final assumed rate of 7.50%, which we feel is reasonable. This rate may not be appropriate for other purposes such as settlement of liabilities.

**Mortality**

Actual mortality rates were last studied for this plan by the prior actuary, using experience from July 1, 2010 through June 30, 2013 for pre-retirement mortality rates and from July 1, 2008 through June 30, 2013 for postretirement, disabled, spouse, and widow mortality rates. The assumed future mortality rates were selected based on the results of this study. Recent plan experience suggests that these retirement rates are reasonable. We will perform a new study once we have a sufficient amount of historical data.

Projected mortality improvement was determined using scale MP-2015 (beginning in 2012).

**Retirement**

Actual rates of retirement by age were last studied for this plan by the prior actuary, using experience from July 1, 2006 through June 30, 2010 for actives and from July 1, 2005 through June 30, 2010 for vested terminations. The assumed future rates of retirement were selected based on the results of this study. Recent plan experience suggests that these retirement rates are reasonable. We will perform a new study once we have a sufficient amount of historical data.

**United Actuarial Services, Inc.**

**CONFIDENTIAL**

1974PLAN_002434

*Appendix B - Actuarial Assumptions and Methods*
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2015 Actuarial Valuation*

JA 000618

## RATIONALE FOR SELECTION OF ACTUARIAL ASSUMPTIONS (CONT.)

| | |
|---|---|
| **Disability** | Actual disability rates by age were last studied for this plan by the prior actuary, using experience from July 1, 2004 through June 30, 2010.  The assumed future disability rates were selected based on the results of this study.  Recent plan experience suggests that these disability rates are reasonable.  We will perform a new study once we have a sufficient amount of historical data. |
| **Withdrawal** | Actual rates of withdrawal by age were last studied for this plan by the prior actuary, using experience from July 1, 2005 through June 30, 2010.  The assumed future rates of withdrawal were selected based on the results of this study.  Recent plan experience suggests that these withdrawal rates are reasonable.  We will perform a new study once we have a sufficient amount of historical data. |
| **Future hours worked** | Based on review of recent plan experience adjusted for anticipated future changes in workforce. |

**Assumption Changes This Year**

- The assumed hourly contribution rate was increased from $5.50 to $6.05 effective July 1, 2015.
- The rate for purchased tons of coal was increased from $1.10 to $1.21 effective July 1, 2015.
- The assumed yearly future service credit, for active participants without a full year of service in all prior years credit, was increased from 0.75 per year to 0.90 per year to represent our best estimate of future service based on recent plan experience.
- The assumed spouse age difference was changed from 3 years to 4 years to reflect our best estimate of the spouse age difference based on recent plan experience.
- The assumed future hours assumption for the 2015-16 plan year was decreased to 13,350,308 based on the estimated hours provided by the Fund Office.  The normal cost was also reduced to reflect this drop in work hours.
- The assumed projections to the mortality rates were changed from an improvement of 0.75% per year for 15 years at each age between 55 and 99 to the MP-2015 projection scale beginning in 2012 at all ages.  This change was made in order to better reflect anticipated improvements in mortality rates for each future year due to medical advances and lifestyle changes.
- The age at which continuing inactive vested participants are assumed to be deceased was increased from age 63 to age 65.
- The current liability interest rate was changed from 3.59% to 3.34%.  The new rate is within established statutory guidelines.

**United Actuarial Services, Inc.**

**CONFIDENTIAL**

**1974PLAN_002435**

*Appendix B - Actuarial Assumptions and Methods*
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2015 Actuarial Valuation*

## ACTUARIAL ASSUMPTIONS USED FOR PROJECTIONS

The assumptions used for the credit balance and funding ratio projections are the same as used throughout the report with the following exceptions.

**Assumed return on fund assets**

| | |
|---|---|
| *Current year projections* | 7.50% (net 0.3% investment expense) |
| *Prior year projections* | 7.50% (net 0.3% investment expense) |

**Future total hours worked**

| | |
|---|---|
| *Current year projections* | 13,350,308 for the plan year ending 2016 with 3% per year reduction thereafter |
| *Prior year projections* | 18,491,110 for the plan year ending 2015 with 3% per year reduction thereafter |

**Future normal cost**

| | |
|---|---|
| *Current year projections* | 10% reduction per year |
| | The 10% reduction is more than the annual hours decline due to the anticipated shift of the active population to NIMs with very limited benefit accrual. |
| *Prior year projections* | 10% reduction per year |
| | The 10% reduction is more than the annual hours decline due to the anticipated shift of the active population to NIMs with very limited benefit accrual. |

**Contribution Rate Increases**

| | |
|---|---|
| *Current year projections* | None |
| *Prior year projections* | None |

**Plan Changes**

| | |
|---|---|
| *Current year projections* | None |
| *Prior year projections* | None |

**United Actuarial Services, Inc.**

**CONFIDENTIAL**

1974PLAN_002436

## ACTUARIAL METHODS

| | |
|---|---|
| **Funding method**<br>*ERISA funding* | Traditional unit credit cost method, effective July 1, 2009. |
| **Population valued**<br>*Actives* | Eligible employees with a full or partial year of credited service during the preceding calendar year. |
| *Inactive vested* | Vested participants with no hours worked during the preceding plan year. |
| *Retirees* | Participants and beneficiaries in pay status as of the valuation date. |
| **Asset valuation method**<br>*Actuarial value* | Smoothed market value with phase-in effective July 1, 2007.  Each year's gain (or loss) is spread over a period of 5 years.  The actuarial value is limited to not less than 80% and not more than 120% of the actual market value of assets in any plan year. |
| *Unfunded vested benefits* | For the rolling 5 method, market value is used |
| **Pension Relief Act of 2010** | • 10-year smoothing was elected with respect to the loss incurred during the plan year ended in 2009.<br><br>• The 130% cap on actuarial value of assets was elected for the plan year beginning in 2010. |
| **Actuarial Methods Changes This Year** | None |

**United Actuarial Services, Inc.**

**CONFIDENTIAL**          **1974PLAN_002437**

*Appendix C - Minimum Funding Amortization Bases*
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2015 Actuarial Valuation*

| Date Established | Source of Change in Unfunded Liability | Original Amount | Original Period | Remaining Period Years | Remaining Period Months | 7/1/2015 Outstanding Balance | 7/1/2015 Amortization Payment |
|---|---|---|---|---|---|---|---|
| **Charges** | | | | | | | |
| 7/1/1976 | Intl Unfnd Frz AAL | 2,096,144,000 | 40 | 1 | 0 | 151,951,763 | 151,951,763 |
| 7/1/1977 | Benefit Increases | 42,396,000 | 40 | 2 | 0 | 5,961,246 | 3,088,357 |
| 7/1/1978 | Benefit Increases | 164,492,000 | 40 | 3 | 0 | 33,574,349 | 12,009,861 |
| 7/1/1979 | Benefit Increases | 7,492,000 | 40 | 4 | 0 | 1,971,326 | 547,511 |
| 7/1/1980 | Benefit Increases | 3,262,000 | 40 | 5 | 0 | 1,042,549 | 239,703 |
| 7/1/1987 | Benefit Increases | 50,461,000 | 30 | 2 | 0 | 7,756,542 | 4,018,450 |
| 7/1/1988 | Benefit Increases | 767,523,000 | 30 | 3 | 0 | 171,171,178 | 61,229,543 |
| 7/1/1989 | Assumption Changes | 91,845,000 | 30 | 4 | 0 | 26,385,782 | 7,328,313 |
| 7/1/1989 | Benefit Increases | 167,986,000 | 30 | 4 | 0 | 48,233,675 | 13,396,287 |
| 7/1/1990 | Benefit Increases | 87,508,000 | 30 | 5 | 0 | 30,339,833 | 6,975,755 |
| 7/1/1991 | 1950 Assumption Ch | 18,060,000 | 30 | 6 | 0 | 6,750,314 | 1,337,786 |
| 7/1/1991 | 1950 Benefit Incrs | 129,588,000 | 30 | 6 | 0 | 48,464,504 | 9,604,758 |
| 7/1/1991 | Benefit Increases | 285,295,000 | 30 | 6 | 0 | 114,784,956 | 22,748,231 |
| 7/1/1992 | 1950 Assumption Ch | 108,079,000 | 30 | 7 | 0 | 45,617,034 | 8,011,638 |
| 7/1/1993 | 1950 Asset Transfer | 210,000,000 | 30 | 8 | 0 | 98,328,237 | 15,616,081 |
| 7/1/1993 | 1950 Assumption Ch | 88,237,000 | 30 | 8 | 0 | 41,312,589 | 6,561,093 |
| 7/1/1994 | 1950 Benefit Change | 79,702,000 | 30 | 9 | 0 | 40,861,441 | 5,958,821 |
| 7/1/1994 | Benefit Increases | 319,252,000 | 30 | 9 | 0 | 174,433,515 | 25,437,625 |
| 7/1/1995 | 1950 Assumption Ch | 60,136,000 | 30 | 10 | 0 | 33,254,760 | 4,506,745 |
| 7/1/1995 | Assumption Changes | 192,373,000 | 30 | 10 | 0 | 113,072,458 | 15,323,782 |
| 7/1/1997 | 1950 Benefit Change | 173,833,000 | 30 | 12 | 0 | 109,152,410 | 13,126,500 |
| 7/1/1997 | Benefit Increases | 155,332,000 | 30 | 12 | 0 | 102,834,179 | 12,366,679 |
| 7/1/1998 | 1950 Assumption Ch | 35,806,000 | 30 | 13 | 0 | 23,696,767 | 2,712,766 |
| 7/1/1998 | Assumption Changes | 118,380,000 | 30 | 13 | 0 | 82,328,335 | 9,424,810 |
| 7/1/1998 | Benefit Increases | 560,740,000 | 30 | 13 | 0 | 389,930,219 | 44,638,557 |
| 7/1/1999 | Assumption Changes | 4,591,000 | 30 | 14 | 0 | 3,338,259 | 365,803 |
| 7/1/1999 | Benefit Increases | 46,904,000 | 30 | 14 | 0 | 34,069,939 | 3,733,348 |
| 7/1/2000 | Benefit Increases | 43,056,000 | 30 | 15 | 0 | 32,488,352 | 3,423,735 |
| 7/1/2002 | 1950 Assumption Ch | 13,728,000 | 30 | 17 | 0 | 10,693,691 | 1,054,448 |
| 7/1/2002 | 1950 Benefit Change | 22,225,000 | 30 | 17 | 0 | 17,309,405 | 1,706,788 |
| 7/1/2002 | Bnft Incr/Asmp Chg | 520,163,000 | 30 | 17 | 0 | 418,773,384 | 41,293,014 |
| 7/1/2003 | 1950 Assumption Ch | 47,090,000 | 30 | 18 | 0 | 37,888,042 | 3,631,224 |
| 7/1/2003 | Bnft Incr/Asmp Chg | 58,888,000 | 30 | 18 | 0 | 48,739,762 | 4,671,262 |
| 7/1/2004 | 1950 Actuarial Loss | 25,131,000 | 15 | 4 | 0 | 9,357,774 | 2,599,002 |
| 7/1/2004 | Benefit Increases | 27,854,000 | 30 | 19 | 0 | 23,638,031 | 2,207,922 |

Page C-1

**CONFIDENTIAL**                    **1974PLAN_002438**

JA-000622

*Appendix C - Minimum Funding Amortization Bases*
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2015 Actuarial Valuation*

| Date Established | Source of Change in Unfunded Liability | Original Amount | Original Period | Remaining Period Years | Remaining Period Months | 7/1/2015 Outstanding Balance | 7/1/2015 Amortization Payment |
|---|---|---|---|---|---|---|---|
| 7/1/2005 | 1950 Assumption Ch | 10,645,000 | 30 | 20 | 0 | 9,125,442 | 832,683 |
| 7/1/2005 | 1950 Plan Change | 596,000 | 30 | 20 | 0 | 509,725 | 46,512 |
| 7/1/2005 | Benefit Increases | 64,941,000 | 30 | 20 | 0 | 56,357,806 | 5,142,568 |
| 7/1/2006 | 1950 Actuarial Loss | 17,638,000 | 15 | 6 | 0 | 9,387,962 | 1,860,518 |
| 7/1/2006 | 1950 Plan Change | 552,000 | 30 | 21 | 0 | 488,480 | 43,636 |
| 7/1/2006 | Benefit Increases | 62,216,000 | 30 | 21 | 0 | 55,474,228 | 4,955,493 |
| 7/1/2007 | 1950 Actuarial Loss | 2,120,000 | 15 | 7 | 0 | 1,281,870 | 225,133 |
| 7/1/2007 | 1950 Plan Change | 70,692,000 | 30 | 22 | 0 | 63,816,948 | 5,591,366 |
| 7/1/2007 | Benefit Increases | 502,065,000 | 30 | 22 | 0 | 453,208,776 | 39,708,201 |
| 7/1/2008 | Benefit Increases | 40,344,000 | 15 | 8 | 0 | 26,930,985 | 4,277,067 |
| 7/1/2009 | Benefit Increases | 37,307,000 | 15 | 9 | 0 | 27,091,694 | 3,950,779 |
| 7/1/2009 | Funding Method Chg | 1,352,071,000 | 10 | 4 | 0 | 663,513,109 | 184,282,284 |
| 7/1/2010 | Assumption Changes | 13,283,000 | 15 | 10 | 0 | 10,368,785 | 1,405,196 |
| 7/1/2010 | Benefit Increases | 15,500,000 | 15 | 10 | 0 | 12,101,467 | 1,640,013 |
| 7/1/2011 | Actuarial Loss | 247,154,000 | 15 | 11 | 0 | 205,410,620 | 26,120,105 |
| 7/1/2011 | Benefit Increases | 13,818,000 | 15 | 11 | 0 | 11,484,538 | 1,460,379 |
| 7/1/2012 | Actuarial Loss | 223,191,000 | 15 | 12 | 0 | 195,948,317 | 23,564,440 |
| 7/1/2013 | Actuarial Loss | 39,483,000 | 15 | 13 | 0 | 36,379,413 | 4,164,654 |
| 7/1/2013 | Benefit Increases | 23,701,000 | 15 | 13 | 0 | 21,838,378 | 2,500,021 |
| 7/1/2015 | Assumption Changes | 172,525,502 | 15 | 15 | 0 | 172,525,502 | 18,181,337 |
| 7/1/2015 | Experience Loss | 66,743,121 | 15 | 15 | 0 | 66,743,121 | 7,033,622 |

*Total Charges:* **4,639,493,766    859,833,968**

United Actuarial Services, Inc.

**CONFIDENTIAL**                    **1974PLAN_002439**

JA-000623

*Appendix C - Minimum Funding Amortization Bases*
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2015 Actuarial Valuation*

| Date Established | Source of Change in Unfunded Liability | Original Amount | Original Period | Remaining Period Years | Remaining Period Months | 7/1/2015 Outstanding Balance | 7/1/2015 Amortization Payment |
|---|---|---|---|---|---|---|---|
| **Credits** | | | | | | | |
| 7/1/1979 | Assumption Changes | 12,011,000 | 40 | 4 | 0 | 3,164,473 | 878,892 |
| 7/1/1988 | Assumption Changes | 460,737,000 | 30 | 3 | 0 | 102,750,248 | 36,754,732 |
| 7/1/1990 | 1950 Assumption Ch | 18,772,000 | 30 | 5 | 0 | 6,054,586 | 1,392,075 |
| 7/1/1991 | Assumption Changes | 40,246,000 | 30 | 6 | 0 | 16,189,863 | 3,208,528 |
| 7/1/1993 | 1950 Term. Of Covg | 86,219,000 | 30 | 8 | 0 | 40,373,216 | 6,411,906 |
| 7/1/1993 | Term. Of Coverage | 18,492,000 | 30 | 8 | 0 | 9,280,881 | 1,473,951 |
| 7/1/1994 | 1950 Assumption Ch | 94,625,000 | 30 | 9 | 0 | 48,512,192 | 7,074,529 |
| 7/1/1996 | 1950 Assumption Ch | 12,942,000 | 30 | 11 | 0 | 7,656,359 | 973,586 |
| 7/1/1999 | 1950 Assumption Ch | 31,363,000 | 30 | 14 | 0 | 21,791,988 | 2,387,943 |
| 7/1/2000 | 1950 Assumption Ch | 22,441,000 | 30 | 15 | 0 | 16,266,556 | 1,714,226 |
| 7/1/2000 | Assumption Changes | 67,650,000 | 30 | 15 | 0 | 51,034,536 | 5,378,197 |
| 7/1/2001 | Assumption Changes | 4,326,000 | 30 | 16 | 0 | 3,372,956 | 343,229 |
| 7/1/2003 | 1950 Actuarial Gain | 35,840,000 | 15 | 3 | 0 | 10,238,113 | 3,662,270 |
| 7/1/2004 | 1950 Assumtion Chg | 16,250,000 | 30 | 19 | 0 | 13,526,101 | 1,263,412 |
| 7/1/2004 | Assumption Changes | 126,541,000 | 30 | 19 | 0 | 107,372,644 | 10,029,194 |
| 7/1/2005 | 1950 Actuarial Gain | 12,303,000 | 15 | 5 | 0 | 5,583,489 | 1,283,759 |
| 7/1/2006 | 1950 Assumption Ch | 22,227,000 | 30 | 21 | 0 | 19,606,877 | 1,751,476 |
| 7/1/2006 | Funding Method Chg | 316,469,000 | 10 | 1 | 0 | 43,297,987 | 43,297,987 |
| 7/1/2007 | Funding Method Chg | 469,970,000 | 10 | 2 | 0 | 123,949,117 | 64,214,602 |
| 7/1/2007 | Funding Method Chg | 353,477,000 | 10 | 2 | 0 | 93,227,373 | 48,298,518 |
| 7/1/2008 | Assumption Changes | 180,156,000 | 15 | 8 | 0 | 120,257,485 | 19,098,793 |
| 7/1/2010 | Actuarial Gain | 239,507,000 | 15 | 10 | 0 | 186,960,799 | 25,337,263 |
| 7/1/2010 | Funding Method Chg | 376,915,000 | 10 | 5 | 0 | 223,164,846 | 51,310,210 |
| 7/1/2013 | Assumption Changes | 74,715,000 | 15 | 13 | 0 | 68,841,868 | 7,880,901 |
| 7/1/2014 | Assumption Changes | 72,299,704 | 15 | 14 | 0 | 69,531,548 | 7,619,194 |
| 7/1/2014 | Experience Gain | 11,423,168 | 15 | 14 | 0 | 10,985,807 | 1,203,813 |
| 7/1/2015 | Amendment | 59,437,160 | 15 | 15 | 0 | 59,437,160 | 6,263,694 |
| | | | | | ***Total Credits:*** | 1,482,429,068 | 360,506,880 |

United Actuarial Services, Inc.

**CONFIDENTIAL**          **1974PLAN_002440**

JA-000624

*Appendix C - Minimum Funding Amortization Bases*
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2015 Actuarial Valuation*

| Date Established | Source of Change in Unfunded Liability | Original Amount | Original Period | Remaining Period | | 7/1/2015 Outstanding Balance | 7/1/2015 Amortization Payment |
|---|---|---|---|---|---|---|---|
| | | | | Years | Months | | |
| | | | | *Net Charges:* | | **3,157,064,698** | **499,327,088** |
| | | | | | | | |
| | | | | *Less Credit Balance:* | | 1,102,344,156 | |
| | | | | *Less Reconciliation Balance:* | | 0 | |
| | | | | *Unfunded Actuarial Liability:* | | **2,054,720,542** | |

United Actuarial Services, Inc.

**CONFIDENTIAL**                    **1974PLAN_002441**

## RULES FOR ENDANGERED AND CRITICAL STATUS

### Background

The Pension Protection Act of 2006 ("PPA"), enacted in August 2006, established special rules for plans in "Endangered" or "Critical" status.  These rules became effective with the plan year beginning in 2008 and were originally scheduled to "sunset" in 2015.

The Multiemployer Pension Reform Act of 2014 ("MPRA"), enacted in December 2014, made the provisions contained in the PPA permanent.  MPRA also made numerous changes to the PPA rules, including adding a new status for deeply troubled plans: Critical and Declining.

Informally, Critical Status is often referred to as "red zone" and Endangered Status as "yellow zone."  A plan that is neither Critical nor Endangered is said to be "green zone."

### Criteria for Endangered and Critical

The table below summarizes the criteria for these categorizations.   Projected deficiencies are calculated as of the last day of each plan year and are based on contribution rates codified in bargaining agreements and, if applicable, wage allocations.

| *Critical Status ("Red Zone")* | *Endangered Status ("Yellow Zone")* |
|---|---|
| **GETTING IN:** ||
| Plan is Critical if it is described in one or more of the following:<br><br>• Funded percentage is less than 65%, and, inability to pay benefits and expenses for next 7 years, or<br><br>• Projected funding deficiency (not recognizing extensions) in the current year or next 3 years (next 4 years if funded at less than 65%), or<br><br>• (1) Contributions are less than current year costs (i.e. "normal cost") plus interest on any unfunded past liabilities, and, (2) value of vested benefits for non-actives is greater than for actives, and, (3) projected funding deficiency (not recognizing extensions) in the current year or next 4 years, or<br><br>• Inability to pay benefits and expenses for next 5 years. | Plan is Endangered if it is not Critical and it is described in one of the following:<br><br>• Funded percentage is less than 80%, or<br><br>• Projected funding deficiency in the current year or next 6 years.<br><br>A non-critical plan that meets both of the preceding criteria is considered "Seriously Endangered"<br><br>A plan that meets one of the two Endangered Status criteria above, but was not in Critical or Endangered for the preceding year, will remain not Critical or Endangered (i.e. it will be in "green zone") provided it is not projected to meet either of the two Endangered Status criteria as of the end of the 10th plan year following the certification year |

## RULES FOR ENDANGERED AND CRITICAL STATUS (CONT.)

| Critical Status ("Red Zone") | Endangered Status ("Yellow Zone") |
|---|---|

| GETTING IN (cont.): | |
|---|---|
| A plan with an amortization extension under IRC Section 431(d) or 412(e) that previously emerged from Critical Status in PYB 2015 or later will re-enter Critical Status only if it is described in one of the following:<br><br>• Projected funding deficiency in the current year or next 9 years (including amortization extensions), or,<br><br>• Projected insolvency within the next 30 years | |

| GETTING OUT: | |
|---|---|
| Plan emerges from Critical Status when it meets all of the following:<br><br>• No longer meets any of the Critical Status tests, and,<br><br>• No projected funding deficiencies in the current year or next 9 years (including amortization extensions), and,<br><br>• No projected insolvencies in the next 30 years<br><br>A plan with an amortization extension under IRC Section 431(d) or 412(e) emerges from Critical Status when it meets all the following:<br><br>• No projected funding deficiencies in the current year or next 9 years (including amortization extensions), and,<br><br>• No projected insolvencies in the next 30 years | Plan emerges from Endangered Status when it no longer meets the requirements to be classified as Endangered or when it enters Critical Status |

**United Actuarial Services, Inc.**

Case 1:18-cv-01905-CJN   Document 28   Filed 06/10/19   Page 632 of 1367

JA 000627

*Appendix D – Summary of Endangered and Critical Status Rules*
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2015 Actuarial Valuation*

## RULES FOR ENDANGERED AND CRITICAL STATUS (CONT.)

### Restrictions for Endangered and Critical Plans

The Plan Sponsor of a plan that is in Endangered or Critical status faces a number of restrictions in plan improvements that can be adopted and bargaining agreements that can be accepted.

| Period | Endangered/Critical Restrictions |
|---|---|
| Date of first certification through adoption of funding improvement/rehabilitation plan ("plan adoption period") | • No reduction in level of contributions for any participants<br>• No suspension of contributions<br>• No exclusion of new or younger employees<br>• No amendment that increases the <u>liabilities</u> of the plan by reason of any increase in benefits, change in accrual, or change in vesting unless required by law |
| After adoption of a funding improvement/rehabilitation plan until end of funding improvement/rehabilitation period | • Cannot be amended so as to be inconsistent with funding improvement/rehabilitation plan<br>• No amendment that increases benefits, including future accruals, unless actuary certifies as being paid for with contributions not contemplated in funding improvement/rehabilitation plan and still expected to meet applicable benchmark after considering the amendment |

**Additionally, Critical status plans cannot pay benefits greater than the single life annuity once the initial red zone notice is sent unless the benefit is eligible for automatic cash-out.**

### Critical and Declining Plans

Beginning in 2015, plans that are in Critical Status and are projecting insolvency within the next 15 years (20 years in some circumstances) are certified by the actuary as being in "Critical and Declining" Status. These plans may have access to new tools that will allow them to reduce many previously-untouchable benefits, including benefits for participants in pay status. However, these expanded benefit reductions require government approval, must <u>not</u> be rejected by a majority of all participants through a vote, and are subject to a number of other requirements and limitations.

### Selected Other MPRA Changes (effective with 2015 plan years)

• Plans projected to be Critical within the next 5 years can elect to be in Critical Status immediately
• New contribution rate increases required by a funding improvement or rehabilitation plan are not considered in calculating an employer's withdrawal liability or payment schedule
• If, upon the expiration of a collective bargaining agreement under a funding improvement or rehabilitation plan, bargaining parties do not adopt a new agreement consistent with an updated schedule, the Plan Sponsor must implement the update to the schedule previously adopted.
• PBGC premium doubled and indexed
• PBGC ability to facilitate mergers and partitions expanded

**United Actuarial Services, Inc.**

Case 1:18-cv-01905-CJN    Document 28    Filed 06/10/19    Page 633 of 1367

*Appendix E – Glossary of Common Pension Terms*
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2015 Actuarial Valuation*

JA 000628

## GLOSSARY OF COMMON PENSION TERMS

### Benefits

**Accrued Benefit:** A benefit that an employee has earned (or accrued) through past participation in the plan. It is the amount payable at normal retirement age.

*Why it matters: Under the law, Accrued Benefits generally may not be reduced by plan amendment (note that special rules allowing for limited reduction and/or suspension of accrued benefits apply to critical status, critical and declining status and insolvent plans).*

**Actuarial Equivalence:** Given a set of actuarial assumptions, when two different sets of payment scenarios have an equal present value.

**Early Retirement Reduction Factor:** A retirement benefit that begins before normal retirement age may be reduced. The plan document defines the amount of the reduction by formula or a table of factors. This reduction may or may not be actuarially equivalent, but its present value can be no less than actuarially equivalent to the benefit payable at normal retirement age.

**Benefit Crediting (Accrual) Rate:** A general reference to the calculation of the amount of monthly retirement benefit earned per dollar contributed or per year or hour worked.

### Assets

**Market Value of Assets:** The market value of all assets in the fund including on an accrued, not cash basis (matching the plan audit).

**Actuarial Value of Assets:** The amount of assets recognized for actuarial valuation purposes. Recent changes in market value may be partially recognized (there are variations allowed on the exact recognition). Generally the actuarial value is limited to not be less than 80% or more than 120% of the market value.

*Why it matters: Many funding calculations use this "smoothed" asset value method to lessen the impact of volatility in the market value of plan assets.*

**Assumed Rate of Return**: Long term assumption of the rate of return on assets based upon the diversification mix of invested assets.

*Why it matters: This assumption is used in calculating the present values discussed in the Liabilities section below. The Assumed Rate of Return has an inverse relationship with plan liabilities. In other words, a lower Assumed Rate of Return increases liabilities, while a higher Assumed Rate of Return decreases plan Liabilities.*

**United Actuarial Services, Inc.**

**CONFIDENTIAL**                                    **1974PLAN_002445**

Case 1:18-cv-01905-CJN    Document 28    Filed 06/10/19    Page 634 of 1367

JA 000629

*Appendix E – Glossary of Common Pension Terms*
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2015 Actuarial Valuation*

## GLOSSARY OF COMMON PENSION TERMS (CONT.)

*Liabilities*

**Present Value of Accrued Benefits:** The discounted value of benefit payments due in the future but based only on the current Accrued Benefits of each participant. The value is based on actuarial assumptions including an assumed rate of investment return.

*Why it matters: This liability is one of the primary factors in determining a plan's annual PPA funded status (see Funded Ratio).*

**Present Value of Vested Benefits:** The discounted value of Accrued Benefits that are considered vested (non-forfeitable). Benefits that are not vested include those of participants who have not satisfied the plan vesting requirement (usually five years of service). In addition under the law some death and temporary disability benefits are also considered non-vested regardless of service because they are not considered protected benefits.

*Why it matters: This liability is the primary driver of a plan's Employer Withdrawal Liability.*

**Actuarial (Accrued) Liability:** For inactive members this is the same as the Present Value of Accrued Benefits above. For active members this depends on the cost method selected by the actuary. Under the accrued benefit or traditional unit credit cost method this is also the same as the Present Value of Accrued Benefits. Under other cost methods (including most commonly entry age normal) this represents an alternate allocation of projected benefit cost over the working lifetime of active members. Under the entry age normal cost method, the active Actuarial Liability is larger than the Present Value of Accrued Benefits.

**Unfunded Actuarial Liability:** The Actuarial Liability less the Actuarial Value of Assets.

**Current Liability:** This is similar to the Present Value of Accrued Benefits, but uses a statutory, significantly lower, interest rate (equivalent to an expected rate of return on a bond only-type portfolio) and statutory mortality tables. The lower interest rate means that Current Liability tends to be significantly higher than the Present Value of Accrued Benefits. This number has very little impact on multiemployer plans.

**Normal Cost:** The present value of all benefits that are expected to accrue or to be earned under the plan during the plan year. The way in which a benefit is considered to be earned varies with the actuarial cost method.

**United Actuarial Services, Inc.**

Case 1:18-cv-01905-CJN     Document 28     Filed 06/10/19     Page 635 of 1367

*Appendix E – Glossary of Common Pension Terms*
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2015 Actuarial Valuation*

JA 000630

## GLOSSARY OF COMMON PENSION TERMS (CONT.)

### Funding

**Funded Ratio (Funded Percentage):** Present Value of Accrued Benefits divided by the Actuarial Value of Assets.  This is one of two key measures used to determine a plan's annual PPA funded status. This may also be referred to as PPA Funded Ratio. This must be greater than 80% to avoid endangered status.

**Credit Balance:** The accumulated excess of actual contributions over legally required minimum contributions as maintained in the funding standard account. The funding standard account is maintained by the actuary in the valuation process and reported annually in schedule MB to the Form 5500 filing.

**Accumulated Funding Deficiency:** A negative credit balance, indicating an excess of total charges to the funding standard account over the total credits to such account. Prior to PPA, an accumulated funding deficiency caused an immediate excise tax (waiver under PPA if certain conditions are met). After PPA, a current or projected funding deficiency is one of the two main criteria used in determining the annual PPA status. It can eventually trigger an excise tax levied on contributing employers.

**Funding Period:** The estimated number of years it would take to pay off the Plan's unfunded liabilities (and be 100% funded).  This calculation is based on the entry age normal liability basis. This is determined by taking the excess of expected contributions over expected normal cost and comparing it to the unfunded entry age accrued liability. This is a good single measure of plan health that looks at both current levels of funding and future expectations.  It is also a good indicator of the level of risk the plan is taking in funding its future benefits.

### Withdrawal Liability

**Unfunded Vested Benefits (UVB):** Present Value of Vested Benefits less the value of plan assets determined on either an actuarial or market value basis. The selection of asset measurement is part of the withdrawal liability method of the Plan.

**Employer Withdrawal Liability (EWL):** An employer that withdraws from a multiemployer plan is liable for its proportionate share of Unfunded Vested Benefits, determined as of the date of withdrawal.

CONFIDENTIAL                      1974PLAN_002447

| **Form 5500**<br>Department of the Treasury<br>Internal Revenue Service<br><br>Department of Labor<br>Employee Benefits Security<br>Administration<br><br>Pension Benefit Guaranty Corporation | **Annual Return/Report of Employee Benefit Plan**<br><br>This form is required to be filed for employee benefit plans under sections 104 and 4065 of the Employee Retirement Income Security Act of 1974 (ERISA) and sections 6047(e), 6057(b), and 6058(a) of the Internal Revenue Code (the Code).<br><br>▶ **Complete all entries in accordance with the instructions to the Form 5500.** | OMB Nos. 1210-0110<br>1210-0089<br><br>**2015**<br><br>**This Form is Open to Public Inspection** |

## Part I    Annual Report Identification Information

For calendar plan year 2015 or fiscal plan year beginning  07/01/2015          and ending  06/30/2016

**A** This return/report is for:

- [X] a multiemployer plan;
- [ ] a multiple-employer plan (Filers checking this box must attach a list of participating employer information in accordance with the form instructions); or
- [ ] a single-employer plan;
- [ ] a DFE (specify) ___

**B** This return/report is:

- [ ] the first return/report;
- [ ] the final return/report;
- [ ] an amended return/report;
- [ ] a short plan year return/report (less than 12 months).

**C** If the plan is a collectively-bargained plan, check here. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ [X]

**D** Check box if filing under:
- [X] Form 5558;
- [ ] automatic extension;
- [ ] the DFVC program;
- [ ] special extension (enter description)

## Part II    Basic Plan Information—enter all requested information

| **1a** Name of plan<br>UNITED MINE WORKERS OF AMERICA 1974 PENSION PLAN | **1b** Three-digit plan number (PN) ▶ 002 |
| --- | --- |
| | **1c** Effective date of plan<br>12/06/1974 |

| **2a** Plan sponsor's name (employer, if for a single-employer plan)<br>Mailing address (include room, apt., suite no. and street, or P.O. Box)<br>City or town, state or province, country, and ZIP or foreign postal code (if foreign, see instructions)<br><br>UMWA 1974 PENSION TRUST BOARD OF TRUSTEES<br><br><br>2121 K STREET N.W. SUITE 350<br>WASHINGTON, DC 20037-1879 | **2b** Employer Identification Number (EIN)<br>52-1050282 |
| --- | --- |
| | **2c** Plan Sponsor's telephone number<br>800-291-1425 |
| | **2d** Business code (see instructions)<br>525920 |

**Caution: A penalty for the late or incomplete filing of this return/report will be assessed unless reasonable cause is established.**

Under penalties of perjury and other penalties set forth in the instructions, I declare that I have examined this return/report, including accompanying schedules, statements and attachments, as well as the electronic version of this return/report, and to the best of my knowledge and belief, it is true, correct, and complete.

| SIGN HERE | Filed with authorized/valid electronic signature. | 04/11/2017 | MICHAEL H. HOLLAND, TRSUTEE |
| --- | --- | --- | --- |
| | Signature of plan administrator | Date | Enter name of individual signing as plan administrator |
| SIGN HERE | | | |
| | Signature of employer/plan sponsor | Date | Enter name of individual signing as employer or plan sponsor |
| SIGN HERE | | | |
| | Signature of DFE | Date | Enter name of individual signing as DFE |

| Preparer's name (including firm name, if applicable) and address (include room or suite number) | Preparer's telephone number |
| --- | --- |
| | |

**For Paperwork Reduction Act Notice and OMB Control Numbers, see the instructions for Form 5500.**

Form 5500 (2015)
v. 150123

Form 5500 (2015)                                                                 Page **2**                                JA 000632

| 3a | Plan administrator's name and address ☒ Same as Plan Sponsor | **3b** Administrator's EIN |
| --- | --- | --- |
| | | **3c** Administrator's telephone number |

| 4 | If the name and/or EIN of the plan sponsor has changed since the last return/report filed for this plan, enter the name, EIN and the plan number from the last return/report: | **4b** EIN |
| --- | --- | --- |
| a | Sponsor's name | **4c** PN |

| 5 | Total number of participants at the beginning of the plan year | **5** | 103323 |
| --- | --- | --- | --- |
| 6 | Number of participants as of the end of the plan year unless otherwise stated (welfare plans complete only lines **6a(1)**, **6a(2)**, **6b**, **6c**, and **6d**). | | |
| a(1) | Total number of active participants at the beginning of the plan year............................................ | **6a(1)** | 7324 |
| a(2) | Total number of active participants at the end of the plan year ................................................... | **6a(2)** | 6084 |
| b | Retired or separated participants receiving benefits....................................................................... | **6b** | 61161 |
| c | Other retired or separated participants entitled to future benefits.................................................. | **6c** | 5402 |
| d | Subtotal. Add lines **6a(2)**, **6b**, and **6c**. ....................................................................................... | **6d** | 72647 |
| e | Deceased participants whose beneficiaries are receiving or are entitled to receive benefits........... | **6e** | 27111 |
| f | Total.  Add lines **6d** and **6e**. ......................................................................................................... | **6f** | 99758 |
| g | Number of participants with account balances as of the end of the plan year (only defined contribution plans complete this item)... | **6g** | |
| h | Number of participants that terminated employment during the plan year with accrued benefits that were less than 100% vested | **6h** | |
| 7 | Enter the total number of employers obligated to contribute to the plan (only multiemployer plans complete this item) ........ | **7** | 42 |

**8a** If the plan provides pension benefits, enter the applicable pension feature codes from the List of Plan Characteristics Codes in the instructions:
1B

**b** If the plan provides welfare benefits, enter the applicable welfare feature codes from the List of Plan Characteristics Codes in the instructions:

| **9a** | Plan funding arrangement (check all that apply) | | **9b** | Plan benefit arrangement (check all that apply) | |
| --- | --- | --- | --- | --- | --- |
| (1) | ☐ | Insurance | (1) | ☐ | Insurance |
| (2) | ☐ | Code section 412(e)(3) insurance contracts | (2) | ☐ | Code section 412(e)(3) insurance contracts |
| (3) | ☒ | Trust | (3) | ☒ | Trust |
| (4) | ☐ | General assets of the sponsor | (4) | ☐ | General assets of the sponsor |

**10** Check all applicable boxes in 10a and 10b to indicate which schedules are attached, and, where indicated, enter the number attached.  (See instructions)

| **a** | Pension Schedules | | | **b** | General Schedules | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| (1) | ☒ | **R**  (Retirement Plan Information) | | (1) | ☒ | **H**  (Financial Information) | |
| (2) | ☒ | **MB**  (Multiemployer Defined Benefit Plan and Certain Money Purchase Plan Actuarial Information) - signed by the plan actuary | | (2) | ☐ | **I**  (Financial Information – Small Plan) | |
| | | | | (3) | ___ | **A**  (Insurance Information) | |
| | | | | (4) | ☒ | **C**  (Service Provider Information) | |
| (3) | ☐ | **SB**  (Single-Employer Defined Benefit Plan Actuarial Information) - signed by the plan actuary | | (5) | ☒ | **D**  (DFE/Participating Plan Information) | |
| | | | | (6) | ☐ | **G**  (Financial Transaction Schedules) | |

1974PLAN_001608

| Part III | Form M-1 Compliance Information (to be completed by welfare benefit plans) |
|----------|---------------------------------------------------------------------------|

**11a** If the plan provides welfare benefits, was the plan subject to the Form M-1 filing requirements during the plan year? (See instructions and 29 CFR 2520.101-2.) ..........................………..… ☐ Yes   ☐ No

If "Yes" is checked, complete lines 11b and 11c.

**11b** Is the plan currently in compliance with the Form M-1 filing requirements? (See instructions and 29 CFR 2520.101-2.) ………... ☐ Yes   ☐ No

**11c** Enter the Receipt Confirmation Code for the 2015 Form M-1 annual report.  If the plan was not required to file the 2015 Form M-1 annual report, enter the Receipt Confirmation Code for the most recent Form M-1 that was required to be filed under the Form M-1 filing requirements. (Failure to enter a valid Receipt Confirmation Code will subject the Form 5500 filing to rejection as incomplete.)

Receipt Confirmation Code_____

| SCHEDULE MB<br>(Form 5500)<br><br>Department of the Treasury<br>Internal Revenue Service<br>Department of Labor<br>Employee Benefits Security Administration<br>Pension Benefit Guaranty Corporation | Multiemployer Defined Benefit Plan and Certain<br>Money Purchase Plan Actuarial Information<br><br>This schedule is required to be filed under section 104 of the Employee Retirement Income Security Act of 1974 (ERISA) and section 6059 of the Internal Revenue Code (the Code).<br><br>▶ File as an attachment to Form 5500 or 5500-SF. | OMB No. 1210-0110<br><br>**2015**<br><br>**This Form is Open to Public Inspection** |
|---|---|---|

For calendar plan year 2015 or fiscal plan year beginning     07/01/2015     and ending     06/30/2016

▶ **Round off amounts to nearest dollar.**

▶ **Caution:** A penalty of $1,000 will be assessed for late filing of this report unless reasonable cause is established.

| **A** Name of plan<br>UNITED MINE WORKERS OF AMERICA 1974 PENSION PLAN | **B** Three-digit<br>plan number (PN)    ▶    002 |
|---|---|

| **C** Plan sponsor's name as shown on line 2a of Form 5500 or 5500-SF<br>UMWA 1974 PENSION TRUST BOARD OF TRUSTEES | **D** Employer Identification Number (EIN)<br>52-1050282 |
|---|---|

**E** Type of plan:    **(1)** ☒ Multiemployer Defined Benefit    **(2)** ☐ Money Purchase (see instructions)

**1a** Enter the valuation date:        Month  07        Day  01        Year  2015

**b** Assets

| | | | |
|---|---|---|---|
| **(1)** Current value of assets ............................................................. | **1b(1)** | | 3808170000 |
| **(2)** Actuarial value of assets for funding standard account ............... | **1b(2)** | | 4111939936 |

**c** **(1)** Accrued liability for plan using immediate gain methods .........................................    **1c(1)**    6166660478

**(2)** Information for plans using spread gain methods:

| | | |
|---|---|---|
| **(a)** Unfunded liability for methods with bases............................................ | **1c(2)(a)** | |
| **(b)** Accrued liability under entry age normal method.................................... | **1c(2)(b)** | |
| **(c)** Normal cost under entry age normal method.......................................... | **1c(2)(c)** | |

**(3)** Accrued liability under unit credit cost method ........................................    **1c(3)**    6166660478

**d** Information on current liabilities of the plan:

**(1)** Amount excluded from current liability attributable to pre-participation service (see instructions)............    **1d(1)**

**(2)** "RPA '94" information:

| | | |
|---|---|---|
| **(a)** Current liability ................................................................................ | **1d(2)(a)** | 9575710282 |
| **(b)** Expected increase in current liability due to benefits accruing during the plan year .......................... | **1d(2)(b)** | 40112865 |
| **(c)** Expected release from "RPA '94" current liability for the plan year ................................................ | **1d(2)(c)** | 607474500 |

**(3)** Expected plan disbursements for the plan year ........................................    **1d(3)**    617619324

**Statement by Enrolled Actuary**

To the best of my knowledge, the information supplied in this schedule and accompanying schedules, statements and attachments, if any, is complete and accurate. Each prescribed assumption was applied in accordance with applicable law and regulations. In my opinion, each other assumption is reasonable (taking into account the experience of the plan and reasonable expectations) and such other assumptions, in combination, offer my best estimate of anticipated experience under the plan.

| **SIGN HERE** | | 01/13/2017 |
|---|---|---|
| | Signature of actuary | Date |
| | WILLIAM J. RUSCHAU, EA FSA, MAAA | 14-03137 |
| | Type or print name of actuary | Most recent enrollment number |
| | UNITED ACTUARIAL SERVICES, INC. | 614-264-4762 |
| | Firm name | Telephone number (including area code) |
| | 11590 N. MERIDIAN STREET, SUITE 610, CARMEL, IN 46032-4529 | |
| | Address of the firm | |

If the actuary has not fully reflected any regulation or ruling promulgated under the statute in completing this schedule, check the box and see instructions    ☐

For Paperwork Reduction Act Notice and OMB Control Numbers, see the instructions for Form 5500 or Form 5500-SF.        Schedule MB (Form 5500) 2015
v. 150123

Schedule MB (Form 5500) 2015                                   Page 2- 1

**2** Operational information as of beginning of this plan year:

**a** Current value of assets (see instructions) ........................................... | **2a** | 3808170000

**b** "RPA '94" current liability/participant count breakdown:

| | | (1) Number of participants | (2) Current liability |
|---|---|---|---|
| (1) | For retired participants and beneficiaries receiving payment ..................... | 89737 | 8103574429 |
| (2) | For terminated vested participants ................................................ | 6262 | 594748101 |
| (3) | For active participants: | | |
| (a) | Non-vested benefits ............................................................. | | 35945441 |
| (b) | Vested benefits ................................................................. | | 841442311 |
| (c) | Total active ................................................................... | 8259 | 877387752 |
| (4) | Total .......................................................................... | 104258 | 9575710282 |

**c** If the percentage resulting from dividing line 2a by line 2b(4), column (2), is less than 70%, enter such percentage ........................................... | **2c** | 39.77 %

**3** Contributions made to the plan for the plan year by employer(s) and employees:

| (a) Date (MM-DD-YYYY) | (b) Amount paid by employer(s) | (c) Amount paid by employees | (a) Date (MM-DD-YYYY) | (b) Amount paid by employer(s) | (c) Amount paid by employees |
|---|---|---|---|---|---|
| 08/15/2015 | 6117583 | | 02/15/2016 | 3924583 | |
| 09/15/2015 | 7391583 | | 03/15/2016 | 3364583 | |
| 10/15/2015 | 6995583 | | 04/15/2016 | 3573584 | |
| 11/15/2015 | 6950583 | | 05/15/2016 | 2661584 | |
| 12/15/2016 | 5135583 | | 06/15/2016 | 2723584 | |
| 01/15/2016 | 4799583 | | 07/15/2016 | 3387584 | |
| | | | Totals ► 3(b) | 57026000 | 3(c)  0 |

**4** Information on plan status:

**a** Funded percentage for monitoring plan's status (line 1b(2) divided by line 1c(3)) ...................... | **4a** | 66.7 %

**b** Enter code to indicate plan's status (see instructions for attachment of supporting evidence of plan's status). If code is "N," go to line 5 ...................... | **4b** | D

**c** Is the plan making the scheduled progress under any applicable funding improvement or rehabilitation plan? ...................... ☐ Yes ☐ No

**d** If the plan is in critical status or critical and declining status, were any benefits reduced (see instructions)? ...................... ☐ Yes ☒ No

**e** If line d is "Yes," enter the reduction in liability resulting from the reduction in benefits (see instructions), measured as of the valuation date ...................... | **4e** |

**f** If the rehabilitation plan projects emergence from critical status or critical and declining status, enter the plan year in which it is projected to emerge. If the rehabilitation plan is based on forestalling possible insolvency, enter the plan year in which insolvency is expected and check here ...................... ☒ | **4f** | 2022

**5** Actuarial cost method used as the basis for this plan year's funding standard account computations (check all that apply):

**a** ☐ Attained age normal   **b** ☐ Entry age normal   **c** ☒ Accrued benefit (unit credit)   **d** ☐ Aggregate

**e** ☐ Frozen initial liability   **f** ☐ Individual level premium   **g** ☐ Individual aggregate   **h** ☐ Shortfall

**i** ☐ Reorganization   **j** ☐ Other (specify):

**k** If box h is checked, enter period of use of shortfall method ...................... | **5k** |

**l** Has a change been made in funding method for this plan year? ...................... ☐ Yes ☒ No

**m** If line l is "Yes," was the change made pursuant to Revenue Procedure 2000-40 or other automatic approval? ...................... ☐ Yes ☐ No

**n** If line l is "Yes," and line m is "No," enter the date (MM-DD-YYYY) of the ruling letter (individual or class) approving the change in funding method ...................... | **5n** |

**6** Checklist of certain actuarial assumptions:

**a** Interest rate for "RPA '94" current liability ...................... | **6a** | 3.34 %

| | Pre-retirement | Post-retirement |
|---|---|---|
| **b** Rates specified in insurance or annuity contracts ...................... | ☐ Yes ☐ No ☒ N/A | ☐ Yes ☐ No ☒ N/A |

**c** Mortality table code for valuation purposes:

Schedule MB (Form 5500) 2015      Page 3 - 1

| | | | | |
|---|---|---|---|---|
| (1) Males | 6c(1) | | 11P+2 | 11P+1 |
| (2) Females | 6c(2) | | 4P-3 | 4P-3 |
| d Valuation liability interest rate | 6d | | 7.50% | 7.50 % |
| e Expense loading | 6e | 59.2% | ☐ N/A | % ☒ N/A |
| f Salary scale | 6f | % | ☒ N/A | % ☒ N/A |
| g Estimated investment return on actuarial value of assets for year ending on the valuation date | 6g | | | 7.3 % |
| h Estimated investment return on current value of assets for year ending on the valuation date | 6h | | | 5.0 % |

**7** New amortization bases established in the current plan year:

| (1) Type of base | (2) Initial balance | (3) Amortization Charge/Credit |
|---|---|---|
| 1 | 66743121 | 7033622 |
| 4 | 172525502 | 18181337 |
| 3 | -59437160 | -6263694 |

**8** Miscellaneous information:

**a** If a waiver of a funding deficiency has been approved for this plan year, enter the date (MM-DD-YYYY) of the ruling letter granting the approval ........... **8a**

**b(1)** Is the plan required to provide a projection of expected benefit payments? (See the instructions.) If "Yes," attach a schedule ........... ☒ Yes ☐ No

**b(2)** Is the plan required to provide a Schedule of Active Participant Data? (See the instructions.) If "Yes," attach a schedule. ........... ☒ Yes ☐ No

**c** Are any of the plan's amortization bases operating under an extension of time under section 412(e) (as in effect prior to 2008) or section 431(d) of the Code? ........... ☐ Yes ☒ No

**d** If line c is "Yes," provide the following additional information:

**(1)** Was an extension granted automatic approval under section 431(d)(1) of the Code? ........... ☐ Yes ☐ No

**(2)** If line 8d(1) is "Yes," enter the number of years by which the amortization period was extended ........... **8d(2)**

**(3)** Was an extension approved by the Internal Revenue Service under section 412(e) (as in effect prior to 2008) or 431(d)(2) of the Code? ........... ☐ Yes ☐ No

**(4)** If line 8d(3) is "Yes," enter the number of years by which the amortization period was extended (not including the number of years in line (2)) ........... **8d(4)**

**(5)** If line 8d(3) is "Yes," enter the date of the ruling letter approving the extension ........... **8d(5)**

**(6)** If line 8d(3) is "Yes," is the amortization base eligible for amortization using interest rates applicable under section 6621(b) of the Code for years beginning after 2007? ........... ☐ Yes ☐ No

**e** If box 5h is checked or line 8c is "Yes," enter the difference between the minimum required contribution for the year and the minimum that would have been required without using the shortfall method or extending the amortization base(s) ........... **8e**

**9** Funding standard account statement for this plan year:

**Charges to funding standard account:**

**a** Prior year funding deficiency, if any ........... **9a**    0

**b** Employer's normal cost for plan year as of valuation date ........... **9b**    41545816

**c** Amortization charges as of valuation date:    Outstanding balance

**(1)** All bases except funding waivers and certain bases for which the amortization period has been extended ........... **9c(1)**    4639493766    859833968

**(2)** Funding waivers ........... **9c(2)**

**(3)** Certain bases for which the amortization period has been extended ........... **9c(3)**

**d** Interest as applicable on lines 9a, 9b, and 9c ........... **9d**    67603486

**e** Total charges. Add lines 9a through 9d ........... **9e**    968983270

**Credits to funding standard account:**

**f** Prior year credit balance, if any ........... **9f**    1102344156

**g** Employer contributions. Total from column (b) of line 3 ........... **9g**    57026000

       Outstanding balance

**h** Amortization credits as of valuation date ........... **9h**    1482429068    360506880

**i** Interest as applicable to end of plan year on lines 9f, 9g, and 9h ........... **9i**    111990560

Schedule MB (Form 5500) 2015                               Page **4**

| | | | |
|---|---|---|---|
| **j** | Full funding limitation (FFL) and credits: | | |
| | **(1)** ERISA FFL (accrued liability FFL) .................... | **9j(1)** | 3765093548 |
| | **(2)** "RPA '94" override (90% current liability FFL) ..................... | **9j(2)** | 4626209626 |
| | **(3)** FFL credit ................................. | **9j(3)** | 0 |
| **k** | **(1)** Waived funding deficiency .................................. | **9k(1)** | 0 |
| | **(2)** Other credits ................................. | **9k(2)** | 0 |
| **l** | Total credits. Add lines 9f through 9i, 9j(3), 9k(1), and 9k(2)............... | **9l** | 1631786596 |
| **m** | Credit balance: If line 9l is greater than line 9e, enter the difference .................. | **9m** | 662803326 |
| **n** | Funding deficiency: If line 9e is greater than line 9l, enter the difference.................... | **9n** | |

| | | | |
|---|---|---|---|
| **9 o** | Current year's accumulated reconciliation account: | | |
| | **(1)** Due to waived funding deficiency accumulated prior to the 2015 plan year .............................. | **9o(1)** | 0 |
| | **(2)** Due to amortization bases extended and amortized using the interest rate under section 6621(b) of the Code: | | |
| | **(a)** Reconciliation outstanding balance as of valuation date.......................... | **9o(2)(a)** | 0 |
| | **(b)** Reconciliation amount (line 9c(3) balance minus line 9o(2)(a)) ....................... | **9o(2)(b)** | 0 |
| | **(3)** Total as of valuation date ................................. | **9o(3)** | 0 |
| **10** | Contribution necessary to avoid an accumulated funding deficiency. (See instructions.)..................... | **10** | 0 |
| **11** | Has a change been made in the actuarial assumptions for the current plan year? If "Yes," see instructions....................... | | ☒ Yes ☐ No |

JA 000638

| **SCHEDULE C**<br>**(Form 5500)**<br><br>Department of the Treasury<br>Internal Revenue Service<br>Department of Labor<br>Employee Benefits Security Administration<br>Pension Benefit Guaranty Corporation | **Service Provider Information**<br><br>This schedule is required to be filed under section 104 of the Employee Retirement Income Security Act of 1974 (ERISA).<br><br>▶ **File as an attachment to Form 5500.** | OMB No. 1210-0110<br><br>**2015**<br><br>**This Form is Open to Public Inspection.** |

For calendar plan year 2015 or fiscal plan year beginning  07/01/2015      and ending  06/30/2016

**A** Name of plan
UNITED MINE WORKERS OF AMERICA 1974 PENSION PLAN

**B** Three-digit
plan number (PN)  ▶   002

**C** Plan sponsor's name as shown on line 2a of Form 5500
UMWA 1974 PENSION TRUST BOARD OF TRUSTEES

**D** Employer Identification Number (EIN)
52-1050282

---

**Part I**   **Service Provider Information (see instructions)**

You must complete this Part, in accordance with the instructions, to report the information required for **each person** who received, directly or indirectly, $5,000 or more in total compensation (i.e., money or anything else of monetary value) in connection with services rendered to the plan or the person's position with the plan during the plan year. If a person received **only** eligible indirect compensation for which the plan received the required disclosures, you are required to answer line 1 but are not required to include that person when completing the remainder of this Part.

**1  Information on Persons Receiving Only Eligible Indirect Compensation**

**a** Check "Yes" or "No" to indicate whether you are excluding a person from the remainder of this Part because they received only eligible indirect compensation for which the plan received the required disclosures (see instructions for definitions and conditions)............... [X] Yes  [ ] No

**b** If you answered line 1a  "Yes," enter the name and EIN or address of each person providing the required disclosures for the service providers who received only eligible indirect compensation.  Complete as many entries as needed (see instructions).

| **(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation |
|---|
| CHARTERHOUSE CAPITAL PARTNERS LLP        7TH FLOOR WARRICK COURT PATERNOSTER SQUARE<br>LONDON, ENGLAND EC4M7DX GB |

| **(b)** Enter name and EIN or address of person who provided you disclosure on eligible indirect compensation |
|---|
| BRIDGEWATER ASSOCIATES        ONE GLENDINNING PLACE<br>WESTPORT, CT 06880 |

| **(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation |
|---|
| KTR CAPITAL PARTNERS<br><br>20-3929631 |

| **(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation |
|---|
| GRANTHAM,MAYO,VAN OTTERLOO & CO LLC<br><br>04-3568347 |

For Paperwork Reduction Act Notice and OMB Control Numbers, see the instructions for Form 5500

Schedule C (Form 5500) 2015
v.150123

Schedule C (Form 5500) 2015    Page **2-** 1    JA 000639

---

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

THE VANGUARD GROUP, INC.

23-1945930

---

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

HARVEST ADVISORS V, LLC

20-8031906

---

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

HARVEST PARTNERS V, LP

20-4202660

---

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

K2D & S MANAGEMENT CO., LLC

13-3970786

---

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

SNOW PHIPPS GROUP, LLC

20-2706360

---

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

SV LIFE SCIENCES ADVISERS, LLC

86-1154144

---

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

BLUM CAPITAL PARTNERS, LP

94-3205364

---

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

MADISON INTERNATIONAL REALTY

27-1459361

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

CAPITAL INTERNATIONAL, INC.

95-4154361

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

KOHLBERG & CO., LLC

13-3850539

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

CLP 2014-A LP

47-2538349

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

CLP 2014-B LP

47-2551206

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

CLP 2014-LT LP

47-2527054

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

AQR CAPITAL MANAGEMENT LLC

13-3967414

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

PHOENIX EQUITY PARTNERS 2006 FUND A

98-0533178

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

QS INVESTORS, LLC

27-3203566

Schedule C (Form 5500) 2015                     Page **2-** 3                     JA 000641

---

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

WELLSPRING CAPITAL MANAGEMENT LLC          390 PARK AVENUE
                                           NEW YORK, NY 10022

---

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

TERRA FIRMA CAPITAL PARTNERS LIMITE        2 MORE LONDON RIVERSIDE
                                           LONDON, ENGLAND SE12AP GB

---

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

THOMAS, MCNERNEY & PARTNERS LP             ONE STAMFORD PLAZA
                                           STAMFORD, CT 06901

---

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

---

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

---

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

---

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

---

**(b)** Enter name and EIN or address of person who provided you disclosures on eligible indirect compensation

Page **3 -** | 1 |   JA 000642

**2. Information on Other Service Providers Receiving Direct or Indirect Compensation.** Except for those persons for whom you answered "Yes" to line 1a above, complete as many entries as needed to list each person receiving, directly or indirectly, $5,000 or more in total compensation (i.e., money or anything else of value) in connection with services rendered to the plan or their position with the plan during the plan year. (See instructions).

**(a)** Enter name and EIN or address (see instructions)

1974 PENSION TRUST

52-6150908

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 10 15 25 27 28 29 30 36 49 50 | EMPLOYEES | 8239474 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**(a)** Enter name and EIN or address (see instructions)

MORGAN, LEWIS & BOCKIUS L

23-0891050

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 29 50 | NONE | 2766670 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**(a)** Enter name and EIN or address (see instructions)

MOONEY GREEN SAINDON

52-1182494

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 29 50 | NONE | 790247 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**2. Information on Other Service Providers Receiving Direct or Indirect Compensation.** Except for those persons for whom you answered "Yes" to line 1a above, complete as many entries as needed to list each person receiving, directly or indirectly, $5,000 or more in total compensation (i.e., money or anything else of value) in connection with services rendered to the plan or their position with the plan during the plan year. (See instructions).

**(a)** Enter name and EIN or address (see instructions)

CITY OF LONDON, EM                     1125 AIRPORT ROAD
                                       COATESVILLE, PA 19320

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 52 27 28 50 51 | NONE | 781448 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**(a)** Enter name and EIN or address (see instructions)

JP MORGAN GUARANTEE TRUST CO

13-3200244

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 19 50 | NONE | 743360 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**(a)** Enter name and EIN or address (see instructions)

BLACKROCK INST. TRUST CO, NA

94-3112180

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 51 21 24 27 28 50 52 | NONE | 728361 | Yes ☒ No ☐ | Yes ☒ No ☐ | 0 | Yes ☐ No ☒ |

**2. Information on Other Service Providers Receiving Direct or Indirect Compensation.** Except for those persons for whom you answered "Yes" to line 1a above, complete as many entries as needed to list each person receiving, directly or indirectly, $5,000 or more in total compensation (i.e., money or anything else of value) in connection with services rendered to the plan or their position with the plan during the plan year. (See instructions).

**(a)** Enter name and EIN or address (see instructions)

UBS TRUMBULL FUN LP

61-1553760

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 51 50 27 28 | NONE | 722043 | Yes ☐  No ☒ | Yes ☐  No ☐ | | Yes ☐  No ☐ |

**(a)** Enter name and EIN or address (see instructions)

BNY MELLON ASSET SERVICING

13-5160382

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 65 72 19 50 99 | NONE | 640604 | Yes ☒  No ☐ | Yes ☒  No ☐ | 0 | Yes ☐  No ☒ |

**(a)** Enter name and EIN or address (see instructions)

AMERICAN REALTY ADVISORS

33-0123114

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 28 50 27 | NONE | 631715 | Yes ☐  No ☒ | Yes ☐  No ☐ | | Yes ☐  No ☐ |

Schedule C (Form 5500) 2015

Page **3 -** 4

JA 000645

**2. Information on Other Service Providers Receiving Direct or Indirect Compensation.** Except for those persons for whom you answered "Yes" to line 1a above, complete as many entries as needed to list each person receiving, directly or indirectly, $5,000 or more in total compensation (i.e., money or anything else of value) in connection with services rendered to the plan or their position with the plan during the plan year. (See instructions).

**(a)** Enter name and EIN or address (see instructions)

ING CLARION

13-3379970

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 27 51 28 50 | NONE | 609087 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**(a)** Enter name and EIN or address (see instructions)

STATE STREET

04-1867445

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 51 28 52 19 50 68 99 | NONE | 416214 | Yes ☒ No ☐ | Yes ☒ No ☐ | 0 | Yes ☐ No ☒ |

**(a)** Enter name and EIN or address (see instructions)

INVESCO NATIONAL TRUST COMPANY

46-3793325

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 28 50 27 51 | NONE | 415337 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**1974PLAN_001621**

Schedule C (Form 5500) 2015 | Page **3 -** 5 | JA 000646

**2. Information on Other Service Providers Receiving Direct or Indirect Compensation.** Except for those persons for whom you answered "Yes" to line 1a above, complete as many entries as needed to list each person receiving, directly or indirectly, $5,000 or more in total compensation (i.e., money or anything else of value) in connection with services rendered to the plan or their position with the plan during the plan year. (See instructions).

**(a)** Enter name and EIN or address (see instructions)

INTECH INVESTMENT MANAGEMENT

01-0614895

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 28 27 50 51 | NONE | 412928 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**(a)** Enter name and EIN or address (see instructions)

DIMENSIONAL FUND ADVISORS

23-6819730

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 27 28 50 | NONE | 409464 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**(a)** Enter name and EIN or address (see instructions)

LSV ASSET MANAGEMENT

23-2772200

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 27 51 28 | NONE | 308271 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**2. Information on Other Service Providers Receiving Direct or Indirect Compensation.** Except for those persons for whom you answered "Yes" to line 1a above, complete as many entries as needed to list each person receiving, directly or indirectly, $5,000 or more in total compensation (i.e., money or anything else of value) in connection with services rendered to the plan or their position with the plan during the plan year. (See instructions).

**(a)** Enter name and EIN or address (see instructions)

GOLDMAN SACHS ASSET MANAGEMENT

13-3575636

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 27 51 50 28 | NONE | 295061 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**(a)** Enter name and EIN or address (see instructions)

ARGUS INVESTORS

13-1931123

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 27 28 50 51 | NONE | 253340 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**(a)** Enter name and EIN or address (see instructions)

BARROW HANLEY, MEWHINNEY &

75-2403190

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 28 51 | NONE | 234679 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

Schedule C (Form 5500) 2015

Page **3 -** 7

JA 000648

**2. Information on Other Service Providers Receiving Direct or Indirect Compensation.** Except for those persons for whom you answered "Yes" to line 1a above, complete as many entries as needed to list each person receiving, directly or indirectly, $5,000 or more in total compensation (i.e., money or anything else of value) in connection with services rendered to the plan or their position with the plan during the plan year. (See instructions).

**(a)** Enter name and EIN or address (see instructions)

VERIZON

47-0751768

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 50 49 | NONE | 210108 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**(a)** Enter name and EIN or address (see instructions)

NORTHERN TRUST COMPANY, T

36-1561860

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 19 65 72 99 | NONE | 203901 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**(a)** Enter name and EIN or address (see instructions)

T. ROWE PRICE ASSOCIATES, INC

52-0556948

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 27 28 50 51 | NONE | 141520 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

1974PLAN_001624

Schedule C (Form 5500) 2015     Page **3 -** 8     JA 000649

**2. Information on Other Service Providers Receiving Direct or Indirect Compensation.** Except for those persons for whom you answered "Yes" to line 1a above, complete as many entries as needed to list each person receiving, directly or indirectly, $5,000 or more in total compensation (i.e., money or anything else of value) in connection with services rendered to the plan or their position with the plan during the plan year. (See instructions).

**(a)** Enter name and EIN or address (see instructions)

1974 PENSION TRUST

52-6150908

| **(b)** Service Code(s) | **(c)** Relationship to employer, employee organization, or person known to be a party-in-interest | **(d)** Enter direct compensation paid by the plan. If none, enter -0-. | **(e)** Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | **(f)** Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | **(g)** Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | **(h)** Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 20 50 | TRUSTEES | 135502 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**(a)** Enter name and EIN or address (see instructions)

LOOMIS SAYLES

04-3200030

| **(b)** Service Code(s) | **(c)** Relationship to employer, employee organization, or person known to be a party-in-interest | **(d)** Enter direct compensation paid by the plan. If none, enter -0-. | **(e)** Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | **(f)** Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | **(g)** Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | **(h)** Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 51 50 27 28 | NONE | 129199 | Yes ☒ No ☐ | Yes ☒ No ☐ | 0 | Yes ☐ No ☒ |

**(a)** Enter name and EIN or address (see instructions)

BLOOMBERG FINANCE, L.P.

13-3417984

| **(b)** Service Code(s) | **(c)** Relationship to employer, employee organization, or person known to be a party-in-interest | **(d)** Enter direct compensation paid by the plan. If none, enter -0-. | **(e)** Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | **(f)** Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | **(g)** Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | **(h)** Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 72 50 | NONE | 119303 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**1974PLAN_001625**

**2. Information on Other Service Providers Receiving Direct or Indirect Compensation.** Except for those persons for whom you answered "Yes" to line 1a above, complete as many entries as needed to list each person receiving, directly or indirectly, $5,000 or more in total compensation (i.e., money or anything else of value) in connection with services rendered to the plan or their position with the plan during the plan year. (See instructions).

**(a)** Enter name and EIN or address (see instructions)

UNITED ACTUARIAL SERVICES

35-2156428

| **(b)** Service Code(s) | **(c)** Relationship to employer, employee organization, or person known to be a party-in-interest | **(d)** Enter direct compensation paid by the plan. If none, enter -0-. | **(e)** Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | **(f)** Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | **(g)** Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | **(h)** Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 11 50 | NONE | 117835 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**(a)** Enter name and EIN or address (see instructions)

BOND BEEBE

52-1044197

| **(b)** Service Code(s) | **(c)** Relationship to employer, employee organization, or person known to be a party-in-interest | **(d)** Enter direct compensation paid by the plan. If none, enter -0-. | **(e)** Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | **(f)** Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | **(g)** Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | **(h)** Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 10 50 | NONE | 113577 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**(a)** Enter name and EIN or address (see instructions)

KELLY PRESS INC

52-0975591

| **(b)** Service Code(s) | **(c)** Relationship to employer, employee organization, or person known to be a party-in-interest | **(d)** Enter direct compensation paid by the plan. If none, enter -0-. | **(e)** Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | **(f)** Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | **(g)** Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | **(h)** Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 49 50 | NONE | 111356 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**2. Information on Other Service Providers Receiving Direct or Indirect Compensation.** Except for those persons for whom you answered "Yes" to line 1a above, complete as many entries as needed to list each person receiving, directly or indirectly, $5,000 or more in total compensation (i.e., money or anything else of value) in connection with services rendered to the plan or their position with the plan during the plan year. (See instructions).

**(a)** Enter name and EIN or address (see instructions)

CROWLEY LIBERATORE RYAN &

54-1740922

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 29 50 | NONE | 106541 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**(a)** Enter name and EIN or address (see instructions)

DELOITTE MANAGEMENT SERVICE    PO BOX 4567
TORONTO, ONTARIO M5WOJ1 CA

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 16 50 | NONE | 100352 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**(a)** Enter name and EIN or address (see instructions)

INSIGHT DIRECT USA, INC.

36-3948996

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 49 50 | NONE | 93812 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

1974PLAN_001627

**2. Information on Other Service Providers Receiving Direct or Indirect Compensation.** Except for those persons for whom you answered "Yes" to line 1a above, complete as many entries as needed to list each person receiving, directly or indirectly, $5,000 or more in total compensation (i.e., money or anything else of value) in connection with services rendered to the plan or their position with the plan during the plan year. (See instructions).

**(a)** Enter name and EIN or address (see instructions)

MESIROW FINANCIAL CONSULT

20-1610027

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 16 50 | NONE | 80656 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**(a)** Enter name and EIN or address (see instructions)

DENTON CANADA LLP

71-0914820

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 29 50 | NONE | 76842 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**(a)** Enter name and EIN or address (see instructions)

CARDMEMBER SERVICE

PO BOX 15153
WILIMTON, DE 19886

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 15 49 50 | NONE | 72359 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**2. Information on Other Service Providers Receiving Direct or Indirect Compensation.** Except for those persons for whom you answered "Yes" to line 1a above, complete as many entries as needed to list each person receiving, directly or indirectly, $5,000 or more in total compensation (i.e., money or anything else of value) in connection with services rendered to the plan or their position with the plan during the plan year. (See instructions).

**(a) Enter name and EIN or address (see instructions)**

AMERICAN ARBITRATION ASSO

13-0429745

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 29 50 | NONE | 65000 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**(a) Enter name and EIN or address (see instructions)**

K & R INDUSTRIES

54-1490546

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 50 49 | NONE | 61754 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**(a) Enter name and EIN or address (see instructions)**

BURGISS GROUP LLC, THE

22-3693659

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 50 72 | NONE | 58646 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

Schedule C (Form 5500) 2015                                    Page **3** - 13

JA 000654

**2. Information on Other Service Providers Receiving Direct or Indirect Compensation.** Except for those persons for whom you answered "Yes" to line 1a above, complete as many entries as needed to list each person receiving, directly or indirectly, $5,000 or more in total compensation (i.e., money or anything else of value) in connection with services rendered to the plan or their position with the plan during the plan year. (See instructions).

**(a)** Enter name and EIN or address (see instructions)

MARSH USA, INC.

36-1436000

| **(b)** Service Code(s) | **(c)** Relationship to employer, employee organization, or person known to be a party-in-interest | **(d)** Enter direct compensation paid by the plan. If none, enter -0-. | **(e)** Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | **(f)** Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | **(g)** Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | **(h)** Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 22 50 | NONE | 55861 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**(a)** Enter name and EIN or address (see instructions)

MICROSOFT CORPORATION

91-1144442

| **(b)** Service Code(s) | **(c)** Relationship to employer, employee organization, or person known to be a party-in-interest | **(d)** Enter direct compensation paid by the plan. If none, enter -0-. | **(e)** Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | **(f)** Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | **(g)** Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | **(h)** Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 49 50 | NONE | 54105 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**(a)** Enter name and EIN or address (see instructions)

MILLIMAN INC

91-0675641

| **(b)** Service Code(s) | **(c)** Relationship to employer, employee organization, or person known to be a party-in-interest | **(d)** Enter direct compensation paid by the plan. If none, enter -0-. | **(e)** Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | **(f)** Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | **(g)** Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | **(h)** Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 11 50 | NONE | 50364 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**2. Information on Other Service Providers Receiving Direct or Indirect Compensation.** Except for those persons for whom you answered "Yes" to line 1a above, complete as many entries as needed to list each person receiving, directly or indirectly, $5,000 or more in total compensation (i.e., money or anything else of value) in connection with services rendered to the plan or their position with the plan during the plan year. (See instructions).

**(a)** Enter name and EIN or address (see instructions)

ASCENTIS

91-1630801

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 16 15 50 | NONE | 45244 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**(a)** Enter name and EIN or address (see instructions)

CONVEY COMPLIANCE SYSTEMS

47-1073810

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 15 50 | NONE | 45056 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**(a)** Enter name and EIN or address (see instructions)

QUINN, CONNOR, WEAVER

63-0917236

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 29 50 | NONE | 44757 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**2. Information on Other Service Providers Receiving Direct or Indirect Compensation.** Except for those persons for whom you answered "Yes" to line 1a above, complete as many entries as needed to list each person receiving, directly or indirectly, $5,000 or more in total compensation (i.e., money or anything else of value) in connection with services rendered to the plan or their position with the plan during the plan year. (See instructions).

**(a)** Enter name and EIN or address (see instructions)

DATABANK IMX, INC.

52-1729143

| (b)<br>Service Code(s) | (c)<br>Relationship to employer, employee organization, or person known to be a party-in-interest | (d)<br>Enter direct compensation paid by the plan. If none, enter -0-. | (e)<br>Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f)<br>Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g)<br>Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h)<br>Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 49 50 | NONE | 43938 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**(a)** Enter name and EIN or address (see instructions)

DOYLE PRINTING & OFFSET C

53-0191325

| (b)<br>Service Code(s) | (c)<br>Relationship to employer, employee organization, or person known to be a party-in-interest | (d)<br>Enter direct compensation paid by the plan. If none, enter -0-. | (e)<br>Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f)<br>Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g)<br>Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h)<br>Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 49 50 | NONE | 38485 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**(a)** Enter name and EIN or address (see instructions)

LEXIS-NEXIS

52-1471842

| (b)<br>Service Code(s) | (c)<br>Relationship to employer, employee organization, or person known to be a party-in-interest | (d)<br>Enter direct compensation paid by the plan. If none, enter -0-. | (e)<br>Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f)<br>Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g)<br>Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h)<br>Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 49 50 | NONE | 35924 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**2. Information on Other Service Providers Receiving Direct or Indirect Compensation.** Except for those persons for whom you answered "Yes" to line 1a above, complete as many entries as needed to list each person receiving, directly or indirectly, $5,000 or more in total compensation (i.e., money or anything else of value) in connection with services rendered to the plan or their position with the plan during the plan year. (See instructions).

| **(a)** Enter name and EIN or address (see instructions) | | | | | | |
|---|---|---|---|---|---|---|
| SAS INSTITUTE, INC. | | | | | | |
| 56-1133017 | | | | | | |
| **(b)** Service Code(s) | **(c)** Relationship to employer, employee organization, or person known to be a party-in-interest | **(d)** Enter direct compensation paid by the plan. If none, enter -0-. | **(e)** Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | **(f)** Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | **(g)** Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | **(h)** Did the service provider give you a formula instead of an amount or estimated amount? |
| 49 50 | NONE | 35270 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

| **(a)** Enter name and EIN or address (see instructions) | | | | | | |
|---|---|---|---|---|---|---|
| DATA DRIVEN DECISIONS, IN | | | | | | |
| 94-3329945 | | | | | | |
| **(b)** Service Code(s) | **(c)** Relationship to employer, employee organization, or person known to be a party-in-interest | **(d)** Enter direct compensation paid by the plan. If none, enter -0-. | **(e)** Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | **(f)** Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | **(g)** Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | **(h)** Did the service provider give you a formula instead of an amount or estimated amount? |
| 16 50 | NONE | 31388 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

| **(a)** Enter name and EIN or address (see instructions) | | | | | | |
|---|---|---|---|---|---|---|
| CISCO SYSTEMS CAPITAL COR | | | | | | |
| 95-2755361 | | | | | | |
| **(b)** Service Code(s) | **(c)** Relationship to employer, employee organization, or person known to be a party-in-interest | **(d)** Enter direct compensation paid by the plan. If none, enter -0-. | **(e)** Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | **(f)** Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | **(g)** Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | **(h)** Did the service provider give you a formula instead of an amount or estimated amount? |
| 49 50 | NONE | 29392 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**2. Information on Other Service Providers Receiving Direct or Indirect Compensation.** Except for those persons for whom you answered "Yes" to line 1a above, complete as many entries as needed to list each person receiving, directly or indirectly, $5,000 or more in total compensation (i.e., money or anything else of value) in connection with services rendered to the plan or their position with the plan during the plan year. (See instructions).

**(a)** Enter name and EIN or address (see instructions)

WILSHIRE ASSOCIATES INC

95-2755361

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 72 27 50 | NONE | 25911 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**(a)** Enter name and EIN or address (see instructions)

GLOBAL TRADING ANALYTICS

20-2368007

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 19 65 72 99 50 | NONE | 25000 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**(a)** Enter name and EIN or address (see instructions)

RICOH USA, INC

23-0334400

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 49 50 | NONE | 23202 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**2. Information on Other Service Providers Receiving Direct or Indirect Compensation.** Except for those persons for whom you answered "Yes" to line 1a above, complete as many entries as needed to list each person receiving, directly or indirectly, $5,000 or more in total compensation (i.e., money or anything else of value) in connection with services rendered to the plan or their position with the plan during the plan year. (See instructions).

**(a)** Enter name and EIN or address (see instructions)

NMS IMAGING, INC.

52-0913097

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 49 50 | NONE | 20378 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**(a)** Enter name and EIN or address (see instructions)

PROTIVITI, INC

04-3661951

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 29 50 | NONE | 20000 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**(a)** Enter name and EIN or address (see instructions)

AXIOM

38-3945432

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 16 50 | NONE | 19561 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

| Page **3 -** 19 |

**2. Information on Other Service Providers Receiving Direct or Indirect Compensation.** Except for those persons for whom you answered "Yes" to line 1a above, complete as many entries as needed to list each person receiving, directly or indirectly, $5,000 or more in total compensation (i.e., money or anything else of value) in connection with services rendered to the plan or their position with the plan during the plan year. (See instructions).

**(a)** Enter name and EIN or address (see instructions)

MERCER

13-2836900

| **(b)** Service Code(s) | **(c)** Relationship to employer, employee organization, or person known to be a party-in-interest | **(d)** Enter direct compensation paid by the plan. If none, enter -0-. | **(e)** Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | **(f)** Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | **(g)** Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | **(h)** Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 11 16 50 | NONE | 18459 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**(a)** Enter name and EIN or address (see instructions)

UNITED PARCEL SERVICE, IN

PO BOX 7247-0244
PHILADELPHIA, PA 19170

| **(b)** Service Code(s) | **(c)** Relationship to employer, employee organization, or person known to be a party-in-interest | **(d)** Enter direct compensation paid by the plan. If none, enter -0-. | **(e)** Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | **(f)** Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | **(g)** Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | **(h)** Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 49 50 | NONE | 17747 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**(a)** Enter name and EIN or address (see instructions)

THE TOWNSEND GROUP

34-1537656

| **(b)** Service Code(s) | **(c)** Relationship to employer, employee organization, or person known to be a party-in-interest | **(d)** Enter direct compensation paid by the plan. If none, enter -0-. | **(e)** Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | **(f)** Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | **(g)** Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | **(h)** Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 16 50 | NONE | 15000 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**2. Information on Other Service Providers Receiving Direct or Indirect Compensation.** Except for those persons for whom you answered "Yes" to line 1a above, complete as many entries as needed to list each person receiving, directly or indirectly, $5,000 or more in total compensation (i.e., money or anything else of value) in connection with services rendered to the plan or their position with the plan during the plan year. (See instructions).

**(a)** Enter name and EIN or address (see instructions)

C I T

04-2547678

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 49 50 | NONE | 13910 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**(a)** Enter name and EIN or address (see instructions)

VONAGE BUSINESS

20-5093831

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 49 50 | NONE | 13895 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**(a)** Enter name and EIN or address (see instructions)

ALLIED TELECOM GROUP, LLC

52-1738021

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 49 50 | NONE | 13499 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**2. Information on Other Service Providers Receiving Direct or Indirect Compensation.** Except for those persons for whom you answered "Yes" to line 1a above, complete as many entries as needed to list each person receiving, directly or indirectly, $5,000 or more in total compensation (i.e., money or anything else of value) in connection with services rendered to the plan or their position with the plan during the plan year. (See instructions).

**(a)** Enter name and EIN or address (see instructions)

COLLIAS, GARY

20-1868030

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 50 29 | NONE | 13494 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**(a)** Enter name and EIN or address (see instructions)

AUTOMON

26-2521148

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 49 50 | NONE | 13324 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**(a)** Enter name and EIN or address (see instructions)

HEAT SOFTWARE USA INC

84-1256502

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 49 50 | NONE | 12885 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

Schedule C (Form 5500) 2015      Page **3** - 22

JA 000663

**2. Information on Other Service Providers Receiving Direct or Indirect Compensation.** Except for those persons for whom you answered "Yes" to line 1a above, complete as many entries as needed to list each person receiving, directly or indirectly, $5,000 or more in total compensation (i.e., money or anything else of value) in connection with services rendered to the plan or their position with the plan during the plan year. (See instructions).

**(a)** Enter name and EIN or address (see instructions)

THOMSON REUTERS (MARKET)

20-4530702

| **(b)** Service Code(s) | **(c)** Relationship to employer, employee organization, or person known to be a party-in-interest | **(d)** Enter direct compensation paid by the plan. If none, enter -0-. | **(e)** Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | **(f)** Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | **(g)** Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | **(h)** Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 26 27 28 50 51 | NONE | 12247 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**(a)** Enter name and EIN or address (see instructions)

SUMMERS COMPTON WELLS

46-3084251

| **(b)** Service Code(s) | **(c)** Relationship to employer, employee organization, or person known to be a party-in-interest | **(d)** Enter direct compensation paid by the plan. If none, enter -0-. | **(e)** Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | **(f)** Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | **(g)** Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | **(h)** Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 29 50 | NONE | 11625 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**(a)** Enter name and EIN or address (see instructions)

EIQ NETWORKS, INC

41-2096085

| **(b)** Service Code(s) | **(c)** Relationship to employer, employee organization, or person known to be a party-in-interest | **(d)** Enter direct compensation paid by the plan. If none, enter -0-. | **(e)** Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | **(f)** Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | **(g)** Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | **(h)** Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 49 50 | NONE | 11150 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**1974PLAN_001639**

**2. Information on Other Service Providers Receiving Direct or Indirect Compensation.** Except for those persons for whom you answered "Yes" to line 1a above, complete as many entries as needed to list each person receiving, directly or indirectly, $5,000 or more in total compensation (i.e., money or anything else of value) in connection with services rendered to the plan or their position with the plan during the plan year. (See instructions).

**(a)** Enter name and EIN or address (see instructions)

VERIAN TECHNOLOGIES, INC

DEPT CH 10799
PALATINE, IL 60055

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 49 50 | NONE | 10589 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**(a)** Enter name and EIN or address (see instructions)

STRONGIN, ANDREW M., ESQ.

P.O. BOX 5779
TAKOMA PARK, MD 20913

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 29 50 | NONE | 10000 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**(a)** Enter name and EIN or address (see instructions)

WEBEX CISCO, LLC

77-0548319

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 49 50 | NONE | 9785 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**2. Information on Other Service Providers Receiving Direct or Indirect Compensation.** Except for those persons for whom you answered "Yes" to line 1a above, complete as many entries as needed to list each person receiving, directly or indirectly, $5,000 or more in total compensation (i.e., money or anything else of value) in connection with services rendered to the plan or their position with the plan during the plan year. (See instructions).

**(a)** Enter name and EIN or address (see instructions)

HUDSON GLOBAL RESOURCES

25-1809839

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 16 50 | NONE | 9536 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**(a)** Enter name and EIN or address (see instructions)

PROTRAK INTERNATIONAL, IN

13-3458861

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 49 50 | NONE | 9467 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**(a)** Enter name and EIN or address (see instructions)

LIFE STATUS 360, LLC

94-3389460

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 15 50 | NONE | 7507 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**2. Information on Other Service Providers Receiving Direct or Indirect Compensation.** Except for those persons for whom you answered "Yes" to line 1a above, complete as many entries as needed to list each person receiving, directly or indirectly, $5,000 or more in total compensation (i.e., money or anything else of value) in connection with services rendered to the plan or their position with the plan during the plan year. (See instructions).

**(a)** Enter name and EIN or address (see instructions)

HELLER WORX, INC

52-1221851

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 16 50 | NONE | 7425 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**(a)** Enter name and EIN or address (see instructions)

BLACKBAUD FUNDWARE

74-2947183

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 49 50 | NONE | 7396 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**(a)** Enter name and EIN or address (see instructions)

MCLAGAN PARTNERS, INC.

13-3975524

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 50 16 | NONE | 7250 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

Schedule C (Form 5500) 2015                    Page **3** - 26                    JA 000667

**2. Information on Other Service Providers Receiving Direct or Indirect Compensation.** Except for those persons for whom you answered "Yes" to line 1a above, complete as many entries as needed to list each person receiving, directly or indirectly, $5,000 or more in total compensation (i.e., money or anything else of value) in connection with services rendered to the plan or their position with the plan during the plan year. (See instructions).

**(a) Enter name and EIN or address (see instructions)**

AUTOMATIC DATA PROCESSING

23-1580985

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 15 50 | NONE | 6809 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**(a) Enter name and EIN or address (see instructions)**

BENDER & COMPANY, MATTHEW

14-0499170

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 72 50 | NONE | 6264 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**(a) Enter name and EIN or address (see instructions)**

THOMSON WEST                    PO BOX 6292
WEST PAYMENT CENTER
CAROL STREAM, IL 60197

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 72 50 | NONE | 6125 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

Schedule C (Form 5500) 2015                    Page **3 -** 27          JA 000668

---

**2. Information on Other Service Providers Receiving Direct or Indirect Compensation.** Except for those persons for whom you answered "Yes" to line 1a above, complete as many entries as needed to list each person receiving, directly or indirectly, $5,000 or more in total compensation (i.e., money or anything else of value) in connection with services rendered to the plan or their position with the plan during the plan year. (See instructions).

**(a)** Enter name and EIN or address (see instructions)

ICORE NETWORKS, INC

20-5093181

| **(b)** Service Code(s) | **(c)** Relationship to employer, employee organization, or person known to be a party-in-interest | **(d)** Enter direct compensation paid by the plan. If none, enter -0-. | **(e)** Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | **(f)** Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | **(g)** Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | **(h)** Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 49 50 | NONE | 5612 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**(a)** Enter name and EIN or address (see instructions)

XPEDITE SYSTEMS LLC                    5775 GLENRIDGE DR
                                       ATLANTA, GA 30328

| **(b)** Service Code(s) | **(c)** Relationship to employer, employee organization, or person known to be a party-in-interest | **(d)** Enter direct compensation paid by the plan. If none, enter -0-. | **(e)** Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | **(f)** Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | **(g)** Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | **(h)** Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 49 50 | NONE | 5323 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**(a)** Enter name and EIN or address (see instructions)

XIOTECH CORPORATION

52-1668212

| **(b)** Service Code(s) | **(c)** Relationship to employer, employee organization, or person known to be a party-in-interest | **(d)** Enter direct compensation paid by the plan. If none, enter -0-. | **(e)** Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | **(f)** Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | **(g)** Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | **(h)** Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 49 50 | NONE | 5181 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**2. Information on Other Service Providers Receiving Direct or Indirect Compensation.** Except for those persons for whom you answered "Yes" to line 1a above, complete as many entries as needed to list each person receiving, directly or indirectly, $5,000 or more in total compensation (i.e., money or anything else of value) in connection with services rendered to the plan or their position with the plan during the plan year. (See instructions).

**(a)** Enter name and EIN or address (see instructions)

BELL & HOWELL LLC

36-3580100

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 49 50 | NONE | 5060 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**(a)** Enter name and EIN or address (see instructions)

CONCUR TECHNOLOGIES, INC.

91-1608052

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| 15 50 | NONE | 5058 | Yes ☐ No ☒ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

**(a)** Enter name and EIN or address (see instructions)

| (b) Service Code(s) | (c) Relationship to employer, employee organization, or person known to be a party-in-interest | (d) Enter direct compensation paid by the plan. If none, enter -0-. | (e) Did service provider receive indirect compensation? (sources other than plan or plan sponsor) | (f) Did indirect compensation include eligible indirect compensation, for which the plan received the required disclosures? | (g) Enter total indirect compensation received by service provider excluding eligible indirect compensation for which you answered "Yes" to element (f). If none, enter -0-. | (h) Did the service provider give you a formula instead of an amount or estimated amount? |
|---|---|---|---|---|---|---|
| | | | Yes ☐ No ☐ | Yes ☐ No ☐ | | Yes ☐ No ☐ |

Page **4-** 1

| Part I | Service Provider Information (continued) |
|---|---|

**3** If you reported on line 2 receipt of indirect compensation, other than eligible indirect compensation, by a service provider, and the service provider is a fiduciary or provides contract administrator, consulting, custodial, investment advisory, investment management, broker, or recordkeeping services, answer the following questions for (a) each source from whom the service provider received $1,000 or more in indirect compensation and (b) each source for whom the service provider gave you a formula used to determine the indirect compensation instead of an amount or estimated amount of the indirect compensation. Complete as many entries as needed to report the required information for each source.

| **(a)** Enter service provider name as it appears on line 2 | **(b)** Service Codes (see instructions) | **(c)** Enter amount of indirect compensation |
|---|---|---|
| | | |

| **(d)** Enter name and EIN (address) of source of indirect compensation | **(e)** Describe the indirect compensation, including any formula used to determine the service provider's eligibility for or the amount of the indirect compensation. |
|---|---|
| | |

| **(a)** Enter service provider name as it appears on line 2 | **(b)** Service Codes (see instructions) | **(c)** Enter amount of indirect compensation |
|---|---|---|
| | | |

| **(d)** Enter name and EIN (address) of source of indirect compensation | **(e)** Describe the indirect compensation, including any formula used to determine the service provider's eligibility for or the amount of the indirect compensation. |
|---|---|
| | |

| **(a)** Enter service provider name as it appears on line 2 | **(b)** Service Codes (see instructions) | **(c)** Enter amount of indirect compensation |
|---|---|---|
| | | |

| **(d)** Enter name and EIN (address) of source of indirect compensation | **(e)** Describe the indirect compensation, including any formula used to determine the service provider's eligibility for or the amount of the indirect compensation. |
|---|---|
| | |

Schedule C (Form 5500) 2015                    Page **5-** 1

| **Part II** | **Service Providers Who Fail or Refuse to Provide Information** |

**4**    Provide, to the extent possible, the following information for each service provider who failed or refused to provide the information necessary to complete this Schedule.

| **(a)** Enter name and EIN or address of service provider (see instructions) | **(b)** Nature of Service Code(s) | **(c)** Describe the information that the service provider failed or refused to provide |
|---|---|---|
| | | |
| **(a)** Enter name and EIN or address of service provider (see instructions) | **(b)** Nature of Service Code(s) | **(c)** Describe the information that the service provider failed or refused to provide |
| | | |
| **(a)** Enter name and EIN or address of service provider (see instructions) | **(b)** Nature of Service Code(s) | **(c)** Describe the information that the service provider failed or refused to provide |
| | | |
| **(a)** Enter name and EIN or address of service provider (see instructions) | **(b)** Nature of Service Code(s) | **(c)** Describe the information that the service provider failed or refused to provide |
| | | |
| **(a)** Enter name and EIN or address of service provider (see instructions) | **(b)** Nature of Service Code(s) | **(c)** Describe the information that the service provider failed or refused to provide |
| | | |
| **(a)** Enter name and EIN or address of service provider (see instructions) | **(b)** Nature of Service Code(s) | **(c)** Describe the information that the service provider failed or refused to provide |
| | | |

| Part III | Termination Information on Accountants and Enrolled Actuaries (see instructions) |
|---|---|
| | (complete as many entries as needed) |

| **a** Name: | **b** EIN: |
|---|---|
| **c** Position: | |
| **d** Address: | **e** Telephone: |

Explanation:

| **a** Name: | **b** EIN: |
|---|---|
| **c** Position: | |
| **d** Address: | **e** Telephone: |

Explanation:

| **a** Name: | **b** EIN: |
|---|---|
| **c** Position: | |
| **d** Address: | **e** Telephone: |

Explanation:

| **a** Name: | **b** EIN: |
|---|---|
| **c** Position: | |
| **d** Address: | **e** Telephone: |

Explanation:

| **a** Name: | **b** EIN: |
|---|---|
| **c** Position: | |
| **d** Address: | **e** Telephone: |

Explanation:

| SCHEDULE D (Form 5500)<br><br>Department of the Treasury<br>Internal Revenue Service<br><br>Department of Labor<br>Employee Benefits Security Administration | DFE/Participating Plan Information<br><br>This schedule is required to be filed under section 104 of the Employee Retirement Income Security Act of 1974 (ERISA).<br><br>▶ File as an attachment to Form 5500. | OMB No. 1210-0110<br><br>**2015**<br><br>**This Form is Open to Public Inspection.** |

| For calendar plan year 2015 or fiscal plan year beginning | 07/01/2015 | and ending | 06/30/2016 |

| **A** Name of plan<br>UNITED MINE WORKERS OF AMERICA 1974 PENSION PLAN | **B** Three-digit<br>plan number (PN) ▶ | 002 |

| **C** Plan or DFE sponsor's name as shown on line 2a of Form 5500<br>UMWA 1974 PENSION TRUST BOARD OF TRUSTEES | **D** Employer Identification Number (EIN)<br>52-1050282 |

| **Part I** | **Information on interests in MTIAs, CCTs, PSAs, and 103-12 IEs (to be completed by plans and DFEs)**<br>(Complete as many entries as needed to report all interests in DFEs) |

**a** Name of MTIA, CCT, PSA, or 103-12 IE:   LMCG COLLECTIVE TRUST

**b** Name of sponsor of entity listed in (a):   SEI TRUST COMPANY

| **c** EIN-PN 26-2540371-023 | **d** Entity code  C | **e** Dollar value of interest in MTIA, CCT, PSA, or 103-12 IE at end of year (see instructions) | 34829515 |

**a** Name of MTIA, CCT, PSA, or 103-12 IE:   EXTENDED EQUITY MARKET FUND

**b** Name of sponsor of entity listed in (a):   BLACKROCK INSTITUTIONAL TRUST CO

| **c** EIN-PN 94-6507863-001 | **d** Entity code  C | **e** Dollar value of interest in MTIA, CCT, PSA, or 103-12 IE at end of year (see instructions) | 26325840 |

**a** Name of MTIA, CCT, PSA, or 103-12 IE:   CANADA MSCI INDEX

**b** Name of sponsor of entity listed in (a):   STATE STREET BANK AND TRUST COMPANY

| **c** EIN-PN 04-0025081-204 | **d** Entity code  C | **e** Dollar value of interest in MTIA, CCT, PSA, or 103-12 IE at end of year (see instructions) | 18760433 |

**a** Name of MTIA, CCT, PSA, or 103-12 IE:   EQUITY INDEX FUND

**b** Name of sponsor of entity listed in (a):   BLACKROCK INSTITUTIONAL TRUST CO

| **c** EIN-PN 94-6052285-001 | **d** Entity code  C | **e** Dollar value of interest in MTIA, CCT, PSA, or 103-12 IE at end of year (see instructions) | 103772642 |

**a** Name of MTIA, CCT, PSA, or 103-12 IE:   THE MICRO CAP SUBTRUST

**b** Name of sponsor of entity listed in (a):   DFA GROUP TRUST

| **c** EIN-PN 23-6819730-004 | **d** Entity code  E | **e** Dollar value of interest in MTIA, CCT, PSA, or 103-12 IE at end of year (see instructions) | 24148955 |

**a** Name of MTIA, CCT, PSA, or 103-12 IE:   THE SMALL CAP SUBTRUST

**b** Name of sponsor of entity listed in (a):   DFA GROUP TRUST

| **c** EIN-PN 23-6819730-001 | **d** Entity code  E | **e** Dollar value of interest in MTIA, CCT, PSA, or 103-12 IE at end of year (see instructions) | 64823761 |

**a** Name of MTIA, CCT, PSA, or 103-12 IE:   INVESCO BALANCED RISK ALLOCATION TR

**b** Name of sponsor of entity listed in (a):   INVESCO NATIONAL TRUST COMPANY

| **c** EIN-PN 26-6399613-001 | **d** Entity code  C | **e** Dollar value of interest in MTIA, CCT, PSA, or 103-12 IE at end of year (see instructions) | 94756024 |

For Paperwork Reduction Act Notice and OMB Control Numbers, see the instructions for Form 5500.

Schedule D (Form 5500) 2015
v. 150123

**a** Name of MTIA, CCT, PSA, or 103-12 IE: US AGGREGATE BOND INDEX SL FUND

**b** Name of sponsor of entity listed in (a): STATE STREET BANK AND TRUST COMPANY

| **c** EIN-PN 04-0025081-069 | **d** Entity code    C | **e** Dollar value of interest in MTIA, CCT, PSA, or 103-12 IE at end of year (see instructions) | 189634408 |
|---|---|---|---|

**a** Name of MTIA, CCT, PSA, or 103-12 IE: MSCI EAFE INDEX SL FUND

**b** Name of sponsor of entity listed in (a): STATE STREET BANK AND TRUST COMPANY

| **c** EIN-PN 04-0025081-240 | **d** Entity code    C | **e** Dollar value of interest in MTIA, CCT, PSA, or 103-12 IE at end of year (see instructions) | 193370721 |
|---|---|---|---|

**a** Name of MTIA, CCT, PSA, or 103-12 IE: MONEY MARKET FUND

**b** Name of sponsor of entity listed in (a): BLACKROCK INSTITUTIONAL TRUST CO. N.A.

| **c** EIN-PN 94-6450621-001 | **d** Entity code    C | **e** Dollar value of interest in MTIA, CCT, PSA, or 103-12 IE at end of year (see instructions) | 94 |
|---|---|---|---|

**a** Name of MTIA, CCT, PSA, or 103-12 IE: CORE ACTIVE BOND FUND

**b** Name of sponsor of entity listed in (a): BLACKROCK INSTITUTIONAL TRUST COMPANY

| **c** EIN-PN 94-6746903-001 | **d** Entity code    C | **e** Dollar value of interest in MTIA, CCT, PSA, or 103-12 IE at end of year (see instructions) | 225534418 |
|---|---|---|---|

**a** Name of MTIA, CCT, PSA, or 103-12 IE: JPMORGAN STRATEGIC PROPERTY TRUST F

**b** Name of sponsor of entity listed in (a): JPMORGAN CHASE BANK, N.A.

| **c** EIN-PN 13-6038770-001 | **d** Entity code    C | **e** Dollar value of interest in MTIA, CCT, PSA, or 103-12 IE at end of year (see instructions) | 106796628 |
|---|---|---|---|

**a** Name of MTIA, CCT, PSA, or 103-12 IE: BRIDGEWATER PURE ALPHA MAJOR MARKET

**b** Name of sponsor of entity listed in (a): BRIDGEWATER ASSOCIATES, LP

| **c** EIN-PN 98-0674465-001 | **d** Entity code    E | **e** Dollar value of interest in MTIA, CCT, PSA, or 103-12 IE at end of year (see instructions) | 56723016 |
|---|---|---|---|

**a** Name of MTIA, CCT, PSA, or 103-12 IE: BRIDGEWATER PURE ALPHA FUNDS

**b** Name of sponsor of entity listed in (a): BRIDGEWATER ASSOCIATES, LP

| **c** EIN-PN 98-0501381-001 | **d** Entity code    E | **e** Dollar value of interest in MTIA, CCT, PSA, or 103-12 IE at end of year (see instructions) | 81937906 |
|---|---|---|---|

**a** Name of MTIA, CCT, PSA, or 103-12 IE: ALL WEATHER PORTFOLIO LIMITED

**b** Name of sponsor of entity listed in (a): ALL WEATHER PORTFOLIO LIMITED

| **c** EIN-PN 98-0501379-001 | **d** Entity code    E | **e** Dollar value of interest in MTIA, CCT, PSA, or 103-12 IE at end of year (see instructions) | 89859503 |
|---|---|---|---|

**a** Name of MTIA, CCT, PSA, or 103-12 IE:

**b** Name of sponsor of entity listed in (a):

| **c** EIN-PN | **d** Entity code | **e** Dollar value of interest in MTIA, CCT, PSA, or 103-12 IE at end of year (see instructions) | |
|---|---|---|---|

**a** Name of MTIA, CCT, PSA, or 103-12 IE:

**b** Name of sponsor of entity listed in (a):

| **c** EIN-PN | **d** Entity code | **e** Dollar value of interest in MTIA, CCT, PSA, or 103-12 IE at end of year (see instructions) | |
|---|---|---|---|

Schedule D (Form 5500) 2015                                    Page **3 -** 1

| **Part II** | **Information on Participating Plans (to be completed by DFEs)** |
|---|---|
| | (Complete as many entries as needed to report all participating plans) |

**a** Plan name

| **b** Name of plan sponsor | **c** EIN-PN |
|---|---|

**a** Plan name

| **b** Name of plan sponsor | **c** EIN-PN |
|---|---|

**a** Plan name

| **b** Name of plan sponsor | **c** EIN-PN |
|---|---|

**a** Plan name

| **b** Name of plan sponsor | **c** EIN-PN |
|---|---|

**a** Plan name

| **b** Name of plan sponsor | **c** EIN-PN |
|---|---|

**a** Plan name

| **b** Name of plan sponsor | **c** EIN-PN |
|---|---|

**a** Plan name

| **b** Name of plan sponsor | **c** EIN-PN |
|---|---|

**a** Plan name

| **b** Name of plan sponsor | **c** EIN-PN |
|---|---|

**a** Plan name

| **b** Name of plan sponsor | **c** EIN-PN |
|---|---|

**a** Plan name

| **b** Name of plan sponsor | **c** EIN-PN |
|---|---|

**a** Plan name

| **b** Name of plan sponsor | **c** EIN-PN |
|---|---|

**a** Plan name

| **b** Name of plan sponsor | **c** EIN-PN |
|---|---|

JA 000676

| SCHEDULE H (Form 5500) | Financial Information | OMB No. 1210-0110 |
|---|---|---|
| Department of the Treasury<br>Internal Revenue Service<br><br>Department of Labor<br>Employee Benefits Security Administration<br><br>Pension Benefit Guaranty Corporation | This schedule is required to be filed under section 104 of the Employee Retirement Income Security Act of 1974 (ERISA), and section 6058(a) of the Internal Revenue Code (the Code).<br><br>▶ **File as an attachment to Form 5500.** | **2015**<br><br>**This Form is Open to Public Inspection** |

For calendar plan year 2015 or fiscal plan year beginning    07/01/2015    and ending    06/30/2016

**A** Name of plan
UNITED MINE WORKERS OF AMERICA 1974 PENSION PLAN

**B** Three-digit plan number (PN)    ▶    002

**C** Plan sponsor's name as shown on line 2a of Form 5500
UMWA 1974 PENSION TRUST BOARD OF TRUSTEES

**D** Employer Identification Number (EIN)
52-1050282

---

| Part I | Asset and Liability Statement |
|---|---|

1   Current value of plan assets and liabilities at the beginning and end of the plan year. Combine the value of plan assets held in more than one trust. Report the value of the plan's interest in a commingled fund containing the assets of more than one plan on a line-by-line basis unless the value is reportable on lines 1c(9) through 1c(14). Do not enter the value of that portion of an insurance contract which guarantees, during this plan year, to pay a specific dollar benefit at a future date. **Round off amounts to the nearest dollar.** MTIAs, CCTs, PSAs, and 103-12 IEs do not complete lines 1b(1), 1b(2), 1c(8), 1g, 1h, and 1i. CCTs, PSAs, and 103-12 IEs also do not complete lines 1d and 1e. See instructions.

| Assets | | (a) Beginning of Year | (b) End of Year |
|---|---|---|---|
| **a** Total noninterest-bearing cash | 1a | 35218506 | 0 |
| **b** Receivables (less allowance for doubtful accounts): | | | |
| (1) Employer contributions | 1b(1) | 6804851 | 3154699 |
| (2) Participant contributions | 1b(2) | | |
| (3) Other | 1b(3) | 55091955 | 71256132 |
| **c** General investments: | | | |
| (1) Interest-bearing cash (include money market accounts & certificates of deposit) | 1c(1) | 1908198 | 1597961 |
| (2) U.S. Government securities | 1c(2) | 0 | |
| (3) Corporate debt instruments (other than employer securities): | | | |
| (A) Preferred | 1c(3)(A) | 3554988 | 978140 |
| (B) All other | 1c(3)(B) | 61326420 | 52370204 |
| (4) Corporate stocks (other than employer securities): | | | |
| (A) Preferred | 1c(4)(A) | 1363549 | 874508 |
| (B) Common | 1c(4)(B) | 702090080 | 555802270 |
| (5) Partnership/joint venture interests | 1c(5) | 430594457 | 330977640 |
| (6) Real estate (other than employer real property) | 1c(6) | 191857469 | 49798788 |
| (7) Loans (other than to participants) | 1c(7) | | |
| (8) Participant loans | 1c(8) | | |
| (9) Value of interest in common/collective trusts | 1c(9) | 1233600961 | 993780723 |
| (10) Value of interest in pooled separate accounts | 1c(10) | | |
| (11) Value of interest in master trust investment accounts | 1c(11) | | |
| (12) Value of interest in 103-12 investment entities | 1c(12) | 368037167 | 317493141 |
| (13) Value of interest in registered investment companies (e.g., mutual funds) | 1c(13) | 738662040 | 661805273 |
| (14) Value of funds held in insurance company general account (unallocated contracts) | 1c(14) | | |
| (15) Other | 1c(15) | 20417149 | 199186755 |

For Paperwork Reduction Act Notice and OMB Control Numbers, see the instructions for Form 5500.

Schedule H (Form 5500) 2015
v. 150123

Schedule H (Form 5500) 2015     Page **2**     JA 000677

| | | | (a) Beginning of Year | (b) End of Year |
|---|---|---|---|---|
| **1d** | Employer-related investments: | | | |
| | **(1)** Employer securities ..................................... | 1d(1) | | |
| | **(2)** Employer real property ................................ | 1d(2) | | |
| **e** | Buildings and other property used in plan operation.............. | 1e | 3244668 | 99899817 |
| **f** | Total assets (add all amounts in lines 1a through 1e) ......... | 1f | 3853772458 | 3338976051 |

### Liabilities

| | | | | |
|---|---|---|---|---|
| **g** | Benefit claims payable ........................................ | 1g | | |
| **h** | Operating payables .......................................... | 1h | 67167097 | 90559854 |
| **i** | Acquisition indebtedness .................................... | 1i | | |
| **j** | Other liabilities............................................... | 1j | 25263091 | 108137824 |
| **k** | Total liabilities (add all amounts in lines 1g through 1j) ...... | 1k | 92430188 | 198697678 |

### Net Assets

| | | | | |
|---|---|---|---|---|
| **l** | Net assets (subtract line 1k from line 1f)................... | 1l | 3761342270 | 3140278373 |

---

| **Part II** | **Income and Expense Statement** |
|---|---|

**2** Plan income, expenses, and changes in net assets for the year. Include all income and expenses of the plan, including any trust(s) or separately maintained fund(s) and any payments/receipts to/from insurance carriers. Round off amounts to the nearest dollar. MTIAs, CCTs, PSAs, and 103-12 IEs do not complete lines 2a, 2b(1)(E), 2e, 2f, and 2g.

### Income

| | | | (a) Amount | (b) Total |
|---|---|---|---|---|
| **a** | **Contributions:** | | | |
| | **(1)** Received or receivable in cash from: **(A)** Employers................................ | 2a(1)(A) | 55103888 | |
| | **(B)** Participants .......................................................... | 2a(1)(B) | | |
| | **(C)** Others (including rollovers) ...................................... | 2a(1)(C) | | |
| | **(2)** Noncash contributions ........................................... | 2a(2) | | |
| | **(3)** Total contributions. Add lines **2a(1)(A), (B), (C),** and line **2a(2)** ............... | 2a(3) | | 55103888 |
| **b** | **Earnings on investments:** | | | |
| | **(1)** Interest: | | | |
| | **(A)** Interest-bearing cash (including money market accounts and certificates of deposit)................. | 2b(1)(A) | 56871 | |
| | **(B)** U.S. Government securities .................................. | 2b(1)(B) | | |
| | **(C)** Corporate debt instruments ............................... | 2b(1)(C) | 4993523 | |
| | **(D)** Loans (other than to participants) ......................... | 2b(1)(D) | | |
| | **(E)** Participant loans ................................................ | 2b(1)(E) | | |
| | **(F)** Other ................................................................ | 2b(1)(F) | 305880 | |
| | **(G)** Total interest. Add lines **2b(1)(A)** through **(F)** ............ | 2b(1)(G) | | 5356274 |
| | **(2)** Dividends: **(A)** Preferred stock.................................. | 2b(2)(A) | 49188 | |
| | **(B)** Common stock ................................................. | 2b(2)(B) | 13750168 | |
| | **(C)** Registered investment company shares (e.g. mutual funds)............ | 2b(2)(C) | 10568326 | |
| | **(D)** Total dividends. Add lines **2b(2)(A), (B),** and **(C)** | 2b(2)(D) | | 24367682 |
| | **(3)** Rents.............................................................. | 2b(3) | | 5497670 |
| | **(4)** Net gain (loss) on sale of assets: **(A)** Aggregate proceeds ..................... | 2b(4)(A) | 725954265 | |
| | **(B)** Aggregate carrying amount (see instructions) ......... | 2b(4)(B) | 624183478 | |
| | **(C)** Subtract line **2b(4)(B)** from line **2b(4)(A)** and enter result .............. | 2b(4)(C) | | 101770787 |
| | **(5)** Unrealized appreciation (depreciation) of assets: **(A)** Real estate.................. | 2b(5)(A) | -38479423 | |
| | **(B)** Other ................................................. | 2b(5)(B) | -101720639 | |
| | **(C)** Total unrealized appreciation of assets. Add lines **2b(5)(A)** and **(B)** | 2b(5)(C) | | -140200062 |

| | | (a) Amount | (b) Total |
|---|---|---|---|
| (6) Net investment gain (loss) from common/collective trusts ...................... | 2b(6) | | 2561789 |
| (7) Net investment gain (loss) from pooled separate accounts ...................... | 2b(7) | | |
| (8) Net investment gain (loss) from master trust investment accounts .......... | 2b(8) | | |
| (9) Net investment gain (loss) from 103-12 investment entities ................... | 2b(9) | | -2832451 |
| (10) Net investment gain (loss) from registered investment companies (e.g., mutual funds)........................... | 2b(10) | | -22166219 |
| c Other income ............................................... | 2c | | 16050277 |
| d Total income. Add all **income** amounts in column (b) and enter total.................... | 2d | | 45509635 |

### Expenses

| | | (a) Amount | (b) Total |
|---|---|---|---|
| e Benefit payment and payments to provide benefits: | | | |
| (1) Directly to participants or beneficiaries, including direct rollovers............. | 2e(1) | 621737324 | |
| (2) To insurance carriers for the provision of benefits ................................. | 2e(2) | | |
| (3) Other ................................................... | 2e(3) | | |
| (4) Total benefit payments. Add lines **2e(1)** through **(3)** ......................... | 2e(4) | | 621737324 |
| f Corrective distributions (see instructions) ...................................... | 2f | | |
| g Certain deemed distributions of participant loans (see instructions)................ | 2g | | |
| h Interest expense.................................................. | 2h | | |
| i Administrative expenses: **(1)** Professional fees ..................................... | 2i(1) | 4267615 | |
| (2) Contract administrator fees ................................. | 2i(2) | | |
| (3) Investment advisory and management fees ..................... | 2i(3) | 7170371 | |
| (4) Other .............................................. | 2i(4) | 33398222 | |
| (5) Total administrative expenses. Add lines **2i(1)** through **(4)**.................... | 2i(5) | | 44836208 |
| j Total expenses. Add all **expense** amounts in column (b) and enter total........ | 2j | | 666573532 |

### Net Income and Reconciliation

| | | (a) Amount | (b) Total |
|---|---|---|---|
| k Net income (loss). Subtract line **2j** from line **2d** ............................... | 2k | | -621063897 |
| l Transfers of assets: | | | |
| (1) To this plan ................................................... | 2l(1) | | |
| (2) From this plan ................................................... | 2l(2) | | |

---

**Part III** | **Accountant's Opinion**

**3** Complete lines 3a through 3c if the opinion of an independent qualified public accountant is attached to this Form 5500. Complete line 3d if an opinion is not attached.

**a** The attached opinion of an independent qualified public accountant for this plan is (see instructions):

(1) ☒ Unqualified      (2) ☐ Qualified      (3) ☐ Disclaimer      (4) ☐ Adverse

**b** Did the accountant perform a limited scope audit pursuant to 29 CFR 2520.103-8 and/or 103-12(d)?     ☐ Yes    ☒ No

**c** Enter the name and EIN of the accountant (or accounting firm) below:

(1) Name: BOND BEEBE, P.C.                                         (2) EIN: 52-1044197

**d** The opinion of an independent qualified public accountant is **not attached** because:

(1) ☐ This form is filed for a CCT, PSA, or MTIA.     (2) ☐ It will be attached to the next Form 5500 pursuant to 29 CFR 2520.104-50.

---

**Part IV** | **Compliance Questions**

**4** CCTs and PSAs do not complete Part IV. MTIAs, 103-12 IEs, and GIAs do not complete lines 4a, 4e, 4f, 4g, 4h, 4k, 4m, 4n, or 5. 103-12 IEs also do not complete lines 4j and 4l. MTIAs also do not complete line 4l.

During the plan year:

| | | Yes | No | N/A | Amount |
|---|---|---|---|---|---|
| **a** Was there a failure to transmit to the plan any participant contributions within the time period described in 29 CFR 2510.3-102? Continue to answer "Yes" for any prior year failures until fully corrected. (See instructions and DOL's Voluntary Fiduciary Correction Program.)...... | 4a | | X | | |
| **b** Were any loans by the plan or fixed income obligations due the plan in default as of the close of the plan year or classified during the year as uncollectible? Disregard participant loans secured by participant's account balance. (Attach Schedule G (Form 5500) Part I if "Yes" is checked.)................................ | 4b | | X | | |

Schedule H  (Form 5500) 2015                                      Page **4-** 1

| | | | Yes | No | N/A | Amount |
|---|---|---|---|---|---|---|
| c | Were any leases to which the plan was a party in default or classified during the year as uncollectible? (Attach Schedule G (Form 5500) Part II if "Yes" is checked.) ............................. | 4c | | X | | |
| d | Were there any nonexempt transactions with any party-in-interest? (Do not include transactions reported on line 4a. Attach Schedule G (Form 5500) Part III if "Yes" is checked.) ..................................... | 4d | | X | | |
| e | Was this plan covered by a fidelity bond? .................................................... | 4e | X | | | 555556 |
| f | Did the plan have a loss, whether or not reimbursed by the plan's fidelity bond, that was caused by fraud or dishonesty? ...................................... | 4f | | X | | |
| g | Did the plan hold any assets whose current value was neither readily determinable on an established market nor set by an independent third party appraiser? ...................................... | 4g | X | | | 1805758000 |
| h | Did the plan receive any noncash contributions whose value was neither readily determinable on an established market nor set by an independent third party appraiser?.......... | 4h | | X | | |
| i | Did the plan have assets held for investment? (Attach schedule(s) of assets if "Yes" is checked, and see instructions for format requirements.) .............................. | 4i | X | | | |
| j | Were any plan transactions or series of transactions in excess of 5% of the current value of plan assets? (Attach schedule of transactions if "Yes" is checked, and see instructions for format requirements.)...................................... | 4j | X | | | |
| k | Were all the plan assets either distributed to participants or beneficiaries, transferred to another plan, or brought under the control of the PBGC?.................................... | 4k | | X | | |
| l | Has the plan failed to provide any benefit when due under the plan? ...................... | 4l | | X | | |
| m | If this is an individual account plan, was there a blackout period? (See instructions and 29 CFR 2520.101-3.)............................ | 4m | | | | |
| n | If 4m was answered "Yes," check the "Yes" box if you either provided the required notice or one of the exceptions to providing the notice applied under 29 CFR 2520.101-3. .......... | 4n | | | | |
| o | Did the plan trust incur unrelated business taxable income? ………………………………… | 4o | | | | |
| p | Were in-service distributions made during the plan year? ………………………………… | 4p | | | | |

**5a** Has a resolution to terminate the plan been adopted during the plan year or any prior plan year?
If "Yes," enter the amount of any plan assets that reverted to the employer this year............................ ☐ Yes ☒ No    Amount:

**5b** If, during this plan year, any assets or liabilities were transferred from this plan to another plan(s), identify the plan(s) to which assets or liabilities were transferred. (See instructions.)

| **5b(1)** Name of plan(s) | **5b(2)** EIN(s) | **5b(3)** PN(s) |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

**5c** If the plan is a defined benefit plan, is it covered under the PBGC insurance program (see ERISA section 4021)? ..... ☒ Yes ☐ No ☐ Not determined

| **Part V** | **Trust Information** |
|---|---|

**6a** Name of trust

**6b** Trust's EIN

**6c** Name of trustee or custodian

**6d** Trustee's or custodian's telephone number

JA 000680

| **SCHEDULE R**<br>**(Form 5500)**<br><br>Department of the Treasury<br>Internal Revenue Service<br><br>Department of Labor<br>Employee Benefits Security Administration<br><br>Pension Benefit Guaranty Corporation | **Retirement Plan Information**<br><br>This schedule is required to be filed under section 104 and 4065 of the Employee Retirement Income Security Act of 1974 (ERISA) and section 6058(a) of the Internal Revenue Code (the Code).<br><br>▶ **File as an attachment to Form 5500.** | OMB No. 1210-0110<br><br>**2015**<br><br>**This Form is Open to Public Inspection.** |
| --- | --- | --- |

| For calendar plan year 2015 or fiscal plan year beginning | 07/01/2015 | and ending | 06/30/2016 |
| --- | --- | --- | --- |

| **A** Name of plan<br>UNITED MINE WORKERS OF AMERICA 1974 PENSION PLAN | **B** Three-digit plan number (PN) ▶ | 002 |
| --- | --- | --- |

| **C** Plan sponsor's name as shown on line 2a of Form 5500<br>UMWA 1974 PENSION TRUST BOARD OF TRUSTEES | **D** Employer Identification Number (EIN)<br>52-1050282 |
| --- | --- |

| **Part I** | **Distributions** |
| --- | --- |

All references to distributions relate only to payments of benefits during the plan year.

**1** Total value of distributions paid in property other than in cash or the forms of property specified in the instructions......................................................................................................................

| **1** | 0 |
| --- | --- |

**2** Enter the EIN(s) of payor(s) who paid benefits on behalf of the plan to participants or beneficiaries during the year (if more than two, enter EINs of the two payors who paid the greatest dollar amounts of benefits):

EIN(s): _____    _____

**Profit-sharing plans, ESOPs, and stock bonus plans, skip line 3.**

**3** Number of participants (living or deceased) whose benefits were distributed in a single sum, during the plan year..........................................................................................................................

| **3** | 0 |
| --- | --- |

| **Part II** | **Funding Information** (If the plan is not subject to the minimum funding requirements of section of 412 of the Internal Revenue Code or ERISA section 302, skip this Part) |
| --- | --- |

**4** Is the plan administrator making an election under Code section 412(d)(2) or ERISA section 302(d)(2)? ...........................  ☐ Yes  ☒ No  ☐ N/A

**If the plan is a defined benefit plan, go to line 8.**

**5** If a waiver of the minimum funding standard for a prior year is being amortized in this plan year, see instructions and enter the date of the ruling letter granting the waiver.    Date:  Month _____  Day _____  Year _____

**If you completed line 5, complete lines 3, 9, and 10 of Schedule MB and do not complete the remainder of this schedule.**

**6 a** Enter the minimum required contribution for this plan year (include any prior year accumulated funding deficiency not waived)..........................................................

| **6a** | |
| --- | --- |

**b** Enter the amount contributed by the employer to the plan for this plan year ........................................

| **6b** | |
| --- | --- |

**c** Subtract the amount in line 6b from the amount in line 6a. Enter the result (enter a minus sign to the left of a negative amount)...........................

| **6c** | |
| --- | --- |

**If you completed line 6c, skip lines 8 and 9.**

**7** Will the minimum funding amount reported on line 6c be met by the funding deadline? ...........................................  ☐ Yes  ☐ No  ☐ N/A

**8** If a change in actuarial cost method was made for this plan year pursuant to a revenue procedure or other authority providing automatic approval for the change or a class ruling letter, does the plan sponsor or plan administrator agree with the change?........................................................................................  ☐ Yes  ☐ No  ☒ N/A

| **Part III** | **Amendments** |
| --- | --- |

**9** If this is a defined benefit pension plan, were any amendments adopted during this plan year that increased or decreased the value of benefits? If yes, check the appropriate box. If no, check the "No" box.    ☐ Increase  ☐ Decrease  ☐ Both  ☒ No

| **Part IV** | **ESOPs** (see instructions). If this is not a plan described under Section 409(a) or 4975(e)(7) of the Internal Revenue Code, skip this Part. |
| --- | --- |

**10** Were unallocated employer securities or proceeds from the sale of unallocated securities used to repay any exempt loan? ...............  ☐ Yes  ☐ No

**11 a** Does the ESOP hold any preferred stock? ...............................................................................  ☐ Yes  ☐ No

**b** If the ESOP has an outstanding exempt loan with the employer as lender, is such loan part of a "back-to-back" loan? (See instructions for definition of "back-to-back" loan.)  ☐ Yes  ☐ No

**12** Does the ESOP hold any stock that is not readily tradable on an established securities market? ........................................  ☐ Yes  ☐ No

For Paperwork Reduction Act Notice and OMB Control Numbers, see the instructions for Form 5500.    **Schedule R (Form 5500) 2015**<br>**v. 150123**

| Part V | Additional Information for Multiemployer Defined Benefit Pension Plans |
|---|---|

**13** Enter the following information for each employer that contributed more than 5% of total contributions to the plan during the plan year (measured in dollars). See instructions. *Complete as many entries as needed to report all applicable employers.*

**a** Name of contributing employer JIM WALTER RESOURCES, INC.

**b** EIN 59-2981186          **c** Dollar amount contributed by employer                    8996997

**d** Date collective bargaining agreement expires *(If employer contributes under more than one collective bargaining agreement, check box ☐ and see instructions regarding required attachment. Otherwise, enter the applicable date.)* Month 12    Day 31    Year 2016

**e** Contribution rate information *(If more than one rate applies, check this box ☐ and see instructions regarding required attachment. Otherwise, complete lines 13e(1) and 13e(2).)*
   (1)  Contribution rate (in dollars and cents) 6.05
   (2)  Base unit measure: ☒ Hourly   ☐ Weekly   ☐ Unit of production   ☐ Other (specify):

**a** Name of contributing employer CUMBERLAND COAL RESOURCES, LP

**b** EIN 84-1521723          **c** Dollar amount contributed by employer                    7517126

**d** Date collective bargaining agreement expires *(If employer contributes under more than one collective bargaining agreement, check box ☐ and see instructions regarding required attachment. Otherwise, enter the applicable date.)* Month 12    Day 31    Year 2016

**e** Contribution rate information *(If more than one rate applies, check this box ☐ and see instructions regarding required attachment. Otherwise, complete lines 13e(1) and 13e(2).)*
   (1)  Contribution rate (in dollars and cents) 6.05
   (2)  Base unit measure: ☒ Hourly   ☐ Weekly   ☐ Unit of production   ☐ Other (specify): _____

**a** Name of contributing employer MARSHALL COUNTY COAL COMPANY (THE)

**b** EIN 46-4064123          **c** Dollar amount contributed by employer                    6851065

**d** Date collective bargaining agreement expires *(If employer contributes under more than one collective bargaining agreement, check box ☐ and see instructions regarding required attachment. Otherwise, enter the applicable date.)* Month 12    Day 31    Year 2016

**e** Contribution rate information *(If more than one rate applies, check this box ☐ and see instructions regarding required attachment. Otherwise, complete lines 13e(1) and 13e(2).)*
   (1)  Contribution rate (in dollars and cents) 6.05
   (2)  Base unit measure: ☒ Hourly   ☐ Weekly   ☐ Unit of production   ☐ Other (specify): _____

**a** Name of contributing employer DRUMMOND COMPANY, INC.

**b** EIN 63-0653224          **c** Dollar amount contributed by employer                    4272350

**d** Date collective bargaining agreement expires *(If employer contributes under more than one collective bargaining agreement, check box ☐ and see instructions regarding required attachment. Otherwise, enter the applicable date.)* Month 12    Day 31    Year 2016

**e** Contribution rate information *(If more than one rate applies, check this box ☒ and see instructions regarding required attachment. Otherwise, complete lines 13e(1) and 13e(2).)*
   (1)  Contribution rate (in dollars and cents)
   (2)  Base unit measure: ☐ Hourly   ☐ Weekly   ☐ Unit of production   ☐ Other (specify): _____

**a** Name of contributing employer OHIO COUNTY COAL COMPANY (THE)

**b** EIN 46-4054000          **c** Dollar amount contributed by employer                    3966574

**d** Date collective bargaining agreement expires *(If employer contributes under more than one collective bargaining agreement, check box ☐ and see instructions regarding required attachment. Otherwise, enter the applicable date.)* Month 12    Day 31    Year 2016

**e** Contribution rate information *(If more than one rate applies, check this box ☐ and see instructions regarding required attachment. Otherwise, complete lines 13e(1) and 13e(2).)*
   (1)  Contribution rate (in dollars and cents) 6.05
   (2)  Base unit measure: ☒ Hourly   ☐ Weekly   ☐ Unit of production   ☐ Other (specify): _____

**a** Name of contributing employer HARRISON COUNTY COAL COMPANY (THE)

**b** EIN 46-4067631          **c** Dollar amount contributed by employer                    3670343

**d** Date collective bargaining agreement expires *(If employer contributes under more than one collective bargaining agreement, check box ☐ and see instructions regarding required attachment. Otherwise, enter the applicable date.)* Month 12    Day 31    Year 2016

**e** Contribution rate information *(If more than one rate applies, check this box ☐ and see instructions regarding required attachment. Otherwise, complete lines 13e(1) and 13e(2).)*
   (1)  Contribution rate (in dollars and cents) 6.05
   (2)  Base unit measure: ☒ Hourly   ☐ Weekly   ☐ Unit of production   ☐ Other (specify): _____

Schedule R (Form 5500) 2015      Page **2** - [2]

| Part V | Additional Information for Multiemployer Defined Benefit Pension Plans |
|---|---|

**13** Enter the following information for each employer that contributed more than 5% of total contributions to the plan during the plan year (measured in dollars). See instructions. *Complete as many entries as needed to report all applicable employers.*

**a** Name of contributing employer   MARION COUNTY COAL COMPANY (THE)

**b** EIN   46-4067755      **c**   Dollar amount contributed by employer      3551652

**d** Date collective bargaining agreement expires *(If employer contributes under more than one collective bargaining agreement, check box ☐ and see instructions regarding required attachment. Otherwise, enter the applicable date.)* Month 12   Day 31   Year 2016

**e** Contribution rate information *(If more than one rate applies, check this box ☐ and see instructions regarding required attachment. Otherwise, complete lines 13e(1) and 13e(2).)*
   (1)   Contribution rate (in dollars and cents) 6.05
   (2)   Base unit measure: ☒ Hourly   ☐ Weekly   ☐ Unit of production   ☐ Other (specify):

**a** Name of contributing employer   PINNACLE MINING COMPANY, LLC

**b** EIN   06-1697780      **c**   Dollar amount contributed by employer      3212801

**d** Date collective bargaining agreement expires *(If employer contributes under more than one collective bargaining agreement, check box ☐ and see instructions regarding required attachment. Otherwise, enter the applicable date.)* Month 12   Day 31   Year 2016

**e** Contribution rate information *(If more than one rate applies, check this box ☐ and see instructions regarding required attachment. Otherwise, complete lines 13e(1) and 13e(2).)*
   (1)   Contribution rate (in dollars and cents) 6.05
   (2)   Base unit measure: ☒ Hourly   ☐ Weekly   ☐ Unit of production   ☐ Other (specify): _____

**a** Name of contributing employer   OAK GROVE RESOURCES, LLC

**b** EIN   27-0062072      **c**   Dollar amount contributed by employer      3202766

**d** Date collective bargaining agreement expires *(If employer contributes under more than one collective bargaining agreement, check box ☐ and see instructions regarding required attachment. Otherwise, enter the applicable date.)* Month 12   Day 31   Year 2016

**e** Contribution rate information *(If more than one rate applies, check this box ☐ and see instructions regarding required attachment. Otherwise, complete lines 13e(1) and 13e(2).)*
   (1)   Contribution rate (in dollars and cents) 6.05
   (2)   Base unit measure: ☒ Hourly   ☐ Weekly   ☐ Unit of production   ☐ Other (specify): _____

**a** Name of contributing employer   OHIO VALLEY COAL COMPANY (THE)

**b** EIN   34-1041310      **c**   Dollar amount contributed by employer      3035834

**d** Date collective bargaining agreement expires *(If employer contributes under more than one collective bargaining agreement, check box ☐ and see instructions regarding required attachment. Otherwise, enter the applicable date.)* Month 12   Day 31   Year 2016

**e** Contribution rate information *(If more than one rate applies, check this box ☐ and see instructions regarding required attachment. Otherwise, complete lines 13e(1) and 13e(2).)*
   (1)   Contribution rate (in dollars and cents) 6.05
   (2)   Base unit measure: ☒ Hourly   ☐ Weekly   ☐ Unit of production   ☐ Other (specify): _____

**a** Name of contributing employer

**b** EIN      **c**   Dollar amount contributed by employer

**d** Date collective bargaining agreement expires *(If employer contributes under more than one collective bargaining agreement, check box ☐ and see instructions regarding required attachment. Otherwise, enter the applicable date.)* Month _____ Day _____ Year _____

**e** Contribution rate information *(If more than one rate applies, check this box ☐ and see instructions regarding required attachment. Otherwise, complete lines 13e(1) and 13e(2).)*
   (1)   Contribution rate (in dollars and cents) _____
   (2)   Base unit measure: ☐ Hourly   ☐ Weekly   ☐ Unit of production   ☐ Other (specify): _____

**a** Name of contributing employer

**b** EIN      **c**   Dollar amount contributed by employer

**d** Date collective bargaining agreement expires *(If employer contributes under more than one collective bargaining agreement, check box ☐ and see instructions regarding required attachment. Otherwise, enter the applicable date.)* Month _____ Day _____ Year _____

**e** Contribution rate information *(If more than one rate applies, check this box ☐ and see instructions regarding required attachment. Otherwise, complete lines 13e(1) and 13e(2).)*
   (1)   Contribution rate (in dollars and cents) _____
   (2)   Base unit measure: ☐ Hourly   ☐ Weekly   ☐ Unit of production   ☐ Other (specify): _____

| 14 | Enter the number of participants on whose behalf no contributions were made by an employer as an employer of the participant for: | | |
|---|---|---|---|
| **a** | The current year ............................................................................................... | **14a** | 45570 |
| **b** | The plan year immediately preceding the current plan year........................................... | **14b** | 46537 |
| **c** | The second preceding plan year ........................................................................... | **14c** | 49594 |

| 15 | Enter the ratio of the number of participants under the plan on whose behalf no employer had an obligation to make an employer contribution during the current plan year to: | | |
|---|---|---|---|
| **a** | The corresponding number for the plan year immediately preceding the current plan year ................ | **15a** | 0.98 |
| **b** | The corresponding number for the second preceding plan year ................................................ | **15b** | 0.92 |

| 16 | Information with respect to any employers who withdrew from the plan during the preceding plan year: | | |
|---|---|---|---|
| **a** | Enter the number of employers who withdrew during the preceding plan year ................ | **16a** | 2 |
| **b** | If line 16a is greater than 0, enter the aggregate amount of withdrawal liability assessed or estimated to be assessed against such withdrawn employers | **16b** | 1510460 |

**17** If assets and liabilities from another plan have been transferred to or merged with this plan during the plan year, check box and see instructions regarding supplemental information to be included as an attachment. ............................................................................................................................ ☐

## Part VI    Additional Information for Single-Employer and Multiemployer Defined Benefit Pension Plans

**18** If any liabilities to participants or their beneficiaries under the plan as of the end of the plan year consist (in whole or in part) of liabilities to such participants and beneficiaries under two or more pension plans as of immediately before such plan year, check box and see instructions regarding supplemental information to be included as an attachment ......................................................................................................................... ☐

**19**    Enter the percentage of plan assets held as:
  **a**    Stock: _____40___% Investment-Grade Debt: _____15___% High-Yield Debt: _____2___% Real Estate: _____10___% Other: _____33___%
  **b**    Provide the average duration of the combined investment-grade and high-yield debt:
  ☐ 0-3 years  ☒ 3-6 years  ☐ 6-9 years  ☐ 9-12 years  ☐ 12-15 years  ☐ 15-18 years  ☐ 18-21 years  ☐ 21 years or more
  **c**    What duration measure was used to calculate line 19(b)?
  ☒ Effective duration  ☐ Macaulay duration  ☐ Modified duration  ☐ Other (specify):

## Part VII    IRS Compliance Questions

| **20a** | Is the plan a 401(k) plan?........................................................................................ | ☐ Yes | ☐ No |
|---|---|---|---|
| **20b** | If "Yes," how does the 401(k) plan satisfy the nondiscrimination requirements for employee deferrals and employer matching contributions (as applicable) under sections 401(k)(3) and 401(m)(2)?.................... | ☐ Design-based safe harbor method | ☐ ADP/ACP test |
| **20c** | If the ADP/ACP test is used, did the 401(k) plan perform ADP/ACP testing for the plan year using the "current year testing method" for nonhighly compensated employees (Treas. Reg sections 1.401(k)-2(a)(2)(ii) and 1.401(m)-2(a)(2)(ii))? | ☐ Yes | ☐ No |
| **21a** | Check the box to indicate the method used by the plan to satisfy the coverage requirements under section 410(b): | ☐ Ratio percentage test | ☐ Average benefit test |
| **21b** | Does the plan satisfy the coverage and nondiscrimination tests of sections 410(b) and 401(a)(4) by combining this plan with any other plans under the permissive aggregation rules? ................................. | ☐ Yes | ☐ No |
| **22a** | Has the plan been timely amended for all required tax law changes?........................................ | ☐ Yes | ☐ No   ☐ N/A |
| **22b** | Date the last plan amendment/restatement for the required tax law changes was adopted ____/____/____. Enter the applicable code _____ (See instructions for tax law changes and codes). | | |
| **22c** | If the plan sponsor is an adopter of a pre-approved master and prototype (M&P) or volume submitter plan that is subject to a favorable IRS opinion or advisory letter, enter the date of that favorable letter ____/____/____ and the letter's serial number _____. | | |
| **22d** | If the plan is an individually-designed plan and received a favorable determination letter from the IRS, enter the date of the plan's last favorable determination letter ____/____/____. | | |
| **23** | Is the Plan maintained in a U.S. territory (i.e., Puerto Rico (if no election under ERISA section 1022(i)(2) has been made), American Samoa, Guam, the Commonwealth of the Northern Mariana Islands or the U.S. Virgin Islands)? | ☐ Yes | ☐ No |

***United Mine Workers of America***
***1974 Pension Plan***

*Financial Statements*

*For the Years Ended June 30, 2016 and 2015*



1974PLAN_001660

**UNITED MINE WORKERS OF AMERICA**
**1974 PENSION PLAN**
**TABLE OF CONTENTS**
**FOR THE YEARS ENDED JUNE 30, 2016 AND 2015**

REPORT OF INDEPENDENT AUDITORS                                    1 - 2

FINANCIAL STATEMENTS

   Statements of Net Assets Available for Benefits                  3

   Statements of Changes in Net Assets Available for Benefits       4

   Notes to Financial Statements                                    5 - 30

REPORT OF INDEPENDENT CERTIFIED PUBLIC ACCOUNTANTS ON
   SUPPLEMENTAL INFORMATION REQUIRED BY THE DEPARTMENT OF
   LABOR'S RULES AND REGULATIONS FOR REPORTING AND DISCLOSURE
   UNDER THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974        31

SCHEDULE H  -
Item 4i             Schedules of Assets (Held at End of Year)

SCHEDULE H  -
Item 4i             Schedule of Reportable Transactions



---

**REPORT OF INDEPENDENT AUDITORS**

---

To the Trustees and Participants
United Mine Workers of America
  1974 Pension Plan

**Report on the Financial Statements**

We have audited the accompanying financial statements of United Mine Workers of America 1974 Pension Plan (the Plan), which comprise the statements of net assets available for benefits as of June 30, 2016 and 2015 and the related statements of changes in net assets available for benefits for the years then ended, and the related notes to the financial statements.

*Management's Responsibility for the Financial Statements*

The Plan's management is responsible for the preparation and fair presentation of these financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

*Auditor's Responsibility*

Our responsibility is to express an opinion on these financial statements based on our audits.  We conducted our audits in accordance with auditing standards generally accepted in the United States of America.  Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements.  The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error.  In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control.  Accordingly, we express no such opinion.  An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

A Professional Corporation with Offices in Bethesda, MD and Alexandria, VA

1974PLAN_001662

**REPORT OF INDEPENDENT AUDITORS**

*Opinion*

In our opinion, the financial statements referred to above present fairly, in all material respects, information regarding the United Mine Workers of America 1974 Pension Plan's net assets available for benefits as of June 30, 2016, and the changes therein for the year then ended and its financial status as of June 30, 2015, and changes therein for the year then ended in accordance with accounting principles generally accepted in the United States of America.

*Restatement of Prior Year Financial Statements*

As discussed in Note 16 to the financial statements, during the year ended June 30, 2016, management determined that during the year ended June 30, 2015, an error was made in the cash and cash equivalents balance and investment income balance.  Management's correction of this error resulted in a decrease in cash and cash equivalents and net assets available for benefits of $46,830,000 as of June 30, 2015 and a decrease in investment income and the change in net assets available for benefits for the year ended June 30, 2015 of $46,830,000.  Our opinion is not modified with respect to this matter.

*Brad Beebe*

**A Professional Corporation**
Bethesda, MD
December 14, 2016

2

JA 000688

**UNITED MINE WORKERS OF AMERICA 1974 PENSION PLAN**
**STATEMENTS OF NET ASSETS AVAILABLE FOR BENEFITS**
**JUNE 30, 2016 AND 2015**

|  | 2016 | 2015 (Restated) |
|---|---|---|
| **ASSETS** | | |
| Cash and cash equivalents | $ 210,093,000 | $ 299,074,000 |
| Investments - at fair value - Note 3 | | |
| Investments held | 2,855,814,000 | 3,489,556,000 |
| Investments on loan - Note 14 | 96,948,000 | - |
| | 2,952,762,000 | 3,489,556,000 |
| Securities lending collateral received as cash and invested - Note 14 | 98,647,000 | - |
| Receivables | | |
| Accrued interest and dividends | 2,491,000 | 1,905,000 |
| Contributions from signatory employers | 3,155,000 | 6,805,000 |
| Due from broker for investments sold | 25,303,000 | 22,327,000 |
| Due from related trusts - Notes 2 and 11 | 41,828,000 | 30,771,000 |
| Other | 1,635,000 | 90,000 |
| | 74,412,000 | 61,898,000 |
| Furniture, equipment and leasehold improvements - cost less accumulated depreciation and amortization of $4,188,000 and $4,033,000 | 369,000 | 507,000 |
| Other assets | 884,000 | 2,738,000 |
| **TOTAL ASSETS** | 3,337,167,000 | 3,853,773,000 |
| **LIABILITIES** | | |
| Accounts payable and accrued administrative expenses | 6,856,000 | 5,655,000 |
| Obligation to refund collateral received as cash and invested - Note 14 | 98,647,000 | - |
| Due to broker for investments purchased | 6,223,000 | 23,932,000 |
| Accrued administrative employees' pension benefit liability - Note 8 | 29,141,000 | 17,649,000 |
| Accrued administrative employees' postretirement benefits other than pensions - Note 9 | 54,563,000 | 43,864,000 |
| Other | 1,457,000 | 1,331,000 |
| **TOTAL LIABILITIES** | 196,887,000 | 92,431,000 |
| **NET ASSETS AVAILABLE FOR BENEFITS** | $ 3,140,280,000 | $ 3,761,342,000 |

1974PLAN_001664

**UNITED MINE WORKERS OF AMERICA 1974 PENSION PLAN**
**STATEMENTS OF CHANGES IN NET ASSETS AVAILABLE FOR BENEFITS**
**FOR THE YEARS ENDED JUNE 30, 2016 AND 2015**

| | 2016 | 2015 (Restated) |
|---|---|---|
| **ADDITIONS** | | |
| Investment income | | |
| Net appreciation (depreciation) in fair value of investments | $ (60,932,000) | $ 96,163,000 |
| Interest | 7,057,000 | 12,129,000 |
| Dividends | 20,850,000 | 28,193,000 |
| Securities lending income - Note 14 | 265,000 | 183,000 |
| Partnership income | 11,858,000 | 8,935,000 |
| Real estate income | 7,968,000 | - |
| Other income | 1,441,000 | 331,000 |
| | (11,493,000) | 145,934,000 |
| Investment expenses | (7,171,000) | (7,768,000) |
| | (18,664,000) | 138,166,000 |
| Contributions from signatory employers - Notes 2 and 5 | 54,991,000 | 96,551,000 |
| Contributions - withdrawal liability | 113,000 | 500,000 |
| Other income | 1,900,000 | 1,899,000 |
| **TOTAL ADDITIONS** | 38,340,000 | 237,116,000 |
| **DEDUCTIONS** | | |
| Pension benefits - Note 1 | 614,601,000 | 608,664,000 |
| Death benefits - Note 1 | 7,135,000 | 9,801,000 |
| Administrative expenses - Note 2 | 28,496,000 | 23,971,000 |
| **TOTAL DEDUCTIONS** | 650,232,000 | 642,436,000 |
| **NET DECREASE BEFORE EMPLOYEE BENEFIT ADJUSTMENTS** | (611,892,000) | (405,320,000) |
| Employees' pension-related changes other than net periodic pension cost - Note 8 | (4,275,000) | (19,000) |
| Employees' postretirement-related changes other than net periodic postretirement benefit cost - Note 9 | (4,895,000) | 1,687,000 |
| **NET DECREASE IN NET ASSETS AVAILABLE FOR BENEFITS** | (621,062,000) | (403,652,000) |
| **NET ASSETS AVAILABLE FOR BENEFITS AT BEGINNING OF YEAR** | 3,761,342,000 | 4,164,994,000 |
| **NET ASSETS AVAILABLE FOR BENEFITS AT END OF YEAR** | $ 3,140,280,000 | $ 3,761,342,000 |

1974PLAN_001665

**UNITED MINE WORKERS OF AMERICA 1974 PENSION PLAN**
**NOTES TO FINANCIAL STATEMENTS**
**FOR THE YEARS ENDED JUNE 30, 2016 AND 2015**

## NOTE 1:  PLAN AND TRUST DESCRIPTION

The following brief description of the United Mine Workers of America 1974 Pension Plan (the "Plan") and Trust (the "Trust") is provided for general information purposes only.  Participants should refer to the Plan and Trust documents for more complete information.

### General

The Trust is an irrevocable trust established by the National Bituminous Coal Wage Agreement of 1974 (1974 Agreement) that became effective December 6, 1974.  Pursuant to the 1974 Agreement, the National Bituminous Coal Wage Agreement of 2011 ("2011 Agreement") that became effective July 1, 2011, and related prior agreements, the Trust provides pension benefits to eligible individuals who retire under provisions of the Plan. Pursuant to the 2011 Agreement and related prior agreements, the Plan defines the type and amount of pension benefits that are provided by the Trust.  The Plan also defines the eligibility requirements that individuals must meet to receive benefits from the Trust. The Plan is subject to the provisions of the Employee Retirement Income Security Act of 1974 (ERISA), as amended.

The United Mine Workers of America (UMWA) 1950 Pension Plan merged into the Plan on June 30, 2007.

### Benefits - 1974 Participants

The following benefits apply to a 1974 Plan participant who is a mine worker who was regularly employed in a classified job on December 6, 1974 or who has earned a year of credited signatory service after December 5, 1974.

#### Normal Retirement

Participants are eligible for normal retirement benefits when they either (1) reach age sixty-five with five years of signatory service, subject to break-in-service rules or (2) reach age sixty-two with ten years of signatory service or twenty years of credited service including the required years of signatory service.  Signatory service is defined as time during which a participant worked as an employee in a classified job for an employer signatory to the National Bituminous Coal Wage Agreement then in effect.  The Plan limits the amount of nonsignatory service that may be recognized by the benefit formula.  In addition to the twenty year credited service requirement, the participant must have the following service with an employer signatory to the National Bituminous Coal Wage Agreement:

| Date of Retirement | Years of Signatory Service Required | Maximum Number of Years of Nonsignatory Service Included in Credited Service |
| --- | --- | --- |
| Before 1/1/77 | 5 | 15 |
| 1/1/77 to 12/31/77 | 6 | 14 |
| 1/1/78 to 12/31/78 | 7 | 13 |
| 1/1/79 to 12/31/79 | 8 | 12 |
| 1/1/80 to 12/31/80 | 9 | 11 |
| 1/1/81 and after | 10 | 10 |

#### Age Fifty-five Retirement Pension

Participants are eligible for early retirement benefits when they reach age fifty-five with at least ten years of signatory service or twenty years of credited service including the required years of signatory service.  The dollar amount for such benefit is subject to reduction for early commencement in accordance with the provisions of the Plan.

5

**NOTES TO FINANCIAL STATEMENTS**

**NOTE 1: PLAN AND TRUST DESCRIPTION - continued**

### Disability Retirement

Participants are eligible for disability retirement benefits when the disability is due to a mine accident occurring on or after December 6, 1974, while the participant is employed in a classified job for a signatory employer, and the participant is eligible for Social Security Disability Insurance benefits as a result of such an accident. The benefit is payable as either:

- A normal disability benefit to participants with at least ten years of signatory service prior to retirement, or

- A minimum disability benefit to participants with less than ten years of signatory service prior to retirement.

### Deferred Vested Pension

Participants vest upon completion of ten years of signatory service or twenty years of credited service (as defined under Normal Retirement Pension eligibility). Participants also vest upon completion of five years of signatory service with one hour of service on or after July 1, 1999. Vested participants who cease classified work prior to attaining age fifty-five and who do not qualify for a Deferred Vested Pension - Special or a Deferred Vested Pension - Enhanced 1996 are eligible for this benefit at age 55 or later, which may be subject to an actuarial reduction.

### Deferred Vested Pension - Special

Vested participants who were between the ages of fifty and fifty-five on their last day of work, which occurs on or after June 7, 1981, who have at least twenty years of signatory service, and who were either (1) laid-off and had not refused recall or (2) terminated under Article III, Section (j) of the 2002 Agreement (or physically unable to perform regular work) and not employed in the coal industry thereafter, are eligible for the benefits. This type of benefit was deleted as of January 1, 2007, for participants who retired under the 2011 Agreement. Those individuals may be eligible for a similar benefit under an existing pension type that makes the Deferred Vested Pension - Special redundant.

### Deferred Vested Pension - Enhanced 1996

Vested participants who ceased classified work on or after December 16, 1993, but prior to attaining age 55, who have at least twenty years of signatory service, and who were either (1) laid-off and had not refused recall or (2) terminated under Article III, Section (j) of the Wage Agreement (or physically unable to perform regular work) and not employed in the coal industry thereafter, and the participants' pension benefits are not in pay status on or before August 16, 1996 are eligible for the benefits.

### Special Permanent Layoff Pension

Vested participants who ceased classified work on or after January 1, 1998, and had twenty years of signatory service, prior to age fifty-five and who either (1) had been permanently laid-off due to mine closing, or (2) permanently laid off (i.e, on layoff status at least 180 days and not refused recall), are eligible for this benefit, which is calculated as if the participants were age 55. Vested participants who do not have credited signatory service between November 1, 1997 and June 17, 1998 and who return to work after June 18, 1998, must work either 250 hours of credited signatory service or have returned to work as a result of a recall to fill a bona fide job opening.

1974PLAN_001667

---

**NOTES TO FINANCIAL STATEMENTS**

---

**NOTE 1:  PLAN AND TRUST DESCRIPTION  -  continued**

### Special 30-and-Out Layoff Pension

Vested participants whose last day of credited service is on or after January 1, 2002, and who had at least 30 years of signatory service on such last day of credited service and who have been laid off and not refused recall are eligible for this benefit.  The dollar amount of such benefit is the amount the participant would be eligible to receive under the Normal Retirement option, not subject to reduction for early commencement.  Any participant who, because of layoff, was not actively at work as of December 31, 2001, must either earn at least 250 hours of credited service following his return to work, or return to work as the result of a recall determined by the Trustees to have been to fill a bona fide job opening and not for the purpose of qualifying for this Special 30-and-Out Layoff Pension Benefit to be eligible for this benefit.  This type of benefit was deleted as of January 1, 2007, for participants who retired under the 2011 Agreement.  Those individuals may be eligible for a similar benefit under an existing pension type that makes the Special 30-and-Out Layoff Pension redundant.

### 30-and-Out Pension

Vested participants whose last day of credited service is on or after January 1, 2003 and who had at least 30 years of signatory service on such last day of credited service are eligible for this benefit.  The dollar amount of such benefit is the amount the participant would be eligible to receive under the Normal Retirement option, not subject to reduction for early commencement.  Any participant who, because of layoff, was not actively at work as of December 31, 2001, must either earn at least 250 hours of credited service following his return to work, or return to work as a result of a recall determined by the Trustees to have been to fill a bona fide job opening, and not for the purpose of qualifying for this 30-and-Out Pension Benefit to be eligible for this benefit.

### Surviving Spouse Benefit

Generally, eligible surviving spouses of participants who had attained age fifty-five and were receiving, or were eligible to receive at the time of death, a pension (except Deferred Vested participants who have less than twenty years of credited service) are eligible for this benefit, which is equal to 75 percent of the participant's pension.  A Surviving Spouse Benefit of $10,000 plus $100 a month is also provided for participants who completed at least ten years of credited service and who died as a result of a mine accident during the term of the National Bituminous Coal Wage Agreement of 1978 or 1981.

### Joint and Survivors Annuity

If a participant qualifies for a pension under the Plan but is not covered by a Surviving Spouse Benefit, the pension benefit otherwise provided to such participant shall be reduced actuarially and 50 percent of such reduced pension benefit will be continued, after the death of the participant, for the life of any eligible surviving spouse.  However, such participant may elect not to take a joint and survivor annuity and instead receive an unreduced pension benefit for life only.

### Preretirement Survivors Annuity

An eligible surviving spouse is entitled to receive a preretirement survivor annuity if the participant completed five years of signatory service for vesting purposes, is not covered by a surviving spouse benefit, and dies before he elects or is entitled to elect a pension benefit.

1974PLAN_001668

**NOTES TO FINANCIAL STATEMENTS**

**NOTE 1: PLAN AND TRUST DESCRIPTION - continued**

### Death Benefits (1974 Participants)

Subject to the following conditions and exceptions, death benefits are provided to the named beneficiaries of any pensioner (other than a pensioner receiving a deferred vested pension based upon less than twenty years of credited service or a pensioner receiving a pension based in whole or in part upon years of service credited under the terms of Article II (G) of the Plan) whose death occurs on or after February 1, 1991. The pensioner's last credited signatory service must have been with an employer signatory to the 2011 Agreement or any agreement that provides for conforming contributions to the Plan. The death benefit is $10,000 if the named beneficiary is the pensioner's surviving spouse or dependent, and $8,500 for all others. However, as a result of the actuary's certification that the Plan is in critical status for the plan year beginning July 1, 2014, effective October 28, 2014, the Plan's lump sum death benefit is limited to $5,000 while the Plan is in critical or critical and declining status. Death benefits are not provided by the Plan for pensioners who are also eligible beneficiaries of the UMWA Combined Benefit Fund.

### Benefits - 1950 Participants

The following benefits apply to a 1950 Plan participant who is a mine worker who qualifies for a pension benefit and who ceased performing classified work for an Employer prior to December 31, 1975 or became disabled between May 28, 1946 and December 6, 1974 as a result of a mine accident.

### Normal Retirement

A participant is eligible for normal retirement benefits when he ceases work, attains age fifty-five, and has completed one of the two service requirements described below:

- Twenty years of credited service including service with an employer signatory to the National Bituminous Coal Wage Agreement:

| Date Attains Age 55 | Years of Signatory Service Required |
|---|---|
| Before 1/1/77 | 5 |
| 1/1/77 to 12/31/77 | 6 |
| 1/1/78 to 12/31/78 | 7 |
| 1/1/79 to 12/31/79 | 8 |
| 1/1/80 to 12/31/80 | 9 |
| 1/1/81 and after | 10 |

- Ten years signatory service including at least three years after December 31, 1970.

### Disability Retirement

A participant is eligible for disability retirement benefits when the disability is due to a mine accident that occurred between May 29, 1946 and December 6, 1974, when the participant worked in a classified job for a signatory employer, and when the participant is eligible for Social Security Disability Insurance benefits as a result of such an accident.

### Widow's Pension

Commencing March 1, 1982, a widow's pension is available to the widow of a pensioner receiving benefits under this Plan at time of death if the widow was married to such pensioner throughout the nine-month period ending on the date of the pensioner's death (unless such nine-month period would be waived for purposes of Social Security widow's benefits).

1974PLAN_001669

**NOTES TO FINANCIAL STATEMENTS**

---

**NOTE 1:  PLAN AND TRUST DESCRIPTION  -  continued**

### Termination with Vested Rights

Participants' rights vest upon completion of either twenty years of credited service (including the required amount of signatory service) or ten years of signatory service and at least three years of which are signatory after December 31, 1970.

### Death Benefits (1950 Participants)

Death benefits are provided for eligible survivors of any participant who either:  (a) was receiving pension payments under this Plan at the time of death and was eligible for health benefits under the UMWA 1992 Benefit Plan; UMWA 1993 Benefit Plan; or a plan maintained by an employer pursuant to section 9711 of the Internal Revenue Code, or (b) had made application for, and was eligible to receive, such payments and benefits.  The death benefit is $10,000 if the named beneficiary is the pensioner's surviving spouse or dependent, and $8,500 for all others.  However, as a result of the actuary's certification that the Plan is in critical status for the plan year beginning July 1, 2014, effective October 28, 2014, the Plan's lump sum death benefit is limited to $5,000 while the Plan is in critical or critical and declining status.  Death benefits are not provided by the Plan for pensioners who are participants of the UMWA Combined Benefit Fund.

**NOTE 2:  SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

The Plan's accounting conforms with accounting principles generally accepted in the United States of America. Significant accounting policies are summarized as follows:

### Cash Equivalents

Demand deposits and highly liquid investments with a maturity of three months or less when acquired, are considered cash equivalents.

### Investments Valuation and Income Recognition

When available, investments are valued based on quoted market prices.  When quoted market prices are not available, valuation is based on quoted prices of like assets, corroborated market data, indices and/or yield curves. The amounts shown in Note 3 for investments that have no quoted market price represent estimated fair value.  The following is a description of the valuation methodologies used for assets measured at fair value:

- Cash equivalents are recorded at cost which generally approximates fair value.

- Certain equities, certain preferred securities, certain short-term and foreign currency investments, investments of securities lending collateral received as cash, and certain fixed income securities are valued based on quoted prices in the active market in which they are traded.

- Certain equities, certain preferred securities, certain fixed income securities, certain short-term and foreign currency investments, and convertible securities are valued using quoted prices of like assets, corroborated market data, indices and/or yield curves.

---

9

**NOTES TO FINANCIAL STATEMENTS**

**NOTE 2:  SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES  -  continued**

- Commingled funds, hedge funds, private equities and real estate common collective trusts are recorded at the value reported to the Plan by the investment manager or the sponsor based on the net asset value (NAV) of the underlying investments in accordance with written policy.  For these investments, NAV is considered the practical expedient.  Fair value estimates of the these investments are reviewed, monitored and adjusted if appropriate by the Trustees of the Plan in accordance with the written policy.

The Plan also invests in wholly-owned subsidiaries, which in turn invest in real estate principally consisting of rental properties subject to long-term leases.  These wholly-owned subsidiaries are corporations exempt from tax under Internal Revenue Code Section 501(c)(2).  These investments are recorded at the estimated fair value reported by the corporations' third-party management, which is estimated on the basis of future rental receipts and estimated residual values discounted at rates commensurate with the risks involved.  The assets of the corporations are appraised periodically by independent appraisers.  The valuations of these investments are reviewed, monitored and adjusted if appropriate by the Trustees of the Plan in accordance with written policy.  The remainder of the subsidiary's assets and liabilities are valued at book value, as provided by the corporations' third-party management, which approximates fair value.  See Note 4.

Purchases and sales of securities are recorded on a trade-date basis.  Investment receivables and investment payables represent amounts due and amounts payable, respectively, for security transactions not yet settled at period end.  Interest income is recorded on the accrual basis.  Dividends are recorded on the ex-dividend date.  Realized and unrealized gains and losses on the value of investments are recognized in net appreciation in fair value of investments on the statements of changes in net assets available for benefits.

**Financial Instruments with Off-Balance-Sheet Risk**

The Plan is a party to a variety of hedge fund investments.  These investments may be used to hedge or shift exposure to the currency, equity and fixed income markets and are carried at market value.  Realized and unrealized gains and losses related to hedge fund investments are included in net appreciation (depreciation) in fair value of investments on the statements of changes in net assets available for benefits.

**Contributions from Signatory Employers**

Contributions from signatory employers are accrued based upon analysis of signatory employer remittance reports and cash receipts subsequent to year-end.  Management believes all contributions receivable are collectible and no allowance for uncollectible accounts has been provided.

**Administrative Expenses**

The Plan pays for administrative services provided to it and to related irrevocable trusts established pursuant to the 1974 Agreement, the 2011 Agreement, related interim agreements, and the Coal Industry Retiree Health Benefit Act of 1992.  Administrative expenses applicable solely to each plan have been directly charged to that plan.  The remaining administrative expenses were allocated among the plans based on functional activities using predetermined factors meaningful to each particular function.  Administrative expenses totaling approximately $28,496,000 and $23,971,000 for the years ended June 30, 2016 and 2015, respectively, are shown net of costs allocated to related party plans.

**Investment Expenses**

Certain investment related expenses are included in the determination of net appreciation (depreciation) in fair value of investments presented on the statements of changes in net assets available for benefits.

1974PLAN_001671

**NOTES TO FINANCIAL STATEMENTS**

**NOTE 2:  SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES  -  continued**

### Furniture, Equipment and Leasehold Improvements

Furniture, equipment and leasehold improvements are capitalized at cost.  Depreciation and amortization on furniture, equipment and leasehold improvements are calculated on the straight-line method over the estimated useful lives of the assets.  Furniture and equipment is depreciated over 3 to 10 years, and leasehold improvements are amortized over the remaining term of the lease.  Depreciation and amortization expenses, after allocation to other related plans, for the years ended June 30, 2016 and 2015 were $144,000 and $160,000, respectively.

### Recognition of Benefits

Benefits are recognized when paid.

### Use of Estimates

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, disclosure of contingent assets and liabilities, and the actuarial present value of accumulated plan benefits at the date of the financial statements and changes therein during the reporting period. Actual results could differ from those estimates.

### Subsequent Events

In preparing these financial statements, management of the Plan has evaluated events and transactions that occurred after June 30, 2016 for potential recognition or disclosure in the financial statements.  These events and transactions were evaluated through December 14, 2016, the date that the financial statements were available to be issued.

**NOTE 3:  FAIR VALUE MEASUREMENTS**

Accounting principles generally accepted in the United States of America define fair value as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date, establish a fair value reporting hierarchy and define three broad levels of inputs (the assumptions that market participants would use in pricing the asset or liability) as noted below:

### Level 1

Inputs are unadjusted quoted prices in active markets for identical assets or liabilities that the reporting entity has the ability to access at the measurement date.

### Level 2

Inputs are quoted prices for similar assets or liabilities in active markets, quoted prices for identical or similar assets or liabilities in markets that are not active or inputs that are derived principally from or corroborated by observable market data by correlation or other means.

### Level 3

Inputs to the valuation methodology are unobservable and significant to the fair value measurement.

A financial instrument's level within the fair value hierarchy is based on the lowest level of any input that is significant to the fair value measurement.  A detailed description of the valuation methodology for investments is included in Note 2.  There have been no changes in the methodology used at June 30, 2016 and 2015.

1974PLAN_001672

**NOTES TO FINANCIAL STATEMENTS**

**NOTE 3:  FAIR VALUE MEASUREMENTS  -  continued**

The availability of observable market data is monitored to assess the appropriate classification of financial instruments within the fair value hierarchy.  Changes in economic conditions or model-based valuation techniques may require the transfer of financial instruments from one fair value level to another.  In such instances, the transfer is reported at the end of the reporting period.

For the year ended June 30, 2016, $33,690,000 of real estate transferred out of level 3 and into level 2.

As of June 30, 2016 and 2015, assets measured at fair value on a recurring basis, including investments categorized by ultimate asset type rather than legal form, are summarized by level within the fair value hierarchy as follows:

| | 2016 | | | |
|---|---|---|---|---|
| | Level 1 | Level 2 | Level 3 | Total Fair Value |
| Convertible securities | $          - | $   11,992,000 | $          - | $    11,992,000 |
| Equities | 840,150,000 | 404,000 | - | 840,554,000 |
| Fixed income securities | 202,152,000 | 45,474,000 | - | 247,626,000 |
| Preferred securities | 875,000 | 165,000 | - | 1,040,000 |
| Real estate | - | 33,690,000 | 14,905,000 | 48,595,000 |
| Short-term and foreign currency investments | 1,204,000 | 10,898,000 | - | 12,102,000 |
| Total investments in the fair value hierarchy | 1,044,381,000 | 102,623,000 | 14,905,000 | 1,161,909,000 |
| Investments measured at net asset value | - | - | - | 1,790,853,000 |
| Investments at fair value | 1,044,381,000 | 102,623,000 | 14,905,000 | 2,952,762,000 |
| Securities lending collateral received as cash and invested | 98,647,000 | - | - | 98,647,000 |
| Cash equivalents | - | 210,093,000 | - | 210,093,000 |
| Total assets at fair value | $ 1,143,028,000 | $   312,716,000 | $   14,905,000 | $   3,261,502,000 |

| | 2015 | | | |
|---|---|---|---|---|
| | Level 1 | Level 2 | Level 3 | Total Fair Value |
| Convertible securities | $          - | $   12,893,000 | $          - | $    12,893,000 |
| Equities | 1,001,740,000 | 1,293,000 | - | 1,003,033,000 |
| Fixed income securities | 185,248,000 | 54,102,000 | - | 239,350,000 |
| Preferred securities | 983,000 | 2,499,000 | - | 3,482,000 |
| Real estate | - | - | 191,722,000 | 191,722,000 |
| Short-term and foreign currency investments | - | 3,123,000 | - | 3,123,000 |
| Total investments in the fair value hierarchy | 1,187,971,000 | 73,910,000 | 191,722,000 | 1,453,603,000 |
| Investments measured at net asset value | - | - | - | 2,035,953,000 |
| Investments at fair value | 1,187,971,000 | 73,910,000 | 191,722,000 | 3,489,556,000 |
| Cash equivalents | - | 299,074,000 | - | 299,074,000 |
| Total assets at fair value | $ 1,187,971,000 | $   372,984,000 | $   191,722,000 | $   3,788,630,000 |

Level 3 investments in real estate include both direct investments and amounts held in common collective trusts.

1974PLAN_001673

**NOTES TO FINANCIAL STATEMENTS**

**NOTE 3:  FAIR VALUE MEASUREMENTS  -  continued**

The following table represents a reconciliation for the years ended June 30, 2016 and 2015 for real estate assets measured at fair value on a recurring basis using Level 3 inputs:

|  | 2016 | 2015 |
|---|---|---|
| Beginning balance | $ 191,722,000 | $ 170,327,000 |
| Total gains or losses (realized/unrealized) | | |
|    Unrealized gains (losses) | (14,408,000) | 7,560,000 |
|    Realized gains | 5,247,000 | 2,781,000 |
| Purchases | 2,804,000 | 11,974,000 |
| Sales | (136,770,000) | (920,000) |
| Transfers out | (33,690,000) | - |
| Ending balance | $ 14,905,000 | $ 191,722,000 |

The following table represents the valuation techniques used to measure the fair value of the Fund's investment in wholly-owned subsidiaries which invest in real estate, and the significant unobservable inputs and the ranges (weighted average) of values for those inputs as of June 30, 2016 and 2015:

| 2016 | | | |
|---|---|---|---|
| Real Estate Holdings | Valuation Technique | Unobservable Inputs | Range |
| Interests in Real Estate | Discounted Cash Flows | Capitalization Rate | 4.82% |
| | | Discount Rate | 8.5%-11% |
| | | Terminal Capitalization Rate | 7.75%-9% |

| 2015 | | | |
|---|---|---|---|
| Real Estate Holdings | Valuation Technique | Unobservable Inputs | Range (Weighted Average) |
| Interests in Real Estate | Discounted Cash Flows | Capitalization Rate | 1.4%-5.6% (4.2%) |
| | | Discount Rate | 6.5%-9.8% (7.4%) |
| | | Terminal Capitalization Rate | 6% - 8% (6.4%) |

The fair values as of June 30, 2016 and 2015 of the following investments have been determined using the net asset value per unit of the investment:

| | 2016 | | 2015 | |
|---|---|---|---|---|
| | Fair Value | Unfunded Commitments | Fair Value | Unfunded Commitments |
| Commingled funds (a) | $ 1,106,301,000 | $ - | $ 1,431,025,000 | $ - |
| Private equities (b) | 199,231,000 | 36,189,000 | 226,574,000 | 46,945,000 |
| Real estate (c) | 198,312,000 | - | 138,933,000 | 22,652,000 |
| Hedge funds (d) | 287,009,000 | - | 239,421,000 | - |
| | $ 1,790,853,000 | $ 36,189,000 | $ 2,035,953,000 | $ 69,597,000 |

13

**NOTES TO FINANCIAL STATEMENTS**

**NOTE 3: FAIR VALUE MEASUREMENTS - continued**

(a)      This category includes funds that hold publicly-traded U.S. and non-U.S. equities in the developed and emerging markets and funds that hold fixed income securities. The U.S. equity funds employ passive index investment strategies and have the goal of achieving the total return of the S&P 500 Index, Nasdaq, Barclays U.S. Aggregate Bond Index, Dow Jones U.S. Total Stock Market Index, the Dow Jones U.S. Completion Total Stock Market Index, MSCI EAFE Index, MSCI Canada Index, Russell Midcap Index, MSCI Emerging Markets Standard Core Index and the MSCI Emerging Markets Small Cap. Several of the non-U.S. equity funds employ passive index investment strategies and have the goal of achieving the total return of the MSCI World Ex-U.S. Index and the MSCI All Country World Ex-U.S. Index. In addition, there are eight funds that employ active stock selection investment strategies in various emerging markets regions or countries. The funds that hold fixed income securities employ passive index investment strategies and have the goal of achieving the total return of the Barclays U.S. Aggregate Bond Index. There are two funds that employ an active security selection investment strategy that is benchmarked to the Barclays U.S. Aggregate Bond Index. Invested amounts may be redeemed on a daily, weekly, monthly, or semi-monthly basis. Certain holdings require a written notice five business days prior to redemption.

(b)      This category includes investments in private equity limited partnerships which invest in private and public company common stock, preferred stock, note, subordinated debt, warrants and options, promissory notes, corporate bonds, and private industrial, technology, and energy companies. A total of 33 funds are held in four main investment strategies: U.S. buyout, venture capital, European buyout, and emerging markets. The fund vintages cover 1998 - 2011. Third-party sales of interests in this category of investment may be done only with written consent of the general partner. In addition, certain distributions in this category have been deemed recallable.

(c)      This category includes investments in two open-ended and two close-ended real estate funds. The open-end funds are both highly diversified geographically within the U.S. and primarily hold stabilized occupancy core office, industrial, residential, and retail properties. The closed-end funds include an opportunisitc industrial property fund and a special situations fund. Redemption terms vary across funds, including monthly with 30-day notice, quarterly with 45-day and 60-day notice, and private equity structures in which redemption is dependent upon the funds' investment activities and resulting liquidity.

(d)      This category includes investments in a fund of hedge funds and three hedge funds. The investment strategies of funds in this category vary widely, and the funds may make extensive use of short-selling, leverage, and derivatives. Liquidity terms vary across funds, including daily, and monthly or quarterly with 30-day or 90-day written notice.

**Financial Instruments with Off-Balance-Sheet Risk**

     The Plan's partnership/joint venture interests consist primarily of limited partnership interests in private equity partnerships. Funds are provided to the investment managers as investments are consummated. As of June 30, 2016 and 2015, the Plan had outstanding commitments to fund an additional $36,189,000 and $69,597,000, respectively, of investments in this asset class.

1974PLAN_001675

---

**NOTES TO FINANCIAL STATEMENTS**

---

## NOTE 4: REAL ESTATE INVESTMENTS

### Investment in Hampden Square Corporation

As of June 30, 2015, the Plan had invested, net of distributions, $34,530,000 in the Hampden Square Corporation, a wholly-owned subsidiary. Hampden Square Corporation purchased a commercial building in 1998, which was leased to unrelated third parties. The property was sold on June 9, 2016 for $74,500,000, and net proceeds distributed to the Plan were $55,970,000 after closing costs, debt repayment, and dissolution fees.

As of June 30, 2015, the appraised fair value of the property was $67,700,000 and the fair value of the property net of related assets and liabilities was $52,362,000. The original cost of the Hampden Square real estate holding was $34,700,000. As of June 30, 2016, the Plan had $1,172,000 still invested for transaction related costs.

### Investment in Von Karman Michelson Corporation

As of June 30, 2015, the Plan had invested, net of distributions, $68,710,000 in the Von Karman Michelson Corporation, a wholly-owned subsidiary. Von Karman Michelson Corporation purchased a commercial building in 2004, which was leased to unrelated third parties. The property was sold on November 17, 2015 for $82,500,000 and net proceeds distributed to the Plan were $80,800,000. As of June 30, 2016, the Plan does not have any remaining capital in this investment.

As of June 30, 2015, the appraised fair value of the property was $78,361,000 and the fair value of the property net of related assets and liabilities was $79,161,000.

### Investment in Westview Corporate Center, Inc.

The Plan has invested, net of distributions, $14,905,000 and $59,955,000 in the Westview Corporate Center, Inc., a wholly-owned subsidiary, as of June 30, 2016 and 2015, respectively. Westview Corporate Center, Inc. purchased a commercial building in 2006, which is leased to unrelated third parties. The appraised fair value of the property was $15,000,000 and $24,600,000 as of June 30, 2016 and 2015, respectively. The fair value of the property net of related assets and liabilities was $14,905,000 and $24,508,000 as of June 30, 2016 and 2015, respectively.

### Investment in Redmond Woods, Inc.

The Plan has invested, net of distributions, $33,690,000 and $32,398,000 in Redmond Woods Inc., a wholly-owned subsidiary, as of June 30, 2016 and 2015, respectively. Redmond Woods Inc. purchased a commercial building in 2006, which is leased to unrelated third parties. The appraised fair value of the property was $34,900,000 and $35,400,000 as of June 30, 2016 and 2015, respectively. The fair value of the property net of related assets and liabilities was $33,690,000 and $35,691,000 as of June 30, 2016 and 2015, respectively. On July 20, 2016, the Redmond Woods property was sold for $36,985,000 with net proceeds estimated to be distributed of $33,700,000 after closing costs, capital expenditures owed, and dissolution fees. The original cost of the Redmond Woods real estate holding was $27,900,000.

## NOTE 5: FUNDING POLICY

Under the Employee Retirement Income Security Act (ERISA), as amended by the Pension Protection Act of 2006 (PPA) and the Multiemployer Pension Reform Act of 2014, the Plan's actuary certified to the Internal Revenue Service and the Plan's Board of Trustees on September 28, 2015 that the Plan was in critical and declining status, as defined in Section 305(b)(6), for the plan year beginning July 1, 2015. Based on this certification and in accordance with applicable law, on May 25, 2016 and August 15, 2016, the UMWA and Bituminous Coal Operators' Association (BCOA) settlors updated the rehabilitation plan, which was originally adopted on February 26, 2015.

---

1974PLAN_001676

**NOTES TO FINANCIAL STATEMENTS**

**NOTE 5: FUNDING POLICY - continued**

Benefits of the Plan are being funded primarily through contributions by employers signatory to the 2011 Agreement and related prior agreements. The 2011 Agreement provides for employer contributions at a rate of $5.50 per hour worked by participants and $1.10 per ton procured or acquired on or after July 1, 2011 and is effective through December 31, 2016. Subsequently, as a result of the actuary's certification that the Plan is in critical and declining status for the plan year beginning July 1, 2015, the contribution rate increased to $6.05 per hour worked and $1.21 per ton procured or acquired. Effective August 15, 2016, a new collective bargaining agreement went into effect, and as a result the contribution rate decreased to $5.00 per hour worked and $0.96 per ton procured or acquired.

**NOTE 6: PLAN TERMINATION**

If the Plan is terminated, it shall remain in force and effect for the period necessary to complete the payment of benefits, in accordance with the terms of the Plan, to the extent assets in the Plan are available to pay such benefits and subject to any applicable requirements of federal law concerning employer liability. The signatory employers have guaranteed the benefits provided by the Plan during the term of the 2011 Agreement, however a new agreement, effective August 15, 2016, no longer guarantees the benefits provided by the Plan. In addition, some benefits may be fully or partially provided for by the existing assets and the Pension Benefit Guaranty Corporation (PBGC), but under the law, other benefits may not be provided for at all. The level of benefits guaranteed by the PBGC is subject to statutory ceiling which may be adjusted periodically.

**NOTE 7: ACTUARIAL PRESENT VALUE OF ACCUMULATED PLAN BENEFITS**

Accumulated plan benefits are expected future periodic payments that are attributable under the Plan's provisions to the service that participants have rendered. Accumulated plan benefits include benefits expected to be paid to (a) retired or terminated participants or their beneficiaries, (b) beneficiaries of deceased participants and (c) present participants or their beneficiaries. Benefits under the Plan are based on participants' years of credited service. Benefits payable under all circumstances (retirement, death, disability and termination of employment) are included, to the extent that they are deemed attributable to employee service rendered prior to the dates on which the benefit information is presented, the valuation dates.

The actuarial present value of accumulated plan benefits is determined by an independent actuarial firm. It is that amount that results from applying actuarial assumptions to adjust the accumulated plan benefits to reflect the time value of money (through discounts for interest) and the probability of payment (by means of decrements such as for death, disability, withdrawal, or retirement) between the valuation date and the expected date of payment. Actuarial assumptions are based on the presumption that the Plan will continue. Were the Plan to terminate, different actuarial assumptions and other factors might be applicable in determining the actuarial present value of accumulated plan benefits.

The significant actuarial assumptions used to determine the actuarial present value of accumulated plan benefits as of June 30, 2015 were:

- Life expectancy of participants:

    - Preretirement mortality, RP-2000 Mortality Table for Blue Collar Male Employees set forward two years and projected using scale MP-2015,

    - Postretirement mortality, RP-2000 Mortality Table for Blue Collar Healthy Male Annuitants set forward one year and projected using scale MP-2015,

1974PLAN_001677

**NOTES TO FINANCIAL STATEMENTS**

**NOTE 7: ACTUARIAL PRESENT VALUE OF ACCUMULATED PLAN BENEFITS  -  continued**

- Spouse and widow mortality, Unisex Pension 1984 Mortality Table set back three years and projected using scale MP-2015,

- Disability mortality, RP-2000 Mortality Table for Blue Collar Healthy Male Annuitants set forward four years and projected using scale MP-2015.

- Disability - 1.5% per year for ages 20 through 64,

- Administrative expenses, flat fee of $25,500,000 per year excluding investment expenses,

- Withdrawal - 125% of the Vaughn Table ultimate rates plus 4%,

- Net investment return - 7.5% per year.

Representative values of the assumed annual rates of retirement at June 30, 2015 are as follows:

| Age | Fewer than 30 Years of Service | 30 or More Years of Service | Vested Terminations |
|---|---|---|---|
| 50 - 53 | 0.00 | 0.13 | 0.00 |
| 54 | 0.00 | 0.20 | 0.00 |
| 55 | 0.10 | 0.38 | 0.45 |
| 56 | 0.07 | 0.34 | 0.19 |
| 57 | 0.07 | 0.30 | 0.12 |
| 58 | 0.08 | 0.30 | 0.09 |
| 59 | 0.09 | 0.30 | 0.06 |
| 60 | 0.10 | 0.30 | 0.06 |
| 61 | 0.14 | 0.35 | 0.06 |
| 62 | 0.40 | 0.70 | 1.00 |
| 63 | 0.30 | 0.45 | 1.00 |
| 64 | 0.60 | 0.30 | 1.00 |
| 65 | 1.00 | 1.00 | 1.00 |

The average expected retirement age is 60.9.

The actuarial present value of accumulated plan benefits as of June 30, 2015 is as follows:

Vested benefits

| | |
|---|---|
| Participants currently receiving payments | $ 8,069,088,000 |
| Other participants | 1,425,252,000 |
| | 9,494,340,000 |
| Nonvested benefits | 150,284,000 |
| | $ 9,644,624,000 |

1974PLAN_001678

**NOTES TO FINANCIAL STATEMENTS**

**NOTE 7:  ACTUARIAL PRESENT VALUE OF ACCUMULATED PLAN BENEFITS  -  continued**

The changes in the actuarial present value of accumulated plan benefits for the year ended June 30, 2015 were as follows:

| | |
|---|---|
| Actuarial present value of accumulated plan benefits as of June 30, 2014 | $ 8,793,419,000 |
| Increase (decrease) attributable to | |
| Interest due to decrease in the discount period | 305,132,000 |
| Change in actuarial assumptions | 464,039,000 |
| Statutory limit on lump sum payments | (99,273,000) |
| Benefits paid | (618,468,000) |
| Benefits accumulated, including actuarial gain/ loss | 799,775,000 |
| | 851,205,000 |
| Actuarial present value of accumulated plan benefits as of June 30, 2015 | $ 9,644,624,000 |

The changes in assumptions include the change in the current liability interest rate, the change in mortality rates, the change in purchased ton rates, the change in contribution rates and the assumed yearly future service credit. The current liability interest rate decreased from 3.59% used at June 30, 2014 to 3.34% used at June 30, 2015. The assumed projections to the mortality rates were changed from an improvement of 0.75% per year for 15 years at each age between 55 and 99 to the MP-2015 projection scale beginning in 2012 at all ages.  The rate for purchased tons of coal was increased from $1.10 to $1.21 effective July 1, 2015.  The assumed hourly contribution rate was increased from $5.50 to $6.05 effective July 1, 2015.  The assumed yearly future service credit, for active participants without a full year of service in all prior years, was increased from 0.75 per year to 0.90 per year to represent the actuary's best estimate of future service based on recent plan experience.

The computation of the actuarial present value of accumulated plan benefits was made as of July 1, 2015. Had the valuation been performed as of June 30, 2015, there would be no material differences. The Plan's actuarially determined Minimum Funding Standards Account met the minimum funding requirements of ERISA as of June 30, 2015, the latest valuation date.

**NOTE 8:  EMPLOYEES' PENSION PLAN**

The Plan sponsors a multiple employer pension plan covering substantially all of the employees of participating employers.  The benefits are based on years of service and the employee's four years of highest earnings.  The Plan's funding policy is to contribute annually at least the minimum required by ERISA.  Contributions are intended to provide for benefits that are attributed to service to date and for those expected to be earned in the future.  Net periodic pension costs and the funded status of the Employees' Pension Plan are determined by the Employees' Pension Plan's actuary.

The employees of the Plan also provide services to other plans.  Accordingly, a portion of the unfunded obligation and related expense of the Employees' Pension Plan have been allocated to other plans and are included in due from other trusts, which is reflected on the statements of net assets available for benefits.  The allocated expense is comprised of two components, the net periodic pension cost and the adjustment for pension-related changes other than net periodic pension cost, which are included on the statements of changes in net assets available for benefits.

1974PLAN_001679

**NOTES TO FINANCIAL STATEMENTS**

**NOTE 8: EMPLOYEES' PENSION PLAN  -  continued**

The computation of accrued pension liability as of June 30, 2016 and 2015 was as follows:

|  | 2016 | 2015 |
|---|---|---|
| Projected benefit obligation | $ (87,815,000) | $ (81,852,000) |
| Fair value of plan assets | 58,674,000 | 64,203,000 |
| Accrued pension liability | $ (29,141,000) | $ (17,649,000) |

As of June 30, 2016 and 2015, the accumulated benefit obligation was $79,516,000 and $73,845,000, respectively.

The change in the projected benefit obligation for the years ended June 30, 2016 and 2015 was determined as follows:

|  | | |
|---|---|---|
| Benefit obligation at beginning of year | $  81,852,000 | $  81,063,000 |
| Increase (decrease) attributable to | | |
| Service cost | 2,258,000 | 2,257,000 |
| Interest cost | 3,140,000 | 3,122,000 |
| Net benefits paid | 8,042,000 | (4,432,000) |
| Actuarial (gain)/loss | (7,477,000) | (158,000) |
|  | 5,963,000 | 789,000 |
| Benefit obligation at end of year | $  87,815,000 | $  81,852,000 |

Following is a summary of significant actuarial assumptions to determine benefit obligations at June 30, 2016 and 2015:

|  | | |
|---|---|---|
| Discount rate | 3.20 % | 4.00 % |
| Rate of compensation increase | 3.50 % | 3.50 % |

The net periodic pension expense, which is included in administrative expenses on the statements of changes in net assets available for benefits, was computed as follows:

|  | | |
|---|---|---|
| Service cost | $    2,258,000 | $    2,257,000 |
| Interest cost | 3,140,000 | 3,122,000 |
| Expected return on plan assets | (3,953,000) | (3,727,000) |
| Amortization of prior service cost | 38,000 | 46,000 |
| Amortization of net loss | 2,108,000 | 2,864,000 |
|  | 3,591,000 | 4,562,000 |
| Amount allocated to the other plans for shared employees | 1,684,000 | 2,105,000 |
| 1974 Pension Plan net periodic pension expenses | $    1,907,000 | $    2,457,000 |

1974PLAN_001680

**NOTES TO FINANCIAL STATEMENTS**

**NOTE 8: EMPLOYEES' PENSION PLAN - continued**

Following is a summary of significant actuarial assumptions used to determine net periodic pension costs for the years ended June 30, 2016 and 2015:

|  | 2016 | 2015 |
|---|---|---|
| Discount rate | 4.00 % | 4.00 % |
| Rate of compensation increase | 3.50 % | 3.50 % |
| Expected long-term rate of return on plan assets | 6.80 % | 6.80 % |

As of June 30, 2016 and 2015, actuarial amounts that have not yet been recognized as components of net periodic pension cost, before allocation to other related plans, were:

|  | | | |
|---|---|---|---|
| Prior service cost | $ | 98,000 | $ 137,000 |
| Net loss | | 27,474,000 | 19,535,000 |
|  | $ | 27,572,000 | $ 19,672,000 |

Prior service cost and net loss not yet recognized as components of net periodic benefit cost are recognized in the computation of projected benefit obligation and, consequently, annual changes in these amounts are recognized as adjustments to net assets available for benefits. Changes in these amounts, to the extent not recognized as current expense, are reflected as pension-related changes other than net periodic pension cost. For the year ended June 30, 2016, the Plan's actuary calculated a decrease in net assets available for benefits of $7,900,000 for these changes. The Plan recognized a decrease in net assets available for benefits of $4,275,000 for these changes after allocation to other related plans. For the year ended June 30, 2015, the Plan's actuary calculated a decrease in net assets available for benefits of $37,000 for these changes. The Plan recognized a decrease in net assets available for benefits of $19,000 for these changes after allocation to other related plans.

Amounts expected to be recognized as components of net periodic benefit cost, before allocation to other related plans, during the year ending June 30, 2016 are as follows:

|  | | |
|---|---|---|
| Net loss | $ | 2,659,000 |
| Prior service credit | | 39,000 |
|  | $ | 2,698,000 |

The Employees' Pension Plan's assets are invested with the objective of being able to meet current and future benefit payment needs, while controlling pension expense volatility and future contributions. Employees' Pension Plan assets are diversified among U.S. large cap equities, U.S. small cap equities, international equities, commodity funds, U.S. fixed income investments and cash equivalents. The "strategic target" allocation ranges are 18-28% equities, 38-48% fixed income, 5-15% commodities, and 0-5% cash equivalents at June 30, 2016.

The Employees' Pension Plan's asset allocations at June 30, 2016 and 2015, by asset category are as follows:

|  | | |
|---|---|---|
| Equities | 47.0 % | 45.0 % |
| Fixed income funds | 43.0 | 43.0 |
| Commodities | 9.0 | 10.0 |
| Other (including cash equivalents) | 1.0 | 2.0 |
|  | 100 % | 100 % |

As of June 30, 2016 and 2015, assets of the Employees' Pension Plan measured at fair value on a recurring basis are summarized by level within the fair value hierarchy as follows:

1974PLAN_001681

**NOTES TO FINANCIAL STATEMENTS**

**NOTE 8: EMPLOYEES' PENSION PLAN - continued**

| | 2015 | | | |
| --- | --- | --- | --- | --- |
| | Level 1 | Level 2 | Level 3 | Total Fair Value |
| Commodity funds | $        - | $        - | $   5,148,000 | $   5,148,000 |
| Total investments in the fair value hierarchy | - | - | 5,148,000 | 5,148,000 |
| Investments measured at net asset value | - | - | - | 51,838,000 |
| Investments at fair value | - | - | 5,148,000 | 56,986,000 |
| Cash equivalents | - | 709,000 | - | 709,000 |
| Total assets at fair value | $        - | $   709,000 | $   5,148,000 | $   57,695,000 |

| | 2016 | | | |
| --- | --- | --- | --- | --- |
| | Level 1 | Level 2 | Level 3 | Total Fair Value |
| Commodity funds | $        - | $        - | $   6,326,000 | $   6,326,000 |
| Total investments in the fair value hierarchy | - | - | 6,326,000 | 6,326,000 |
| Investments measured at net asset value | - | - | - | 57,274,000 |
| Investments at fair value | - | - | 6,326,000 | 63,600,000 |
| Cash equivalents | - | 1,177,000 | - | 1,177,000 |
| Total assets at fair value | $        - | $   1,177,000 | $   6,326,000 | $   64,777,000 |

No plan assets are expected to be returned to the employers during fiscal year 2017.

The Plan and the other plans contributed $0 and $3,012,000 to the Employees' Pension Plan for the years ended June 30, 2016 and 2015, respectively. Management of the Plan and the other plans expect to contribute $619,000 to the Employees' Pension Plan during fiscal year 2017.

The Employees' Pension Plan paid benefits of $7,477,000 and $4,432,000 to eligible 1974 Pension Plan employees during the years ended June 30, 2016 and 2015, respectively. As of June 30, 2016, expected benefit payments for each of the next five fiscal years and for the following five fiscal year period in aggregate are as follows:

| | |
| --- | --- |
| 2017 | $   6,546,000 |
| 2018 | $   6,345,000 |
| 2019 | $   6,207,000 |
| 2020 | $   5,735,000 |
| 2021 | $   5,208,000 |
| 2022- 2026 | $  25,222,000 |

**NOTE 9: POSTRETIREMENT BENEFITS OTHER THAN PENSIONS**

The Plan sponsors a health benefits plan covering its administrative employees. The plan pays health insurance premiums for retirees who are not Medicare eligible. The plan substitutes Medicare supplemental coverage for the regular health coverage once retirees become Medicare eligible. Retirees who have less than 20 years of service must contribute a portion of the premiums until they become Medicare eligible.

1974PLAN_001682

**NOTES TO FINANCIAL STATEMENTS**

**NOTE 9: POSTRETIREMENT BENEFITS OTHER THAN PENSIONS - continued**

The accrued administrative employees' postretirement benefits other than pensions, which are included on the statements of net assets available for benefits, reflect the entire liability for employees' postretirement benefits other than pensions. As certain employees' benefits are allocated to the other trust funds, an allocated portion of the liability is included in due from other trusts, which is included on the statements of net assets available for benefits.

The Plan's postretirement health benefits plan is unfunded. The computation of accrued postretirement benefit obligation as of June 30, 2016 and 2015 was as follows:

|  | 2016 | 2015 |
|---|---|---|
| Accumulated postretirement benefit obligation |  |  |
| Retirees, beneficiaries and covered dependents | $ 25,217,000 | $ 19,721,000 |
| Active plan participants eligible for benefits | 9,998,000 | 8,714,000 |
| Active plan participants not yet eligible | 19,348,000 | 15,429,000 |
|  | 54,563,000 | 43,864,000 |
| Plan assets at fair value | - | - |
| Accrued postretirement benefit obligation in excess of plan assets | $ 54,563,000 | $ 43,864,000 |

Significant actuarial assumptions used in determining the benefit obligations at June 30, 2016 and 2015 were as follows:

|  | 2016 | 2015 |
|---|---|---|
| Discount rate | 3.40 % | 4.30 % |

The change in benefit obligations for the years ended June 30, 2016 and 2015 was determined as follows:

|  | 2016 | 2015 |
|---|---|---|
| Accumulated postretirement benefit obligation at beginning of year | $ 43,864,000 | $ 44,190,000 |
| Increase (decrease) attributable to |  |  |
| Service cost | 1,345,000 | 1,475,000 |
| Interest cost | 1,853,000 | 1,822,000 |
| Net benefits paid | (1,624,000) | (1,236,000) |
| Actuarial (gain)/loss | 9,125,000 | (2,387,000) |
|  | 10,699,000 | (326,000) |
| Accumulated postretirement benefit obligation at end of year | $ 54,563,000 | $ 43,864,000 |

1974PLAN_001683

**NOTES TO FINANCIAL STATEMENTS**

**NOTE 9: POSTRETIREMENT BENEFITS OTHER THAN PENSIONS - continued**

Components of net periodic postretirement benefit cost which is included in administrative expenses for the years ended June 30, 2016 and 2015 are as follows:

|  | 2016 | 2015 |
|---|---|---|
| Service cost | $ 1,345,000 | $ 1,475,000 |
| Interest cost | 1,853,000 | 1,822,000 |
| Amortizations |  |  |
| Transition obligation | - | 323,000 |
| Prior service cost | - | 464,000 |
|  | 3,198,000 | 4,084,000 |
| Amount allocated to other plans for shared employees | 1,537,000 | 1,961,000 |
| 1974 Pension Plan net periodic postretirement benefits | $ 1,661,000 | $ 2,123,000 |

As of June 30, 2016 and 2015, actuarial amounts that have not yet been recognized as components of net periodic postretirement benefit cost, before allocation to other related plans, were:

| Net loss | $ 10,793,000 | $ 1,668,000 |
|---|---|---|

The discount rate used to determine net periodic postretirement benefit costs was 4.30% for both years ended June 30, 2016 and 2015.

Prior service cost, net loss and transition obligation not yet recognized as components of net periodic postretirement benefit cost are recognized in the computation of accumulated benefit obligation and, consequently, annual changes in these amounts are recognized as adjustments to net assets available for benefits. Changes in these amounts, to the extent not recognized as current expense, are reflected as postretirement-related changes other than net periodic postretirement benefit cost. For the year ended June 30, 2016, the Plan's actuary calculated an increase in net assets available for benefits of $9,125,000 for these changes. The Plan recognized a decrease in net assets available for benefits of $4,895,000 for these changes after allocation to other related plans. For the year ended June 30, 2015, the Plan's actuary calculated a increase in net assets available for benefits of $3,174,000 for these changes. The Plan recognized a increase in net assets available for benefits of $1,687,000 for these changes after allocation to other related plans.

The amount expected to be recognized during the year ending June 30, 2016 as a component of net periodic postretirement benefit cost for the amortization of net loss, before allocation to other related plans, is $778,000.

The following benefit payments, which reflect expected future service, as appropriate, are expected to be paid:

|  | Postretirement Benefits* |
|---|---|
| 2017 | $ 1,798,000 |
| 2018 | 2,010,000 |
| 2019 | 2,269,000 |
| 2020 | 2,373,000 |
| 2021 | 2,519,000 |
| Years 2022 - 2026 | 13,843,000 |
|  | $ 24,812,000 |

* Payments shown are the net of retiree contributions, representing the Fund's share of the cost of benefits.

1974PLAN_001684

**NOTES TO FINANCIAL STATEMENTS**

**NOTE 9: POSTRETIREMENT BENEFITS OTHER THAN PENSIONS - continued**

The effect of change in assumed health care cost trend rates for the years ended June 30, 2016 and 2015 is as follows:

|  | 2016 | 2015 |
|---|---|---|
| Effect on total service cost and interest cost components |  |  |
| One-percentage point increase | $ 605,000 | $ 704,000 |
| One-percentage point decrease | $ (479,000) | $ (466,000) |
| Effect on year-end postretirement benefit obligation |  |  |
| One-percentage point increase | $ 8,884,000 | $ 6,822,000 |
| One-percentage point decrease | $ (7,161,000) | $ (5,538,000) |

**NOTE 10: LEASE AGREEMENTS**

The Plan is obligated under various operating lease agreements for office space and equipment. These lease expenses are allocated along with other administrative expenses (Note 2). Minimum annual rentals required for future fiscal years are:

| 2017 | $ 2,256,000 |
|---|---|
| 2018 | 2,301,000 |
| 2019 | 2,349,000 |
| 2020 | 1,796,000 |
|  | $ 8,702,000 |

Rental expenses incurred during the years ended June 30, 2016 and 2015 before allocation to other plans were approximately $2,146,000 and $2,092,000, respectively.

**NOTE 11: RELATED PARTY TRANSACTIONS**

The Plan invests certain assets in investment funds operated by various investment advisors of the Plan, who are considered parties in interest under ERISA. These transactions qualify for exemption from the prohibited transaction rules under ERISA.

At June 30, 2016 and 2015, the Plan had amounts due from/(to) related trusts for each trust's respective share of allocable expenses and contributions received as follows:

|  | 2016 | 2015 |
|---|---|---|
| Due (to) from related trusts |  |  |
| UMWA Combined Benefit Fund | $ 24,865,000 | $ 20,350,000 |
| UMWA 1993 Benefit Plan | 7,836,000 | 4,571,000 |
| UMWA 1992 Benefit Plan | 8,823,000 | 6,008,000 |
| UMWA Cash Deferred Savings Plan of 1988 | 644,000 | 558,000 |
| UMWA Prefunded Benefit Plan | 170,000 | 60,000 |
| UMWA 2012 Retiree Bonus Account Plan | (510,000) | (776,000) |
|  | $ 41,828,000 | $ 30,771,000 |

1974PLAN_001685

**NOTES TO FINANCIAL STATEMENTS**

**NOTE 12: RISK AND UNCERTAINTIES**

The Plan invests in various investment securities. Investment securities are exposed to various risks such as interest rate, market and credit risks. Due to the level of risk associated with certain investment securities, it is at least reasonably possible that changes in the values of investment securities will occur in the near term and that such changes could materially affect the amounts reported in the statements of net assets available for benefits.

The actuarial present value of accumulated plan benefits (Note 7), the projected benefit obligation and net periodic pension cost (Note 8), and the accumulated benefit obligation and the related net periodic benefit cost of postretirement benefits other than pensions (Note 9) are reported based on certain assumptions pertaining to interest rates, inflation rates and employee demographics, all of which are subjected to change. Due to uncertainties inherent in the estimations and assumptions process, it is at least reasonably possible that changes in these estimates and assumptions in the near term would be material to the financial statements.

The Plan maintains its cash in bank deposit accounts and its investments in custodial accounts which, at times, may exceed federally insured limits. The Plan has not experienced any significant losses on such accounts and does not believe that it is exposed to any significant financial risk on cash or investments.

**NOTE 13: TAX STATUS**

The Plan obtained its latest determination letter dated November 12, 2015, in which the Internal Revenue Service stated that the Plan, as then designed, was in compliance with the applicable requirements of the Internal Revenue Code (Code).

Accounting principles generally accepted in the United States of America require management to evaluate income tax positions taken and recognize a tax liability if the Plan has taken an uncertain position that more likely than not would not be sustained upon examination by the Internal Revenue Service. Management has analyzed the tax positions taken by the Plan and has concluded that as of June 30, 2016, there are no uncertain positions taken or expected to be taken that would require recognition of a liability in the financial statements. The Plan is subject to routine audits by taxing jurisdictions and on December 13, 2016, the Plan received notification that it has been selected for an IRS examination for the year ended June 30, 2015. Management believes the Plan is no longer subject to income tax examinations for years prior to the year ended June 30, 2013.

**NOTE 14: SECURITIES LENDING PROGRAM**

During a portion of the year ended June 30, 2015, the Trustees of the Plan were in an agreement with the bank that acted as custodian for the Plan's investments, which authorized the bank to lend securities held in the Plan's accounts to third parties. This agreement was terminated as of June 30, 2015. Effective July 1, 2015, the Plan entered into a custodian agreement with a new bank, and during the year ended June 30, 2016, entered into a securities lending agreement with the new custodian.

The bank must obtain collateral from the borrower in the form of cash, letters of credit issued by an entity other than the borrower, or acceptable securities. Both the collateral and the securities loaned are marked-to-market on a daily basis so that an adequate amount of collateral has been received from the borrower. In the event that the loaned securities are not returned by the borrower, the bank will, at its own expense, either replace the loaned securities or, if unable to purchase those securities on the open market, credit the Plan's accounts with cash equal to the market value of the loaned securities. Once cash collateral is received by the custodian bank, it is invested and the investments are subject to market and credit risk. The custodial bank is not responsible for any losses on invested collateral.

1974PLAN_001686

## NOTES TO FINANCIAL STATEMENTS

### NOTE 14:  SECURITIES LENDING PROGRAM  -  continued

Although the Plan's securities lending activities are collateralized as described above, and although the terms of the securities lending agreement with the custodial bank require the bank to comply with government rules and regulations related to the lending of securities held by ERISA plans, the securities lending program involves both market and credit risks.  In this context, market risk refers to the possibility that the borrowers of securities will be unable to collateralize their loan upon a sudden material change in the fair value of the loaned securities or the collateral, or that the bank's investment of cash collateral received from the borrowers of the Plan's securities may be subject to unfavorable market fluctuations.  Credit risk refers to the possibility that counter-parties involved in the securities lending program may fail to perform in accordance with the terms of their contracts.  To date, the Plan has experienced no material losses in connection with the securities lending program.

At June 30, 2016 and 2015, respectively, the market value of securities loaned, by asset category, was as follows:

|  | 2016 | 2015 |
|---|---|---|
| Corporate and foreign government bonds | $ 9,154,000 | $ - |
| Corporate stocks | 85,624,000 | - |
| Global equities | 2,170,000 | - |
|  | $ 96,948,000 | $ - |

Collateral received for loaned securities was as follows:

|  | | |
|---|---|---|
| Received as cash and invested | $ 98,647,000 | $ - |

In order to present the statements of net assets available for benefits in accordance with accounting principles generally accepted in the United States of America, the fair value of loaned securities is separately identified, the value of investments of cash received as collateral is reflected as an asset and the obligation to refund the cash collateral received is reflected as a liability.

In fiscal year 2016, under the terms of the securities lending agreement with the current custodian, the Plan received 80% of revenue derived from all securities lending activities.  In fiscal year 2015, under the terms of the securities lending agreement the Plan's former custodian, the Plan received 80% on the first $1,250,000 in gross revenue derived from all securities lending activities and was prospectively increased to 87% on the remainder of the earnings.  The net income derived from securities lending activities earned during the years ended June 30, 2016 and 2015 was $265,000 and $183,000, respectively.  These amounts are included on the statements of changes in net assets available for benefits and were determined as follows:

|  | | |
|---|---|---|
| Gross earnings on collateral | $ 342,000 | $ 139,000 |
| Rebate (to) from securities borrower | (4,000) | 90,000 |
| Net earnings on collateral | 338,000 | 229,000 |
| Fees paid to custodial bank | (73,000) | (46,000) |
|  | $ 265,000 | $ 183,000 |

1974PLAN_001687

---

**NOTES TO FINANCIAL STATEMENTS**

---

**NOTE 15:  LITIGATION**

The Plan is an apparent member of a class of defendants described in an adversary proceeding brought in 2010 by unsecured creditors in the Tribune Company's Chapter 11 bankruptcy proceeding in the U.S. Bankruptcy Court for Delaware, and it is also a named defendant in a civil action filed by individual secured creditors of the Tribune Company in the U.S. District Court for the District of Columbia in 2011.  These actions have named or described as defendant class members those investors in the Tribune Company who sold equity shares of the Company pursuant to a 2007 leveraged buyout tender offer by the Company.  The Tribune Company filed for bankruptcy protection in Delaware in 2008.  Plaintiffs allege that the tender offer constituted a fraudulent conveyance or constructive fraudulent conveyance, and they seek to void the transactions and recover their proceeds.  One of the Plan's investment managers, LSV Asset Management, held Tribune Company shares on behalf of the Plan and tendered them for payment of approximately $1.6 million in the 2007 transaction.  The relief sought in the actions could include repayment by the Plan of this amount.  The cases have been consolidated for pre-trial proceedings in the Southern District of New York, and they have been stayed pending rulings on motions to dismiss.  In September 2013, the District Court dismissed the actions brought by individual secured creditors for lack of those creditors' standing under the Bankruptcy Code.  The plaintiffs then filed notice of appeal to the U.S. Court of Appeals for the Second Circuit.  On March 29, 2016 the 2nd Circuit affirmed the individual secured creditors lack of standing.  The individual secured creditors filed a request for a hearing en banc, which the 2nd Circuit denied on July 22, 2016.  The claims alleged by the unsecured creditors against a class of defendants that is described to include the Plan are still pending.  The Plan has been represented in these matters by counsel provided by LSV Asset Management, which under ERISA is a fiduciary for this investment.  The Trustees and counsel expect to present valid defenses against these claims, but they are unable to predict the outcome of the litigation.

On May 12, 2015 Patriot Coal Corporation and its subsidiaries ("Patriot") filed Chapter 11 bankruptcy petitions in the U.S. Bankruptcy Court for the Eastern District of Virginia in Richmond.  This was the second Patriot bankruptcy filing, the same Debtors having completed a reorganization proceeding and emerged from bankruptcy in the Eastern District of Missouri in December 2013.  In September 2015, the Virginia Bankruptcy Court granted Patriot's motion to authorize rejection of its collective bargaining agreement, and in October 2015, the confirmed plan of reorganization became effective providing for the sale of all of Patriot's operating assets in two parts, to Blackhawk Mining LLC and to Virginia Conservation Legacy Fund.  Patriot gave notice of rejection of the collective bargaining agreement, closed the sales of assets and withdrew from the 1974 Pension Plan as of October 26, 2015.  Neither Blackhawk nor VCLF will participate in the 1974 Pension Plan.  Prior to its withdrawal Patriot's contributions represented approximately 16% of all employer contributions to the 1974 Pension Plan.  The 1974 Plan filed a contingent proof of claim in the bankruptcy for the estimated withdrawal liability, and in a settlement with the Patriot Debtors, the confirmed plan of reorganization included an allowed administrative expense claim for $23 million and a general unsecured claim for $888 million.  A distribution has not yet occurred, however, and it is unlikely that a substantial payment to the Plan will result from these claims. The larger portion of the withdrawal liability claim filed against Patriot in its bankruptcy continues to be pursued in the Peabody bankruptcy as an evade or avoid claim as described below.

Outside of the Patriot bankruptcy proceeding, on July 16, 2015, the 1974 Plan filed a lawsuit against Peabody Energy Corporation and Peabody Holding Company ("Peabody") and Arch Coal Inc. ("Arch") in the U.S. District Court for the District of Columbia seeking to compel those companies to submit to arbitration of the Trustees' determination that a principal purpose of those companies' respective spinoffs of subsidiaries that became Patriot was to evade or avoid their obligations to the 1974 Plan, including withdrawal liability.  On October 29, 2015, the 1974 Plan issued its notice and demand letters to Peabody for withdrawal liability in the amount of $644,213,302, together with a determination that the transaction in which Patriot was spun off from Peabody was a transaction to evade and avoid withdrawal liability.  A similar notice was sent to Arch for its assessment of $299,768,513. Peabody Energy and 129 of its subsidiary companies filed for Chapter 11 bankruptcy protection in St. Louis, Missouri on April 13, 2016.

1974PLAN_001688

**NOTES TO FINANCIAL STATEMENTS**

**NOTE 15: LITIGATION - continued**

Prior to its bankruptcy filing on April 13, 2016, Peabody and the Pension Plan commenced arbitration of the withdrawal liability assessment, as mandated in ERISA. The Peabody bankruptcy filing triggered an automatic stay of the arbitration proceedings but the Bankruptcy Court approved a stipulation by the parties to permit the selection of an arbitrator and the exchange of discovery documents. Peabody later filed an objection to the claim and the arbitration thereof, arguing that the Bankruptcy Court should adjudicate the claim. On October 18, 2016, pursuant to a motion filed by the Plan, the Bankruptcy Court ruled that the automatic stay could be lifted if AAA arbitration could yield a decision by January 26, 2017.  AAA agreed to this condition and arbitration of the claim is proceeding on an expedited basis.  Discovery is proceeding, and a hearing in the arbitration is scheduled to begin December 19, 2016.  The Plan and its counsel are unable to predict the outcome of this arbitration proceeding. On September 9, 2016, the 1974 Pension Plan and Arch reached settlement with respect to the Plan's withdrawal liability claim, which could result in a distribution of approximately $500,000 to the 1974 Plan as part of a plan of reorganization that allows for a small distribution to general unsecured creditors such as the 1974 Pension Trust; this plan was confirmed after a hearing September 13, 2016

Walter Energy, Inc. and 22 of its subsidiaries ("Walter") filed Chapter 11 bankruptcy petitions on July 15, 2015 in the U.S. Bankruptcy Court for the Northern District of Alabama.  In 2014, the Debtors' contributions represented approximately 18% of the total contributions received by the 1974 Pension Plan from all contributing employers. On December 28, 2015, the Bankruptcy Court granted Walter's motion to reject its collective bargaining obligations. The 1974 Plan appealed the Bankruptcy Court's order.  Subsequently an agreement was reached between the UMWA, Walter, and the entity purchasing Walter's core mining assets (Coal Acquisitions, LLC), which resulted in a settlement that included a new collective bargaining agreement, and mooted the appeal with respect to the 1974 Plan, Thereafter, Walter stopped contributing to the 1974 Plan.

This triggered Walter's withdrawal from participation in the 1974 Pension Plan, and the 1974 Pension Plan has assessed the Walter companies for $904 million in withdrawal liability.  On December 8, 2015 certain Canadian subsidiaries of Walter Energy filed for protection under Canada's Companies Creditors Arrangement Act.  Through Canadian counsel, the 1974 Pension Plan has asserted its claim for withdrawal liability against the Canadian debtors as jointly and severally liable under Title IV of ERISA.  The Canadian debtors have objected to the claim, as has the labor organization that represents employees of the Canadian debtors. A proceeding on the objection is in progress with a hearing scheduled for January 2017.

On August 3, 2015, Alpha Natural Resources and 150 of its affiliates filed chapter 11 petitions in the US Bankruptcy Court in Richmond, Virginia.  Alpha is one of the top five employer groups contributing to the 1974 Pension Plan.  In 2014, the Alpha Debtors contributed approximately $14.5 million to the 1974 Pension Plan.  In the bankruptcy, the 1974 Pension Trust sits on the Committee of Unsecured Creditors. With Bankruptcy Court approval, the Alpha companies rejected their NBCWAs, incurring $782 million in withdrawal liability.

On July 6, 2016, all concerned plans within the Funds reached a universal settlement with Alpha on their claims in the bankruptcy. Under the settlement the Funds will receive a total of $10 million: $2.5 million to be paid on the effective date of the Alpha bankruptcy plan, $0.5 million at December 31, 2017, $1 million at December 31, 2018, and payments of $2 million at the end of each of the three following years. The future payments are to be the obligation of the new entity formed by Alpha's secured lenders that will purchase Alpha's core assets in a sale that was confirmed following a hearing on July 7, 2016. The settlement was approved, and the first payment of $2.5 million was received in July 2016.  Allocation of the proceeds among the 1974 Plan and the other involved trusts is not yet complete.

1974PLAN_001689

**NOTES TO FINANCIAL STATEMENTS**

**NOTE 16: RESTATEMENT**

During the year ended June 30, 2016, management determined that there was an error in the recording of an investment transaction during the year ended June 30, 2015 which caused both the cash and cash equivalents balance and the investment income balance to be overstated. Accordingly, the financial statements for the year ended June 30, 2015 have been adjusted and restated from previously issued financial statements to correct the effects of this error.

As a result of the correction, the statement of changes in net assets available for benefits for the year ended June 30, 2015 reflects a decrease in investment income and the net change in net assets available for benefits for the year of $46,830,000 and the statement of net assets available for benefits as of June 30, 2015 reflects a reduction in the cash and cash equivalents balance and net assets available for benefits of $46,830,000.

**NOTE 17: RECENTLY ISSUED ACCOUNTING PRONOUNCEMENTS**

In May 2015, the Financial Accounting Standards Board (FASB) issued Accounting Standards Update No. 2015-07 "Disclosures for Investments in Certain Entities That Calculate Net Asset Value per Share (or Its Equivalent)" (ASU 2015-07) which states that investments for which fair value is determined by the net asset value per share (or its equivalent) as a practical expedient should not be categorized in the fair value hierarchy. However, the ASU states that although those investments are not categorized within the fair value hierarchy, a plan must provide the amount measured using the net asset value per share (or its equivalent) as a practical expedient to permit reconciliation of the fair value of the investments included in the fair value hierarchy to the fair value of investments presented on the statement of net assets available for benefits. The ASU further requires retrospective application to all prior periods presented in the year of adoption. The amendments in this ASU are effective for reporting periods beginning after December 15, 2016, but early adoption is permitted.

Generally accepted accounting principles in effect prior to the adoption of ASU 2015-07 require that assets measured at fair value using net asset value as a practical expedient be included in the fair value hierarchy and classified using a methodology that is inconsistent with the methodology used for other assets classified within the hierarchy. Removing assets measured using the practical expedient of net asset value from the hierarchy results in a presentation of assets in the hierarchy that have been classified using a consistent methodology. Management believes that this change results in an improvement in presentation and, consequently, has elected early adoption of ASU 2015-07 as of and for the year ended June 30, 2016. Accordingly, the financial statements herein present the investment disclosure required by ASU 2015-07 in the fair value hierarchy tables for 2016 and retrospectively for 2015. The early adoption of ASU 2015-07 did not have any effect on net assets available for benefits or changes in net assets available for benefits for the years ended June 30, 2016 and 2015.

In July 2015, the Financial Accounting Standards Board (FASB) issued Accounting Standards Update (ASU) 2015-12 "Plan Accounting: Defined Benefit Pension Plans (Topic 960), Defined Contribution Plans (Topic 962), Health and Welfare Benefit Plans (Topic 965)". The amendments to generally accepted accounting principles in Part I and Part III of ASU 2015-12 are not applicable to this Plan. Part II of ASU 2015-12 amends prior reporting standards and requires disaggregation of investments measured at fair value only by general type, either on the face of the financial statements or in the notes. Part II of this ASU also eliminates the requirement to disclose the net appreciation (depreciation) in fair value of investments by general type and the requirement to disclose individual investments that represent 5% or more of net assets available for benefits. The ASU requires retrospective application to all prior periods presented in the year of adoption. The amendments in this ASU are effective for reporting periods beginning after December 15, 2015, but early adoption is permitted.

Management has determined that adoption of ASU 2015-12 results in the elimination of disclosures that are not significant and do not provide decision-useful information to readers of the financial statements. Consequently, management has elected early adoption of ASU 2015-12, and the changes in presentation created by this ASU are reflected in these financial statements. The early adoption of ASU 2015-12 did not have any effect on the net assets available for benefits or the changes in net assets available for benefits for the years ended June 30, 2016 and 2015.

1974PLAN_001690

JA 000715

**NOTES TO FINANCIAL STATEMENTS**

**NOTE 18:  RECLASSIFICATION**

Certain amounts for the year ended June 30, 2015 have been reclassified from previously issued financial statements.  $587,507,000 and $207,348,000 of investment holdings previously classified as fixed income securities valued at net asset value and hedge funds valued at net asset value, respectively, have been reclassified to commingled funds valued at net asset value.  Additionally, $186,541,000 of investment holdings previously classified as equities have been reclassified to fixed income securities.  These reclassifications had no impact on the amount of net assets available for benefits as of June 30, 2015 or changes in net assets available for benefits for the year then ended from previously issued financial statements.

1974PLAN_001691



---

**REPORT OF INDEPENDENT CERTIFIED PUBLIC ACCOUNTANTS ON SUPPLEMENTAL INFORMATION REQUIRED BY THE DEPARTMENT OF LABOR'S RULES AND REGULATIONS FOR REPORTING AND DISCLOSURE UNDER THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974**

---

To the Trustees and Participants
United Mine Workers of America 1974
  Pension Plan

We have audited the financial statements of United Mine Workers of America 1974 Pension Plan as of and for the year ended June 30, 2016, and our report thereon dated December 14, 2016 which expressed an unmodified opinion on those financial statements, appears on pages 1 - 2.  Our audit was conducted for the purpose of forming an opinion on the financial statements as a whole.  The supplemental schedules of assets (held at end of year) and reportable transactions are presented for purposes of additional analysis and are not a required part of the financial statements but are supplementary information required by the Department of Labor's Rules and Regulations for Reporting and Disclosure under the Employee Retirement Income Security Act of 1974.  Such information is the responsibility of the Plan's management and was derived from and relates directly to the underlying accounting and other records used to prepare the financial statements.  The information has been subjected to the auditing procedures applied in the audit of the financial statements and certain additional procedures, including comparing and reconciling such information directly to the underlying accounting and other records used to prepare the financial statements or to the financial statements themselves, and other additional procedures in accordance with auditing standards generally accepted in the United States of America.  In our opinion, the information is fairly stated in all material respects in relation to the financial statements as a whole.

*Bond Beebe*

**A Professional Corporation**
Bethesda, MD
December 14, 2016

A Professional Corporation with Offices in Bethesda, MD and Alexandria, VA

1974PLAN_001692

United Mine Workers of America 1974 Pension Plan
EIN 52-1050282
Plan No. 002
Plan Year Ended June 30, 2016

Form 5500, Schedule H, Part IV, Line 4i
Schedule of Assets (Held At End of Year)

| (a) | (b) Identity of issue, borrower, lessor, or similar party | (c) Description of investment including maturity date, rate of interest collateral, par, or maturity value | (d) Cost | (e) Current value |
|---|---|---|---|---|
| | **Interest bearing-cash** | see attached | $ 1,597,961 | $ 1,597,961 |
| | **Corporate debt instruments - preferred** | see attached | 734,597 | 978,140 |
| | **Corporate debt instruments - other** | see attached | 55,095,371 | 52,370,204 |
| | **Corporate stocks - preferred** | see attached | 1,003,356 | 874,508 |
| | **Corporate stocks - common** | see attached | 458,340,880 | 555,802,270 |
| | **Partnership/joint venture interests** | see attached | 518,139,123 | 330,977,640 |
| | **Real estate** | see attached | 92,147,830 | 49,798,788 |
| | **Other** | see attached | 184,721,861 | 198,073,073 |
| | E.I.P. CHINA H SHARE FUND | 10,344.000 shares | 1,078,000 | 1,113,682 |
| | | | 185,799,861 | 199,186,755 |
| | **Common collective trusts** | | | |
| | BR CORE ACTIVE BOND | 8,525,960 shares | 200,670,629 | 225,534,418 |
| | BR EQUITY INDEX FD A | 142,428 shares | 40,921,882 | 103,772,642 |
| | BR EXTENDED MRKT | 68,523 shares | 3,170,456 | 26,325,840 |
| | BR MONEY MKT FOR EBT | 94 shares | 94 | 94 |
| | LMCG COLLECTIVE TRUST | 4,459,605 shares | 43,748,724 | 34,829,515 |
| | JP MORGAN STRATEGIC PROPERTY FUND | 97,884,580 shares | 97,884,580 | 106,796,628 |
| | INVESCO BALANCED RISK ALLOCATION TRUST FUND | 4,889,372 shares | 82,972,638 | 94,756,024 |
| | MSCI EAFE INDEX SL FUND | 2,557,137 shares | 147,109,362 | 193,370,721 |
| | SSGA AGGREGATE BOND INDX SL | 6,349,295 shares | 173,482,618 | 189,634,408 |
| | SSGA MSCI CANADA INDEX SL | 238,582 shares | 16,865,965 | 18,760,433 |
| | | | 806,826,948 | 993,780,723 |
| | **103-12 investment entities** | | | |
| | BRIDGEWATER PURE ALPHA MAJOR MARKETS LLC SERIES 3 | 44,452 shares | 45,966,833 | 56,723,016 |
| | BRIDGEWATER PURE ALPHA FD SER CLXXXIV | 26,153 shares | 80,887,361 | 81,937,906 |
| | BW ALL WEATHER PORTFOLIO CL B SER 2000-165 | 89,180 shares | 89,179,810 | 89,859,503 |
| | DFA U.S. MICRO CAP TR | 4,009 shares | 3,646,807 | 24,148,955 |
| | DFA U.S. SMALL CAP TR | 28,685 shares | 10,612,054 | 64,823,761 |
| | | | 230,292,865 | 317,493,141 |
| | **Registered investment companies** | see attached | 448,832,726 | 443,930,432 |
| | NTGI COLTV GOVT STIF REGISTERED | 217,874,841 | 217,874,841 | 217,874,841 |
| | | | 666,707,567 | 661,805,273 |
| | | | $ 2,797,005,548 | $ 2,911,996,023 |



**United Actuarial
Services, Inc.**
Actuaries and Consultants

September 10, 2014

Mr. John Adams
Director of Investments
UMWA Health and Retirement Funds
2121 K Street, NW, Suite 350
Washington, DC 20037

**RE: 2014 Actuarial Valuation Assumptions for UMWA 1974 Plan**

Dear John:

The purpose of this letter is to summarize the actuarial assumptions we propose to use for the 2014 valuation of the UMWA 1974 Pension Plan. I will review each assumption in turn.

*Interest Rate*

Current Assumption:    7.80% (8.00% gross less 0.2% for investment expenses)

Proposed Assumption:    7.50% (7.80% gross less 0.3% for investment expenses)

Discussion:    My July 1, 2014 went into great detail about how we looked at this assumption, so I will not review that here. The changes we made since that prior letter were as follows:

- We adjusted the timing of the investment allocation changes to be the April 1 following the July 1 allocations in your investment policy statement.

- We made adjustments to some of the merged categories based on your input.

- We added 0.173% to the estimated returns to represent historical plan alpha and 0.005% for the effect of securities lending, both based on the data you provided.

- We updated the expected return assumptions based on the updated market expectations from the 2014 Horizon manager survey, which were just recently released. These revised expectations generally decreased equity returns but increased fixed income returns.

Our updated analysis showed that based on the current investment allocation (excluding future anticipated changes) and using only the forward-looking assumptions from the 2014 investment survey we have the following range of expectations:

| 60th Percentile | Median | 40th Percentile |
|---|---|---|
| 7.85% | 7.29% | 6.66% |

11590 North Meridian Street, Suite 610 • Carmel, Indiana 46032-4529 • (317) 580-8670 • Fax (317) 580-8651

Confidential

As previously discussed, we used the 40th and 60th percentiles here as the outside edges of our reasonable range. In order to focus on the most appropriate rate within this range we first reflected the expected changes in the investment allocation from your investment policy, but still using only the forward-looking assumptions from the Horizon survey. This produced the following results:

| 60th Percentile | Median | 40th Percentile |
|---|---|---|
| 7.48% | 6.99% | 6.42% |

Finally, we blended these returns equally with historical returns for each investment category, as described in my earlier letter, but limited to the reasonable range described above. This produced the following range:

| 60th Percentile | Median | 40th Percentile |
|---|---|---|
| 7.85% | 7.58% | 7.02% |

Providing slightly greater weight to the forward-looking assumptions produces a median return of 7.46% if the weighting is 60%/40% and 7.38% if the weighting is 67%/33%.

Based on all of this input we selected 7.50% as being the most appropriate assumption for the valuation. This is well above the median using only the forward-looking assumptions, but slightly below the median taking into account historical asset performance.

We have attached exhibits to this letter showing the updated investment assumptions from the Horizon survey and the year by year expected returns under various scenarios.

### Mortality Assumption (Healthy and Disabled)

Current Assumption:    Based on actual plan experience, as reviewed by Mercer last year.

Proposed Assumption:    No Change

Discussion:    Assumption reflects the most recent plan experience and is reasonable and appropriate for this purpose.

### Retirement Assumption

Current Assumption:    Based on actual 2005-2010 plan experience, as reviewed by Mercer.

Proposed Assumption:    No Change

Discussion:    Assumption reflects recent plan experience and appears to be reasonable and appropriate for this purpose. We will need a few more years of experience before we review and update this assumption.

CONFIDENTIAL

*Member Turnover*

    Current Assumption:        Based on actual 2005-2010 plan experience, as reviewed by Mercer.

    Proposed Assumption:      No Change

    Discussion:        Assumption reflects recent plan experience and appears to be reasonable and appropriate for this purpose. We will need a few more years of experience before we review and update this assumption.

*Disability Rate*

    Current Assumption:        Based on actual 2004-2010 plan experience, as reviewed by Mercer.

    Proposed Assumption:      No Change

    Discussion:        Assumption reflects recent plan experience and appears to be reasonable and appropriate for this purpose. We will need a few more years of experience before we review and update this assumption.

*Dependent Assumptions*

    Current Assumption:        Based on actual plan experience, as reviewed by Mercer last year.

    Proposed Assumption:      No Change

    Discussion:        Assumptions reflect recent plan experience and appear to be reasonable and appropriate for this purpose.

*Administrative Expenses*

    Current Assumption:        3.5% load to liabilities and normal cost

    Proposed Assumption:      No Change

    Discussion:        We discussed revising the actuarial method for expenses to delete the load and add expected annual administrative expenses (approximately $25M) to the normal cost. This requires approval by the Settlers. Let us know if they wish to make this change.

*Terminated Vested Participant Drop Age*

    Current Assumption:        Terminated Vesteds over age 63 are assumed to be dead

    Proposed Assumption:      No Change

    Discussion:        This was just revised by Mercer last year based on recent data. No change is needed at this time.

There are other assumptions (tons of purchased coal, decline in normal cost, decline in future hours) that affect projections but are not used in the actuarial valuation. Thus they are not referenced here.

Confidential

If you see any reason why these proposed assumptions are not appropriate please let us know and we can discuss. Otherwise we will proceed with the valuation on this basis.

### Certification

I am a Member of the Academy of Actuaries and fully meet the requirements of the Academy to render the actuarial opinions contained herein. I am not aware of any direct or material indirect financial interest or relationship that could create a conflict of interest that would impair the objectivity of our work.

I am available to answer any questions you may have about this report.

William J. Ruschau, FSA, EA, MAAA

cc:   M. Fesshaie
      P. Bullock

## 2014 Horizon Survey – Composite Capital Market Assumptions

| | Asset Classes | Long-Term Mean | Risk | Var. |
|---|---|---|---|---|
| 1 | US Large Cap | 9.25% | 17.48% | 3.06% |
| 2 | US Sml/Mid Cap | 10.22% | 21.11% | 4.46% |
| 3 | Non-US Developed | 9.87% | 19.77% | 3.91% |
| 4 | Non-US Emerging | 12.23% | 26.36% | 6.95% |
| 5 | US Fixed - Core | 4.84% | 5.36% | 0.29% |
| 6 | US Fixed - Long | 5.81% | 11.34% | 1.29% |
| 7 | US Fixed - High Yld | 7.00% | 11.46% | 1.31% |
| 8 | Non-US Fixed - Dvlpd | 4.39% | 7.64% | 0.58% |
| 9 | Non-US Fixed - Emrgng | 6.49% | 10.88% | 1.18% |
| 10 | Treasuries/Cash | 3.47% | 2.28% | 0.05% |
| 11 | Real Estate | 7.23% | 13.13% | 1.72% |
| 12 | Hedge Funds | 7.22% | 8.95% | 0.80% |
| 13 | Commodities | 6.80% | 18.01% | 3.24% |
| 14 | Infrastructure | 8.43% | 13.51% | 1.83% |
| 15 | Private Equity | 13.00% | 24.82% | 6.16% |
| | Total | | | |

### Correlation Coefficients

| | Asset Classes | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | US Large Cap | 1.00 | | | | | | | | | | | | | | |
| 2 | US Sml/Mid Cap | 0.88 | 1.00 | | | | | | | | | | | | | |
| 3 | Non-US Developd | 0.84 | 0.76 | 1.00 | | | | | | | | | | | | |
| 4 | Non-US Emerging | 0.74 | 0.72 | 0.81 | 1.00 | | | | | | | | | | | |
| 5 | US Fixed - Core | 0.19 | 0.15 | 0.18 | 0.18 | 1.00 | | | | | | | | | | |
| 6 | US Fixed - Long | 0.19 | 0.13 | 0.20 | 0.15 | 0.89 | 1.00 | | | | | | | | | |
| 7 | US Fixed - High Yld | 0.64 | 0.62 | 0.61 | 0.62 | 0.39 | 0.38 | 1.00 | | | | | | | | |
| 8 | Non-US Fixed - Dvlpd | 0.21 | 0.16 | 0.38 | 0.23 | 0.58 | 0.54 | 0.24 | 1.00 | | | | | | | |
| 9 | Non-US Fixed - Emrgng | 0.53 | 0.51 | 0.55 | 0.65 | 0.48 | 0.42 | 0.63 | 0.35 | 1.00 | | | | | | |
| 10 | Treasuries/Cash | (0.06) | (0.28) | (0.19) | (0.24) | 0.31 | 0.26 | (0.11) | 0.27 | 0.11 | 1.00 | | | | | |
| 11 | Real Estate | 0.39 | 0.37 | 0.37 | 0.32 | 0.09 | 0.12 | 0.31 | 0.07 | 0.26 | 0.04 | 1.00 | | | | |
| 12 | Hedge Funds | 0.60 | 0.59 | 0.64 | 0.68 | 0.17 | 0.18 | 0.53 | 0.18 | 0.49 | 0.05 | 0.29 | 1.00 | | | |
| 13 | Commodities | 0.33 | 0.32 | 0.43 | 0.45 | 0.13 | 0.10 | 0.31 | 0.23 | 0.31 | 0.02 | 0.22 | 0.43 | 1.00 | | |
| 14 | Infrastructure | 0.51 | 0.50 | 0.52 | 0.50 | 0.33 | 0.29 | 0.51 | 0.23 | 0.36 | 0.15 | 0.34 | 0.45 | 0.32 | 1.00 | |
| 15 | Private Equity | 0.74 | 0.72 | 0.70 | 0.63 | 0.03 | 0.07 | 0.52 | 0.13 | 0.45 | (0.11) | 0.43 | 0.58 | 0.30 | 0.49 | 1.00 |

**United Actuarial Services, Inc.**

Confidential

## UMWA 1974 Pension Plan
Revised Projection of Expected Returns in Next 10 Years with
Forward Returns Only (Red) and Blend of Forward and Historical Returns (Blue)



United Actuarial Services, Inc.

Confidential

 **United Actuarial
Services, Inc.**
Actuaries and Consultants

July 1, 2014

Mr. John Adams
Director of Investments
UMWA Health and Retirement Funds
2121 K Street, NW, Suite 350
Washington, DC 20037

**RE:  Initial Analysis of Interest Assumption for UMWA 1974 Pension Plan**

Dear John:

The purpose of this letter is to summarize our initial analysis of the appropriate interest rate assumption for the July 1, 2014 actuarial valuation of the above plan.  After you have reviewed I would like to schedule a conference call to discuss a number of issues raised in this letter.  As you know, ERISA charges the plan's Enrolled Actuary with establishing actuarial assumptions that represent his best expectation of future plan experience.  I believe it is appropriate to gather input and opinions from multiple sources to work toward the most appropriate assumption. While we will be reviewing all of the actuarial assumptions, we will wait until after our August 27 conference call to finalize the other assumptions.   We will also finalize the interest assumption after that call.

The following issues will be reviewed in this letter:

- American Academy of Actuaries ASOP #27
- Investment Expense Assumption
- Future Return Assumptions
- Historical Experience
- Planned Changes in the Investment Allocation
- Portfolio Alpha

I will review each of these in turn.

*American Academy of Actuaries ASOP Number #27*

Development of actuarial assumptions must be consistent with actuarial standards of practice (ASOP).   These standards are developed by the American Academy of Actuaries, which oversees professional standards and practices for the actuarial profession.  In September, 2013 the American Academy of Actuaries Issued a revised Actuarial Standard of Practice (ASOP #27) which governs the selection of economic assumptions for measuring pension obligations.  The revised ASOP is effective for measurement dates on or after September 30, 2014, hence it is not mandated that we comply with the revised standard for the valuation this year.  However, it will be mandated in all future years, and earlier compliance is recommended.

11590 North Meridian Street, Suite 610 • Carmel, Indiana 46032-4529 • (317) 580-8670 • Fax (317) 580-8651

Confidential

Mr. John Adams
July 1, 2014
Page 2

Overall, the revised ASOP #27 does not make substantial revisions to earlier practice, but it does add clarification and tightens prior standards. Of particular note for the analysis that follows:

- The ASOP continues to recognize that there is uncertainty in the selection of assumptions and that a range of assumptions may be reasonable. However, the standard also indicates there must be no significant bias (optimistic or pessimistic) in the assumptions. Taken together, this suggests a tightening of the range of assumptions. Ultimately the actuary must select the one assumption within that range that represents his or her best estimate.
- Investment return assumptions are typically set using assumptions that represent market or index values. In the past these have often been adjusted by the amount of alpha a manager could reasonably expect to add through active management. The new ASOP permits this, but only to the extent that the manager can provide data to demonstrate superior performance.
- The ASOP indicates that the return assumption should consider changes to the investment policy that are expected to change during the measurement period. The investment policy statement you adopted in May anticipates future changes in the investment allocation as the investment fund declines and more funds are needed to pay benefits. I will discuss this later in this letter.

*Investment Expense Assumption*

Most pension funds reflect investment expenses by reducing gross expected returns by a margin for investment expenses. Last year the UMW fund used a 0.20% reduction for these expenses. Looking at your audited asset statement as of June 30, 2013 we determined that actual investment expenses represented 0.296% of average assets in the year ended June 30, 2012 and 0.28% for the year ended June 30, 2013. This suggests that an increase in this load to 0.25% - 0.30% would be appropriate. As the portfolio decreases its investment in private equities and other classes that generally require higher expenses, this could push toward the low end of this range. However, as the fund decreases in size expense margins could increase, pushing us toward the higher end of this range. In the analysis that follows all returns are net of a 0.30% expense load, but this is an item we should discuss.

*Future Return Assumptions*

The starting point for our projected future returns was expected return, standard deviation and correlation factors from the 2013 survey of investment managers conducted by Horizon Actuarial Services, LLC. This survey summarized expectations from a broad cross-section of multiemployer investment advisors. Using these assumptions, our return model, and the investment allocation expected from your April, 2014 investment policy statement, we generated the following expected returns. (Note I have shown the 2013 results using these same assumptions to show how the effect of the change in investment allocation.):

|  | 60th Percentile | Median | 40th Percentile |
|---|---|---|---|
| July 1, 2014 | 8.03% | 7.42% | 6.73% |
| July 1, 2013 | 8.17% | 7.55% | 6.84% |

CONFIDENTIAL    1974PLAN_003984

Mr. John Adams
July 1, 2014
Page 3

I have used the 40th and 60th percentiles here to define what might be considered the outside
boundaries of the reasonable range. While historically many actuaries have used a wider range
than this, I believe that based on the provision of ASOP #27 to avoid any significant bias, the
standard is pushing toward a somewhat narrower range of outcomes that might be deemed
reasonable. As you can see, this still provides a fairly wide range of outcomes. Also, note that
these are based on the static investment allocation as of each of these dates. We will later
examine the effect of planned changes in the allocation.

From this range of reasonable returns we must then hone in on the most appropriate return for
the fund. To do this we added a further analysis based on historical experience, as discussed in
the following section.

### Historical Experience

We next looked at actual investment returns for the 35-year period 1978-2012. This period
covers a wide range of bull and bear markets, growth and recession scenarios. We looked at
average real returns over this period, reducing average returns by the average inflation (CPI-U)
and added these real returns to our inflation expectations for future years. For this purpose we
assumed 3.0% inflation. This is somewhat higher than typical assumptions in the recent past
(and the assumption from the Horizon survey) and higher than current inflation rates, but I felt
that the continued high level of deficit spending by the government will eventually translate into
an increase in inflation. There was not sufficient data on hedge funds or private equity, so we
simply used the projections from the Horizon survey for this purpose. Using this historical
experience and averaging it with the forward-looking assumptions from the Horizon survey
generated the following results:

|  | 60th Percentile | Median | 40th Percentile |
|---|---|---|---|
| July 1, 2014 | 8.03% | 7.92% | 7.23% |
| July 1, 2013 | 8.17% | 8.04% | 7.33% |

Note that because the 60th percentile results would be outside the range we deemed to be
reasonable, we have limited that here to the reasonable range.

### Planned Changes in the Investment Allocation

As noted earlier, ASOP #27 specifies that "The actuary should consider whether the current
investment policy is expected to change during the measurement period." (Measurement period
is the period during which the assumption will apply, and would include the entire future benefit
period for this purpose.) The fund's investment policy statement specifically anticipates changes
to the investment allocation over the next ten years as the invested assets are expected to shrink
and a growing portion is needed to make benefit payments. To measure the effect of this we
looked at the expected returns based on the projected fund allocation in each year. The attached
graph shows the expected returns by year. Returns decline each year as cash and cash
equivalents become a greater and greater portion of the fund.

CONFIDENTIAL                    1974PLAN_003985

Mr. John Adams
July 1, 2014
Page 4

We then converted these return streams into a level return assumption. To do this we looked at the total return the fund is expected to generate based on these declining returns and calculated a flat return rate that would generate the same total investment income. This approach reflects not only the changing return expectations but also the declining amount of fund assets. The following tables show the returns generated, and compares them to the returns from the current allocation shown previously.

*Forward Return Assumptions Only*

|  | 60th Percentile | Median | 40th Percentile |
|---|---|---|---|
| Current Allocation (7/1/2014) | 8.03% | 7.42% | 6.73% |
| Changing Allocation | 7.75% | 7.20% | 6.55% |

*Blend of Forward Assumptions and Historical Experience*

|  | 60th Percentile | Median | 40th Percentile |
|---|---|---|---|
| Current Allocation (7/1/2014) | 8.03% | 7.92% | 7.23% |
| Changing Allocation | 7.75% | 7.70% | 7.06% |

Once again the 60th percentile values for the blended returns have been capped to remain in the reasonable range developed from the forward assumptions.

You might note that assuming the asset allocations in the future align with those in the investment policy, the average return developed reflecting the changing investments is expected to decline each year for future valuations. Of course, the same is true when just looking at the current allocation each year.

### Portfolio Alpha

All of the return assumptions above are based on index returns. To the extent that active management enables funds to achieve a greater return, net of the additional expenses, this can be reflected in the overall investment return assumption. However, ASOP #27 significantly restricts this by indicating that the actuary can only reflect a superior return expectation if "the actuary believes, based on relevant supporting data, that superior or inferior returns represent a reasonable expectation." While historically we could rely on representations and expectations provided by the fund's investment managers, we cannot do this any longer without documented proof that the manager has been able to achieve this. You will need to determine if such data exists that would justify the use of an alpha adjustment.

Mr. John Adams
July 1, 2014
Page 5

### *Summary*

Clearly there are a lot of factors to be considered in establishing the return assumption for the fund. To the extent that you have other data that may factor into the determination of the most appropriate rate, we will need to carefully consider that as well. From the information above my best estimate at this point is that that some decrease in the return assumption is likely, and an assumption in the 7.50% - 7.75% range may well be appropriate. Note, though, that this is very preliminary at this point. After you have reviewed this we will talk to discuss the issues and work toward the best rate.

### *Certification*

I am a Member of the Academy of Actuaries and fully meet the requirements of the Academy to render the actuarial opinions contained herein. I am not aware of any direct or material indirect financial interest or relationship that could create a conflict of interest that would impair the objectivity of our work.

I am available to answer any questions you may have about this report.

William J. Ruschau, FSA, EA, MAAA

cc:    M. Fesshaie
       P. Bullock

Confidential

**UMWA 1974 Pension Plan**
Projection of Expected Returns in Next 10 Years with
Forward Returns Only (Red) and Blend of Forward and Historical Returns (Blue)



Confidential

*UNITED MINE WORKERS OF AMERICA*
*1974 PENSION PLAN*
*WASHINGTON, DC*

*Actuarial Valuation Report*
*For Plan Year Commencing*
*July 1, 2014*


**United Actuarial Services, Inc.**
Actuaries and Consultants

February 13, 2015

Board of Trustees
United Mine Workers of America 1974 Pension Plan
Washington, DC

Dear Trustees and Settlors:

We have been retained by the Board of Trustees of the United Mine Workers of America 1974 Pension Plan to perform annual actuarial valuations of the pension plan. This report presents the results of our actuarial valuation for the plan year beginning July 1, 2014. The valuation results contained herein are based on current plan provisions summarized in Appendix A, the actuarial assumptions and methods listed in Appendix B and on financial statements audited by Bond Beebe Accountants & Advisors. Participant data was provided by the Funds Office. While we have reviewed the data for reasonableness in accordance with Actuarial Standards of Practice No. 23, we have not audited it. The data was relied on as being both accurate and comprehensive.

This report has been prepared in order to (1) assist the Trustees in evaluating the current actuarial position of the plan, (2) determine the minimum required and maximum deductible contribution amounts under Internal Revenue Code §431 and §404, (3) provide the fund's auditor with information necessary to comply with Accounting Standards Codification 960, and (4) document the plan's certified status under Internal Revenue Code §432 for the current year and provide the basis to certify such status for the subsequent year. In addition, information contained in this report will be used to prepare Schedule MB of Form 5500 that is filed annually with the IRS and could be used to calculate employer withdrawal liability. We are not responsible, for the use of, or reliance upon this report for any other purpose.

We have prepared this report in accordance with generally accepted actuarial principles and practices and have performed such tests as we considered necessary to assure the accuracy of the results. The results have been determined on the basis of actuarial assumptions that, in our opinion, are appropriate for the purposes of this report, are individually reasonable and in combination represent our best estimate of anticipated experience under the plan. Actuarial assumptions may be changed from previous valuations due to changes in mandated requirements, plan experience resulting in changes in expectations about the future, and/or other factors. An assumption change does not indicate that prior assumptions were unreasonable when made. For purposes of current liability calculations, assumptions are prescribed by regulation or statute. By relying on this valuation report, the Trustees confirm they have accepted the assumptions contained in the report.

The results are based on our best interpretation of existing laws and regulations and are subject to revision based on future regulatory or other guidance.

Future actuarial measurements may differ significantly from the current measurements presented in this report due to such factors as the following: plan experience differing from that anticipated by the economic or demographic assumptions, changes in economic or demographic assumptions, increases or decreases expected as part of the

11590 North Meridian Street, Suite 610 ▪ Carmel, Indiana 46032-4529 ▪ (317) 580-8670 ▪ Fax (317) 580-8651

## United Actuarial Services, Inc.
### Actuaries and Consultants

Board of Trustees and Settlors                    -2-                    February 13, 2015

natural operation of the methodology used for these measurements (such as the end of an amortization period or additional cost or contribution requirements based on the plan's funded status), and changes in plan provisions or applicable law.

United Actuarial Services, Inc. does not provide, nor charge for, investment, tax or legal advice. None of the comments made herein should be construed as constituting such advice. We are not aware of any direct or material indirect financial interest or relationship that could create a conflict of interest that would impair the objectivity of our work.

The undersigned actuarys meet the Qualification Standards of the American Academy of Actuaries to render the actuarial opinion contained in this report.

We are available to respond to any questions you may have about this report.

UNITED ACTUARIAL SERVICES, INC.

William J. Rushau, FSA, EA, MAAA
Consulting Actuary

Paul Bullock, ASA, EA, MAAA
Vice President

## TABLE OF CONTENTS

### PART I:  SUMMARY OF RESULTS                                                      1
5 - Year Summary of Valuation Results                                                2
Changes From Prior Study                                                             3
Experience vs. Assumptions                                                           4
Rate of Return on Fund Assets                                                        5
Funded Ratios                                                                        6
Funding Standard Account                                                            7
PPA Funding Status Report                                                           8
Unfunded Vested Benefits/Employer Withdrawal Liability                             9
Participant Data Reconciliation                                                     10
Active Information                                                                  11
Retiree Information                                                                 12

### PART II:  SUPPLEMENTAL STATISTICS                                               13
Hours Worked During Plan Year                                                      14
Contribution Allocation                                                            15
Active Information                                                                  16
Inactive Vested Information                                                         18
Retiree Information                                                                 19

### PART III:  ASSET INFORMATION                                                    21
Market and Actuarial Fund Values                                                   22
Flow of Funds                                                                       23
Investment Gain and Loss                                                           24

### PART IV:  ENROLLED ACTUARY'S REPORT                                             25
Normal Cost/Actuarial Liability                                                    26
Actuarial Liability Reconciliation/Projection                                      27
Current Liability                                                                   28
Full Funding Limit                                                                  29
Minimum Required Contribution and Full Funding Credit                              30
Maximum Deductible Contribution                                                     31
Reorganization Index                                                               32
ASC 960 Information                                                                 33
Benefit Payout Projection                                                          34

### APPENDICES
Plan Provisions                                                         Appendix A
Actuarial Assumptions and Methods                                      Appendix B
Minimum Funding Amortization Bases                                     Appendix C
Summary of Endangered and Critical Status Rules                       Appendix D
Glossary of Common Pension Terms                                       Appendix E

**CONFIDENTIAL**                                              **1974PLAN_002302**

*PART I:  SUMMARY OF RESULTS*

United Actuarial Services, Inc.

CONFIDENTIAL          1974PLAN_002303

*Summary of Results*
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2014 Actuarial Valuation*

## 5 - Year Summary of Valuation Results

| Actuarial Study as of July 1, | 2014 | 2013 | 2012 | 2011 | 2010 |
|---|---|---|---|---|---|

### PPA Certification

| | | | | | |
|---|---|---|---|---|---|
| PPA funded status | Critical | Ser Endg | Ser Endg | Ser Endg | Safe* |
| Progress under FIP/RP | n/a | n/a | n/a | n/a | n/a |
| | | | | | |
| Funded ratio | | | | | |
| *PPA certification* | 0.71 | 0.71 | 0.73 | 0.77 | 0.81 |
| *Valuation report* | 0.71 | 0.71 | 0.72 | 0.77 | 0.81 |
| | | | | | |
| Date of first projected funding deficiency | | | | | |
| *PPA certification* | 6/30/19 | 6/30/19 | 6/30/19 | 6/30/18 | |
| *Valuation report* | 6/30/19** | | | | |

   *   Final PPA status for 2010 was neither Critical nor Endangered status
   **  Based on assumptions used for the credit balance projection graph as shown on page B-8.

### Assets and Liabilities

| | | | | | |
|---|---|---|---|---|---|
| Asset values ($ 000,000) | | | | | |
| *Market* | 4,165 | 4,093 | 4,202 | 4,421 | 4,254 |
| *Actuarial* | 4,363 | 4,508 | 4,658 | 5,077 | 5,104 |
| | | | | | |
| Estimated net investment return (for preceding plan year) | | | | | |
| *On market value* | 15.74% | 9.52% | 9.04% | 18.20% | 15.74% |
| *On actuarial value* | 9.07% | 7.61% | 3.61% | 2.90% | 13.09% |
| | | | | | |
| Credit balance ($ 000,000) | 1,445 | 1,719 | 1,838 | 2,155 | 2,432 |
| | | | | | |
| Unfnd. vst. ben. ($ 000,000) | 4,392 | 5,478 | 5,107 | 4,371 | 4,153 |

### Participants

| | | | | | |
|---|---|---|---|---|---|
| Active | 9,218 | 10,103 | 10,825 | 10,427 | 10,154 |
| Inactive vested | 6,676 | 7,503 | 10,570 | 12,231 | 14,138 |
| Receiving benefits | 90,754 | 92,218 | 93,662 | 95,353 | 96,862 |
| Total | 106,648 | 109,824 | 115,057 | 118,011 | 121,154 |
| | | | | | |
| Unrecorded dates of birth | 5 | | | | |
| | | | | | |
| Average entry age | 29.3 | | | | |
| Average attained age | 44.4 | | | | |

**United Actuarial Services, Inc.**

**CONFIDENTIAL**

**1974PLAN_002304**

*Summary of Results*
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2014 Actuarial Valuation*

## CHANGES FROM PRIOR STUDY

### Changes in Plan Provisions

To the best of our knowledge and belief, the plan provisions underlying this valuation are the same as those valued last year by the prior actuary.

### Changes in Actuarial Assumptions and Methods

The actuarial assumptions and methods used in this valuation differ from those used in the prior valuation in the following respects:

- In accordance with direction from the Settlors, a change was made in the method used to reflect administrative expenses from a percentage load on plan liabilities to a flat dollar addition to the normal cost.
- As a result of this method change, we assumed a flat load of $25,500,000 on normal cost for future administrative expenses. This reflects our best estimate of future operational expenses based on recent plan experience.
- We changed the ERISA rate of return assumption from 8.00% to 7.80% gross of investment expenses and from 7.80% to 7.50% net of investment expenses. These changes provide our best estimate based on the Plan's investment policy over future years.
- We changed the current liability interest rate from 3.61% to 3.59%. The new rate is consistent with established statutory guidelines.

### History of Major Assumptions

| Assumption | Actuarial Study as of July 1, | | | | |
|---|---|---|---|---|---|
| | 2014 | 2013 | 2012 | 2011 | 2010 |
| Future rate of investment return | 7.80% gross 7.50% net | 8.00% gross 7.80% net | 8.00% gross 7.8% net | 8.00% gross 7.8% net | 8.00% gross 7.8% net |
| Post-retirement mortality table | RP-2000 Male EE w/BCA +1 (improve 0.75%/yr for 15 yrs beg 7/1/08 for ages 55-99) | RP-2000 Male EE w/BCA +1 (improve 0.75%/yr for 15 yrs beg 7/1/08 for ages 55-99) | RP-2000 Male EE w/BCA +1 (improve 0.75%/yr for 15 yrs beg 7/1/08 for ages 55-99) | RP-2000 Male EE w/BCA +1 (improve 0.75%/yr for 15 yrs beg 7/1/08 for ages 55-99) | RP-2000 Male EE w/BCA +1 (improve 0.75%/yr for 15 yrs beg 7/1/08 for ages 55-99) |
| Future operational expenses | $ 25,500,000 | 3.5% of benefit payments | 3.5% of benefit payments | 3.5% of benefit payments | 3.5% of benefit payments |
| Average future hourly contribution rate | $5.50 | $5.50 | $5.50 | $5.50 | |
| Average expected retirement age* | | | | | |
| *Actives* | 60.9 | | | | |
| *Inactive vested* | 62.0 | | | | |

\*    Resulting from the application of the retirement probabilities shown in Appendix B to active participants.

**United Actuarial Services, Inc.**

**CONFIDENTIAL**                                                                    **1974PLAN_002305**

## EXPERIENCE VS. ASSUMPTIONS

*Comparing the prior year's experience to assumptions provides indications as to why overall results may differ from those expected* experience.

Actuarial assumptions are used to project certain future events related to the pension plan (e.g. deaths, withdrawals, investment income, expenses, etc.). While actual results for a single plan year will rarely match expected experience, it is intended that the assumptions will provide a reasonable long term estimate of developing

The following table provides a comparison of expected outcomes for the prior plan year with the actual experience observed during the same period. This display may provide insight as to why the plan's overall actuarial position may be different from what was expected.

| Plan Year Ending June 30, 2014 | Expected | Actual |
|---|---|---|
| Decrements | | |
| Terminations (actual net of rehires) | 898 | 645 |
| Retirements and disabilities | 926 | 703 |
| Deaths - pre-retirement | 99 | 144 |
| Deaths - post-retirement | 5,221 | 4,887 |
| | | |
| Asset assumptions | | |
| Rate of gross investment return on actuarial value | 8.00% | 9.07% |
| Operational plus investment expenses | 3.5% of benefit payments plus 0.2% of assets | $ 32,393,000 |

**United Actuarial Services, Inc.**

**CONFIDENTIAL**                                    **1974PLAN_002306**

### RATE OF RETURN ON FUND ASSETS

*Historical Rates of Net Investment Return*



*Average Rates of Net Investment Return (dollar weighted)*

|  | Return on Market Value | | Return on Actuarial Value | |
|---|---|---|---|---|
|  | Period Ending June 30, | | Period Ending June 30, | |
| Period | 2014 | 2013 | 2014 | 2013 |
| One year | 15.74% | 9.52% | 9.07% | 7.61% |
| 5 years | 13.85% | 4.52% | 9.10% | 3.25% |
| 10 years | 7.72% | 8.95% | n/a | n/a |
| 15 years | 6.06% | n/a | n/a | n/a |

**United Actuarial Services, Inc.**

*Summary of Results*
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2014 Actuarial Valuation*

## FUNDED RATIOS

*The funded ratio can be used as an indication of ongoing funding progress*

The present value of vested accumulated benefits is the amount that would have to be invested as of the valuation date in order to pay, when due, the benefits accrued and vested as of the valuation date.  This calculation assumes fund assets will earn interest at the assumed rate and all other aspects of the fund's experience will follow the actuarial assumptions.  Similarly, the present value of all accumulated benefits is the amount necessary to fund all benefits accrued as of the valuation date.

The extent to which the value of vested, accumulated benefits and total accumulated benefits are funded provides a "snapshot" measure of the plan's funded status as of the valuation date.  The present values shown in this exhibit were determined using the same actuarial assumptions as were used to determine the plan's funding period.

*Present Value of Accumulated Benefits/*
*Funded Ratios*

| *Actuarial Study as of July 1,* | | *2014* | | *2013* |
|---|---|---|---|---|
| Present value of vested accumulated benefits | | | | |
| *Participants currently receiving benefits* | $ | 5,091,764,210 | $ | 5,115,063,000 |
| *Inactive vested participants* | | 296,791,410 | | 316,289,000 |
| *Active participants* | | 597,713,951 | | 622,198,000 |
| Total | | 5,986,269,571 | | 6,053,550,000 |
| Nonvested accumulated benefits | | 166,980,340 | | 271,373,000 |
| Present value of all accumulated benefits | $ | 6,153,249,911 | $ | 6,324,923,000 |
| Actuarial value of assets | $ | 4,362,514,000 | $ | 4,508,468,000 |
| Funded ratios | | | | |
| *Vested benefits* | | 0.73 | | 0.74 |
| *All accumulated benefits* | | 0.71 | | 0.71 |
| Interest rate used to value benefits | | 7.50% | | 7.80% |

**United Actuarial Services, Inc.**

**CONFIDENTIAL**                    **1974PLAN_002308**

*Summary of Results*
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2014 Actuarial Valuation*

## FUNDING STANDARD ACCOUNT

| *The minimum funding requirements have been met for the most recent plan year* |
|---|

The Funding Standard Account is used to determine whether the plan meets the minimum funding requirements established by ERISA. Such a determination is done by subtracting the year's charges from the credits. A positive result establishes a credit balance that represents the amount the plan is in excess of the minimum required contribution on a cumulative basis. A negative result represents a funding deficiency which could produce excise taxes and actually lead to the forced termination of the plan (unless the plan is following a rehabilitation plan under critical status).

Funding Standard Account charges include the normal cost, which represents the cost of benefit accruals in the past year plus assumed expenses. Credits include contributions made in the past year and the credit balance, if any, that existed at the end of the previous plan year.

For plans in critical status, the excise tax for failure to meet minimum funding requirements is waived assuming the provisions of the rehabilitation plan continue to be met. This includes making adequate progress under the rehabilitation plan.

| *Funding Standard Account*<br>*Plan Year Ending June 30,* | *2015*<br>*(Projected)* | *2014*<br>*(Final)** |
|---|---|---|
| Charges | | |
| *Prior year funding deficiency* | $ - | $ - |
| *Normal cost* | 46,527,168** | 23,543,000 |
| *Amortization charges (see Appendix C)* | 862,080,279 | 855,236,000 |
| *Interest on above* | 68,145,561 | 68,544,762 |
| Total charges | 976,753,008 | 947,323,762 |
| | | |
| Credits | | |
| *Prior year credit balance* | 1,444,564,155 | 1,719,118,000 |
| *Employer contributions* | 102,251,105 | 105,527,000 |
| *Amortization credits (see Appendix C)* | 402,790,068 | 398,534,000 |
| *Interest on above* | 141,773,545 | 168,708,917 |
| *ERISA full funding credit* | - | - |
| Total credits | 2,091,378,873 | 2,391,887,917 |
| | | |
| Credit balance (credits less charges) | $ 1,114,625,865 | $ 1,444,564,155 |

\*    Estimate. Final values to be provided by prior actuary.
\*\*    Includes a flat load of $25,500,000 for future administrative expenses as stated on page 3.

**United Actuarial Services, Inc.**

**CONFIDENTIAL**                                                              **1974PLAN_002309**

*Summary of Results*
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2014 Actuarial Valuation*

## PPA FUNDING STATUS REPORT

**The plan is in Critical status for 2014**

The Pension Protection Act of 2006 (PPA) established the status designations of "Endangered", "Seriously Endangered", or "Critical" status and new rules that these plans must follow. As the actuary, we must certify within 90 days of the beginning of the plan year if the plan has entered into one of these status designations. We must also certify if the plan has made scheduled progress if it has entered into the funding improvement or rehabilitation period. The criteria for these determinations are outlined in Appendix D. Due to the timing of the PPA certification(s), it relied on data different from that used in this report (see certification letter for additional details). The results are summarized below.

Endangered, seriously endangered, and critical status plans have to notify all parties (participants, employers, unions, PBGC, DOL) of such status within 30 days of the actuarial certification and must also set up a plan to improve funding.

Refer to Appendix D for more detail on funding improvement or rehabilitation plans.

Failure to meet scheduled progress for three consecutive years operating under a rehabilitation plan would trigger an excise tax calculated as if the plan had an accumulated funding deficiency equal to the greater of any existing funding deficiency or the amount needed to make scheduled progress. Failure to meet scheduled progress at the end of a funding improvement plan would trigger an excise tax for seriously endangered plans and a potential penalty for endangered plans.

| Description | Values Used for PPA Certification | |
| --- | --- | --- |
| | *2014* | *2013* |
| Funded ratio | 0.71 | 0.71 |
| Date of first projected funding deficiency | 6/30/2019 | 6/30/2019 |
| Plan year contributions | $  104,599,946 | |
| Normal cost | $    20,636,864 | |
| Interest on unfunded liabilities, last PY | 132,291,587 | |
| Normal cost plus unfunded liability interest | $  152,928,451 | |
| PV of vested benefits, nonactive | $5,452,426,090 | |
| PV of vested benefits, active | $   591,929,274 | |
| Years of benefit payments in assets | 8+ | 8+ |
| Certified PPA status | Critical | Seriously Endngrd |
| Making progress under FIP/RP | n/a | n/a |

**United Actuarial Services, Inc.**

**CONFIDENTIAL**

1974PLAN_002310

*Summary of Results*
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2014 Actuarial Valuation*

## UNFUNDED VESTED BENEFITS/EMPLOYER WITHDRAWAL LIABILITY

*An employer withdrawing during the coming year may have withdrawal liability*

The following table shows a history of the plan's unfunded vested benefits required to compute a specific employer withdrawal liability under the rolling 5 method.

*Rolling 5 Method*

| June 30, | Vested Benefits Interest Rate | Value of Vested Benefits* | Asset Value** | Unfunded Vested Benefits |
|----------|-------------------------------|---------------------------|---------------|--------------------------|
| 2010 | PBGC*** | 8,406,314,000 | 4,253,508,000 | 4,152,806,000 |
| 2011 | PBGC*** | 8,792,378,000 | 4,421,136,000 | 4,371,242,000 |
| 2012 | PBGC*** | 9,309,607,000 | 4,202,245,000 | 5,107,362,000 |
| 2013 | PBGC*** | 9,571,196,000 | 4,093,377,000 | 5,477,819,000 |
| 2014 | PBGC*** | 8,557,439,428 | 4,164,994,000 | 4,392,445,428 |

\*    Includes expenses as outlined under Section 4281 of ERISA.
\*\*   Market Value
\*\*\*  The Value of Vested Benefits was computed using the Pension Benefit Guaranty Corporation's valuation assumptions for multiemployer plans terminating as of the first day of the Plan Year following the date shown.

**United Actuarial Services, Inc.**

*Summary of Results*
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2014 Actuarial Valuation*

## PARTICIPANT DATA RECONCILIATION

**The data reconciliation table shows the movement of participants from one class to another**

The participant data reconciliation table below provides information as to how the plan's covered population changed since the prior actuarial study. Such factors as the number of participants retiring, withdrawing and returning to work have an impact on the actuarial position of the pension fund.

| Participants Valued As | Active | Active Electing Miners | New Inexperienced Miners | Terminated* Miners & Truckers | Terminated* Non-Retired Disabled | Pensioners Retired and Disabled | Pensioners Surviving Spouses | Total |
|---|---|---|---|---|---|---|---|---|
| Total as of 7/1/2013 | 9,724 | 33 | 346 | 106,120 | 42 | 62,447 | 29,771 | 208,483 |
| | | | | | | | | |
| Change due to: | | | | | | | | |
| New hire | 324 | 0 | 152 | 0 | 0 | 0 | 0 | 476 |
| Rehire | 77 | 0 | 0 | -76 | 0 | -1 | 0 | 0 |
| Electing Miners | -1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 |
| New Inexperienced Miners | -5 | 0 | 5 | 0 | 0 | 0 | 0 | 0 |
| Termination | -693 | -2 | -27 | 722 | 0 | 0 | 0 | 0 |
| Retirement and disability | -703 | 0 | 0 | -1,265 | 0 | 1,968 | 0 | 0 |
| New beneficiary | 0 | 0 | 0 | 0 | 0 | 0 | 1,279 | 1,279 |
| Death | -12 | 0 | 0 | -132 | 0 | -2,464 | -2,423 | -5,031 |
| Data adjustment | 0 | 0 | -1 | 49 | 0 | -22 | 199 | 225 |
| Net change: | -1,013 | -1 | 129 | -702 | 0 | -519 | -945 | -3,051 |
| | | | | | | | | |
| Total as of 7/1/2014 | 8,711 | 32 | 475 | 105,418 | 42 | 61,928 | 28,826 | 205,432** |

* Based upon entry age and service assumptions it was assumed that 6,676 terminated miners and truckers and no non-retired disabled have vested rights. All non-retired terminated participants over age 63 are assumed to be either dead or ineligible to collect a pension and have thus been excluded from the count of participants with vested rights. Those assumed to be nonvested are excluded from plan costs and liabilities. Terminated counts shown do not include the 0.6% load for unreported prior 1950 Pension Plan vested terminated participants.

** In addition, there are 938 spouses of prior 1950 Pension Plan pensioners who are not currently eligible for benefits, but can become eligible when the pensioner dies.

**United Actuarial Services, Inc.**

**CONFIDENTIAL**

*Summary of Plan Results*
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2014 Actuarial Valuation*

### ACTIVE INFORMATION

| Age* | Number of Participants | | | |
|---|---|---|---|---|
| | Actives | Electing Miners | New Inexperienced Miners | Terminated Vested Participants** |
| < 25 | 294 | 1 | 108 | 0 |
| 25-29 | 824 | 0 | 103 | 18 |
| 30-34 | 1,081 | 3 | 74 | 96 |
| 35-39 | 1,066 | 5 | 68 | 160 |
| 40-44 | 1,076 | 7 | 48 | 199 |
| 45-49 | 779 | 2 | 40 | 255 |
| 50-54 | 787 | 5 | 28 | 975 |
| 55-59 | 1,677 | 4 | 6 | 3,271 |
| 60-64 | 1,017 | 3 | 0 | 1,743 |
| 65+ | 110 | 2 | 0 | 0 |
| Totals | 8,711 *** | 32 | 475 | 6,717 |

- The average age and credited service for active employees are 45.0 and 13.2, respectively.
- The average age and combined credited/supplemental service for electing miners are 46.7 and 12.8, respectively.
- The average age and supplemental service for new inexperienced miners are 33.1 and 2.0, respectively.
- The average monthly benefit for vested terminated participants is $530.75

\* Age was assumed based on the average age of those with the same status code for 5 Terminated Vested Participants whose age was missing.

\*\* Terminated Vested Participants counts listed here include the 0.6% load for unreported prior 1950 Pension Plan vested terminated participants.

\*\*\* Of this number, 5,825 were assumed to have vested rights.

**United Actuarial Services, Inc.**

**CONFIDENTIAL**

**1974PLAN_002313**

### RETIREE INFORMATION

| Age | Number of Participants | | |
|-----|-------------------|-------------------|-------------------|
| | *Regular Retirees* | *Disabled Retirees* | *Surviving Spouses* |
| < 55 | 111 | 246 | 546 |
| 55-59 | 5,032 | 1,174 | 1,089 |
| 60-64 | 12,237 | 2,171 | 2,104 |
| 65-69 | 13,028 | 2,196 | 3,111 |
| 70-74 | 9,063 | 1,577 | 3,515 |
| 75-79 | 6,002 | 908 | 4,059 |
| 80-84 | 3,639 | 367 | 4,796 |
| 85+ | 4,031 | 146 | 9,606 |
| Totals | 53,143 | 8,785 | 28,826 |

- The average monthly benefit for regular retirees is $649.
- The average monthly benefit for disabled retirees is $563.
- The average monthly benefit for surviving spouses is $334.

**United Actuarial Services, Inc.**

**CONFIDENTIAL**                    **1974PLAN_002314**

JA 000746

## *PART II:  SUPPLEMENTAL STATISTICS*

**United Actuarial Services, Inc.**

**CONFIDENTIAL**                    **1974PLAN_002315**

*Supplemental Information*    JA 000747
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2014 Actuarial Valuation*

## HOURS WORKED DURING PLAN YEAR

*History of Actual and Expected Total Hours Worked*



**United Actuarial Services, Inc.**

**CONFIDENTIAL**                    **1974PLAN_002316**

## CONTRIBUTION ALLOCATION

The following allocation charts illustrate the percentage of current expected contributions required to pay for benefits being earned in the current year as well as the expected annual plan expenses, with the remaining portion being applied toward funding of accrued benefits.

*Contribution Allocation as of July 1, 2014*



United Actuarial Services, Inc.

**CONFIDENTIAL**                 1974PLAN_002317

*Supplemental Information*
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2014 Actuarial Valuation*

## ACTIVE INFORMATION

*Active Participants\* by Age and Service as of July 1, 2014*

| Age | Years of Service | | | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| | < 5 | 5-9 | 10-14 | 15-19 | 20-24 | 25-29 | 30-34 | 35-39 | 40+ | |
| < 25 | 393 | 9 | - | - | - | - | - | - | - | 402 |
| 25-29 | 706 | 221 | - | - | - | - | - | - | - | 927 |
| 30-34 | 639 | 465 | 54 | - | - | - | - | - | - | 1,158 |
| 35-39 | 540 | 468 | 124 | 7 | - | - | - | - | - | 1,139 |
| 40-44 | 500 | 487 | 120 | 21 | 3 | - | - | - | - | 1,131 |
| 45-49 | 332 | 355 | 82 | 35 | 16 | 1 | - | - | - | 821 |
| 50-54 | 188 | 192 | 75 | 34 | 183 | 120 | 14 | 14 | - | 820 |
| 55-59 | 79 | 86 | 43 | 46 | 184 | 991 | 46 | 212 | - | 1,687 |
| 60-64 | 15 | 30 | 14 | 25 | 54 | 616 | 60 | 194 | 12 | 1,020 |
| 65-69 | - | 6 | 5 | - | 3 | 25 | 43 | 3 | 19 | 104 |
| 70+ | 1 | 1 | 1 | - | - | - | 1 | 1 | 4 | 9 |
| Totals | 3,393 | 2,320 | 518 | 168 | 443 | 1,753 | 164 | 424 | 35 | 9,218 |
| Unrecorded DOB | - | - | - | - | - | - | - | - | - | - |
| Total Active Lives | 3,393 | 2,320 | 518 | 168 | 443 | 1,753 | 164 | 424 | 35 | 9,218 |

\*    Includes 32 active electing miners and 475 new inexperienced miners.

**United Actuarial Services, Inc.**

**CONFIDENTIAL**

JA 000750

*Supplemental Information*
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2014 Actuarial Valuation*

## ACTIVE INFORMATION (CONT.)

*History of Ratio of Actives to Retired Participants*



**United Actuarial Services, Inc.**

**CONFIDENTIAL**                    **1974PLAN_002319**

*Supplemental Information*
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2014 Actuarial Valuation*

### INACTIVE VESTED INFORMATION

*Inactive Vested Participants\* by Age as of July 1, 2014*

| Age Group\*\* | Number | Estimated Deferred Vested Benefits |
|---|---|---|
| < 30 | 18 | $ 6,842 |
| 30-34 | 96 | 39,823 |
| 35-39 | 160 | 69,762 |
| 40-44 | 199 | 92,730 |
| 45-49 | 255 | 128,336 |
| 50-54 | 975 | 578,021 |
| 55-59 | 3,271 | 1,747,674 |
| 60-64 | 1,743 | 901,369 |
| 65-69 | - | - |
| 70+ | - | - |
| Total inactive vested lives | 6,717 | $ 3,564,557 |

\*    Amount payable at assumed retirement age as used in the valuation process. Amount payable and inactive counts include the 0.6% load to inactive vesteds.

\*\*   Age was assumed based on the average age of those with the same status code for 5 participants whose age was missing.

CONFIDENTIAL

1974PLAN_002320

*Supplemental Information*
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2014 Actuarial Valuation*

## RETIREE INFORMATION

*Benefits Being Paid by Form of Payment as of July 1, 2014*

| Form of Payment | Number | Monthly Benefits Being Paid | | | |
|---|---|---|---|---|---|
| | | Total | Average | Smallest | Largest |
| 1950 Pensioners | 2,219 | $ 617,990 | $ 278 | $ 121 | $ 425 |
| 1974 Pensioners | 50,924 | 33,894,428 | 666 | 57 | 2,889 |
| Disability | 8,785 | 4,944,514 | 563 | 249 | 1,764 |
| Surviving spouses | 28,826 | 9,629,820 | 334 | 74 | 1,945 |
| Totals | 90,754 | $ 49,086,752 | $ 541 | $ 57 | $ 2,889 |

*Retirees by Age and Form of Payment as of July 1, 2014*

| Age Group | Form of Benefits Being Paid | | | |
|---|---|---|---|---|
| | 1950 Pensioners | 1974 Pensioners | Disability | Total |
| < 40 | - | - | 5 | 5 |
| 40-44 | - | 2 | 10 | 12 |
| 45-49 | - | 1 | 40 | 41 |
| 50-54 | - | 108 | 191 | 299 |
| 55-59 | - | 5,032 | 1,174 | 6,206 |
| 60-64 | 70 | 12,167 | 2,171 | 14,408 |
| 65-69 | 276 | 12,752 | 2,196 | 15,224 |
| 70-74 | 340 | 8,723 | 1,577 | 10,640 |
| 75-79 | 335 | 5,667 | 908 | 6,910 |
| 80-84 | 349 | 3,290 | 367 | 4,006 |
| 85-89 | 454 | 2,194 | 125 | 2,773 |
| 90-94 | 276 | 857 | 18 | 1,151 |
| 95+ | 119 | 131 | 3 | 253 |
| Totals | 2,219 | 50,924 | 8,785 | 61,928 |
| *plus*: Surviving spouses | | | | 28,826 |
| Total receiving benefits | | | | 90,754 |

**United Actuarial Services, Inc.**

**CONFIDENTIAL**

**1974PLAN_002321**

JA 000753
Supplemental Information
United Mine Workers of America 1974 Pension Plan
July 1, 2014 Actuarial Valuation

## RETIREE INFORMATION (CONT.)

**Age of Participants Retiring from Active or Inactive Vested Status During Prior Plan Year (excludes beneficiaries and disability retirements)**

| Age at Retirement | Plan Year Ending June 30, 2014 |
|---|---|
| < 45 | 1 |
| 45 | - |
| 46 | - |
| 47 | - |
| 48 | - |
| 49 | - |
| 50 | - |
| 51 | - |
| 52 | 4 |
| 53 | 5 |
| 54 | 8 |
| 55 | 113 |
| 56 | 309 |
| 57 | 169 |
| 58 | 148 |
| 59 | 127 |
| 60 | 132 |
| 61 | 129 |
| 62 | 181 |
| 63 | 289 |
| 64 | 102 |
| 65 | 79 |
| 66+ | 161 |
| Totals | 1,957 |

**History of Average Retirement Ages**
**(excludes beneficiaries and disability retirements)**

| Retirement During Plan Year Ending In: | Number | Average Retirement Age |
|---|---|---|
| 2014 | 1,957 | 60.3 |

**United Actuarial Services, Inc.**

**CONFIDENTIAL**

1974PLAN_002322

JA 000754

# PART III: ASSET INFORMATION

United Actuarial Services, Inc.

CONFIDENTIAL

JA 000755

*Asset Information*
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2014 Actuarial Valuation*

## MARKET AND ACTUARIAL FUND VALUES

Asset information extracted from the fund's financial statements audited by Bond Beebe Accountants & Advisors.

| *Market/Actuarial Value of Fund Investments as of June 30,* | *2014* | *2013* | *2012* |
|---|---|---|---|
| Invested assets | | | |
| *Corporate stocks - common* | $ 744,339,000 | $ 774,456,000 | $ 726,405,000 |
| *Corporate stock - preferred* | 3,143,000 | 3,326,000 | 1,645,000 |
| *Registered inv. companies* | 663,090,000 | 562,872,000 | 374,252,000 |
| *Common/collective trusts* | 1,406,195,000 | 1,355,286,000 | 1,227,746,000 |
| *Partnership/joint venture* | 458,560,000 | 484,651,000 | 559,064,000 |
| *Real estate* | 170,326,000 | 184,612,000 | 236,626,000 |
| *Corporate bonds* | 67,319,000 | 68,119,000 | 142,373,000 |
| *US government securities* | 8,334,000 | | 525,160,000 |
| *Short-term & foreign currency* | 3,275,000 | 2,187,000 | 3,372,000 |
| *Cash and cash equivalents* | 212,293,000 | 334,527,000 | 146,610,000 |
| *Securities held as collateral* | 101,824,000 | 61,749,000 | 299,990,000 |
| *Office furniture & equipment* | 637,000 | 783,000 | 807,000 |
| *Other* | 392,695,000 | 349,420,000 | 283,642,000 |
| | 4,232,030,000 | 4,181,988,000 | 4,527,692,000 |
| Net receivables* | (67,036,000) | (88,611,000) | (325,447,000) |
| Market value | $ 4,164,994,000 | $ 4,093,377,000 | $ 4,202,245,000 |
| Fund assets - Actuarial value | | | |
| *Market value* | $ 4,164,994,000 | $ 4,093,377,000 | $ 4,202,245,000 |
| less*: Deferred investment gains and (losses)* | (197,520,000) | (415,091,000) | (455,940,000) |
| Actuarial value | $ 4,362,514,000 | $ 4,508,468,000 | $ 4,658,185,000 |
| Actuarial value as a percentage of market value | 104.74% | 110.14% | 110.85% |

* Equals receivables, less any liabilities

**United Actuarial Services, Inc.**

**CONFIDENTIAL**                                                    **1974PLAN_002324**

JA 000756

*Asset Information*
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2014 Actuarial Valuation*

## FLOW OF FUNDS

Asset information extracted from the fund's financial statements audited by Bond Beebe Accountants & Advisors.

| Plan Year Ending June 30, | 2014 | 2013 | 2012 |
|---|---|---|---|
| Market value at beginning of plan year | $ 4,093,377,000 | $ 4,202,245,000 | $ 4,421,136,000 |
| **Additions** | | | |
| Employer contributions | 105,527,000 | 115,418,000 | 129,211,000 |
| Net investment income* | 602,634,000 | 377,054,000 | 372,958,000 |
| Other income | 1,962,000 | 1,997,000 | 2,618,000 |
| | 710,123,000 | 494,469,000 | 504,787,000 |
| **Deductions** | | | |
| Benefits paid | 609,838,000 | 573,261,000 | 685,402,000 |
| Net expenses* | 32,393,000 | 36,316,000 | 38,285,000 |
| | 642,231,000 | 609,577,000 | 723,687,000 |
| Net increase (decrease) | 67,892,000 | (115,108,000) | (218,900,000) |
| Adjustment | 3,725,000 | 6,240,000 | 9,000 |
| Market value at end of plan year | $ 4,164,994,000 | $ 4,093,377,000 | $ 4,202,245,000 |
| **Estimated net investment return** | | | |
| On market value | 15.74% | 9.52% | 9.04% |
| On actuarial value | 9.07% | 7.61% | 3.61% |

\*    Investment expenses have been offset against gross investment income.

**United Actuarial Services, Inc.**

**CONFIDENTIAL**

1974PLAN_002325

JA 000757

*Asset Information*
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2014 Actuarial Valuation*

## INVESTMENT GAIN AND LOSS

*Investment Gain or Loss*
*Plan Year Ending June 30, 2014*

| | |
|---|---:|
| Expected market value at end of plan year | |
| *Market value at beginning of plan year* | $ 4,093,377,000 |
| *Employer contributions and non-investment income* | 111,214,000 |
| *Benefits and expenses paid* | (642,231,000) |
| *Expected investment income (at 8.00% rate of return)* | 303,671,486 |
| | 3,866,031,486 |
| Actual market value at end of plan year | 4,164,994,000 |
| *less*: Expected market value | 3,866,031,486 |
| Investment gain or (loss) | $ 298,962,514 |

*History of Gains and (Losses)*

| Plan Year Ending June 30, | Investment Gain or (Loss) |
|---|---:|
| 2014 | $ 298,962,514 |
| 2013 | 62,448,000 |
| 2012 | 47,196,000 |
| 2011 | 408,910,000 |
| 2010 | 307,966,000 |
| 2009 | (1,437,048,000) |
| Total | $ (314,272,560) |

*Deferred Investment Gains and (Losses)**

| Plan Year Ending June 30, | Amount of Gain or (Loss) Deferred as of June 30, | | | |
|---|---|---|---|---|
| | *2014* | *2015* | *2016* | *2017* |
| 2014 | $ 239,170,000 | $ 179,378,000 | $ 119,585,000 | $ 59,793,000 |
| 2013 | 37,469,000 | 24,979,000 | 12,490,000 | - |
| 2012 | 18,878,000 | 9,439,000 | - | - |
| 2011 | 81,782,000 | - | - | - |
| 2010 | - | - | - | - |
| 2009 | (574,819,000) | (431,114,000) | (287,410,000) | (143,705,000) |
| Totals | $ (197,520,000) | $ (217,318,000) | $ (155,335,000) | $ (83,912,000) |

* 10-year smoothing was elected with respect to the loss incurred during plan year ending 2009.

**United Actuarial Services, Inc.**

## *PART IV:  ENROLLED ACTUARY'S REPORT*

United Actuarial Services, Inc.

**CONFIDENTIAL**          **1974PLAN_002327**

## NORMAL COST/ACTUARIAL LIABILITY

### Normal Cost as of July 1, 2014

| | | |
|---|---|---:|
| Active participants - service prior to valuation date | $ | - |
| Active participants - service after valuation date | | 21,948,855 |
| Anticipated administrative expenses (beg. of year) | | 24,578,313 |
| | | |
| Total normal cost | $ | 46,527,168 |

### Unfunded Actuarial Liability as of July 1, 2014

| | | |
|---|---|---:|
| Actuarial liability | | |
| *Participants currently receiving benefits* | $ | 5,091,764,210 |
| *Inactive vested participants* | | 435,975,219 |
| *Active participants - service prior to val. date* | | 625,510,482 |
| *Active participants - service after val. date* | | - |
| | | 6,153,249,911 |
| | | |
| *less*:  Fund assets (actuarial value) | | 4,362,514,000 |
| | | |
| Unfunded actuarial liability (not less than 0) | $ | 1,790,735,911 |

**United Actuarial Services, Inc.**

**CONFIDENTIAL**                                    **1974PLAN_002328**

JA 000760

*Enrolled Actuary Report*
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2014 Actuarial Valuation*

## ACTUARIAL LIABILITY RECONCILIATION/PROJECTION

### Reconciliation of Unfunded Actuarial Liability

| | |
|---|---:|
| Expected unfunded actuarial liability as of June 30, 2014 | |
| *Unfunded actuarial liability as of July 1, 2013* | $    1,816,455,000 |
| *Normal cost* | 23,543,000 |
| *Actual contributions* | (105,527,000) |
| *Interest to end of plan year* | 139,987,783 |
| | 1,874,458,783 |
| | |
| Increase (decrease) due to: | |
| *Experience (gain) or loss – assets* | (48,184,000) |
| *Experience (gain) or loss – plan experience* | 36,760,832 |
| *Plan amendment* | - |
| *Change in actuarial assumptions* | 143,059,696 |
| *Change in actuarial method* | (215,359,400) |
| Net increase (decrease) | (83,722,872) |
| | |
| Unfunded actuarial liability as of July 1, 2014 | $    1,790,735,911 |

### Projection of Actuarial Liability to Year End

| | |
|---|---:|
| Actuarial liability as of July 1, 2014 | $    6,153,249,911 |
| | |
| Expected increase (decrease) due to: | |
| *Normal cost* | 46,527,168 |
| *Benefits paid* | (611,067,605) |
| *Interest on above* | (21,335,084) |
| *Interest on actuarial liability* | 461,493,743 |
| Net expected increase (decrease) | (124,381,778) |
| | |
| Expected actuarial liability as of June 30, 2015 | $    6,028,868,133 |

**United Actuarial Services, Inc.**

**CONFIDENTIAL**                                                                 **1974PLAN_002329**

*Enrolled Actuary Report*
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2014 Actuarial Valuation*

## CURRENT LIABILITY

Current liability is developed for the purpose of determining the full funding limitation under Section 431(c)(6) of the Internal Revenue Code and the maximum deductible contribution under Section 404(a)(1)(D) of the Internal Revenue Code.  As prescribed under Section 431(c)(6), the current liability uses a different interest rate and mortality table than regular plan funding under ERISA.

### Current Liability as of July 1, 2014

| | |
|---|---:|
| Vested current liability | |
| *Participants currently receiving benefits* | $   7,833,383,081 |
| *Inactive vested participants* | 535,381,398 |
| *Active participants* | 1,125,557,695 |
| | 9,494,322,174 |
| | |
| Nonvested current liability | |
| *Inactive vested participants* | 179,418,454 |
| *Active participants* | 60,937,860 |
| | 240,356,314 |
| | |
| Total current liability | $   9,734,678,488 |

### Projection of Current Liability to Year End

| | |
|---|---:|
| Current liability as of July 1, 2014 | $   9,734,678,488 |
| | |
| Expected increase (decrease) due to: | |
| *Benefits accruing* | 75,417,404 |
| *Benefits paid* | (611,067,605) |
| *Interest on above* | (9,175,234) |
| *Interest on current  liability* | 349,474,958 |
| Net expected increase (decrease) | (195,350,477) |
| | |
| Expected current liability as of June 30, 2015 | $   9,539,328,011 |

**United Actuarial Services, Inc.**

**CONFIDENTIAL**

*Enrolled Actuary's Report*
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2014 Actuarial Valuation*

## FULL FUNDING LIMIT

The full funding limit, as required under Section 431(c)(6) and Section 404(a)(1) of the Internal Revenue Code, provides a limitation to both the minimum required contribution and the maximum deductible contribution. Both results are limited to be no greater than the unfunded liability (plus the ERISA credit balance for the minimum required contribution only). This limitation amount is overridden if 90% of the current liability minus the actuarial value of assets is greater or, for the maximum deductible contribution only, if 140% of the vested current liability minus the actuarial value of assets is greater.

| Projection of Assets for Full Funding Limit | Market Value | Actuarial Value |
|---|---|---|
| Asset value as of July 1, 2014 | $ 4,164,994,000 | $ 4,362,514,000 |
| Expected increase (decrease) due to: | | |
| *Benefits paid* | (611,067,605) | (611,067,605) |
| *Investment income* | 299,051,926 | 314,458,486 |
| Net expected increase (decrease) | (312,015,679) | (296,609,119) |
| Expected value as of June 30, 2015* | $ 3,852,978,321 | $ 4,065,904,881 |

\*    Ignoring expected employer contributions (as required by regulation).

| Full Funding Limit as of June 30, 2015 | For Minimum Required | For Maximum Deductible |
|---|---|---|
| ERISA full funding limit (not less than 0) | | |
| *Actuarial liability* | $ 6,028,868,133 | $ 6,028,868,133 |
| less:  *Assets (lesser of market or actuarial)* | 3,852,978,321 | 3,852,978,321 |
| plus*:  Credit balance (w/interest to year end)* | 1,552,906,467 | n/a |
| | 3,728,796,279 | 2,175,889,812 |
| Full funding limit override (not less than 0) | | |
| *90% of current liability* | 8,585,395,210 | 8,585,395,210 |
| less:  *Assets (actuarial value)* | 4,065,904,881 | 4,065,904,881 |
| | 4,519,490,329 | 4,519,490,329 |
| Full funding limit (greater of ERISA limit and full funding override) | $ 4,519,490,329 | $ 4,519,490,329 |

**United Actuarial Services, Inc.**

**CONFIDENTIAL**                                    **1974PLAN_002331**

*Enrolled Actuary's Report*
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2014 Actuarial Valuation*

## MINIMUM REQUIRED CONTRIBUTION AND FULL FUNDING CREDIT

*Minimum Required Contribution*
*Plan Year Beginning July 1, 2014*

| | | |
|---|---|---:|
| Minimum funding cost | | |
| *Total normal cost* | $ | 46,527,168 |
| *Net amortization of unfunded liabilities* | | 459,290,211 |
| *Interest to end of plan year* | | 37,936,303 |
| | | 543,753,682 |
| | | |
| Full funding limit | | 4,519,490,329 |
| | | |
| Net charge to funding std. acct. (lesser of above) | | 543,753,682 |
| less:  *Credit balance with interest to year end* | | 1,552,906,467 |
| | | |
| Minimum Required Contribution (not less than 0) | $ | - |

*Full Funding Credit to Funding Standard*
*Account Plan Year Ending June 30, 2015*

| | | |
|---|---|---:|
| Full funding credit (not less than 0) | | |
| *Minimum funding cost (n.c., amort., int.)* | $ | 543,753,682 |
| less*:  full funding limit* | | 4,519,490,329 |
| | | |
| | $ | - |

**United Actuarial Services, Inc.**

**CONFIDENTIAL**

**1974PLAN_002332**

JA 000764

*Enrolled Actuary's Report*
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2014 Actuarial Valuation*

## MAXIMUM DEDUCTIBLE CONTRIBUTION

The maximum amount of tax-deductible employer contributions made to a pension plan is determined in accordance with Section 404(a) of the Internal Revenue Code. For a multiemployer pension plan, Section 413(b)(7) of the Internal Revenue Code and IRS Announcement 98-1 provide that, if underlined anticipated employer contributions are less than the deductible limit for a plan year, then all employer contributions paid during the year are guaranteed to be deductible. If anticipated employer contributions exceed the deductible limit, the Trustees have two years from the close of the plan year in question to retroactively improve benefits to alleviate the problem.

*Maximum Deductible Contribution*
*Plan Year Beginning July 1, 2014*

| | | |
|---|---:|---:|
| Preliminary deductible limit | | |
| *Total normal cost* | $ | 46,527,168 |
| *10-year limit adjustment (using "fresh start" alternative)* | | 242,683,741 |
| *Interest to end of plan year* | | 21,690,819 |
| | | 310,901,728 |
| | | |
| Full funding limit | | 4,519,490,329 |
| | | |
| Maximum deductible contribution override | | |
| *140% of vested current liability projected to June 30, 2015* | | 13,025,313,060 |
| less*: Actuarial value of assets projected to June 30, 2015* | | 4,065,904,881 |
| | | 8,959,408,179 |
| | | |
| Maximum deductible contribution* | $ | 8,959,408,179 |
| | | |
| Anticipated employer contributions | $ | 102,251,105 |

\*     Equals the lesser of the preliminary deductible limit and the full funding limit, but not less than the maximum deductible contribution override.

**United Actuarial Services, Inc.**

**CONFIDENTIAL**

1974PLAN_002333

JA-000765

*Enrolled Actuary's Report*
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2014 Actuarial Valuation*

## REORGANIZATION INDEX

Financially troubled multiemployer plans are considered to be in a status of "reorganization" under certain conditions and become subject to special rules regarding funding and adjustments in accrued benefits. As defined in ERISA Section 4241, a plan is in reorganization if the reorganization index is greater than zero. The reorganization index is the excess of the vested benefits charge over the net charge to the funding standard account (FSA). The reorganization index is calculated according to the "current valuation" option described in ERISA Section 4241(b)(4)(A)(i)(II). The reorganization rules have been repealed by the Multiemployer Pension Reform Act of 2014 (MEPRA) starting with the plan year beginning in 2015.

*Reorganization Index*
*Plan Year Ending June 30, 2014*

| | |
|---|---:|
| Value of vested benefits in pay status as of June 30, 2014 | $ 5,091,764,210 |
| Value of all vested benefits as of June 30, 2014 | 5,986,269,571 |
| Assets as of June 30, 2014* | 4,164,994,000 |
| | |
| Unfunded vested benefits (UVB) in pay status | 926,770,210 |
| Unfunded vested benefits not in pay status | 894,505,361 |
| | |
| Vested benefits charge | |
| *10 year amortization of UVB in pay status* | 125,597,561 |
| *25 year amortization of UVB not in pay status* | 74,648,071 |
| | 200,245,632 |
| | |
| Net charge to the FSA as of June 30, 2014 | |
| *Total normal cost* | 23,543,000 |
| *Charges to the FSA* | 855,236,000 |
| *less: credits to the FSA* | 398,534,000 |
| | 480,245,000 |
| | |
| Vested benefits charge *less* net charge to FSA | (279,999,368) |
| | |
| Reorganization index (preceding value, not less than zero) | $               - |
| | |
| Plan in reorganization for plan year ending June 30, 2014? | NO |

\*    Market value

**United Actuarial Services, Inc.**

**CONFIDENTIAL**                                          **1974PLAN_002334**

JA 000766

*Enrolled Actuary Report*
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2014 Actuarial Valuation*

## ASC 960 INFORMATION

The following displays are intended to assist the fund's auditor in complying with Accounting Standards Codification 960.  The results shown are not necessarily indicative of the plan's potential liability upon termination.

| *Present Value of Accumulated Benefits*<br>*Actuarial Study as of July 1,* | | *2014* | | *2013* |
|---|---|---|---|---|
| Present value of vested accumulated benefits | | | | |
| *Participants currently receiving benefits* | $ | 7,002,094,897 | $ | 7,910,935,000 |
| *Other participants* | | 1,484,022,604 | | 1,901,050,000 |
| | | 8,486,117,501 | | 9,811,985,000 |
| Nonvested accumulated benefits | | 307,301,402 | | 104,311,000 |
| Present value of all accumulated benefits | $ | 8,793,418,903 | $ | 9,916,296,000 |
| Market value of plan assets | $ | 4,164,994,000 | $ | 4,093,377,000 |
| Interest rate used to value benefits | | | | |
| *First 20 years* | | 3.47% | | 2.50% |
| *Thereafter* | | 3.64% | | 3.20% |

### Changes in Present Value of Accumulated Benefits

| | | |
|---|---|---|
| Present value of accumulated benefits as of July 1, 2013 | $ | 9,916,296,000 |
| Increase (decrease) due to: | | |
| *Plan amendment* | | - |
| *Change in actuarial assumptions* | | 143,059,696 |
| *Benefits accumulated and experience gain or loss* | | (875,573,621) |
| *Interest due to decrease in discount period* | | 219,474,828 |
| *Benefits paid* | | (609,838,000) |
| Net increase (decrease) | | (1,122,877,097) |
| Present value of accumulated benefits as of July 1, 2014 | $ | 8,793,418,903 |

**United Actuarial Services, Inc.**

**CONFIDENTIAL**                    1974PLAN_002335

JA 000767

*Enrolled Actuary Report*
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2014 Actuarial Valuation*

## BENEFIT PAYOUT PROJECTION

Estimated benefit payments for the next forty years, based upon the actuarial assumptions used in the valuation and benefit levels scheduled to take effect during the term of the collective bargaining agreement applicable to the plan (and reflecting expected future accruals for actives), are shown. Future benefit payments will vary from the projections as actual experience differs from the assumed experience for mortality, turnover, retirement, etc.

| Plan Year Beginning July 1, | Expected Benefit Payments | Plan Year Beginning July 1, | Expected Benefit Payments |
|---|---|---|---|
| 2014 | $590,760,222 | 2034 | $319,513,783 |
| 2015 | 589,672,672 | 2035 | 300,699,060 |
| 2016 | 586,491,507 | 2036 | 281,931,226 |
| 2017 | 581,267,121 | 2037 | 263,107,207 |
| 2018 | 575,016,409 | 2038 | 244,513,793 |
| 2019 | 566,977,741 | 2039 | 226,180,734 |
| 2020 | 557,208,621 | 2040 | 208,428,966 |
| 2021 | 544,672,389 | 2041 | 191,104,893 |
| 2022 | 530,177,339 | 2042 | 174,433,000 |
| 2023 | 514,553,009 | 2043 | 158,539,898 |
| 2024 | 497,904,978 | 2044 | 143,520,455 |
| 2025 | 480,856,999 | 2045 | 129,241,599 |
| 2026 | 463,499,815 | 2046 | 116,017,285 |
| 2027 | 445,868,179 | 2047 | 103,794,529 |
| 2028 | 428,243,082 | 2048 | 92,563,937 |
| 2029 | 410,568,815 | 2049 | 82,412,767 |
| 2030 | 392,918,670 | 2050 | 73,191,042 |
| 2031 | 375,025,005 | 2051 | 64,942,710 |
| 2032 | 356,742,586 | 2052 | 57,526,072 |
| 2033 | 338,242,230 | 2053 | 50,934,361 |

**United Actuarial Services, Inc.**

CONFIDENTIAL

1974PLAN_002336

*APPENDICES*

## PLAN HISTORY

### Origins/Purpose

The United Mine Workers of America 1974 Pension Plan was established by the UMWA and the Bituminous Coal Operators' Association, Inc. (BCOA) during the negotiation of the National Bituminous Coal Wage Agreement of 1974.  It became effective December 6, 1974 and is the continuation of the benefit program established under the UMWA Welfare and Retirement Fund of 1950.  Effective June 30, 2007, it is also the surviving plan following the merger with the United Mine Workers of America 1950 Pension Plan.

The Pension Plan is managed under the provisions of Article XX of the National Bituminous Coal Wage Agreement of 2011, as amended from time to time, by a Board of Trustees consisting of two representatives from the Union and two representatives from the Employers.

The purpose of the Pension Plan is to provide Normal and Early Retirement Benefits, Surviving Spouse Benefits, Disability Benefits, Deferred Vested Benefits, Widow Benefits, and Death Benefits.

### Employer Contributions

The Pension Plan is financed entirely by contributions from the employers as specified in the Collective Bargaining Agreement.  Following is a partial listing of hourly pension contribution rates.

| Date | Hourly Contribution Rate |
|------|--------------------------|
| 1/1/2007 | $2.00 |
| 1/1/2008 | $3.50 |
| 1/1/2009 | $4.25 |
| 1/1/2010 | $5.00 |
| 1/1/2011 | $5.50 |

The employers must also pay a contribution based on tons of "purchased coal".  The current rate is $1.10 per ton of "purchased coal".

**United Actuarial Services, Inc.**

**CONFIDENTIAL**                                    **1974PLAN_002338**

*Appendix A - Plan Provisions*
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2014 Actuarial Valuation*

## PLAN HISTORY (CONT.)

### Normal Retirement Benefit and Disability Benefit 1974 Pension Plan

Following are the monthly historical normal retirement benefit amounts earned for each year of service for retirements or terminations prior to February 1, 1988:

| Retirement or Termination During: | Credited Non-Signatory Service | Credited Signatory Service | | | |
|---|---|---|---|---|---|
| | | 1st 10 Years | 2nd 10 Years | 3rd 10 Years | In Excess of 30 Years |
| 1/1/1976 to 12/31/1976 | $7.50 | $12.00 | $12.50 | $13.00 | $13.50 |
| 1/1/1977 to 3/26/1978 | $7.50 | $12.50 | $13.00 | $13.50 | $14.00 |
| 3/27/1978 to 6/6/1981 | $7.50 | $13.50 | $14.00 | $14.50 | $15.00 |
| 6/7/1981 to 6/6/1983 | $7.50 | $14.50 | $15.00 | $15.50 | $16.00 |
| 6/7/1983 to 9/30/1984 | $7.50 | $15.50 | $16.00 | $16.50 | $17.00 |
| 10/1/1984 to 9/30/1987 | $7.50 | $16.50 | $17.00 | $17.50 | $18.00 |
| 10/1/1987 to 1/31/1988 | $7.50 | $17.00 | $17.50 | $18.00 | $18.50 |

Following are the monthly historical normal retirement benefit amounts earned for each year of service for retirements or terminations on or after February 1, 1988 (the sum of (a) plus (b) plus (c) plus (d) plus (e)):

| Retirement or Termination During: | Credited Non-Signatory Service (a) | Credited Signatory Service (earned prior to 2/1/1989) (b) | | | |
|---|---|---|---|---|---|
| | | 1st 10 Years | 2nd 10 Years | 3rd 10 Years | In Excess of 30 Years |
| 2/1/1988 to 1/31/1991 | $7.50 | $20.00 | $20.50 | $21.00 | $21.50 |
| 2/1/1991 to 12/15/1993 | $10.00 | $22.50 | $23.00 | $23.50 | $24.00 |
| 12/16/1993 to 8/16/1996* | $10.00 | $26.50 | $27.00 | $27.50 | $28.00 |
| 8/17/1996 to 12/31/1997* | $12.00 | $28.50 | $29.00 | $29.50 | $30.00 |
| 1/1/1998 to 12/31/1999 | $12.00 | $32.50 | $33.00 | $33.50 | $34.00 |
| 1/1/2000 to 12/31/2001 | $14.00 | $34.50 | $35.00 | $35.50 | $36.00 |
| 1/1/2002 to 12/31/2003 | $18.00 | $38.50 | $39.00 | $39.50 | $40.00 |
| 1/1/2004 to 12/31/2005 | $20.00 | $40.50 | $41.00 | $41.50 | $42.00 |
| 1/1/2006 to 12/31/2006 | $24.00 | $44.50 | $45.00 | $45.50 | $46.00 |
| 1/1/2007 to 12/31/2008 | $28.00 | $48.50 | $49.00 | $49.50 | $50.00 |
| 1/1/2009 to 12/31/2010 | $32.00 | $52.50 | $53.00 | $53.50 | $54.00 |
| On or after 1/1/2011 | $34.00 | $54.50 | $55.00 | $55.50 | $56.00 |

\*   Pension application authorized.

Page A-2

**United Actuarial Services, Inc.**

*Appendix A - Plan Provisions*
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2014 Actuarial Valuation*

## PLAN HISTORY (CONT.)

| Retirement or Termination During: | Credited Signatory Service (earned from 2/1/1989 through 1/31/1990) (c) | Credited Signatory Service (earned from 2/1/1990 through 12/15/1993) (d) | Credited Signatory Service (earned on or after 12/16/1993) (e) |
|---|---|---|---|
| 2/1/1988 to 1/31/1991 | $27.50 | $32.00 | N/A |
| 2/1/1991 to 12/15/1993 | $30.00 | $34.50 | N/A |
| 12/16/1993 to 8/16/1996* | $34.00 | $38.50 | $41.50 |
| 8/17/1996 to 12/31/1997* | $36.00 | $40.50 | $43.50 |
| 1/1/1998 to 12/31/1999 | $40.00 | $44.50 | $47.50 |
| 1/1/2000 to 12/31/2001 | $42.00 | $46.50 | $49.50 |
| 1/1/2002 to 12/31/2003 | $46.00 | $50.50 | $53.50 |
| 1/1/2004 to 12/31/2005 | $48.00 | $52.50 | $55.50 |
| 1/1/2006 to 12/31/2006 | $52.00 | $56.50 | $59.50 |
| 1/1/2007 to 12/31/2008 | $56.00 | $60.50 | $63.50 |
| 1/1/2009 to 12/31/2010 | $60.00 | $64.50 | $67.50 |
| On or after 1/1/2011 | $62.00 | $66.50 | $69.50 |

\*    Pension application authorized

### Minimum Disability Benefit 1974 Pension Plan

Following are the monthly historical minimum disability retirement benefit amounts, based on date of retirement:

| Retirement Date | Benefit Amount |
|---|---|
| Prior to 3/27/1978 | $125.00 |
| 3/27/1978 to 6/6/1981 | $135.00 |
| 6/7/1981 to 6/6/1983 | $145.00 |
| 6/7/1983 to 9/30/1984 | $155.00 |
| 10/1/1984 to 9/30/1987 | $165.00 |
| 10/1/1987 to 1/31/1988 | $170.00 |
| 2/1/1988 to 1/31/1990 | $190.00 |
| 2/1/1990 to 12/31/1997 | $200.00 |
| 1/1/1998 to 12/31/2001 | $215.00 |
| 1/1/2002 to 12/31/2006 | $230.00 |
| 1/1/2007 to 12/31/2008 | $245.00 |
| On or after 1/1/2009 | $250.00 |

**United Actuarial Services, Inc.**

**CONFIDENTIAL**

**1974PLAN_002340**

## PLAN HISTORY (CONT.)

*Pension Benefit Increases 1974 Pension Plan*

Following are the monthly benefit increases applied to prior retirements:

A.    Pension increases for participants who retired prior to 2/1/1988, excluding those with a Minimum Disability Retirement pension or those with a Deferred Vested Retirement pension prior to 2/1/1988:

| Effective Date of Increase | Increase Applicable to Retirements Prior to | Amount of Monthly Pension Increase |
|---|---|---|
| 1/1/1977 | 12/31/1976 | $10.00 |
| 4/1/1978 | 3/27/1978 | $10.00 |
| 4/1/1979 | 3/27/1978 | $10.00 |
| 4/1/1980 | 3/27/1978 | $5.00 |
| 7/1/1981 | 6/7/1981 | $10.00 |
| 7/1/1982 | 6/7/1981 | $10.00 |
| 7/1/1983 | 6/7/1981 | $5.00 |
| 10/1/1984 | 10/1/1984 | $10.00 |
| 10/1/1987 | 10/1/1984 | $10.00 |
| 2/1/1988 | 2/1/1988 | $20.00 |
| 2/1/1990 | 2/1/1988 | $10.00 |

B.    Pension increases for participants with a Minimum Disability Retirement pension who retired prior to 2/1/1988:

| Effective Date of Increase | Increase Applicable to Retirements Prior to | Amount of Monthly Pension Increase |
|---|---|---|
| 4/1/1978 | 3/27/1978 | $5.00 |
| 4/1/1979 | 3/27/1978 | $5.00 |
| 4/1/1980 | 3/27/1978 | $2.50 |
| 7/1/1981 | 6/7/1981 | $5.00 |
| 7/1/1982 | 6/7/1981 | $5.00 |
| 7/1/1983 | 6/7/1981 | $2.50 |

| Effective Date of Increase | Increase Applicable to Retirements Prior to | Amount of Monthly Pension |
|---|---|---|
| 10/1/1984 | 10/1/1984 | $160.00 |
| 10/1/1987 | 10/1/1984 | 170.00 * |
| 2/1/1988 | 2/1/1988 | 190.00 |
| 2/1/1990 | 2/1/1988 | 200.00 |
| 1/1/1998 | 1/1/1998 | 215.00 |
| 1/1/2002 | 1/1/2002 | 230.00 |
| 1/1/2007 | 1/1/2007 | 245.00 |
| 1/1/2009 | 1/1/2009 | 250.00 |

*        $165 if approved after October 1, 1984.

Page A-4

**United Actuarial Services, Inc.**

## PLAN HISTORY (CONT.)

C.  Pension increases for surviving spouses of pensioners (other than deferred vested pensioners not eligible for the Deferred Vested Retirement – Special benefit for increases prior to February 1, 1988) who died prior to February 1, 1988:

| Effective Date of Increase | Increase Applicable to Retirements Prior to | Amount of Monthly Pension Increase |
|---|---|---|
| 10/1/1984 | 10/1/1984 | $5.00 |
| 10/1/1987 | 10/1/1984 | $5.00 |
| 2/1/1988 | 2/1/1988 | (1/31/1988 amount + $10.00) x 1.5 |
| 2/1/1990 | 2/1/1988 | (1/31/1988 amount + $15.00) x 1.5 |

D.  Pensions of participants eligible for a Deferred Vested Retirement – Regular pension who ceased work prior to June 7, 1981, and satisfy the criteria for a Deferred Vested Retirement – Special pension are recomputed (prospectively only) using the ¼% reduction and the Normal Retirement benefit schedule in effect on the last day of credited service.  Pension of such participants are increased by any increases applicable to Early Retirement pensioners which occurred after the date of retirement and application for pension.

E.  A monthly benefit increase of $15.00 is provided to all pensioners and surviving spouses in pay status, and to all terminated vested participants (not yet in pay status), on January 1, 1998.

F.  A monthly benefit increase of $15.00 is provided to all pensioners and surviving spouses in pay status, and to all terminated vested participants (not yet in pay status), on January 1, 2002.

G.  A monthly benefit increase of $15.00 is provided to all pensioners and surviving spouses in pay status, and to all terminated vested participants (not yet in pay status), on January 1, 2007.

H.  A monthly benefit increase of $5.00 is provided to all pensioners and surviving spouses in pay status, and to all terminated vested participants (not yet in pay status), on January 1, 2009.

**United Actuarial Services, Inc.**

**CONFIDENTIAL**                                    **1974PLAN_002342**

*Appendix A - Plan Provisions*
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2014 Actuarial Valuation*

## PLAN HISTORY (CONT.)

### Normal and 1950 Partial Benefits: 1950 Pension Plan

Following are the monthly historical normal retirement benefit amounts paid:

A.  For pensioners with at least 20 years of credited service:

| Period Beginning: | Monthly Benefit | |
|---|---|---|
| | Without Black Lung Benefit | With Black Lung Benefit |
| 1/1/1975 | $200.00 | $200.00 |
| 1/1/1976 | $225.00 | $215.00 |
| 1/1/1977 | $250.00 | $225.00 |
| 4/1/1978 | $275.00 | $275.00 |
| 7/1/1981 | $290.00 | $290.00 |
| 7/1/1982 | $305.00 | $305.00 |
| 7/1/1983 | $315.00 | $315.00 |
| 10/1/1984 | $325.00 | $325.00 |
| 10/1/1987 | $335.00 | $335.00 |
| 2/1/1988 | $365.00 | $365.00 |
| 2/1/1990 | $375.00 | $375.00 |
| 1/1/1998 | $390.00 | $390.00 |
| 1/1/2002 | $405.00 | $405.00 |
| 1/1/2007 | $420.00 | $420.00 |
| 1/1/2009 | $425.00 | $425.00 |

B.  For 1950 Partial pensioners with less than 20 years of credited service and terminated vested (need 10 years of signatory service, 3 years of which are after 12/31/1970):

| Period Beginning: | Monthly Benefit Amount to be Multiplied by the Ratio of Years of Credited Signatory Service to 20 Years | |
|---|---|---|
| | Without Black Lung Benefit | With Black Lung Benefit |
| 1/1/1975 | $200.00 | $200.00 |
| 1/1/1976 | $225.00 | $215.00 |
| 1/1/1977 | $250.00 | $225.00 |
| 7/1/1981 | $250.00 | $250.00 |

**United Actuarial Services, Inc.**

Case 1:18-cv-01905-CJN    Document 28    Filed 06/10/19    Page 780 of 1367

*Appendix A - Plan Provisions* JA 000775
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2014 Actuarial Valuation*

## PLAN HISTORY (CONT.)

### Pension Benefit Increases 1950 Pension Plan

The amounts determined in B. above were increased according to the following schedule:

| Effective Date of Increase | Amount of Monthly Pension Increase |
|---|---|
| 2/1/1988 | $30.00 |
| 2/1/1990 | $10.00 |
| 1/1/1998 | $15.00 |
| 1/1/2002 | $15.00 |
| 1/1/2007 | $15.00 |
| 1/1/2009 | $5.00 |

### Disability Benefit 1950 Pension Plan

Following are the monthly historical Disability Retirement benefit amounts:

| Period Beginning | Monthly Benefit |
|---|---|
| 1/1/1975 | $125.00 |
| 4/1/1978 | $130.00 |
| 4/1/1979 | $135.00 |
| 4/1/1980 | $137.50 |
| 7/1/1981 | $147.50 |
| 7/1/1982 | $152.50 |
| 7/1/1983 | $157.50 |
| 10/1/1984 | $167.50 |
| 10/1/1987 | $177.50 |
| 2/1/1988 | $207.50 |
| 2/1/1990 | $217.50 |
| 1/1/1998 | $232.50 |
| 1/1/2002 | $247.50 |
| 1/1/2007 | $262.50 |
| 1/1/2009 | $267.50 |

CONFIDENTIAL

## PLAN HISTORY (CONT.)

*Widow's Benefit 1950 Pension Plan*

Following are the monthly historical Widow's benefit amounts:

| Period Beginning | Monthly Benefit |
|---|---|
| 3/1/1982 | $95.00 |
| 10/1/1984 | $100.00 |
| 10/1/1987 | $105.00 |
| 2/1/1988 | $120.00 |
| 2/1/1990 | $125.00 |
| 1/1/1998 | $140.00 |
| 1/1/2002 | $155.00 |
| 1/1/2007 | $170.00 |
| 1/1/2009 | $175.00 |

**United Actuarial Services, Inc.**

**CONFIDENTIAL**                                        1974PLAN_002345

## SUMMARY OF PLAN PROVISIONS 1974 PENSION PLAN

**Participation**

Completion of at least 1,000 hours of credited service (or 800 hours of credited service for weekend/holiday crew of a signatory Employer) within a 12-month period after the effective date.

**Class of Employee Covered**

All eligible persons retiring on or after December 31, 1975, or becoming totally disabled due to a mine accident on or after December 6, 1974.  New Inexperienced Miners first hired on or after January 1, 2012 (NIMs) will not earn any vesting, signatory, or credited service.  Also, miners who are active participants may opt out of the plan on or after January 1, 2012 (Electing Miners).  After the opt-out date, Electing Miners will earn service credit for vesting and "any early retirement adjustments based on the type of pension benefit," but not signatory or credited service.   NIMs and Electing Miners will be eligible for disability benefits and, if they meet the eligibility requirements, lump sum death benefits.

**Year of credited service**

For non weekend and holiday employees (non-signatory and signatory service):

| Hours Worked | Service |
|---|---|
| 249 or less | 0.00 |
| 250-499 | 0.25 |
| 500-749 | 0.50 |
| 750-999 | 0.75 |
| 1,000 + | 1.00 |

For weekend and holiday employees (signatory service):

| Hours Worked | Service |
|---|---|
| 200 or less | 0.00 |
| 200-399 | 0.25 |
| 400-599 | 0.50 |
| 600-799 | 0.75 |
| 800 + | 1.00 |

**United Actuarial Services, Inc.**

CONFIDENTIAL                                           1974PLAN_002346

*Appendix A - Plan Provisions*
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2014 Actuarial Valuation*

## SUMMARY OF PLAN PROVISIONS 1974 PENSION PLAN (CONT.)

| | |
|---|---|
| **Normal retirement benefit** | |
| *Eligibility* | Earlier of   (1) later of age 65 or the 5th anniversary employed in signatory service,   (2) age 62 and 10 years of signatory service, or (3) age 62 and at least 20 years of credited service including the required signatory service |
| *Monthly amount* | $34.00 per year of credited non-signatory service, plus $54.50 per year for the 1st 10 years of credited signatory service earned prior to February 1, 1989, plus $55.00 per year for the 2nd 10 years of credited signatory service earned prior to February 1, 1989, plus $55.50 per year for the 3rd 10 years of credited signatory service earned prior to February 1, 1989, plus $56.00 per year for any further years of credited signatory service earned prior to February 1, 1989, plus $62.00 per year of credited signatory service earned from February 1, 1989 through January 31, 1990, plus $66.50 per year of credited signatory service earned from February 1, 1990 through December 15, 1993, plus $69.50 per year of credited signatory service earned on or after December 16, 1993. Payable for life if not married.  If married, benefits are payable for life, without reduction, with 75% of the benefit continuing to an eligible spouse after the participant's death. |
| **Age 55 retirement benefit** | |
| *Eligibility* | Age 55 and 10 years of signatory service or 20 years of credited service including the required amount of signatory service |
| *Monthly amount* | Normal reduced by 1/4% for each month prior to age 62. Form of payment same as for Normal Retirement. |

**CONFIDENTIAL**                                    **1974PLAN_002347**

## SUMMARY OF PLAN PROVISIONS 1974 PENSION PLAN (CONT.)

**Disability benefit**

*Eligibility* | 1974 Participants, NIMs and Electing Miners who have at least 10 years of service. Service is credited service plus, for NIMs and Electing Miners, years of Supplemental Pension Contributions.

*Monthly amount* | Same as normal retirement benefit.

**Minimum disability benefit**

*Eligibility* | 1974 Participants, NIMs and Electing Miners who have less than 10 years of service. Service is credited service plus, for NIMs and Electing Miners, years of Supplemental Pension Contributions.

*Monthly amount* | $250 per month.

**Deferred vested benefit - normal**

*Eligibility* | Termination of employee prior to age 55 plus either 5 years of signatory service or 20 years of credited service.

*Monthly amount* | Normal payable at age 62, or actuarially reduced payable at early. With 20 years of credited service, there is a minimum monthly benefit of $200. If unmarried, the benefit is payable for the participant's lifetime. If married with at least 20 years of credited service, benefits are payable for life, without reduction, with 75% of the benefit continuing to an eligible spouse after the participant's death. If married with less than 20 years of credited service, a 50% joint and survivor benefit actuarially equivalent to a life annuity is payable.

**United Actuarial Services, Inc.**

**CONFIDENTIAL**

## SUMMARY OF PLAN PROVISIONS 1974 PENSION PLAN (CONT.)

**Deferred vested benefit – enhanced 1996**

*Eligibility*

20 years of signatory service, termination of employment prior to attaining age 55, benefits were not in pay status on or before August 16, 1996, and either had not refused recall to the mine from which he or she was laid off or had been terminated under Article III, Section (j) of the Wage Agreement (or physically unable to perform work) and was not employed in the coal industry thereafter.

*Monthly amount*

Amount and form of payment same as Age 55 retirement benefit.

**Deferred vested benefit – special permanent layoff**

*Eligibility*

20 years of signatory service, termination of employment prior to attaining age 55, and participant was permanently laid off.

*Monthly amount*

Normal payable as if age 55 (with 21% reduction) payable at any age under 55. If unmarried, benefit is payable during participant's lifetime. If married, benefits are payable during participant's lifetime (early retirement reduction only) with 75% of the participant's benefit continuing to an eligible spouse after the participant's death.

**30 and out benefit**

*Eligibility*

30 years of credited service and termination is on or after January 1, 2003.

*Monthly amount*

Amount and form of payment same as Normal retirement benefit.

**Pre-retirement surviving spouse benefit**

*Eligibility*

Death of participant eligible for an immediate pension at time of death, except Deferred Vested participants with less than 20 years of credited service

*Monthly amount*

75% of the pension that the participant would have received had he elected a pension on the day preceding his death. Payable for life of eligible spouse.

**United Actuarial Services, Inc.**

**CONFIDENTIAL**                    **1974PLAN_002349**

## SUMMARY OF PLAN PROVISIONS 1974 PENSION PLAN (CONT.)

**Pre-retirement joint and survivor annuity**

*Eligibility*

Not eligible for a pre-retirement surviving spouse benefit, but qualifies for a pension under the plan or has 5 years of signatory service

*Monthly amount*

75% of the pension that the participant would have received had he separated from service on the day of his actual death, and survived to retire at age 55 (or current age at death, if later) and died on the next day. Payable for life of eligible spouse, starting at the later of the first of the month following the date of death or the first of the month following the date the participant would have attained age 55.

**Lump sum death benefit**

*Eligibility*

Death of a regular or disabled pensioner (excluding anyone receiving a deferred vested pension based on less than 20 years of credited service or anyone who is an eligible beneficiary of the UMWA Combined Benefit Fund), an eligible inactive NIM, or an eligible inactive Electing Miner. Last service must have been with an employer signatory to an agreement.

*Lump sum amount*

$10,000 for the named beneficiary who is the surviving spouse or an eligible dependent, and $8,500 for any other named beneficiary.

**Special surviving spouse benefit**

*Eligibility*

January 1, 1998, surviving spouse who 1) was married to a miner who died as a result of a mine accident during the term of the 1978 or 1981 Wage Agreement (with 10 years of credited service) and who was not in Construction Industry Service at time of death, 2) never remarried, and 3) never received a monthly surviving spouse benefit.

*Benefit*

Lump sum of $10,000 on February 1, 1998, plus monthly benefit of $100 beginning February 1, 1998, and continuing until remarriage or death.

**United Actuarial Services, Inc.**

**CONFIDENTIAL**

1974PLAN_002350

## SUMMARY OF PLAN PROVISIONS FORMER 1950 PENSION PLAN

| | |
|---|---|
| **Participation** | Persons who terminated classified work prior to December 31, 1975 or became disabled between May 29, 1946 and December 6, 1974 as a result of a mine accident. |
| **Normal retirement benefit**<br>*Eligibility* | Age 55 with 20 years of credited service including the required signatory service |
| *Monthly amount* | $425 payable for life |
| **Disability benefit**<br>*Eligibility* | Disabled as the result of a mine accident which occurred after May 29, 1946 while in a classified job and eligible for Social Security disability benefits as a result of such accident. |
| *Monthly amount* | $267.50 payable for life |
| **1950 partial pension**<br>*Eligibility* | 10 years of signatory service including at least 3 years after December 31, 1970 |
| *Monthly amount* | $250 multiplied by ratio of years of credited signatory service (to the nearest ¼ year) to 20 years. Payable for life. |
| **Widow's benefit**<br>*Eligibility* | Widow of pensioner receiving benefits under this plan at time of death, who was married to the pensioner throughout nine-month period ending on date of pensioner's death. |
| *Monthly amount* | $175 payable for life, except payment ceases upon remarriage<br>(Note: In limited circumstances, surviving spouses may be entitled to other survivor benefits in lieu of the above. See next section.) |

**United Actuarial Services, Inc.**

**CONFIDENTIAL**                    **1974PLAN_002351**

## SUMMARY OF PLAN PROVISIONS *1950 PENSION PLAN (CONT.)*

**Pre-retirement surviving spouse benefit**

*Eligibility*

One hour of service under the 1950 Pension Plan on or after September 2, 1974 and dies on or after July 1, 2011, but prior to receiving his pension.

*Monthly amount*

50% of the pension that the participant would have received had he elected a pension on the day preceding his death. Payable for life of eligible spouse.

**Joint and survivor benefit**

*Eligibility*

One hour of service under the 1950 Pension Plan on or after September 2, 1974 and begins receiving his pension on or after July 1, 2011.

*Monthly amount*

In lieu of the Widow's Benefit, an actuarially reduced benefit of which 50% is payable to the eligible spouse.

**Lump sum death benefit**

*Eligibility*

Death of a regular or disabled pensioner on or after February 1, 1991, excluding anyone receiving a deferred vested pension based on less than 20 years of credited service and anyone who is an eligible beneficiary of the UMWA Combined Benefit Fund. Regular pensioners with less than 20 years of credited service who used non-classified service for vesting purposes are not eligible for lump sum death benefits.

*Lump sum amount*

$10,000 for the named beneficiary who is the surviving spouse or an eligible dependent, and $8,500 for any other named beneficiary.

**United Actuarial Services, Inc.**

## HISTORICAL PLAN MODIFICATIONS

**Deferred vested benefit – special**
  *Provisions*          This benefit was removed for participants who retire under the 2007 or later Agreements because the benefit had become redundant.

**Special 30-and-out layoff pension**
  *Provisions*          This benefit was removed for participants who retire under the 2007 or later Agreements because the benefit had become redundant.

**Social security supplement**
  *Provisions*          This benefit was deleted for participants who retire under the 2007 or later Agreements because the benefit had expired by its own terms.

**Electing Miners**
  *Provisions*          Miners who are active participants may opt out of the plan on or after January 1, 2012. After the opt-out date, Electing Miners will earn service credit for vesting and any early retirement adjustments based on the type of pension benefit, but not signatory or credited service. Electing Miners will be eligible for normal and minimum disability benefits and, if they meet the eligibility requirements, lump sum death benefits.

**New Inexperienced Miners**
  *Provisions*          New Inexperienced Miners first hired on or after January 1, 2012 will not earn any vesting, signatory, or credited service. New Inexperienced Miners will be eligible for normal and minimum disability benefits and, if they meet the eligibility requirements, lump sum death benefits.

**United Actuarial Services, Inc.**

Case 1:18-cv-01905-CJN    Document 28    Filed 06/10/19    Page 790 of 1367

JA 000785

*Appendix B - Actuarial Assumptions and Methods*
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2014 Actuarial Valuation*

## ACTUARIAL ASSUMPTIONS

The following assumptions are used throughout this report except as specifically noted herein.

| | |
|---|---|
| **Valuation date** | July 1, 2014 |
| **Interest rates** | |
| *ERISA rate of return used to value liabilities* | 7.8% per year gross of investment expenses and 7.5% per year net of investment expenses |
| *Unfunded vested benefits and ASC 960 accounting* | 3.47% for 20 years, then 3.64% thereafter |
| *Current liability* | 3.59% (in accordance with Section 431(c)(6) of the Internal Revenue Code) |
| **Administrative expenses** | $25,500,000 per year excluding investment expenses |
| **Loading for non-reported vested terminated participants (1950 Plan)** | Terminated vested liabilities increased by 0.6% |
| **Mortality** | |
| *Assumed plan mortality- pre-retirement* | RP-2000 Mortality Table for Blue Collar Male Employees, set forward 2 years and assumed to improve by .75% per year for 15 years (beginning July 1, 2013) at each age between 55 and 99 - specimen rates shown below for a participant born in 1970: |

| Age | Mortality Rate: |
|-----|-----------------|
| 25 | .0006 |
| 35 | .0012 |
| 45 | .0020 |
| 55 | .0037 |
| 65 | .0078 |

**United Actuarial Services, Inc.**

**CONFIDENTIAL**                    **1974PLAN_002354**

## ACTUARIAL ASSUMPTIONS (CONT.)

| | |
|---|---|
| *Assumed plan mortality-post-retirement* | RP-2000 Mortality Table for Blue Collar Healthy Male Annuitants, set forward 1 year and assumed to improve by .75% per year for 20 years (beginning July 1, 2008) at each age between 55 and 99 - specimen rates shown below for a participant born in 1970: |

| Age | Mortality Rate: |
|---|---|
| 55 | .0067 |
| 65 | .0157 |
| 75 | .0410 |
| 85 | .1087 |
| 95 | .2442 |

| | |
|---|---|
| *Assumed plan mortality-post-disablement* | RP-2000 Mortality Table for Blue Collar Healthy Male Annuitants, set forward 4 years and assumed to improve by .75% per year for 15 years (beginning July 1, 2013) at each age between 55 and 99 - specimen rates shown below for a participant born in 1970: |

| Age | Mortality Rate: |
|---|---|
| 25 | .0007 |
| 35 | .0013 |
| 45 | .0023 |
| 55 | .0088 |
| 65 | .0218 |
| 75 | .0572 |
| 85 | .1485 |
| 95 | .2949 |

| | |
|---|---|
| *Assumed plan mortality-spouse/widow* | Unisex Pension 1984 Mortality Table, set back 3 years and assumed to improve by .75% per year for 15 years (beginning July 1, 2013) at each age between 55 and 99 - specimen rates shown below for a spouse born in 1970: |

| Age | Mortality Rate: |
|---|---|
| 25 | .0012 |
| 35 | .0012 |
| 45 | .0026 |
| 55 | .0061 |
| 65 | .0152 |
| 75 | .0365 |
| 85 | .0859 |
| 95 | .1921 |

**United Actuarial Services, Inc.**

**CONFIDENTIAL**                          **1974PLAN_002355**

## ACTUARIAL ASSUMPTIONS (CONT.)

| | |
|---|---|
| *Current liability* | Separate annuitant and non-annuitant rates based on the RP-2000 Mortality Tables Report developed for males and females as prescribed by Section 431(c)(6) of the Internal Revenue Code. |

**Withdrawal**

125% of the Vaughn Table ultimate rates plus 4%

| Age | Withdrawal Rate |
|---|---|
| 20 | .273 |
| 30 | .166 |
| 40 | .121 |
| 50 | .096 |
| 55 | .000 |

Participants terminating before age 55 with at least 20 years of signatory service are assumed to be permanently laid off.

**Disability**

1.5% per year for ages 20 through 64

**Retirement**
*Active lives*

According to the following schedule:

| | Active Participants | | |
|---|---|---|---|
| Age | Service <30 Years | Service ≥30 Years | Vested Terminations |
| 50-53 | .00 | .13 | .00 |
| 54 | .00 | .20 | .00 |
| 55 | .10 | .38 | .45 |
| 56 | .07 | .34 | .19 |
| 57 | .07 | .30 | .12 |
| 58 | .08 | .30 | .09 |
| 59 | .09 | .30 | .06 |
| 60 | .10 | .30 | .06 |
| 61 | .14 | .35 | .06 |
| 62 | .40 | .70 | 1.00 |
| 63 | .30 | .45 | 1.00 |
| 64 | .60 | .30 | 1.00 |
| 65 | 1.00 | 1.00 | 1.00 |

Resulting in an average expected retirement age of 60.9.

**United Actuarial Services, Inc.**

**CONFIDENTIAL**                    **1974PLAN_002356**

## ACTUARIAL ASSUMPTIONS (CONT.)

**Future service**

| Participant Category | Future Service |
|---|---|
| Active participants who earned a full year of service every calendar year since entry, during the period starting in 1997 | 1.00 year |
| All other active participants | 0.75 year |

Active Electing Miner and NIMs will earn one Year of Supplemental Pension Contributions for each future calendar year until they enter terminated or retired status.

**Entry Age**

Participants with credible past service data: Actual entry age. Category includes participants whose first service credit occurred in 1979 or later at age 45 or younger.

Participants without complete past service data: Assumed to enter at age 24 or present age, if younger.

**Past service**

Participants with credible past service data: Actual service earned to end of calendar year preceding valuation date plus ½ of the assumed future service for the six-month period ending on the valuation date.

Participants without complete past service data: The sum of (a) plus (b) plus (c).
- (a) ½ of the assumed future service for the six-month period ending on the valuation date.
- (b) Actual signatory service credits for calendar years 1977 and later.
- (c) For periods of assumed service prior to 1977, according to the following chart:

| Participant Category | Service |
|---|---|
| Active participants who earned a full year of service every calendar year since entry, during the period starting in 1977 | 1.00 year |
| All other active and terminated participants | 0.85 year |

Past service is not imputed for New Inexperienced Miners

## ACTUARIAL ASSUMPTIONS (CONT.)

| | |
|---|---|
| **Rehire** | Retired, disabled and terminated participants are assumed to be permanently retired or terminated and not assumed to be rehired. |
| **Future hours worked** | Total plan hours worked the prior plan year, decreasing 3% each year |
| **Attained age** | All participants are assumed to be at least 18 years old. All active participants are assumed to be less than 80 years old. Adjustments were made to the data if participants were reported outside those ranges. (If an active participant is reported younger than 18 years old they are adjusted so that their entry age was 18.) |
| **Age of participants with unrecorded birth dates** | Based on average age of the other participants in the same status category |
| **Gender** | All participants, other than surviving spouses, are assumed to be male |
| **Marriage** | 75% assumed married with the male spouse 3 years older than his wife |
| **Inactive vested lives over age 63** | Continuing inactive vested participants over age 63 are assumed deceased and are not valued. |
| **Section 415 limit assumptions** | |
|   *Dollar limit* | $210,000 per year |
|   *Assumed form of payment for those limited by Section 415* | Qualified joint and 50% survivor annuity |
| **Benefits not valued** | Pre-retirement death benefits following withdrawal and disability for active participants. |

**United Actuarial Services, Inc.**

**CONFIDENTIAL**                                    **1974PLAN_002358**

*Appendix B - Actuarial Assumptions and Methods*
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2014 Actuarial Valuation*

JA 000790

## RATIONALE FOR SELECTION OF ACTUARIAL ASSUMPTIONS

The non prescribed actuarial assumptions were selected to provide a reasonable long term estimate of developing experience. The assumptions are reviewed annually, including a comparison to actual experience. The following describes our rationale for the selection of each non-prescribed assumption that has a significant effect on the valuation results.

**ERISA rate of return used to value liabilities**

Future rates of return were modeled based on the Plan's current investment policy asset allocation and composite, long-term capital market assumptions taken from Horizon Actuarial's 2014 survey of investment consultants.

Based on this analysis, we selected a final assumed rate of 7.50%, which we feel is reasonable. This rate may not be appropriate for other purposes such as settlement of liabilities.

**Mortality**

Actual mortality rates were last studied for this plan by the prior actuary, using experience from July 1, 2010 through June 30, 2013 for pre-retirement mortality rates and from July 1, 2008 through June 30, 2013 for postretirement, disabled, spouse, and widow mortality rates. The assumed future mortality rates were selected based on the results of this study. Recent plan experience suggests that these retirement rates are reasonable. We will perform a new study once we have a sufficient amount of historical data.

**Retirement**

Actual rates of retirement by age were last studied for this plan by the prior actuary, using experience from July 1, 2006 through June 30, 2010 for actives and from July 1, 2005 through June 30, 2010 for vested terminations. The assumed future rates of retirement were selected based on the results of this study. Recent plan experience suggests that these retirement rates are reasonable. We will perform a new study once we have a sufficient amount of historical data.

**Disability**

Actual disability rates by age were last studied for this plan by the prior actuary, using experience from July 1, 2004 through June 30, 2010. The assumed future disability rates were selected based on the results of this study. Recent plan experience suggests that these disability rates are reasonable. We will perform a new study once we have a sufficient amount of historical data.

United Actuarial Services, Inc.

CONFIDENTIAL

1974PLAN_002359

## RATIONALE FOR SELECTION OF ACTUARIAL ASSUMPTIONS (CONT.)

**Withdrawal**

Actual rates of withdrawal by age were last studied for this plan by the prior actuary, using experience from July 1, 2005 through June 30, 2010. The assumed future rates of withdrawal were selected based on the results of this study. Recent plan experience suggests that these withdrawal rates are reasonable. We will perform a new study once we have a sufficient amount of historical data.

**Future hours worked**

Based on review of recent plan experience adjusted for anticipated future changes in workforce.

**United Actuarial Services, Inc.**

**CONFIDENTIAL**                                                        **1974PLAN_002360**

## ACTUARIAL ASSUMPTIONS USED FOR PROJECTIONS

The assumptions used for the credit balance and funding ratio projections are the same as used throughout the report with the following exceptions.

**Assumed return on fund assets**
*Current year projections* | 7.50% (net 0.3% investment expense)

**Future total hours worked**
*Current year projections* | 18,491,110 for the plan year ending 2015 with 3% per year reduction thereafter

**Future normal cost**
*Current year projections* | 10% reduction per year

The 10% reduction is more than the annual hours decline due to the anticipated shift of the active population to NIMs with very limited benefit accrual.

**Contribution Rate Increases**
*Current year projections* | None

**Plan Changes**
*Current year projections* | None

**United Actuarial Services, Inc.**

**CONFIDENTIAL**

1974PLAN_002361

## ACTUARIAL METHODS

| | |
|---|---|
| **Funding method**<br>*ERISA funding* | Traditional unit credit cost method, effective July 1, 2009. |
| **Population valued**<br>*Actives* | Eligible employees with a full or partial year of credited service during the preceding calendar year. |
| *Inactive vested* | Vested participants with no hours worked during the preceding plan year. |
| *Retirees* | Participants and beneficiaries in pay status as of the valuation date. |
| **Operational expense** | The Plan's future anticipated operational expenses are valued with a flat dollar load added to normal cost. |
| **Asset valuation method**<br>*Actuarial value* | Smoothed market value with phase-in effective July 1, 2007.  Each year's gain (or loss) is spread over a period of 5 years.  The actuarial value is limited to not less than 80% and not more than 120% of the actual market value of assets in any plan year. |
| *Unfunded vested benefits* | For the rolling 5 method, market value is used |
| **Pension Relief Act of 2010** | • 10-year smoothing was elected with respect to the loss incurred during the plan year ended in 2009.<br><br>• The 130% cap on actuarial value of assets was elected for the plan year beginning in 2010. |

**United Actuarial Services, Inc.**

**CONFIDENTIAL**                    **1974PLAN_002362**

*Appendix C - Minimum Funding Amortization Bases*
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2014 Actuarial Valuation*

| Date Established | Source of Change in Unfunded Liability | Original Amount | Original Period | Remaining Period | | 7/1/2014 Outstanding Balance | 7/1/2014 Amortization Payment |
|---|---|---|---|---|---|---|---|
| | | | | Years | Months | | |
| **Charges** | | | | | | | |
| 7/1/1976 | Intl Unfnd Frz AAL | 2,096,144,000 | 40 | 2 | 0 | 293,302,240 | 151,951,763 |
| 7/1/1977 | Benefit Increases | 42,396,000 | 40 | 3 | 0 | 8,633,702 | 3,088,357 |
| 7/1/1978 | Benefit Increases | 164,492,000 | 40 | 4 | 0 | 43,241,814 | 12,009,861 |
| 7/1/1979 | Benefit Increases | 7,492,000 | 40 | 5 | 0 | 2,381,302 | 547,511 |
| 7/1/1980 | Benefit Increases | 3,262,000 | 40 | 6 | 0 | 1,209,516 | 239,703 |
| 7/1/1985 | Benefit Increases | 149,836,000 | 30 | 1 | 0 | 11,897,886 | 11,897,886 |
| 7/1/1987 | Benefit Increases | 50,461,000 | 30 | 3 | 0 | 11,233,838 | 4,018,450 |
| 7/1/1988 | Benefit Increases | 767,523,000 | 30 | 4 | 0 | 220,458,546 | 61,229,543 |
| 7/1/1989 | Assumption Changes | 91,845,000 | 30 | 5 | 0 | 31,873,226 | 7,328,313 |
| 7/1/1989 | Benefit Increases | 167,986,000 | 30 | 5 | 0 | 58,264,822 | 13,396,287 |
| 7/1/1990 | Benefit Increases | 87,508,000 | 30 | 6 | 0 | 35,198,856 | 6,975,755 |
| 7/1/1991 | 1950 Assumption Ch | 18,060,000 | 30 | 7 | 0 | 7,617,148 | 1,337,786 |
| 7/1/1991 | 1950 Benefit Incrs | 129,588,000 | 30 | 7 | 0 | 54,688,018 | 9,604,758 |
| 7/1/1991 | Benefit Increases | 285,295,000 | 30 | 7 | 0 | 129,524,934 | 22,748,231 |
| 7/1/1992 | 1950 Assumption Ch | 108,079,000 | 30 | 8 | 0 | 50,446,088 | 8,011,638 |
| 7/1/1993 | 1950 Asset Transfer | 210,000,000 | 30 | 9 | 0 | 107,084,208 | 15,616,081 |
| 7/1/1993 | 1950 Assumption Ch | 88,237,000 | 30 | 9 | 0 | 44,991,408 | 6,561,093 |
| 7/1/1994 | 1950 Benefit Change | 79,702,000 | 30 | 10 | 0 | 43,969,464 | 5,958,821 |
| 7/1/1994 | Benefit Increases | 319,252,000 | 30 | 10 | 0 | 187,701,360 | 25,437,625 |
| 7/1/1995 | 1950 Assumption Ch | 60,136,000 | 30 | 11 | 0 | 35,441,406 | 4,506,745 |
| 7/1/1995 | Assumption Changes | 192,373,000 | 30 | 11 | 0 | 120,507,464 | 15,323,782 |
| 7/1/1997 | 1950 Benefit Change | 173,833,000 | 30 | 13 | 0 | 114,663,626 | 13,126,500 |
| 7/1/1997 | Benefit Increases | 155,332,000 | 30 | 13 | 0 | 108,026,380 | 12,366,679 |
| 7/1/1998 | 1950 Assumption Ch | 35,806,000 | 30 | 14 | 0 | 24,756,270 | 2,712,766 |
| 7/1/1998 | Assumption Changes | 118,380,000 | 30 | 14 | 0 | 86,009,308 | 9,424,810 |
| 7/1/1998 | Benefit Increases | 560,740,000 | 30 | 14 | 0 | 407,364,342 | 44,638,557 |
| 7/1/1999 | Assumption Changes | 4,591,000 | 30 | 15 | 0 | 3,471,160 | 365,803 |
| 7/1/1999 | Benefit Increases | 46,904,000 | 30 | 15 | 0 | 35,426,314 | 3,733,348 |
| 7/1/2000 | 1950 Actuarial Loss | 4,801,000 | 15 | 1 | 0 | 487,256 | 487,256 |
| 7/1/2000 | Benefit Increases | 43,056,000 | 30 | 16 | 0 | 33,645,458 | 3,423,735 |
| 7/1/2002 | 1950 Assumption Ch | 13,728,000 | 30 | 18 | 0 | 11,002,068 | 1,054,448 |
| 7/1/2002 | 1950 Benefit Change | 22,225,000 | 30 | 18 | 0 | 17,808,560 | 1,706,788 |
| 7/1/2002 | Bnft Incr/Asmp Chg | 520,163,000 | 30 | 18 | 0 | 430,849,650 | 41,293,014 |
| 7/1/2003 | 1950 Assumption Ch | 47,090,000 | 30 | 19 | 0 | 38,875,914 | 3,631,224 |
| 7/1/2003 | Bnft Incr/Asmp Chg | 58,888,000 | 30 | 19 | 0 | 50,010,576 | 4,671,262 |

Page C-1

**United Actuarial Services, Inc.**

*Appendix C - Minimum Funding Amortization Bases*
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2014 Actuarial Valuation*

| Date Established | Source of Change in Unfunded Liability | Original Amount | Original Period | Remaining Period | | 7/1/2014 Outstanding Balance | 7/1/2014 Amortization Payment |
|---|---|---|---|---|---|---|---|
| | | | | Years | Months | | |
| 7/1/2004 | 1950 Actuarial Loss | 25,131,000 | 15 | 5 | 0 | 11,303,908 | 2,599,002 |
| 7/1/2004 | Benefit Increases | 27,854,000 | 30 | 20 | 0 | 24,196,788 | 2,207,922 |
| 7/1/2005 | 1950 Assumption Ch | 10,645,000 | 30 | 21 | 0 | 9,321,466 | 832,683 |
| 7/1/2005 | 1950 Plan Change | 596,000 | 30 | 21 | 0 | 520,674 | 46,512 |
| 7/1/2005 | Benefit Increases | 64,941,000 | 30 | 21 | 0 | 57,568,434 | 5,142,568 |
| 7/1/2006 | 1950 Actuarial Loss | 17,638,000 | 15 | 7 | 0 | 10,593,506 | 1,860,518 |
| 7/1/2006 | 1950 Plan Change | 552,000 | 30 | 22 | 0 | 498,036 | 43,636 |
| 7/1/2006 | Benefit Increases | 62,216,000 | 30 | 22 | 0 | 56,559,426 | 4,955,493 |
| 7/1/2007 | 1950 Actuarial Loss | 2,120,000 | 15 | 8 | 0 | 1,417,570 | 225,133 |
| 7/1/2007 | 1950 Plan Change | 70,692,000 | 30 | 23 | 0 | 64,955,968 | 5,591,366 |
| 7/1/2007 | Benefit Increases | 502,065,000 | 30 | 23 | 0 | 461,297,760 | 39,708,201 |
| 7/1/2008 | Benefit Increases | 40,344,000 | 15 | 9 | 0 | 29,329,146 | 4,277,067 |
| 7/1/2009 | Benefit Increases | 37,307,000 | 15 | 10 | 0 | 29,152,354 | 3,950,779 |
| 7/1/2009 | Funding Method Chg | 1,352,071,000 | 10 | 5 | 0 | 801,503,780 | 184,282,284 |
| 7/1/2010 | Assumption Changes | 13,283,000 | 15 | 11 | 0 | 11,050,578 | 1,405,196 |
| 7/1/2010 | Benefit Increases | 15,500,000 | 15 | 11 | 0 | 12,897,192 | 1,640,013 |
| 7/1/2011 | Actuarial Loss | 247,154,000 | 15 | 12 | 0 | 217,199,752 | 26,120,105 |
| 7/1/2011 | Benefit Increases | 13,818,000 | 15 | 12 | 0 | 12,143,670 | 1,460,379 |
| 7/1/2012 | Actuarial Loss | 223,191,000 | 15 | 13 | 0 | 205,841,944 | 23,564,440 |
| 7/1/2013 | Actuarial Loss | 39,483,000 | 15 | 14 | 0 | 38,005,968 | 4,164,654 |
| 7/1/2013 | Benefit Increases | 23,701,000 | 15 | 14 | 0 | 22,814,792 | 2,500,021 |
| 7/1/2014 | Assumption | 143,059,696 | 15 | 15 | 0 | 143,059,696 | 15,076,128 |

**Total Charges:    5,083,296,536    862,080,279**

**United Actuarial Services, Inc.**

**CONFIDENTIAL**                    **1974PLAN_002364**

*Appendix C - Minimum Funding Amortization Bases*
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2014 Actuarial Valuation*

| Date Established | Source of Change in Unfunded Liability | Original Amount | Original Period | Remaining Period | | 7/1/2014 Outstanding Balance | 7/1/2014 Amortization Payment |
|---|---|---|---|---|---|---|---|
| | | | | Years | Months | | |
| ***Credits*** | | | | | | | |
| 7/1/1979 | Assumption Changes | 12,011,000 | 40 | 5 | 0 | 3,822,588 | 878,892 |
| 7/1/1988 | Assumption Changes | 460,737,000 | 30 | 4 | 0 | 132,336,358 | 36,754,732 |
| 7/1/1990 | 1950 Assumption Ch | 18,772,000 | 30 | 6 | 0 | 7,024,248 | 1,392,075 |
| 7/1/1991 | Assumption Changes | 40,246,000 | 30 | 7 | 0 | 18,268,866 | 3,208,528 |
| 7/1/1993 | 1950 Term. Of Covg | 86,219,000 | 30 | 9 | 0 | 43,968,386 | 6,411,906 |
| 7/1/1993 | Term. Of Coverage | 18,492,000 | 30 | 9 | 0 | 10,107,328 | 1,473,951 |
| 7/1/1994 | 1950 Assumption Ch | 94,625,000 | 30 | 10 | 0 | 52,202,150 | 7,074,529 |
| 7/1/1996 | 1950 Assumption Ch | 12,942,000 | 30 | 12 | 0 | 8,095,780 | 973,586 |
| 7/1/1999 | 1950 Assumption Ch | 31,363,000 | 30 | 15 | 0 | 22,659,560 | 2,387,943 |
| 7/1/2000 | 1950 Assumption Ch | 22,441,000 | 30 | 16 | 0 | 16,845,906 | 1,714,226 |
| 7/1/2000 | Assumption Changes | 67,650,000 | 30 | 16 | 0 | 52,852,184 | 5,378,197 |
| 7/1/2001 | Assumption Changes | 4,326,000 | 30 | 17 | 0 | 3,480,862 | 343,229 |
| 7/1/2003 | 1950 Actuarial Gain | 35,840,000 | 15 | 4 | 0 | 13,186,096 | 3,662,270 |
| 7/1/2004 | 1950 Assumtion Chg | 16,250,000 | 30 | 20 | 0 | 13,845,832 | 1,263,412 |
| 7/1/2004 | Assumption Changes | 126,541,000 | 30 | 20 | 0 | 109,910,724 | 10,029,194 |
| 7/1/2005 | 1950 Actuarial Gain | 12,303,000 | 15 | 6 | 0 | 6,477,702 | 1,283,759 |
| 7/1/2005 | Funding Method Chg | 196,925,000 | 10 | 1 | 0 | 26,980,184 | 26,980,184 |
| 7/1/2006 | 1950 Assumption Ch | 22,227,000 | 30 | 22 | 0 | 19,990,432 | 1,751,476 |
| 7/1/2006 | Funding Method Chg | 316,469,000 | 10 | 2 | 0 | 83,575,184 | 43,297,987 |
| 7/1/2007 | Funding Method Chg | 353,477,000 | 10 | 3 | 0 | 135,021,656 | 48,298,518 |
| 7/1/2007 | Funding Method Chg | 469,970,000 | 10 | 3 | 0 | 179,516,106 | 64,214,602 |
| 7/1/2008 | Assumption Changes | 180,156,000 | 15 | 9 | 0 | 130,966,220 | 19,098,793 |
| 7/1/2010 | Actuarial Gain | 239,507,000 | 15 | 11 | 0 | 199,254,286 | 25,337,263 |
| 7/1/2010 | Funding Method Chg | 376,915,000 | 10 | 6 | 0 | 258,905,416 | 51,310,210 |
| 7/1/2013 | Assumption Changes | 74,715,000 | 15 | 14 | 0 | 71,919,848 | 7,880,901 |
| 7/1/2014 | Experience | 11,423,168 | 15 | 15 | 0 | 11,423,168 | 1,203,813 |
| 7/1/2014 | Method | 215,359,400 | 10 | 10 | 0 | 215,359,400 | 29,185,892 |
| | | | | | | ***Total Credits:*** | |
| | | | | | | 1,847,996,470 | 402,790,068 |

*United Actuarial Services, Inc.*

**CONFIDENTIAL**

JA-000797

| Date Established | Source of Change in Unfunded Liability | Original Amount | Original Period | Remaining Period | | 7/1/2014 Outstanding Balance | 7/1/2014 Amortization Payment |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | Years | Months | | |
| | | | | | *Net Charges:* | **3,235,300,066** | **459,290,211** |
| | | | | | *Less Credit Balance:* | 1,444,564,155 | |
| | | | | | *Less Reconciliation Balance:* | 0 | |
| | | | | | *Unfunded Actuarial Liability:* | **1,790,735,911** | |

United Actuarial Services, Inc.

**CONFIDENTIAL**                    1974PLAN_002366

## RULES FOR ENDANGERED AND CRITICAL STATUS

### Background

The Pension Protection Act of 2006 ("PPA"), enacted in August 2006, established special rules for plans in "Endangered" or "Critical" status. These rules became effective with the plan year beginning in 2008 and were originally scheduled to "sunset" in 2015.

The Multiemployer Pension Reform Act of 2014 ("MEPRA"), enacted in December 2014, made the provisions contained in the PPA permanent. MEPRA also made numerous changes to the PPA rules, including adding a new status for deeply troubled plans: Critical and Declining.

Informally, Critical Status is often referred to as "red zone" and Endangered Status as "yellow zone." A plan that is neither Critical nor Endangered is said to be "green zone."

### Criteria for Endangered and Critical

The table below summarizes the criteria for these categorizations. Projected deficiencies are calculated as of the <u>last day</u> of each plan year and are based on contribution rates codified in bargaining agreements and, if applicable, wage allocations.

| *Critical Status ("Red Zone")* | *Endangered Status ("Yellow Zone")* |
|---|---|
| **GETTING IN:** | |
| Plan is Critical if it is described in one or more of the following: | Plan is Endangered if it is <u>not</u> Critical <u>and</u> it is described in one of the following: |
| • Funded percentage is less than 65%, <u>and</u>, inability to pay benefits and expenses for next 7 years, or | • Funded percentage is less than 80%, or |
| • Projected funding deficiency (<u>not</u> recognizing extensions) in the current year or next 3 years (next 4 years if funded at less than 65%), or | • Projected funding deficiency in the current year or next 6 years. |
| | A non-critical plan that meets both of the preceding criteria is considered "<u>Seriously Endangered</u>" |
| • (1) Contributions are less than current year costs (i.e. "normal cost") plus interest on any unfunded past liabilities, <u>and</u>, (2) value of vested benefits for non-actives is greater than for actives, <u>and</u>, (3) projected funding deficiency (<u>not</u> recognizing extensions) in the current year or next 4 years, or | A plan that meets one of the two Endangered Status criteria above, but was not in Critical or Endangered for the preceding year, will remain not Critical or Endangered (i.e. it will be in "green zone") provided it is not projected to meet either of the two Endangered Status criteria as of the end of the 10th plan year following the certification year |
| • Inability to pay benefits and expenses for next 5 years. | |

**United Actuarial Services, Inc.**

## RULES FOR ENDANGERED AND CRITICAL STATUS (CONT.)

| Critical Status ("Red Zone") | Endangered Status ("Yellow Zone") |
|---|---|

| GETTING IN (cont.): | |
|---|---|
| A plan with an amortization extension under IRC Section 431(d) or 412(e) that previously emerged from Critical Status in PYB 2015 or later will re-enter Critical Status <u>only</u> if it is described in one of the following:<br><br>• Projected funding deficiency in the current year or next 9 years (<u>including</u> amortization extensions), or,<br><br>• Projected insolvency within the next 30 years | |

| GETTING OUT: | |
|---|---|
| Plan emerges from Critical Status when it meets all of the following:<br><br>• No longer meets any of the Critical Status tests, <u>and</u>,<br><br>• No projected funding deficiencies in the current year or next 9 years (<u>including</u> amortization extensions), <u>and</u>,<br><br>• No projected insolvencies in the next 30 years<br><br>A plan with an amortization extension under IRC Section 431(d) or 412(e) emerges from Critical Status when it meets all the following:<br><br>• No projected funding deficiencies in the current year or next 9 years (<u>including</u> amortization extensions), <u>and</u>,<br><br>• No projected insolvencies in the next 30 years | Plan emerges from Endangered Status when it no longer meets the requirements to be classified as Endangered or when it enters Critical Status |

**CONFIDENTIAL**

## RULES FOR ENDANGERED AND CRITICAL STATUS (CONT.)

### Restrictions for Endangered and Critical Plans

The Plan Sponsor of a plan that is in Endangered or Critical status faces a number of restrictions in plan improvements that can be adopted and bargaining agreements that can be accepted.

| *Period* | *Endangered/Critical Restrictions* |
|---|---|
| Date of first certification through adoption of funding improvement/rehabilitation plan ("plan adoption period") | • No reduction in level of contributions for any participants<br>• No suspension of contributions<br>• No exclusion of new or younger employees<br>• No amendment that increases the <u>liabilities</u> of the plan by reason of any increase in benefits, change in accrual, or change in vesting unless required by law |
| After adoption of a funding improvement/rehabilitation plan until end of funding improvement/rehabilitation period | • Cannot be amended so as to be inconsistent with funding improvement/rehabilitation plan<br>• No amendment that increases benefits, including future accruals, unless actuary certifies as being paid for with contributions not contemplated in funding improvement/rehabilitation plan and still expected to meet applicable benchmark after considering the amendment |

**Additionally, Critical status plans cannot pay benefits greater than the single life annuity once the initial red zone notice is sent unless the benefit is eligible for automatic cash-out.**

### Critical and Declining Plans

Beginning in 2015, plans that are in Critical Status and are projecting insolvency within the next 15 years (20 years in some circumstances) are certified by the actuary as being in "Critical and Declining" Status. These plans may have access to new tools that will allow them to reduce many previously-untouchable benefits, including benefits for participants in pay status. However, these expanded benefit reductions require government approval, must <u>not</u> be rejected by a majority of all participants through a vote, and are subject to a number of other requirements and limitations.

### Selected Other MEPRA Changes (effective with 2015 plan years)

• Plans projected to be Critical within the next 5 years can elect to be in Critical Status immediately
• New contribution rate increases required by a funding improvement or rehabilitation plan are not considered in calculating an employer's withdrawal liability or payment schedule
• If, upon the expiration of a collective bargaining agreement under a funding improvement or rehabilitation plan, bargaining parties do not adopt a new agreement consistent with an updated schedule, the Plan Sponsor must implement the update to the schedule previously adopted.
• PBGC premium doubled and indexed
• PBGC ability to facilitate mergers and partitions expanded

**United Actuarial Services, Inc.**

Case 1:18-cv-01905-CJN    Document 28    Filed 06/10/19    Page 806 of 1367

JA 000801

*Appendix E – Glossary of Common Pension Terms*
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2014 Actuarial Valuation*

## GLOSSARY OF COMMON PENSION TERMS

### *Benefits*

**Accrued Benefit:** A benefit that an employee has earned (or accrued) through past participation in the plan. It is the amount payable at normal retirement age.

*Why it matters: Under the law, Accrued Benefits generally may not be reduced by plan amendment (note that special rules allowing for limited reduction and/or suspension of accrued benefits apply to critical status, critical and declining status and insolvent plans).*

**Actuarial Equivalence:** Given a set of actuarial assumptions, when two different sets of payment scenarios have an equal present value.

**Early Retirement Reduction Factor:** A retirement benefit that begins before normal retirement age may be reduced. The plan document defines the amount of the reduction by formula or a table of factors. This reduction may or may not be actuarially equivalent, but its present value can be no less than actuarially equivalent to the benefit payable at normal retirement age.

**Benefit Crediting (Accrual) Rate:** A general reference to the calculation of the amount of monthly retirement benefit earned per dollar contributed or per year or hour worked.

### *Assets*

**Market Value of Assets:** The market value of all assets in the fund including on an accrued, not cash basis (matching the plan audit).

**Actuarial Value of Assets:** The amount of assets recognized for actuarial valuation purposes. Recent changes in market value may be partially recognized (there are variations allowed on the exact recognition). Generally the actuarial value is limited to not be less than 80% or more than 120% of the market value.

*Why it matters: Many funding calculations use this "smoothed" asset value method to lessen the impact of volatility in the market value of plan assets.*

**Assumed Rate of Return**: Long term assumption of the rate of return on assets based upon the diversification mix of invested assets.

*Why it matters: This assumption is used in calculating the present values discussed in the Liabilities section below. The Assumed Rate of Return has an inverse relationship with plan liabilities. In other words, a lower Assumed Rate of Return increases liabilities, while a higher Assumed Rate of Return decreases plan Liabilities.*

**United Actuarial Services, Inc.**

**CONFIDENTIAL**                    1974PLAN_002370

Case 1:18-cv-01905-CJN    Document 28    Filed 06/10/19    Page 807 of 1367

JA 000802

*Appendix E – Glossary of Common Pension Terms*
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2014 Actuarial Valuation*

## GLOSSARY OF COMMON PENSION TERMS (CONT.)

*Liabilities*

**Present Value of Accrued Benefits:**  The discounted value of benefit payments due in the future but based only on the current Accrued Benefits of each participant. The value is based on actuarial assumptions including an assumed rate of investment return.

*Why it matters: This liability is one of the primary factors in determining a plan's annual PPA funded status (see Funded Ratio).*

**Present Value of Vested Benefits:** The discounted value of Accrued Benefits that are considered vested (non-forfeitable). Benefits that are not vested include those of participants who have not satisfied the plan vesting requirement (usually five years of service). In addition under the law some death and temporary disability benefits are also considered non-vested regardless of service because they are not considered protected benefits.

*Why it matters: This liability is the primary driver of a plan's Employer Withdrawal Liability.*

**Actuarial (Accrued) Liability:** For inactive members this is the same as the Present Value of Accrued Benefits above. For active members this depends on the cost method selected by the actuary. Under the accrued benefit or traditional unit credit cost method this is also the same as the Present Value of Accrued Benefits. Under other cost methods (including most commonly entry age normal) this represents an alternate allocation of projected benefit cost over the working lifetime of active members. Under the entry age normal cost method, the active Actuarial Liability is larger than the Present Value of Accrued Benefits.

**Unfunded Actuarial Liability:** The Actuarial Liability less the Actuarial Value of Assets.

**Current Liability:** This is similar to the Present Value of Accrued Benefits, but uses a statutory, significantly lower, interest rate (equivalent to an expected rate of return on a bond only-type portfolio) and statutory mortality tables.  The lower interest rate means that Current Liability tends to be significantly higher than the Present Value of Accrued Benefits.  This number has very little impact on multiemployer plans.

**Normal Cost:** The present value of all benefits that are expected to accrue or to be earned under the plan during the plan year. The way in which a benefit is considered to be earned varies with the actuarial cost method.

**United Actuarial Services, Inc.**

**CONFIDENTIAL**                                    **1974PLAN_002371**

Case 1:18-cv-01905-CJN    Document 28    Filed 06/10/19    Page 808 of 1367

JA 000803

*Appendix E – Glossary of Common Pension Terms*
*United Mine Workers of America 1974 Pension Plan*
*July 1, 2014 Actuarial Valuation*

## GLOSSARY OF COMMON PENSION TERMS (CONT.)

### Funding

**Funded Ratio (Funded Percentage):** Present Value of Accrued Benefits divided by the Actuarial Value of Assets.  This is one of two key measures used to determine a plan's annual PPA funded status. This may also be referred to as PPA Funded Ratio. This must be greater than 80% to avoid endangered status.

**Credit Balance:** The accumulated excess of actual contributions over legally required minimum contributions as maintained in the funding standard account. The funding standard account is maintained by the actuary in the valuation process and reported annually in schedule MB to the Form 5500 filing.

**Accumulated Funding Deficiency:** A negative credit balance, indicating an excess of total charges to the funding standard account over the total credits to such account. Prior to PPA, an accumulated funding deficiency caused an immediate excise tax (waiver under PPA if certain conditions are met). After PPA, a current or projected funding deficiency is one of the two main criteria used in determining the annual PPA status. It can eventually trigger an excise tax levied on contributing employers.

**Funding Period:** The estimated number of years it would take to pay off the Plan's unfunded liabilities (and be 100% funded).  This calculation is based on the entry age normal liability basis. This is determined by taking the excess of expected contributions over expected normal cost and comparing it to the unfunded entry age accrued liability. This is a good single measure of plan health that looks at both current levels of funding and future expectations.  It is also a good indicator of the level of risk the plan is taking in funding its future benefits.

### Withdrawal Liability

**Unfunded Vested Benefits (UVB):** Present Value of Vested Benefits less the value of plan assets determined on either an actuarial or market value basis. The selection of asset measurement is part of the withdrawal liability method of the Plan.

**Employer Withdrawal Liability (EWL):** An employer that withdraws from a multiemployer plan is liable for its proportionate share of Unfunded Vested Benefits, determined as of the date of withdrawal.

United Actuarial Services, Inc.

**CONFIDENTIAL**                                                    **1974PLAN_002372**

UNITED MINE WORKERS OF AMERICA 1974 PENSION TRUST

Pursuant to Article XX of the National Bituminous Coal Wage Agreement of 1974, there is hereby established a trust to be known as the "United Mine Workers of America 1974 Pension Trust" (hereinafter sometimes referred to as "Trust" or "1974 Pension Trust") for the purpose of making benefit payments pursuant to the provisions of the United Mine Workers of America 1974 Pension Plan (hereinafter sometimes referred to as the "Plan" or the "1974 Pension Plan"). The provisions of said 1974 Pension Trust are effective as of December 6, 1974, and, as amended as of March 27, 1978, April 29, 1980, June 7, 1981, October 1, 1984, February 1, 1988, February 1, 1991, December 16, 1993, January 1, 1998, January 1, 2002, January 1, 2007, and July 1, 2011, are as set forth below.

The 1974 Pension Plan and Trust is a continuation of the benefit program established under the UMWA Welfare and Retirement Fund of 1950 and, effective June 30, 2007, is the surviving Plan and Trust following the merger of the United Mine Workers of America 1950 Pension Plan and the United Mine Workers of America 1950 Pension Trust with the 1974 Pension Plan and the 1974 Pension Trust.

Except to the extent otherwise required by the Employee Retirement Income Security Act of 1974 ("ERISA") or other applicable law, governmental rule or regulation, and except to the extent that the 1974 Pension Plan or 1974 Pension Trust specifically provides otherwise, or as required by the context, all amendments to the 1974 Pension Trust effective as of July 1, 2011, pursuant to the authority contained in Article XI herein, shall be given only prospective application commencing on July 1, 2011, and shall have no retroactive application whatever. The amendments effective as of July 1, 2011, shall not be deemed to be an approval or disapproval by the parties to any action or failure to act by any Trustee or Trustees for any period prior to July 1, 2011. The terms and provisions of the 1974 Pension Trust in effect as of June 30, 2011, shall continue in effect and shall be applicable only to circumstances or events which occurred prior to July 1, 2011, and which are not governed by the amendments adopted as of July 1, 2011.

ARTICLE I

The following terms shall have the meanings herein set forth:

(1)     "Wage Agreement" means the National Bituminous Coal Wage Agreement of 1974, as amended from time to time and any successor thereto, including, but not limited to, the National Bituminous Coal Wage Agreement of 2011. Any reference in this Trust to the Wage Agreement or to the bituminous coal wage agreement then in effect shall also refer (a) to the Sub-bituminous and Lignite Agreement and the National Coal Mine Construction Agreement with respect to any period for which such agreements provide that pension benefit payments shall be made available pursuant to this Trust or a predecessor Trust established under the bituminous coal wage agreement, (b) with respect to any period prior to the 1950 Bituminous Coal Wage Agreement, to any collective bargaining contract between the United Mine Workers of America and any employer in the bituminous coal industry, and (c) solely for the purposes of determining who is

required to make contributions to, and receive benefits under, the 1974 Pension Trust, any other collective bargaining contract entered into between the United Mine Workers of America and any employer in the bituminous coal industry, which contract provides that contributions shall be made to or benefit payments made from this Plan.

(2)    "Employer" means an employer who is signatory to the Wage Agreement or, with respect to prior periods, was signatory to the bituminous coal wage agreement then in effect.

(3)    "Plan" shall refer to the "United Mine Workers of America 1974 Pension Plan" established pursuant to Article XX of the National Bituminous Coal Wage Agreement of 1974.

(4)    "Trustees" shall mean the trustees of this Trust designated in accordance with the provisions of Article II hereof, who shall be the named fiduciaries required pursuant to Section 402 of ERISA and the Plan Administrator, as that term is defined in that Act; provided, however, that this instrument may be amended pursuant to Article XI hereof to designate other or additional named fiduciaries.

(5)    "UMWA" or "Union" shall mean the United Mine Workers of America.

## ARTICLE II

The 1974 Pension Trust shall be administered by a Board of four Trustees, two of whom shall be appointed as representatives of the Employers, and two of whom shall be appointed as representatives of the Union. The Union may remove the Trustees appointed by it, at any time and for any reason, and the Employers may remove the Trustees appointed by them, at any time and for any reason.

For purposes of taking any action and all other aspects of administration under the 1974 Pension Plan or Trust, a quorum shall consist of two of the four Trustees, one of whom must be a representative of the Union, and one of whom must be a representative of the Employers; provided, however, that a quorum shall not be deemed to exist unless all Trustees have received reasonable notice of the meeting at which any action is taken, unless such notice is waived. Any Trustee may call a meeting of the Trustees pursuant to the provisions hereof. The Trustees need not be physically present to constitute a quorum, but may conduct business telephonically or through similar modes of simultaneous communication. Alternatively, the Trustees may act without meeting, by written resolution signed by all Trustees.

In the event that a meeting is held or action is taken without the participation of both of the Trustees appointed by the Union and both of the Trustees appointed by the Employers, each side (the Employer Trustees and the Union Trustees) shall be required to vote as a unit. In all other cases, each Trustee will be entitled to one vote.

In the event of resignation, death, removal, inability or unwillingness to serve of a Trustee appointed by the Employers or a Trustee appointed by the Union, the Employers shall appoint the successor of the Trustee originally appointed by them in accordance with the terms of Article

2

XX of the National Bituminous Coal Wage Agreement of 2011, as amended from time to time, and any successor agreements to that specific Agreement, and the Union shall appoint the successor of the Trustee originally appointed by it  In the event of a deadlock on the administration of the Trust Fund between the Employer Trustees and the Union Trustees, an impartial umpire shall be selected either by agreement of the four Trustees, representatives of the contracting parties hereto, or by petition by either of the contracting parties hereto or by either of the two groups of Trustees to the United States District Court of the District of Columbia for the appointment of such an impartial umpire, all as made and provided in Section 302(c) of the Labor-Management Relations Act of 1947.

The four Trustees so designated shall constitute the Board of Trustees to administer the 1974 Pension Trust, as it may be amended from time to time.  The Union shall designate one Trustee to serve as Chairman.

The UMWA and the BCOA may each designate a liaison representative who shall be permitted to attend Trustee meetings, to request and receive data and information relating to Fund operations, and to meet with Fund staff and representatives regarding issues relating to the Fund.

The Trustees shall retain outside co-counsel who shall serve as the legal advisors to the Fund and the Trustees.  This shall not preclude the Trustees from exercising their authority to retain additional counsel as set forth in Article VI(10).

This Trust shall have its principal place of business in Washington, D.C., or such other place as may be determined by the Trustees.

## ARTICLE III

The 1974 Pension Trust established with the Trustees hereunder is an irrevocable trust created pursuant to Section 302(c) of the Labor-Management Relations Act of 1947, which shall endure as long as the purposes for its creation shall exist.  The 1974 Pension Trust consists of such sums of money and other property, acceptable to the Trustees, as from time to time shall be contributed to, held by, or paid or delivered to the Trustees and such earnings, profits, and increments thereon as may occur from time to time.  All such money and other property delivered to the Trustees and all investments and reinvestments made therewith or proceeds thereof and all earnings and profits thereon, less the payments which at the time of reference shall have been made by the Trustees as authorized herein, are referred to herein as the "assets of the 1974 Pension Trust."  The assets of the 1974 Pension Trust shall be held by the Trustees and dealt with in accordance with the express provisions of this instrument and the requirements of law.

The monies to be paid into the 1974 Pension Trust shall not in any manner be liable for or subject to the debts, contract, liabilities or torts of the parties entitled to such money, i.e., the beneficiaries of said 1974 Pension Trust under the terms of the instrument.

3

## ARTICLE IV

The Trustees, or such other persons as may be properly designated pursuant to Article IX hereof, are directed and authorized (a) to hold, to invest and to reinvest the assets of the 1974 Pension Trust as provided herein; (b) to pay monies from the 1974 Pension Trust in accordance with the terms of the Plan for the purpose of distributing the benefits payable under the Plan; and (c) to pay the cost of administration of the 1974 Pension Trust as hereinafter provided.

Subject to the provisions of this Trust and the Plan, the Trustees shall have full and exclusive authority and discretion to determine all questions of coverage and eligibility, including all factual determinations, investment of trust funds, delivery of benefits, and all other related matters. They shall have full discretionary power to construe the provisions of this Agreement and Declaration of Trust and the Plan. The Trustees are empowered to promulgate such reasonable rules and regulations as they determine to be desirable for carrying out the purposes of this Trust and of the Plan.

## ARTICLE V

The Trustees, or such other persons as may be properly designated pursuant to Article IX hereof, shall have full discretionary powers of management and control, of sale and resale, in fee simple or otherwise, mortgage, lease, and pledge, of the assets of the 1974 Pension Trust, and shall not be restricted to investments in securities or property of the character now or hereafter authorized by law or rules of the United States District Court for the District of Columbia. To the extent permitted by ERISA, the Trustees are authorized to invest assets of the 1974 Pension Trust in deposits described in Section 408(b)(4) of ERISA, and in common or collective trust funds or pooled investment funds, including but not limited to those described in Section 408(b)(8) of ERISA. In the event that the Trustees invest assets of the 1974 Pension Trust in a pooled investment trust which is exempt from taxation as a group trust under Sections 401(a) and 501(a) of the Internal Revenue Code (with respect to funds which equitably belong to participating trusts described in such Sections of the Code), the provisions of said pooled investment trust shall be deemed to be a part of the Plan. The assets of the 1974 Pension Trust shall be invested and reinvested, without distinction between principal and income, in securities and other forms of property, including but not limited to, real estate, corporate stocks (common and preferred), debentures, bonds and other obligations whether or not secured. The Trustees, or such other persons as may be properly designated pursuant to Article IX hereof, shall not be limited to the amount or type of any investment in relation to the amount or type of investments constituting the Trust as a whole, except as provided by ERISA.

The Trustees or such other persons as may be properly designated pursuant to Article IX hereof may, in their discretion, keep such portion of the assets of the 1974 Pension Trust in cash or cash balances as the Trustees may determine to be reasonably necessary to satisfy the current needs of the Trust.

4

## ARTICLE VI

Neither by way of limitation nor in derogation, but in amplification of any powers granted herein, the Trustees, or such other persons as may be properly designated pursuant to Article IX hereof, are further authorized:

(1)     To purchase, sell, exchange, convey, transfer or dispose of, and also to grant options with respect to, any property, whether real or personal, at any time held by them and to make any sale, private or public;

(2)     To retain, manage, operate, repair, improve, develop, preserve, mortgage or lease for any period any real property interests or rights held by the Trustees upon such terms and conditions as the Trustees deem proper, either alone or by joining with others, using other trust assets for any of such purposes if by them deem advisable; to modify, extend, renew, or otherwise adjust any or all of the provisions of any such mortgage or lease, including the waiver of rentals, if by them deemed advisable;

(3)     To compromise, compound and settle any debt or obligations due from third persons to them or to third persons from them, as Trustees hereunder, and to reduce the rate of interest on, to extend or otherwise modify, or to foreclose upon default or otherwise enforce, any such obligations;

(4)     To vote in person or by proxy and to give general or special proxies or powers of attorney, with or without power of substitution, on any securities or other investments held by them;

(5)     To exercise any rights or options appurtenant to any securities or other property held by them for the conversion thereof into other securities or property, or to exercise any rights or options held by them to subscribe for or purchase additional securities or other property, and to make any and all necessary payments with respect to any such conversion or exercise;

(6)     To join in, dissent from or oppose, the reorganization, recapitalization, consolidation, sale or merger of corporations or properties of which they may hold stocks, bonds or other securities or in which they may be interested, upon such terms and conditions as they may deem prudent; to pay any expenses, assessments or subscriptions in connection therewith and to accept any securities or property (whether or not the Trustees would be authorized to then invest in such securities or property) which may be issued upon any such reorganization, recapitalization, consolidation, sale or merger, and thereafter to hold the same;

(7)     To make, execute, acknowledge and deliver any and all deeds, leases, mortgages, assignments, documents of transfer and conveyance and any and all other instruments that may be necessary or appropriate to carry out the powers herein granted;

(8)     To enforce any right, obligation or claim in their absolute discretion and in general to protect in any way the interest of the Trust, either before or after default with respect to any such

5

right, obligation or claim, and, in case they shall consider such action for the best interest of the Trust, in their absolute discretion to abstain from the enforcement of any right, obligation or claim and to abandon any property, whether real or personal, which at any time may be held by them;

(9)    To borrow or raise money for the purpose of the Trust in such amount and upon such terms and conditions as in their absolute discretion they may deem advisable; and for any sums so borrowed to issue their promissory note as Trustees and to secure the repayment thereof by mortgaging or pledging all or any part of the Trust; and no person lending money to the Trustees shall be bound to see to the application of the money loaned or to inquire into the validity, expediency or propriety of any such borrowing;

(10)    To employ suitable agents and counsel from time to time, and to pay them reasonable expenses and compensation;

(11)    To retain without liability for depreciation any securities or property at any time purchased and/or received by the Trustees as a part of the Trust;

(12)    To do all acts which may be necessary to comply with any of the requirements of ERISA or any other federal law;

(13)    To enter into any and all contracts and agreements for carrying out the terms of the Plan and the 1974 Pension Trust and for the administration of such Plan and Trust; and

(14)    To do all acts which they may deem necessary or proper and to exercise any and all powers of the Trustees under this instrument under such terms and conditions as they may deem to be for the best interest of the Trust.

(15)    To enter into an arrangement with the UMWA for the check-off of membership dues, including assessments, initiation fees, credit union, voluntary COMPAC contributions and other voluntary deductions; provided that any such arrangement must be terminable by the Trustees upon reasonable notice, must be revocable by the Participant at any time upon reasonable notice to the Trustees, and either

(a)    such arrangement must not permit any Participant or beneficiary to check-off an amount exceeding 10% of his or her monthly benefit; or

(b)    the designated recipient must file a written acknowledgement that it has no enforceable right in or to any plan benefit or portion thereof (except to the extent of payments actually received pursuant to the terms of the arrangement);

and such arrangement must comply in all respects with the requirements of the Internal Revenue Code of 1986, as amended, ERISA, the Labor Management Relations Act of 1947, as amended, and any other applicable law.

6

1974PLAN_000025

The Trustees may, in their sole discretion, cause the securities which from time to time may comprise the Trust, to be registered in their name as Trustees hereunder, or in the name of their nominee without disclosing the ownership thereof or to take and keep the same unregistered, and to retain them, or any part thereof, in such condition that they will pass by delivery.

Notwithstanding the above authority granted the Trustees hereunder, no power shall be exercisable in any manner which will, or might, prevent the 1974 Pension Plan and Trust from qualifying, or continuing to qualify, under Section 401 of the Internal Revenue Code, nor shall any action be taken by the Trustees which violates the requirements of ERISA or any other applicable law, governmental rule or regulation.

## ARTICLE VII

The expenses incurred by the Trustees in the performance of their duties hereunder, including reasonable compensation for the Trustees in accordance with Section 408(c)(2) of ERISA, for agents, and for service of counsel rendered to the Trustees and expenses incident thereto, and all other proper charges and disbursements of the Trustees, including all taxes of any kind and all kinds whatsoever that may be levied or assessed under existing or future laws of any jurisdiction upon or in respect of the Trust hereby created or any money, property or securities forming a part thereof, shall be paid by the Trustees out of the Trust.

## ARTICLE VIII

A Trustee shall not be liable for the making, retention, or sale of any investment or reinvestment made by him as herein provided; for any loss to or diminution of the Trust; or for anything done or omitted under this instrument, except for his own willful misconduct or lack of good faith, or any other action or omission for which personal liability is imposed under Part 4 of Subtitle B of Title I of ERISA. Any Trustee may consult with legal counsel concerning any questions which may arise with reference to his duties under this instrument, and, except as otherwise provided by ERISA, the opinion of such counsel shall be full and complete protection in respect to any action taken or suffered by such Trustee hereunder in good faith and in accordance with the opinion of such counsel.

When and if a monetary claim or suit is lodged against one or more fiduciaries of the Trust, including the Trustees thereof, in their individual capacities, arising out of their actions as fiduciaries, the Trust may engage and compensate counsel to represent such fiduciary until a final court decision, or a final government agency decision if no court appeal is filed, finds that such fiduciary in his individual capacity (1) has breached his fiduciary obligations under the Employee Retirement Income Security Act; (2) by so doing has caused a loss to the Trust or its corresponding Plan or has gained by use of Trust assets; and (3) is therefore liable in his individual capacity for damages or to return any profit occasioned by such breach to the complaining person, persons, entity or entities.

7

If the Trust expends moneys for counsel under the preceding paragraph, and the individual liability described therein is so finally determined against one or more fiduciaries, each individual found so liable shall reimburse the Trust for moneys so expended for his counsel.

No provision in this Article shall be construed in its interpretation so as to violate the provisions of Section 410 of the Employee Retirement Income Security Act.

ARTICLE IX

The Trustees, or such other persons as may be properly designated pursuant to Article IX hereof, shall keep accurate and detailed accounts of all investments, receipts, and disbursements and other transactions hereunder, and such accounts, books and records relating thereto shall be open to inspection and audit by the Employers and the Union and by the beneficiaries of the 1974 Pension Trust at all reasonable times at the offices of the 1974 Pension Trust. The Trustees, or such other persons as may be properly designated pursuant to this Article IX shall be responsible for providing participants and beneficiaries under the plan with all information required to be furnished pursuant to the provisions of ERISA or the regulations promulgated thereunder.

For purposes of computing charges to the funding standard account of the Trust, the Trustees shall adopt any actuarial cost or funding method designated by the Employers, including the "short-fall method," and permitted now or hereafter by applicable federal law and federal regulations issued thereunder. The Trustees shall give the Employers notice sixty (60) days prior to the time any such election is required or permitted.

The Trustees, or such other persons as may be properly designated pursuant to this Article IX shall be responsible for maintaining records sufficient to comply with any requirements of ERISA and for the filing of all reports with the Labor Department, Treasury Department, and Pension Benefit Guaranty Corporation which may be required by any provision of ERISA or the regulations issued thereunder, including the plan description and reports specified by Section 101(b). A copy of each document or report provided to plan participants or beneficiaries or filed by the Trustees pursuant to the requirements of ERISA or any other applicable law, governmental rule or regulation shall be sent to the Employers and to the Union unless the right to receive such copy has been waived in writing. The Trustees are authorized to apply for permission to implement an alternative method of satisfying any of the requirements of this Article IX in accordance with Section 110 of ERISA, and, upon receiving the approval of the Labor Department for such alternative method, may utilize such method in lieu of the corresponding requirements of ERISA and of Article IX of this instrument.

The Trustees shall provide the Employers and the Union with such other information and/or documentation as the Employers and the Union may reasonably request within a reasonable time from when such request shall be made.

The Trustees shall provide the Employers and the Union with quarterly reports summarizing all pending litigation involving the Trust and the Plan and describing all significant operational issues that are under review. Within 90 days following the close of each calendar year, or

8

following the close of each such other annual period as may be adopted by the Trustees, and within 90 days after a Trustee ceases to be a Trustee as provided for in Article II hereof, the Trustees shall file with the Employers and the Union a written report setting forth in such form and detail as they may request the transactions effected by the Trustees during such calendar year or other annual period to the date on which such Trustee's tenure ceases. The annual report shall incorporate the report of an independent certified public accountant and shall be the same as required by Section 103 of ERISA unless the Employers and the Union shall jointly request that additional or supplemental information be incorporated in the report which they receive. Upon the expiration of ninety (90) days from the date of any report to the Employers and the Union, the Trustees shall be forever released and discharged from any liability or accountability to anyone as respects the propriety of their acts or transactions shown in the aforementioned report except as otherwise provided by law or with respect to any acts or transactions as to which the Employers or the Union shall file written objections with the Trustees within such period of ninety (90) days.

The UMWA or the BCOA may audit the accounts, books and records, and operation of the Plan and Trust, at any time and for any reason, upon reasonable notice to the Trustees. The Trustees shall cooperate fully in connection with any such audit and shall make available appropriate personnel and records deemed necessary by the auditors for inspection and copying at reasonable times and places.

The Trustees are hereby authorized to allocate fiduciary responsibilities in any manner permitted pursuant to Section 405(c) of ERISA.

The Trustees may appoint an investment manager or managers to manage any investments held under this instrument as permitted by Section 402(c) of ERISA.

To the extent not inconsistent with the provisions hereof, the Trustees shall comply with the further requirements imposed upon them by and shall have the further powers contained in Article XX, Sections (e), (f), and (g) of the National Bituminous Coal Wage Agreement of 2011, as amended from time to time, and any successor agreements to that specific Agreement.

## ARTICLE X

Any action of the Employers which may, or must, be taken hereunder may be taken only by BCOA. Any action which must be taken in writing shall be signed by the President of BCOA. In the event that BCOA ceases to exist, or in the event that more than 50% of the tonnage membership of BCOA on the Effective Date of the 2011 Wage Agreement has withdrawn prior to the time when BCOA is required or permitted to take action under this Article, then such action may be taken by a majority vote, based on tonnage, of existing Employers who were BCOA members on the Effective Date of the 2011 Wage Agreement.

Any Employer who employed any participant eligible for coverage under, or who received or receives benefits under, the 1974 Pension Plan, or any Employer who was or is required to make, or who has made or makes contributions to the 1974 Pension Plan and Trust, is obligated and

9

required to comply with the terms and conditions of the 1974 Pension Plan and Trust, as amended from time to time, including, but not limited to, making contributions required under the National Bituminous Coal Wage Agreement of 1978, as amended from time to time, and any successor agreements thereto, including, but not limited to, the National Bituminous Coal Wage Agreement of 2011.

## ARTICLE XI

The Employers and the Union, by joint action, reserve the right at any time and from time to time to modify or amend in whole or in part any or all of the provisions of this instrument, without reopening or otherwise affecting the integrity of any other provision of the Wage Agreement, by a written agreement between the Employers and Union, provided, however, that such modification or amendment does not permit any part of the corpus or income of the Trust to be used for, or diverted to, purposes other than for the sole and exclusive benefit of the participants and their beneficiaries, and provided further, that the Employers and the Union have delegated to the Trustees the authority and responsibility to make certain changes and amendments as set forth in Article XX(g)(4) of the National Bituminous Coal Wage Agreement of 2011, as amended from time to time, and any successor agreements to that specific Agreement. Any written agreement executed by the Union shall be signed by the International President.

## ARTICLE XII

Notwithstanding anything to the contrary contained in this instrument, or any amendment hereto, it shall be unlawful for any part of the 1974 Pension Trust, other than such part as is required to pay taxes and administrative expenses, to be used for, or diverted to, purposes other than for the sole and exclusive benefit of the participants and beneficiaries of the Plan, except that in the case of a contribution which is made by an Employer by a mistake of fact, or law (other than a mistake relating to Plan qualification), such mistaken contribution may be returned to the Employer within six months after the Trustees determine that the contribution was mistakenly made. Monies held by the 1974 Pension Trust do not constitute a part of the deceased beneficiary's estate which can be claimed by his administrator, executor, heirs, or creditors, unless such person or persons are otherwise eligible under the terms and conditions of the Plan, nor are said monies equivalent to the proceeds of an insurance policy in which a beneficiary may be designated; and no participant or beneficiary of the Plan may, during his lifetime, assign, devise or will monies from this Trust, and any attempt so to do shall be void.

Notwithstanding the foregoing, a Participant or beneficiary may make a voluntary, revocable assignment permitted under an arrangement established by the Trustees pursuant to Article VI(15).

To the extent not inconsistent with and permitted by applicable law, governmental rule or regulation, and in such manner as to ensure that the 1974 Pension Plan and Trust is qualified under Section 401 of the Internal Revenue Code and that contributions are deductible under Section 404 of the Internal Revenue Code, the Trustees shall transfer assets or liabilities, or both, of the Trust, in such amounts, at such times and in such manner as the Employers and the Union

10

may jointly direct, to any other trust qualified under Section 401 of the Internal Revenue Code which provides benefits to persons who at any time were or are participants under the 1974 Pension Plan.

The Employers, the Union, and the Trustees shall fully cooperate to obtain all necessary rulings and do all other acts appropriate to ensure that the 1974 Pension Plan and Trust is qualified under Section 401 of the Internal Revenue Code and that contributions are deductible under Section 404 of the Internal Revenue Code.

Any assets which remain upon termination of the 1974 Pension Plan, after satisfaction of all benefits and liabilities arising under the 1974 Pension Plan and 1974 Pension Trust in a manner consistent with the principles of Section 4044 of ERISA, shall be distributed as may be mutually agreed upon by the Employers and the Union.


### ARTICLE XIII

This instrument shall be construed, regulated and administered under Federal law and, to the extent not preempted or inconsistent with such Federal law, the laws of the District of Columbia.

IN WITNESS WHEREOF, the Employers and the Union, pursuant to proper authority, have caused this instrument, effective December 6, 1974, and amended as of July 1, 2011, to be signed by their proper officers or representatives on this 31st day of December, 2012.

UNITED MINE WORKERS OF AMERICA


International President


BITUMINOUS COAL OPERATORS' ASSOCIATION, INC.


President


11

Accepted by:

Dated: _____1-29-13_____

_____
Trustee

Dated: _____1/29/2013_____

_____
Trustee

Dated: _____1/29/2013_____

_____
Trustee

Dated: _____1/29/2013_____

_____
Trustee

12

31/ 68290993.2

**1974PLAN_000031**

JA 000816

# United Mine Workers of America

# 1974 Pension Plan

February, 1988

JA 000817

UMWA 1974 PENSION PLAN
TABLE OF CONTENTS
(Material in Parenthesis Does Not Appear as a Title in Document)

ARTICLE I - INTRODUCTION. . . . . . . . . . . . . . . . 1

   A. Definitions . . . . . . . . . . . . . . . . . . . 1

       (1) "Wage Agreement". . . . . . . . . . . . . . . 1
       (2) "Employer". . . . . . . . . . . . . . . . . . 2
       (3) "Construction Employer" . . . . . . . . . . . 2
       (4) "Bituminous Coal Segment" . . . . . . . . . . 2
       (5) "Participant". . . . . . . . . . . . . . . . . 2
       (6) "Pensioner" . . . . . . . . . . . . . . . . . 2
       (7) "1974 Pension Trust". . . . . . . . . . . . . 2
       (8) "Trustees". . . . . . . . . . . . . . . . . . 2
       (9) "Credited Service". . . . . . . . . . . . . . 3
      (10) "Hours of Service". . . . . . . . . . . . . . 3
      (11) "UMWA" . . . . . . . . . . . . . . . . . . . 3
      (12) "Hours Worked". . . . . . . . . . . . . . . . 3
      (13) "Construction Industry Service" . . . . . . . 3

   B. When Retirement Occurs. . . . . . . . . . . . . . 4

   C. Attainment of Age . . . . . . . . . . . . . . . . 4


ARTICLE II - ELIGIBILITY. . . . . . . . . . . . . . . . 4

   A. Age 55 Retirement . . . . . . . . . . . . . . . . 4

   B. Normal Retirement . . . . . . . . . . . . . . . . 4

   C. Disability Retirement . . . . . . . . . . . . . . 5

   D. Minimum Disability Retirement . . . . . . . . . . 5

   E. Deferred Vested Retirement. . . . . . . . . . . . 6

   F. Nonduplication. . . . . . . . . . . . . . . . . . 6

       (1) (Entitlement). . . . . . . . . . . . . . . . . 6
       (2) (Retirement before 12/31/75). . . . . . . . . 7
       (3) (Reemployment). . . . . . . . . . . . . . . . 7

   G. Employment for Vesting Purposes . . . . . . . . . 7


ARTICLE III - AMOUNT OF PENSION . . . . . . . . . . . . 8

   A. Retirement On or After June 7, 1981 . . . . . . . 8

       (1) Age 55 Retirement Pension . . . . . . . . . . 9
       (2) Normal Retirement Pension . . . . . . . . . . 9
       (3) Disability Retirement Pension . . . . . . . . 9
       (4) Minimum Disability Retirement Pension . . . 10
       (5) Deferred Vested Pension . . . . . . . . . . 10

i

UMWA 1974 PENSION PLAN
Table of Contents Continued
(Material in Parenthesis Does Not Appear as Title in Document)

ARTICLE III – UNDERLINE{AMOUNT OF PENSION} (cont.). . . . . . . . . . 10

  B. Increased Pension. . . . . . . . . . . . . . . . 10

  C. Application for Pension and Commencement,
    Suspension and Termination of Pensions . . . . . 11

      (1) (First Payment). . . . . . . . . . . . . . 11
      (2) (Last Payment). . . . . . . . . . . . . . 11
      (3) (Date Payable) . . . . . . . . . . . . . . 11
      (4) (Suspension) . . . . . . . . . . . . . . . 11
      (5) (Reemployment) . . . . . . . . . . . . . . 11

ARTICLE IV – CREDITED SERVICE. . . . . . . . . . . . . . 11

  A. Nonsignatory Service . . . . . . . . . . . . . . 11

      (1) (Service after 12/31/36) . . . . . . . . . 12
      (2) (Service before 1/1/37). . . . . . . . . . 12
      (3) (Credit for occupational injury/disease) . . . 12
      (4) (Military Service) . . . . . . . . . . . . 13

  B. Signatory Service. . . . . . . . . . . . . . . . 13

      (1) (Definition) . . . . . . . . . . . . . . . 13
      (2) (Credit for occupational injury/disease). . . 14
      (3) (Credit while receiving Sickness/Accident
         benefits) . . . . . . . . . . . . . . . . 14
      (4) (Credit for employment by UMWA). . . . . . 14
      (5) (Military Service) . . . . . . . . . . . . 15
      (6) (Service for Employers who later became
         signatory). . . . . . . . . . . . . . . . 15

  C. Additional Rules Concerning Credited Service . . . 15

      (1) (Employment after 4/1/71). . . . . . . . . 15
      (2) (Combination of rules) . . . . . . . . . . 15
      (3) (Maximum nonsignatory service allowed
         after 12/31/81) . . . . . . . . . . . . . 15
      (4) (Ownership, operation, Management of mine) . . 16
      (5) (Maximum nonsignatory service credited). . . 16
      (6) (Participants with less than 10 years
         signatory service). . . . . . . . . . . . 16
      (7) (Service credit accruals). . . . . . . . . 17
      (8) (Last day of credited service) . . . . . . 17
      (9) (Temporary supervisory duties) . . . . . . 17

  D. Construction Industry Service . . . . . . . . . . 17

UMWA 1974 PENSION PLAN
Table of Contents Continued
(Material in Parenthesis Does Not Appear as Title in Document)

ARTICLE V – REEMPLOYMENT AFTER ATTAINMENT OF PENSION
            ELIGIBILITY. . . . . . . . . . . . . . . 18

    A. (General Rules). . . . . . . . . . . . . 18

    B. (Reemployment before receiving deferred vested
        pension). . . . . . . . . . . . . . . 18

    C. (Reemployment after receiving deferred vested
        pension). . . . . . . . . . . . . . . 18

ARTICLE VI – SURVIVING SPOUSE BENEFIT . . . . . . . 18

    A. (1) (Eligibility). . . . . . . . . . . . 18
       (2) (Amount) . . . . . . . . . . . . . 18
       (3) (Length of marriage) . . . . . . . . 19
       (4) (Terms of payment) . . . . . . . . . 19

    B. (1) (Noneligibility) . . . . . . . . . . 19
       (2) (Reemployment) . . . . . . . . . . . 19

ARTICLE VII – JOINT AND SURVIVOR ANNUITIES . . . . . 19

    A. (Amount) . . . . . . . . . . . . . . . 19

    B. (Eligibility). . . . . . . . . . . . . . 19

    C. (Election Period). . . . . . . . . . . . 20

    D. (Spousal consent of waiver). . . . . . . 20

    E. (Qualified Surviving Spouse) . . . . . . . 20

    F. (Payment). . . . . . . . . . . . . . . 20

ARTICLE VIII – MISCELLANEOUS . . . . . . . . . . . 20

    A. Determination of Eligibility . . . . . . . 20

    B. General. . . . . . . . . . . . . . . . 21

       (1) (Rules and Regulations). . . . . . . 21
       (2) (Transfer of benefits) . . . . . . . 21
       (3) (Amendment of plan). . . . . . . . . 21
       (4) (Termination of plan). . . . . . . . 21

UMWA 1974 PENSION PLAN
Table of Contents Continued
(Material in Parenthesis Does Not Appear as Title in Document)

ARTICLE VIII - MISCELLANEOUS (cont.) . . . . . . . . . . . 21

    B. General (cont.). . . . . . . . . . . . . . . . . 21

        (5) (Forfeitures). . . . . . . . . . . . . . . 21
        (6) (Denial notification/review) . . . . . . . . 21
        (7) (Fiduciary responsibilities) . . . . . . . . 22
        (8) (Contributions). . . . . . . . . . . . . . 22
        (9) (Merger or consolidation/transfer of
            assets of liabilities). . . . . . . . . . 22
        (10) (Liquidated Damages) . . . . . . . . . . . 22
        (11) (Rights of participants on termination). . . . 22
        (12) (Integrity of assets/mistaken
             contribution). . . . . . . . . . . . . . 22
        (13) (Trustee responsibilities) . . . . . . . . . 22
        (14) (Laws) . . . . . . . . . . . . . . . . . 22
        (15) (Action by Employers). . . . . . . . . . . 22
        (16) (Employers in plan) . . . . . . . . . . . 23
        (17) (Tax deductibility of contributions) . . . . 23
        (18) (Commencement of Benefits) . . . . . . . . 23

ARTICLE IX - PARTICIPANTS COVERED BY A SUCCESSOR PLAN. . . 23

ARTICLE X - (WITHDRAWAL LIABILITY) . . . . . . . . . . . 23

    A. (Calculation of withdrawal liabilities) . . . . . 23

    B. (Construction segment) . . . . . . . . . . . . . 24

        (1) (Credited service) . . . . . . . . . . . . 24
        (2) (Allocation of assets) . . . . . . . . . . 24
        (3) (Investment income). . . . . . . . . . . . 25
        (4) (Payments) . . . . . . . . . . . . . . . . 25

    C. (Interest assumption). . . . . . . . . . . . . . 25

    D. (Availability of assets) . . . . . . . . . . . . 25

    E. (Withdrawal liability formula) . . . . . . . . . 25

    F. (Common control) . . . . . . . . . . . . . . . . 26

    G. (Payment of withdrawal liability). . . . . . . . 26

    H. (Late payment) . . . . . . . . . . . . . . . . . 26

UMWA 1974 PENSION PLAN
Table of Contents Continued
(Material in Parenthesis Does Not Appear as Title in Document)

ARTICLE X - (cont.) . . . . . . . . . . . . . . . . . . . 26

    I. (Default) . . . . . . . . . . . . . . . . . . . . . 26

    J. (Prepayment). . . . . . . . . . . . . . . . . . . . 27

    K. (Termination of plan) . . . . . . . . . . . . . . . 27

    L. (Partial withdrawal) . . . . . . . . . . . . . . . 27

    M. (Presumptive partial withdrawal) . . . . . . . . . 27

    N. (Sale of Assets). . . . . . . . . . . . . . . . . . 27

    O. (Response to court action). . . . . . . . . . . . . 28

APPENDIX A - Acturial Equivalence Factors for
    Deferred Vested Retirement Benefits
    Commencing Prior to Age 62 . . . . . . . . . . . 29

APPENDIX B - Table of Percentages to be Applied
    Against Pension Payable to Partici-
    pant Under Joint and Survivors
    Annuities . . . . . . . . . . . . . . . . . . . 31

    (SIGNATURE PAGE). . . . . . . . . . . . . . . . . . . . 32

UNITED MINE WORKERS OF AMERICA
1974 PENSION PLAN
EFFECTIVE DECEMBER 6, 1974

## ARTICLE I - INTRODUCTION

Pursuant to Article XX of the National Bituminous Coal Wage Agreement of 1974, the United Mine Workers of America 1974 Pension Plan (hereinafter sometimes referred to as the "1974 Pension Plan" or the "Plan") provides pension benefits as hereinafter set forth. The Plan is effective as of December 6, 1974 (the "effective date") and, as amended March 27, 1978, April 29, 1980, June 7, 1981, October 1, 1984, and February 1, 1988, the provisions of the Plan are set forth below. Except in the case of total disability resulting from mine accidents occurring after the effective date, this Plan does not provide benefits to persons retiring on or before December 31, 1975, but such persons may be entitled to pension benefits under the United Mine Workers of America 1950 Pension Plan (hereinafter referred to as the "1950 Pension Plan").

Along with the 1974 Benefit Plan and Trust, the 1974 Pension Plan and Trust is a continuation of the benefit program established under the UMWA Welfare and Retirement Fund of 1950. Every Employer that is obligated to make contributions to the 1974 Pension Trust is required to participate in the pooled benefit program comprised of the two 1974 Plans and Trusts, and to contribute to the 1974 Benefit Trust at the rate and on the same basis as set forth in the National Bituminous Coal Wage Agreement of 1988, as may be amended from time to time.

Except to the extent otherwise required by the Employee Retirement Income Security Act of 1974 ("ERISA") or other applicable law, governmental rule or regulation, and except to the extent that the 1974 Pension Plan or 1974 Pension Trust specifically provides otherwise, or as required by the context, all amendments to the 1974 Pension Plan effective as of February 1, 1988, pursuant to the authority contained in Article VIII herein, shall be given only prospective application commencing on February 1, 1988, and shall have no retroactive application whatsoever. The amendments effective as of February 1, 1988, shall not be deemed to be an approval or disapproval by the parties to any action or failure to act by any Trustee or Trustees for any period prior to February 1, 1988. The terms and provisions of the 1974 Pension Plan in effect as of January 31, 1988, shall continue in effect and shall be applicable only to circumstances or events which occurred prior to February 1, 1988, and which are not governed by the amendments adopted as of February 1, 1988.

### A. Definitions

(1) "Wage Agreement" means the National Bituminous Coal Wage Agreement of 1974, as amended from time to time and any successor thereto, including, but not limited to, the National Bituminous Coal Wage Agreement of 1988. Any reference in this Plan to the Wage Agreement or to the bituminous coal wage agreement then in effect shall also refer (a) to the Sub-bituminous and Lignite Agreement and the National Coal Mine Construction Agreement with respect to any period for which such agreements provide that pension benefits shall be made available pursuant to this Plan or a predecessor plan established under the bituminous coal wage agreement, and (b) with respect to any period prior to the 1950 Bituminous Coal Wage Agreement, to any collective bargaining contract between the United Mine Workers of America and any employer in the bituminous coal industry, and (c) solely for the purposes of determining who is

required to make contributions to, and receive benefits under, the 1974 Pension Trust, any other collective bargaining contract entered into between the United Mine Workers of America and any Employer in the bituminous coal industry, which contract provides that contributions shall be made to or benefit payments made from this Plan.

(2) "Employer" means an employer who is signatory to the Wage Agreement, or, with respect to prior periods, was signatory to the bituminous coal wage agreement then in effect.

(3) "Construction Employer" means an Employer that is signatory to the National Coal Mine Construction Agreement of 1984, as amended from time to time and any successor thereto; or is signatory to any other collective bargaining contract with the United Mine Workers of America which provides that contributions shall be made to the 1974 Pension Trust or the United Mine Workers of America 1985 Construction Workers Pension Trust for construction work related to the development, expansion or alteration of coal mines, provided that substantially all the employees, with respect to whom the employer has an obligation to contribute, perform construction work related to the development, expansion or alteration of coal mines, including the erection of tipples and preparation plants and other facilities placed in, on or around the coal mines, sinking of shafts, slopes, drifts or tunnels and all other such coal-related work that is performed under a Wage Agreement. In the case of a Construction Employer which is a single trade or business and which is also signatory to a Wage Agreement other than a Wage Agreement described in the preceding sentence, the Construction Employer shall be treated as an Employer other than a Construction Employer with respect to its employees or operations for which it has an obligation to contribute to the Plan pursuant to such Wage Agreement.

(4) "Bituminous Coal Segment" and "Coal Mine Construction Segment" mean the two accounts within the 1974 Pension Plan maintained after June 30, 1981, for the sole purpose of calculating employer withdrawal liability under Article X.

(5) "Participant" means any person who is employed in a classified job for an Employer after the effective date and any person entitled to receive pension benefits under the Plan; provided, however, that any person who is not employed in a classified job for an Employer on the effective date shall not become a participant until such person completes at least 1,000 hours of Credited Service within a 12-month period after the effective date, or unless such person is subject to the provisions of Article II(f)(3).

(6) "Pensioner" means any person who is receiving a pension pursuant to Article II of this Plan.

(7) "1974 Pension Trust" means the trust established pursuant to the National Bituminous Coal Wage Agreement of 1974 to fund this Plan.

(8) "Trustees" means the Trustees of the 1974 Pension Trust, who shall be named fiduciaries pursuant to Section 402 of ERISA and the Plan Administrator,

as that term is defined in that Act; provided, however, that the 1974 Pension Trust may be amended to designate other or additional named fiduciaries under said Trust and the Plan.

(9) "Credited Service" means signatory and nonsignatory service determined pursuant to Article IV.

(10) "Hour of Service" shall mean each hour for which the participant is directly or indirectly paid or entitled to be paid by the Employer (a) for the performance of duties or (b) on account of a period of time during which no duties are performed due to vacation, holiday, illness, sickness and accident, incapacity, layoff, bereavement, jury duty, military duty or leave of absence; or (c) time spent performing contractual obligations such as safety inspections and mine committee work, even though such time off is not paid for by the Employer, provided that:

(1) except for hours of service credited on account of a period during which a Participant is eligible to receive benefits under Article IV(B)(3), no more than 501 hours of service shall be credited to a Participant on account of a single continuous period during which the Participant performed no duties;

(2) no credit shall be given for payments made or due under a plan maintained solely for the purpose of complying with the applicable worker's compensation or unemployment compensation or disability insurance laws or payments which solely reimburse a Participant for medically related expenses incurred by the Participant; and

(3) hours of service shall be credited for back pay for the period for which such back pay was awarded, irrespective of mitigation of damages, either awarded or agreed to by the Employer to the extent such back pay represents payment for hours which are required to be taken into account. However, no hours of service shall be credited for back pay if such hours were previously credited. The determination of hours of service for reasons other than the performance of duties shall be made in accordance with the applicable rules of the regulations prescribed by the Secretary of Labor under 29 C.F.R. Part 2530.200b-2(b).

(11) "UMWA" or "Union" shall mean the United Mine Workers of America.

(12) "Hours Worked" shall mean (a) each hour for which an employee is paid, or entitled to payment, for the performance of duties for the Employer during the calendar year, and (b) hours for which back pay, irrespective of mitigation of damages, is awarded or agreed to by an Employer, to the extent that such award or agreement is intended to compensate an Employee for periods which the Employee would have been engaged in a performance of duties for the Employer. Time spent performing contractual obligations such as safety inspections and mine committee work and periods of time when the Participant is eligible to receive sickness and accident benefits shall be included as hours worked.

(13) "Construction Industry Service" means, with respect to a participant,

(a) all periods of service after June 20, 1985 with a Construction Employer that involves work related to the development, expansion or alteration of coal mines; and

(b) all periods of signatory and nonsignatory service before July 1, 1985,

- 4 -

if the participant's last such service before July 1, 1985 was for a Construction Employer.

## B. When Retirement Occurs

For the purposes of this Plan, in the case of any Participant, retirement shall be considered to occur on the last day of credited service, within the meaning of Article IV C(8), provided that on such day he was eligible for an immediate or deferred pension under this Plan.

## C. Attainment of Age

For the purposes of this Plan, a Participant shall be deemed to have attained an age as of 12:01 A.M. on the respective anniversary date of the Participant's birth.

## ARTICLE II - ELIGIBILITY

### A. Age 55 Retirement

Any Participant who (a) has at least 10 years of signatory service or at least twenty years of credited service, including the required amount of signatory service as set forth in Article IV(C)(6), and (b) has attained the age of 55 years (but not the age of 62) prior to retirement shall be eligible to retire on or after February 1, 1988, and shall upon his retirement (hereinafter "Age 55 Retirement") be eligible for a pension.

### B. Normal Retirement

(1) Any Participant shall be eligible to retire on or after February 1, 1988, and shall upon his retirement (hereinafter "Normal Retirement") be eligible for a pension, provided such Participant has attained the normal retirement date which shall be the earlier of —

(a) a Participant's attainment of age 62 years and completion of at least 10 years of signatory service or at least 20 years of credited service, including the required amount of signatory service as set forth in Article IV(C)(6), or

(b) the later of —

(i) the time a Participant attains age 62, or
(ii) the 10th anniversary of the time the Participant became employed in signatory service.

(2) In determining the time the Participant became employed in signatory service (for purposes of Article II(B)(1)(b)(ii)), any employment of a Participant in signatory service who is not entitled to a pension under Article II (A) or (E) (Age 55 Retirement or Deferred Vested Retirement) shall be disregarded if it precedes a period of consecutive one-year breaks in signatory service and the number of consecutive one-year breaks in signatory service equals or exceeds the greater of

(a) five, or

(b) the aggregate number of years of signatory service before such breaks.

In addition to the foregoing, any employment prior to a period of consecutive one-year breaks in signatory service shall be disregarded unless the Employee completes 1,000 hours of signatory service within a 12-month period after the breaks in signatory service. Such aggregate-number of years of signatory service before any period of consecutive one-year breaks in signatory service shall be deemed not to include any years of signatory service not required to be taken into account under this subparagraph by reason of any prior break in signatory service. For purposes of this Article II(B)(1)(b)(ii), a year of signatory service shall be calculated on the basis of a calendar year and in the manner specified in Article IV; a break in signatory service shall be defined in accordance with the terms of Article II(G)(3); and nonclassified signatory service shall be disregarded unless it immediately precedes or follows classified signatory service with the same Employer.

### C.  Disability Retirement

A Participant who (a) has at least 10 years of signatory service prior to retirement, and (b) becomes totally disabled as a result of a mine accident occurring on or after February 1, 1988, shall, upon retirement (hereinafter "Disability Retirement"), be eligible for a pension while so disabled. A Participant shall be considered to be totally disabled only if by reason of such accident such Participant is subsequently determined to be eligible for Social Security Disability Insurance Benefits under Title II of the Social Security Act or its successor.

When a Participant who has been receiving a disability pension under this Section C recovers sufficiently to become ineligible for Social Security disability benefits or is disqualified because of earnings, the Trustees shall implement procedures to determine the Participant's ability to perform classified work in the industry. The continuance of a disability pension shall be based on medical evidence that supports the Participant's inability to be employed in classified work in the industry.

If such Participant is medically certified able to perform classified work in the industry, he will no longer be eligible for a disability pension.

### D.  Minimum Disability Retirement

Any Participant who (a) has less than 10 years of signatory service prior to retirement and (b) becomes totally disabled as a result of a mine accident occurring on or after February 1, 1988, shall, upon retirement (hereinafter "Minimum Disability Retirement") be eligible for a pension while so disabled. A Participant shall be considered to be totally disabled only if by reason of such accident such Participant is subsequently determined to be eligible for Social Security Disability Insurance Benefits under Title II of the Social Security Act or its successor.

When a Participant who has been receiving a disability pension under this Section D recovers sufficiently to become ineligible for Social Security disability benefits or is disqualified because of earnings, the Trustees shall implement procedures to determine the Participant's ability to perform classified work in the industry. The continuance of a disability pension shall be based on medical evidence that supports the Participant's inability to be employed in classified work in the industry.

If such Participant is medically certified able to perform classified work in the industry, such Participant will no longer be eligible for a disability pension.

### E. Deferred Vested Retirement

(1) Any Participant who ceases working in a classified job for an Employer for any reason, except as provided in (2) below, and who is not eligible to receive a pension under any other provision of this Article II, shall be eligible for a pension (hereinafter "Deferred Vested Pension"), upon attaining age 62, or at the election of the Participant, such Participant shall be eligible for a reduced pension beginning at any time after attaining age 55, provided

(a) the Participant's last day of Credited Service is on or after February 1, 1988, but prior to the attainment of age 55; and

(b) the Participant has

(i) at least 10 years of signatory service, or

(ii) at least 20 years of Credited Service as set forth in Article IV(C)(6).

(2) Any Participant who ceases working in a classified job for an Employer, who is not eligible to receive a pension under any other provision of this Article II, shall be eligible for a pension (hereinafter "Deferred Vested Pension - Special") upon attaining age 62, or at the election of the Participant, such Participant shall be eligible for a reduced pension beginning at any time after attaining age 55, calculated pursuant to Article III A(5)(b), provided

(a) the Participant's last day of Credited Service is on or after February 1, 1988, but prior to attainment of age 55;

(b) had 20 years of signatory service on the date last worked;

(c) had attained the age of 50 on the date last worked; and either

(d) had been laid off and had not refused recall to the mine from which the Participant was laid off; or

(e) had been terminated under Article III, Section (j) of the Wage Agreement (or if the Participant had not been terminated, there had been a deterioration in physical condition which prevented the Participant from performing the Participant's regular work as determined by a panel of three physicians, if the degree of physical deterioration is disputed by the Trustees) and was not employed in the coal industry thereafter.

Within a reasonable period of time after such Participant's employment has ceased, an appropriate written notice of eligibility and other relevant data will be provided.

### F. Nonduplication

(1) A Participant shall be entitled to receive a pension under only one of

the foregoing paragraphs of this Article II with respect to any retirement.

(2) Except as provided in paragraph (C), (D), or (F)(3) of this Article II, any person whose retirement occurs on or before December 31, 1975, shall not be entitled to receive pension benefits under this Plan, but shall be entitled only to receive such benefits as may be provided under the 1950 Pension Plan. ——

(3) Any person who (a) retires on or before December 31, 1975, (b) at the time of retirement is entitled to, or, upon attaining age 55 would be entitled to, a pension benefit under the 1950 Pension Plan, and (c) is again employed for at least 250 hours in a classified job for an Employer after December 31, 1975, shall upon subsequent retirement (or, if later, upon attaining age 55) be eligible for a pension only under this Plan and not under the 1950 Pension Plan, in the amount hereinafter specified. The amount of pension for a Participant described in this paragraph shall be the sum of the amount of pension to which such Participant would be entitled upon attaining age 55 under the 1950 Pension Plan if he had not been employed in a classified job for an Employer after December 31, 1975, plus the excess of (i) over (ii) where (i) is the pension to which such Participant would be entitled except for this paragraph under Article III(A)(2) or III(B)(2) based upon all years of Credited Service under this Plan and (ii) is the pension to which such Participant would be entitled under Article III(A)(2) or III(B)(2) based solely on his Credited Service prior to December 31, 1975.

G. Employment for Vesting Purposes

(1) For purposes of this Article II, all years of classified service by a Participant with Employers signatory to the bituminous coal wage agreement then in effect shall be used for purposes of any eligibility requirement of minimum signatory service under this Article. A year of service shall be calculated on the basis of a calendar year and in accordance with the terms of Article IV(A).

(2) For purposes of this Article II. years of nonclassified signatory service in the coal industry by a Participant after May 28, 1946, for Employers signatory to the bituminous coal wage agreement then in effect shall be used for purposes of any eligibility requirement of minimum signatory service provided that:

(a) the nonclassified signatory service with an Employer immediately preceded or followed classified signatory service with the same Employer;

(b) credit for nonclassified service shall not be given for any calendar year in which the Participant completed less than 1,000 hours of such service, as defined under Article I(A)(7);

(c) all years of service before age 18 shall be disregarded;

(d) all years of service performed before January 1, 1971, shall be disregarded unless the Participant completed at least three years of employment after December 31, 1970;

Provided further that, if the employee has not earned a non-forfeitable right to a pension:

- 8 -

(e) all years of service prior to a break in service shall be disregarded unless the employee completes 1,000 hours of service within a 12-month period after the break;

(f) all years of service prior to any period of consecutive one-year breaks in service shall be disregarded if the number of such consecutive one-year breaks equals or exceeds the greater of (i) five, or (ii) the aggregate number of years of service before such breaks. Such aggregate number of years of service before such breaks shall be deemed not to include any years of service not required to be taken into account under this subparagraph by reason of any prior break in service.

(3) For purposes of Article II(G)(2) and II(B)(2), an employee shall incur a break in service for any calendar year in which such Employee completes not more than 500 hours of service; provided that, in the case of an Employee who is absent from work for any period —

(a) by reason of the pregnancy of the Employee,

(b) by reason of the birth of a child of the Employee,

(c) by reason of the placement of a child with the Employee in connection with the adoption of such child by such Employee, or

(d) for purposes of caring for such child for a period beginning immediately following such birth or placement,

the Employee shall be considered to have completed the hours of service which otherwise would normally have been credited to him but for such absence, subject to the limitation set forth in Article I A(8)(1). The preceding sentence shall be applicable only in the year in which the Employee's absence from work begins, if the Employee would be prevented from incurring a one-year break in service in such year solely because of the application of the preceding sentence, or in any other case, in the immediately following year. No credit will be given to an Employee pursuant to this subparagraph unless the Employee furnishes to the Trustees such timely information as they may reasonably require to establish that the absence from work is for reasons referred to in (a), (b), (c), or (d) above, and the number of days for which there was such an absence.

(4) The provisions of this paragraph shall be interpreted and construed in accordance with the requirements of ERISA and the regulations issued thereunder.

(5) Service after June 30, 1985 with a Construction Employer shall be used for purposes of paragraph G(1), only if the United Mine Workers of America 1985 Construction Workers Pension Plan grants participants credit for the same purposes under that plan for service with Employers, other than Construction Employers, except that a year of service shall be calculated on the basis of a calendar year and in accordance with the terms of Article IV.

ARTICLE III - AMOUNT OF PENSION

A.  Retirement On or After February 1, 1988

A pension granted to a Participant who retires on or after February 1,

1988, pursuant to Article II shall consist of a pension amount payable in monthly installments provided in accordance with the provisions of this Article III as set forth below. In no event, however, shall the annual retirement benefit payable to a Participant exceed the limitation of Section 415 of the Internal Revenue Code of 1986 and any regulations promulgated thereunder.

(1) Age 55 Retirement Pension

(a) A deferred pension, commencing after attainment of age 62, computed under the provisions of paragraph 2 below; or, at the election of the Participant, (b) an immediate pension, equal to the deferred pension to which the Participant could have been eligible under (a) above had the Participant so elected, reduced by 1/4 of one percent (1%) for each full month (3 percent (3%) per year) between the date on which pension benefits began and the date on which Participant attains age 62.

(2) Normal Retirement Pension

For retirements occurring during the 1988 Wage Agreement the amount of pension for Normal Retirement shall be determined as follows:

(a) for each year of credited non-signatory service as defined herein, $7.50 per month;

(b) for each of the first 10 years of credited signatory service earned prior to February 1, 1989, $20.00 per month;

(c) for each year of credited signatory service in excess of 10 years but not to exceed 20 years earned prior to February 1, 1989, $20.50 per month;

(d) for each year of credited signatory service in excess of 20 years but not to exceed 30 years earned prior to February 1, 1989, $21.00 per month;

(e) for each year of credited signatory service in excess of 30 years earned prior to February 1, 1989. $21.50 per month.

(f) The retirement benefit for a year of credited signatory service earned from February 1, 1989 to January 31, 1990, is $27.50 per month.

(g) The retirement benefit for each year of credited signatory service earned after February 1, 1990, is $32.00 per month.

Proportional credit shall be allowed for any fractional years of credited service pursuant to Article IV hereof. Periods of Construction Industry Service shall be taken into account solely to determine whether the amount specified in clause (a), (b), (c), (d), or (e) is to be used in determining the amount of pension that is earned for a given period of Credited Service. In any year for which two of clauses (a), (b), (c), (d), or (e) would apply, if a Participant has both Credited Service and Construction Industry Service, the amount determined under each clause shall be equal to the amount that would be determined if Construction Industry Service in that year were considered service under this Plan, multiplied by a fraction, the numerator of which is the Participant's hours of service under this Plan for that year and the denominator of which is the sum of hours and the Participant's hours of Construction Service for that year.

(3) Disability Retirement Pension

Subject to (4) below for a Participant whose disabling accident occurs

after February 1, 1988, the pension payment shall be computed under the provisions of paragraph (2) above.  In the case of a participant who has both Construction Industry Service and Credited Service, the amount of pension under this subparagraph (3) shall be based only on the Participant's years of Credited Service and shall be determined in the same manner as under Article III.A.(2).

(4)  <u>Minimum Disability Retirement Pension</u>

Effective February 1, 1988, the amount of pension for Minimum Disability Retirement shall be $190 per month and $200 per month for disabilities occurring on or after February 1, 1990.  In any case in which a participant entitled to pension for Minimum Disability Retirement has both Credited Service and Construction Service, the amount of pension under this subparagraph (4) shall be equal to the amount otherwise payable under this subparagraph, multiplied by a fraction, the numerator of which is the number of years of Credited Service and the denominator of which is the sum of the number of years of Credited Service and the number of years of Construction Industry Service.

(5)  <u>Deferred Vested Pension</u>

(a) The amount of a deferred vested pension (Article II E(1) shall be a pension, commencing on or after attainment of age 62, computed under the provisions of Subsection A(2) of this Article III, or, at the Participant's election, between ages 55 and 62 with the pension payable reduced to its actuarial equivalent pursuant to Appendix A; provided, however, that in the case of any Participant with at least (20) years of credited service, such pension shall not be reduced to less than $150.00 per month.

(b) The amount of a deferred vested pension (Article II E(2)) shall be a pension, commencing on or after attainment of age 62, computed under the provisions of Subsection A(2) of this Article III, or, at the Participant's election, between ages 55 and 62 with the pension computed under the provisions of Subsection A(1) of this Article III.

B.  <u>Increased Pension</u>

(1) The pension of any Participant who retired prior to February 1, 1988, on other than a minimum disability pension shall be increased effective February 1, 1988, by $20 per month and shall be further increased by $10 per month effective February 1, 1990.

(2) The pension of any Participant who retired prior to February 1, 1988, on a minimum disability pension shall be increased effective February 1, 1988, to $190.00 per month, and shall be further increased effective February 1, 1990, to $200.00 per month.

(3) Surviving Spouse Benefit of a 1974 pensioner who died prior to February 1, 1988 is increased effective February 1, 1988 by adding $10.00 to the current benefit and multiplying that sum by 1.5.  Effective February 1, 1990, Surviving Spouse Benefit of a pensioner who died prior to February 1, 1988 is increased by calculating the benefit without regard to the previous sentence, adding $15.00, and multiplying that sum by 1.5.

(4) Except as provided in (5) below, increases in pensions are not

applicable to Participants whose employment was terminated prior to February 1, 1988, and who will become eligible for only a deferred vested pension (II E(1))

(5) Any Participant who retired prior to the effective date of the 1981 Wage Agreement, is eligible to receive a deferred vested pension under this Plan and satisfies the criteria in Article II E(2), shall have his pension recomputed pursuant to the provisions of Subsection A(2) of this Article III (3% reduction) but based on the maximum benefit formula in effect at his retirement. Such Participant shall have his pension increased by any increases applicable to Age 55 Retirement which occurred after the date of his retirement and application for pension. Any increase under this paragraph shall be applied prospectively only.

C.  **Application for Pension and Commencement, Suspension and Termination of Pensions**

Payments of pensions shall be subject to the following:

(1) The first payment on any pension shall be made as soon as possible after an application for pension has been received and shall be for the month following the month in which the Participant retires (Article I B) and becomes eligible for a pension in accordance with Article II; provided, however, that in the case of a deferred pension pursuant to Article III(A)(1) or a deferred vested pension pursuant to Article III(A)(5), such payment shall be for the later of (a) the month specified by the Participant in his application for pension if such month is subsequent to the month in which such Participant attains age 55, or (b) the month in which the application for pension is received, but not later than the month following the month in which such Participant attains age 62.

(2) The last payment shall be for the month in which the pensioner dies.

(3) Pension payments shall be payable on the first day of each month at the pensioner's last address of record.

(4) Pension payments shall be suspended for any month in which the pensioner is employed, subsequent to commencement of such payments, in the bituminous coal industry, in the same trade or craft (trade or craft shall mean the coal mining industry), and in the same geographic area covered by this Plan. The provisions of this paragraph shall be interpreted in accordance with any regulations issued pursuant to Sections 203(a)(3) and (B) of ERISA.

(5) Any Participant who continues to be employed by an Employer after retirement shall not be entitled to receive pension benefits under this Plan until such time as such Participant is no longer employed by an Employer; provided, however, that benefit payments shall commence not later than April 1 of the calendar year following the calendar year in which the Participant attains age 70-1/2.

ARTICLE IV - CREDITED SERVICE

A.  Nonsignatory Service

Subject to the limitations in paragraph C of this Article IV, credited

service is a period during which the participant meets the requirements of subparagraphs (1), (2), (3) or (4) below. Any credited service shall be nonsignatory service unless it qualifies as signatory service pursuant to Article IV(B) hereof.

(1) A Participant shall receive credit for a year of service for any calendar year in which he worked, subsequent to December 31, 1936, as an employee in a job classified in the then existing bituminous coal wage agreement for an employer in the coal industry for at least 1,000 hours of service, with credit given for the next lowest 1/4 year in the event any employee works less than 1,000 hours of service as follows:

| | |
|---|---|
| 750-999 hours, | 3/4 year |
| 500-749 hours, | 1/2 year |
| 250-499 hours, | 1/4 year |
| 249 hours or less, | 0 |

With respect to any period of such service for which records of hours of service are not available or it is not feasible in light of the administrative and cost difficulties involved to compile a record of service, an applicant shall be deemed to have worked a thousand hours of service if the employee received wages in an amount equal to the product of (i) the lesser of 125 days or 1/2 the average number of days the bituminous mines in the United States were active, multiplied by (ii) the daily basic rate paid in the bituminous coal industry for that year; provided that for any year for which information is not available as to the average number of days the mines were active, the available data for the nearest year next preceding shall be used; provided further that if an applicant earned less than the minimum amount required for a year of service, credit for service shall be given to the next lowest 1/4 year in the manner indicated with respect to hours of service.

(2) A Participant shall receive credit for a year of service for any calendar year in which the Participant worked, prior to January 1, 1937, as an employee in a job classified in the then existing coal wage agreement for an Employer in the bituminous coal industry, in a minimum of at least six (6) months during a calendar year, provided that if the applicant worked in less than six (6) months, credit for service shall be awarded to the next lowest one-fourth (1/4) year, based upon service in six (6) months equalling a year's service.

(3) A Participant shall receive credit for a year of service for any calendar year in which the Participant received state worker's compensation payments pursuant to an award as a result of an occupational disease or injury sustained in the mine while regularly employed in a classified job under the bituminous coal wage agreement then in effect; provided, in the case of occupational disease, the Participant had been so employed by an Employer signatory to the Wage Agreement then in effect for at least ten (10) years after May 28, 1946. Credit shall be given up to a maximum of four (4) years service credit from date of injury, or from the date of last employment in case of occupational disease, provided the Participant did not work regularly (earned at least $200 per month) during the compensable period. Benefits awarded pursuant to the Federal Coal Mine Health and Safety Act of 1969 shall be deemed "state worker's compensation payments" within the meaning of this section, only if the miner was last regularly employed in the coal industry after the enactment date of the Act, December 30, 1969, in a classified job

under the bituminous coal wage agreement then in effect, and had been so employed by an operator signatory to the agreement for at least ten (10) years after May 28, 1946. In no event shall any service be credited under this paragraph (3) with respect to periods after December 6, 1974.

(4) A Participant shall receive credit for a year of service for any year-served in the military service of the United States in any war, national emergency, or international police action, immediately following regular employment in a classified job under the bituminous coal wage agreement then in effect, provided that credit for such service shall be limited to the original period of enlistment or obligated military service; and provided further that the Participant returned to work in a classified job within twelve (12) months after his date of separation from the military service, unless he was precluded from doing so by service connected sickness, accident, or other disability, and returns to work in a classified job when no longer precluded by such disability. Service credit for the period of military service shall be computed in the same manner as credit is computed for service prior to 1937, as described in paragraph A(2) hereof.

B. Signatory Service

Credited signatory service is:

(1)(a) For any calendar year prior to January 1, 1978, service as defined in paragraph A(1) hereof during which a Participant worked as an employee in a classified job for an Employer signatory to the bituminous coal wage agreement then in effect.

(b) For purposes of determining eligibility for a pension (vesting) under Article II, service for any calendar year subsequent to December 31, 1977 during which a Participant works as an employee in a classified job for an Employer signatory to the bituminous coal wage agreement then in effect, computed based on hours of service as defined in Article I A(10) as follows:

| Hours of Service During a Calendar Year as a Classified Employee for a Signatory Employer | Percentage of a Year of Credited Signatory Service |
|---|---|
| 249 or less | 0% |
| 250 - 499 | 25% |
| 500 - 749 | 50% |
| 750 - 999 | 75% |
| 1,000 or more | 100% |

(c) For purposes of determining the amount of pension, under Article III, service for any calendar year subsequent to December 31, 1977, during which a Participant works as an employee in a classified job for an Employer signatory to the bituminous coal wage agreement then in effect, computed based on hours worked as defined in Article I A(12) as follows:

- 14 -

| Hours Worked During a Calendar Year as a Classified Employee for a Signatory Employer | Percentage of a Year of Credited Signatory Service |
|---|---|
| 249 or less | 0% |
| 250 - 499 | 25% |
| 500 - 749 | 50% |
| 750 - 999 | 75% |
| 1,000 or more | 100% |

(2) Service prior to December 6, 1974, as defined in paragraph A(3) hereof during which a Participant received state worker's compensation payments if such payments are pursuant to an award as a result of an occupational disease or injury awarded after May 28, 1946, and if the Participant was last regularly employed prior to such service as an employee in a classified job for an Employer signatory to the bituminous coal wage agreement then in effect.

(3) Service, at a rate of 8 hours for each regularly scheduled work day, during which a Participant receives or is eligible to receive weekly Sickness and Accident Benefits pursuant to Article XI of the National Bituminous Coal Wage Agreement of 1974, as amended from time to time, and any successor agreements thereto.

(4) A Participant who retires on or after March 27, 1978, shall receive credit for a year of service for any calendar year (including calendar years prior to 1978) in which he rendered service as an employee of the United Mine Workers of America (UMWA) in the coal industry immediately following regular employment in a classified job under the bituminous coal wage agreement then in effect; provided that the Participant does not, or is not eligible to, receive a pension or other retirement income from the UMWA. Credit or service with the UMWA shall be computed in the same manner as:

(a) credit is computed for service prior to 1937, as described in paragraph A(2) hereof, or

(b) credit is computed for service under the pension plan of the UMWA, whichever is greater, for service prior to January 1, 1978.

Credit for service after December 31, 1977, shall be computed in the same manner as credit is computed for service under the pension plan of the UMWA.

In no event shall a Participant receive credit under this paragraph (4) while receiving a pension under this Plan.

Notwithstanding anything in this paragraph (4) to the contrary, a Participant,

(a) who is not employed in a classified job for an Employer on March 27, 1978, or

(b) who is not employed by the UMWA on March 27, 1978, or

(c) who had retired prior to March 27, 1978, and was eligible to receive, or upon application would have been eligible to receive, a pension under the 1950 Pension Plan, the 1974 Pension Plan or a retirement plan of the UMWA prior to March 27, 1978,

- 15 -

shall not receive signatory service credit for the years of UMWA employment described above if it occurred prior to March 27, 1978, unless such Participant is re-employed in a classified job and

(1) obtains at least 3 years of credited service after March 27, 1978, or

(2) ceases to be employed in the classified job or employed by the UMWA as the result of
(i) nonoccupational disability or accident

(ii) occupational injury for which the Participant receives worker's compensation, or

(3) dies after March 27, 1978 at a time when the Participant is employed in a classified job for an Employer or when employed by the UMWA.

(5) Service as defined in paragraph A(4) hereof during which a Participant served in the military service of the United States, provided that the classified employment referred to therein (both before and after military service) is for an Employer signatory to the bituminous coal wage agreement then in effect and provided further, however, that for military service credited after December 31, 1974, the Participant returned to work in a classified job within ninety (90) days after the date of separation from the military service or such longer period as may be allowed by law.

(6) Service (within the meaning of paragraph A(1) hereof) by an employee in a classified job for an Employer not signatory to the bituminous coal wage agreement then in effect if (i) such service is continuous, (ii) such Employer becomes a signatory to the bituminous coal wage agreement after the effective date as a result of recognizing the UMWA as the bargaining representative of its employees, (iii) the employee is working in a classified job with such Employer at the time such Employer becomes signatory to the bituminous coal wage agreement, and (iv) such employee remains in a classified job with such Employer during the twenty-four month period immediately following the date on which such Employer becomes signatory to the bituminous coal wage agreement; provided, however, that not more than ten (10) years of nonsignatory service may be recognized or awarded as signatory service to any person pursuant to this paragraph (6).

C.    Additional Rules Concerning Credited Service

(1) Except as provided in Article IV(B)(6), employment after April 1, 1971, will not constitute credited service under paragraph A(1) hereof unless such employment was in a classified job for an Employer.

(2) A Participant shall not be credited with more than one year of service for any calendar year by reason of any combination of the rules of this Article IV.

(3) The maximum number of years of nonsignatory service which may be included in the credited service of any Participant retiring after December 31, 1981 shall be the number of years by which twenty years exceeds such Participant's signatory service, but not in excess of ten years.

(4) No credit for service shall be awarded a Participant for any period in which such Participant was directly connected with the ownership, operation or management of a mine; provided, however, that in the case of any Participant who received credit for such service before July 1, 1974, under the terms of the pension plan program established under the United Mine Workers of America Welfare and Retirement Fund of 1950, credit shall be awarded for any period prior to July 1, 1975, in which the Participant worked as an employee in a classified job in a mine in which such Participant had no controlling interest, as a member of a cooperative or gang-working crew which shared the profits and losses, and which was operated under the bituminous coal wage agreement then in effect; and provided further, that in the case of a Participant who received credit for service before July 1, 1974, under the terms of the pension plan program established under the United Mine Workers of America Welfare and Retirement Fund of 1950, credit for signatory service shall be awarded for any period prior to July 1, 1975, during which such Participant worked in a classified job pursuant to an agreement to produce coal for a signatory coal company which exercised control over the operation of the mine and was responsible for royalty payments on such coal produced to the 1974 Pension Trust or its predecessor.

(5) The following maximum years of nonsignatory service may be included in credited service under this Plan:

| Date of Retirement | Maximum Years of Nonsignatory Service |
|---|---|
| January 1, 1978 to December 31, 1978 | 13 |
| January 1, 1979 December 31, 1979 | 12 |
| January 1, 1980 to December 31, 1980 | 11 |
| January 1, 1981 and thereafter | 10 |

(6) A Participant with less than ten years of signatory service shall not be entitled to receive a pension under paragraph (A), (B), or (E) of Article II unless such Participant has at least twenty years of credited service, including at least the following minimum number of years of signatory service:

| Date of Retirement | Years of Signatory Service Required |
|---|---|
| January 1, 1978 to December 31, 1978 | Seven (7) years |
| January 1, 1979 to December 31, 1979 | Eight (8) years |
| January 1, 1980 to December 31, 1980 | Nine (9) years |
| January 1, 1981 and thereafter | Ten (10) years |

(7) Except as provided in Article V, service credits shall not be accrued subsequent to the effective date of pension payments.

(8) In the case of any Participant, except a Participant covered under Article IV B(4), the last day of credited service shall be the last day on which the Participant works as an employee in a classified job for an Employer, unless such Participant continues to accrue credited service during the period for which such Participant receives or is eligible to receive weekly sickness and accident benefit pursuant to Article XI of the Wage Agreement, in which case the last day of credited service shall be the last day for which such sickness and accident benefits are paid or would have been paid. For a Participant covered under Article IV B(4), the last day of credited service shall be the later of the last day as determined in the preceding sentence or the last day the Participant worked for the UMWA.

(9) An employee who is regularly employed in a classified job for an Employer and who performs supervisory duties on a temporary basis for not more than 120 work days during any consecutive period of 12 months, shall be deemed to be employed in a classified job during the days on which the Participant performs such supervisory duties.

D. Construction Industry Service

(1) Notwithstanding anything to the contrary, and except for purposes of Article II.C and II.D and as provided by Article II.G, no Construction Industry Service of a Participant shall be considered Credited Service under this Plan.

(2) In any case in which a Participant has both Construction Industry Service and at least one hour of service creditable under paragraphs B or C of this Article for any year beginning after December 31, 1985, the Participant's Credited Service for that year shall be determined by multiplying the Credited Service the Participant would be entitled to if Construction Industry Service were considered service under this Article by a fraction, the numerator of which is the Participant's hours of service creditable under this Article for that year and the denominator of which is the sum of such hours and the Participant's hours of Construction Industry Service for that year.

(3) In any case in which, after June 30, 1985, and before January 1, 1986, a Participant has both Construction Industry Service and at least one hour of service creditable under the provisions of paragraphs B or C of this Article, the Participant's Credited Service for that year shall be equal to the sum of his Credited Service for the period beginning January 1, 1985, and ending June 30 1985, and a fraction of what his Credited Service would be for the period beginning July 1, 1985 and ending December 31, 1985, if Construction Industry Service were considered service under this Article. Such fraction is determined by dividing the Participant's hours of service under paragraphs B and C of this Article by the sum of such hours of service and the Participant's hours of Construction Industry Service.

(4) Notwithstanding subparagraph D.(2) or D.(3), the Credited Service of of a Participant for a year in which either subparagraph applies shall not exceed one minus the portion of a year for which the Participant receives credit for accrual purposes under the United Mine Workers of America Construction Workers Pension Plan. If, in any year, a Participant receives one year of credit for accrual purposes under the United Mine Workers of America

Construction Workers Pension Plan, he shall not be entitled to any Credited Service for such year.

ARTICLE V - <u>REEMPLOYMENT AFTER ATTAINMENT OF PENSION ELIGIBILITY</u>

A.  Any Participant who has been retired and receiving a pension under this Plan and who shall be reemployed in a classified job by an Employer shall, for the purpose of calculating any subsequent pension benefits to which such Participant may become entitled, upon subsequent retirement, be granted a pension equal to the sum of the pension such Participant was previously receiving plus the excess of (i) over (ii) where (i) is the pension to which such Participant would be entitled at the time of such retirement, based upon all years of Credited Service under the Plan and (ii) is the pension to which such Participant would be entitled at the time of such retirement, based solely on Credited Service at the time of his previous retirement.

B.  Any Participant eligible for a deferred vested pension under this Plan whose shall be reemployed in a classified job by an Employer prior to the commencement of pension benefit shall, for the purpose of calculating any subsequent pension benefits to which he may become entitled, be granted his credited service applicable to the deferred vested pension plus his credited service accrued after such reemployment.

C.  Any Participant who is reemployed in a classified job by an Employer after attainment of eligibility for a deferred vested pension under this Plan, whose employment is subsequently terminated and who at that time is not eligible for a pension under any provision of Article II by reason of Article IV(C)(6), shall be considered to be eligible for the deferred vested pension for which such Participant was eligible prior to such reemployment and upon application for pension the date of retirement shall be considered to be the date of retirement which would, upon application for pension, have been applicable to the deferred vested pension for which such Participant was eligible prior to such reemployment.

ARTICLE VI - <u>SURVIVING SPOUSE BENEFIT</u>

A.  (1) Except as provided in paragraph (B) of this Article, a Surviving Spouse Benefit is provided for any Participant who (a) has retired and is receiving a pension under this Plan, except a Participant receiving a deferred vested pension who has not completed at least twenty years of credited service, (b) has not retired but at the date of his death otherwise met the eligibility requirements for an immediate pension under Article II(A), (B), (C) or (D) under this Plan, or (c) has attained age 55 with at least twenty years of credited service and who has retired and is entitled to elect an immediate pension under Article II(A), II(B) or II(E) at the date of death.

(2) The amount of such benefit shall be equal to 75% of the amount of the Participant's pension at the time of death or, in the event the Participant dies after age 55 at a time when such Participant was eligible to elect a pension or to retire and receive a pension under Article II, but prior to the receipt of a pension, 75% of the amount of the pension such Participant would have received if such Participant had elected a pension or retired and become entitled to a pension as of the date immediately preceding the date of death.

(3) The Surviving Spouse Benefit will not be effective unless the Participant and the spouse have been married throughout the nine-month period ending on the date of the Participant's death or unless such nine-month requirement would be waived for purposes of determining entitlement to widow's or widower's insurance benefits under the Social Security Act.

(4) Payment to an eligible spouse will commence as of the first of the month following the month in which the Participant's death occurs and the final payment shall be made for the month in which the spouse's death occurs.

B.   (1) Any Participant who is not employed in a classified job for an Employer on December 6, 1974, is not covered for a Surviving Spouse Benefit under this Article unless such Participant (a) obtains at least three years of credited service after such date, or (b) had ceased to be employed in a classified job as a result of (i) layoff, (ii) nonoccupational disability or accident, or (iii) occupational injury for which such Participant was receiving workers' compensation, or (c) such Participant dies at a time when he is employed in a classified job for an Employer.

(2) Any Participant who retires on or before December 31, 1975, and is again employed in a classified job for an Employer after such retirement, is not covered for a Surviving Spouse Benefit under this Article unless (a) such Participant obtains at least three years of credited service after such reemployment or (b) unless such reemployment ceases as a result of (i) layoff, (ii) nonoccupational disability or accident, or (iii) occupational injury for which worker's compensation benefits were awarded, or (c) such Participant dies while employed in a classified job for an Employer.

## ARTICLE VII - JOINT AND SURVIVOR ANNUITIES

A. Notwithstanding any other provision of this Plan, if a Participant qualifies for a pension under this Plan, but is not covered by a Surviving Spouse Benefit, the Pension benefit otherwise provided to such Participant shall be reduced actuarially pursuant to Appendix B, and 50% of such reduced pension benefit will be continued, after the death of the Participant, for the life of any qualified surviving spouse; provided, however, that such Participant may elect, within the election period specified in Paragraph C(1) below, and subject to the requirement of Paragraph D below, not to take a joint and survivor annuity as provided for in this Article and instead to receive a pension benefit for life only.

B.   If a Participant has completed 10 years of signatory service for vesting purposes, calculated pursuant to Article II (G), is not covered by a Surviving Spouse Benefit, and dies before he is entitled to elect or elects to receive a pension benefit, the qualified surviving spouse shall be entitled to receive a survivor's benefit in the form of an annuity for life in an amount equal to 75% of the pension benefit the decedent would have received if the decedent had --

(1) separated from service on the date of death,

(2) survived to age 55 (in the case of a decedent who died before attaining age 55),

(3) retired with an immediate Joint and Survivor Annuity as provided for in this Article at age 55 (or, if later on the day before the decedent's date of death), and

(4) died on the day after the day on which the decedent would have attained age 55 (in the case of a decedent who died before attaining age 55).

Payment to a qualified spouse under this paragraph will commence on the first of the month following the month in which the decedent would have attained age 55 (or, if later, the first of the month following the month of the decedent's death) and the final payment shall be for the month in which the spouse's death occurs.

C. (1) The "election period" in the case of an election to waive the Joint and Survivor Annuity described in Paragraph A shall be the 180-day period ending on the date of the commencement of benefits. Prior to the election period, the Trustees shall furnish the Participant (a) a general description or explanation of the qualified Joint and Survivor Annuity, the circumstances in which it will be provided unless the Participant elects not to have benefits provided in that form, the availability of such election and the right to revoke such election, and the rights of the Participant's spouse; and (b) a general explanation of the relative financial effect of such election on the Participant's pension. In the event a Participant elects not to receive a Joint and Survivor Annuity, such election shall not become effective if the Participant dies within a period of two years beginning on the date of such election.

(2) A Participant may revoke any election made pursuant to this Article at any time during the applicable election period.

D. An election made under this Article shall not take effect unless—

(1) the spouse of the Participant consents in writing to such election, and the spouse's consent acknowledges the effect of such election and is witnessed by a Plan representative or a notary public, or

(2) it is established to the satisfaction of the Trustees that the consent required under subparagraph (1) may not be obtained because there is no spouse, because the spouse cannot be located, or because of such other circumstances as the Trustees may by law consider.

E. A qualified surviving spouse shall be any spouse who has been married to the Participant for at least nine months prior to death, unless such nine-month requirement would be waived for purposes of determining entitlement to widow or widower's insurance benefits under the Social Security Act.

F. Except as provided in Paragraph B above, payment to a qualified surviving spouse under this Article will commence as of the first of the month following the month in which the Participant's death occurs, and the final payment shall be made for the month in which the spouse's death occurs.

ARTICLE VIII - MISCELLANEOUS

A. Determination of Eligibility

The Trustees or such other named fiduciaries as may be properly designated

shall have full and final determination as to all issues concerning eligibility for benefits.

### B. General

(1) The Trustees are authorized to promulgate rules and regulations to implement this Plan, and those rules and regulations shall be binding upon all persons dealing with and Participants claiming benefits under this Plan.

(2) No benefit payable under this Plan shall be subject in any way to alienation, sale, transfer, assignment, pledge, attachments, garnishments, execution or encumbrance of any kind, and any attempt to accomplish the same shall be void. Notwithstanding the foregoing, the Plan shall comply with any qualified domestic relations order, as that term is defined in ERISA.

(3) The Employers and the Union, by joint action, reserve the right at any time and from time to time to modify or amend in whole or in part any or all of the provisions of this instrument or to terminate this Plan, without reopening or otherwise affecting the integrity of any other provision of the Wage Agreement, by a written agreement between the Employers and the Union, provided, however, that:

(a) this Plan shall not be amended in such manner as would cause or permit any part of the assets in the 1974 Pension Trust to be diverted to purposes other than the exclusive benefit of the Participants and their beneficiaries;

(b) this Plan shall not be amended to deny to a Participant retroactively any benefits to which such Participant was entitled under this Plan, unless such amendment is necessary to conform this Plan to, or to satisfy the conditions of, any law, governmental regulations or ruling; and

(c) the Employers and the Union have delegated to the Trustees the authority and responsibility to make certain changes and amendments as set forth in Article XX(g)(4) of the National Bituminous Coal Wage Agreement of 1988, as amended from time to time, and any successor agreements to that specific Agreement.

(4) Upon the termination of this Plan or the complete discontinuance of contributions to the 1974 Pension Trust, this Plan shall remain in force and effect for the period necessary to complete the payment of benefits in accordance with the terms of this Plan to the extent assets in the 1974 Pension Trust are available to pay such benefits.

(5) Forfeitures arising from the operation of the Plan shall not be used to increase the benefits which otherwise would be received under this Plan.

(6) Any Participant or beneficiary whose claim for benefits under this Plan has been denied shall be (a) provided with adequate notice in writing setting forth the specific reasons for such denial, such notice shall be written in a manner calculated to be understood by the Participant, and (b) afforded a reasonable opportunity for a full and fair review of the decision denying the claim by an appropriate named fiduciary or a person properly designated to carry out such responsibility.

- 22 -

(7) The Trustees are hereby authorized to allocate fiduciary responsibilities in any manner permitted pursuant to section 405(c) of ERISA and to appoint an investment manager or managers as permitted by section 402(c) of ERISA.

(8) Contributions to the 1974 Pension Trust to fund the benefits under this Plan shall be paid solely by the Employers in accordance with Article XX of the National Bituminous Coal Wage Agreement of 1988, as amended from time to time, and any successor agreements to that specific Agreement.

(9) In the event that this Plan merges or consolidates with, or transfers some or all of its assets or liabilities to, any other plan, no Participant or beneficiary herein shall, solely on account of merger, consolidation or transfer, be entitled to an accrued benefit immediately following such event which is less than the benefit to which such Participant or beneficiary would have been entitled immediately preceding such event.

(10) In the event that an Employer fails to make the contributions to the Plan required by Article XX of the National Bituminous Coal Wage Agreement of 1988, interest (calculated at a rate established by the Trustees at the beginning of each calendar year) shall accrue from the date due until the date on which payment is made. If the Trustees file suit to collect unpaid contributions, plus accrued interest, and a judgment is entered by the courts in favor of the Trustees, the judgment entered shall provide for an additional amount equal to the accrued interest in liquidated damages.

(11) Upon the termination or partial termination of the Plan, the rights of all affected Participants to benefits accrued to the date of such termination or partial termination, are nonforfeitable to the extent required by law or to the extent provided for under the National Bituminous Coal Wage Agreement of 1988.

(12) Except as otherwise provided herein, it shall be unlawful for any part of the assets held pursuant to this Plan, other than such part as is required to pay taxes and administrative expenses, to be used for, or diverted to, purposes other than for the sole and exclusive benefit of the Participants of the Plan except that in the case of a contribution which is made by an Employer by a mistake of fact, or law (other than a mistake relating to Plan qualification), such mistaken contribution may be returned to the Employer within six months after the Trustees determine that the contribution was mistakenly made.

(13) To the extent not inconsistent with the provisions hereof, the Trustees shall comply with the further requirements imposed upon them by and shall have the further powers contained in Article XX, Sections (e), (f), and (g) of the National Bituminous Coal Wage Agreement of 1988, as amended from time to time, and any successor agreements to that specific Agreement.

(14) This instrument, and the 1974 Pension Trust shall be construed regulated and administered in accordance with Federal law, and, to the extent not preempted or inconsistent with such Federal law, the laws of the District of Columbia.

(15) Any action of the Employers which may, or must, be taken hereunder may be taken by BCOA.

(16) Any Employer who employed any Participant eligible for coverage under, or who received or receives benefits under, the 1974 Pension Plan, or any Employer who was or is required to make, or who has made or makes contributions to the 1974 Pension Plan and Trust, is obligated and required to comply with the terms and conditions of the 1974 Pension Plan and Trust, as amended from time to time, including, but not limited to, making the contributions required under the National Bituminous Coal Wage Agreement of 1978 as amended from time to time and any successor agreements thereto, including, but not limited to, the National Bituminous Coal Wage Agreement of 1988.

(17) The Employers, the Union and the Trustees shall fully cooperate to obtain all necessary rulings and do all other acts appropriate to ensure that the 1974 Pension Plan and Trust are qualified under Section 401 of the Internal Revenue Code, and that contributions are deductible under Section 404 of the Internal Revenue Code.

(18) Notwithstanding any other provision of this Plan to the contrary, a distribution of benefits shall commence to a participant not later than the April 1 of the calendar year following the calendar year in which the Participant attains age 70-1/2 and shall be distributed over the life of such Participant or over the lives of such Participant and his surviving spouse, in accordance with Section 401(a)(9) of the Internal Revenue Code of 1986 and any regulations promulgated thereunder. In the event that the Participant dies before distributions have commenced hereunder, the surviving spouse shall begin to receive a distribution of the benefit, if any, to which such spouse is entitled no later than the date on which the participant would have attained age 70-1/2 and shall be distributed over the life of such surviving spouse.

## ARTICLE IX - PARTICIPANTS COVERED BY A SUCCESSOR PLAN

The following individuals shall cease to be Participants in the Plan and shall not be entitled to benefits hereunder (with respect to Credited Service prior to December 6, 1977):

(1) A Participant in this Plan who retired prior to December 6. 1977, if the Participant is entitled to a pension under a plan qualified under Section 401(a) of the Internal Revenue Code and established by an employer pursuant to an agreement with the UMWA which is a successor agreement to the Western Surface Coal Wage Agreement of 1975, provided that the pension is at least as great as the pension due under the terms of this Plan in effect on December 5, 1977;

(2) A Participant in this Plan prior to December 6, 1977, who on or after December 6, 1977, is an employee of a employer which is signatory with the UMWA to a successor agreement to the Western Surface Coal Wage Agreement of 1975, if the Participant becomes a participant in a pension plan qualified under Section 401(a) of the Internal Revenue Code established by such employer pursuant to such agreement, provided that the plan gives credit for participation, vesting and Credited Service prior to December 6, 1977, determined under the terms of this Plan in effect on December 5, 1977.

## ARTICLE X

A.  As soon as practicable after an Employer's complete or partial withdrawal, the Trustees shall calculate and demand payment of withdrawal

- 24 -

liability in accordance with Section 4219 of ERISA.  In the case of a
Construction Employer that withdraws on or after July 1, 1981, the amount of
unfunded vested benefits allocable to it will be determined with reference to
the unfunded vested benefits of the Coal Mine Construction Segment of the 1974
Pension Plan.  In the case of an Employer other than a Construction Employer
that withdraws on or after July 1, 1981, the amount of unfunded vested benefits
allocable to it will be determined with reference to the unfunded vested
benefits of the Bituminous Coal Segment of the 1974 Pension Plan.

        B.  The Trustees shall establish the Bituminous Coal and Coal Mine
Construction Segments of the 1974 Pension Plan for the sole purpose of
calculating employer withdrawal liability under this Article.  Assets and
liabilities will be allocated to the two segments in accordance with the
following:

        (1) All of a Participant's Credited Service under the Plan through
June 30, 1981 will be allocated to the Coal Mine Construction Segment if the
Participant's last Credited Service on or before June 30, 1981 was rendered for
a Construction Employer.  All of a Participant's Credited Service under the
Plan through June 30, 1981 will be allocated to the Bituminous Coal Segment if
the Participant's last Credited Service on or before June 30, 1981 was rendered
for an Employer other than a Construction Employer.  Service credited under the
Plan for any period after June 30, 1981 will be allocated to the Coal Mine
Construction Segment if rendered for a Construction Employer, or to the
Bituminous Coal Segment if rendered for an Employer other than a Construction
Employer.  If a Participant renders service for both a Construction Employer
and an Employer other than a Construction Employer within the same calendar
year, his Credited Service will be allocated on a pro rata basis between the
two segments.  For purposes of this paragraph, in the case of service credit
earned in the 1981 calendar year, credit hours attributable to service prior to
July 1, 1981, will be assigned as follows:

| Number of Credit Hours Attributable to Participant's Service Prior to July 1, 1981 | Credited Service Assigned to Period Prior to July 1, 1981 |
|---|---|
| 250 or less | 0 |
| 250 - 499 | 1/4 year |
| 500 - 749 | 1/2 year |
| 750 - 999 | 3/4 year |
| 1,000 or more | 1 year |

        (2) An initial allocation of assets will be made to the Bituminous Coal
and Coal Mine Construction Segments in order that as of June 30, 1981, the
proportion of assets to liabilities in each segment is identical.
Contributions and withdrawal liability payments made by Construction employers
after June 30, 1981 will be allocated to the Coal Mine Construction Segment.
Contributions and withdrawal liability payments made by Employers other than
Construction Employers after June 30, 1981 will be allocated to the Bituminous
Coal Segment.  Plan and Trust expenses after June 30, 1981, will be allocated
to each segment in the same ratio as the segment's income bears to the total
income of the Trust; however, extraordinary expenses generated specially by one

segment will be charged to that segment alone. The Trustees' determinations concerning the initial allocation of assets under this paragraph shall be final and binding on all persons dealing with the Plan.

(3) Investment income (including realized and unrealized capital gains and losses) will be allocated monthly to each segment in the same ratio that the segment's assets bear to the total assets of the Trust.

(4) Pension and other benefit payments made under the Plan will be charged to each segment in the same ratio that credited service on which a payment is based is allocated to the specific segment.

C. The Trustees shall adopt (and modify as appropriate) a reasonable interest assumption used to calculate the value of unfunded vested benefits under the Plan which will be uniformly applicable to withdrawals by all Employers.

D. The Bituminous Coal and Coal Mine Construction Segments are maintained solely for the purpose of determining withdrawal liability under this Article. The benefit levels, eligiblity rules, credited service provisions, and all other rules and regulations of the Plan shall be applied uniformly to all Participants. All Trust assets are available to pay all benefits under the Plan. In the event that only one segment has unfunded vested benefits in a given Plan year, the excess of allocated assets over the value of vested benefits in the other segment will be used to reduce the first segment's unfunded vested benefits. Notwithstanding any other provision of this Article X, if as of the last day of any Plan year the Trustees determine that all or substantially all of the Employers that have an obligation to contribute to one segment have withdrawn from that segment, the liability of any Employer that withdraws from the Plan in that or any subsequent Plan year shall be calculated under the provisions in effect for withdrawals occurring on or before June 30, 1981.

E. The amount of unfunded vested benefits allocable to an Employer that withdraws from the Plan is the product of —

(1) the appropriate segment's unfunded vested benefits as of the end of the Plan year preceding the Plan year in which the Employer withdraws, less the value as of the end of such year of all outstanding claims for withdrawal liability with respect to that segment which can reasonably be expected to be collected from that segment's Employers withdrawing before such year; multiplied by

(2) a fraction – (a) the numerator of which is the total amount required to be contributed by the Employer under the Plan with respect to the appropriate Plan segment for the last 5 Plan years ending before the withdrawal, and

(b) the denominator of which is the total amount contributed with respect to the appropriate Plan segment under the Plan by all of the appropriate segment's Employers for the last 5 Plan years ending

before the withdrawal, increased by any Employer contributions owed (to the
segment) with respect to earlier periods which were collected in those Plan
years, and decreased by any amount contributed to the Plan during those Plan
years by Employers who withdrew from that segment of the Plan during those Plan
years.

(3) For purposes of subparagraph (E)(2)(b) the "total amount
contributed" for a Plan year includes contributions actually received during
the Plan year, and contributions received on or before July 31 following the
end of the Plan year.  Contributions counted for one Plan year may not be
counted for any other Plan year.

F.  For purposes of determining whether a withdrawal has occurred and for
purposes of assessing withdrawal liability under this Article, all employees of
trades or businesses (whether or not incorporated) which are under common
control shall be treated as employed by a single Employer and all such trades
and businesses as a single Employer.  (The preceding sentence shall not be
deemed to preclude assessing liability under any other applicable law.) In the
case of an Employer which contributes to the 1974 Pension Trust through one or
more trades or businesses which would otherwise be considered Construction
Employers and one or more trades or businesses which would otherwise be
considered Employers other than Construction Employers, all calculations
related to the establishment of the Bituminous Coal and Coal Mine Construction
Segments of the Plan will be performed as if each trade or business were a
separate Employer.  In the case of an Employer described in the preceding
sentence, the amount of unfunded vested benefits allocable to the Employer in
the event of a complete withdrawal will be the sum of all unfunded vested
benefits allocable to the individual trades or businesses calculated as if they
were separate Employers.  In the case of an Employer described in the third
sentence of this paragraph, the amount of unfunded vested benefits allocable in
the event of a partial withdrawal will be determined by the Trustees, based
upon the proportional extent to which the partial withdrawal is attributable to
each trade or business, and assigning liability (based on the unfunded vested
benefits of the appropriate segments) accordingly.  The Trustees shall have the
authority to establish rules implementing such assignment of liability.

G.  Payment of withdrawal liability must begin within 60 days,
notwithstanding any request for review or appeal of the determination of the
amount of such liability, after the date on which the Trustees notify the
Employer of the amount of withdrawal liability.  Annual payments are to be made
in twelve (12) equal installments, due on the 10th day of each month.

H.  If payment is not made when due, interest on the payment shall accrue
from the due date until the date on which the payment is made.  Interest on
delinquent payment of withdrawal liability shall be payable at the rate
established by the PBGC pursuant to Section 4219(c)(6).  Default will occur if
the Employer fails to make payment when due and then fails to make payment
within 60 days after receiving written notice from the Trustees of such
failure, or as otherwise determined pursuant to Section 4219(c)(5).

I.  If any Employer defaults on payment (as determined pursuant to Section
4219(c)(5)), the Trustees shall require immediate payment of the outstanding

- 27 -

amount of withdrawal liability, plus accrued interest on the total outstanding liability from the due date of the first payment which was not timely made. If the Trustees file suit to collect the outstanding balance of withdrawal liability, plus accrued interest, and a judgment is entered by the court in favor of the Trustees, the judgment entered shall provide for an additional amount equal to 20% of the outstanding amount of withdrawal liability as liquidated damages. The Trustees shall have the authority to promulgate rules regarding default and an arbitration procedure.

J. An Employer is entitled to prepay the outstanding amount of any unpaid withdrawal liability, plus accrued interest, if any, in whole or in part, without penalty. However, if the pre-payment is made, pursuant to a withdrawal which is later determined to be part of a withdrawal described in Section 4219(c)(1)(D) of ERISA, the withdrawal liability of the Employer shall not be limited to the amount of pre-payment.

K. In the event that this Plan terminates, an Employer's obligation to make payments under this Article ceases at the end of the Plan year in which the assets of this Plan (exclusive of withdrawal liability claims) are sufficient to meet all obligations of this Plan, as determined by the PBGC.

L. In conformance with Section 4208(c) of ERISA, in any Plan year following an Employer's partial withdrawal under Section 4205(a)(1) of ERISA, when the number of contribution base units with respect to which the Employer has an obligation to contribute for such year equals or exceeds 130% of the number of contribution base units with respect to which the Employer had an obligation to contribute in the partial withdrawal year, the amount of the Employer's partial withdrawal liability payment for such year shall be reduced pro rata, in accordance with PBGC regulations.

M. The presumptive partial withdrawal rules in Section 4205(a) and (b) of ERISA shall apply to this Plan.

N. A complete or partial withdrawal of an Employer (hereinafter in this section referred to as the "seller") under this Plan does not occur solely because, as a result of a bona fide, arm's-length sale of assets to an unrelated party (hereinafter in this section referred to as the "purchaser"), the seller ceases covered operations or ceases to have an obligation to contribute for such operations, if —

(1) the purchaser is, or becomes at the time of the sale, signatory to the Wage Agreement or any other collective bargaining agreement entered into with the United Mine Workers of America which provides that contributions at the same rate as contributions required under the Wage Agreement shall be made to this Plan;

(2) the purchaser has an obligation to contribute to this Plan with respect to the operations for substantially the same employees and the same number of contribution base units for which the seller had an obligation to contribute to this Plan;

(3) the purchaser provides to the Plan for a period of 5 plan years commencing with the first plan year beginning after the sale of assets, a bond or escrow deposit meeting the requirements of Section 4204 (a)(1)(B).  If the Plan is in reorganization, the amount of such bond or escrow deposit shall be twice the amount provided in Section 4204 (a)(1)(B).

(4) the contract for sale provides that, if the purchaser withdraws in a complete withdrawal, or a partial withdrawal with respect to operations during such first 5 Plan years, the seller is secondarily liable for any withdrawal liability the seller would have had to this Plan with respect to the operations (but for this section) if the liability of the purchaser with respect to this Plan is not paid.

If the purchaser —

(1) withdraws before the last day of the fifth plan year beginning after the sale, and

(2) fails to make any withdrawal liability payment when due, because of a complete or partial withdrawal, then the seller shall pay to this Plan an amount equal to the payment that would have been due from the seller but for this section.

If all, or substantially all, of the seller's assets are distributed, or if the seller is liquidated before the end of the 5 plan year period described above, then the seller shall provide a bond issued by a corporate surety company that is an acceptable surety for purposes of Section 412 of ERISA, or an amount held in escrow by a bank or similar financial institution satisfactory to the Trustees, in an amount equal to the present value of the withdrawal liability the seller would have had but for this paragraph.

If only a portion of the seller's assets are distributed during such period, then a bond or escrow shall be required, in accordance with rules established by the Trustees, to the extent consistent with PBGC regulations.

The liability of the party furnishing a bond or escrow under the above paragraph shall be reduced, upon payment of the bond thereof.

For the purposes of this section, the liability of the purchaser shall be determined as if the purchaser had been required to contribute to this Plan in the year of the sale and the 4 plan years preceding the sale the amount the seller was required to contribute for such operations for such 5 plan years.

O.  If a court or tribunal of competent jurisdiction determines by a final decision or award that any provision of this Article X creates two separate multiemployer plans, or limits or reduces any employer's liability under this Article in a manner not specifically provided for herein, then the amendments to this Plan, creating two segments for the sole purpose of calculating employer liability under this Article, shall thereafter be considered null and void (without affecting any other provision of this Plan), and all employer liability under this Article shall, prospectively from the date of any such holding, be calculated under the provisions in effect for withdrawals occurring on or before June 30, 1981.

- 29 -

## APPENDIX A

### ACTUARIAL EQUIVALENCE FACTORS FOR DEFERRED VESTED RETIREMENT BENEFITS COMMENCING PRIOR TO AGE 62

The following factors are to be multiplied by the full accrued benefit payable commencing at normal retirement age 62 to yield the equivalent benefit payable commencing at the indicated age:

| AGE Years | Months | Actuarial Equivalence Factor | AGE Years | Months | Actuarial Equivalence Factor |
|---|---|---|---|---|---|
| 55 | 0 | .522 | 56 | 0 | .569 |
| | 1 | .526 | | 1 | .573 |
| | 2 | .529 | | 2 | .577 |
| | 3 | .533 | | 3 | .582 |
| | 4 | .537 | | 4 | .586 |
| | 5 | .541 | | 5 | .590 |
| | 6 | .545 | | 6 | .595 |
| | 7 | .549 | | 7 | .599 |
| | 8 | .553 | | 8 | .604 |
| | 9 | .557 | | 9 | .608 |
| | 10 | .561 | | 10 | .612 |
| | 11 | .565 | | 11 | .617 |
| 57 | 0 | .621 | 58 | 0 | .680 |
| | 1 | .626 | | 1 | .685 |
| | 2 | .631 | | 2 | .691 |
| | 3 | .636 | | 3 | .696 |
| | 4 | .641 | | 4 | .702 |
| | 5 | .646 | | 5 | .707 |
| | 6 | .651 | | 6 | .713 |
| | 7 | .655 | | 7 | .718 |
| | 8 | .660 | | 8 | .724 |
| | 9 | .665 | | 9 | .729 |
| | 10 | .670 | | 10 | .735 |
| | 11 | .675 | | 11 | .740 |

- 30 -

(cont.)

| AGE Years | Months | Actuarial Equivalence Factor | AGE Years | Months | Actuarial Equivalence Factor |
|---|---|---|---|---|---|
| 59 | 0 | .746 | 60 | 0 | .820 |
| | 1 | .752 | | 1 | .827 |
| | 2 | .758 | | 2 | .834 |
| | 3 | .765 | | 3 | .841 |
| | 4 | .771 | | 4 | .848 |
| | 5 | .777 | | 5 | .855 |
| | 6 | .783 | | 6 | .863 |
| | 7 | .789 | | 7 | .870 |
| | 8 | .796 | | 8 | .877 |
| | 9 | .802 | | 9 | .884 |
| | 10 | .808 | | 10 | .891 |
| | 11 | .814 | | 11 | .898 |
| 61 | 0 | .905 | 62 | 0 | 1.000 |
| | 1 | .913 | | | |
| | 2 | .920 | | | |
| | 3 | .928 | | | |
| | 4 | .936 | | | |
| | 5 | .944 | | | |
| | 6 | .952 | | | |
| | 7 | .960 | | | |
| | 8 | .968 | | | |
| | 9 | .976 | | | |
| | 10 | .984 | | | |
| | 11 | .992 | | | |

Actuarial Basis: 95% of 1959-61 U.S. Total Male Population
Mortality Table at 5% Interest.

APPENDIX B

TABLE OF PERCENTAGES TO BE APPLIED
AGAINST PENSION PAYABLE TO PARTICIPANT
UNDER JOINT AND SURVIVOR ANNUITIES

| AGE OF SPOUSE* | AGE OF PARTICIPANT* | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 55 | 56 | 57 | 58 | 59 | 60 | 61 | 62 |
| | % | % | % | % | % | % | % | % |
| 50 | 85.1 | 84.2 | 83.3 | 82.3 | 81.2 | 80.2 | 79.1 | 77.9 |
| 51 | 85.6 | 84.7 | 83.7 | 82.7 | 81.7 | 80.7 | 79.6 | 78.5 |
| 52 | 86.0 | 65.1 | 84.2 | 83.2 | 82.2 | 81.2 | 80.1 | 79.0 |
| 53 | 86.5 | 85.6 | 84.7 | 83.7 | 82.8 | 81.7 | 80.7 | 79.6 |
| 54 | 86.9 | 86.1 | 85.2 | 84.3 | 83.3 | 82.3 | 81.2 | 80.1 |
| 55 | 87.4 | 86.6 | 85.7 | 84.8 | 83.8 | 82.8 | 81.8 | 80.7 |
| 56 | 87.9 | 87.1 | 86.2 | 85.3 | 84.4 | 83.4 | 82.4 | 81.3 |
| 57 | 88.3 | 87.5 | 86.7 | 85.8 | 84.9 | 84.0 | 83.0 | 81.9 |
| 58 | 88.8 | 88.0 | 87.2 | 86.4 | 85.5 | 84.5 | 83.6 | 82.6 |
| 59 | 89.3 | 88.5 | 87.7 | 86.9 | 86.0 | 85.1 | 84.2 | 83.2 |
| 60 | 89.7 | 89.0 | 88.3 | 87.4 | 86.6 | 85.7 | 84.8 | 83.8 |
| 61 | 90.2 | 89.5 | 88.8 | 88.0 | 87.2 | 86.3 | 85.4 | 84.5 |
| 62 | 90.7 | 90.0 | 89.3 | 88.5 | 87.7 | 86.9 | 86.0 | 85.1 |

* Age to nearest birthday.

Pension payable to qualified surviving spouse pursuant to Article VII (A) will be equal to 50% of the Participant's Pension as reduced in accordance with the above Table. The benefit payable to a qualified surviving spouse under Article VII (B) will be equal to 75% of the amount reduced in accordance with the above Table.

- 32 -

IN WITNESS WHEREOF, the Employers and the Union, pursuant to proper authority, have caused this instrument, effective December 6, 1974 and amended as of February 1, 1988, to be signed by their proper officers or representatives in Washington, D. C. on this _____16th_____ day of MAY, 1988.

UNITED MINE WORKERS OF AMERICA

International President

International Vice President

International Secretary-Treasurer

BITUMINOUS COAL OPERATORS ASSOCIATION, INC.

President

## AMENDMENT OF THE
## UNITED MINE WORKERS OF AMERICA 1974 PENSION PLAN

Pursuant to Article XX (g)(4) of the National Bituminous Coal Wage Agreement of 1988 and Article VII C.(1) of the United Mine Workers of America 1974 Pension Plan, we the undersigned Trustees of the Plan, after consultation with the Employers and the Union, hereby adopt the following:

The first sentence of Article VII.C(1) of the 1974 United Mine Workers of America Pension Plan is amended to read as follows:

> The "election period" in the case of an election to waive the Joint and Survivor Annuity described in Paragraph A shall be the 90-day period ending on the date of the commencement of benefits.

By the Board of Trustees of the United Mine Workers of America 1974 Pension Plan

_____    2/5/90
Joseph P. Connors, Sr., Chairman    Date

_____    2/2/90
Paul R. Dean, Trustee               Date

_____    2/5/90
William Miller, Trustee             Date

_____    2/2/90
Donald E. Pierce, Jr., Trustee      Date

_____    2/7/90
Thomas H. Saggau, Trustee           Date

74PPAMEN\mst

JA 000856

JA 000857

JA 000858

# United Mine Workers Of America

# 1974 Pension Plan

December, 1993

UNITED MINE WORKERS OF AMERICA
1974 PENSION PLAN
EFFECTIVE DECEMBER 6, 1974

## ARTICLE I - INTRODUCTION

Pursuant to Article XX of the National Bituminous Coal Wage Agreement of 1974, the United Mine Workers of America 1974 Pension Plan (hereinafter sometimes referred to as the "1974 Pension Plan" or the "Plan") provides pension benefits as hereinafter set forth. The Plan is effective as of December 6, 1974 (the "effective date") and, as amended March 27, 1978, April 29, 1980, June 7, 1981, October 1, 1984, February 1, 1988, February 1, 1991, January 16, 1992 and December 16, 1993, the provisions of the Plan are set forth below. Except in the case of total disability resulting from mine accidents occurring after the effective date, this Plan does not provide benefits to persons retiring on or before December 31, 1975, but such persons may be entitled to pension benefits under the United Mine Workers of America 1950 Pension Plan (hereinafter referred to as the "1950 Pension Plan").

The 1974 Pension Plan and Trust is a continuation of the benefit program established under the UMWA Welfare and Retirement Fund of 1950.

Except to the extent otherwise required by the Employee Retirement Income Security Act of 1974 ("ERISA") or other applicable law, governmental rule or regulation, and except to the extent that the 1974 Pension Plan or 1974 Pension Trust specifically provides otherwise, or as required by the context, all amendments to the 1974 Pension Plan effective as of December 16, 1993, pursuant to the authority contained in Article VIII herein, shall be given only prospective application commencing on December 16, 1993, and shall have no retroactive application whatsoever. The amendments effective as of December 16, 1993, shall not be deemed to be an approval or disapproval by the parties to any action or failure to act by any Trustee or Trustees for any period prior to December 16, 1993. The terms and provisions of the 1974 Pension Plan in effect as of December 15, 1993, shall continue in effect and shall be applicable only to circumstances or events which occurred prior to December 16, 1993, and which are not governed by the amendments adopted as of December 16, 1993.

A. Definitions

(1) "Wage Agreement" means the National Bituminous Coal Wage Agreement of 1974, as amended from time to time and any successor thereto, including, but not limited to, the National Bituminous Coal Wage Agreement of 1993. Any reference in this

1

Plan to the Wage Agreement or to the bituminous coal wage agreement then in effect shall also refer (a) to the Sub-bituminous and Lignite Agreement and the National Coal Mine Construction Agreement with respect to any period for which such agreements provide that pension benefits shall be made available pursuant to this Plan or a predecessor plan established under the bituminous coal wage agreement, and (b) with respect to any period prior to the 1950 Bituminous Coal Wage Agreement, to any collective bargaining contract between the United Mine Workers of America and any employer in the bituminous coal industry, and (c) solely for the purposes of determining who is required to make contributions to, and receive benefits under, the 1974 Pension Trust, any other collective bargaining contract entered into between the United Mine Workers of America and any Employer in the bituminous coal industry, which contract provides that contributions shall be made to or benefit payments made from this Plan.

(2)    "Employer" means an employer who is signatory to the Wage Agreement, or, with respect to prior periods, was signatory to the bituminous coal wage agreement then in effect.

(3)    "Construction Employer" means an Employer that is signatory to the National Coal Mine Construction Agreement of 1984, as amended from time to time and any successor thereto; or is signatory to any other collective bargaining contract with the United Mine Workers of America which provides that contributions shall be made to the 1974 Pension Trust or the United Mine Workers of America 1985 Construction Workers Pension Trust for construction work related to the development, expansion or alteration of coal mines, provided that substantially all the employees, with respect to whom the employer has an obligation to contribute, perform construction work related to the development, expansion or alteration of coal mines, including the erection of tipples and preparation plants and other facilities placed in, on or around the coal mines, sinking of shafts, slopes, drifts or tunnels and all other such coal-related work that is performed under a Wage Agreement.    In the case of a Construction Employer which is a single trade or business and which is also signatory to a Wage Agreement other than a Wage Agreement described in the preceding sentence, the Construction Employer shall be treated as an Employer other than a Construction Employer with respect to its employees or operations for which it has an obligation to contribute to the Plan pursuant to such Wage Agreement.

(4)    "Bituminous Coal Segment" and "Coal Mine Construction Segment" mean the two accounts within the 1974 Pension Plan maintained after June 30, 1981, for the sole purpose of calculating employer withdrawal liability under Article X.

(5)    "Participant" means any person who is employed in a classified job for an Employer after the effective date and any

2

person entitled to receive pension benefits under the Plan; provided, however, that any person who is not employed in a classified job for an Employer on the effective date shall not become a participant until such person completes at least 1,000 hours (or 800 hours worked on the weekend/holiday crew of a signatory Employer as provided in Appendix C of the 1993 NBCWA) of Credited Service within a 12-month period after the effective date, or unless such person is subject to the provisions of Article II(f)(3).

(6)  "Pensioner" means any person who is receiving a pension pursuant to Article II of this Plan.

(7)  "1974 Pension Trust" means the trust established pursuant to the National Bituminous Coal Wage Agreement of 1974 to fund this Plan.

(8)  "Trustees" means the Trustees of the 1974 Pension Trust, who shall be named fiduciaries pursuant to Section 402 of ERISA and the Plan Administrator, as that term is defined in that Act; provided, however, that the 1974 Pension Trust may be amended to designate other or additional named fiduciaries under said Trust and the Plan.

(9)  "Credited Service" means signatory and nonsignatory service determined pursuant to Article IV.

(10) "Hour of Service" shall mean each hour for which the participant is directly or indirectly paid or entitled to be paid by the Employer (a) for the performance of duties or (b) on account of a period of time during which no duties are performed due to vacation, holiday, illness, sickness and accident, incapacity, layoff, bereavement, jury duty, military duty or leave of absence; or (c) time spent performing contractual obligations such as safety inspections and mine committee work, even though such time off is not paid for by the Employer, provided that:

(1)  except for hours of service credited on account of a period during which a Participant is eligible to receive benefits under Article IV(B)(3), no more than 501 hours of service shall be credited to a Participant on account of a single continuous period during which the Participant performed no duties;

(2)  no credit shall be given for payments made or due under a plan maintained solely for the purpose of complying with the applicable worker's compensation or unemployment compensation or disability insurance laws or payments which solely reimburse a Participant for medically related expenses incurred by the Participant; and

3

(3)   hours of service shall be credited for back pay for the period for which such back pay was awarded, irrespective of mitigation of damages, either awarded or agreed to by the Employer to the extent such back pay represents payment for hours which are required to be taken into account.  However, no hours of service shall be credited for back pay if such hours were previously credited.  The determination of hours of service for reasons other than the performance of duties shall be made in accordance with the applicable rules of the regulations prescribed by the Secretary of Labor  under 29 C.F.R. Part 2530.200b-2(b).

(11) "UMWA" or "Union" shall mean the United Mine Workers of America.

(12) "Hours Worked" shall mean (a) each hour for which an employee is paid, or entitled to payment, for the performance of duties for the Employer during the calendar year, and (b) hours for which back pay, irrespective of mitigation of damages, is awarded or agreed to by an Employer, to the extent that such award or agreement is intended to compensate an Employee for periods which the Employee would have been engaged in a performance of duties for the Employer.  Time spent performing contractual obligations such as safety inspections and mine committee work and periods of time when the Participant is eligible to receive sickness and accident benefits shall be included as hours worked.

(13) "Construction Industry Service" means, with respect to a participant,

(a)   all periods of service after June 20, 1985 with a Construction Employer that involves work related to the development,expansion or alteration of coal mines; and

(b)   all periods of signatory and nonsignatory service before July 1, 1985, if the participant's last such service before July 1,1985 was for a Construction Employer.

B.    When Retirement Occurs

For the purposes of this Plan, in the case of any Participant, retirement shall be considered to occur on the last day of credited service, within the meaning of Article IV C(8), provided that on such day he was eligible for an immediate or deferred pension under this Plan.

4

C.    Attainment of Age

For the purposes of this Plan, a Participant shall be deemed to have attained an age as of 12:01 A.M. on the respective anniversary date of the Participant's birth.

ARTICLE II - ELIGIBILITY

A.   Age 55 Retirement

Any Participant who (a) has at least 10 years of signatory service or at least twenty years of credited service, including the required amount of signatory service as set forth in Article IV(C)(6), and (b) has attained the age of 55 years (but not the age of 62) prior to retirement shall be eligible to retire on or after December 16, 1993, and shall upon his retirement (hereinafter "Age 55 Retirement") be eligible for a pension.

B.   Normal Retirement

(1)   Any Participant shall be eligible to retire on or after December 16, 1993, and shall upon his retirement (hereinafter "Normal Retirement") be eligible for a pension, provided such Participant has attained the normal retirement date which shall be the earlier of --

(a)  a Participant's attainment of age 62 years and completion of at least 10 years of signatory service or at least 20 years of credited service, including the required amount of signatory service as set forth in Article IV(C)(6), or

(b)  the later of --

(i)   the time a Participant attains age 65, or

(ii)  the 5th anniversary of the time the Participant became employed in signatory service.

(2)   In determining the time the Participant became employed in signatory service (for purposes of Article II(B)(1)(b)(ii)), any employment of a Participant in signatory service who is not entitled to a pension under Article II (A) or (E) (Age 55 Retirement or Deferred Vested Retirement) shall be disregarded if it precedes a period of consecutive one-year breaks in signatory service and the number of consecutive one-year breaks in signatory service equals or exceeds the greater of

(a)   five, or

(b)   the aggregate number of years of signatory service before such breaks.

In addition to the foregoing, any employment prior to a period of consecutive one-year breaks in signatory service shall be disregarded unless the Employee completes 1,000 hours (or 800 hours worked on the weekend/holiday crew of a signatory Employer as provided in Appendix C of the 1993 NBCWA) of signatory service

within a 12-month period after the breaks in signatory service. Such aggregate number of years of signatory service before any period of consecutive one-year breaks in signatory service shall be deemed not to include any years of signatory service not required to be taken into account under this subparagraph by reason of any prior break in signatory service. For purposes of this Article II(B)(1)(b)(ii), a year of signatory service shall be calculated on the basis of a calendar year and in the manner specified in Article IV; a break in signatory service shall be defined in accordance with the terms of Article II(G)(3); and nonclassified signatory service shall be disregarded unless it immediately precedes or follows classified signatory service with the same Employer.

C.    Disability Retirement

A Participant who (a) has at least 10 years of signatory service prior to retirement, and (b) becomes totally disabled as a result of a mine accident occurring on or after December 16, 1993, shall, upon retirement (hereinafter "Disability Retirement"), be eligible for a pension while so disabled. A Participant shall be considered to be totally disabled only if by reason of such accident such Participant is subsequently determined to be eligible for Social Security Disability Insurance Benefits under Title II of the Social Security Act or its successor.

When a Participant who has been receiving a disability pension under this Section C recovers sufficiently to become ineligible for Social Security disability benefits or is disqualified because of earnings, the Trustees shall implement procedures to determine the Participant's ability to perform classified work in the industry. The continuance of a disability pension shall be based on medical evidence that supports the Participant's inability to be employed in classified work in the industry.

If such Participant is medically certified able to perform classified work in the industry, he will no longer be eligible for a disability pension.

D.    Minimum Disability Retirement

Any Participant who (a) has less than 10 years of signatory service prior to retirement and (b) becomes totally disabled as a result of a mine accident occurring on or after December 16, 1993, shall, upon retirement (hereinafter "Minimum Disability Retirement") be eligible for a pension while so disabled. A Participant shall be considered to be totally disabled only if by reason of such accident such Participant is subsequently determined to be eligible for Social Security Disability

7

Insurance Benefits under Title II of the Social Security Act or its successor.

When a Participant who has been receiving a disability pension under this Section D recovers sufficiently to become ineligible for Social Security disability benefits or is disqualified because of earnings, the Trustees shall implement procedures to determine the Participant's ability to perform classified work in the industry. The continuance of a disability pension shall be based on medical evidence that supports the Participant's inability to be employed in classified work in the industry.

If such Participant is medically certified able to perform classified work in the industry, such Participant will no longer be eligible for a disability pension.

E.  Deferred Vested Retirement

(1)  Any Participant who ceases working in a classified job for an Employer for any reason, except as provided in (2) below, and who is not eligible to receive a pension under any other provision of this Article II, shall be eligible for a pension (hereinafter "Deferred Vested Pension"), upon attaining age 62, or at the election of the Participant, such Participant shall be eligible for a reduced pension beginning at any time after attaining age 55, provided

(a)  the Participant's last day of Credited Service is on or after December 16, 1993, but prior to attainment of age 55;

(b)  the Participant has

(i) at least 10 years of signatory service, or

(ii) at least 20 years of Credited Service as set forth in Article IV(C)(6).

(2)  Any Participant who ceases working in a classified job for an Employer, who is not eligible to receive a pension under any other provision of this Article II, shall be eligible for a pension (hereinafter "Deferred Vested Pension - Special") upon attaining age 62, or at the election of the Participant, such Participant shall be eligible for a reduced pension beginning at any time after attaining age 55, calculated pursuant to Article III A(5)(b), provided

(a)  the Participant's last day of Credited Service is on or after December 16, 1993, but prior to attainment of age 55;

(b)   had 20 years of signatory service on the date last worked;

(c)   had attained the age of 50 on the date last worked; and either

(d)   had been laid off and had not refused recall to the mine from which the Participant was laid off; or

(e)   had been terminated under Article III, Section (j) of the Wage Agreement (or if the Participant had not been terminated, there had been a deterioration in physical condition which prevented the Participant from performing the Participant's regular work as determined by a panel of three physicians, if the degree of physical deterioration is disputed by the Trustees) and was not employed in the coal industry thereafter.

Within a reasonable period of time after such Participant's employment has ceased, an appropriate written notice of eligibility and other relevant data will be provided.

F.   Nonduplication

(1)   A Participant shall be entitled to receive a pension under only one of the foregoing paragraphs of this Article II with respect to any retirement.

(2)   Except as provided in paragraph (C), (D), or (F)(3) of this Article II, any person whose retirement occurs on or before December 31, 1975, shall not be entitled to receive pension benefits under this Plan, but shall be entitled only to receive such benefits as may be provided under the 1950 Pension Plan.

(3)   Any person who (a) retires on or before December 31, 1975, (b) at the time of retirement is entitled to or, upon attaining age 55 would be entitled to, a pension benefit under the 1950 Pension Plan, and (c) is again employed for at least 250 hours in a classified job for an Employer after December 31, 1975, shall upon subsequent retirement (or, if later, upon attaining age 55) be eligible for a pension only under this Plan and not under the 1950 Pension Plan, in the amount hereinafter specified.   The amount of pension for a Participant described in this paragraph shall be the sum of the amount of pension to which such Participant would be entitled upon attaining age 55 under the 1950 Pension Plan if he had not been employed in a classified job for an Employer after December 31, 1975, plus the excess of (i) over (ii) where (i) is the pension to which such Participant would be entitled except for this paragraph under Article III(A)(2) or III(B)(2) based upon all years of Credited Service under this Plan and (ii) is the pension to which such Participant

9

would be entitled under Article III(A)(2) or III(B)(2) based solely on his Credited Service prior to December 31, 1975.

G. Employment for Vesting Purposes

(1) For purposes of this Article II, all years of classified service by a Participant with Employers signatory to the bituminous coal wage agreement then in effect shall be used for purposes of any eligibility requirement of minimum signatory service under this Article. A year of service shall be calculated on the basis of a calendar year and in accordance with the terms of Article IV(A).

(2) For purposes of this Article II, years of nonclassified signatory service in the coal industry by a Participant after May 28, 1946, for Employers signatory to the bituminous coal wage agreement then in effect shall be used for purposes of any eligibility requirement of minimum signatory service provided that:

(a) the nonclassified signatory service with an Employer immediately preceded or followed classified signatory service with the same Employer;

(b) credit for nonclassified service shall not be given for any calendar year in which the Participant completed less than 1,000 hours of such service, as defined under Article I(A)(7);

(c) all years of service before age 18 shall be disregarded;

(d) all years of service performed before January 1, 1971, shall be disregarded unless the Participant completed at least three years of employment after December 31, 1970;

Provided further that, if the employee has not earned a non-forfeitable right to a pension:

(e) all years of service prior to a break in service shall be disregarded unless the employee completes 1,000 hours (or 800 hours worked on the weekend/holiday crew of a signatory Employer as provided in Appendix C of the 1993 NBCWA) of service within a 12-month period after the break;

(f) all years of service prior to any period of consecutive one-year breaks in service shall be disregarded if the number of such consecutive one-year breaks equals or exceeds the greater of (i) five, or (ii) the aggregate number of years of service before such breaks shall be deemed not to include any years of service not required to

10

be taken into account under this subparagraph by reason of any prior break in service.

(3)  For purposes of Article II(G)(2) and II(B)(2), an employee shall incur a break in service for any calendar year in which such Employee completes not more than 500 hours (or 400 hours worked on the weekend/holiday crew of a signatory Employer as provided in Appendix C of the 1993 NBCWA) of service; provided that, in the case of an Employee who is absent from work for any period --

      (a)  by reason of the pregnancy of the Employee,

      (b)  by reason of the birth of a child of the Employee,

      (c)  by reason of the placement of a child with the Employee in connection with the adoption of such child by such Employee, or

      (d)  for purposes of caring for such child for a period beginning immediately following such birth or placement,

the Employee shall be considered to have completed the hours of service which otherwise would normally have been credited to him but for such absence, subject to the limitation set forth in Article I A(8)(1). The preceding sentence shall be applicable only in the year in which the Employee's absence from work begins, if the Employee would be prevented from incurring a one-year break in service in such year solely because of the application of the preceding sentence, or in any other case, in the immediately following year.  No credit will be given to an Employee pursuant to this subparagraph unless the Employee furnishes to the Trustees such timely information as they may reasonably require to establish that the absence from work is for reasons referred to in (a), (b), (c), or (d) above, and the number of days for which there was such an absence.

(4)  The provisions of this paragraph shall be interpreted and construed in accordance with the requirements of ERISA and the regulations issued thereunder.

(5)  Service after June 30, 1985 with a Construction Employer shall be used for purposes of paragraph G(1), only if the United Mine Workers of America 1985 Construction Workers Pension Plan grants participants credit for the same purposes under that plan for service with Employers, other than Construction Employers, except that a year of service shall be calculated on the basis of a calendar year and in accordance with the terms of Article IV.

ARTICLE III - <u>AMOUNT OF PENSION AND DEATH BENEFIT</u>

A.   Retirement On or After December 16, 1993

A pension granted to a Participant who retires on or after December 16, 1993, pursuant to Article II shall consist of a pension amount payable in monthly installments provided in accordance with the provisions of this Article III as set forth below.  In no event, however, shall the annual retirement benefit payable to a Participant exceed the limitation of Section 415 of the Internal Revenue Code of 1986 and any regulations promulgated thereunder.

(1)  <u>Age 55 Retirement Pension</u>

(a)  A deferred pension, commencing after attainment of age 62, computed under the provisions of paragraph 2 below; or, at the election of the Participant, (b) an immediate pension, equal to the deferred pension to which the Participant could have been eligible under (a) above had the Participant so elected, reduced by 1/4 of one percent (1%) for each full month (3 percent (3%) per year) between the date on which pension benefits began and the date on which Participant attains age 62.

(2)  <u>Normal Retirement Pension</u>

For retirements occurring during the 1993 Wage Agreement the amount of pension for Normal Retirement shall be determined as follows:

(a)  for each year of credited non-signatory service as defined herein, $10.00 per month;

(b)  for each of the first 10 years of credited signatory service earned prior to February 1, 1989, $26.50 per month;

(c)  for each year of credited signatory service in excess of 10 years but not to exceed 20 years earned prior to February 1, 1989, $27.00 per month;

(d)  for each year of credited signatory service in excess of 20 years but not to exceed 30 years earned prior to February 1, 1989, $27.50 per month;

(e)  for each year of credited signatory service in excess of 30 years earned prior to February 1, 1989, $28.00 per month.

(f)  The retirement benefit for a year of credited signatory service earned from February 1, 1989 to January 31, 1990, is $34.00 per month.

12

(g)   The retirement benefit for each year of credited signatory service earned from February 1, 1990 to December 16, 1993, is $38.50 per month.

(h)   The retirement benefit for each year of credited signatory service earned from December 16, 1993 is $41.50 per month.

Proportional credit shall be allowed for any fractional years of credited service pursuant to Article IV hereof. Periods of Construction Industry Service shall be taken into account solely to determine whether the amount specified in clause (a), (b), (c), (d), or (e) is to be used in determining the amount of pension that is earned for a given period of Credited Service. In any year for which two of clauses (a), (b), (c), (d), or (e) would apply, if a Participant has both Credited Service and Construction Industry Service, the amount determined under each clause shall be equal to the amount that would be determined if Construction Industry Service in that year were considered service under this Plan, multiplied by a fraction, the numerator of which is the Participant's hours of service under this Plan for that year and the denominator of which is the sum of such hours and the Participant's hours of Construction Service for that year.

(3)   Disability Retirement Pension

Subject to (4) below for a Participant whose disabling accident occurs after December 16, 1993, the pension payment shall be computed under the provisions of paragraph (2) above. In the case of a participant who has both Construction Industry Service and Credited Service, the amount of pension under this subparagraph (3) shall be based only on the Participant's years of Credited Service and shall be determined in the same manner as under Article III.A.(2).

(4)   Minimum Disability Retirement Pension

The amount of pension for Minimum Disability Retirement shall be $200 per month for disabilities occurring on or after February 1, 1990. In any case in which a participant entitled to pension for Minimum Disability Retirement has both Credited Service and Construction Service, the amount of pension under this subparagraph (4) shall be equal to the amount otherwise payable under this subparagraph, multiplied by a fraction, the numerator of which is the number of years of Credited Service and the denominator of which is the sum of the number of years of Credited Service and the number of years of Construction Industry Service.

13

(5)  <u>Deferred Vested Pension</u>

(a)  The amount of a deferred vested pension (Article II E(1) shall be a pension, commencing on or after attainment of age 62, computed under the provisions of Subsection A(2) of this Article III, or, at the Participant's election, between ages 5 and 62 with the pension payable reduced to its actuarial equivalent pursuant to Appendix A; provided, however, that in the case of any Participant with at least (20) years of credited service, such pension shall not be reduced to less than $150.00 per month.

(b)  The amount of a deferred vested pension (Article II E(2))shall be a pension, commencing on or after attainment of age 62, computed under the provisions of Subsection A(2) of this Article III, or, at the Participant's election, between ages 55 and 62 with the pension computed under the provisions of Subsection A(1) of this Article III.

B.  <u>Increased Pension</u>

(1)  Increases in pensions are not applicable to Participants whose employment was terminated prior to December 16, 1993, and who will become eligible for only a deferred vested pension (II E(1)).

(2) (a)  Any Participant not described in clause (b) whose pension is in pay status as of December 16, 1993, shall receive a one-time single sum payment of $500. Any Participant not described in clause (b) whose pension is in pay status as of December 16, 1994, shall receive a one-time single sum payment of $500. Any Participant not described in clause (b) whose pension is in pay status as of December 16, 1995, shall receive a one-time single sum payment of $500.

(b)  Any Participant whose disability retirement pursuant to Article II C or D is in pay status as of December 16, 1993, shall receive a one-time single sum payment of $290. Any Participant whose disability retirement pursuant to Article II C or D is in pay status as of December 16, 1994, shall receive a one-time single sum payment of $290. Any Participant whose disability retirement pursuant to Article II C or D is in pay status as of December 16, 1995, shall receive a one-time single sum payment of $290.

(c)  Any Surviving Spouse whose benefit under Article VI is in pay status as of December 16, 1993, shall receive a one-time single sum payment of $375. Any Surviving Spouse whose benefit under Article VI is in pay status as of December 16, 1994 shall receive a one-time single sum payment of $375. Any Surviving

Spouse whose benefit under Article VI is in pay status as of December 16, 1995 shall receive a one-time single sum payment of $375.

(d)   Any qualified surviving spouse whose benefit under Article VII is in pay status as of December 16, 1993, shall receive a one-time single sum payment of $375.  Any qualified surviving spouse whose benefit under Article VII is in pay status as of December 16, 1994 shall receive a one-time single sum payment of $375.  Any qualified surviving spouse whose benefit under Article VII is in pay status as of December 16, 1995 shall receive a one-time single sum payment of $375.

(e)   The one-time single sum payments provided for herein are not intended as an ongoing feature of this Plan, and the Plan shall have no obligation to provide payments of this type other than those expressly provided for above.

C.   Application for Pension and Commencement, Suspension and Termination of Pensions

Payments of pensions shall be subject to the following:

(1)   The first payment on any pension shall be made as soon as possible after an application for pension has been received and shall be for the month following the month in which the Participant retires (Article I B) and becomes eligible for a pension in accordance with Article II; provided, however, that in the case of a deferred pension pursuant to Article III(A)(1) or a deferred vested pension pursuant to Article III(A)(5), such payment shall be for the later of (a) the month specified by the Participant in his application for pension if such month is subsequent to the month in which such Participant attains age 55, or (b) the month in which the application for pension is received, but not later than the month following the month in which such Participant attains age 62.

(2)   The last payment shall be for the month in which the pensioner dies.

(3)   Pension payments shall be payable on the first day of each month at the pensioner's last address of record.

(4)   Pension payments shall be suspended for any month in which the pensioner is employed, subsequent to commencement of such payments, in the bituminous coal industry, in the same trade or craft (trade or craft shall mean the coal mining industry), and in the same geographic area covered by this Plan.  The provisions of this paragraph shall be interpreted in accordance with any regulations issued pursuant to Sections 203(a)(3) and (B) of ERISA.

15

(5)   Any Participant who continues to be employed by an Employer after retirement shall not be entitled to receive pension benefits under this Plan until such time as such Participant is no longer employed by an Employer; provided, however, that benefit payments shall commence not later than April 1 of the calendar year following the calendar year in which the Participant attains age 70-1/2.

D.   Death Benefit

(1) Except as otherwise provided herein, a death benefit shall be paid to the named beneficiary of any pensioner (other than a Pensioner receiving a deferred vested pension based on less than 20 years of credited service or a Pensioner receiving a pension based in whole or in part on years of service credited under the terms of Article II G) whose death occurs on or after February 1, 1993, and who meets the requirements of paragraph (2) of this section.  The death benefit shall be equal to $5,000 if the named beneficiary is the Pensioner's surviving spouse or dependent.  In any other case, the death benefit shall be equal to $4,000.  The death benefit provided under this section shall not be payable if any other death or life insurance benefit is paid on behalf of the Pensioner from any other Plan maintained by an Employer.

(2)   A Pensioner meets the requirements of this paragraph only if he is not entitled to death benefit coverage from a plan maintained by his former Employer and he meets one of the following conditions:

(i)  the Pensioner is a participant in the 1992 UMWA Benefit Plan;

(ii) the Pensioner is a participant in the UMWA 1993 Benefit Trust;

(iii) the Pensioner is a participant in an individual employer plan maintained pursuant to section 9711 of the Internal Revenue Code and whose last signatory employer ceased producing and/or processing coal prior to December 16, 1993;

(iv) the Pensioner was entitled to death benefit coverage from this Plan on February 1, 1993 (or would have been had he been retired or eligible to retire on that date); or

(v)  the Pensioner's last signatory employer (the Employer for whom such pensioner last worked in signatory classified employment) is a current contributor to this Plan and is signatory either to the National Bituminous Coal Wage Agreement of 1993 or to an agreement (including prior agreements,

16

where applicable) requiring a contribution obligation with respect to this Plan that is identical to the contribution obligation set forth in the National Bituminous Coal Wage Agreement of 1993 (or prior National Bituminous Coal Wage Agreements, where applicable).

(3)  The death benefit provided under this section shall not be payable with respect to any Pensioner who was an eligible beneficiary of the United Mine Workers of America Combined Benefit Fund described in section 9703(f) of the Internal Revenue Code of 1986, as amended by the Coal Industry Retiree Health Benefit Act of 1992, whose death occurs on or after February 1, 1993.

(4)  For purposes of this section, the term "dependent" shall mean any person described in (a) through (e), below, as of the date of death of the Pensioner.  A person shall be considered to have been a dependent of a Pensioner if such Pensioner or his spouse provided over one-half of the support to such person on a regular basis.

(i) a spouse who is living with or being supported by the Pensioner;

(ii) an unmarried dependent child of the Pensioner who has not attained age 22;

(iii)  a parent of a Pensioner or of a Pensioner's spouse, if the parent has been dependent upon and living in the same household (residence) as the Pensioner for a continuous period of at least one year;

(iv) an unmarried dependent grandchild of a Pensioner or of a Pensioner's spouse who has not attained age 22, and is living in the same household (residence) with such Pensioner; and

(v)  a dependent child (of any age) of a Pensioner or of a Pensioner's spouse who is mentally retarded or who becomes disabled prior to attaining age 22, and such disability is continuous, and who is either living in the same household with such Pensioner or is confined to an institution for care or treatment.

ARTICLE IV - <u>CREDITED SERVICE</u>

A.    <u>Nonsignatory Service</u>

Subject to the limitations in paragraph C of this article IV, credited service is a period during which the participant meets the requirements of subparagraphs (1), (2), (3) or (4) below.  Any credited service shall be nonsignatory service unless it qualifies as signatory service pursuant to Article IV(B) hereof.

(1)  A Participant shall receive credit for a year of service for any calendar year in which he worked, subsequent to December 31, 1936, as an employee in a job classified in the then existing bituminous coal wage agreement for an employer in the coal industry for at least 1,000 hours of service, with credit given for the next lowest 1/4 year in the event any employee works less than 1,000 hours of service as follows:

|  |  |
|---|---|
| 750-999 hours, | 3/4 year |
| 500-749 hours, | 1/2 year |
| 250-499 hours, | 1/4 year |
| 249 hours or less, | 0 |

With respect to any period of such service for which records of hours of service are not available or it is not feasible in light of the administrative and cost difficulties involved to compile a record of service, an applicant shall be deemed to have worked a thousand hours of service if the employee received wages in an amount equal to the product of (i) the lesser of 125 days or 1/2 the average number of days the bituminous mines in the United States were active, multiplied by (ii) the daily basic rate paid in the bituminous coal industry for that year; provided that for any year for which information is not available as to the average number of days the mines were active, the available data for the nearest year next preceding shall be used; provided further that if an applicant earned less than the minimum amount required for a year of service, credit for service shall be given to the next lowest 1/4 year in the manner indicated with respect to hours of service.

(2)  A Participant shall receive credit for a year of service for any calendar year in which the Participant worked, prior to January 1, 1937, as an employee in a job classified in the then existing coal wage agreement for an Employer in the bituminous coal industry, in a minimum of at least six (6) months during a calendar year, provided that if the applicant worked in less than six (6) months, credit for service shall be awarded to the next lowest one-fourth (1/4) year, based upon service in six (6) monthly equalling a year's service.

18

(3)   A Participant shall receive credit for a year of service for any calendar year in which the Participant received state worker's compensation payments pursuant to an award as a result of an occupational disease or injury sustained in the mine while regularly employed in a classified job under the bituminous coal wage agreement then in effect; provided, in the case of occupational disease, the Participant had been so employed by an Employer signatory to the Wage Agreement then in effect for at least ten (10) years after May 28, 1946.   Credit shall be given up to a maximum of four (4) years service credit from date of injury, or from the date of last employment in case of occupational disease, provided the Participant did not work regularly (earned at least $200 per month) during the compensable period.   Benefits awarded pursuant to the Federal Coal Mine Health and Safety Act of 1969 shall be deemed "state worker's compensation payments" within the meaning of this section, only if the miner was last regularly employed in the coal industry after the enactment date of the Act, December 30, 1969, in a classified job under the bituminous coal wage agreement then in effect, and had been so employed by an operator signatory to the agreement for at least ten (10) years after May 28, 1946.   In no event shall any service be credited under this paragraph (3) with respect to periods after December 6, 1974.

(4)   A Participant shall receive credit for a year of service for any year served in the military service of the United States in any war, national emergency, or international police action, immediately following regular employment in a classified job under the bituminous coal wage agreement then in effect, provided that credit for such service shall be limited to the original period of enlistment or obligated military service; and provided further that the Participant returned to work in a classified job within twelve (12) months after his date of separation from the military service, unless he was precluded from doing so by service connected sickness, accident, or other disability, and returns to work in a classified job when no longer precluded by such disability.   Service credit for the period of military service shall be computed in the same manner as credit is computed for service prior to 1937, as described in paragraph A(2) hereof.

B.   Signatory Service

Credited signatory service is:

(1)(a)   For any calendar year prior to January 1, 1978, service as defined in paragraph A(1) hereof during which a Participant worked as an employee in a classified job for an Employer signatory to the bituminous coal wage agreement then in effect.

19

(b)   For purposes of determining eligibility for a pension (vesting) under Article II, service for any calendar year subsequent to December 31, 1977 during which a Participant works as an employee in a classified job for an Employer signatory to the bituminous coal wage agreement then in effect, computed based on hours of service as defined in Article I A(10) as follows:

| Hours of Service During a Calendar Year as a Classified Employee for a Signatory Employer | Percentage of a Year of Credited Signatory Service |
|---|---|
| 249 or less | 0% |
| 250 - 499 | 25% |
| 500 - 749 | 50% |
| 750 - 999 | 75% |
| 1,000 or more | 100% |

Notwithstanding the foregoing, a classified Employee working on the weekend/holiday crew of a signatory Employer as provided in Appendix C of the National Bituminous Coal Wage Agreement of 1993 shall receive credit for a percentage of a year calculated in accordance with the following schedule:

| Hours Worked On Weekend/Holiday Crew | Percentage of a Year of Signatory Service |
|---|---|
| less than 200 | 0 |
| 200-399 | 25% |
| 400-599 | 50% |
| 600-799 | 75% |
| 800 or more | 100% |

A Classified Employee who earns both regular hours and weekend/holiday crew hours during a calendar year, but who earns fewer than 1,000 hours in total for the year, may combine the partial credits earned under each of the schedules shown above.

Special Rule for 1993 -- For the calendar year 1993, a classified Employee who participated in an authorized strike following expiration of the 1988 Wage Agreement and who worked at least 500 hours will receive credit for a full year of signatory service.

(c)   For purposes of determining the amount of pension, under Article III, service for any calendar year subsequent to December 31, 1977, during which a Participant works as an employee in a classified job for an Employer signatory to

the bituminous coal wage agreement then in effect, computed based on hours worked as defined in Article I A(12) as follows:

| Hours of Service During a Calendar Year as a Classified Employee for a Signatory Employer | Percentage of a Year of Credited Signatory Service |
|---|---|
| 249 or less | 0% |
| 250 - 499 | 25% |
| 500 - 749 | 50% |
| 750 - 999 | 75% |
| 1,000 or more | 100% |

Notwithstanding the foregoing, a classified Employee working on the weekend/holiday crew of a signatory Employer as provided in Appendix C of the National Bituminous Coal Wage Agreement of 1993 shall receive credit for a percentage of a year calculated in accordance with the following schedule:

| Hours Worked On Weekend/Holiday Crew | Percentage of a Year of Signatory Service |
|---|---|
| less than 200 | 0 |
| 200-399 | 25% |
| 400-599 | 50% |
| 600-799 | 75% |
| 800 or more | 100% |

A Classified Employee who earns both regular hours and weekend/holiday crew hours during a calendar year, but who earns fewer than 1,000 hours in total for the year, may combine the partial credits earned under each of the schedules shown above.

Special Rule for 1993 -- For the calendar year 1993, a classified Employee who participated in an authorized strike following expiration of the 1988 Wage Agreement and who worked at least 500 hours will receive credit for a full year of signatory service.

(2)   Service prior to December 6, 1974, as defined in paragraph A(3) hereof during which a Participant received state worker's compensation payments if such payments are pursuant to an award as a result of an occupational disease or injury awarded after May 28, 1946, and if the Participant was last regularly employed prior to such service as an employee in a classified job for an Employer signatory to the bituminous coal wage agreement then in effect.

21

(3)  Service, at a rate of 8 hours for each regularly scheduled work day, during which a Participant receives or is eligible to receive weekly Sickness and Accident Benefits pursuant to Article XI of the National Bituminous Coal Wage Agreement of 1974, as amended from time to time, and any successor agreements thereto.

(4)  A Participant who retires on or after March 27, 1978, shall receive credit for a year of service for any calendar year (including calendar years prior to 1978) in which he rendered service as an employee of the United Mine Workers of America (UMWA) in the coal industry immediately following regular employment in a classified job under the bituminous coal wage agreement then in effect; provided that the Participant does not, or is not eligible to, receive a pension or other retirement income from the UMWA.  Credit or service with the UMWA shall be computed in the same manner as:

(a)  credit is computed for service prior to 1937, as described in paragraph A(2) hereof, or

(b)  credit is computed for service under the pension plan of the UMWA, whichever is greater, for service prior to January 1, 1978.

Credit for service after December 31, 1977, shall be computed in the same manner as credit is computed for service under the pension plan of the UMWA.

In no event shall a Participant receive credit under this paragraph (4) while receiving a pension under this Plan.

Notwithstanding anything in this paragraph (4) to the contrary, a Participant,

(a)  who is not employed in a classified job for an Employer on March 27, 1978, or

(b)  who is not employed by the UMWA on March 27, 1978, or

(c)  who had retired prior to March 27, 1978, and was eligible to receive, or upon application would have been eligible to receive, a pension under the 1950 Pension Plan, the 1974 Pension Plan or a retirement plan of the UMWA prior to March 27, 1978, shall not receive signatory service credit for the years of UMWA employment described above if it occurred prior to March 27, 1978, unless such Participant is re-employed in a classified job and

(1)  obtains at least 3 years of credited service after March 27, 1978, or

22

(2)   ceases to be employed in the classified job or employed by the UMWA as the result of

(i)   nonoccupational disability or accident

(ii)  occupational injury for which the Participant receives worker's compensation, or

(3)   dies after March 27, 1978 at a time when the Participant is employed in a classified job for an Employer or when employed by the UMWA.

(5)   Service as defined in paragraph A(4) hereof during which a Participant served in the military service of the United States, provided that the classified employment referred to therein (both before and after military service) is for an Employer signatory to the bituminous coal wage agreement then in effect and provided further, however, that for military service credited after December 31, 1974, the Participant returned to work in a classified job within ninety (90) days after the date of separation from the military service or such longer period as may be allowed by law.

(6)   Service (within the meaning of paragraph A(1) hereof) by an employee in a classified job for an Employer not signatory to the bituminous coal wage agreement then in effect if (i) such service is continuous, (ii) such Employer becomes a signatory to the bituminous coal wage agreement after the effective date as a result of recognizing the UMWA as the bargaining representative of its employees, (iii) the employee is working in a classified job with such Employer at the time such Employer becomes signatory to the bituminous coal wage agreement, and (iv) such employee remains in a classified job with such Employer during the twenty-four month period immediately following the date on which such Employer becomes signatory to the bituminous coal wage agreement; provided, however, that not more than ten (10) years of nonsignatory service may be recognized or awarded as signatory service to any person pursuant to this paragraph (6).

C.   Additional Rules Concerning Credited Service

(1)   Except as provided in Article IV(B)(6), employment after April 1, 1971, will not constitute credited service under paragraph A(1) hereof unless such employment was in a classified job for an Employer.

(2)   A Participant shall not be credited with more than one year of service for any calendar year by reason of any combination of the rules of this Article IV.

(3)   The maximum number of years of nonsignatory service which may be included in the credited service of any Participant

retiring after December 31, 1981 shall be the number of years by which twenty years exceeds such Participant's signatory service, but not in excess of ten years.

(4)  No credit for service shall be awarded a Participant for any period in which such Participant was directly connected with the ownership, operation or management of a mine; provided, however, that in the case of any Participant who received credit for such service before July 1, 1974, under the terms of the pension plan program established under the United Mine Workers of America Welfare and Retirement Fund of 1950, credit shall be awarded for any period prior to July 1, 1975, in which the Participant worked as an employee in a classified job in a mine in which such Participant had no controlling interest, as a member of a cooperative or gang-working crew which shared the profits and losses, and which was operated under the bituminous coal wage agreement then in effect; and provided further, that in the case of a Participant who received credit for service before July 1, 1974, under the terms of the pension plan program established under the United Mine Workers of America Welfare and Retirement Fund of 1950, credit for signatory service shall be awarded for any period prior to July 1, 1975, during which such Participant worked in a classified job pursuant to an agreement to produce coal for a signatory coal company which exercised control over the operation of the mine and was responsible for royalty payments on such coal produced to the 1974 Pension Trust or its predecessor.

(5)  The following maximum years of nonsignatory service may be included in credited service under this Plan:

| Date of Retirement | Maximum Years of Nonsignatory Service |
|---|---|
| January 1, 1978 to December 31, 1978 | 13 |
| January 1, 1979 to December 31, 1979 | 12 |
| January 1, 1980 to December 31, 1980 | 11 |
| January 1, 1981 and thereafter | 10 |

(6)  A Participant with less than ten years of signatory service shall not be entitled to receive a pension under paragraph (A), (B), or (E) of Article II unless such Participant has at least twenty years of credited service, including at least the following minimum number of years of signatory service:

24

| Date of Retirement | Years of Signatory Service Required |
|---|---|
| January 1, 1978 to December 31, 1978 | Seven (7) years |
| January 1, 1979 to December 31, 1979 | Eight (8) years |
| January 1, 1980 to December 31, 1980 | Nine (9) years |
| January 1, 1981 and thereafter | Ten (10) years |

(7)  Except as provided in Article V, service credits shall not be accrued subsequent to the effective date of pension payments.

(8)  In the case of any Participant, except a Participant covered under Article IV B(4), the last day of credited service shall be the last day on which the Participant works as an employee in a classified job for an Employer, unless such Participant continues to accrue credited service during the period for which such Participant receives or is eligible to receive weekly sickness and accident benefit pursuant to Article XI of the Wage Agreement, in which case the last day of credited service shall be the last day for which such sickness and accident benefits are paid or would have been paid.  For a Participant covered under Article IV B(4), the last day of credited service shall be the later of the last day as determined in the preceding sentence or the last day the Participant worked for the UMWA.

(9)  An employee who is regularly employed in a classified job for an Employer and who performs supervisory duties on a temporary basis for not more than 120 work days during any consecutive period of 12 months, shall be deemed to be employed in a classified job during the days on which the Participant performs such supervisory duties.

D.  **Construction Industry Service**

(1)  Notwithstanding anything to the contrary, and except for purposes of Article II.C and II.D and as provided by Article II.G, no Construction Industry Service of a Participant shall be considered Credited Service under this Plan.

(2)  In any case in which a Participant has both Construction Industry Service and at least one hour of service creditable under paragraphs B or C of this Article for any year beginning after December 31, 1985, the Participant's Credited

Service for that year shall be determined by multiplying the Credited Service the Participant would be entitled to if Construction Industry Service were considered service under this Article by a fraction, the numerator of which is the Participant's hours of service creditable under this Article for that year and the denominator of which is the sum of such hours and the Participant's hours of Construction Industry Service for that year.

(3)   In any case in which, after June 30, 1985, and before January 1, 1986, a Participant has both Construction Industry Service and at least one hour of service creditable under the provisions of paragraphs B or C of this Article, the Participant's Credited Service for that year shall be equal to the sum of his Credited Service for the period beginning January 1, 1985, and ending June 30, 1985, and a fraction of what his Credited Service would be for the period beginning July 1, 1985 and ending December 31, 1985, if Construction Industry Service were considered service under this Article.  Such fraction is determined by dividing the Participant's hours of service under paragraphs B and C of this Article by the sum of such hours of service and the Participant's hours of Construction Industry Service.

(4)   Notwithstanding subparagraph D.(2) or D.(3), the Credited Service of of a Participant for a year in which either subparagraph applies shall not exceed one minus the portion of a year for which the Participant receives credit for accrual purposes under the United Mine Workers of America Construction Workers Pension Plan.  If, in any year, a Participant receives one year of credit for accrual purposes under the United Mine Workers of America Construction Workers Pension Plan, he shall not be entitled to any Credited Service for such year.

26

## ARTICLE V - REEMPLOYMENT AFTER ATTAINMENT OF PENSION ELIGIBILITY

A.    Any Participant who has been retired and receiving a pension under this Plan and who shall be reemployed in a classified job by an Employer shall, for the purpose of calculating any subsequent pension benefits to which such Participant may become entitled, upon subsequent retirement, be granted a pension equal to the sum of the pension such Participant was previously receiving plus the excess of (i) over (ii) where (i) is the pension to which such Participant would be entitled at the time of such retirement, based upon all years of Credited Service under the Plan and (ii) is the pension to which such Participant would be entitled at the time of such retirement, based solely on Credited Service at the time of his previous retirement.

B.    Any Participant eligible for a deferred vested pension under this Plan whose shall be reemployed in a classified job by an Employer prior to the commencement of pension benefit shall, for the purpose of calculating any subsequent pension benefits to which he may become entitled, be granted his credited service applicable to the deferred vested pension plus his credited service accrued after such reemployment.

C.    Any Participant who is reemployed in a classified job by an Employer after attainment of eligibility for a deferred vested pension under this Plan, whose employment is subsequently terminated and who at that time is not eligible for a pension under any provision of Article II by reason of Article IV(C)(6), shall be considered to be eligible for the deferred vested pension for which such Participant was eligible prior to such reemployment and upon application for pension the date of retirement shall be considered to be the date of retirement which would, upon application for pension, have been applicable to the deferred vested pension for which such Participant was eligible prior to such reemployment.

27

## ARTICLE VI - <u>SURVIVING SPOUSE BENEFIT</u>

A.    (1)    Except as provided in paragraph (B) of this Article, a Surviving Spouse Benefit is provided for any Participant who (a) has retired and is receiving a pension under this Plan, except a Participant receiving a deferred vested pension who has not completed at least twenty years of credited service, (b) has not retired but at the date of his death otherwise met the eligibility requirements for an immediate pension under Article II(A), (B), (C) or (D) under this Plan, or (c) has attained age 55 with at least twenty years of credited service and who has retired and is entitled to elect an immediate pension under Article II(A), II(B) or II(E) at the date of death.

(2)    The amount of such benefit shall be equal to 75% of the amount of the Participant's pension at the time of death or, in the event the Participant dies after age 55 at a time when such Participant was eligible to elect a pension or to retire and receive a pension under Article II, but prior to the receipt of a pension, 75% of the amount of the pension such Participant would have received if such Participant had elected a pension or retired and become entitled to a pension as of the date immediately preceding the date of death.

(3)    The Surviving Spouse Benefit will not be effective unless the Participant and the spouse have been married throughout the nine-month period ending on the date of the Participant's death or unless such nine-month requirement would be waived for purposes of determining entitlement to widow's or widower's insurance benefits under the Social Security Act.

(4)    Payment to an eligible spouse will commence as of the first of the month following the month in which the Participant's death occurs and the final payment shall be made for the month in which the spouse's death occurs.

B.    (1)    Any Participant who is not employed in a classified job for an Employer on December 6, 1974, is not covered for a Surviving Spouse Benefit under this Article unless such Participant (a) obtains at least three years of credited service after such date, or (b) had ceased to be employed in a classified job as a result of (i) layoff, (ii) nonoccupational disability or accident, or (iii) occupational injury for which such Participant was receiving workers' compensation, or (c) such Participant dies at a time when he is employed in a classified job for an Employer.

(2)    Any Participant who retires on or before December 31, 1975, and is again employed in a classified job for an Employer after such retirement, is not covered for a Surviving Spouse Benefit under this Article unless (a) such Participant obtains at least three years of credited service after such

28

reemployment or (b) unless such reemployment ceases as a result of (i) layoff, (ii) nonoccupational disability or accident, or (iii) occupational injury for which worker's compensation benefits were awarded, or (c) such Participant dies while employed in a classified job for an Employer.

ARTICLE VII - <u>JOINT AND SURVIVOR ANNUITIES</u>

A.    Notwithstanding any other provision of this Plan, if a Participant qualifies for a pension under this Plan, but is not covered by a Surviving Spouse Benefit, the Pension benefit otherwise provided to such Participant shall be reduced actuarially pursuant to Appendix B, and 50% of such reduced pension benefit will be continued, after the death of the Participant, for the life of any qualified surviving spouse; provided, however, that such Participant may elect, within the election period specified in Paragraph C(1) below, and subject to the requirement of Paragraph D below, not to take a joint and survivor annuity as provided for in this Article and instead to receive a pension benefit for life only.

B.    If a Participant has completed 10 years of signatory service for vesting purposes, calculated pursuant to Article II (G), is not covered by a Surviving Spouse Benefit, and dies before he is entitled to elect or elects to receive a pension benefit, the qualified surviving spouse shall be entitled to receive a survivor's benefit in the form of an annuity for life in an amount equal to 75% of the pension benefit the decedent would have received if the decedent had --

(1)   separated from service on the date of death,

(2)   survived to age 55 (in the case of a decedent who died before attaining age 55),

(3) retired with an immediate Joint and Survivor Annuity as provided for in this Article at age 55, (or, if later on the date before the decedent's date of death).

(4)   died on the day after the day on which the decedent would have attained age 55 (in the case of a decedent who died before attaining age 55).

Payment to a qualified spouse under this paragraph will commence on the first of the month following the month in which the decedent would have attained age 55 (or, if later, the first of the month following the month of the decedent's death) and the final payment shall be for the month in which the spouse's death occurs.

C.    (1)   The "election period" in the case of an election to waive the Joint and Survivor Annuity described in Paragraph A shall be the 180-day period ending on the date of the commencement of benefits. Prior to the election period, the Trustees shall furnish the Participant (a) a general description or explanation of the qualified Joint and Survivor Annuity, the circumstances in which it will be provided unless the Participant elects not to have benefits provided in that form, the

30

availability of such election and the right to revoke such election, and the rights of the Participant's spouse; and (b) a general explanation of the relative financial effect of such election on the Participant's pension.  In the event a Participant elects not to receive a Joint and Survivor Annuity, such election shall not become effective if the Participant dies within a period of two years beginning on the date of such election.

(2)  A Participant may revoke any election made pursuant to this Article at any time during the applicable election period.

D.  An election made under this Article shall not take effect unless--

(1)  the spouse of the Participant consents in writing to such election, and the spouse's consent acknowledges the effect of such election and is witnessed by a Plan representative or a notary public, or

(2)  It is established to the satisfaction of the Trustees that the consent required under subparagraph (1) may not be obtained because there is no spouse, because the spouse cannot be located, or because of such other circumstances as the Trustees may by law consider.

E.  A qualified surviving spouse shall be any spouse who has been married to the Participant for at least nine months prior to death, unless such nine-month requirement would be waived for purposes of determining entitlement to widow or widower's insurance benefits under the Social Security Act.

F.  Except as provided in Paragraph B above, payment to a qualified surviving spouse under this Article will commence as of the first of the month following the month in which the Participant's death occurs, and the final payment shall be made for the month in which the spouse's death occurs.

ARTICLE VIII - <u>MISCELLANEOUS</u>

A.   <u>Determination of Eligibility</u>

The Trustees or such other named fiduciaries as may be properly designated shall have full and final determination as to all issues concerning eligibility for benefits.

B.   <u>General</u>

(1)   The Trustees are authorized to promulgate rules and regulations to implement this Plan, and those rules and regulations shall be binding upon all persons dealing with and Participants claiming benefits under this Plan.

(2)   No benefit payable under this Plan shall be subject in any way to alienation, sale, transfer, assignment, pledge, attachments, garnishments, execution or encumbrance of any kind, and any attempt to accomplish the same shall be void. Notwithstanding the foregoing, the Plan shall comply with any qualified domestic relations order, as that term is defined in ERISA, and with any written authorization by a Participant or beneficiary made pursuant to paragraph (19) of this section.

(3)   The Employers and the Union, by joint action, reserve the right at any time and from time to time to modify or amend in whole or in part any or all of the provisions of this instrument or to terminate this Plan, without reopening or otherwise affecting the integrity of any other provision of the Wage Agreement, by a written agreement between the Employers and the Union, provided, however, that:

(a)   this Plan shall not be amended in such manner as would cause or permit any part of the assets in the 1974 Pension Trust to be diverted to purposes other than the exclusive benefit of the Participants and their beneficiaries;

(b)   this Plan shall not be amended to deny to a Participant retroactively any benefits to which such Participant was entitled under this Plan, unless such amendment is necessary to conform this Plan to, or to satisfy the conditions of, any law, governmental regulations or ruling;

(c)   the Employers and the Union have delegated to the Trustees the authority and responsibility to make certain changes and amendments as set forth in Article XX(g)(4) of the National Bituminous Coal Wage Agreement of 1993, as amended from time to time, and any successor agreements to that specific Agreement; and

32

(d)   any written agreement executed by the Union shall be signed by the International President.

(4)   Upon the termination of this Plan or the complete discontinuance of contributions to the 1974 Pension Trust, this Plan shall remain in force and effect for the period necessary to complete the payment of benefits in accordance with the terms of this Plan to the extent assets in the 1974 Pension Trust are available to pay such benefits.

(5)   Forfeitures arising from the operation of the Plan shall not be used to increase the benefits which otherwise would be received under this Plan.

(6)   Any Participant or beneficiary whose claim for benefits under this Plan has been denied shall be (a) provided with adequate notice in writing setting forth the specific reasons for such denial, such notice shall be written in a manner calculated to be understood by the Participant, and (b) afforded a reasonable opportunity for a full and fair review of the decision denying the claim by an appropriate named fiduciary or a person properly designated to carry out such responsibility.

(7)   The Trustees are hereby authorized to allocate fiduciary responsibilities in any manner permitted pursuant to section 405(c) of ERISA and to appoint an investment manager or managers as permitted by section 402(c) of ERISA.

(8)   Contributions to the 1974 Pension Trust to fund the benefits under this Plan shall be paid solely by the Employers in accordance with Article XX of the National Bituminous Coal Wage Agreement of 1993, as amended from time to time, and any successor agreements to that specific Agreement.

(9)   In the event that this Plan merges or consolidates with, or transfers some or all of its assets or liabilities to, any other plan, no Participant or beneficiary herein shall, solely on account of merger, consolidation or transfer, be entitled to an accrued benefit immediately following such event which is less than the benefit to which such Participant or beneficiary would have been entitled immediately preceding such event.

(10) In the event that an Employer fails to make the contributions to the Plan required by Article XX of the National Bituminous Coal Wage Agreement of 1993, interest (calculated at a rate established by the Trustees at the beginning of each calendar year) shall accrue from the date due until the date on which payment is made.  If the Trustees file suit to collect unpaid contributions, plus accrued interest, and a judgment is entered by the courts in favor of the Trustees, the judgment

33

entered shall provide for an additional amount equal to the accrued interest in liquidated damages.

(11) Upon the termination or partial termination of the Plan, the rights of all affected Participants to benefits accrued to the date of such termination or partial termination, are nonforfeitable to the extent required by law or to the extent provided for under the National Bituminous Coal Wage Agreement of 1993.

(12) Except as otherwise provided herein, it shall be unlawful for any part of the assets held pursuant to this Plan, other than such part as is required to pay taxes and administrative expenses, to be used for, or diverted to, purposes other than for the sole and exclusive benefit of the Participants of the Plan except that in the case of a contribution which is made by an Employer by a mistake of fact, or law (other than a mistake relating to Plan qualification), such mistaken contribution may be returned to the Employer within six months after the Trustees determine that the contribution was mistakenly made.

(13) To the extent not inconsistent with the provisions hereof, the Trustees shall comply with the further requirements imposed upon them by and shall have the further powers contained in Article XX, Sections (e), (f), and (g) of the National Bituminous Coal Wage Agreement of 1993, as amended from time to time, and any successor agreements to that specific Agreement.

(14) This instrument, and the 1974 Pension Trust shall be construed, regulated and administered in accordance with Federal law, and, to the extent not preempted or inconsistent with such Federal law, the laws of the District of Columbia.

(15) Any action of the Employers which may, or must, be taken hereunder may be taken by BCOA. Any action which must be taken in writing shall be signed by the President of BCOA.

(16) Any Employer who employed any Participant eligible for coverage under, or who received or receives benefits under, the 1974 Pension Plan, or any Employer who was or is required to make, or who has made or makes contributions to the 1974 Pension Plan and Trust, is obligated and required to comply with the terms and conditions of the 1974 Pension Plan and Trust, as amended from time to time, including, but not limited to, making the contributions required under the National Bituminous Coal Wage Agreement of 1978 as amended from time to time and any successor agreements thereto, including, but not limited to, the National Bituminous Coal Wage Agreement of 1993.

(17) The Employers, the Union and the Trustees shall fully cooperate to obtain all necessary rulings and do all other acts

34

appropriate to ensure that the 1974 Pension Plan and Trust are qualified under Section 401 of the Internal Revenue Code, and that contributions are deductible under Section 404 of the Internal Revenue Code.

(18) Notwithstanding any other provision of this Plan to the contrary, a distribution of benefits shall commence to a participant not later than the April 1 of the calendar year following the calendar year in which the Participant attains age 70-1/2 and shall be distributed over the life of such Participant or over the lives of such Participant and his surviving spouse, in accordance with Section 401(a)(9) of the Internal Revenue Code of 1986 and any regulations promulgated thereunder.   In the event that the Participant dies before distributions have commenced hereunder, the surviving spouse shall begin to receive a distribution of the benefit, if any, to which such spouse is entitled no later than the date on which the participant would have attained age 70-1/2 and shall be distributed over the life of such surviving spouse.

(19) Any Participant or beneficiary whose benefit is in pay status may voluntarily authorize the Trustees to check-off an amount from his or her monthly benefit for remittance to the UMWA of Union membership dues, including assessments, initiation fees, credit union, voluntary COMPAC contributions and other voluntary deductions, provided that any such arrangement must be terminable by the Trustees upon reasonable notice, must be revocable by the Participant at any time upon reasonable notice to the Trustees, and either:

(a)   such arrangement must not permit any Participant or beneficiary to check-off an amount exceeding 10% of his or her monthly benefit; or

(b)   the designated recipient must file a written acknowledgement that it has no enforceable right in or to any Plan benefit or portion thereof (except to the extent of payments actually received pursuant to the terms of the arrangement); and

an agreement for such check-off is in effect between the Plan and the Union.  Any check-off authorization must be in writing, must be voluntary and must comply in all respects with the requirements of the Internal Revenue Code of 1986, as amended, ERISA, the Labor Management Relations Act of 1947, as amended, and any other applicable law.

ARTICLE IX - <u>PARTICIPANTS COVERED BY A SUCCESSOR PLAN</u>

The following individuals shall cease to be Participants in the Plan and shall not be entitled to benefits hereunder (with respect to Credited Service prior to December 6, 1977):

(1)  A Participant in this Plan who retired prior to December 6, 1977, if the Participant is entitled to a pension under a plan qualified under Section 401(a) of the Internal Revenue Code and established by an employer pursuant to an agreement with the UMWA which is a successor agreement to the Western Surface Coal Wage Agreement of 1975, provided that the pension is at least as great as the pension due under the terms of this Plan in effect on December 5, 1977;

(2)  A Participant in this Plan prior to December 6, 1977, who on or after December 6, 1977, is an employee of a employer which is signatory with the UMWA to a successor agreement to the Western Surface Coal Wage Agreement of 1975, if the Participant becomes a participant in a pension plan qualified under Section 401(a) of the Internal Revenue Code established by such employer pursuant to such agreement, provided that the plan gives credit for participation, vesting and Credited Service prior to December 6, 1977, determined under the terms of this Plan in effect on December 5, 1977.

ARTICLE X

A.    As soon as practicable after an Employer's complete or partial withdrawal, the Trustees shall calculate and demand payment of withdrawal liability in accordance with Section 4219 of ERISA.  In the case of a Construction Employer that withdraws on or after July 1, 1981, the amount of unfunded vested benefits allocable to it will be determined with reference to the unfunded vested benefits of the Coal Mine Construction Segment of the 1974 Pension Plan.  In the case of an Employer other than a Construction Employer that withdraws on or after July 1, 1981, the amount of unfunded vested benefits allocable to it will be determined with reference to the unfunded vested benefits of the Bituminous Coal Segment of the 1974 Pension Plan.

B.    The Trustees shall establish the Bituminous Coal and Coal Mine Construction Segments of the 1974 Pension Plan for the sole purpose of calculating employer withdrawal liability under this Article.  Assets and liabilities will be allocated to the two segments in accordance with the following:

(1)  All of a Participant's Credited Service under the Plan through June 30, 1981 will be allocated to the Coal Mine Construction Segment if the Participant's last Credited Service on or before June 30, 1981 was rendered for a Construction Employer.  All of a Participant's Credited Service under the Plan through June 30, 1981 will be allocated to the Bituminous Coal Segment if the Participant's last Credited Service on or before June 30, 1981 was rendered for an Employer other than a Construction Employer.  Service credited under the Plan for any period after June 30, 1981 will be allocated to the Coal Mine Construction Segment if rendered for a Construction Employer, or to the Bituminous Coal Segment if rendered for an Employer other than a Construction Employer.  If a Participant renders service for both a Construction Employer and an Employer other than a Construction Employer within the same calendar year, his Credited Service will be allocated on a pro rata basis between the two segments.  For purposes of this paragraph, in the case of service credit earned in the 1981 calendar year, credit hours attributable to service prior to July 1, 1981, will be assigned as follows:

| Number of Credit Hours Attributable to Participant's Service Prior to July 1, 1981 | Credited Service Assigned to Period Prior to July 1, 1981 |
|---|---|
| 250 or less | 0 |
| 250 - 499 | 1/4 year |
| 500 - 749 | 1/2 year |
| 750 - 999 | 3/4 year |
| 1,000 or more | 1 year |

37

(2)  An initial allocation of assets will be made to the Bituminous Coal and Coal Mine Construction Segments in order that as of June 30, 1981, the proportion of assets to liabilities in each segment is identical.  Contributions and withdrawal liability payments made by Construction employers after June 30, 1981 will be allocated to the Coal Mine Construction Segment. Contributions and withdrawal liability payments made by Employers other than Construction Employers after June 30, 1981 will be allocated to the Bituminous Coal Segment.  Plan and Trust expenses after June 30, 1981, will be allocated to each segment in the same ratio as the segment's income bears to the total income of the Trust; however, extraordinary expenses generated specially by one segment will be charged to that segment alone. The Trustees' determinations concerning the initial allocation of assets under this paragraph shall be final and binding on all persons dealing with the Plan.

(3)  Investment income (including realized and unrealized capital gains and losses) will be allocated monthly to each segment in the same ratio that the segment's assets bear to the total assets of the Trust.

(4)  Pension and other benefit payments made under the Plan will be charged to each segment in the same ratio that credited service on which a payment is based is allocated to the specific segment.

C.  The Trustees shall adopt (and modify as appropriate) a reasonable interest assumption used to calculate the value of unfunded vested benefits under the Plan which will be uniformly applicable to withdrawals by all Employers.

D.  The Bituminous Coal and Coal Mine Construction Segments are maintained solely for the purpose of determining withdrawal liability under this Article.  The benefit levels, eligiblity rules, credited service provisions, and all other rules and regulations of the Plan shall be applied uniformly to all Participants.  All Trust assets are available to pay all benefits under the Plan.  In the event that only one segment has unfunded vested benefits in a given Plan year, the excess of allocated assets over the value of vested benefits in the other segment will be used to reduce the first segment's unfunded vested benefits.  Notwithstanding any other provision of this Article X, if as of the last day of any Plan year the Trustees determine that all or substantially all of the Employers that have an obligation to contribute to one segment have withdrawn from that segment, the liability of any Employer that withdraws from the Plan in that or any subsequent Plan year shall be calculated under the provisions in effect for withdrawals occurring on or before June 30, 1981.

E.    The amount of unfunded vested benefits allocable to an Employer that withdraws from the Plan is the product of --

(1)    the appropriate segment's unfunded vested benefits as of the end of the Plan year preceding the Plan year in which the Employer withdraws, less the value as of the end of such year of all outstanding claims for withdrawal liability with respect to that segment which can reasonably be expected to be collected from that segment's Employers withdrawing before such year; multiplied by

(2)    a fraction - (a) the numerator of which is the total amount required to be contributed by the Employer under the Plan with respect to the appropriate Plan segment for the last 5 Plan years ending before the withdrawal, and

(b)    the denominator of which is the total amount contributed with respect to the appropriate Plan segment under the Plan by all of the appropriate segment's Employers for the last 5 Plan years ending before the withdrawal, increased by any Employer contributions owed (to the segment) with respect to earlier periods which were collected in those Plan years, and decreased by any amount contributed to the Plan during those Plan years by Employers who withdrew from that segment of the Plan during those Plan years.

(3)    For purposes of subparagraph (E)(2)(b) the "total amount contributed" for a Plan year includes contributions actually received during the Plan year, and contributions received on or before July 31 following the end of the Plan year. Contributions counted for one Plan year may not be counted for any other Plan year.

F.    For purposes of determining whether a withdrawal has occurred and for purposes of assessing withdrawal liability under this Article, all employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single Employer and all such trades and businesses as a single Employer.  (The preceding sentence shall not be deemed to preclude assessing liability under any other applicable law.)  In the case of an Employer which contributes to the 1974 Pension Trust through one or more trades or businesses which would otherwise be considered Construction Employers and one or more trades or businesses which would otherwise be considered Employers other than Construction Employers, all calculations related to the establishment of the Bituminous Coal and Coal Mine Construction Segments of the Plan will be performed as if each trade or business were a separate Employer.  In the case of an Employer described in the preceding sentence, the amount of unfunded vested benefits allocable to the Employer in the event of a complete withdrawal will be the sum of all unfunded vested benefits allocable to the individual trades or

39

businesses calculated as if they were separate Employers. In the case of an Employer described in the third sentence of this paragraph, the amount of unfunded vested benefits allocable in the event of a partial withdrawal will be determined by the Trustees, based upon the proportional extent to which the partial withdrawal is attributable to each trade or business, and assigning liability (based on the unfunded vested benefits of the appropriate segments) accordingly. The Trustees shall have the authority to establish rules implementing such assignment of liability.

G. Payment of withdrawal liability must begin within 60 days, notwithstanding any request for review or appeal of the determination of the amount of such liability, after the date on which the Trustees notify the Employer of the amount of withdrawal liability. Annual payments are to be made in twelve (12) equal installments, due on the 10th day of each month.

H. If payment is not made when due, interest on the payment shall accrue from the due date until the date on which the payment is made. Interest on delinquent payment of withdrawal liability shall be payable at the rate established by the PBGC pursuant to Section 4219(c)(6). Default will occur if the Employer fails to make payment when due and then fails to make payment within 60 days after receiving written notice from the Trustees of such failure, or as otherwise determined pursuant to Section 4219(c)(5).

I. If any Employer defaults on payment (as determined pursuant to Section 4219(c)(5)), the Trustees shall require immediate payment of the outstanding amount of withdrawal liability, plus accrued interest on the total outstanding liability from the due date of the first payment which was not timely made. If the Trustees file suit to collect the outstanding balance of withdrawal liability, plus accrued interest, and a judgment is entered by the court in favor of the Trustees, the judgment entered shall provide for an additional amount equal to 20% of the outstanding amount of withdrawal liability as liquidated damages. The Trustees shall have the authority to promulgate rules regarding default and an arbitration procedure.

J. An Employer is entitled to prepay the outstanding amount of any unpaid withdrawal liability, plus accrued interest, if any, in whole or in part, without penalty. However, if the pre-payment is made pursuant to a withdrawal which is later determined to be part of a withdrawal described in Section 4219(c)(1)(D) of ERISA, the withdrawal liability of the Employer shall not be limited to the amount of pre-payment.

K. In the event that this Plan terminates, an Employer's obligation to make payments under this Article ceases at the end

40

of the Plan year in which the assets of this Plan (exclusive of withdrawal liability claims) are sufficient to meet all obligations of this Plan, as determined by the PBGC.

L.   In conformance with Section 4208(c) of ERISA, in any Plan year following an Employer's partial withdrawal under Section 4205(a)(1) of ERISA, when the number of contribution base units with respect to which the Employer has an obligation to contribute for such year equals or exceeds 130% of the number of contribution base units with respect to which the Employer had an obligation to contribute in the partial withdrawal year, the amount of the Employer's partial withdrawal liability payment for such year shall be reduced pro rata, in accordance with PBGC regulations.

M.   The presumptive partial withdrawal rules in Section 4205(a) and (b) of ERISA shall apply to this Plan.

N.   A complete or partial withdrawal of an Employer (hereinafter in this section referred to as the "seller") under this Plan does not occur solely because, as a result of a bona fide, arm's-length sale of assets to an unrelated party (hereinafter in this section referred to as the "purchaser"), the seller ceases covered operations or ceases to have an obligation to contribute for such operations, if --

     (1)   the purchaser is, or becomes at the time of the sale, signatory to the Wage Agreement or any other collective bargaining agreement entered into with the United Mine Workers of America which provides that contributions at the same rate as contributions required under the Wage Agreement shall be made to this Plan;

     (2)   the purchaser has an obligation to contribute to this Plan with respect to the operations for substantially the same employees and the same number of contribution base units for which the seller had an obligation to contribute to this Plan;

     (3)   the purchaser provides to the Plan for a period of 5 plan years commencing with the first plan year beginning after the sale of assets, a bond or escrow deposit meeting the requirements of Section 4204(a)(1)(B).  If the Plan is in reorganization, the amount of such bond or escrow deposit shall be twice the amount provided in Section 4204 (a)(1)(B).

     (4)   the contract for sale provides that, if the purchaser withdraws in a complete withdrawal, or a partial withdrawal with respect to operations, during such first 5 Plan years, the seller is secondarily liable for any withdrawal liability the seller would have had to this Plan

41

with respect to the operations (but for this section) if the liability of the purchaser with respect to this Plan is not paid.

If the purchaser --

(1)  withdraws before the last day of the fifth plan year beginning after the sale, and

(2)  fails to make any withdrawal liability payment when due, because of a complete or partial withdrawal, then the seller shall pay to this Plan an amount equal to the payment that would have been due from the seller but for this section.

If all, or substantially all, of the seller's assets are distributed, or if the seller is liquidated before the end of the 5 plan year period described above, then the seller shall provide a bond issued by a corporate surety company that is an acceptable surety for purposes of Section 412 of ERISA, or an amount held in escrow by a bank or similar financial institution satisfactory to the Trustees, in an amount equal to the present value of the withdrawal liability the seller would have had but for this paragraph.

If only a portion of the seller's assets are distributed during such period, then a bond or escrow shall be required, in accordance with rules established by the Trustees, to the extent consistent with PBGC regulations.

The liability of the party furnishing a bond or escrow under the above paragraph shall be reduced, upon payment of the bond thereof.

For the purposes of this section, the liability of the purchaser shall be determined as if the purchaser had been required to contribute to this Plan in the year of the sale and the 4 plan years preceding the sale the amount the seller was required to contribute for such operations for such 5 plan years.

O.    If a court or tribunal of competent jurisdiction determines by a final decision or award that any provision of this Article X creates two separate multiemployer plans, or limits or reduces any employer's liability under this Article in a manner not specifically provided for herein, then the amendments to this Plan, creating two segments for the sole purpose of calculating employer liability under this Article, shall thereafter be considered null and void (without affecting any other provision of this Plan), and all employer liability under this Article shall, prospectively from the date of any such holding, be calculated under the provisions in effect for withdrawals occurring on or before June 30, 1981.

42

## ARTICLE XI - SOCIAL SECURITY SUPPLEMENT

### A.  Eligibility For Benefit

Each Employer signatory to the National Bituminous Coal Wage Agreement of 1993, or to another Wage Agreement meeting the requirements of section C of this Article, shall notify the Trustees of the names of individuals eligible for the annual supplemental benefit payable under this Article.  Eligibility is limited to individuals who, as of January 1, 1994 and thereafter during the term of the National Bituminous Coal Wage Agreement of 1993, are both eligible for Employer-provided health benefits under such Employer's individual health plan maintained pursuant to its Wage Agreement and subject to such plan's annual deductible requirement.  No individual who has received a health care bonus payment from his Employer shall be eligible for a benefit under this Article for the same year.  Subject to the foregoing, eligible individuals are as follows:

1.  A Pensioner under age 65 who is covered under this Plan.

2.  A deceased Pensioner's surviving spouse who is under age 65 and covered under this Plan.

3.  A deceased employee's surviving spouse who is under age 65, regardless of whether such surviving spouse is otherwise entitled to a currently payable benefit under this Plan.

### B.  Amount of Benefit

The benefit is payable on January 1 of each year after 1993 which is during the term of the National Bituminous Coal Wage Agreement of 1993.  The benefit will be in the amount of $1,000.00, except in the case of the following:

1.  The payment for a surviving spouse whose Employer-provided health care will terminate during the calendar year will be the pro-rata portion of $1,000 that reflects the number of calendar quarters during which the surviving spouse is entitled to Employer-provided health care under the plan during such year.

2.  The payment for a Pensioner or a surviving spouse for the calendar year in which he or she will attain age 65 shall be the pro-rata portion of $1,000 that reflects the number of calendar quarters during such year prior to the month in which he or she attains age 65.

3.  The payment for a disabled individual under age 65 will cease to be in effect beginning with the first calendar year following his or her eligibility for Medicare benefits.

43

(4)  The payment for any individual shall not exceed the lesser of $1,000 or the amount of the deductible to which such individual is subject during the calendar year under the applicable Employer's individual health plan.

C.  Other Wage Agreements

A Wage Agreement meets the requirements of this section if:

1.  it requires contributions to this Plan that conform to the requirements of Article VIII.B(16) and that are to continue at least through the term of the National Bituminous Coal Wage Agreement of 1993;

2.  it provides for an individual employer health plan that includes an annual deductible requirement applicable to participants and beneficiaries (other than retirees and surviving spouses over age 65 and disabled employees eligible for Medicare benefits);

3.  it provides for the Employer to pay to each employee subject to the deductible requirement an annual payment equal to the amount of the deductible; and

4.  it provides for this Plan to make an annual payment equal to the annual deductible to each retiree and surviving spouse subject to the deductible requirement.

## APPENDIX A

### ACTUARIAL EQUIVALENCE FACTORS FOR DEFERRED VESTED RETIREMENT BENEFITS COMMENCING PRIOR TO AGE 62

The following factors are to be multiplied by the full accrued benefit payable commencing at normal retirement age 62 to yield the equivalent benefit payable commencing at the indicated age:

| AGE Years | Months | Actuarial Equivalence Factor | AGE Years | Months | Actuarial Equivalence Factor |
|---|---|---|---|---|---|
| 55 | 0 | .522 | 56 | 0 | .569 |
| | 1 | .526 | | 1 | .573 |
| | 2 | .529 | | 2 | .577 |
| | 3 | .533 | | 3 | .582 |
| | 4 | .537 | | 4 | .586 |
| | 5 | .541 | | 5 | .590 |
| | 6 | .545 | | 6 | .595 |
| | 7 | .549 | | 7 | .599 |
| | 8 | .553 | | 8 | .604 |
| | 9 | .557 | | 9 | .608 |
| | 10 | .561 | | 10 | .612 |
| | 11 | .565 | | 11 | .617 |
| 57 | 0 | .621 | 58 | 0 | .680 |
| | 1 | .626 | | 1 | .685 |
| | 2 | .631 | | 2 | .691 |
| | 3 | .636 | | 3 | .696 |
| | 4 | .641 | | 4 | .702 |
| | 5 | .646 | | 5 | .707 |
| | 6 | .651 | | 6 | .713 |
| | 7 | .655 | | 7 | .718 |
| | 8 | .660 | | 8 | .724 |
| | 9 | .665 | | 9 | .729 |
| | 10 | .670 | | 10 | .735 |
| | 11 | .675 | | 11 | .740 |
| 59 | 0 | .746 | 60 | 0 | .820 |
| | 1 | .752 | | 1 | .827 |
| | 2 | .758 | | 2 | .834 |
| | 3 | .765 | | 3 | .841 |
| | 4 | .771 | | 4 | .848 |
| | 5 | .777 | | 5 | .855 |
| | 6 | .783 | | 6 | .863 |
| | 7 | .789 | | 7 | .870 |
| | 8 | .796 | | 8 | .877 |
| | 9 | .802 | | 9 | .884 |
| | 10 | .808 | | 10 | .891 |
| | 11 | .814 | | 11 | .898 |

| 61 | 0 | .905 | 62 | 0 | 1.000 |
|----|---|------|----|---|-------|
|    | 1 | .913 |    |   |       |
|    | 2 | .920 |    |   |       |
|    | 3 | .928 |    |   |       |
|    | 4 | .936 |    |   |       |
|    | 5 | .944 |    |   |       |
|    | 6 | .952 |    |   |       |
|    | 7 | .960 |    |   |       |
|    | 8 | .968 |    |   |       |
|    | 9 | .976 |    |   |       |
|    | 10 | .984 |    |   |       |
|    | 11 | .992 |    |   |       |

Actuarial Basis:  95% of 1959-61 U.S. Total Male Population
Mortality Table at 5% Interest.

## APPENDIX B

### TABLE OF PERCENTAGES TO BE APPLIED AGAINST PENSION PAYABLE TO PARTICIPANT UNDER JOINT AND SURVIVOR ANNUITIES

### AGE OF PARTICIPANT*

| AGE OF SPOUSE* | 55 | 56 | 57 | 58 | 59 | 60 | 61 | 62 |
|---|---|---|---|---|---|---|---|---|
| | % | % | % | % | % | % | % | % |
| 50 | 85.1 | 84.2 | 83.3 | 82.3 | 81.2 | 80.2 | 79.1 | 77.9 |
| 51 | 85.6 | 84.7 | 83.7 | 82.7 | 81.7 | 80.7 | 79.6 | 78.5 |
| 52 | 86.0 | 85.1 | 84.2 | 83.2 | 82.2 | 81.2 | 80.1 | 79.0 |
| 53 | 86.5 | 85.6 | 84.7 | 83.7 | 82.8 | 81.7 | 80.7 | 79.6 |
| 54 | 86.9 | 86.1 | 85.2 | 84.3 | 83.3 | 82.3 | 81.2 | 80.1 |
| 55 | 87.4 | 86.6 | 85.7 | 84.8 | 83.8 | 82.8 | 81.8 | 80.7 |
| 56 | 87.9 | 87.1 | 86.2 | 85.3 | 84.4 | 83.4 | 82.4 | 81.3 |
| 57 | 88.3 | 87.5 | 86.7 | 85.8 | 84.9 | 84.0 | 83.0 | 81.9 |
| 58 | 88.8 | 88.0 | 87.2 | 86.4 | 85.5 | 84.5 | 83.6 | 82.6 |
| 59 | 89.3 | 88.5 | 87.7 | 86.9 | 86.0 | 85.1 | 84.2 | 83.2 |
| 60 | 89.7 | 89.0 | 88.3 | 87.4 | 86.6 | 85.7 | 84.8 | 83.8 |
| 61 | 90.2 | 89.5 | 88.8 | 88.0 | 87.2 | 86.3 | 85.4 | 84.5 |
| 62 | 90.7 | 90.0 | 89.3 | 88.5 | 87.7 | 86.9 | 86.0 | 85.1 |

---

* Age to nearest birthday.

Pension payable to qualified surviving spouse pursuant to Article VII (A) will be equal to 50% of the Participant's Pension as reduced in accordance with the above Table. The benefit payable to a qualified surviving spouse under Article VII (B) will be equal to 75% of the amount reduced in accordance with the above table.

IN WITNESS WHEREOF, the Employers and the Union, pursuant to proper authority, have caused this instrument, effective December 6, 1974 and amended as of December 16, 1993, to be signed by their proper officers or representatives in Washington, D C. on this ____ day of _____ , 1994.

UNITED MINE WORKERS OF AMERICA

International President

BITUMINOUS COAL OPERATORS ASSOCIATION, INC.

President

48

JA 000907

JA 000908

JA 000909

JA 000910

# United Mine Workers of America
# 1974 Pension Plan
# (1998)

UNITED MINE WORKERS OF AMERICA
1974 PENSION PLAN
EFFECTIVE DECEMBER 6, 1974

## ARTICLE I - INTRODUCTION

Pursuant to Article XX of the National Bituminous Coal Wage Agreement of 1974, the United Mine Workers of America 1974 Pension Plan (hereinafter sometimes referred to as the "1974 Pension Plan" or the "Plan") provides pension benefits as hereinafter set forth. The Plan is effective as of December 6, 1974 (the "effective date") and, as amended March 27, 1978, April 29, 1980, June 7, 1981, October 1, 1984, February 1, 1988, February 1, 1991, January 16, 1992, December 16, 1993, August 16, 1996, and January 1, 1998, the provisions of the Plan are set forth below. Except in the case of total disability resulting from mine accidents occurring after the effective date, this Plan does not provide benefits to persons retiring on or before December 31, 1975, but such persons may be entitled to pension benefits under the United Mine Workers of America 1950 Pension Plan (hereinafter referred to as the "1950 Pension Plan").

The 1974 Pension Plan and Trust is a continuation of the benefit program established under the UMWA Welfare and Retirement Fund of 1950.

Except to the extent otherwise required by the Employee Retirement Income Security Act of 1974 ("ERISA") or other applicable law, governmental rule or regulation, and except to the extent that the 1974 Pension Plan or 1974 Pension Trust specifically provides otherwise, or as required by the context, all amendments to the 1974 Pension Plan effective as of January 1, 1998, pursuant to the authority contained in Article VIII herein, shall be given only prospective application commencing on January 1, 1998, and shall have no retroactive application whatsoever. The amendments effective as of January 1, 1998, shall not be deemed to be an approval or disapproval by the parties to any action or failure to act by any Trustee or Trustees for any period prior to January 1, 1998. The terms and provisions of the 1974 Pension Plan in effect as of December 31, 1997, shall continue in effect and shall be applicable only to circumstances or events which occurred prior to January 1, 1998, and which are not governed by the amendments adopted as of January 1, 1998.

A.    Definitions

(1)    "Wage Agreement" means the National Bituminous Coal Wage Agreement of 1974, as amended from time to time and any successor thereto, including, but not limited to, the National Bituminous Coal Wage Agreement of 1998. Any reference in this Plan to the Wage Agreement or to the bituminous coal wage agreement then in effect shall also refer (a) to the Sub-bituminous and Lignite Agreement and the National Coal Mine Construction Agreement with respect to any period for which such agreements provide that pension benefits shall be ma available pursuant to this Plan or a predecessor plan established under the bituminous coal wage

agreement, and the list respect to any period prior to the 1950 Bituminous Coal Wage Agreement, to any collective bargaining contract between the United Mine Workers of America and any employer in the bituminous coal industry, and (c) solely for the purposes of determining who is required to make contributions to, and receive benefits under, the 1974 Pension Trust, any other collective bargaining contract entered into between the United Mine Workers of America and any Employer in the bituminous coal industry, which contract provides that contributions shall be made to or benefit payments made from this Plan.

(2)    "Employer" means an employer who is signatory to the Wage Agreement, or, with respect to prior periods, was signatory to the bituminous coal wage agreement then in effect.

(3)    "Construction Employer" means an Employer that is signatory to the National Coal Mine Construction Agreement of 1984, as amended from time to time and any successor thereto; or is signatory to any other collective bargaining contract with the United Mine Workers of America which provides that contributions shall be made to the 1974 Pension Trust or the United Mine Workers of America 1985 Construction Workers Pension Trust for construction work related to the development, expansion or alteration of coal mines, provided that substantially all the employees, with respect to whom the employer has an obligation to contribute, perform construction work related to the development, expansion or alteration of coal mines, including the erection of tipples and preparation plants and other facilities placed in, on or around the coal mines, sinking of shafts, slopes, drifts or tunnels and all other such coal-related work that is performed under a Wage Agreement. In the case of a Construction Employer which is a single trade or business and which is also signatory to a Wage Agreement other than a Wage Agreement described in the preceding sentence, the Construction Employer shall be treated as an Employer other than a Construction Employer with respect to its employees or operations for which it has an obligation to contribute to the Plan pursuant to such Wage Agreement.

(4)    "Bituminous Coal Segment" and "Coal Mine Construction Segment" mean the two accounts within the 1974 Pension Plan maintained after June 30, 1981, for the sole purpose of calculating employer withdrawal liability under Article X.

(5)    "Participant" means any person who is employed in a classified job for an Employer after the effective date and any person entitled to receive pension benefits under the Plan; provided, however, that any person who is not employed in a classified job for an Employer on the effective date shall not become a participant until such person completes at least 1,000 hours (or 800 hours worked on the weekend/holiday crew of a signatory Employer as provided in Appendix C of the 1998 NBCWA) of Credited Service within a 12-month period after the effective date, or unless such person is subject to the provisions of Article II(f)(3).

(6)    "Pensioner" means any person who is receiving a pension pursuant to Article II of this Plan.

(7)     "1974 Pension Trust" means the trust established pursuant to the National Bituminous Coal Wage Agreement of 1974 to fund this Plan.

(8)     "Trustees" means the Trustees of the 1974 Pension Trust, who shall be named fiduciaries pursuant to Section 402 of ERISA and the Plan Administrator, as that term is defined in that Act; provided, however, that the 1974 Pension Trust may be amended to designate other or additional named fiduciaries under said Trust and the Plan.

(9)     "Credited Service" means signatory and nonsignatory service determined pursuant to Article IV.

(10)     "Hour of Service" shall mean each hour for which the participant is directly or indirectly paid or entitled to be paid by the Employer (a) for the performance of duties or (b) on account of a period of time during which no duties are performed due to vacation, holiday, illness, sickness and accident, incapacity, layoff, bereavement, jury duty, military duty or leave of absence; or (c) time spent performing contractual obligations such as safety inspections and mine committee work, even though such time off is not paid for by the Employer, provided that:

    (1)     except for hours of service credited on account of a period during which a Participant is eligible to receive benefits under Article IV(B)(3), no more than 501 hours of service shall be credited to a Participant on account of a single continuous period during which the Participant performed no duties;

    (2)     no credit shall be given for payments made or due under a plan maintained solely for the purpose of complying with the applicable worker's compensation or unemployment compensation or disability insurance laws or payments which solely reimburse a Participant for medically related expenses incurred by the Participant; and

    (3)     hours of service shall be credited for back pay for the period for which such back pay was awarded, irrespective of mitigation of damages, either awarded or agreed to by the Employer to the extent such back pay represents payment for hours which are required to be taken into account. However, no hours of service shall be credited for back pay if such hours were previously credited. The determination of hours of service for reasons other than the performance of duties shall be made in accordance with the applicable rules of the regulations prescribed by the Secretary of Labor under 29 C.F.R. Part 2530.200b-2(b).

(11)     "UMWA" or "Union" shall mean the United Mine Workers of America.

(12)     "Hours Worked" shall mean (a) each hour for which an employee is paid, or entitled to payment, for the performance of duties for the Employer during the calendar year, and (b) hours for which back pay, irrespective of mitigation of damages, is awarded or agreed to by an Employer, to the extent that such award or agreement is intended to compensate an Employee

for periods which the Employee would have been engaged in a performance of duties for the Employer. Time spent performing contractual obligations such as safety inspections and mine committee work and periods of time when the Participant is eligible to receive sickness and accident benefits shall be included as hours worked.

(13)  "Construction Industry Service" means, with respect to a participant,

(a)  all periods of service after June 20, 1985 with a Construction Employer that involves work related to the development, expansion or alteration of coal mines; and

(b)  all periods of signatory and nonsignatory service before July 1, 1985, if the participant's last such service before July 1, 1985 was for a Construction Employer.

B.    Underline When Retirement Occurs

For the purposes of this Plan, in the case of any Participant, retirement shall be considered to occur on the last day of credited service, within the meaning of Article IV C(8), provided that on such day he was eligible for an immediate or deferred pension under this Plan.

C.    Underline Attainment of Age

For the purposes of this Plan, a Participant shall be deemed to have attained an age as of 12:01 A.M. on the respective anniversary date of the Participant's birth.

ARTICLE II - ELIGIBILITY

A.    Underline Age 55 Retirement

Any Participant who (a) has at least 10 years of signatory service or at least twenty years of credited service, including the required amount of signatory service as set forth in Article IV(C)(6), and (b) has attained the age of 55 years (but not the age of 62) prior to retirement shall be eligible to retire on or after January 1, 1998, and shall upon his retirement (hereinafter "Age 55 Retirement") be eligible for a pension.

B.    Underline Normal Retirement

(1)  Any Participant shall be eligible to retire on or after January 1, 1998, and shall upon his retirement (hereinafter "Normal Retirement") be eligible for a pension, provided such Participant has attained the normal retirement date which shall be the earlier of --

(a)  a Participant's attainment of age 62 years and completion of at least 10 years of signatory service or at least 20 years of credited service, including the required amount of signatory service as set forth in Article IV(C)(6), or

- 4 -

(b)    the later of --

(i)    the time a Participant attains age 65, or

(ii)    the 5th anniversary of the time the Participant became employed in signatory service.

(2)    In determining the time the Participant became employed in signatory service (for purposes of Article II(B)(1)(b)(ii)), any employment of a Participant in signatory service who is not entitled to a pension under Article II (A) or (E) (Age 55 Retirement or Deferred Vested Retirement) shall be disregarded if it precedes a period of consecutive one-year breaks in signatory service and the number of consecutive one-year breaks in signatory service equals or exceeds the greater of

(a)    five, or

(b)    the aggregate number of years of signatory service before such breaks.

In addition to the foregoing, any employment prior to a period of consecutive one-year breaks in signatory service shall be disregarded unless the Employee completes 1,000 hours (or 800 hours worked on the weekend/holiday crew of a signatory Employer as provided in Appendix C of the 1998 NBCWA) of signatory service within a 12-month period after the breaks in signatory service. Such aggregate number of years of signatory service before any period of consecutive one-year breaks in signatory service shall be deemed not to include any years of signatory service not required to be taken into account under this subparagraph by reason of any prior break in signatory service. For purposes of this Article II(B)(1)(b)(ii), a year of signatory service shall be calculated on the basis of a calendar year and in the manner specified in Article IV; a break in signatory service shall be defined in accordance with the terms of Article II(G)(3); and nonclassified signatory service shall be disregarded unless it immediately precedes or follows classified signatory service with the same Employer.

C.    Disability Retirement

A Participant who (a) has at least 10 years of signatory service prior to retirement, and (b) becomes totally disabled as a result of a mine accident occurring on or after January 1, 1998, shall, upon retirement (hereinafter "Disability Retirement"), be eligible for a pension while so disabled. A Participant shall be considered to be totally disabled only if by reason of such accident such Participant is subsequently determined to be eligible for Social Security Disability Insurance Benefits under Title II of the Social Security Act or its successor.

When a Participant who has been receiving a disability pension under this Section C recovers sufficiently to become ineligible for Social Security disability benefits or is disqualified because of earnings, the Trustees shall implement procedures to determine the Participant's

ability to perform classified work in the industry. The continuance of a disability pension shall be based on medical evidence that supports the Participant's inability to be employed in classified work in the industry.

If such Participant is medically certified able to perform classified work in the industry, he will no longer be eligible for a disability pension.

D.    Minimum Disability Retirement

Any Participant who (a) has less than 10 years of signatory service prior to retirement and (b) becomes totally disabled as a result of a mine accident occurring on or after January 1, 1998, shall, upon retirement (hereinafter "Minimum Disability Retirement") be eligible for a pension while so disabled. A Participant shall be considered to be totally disabled only if by reason of such accident such Participant is subsequently determined to be eligible for Social Security Disability Insurance Benefits under Title II of the Social Security Act or its successor.

When a Participant who has been receiving a disability pension under this Section D recovers sufficiently to become ineligible for Social Security disability benefits or is disqualified because of earnings, the Trustees shall implement procedures to determine the Participant's ability to perform classified work in the industry. The continuance of a disability pension shall be based on medical evidence that supports the Participant's inability to be employed in classified work in the industry.

If such Participant is medically certified able to perform classified work in the industry, such Participant will no longer be eligible for a disability pension.

E.    Deferred Vested Retirement

(1)    Any Participant who ceases working in a classified job for an Employer for any reason, except as provided in (2), (3), or (4) below, and who is not eligible to receive a pension under any other provision of this Article II, shall be eligible for a pension (hereinafter "Deferred Vested Pension"), upon attaining age 62, or at the election of the Participant, such Participant shall be eligible for a reduced pension beginning at any time after attaining age 55, provided

(a)    the Participant's last day of Credited Service is on or after January 1, 1998, but prior to attainment of age 55;

(b)    the Participant has

(i)    at least 10 years of signatory service, or for a Participant with one hour of service on or after the date set by law for a five-year vesting schedule, at least 5 years of signatory service, or

- 6 -

(iii)    at least 20 years of Credited Service as set forth in Article IV(C)(6).

(2)    Any Participant who ceases working in a classified job for an Employer, who is not eligible to receive a pension under any other provision of this Article II, shall be eligible for a pension (hereinafter "Deferred Vested Pension - Special") upon attaining age 62, or at the election of the Participant, such Participant shall be eligible for a reduced pension beginning at any time after attaining age 55, calculated pursuant to Article III A(5)(b), provided

(a)    the Participant's last day of Credited Service is on or after January 1, 1998, but prior to attainment of age 55;

(b)    had 20 years of signatory service on the date last worked;

(c)    had attained the age of 50 on the date last worked; and either

(d)    had been laid off and had not refused recall to the mine from which the Participant was laid off; or

(e)    had been terminated under Article III, Section (j) of the Wage Agreement (or if the Participant had not been terminated, there had been a deterioration in physical condition which prevented the Participant from performing the Participant's regular work as determined by a panel of three physicians, if the degree of physical deterioration is disputed by the Trustees) and was not employed in the coal industry thereafter.

(3)    Any Participant who ceases working in a classified job for an Employer, who is not eligible to receive a pension under any other provision of this Article II, shall be eligible for a pension (hereinafter "Deferred Vested Pension-Enhanced 1996") upon attaining age 62, or at the election of the Participant, such Participant shall be eligible for a reduced pension beginning at any time after attaining age 55, calculated pursuant to Article III A(5)(b), provided:

(a)    the Participant's last day of Credited Service is on or after December 16, 1993, but prior to attainment of age 55;

(b)    the Participant had 20 years of signatory service on the date last worked;

(c)    the Participant had been laid off and had not refused recall to the mine from which the Participant was laid off; or

(d)    he had been terminated under Article III, Section (j) of the Wage Agreement (or if the Participant had not been terminated, there had been a deterioration in physical condition which prevented the Participant from performing the Participant's regular work as determined by a panel of three physicians, if the degree of physical

- 7 -

deterioration is disputed by the Trustees) and was not employed in the coal industry thereafter; and

(e) the Participant's pension benefits are not in pay status on or before August 16, 1996.

Within a reasonable period of time after such Participant's employment has ceased, an appropriate written notice of eligibility and other relevant data will be provided.

(4) Any Participant who, on or after January 1, 1998, ceases working in a classified job for an Employer and who is not eligible to receive a pension under any other provision of this Article II shall be eligible for a pension (hereinafter "Special Permanent Layoff Pension"), calculated pursuant to Article III A(5)(b), using the Participant's actual Credited Service and an assumed age of 55, provided:

(a) the Participant's last day of Credited Service is on or after January 1, 1998, but prior to attainment of age 55;

(b) the Participant had 20 years of signatory service on the date last worked;

(c) (i) the Participant was permanently laid off under circumstances in which his Employer has permanently closed the mine, or

(ii) the Participant was permanently laid off, meaning that he was on layoff status for at least 180 days, and had not refused a recall to the mine from which he was laid off;

In the case of a layoff described in (c)(i) above, the pension will be effective on the first day of the first month following both the layoff and the filing of a pension application. In the case of a layoff described in (c)(ii) above, the pension will be effective on the first day of the first month following both a period of 180 days after the layoff and the filing of a pension application.

Notwithstanding the foregoing, in the case of a Participant who earned no hours of credited signatory service during the period beginning November 1, 1997 and ending June 17, 1998, and who subsequently returned to active employment on or after June 18, 1998, in addition to meeting the requirements stated above, prior to satisfying Paragraph (4)(c), above, such Participant must either:

(d) have earned at least 250 hours of credited signatory service, or

(e) have returned to active employment as the result of a recall determined by the Trustees to have been to fill a bona fide job

- 8 -

opening, and not for the purpose of entitling the Participant to this Special Permanent Layoff Pension benefit.

F.    Nonduplication

(1)    A Participant shall be entitled to receive a pension under only one of the foregoing paragraphs of this Article II with respect to any retirement.

(2)    Except as provided in paragraph (C), (D), or (F)(3) of this Article II, any person whose retirement occurs on or before December 31, 1975, shall not be entitled to receive pension benefits under this Plan, but shall be entitled only to receive such benefits as may be provided under the 1950 Pension Plan.

(3)    Any person who (a) retires on or before December 31, 1975, (b) at the time of retirement is entitled to or, upon attaining age 55 would be entitled to, a pension benefit under the 1950 Pension Plan, and (c) is again employed for at least 250 hours in a classified job for an Employer after December 31, 1975, shall upon subsequent retirement (or, if later, upon attaining age 55) be eligible for a pension only under this Plan and not under the 1950 Pension Plan, in the amount hereinafter specified.  The amount of pension for a Participant described in this paragraph shall be the sum of the amount of pension to which such Participant would be entitled upon attaining age 55 under the 1950 Pension Plan if he had not been employed in a classified job for an Employer after December 31, 1975, plus the excess of (i) over (ii) where (i) is the pension to which such Participant would be entitled except for this paragraph under Article III(A)(2) or III(B)(2) based upon all years of Credited Service under this Plan and (ii) is the pension to which such Participant would be entitled under Article III(A)(2) or III(B)(2) based solely on his Credited Service prior to December 31, 1975.

G.    Employment for Vesting Purposes

(1)    For purposes of this Article II, all years of classified service by a Participant with Employers signatory to the bituminous coal wage agreement then in effect shall be used for purposes of any eligibility requirement of minimum signatory service under this Article.  A year of service shall be calculated on the basis of a calendar year and in accordance with the terms of Article IV(A).

(2)    For purposes of this Article II, years of nonclassified signatory service in the coal industry by a Participant after May 28, 1946, for Employers signatory to the bituminous coal wage agreement then in effect shall be used for purposes of any eligibility requirement of minimum signatory service provided that:

(a)    the nonclassified signatory service with an Employer immediately preceded or followed classified signatory service with the same Employer;

(b)    credit for nonclassified service shall not be given for any calendar year in which the Participant completed less than 1,000 hours of such service, as defined under Article I(A)(7);

(c)    all years of service before age 18 shall be disregarded;

(d)    all years of service performed before January 1, 1971, shall be disregarded unless the Participant completed at least three years of employment after December 31, 1970;

Provided further that, if the employee has not earned a non-forfeitable right to a pension:

(e)    all years of service prior to a break in service shall be disregarded unless the employee completes 1,000 hours (or 800 hours worked on the weekend/holiday crew of a signatory Employer as provided in Appendix C of the 1998 NBCWA) of service within a 12-month period after the break;

(f)    all years of service prior to any period of consecutive one-year breaks in service shall be disregarded if the number of such consecutive one-year breaks equals or exceeds the greater of (i) five, or (ii) the aggregate number of years of service before such breaks shall be deemed not to include any years of service not required to be taken into account under this subparagraph by reason of any prior break in service.

(3)    For purposes of Article II(G)(2) and II(B)(2), an employee shall incur a break in service for any calendar year in which such Employee completes not more than 500 hours (or 400 hours worked on the weekend/holiday crew of a signatory Employer as provided in Appendix C of the 1998 NBCWA) of service; provided that, in the case of an Employee who is absent from work for any period --

(a)    by reason of the pregnancy of the Employee,

(b)    by reason of the birth of a child of the Employee,

(c)    by reason of the placement of a child with the Employee in connection with the adoption of such child by such Employee, or

(d)    for purposes of caring for such child for a period beginning immediately following such birth or placement,

the Employee shall be considered to have completed the hours of service which otherwise would normally have been credited to him but for such absence, subject to the limitation set forth in Article I A(8)(l). The preceding sentence shall be applicable only in the year in which the Employee's absence from work begins, if the Employee would be prevented from incurring a

one-year break in service in such year solely because of the application of the preceding sentence, or in any other case, in the immediately following year. No credit will be given to an Employee pursuant to this subparagraph unless the Employee furnishes to the Trustees such timely information as they may reasonably require to establish that the absence from work is for reasons referred to in (a), (b), (c), or (d) above, and the number of days for which there was such an absence.

(4)    The provisions of this paragraph shall be interpreted and construed in accordance with the requirements of ERISA and the regulations issued thereunder.

(5)    Service after June 30, 1985 with a Construction Employer shall be used for purposes of paragraph G(1), only if the United Mine Workers of America 1985 Construction Workers Pension Plan grants participants credit for the same purposes under that plan for service with Employers, other than Construction Employers, except that a year of service shall be calculated on the basis of a calendar year and in accordance with the terms of Article IV.

## ARTICLE III - AMOUNT OF PENSION AND DEATH BENEFIT

A.    Retirement On or After January 1, 1998

A pension granted to a Participant who retires on or after January 1, 1998, pursuant to Article II shall consist of a pension amount payable in monthly installments provided in accordance with the provisions of this Article III as set forth below. In no event, however, shall the annual retirement benefit payable to a Participant exceed the limitation of Section 415 of the Internal Revenue Code of 1986 and any regulations promulgated thereunder.

(1)    Age 55 Retirement Pension

(a)    A deferred pension, commencing after attainment of age 62, computed under the provisions of paragraph 2 below; or, at the election of the Participant, (b) an immediate pension, equal to the deferred pension to which the Participant could have been eligible under (a) above had the Participant so elected, reduced by 1/4 of one percent (1%) for each full month (3 percent (3%) per year) between the date on which pension benefits began and the date on which Participant attains age 62.

(2)    Normal Retirement Pension

For retirements occurring during the 1998 Wage Agreement the amount of pension for Normal Retirement shall be determined as follows:

(a)    for each year of credited non-signatory service as defined herein, $12.00 per month;

(b)    for each of the first 10 years of credited signatory service earned prior to February 1, 1989, $32.50 per month;

(c)    for each year of credited signatory service in excess of 10 years but not to exceed 20 years earned prior to February 1, 1989, $33.00 per month;

(d)    for each year of credited signatory service in excess of 20 years but not to exceed 30 years earned prior to February 1, 1989, $33.50 per month;

(e)    for each year of credited signatory service in excess of 30 years earned prior to February 1, 1989, $34.00 per month.

(f)    The retirement benefit for a year of credited signatory service earned from February 1, 1989 to January 31, 1990, is $40.00 per month.

(g)    The retirement benefit for each year of credited signatory service earned from February 1, 1990 to December 16, 1993, is $44.50 per month.

(h)    The retirement benefit for each year of credited signatory service earned from December 15, 1993 is $47.50 per month.

(i)    Each amount specified in clauses (a) through (h) shall be increased by $2.00 in the case of any Participant who is employed in classified signatory service on or after January 1, 2000.

Proportional credit shall be allowed for any fractional years of credited service pursuant to Article IV hereof. Periods of Construction Industry Service shall be taken into account solely to determine whether the amount specified in clause (a), (b), (c), (d), or (e) is to be used in determining the amount of pension that is earned for a given period of Credited Service. In any year for which two of clauses (a), (b), (c), (d), or (e) would apply, if a Participant has both Credited Service and Construction Industry Service, the amount determined under each clause shall be equal to the amount that would be determined if Construction Industry Service in that year were considered service under this Plan, multiplied by a fraction, the numerator of which is the Participant's hours of service under this Plan for that year and the denominator of which is the sum of such hours and the Participant's hours of Construction Service for that year.

(3)    Disability Retirement Pension

Subject to (4) below for a Participant whose disabling accident occurs after January 1, 1998, the pension payment shall be computed under the provisions of paragraph (2) above. In the case of a participant who has both Construction Industry Service and Credited Service, the amount of pension under this subparagraph (3) shall be based only on the Participant's years of Credited Service and shall be determined in the same manner as under Article III.A.(2).

- 12 -

(4)    Minimum Disability Retirement Pension

The amount of pension for Minimum Disability Retirement shall be $215 per month for disabilities occurring on or after January 1, 1998. In any case in which a participant entitled to pension for Minimum Disability Retirement has both Credited Service and Construction Service, the amount of pension under this subparagraph (4) shall be equal to the amount otherwise payable under this subparagraph, multiplied by a fraction, the numerator of which is the number of years of Credited Service and the denominator of which is the sum of the number of years of Credited Service and the number of years of Construction Industry Service.

(5)    Deferred Vested Pension

(a)    The amount of a deferred vested pension (Article II E(1)) shall be a pension, commencing on or after attainment of age 62, computed under the provisions of Subsection A(2) of this Article III, or, at the Participant's election, between ages 55 and 62 with the pension payable reduced to its actuarial equivalent pursuant to Appendix A; provided, however, that in the case of any Participant with at least (20) years of credited service, such pension shall not be reduced to less than $165.00 per month.

(b)    The amount of a deferred vested pension (Article II E(2) and (3)) shall be a pension, commencing on or after attainment of age 62, computed under the provisions of Subsection A(2) of this Article III, or, at the Participant's election, between ages 55 and 62 with the pension computed under the provisions of Subsection A(1) of this Article III.

B.    Increased Pension

(1)    Increases in pensions under Plan amendments effective December 16, 1993 and August 16, 1996 are not applicable to Participants whose employment was terminated prior to December 16, 1993, and who will become eligible for only a deferred vested pension (II E(1)). Increases in pensions under Plan amendments effective August 16, 1996 are not applicable to Participants whose employment was terminated on or after December 16, 1993, and whose pension benefits are in pay status on or before August 16, 1996.

(2) (a)  Any Participant not described in clause (b) whose pension is in pay status as of October 31, 1999, shall be issued by November 1, 1999 a one-time single sum payment of $525. Any Participant not described in clause (b) whose pension is in pay status as of October 31, 2000, shall be issued by November 1, 2000 a one-time single sum payment of $525. Any Participant not described in clause (b) whose pension is in pay status as of October 31, 2001, shall be issued by November 1, 2001 a one-time single sum payment of $525. Any Participant not described in clause (b) whose pension is in pay status as of October 31, 2002, shall be issued by November 1, 2002 a one-time single sum payment of $550.

- 13 -

(b)     Any Participant whose disability retirement pursuant to Article II C or D is in pay status as of October 31, 1999 shall be issued by November 1, 1999 a one-time single sum payment of $315. Any Participant whose disability retirement pursuant to Article II C or D is in pay status as of October 31, 2000, shall be issued by November 1, 2000 a one-time single sum payment of $315. Any Participant whose disability retirement pursuant to Article II C or D is in pay status as of October 31, 2001, shall be issued by November 1, 2001 a one-time single sum payment of $315. Any Participant whose disability retirement pursuant to Article II C or D is in pay status as of October 31, 2002, shall  be issued by November 1, 2002 a one-time single sum payment of $340.

(c)     Any Surviving Spouse whose benefit under Article VI  is in pay status as of October 31, 1999, shall be issued by November 1, 1999 a one-time single sum payment of $400. Any Surviving Spouse whose benefit under Article VI is in pay status as of October 31, 2000 shall be issued by November 1, 2000 a one-time single sum payment of $400. Any Surviving Spouse whose benefit under Article VI is in pay status as of October 31, 2001 shall be issued by November 1, 2001 a one-time single sum payment of $400. Any Surviving Spouse whose benefit under Article VI is in pay status as of  October 31, 2002 shall be issued by November 1, 2002 a one-time single sum payment of $425.

(d)     Any qualified surviving spouse whose benefit under Article VII is in pay status as of October 31, 1999, shall be issued by November 1, 1999 a one-time single sum payment of $400. Any qualified surviving spouse whose benefit under Article VII is in pay status as of October 31, 2000 shall be issued by November 1, 2000 a one-time single sum payment of $400. Any qualified surviving spouse whose benefit under Article VII is in pay status as of October 31, 2001 shall be issued by November 1, 2001 a one-time single sum payment of $400. Any qualified surviving spouse whose benefit under Article VII is in pay status as of October 31, 2002 shall be issued by November 1, 2002 a one-time single sum payment of $425.

(e)     The one-time single sum payments provided for herein are not intended as an ongoing feature of this Plan, and the Plan shall have no obligation to provide payments of this type other than those expressly provided for above.

C.     Application for Pension and Commencement, Suspension and Termination of Pensions

Payments of pensions shall be subject to the following:

(1)     The first payment on any pension shall be made as soon as possible after an application for pension has been received and shall be for the month following the month in which the Participant retires (Article I B) and becomes eligible for a pension in accordance with Article II; provided, however, that in the case of a deferred pension pursuant to Article III(A)(l) or a deferred vested pension pursuant to Article III(A)(5) (other than a Special Permanent layoff Pension pursuant to Article II.E(4)), such payment shall be for the later of (a) the

- 14 -

month specified by the Participant in his application for pension if such month is subsequent to the month in which such Participant attains age 55, or (b) the month in which the application for pension is received, but not later than the month following the month in which such Participant attains age 62.

(2)    The last payment shall be for the month in which the pensioner dies.

(3)    Pension payments shall be payable on the first day of each month at the pensioner's last address of record.

(4)    Pension payments shall be suspended for any month in which the pensioner is employed, subsequent to commencement of such payments, in the bituminous coal industry, in the same trade or craft (trade or craft shall mean the coal mining industry), and in the same geographic area covered by this Plan. The provisions of this paragraph shall be interpreted in accordance with any regulations issued pursuant to Sections 203(a)(3) and (B) of ERISA.

(5)    Any Participant who continues to be employed by an Employer after retirement shall not be entitled to receive pension benefits under this Plan until such time as such Participant is no longer employed by an Employer; provided, however, that benefit payments shall commence not later than April 1 of the calendar year following the calendar year in which the Participant attains age 70-1/2.

D.    Death Benefit

(1) Except as otherwise provided herein, a death benefit shall be paid to the named beneficiary of any pensioner (other than a Pensioner receiving a deferred vested pension based on less than 20 years of credited service or a Pensioner receiving a pension based in whole or in part on years of service credited under the terms of Article II G) whose death occurs on or after January 1, 1998, and who meets the requirements of paragraph (2) of this section. The death benefit shall be equal to $6,000 if the named beneficiary is the Pensioner's surviving spouse or dependent. In any other case, the death benefit shall be equal to $5,000. The death benefit provided under this section shall not be payable if any other death or life insurance benefit is paid on behalf of the Pensioner from any other Plan maintained by an Employer.

(2)    A Pensioner meets the requirements of this paragraph only if he is not entitled to death benefit coverage from a plan maintained by his former Employer and he meets one of the following conditions:

(i)    the Pensioner is a participant in the 1992 UMWA Benefit Plan;

(ii)    the Pensioner is a participant in the UMWA 1993 Benefit Trust;

- 15 -

(iii)    the Pensioner is a participant in an individual employer plan maintained pursuant to section 9711 of the Internal Revenue Code and whose last signatory employer ceased producing and/or processing coal prior to December 16, 1993;

(iv)    the Pensioner was entitled to death benefit coverage from this Plan on January 1, 1998 (or would have been had he been retired or eligible to retire on that date); or

(v)    the Pensioner's last signatory employer (the Employer for whom such pensioner last worked in signatory classified employment) is a current contributor to this Plan and is signatory either to the National Bituminous Coal Wage Agreement of 1998 or to an agreement (including prior agreements, where applicable) requiring a contribution obligation with respect to this Plan that is identical to the contribution obligation set forth in the National Bituminous Coal Wage Agreement of 1998 (or prior National Bituminous Coal Wage Agreements, where applicable).

(3)    The death benefit provided under this section shall not be payable with respect to any Pensioner who was an eligible beneficiary of the United Mine Workers of America Combined Benefit Fund described in section 9703(f) of the Internal Revenue Code of 1986, as amended by the Coal Industry Retiree Health Benefit Act of 1992, whose death occurs on or after February 1, 1993.

(4)    For purposes of this section, the term "dependent" shall mean any person described in (a) through (e), below, as of the date of death of the Pensioner.  A person shall be considered to have been a dependent of a Pensioner if such Pensioner or his spouse provided over one-half of the support to such person on a regular basis.

(i)    a spouse who is living with or being supported by the Pensioner;

(ii)    an unmarried dependent child of the Pensioner who has not attained age 22;

(iii)    a parent of a Pensioner or of a Pensioner's spouse, if the parent has been dependent upon and living in the same household (residence) as the Pensioner for a continuous period of at least one year;

(iv)    an unmarried dependent grandchild of a Pensioner or of a Pensioner's spouse who has not attained age 22, and is living in the same household (residence) with such Pensioner; and

(v)    a dependent child (of any age) of a Pensioner or of a Pensioner's spouse who is mentally retarded or who becomes disabled prior to attaining age 22, and such disability is continuous, and who is either living in the same

household with such Pensioner or is confined to an institution for care or treatment.

## ARTICLE IV - CREDITED SERVICE

A.    Nonsignatory Service

Subject to the limitations in paragraph C of this article IV, credited service is a period during which the participant meets the requirements of subparagraphs (1), (2), (3) or (4) below. Any credited service shall be nonsignatory service unless it qualifies as signatory service pursuant to Article IV(B) hereof.

(1)    A Participant shall receive credit for a year of service for any calendar year in which he worked, subsequent to December 31, 1936, as an employee in a job classified in the then existing bituminous coal wage agreement for an employer in the coal industry for at least 1,000 hours of service, with credit given for the next lowest 1/4 year in the event any employee works less than 1,000 hours of service as follows:

| | |
|---|---|
| 750-999 hours, | 3/4 year |
| 500-749 hours, | 1/2 year |
| 250-499 hours, | 1/4 year |
| 249 hours or less, | 0 |

With respect to any period of such service for which records of hours of service are not available or it is not feasible in light of the administrative and cost difficulties involved to compile a record of service, an applicant shall be deemed to have worked a thousand hours of service if the employee received wages in an amount equal to the product of (i) the lesser of 125 days or 1/2 the average number of days the bituminous mines in the United States were active, multiplied by (ii) the daily basic rate paid in the bituminous coal industry for that year; provided that for any year for which information is not available as to the average number of days the mines were active, the available data for the nearest year next preceding shall be used; provided further that if an applicant earned less than the minimum amount required for a year of service, credit for service shall be given to the next lowest 1/4 year in the manner indicated with respect to hours of service.

(2)    A Participant shall receive credit for a year of service for any calendar year in which the Participant worked, prior to January 1, 1937, as an employee in a job classified in the then existing coal wage agreement for an Employer in the bituminous coal industry, in a minimum of at least six (6) months during a calendar year, provided that if the applicant worked in less than six (6) months, credit for service shall be awarded to the next lowest one-fourth (1/4) year, based upon service in six (6) monthly equalling a year's service.

- 17 -

(3)    A Participant shall receive credit for a year of service for any calendar year in which the Participant received state worker's compensation payments pursuant to an award as a result of an occupational disease or injury sustained in the mine while regularly employed in a classified job under the bituminous coal wage agreement then in effect; provided, in the case of occupational disease, the Participant had been so employed by an Employer signatory to the Wage Agreement then in effect for at least ten (10) years after May 28, 1946. Credit shall be given up to a maximum of four (4) years service credit from date of injury, or from the date of last employment in case of occupational disease, provided the Participant did not work regularly (earned at least $200 per month) during the compensable period. Benefits awarded pursuant to the Federal Coal Mine Health and Safety Act of 1969 shall be deemed "state worker's compensation payments" within the meaning of this section, only if the miner was last regularly employed in the coal industry after the enactment date of the Act, December 30, 1969, in a classified job under the bituminous coal wage agreement then in effect, and had been so employed by an operator signatory to the agreement for at least ten (10) years after May 28, 1946. In no event shall any service be credited under this paragraph (3) with respect to periods after December 6, 1974.

(4)    A Participant shall receive credit for a year of service for any year served in the military service of the United States in any war, national emergency, or international police action, immediately following regular employment in a classified job under the bituminous coal wage agreement then in effect, provided that credit for such service shall be limited to the original period of enlistment or obligated military service; and provided further that the Participant returned to work in a classified job within twelve (12) months after his date of separation from the military service, unless he was precluded from doing so by service connected sickness, accident, or other disability, and returns to work in a classified job when no longer precluded by such disability. Service credit for the period of military service shall be computed in the same manner as credit is computed for service prior to 1937, as described in paragraph A(2) hereof.

B.    Signatory Service

Credited signatory service is:

(1)(a)  For any calendar year prior to January 1, 1978, service as defined in paragraph A(1) hereof during which a Participant worked as an employee in a classified job for an Employer signatory to the bituminous coal wage agreement then in effect.

(b)    For purposes of determining eligibility for a pension (vesting) under Article II, service for any calendar year subsequent to December 31, 1977 during which a Participant works as an employee in a classified job for an Employer signatory to the bituminous coal wage agreement then in effect, computed based on hours of service as defined in Article I A(10) as follows:

- 18 -

| Hours of Service During a Calendar Year as a Classified Employee for a Signatory Employer | Percentage of a Year of Credited Signatory Service |
|---|---|
| 249 or less | 0% |
| 250 - 499 | 25% |
| 500 - 749 | 50% |
| 750 - 999 | 75% |
| 1,000 or more | 100% |

Notwithstanding the foregoing, a classified Employee working on the weekend/holiday crew of a signatory Employer as provided in Appendix C of the National Bituminous Coal Wage Agreement of 1998 shall receive credit for a percentage of a year calculated in accordance with the following schedule:

| Hours Worked On Weekend/Holiday Crew | Percentage of a Year of Signatory Service |
|---|---|
| less than 200 | 0 |
| 200-399 | 25% |
| 400-599 | 50% |
| 600-799 | 75% |
| 800 or more | 100% |

A Classified Employee who earns both regular hours and weekend/holiday crew hours during a calendar year, but who earns fewer than 1,000 hours in total for the year, may combine the partial credits earned under each of the schedules shown above.

Special Rule for 1993 -- For the calendar year 1993, a classified Employee who participated in an authorized strike following expiration of the 1988 Wage Agreement, or who was laid off as a direct result of such an authorized strike, and who worked at least 500 hours will receive credit for a full year of signatory service.

(c)    For purposes of determining the amount of pension, under Article III, service for any calendar year subsequent to December 31, 1977, during which a Participant works as an employee in a classified job for an Employer signatory to the bituminous coal wage agreement then in effect, computed based on hours worked as defined in Article I A(l2) as follows:

- 19 -

| Hours of Service During a Calendar Year as a Classified Employee for a Signatory Employer | Percentage of a Year of Credited Signatory Service |
|---|---|
| 249 or less | 0% |
| 250 - 499 | 25% |
| 500 - 749 | 50% |
| 750 - 999 | 75% |
| 1,000 or more | 100% |

Notwithstanding the foregoing, a classified Employee working on the weekend/holiday crew of a signatory Employer as provided in Appendix C of the National Bituminous Coal Wage Agreement of 1998 shall receive credit for a percentage of a year calculated in accordance with the following schedule:

| Hours Worked On Weekend/Holiday Crew | Percentage of a Year of Signatory Service |
|---|---|
| less than 200 | 0 |
| 200-399 | 25% |
| 400-599 | 50% |
| 600-799 | 75% |
| 800 or more | 100% |

A Classified Employee who earns both regular hours and weekend/holiday crew hours during a calendar year, but who earns fewer than 1,000 hours in total for the year, may combine the partial credits earned under each of the schedules shown above.

Special Rule for 1993 -- For the calendar year 1993, a classified Employee who participated in an authorized strike following expiration of the 1988 Wage Agreement, or who was laid off as a direct result of such an authorized strike, and who worked at least 500 hours will receive credit for a full year of signatory service.

(2)     Service prior to December 6, 1974, as defined in paragraph A(3) hereof during which a Participant received state worker's compensation payments if such payments are pursuant to an award as a result of an occupational disease or injury awarded after May 28, 1946, and if the Participant was last regularly employed prior to such service as an employee in a classified job for an Employer signatory to the bituminous coal wage agreement then in effect.

(3)    Service, at a rate of 8 hours for each regularly scheduled work day, during which a Participant receives or is eligible to receive weekly Sickness and Accident Benefits pursuant to Article XI of the National Bituminous Coal Wage Agreement of 1974, as amended from time to time, and any successor agreements thereto.

(4)    A Participant who retires on or after March 27, 1978, shall receive credit for a year of service for any calendar year (including calendar years prior to 1978) in which he rendered service as an employee of the United Mine Workers of America (UMWA) in the coal industry immediately following regular employment in a classified job under the bituminous coal wage agreement then in effect; provided that the Participant does not, or is not eligible to, receive a pension or other retirement income from the UMWA.  Credit or service with the UMWA shall be computed in the same manner as:

(a)    credit is computed for service prior to 1937, as described in paragraph A(2) hereof, or

(b)    credit is computed for service under the pension plan of the UMWA, whichever is greater, for service prior to January 1, 1978.

Credit for service after December 31, 1977, shall be computed in the same manner as credit is computed for service under the pension plan of the UMWA.

In no event shall a Participant receive credit under this paragraph (4) while receiving a pension under this Plan.

Notwithstanding anything in this paragraph (4) to the contrary, a Participant,

(a)    who is not employed in a classified job for an Employer on March 27, 1978, or

(b)    who is not employed by the UMWA on March 27, 1978, or

(c)    who had retired prior to March 27, 1978, and was eligible to receive, or upon application would have been eligible to receive, a pension under the 1950 Pension Plan, the 1974 Pension Plan or a retirement plan of the UMWA prior to March 27, 1978, shall not receive signatory service credit for the years of UMWA employment described above if it occurred prior to March 27, 1978, unless such Participant is re-employed in a classified job and

(1)    obtains at least 3 years of credited service after March 27, 1978, or

(2)    ceases to be employed in the classified job or employed by the UMWA as the result of

- 21 -

          (i)     nonoccupational disability or accident

          (ii)    occupational injury for which the Participant receives worker's compensation. or

       (3)    dies after March 27, 1978 at a time when the Participant is employed in a classified job for an Employer or when employed by the UMWA.

     (5)    Service as defined in paragraph A(4) hereof during which a Participant served in the military service of the United States, provided that the classified employment referred to therein (both before and after military service) is for an Employer signatory to the bituminous coal wage agreement then in effect and provided further, however, that for military service credited after December 31, 1974, the Participant returned to work in a classified job within ninety (90) days after the date of separation from the military service or such longer period as may be allowed by law.

     (6)    Service (within the meaning of paragraph A(l) hereof) by an employee in a classified job for an Employer not signatory to the bituminous coal wage agreement then in effect if (i) such service is continuous, (ii) such Employer becomes a signatory to the bituminous coal wage agreement after the effective date as a result of recognizing the UMWA as the bargaining representative of its employees, (iii) the employee is working in a classified job with such Employer at the time such Employer becomes signatory to the bituminous coal wage agreement, and (iv) such employee remains in a classified job with such Employer during the twenty-four month period immediately following the date on which such Employer becomes signatory to the bituminous coal wage agreement; provided, however, that not more than ten (l0) years of nonsignatory service may be recognized or awarded as signatory service to any person pursuant to this paragraph (6).

C.    <u>Additional Rules Concerning Credited Service</u>

     (1)    Except as provided in Article IV(B)(6), employment after April 1, 1971, will not constitute credited service under paragraph A(l) hereof unless such employment was in a classified job for an Employer.

     (2)    A Participant shall not be credited with more than one year of service for any calendar year by reason of any combination of the rules of this Article IV.

     (3)    The maximum number of years of nonsignatory service which may be included in the credited service of any Participant retiring after December 31, 1981 shall be the number of years by which twenty years exceeds such Participant's signatory service, but not in excess of ten years.

(4)    No credit for service shall be awarded a Participant for any period in which such Participant was directly connected with the ownership, operation or management of a mine; provided, however, that in the case of any Participant who received credit for such service before July l, 1974, under the terms of the pension plan program established under the United Mine Workers of America Welfare and Retirement Fund of l950, credit shall be awarded for any period prior to July 1, 1975, in which the Participant worked as an employee in a classified job in a mine in which such Participant had no controlling interest, as a member of a cooperative or gang-working crew which shared the profits and losses, and which was operated under the bituminous coal wage agreement then in effect; and provided further, that in the case of a Participant who received credit for service before July l, l974, under the terms of the pension plan program established under the United Mine Workers of America Welfare and Retirement Fund of 1950, credit for signatory service shall be awarded for any period prior to July 1, 1975, during which such Participant worked in a classified job pursuant to an agreement to produce coal for a signatory coal company which exercised control over the operation of the mine and was responsible for royalty payments on such coal produced to the l974 Pension Trust or its predecessor.

(5)    The following maximum years of nonsignatory service may be included in credited service under this Plan:

| Date of Retirement | Maximum Years of Nonsignatory Service |
|---|---|
| January 1, 1978 to December 31, 1978 | 13 |
| January 1, 1979 to December 31, 1979 | 12 |
| January 1, 1980 to December 31, 1980 | 11 |
| January 1, 1981 and thereafter | 10 |

(6)    Subject to Article II E(1)(b)(i), a Participant with less than ten years of signatory service shall not be entitled to receive a pension under paragraph (A), (B), or (E) of Article II unless such Participant has at least twenty years of credited service, including at least the following minimum number of years of signatory service:

| Date of Retirement | Years of Signatory Service Required |
|---|---|
| January 1, 1978 to December 31, 1978 | Seven (7) years |
| January 1, 1979 to December 31, 1979 | Eight (8) years |
| January 1, 1980 to December 31, 1980 | Nine (9) years |
| January 1, 1981 and thereafter | Ten (10) years |

(7)    Except as provided in Article V, service credits shall not be accrued subsequent to the effective date of pension payments.

(8)    In the case of any Participant, except a Participant covered under Article IV B(4), the last day of credited service shall be the last day on which the Participant works as an employee in a classified job for an Employer, unless such Participant continues to accrue credited service during the period for which such Participant receives or is eligible to receive weekly sickness and accident benefit pursuant to Article XI of the Wage Agreement, in which case the last day of credited service shall be the last day for which such sickness and accident benefits are paid or would have been paid.  For a Participant covered under Article IV B(4), the last day of credited service shall be the later of the last day as determined in the preceding sentence or the last day the Participant worked for the UMWA.

(9)    An employee who is regularly employed in a classified job for an Employer and who performs supervisory duties on a temporary basis for not more than 120 work days during any consecutive period of 12 months, shall be deemed to be employed in a classified job during the days on which the Participant performs such supervisory duties.

D.    Construction Industry Service

(1)    Notwithstanding anything to the contrary, and except for purposes of Article II.C and II.D and as provided by Article II.G, no Construction Industry Service of a Participant shall be considered Credited Service under this Plan.

(2)    In any case in which a Participant has both Construction Industry Service and at least one hour of service creditable under paragraphs B or C of this Article for any year beginning after December 31, 1985, the Participant's Credited Service for that year shall be determined by multiplying the Credited Service the Participant would be entitled to if

- 24 -

Construction Industry Service were considered service under this Article by a fraction. the numerator of which is the Participant's hours of service creditable under this Article for that year and the denominator of which is the sum of such hours and the Participant's hours of Construction Industry Service for that year.

(3)     In any case in which, after June 30, 1985, and before January 1, 1986, a Participant has both Construction Industry Service and at least one hour of service creditable under the provisions of paragraphs B or C of this Article, the Participant's Credited Service for that year shall be equal to the sum of his Credited Service for the period beginning January 1, 1985, and ending June 30, 1985, and a fraction of what his Credited Service would be for the period beginning July 1, 1985 and ending December 31, 1985. If, in any year, a Participant were considered service under this Article. Such fraction is determined by dividing the Participant's hours of service under paragraphs B and C of this Article by the sum of such hours of service and the Participant's hours of Construction Industry Service.

(4)     Notwithstanding subparagraph D.(2) or D.(3), the Credited Service of of a Participant for a year in which either subparagraph applies shall not exceed one minus the portion of a year for which the Participant receives credit for accrual purposes under the United Mine Workers of America Construction Workers Pension Plan. If, in any year, a Participant receives one year of credit for accrual purposes under the United Mine Workers of America Construction Workers Pension Plan, he shall not be entitled to any Credited Service for such year.

## ARTICLE V - <u>REEMPLOYMENT AFTER ATTAINMENT OF PENSION ELIGIBILITY</u>

A.     Any Participant who has been retired and receiving a pension under this Plan and who shall be reemployed in a classified job by an Employer shall, for the purpose of calculating any subsequent pension benefits to which such Participant may become entitled, upon subsequent retirement, be granted a pension equal to the sum of the pension such Participant was previously receiving plus the excess of (i) over (ii) where (i) is the pension to which such Participant would be entitled at the time of such retirement, based upon all years of Credited Service under the Plan and (ii) is the pension to which such Participant would be entitled at the time of such retirement. based solely on Credited Service at the time of his previous retirement.

B.     Any Participant eligible for a deferred vested pension under this Plan whose shall be reemployed in a classified job by an Employer prior to the commencement of pension benefit shall, for the purpose of calculating any subsequent pension benefits to which he may become entitled. be granted his credited service applicable to the deferred vested pension plus his credited service accrued after such reemployment.

C.     Any Participant who is reemployed in a classified job by an Employer after attainment of eligibility for a deferred vested pension under this Plan, whose employment is

subsequently terminated and who at that time is not eligible for a pension under any provision of Article II by reason of Article IV(C)(6), shall be considered to be eligible for the deferred vested pension for which such Participant was eligible prior to such reemployment and upon application for pension the date of retirement shall be considered to be the date of retirement which would, upon application for pension, have been applicable to the deferred vested pension for which such Participant was eligible prior to such reemployment.

## ARTICLE VI - SURVIVING SPOUSE BENEFIT

A.    (1)    Except as provided in paragraph (B) of this Article, a Surviving Spouse Benefit is provided for any Participant who (a) has retired and is receiving a pension under this Plan, except a Participant receiving a deferred vested pension who has not completed at least twenty years of credited service, (b) has not retired but at the date of his death otherwise met the eligibility requirements for an immediate pension under Article II(A), (B), (C) or (D) under this Plan, or (c) has attained age 55 with at least twenty years of credited service and who has retired and is entitled to elect an immediate pension under Article II(A), II(B) or II(E) at the date of death.

(2)    The amount of such benefit shall be equal to 75% of the amount of the Participant's pension at the time of death or, in the event the Participant dies after age 55 at a time when such Participant was eligible to elect a pension or to retire and receive a pension under Article II, but prior to the receipt of a pension, 75% of the amount of the pension such Participant would have received if such Participant had elected a pension or retired and become entitled to a pension as of the date immediately preceding the date of death.

(3)    The Surviving Spouse Benefit will not be effective unless the Participant and the spouse have been married throughout the nine-month period ending on the date of the Participant's death or unless such nine-month requirement would be waived for purposes of determining entitlement to widow's or widower's insurance benefits under the Social Security Act.

(4)    Payment to an eligible spouse will commence as of the first of the month following the month in which the Participant's death occurs and the final payment shall be made for the month in which the spouse's death occurs.

B.    (1)    Any Participant who is not employed in a classified job for an Employer on December 6, 1974, is not covered for a Surviving Spouse Benefit under this Article unless such Participant (a) obtains at least three years of credited service after such date, or (b) had ceased to be employed in a classified job as a result of (i) layoff, (ii) nonoccupational disability or accident, or (iii) occupational injury for which such Participant was receiving workers' compensation, or (c) such Participant dies at a time when he is employed in a classified job for an Employer.

(2)    Any Participant who retires on or before December 31, 1975, and is again employed in a classified job for an Employer after such retirement, is not covered for a Surviving Spouse Benefit under this Article unless (a) such Participant obtains at least three years of credited service after such reemployment or (b) unless such reemployment ceases as a result of (i) layoff, (ii) nonoccupational disability or accident, or (iii) occupational injury for which worker's compensation benefits were awarded, or (c) such Participant dies while employed in a classified job for an Employer.

C.    (1)    A Surviving Spouse benefit is provided for any Participant who completed at least ten years of credited service, who died as a result of a mine accident during the term of the National Bituminous Coal Wage Agreement of 1978 or 1981, and who was not in Construction Industry Service at the time of the mine accident. The amount of such Surviving Spouse benefit shall be a lump sum in the amount of $10,000, plus $100.00 a month beginning with the month of February, 1998 and for each month thereafter during the spouse's eligibility. The final payment shall be made for the month in which the spouse's death (or if earlier, the spouse's remarriage) occurs.

(2)    The Surviving Spouse Benefit will not be effective unless (a) the Participant and the spouse were married throughout the nine-month period ending on the date of the Participant's death or unless such nine-month requirement would be waived for purposes of determining entitlement to widow's or widower's insurance benefits under the Social Security Act; (b) the spouse was never eligible for a monthly benefit under this Plan or under any other plan or provision under a Wage Agreement; and (c) the spouse has never remarried and is surviving on February 1, 1998.

## ARTICLE VII - JOINT AND SURVIVOR ANNUITIES

A.    Notwithstanding any other provision of this Plan, if a Participant qualifies for a pension under this Plan, but is not covered by a Surviving Spouse Benefit, the Pension benefit otherwise provided to such Participant shall be reduced actuarially pursuant to Appendix B, and 50% of such reduced pension benefit will be continued, after the death of the Participant, for the life of any qualified surviving spouse; provided, however, that such Participant may elect, within the election period specified in Paragraph C(l) below, and subject to the requirement of Paragraph D below, not to take a joint and survivor annuity as provided for in this Article and instead to receive a pension benefit for life only.

B.    If a Participant has completed 10 years of signatory service for vesting purposes, calculated pursuant to Article II (G), is not covered by a Surviving Spouse Benefit, and dies before he is entitled to elect or elects to receive a pension benefit, the qualified surviving spouse shall be entitled to receive a survivor's benefit in the form of an annuity for life in an amount equal to 75% of the pension benefit the decedent would have received if the decedent had --

(1)    separated from service on the date of death,

(2)     survived to age 55 (in the case of a decedent who died before attaining age 55),

(3)     retired with an immediate Joint and Survivor Annuity as provided for in this Article at age 55, (or, if later on the date before the decedent's date of death).

(4)     died on the day after the day on which the decedent would have attained age 55 (in the case of a decedent who died before attaining age 55).

Payment to a qualified spouse under this paragraph will commence on the first of the month following the month in which the decedent would have attained age 55 (or, if later, the first of the month following the month of the decedent's death) and the final payment shall be for the month in which the spouse's death occurs.

C.     (1)     The "election period" in the case of an election to waive the Joint and Survivor Annuity described in Paragraph A shall be the 180-day period ending on the date of the commencement of benefits.  Prior to the election period, the Trustees shall furnish the Participant (a) a general description or explanation of the qualified Joint and Survivor Annuity, the circumstances in which it will be provided unless the Participant elects not to have benefits provided in that form, the availability of such election and the right to revoke such election, and the rights of the Participant's spouse; and (b) a general explanation of the relative financial effect of such election on the Participant's pension.  In the event a Participant elects not to receive a Joint and Survivor Annuity, such election shall not become effective if the Participant dies within a period of two years beginning on the date of such election.

(2)     A Participant may revoke any election made pursuant to this Article at any time during the applicable election period.

D.     An election made under this Article shall not take effect unless--

(1)     the spouse of the Participant consents in writing to such election, and the spouse's consent acknowledges the effect of such election and is witnessed by a Plan representative or a notary public, or

(2)     It is established to the satisfaction of the Trustees that the consent required under subparagraph (1) may not be obtained because there is no spouse, because the spouse cannot be located, or because of such other circumstances as the Trustees may by law consider.

E.     A qualified surviving spouse shall be any spouse who has been married to the Participant for at least nine months prior to death, unless such nine-month requirement would be waived for purposes of determining entitlement to widow or widower's insurance benefits under the Social Security Act.

F.      Except as provided in Paragraph B above, payment to a qualified surviving spouse under this Article will commence as of the first of the month following the month in which the Participant's death occurs, and the final payment shall be made for the month in which the spouse's death occurs.

## ARTICLE VIII - MISCELLANEOUS

A.      Determination of Eligibility

The Trustees or such other named fiduciaries as may be properly designated shall have full and final determination as to all issues concerning eligibility for benefits.

B.      General

(1)      The Trustees are authorized to promulgate rules and regulations to implement this Plan, and those rules and regulations shall be binding upon all persons dealing with and Participants claiming benefits under this Plan.

(2)      No benefit payable under this Plan shall be subject in any way to alienation, sale, transfer, assignment, pledge, attachments, garnishments, execution or encumbrance of any kind, and any attempt to accomplish the same shall be void. Notwithstanding the foregoing, the Plan shall comply with any qualified domestic relations order, as that term is defined in ERISA, and with any written authorization by a Participant or beneficiary made pursuant to paragraph (19) of this section.

(3)      The Employers and the Union, by joint action, reserve the right at any time and from time to time to modify or amend in whole or in part any or all of the provisions of this instrument or to terminate this Plan, without reopening or otherwise affecting the integrity of any other provision of the Wage Agreement, by a written agreement between the Employers and the Union, provided, however, that:

(a)      this Plan shall not be amended in such manner as would cause or permit any part of the assets in the 1974 Pension Trust to be diverted to purposes other than the exclusive benefit of the Participants and their beneficiaries;

(b)      this Plan shall not be amended to deny to a Participant retroactively any benefits to which such Participant was entitled under this Plan, unless such amendment is necessary to conform this Plan to, or to satisfy the conditions of, any law, governmental regulations or ruling;

(c)      the Employers and the Union have delegated to the Trustees the authority and responsibility to make certain changes and amendments as set forth in Article XX(g)(4) of the National Bituminous Coal Wage Agreement of 1998.

as amended from time to time, and any successor agreements to that specific Agreement; and

     (d)    any written agreement executed by the Union shall be signed by the International President.

     (4)    Upon the termination of this Plan or the complete discontinuance of contributions to the 1974 Pension Trust, this Plan shall remain in force and effect for the period necessary to complete the payment of benefits in accordance with the terms of this Plan to the extent assets in the 1974 Pension Trust are available to pay such benefits.

     (5)    Forfeitures arising from the operation of the Plan shall not be used to increase the benefits which otherwise would be received under this Plan.

     (6)    Any Participant or beneficiary whose claim for benefits under this Plan has been denied shall be (a) provided with adequate notice in writing setting forth the specific reasons for such denial, such notice shall be written in a manner calculated to be understood by the Participant, and (b) afforded a reasonable opportunity for a full and fair review of the decision denying the claim by an appropriate named fiduciary or a person properly designated to carry out such responsibility.

     (7)    The Trustees are hereby authorized to allocate fiduciary responsibilities in any manner permitted pursuant to section 405(c) of ERISA and to appoint an investment manager or managers as permitted by section 402(c) of ERISA.

     (8)    Contributions to the 1974 Pension Trust to fund the benefits under this Plan shall be paid solely by the Employers in accordance with Article XX of the National Bituminous Coal Wage Agreement of 1998, as amended from time to time, and any successor agreements to that specific Agreement.

     (9)    In the event that this Plan merges or consolidates with, or transfers some or all of its assets or liabilities to, any other plan, no Participant or beneficiary herein shall, solely on account of merger, consolidation or transfer, be entitled to an accrued benefit immediately following such event which is less than the benefit to which such Participant or beneficiary would have been entitled immediately preceding such event.

     (10)    In the event that an Employer fails to make the contributions to the Plan required by Article XX of the National Bituminous Coal Wage Agreement of 1998, interest (calculated at a rate established by the Trustees at the beginning of each calendar year) shall accrue from the date due until the date on which payment is made. If the Trustees file suit to collect unpaid contributions, plus accrued interest, and a judgment is entered by the courts in favor of the Trustees, the judgment entered shall provide for an additional amount equal to the accrued interest in liquidated damages.

(11)    Upon the termination or partial termination of the Plan, the rights of all affected Participants to benefits accrued to the date of such termination or partial termination, are nonforfeitable to the extent required by law or to the extent provided for under the National Bituminous Coal Wage Agreement of 1998.

(12)    Except as otherwise provided herein, it shall be unlawful for any part of the assets held pursuant to this Plan, other than such part as is required to pay taxes and administrative expenses, to be used for, or diverted to, purposes other than for the sole and exclusive benefit of the Participants of the Plan except that in the case of a contribution which is made by an Employer by a mistake of fact, or law (other than a mistake relating to Plan qualification), such mistaken contribution may be returned to the Employer within six months after the Trustees determine that the contribution was mistakenly made.

(13)    To the extent not inconsistent with the provisions hereof, the Trustees shall comply with the further requirements imposed upon them by and shall have the further powers contained in Article XX, Sections (e), (f), and (g) of the National Bituminous Coal Wage Agreement of 1998, as amended from time to time, and any successor agreements to that specific Agreement.

(14)    This instrument, and the 1974 Pension Trust shall be construed, regulated and administered in accordance with Federal law, and, to the extent not preempted or inconsistent with such Federal law, the laws of the District of Columbia.

(15)    Any action of the Employers which may, or must, be taken hereunder may be taken by BCOA. Any action which must be taken in writing shall be signed by the President of BCOA.

(16)    Any Employer who employed any Participant eligible for coverage under, or who received or receives benefits under, the 1974 Pension Plan, or any Employer who was or is required to make, or who has made or makes contributions to the 1974 Pension Plan and Trust, is obligated and required to comply with the terms and conditions of the 1974 Pension Plan and Trust, as amended from time to time, including, but not limited to, making the contributions required under the National Bituminous Coal Wage Agreement of 1978 as amended from time to time and any successor agreements thereto, including, but not limited to, the National Bituminous Coal Wage Agreement of 1998.

(17)    The Employers, the Union and the Trustees shall fully cooperate to obtain all necessary rulings and do all other acts appropriate to ensure that the 1974 Pension Plan and Trust are qualified under Section 401 of the Internal Revenue Code, and that contributions are deductible under Section 404 of the Internal Revenue Code.

(18)    Notwithstanding any other provision of this Plan to the contrary, a distribution of benefits shall commence to a participant not later than the April 1 of the calendar year following

the calendar year in which the Participant attains age 70-1/2 and shall be distributed over the life of such Participant or over the lives of such Participant and his surviving spouse, in accordance with Section 401(a)(9) of the Internal Revenue Code of 1986 and any regulations promulgated thereunder. In the event that the Participant dies before distributions have commenced hereunder, the surviving spouse shall begin to receive a distribution of the benefit, if any, to which such spouse is entitled no later than the date on which the participant would have attained age 70-1/2 and shall be distributed over the life of such surviving spouse.

(19)    Any Participant or beneficiary whose benefit is in pay status may voluntarily authorize the Trustees to check-off an amount from his or her monthly benefit for remittance to the UMWA of Union membership dues, including assessments, initiation fees, credit union, voluntary COMPAC contributions and other voluntary deductions, provided that any such arrangement must be terminable by the Trustees upon reasonable notice, must be revocable by the Participant at any time upon reasonable notice to the Trustees, and either:

(a)    such arrangement must not permit any Participant or beneficiary to check-off an amount exceeding 10% of his or her monthly benefit; or

(b)    the designated recipient must file a written acknowledgement that it has no enforceable right in or to any Plan benefit or portion thereof (except to the extent of payments actually received pursuant to the terms of the arrangement); and

an agreement for such check-off is in effect between the Plan and the Union. Any check-off authorization must be in writing, must be voluntary and must comply in all respects with the requirements of the Internal Revenue Code of 1986, as amended, ERISA, the Labor Management Relations Act of 1947, as amended, and any other applicable law.

(20)    (a)    Notwithstanding any provision of the plan to the contrary that would otherwise limit a distributee's election under this part, a distributee may elect, at the time and in the manner prescribed by the Trustees, to have any portion of an eligible rollover distribution paid directly to an eligible retirement plan specified by the distributee in a direct rollover.

(b)    An "eligible rollover distribution" is any distribution of all or any portion of the balance to the credit of the distributee, except that an eligible rollover distribution does not include: any distribution that is one of a series of substantially equal periodic payments (not less frequently than annually) made for the life (or life expectancy) of the distributee or the joint lives (or joint life expectancies) of the distributee and the distributee's designated beneficiary, or for a specified period of ten (10) years or more; any distribution to the extent such distribution is required under Section 401(a)(9) of the Code; and the portion of any distribution that is not includible in gross income (determined without regard to the exclusion of net unrealized appreciation with respect to employer securities).

(c)    An "eligible retirement plan" is an individual retirement account described in Section 408(a) of the Code, an individual retirement annuity described in Section 408(b) of the Code, an annuity plan described in section 403(a) of the Code, or a qualified trust described in Section 401(a) of the Code, that accepts that distributee's eligible rollover distribution. However, in the case of an eligible rollover distribution to the surviving spouse, an eligible retirement plan is an individual retirement account or individual retirement annuity.

(d)    A "distributee" includes a Pensioner and a surviving spouse.  In addition, a Pensioner's surviving spouse and the Pensioner's spouse or former spouse who is an alternate payee under a qualified domestic relations order, as defined in Section 414(q) of the code, are distributees with regard to the interest of the spouse or former spouse.

(e)    A "direct rollover" is a payment by the Plan to the eligible retirement plan specified by the distributee.

## ARTICLE IX - PARTICIPANTS COVERED BY A SUCCESSOR PLAN

The following individuals shall cease to be Participants in the Plan and shall not be entitled to benefits hereunder (with respect to Credited Service prior to December 6, 1977):

(1)    A Participant in this Plan who retired prior to December 6, 1977, if the Participant is entitled to a pension under a plan qualified under Section 401(a) of the Internal Revenue Code and established by an employer pursuant to an agreement with the UMWA which is a successor agreement to the Western Surface Coal Wage Agreement of 1975, provided that the pension is at least as great as the pension due under the terms of this Plan in effect on December 5, 1977;

(2)    A Participant in this Plan prior to December 6, 1977, who on or after December 6, 1977, is an employee of a employer which is signatory with the UMWA to a successor agreement to the Western Surface Coal Wage Agreement of 1975, if the Participant becomes a participant in a pension plan qualified under Section 401(a) of the Internal Revenue Code established by such employer pursuant to such agreement, provided that the plan gives credit for participation, vesting and Credited Service prior to December 6, 1977, determined under the terms of this Plan in effect on December 5, 1977.

## ARTICLE X

A.    As soon as practicable after an Employer's complete or partial withdrawal, the Trustees shall calculate and demand payment of withdrawal liability in accordance with Section 4219 of ERISA. In the case of a Construction Employer that withdraws on or after July 1, 1981, the amount of unfunded vested benefits allocable to it will be determined with reference to the unfunded vested benefits of the Coal Mine Construction Segment of the 1974 Pension Plan. In the case of an Employer other than a Construction Employer that withdraws on or after July 1,

1981, the amount of unfunded vested benefits allocable to it will be determined with reference to the unfunded vested benefits of the Bituminous Coal Segment of the 1974 Pension Plan.

B.    The Trustees shall establish the Bituminous Coal and Coal Mine Construction Segments of the 1974 Pension Plan for the sole purpose of calculating employer withdrawal liability under this Article.  Assets and liabilities will be allocated to the two segments in accordance with the following:

(1)    All of a Participant's Credited Service under the Plan through June 30, 1981 will be allocated to the Coal Mine Construction Segment if the Participant's last Credited Service on or before June 30, 1981 was rendered for a Construction Employer.  All of a Participant's Credited Service under the Plan through June 30, 1981 will be allocated to the Bituminous Coal Segment if the Participant's last Credited Service on or before June 30, 1981 was rendered for an Employer other than a Construction Employer.  Service credited under the Plan for any period after June 30, 1981 will be allocated to the Coal Mine Construction Segment if rendered for a Construction Employer, or to the Bituminous Coal Segment if rendered for an Employer other than a Construction Employer.  If a Participant renders service for both a Construction Employer and an Employer other than a Construction Employer within the same calendar year, his Credited Service will be allocated on a pro rata basis between the two segments.  For purposes of this paragraph, in the case of service credit earned in the 1981 calendar year, credit hours attributable to service prior to July 1, 1981, will be
assigned as follows:

| Number of Credit Hours Attributable to Participant's Service Prior to July 1, 1981 | Credited Service Assigned to Period Prior to July 1, 1981 |
|---|---|
| 250 or less | 0 |
| 250 - 499 | 1/4 year |
| 500 - 749 | 1/2 year |
| 750 - 999 | 3/4 year |
| 1,000 or more | 1 year |

(2)    An initial allocation of assets will be made to the Bituminous Coal and Coal Mine Construction Segments in order that as of June 30, 1981, the proportion of assets to liabilities in each segment is identical.  Contributions and withdrawal liability payments made by Construction employers after June 30, 1981 will be allocated to the Coal Mine Construction Segment.  Contributions and withdrawal liability payments made by Employers other than Construction Employers after June 30, 1981 will be allocated to the Bituminous Coal Segment. Plan and Trust expenses after June 30, 1981, will be allocated to each segment in the same ratio as the segment's income bears to the total income of the Trust; however, extraordinary expenses generated specially by one segment will be charged to that segment alone.  The Trustees'

- 34 -

determinations concerning the initial allocation of assets under this paragraph shall be final and binding on all persons dealing with the Plan.

(3)    Investment income (including realized and unrealized capital gains and losses) will be allocated monthly to each segment in the same ratio that the segment's assets bear to the total assets of the Trust.

(4)    Pension and other benefit payments made under the Plan will be charged to each segment in the same ratio that credited service on which a payment is based is allocated to the specific segment.

C.    The Trustees shall adopt (and modify as appropriate) a reasonable interest assumption used to calculate the value of unfunded vested benefits under the Plan which will be uniformly applicable to withdrawals by all Employers.

D.    The Bituminous Coal and Coal Mine Construction Segments are maintained solely for the purpose of determining withdrawal liability under this Article. The benefit levels, eligiblity rules, credited service provisions, and all other rules and regulations of the Plan shall be applied uniformly to all Participants. All Trust assets are available to pay all benefits under the Plan. In the event that only one segment has unfunded vested benefits in a given Plan year, the excess of allocated assets over the value of vested benefits in the other segment will be used to reduce the first segment's unfunded vested benefits. Notwithstanding any other provision of this Article X, if as of the last day of any Plan year the Trustees determine that all or substantially all of the Employers that have an obligation to contribute to one segment have withdrawn from that segment, the liability of any Employer that withdraws from the Plan in that or any subsequent Plan year shall be calculated under the provisions in effect for withdrawals occurring on or before June 30, 1981.

E.    The amount of unfunded vested benefits allocable to an Employer that withdraws from the Plan is the product of --

(1)    the appropriate segment's unfunded vested benefits as of the end of the Plan year preceding the Plan year in which the Employer withdraws, less the value as of the end of such year of all outstanding claims for withdrawal liability with respect to that segment which can reasonably be expected to be collected from that segment's Employers withdrawing before such year; multiplied by

(2)    a fraction - (a) the numerator of which is the total amount required to be contributed by the Employer under the Plan with respect to the appropriate Plan segment for the last 5 Plan years ending before the withdrawal, and

(b)    the denominator of which is the total amount contributed with respect to the appropriate Plan segment under the Plan by all of the appropriate segment's Employers for the

last 5 Plan years ending before the withdrawal, increased by any Employer contributions owed (to the segment) with respect to earlier periods which were collected in those Plan years, and decreased by any amount contributed to the Plan during those Plan years by Employers who withdrew from that segment of the Plan during those Plan years.

(3)    For purposes of subparagraph (E)(2)(b) the "total amount contributed" for a Plan year includes contributions actually received during the Plan year, and contributions received on or before July 31 following the end of the Plan year. Contributions counted for one Plan year may not be counted for any other Plan year.

F.    For purposes of determining whether a withdrawal has occurred and for purposes of assessing withdrawal liability under this Article, all employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single Employer and all such trades and businesses as a single Employer. (The preceding sentence shall not be deemed to preclude assessing liability under any other applicable law.) In the case of an Employer which contributes to the 1974 Pension Trust through one or more trades or businesses which would otherwise be considered Construction Employers and one or more trades or businesses which would otherwise be considered Employers other than Construction Employers, all calculations related to the establishment of the Bituminous Coal and Coal Mine Construction Segments of the Plan will be performed as if each trade or business were a separate Employer. In the case of an Employer described in the preceding sentence, the amount of unfunded vested benefits allocable to the Employer in the event of a complete withdrawal will be the sum of all unfunded vested benefits allocable to the individual trades or businesses calculated as if they were separate Employers. In the case of an Employer described in the third sentence of this paragraph, the amount of unfunded vested benefits allocable in the event of a partial withdrawal will be determined by the Trustees, based upon the proportional extent to which the partial withdrawal is attributable to each trade or business, and assigning liability (based on the unfunded vested benefits of the appropriate segments) accordingly. The Trustees shall have the authority to establish rules implementing such assignment of liability.

G.    Payment of withdrawal liability must begin within 60 days, notwithstanding any request for review or appeal of the determination of the amount of such liability, after the date on which the Trustees notify the Employer of the amount of withdrawal liability. Annual payments are to be made in twelve (12) equal installments, due on the 10th day of each month.

H.    If payment is not made when due, interest on the payment shall accrue from the due date until the date on which the payment is made. Interest on delinquent payment of withdrawal liability shall be payable at the rate established by the PBGC pursuant to Section 4219(c)(6). Default will occur if the Employer fails to make payment when due and then fails to make payment within 60 days after receiving written notice from the Trustees of such failure, or as otherwise determined pursuant to Section 4219(c)(5).

I.    If any Employer defaults on payment (as determined pursuant to Section 4219(c)(5)), the Trustees shall require immediate payment of the outstanding amount of withdrawal liability, plus accrued interest on the total outstanding liability from the due date of the first payment which was not timely made. If the Trustees file suit to collect the outstanding balance of withdrawal liability, plus accrued interest, and a judgment is entered by the court in favor of the Trustees, the judgment entered shall provide for an additional amount equal to 20% of the outstanding amount of withdrawal liability as liquidated damages. The Trustees shall have the authority to promulgate rules regarding default and an arbitration procedure.

J.    An Employer is entitled to prepay the outstanding amount of any unpaid withdrawal liability, plus accrued interest, if any, in whole or in part, without penalty. However, if the pre-payment is made pursuant to a withdrawal which is later determined to be part of a withdrawal described in Section 4219(c)(1)(D) of ERISA, the withdrawal liability of the Employer shall not be limited to the amount of pre-payment.

K.    In the event that this Plan terminates, an Employer's obligation to make payments under this Article ceases at the end of the Plan year in which the assets of this Plan (exclusive of withdrawal liability claims) are sufficient to meet all obligations of this Plan, as determined by the PBGC.

L.    In conformance with Section 4208(c) of ERISA, in any Plan year following an Employer's partial withdrawal under Section 4205(a)(1) of ERISA, when the number of contribution base units with respect to which the Employer has an obligation to contribute for such year equals or exceeds 130% of the number of contribution base units with respect to which the Employer had an obligation to contribute in the partial withdrawal year, the amount of the Employer's partial withdrawal liability payment for such year shall be reduced pro rata, in accordance with PBGC regulations.

M.    The presumptive partial withdrawal rules in Section 4205(a) and (b) of ERISA shall apply to this Plan.

N.    A complete or partial withdrawal of an Employer (hereinafter in this section referred to as the "seller") under this Plan does not occur solely because, as a result of a bona fide, arm's-length sale of assets to an unrelated party (hereinafter in this section referred to as the "purchaser"), the seller ceases covered operations or ceases to have an obligation to contribute for such operations, if --

(1)    the purchaser is, or becomes at the time of the sale, signatory to the Wage Agreement or any other collective bargaining agreement entered into with the United Mine Workers of America which provides that contributions at the same rate as contributions required under the Wage Agreement shall be made to this Plan;

(2)    the purchaser has an obligation to contribute to this Plan with respect to the operations for substantially the same employees and the same number of contribution base units for which the seller had an obligation to contribute to this Plan;

(3)    the purchaser provides to the Plan for a period of 5 plan years commencing with the first plan year beginning after the sale of assets, a bond or escrow deposit meeting the requirements of Section 4204 (a)(1)(B). If the Plan is in reorganization, the amount of such bond or escrow deposit shall be twice the amount provided in Section 4204 (a)(1)(B).

(4)    the contract for sale provides that, if the purchaser withdraws in a complete withdrawal, or a partial withdrawal with respect to operations, during such first 5 Plan years, the seller is secondarily liable for any withdrawal liability the seller would have had to this Plan with respect to the operations (but for this section) if the liability of the purchaser with respect to this Plan is not paid.

If the purchaser --

(1)    withdraws before the last day of the fifth plan year beginning after the sale, and

(2)    fails to make any withdrawal liability payment when due, because of a complete or partial withdrawal, then the seller shall pay to this Plan an amount equal to the payment that would have been due from the seller but for this section.

If all, or substantially all, of the seller's assets are distributed, or if the seller is liquidated before the end of the 5 plan year period described above, then the seller shall provide a bond issued by a corporate surety company that is an acceptable surety for purposes of Section 412 of ERISA, or an amount held in escrow by a bank or similar financial institution satisfactory to the Trustees, in an amount equal to the present value of the withdrawal liability the seller would have had but for this paragraph.

If only a portion of the seller's assets are distributed during such period, then a bond or escrow shall be required, in accordance with rules established by the Trustees, to the extent consistent with PBGC regulations.

The liability of the party furnishing a bond or escrow under the above paragraph shall be reduced, upon payment of the bond thereof.

For the purposes of this section, the liability of the purchaser shall be determined as if the purchaser had been required to contribute to this Plan in the year of the sale and the 4 plan years preceding the sale the amount the seller was required to contribute for such operations for such 5 plan years.

O.    If a court or tribunal of competent jurisdiction determines by a final decision or award that any provision of this Article X creates two separate multiemployer plans, or limits or reduces any employer's liability under this Article in a manner not specifically provided for herein, then the amendments to this Plan, creating two segments for the sole purpose of calculating employer liability under this Article, shall thereafter be considered null and void (without affecting any other provision of this Plan), and all employer liability under this Article shall, prospectively from the date of any such holding, be calculated under the provisions in effect for withdrawals occurring on or before June 30, 1981.

## ARTICLE XI - SOCIAL SECURITY SUPPLEMENT

A.    Eligibility For Benefit

Each Employer signatory to the National Bituminous Coal Wage Agreement of 1998, or to another Wage Agreement meeting the requirements of section C of this Article, shall notify the Trustees of the names of individuals eligible for the annual supplemental benefit payable under this Article. Eligibility is limited to individuals who, as of January 1, 1998 and thereafter during the term of the National Bituminous Coal Wage Agreement of 1998, are both eligible for Employer-provided health benefits under such Employer's individual health plan maintained pursuant to its Wage Agreement and subject to such plan's annual deductible requirement. No individual who has received a health care bonus payment from his Employer shall be eligible for a benefit under this Article for the same year. Subject to the foregoing, eligible individuals are as follows:

1.    A Pensioner under age 65 who is covered under this Plan.

2.    A deceased Pensioner's surviving spouse who is under age 65 and covered under this Plan.

3.    A deceased employee's surviving spouse who is under age 65, regardless of whether such surviving spouse is otherwise entitled to a currently payable benefit under this Plan.

B.    Amount of Benefit

The benefit is payable on January 1 of each year after 1997 which is during the term of the National Bituminous Coal Wage Agreement of 1998. The benefit will be in the amount of $1,000.00, except in the case of the following:

1.    The payment for a surviving spouse whose Employer-provided health care will terminate during the calendar year will be the pro-rata portion of $1,000 that reflects the number

of calendar quarters during which the surviving spouse is entitled to Employer-provided health care under the plan during such year.

2.     The payment for a Pensioner or a surviving spouse for the calendar year in which he or she will attain age 65 shall be the pro-rata portion of $1,000 that reflects the number of calendar quarters during such year prior to the month in which he or she attains age 65.

3.     The payment for a disabled individual under age 65 will cease to be in effect beginning with the first calendar year following his or her eligibility for Medicare benefits.

4.     The payment for any individual shall not exceed the lesser of the amount specified in the applicable Wage Agreement as payable by this Plan, or the following: $1,000 for an individual who is subject to a deductible of at least $750 during the calendar year under the applicable Employer's individual health plan; $750 for an individual subject to a deductible of at least $562 during the calendar year, but less than $750; $500 for an individual subject to a deductible of at least $375 during the calendar year, but less than $562; and $250 for an individual subject to a deductible of at least $187 during the calendar year, but less than $375.

C.     Other Wage Agreements

A Wage Agreement meets the requirements of this section if:

1.     it requires contributions to this Plan that conform to the requirements of Article VIII.B(16) and that are to continue at least through the term of the National Bituminous Coal Wage Agreement of 1998;

2.     it provides for an individual employer health plan that includes an annual deductible requirement applicable to participants and beneficiaries (other than retirees and surviving spouses over age 65 and disabled employees eligible for Medicare benefits);

3.     it provides for the Employer to pay to each employee subject to the deductible requirement an annual payment related to the amount of the deductible; and

4.     it provides for this Plan to make an annual payment to each retiree and surviving spouse subject to the deductible requirement, in the same amount that would be paid under the applicable Wage Agreement to an active employee subject to the same deductible requirement.

## APPENDIX A

### ACTUARIAL EQUIVALENCE FACTORS FOR DEFERRED VESTED RETIREMENT BENEFITS COMMENCING PRIOR TO AGE 62

The following factors are to be multiplied by the full accrued benefit payable commencing at normal retirement age 62 to yield the equivalent benefit payable commencing at the indicated age:

| Years | AGE Months | Factor | Actuarial Equivalence Years | AGE Months | Factor | Actuarial Equivalence |
|-------|------------|--------|------------------------------|------------|--------|------------------------|
| 55 | 0 | .522 | 56 | 0 | .569 | |
| | 1 | .526 | | 1 | .573 | |
| | 2 | .529 | | 2 | .577 | |
| | 3 | .533 | | 3 | .582 | |
| | 4 | .537 | | 4 | .586 | |
| | 5 | .541 | | 5 | .590 | |
| | 6 | .545 | | 6 | .595 | |
| | 7 | .549 | | 7 | .599 | |
| | 8 | .553 | | 8 | .604 | |
| | 9 | .557 | | 9 | .608 | |
| | 10 | .561 | | 10 | .612 | |
| | 11 | .565 | | 11 | .617 | |
| 57 | 0 | .621 | 58 | 0 | .680 | |
| | 1 | .626 | | 1 | .685 | |
| | 2 | .631 | | 2 | .691 | |
| | 3 | .636 | | 3 | .696 | |
| | 4 | .641 | | 4 | .702 | |
| | 5 | .646 | | 5 | .707 | |
| | 6 | .651 | | 6 | .713 | |
| | 7 | .655 | | 7 | .718 | |
| | 8 | .660 | | 8 | .724 | |
| | 9 | .665 | | 9 | .729 | |
| | 10 | .670 | | 10 | .735 | |
| | 11 | .675 | | 11 | .740 | |
| 59 | 0 | .746 | 60 | 0 | .820 | |
| | 1 | .752 | | 1 | .827 | |
| | 2 | .758 | | 2 | .834 | |
| | 3 | .765 | | 3 | .841 | |
| | 4 | .771 | | 4 | .848 | |
| | 5 | .777 | | 5 | .855 | |
| | 6 | .783 | | 6 | .863 | |
| | 7 | .789 | | 7 | .870 | |
| | 8 | .796 | | 8 | .877 | |
| | 9 | .802 | | 9 | .884 | |
| | 10 | .808 | | 10 | .891 | |
| | 11 | .814 | | 11 | .898 | |

| | 61 | 0 | .905 | 62 | 0 | 1.000 |
|---|---|---|---|---|---|---|
| | | 1 | .913 | | | |
| | | 2 | .920 | | | |
| | | 3 | .928 | | | |
| | | 4 | .936 | | | |
| | | 5 | .944 | | | |
| | | 6 | .952 | | | |
| | | 7 | .960 | | | |
| | | 8 | .968 | | | |
| | | 9 | .976 | | | |
| | | 10 | .984 | | | |
| | | 11 | .992 | | | |

Actuarial Basis: 95% of 1959-61 U.S. Total Male Population
Mortality Table at 5% Interest.

## APPENDIX B

### TABLE OF PERCENTAGES TO BE APPLIED
AGAINST PENSION PAYABLE TO PARTICIPANT
UNDER JOINT AND SURVIVOR ANNUITIES

### AGE OF PARTICIPANT*

| AGE OF SPOUSE* | 55 | 56 | 57 | 58 | 59 | 60 | 61 | 62 |
|---|---|---|---|---|---|---|---|---|
| | % | % | % | % | % | % | % | % |
| 50 | 85.1 | 84.2 | 83.3 | 82.3 | 81.2 | 80.2 | 79.1 | 77.9 |
| 51 | 85.6 | 84.7 | 83.7 | 82.7 | 81.7 | 80.7 | 79.6 | 78.5 |
| 52 | 86.0 | 85.1 | 84.2 | 83.2 | 82.2 | 81.2 | 80.1 | 79.0 |
| 53 | 86.5 | 85.6 | 84.7 | 83.7 | 82.8 | 81.7 | 80.7 | 79.6 |
| 54 | 86.9 | 86.1 | 85.2 | 84.3 | 83.3 | 82.3 | 81.2 | 80.1 |
| 55 | 87.4 | 86.6 | 85.7 | 84.8 | 83.8 | 82.8 | 81.8 | 80.7 |
| 56 | 87.9 | 87.1 | 86.2 | 85.3 | 84.4 | 83.4 | 82.4 | 81.3 |
| 57 | 88.3 | 87.5 | 86.7 | 85.8 | 84.9 | 84.0 | 83.0 | 81.9 |
| 58 | 88.8 | 88.0 | 87.2 | 86.4 | 85.5 | 84.5 | 83.6 | 82.6 |
| 59 | 89.3 | 88.5 | 87.7 | 86.9 | 86.0 | 85.1 | 84.2 | 83.2 |
| 60 | 89.7 | 89.0 | 88.3 | 87.4 | 86.6 | 85.7 | 84.8 | 83.8 |
| 61 | 90.2 | 89.5 | 88.8 | 88.0 | 87.2 | 86.3 | 85.4 | 84.5 |
| 62 | 90.7 | 90.0 | 89.3 | 88.5 | 87.7 | 86.9 | 86.0 | 85.1 |

---

* Age to nearest birthday.

Pension payable to qualified surviving spouse pursuant to Article VII (A) will be equal to 50% of the Participant's Pension as reduced in accordance with the above Table. The benefit payable to a qualified surviving spouse under Article VII (B) will be equal to 75% of the amount reduced in accordance with the above table.

- 44 -

IN WITNESS WHEREOF, the Employers and the Union, pursuant to proper authority, have caused this instrument, effective December 6, 1974 and amended as of January 1, 1998, to be signed by their proper officers or representatives in Washington, D C. on this ___26___ day of ___MAY___ , 1998.

UNITED MINE WORKERS OF AMERICA

_____
International President

BITUMINOUS COAL OPERATORS
ASSOCIATION, INC.

_____
President

- 45 -

JA 000957

## UNITED MINE WORKERS OF AMERICA 1974 PENSION PLAN
### EFFECTIVE DECEMBER 6, 1974

### ARTICLE I - INTRODUCTION

Pursuant to Article XX of the National Bituminous Coal Wage Agreement of 1974, the United Mine Workers of America 1974 Pension Plan (hereinafter sometimes referred to as the "1974 Pension Plan" or the "Plan") provides pension benefits as hereinafter set forth. The Plan is effective as of December 6, 1974 (the "effective date") and, as amended March 27, 1978, April 29, 1980, June 7, 1981, October 1, 1984, February 1, 1988, February 1, 1991, January 16, 1992, December 16, 1993, August 16, 1996, January 1, 1998, and January 1, 2002, the provisions of the Plan are set forth below. Except in the case of total disability resulting from mine accidents occurring after the effective date, this Plan does not provide benefits to persons retiring on or before December 31, 1975, but such persons may be entitled to pension benefits under the United Mine Workers of America 1950 Pension Plan (hereinafter referred to as the "1950 Pension Plan").

The 1974 Pension Plan and Trust is a continuation of the benefit program established under the UMWA Welfare and Retirement Fund of 1950.

Except to the extent otherwise required by the Employee Retirement Income Security Act of 1974 ("ERISA") or other applicable law, governmental rule or regulation, and except to the extent that the 1974 Pension Plan or 1974 Pension Trust specifically provides otherwise, or as required by the context, all amendments to the 1974 Pension Plan effective as of January 1, 2002, pursuant to the authority contained in Article VIII herein, shall be given only prospective application commencing on January 1, 2002, and shall have no retroactive application whatsoever. The amendments effective as of January 1, 2002, shall not be deemed to be an approval or disapproval by the parties to any action or failure to act by any Trustee or Trustees for any period prior to January 1, 2002. The terms and provisions of the 1974 Pension Plan in effect as of December 31, 2001, shall continue in effect and shall be applicable only to circumstances or events which occurred prior to January 1, 2002, and which are not governed by the amendments adopted as of January 1, 2002.

### Section A  Definitions

(1)    "Wage Agreement" means the National Bituminous Coal Wage Agreement of 1974, as amended from time to time and any successor thereto, including, but not limited to, the National Bituminous Coal Wage Agreement of 2002. Any reference in this Plan to the Wage Agreement or to the bituminous coal wage agreement then in effect shall also refer (a) to the Sub-bituminous and Lignite Agreement and the National Coal Mine Construction Agreement with respect to any period for which such agreements provide that pension benefits shall be made available pursuant to this Plan or a predecessor plan established under the bituminous coal wage agreement, and (b) with respect to any period prior to the 1950 Bituminous Coal Wage Agreement, to any collective bargaining contract between the United Mine Workers of America and any employer in the bituminous coal industry, and (c) solely for the purposes of determining who is required to make contributions to, and receive benefits under, the 1974 Pension Trust, any other collective bargaining contract entered into between the United Mine Workers of America and any Employer in the bituminous coal industry, which contract provides that contributions shall be made to or benefit payments made from this Plan.

(2)     "Employer" means an employer who is signatory to the Wage Agreement, or, with respect to prior periods, was signatory to the bituminous coal wage agreement then in effect.

(3)     "Construction Employer" means an Employer that is signatory to the National Coal Mine Construction Agreement of 1984, as amended from time to time and any successor thereto; or is signatory to any other collective bargaining contract with the United Mine Workers of America which provides that contributions shall be made to the 1974 Pension Trust or the United Mine Workers of America 1985 Construction Workers Pension Trust for construction work related to the development, expansion or alteration of coal mines, provided that substantially all the employees, with respect to whom the employer has an obligation to contribute, perform construction work related to the development, expansion or alteration of coal mines, including the erection of tipples and preparation plants and other facilities placed in, on or around the coal mines, sinking of shafts, slopes, drifts or tunnels and all other such coal-related work that is performed under a Wage Agreement.  In the case of a Construction Employer which is a single trade or business and which is also signatory to a Wage Agreement other than a Wage Agreement described in the preceding sentence, the Construction Employer shall be treated as an Employer other than a Construction Employer with respect to its employees or operations for which it has an obligation to contribute to the Plan pursuant to such Wage Agreement.

(4)     "Bituminous Coal Segment" and "Coal Mine Construction Segment" mean the two accounts within the 1974 Pension Plan maintained after June 30, 1981, for the sole purpose of calculating employer withdrawal liability under Article X.

(5)     "Participant" means any person who is employed in a classified job for an Employer after the effective date and any person entitled to receive pension benefits under the Plan; provided, however, that any person who is not employed in a classified job for an Employer on the effective date shall not become a participant until such person completes at least 1,000 hours (or 800 hours worked on th weekend/holiday crew of a signatory Employer as provided in Appendix C of the 2002 NBCWA) of Credited Service within a 12-month period after the effective date, or unless such person is subject to the provisions of Article II(f)(3).

(6)     "Pensioner" means any person who is receiving a pension pursuant to Article II of this Plan.

(7)     "1974 Pension Trust" means the trust established pursuant to the National Bituminous Coal Wage Agreement of 1974 to fund this Plan.

(8)     "Trustees" means the Trustees of the 1974 Pension Trust, who shall be named fiduciaries pursuant to Section 402 of ERISA and the Plan Administrator, as that term is defined in that Act; provided, however, that the 1974 Pension Trust may be amended to designate other or additional named fiduciaries under said Trust and the Plan.

(9)     "Credited Service" means signatory and nonsignatory service determined pursuant to Article IV.

2

(10)   "Hour of Service" shall mean each hour for which the participant is directly or indirectly paid or entitled to be paid by the Employer (a) for the performance of duties or (b) on account of a period of time during which no duties are performed due to vacation, holiday, illness, sickness and accident, incapacity, layoff, bereavement, jury duty, military duty or leave of absence; or (c) time spent performing contractual obligations such as safety inspections and mine committee work, even though such time off is not paid for by the Employer, provided that:

(1)   except for hours of service credited on account of a period during which a Participant is eligible to receive benefits under Article IV(B)(3), no more than 501 hours of service shall be credited to a Participant on account of a single continuous period during which the Participant performed no duties;

(2)   no credit shall be given for payments made or due under a plan maintained solely for the purpose of complying with the applicable worker's compensation or unemployment compensation or disability insurance laws or payments which solely reimburse a Participant for medically related expenses incurred by the Participant; and

(3)   hours of service shall be credited for back pay for the period for which such back pay was awarded, irrespective of mitigation of damages, either awarded or agreed to by the Employer to the extent such back pay represents payment for hours which are required to be taken into account. However, no hours of service shall be credited for back pay if such hours were previously credited. The determination of hours of service for reasons other than the performance of duties shall be made in accordance with the applicable rules of the regulations prescribed by the Secretary of Labor under 29 C.F.R. Part 2530.200b-2(b).

(11)   "UMWA" or "Union" shall mean the United Mine Workers of America.

(12)   "Hours Worked" shall mean (a) each hour for which an employee is paid, or entitled to payment, for the performance of duties for the Employer during the calendar year, and (b) hours for which back pay, irrespective of mitigation of damages, is awarded or agreed to by an Employer, to the extent that such award or agreement is intended to compensate an Employee for periods which the Employee would have been engaged in a performance of duties for the Employer. Time spent performing contractual obligations such as safety inspections and mine committee work and periods of time when the Participant is eligible to receive sickness and accident benefits shall be included as hours worked.

(13)   "Construction Industry Service" means, with respect to a participant,

(a)   all periods of service after June 20, 1985 with a Construction Employer that involves work related to the development, expansion or alteration of coal mines; and

(b)   all periods of signatory and nonsignatory service before July 1, 1985, if the participant's last such service before July 1,1985 was for a Construction Employer.

3

B.    When Retirement Occurs

For the purposes of this Plan, in the case of any Participant, retirement shall be considered to occur on the last day of credited service, within the meaning of Article IV C(8), provided that on such day he was eligible for an immediate or deferred pension under this Plan.

C.    Attainment of Age

For the purposes of this Plan, a Participant shall be deemed to have attained an age as of 12:01 A.M. on the respective anniversary date of the Participant's birth.

## ARTICLE II – ELIGIBILITY

A.    Age 55 Retirement

Any Participant who (a) has at least 10 years of signatory service or at least twenty years of credited service, including the required amount of signatory service as set forth in Article IV(C)(6), and (b) has attained the age of 55 years (but not the age of 62) prior to retirement shall be eligible to retire on or after January 1, 2002, and shall upon his retirement (hereinafter "Age 55 Retirement") be eligible for a pension.

B.    Normal Retirement

(1)    Any Participant shall be eligible to retire on or after January 1, 2002, and shall upon his retirement (hereinafter "Normal Retirement") be eligible for a pension, provided such Participant has attained the normal retirement date which shall be the earlier of --

(a)    a Participant's attainment of age 62 years and completion of at least 10 years of signatory service or at least 20 years of credited service, including the required amount of signatory service as set forth in Article IV(C)(6), or

(b)    the later of --

(i)    the time a Participant attains age 65, or

(ii)    the 5th anniversary of the time the Participant became employed in signatory service.

(2)    In determining the time the Participant became employed in signatory service (for purposes of Article II(B)(1)(b)(ii)), any employment of a Participant in signatory service who is not entitled to a pension under Article II (A) or (E) (Age 55 Retirement or Deferred Vested Retirement) shall be disregarded if it precedes a period of consecutive one-year breaks in signatory service and the number of consecutive one-year breaks in signatory service equals or exceeds the greater of

4

(a)    five, or

(b)    the aggregate number of years of signatory service before such breaks.

In addition to the foregoing, any employment prior to a period of consecutive one-year breaks in signatory service shall be disregarded unless the Employee completes 1,000 hours (or 800 hours worked on the weekend/holiday crew of a signatory Employer as provided in Appendix C of the 2002 NBCWA) of signatory service within a 12-month period after the breaks in signatory service. Such aggregate number of years of signatory service before any period of consecutive one-year breaks in signatory service shall be deemed not to include any years of signatory service not required to be taken into account under this subparagraph by reason of any prior break in signatory service. For purposes of this Article II(B)(1)(b)(ii), a year of signatory service shall be calculated on the basis of a calendar year and in the manner specified in Article IV; a break in signatory service shall be defined in accordance with the terms of Article II(G)(3); and nonclassified signatory service shall be disregarded unless it immediately precedes or follows classified signatory service with the same Employer.

C.    Disability Retirement

A Participant who (a) has at least 10 years of signatory service prior to retirement, and (b) becomes totally disabled as a result of a mine accident occurring on or after January 1, 2002, shall, upon retirement (hereinafter " Disability Retirement"), be eligible for a pension while so disabled. A Participant shall be considered to be totally disabled only if by reason of such accident such Participant is subsequently determined to be eligible for Social Security Disability Insurance Benefits under Title II of the Social Security Act or its successor.

When a Participant who has been receiving a disability pension under this Section C recovers sufficiently to become ineligible for Social Security disability benefits or is disqualified because of earnings, the Trustees shall implement procedures to determine the Participant's ability to perform classified work in the industry. The continuance of a disability pension shall be based on medical evidence that supports the Participant's inability to be employed in classified work in the industry.

If such Participant is medically certified able to perform classified work in the industry, he will no longer be eligible for a disability pension.

D.    Minimum Disability Retirement

Any Participant who (a) has less than 10 years of signatory service prior to retirement and (b) becomes totally disabled as a result of a mine accident occurring on or after January 1, 2002, shall, upon retirement (hereinafter "Minimum Disability Retirement") be eligible for a pension while so disabled. A Participant shall be considered to be totally disabled only if by reason of such accident such Participant is subsequently determined to be eligible for Social Security Disability Insurance Benefits under Title II of the Social Security Act or its successor.

5

Then a Participant who has been receiving a disability pension under this Section D recovers sufficiently to become ineligible for Social Security disability benefits or is disqualified because of earnings, the Trustees shall implement procedures to determine the Participant's ability to perform classified work in the industry. The continuance of a disability pension shall be based on medical evidence that supports the Participant's inability to be employed in classified work in the industry.

If such Participant is medically certified able to perform classified work in the industry, such Participant will no longer be eligible for a disability pension.

E.    Deferred Vested and Special Retirement

(1)    Any Participant who ceases working in a classified job for an Employer for any reason, except as provided in (2), (3), or (4) below, and who is not eligible to receive a pension under any other provision of this Article II, shall be eligible for a pension (hereinafter "Deferred Vested Pension"), upon attaining age 62, or at the election of the Participant, such Participant shall be eligible for a reduced pension beginning at any time after attaining age 55, provided

(a)    the Participant's last day of Credited Service is on or after January 1, 2002, but prior to attainment of age 55;

(b)    the Participant has

(i)    at least 10 years of signatory service, or for a Participant with one hour of service on or after the date set by law for a five-year vesting schedule, at least 5 years of signatory service, or

(ii)    at least 20 years of Credited Service as set forth in Article IV(C)(6).

(2)    Any Participant who ceases working in a classified job for an Employer, who is not eligible to receive a pension under any other provision of this Article II, shall be eligible for a pension (hereinafter "Deferred Vested Pension - Special") upon attaining age 62, or at the election of the Participant, such Participant shall be eligible for a reduced pension beginning at any time after attaining age 55, calculated pursuant to Article III A(5)(b), provided

(a)    the Participant's last day of Credited Service is on or after January 1, 2002, but prior to attainment of age 55;

(b)    had 20 years of signatory service on the date last worked;

(c)    had attained the age of 50 on the date last worked; and either

6

(d)    had been laid off and had not refused recall to the mine from which the Participant was laid off; or

(e)    had been terminated under Article III, Section (j) of the Wage Agreement (or if the Participant had not been terminated, there had been a deterioration in physical condition which prevented the Participant from performing the Participant's regular work as determined by a panel of three physicians, if the degree of physical deterioration is disputed by the Trustees) and was not employed in the coal industry thereafter.

(3)    Any Participant who ceases working in a classified job for an Employer, who is not eligible to receive a pension under any other provision of this Article II, shall be eligible for a pension (hereinafter "Deferred Vested Pension-Enhanced 1996") upon attaining age 62, or at the election of the Participant, such Participant shall be eligible for a reduced pension beginning at any time after attaining age 55, calculated pursuant to Article III A(5)(b), provided:

(a)    the Participant's last day of Credited Service is on or after January 1, 2002, but prior to attainment of age 55;

(b)    the Participant had 20 years of signatory service on the date last worked;

(c)    the Participant had been laid off and had not refused recall to the mine from which the Participant was laid off; or

(d)    he had been terminated under Article III, Section (j) of the Wage Agreement (or if the Participant had not been terminated, there had been a deterioration in physical condition which prevented the Participant from performing the Participant's regular work as determined by a panel of three physicians, if the degree of physical deterioration is disputed by the Trustees) and was not employed in the coal industry thereafter; and

(e)    the Participant's pension benefits are not in pay status on or before August 16, 1996.

Within a reasonable period of time after such Participant's employment has ceased, an appropriate written notice of eligibility and other relevant data will be provided.

(4)    Any Participant who, on or after January 1, 2002, ceases working in a classified job for an Employer and who is not eligible to receive a pension under any other provision of this Article II shall be eligible for a pension (hereinafter "Special Permanent Layoff Pension"), calculated pursuant to Article III A(5)(b), using the Participant's actual Credited Service and an assumed age of 55, provided:

(a)    the Participant's last day of Credited Service is on or after January 1, 2002, but prior to attainment of age 55;

7

      (b)    the Participant had 20 years of signatory service as of his last day of Service;

      (c)   (i)    the Participant was permanently laid off under circumstances in which his Employer has permanently closed the mine, or

      (ii)    the Participant was permanently laid off, meaning that he was on layoff status for at least 180 days, and had not refused a recall to the mine from which he was laid off;

In the case of a layoff described in (c)(i) above, the pension will be effective on the first day of the first month following both the layoff and the filing of a pension application. In the case of a layoff described in (c)(ii) above, the pension will be effective on the first day of the first month following both a period of 180 days after the layoff and the filing of a pension application.

Notwithstanding the foregoing, in the case of a Participant who earned no hours of credited signatory service during the period beginning November 1, 1997 and ending June 17, 1998, and who subsequently returned to active employment on or after June 18, 1998, in addition to meeting the requirements stated above, prior to satisfying Paragraph (4)(c), above, such Participant must either:

      (d)    have earned at least 250 hours of credited signatory service, or

      (e)    have returned to active employment as the result of a recall determined by the Trustees to have been to fill a bona fide job opening, and not for the purpose of entitling the Participant to this Special Permanent Layoff Pension benefit.

      (5)    Any Participant who, on or after January 1, 2002, ceases working in a classified job for an Employer shall be eligible for a pension (hereinafter "Special 30-and-Out Layoff Pension"), calculated pursuant to Article III A(5)(b), but with no actuarial reduction on account of age, provided:

      (a)    the Participant's last day of Credited Service is on or after January 1, 2002; and

      (b)    the Participant had at least 30 years of signatory service on such last day of Credited service; and

      (c)    the Participant has been laid off and has not refused a recall to the mine from which he was laid off;

      (d)    if, because of a layoff, he was not actively at work as of December 31, 2001:

      (i) he earned at least 250 hours of credited signatory service following his return to work, or

8

(ii) he returned to active employment as the result of a recall determined by the Trustees have been to fill a bona fide job opening, and not for the purpose of entitling the Participant to this Special 30-and-Out Layoff Pension benefit.

(6)    Any Participant who, on or after January 1, 2003 ceases working in a classified job for an Employer shall be eligible for a pension (hereinafter "30-and-Out Pension"), calculated pursuant to Article III A(5)(b), but with no actuarial reduction on account of age, provided:

(a)    the Participant's last day of Credited Service is on or after January 1, 2003; and

(b)    the Participant had at least 30 years of signatory service on such last day of Credited service;

(c)    if, because of a layoff, he was not actively at work as of December 31, 2001:

(i) he earned at least 250 hours of credited signatory service following his return to work, or

(ii) he returned to active employment as the result of a recall determined by the Trustees to have been to fill a bona fide job opening, and not for the purpose of entitling the Participant to this 30-and-Out Pension benefit.

F.    Nonduplication

(1)    A Participant shall be entitled to receive a pension under only one of the foregoing paragraphs of this Article II with respect to any retirement.

(2)    Except as provided in paragraph (C), (D), or (F)(3) of this Article II, any person whose retirement occurs on or before December 31, 1975, shall not be entitled to receive pension benefits under this Plan, but shall be entitled only to receive such benefits as may be provided under the 1950 Pension Plan.

(3)    Any person who (a) retires on or before December 31, 1975, (b) at the time of retirement is entitled to or, upon attaining age 55 would be entitled to, a pension benefit under the 1950 Pension Plan, and (c) is again employed for at least 250 hours in a classified job for an Employer after December 31, 1975, shall upon subsequent retirement (or, if later, upon attaining age 55) be eligible for a pension only under this Plan and not under the 1950 Pension Plan, in the amount hereinafter specified. The amount of pension for a Participant described in this paragraph shall be the sum of the amount of pension to which such Participant would be entitled upon attaining age 55 under the 1950 Pension Plan if he had not been employed in a classified job for an Employer after December 31, 1975, plus the excess of (i) over (ii) where (i) is the pension to which such Participant would be entitled except for this paragraph under Article III(A)(2) or III(B)(2) based upon all years of Credited Service under this Plan and (ii) is the pension to

9

which such Participant would be entitled under Article III(A)(2) or III(B)(2) based solely on his Credited Service prior to December 31, 1975.

G.    Employment for Vesting Purposes

(1)    For purposes of this Article II, all years of classified service by a Participant with Employers signatory to the bituminous coal wage agreement then in effect shall be used for purposes of any eligibility requirement of minimum signatory service under this Article.  A year of service shall be calculated on the basis of a calendar year and in accordance with the terms of Article IV(A).

(2)    For purposes of this Article II, years of nonclassified signatory service in the coal industry by a Participant after May 28, 1946, for Employers signatory to the bituminous coal wage agreement then in effect shall be used for purposes of any eligibility requirement of minimum signatory service provided that:

(a)    the nonclassified signatory service with an Employer immediately preceded or followed classified signatory service with the same Employer;

(b)    credit for nonclassified service shall not be given for any calendar year in which the Participant completed less than 1,000 hours of such service, as defined under Article I(A)(7);

(c)    all years of service before age 18 shall be disregarded;

(d)    all years of service performed before January 1, 1971, shall be disregarded unless the Participant completed at least three years of employment after December 31, 1970;

Provided further that, if the employee has not earned a non-forfeitable right to a pension:

(e)    all years of service prior to a break in service shall be disregarded unless the employee completes 1,000 hours (or 800 hours worked on the weekend/holiday crew of a signatory Employer as provided in Appendix C of the 2002 NBCWA) of service within a 12-month period after the break;

(f)    all years of service prior to any period of consecutive one-year breaks in service shall be disregarded if the number of such consecutive one-year breaks equals or exceeds the greater of (i) five, or (ii) the aggregate number of years of service before such breaks shall be deemed not to include any years of service not required to be taken into account under this subparagraph by reason of any prior break in service.

(3)    For purposes of Article II(G)(2) and II(B)(2), an employee shall incur a break in service for any calendar year in which such Employee completes not more than 500 hours (or 400 hours worked on the weekend/holiday crew of a signatory Employer as provided in Appendix C of the 2002 NBCWA) of service; provided that, in the case of an Employee who is absent from work for any period --

10

(a)    by reason of the pregnancy of the Employee,

(b)    by reason of the birth of a child of the Employee,

(c)    by reason of the placement of a child with the Employee in connection with the adoption of such child by such Employee, or

(d)    for purposes of caring for such child for a period beginning immediately following such birth or placement, the Employee shall be considered to have completed the hours of service which otherwise would normally have been credited to him but for such absence, subject to the limitation set forth in Article I A(8)(l). The preceding sentence shall be applicable only in the year in which the Employee's absence from work begins, if the Employee would be prevented from incurring a one-year break in service in such year solely because of the application of the preceding sentence, or in any other case, in the immediately following year. No credit will be given to an Employee pursuant to this subparagraph unless the Employee furnishes to the Trustees such timely information as they may reasonably require to establish that the absence from work is for reasons referred to in (a), (b), (c), or (d) above, and the number of days for which there was such an absence.

(4)    The provisions of this paragraph shall be interpreted and construed in accordance with the requirements of ERISA and the regulations issued thereunder.

(5)    Service after June 30, 1985 with a Construction Employer shall be used for purposes of paragraph G(1), only if the United Mine Workers of America 1985 Construction Workers Pension Plan grants participants credit for the same purposes under that plan for service with Employers, other than Construction Employers, except that a year of service shall be calculated on the basis of a calendar year and in accordance with the terms of Article IV.

ARTICLE III - AMOUNT OF PENSION AND DEATH BENEFIT

A.    Retirement On or After January 1, 2002

A pension granted to a Participant who retires on or after January 1, 2002, pursuant to Article II shall consist of a pension amount payable in monthly installments provided in accordance with the provisions of this Article III as set forth below. In no event, however, shall the annual retirement benefit payable to a Participant exceed the limitation of Section 415 of the Internal Revenue Code of 1986 and any regulations promulgated thereunder.

(1)    Age 55 Retirement Pension

(a)    A deferred pension, commencing after attainment of age 62, computed under the provisions of paragraph 2 below; or, at the election of the Participant, (b) an immediate pension, equal to the deferred pension to which the Participant could have been eligible under (a) above had the Participant so elected, reduced by 1/4 of one percent (1%) for each full month (3 percent (3%) per year) between the date on which pension benefits began and the date on which Participant attains age 62.

(2)    Normal Retirement Pension

For retirements occurring during the 2002 Wage Agreement the amount of pension for Normal Retirement shall be determined as follows:

(a)    for each year of credited non-signatory service as defined herein, $18.00 per month;

(b)    for each of the first 10 years of credited signatory service earned prior to February 1, 1989, $38.50 per month;

(c)    for each year of credited signatory service in excess of 10 years but not to exceed 20 years earned prior to February 1, 1989, $39.00 per month;

(d)    for each year of credited signatory service in excess of 20 years but not to exceed 30 years earned prior to February 1, 1989, $39.50 per month;

(e)    for each year of credited signatory service in excess of 30 years earned prio to February 1, 1989, $40.00 per month.

(f)    The retirement benefit for a year of credited signatory service earned from February 1, 1989 to January 31, 1990, is $46.00 per month.

(g)    The retirement benefit for each year of credited signatory service earned from February 1, 1990 to December 16, 1993, is $50.50 per month.

(h)    The retirement benefit for each year of credited signatory service earned from December 16, 1993 is $53.50 per month.

(i)    Each amount specified in clauses (a) through (h) shall be increased by $2.00 in the case of any Participant who is employed in classified signatory service on or after January 1, 2004, and by an additional $4.00 in the case of any Participant who is employed in classified signatory service on or after January 1, 2006.

Proportional credit shall be allowed for any fractional years of credited service pursuant to Article IV hereof. Periods of Construction Industry Service shall be taken into account solely to determine whether the amount specified in clause (a), (b), (c), (d), or (e) is to be used in determining the amount of pension that is earned for a given period of Credited Service. In any year for which two of clauses (a), (b), (c), (d), or (e) would apply, if a Participant has both Credited Service and Construction Industry Service, the amount determined under each clause shall be equal to the amount that would be determined if Construction Industry Service in that year were considered service under this Plan, multiplied by a fraction, the numerator of which is the Participant's hours of service under this Plan for that year and the denominator of which is the sum of such hours and the Participant's hours of Construction Service for that year.

(3) Disability Retirement Pension

Subject to (4) below for a Participant whose disabling accident occurs after January 1, 2002, the pension payment shall be computed under the provisions of paragraph (2) above. In the case of a participant who has both Construction Industry Service and Credited Service, the amount of pension under this subparagraph (3) shall be based only on the Participant's years of Credited Service and shall be determined in the same manner as under Article III.A.(2).

(4) Minimum Disability Retirement Pension

The amount of pension for Minimum Disability Retirement shall be $230 per month for disabilities occurring on or after January 1, 2002. In any case in which a participant entitled to pension for Minimum Disability Retirement has both Credited Service and Construction Service, the amount of pension under this subparagraph (4) shall be equal to the amount otherwise payable under this subparagraph, multiplied by a fraction, the numerator of which is the number of years of Credited Service and the denominator of which is the sum of the number of years of Credited Service and the number of years of Construction Industry Service.

(5) Deferred Vested Pension

(a) The amount of a deferred vested pension (Article II E(1)) shall be a pension, commencing on or after attainment of age 62, computed under the provisions of Subsection A(2) of this Article III, or, at the Participant's election, between ages 55 and 62 with the pension payable reduced to its actuarial equivalent pursuant to Appendix A; provided, however, that in the case of any Participant with at least (20) years of credited service, such pension shall not be reduced to less than $180.00 per month.

(b) The amount of a deferred vested pension (Article II E(2) and (3)) shall be a pension, commencing on or after attainment of age 62, computed under the provisions of Subsection A(2) of this Article III, or, at the Participant's election, between ages 55 and 62 with the pension computed under the provisions of Subsection A(1) of this Article III.

13

B.    Increased Pension

(1)    Increases in pensions under Plan amendments effective December 16, 1993 and August 16, 1996 are not applicable to Participants whose employment was terminated prior to December 16, 1993, and who will become eligible for only a deferred vested pension (II E(1)). Increases in pensions under Plan amendments effective August 16, 1996 are not applicable to Participants whose employment was terminated on or after December 16, 1993, and whose pension benefits are in pay status on or before August 16, 1996.

(2) (a)  Any Participant not described in clause (b) whose pension is in pay status as of October 31, 2002, shall be issued by November 1, 2002 a one-time single sum payment of $550. Any Participant not described in clause (b) whose pension is in pay status as of October 31, 2003, shall be issued by November 1, 2003 a one-time single sum payment of $550. Any Participant not described in clause (b) whose pension is in pay status as of October 31, 2004, shall be issued by November 1, 2004 a one-time single sum payment of $550. Any Participant not described in clause (b) whose pension is in pay status as of October 31, 2005, shall be issued by November 1, 2005 a one-time single sum payment of $565. Any Participant not described in clause (b) whose pension is in pay status as of October 31, 2006, shall be issued by November 1, 2006 a one-time single sum payment of $565.

(b)    Any Participant whose disability retirement pursuant to Article II C or D is in pay status as of October 31, 2002 shall be issued by November 1, 2002 a one-time single sum payment of $425. Any Participant whose disability retirement pursuant to Article II C or D is in pay status as of October 31, 2003, shall be issued by November 1, 2003 a one-time single sum payment of $425. Any Participant whose disability retirement pursuant to Article II C or D is in pay status as of October 31, 2004, shall be issued by November 1, 2004 a one-time single sum payment of $425. Any Participant whose disability retirement pursuant to Article II C or D is in pay status as of October 31, 2005, shall be issued November 1, 2005 a one-time single sum payment of $440. Any Participant whose disability retirement pursuant to Article II C or D is in pay status as of October 31, 2006, shall be issued by November 1, 2006 a one-time single sum payment of $440.

(c)    Any Surviving Spouse whose benefit under Article VI is in pay status as of October 31, 2002, shall be issued by November 1, 2002 a one-time single sum payment of $425. Any Surviving Spouse whose benefit under Article VI is in pay status as of October 31, 2003 shall be issued by November 1, 2003 a one-time single sum payment of $425. Any Surviving Spouse whose benefit under Article VI is in pay status as of October 31, 2004 shall be issued by November 1, 2004 a one-time single sum payment of $425. Any Surviving Spouse whose benefit under Article VI is in pay status as of October 31, 2005 shall be issued by November 1, 2005 a one-time single sum payment of $440. Any Surviving Spouse whose benefit under Article VI is in pay status as of October 31, 2006 shall be issued by November 1, 2006 a one-time single sum payment of $440.

(d)    Any qualified surviving spouse whose benefit under Article VII is in pay status as of October 31, 2002, shall be issued by November 1, 2002 a one-time single sum payment of $425. Any qualified surviving spouse whose benefit under Article VII is in pay status as of October 31,

14

2003 shall be issued by November 1, 2003 a one-time single sum payment of $425. Any qualified surviving spouse whose benefit under Article VII is in pay status as of October 31, 2004 shall be issued by November 1, 2004 a one-time single sum payment of $425. Any qualified surviving spouse whose benefit under Article VII is in pay status as of October 31, 2005 shall be issued by November 1, 2005 a one-time single sum payment of $440. Any qualified surviving spouse whose benefit under Article VII is in pay status as of October 31, 2006 shall be issued by November 1, 2006 a one-time single sum payment of $440.

    (e)    In recognition of anticipated hardship due to increased medical costs under the UMWA 1993 Benefit Plan, any Pensioner, disabled miner not yet eligible for immediate pension benefits, or surviving spouse, who is eligible for benefits from the UMWA 1993 Benefit Plan as of January 1, 2002, will receive a one-time single sum payment of $2,250 on or before April 1, 2002, and on or about January 1 of each successive year of this Agreement. In recognition of anticipated hardship due to increased medical costs under the UMWA 1993 Benefit Plan, any Pensioner, disabled miner not yet eligible for immediate pension benefits, or surviving spouse, who is determined to be eligible for benefits from the 1993 Plan during the term of the 2002 NBCWA will receive a $2,250 one-time single sum payment on or about the later of April 1, 2002, or the first day of the second month following the month in which such individual is determined to be eligible for benefits from the 1993 Plan, and on or about January 1 of each successive year of the 2002 NBCWA.

    (f)    The one-time single sum payments provided for herein are not intended as an ongoing feature of this Plan, and the Plan shall have no obligation to provide payments of this type other than those expressly provided for above.

C.    <u>Application for Pension and Commencement, Suspension and Termination of Pensions</u>

Payments of pensions shall be subject to the following:

    (1)    The first payment on any pension shall be made as soon as possible after an application for pension has been received and shall be for the month following the month in which the Participant retires (Article I B) and becomes eligible for a pension in accordance with Article II; provided, however, that in the case of a deferred pension pursuant to Article III(A)(1) or a deferred vested pension pursuant to Article III(A)(5) (other than a Special Permanent layoff Pension pursuant to Article II.E(4)), such payment shall be for the later of (a) the month specified by the Participant in his application for pension if such month is subsequent to the month in which such Participant attains age 55, or (b) the month in which the application for pension is received, but not later than the month following the month in which such Participant attains age 62.

    (2)    The last payment shall be for the month in which the pensioner dies.

    (3)    Pension payments shall be payable on the first day of each month at the pensioner's last address of record.

(4)     Pension payments shall be suspended for any month in which the pensioner is employed, subsequent to commencement of such payments, in the bituminous coal industry, in the same trade or craft (trade or craft shall mean the coal mining industry), and in the same geographic area covered by this Plan. The provisions of this paragraph shall be interpreted in accordance with any regulations issued pursuant to Sections 203(a)(3) and (B) of ERISA.

(5)     Any Participant who continues to be employed by an Employer after retirement shall not be entitled to receive pension benefits under this Plan until such time as such Participant is no longer employed by an Employer; provided, however, that benefit payments shall commence not later than April 1 of the calendar year following the calendar year in which the Participant attains age 70-1/2.

D.     Death Benefit

(1) Except as otherwise provided herein, a death benefit shall be paid to the named beneficiary of any pensioner (other than a Pensioner receiving a deferred vested pension based on less than 20 years of credited service or a Pensioner receiving a pension based in whole or in part on years of service credited under the terms of Article II G) whose death occurs on or after January 1, 2002, and who meets the requirements of paragraph (2) of this section. The death benefit shall be equal to $7,000 if the named beneficiary is the Pensioner's surviving spouse or dependent. In any other case, the death benefit shall be equal to $6,000. The death benefit provided under this section shall not be payable if any other death or life insurance benefit is paid on behalf of the Pensioner from any other Plan maintained by an Employer.

(2)     A Pensioner meets the requirements of this paragraph only if he is not entitled to death benefit coverage from a plan maintained by his former Employer and he meets one of the following conditions:

(i)     the Pensioner is a participant in the 1992 UMWA Benefit Plan;

(ii)     the Pensioner is a participant in the UMWA 1993 Benefit Trust;

(iii)     the Pensioner is a participant in an individual employer plan maintained pursuant to section 9711 of the Internal Revenue Code and whose last signatory employer ceased producing and/or processing coal prior to December 16, 1993;

(iv)     the Pensioner was entitled to death benefit coverage from this Plan on January 1, 2002 (or would have been had he been retired or eligible to retire on that date); or

(v)     the Pensioner's last signatory employer (the Employer for whom such pensioner last worked in signatory classified employment) is a current contributor to this Plan and is signatory either to the National Bituminous Coal Wage Agreement of 2002 or to an agreement (including prior agreements, where applicable) requiring a contribution obligation with respect to this Plan that is identical to the applicable contribution obligation set forth in the National Bituminous Coal Wage Agreement of 2002 (or prior National Bituminous Coal Wage Agreements, where applicable).

16

(3)    The death benefit provided under this section shall not be payable with respect to any Pensioner who was an eligible beneficiary of the United Mine Workers of America Combined Benefit Fund described in section 9703(f) of the Internal Revenue Code of 1986, as amended by the Coal Industry Retiree Health Benefit Act of 1992, whose death occurs on or after February 1, 1993.

(4)    For purposes of this section, the term "dependent" shall mean any person described in (a) through (e), below, as of the date of death of the Pensioner.  A person shall be considered to have been a dependent of a Pensioner if such Pensioner or his spouse provided over one-half of the support to such person on a regular basis.

(i)    a spouse who is living with or being supported by the Pensioner;

(ii)    an unmarried dependent child of the Pensioner who has not attained age 22;

(iii)    a parent of a Pensioner or of a Pensioner's spouse, if the parent has been dependent upon and living in the same household (residence) as the Pensioner for a continuous period of at least one year;

(iv)    an unmarried dependent grandchild of a Pensioner or of a Pensioner's spouse who has not attained age 22, and is living in the same household (residence) with such Pensioner; and

(v)    a dependent child (of any age) of a Pensioner or of a Pensioner's spouse who is mentally retarded or who becomes disabled prior to attaining age 22, and such disability is continuous, and who is either living in the same household with such Pensioner or is confined to an institution for care or treatment.

E.    <u>Benefit Increase for Pensions in Pay Status on December 31, 2001</u>

The pension of any Participant or Surviving Spouse who is in pay status as of December 31, 2001 shall be increased by $15.00.

ARTICLE IV – <u>CREDITED SERVICE</u>

A.    <u>Nonsignatory Service</u>

Subject to the limitations in paragraph C of this article IV, credited service is a period during which the participant meets the requirements of subparagraphs (1), (2), (3) or (4) below.  Any credited service shall be nonsignatory service unless it qualifies as signatory service pursuant to Article IV(B) hereof.

(1)    A Participant shall receive credit for a year of service for any calendar year in which he worked, subsequent to December 31, 1936, as an employee in a job classified in the then existing bituminous coal wage agreement for an employer in the coal industry for at least 1,000 hours of service,

17

with credit given for the next lowest 1/4 year in the event any employee works less than 1,000 hours of service as follows:

| | |
|---|---|
| 750-999 hours, | 3/4 year |
| 500-749 hours, | 1/2 year |
| 250-499 hours, | 1/4 year |
| 249 hours or less, | 0 |

With respect to any period of such service for which records of hours of service are not available or it is not feasible in light of the administrative and cost difficulties involved to compile a record of service, an applicant shall be deemed to have worked a thousand hours of service if the employee received wages in an amount equal to the product of (i) the lesser of 125 days or 1/2 the average number of days the bituminous mines in the United States were active, multiplied by (ii) the daily basic rate paid in the bituminous coal industry for that year; provided that for any year for which information is not available as to the average number of days the mines were active, the available data for the nearest year next preceding shall be used; provided further that if an applicant earned less than the minimum amount required for a year of service, credit for service shall be given to the next lowest 1/4 year in the manner indicated with respect to hours of service.

(2) A Participant shall receive credit for a year of service for any calendar year in which the Participant worked, prior to January 1, 1937, as an employee in a job classified in the then existing coal wage agreement for an Employer in the bituminous coal industry, in a minimum of at least six (6) months during a calendar year, provided that if the applicant worked in less than six (6) months, credit for service shall be awarded to the next lowest one-fourth (1/4) year, based upon service in six (6) monthly equaling a year's service.

(3) A Participant shall receive credit for a year of service for any calendar year in which the Participant received state worker's compensation payments pursuant to an award as a result of an occupational disease or injury sustained in the mine while regularly employed in a classified job under the bituminous coal wage agreement then in effect; provided, in the case of occupational disease, the Participant had been so employed by an Employer signatory to the Wage Agreement then in effect for at least ten (10) years after May 28, 1946. Credit shall be given up to a maximum of four (4) years service credit from date of injury, or from the date of last employment in case of occupational disease, provided the Participant did not work regularly (earned at least $200 per month) during the compensable period. Benefits awarded pursuant to the Federal Coal Mine Health and Safety Act of 1969 shall be deemed "state worker's compensation payments" within the meaning of this section, only if the miner was last regularly employed in the coal industry after the enactment date of the Act, December 30, 1969, in a classified job under the bituminous coal wage agreement then in effect, and had been so employed by an operator signatory to the agreement for at least ten (10) years after May 28, 1946. In no event shall any service be credited under this paragraph (3) with respect to periods after December 6, 1974.

18

(4)    A Participant shall receive service credit for any period of service in the military service of the United States, to the extent required by section 414(u) of the Internal Revenue Code.

B.    Signatory Service

Credited signatory service is:

(1)    (a) For any calendar year prior to January 1, 1978, service as defined in paragraph A(l) hereof during which a Participant worked as an employee in a classified job for an Employer signatory to the bituminous coal wage agreement then in effect.

(b)    For purposes of determining eligibility for a pension (vesting) under Article II, service for any calendar year subsequent to December 31, 1977 during which a Participant works as an employee in a classified job for an Employer signatory to the bituminous coal wage agreement then in effect, computed based on hours of service as defined in Article I A(10) as follows:

| Hours of Service During a Calendar Year as a Classified Employee for a Signatory Employer | Percentage of a Year of Credited Signatory Service |
|---|---|
| 249 or less | 0% |
| 250 – 499 | 25% |
| 500 – 749 | 50% |
| 750 – 999 | 75% |
| 1,000 or more | 100% |

Notwithstanding the foregoing, a classified Employee working on the weekend/holiday crew of a signatory Employer as provided in Appendix C of the National Bituminous Coal Wage Agreement of 2002 shall receive credit for a percentage of a year calculated in accordance with the following schedule:

| Hours Worked On Weekend/Holiday Crew | Percentage of a Year of Signatory Service |
|---|---|
| less than 200 | 0 |
| 200-399 | 25% |
| 400-599 | 50% |
| 600-799 | 75% |
| 800 or more | 100% |

19

A Classified Employee who earns both regular hours and weekend/holiday crew hours during a calendar year, but who earns fewer than 1,000 hours in total for the year, may combine the partial credits earned under each of the schedules shown above.

Special Rule for 1993 -- For the calendar year 1993, a classified Employee who participated in an authorized strike following expiration of the 1988 Wage Agreement, or who was laid off as a direct result of such an authorized strike, and who worked at least 500 hours will receive credit for a full year of signatory service.

          (c)     For purposes of determining the amount of pension, under Article III, service for any calendar year subsequent to December 31, 1977, during which a Participant works as an employee in a classified job for an Employer signatory to the bituminous coal wage agreement then in effect, computed based on hours worked as defined in Article I A(12) as follows:

| Hours of Service During a Calendar Year as a Classified Employee for a Signatory Employer | Percentage of a Year of Credited Signatory Service |
|---|---|
| 249 or less | 0% |
| 250 – 499 | 25% |
| 500 – 749 | 50% |
| 750 – 999 | 75% |
| 1,000 or more | 100% |

Notwithstanding the foregoing, a classified Employee working on the weekend/holiday crew of a signatory Employer as provided in Appendix C of the National Bituminous Coal Wage Agreement of 2002 shall receive credit for a percentage of a year calculated in accordance with the following schedule:

20

| Hours Worked<br>On Weekend/Holiday Crew | Percentage of a Year of<br>Signatory Service |
|---|---|
| less than 200 | 0 |
| 200-399 | 25% |
| 400-599 | 50% |
| 600-799 | 75% |
| 800 or more | 100% |

A Classified Employee who earns both regular hours and weekend/holiday crew hours during a calendar year, but who earns fewer than 1,000 hours in total for the year, may combine the partial credits earned under each of the schedules shown above.

Special Rule for 1993 -- For the calendar year 1993, a classified Employee who participated in an authorized strike following expiration of the 1988 Wage Agreement, or who was laid off as a direct result of such an authorized strike, and who worked at least 500 hours will receive credit for a full year of signatory service.

(2)    Service prior to December 6, 1974, as defined in paragraph A(3) hereof during which a Participant received state worker's compensation payments if such payments are pursuant to an award as a result of an occupational disease or injury awarded after May 28, 1946, and if the Participant was last regularly employed prior to such service as an employee in a classified job for an Employer signatory to the bituminous coal wage agreement then in effect.

(3)    Service during which a Participant receives or is eligible to receive weekly Sickness and Accident Benefits pursuant to Article XI of the National Bituminous Coal Wage Agreement of 1974, as amended from time to time, and any successor agreements thereto. Service shall be computed at a rate of 8 hours for each regularly scheduled work day, or if greater than 8 hours, then at a rate equal to the number of hours, for each regularly scheduled work day, that the Participant would have worked under an alternate work schedule under Article IV(c) of the Wage Agreement.

(4)    A Participant who retires on or after March 27, 1978, shall receive credit for a year of service for any calendar year (including calendar years prior to 1978) in which he rendered service as an employee of the United Mine Workers of America (UMWA) in the coal industry immediately following regular employment in a classified job under the bituminous coal wage agreement then in effect; provided that the Participant does not, or is not eligible to, receive a pension or other retirement income from the UMWA. Credit or service with the UMWA shall be computed in the same manner as:

21

(a)    credit is computed for service prior to 1937, as described in paragraph A(2) hereof, or

(b)    credit is computed for service under the pension plan of the UMWA, whichever is greater, for service prior to January 1, 1978.

Credit for service after December 31, 1977, shall be computed in the same manner as credit is computed for service under the pension plan of the UMWA.

In no event shall a Participant receive credit under this paragraph (4) while receiving a pension under this Plan.

Notwithstanding anything in this paragraph (4) to the contrary, a Participant,

(a)    who is not employed in a classified job for an Employer on March 27, 1978, or

(b)    who is not employed by the UMWA on March 27, 1978, or

(c)    who had retired prior to March 27, 1978, and was eligible to receive, or upon application would have been eligible to receive, a pension under the 1950 Pension Plan, the 1974 Pension Plan or a retirement plan of the UMWA prior to March 27, 1978, shall not receive signatory service credit for the years of UMWA employment described above if it occurred prior to March 27, 1978, unless such Participant is re-employed in a classified job and

(1)    obtains at least 3 years of credited service after March 27, 1978, or

(2)    ceases to be employed in the classified job or employed by the UMWA as the result of

(i)    nonoccupational disability or accident

(ii)    occupational injury for which the Participant receives worker's compensation, or

(3)    dies after March 27, 1978 at a time when the Participant is employed in a classified job for an Employer or when employed by the UMWA.

22

(5)    Service as defined in paragraph A(4) hereof during which a Participant served in the military service of the United States, provided that the classified employment referred to therein (both before and after military service) is for an Employer signatory to the bituminous coal wage agreement then in effect and provided further, however, that for military service credited after December 31, 1974, the Participant returned to work in a classified job within ninety (90) days after the date of separation from the military service or such longer period as may be allowed by law.

(6)    Service (within the meaning of paragraph A(l) hereof) by an employee in a classified job for an Employer not signatory to the bituminous coal wage agreement then in effect if (i) such service is continuous, (ii) such Employer becomes a signatory to the bituminous coal wage agreement after the effective date as a result of recognizing the UMWA as the bargaining representative of its employees, (iii) the employee is working in a classified job with such Employer at the time such Employer becomes signatory to the bituminous coal wage agreement, and (iv) such employee remains in a classified job with such Employer during the twenty-four month period immediately following the date on which such Employer becomes signatory to the bituminous coal wage agreement; provided, however, that not more than ten (10) years of nonsignatory service may be recognized or awarded as signatory service to any person pursuant to this paragraph (6).

C.    Additional Rules Concerning Credited Service

(1)    Except as provided in Article IV(B)(6), employment after April 1, 1971, will not constitute credited service under paragraph A(l) hereof unless such employment was in a classified job for an Employer.

(2)    A Participant shall not be credited with more than one year of service for any calendar year by reason of any combination of the rules of this Article IV.

(3)    The maximum number of years of nonsignatory service which may be included in the credited service of any Participant retiring after December 31, 1981 shall be the number of years by which twenty years exceeds such Participant's signatory service, but not in excess of ten years.

(4)    No credit for service shall be awarded a Participant for any period in which such Participant was directly connected with the ownership, operation or management of a mine; provided, however, that in the case of any Participant who received credit for such service before July 1, 1974, under the terms of the pension plan program established under the United Mine Workers of America Welfare and Retirement Fund of 1950, credit shall be awarded for any period prior to July 1, 1975, in which the Participant worked as an employee in a classified job in a mine in which such Participant had no controlling interest, as a member of a cooperative or gang-working crew which shared the profits and losses, and which was operated under the bituminous coal wage agreement then in effect; and provided further, that in the case of a Participant who received credit for service before July 1, 1974, under the terms of the pension plan program established under the United Mine Workers of America Welfare and Retirement Fund of 1950, credit for signatory service shall be awarded for any period prior to July 1, 1975, during which such Participant worked in a classified job pursuant to an agreement to produce coal for a

23

signatory coal company which exercised control over the operation of the mine and was responsible for royalty payments on such coal produced to the 1974 Pension Trust or its predecessor.

(5)    The following maximum years of nonsignatory service may be included in credited service under this Plan:

| Date of Retirement | Maximum Years of Nonsignatory Service |
|---|---|
| January 1, 1978 to December 31, 1978 | 13 |
| January 1, 1979 to December 31, 1979 | 12 |
| January 1, 1980 to December 31, 1980 | 11 |
| January 1, 1981 and thereafter | 10 |

(6)    Subject to Article II E(1)(b)(i), a Participant with less than ten years of signatory service shall not be entitled to receive a pension under paragraph (A), (B), or (E) of Article II unless such Participant has at least twenty years of credited service, including at least the following minimum number of years of signatory service:

| Date of Retirement | Years of Signatory Service Required |
|---|---|
| January 1, 1978 to December 31, 1978 | Seven (7) years |
| January 1, 1979 to December 31, 1979 | Eight (8) years |
| January 1, 1980 to December 31, 1980 | Nine (9) years |
| January 1, 1981 and thereafter | Ten (10) years |

(7)    Except as provided in Article V, service credits shall not be accrued subsequent to the effective date of pension payments.

(8)    In the case of any Participant, except a Participant covered under Article IV B(4), the last day of credited service shall be the last day on which the Participant works as an employee in a classified job for an Employer, unless such Participant continues to accrue credited service during the period for which such Participant receives or is eligible to receive weekly sickness and accident benefit pursuant to Article XI of the Wage Agreement, in which case the last day of credited service shall be the last day for which such sickness and accident benefits are paid or would have been paid. For a Participant covered under Article IV B(4), the last day of credited service shall be the later of the last day as determined in the preceding sentence or the last day the Participant worked for the UMWA.

24

(9)      An employee who is regularly employed in a classified job for an Employer and who performs supervisory duties on a temporary basis for not more than 120 work days during any consecutive period of 12 months, shall be deemed to be employed in a classified job during the days on which the Participant performs such supervisory duties.

D.      Construction Industry Service

(1)      Notwithstanding anything to the contrary, and except for purposes of Article II.C and II.D as provided by Article II.G, no Construction Industry Service of a Participant shall be considered Credited Service under this Plan.

(2)      In any case in which a Participant has both Construction Industry Service and at least one hour of service creditable under paragraphs B or C of this Article for any year beginning after December 31, 1985, the Participant's Credited Service for that year shall be determined by multiplying the Credited Service the Participant would be entitled to if Construction Industry Service were considered service under this Article by a fraction, the numerator of which is the Participant's hours of service creditable under this Article for that year and the denominator of which is the sum of such hours and the Participant's hours of Construction Industry Service for that year.

(3)      In any case in which, after June 30, 1985, and before January 1, 1986, a Participant has both Construction Industry Service and at least one hour of service creditable under the provisions of paragraphs B or C of this Article, the Participant's Credited Service for that year shall be equal to the sum of his Credited Service for the period beginning January 1, 1985, and ending June 30, 1985, and a fraction of what his Credited Service would be for the period beginning July 1, 1985 and ending December 31, 1985, if Construction Industry Service were considered service under this Article. Such fraction is determined by dividing the Participant's hours of service under paragraphs B and C of this Article by the sum of such hours of service and the Participant's hours of Construction Industry Service.

(4)      Notwithstanding subparagraph D.(2) or D.(3), the Credited Service of a Participant for a year in which either subparagraph applies shall not exceed one minus the portion of a year for which the Participant receives credit for accrual purposes under the United Mine Workers of America Construction Workers Pension Plan. If, in any year, a Participant receives one year of credit for accrual purposes under the United Mine Workers of America Construction Workers Pension Plan, he shall not be entitled to any Credited Service for such year.

ARTICLE V – REEMPLOYMENT AFTER ATTAINMENT OF PENSION ELIGIBILITY

A.      Any Participant who has been retired and receiving a pension under this Plan and who shall be reemployed in a classified job by an Employer shall, for the purpose of calculating any subsequent pension benefits to which such Participant may become entitled, upon subsequent retirement, be granted a pension equal to the sum of the pension such Participant was previously receiving plus the excess of (i) over (ii) where (i) is the pension to which such Participant would be entitled at the time of such retirement,

25

based upon all years of Credited Service under the Plan and (ii) is the pension to which such Participant would be entitled at the time of such retirement, based solely on Credited Service at the time of his previous retirement.

B.    Any Participant eligible for a deferred vested pension under this Plan whose shall be reemployed in a classified job by an Employer prior to the commencement of pension benefit shall, for the purpose of calculating any subsequent pension benefits to which he may become entitled, be granted his credited service applicable to the deferred vested pension plus his credited service accrued after such reemployment.

C.    Any Participant who is reemployed in a classified job by an Employer after attainment of eligibility for a deferred vested pension under this Plan, whose employment is subsequently terminated and who at that time is not eligible for a pension under any provision of Article II by reason of Article IV(C)(6), shall be considered to be eligible for the deferred vested pension for which such Participant was eligible prior to such reemployment and upon application for pension the date of retirement shall be considered to be the date of retirement which would, upon application for pension, have been applicable to the deferred vested pension for which such Participant was eligible prior to such reemployment.

ARTICLE VI – SURVIVING SPOUSE BENEFIT

A.    (1)    Except as provided in paragraph (B) of this Article, a Surviving Spouse Benefit is provided for any Participant who (a) has retired and is receiving a pension under this Plan, except a Participant receiving a deferred vested pension who has not completed at least twenty years of credited service, (b) has not retired but at the date of his death otherwise met the eligibility requirements for an immediate pension under Article II(A), (B), (C), (D) or (E)(6) under this Plan, or (c) has attained age 55 with at least twenty years of credited service and who has retired and is entitled to elect an immediate pension under Article II(A), II(B) or II(E) at the date of death.

(2)    The amount of such benefit shall be equal to 75% of the amount of the Participant's pension at the time of death or, in the event the Participant dies after age 55 at a time when such Participant was eligible to elect a pension or to retire and receive a pension under Article II, but prior to the receipt of a pension, 75% of the amount of the pension such Participant would have received if such Participant had elected a pension or retired and become entitled to a pension as of the date immediately preceding the date of death.

(3)    The Surviving Spouse Benefit will not be effective unless the Participant and the spouse have been married throughout the nine-month period ending on the date of the Participant's death or unless such nine-month requirement would be waived for purposes of determining entitlement to widow's or widower's insurance benefits under the Social Security Act.

(4)    Payment to an eligible spouse will commence as of the first of the month following the month in which the Participant's death occurs and the final payment shall be made for the month in which the spouse's death occurs.

26

B.    (1)    Any Participant who is not employed in a classified job for an Employer on December 6, 1974, is not covered for a Surviving Spouse Benefit under this Article unless such Participant (a) obtains at least three years of credited service after such date, or (b) had ceased to be employed in a classified job as a result of (i) layoff, (ii) nonoccupational disability or accident, or (iii) occupational injury for which such Participant was receiving workers' compensation, or (c) such Participant dies at a time when he is employed in a classified job for an Employer.

(2)    Any Participant who retires on or before December 31, 1975, and is again employed in a classified job for an Employer after such retirement, is not covered for a Surviving Spouse Benefit under this Article unless (a) such Participant obtains at least three years of credited service after such reemployment or (b) unless such reemployment ceases as a result of (i) layoff, (ii) nonoccupational disability or accident, or (iii) occupational injury for which worker's compensation benefits were awarded, or (c) such Participant dies while employed in a classified job for an Employer.

C.    (1)    A Surviving Spouse benefit is provided for any Participant who completed at least ten years of credited service, who died as a result of a mine accident during the term of the National Bituminous Coal Wage Agreement of 1978 or 1981, and who was not in Construction Industry Service at the time of the mine accident. The amount of such Surviving Spouse benefit shall be a lump sum in the amount of $10,000, plus $100.00 a month beginning with the month of February, 1998 and for each month thereafter during the spouse's eligibility. The final payment shall be made for the month in which the spouse's death (or if earlier, the spouse's remarriage) occurs.

(2)    The Surviving Spouse Benefit will not be effective unless (a) the Participant and the spouse were married throughout the nine-month period ending on the date of the Participant's death or unless such nine-month requirement would be waive d for purposes of determining entitlement to widow's or widower's insurance benefits under the Social Security Act; (b) the spouse was never eligible for a monthly benefit under this Plan or under any other plan or provision under a Wage Agreement; and (c) the spouse has never remarried and is surviving on February 1, 1998.

## ARTICLE VII - JOINT AND SURVIVOR ANNUITIES

A.    Notwithstanding any other provision of this Plan, if a Participant qualifies for a pension under this Plan, but is not covered by a Surviving Spouse Benefit, the Pension benefit otherwise provided to such Participant shall be reduced actuarially pursuant to Appendix B, and 50% of such reduced pension benefit will be continued, after the death of the Participant, for the life of any qualified surviving spouse; provided, however, that such Participant may elect, within the election period specified in Paragraph C(l) below, and subject to the requirement of Paragraph D below, not to take a joint and survivor annuity as provided for in this Article and instead to receive a pension benefit for life only.

B.    If a Participant has completed 5 years of signatory service for vesting purposes, calculated pursuant to Article II (G), is not covered by a Surviving Spouse Benefit, and dies before he is entitled to elect or elects to receive a pension benefit, the qualified surviving spouse shall be entitled to receive a

27

survivor's benefit in the form of an annuity for life in an amount equal to 75% of the pension benefit the decedent would have received if the decedent had --

        (1)     separated from service on the date of death,

        (2)     survived to age 55 (in the case of a decedent who died before attaining age 55),

        (3)     retired with an immediate Joint and Survivor Annuity as provided for in this Article at age 55, (or, if later on the date before the decedent's date of death).

        (4)     died on the day after the day on which the decedent would have attained age 55 (in the case of a decedent who died before attaining age 55).

Payment to a qualified spouse under this paragraph will commence on the first of the month following the month in which the decedent would have attained age 55 (or, if later, the first of the month following the month of the decedent's death) and the final payment shall be for the month in which the spouse's death occurs. Notwithstanding the foregoing, payment to a surviving spouse of a Participant who died prior to age 55, but while eligible for an immediate pension benefit, will commence on the first of the month following the month of the Participant's death. The benefit shall be calculated as set forth herein, but as if the Participant had retired with an immediate Joint and Survivor Annuity on the date before the date of his death.

        C.    (1)     The "election period" in the case of an election to waive the Joint and Survivor Annuity described in Paragraph A shall be the 90-day period ending on the date of the commencement of benefits. Not less than 30 days and not more than 90 days prior to the date of the commencement of benefits, the Trustees shall furnish the Participant (a) a general description or explanation of the qualified Joint and Survivor Annuity, the circumstances in which it will be provided unless the Participant elects not to have benefits provided in that form, the availability of such election and the right to revoke such election, and the rights of the Participant's spouse; and (b) a general explanation of the relative financial effect of such election on the Participant's pension. In the event a Participant elects not to receive a Joint and Survivor Annuity, such election shall not become effective if the Participant dies within a period of two years beginning on the date of such election.

        (2)     A Participant may revoke any election made pursuant to this Article at any time during the applicable election period.

        D.     An election made under this Article shall not take effect unless--

        (1)     the spouse of the Participant consents in writing to such election, and the spouse's consent acknowledges the effect of such election and is witnessed by a Plan representative or a notary public, or

(2)    It is established to the satisfaction of the Trustees that the consent required under subparagraph (1) may not be obtained because there is no spouse, because the spouse cannot be located, or because of such other circumstances as the Trustees may by law consider.

E.    A qualified surviving spouse shall be any spouse who has been married to the Participant for at least nine months prior to death, unless such nine-month requirement would be waived for purposes of determining entitlement to widow or widower's insurance benefits under the Social Security Act.

F.    Except as provided in Paragraph B above, payment to a qualified surviving spouse under this Article will commence as of the first of the month following the month in which the Participant's death occurs, and the final payment shall be made for the month in which the spouse's death occurs.

## ARTICLE VIII – MISCELLANEOUS

### A.    Determination of Eligibility

The Trustees or such other named fiduciaries as may be properly designated shall have full and final determination as to all issues concerning eligibility for benefits.

### B.    General

(1)    The Trustees are authorized to promulgate rules and regulations to implement this Plan, and those rules and regulations shall be binding upon all persons dealing with and Participants claiming benefits under this Plan.

(2)    No benefit payable under this Plan shall be subject in any way to alienation, sale, transfer, assignment, pledge, attachments, garnishments, execution or encumbrance of any kind, and any attempt to accomplish the same shall be void. Notwithstanding the foregoing, the Plan shall comply with any qualified domestic relations order, as that term is defined in ERISA, and with any written authorization by a Participant or beneficiary made pursuant to paragraph (19) of this section.

(3)    The Employers and the Union, by joint action, reserve the right at any time and from time to time to modify or amend in whole or in part any or all of the provisions of this instrument or to terminate this Plan, without reopening or otherwise affecting the integrity of any other provision of the Wage Agreement, by a written agreement between the Employers and the Union, provided, however, that:

(a)    this Plan shall not be amended in such manner as would cause or permit any part of the assets in the 1974 Pension Trust to be diverted to purposes other than the exclusive benefit of the Participants and their beneficiaries;

(b)    this Plan shall not be amended to deny to a Participant retroactively any benefits to which such Participant was entitled under this Plan, unless such amendment is necessary to conform this Plan to, or to satisfy the conditions of, any law, governmental regulations or ruling;

29


(c)    the Employers and the Union have delegated to the Trustees the authority and responsibility to make certain changes and amendments as set forth in Article XX(g)(4) of the National Bituminous Coal Wage Agreement of 2002, as amended from time to time, and any successor agreements to that specific Agreement; and

(d)    any written agreement executed by the Union shall be signed by the International President.

(4)    Upon the termination of this Plan or the complete discontinuance of contributions to the 1974 Pension Trust, this Plan shall remain in force and effect for the period necessary to complete the payment of benefits in accordance with the terms of this Plan to the extent assets in the 1974 Pension Trust are available to pay such benefits.

(5)    Forfeitures arising from the operation of the Plan shall not be used to increase the benefits which otherwise would be received under this Plan.

(6)    Any Participant or beneficiary whose claim for benefits under this Plan has been denied shall be (a) provided with adequate notice in writing setting forth the specific reasons for such denial, such notice shall be written in a manner calculated to be understood by the Participant, and (b) afforded a reasonable opportunity for a full and fair review of the decision denying the claim by an appropriate named fiduciary or a person properly designated to carry out such responsibility.

(7)    The Trustees are hereby authorized to allocate fiduciary responsibilities in any manner permitted pursuant to section 405(c) of ERISA and to appoint an investment manager or managers as permitted by section 402(c) of ERISA.

(8)    Contributions to the 1974 Pension Trust to fund the benefits under this Plan shall be paid solely by the Employers in accordance with Article XX of the National Bituminous Coal Wage Agreement of 2002, as amended from time to time, and any successor agreements to that specific Agreement.

(9)    In the event that this Plan merges or consolidates with, or transfers some or all of its assets or liabilities to, any other plan, no Participant or beneficiary herein shall, solely on account of merger, consolidation or transfer, be entitled to an accrued benefit immediately following such event which is less than the benefit to which such Participant or beneficiary would have been entitled immediately preceding such event.

(10)    In the event that an Employer fails to make the contributions to the Plan required by Article XX of the National Bituminous Coal Wage Agreement of 2002, interest (calculated at a rate established by the Trustees at the beginning of each calendar year) shall accrue from the date due until the date on which payment is made. If the Trustees file suit to collect unpaid contributions, plus accrued

interest, and a judgment is entered by the courts in favor of the Trustees, the judgment entered shall provide for an additional amount equal to the accrued interest in liquidated damages.

(11)    Upon the termination or partial termination of the Plan, the rights of all affected Participants to benefits accrued to the date of such termination or partial termination, are nonforfeitable to the extent required by law or to the extent provided for under the National Bituminous Coal Wage Agreement of 2002.

(12)    Except as otherwise provided herein, it shall be unlawful for any part of the assets held pursuant to this Plan, other than such part as is required to pay taxes and administrative expenses, to be used for, or diverted to, purposes other than for the sole and exclusive benefit of the Participants of the Plan except that in the case of a contribution which is made by an Employer by a mistake of fact, or law (other than a mistake relating to Plan qualification), such mistaken contribution may be returned to the Employer within six months after the Trustees determine that the contribution was mistakenly made.

(13)    To the extent not inconsistent with the provisions hereof, the Trustees shall comply with the further requirements imposed upon them by and shall have the further powers contained in Article XX, Sections (e), (f), and (g) of the National Bituminous Coal Wage Agreement of 2002, as amended from time to time, and any successor agreements to that specific Agreement.

(14)    This instrument, and the 1974 Pension Trust shall be construed, regulated and administered in accordance with Federal law, and, to the extent not preempted or inconsistent with such Federal law, the laws of the District of Columbia.

(15)    Any action of the Employers which may, or must, be taken hereunder may be taken by BCOA. Any action which must be taken in writing shall be signed by the President of BCOA.

(16)    Any Employer who employed any Participant eligible for coverage under, or who received or receives benefits under, the 1974 Pension Plan, or any Employer who was or is required to make, or who has made or makes contributions to the 1974 Pension Plan and Trust, is obligated and required to comply with the terms and conditions of the 1974 Pension Plan and Trust, as amended from time to time, including, but not limited to, making the contributions required under the National Bituminous Coal Wage Agreement of 1978 as amended from time to time and any successor agreements thereto, including, but not limited to, the National Bituminous Coal Wage Agreement of 2002.

(17)    The Employers, the Union and the Trustees shall fully cooperate to obtain all necessary rulings and do all other acts appropriate to ensure that the 1974 Pension Plan and Trust are qualified under Section 401 of the Internal Revenue Code, and that contributions are deductible under Section 404 of the Internal Revenue Code.

(18)    Notwithstanding any other provision of this Plan to the contrary, a distribution of benefits shall commence to a participant not later than the April 1 of the calendar year following the calendar year in which the Participant attains age 70-1/2 and shall be distributed over the life of such

· JA 000989

Participant or over the lives of such Participant and his surviving spouse, in accordance with Section 401(a)(9) of the Internal Revenue Code of 1986 and any regulations promulgated thereunder. In the event that the Participant dies before distributions have commenced hereunder, the surviving spouse shall begin to receive a distribution of the benefit, if any, to which such spouse is entitled no later than the date on which the participant would have attained age 70-1/2 and shall be distributed over the life of such surviving spouse.

(19)     Any Participant or beneficiary whose benefit is in pay status (including a disabled miner who is entitled to a one-time single sum payment of $2,250) may voluntarily authorize the Trustees to check-off an amount from his or her monthly benefit for remittance to the UMWA of Union membership dues, including assessments, initiation fees, credit union, voluntary COMPAC contributions and other voluntary deductions, or from his or her one-time single sum payment of $2,250 for remittance to the UMWA 1993 Benefit Trust of the required annual payment, provided that an y such arrangement must be terminable by the Trustees upon reasonable notice, must be revocable by the Participant at any time upon reasonable notice to the Trustees, and either:

(a)     such arrangement must not permit any Participant or beneficiary to check-off an amount exceeding 10% of his or her monthly benefit; or

(b)     the designated recipient must file a written acknowledgement that it has no enforceable right in or to any Plan benefit or portion thereof (except to the extent of payments actually received pursuant to the terms of the arrangement); and

an agreement for such check-off is in effect between the Plan and the Union, or between the Plan and the UMWA 1993 Benefit Trust. Any check-off authorization must be in writing, must be voluntary and must comply in all respects with the requirements of the Internal Revenue Code of 1986, as amended, ERISA, the Labor Management Relations Act of 1947, as amended, and any other applicable law.

(20)     (a)     Notwithstanding any provision of the plan to the contrary that would otherwise limit a distributee's election under this part, a distributee may elect, at the time and in the manner prescribed by the Trustees, to have any portion of an eligible rollover distribution paid directly to an eligible retirement plan specified by the distributee in a direct rollover.

(b)     An "eligible rollover distribution" is any distribution of all or any portion of the balance to the credit of the distributee, except that an eligible rollover distribution does not include: any distribution that is one of a series of substantially equal periodic payments (not less frequently than annually) made for the life (or life expectancy) of the distributee or the joint lives (or joint life expectancies) of the distributee and the distributee's designated beneficiary, or for a specified period of ten (10) years or more; any distribution to the extent such distribution is required under Section 401(a)(9) of the Code; the portion of any distribution that is not includible in gross income (determined without regard to the exclusion of net unrealized appreciation with respect to employer securities); and any amount that is treated by the Plan as distributed on account of hardship.

32

(c)    An "eligible retirement plan" is an individual retirement account described in Section 408(a) of the Code, an individual retirement annuity described in Section 408(b) of the Code, an annuity plan described in section 403(a) of the Code, or a qualified trust described in Section 401(a) of the Code, that accepts that distributee's eligible rollover distribution. However, in the case of an eligible rollover distribution to the surviving spouse, an eligible retirement plan is an individual retirement account or individual retirement annuity.

(d)    A "distributee" includes a Pensioner and a surviving spouse. In addition, a Pensioner's surviving spouse and the Pensioner's spouse or former spouse who is an alternate payee under a qualified domestic relations order, as defined in Section 414(q) of the code, are distributees with regard to the interest of the spouse or former spouse.

(e)    A "direct rollover" is a payment by the Plan to the eligible retirement plan specified by the distributee.

## ARTICLE IX - PARTICIPANTS COVERED BY A SUCCESSOR PLAN

The following individuals shall cease to be Participants in the Plan and shall not be entitled to benefits hereunder (with respect to Credited Service prior to December 6, 1977):

(1)    A Participant in this Plan who retired prior to December 6, 1977, if the Participant is entitled to a pension under a plan qualified under Section 401(a) of the Internal Revenue Code and established by an employer pursuant to an agreement with the UMWA which is a successor agreement to the Western Surface Coal Wage Agreement of 1975, provided that the pension is at least as great as the pension due under the terms of this Plan in effect on December 5, 1977;

(2)    A Participant in this Plan prior to December 6, 1977, who on or after December 6, 1977, is an employee of a employer which is signatory with the UMWA to a successor agreement to the Western Surface Coal Wage Agreement of 1975, if the Participant becomes a participant in a pension plan qualified under Section 401(a) of the Internal Revenue Code established by such employer pursuant to such agreement, provided that the plan gives credit for participation, vesting and Credited Service prior to December 6, 1977, determined under the terms of this Plan in effect on December 5, 1977.

## ARTICLE X

A.    As soon as practicable after an Employer's complete or partial withdrawal, the Trustees shall calculate and demand payment of withdrawal liability in accordance with Section 4219 of ERISA. In the case of a Construction Employer that withdraws on or after July 1, 1981, the amount of unfunded vested benefits allocable to it will be determined with reference to the unfunded vested benefits of the Coal Mine Construction Segment of the 1974 Pension Plan. In the case of an Employer other than a Construction Employer that withdraws on or after July 1, 1981, the amount of unfunded vested benefits allocable to it will be determined with reference to the unfunded vested benefits of the Bituminous Coal Segment of the 1974 Pension Plan.

B.    The Trustees shall establish the Bituminous Coal and Coal Mine Construction Segments of the 1974 Pension Plan for the sole purpose of calculating employer withdrawal liability under this Article. Assets and liabilities will be allocated to the two segments in accordance with the following:

(1)    All of a Participant's Credited Service under the Plan through June 30, 1981 will be allocated to the Coal Mine Construction Segment if the Participant's last Credited Service on or before June 30, 1981 was rendered for a Construction Employer. All of a Participant's Credited Service under the Plan through June 30, 1981 will be allocated to the Bituminous Coal Segment if the Participant's last Credited Service on or before June 30, 1981 was rendered for an Employer other than a Construction Employer. Service credited under the Plan for any period after June 30, 1981 will be allocated to the Coal Mine Construction Segment if rendered for a Construction Employer, or to the Bituminous Coal Segment if rendered for an Employer other than a Construction Employer. If a Participant renders service for both a Construction Employer and an Employer other than a Construction Employer within the same calendar year, his Credited Service will be allocated on a pro rata basis between the two segments. For purposes of this paragraph, in the case of service credit earned in the 1981 calendar year, credit hours attributable to service prior to July 1, 1981, will be assigned as follows:

| Number of Credit Hours Attributable to Participant's Service Prior to July 1, 1981 | Credited Service Assigned to Period Prior to July 1, 1981 |
|---|---|
| 250 or less | 0 |
| 250 - 499 | 1/4 year |
| 500 - 749 | 1/2 year |
| 750 - 999 | 3/4 year |
| 1,000 or more | 1 year |

(2)    An initial allocation of assets will be made to the Bituminous Coal and Coal Mine Construction Segments in order that as of June 30, 1981, the proportion of assets to liabilities in each segment is identical. Contributions and withdrawal liability payments made by Construction employers after June 30, 1981 will be allocated to the Coal Mine Construction Segment. Contributions and withdrawal liability payments made by Employers other than Construction Employers after June 30, 1981 will be allocated to the Bituminous Coal Segment. Plan and Trust expenses after June 30, 1981, will be allocated to each segment in the same ratio as the segment's income bears to the total income of the Trust; however, extraordinary expenses generated specially by one segment will be charged to that segment alone. The Trustees' determinations concerning the initial allocation of assets under this paragraph shall be final and binding on all persons dealing with the Plan.

34

IA 000992

(3)     Investment income (including realized and unrealized capital gains and losses) will be allocated monthly to each segment in the same ratio that the segment's assets bear to the total assets of the Trust.

(4)     Pension and other benefit payments made under the Plan will be charged to each segment in the same rat io that credited service on which a payment is based is allocated to the specific segment.

C.     The Trustees shall adopt (and modify as appropriate) a reasonable interest assumption used to calculate the value of unfunded vested benefits under the Plan which will be uniformly applicable to withdrawals by all Employers.

D.     The Bituminous Coal and Coal Mine Construction Segments are maintained solely for the purpose of determining withdrawal liability under this Article. The benefit levels, eligibility rules, credited service provisions, and all other rules and regulations of the Plan shall be applied uniformly to all Participants. All Trust assets are available to pay all benefits under the Plan. In the event that only one segment has unfunded vested benefits in a given Plan year, the excess of allocated assets over the value of vested benefits in the other segment will be used to reduce the first segment's unfunded vested benefits. Notwithstanding any other provision of this Article X, if as of the last day of any Plan year the Trustees determine that all or substantially all of the Employers that have an obligation to contribute to one segment have withdrawn from that segment, the liability of any Employer that withdraws from the Plan in that or any subsequent Plan year shall be calculated under the provisions in effect for withdrawals occurring on or before June 30, 1981.

E.     The amount of unfunded vested benefits allocable to an Employer that withdraws from the Plan is the product of --

(1)     the appropriate segment's unfunded vested benefits as of the end of the Plan year preceding the Plan year in which the Employer withdraws, less the value as of the end of such year of all outstanding claims for withdrawal liability with respect to that segment which can reasonably be expected to be collected from that segment's Employers withdrawing before such year; multiplied by

(2)     a fraction - (a) the numerator of which is the total amount required to be contributed by the Employer under the Plan with respect to the appropriate Plan segment for the last 5 Plan years ending before the withdrawal, and

(b)     the denominator of which is the total amount contributed with respect to the appropriate Plan segment under the Plan by all of the appropriate segment's Employers for the last 5 Plan years ending before the withdrawal, increased by any Employer contributions owed (to the segment) with respect to earlier periods which were collected in those Plan years, and decreased by any amount contributed to the Plan during those Plan years by Employers who withdrew from that segment of the Plan during those Plan years.

35

(3)    For purposes of subparagraph (E)(2)(b) the "total amount contributed" for a Plan year includes contributions actually received during the Plan year, and contributions received on or before July 31 following the end of the Plan year. Contributions counted for one Plan year may not be counted for any other Plan year.

F.    For purposes of determining whether a withdrawal has occurred and for purposes of assessing withdrawal liability under this Article, all employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single Employer and all such trades and businesses as a single Employer. (The preceding sentence shall not be deemed to preclude assessing liability under any other applicable law.) In the case of an Employer which contributes to the 1974 Pension Trust through one or more trades or businesses which would otherwise be considered Construction Employers and one or more trades or businesses which would otherwise be considered Employers other than Construction Employers, all calculations related to the establishment of the Bituminous Coal and Coal Mine Construction Segments of the Plan will be performed as if each trade or business were a separate Employer. In the case of an Employer described in the preceding sentence, the amount of unfunded vested benefits allocable to the Employer in the event of a complete withdrawal will be the sum of all unfunded vested benefits allocable to the individual trades or businesses calculated as if they were separate Employers. In the case of an Employer described in the third sentence of this paragraph, the amount of unfunded vested benefits allocable in the event of a partial withdrawal will be determined by the Trustees, based upon the proportional extent to which the partial withdrawal is attributable to each trade or business, and assigning liability (based on the unfunded vested benefits of the appropriate segments) accordingly. The Trustees shall have the authority to establish rules implementing such assignment of liability.

G.    Payment of withdrawal liability must begin within 60 days, notwithstanding any request for review or appeal of the determination of the amount of such liability, after the date on which the Trustees notify the Employer of the amount of withdrawal liability. Annual payments are to be made in twelve (12) equal installments, due on the 10th day of each month.

H.    If payment is not made when due, interest on the payment shall accrue from the due date until the date on which the payment is made. Interest on delinquent payment of withdrawal liability shall be payable at the rate established by the PBGC pursuant to Section 4219(c)(6). Default will occur if the Employer fails to make payment when due and then fails to make payment within 60 days after receiving written notice from the Trustees of such failure, or as otherwise determined pursuant to Section 4219(c)(5).

I.    If any Employer defaults on payment (as determined pursuant to Section 4219(c)(5)), the Trustees shall require immediate payment of the outstanding amount of withdrawal liability, plus accrued interest on the total outstanding liability from the due date of the first payment which was not timely made. If the Trustees file suit to collect the outstanding balance of withdrawal liability, plus accrued interest, and a judgment is entered by the court in favor of the Trustees, the judgment entered shall provide for an additional amount equal to 20% of the outstanding amount of withdrawal liability as liquidated damages. The Trustees shall have the authority to promulgate rules regarding default and an arbitration procedure.

36

J.      An Employer is entitled to prepay the outstanding amount of any unpaid withdrawal liability, plus accrued interest, if any, in whole or in part, without penalty. However, if the pre-payment is made pursuant to a withdrawal which is later determined to be part of a withdrawal described in Section 4219(c)(I)(D) of ERISA, the withdrawal liability of the Employer shall not be limited to the amount of pre-payment.

K.      In the event that this Plan terminates, an Employer's obligation to make payments under this Article ceases at the end of the Plan year in which the assets of this Plan (exclusive of withdrawal liability claims) are sufficient to meet all obligations of this Plan, as determined by the PBGC.

L.      In conformance with Section 4208(c) of ERISA, in any Plan year following an Employer's partial withdrawal under Section 4205(a)(I) of ERISA, when the number of contribution base units with respect to which the Employer has an obligation to contribute for such year equals or exceeds 130% of the number of contribution base units with respect to which the Employer had an obligation to contribute in the partial withdrawal year, the amount of the Employer' s partial withdrawal liability payment for such year shall be reduced pro rata, in accordance with PBGC regulations.

M.      The presumptive partial withdrawal rules in Section 4205(a) and (b) of ERISA shall apply to this Plan.

N.      A complete or partial withdrawal of an Employer (hereinafter in this section referred to as the "seller") under this Plan does not occur solely because, as a result of a bona fide, arm's-length sale of assets to an unrelated party (hereinafter in this section referred to as the "purchaser"), the seller ceases covered operations or ceases to have an obligation to contribute for such operations, if --

(1)      the purchaser is, or becomes at the time of the sale, signatory to the Wage Agreement or any other collective bargaining agreement entered into with the United Mine Workers of America which provides that contributions at the same rate as contributions required under the Wage Agreement shall be made to this Plan;

(2)      the purchaser has an obligation to contribute to this Plan with respect to the operations for substantially the same employees and the same number of contribution base units for which the seller had an obligation to contribute to this Plan;

(3)      the purchaser provides to the Plan for a period of 5 plan years commencing with the first plan year beginning after the sale of assets, a bond or escrow deposit meeting the requirements of Section 4204 (a)(1)(B). If the Plan is in reorganization, the amount of such bond or escrow deposit shall be twice the amount provided in Section 4204 (a)(1)(B).

(4)      the contract for sale provides that, if the purchaser withdraws in a complete withdrawal, or a partial withdrawal with respect to operations, during such first 5 Plan years, the seller is secondarily liable for any withdrawal liability the seller would have had to this Plan with respect to the operations (but for this section) if the liability of the purchaser with respect to this Plan is not paid.

37

If the purchaser --

      (1)     withdraws before the last day of the fifth plan year beginning after the sale, and

      (2)     fails to make any withdrawal liability payment when due, because of a complete or partial withdrawal, then the seller shall pay to this Plan an amount equal to the payment that would have been due from the seller but for this section.

If all, or substantially all, of the seller's assets are distributed, or if the seller is liquidated before the end of the 5 plan year period described above, then the seller shall provide a bond issued by a corporate surety company that is an acceptable surety for purposes of Section 412 of ERISA, or an amount held in escrow by a bank or similar financial institution satisfactory to the Trustees, in an amount equal to the present value of the withdrawal liability the seller would have had but for this paragraph.

If only a portion of the seller's assets are distributed during such period, then a bond or escrow shall be required, in accordance with rules established by the Trustees, to the extent consistent with PBGC regulations.

The liability of the party furnishing a bond or escrow under the above paragraph shall be reduced, upon payment of the bond thereof.

For the purposes of this section, the liability of the purchaser shall be determined as if the purchaser had been required to contribute to this Plan in the year of the sale and the 4 plan years preceding the sale the amount the seller was required to contribute for such operations for such 5 plan years.

      O.     If a court or tribunal of competent jurisdiction determines by a final decision or award that any provision of this Article X creates two separate multiemployer plans, or limits or reduces any employer's liability under this Article in a manner not specifically provided for herein, then the amendments to this Plan, creating two segments for the sole purpose of calculating employer liability under this Article, shall thereafter be considered null and void (without affecting any other provision of this Plan), and all employer liability under this Article shall, prospectively from the date of any such holding, be calculated under the provisions in effect for withdrawals occurring on or before June 30, 1981.

## ARTICLE XI - SOCIAL SECURITY SUPPLEMENT

      A.    <u>Eligibility For Benefit</u>

Each Employer signatory to the National Bituminous Coal Wage Agreement of 2002, or to another Wage Agreement meeting the requirements of section C of this Article, shall notify the Trustees of the names of individuals eligible for the annual supplemental benefit payable under this Article. Eligibility is limited to individuals who, as of January 1, 2002 and thereafter during the term of the National Bituminous Coal Wage Agreement of 2002, are both eligible for Employer-provided health benefits under such Employer's

38

JA 000996

individual health plan maintained pursuant to its Wage Agreement and subject to such plan's annual deductible requirement. No individual who has received a health care bonus payment from his Employer shall be eligible for a benefit under this Article for the same year. Subject to the foregoing, eligible individuals are as follows:

       1.    A Pensioner who is not eligible for unreduced Social Security benefits and who is covered under this Plan.

       2.    A deceased Pensioner's surviving spouse who is not eligible for unreduced Social Security benefits and who is covered under this Plan.

       3.    A deceased employee's surviving spouse who is not eligible for unreduced Social Security benefits, regardless of whether such surviving spouse is otherwise entitled to a currently payable benefit under this Plan.

       B.    <u>Amount of Benefit</u>

The benefit is payable on January 1 of each year after 2001 which is during the term of the National Bituminous Coal Wage Agreement of 2002. The benefit will be in the amount of $1,000.00 except in the case of the following:

       1.    The payment for a surviving spouse whose Employer-provided health care will terminate during the calendar year will be the pro-rata portion of $1,000 that reflects the number of calendar quarters during which the surviving spouse is entitled to Employer-provided health care under the plan during such year.

       2.    The payment for a Pensioner or a surviving spouse for the calendar year in which he or she will attain eligibility for unreduced Social Security benefits shall be the pro-rata portion of $1,000 that reflects the number of calendar quarters during such year prior to the month in which he or she attains such eligibility.

       3.    The payment for a disabled individual who is not eligible for Medicare benefits will cease to be in effect beginning with the first calendar year following his or her eligibility for Medicare benefits.

       4.    The payment for any individual shall not exceed the lesser of the amount specified in the applicable Wage Agreement as payable by this Plan, or the following: $1,000 for an individual who is subject to a deductible of at least $750 during the calendar year under the applicable Employer's individual health plan; $750 for an individual subject to a deductible of at least $562 during the calendar year, but less than $750; $500 for an individual subject to a deductible of at least $375 during the calendar year, but less

than $562; and $250 for an individual subject to a deductible of at least $187 during the calendar year, but less than $375.

C.    Other Wage Agreements

A Wage Agreement meets the requirements of this section if:

1.    it requires contributions to this Plan that conform to the requirements of Article VIII.B(16) and that are to continue at least through the term of the National Bituminous Coal Wage Agreement of 2002;

2.    it provides for an individual employer health plan that includes an annual deductible requirement applicable to participants and beneficiaries (other than retirees and surviving spouses eligible for unreduced Social Security benefits and disabled employees eligible for Medicare benefits);

3.    it provides for the Employer to pay to each employee subject to the deductible requirement an annual payment related to the amount of the deductible; and

4.    it provides for this Plan to make an annual payment to each retiree and surviving spouse subject to the deductible requirement, in the same amount that would be paid under the applicable Wage Agreement to an active employee subject to the same deductible requirement.

## APPENDIX A

### ACTUARIAL EQUIVALENCE FACTORS FOR DEFERRED VESTED RETIREMENT BENEFITS COMMENCING PRIOR TO AGE 62

The following factors are to be multiplied by the full accrued benefit payable commencing at normal retirement age 62 to yield the equivalent benefit payable commencing at the indicated age:

| AGE Years | Months | Actuarial Equivalence Factor | AGE Years | Months | Factor |
|-----------|--------|------------------------------|-----------|--------|--------|
| 55 | 0 | .522 | 56 | 0 | .569 |
|    | 1 | .526 |    | 1 | .573 |
|    | 2 | .529 |    | 2 | .577 |
|    | 3 | .533 |    | 3 | .582 |
|    | 4 | .537 |    | 4 | .586 |
|    | 5 | .541 |    | 5 | .590 |
|    | 6 | .545 |    | 6 | .595 |
|    | 7 | .549 |    | 7 | .599 |
|    | 8 | .553 |    | 8 | .604 |
|    | 9 | .557 |    | 9 | .608 |
|    | 10 | .561 |    | 10 | .612 |
|    | 11 | .565 |    | 11 | .617 |
| 57 | 0 | .621 | 58 | 0 | .680 |
|    | 1 | .626 |    | 1 | .685 |
|    | 2 | .631 |    | 2 | .691 |
|    | 3 | .636 |    | 3 | .696 |
|    | 4 | .641 |    | 4 | .702 |
|    | 5 | .646 |    | 5 | .707 |
|    | 6 | .651 |    | 6 | .713 |
|    | 7 | .655 |    | 7 | .718 |
|    | 8 | .660 |    | 8 | .724 |
|    | 9 | .665 |    | 9 | .729 |
|    | 10 | .670 |    | 10 | .735 |
|    | 11 | .675 |    | 11 | .740 |
| 59 | 0 | .746 | 60 | 0 | .820 |
|    | 1 | .752 |    | 1 | .827 |
|    | 2 | .758 |    | 2 | .834 |
|    | 3 | .765 |    | 3 | .841 |
|    | 4 | .771 |    | 4 | .848 |
|    | 5 | .777 |    | 5 | .855 |

41

JA 000999

| | | | | |
|---|---|---|---|---|
| | 6 | .783 | | 6 | .863 |
| | 7 | .789 | | 7 | .870 |
| | 8 | .796 | | 8 | .877 |
| | 9 | .802 | | 9 | .884 |
| | 10 | .808 | | 10 | .891 |
| | 11 | .814 | | 11 | .898 |
| 61 | 0 | .905 | 62 | 0 | 1.000 |
| | 1 | .913 | | | |
| | 2 | .920 | | | |
| | 3 | .928 | | | |
| | 4 | .936 | | | |
| | 5 | .944 | | | |
| | 6 | .952 | | | |
| | 7 | .960 | | | |
| | 8 | .968 | | | |
| | 9 | .976 | | | |
| | 10 | .984 | | | |
| | 11 | .992 | | | |

Actuarial Basis:  95% of 1959-61 U.S. Total Male Population
Mortality Table at 5% Interest.

42

JA 001000

## APPENDIX B

### TABLE OF PERCENTAGES TO BE APPLIED
### AGAINST PENSION PAYABLE TO PARTICIPANT
### UNDER JOINT AND SURVIVOR ANNUITIES

### AGE OF PARTICIPANT*

| AGE OF SPOUSE* | 55 | 56 | 57 | 58 | 59 | 60 | 61 | 62 |
|---|---|---|---|---|---|---|---|---|
| | % | % | % | % | % | % | % | % |
| 50 | 85.1 | 84.2 | 83.3 | 82.3 | 81.2 | 80.2 | 79.1 | 77.9 |
| 51 | 85.6 | 84.7 | 83.7 | 82.7 | 81.7 | 80.7 | 79.6 | 78.5 |
| 52 | 86.0 | 85.1 | 84.2 | 83.2 | 82.2 | 81.2 | 80.1 | 79.0 |
| 53 | 86.5 | 85.6 | 84.7 | 83.7 | 82.8 | 81.7 | 80.7 | 79.6 |
| 54 | 86.9 | 86.1 | 85.2 | 84.3 | 83.3 | 82.3 | 81.2 | 80.1 |
| 55 | 87.4 | 86.6 | 85.7 | 84.8 | 83.8 | 82.8 | 81.8 | 80.7 |
| 56 | 87.9 | 87.1 | 86.2 | 85.3 | 84.4 | 83.4 | 82.4 | 81.3 |
| 57 | 88.3 | 87.5 | 86.7 | 85.8 | 84.9 | 84.0 | 83.0 | 81.9 |
| 58 | 88.8 | 88.0 | 87.2 | 86.4 | 85.5 | 84.5 | 83.6 | 82.6 |
| 59 | 89.3 | 88.5 | 87.7 | 86.9 | 86.0 | 85.1 | 84.2 | 83.2 |
| 60 | 89.7 | 89.0 | 88.3 | 87.4 | 86.6 | 85.7 | 84.8 | 83.8 |
| 61 | 90.2 | 89.5 | 88.8 | 88.0 | 87.2 | 86.3 | 85.4 | 84.5 |
| 62 | 90.7 | 90.0 | 89.3 | 88.5 | 87.7 | 86.9 | 86.0 | 85.1 |

* Age to nearest birthday.

Pension payable to qualified surviving spouse pursuant to Article VII (A) will be equal to 50% of the Participant's Pension as reduced in accordance with the above Table.  The benefit payable to a qualified surviving spouse under Article VII (B) will be equal to 75% of the amount reduced in accordance with the above table.

43

IN WITNESS WHEREOF, the Employers and the Union, pursuant to proper authority, have caused this instrument, effective December 6, 1974, and amended as of January 1, 2002, to be signed by their proper officers or representatives in Washington, D.C. on this _____ day of _____, 2002.

UNITED MINE WORKERS OF AMERICA

_____

International President

BITUMINOUS COAL OPERATORS'
ASSOCIATION, INC.

_____

President

Accepted by:

Dated: _____    _____

Trustee

Dated: _____    _____

Trustee

Dated: _____    _____

Trustee

Dated: _____    _____

Trustee

44

JA 001003

JA 001004

# UNITED MINE WORKERS OF AMERICA

# 1974 PENSION PLAN

# (JULY 1, 2011)

UNITED MINE WORKERS OF AMERICA 1974 PENSION PLAN
EFFECTIVE DECEMBER 6, 1974


ARTICLE I - INTRODUCTION

Pursuant to Article XX of the National Bituminous Coal Wage Agreement of 1974, the United
Mine Workers of America 1974 Pension Plan (hereinafter sometimes referred to as the "1974
Pension Plan" or the "Plan") provides pension benefits as hereinafter set forth.  The Plan is
effective as of December 6, 1974 (the "effective date") and, as amended March 27, 1978, April
29, 1980, June 7, 1981, October 1, 1984, February 1, 1988, February 1, 1991, January 16, 1992,
December 16, 1993, August 16, 1996, January 1, 1998, January 1, 2002, June 27, 2003,
December 18, 2003, January 1, 2007, June 30, 2007, and July 1, 2011, the provisions of the Plan
are set forth below.  The 1974 Pension Plan and Trust is a continuation of the benefit program
established under the UMWA Welfare and Retirement Fund of 1950, and effective June 30,
2007, is the surviving plan following the merger of the Plan and the United Mine Workers of
America 1950 Pension Plan (hereinafter referred to as the "1950 Pension Plan.")

Except to the extent otherwise required by the Employee Retirement Income Security Act of
1974 ("ERISA") or other applicable law, governmental rule or regulation, and except to the
extent that the 1974 Pension Plan or 1974 Pension Trust specifically provides otherwise, or as
required by the context, all amendments to the 1974 Pension Plan effective as of July 1, 2011,
pursuant to the authority contained in Article XII herein, shall be given only prospective
application commencing on July 1, 2011, and shall have no retroactive application whatsoever.
The amendments effective as of July 1, 2011, shall not be deemed to be an approval or
disapproval by the parties to any action or failure to act by any Trustee or Trustees for any period
prior to July 1, 2011.  The terms and provisions of the 1974 Pension Plan in effect as of June 30,
2011, shall continue in effect and shall be applicable only to circumstances or events which
occurred prior to July 1, 2011, and which are not governed by the amendments adopted as of
July 1, 2011.

Section A  Definitions

(1)   "Wage Agreement" means the National Bituminous Coal Wage
Agreement of 1974, as amended from time to time and any successor thereto, including, but not
limited to, the National Bituminous Coal Wage Agreement of 2011.  Any reference in this Plan
to the Wage Agreement or to the bituminous coal wage agreement then in effect shall also refer
(a) to the Sub-bituminous and Lignite Agreement and the National Coal Mine Construction
Agreement with respect to any period for which such agreements provide that pension benefits
shall be made available pursuant to this Plan or a predecessor plan established under the
bituminous coal wage agreement, and (b) with respect to any period prior to the 1950
Bituminous Coal Wage Agreement, to any collective bargaining contract between the United

Mine Workers of America and any employer in the bituminous coal industry, and (c) solely for the purposes of determining who is required to make contributions to, and receive benefits under, the 1974 Pension Trust, any other collective bargaining contract entered into between the United Mine Workers of America and any Employer in the bituminous coal industry, which contract provides that contributions shall be made to or benefit payments made from this Plan or the 1950 Pension Plan.

(2)    "Employer" means an employer who is signatory to the Wage Agreement, or, with respect to prior periods, was signatory to the bituminous coal wage agreement then in effect.

(3)    "Construction Employer" means an Employer that is signatory to the National Coal Mine Construction Agreement of 1984, as amended from time to time and any successor thereto; or is signatory to any other collective bargaining contract with the United Mine Workers of America which provides that contributions shall be made to the 1974 Pension Trust or the United Mine Workers of America 1985 Construction Workers Pension Trust for construction work related to the development, expansion or alteration of coal mines, provided that substantially all the employees, with respect to whom the employer has an obligation to contribute, perform construction work related to the development, expansion or alteration of coal mines, including the erection of tipples and preparation plants and other facilities placed in, on or around the coal mines, sinking of shafts, slopes, drifts or tunnels and all other such coal-related work that is performed under a Wage Agreement. In the case of a Construction Employer which is a single trade or business and which is also signatory to a Wage Agreement other than a Wage Agreement described in the preceding sentence, the Construction Employer shall be treated as an Employer other than a Construction Employer with respect to its employees or operations for which it has an obligation to contribute to the Plan pursuant to such Wage Agreement.

(4)    "1950 Participant" means any person who qualifies for a pension benefit pursuant to the eligibility rules set forth in Article VIII.

(5)    "1974 Participant" means any person who is employed in a classified job for an Employer after the effective date, other than a New Inexperienced Miner hired on or after January 1, 2012 or an Electing Miner (except as otherwise specifically provided for In Article II. C and D herein), and any person entitled to receive pension benefits under the Plan; provided, however, that any person who is not employed in a classified job for an Employer on the effective date shall not become a participant until such person completes at least 1,000 hours (or 800 hours worked on the weekend/holiday crew of a signatory Employer as provided in Appendix C of the 2011 NBCWA) of Credited Service within a 12-month period after the effective date, or unless such person is subject to the provisions of Article II.F.(3) of the Plan.

(6)    "Participant" means a 1950 Participant or a 1974 Participant.

2

(7)     "1950 Pensioner" means any person who is receiving a pension pursuant to Article VIII of this Plan.

(8)     "1974 Pensioner" means any person who is receiving a pension pursuant to Article II of this Plan.

(9)     "Pensioner" means a 1950 Pensioner or 1974 Pensioner.

(10)     "1950 Pension Trust" means the trust established pursuant to the National Bituminous Coal Wage Agreement of 1974 to fund the 1950 Pension Plan.

(11)     "1974 Pension Trust" means the trust established pursuant to the National Bituminous Coal Wage Agreement of 1974 to fund this Plan.

(12)     "Trustees" means the Trustees of the 1974 Pension Trust, who shall be named fiduciaries pursuant to Section 402 of ERISA and the Plan Administrator, as that term is defined in that Act; provided, however, that the 1974 Pension Trust may be amended to designate other or additional named fiduciaries under said Trust and the Plan.

(13)     For a 1974 Participant, "Credited Service" means signatory and nonsignatory service determined pursuant to Article IV.  For a 1950 Participant, "Credited Service" means signatory and nonsignatory service determined pursuant to Article X.

(14)     "Hour of Service" shall mean, with respect to a 1974 Participant, each hour for which the 1974 Participant is directly or indirectly paid or entitled to be paid by the Employer (a) for the performance of duties or (b) on account of a period of time during which no duties are performed due to vacation, holiday, illness, sickness and accident, incapacity, layoff, bereavement, jury duty, military duty or leave of absence; or (c) time spent performing contractual obligations such as safety inspections and mine committee work, even though such time off is not paid for by the Employer, provided that:

(1)     except for hours of service credited on account of a period during which a 1974 Participant is eligible to receive benefits under Article IV(B)(3), no more than 501 hours of service shall be credited to a 1974 Participant on account of a single continuous period during which the 1974 Participant performed no duties;

(2)     no credit shall be given for payments made or due under a plan maintained solely for the purpose of complying with the applicable worker's compensation or unemployment compensation or disability insurance laws or payments which solely reimburse a 1974 Participant for medically related expenses incurred by the 1974 Participant; and

3

(3)    hours of service shall be credited for back pay for the period for which such back pay was awarded, irrespective of mitigation of damages, either awarded or agreed to by the Employer to the extent such back pay represents payment for hours which are required to be taken into account. However, no hours of service shall be credited for back pay if such hours were previously credited. The determination of hours of service for reasons other than the performance of duties shall be made in accordance with the applicable rules of the regulations prescribed by the Secretary of Labor under 29 C.F.R. Part 2530.200b-2(b).

(15)    "UMWA" or "Union" shall mean the United Mine Workers of America.

(16)    "Hours Worked" shall mean (a) each hour for which an employee who is a 1974 Participant is paid, or entitled to payment, for the performance of duties for the Employer during the calendar year, and (b) hours for which back pay, irrespective of mitigation of damages, is awarded or agreed to by an Employer, to the extent that such award or agreement is intended to compensate an Employee for periods which the Employee would have been engaged in a performance of duties for the Employer. Time spent performing contractual obligations such as safety inspections and mine committee work and periods of time when the 1974 Participant is eligible to receive sickness and accident benefits shall be included as hours worked.

(17)    "Construction Industry Service" means, with respect to a 1974 Participant,

(a)    all periods of service after June 20, 1985 with a Construction Employer that involves work related to the development, expansion or alteration of coal mines; and

(b)    all periods of signatory and nonsignatory service before July 1, 1985, if the 1974 Participant's last such service before July 1, 1985 was for a Construction Employer.

(18)    "Electing Miner" means a 1974 Participant who has irrevocably chosen to opt out of the 1974 Pension Plan pursuant to the provisions of Article XXB(d)7 of the 2011 NBCWA.

(19)    "New Inexperienced Miner hired on or after January 1, 2012" refers to a miner described in Article XX(3A) of the National Bituminous Coal Wage Agreement of 2011.

(20)    "Supplemental Pension Contributions" shall mean the contributions to the United Mine Workers of America Cash Deferred Savings Plan of 1988 as described in Article XXB (d) of the 2011 NBCWA. "Years of Supplemental Pension Contributions" shall mean the

4

number of years an Electing Miner or a New Inexperienced Miner hired on or after January 1, 2012 has received Supplemental Pension Contributions to the United Mine Workers of America Cash Deferred Savings Plan of 1988. "Supplemental Pension Contribution Hours" shall mean the number of Supplemental Pension Contribution hours received by an Electing Miner or a New Inexperienced Miner hired on or after January 1, 2012 for the United Mine Workers of America Cash Deferred Savings Plan of 1988.

B.    When Retirement Occurs

For the purposes of this Plan, in the case of any Participant, retirement shall be considered to occur on the last day of credited service, within the meaning of Article IV or Article X, whichever is applicable, provided that on such day he was eligible for an immediate or deferred pension under this Plan or under the 1950 Pension Plan.

C.    Attainment of Age

For the purposes of this Plan, a Participant shall be deemed to have attained an age as of 12:01 A.M. on the respective anniversary date of the Participant's birth.

ARTICLE II – ELIGIBILITY OF 1974 PENSIONERS

A.    Age 55 Retirement

Any 1974 Participant who (a) has at least 10 years of signatory service or at least.twenty years of credited service, including the required amount of signatory service as set forth in Article IV(C)(6), and (b) has attained the age of 55 years (but not the age of 62) prior to retirement shall be eligible to retire on or after July 1, 2011, and shall upon his retirement (hereinafter "Age 55 Retirement") be eligible for a pension.

B.    Normal Retirement

(1)    Any 1974 Participant shall be eligible to retire on or after July 1, 2011, and shall upon his retirement (hereinafter "Normal Retirement") be eligible for a pension, provided such 1974 Participant has attained the normal retirement date which shall be the earlier of --

(a)    a 1974 Participant's attainment of age 62 years and completion of at least 10 years of signatory service or at least 20 years of credited service, including the required amount of signatory service as set forth in Article IV(C)(6), or

(b)    the later of --

5

(i)    the time a 1974 Participant attains age 65, or

(ii)    the 5th anniversary of the time the 1974 Participant became employed in signatory service.

(2)    In determining the time the 1974 Participant became employed in signatory service (for purposes of Article II(B)(1)(b)(ii)), any employment of a 1974 Participant in signatory service who is not entitled to a pension under Article II (A) or (E) (Age 55 Retirement or Deferred Vested Retirement) shall be disregarded if it precedes a period of consecutive one-year breaks in signatory service and the number of consecutive one-year breaks in signatory service equals or exceeds the greater of

(a)    five, or

(b)    the aggregate number of years of signatory service before such breaks.

In addition to the foregoing, any employment prior to a period of consecutive one-year breaks in signatory service shall be disregarded unless the 1974 Participant completes 1,000 hours (or 800 hours worked on the weekend/holiday crew of a signatory Employer as provided in Appendix C of the 2011 NBCWA) of signatory service within a 12-month period after the breaks in signatory service. Such aggregate number of years of signatory service before any period of consecutive one-year breaks in signatory service shall be deemed not to include any years of signatory service not required to be taken into account under this subparagraph by reason of any prior break in signatory service. For purposes of Article II(B)(1)(b)(ii), a year of signatory service shall be calculated on the basis of a calendar year and in the manner specified in Article IV; a break in signatory service shall be defined in accordance with the terms of Article II(G)(3); and nonclassified signatory service shall be disregarded unless it immediately precedes or follows classified signatory service with the same Employer.

C.    Disability Retirement

A 1974 Participant who (a) has at least 10 years of signatory service prior to retirement, and (b) becomes totally disabled as a result of a mine accident occurring on or after July 1, 2011, shall, upon retirement (hereinafter "Disability Retirement"), be eligible for a pension while so disabled. A 1974 Participant shall be considered to be totally disabled only if by reason of such accident such 1974 Participant is subsequently determined to be eligible for Social Security Disability Insurance Benefits under Title II of the Social Security Act or its successor.

6

Effective January 1, 2012, (i) a New Inexperienced Miner first hired on or after January 1, 2012 who becomes permanently and totally disabled as a result of mine accident occurring on or after January 1, 2012 and has received Supplemental Pension Contributions for at least 10 years, and (ii) an Electing Miner who becomes permanently and totally disabled as a result of a mine accident occurring on or after his opt-out date and has received 1974 Pension Plan credit hours and Supplemental Pension Contribution Hours which, when combined, total at least 10 years, are eligible upon termination of employment for a Disability Retirement pension while so disabled. A New Inexperienced Miner first hired on or after January 1, 2012 and an Electing Miner shall be considered totally disabled only if by reason of such accident such New Inexperienced Miner or Electing Miner is subsequently determined to be eligible for Social Security Disability Insurance Benefits under Title II of the Social Security Act or its successor.

When a 1974 Participant, New Inexperienced Miner first hired on or after January 1, 2012 or Electing Miner who has been receiving a disability pension under this Section C recovers sufficiently to become ineligible for Social Security disability benefits or is disqualified because of earnings, the Trustees shall implement procedures to determine the 1974 Participant's, such New Inexperienced Miner's or Electing Miner's ability to perform classified work in the industry. The continuance of a disability pension shall be based on medical evidence that supports the 1974 Participant's, such New Inexperienced Miner's or Electing Miner's inability to be employed in classified work in the industry.

If such 1974 Participant, New Inexperienced Miner first hired on or after January 1, 2012 or Electing Miner is medically certified as able to perform classified work in the industry, he will no longer be eligible for a disability pension.

D.    Minimum Disability Retirement

Any 1974 Participant who (a) has less than 10 years of signatory service prior to retirement and (b) becomes totally disabled as a result of a mine accident occurring on or after July 1, 2011, shall, upon retirement (hereinafter "Minimum Disability Retirement") be eligible for a pension while so disabled. A 1974 Participant shall be considered to be totally disabled only if by reason of such accident such 1974 Participant is subsequently determined to be eligible for Social Security Disability Insurance Benefits under Title II of the Social Security Act or its successor.

Effective January 1, 2012, (i) a New Inexperienced Miner first hired on or after January 1, 2012 who becomes permanently and totally disabled as a result of mine accident occurring on or after January 1, 2012 and has received Supplemental Pension Contributions for less than 10 years, and (ii) an Electing Miner who becomes permanently and totally disabled as a result of a mine accident occurring on or after his opt-out date and has received 1974 Pension Plan credit hours and Supplemental Pension Contribution Hours which, when combined, total less than 10 years, are eligible upon termination of employment for a Minimum Disability Retirement pension while

7

so disabled. A New Inexperienced Miner first hired on or after January 1, 2012 and an Electing Miner shall be considered totally disabled only if by reason of such accident such New Inexperienced Miner or Electing Miner is subsequently determined to be eligible for Social Security Disability Insurance Benefits under Title II of the Social Security Act or its successor.

When a 1974 Participant, New Inexperienced Miner first hired on or after January 1, 2012 or Electing Miner who has been receiving a disability pension under this Section D recovers sufficiently to become ineligible for Social Security disability benefits or is disqualified because of earnings, the Trustees shall implement procedures to determine the 1974 Participant's, such New Inexperienced Miner's or the Electing Miner's ability to perform classified work in the industry. The continuance of a disability pension shall be based on medical evidence that supports the 1974 Participant's, such New Inexperienced Miner's or Electing Miner's inability to be employed in classified work in the industry.

If such 1974 Participant, New Inexperienced Miner or Electing Miner is medically certified as able to perform classified work in the industry, such 1974 Participant, New Inexperienced Miner or Electing Miner will no longer be eligible for a disability pension.

     E.    Deferred Vested and Special Retirement

        (1)    Any 1974 Participant who ceases working in a classified job for an Employer for any reason, except as provided in (2), (3), or (4) below, and who is not eligible to receive a pension under any other provision of this Article II, shall be eligible for a pension (hereinafter "Deferred Vested Pension"), upon attaining age 62, or at the election of the 1974 Participant, such 1974 Participant shall be eligible for a reduced pension beginning at any time after attaining age 55, provided

        (a)    the 1974 Participant's last day of Credited Service is on or after July 1, 2011, but prior to attainment of age 55;

        (b)    the 1974 Participant has

        (i)    at least 10 years of signatory service, or for a 1974 Participant with one hour of service on or after the date set by law for a five-year vesting schedule, at least 5 years of signatory service, or

        (ii)    at least 20 years of Credited Service as set forth in Article IV(C)(6).

        (2)    Any 1974 Participant who ceases working in a classified job for an Employer, who is not eligible to receive a pension under any other provision of this Article II,

shall be eligible for a pension (hereinafter "Deferred Vested Pension-Enhanced 1996") upon attaining age 62, or at the election of the 1974 Participant, such 1974 Participant shall be eligible for a reduced pension beginning at any time after attaining age 55, calculated pursuant to Article III A(5)(b), provided:

        (a)    the 1974 Participant's last day of Credited Service is on or after July 1, 2011, but prior to attainment of age 55;

        (b)    the 1974 Participant had 20 years of signatory service on the date last worked;

        (c)    the 1974 Participant had been laid off and had not refused recall to the mine from which the 1974 Participant was laid off; or

        (d)    he had been terminated under Article III, Section (j) of the Wage Agreement (or if the 1974 Participant had not been terminated, there had been a deterioration in physical condition which prevented the 1974 Participant from performing the 1974 Participant's regular work as determined by a panel of three physicians, if the degree of physical deterioration is disputed by the Trustees) and was not employed in the coal industry thereafter; and

        (e) the 1974 Participant's pension benefits are not in pay status on or before August 16, 1996.

Within a reasonable period of time after such 1974 Participant's employment has ceased, an appropriate written notice of eligibility and other relevant data will be provided.

        (3)    Any 1974 Participant who, on or after July 1, 2011, ceases working in a classified job for an Employer and who is not eligible to receive a pension under any other provision of this Article II shall be eligible for a pension (hereinafter "Special Permanent Layoff Pension"), calculated pursuant to Article III A(5)(b), using the 1974 Participant's actual Credited Service and an assumed age of 55, provided:

        (a)    the 1974 Participant's last day of Credited Service is on or after July 1, 2011, but prior to attainment of age 55;

        (b)    the 1974 Participant had 20 years of signatory service as of his last day of Credited Service;

        (c)    (i)    the 1974 Participant was permanently laid off under circumstances in which his Employer has permanently closed the mine, or

9

(ii)     the 1974 Participant was permanently laid off, meaning that he was on layoff status for at least 180 days, and had not refused a recall to the mine from which he was laid off;

In the case of a layoff described in (c)(i) above, the pension will be effective on the first day of the first month following both the layoff and the filing of a pension application. In the case of a layoff described in (c)(ii) above, the pension will be effective on the first day of the first month following both a period of 180 days after the layoff and the filing of a pension application.

Notwithstanding the foregoing, in the case of a 1974 Participant who earned no hours of credited signatory service during the period beginning November 1, 1997 and ending June 17, 1998, and who subsequently returned to active employment on or after June 18, 1998, in addition to meeting the requirements stated above, prior to satisfying Paragraph (4)(c), above, such 1974 Participant must either:

(d)     have earned at least 250 hours of credited signatory service, or

(e)     have returned to active employment as the result of a recall determined by the Trustees to have been to fill a bona fide job opening, and not for the purpose of entitling the 1974 Participant to this Special Permanent Layoff Pension benefit.

(4)     Any 1974 Participant who, on or after January 1, 2003 ceases working in a classified job for an Employer shall be eligible for a pension (hereinafter "30-and-Out Pension"), calculated pursuant to Article III A(5)(b), but with no actuarial reduction on account of age, provided:

(a)     the 1974 Participant's last day of Credited Service is on or after January 1, 2003; and

(b)     the 1974 Participant had at least 30 years of signatory service on such last day of Credited service;

(c)     if, because of a layoff, he was not actively at work as of December 31, 2001:

(i) he earned at least 250 hours of credited signatory service following his return to work, or

(ii) he returned to active employment as the result of a recall determined by the Trustees to have been to fill a bona fide job opening, and not for the purpose of entitling the 1974 Participant to this 30-and-Out Pension benefit.

10

F.    Nonduplication

(1)    A 1974 Participant shall be entitled to receive a pension under only one of the foregoing paragraphs of this Article II with respect to any retirement.

(2)    Except as provided in paragraph (F)(3) of this Article II, any person whose retirement occurs on or before December 31, 1975, shall not be entitled to receive pension benefits under this Article, but shall be entitled only to receive such benefits as may be provided under Article VIII.

(3)    Any person who (a) retires on or before December 31, 1975, (b) at the time of retirement is entitled to or, upon attaining age 55 would be entitled to, a pension benefit under the 1950 Pension Plan, and (c) is again employed for at least 250 hours in a classified job for an Employer after December 31, 1975, shall upon subsequent retirement (or, if later, upon attaining age 55) be eligible for a pension only under this Article and not under Article VIII, in the amount hereinafter specified. The amount of pension for a 1974 Participant described in this paragraph shall be the sum of the amount of pension to which such 1974 Participant would be entitled upon attaining age 55 under the 1950 Pension Plan prior to its merger with this Plan if he had not been employed in a classified job for an Employer after December 31, 1975, plus the excess of (i) over (ii) where (i) is the pension to which such 1974 Participant would be entitled except for this paragraph under Article III(A)(2) based upon all years of Credited Service under this Plan prior to its merger with the 1950 Pension Plan and (ii) is the pension to which such 1974 Participant would be entitled under Article III(A)(2) based solely on his Credited Service prior to December 31, 1975.

G.    Employment for Vesting Purposes

(1)    For purposes of this Article II and except as set forth herein, all years of classified service by a 1974 Participant with Employers signatory to the bituminous coal wage agreement then in effect shall be used for purposes of any eligibility requirement of minimum signatory service under this Article. A year of service shall be calculated on the basis of a calendar year and in accordance with the terms of Article IV(A).

Notwithstanding the foregoing, a New Inexperienced Miner first hired on or after January 1, 2012 shall not receive any vesting, signatory or credited service under the 1974 Pension Plan except as provided in Paragraphs C and D of this Article II and Article III D.

Notwithstanding the foregoing and subject to the terms of Article XX B (d)7 of the 2011 NBCWA, an Electing Miner shall continue to receive only vesting credit after the date

11

of his election to opt out of the 1974 Pension Plan for purposes of eligibility for vesting into pension benefits under this Article II and Article III D and, after his election, shall receive no signatory or credited service under the 1974 Pension Plan.

(2)    For purposes of this Article II, years of nonclassified signatory service in the coal industry by a 1974 Participant after May 28, 1946, for Employers signatory to the bituminous coal wage agreement then in effect shall be used for purposes of any eligibility requirement of minimum signatory service provided that:

(a)    the nonclassified signatory service with an Employer immediately preceded or followed classified signatory service with the same Employer;

(b)    credit for nonclassified service shall not be given for any calendar year in which the 1974 Participant completed less than 1,000 hours of such service, as defined under Article I(A)(15);

(c)    all years of service before age 18 shall be disregarded;

(d)    all years of service performed before January 1, 1971, shall be disregarded unless the 1974 Participant completed at least three years of employment after December 31, 1970;

Provided further that, if the employee has not earned a non-forfeitable right to a pension:

(e)    all years of service prior to a break in service shall be disregarded unless the employee completes 1,000 hours (or 800 hours worked on the weekend/holiday crew of a signatory Employer as provided in Appendix C of the 2011 NBCWA) of service within a 12-month period after the break;

(f)    all years of service prior to any period of consecutive one-year breaks in service shall be disregarded if the number of such consecutive one-year breaks equals or exceeds the greater of (i) five, or (ii) the aggregate number of years of service before such breaks shall be deemed not to include any years of service not required to be taken into account under this subparagraph by reason of any prior break in service.

(3)    For purposes of Article II(G)(2) and II(B)(2), an employee shall incur a break in service for any calendar year in which such Employee completes not more than 500 hours (or 400 hours worked on the weekend/holiday crew of a signatory Employer as provided in Appendix C of the 2011 NBCWA) of service; provided that, in the case of an Employee who is absent from work for any period --

12

(a)     by reason of the pregnancy of the Employee,

(b)     by reason of the birth of a child of the Employee,

(c)     by reason of the placement of a child with the Employee in connection with the adoption of such child by such Employee, or

(d)     for purposes of caring for such child for a period beginning immediately following such birth or placement, the Employee shall be considered to have completed the hours of service which otherwise would normally have been credited to him but for such absence, subject to the limitation set forth in Article I A(15)(l). The preceding sentence shall be applicable only in the year in which the Employee's absence from work begins, if the Employee would be prevented from incurring a one-year break in service in such year solely because of the application of the preceding sentence, or in any other case, in the immediately following year. No credit will be given to an Employee pursuant to this subparagraph unless the Employee furnishes to the Trustees such timely information as they may reasonably require to establish that the absence from work is for reasons referred to in (a), (b), (c), or (d) above, and the number of days for which there was such an absence.

(4)     The provisions of this paragraph shall be interpreted and construed in accordance with the requirements of ERISA and the regulations issued thereunder.

(5)     Service after June 30, 1985 with a Construction Employer shall be used for purposes of paragraph G(1), only if the United Mine Workers of America 1985 Construction Workers Pension Plan grants 1974 Participants credit for the same purposes under that plan for service with Employers, other than Construction Employers, except that a year of service shall be calculated on the basis of a calendar year and in accordance with the terms of Article IV.

H.     Electing Miner

An Electing Miner shall accrue no additional signatory service after his opt-out date and his opt-out date shall be his last day of credited service. An Electing Miner shall continue to earn only vesting credit from the 1974 Pension Plan for purposes of eligibility for vesting into pension benefits from the 1974 Pension Plan. Upon the retirement of an Electing Miner, the retirement benefit per month per year of service shall be the amount of the retirement benefit per month per year of service as of the Electing Miner's opt-out date. In no event will earning additional vesting credit for pension benefits pursuant to this paragraph increase the pension benefit to be paid to an Electing Miner, except for any required early retirement adjustments based on the type of pension benefit. Notwithstanding the foregoing, the disability pension for an Electing Miner shall be based on the calculation of the number of combined years he has received 1974 Pension Plan credit hours and Supplemental Pension Contribution Hours.

13

An Electing Miner's opt-out date shall be the last day of the month in which the Electing Miner completed the Plan's opt-out application.

## ARTICLE III – 1974 PENSIONERS - AMOUNT OF PENSION AND DEATH BENEFIT

### A.    Retirement On or After July 1, 2011

A pension granted to a 1974 Participant who retires on or after July 1, 2011, pursuant to Article II shall consist of a pension amount payable in monthly installments provided in accordance with the provisions of this Article III as set forth below.  In no event, however, shall the annual retirement benefit payable to a 1974 Participant exceed the limitation of Section 415 of the Internal Revenue Code of 1986 and any regulations promulgated thereunder.

(1)    Age 55 Retirement Pension

(a)    A deferred pension, commencing after attainment of age 62, computed under the provisions of paragraph 2 below; or, at the election of the 1974 Participant, (b) an immediate pension, equal to the deferred pension to which the 1974 Participant could have been eligible under (a) above had the 1974 Participant so elected, reduced by 1/4 of one percent (1%) for each full month (3 percent (3%) per year) between the date on which pension benefits began and the date on which 1974 Participant attains age 62.

(2)    Normal Retirement Pension

For retirements occurring during the 2011 Wage Agreement the amount of pension for Normal Retirement shall be determined as follows:

(a)    for each year of credited non-signatory service as defined herein, $28.00 per month;

(b)    for each of the first 10 years of credited signatory service earned prior to February 1, 1989, $54.50 per month;

(c)    for each year of credited signatory service in excess of 10 years but not to exceed 20 years earned prior to February 1, 1989, $55.00 per month;

(d)    for each year of credited signatory service in excess of 20 years but not to exceed 30 years earned prior to February 1, 1989, $55.50 per month;

14

(e)    for each year of credited signatory service in excess of 30 years earned prior to February 1, 1989, $56.00 per month.

(f)    The retirement benefit for a year of credited signatory service earned from February 1, 1989 to January 31, 1990, is $62.00 per month.

(g)    The retirement benefit for each year of credited signatory service earned from February 1, 1990 to December 16, 1993, is $66.50 per month.

(h)    The retirement benefit for each year of credited signatory service earned from December 16, 1993 is $69.50 per month.

Proportional credit shall be allowed for any fractional years of credited service pursuant to Article IV hereof. Periods of Construction Industry Service shall be taken into account solely to determine whether the amount specified in clause (a), (b), (c), (d), or (e) is to be used in determining the amount of pension that is earned for a given period of Credited Service. In any year for which two of clauses (a), (b), (c), (d), or (e) would apply, if a 1974 Participant has both Credited Service and Construction Industry Service, the amount determined under each clause shall be equal to the amount that would be determined if Construction Industry Service in that year were considered service under this Plan, multiplied by a fraction, the numerator of which is the 1974 Participant's hours of service under this Plan for that year and the denominator of which is the sum of such hours and the 1974 Participant's hours of Construction Service for that year.

(3)    Disability Retirement Pension

Subject to (4) below for a 1974 Participant whose disabling accident occurs after July 1, 2011, the pension payment shall be computed under the provisions of paragraph (2) above. In the case of a 1974 Participant who has both Construction Industry Service and Credited Service, the amount of pension under this subparagraph (3) shall be based only on the 1974 Participant's years of Credited Service and shall be determined in the same manner as under Article III.A.(2).

The disability pension for a New Inexperienced Miner first hired on or after January 1, 2012 shall be based on the calculation of his Years of Supplemental Pension Contributions. The disability pension for an Electing Miner shall be based on the calculation of the number of combined years he has received 1974 Pension Plan credit hours and Supplemental Pension Contribution Hours.

(4)    Minimum Disability Retirement Pension

15

The amount of pension for Minimum Disability Retirement shall be $250 per month for disabilities occurring on or after July 1, 2011. In any case in which a 1974 Participant entitled to pension for Minimum Disability Retirement has both Credited Service and Construction Service, the amount of pension under this subparagraph (4) shall be equal to the amount otherwise payable under this subparagraph, multiplied by a fraction, the numerator of which is the number of years of Credited Service and the denominator of which is the sum of the number of years of Credited Service and the number of years of Construction Industry Service.

    (5)    Deferred Vested Pension

        (a)    The amount of a deferred vested pension (Article II E(1)) shall be a pension, commencing on or after attainment of age 62, computed under the provisions of Subsection A(2) of this Article III, or, at the 1974 Participant's election, between ages 55 and 62 with the pension payable reduced to its actuarial equivalent pursuant to Appendix A; provided, however, that in the case of any 1974 Participant with at least (20) years of credited service, such pension shall not be reduced to less than $200.00 per month effective July 1, 2011.

        (b)    The amount of a deferred vested pension (Article II E(2)) shall be a pension, commencing on or after attainment of age 62, computed under the provisions of Subsection A(2) of this Article III, or, at the 1974 Participant's election, between ages 55 and 62 with the pension computed under the provisions of Subsection A(l) of this Article III.

    B.    Pension Amounts Based on Prior Plan Amendments

        (1)    Increases in pensions under Plan amendments effective December 16, 1993 and August 16, 1996 are not applicable to 1974 Participants whose employment was terminated prior to December 16, 1993, and who will become eligible for only a deferred vested pension (II E(1)). Increases in pensions under Plan amendments effective August 16, 1996 are not applicable to 1974 Participants whose employment was terminated on or after December 16, 1993, and whose pension benefits are in pay status on or before August 16, 1996.

        (2)    (a) Any 1974 Participant not described in clause (b) whose pension is in pay status as of October 31, 2011, shall be issued by November 1, 2011 a one-time single sum payment of $580.

        (b)    Any 1974 Participant whose disability retirement pursuant to Article II C or D is in pay status as of October 31, 2011, shall be issued by November 1, 2011 a one-time single sum payment of $455.

16

(c)     Any Surviving Spouse whose benefit under Article VI is in pay status as of October 31, 2011 shall be issued by November 1, 2011 a one-time single sum payment of $455.

(d)     Any qualified surviving spouse whose benefit under Article VII is in pay status as of October 31, 2011 shall be issued by November 1, 2011 a one-time single sum payment of $455.

(e)     The one-time single sum payments provided for herein and under Article IX are not intended as an ongoing feature of this Plan, and the Plan shall have no obligation to provide payments of this type other than those expressly provided for above.

C.     Application for Pension and Commencement, Suspension and Termination of Pensions

Payments of pensions shall be subject to the following:

(1)     The first payment on any pension shall be made as soon as possible after an application for pension has been received and shall be for the month following the month in which the 1974 Participant retires (Article I B) and becomes eligible for a pension in accordance with Article II; provided, however, that in the case of a deferred pension pursuant to Article III(A)(!) or a deferred vested pension pursuant to Article III(A)(5) (other than a Special Permanent layoff Pension pursuant to Article II E(3)), such payment shall be for the later of (a) the month specified by the 1974 Participant in his application for pension if such month is subsequent to the month in which such 1974 Participant attains age 55, or (b) the month in which the application for pension is received, but not later than the month following the month in which such 1974 Participant attains age 62.

(2)     The last payment shall be for the month in which the pensioner dies.

(3)     Pension payments shall be payable on the first day of each month at the pensioner's last address of record.

(4)     Pension payments shall be suspended for any month in which the pensioner is employed, subsequent to commencement of such payments, in the bituminous coal industry, in the same trade or craft (trade or craft shall mean the coal mining industry), and in the same geographic area covered by this Plan. The provisions of this paragraph shall be interpreted in accordance with any regulations issued pursuant to Sections 203(a)(3) and (B) of ERISA.

(5)     Any 1974 Participant who continues to be employed by an Employer after retirement shall not be entitled to receive pension benefits under this Plan until such time as such

17

1974 Participant is no longer employed by an Employer; provided, however, that benefit payments shall commence not later than April 1 of the calendar year following the calendar year in which the 1974 Participant attains age 70-1/2.

D.    Death Benefit

(1) Except as otherwise provided herein, a death benefit shall be paid to the named beneficiary of (a) any 1974 Pensioner (other than a 1974 Pensioner receiving a deferred vested pension based on less than 20 years of credited service or a Pensioner receiving a pension based in whole or in part on years of service credited under the terms of Article II G), (b) a New Inexperienced Miner first hired on or after January 1, 2012, who is no longer in active employment in the bituminous coal industry and who has 20 years of service as defined in Article XX(9)(c)(d) and (e) of the 2011 NBCWA, and (c) an Electing Miner who is no longer in active employment in the bituminous coal industry and who has 20 years of service as defined in Article XX(9)(c)(d) and (e) of the 2011 NBCWA, whose death occurs on or after July 1, 2011, and who meet the requirements of paragraph (2) of this section. The death benefit shall be equal to $8,500 if the named beneficiary of such 1974 Pensioner, New Inexperienced Miner or Electing Miner described in (a), (b), and (c) above is the surviving spouse or dependent. In any other case, the death benefit shall be equal to $7,000. Effective July 1, 2013 the death benefit shall be equal to $10,000 if the named beneficiary of such 1974 Pensioner, New Inexperienced Miner or Electing Miner described in (a), (b), and (c) above is the surviving spouse or dependent. In any other case, the death benefit shall be equal to $8,500. The death benefit provided under this section shall not be payable if any other death or life insurance benefit is paid on behalf of such 1974 Pensioner, New Inexperienced Miner or Electing Miner described in (a), (b) and (c) above from any other Plan maintained by an Employer.  Notwithstanding any other provision herein, this Plan amendment providing for increases in the death benefit shall be effective July 1, 2013.

(2)    A 1974 Pensioner, a New Inexperienced Miner first hired on or after January 1, 2012, and an Electing Miner meets the requirements of this paragraph only if he is not entitled to death benefit coverage from a plan maintained by his former Employer and he meets one of the following conditions:

(i)    the 1974 Pensioner is a participant in the 1992 UMWA Benefit Plan;

(ii)    the 1974 Pensioner, New Inexperienced Miner first hired on or after January 1, 2012, or Electing Miner is a participant in the UMWA 1993 Benefit Trust;

18

(iii)    the 1974 Pensioner is a participant in an individual employer plan maintained pursuant to section 9711 of the Internal Revenue Code and whose last signatory employer ceased producing and/or processing coal prior to December 16, 1993;

(iv)    the 1974 Pensioner was entitled to death benefit coverage from this Plan on June 30, 2011 (or would have been had he been retired or eligible to retire on that date); or

(v)    the last signatory employer (the Employer for whom the 1974 Pensioner, New Inexperienced Miner first hired on or after January 1, 2012, or Electing Miner last worked in signatory classified employment) is a current contributor to this Plan and is signatory either to the National Bituminous Coal Wage Agreement of 2011 or to an agreement (including prior agreements, where applicable) requiring a contribution obligation with respect to this Plan that is identical to the applicable contribution obligation set forth in the National Bituminous Coal Wage Agreement of 2011 (or prior National Bituminous Coal Wage Agreements, where applicable).

(3)    The death benefit provided under this section shall not be payable with respect to any 1974 Pensioner who was an eligible beneficiary of the United Mine Workers of America Combined Benefit Fund described in section 9703(f) of the Internal Revenue Code of 1986, as amended by the Coal Industry Retiree Health Benefit Act of 1992, whose death occurs on or after February 1, 1993.

(4)    For purposes of this section, the term "dependent" shall mean any person described in (a) through (e), below, as of the date of death of the 1974 Pensioner, New Inexperienced Miner first hired on or after January 1, 2012, or Electing Miner. A person shall be considered to have been a dependent of a 1974 Pensioner, New Inexperienced Miner first hired on or after January 1, 2012, or Electing Miner if such 1974 Pensioner, New Inexperienced Miner or his spouse, provided over one-half of the support to such person on a regular basis.

(i)    a spouse who is living with or being supported by the 1974 Pensioner, New Inexperienced Miner first hired on or after January 1, 2012, or Electing Miner;

(ii)    an unmarried dependent child of the 1974 Pensioner, New Inexperienced Miner first hired on or after January 1, 2012, or Electing Miner, who has not attained age 22;

(iii)    a parent of a 1974 Pensioner, New Inexperienced Miner first hired on or after January 1, 2012, or Electing Miner or of such 1974 Pensioner's, New Inexperienced Miner's or Electing Miner's spouse, if the parent has been dependent upon and living in the same

19

household (residence) as the 1974 Pensioner, New Inexperienced Miner first hired on or after January 1, 2012, or Electing Miner, for a continuous period of at least one year;

(iv)     an unmarried dependent grandchild of a 1974 Pensioner, New Inexperienced Miner first hired on or after January 1, 2012, or Electing Miner or of such 1974 Pensioner's, New Inexperienced Miner's or Electing Miner's spouse, who has not attained age 22, and is living in the same household (residence) with such 1974 Pensioner, New Inexperienced Miner or Electing Miner; and

(v)     a dependent child (of any age) of a 1974 Pensioner, New Inexperienced Miner first hired on or after January 1, 2012, or Electing Miner or of such 1974 Pensioner's, New Inexperienced Miner's or Electing Miner's spouse, who is mentally retarded or who becomes disabled prior to attaining age 22, and such disability is continuous, and who is either living in the same household with such 1974 Pensioner, New Inexperienced Miner or Electing Miner, or is confined to an institution for care or treatment.

## ARTICLE IV – 1974 PENSIONERS - CREDITED SERVICE

A.     Nonsignatory Service

Subject to the limitations in paragraph C of this Article IV, credited service is a period during which the 1974 Participant meets the requirements of subparagraphs (l), (2), (3) or (4) below. Any credited service shall be nonsignatory service unless it qualifies as signatory service pursuant to Article IV(B) hereof.

(1)     A 1974 Participant shall receive credit for a year of service for any calendar year in which he worked, subsequent to December 31, 1936, as an employee in a job classified in the then existing bituminous coal wage agreement for an employer in the coal industry for at least 1,000 hours of service, with credit given for the next lowest 1/4 year in the event any employee works less than 1,000 hours of service as follows:

| | |
|---|---|
| 750-999 hours, | 3/4 year |
| 500-749 hours, | 1/2 year |
| 250-499 hours, | 1/4 year |
| 249 hours or less, | 0 |

With respect to any period of such service for which records of hours of service are not available or it is not feasible in light of the administrative and cost difficulties involved to compile a record

20

of service, an applicant shall be deemed to have worked a thousand hours of service if the employee received wages in an amount equal to the product of (i) the lesser of 125 days or 1/2 the average number of days the bituminous mines in the United States were active, multiplied by (ii) the daily basic rate paid in the bituminous coal industry for that year; provided that for any year for which information is not available as to the average number of days the mines were active, the available data for the nearest year next preceding shall be used; provided further that if an applicant earned less than the minimum amount required for a year of service, credit for service shall be given to the next lowest 1/4 year in the manner indicated with respect to hours of service.

(2) A 1974 Participant shall receive credit for a year of service for any calendar year in which the 1974 Participant worked, prior to January 1, 1937, as an employee in a job classified in the then existing coal wage agreement for an Employer in the bituminous coal industry, in a minimum of at least six (6) months during a calendar year; provided that if the applicant worked in less than six (6) months, credit for service shall be awarded to the next lowest one-fourth (1/4) year, based upon service in six (6) monthly equaling a year's service.

(3) A 1974 Participant shall receive credit for a year of service for any calendar year in which the 1974 Participant received state worker's compensation payments pursuant to an award as a result of an occupational disease or injury sustained in the mine while regularly employed in a classified job under the bituminous coal wage agreement then in effect; provided, in the case of occupational disease, the 1974 Participant had been so employed by an Employer signatory to the Wage Agreement then in effect for at least ten (10) years after May 28, 1946. Credit shall be given up to a maximum of four (4) years service credit from date of injury, or from the date of last employment in case of occupational disease, provided the 1974 Participant did not work regularly (earned at least $200 per month) during the compensable period. Benefits awarded pursuant to the Federal Coal Mine Health and Safety Act of 1969 shall be deemed "state worker's compensation payments" within the meaning of this section, only if the miner was last regularly employed in the coal industry after the enactment date of the Act, December 30, 1969, in a classified job under the bituminous coal wage agreement then in effect, and had been so employed by an operator signatory to the agreement for at least ten (l0) years after May 28, 1946. In no event shall any service be credited under this paragraph (3) with respect to periods after December 6, 1974.

(4) Effective December 12, 1994, a 1974 Participant shall receive service credit for any period of service in the military service of the United States, to the extent required by section 414(u) of the Internal Revenue Code.

B. Signatory Service

Credited signatory service is:

(1)    (a) For any calendar year prior to January 1, 1978, service as defined in paragraph A(l) hereof during which a 1974 Participant worked as an employee in a classified job for an Employer signatory to the bituminous coal wage agreement then in effect.

(b)    For purposes of determining eligibility for a pension (vesting) under Article II, service for any calendar year subsequent to December 31, 1977 during which a 1974 Participant works as an employee in a classified job for an Employer signatory to the bituminous coal wage agreement then in effect, computed based on hours of service as defined in Article I A(14) as follows:

| Hours of Service During a Calendar Year as a Classified Employee for a Signatory Employer | Percentage of a Year of Credited Signatory Service |
|---|---|
| 249 or less | 0% |
| 250 – 499 | 25% |
| 500 – 749 | 50% |
| 750 – 999 | 75% |
| 1,000 or more | 100% |

Notwithstanding the foregoing, a classified Employee working on the weekend/holiday crew of a signatory Employer as provided in Appendix C of the National Bituminous Coal Wage Agreement of 2011 shall receive credit for a percentage of a year calculated in accordance with the following schedule:

| Hours Worked On Weekend/Holiday Crew | Percentage of a Year of Signatory Service |
|---|---|
| less than 200 | 0 |
| 200-399 | 25% |
| 400-599 | 50% |
| 600-799 | 75% |
| 800 or more | 100% |

22

A Classified Employee who earns both regular hours and weekend/holiday crew hours during a calendar year, but who earns fewer than 1,000 hours in total for the year, may combine the partial credits earned under each of the schedules shown above.

Special Rule for 1993 -- For the calendar year 1993, a classified Employee who participated in an authorized strike following expiration of the 1988 Wage Agreement, or who was laid off as a direct result of such an authorized strike, and who worked at least 500 hours will receive credit for a full year of signatory service.

        (c)     For purposes of determining the amount of pension, under Article III, service for any calendar year subsequent to December 31, 1977, during which a 1974 Participant works as an employee in a classified job for an Employer signatory to the bituminous coal wage agreement then in effect, computed based on hours worked as defined in Article I A(16) as follows:

| Hours of Service During a Calendar Year as a Classified Employee for a Signatory Employer | Percentage of a Year of Credited Signatory Service |
|---|---|
| 249 or less | 0% |
| 250 – 499 | 25% |
| 500 – 749 | 50% |
| 750 – 999 | 75% |
| 1,000 or more | 100% |

Notwithstanding the foregoing, a classified Employee working on the weekend/holiday crew of a signatory Employer as provided in Appendix C of the National Bituminous Coal Wage Agreement of 2011 shall receive credit for a percentage of a year calculated in accordance with the following schedule:

| Hours Worked On Weekend/Holiday Crew | Percentage of a Year of Signatory Service |
|---|---|
| less than 200 | 0 |
| 200-399 | 25% |

23

| 400-599 | 50% |
| 600-799 | 75% |
| 800 or more | 100% |

A Classified Employee who earns both regular hours and weekend/holiday crew hours during a calendar year, but who earns fewer than 1,000 hours in total for the year, may combine the partial credits earned under each of the schedules shown above.

Special Rule for 1993 -- For the calendar year 1993, a classified Employee who participated in an authorized strike following expiration of the 1988 Wage Agreement, or who was laid off as a direct result of such an authorized strike, and who worked at least 500 hours will receive credit for a full year of signatory service.

(2)     Service prior to December 6, 1974, as defined in paragraph A(3) hereof during which a 1974 Participant received state worker's compensation payments if such payments are pursuant to an award as a result of an occupational disease or injury awarded after May 28, 1946, and if the 1974 Participant was last regularly employed prior to such service as an employee in a classified job for an Employer signatory to the bituminous coal wage agreement then in effect.

(3)     Service during which a 1974 Participant receives or is eligible to receive weekly Sickness and Accident Benefits pursuant to Article XI of the National Bituminous Coal Wage Agreement of 1974, as amended from time to time, and any successor agreements thereto. Service shall be computed at a rate of 8 hours for each regularly scheduled work day, or if greater than 8 hours, then at a rate equal to the number of hours, for each regularly scheduled work day, that the 1974 Participant would have worked under an alternate work schedule under Article IV(c) of the Wage Agreement.

(4)     A 1974 Participant who retires on or after March 27, 1978, shall receive credit for a year of service for any calendar year (including calendar years prior to 1978) in which he rendered service as an employee of the United Mine Workers of America (UMWA) in the coal industry immediately following regular employment in a classified job under the bituminous coal wage agreement then in effect; provided that the 1974 Participant does not, or is not eligible to, receive a pension or other retirement income from the UMWA. Credit or service with the UMWA shall be computed in the same manner as:

(a)     credit is computed for service prior to 1937, as described in paragraph A(2) hereof, or

24

(b)     credit is computed for service under the pension plan of the UMWA, whichever is greater, for service prior to January 1, 1978.

Credit for service after December 31, 1977, shall be computed in the same manner as credit is computed for service under the pension plan of the UMWA.

In no event shall a 1974 Participant receive credit under this paragraph (4) while receiving a pension under this Plan.

Notwithstanding anything in this paragraph (4) to the contrary, a 1974 Participant,

    (a)    who is not employed in a classified job for an Employer on March 27, 1978, or

    (b)    who is not employed by the UMWA on March 27, 1978, or

    (c)    who had retired prior to March 27, 1978, and was eligible to receive, or upon application would have been eligible to receive, a pension under the 1950 Pension Plan, the 1974 Pension Plan or a retirement plan of the UMWA prior to March 27, 1978, shall not receive signatory service credit for the years of UMWA employment described above if it occurred prior to March 27, 1978, unless such 1974 Participant is re-employed in a classified job and

        (1)    obtains at least 3 years of credited service after March 27, 1978, or

        (2)    ceases to be employed in the classified job or employed by the UMWA as the result of

            (i)    nonoccupational disability or accident

            (ii)    occupational injury for which the 1974 Participant receives worker's compensation, or

        (3)    dies after March 27, 1978 at a time when the 1974 Participant is employed in a classified job for an Employer or when employed by the UMWA.

(5) Service as defined in paragraph A(4) hereof during which a 1974 Participant served in the military service of the United States, provided that the classified employment referred to therein (both before and after military service) is for an Employer signatory to the bituminous coal wage agreement then in effect and provided further, however, that for military service credited after December 31, 1974, the 1974 Participant returned to work in a classified job within ninety (90) days after the date of separation from the military service or such longer period as may be allowed by law.

(6) Service (within the meaning of paragraph A(l) hereof) by an employee in a classified job for an Employer not signatory to the bituminous coal wage agreement then in effect if (i) such service is continuous, (ii) such Employer becomes a signatory to the bituminous coal wage agreement after the effective date as a result of recognizing the UMWA as the bargaining representative of its employees, (iii) the employee is working in a classified job with such Employer at the time such Employer becomes signatory to the bituminous coal wage agreement, and (iv) such employee remains in a classified job with such Employer during the twenty-four month period immediately following the date on which such Employer becomes signatory to the bituminous coal wage agreement; provided, however, that not more than ten (10) years of nonsignatory service may be recognized or awarded as signatory service to any person pursuant to this paragraph (6).

(7) Notwithstanding anything to the contrary in this Article IV or this Plan, a New Inexperienced Miner first hired on or after January 1, 2012 shall not earn any vesting, signatory or credited service under this Article IV or this Plan and an Electing Miner shall not earn any signatory or credited service under this Article IV or this Plan on or after his opt-out date.

C. Additional Rules Concerning Credited Service

(1) Except as provided in Article IV(B)(6), employment after April 1, 1971, will not constitute credited service under paragraph A(l) hereof unless such employment was in a classified job for an Employer.

(2) A 1974 Participant shall not be credited with more than one year of service for any calendar year by reason of any combination of the rules of this Article IV.

(3) The maximum number of years of nonsignatory service which may be included in the credited service of any 1974 Participant retiring after December 31, 1981 shall be the number of years by which twenty years exceeds such 1974 Participant's signatory service, but not in excess of ten years.

26

(4)    No credit for service shall be awarded a 1974 Participant for any period in which such 1974 Participant was directly connected with the ownership, operation or management of a mine; provided, however, that in the case of any 1974 Participant who received credit for such service before July 1, 1974, under the terms of the pension plan program established under the United Mine Workers of America Welfare and Retirement Fund of 1950, credit shall be awarded for any period prior to July 1, 1975, in which the 1974 Participant worked as an employee in a classified job in a mine in which such 1974 Participant had no controlling interest, as a member of a cooperative or gang-working crew which shared the profits and losses, and which was operated under the bituminous coal wage agreement then in effect; and provided further, that in the case of a 1974 Participant who received credit for service before July 1, 1974, under the terms of the pension plan program established under the United Mine Workers of America Welfare and Retirement Fund of 1950, credit for signatory service shall be awarded for any period prior to July 1, 1975, during which such 1974 Participant worked in a classified job pursuant to an agreement to produce coal for a signatory coal company which exercised control over the operation of the mine and was responsible for royalty payments on such coal produced to the 1974 Pension Trust or its predecessor.

(5)    The following maximum years of nonsignatory service may be included in credited service under this Plan:

| Date of Retirement | Maximum Years of Nonsignatory Service |
|---|---|
| January 1, 1978 to December 31, 1978 | 13 |
| January 1, 1979 to December 31, 1979 | 12 |
| January 1, 1980 to December 31, 1980 | 11 |
| January 1, 1981 and thereafter | 10 |

(6)    Subject to Article II E(1)(b)(i), a 1974 Participant with less than ten years of signatory service shall not be entitled to receive a pension under paragraph (A), (B), or (E) of Article II unless such 1974 Participant has at least twenty years of credited service, including at least the following minimum number of years of signatory service:

| Date of Retirement | Years of Signatory Service Required |
|---|---|
| January 1, 1978 to December 31, 1978 | Seven (7) years |

27

| January 1, 1979 to December 31, 1979 | Eight (8) years |
| January 1, 1980 to December 31, 1980 | Nine (9) years |
| January 1, 1981 and thereafter | Ten (10) years |

(7)    Except as provided in Article V, service credits shall not be accrued subsequent to the effective date of pension payments.

(8)    In the case of any 1974 Participant, except a 1974 Participant covered under Article IV B(4), the last day of credited service shall be the last day on which the 1974 Participant works as an employee in a classified job for an Employer, unless such 1974 Participant continues to accrue credited service during the period for which such 1974 Participant receives or is eligible to receive weekly sickness and accident benefit pursuant to Article XI of the Wage Agreement, in which case the last day of credited service shall be the last day for which such sickness and accident benefits are paid or would have been paid. For a 1974 Participant covered under Article IV B(4), the last day of credited service shall be the later of the last day as determined in the preceding sentence or the last day the 1974 Participant worked for the UMWA.

(9) In the case of an Electing Miner, his last day of credited service shall be his opt-out date, which is the last day of the month in which the Electing Miner completed the Plan's opt-out application.

(10)    An employee who is regularly employed in a classified job for an Employer and who performs supervisory duties on a temporary basis for not more than 120 work days during any consecutive period of 12 months, shall be deemed to be employed in a classified job during the days on which the 1974 Participant performs such supervisory duties.

(11)    Notwithstanding anything to the contrary in this Article IV or this Plan, a New Inexperienced Miner first hired on or after January 1, 2012 shall not earn any vesting, signatory or credited service under this Article IV or this Plan and an Electing Miner shall not earn any signatory or credited service under this Article IV or this Plan on or after his opt out date.

D.    Construction Industry Service

(1)    Notwithstanding anything to the contrary, and except for purposes of Article II.C and II.D and as provided by Article II.G, no Construction Industry Service of a 1974 Participant shall be considered Credited Service under this Plan.

28

(2)    In any case in which a 1974 Participant has both Construction Industry Service and at least one hour of service creditable under paragraphs B or C of this Article for any year beginning after December 31, 1985, the 1974 Participant's Credited Service for that year shall be determined by multiplying the Credited Service the 1974 Participant would be entitled to if Construction Industry Service were considered service under this Article by a fraction, the numerator of which is the 1974 Participant's hours of service creditable under this Article for that year and the denominator of which is the sum of such hours and the 1974 Participant's hours of Construction Industry Service for that year.

(3)    In any case in which, after June 30, 1985, and before January 1, 1986, a 1974 Participant has both Construction Industry Service and at least one hour of service creditable under the provisions of paragraphs B or C of this Article, the 1974 Participant's Credited Service for that year shall be equal to the sum of his Credited Service for the period beginning January 1, 1985, and ending June 30, 1985, and a fraction of what his Credited Service would be for the period beginning July 1, 1985 and ending December 31, 1985, if Construction Industry Service were considered service under this Article. Such fraction is determined by dividing the 1974 Participant's hours of service under paragraphs B and C of this Article by the sum of such hours of service and the 1974 Participant's hours of Construction Industry Service.

(4)    Notwithstanding subparagraph D.(2) or D.(3), the Credited Service of a 1974 Participant for a year in which either subparagraph applies shall not exceed one minus the portion of a year for which the 1974 Participant receives credit for accrual purposes under the United Mine Workers of America Construction Workers Pension Plan. If, in any year, a 1974 Participant receives one year of credit for accrual purposes under the United Mine Workers of America Construction Workers Pension Plan, he shall not be entitled to any Credited Service for such year.

## ARTICLE V – REEMPLOYMENT OF 1974 PENSIONERS AFTER ATTAINMENT OF PENSION ELIGIBILITY

A.    Any 1974 Participant who has been retired and receiving a pension under this Plan and who shall be reemployed in a classified job by an Employer shall, for the purpose of calculating any subsequent pension benefits to which such 1974 Participant may become entitled, upon subsequent retirement, be granted a pension equal to the sum of the pension such 1974 Participant was previously receiving plus the excess of (i) over (ii) where (i) is the pension to which such 1974 Participant would be entitled at the time of such retirement, based upon all years of Credited Service under the Plan and (ii) is the pension to which such 1974 Participant would be entitled at the time of such retirement, based solely on Credited Service at the time of his previous retirement.

29

B.     Any 1974 Participant eligible for a deferred vested pension under this Plan whose shall be reemployed in a classified job by an Employer prior to the commencement of pension benefit shall, for the purpose of calculating any subsequent pension benefits to which he may become entitled, be granted his credited service applicable to the deferred vested pension plus his credited service accrued after such reemployment.

C.     Any 1974 Participant who is reemployed in a classified job by an Employer after attainment of eligibility for a deferred vested pension under this Plan, whose employment is subsequently terminated and who at that time is not eligible for a pension under any provision of Article II by reason of Article IV(C)(6), shall be considered to be eligible for the deferred vested pension for which such 1974 Participant was eligible prior to such reemployment and upon application for pension the date of retirement shall be considered to be the date of retirement which would, upon application for pension, have been applicable to the deferred vested pension for which such 1974 Participant was eligible prior to such reemployment.

## ARTICLE VI – 1974 PENSIONERS - SURVIVING SPOUSE BENEFIT

A.     (1)     Except as provided in paragraph (B) of this Article, a Surviving Spouse Benefit is provided for any 1974 Participant who (a) has retired and is receiving a pension under this Plan, except a 1974 Participant receiving a deferred vested pension who has not completed at least twenty years of credited service, (b) has not retired but at the date of his death otherwise met the eligibility requirements for an immediate pension under Article II(A), (B), (C), (D) or (E)(4) under this Plan, or (c) has attained age 55 with at least twenty years of credited service and who has retired and is entitled to elect an immediate pension under Article II(A), II(B) or II(E) at the date of death.

(2)     The amount of such benefit shall be equal to 75% of the amount of the 1974 Participant's pension at the time of death or, in the event the 1974 Participant dies after age 55 at a time when such 1974 Participant was eligible to elect a pension or to retire and receive a pension under Article II, but prior to the receipt of a pension, 75% of the amount of the pension such 1974 Participant would have received if such 1974 Participant had elected a pension or retired and become entitled to a pension as of the date immediately preceding the date of death.

(3)     The Surviving Spouse Benefit will not be effective unless the 1974 Participant and the spouse have been married throughout the nine-month period ending on the earlier of the participant's annuity starting date or the date of the participant's death, unless such nine-month requirement would be waived for purposes of determining entitlement to widow's or widower's insurance benefits under the Social Security Act.

30

(4)     Payment to an eligible spouse will commence as of the first of the month following the month in which the 1974 Participant's death occurs and the final payment shall be made for the month in which the spouse's death occurs.

B.     (1)     Any 1974 Participant who is not employed in a classified job for an Employer on December 6, 1974, is not covered for a Surviving Spouse Benefit under this Article unless such 1974 Participant (a) obtains at least three years of credited service after such date, or (b) had ceased to be employed in a classified job as a result of (i) layoff, (ii) nonoccupational disability or accident, or (iii) occupational injury for which such 1974 Participant was receiving workers' compensation, or (c) such 1974 Participant dies at a time when he is employed in a classified job for an Employer.

(2)     Any 1974 Participant who retires on or before December 31, 1975, and is again employed in a classified job for an Employer after such retirement, is not covered for a Surviving Spouse Benefit under this Article unless (a) such 1974 Participant obtains at least three years of credited service after such reemployment or (b) unless such reemployment ceases as a result of (i) layoff, (ii) nonoccupational disability or accident, or (iii) occupational injury for which worker's compensation benefits were awarded, or (c) such 1974 Participant dies while employed in a classified job for an Employer.

C.     (1)     A Surviving Spouse benefit is provided for any 1974 Participant who completed at least ten years of credited service, who died as a result of a mine accident during the term of the National Bituminous Coal Wage Agreement of 1978 or 1981, and who was not in Construction Industry Service at the time of the mine accident. The amount of such Surviving Spouse benefit shall be a lump sum in the amount of $10,000, plus $100.00 a month beginning with the month of February, 1998 and for each month thereafter during the spouse's eligibility. The final payment shall be made for the month in which the spouse's death (or if earlier, the spouse's remarriage) occurs.

(2)     The Surviving Spouse Benefit will not be effective unless (a) the 1974 Participant and the spouse were married throughout the nine-month period ending on the earlier of the participant's annuity starting date or the date of the participant's death, unless such nine-month requirement would be waived for purposes of determining entitlement to widow's or widower's insurance benefits under the Social Security Act; (b) the spouse was never eligible for a monthly benefit under this Plan or under any other plan or provision under a Wage Agreement; and (c) the spouse has never remarried and is surviving on February 1, 1998.

ARTICLE VII – 1974 PENSIONERS - JOINT AND SURVIVOR ANNUITIES

A.     Notwithstanding any other provision of this Plan, if a 1974 Participant qualifies for a pension under this Plan, but is not covered by a Surviving Spouse Benefit, the Pension

31

benefit otherwise provided to such 1974 Participant shall be reduced actuarially pursuant to Appendix B, and 50% of such reduced pension benefit will be continued, after the death of the 1974 Participant, for the life of any qualified surviving spouse; provided, however, that such 1974 Participant may elect, within the election period specified in Paragraph C(l) below, and subject to the requirement of Paragraph D below, not to take a joint and survivor annuity as provided for in this Article and instead to receive a pension benefit for life only.

B.      If a 1974 Participant has completed 5 years of signatory service for vesting purposes, calculated pursuant to Article II (G), is not covered by a Surviving Spouse Benefit, and dies before he is entitled to elect or elects to receive a pension benefit, the qualified surviving spouse shall be entitled to receive a survivor's benefit in the form of an annuity for life in an amount equal to 75% of the pension benefit the decedent would have received if the decedent had --

       (1)      separated from service on the date of death,

       (2)      survived to age 55 (in the case of a decedent who died  before attaining age 55),

       (3)      retired with an immediate Joint and Survivor Annuity as provided for in this Article at age 55, (or, if later on the date before the decedent's date of death).

       (4)      died on the day after the day on which the decedent would have attained age 55 (in the case of a decedent who died before attaining age 55).

Payment to a qualified spouse under this paragraph will commence on the first of the month following the month in which the decedent would have attained age 55 (or, if later, the first of the month following the month of the decedent's death) and the final payment shall be for the month in which the spouse's death occurs.  Notwithstanding the foregoing, payment to a surviving spouse of a 1974 Participant who died prior to age 55, but while eligible for an immediate pension benefit, will commence on the first of the month following the month of the 1974 Participant's death.  The benefit shall be calculated as set forth herein, but as if the 1974 Participant had retired with an immediate Joint and Survivor Annuity on the date before the date of his death.

C.      (1)      The "election period" in the case of an election to waive the Joint and Survivor Annuity described in Paragraph A shall be the 180-day period ending on the date of the commencement of benefits. Not less than 30 days and not more than 180 days prior to the date of the commencement of benefits, the Trustees shall furnish the 1974 Participant (a) a general description or explanation of the qualified Joint and Survivor Annuity, the circumstances in which it will be provided unless the 1974 Participant elects not to have benefits provided in that

32

form, the availability of such election and the right to revoke such election, and the rights of the 1974 Participant's spouse; and (b) a general explanation of the relative financial effect of such election on the 1974 Participant's pension.  In the event a 1974 Participant elects not to receive a Joint and Survivor Annuity, such election shall not become effective if the 1974 Participant dies within a period of two years beginning on the date of such election.

        (2)    A 1974 Participant may revoke any election made pursuant to this Article at any time during the applicable election period.

        D.    An election made under this Article shall not take effect unless--

        (1)    the spouse of the 1974 Participant consents in writing to such election, and the spouse's consent acknowledges the effect of such election and is witnessed by a Plan representative or a notary public, or

        (2)    It is established to the satisfaction of the Trustees that the consent required under subparagraph (1) may not be obtained because there is no spouse, because the spouse cannot be located, or because of such other circumstances as the Trustees may by law consider.

        E.    A qualified surviving spouse shall be any spouse who has been married to the 1974 Participant for at least nine months prior to the earlier of the participant's annuity starting date or the date of the participant's death, unless such nine-month requirement would be waived for purposes of determining entitlement to widow's or widower's insurance benefits under the Social Security Act.

        F.    Except as provided in Paragraph B above, payment to a qualified surviving spouse under this Article will commence as of the first of the month following the month in which the 1974 Participant's death occurs, and the final payment shall be made for the month in which the spouse's death occurs.

## ARTICLE VIII – ELIGIBILITY OF 1950 PENSIONERS

A.    Continuation of Pension Under 1950 Fund

A 1950 Participant entitled to receive a pension benefit on the effective date pursuant to the eligibility rules of the United Mine Workers of America Welfare and Retirement Fund of 1950 shall be eligible for a pension under this Article.

B.    Persons Retiring Before 1976

A 1950 Participant who ceased or ceases to perform classified work for an Employer prior to December 31, 1975 (whether or not re-employed in a classified job for an Employer after December 31, 1975), and was not eligible for pension benefits under the 1974 Pension Plan prior to its merger with the 1950 Pension Plan, shall be eligible for a pension under this Article if he has:

(1)    Attained the age of fifty-five (55) years, and,

(2)    Either completed twenty (20) years of Credited Service, including the required amount of signatory service as set forth in Article X (C) (4) or completed at least ten (10) years of signatory service, including at least three (3) years of signatory service after December 31, 1970.

C.    Disability Pensions

A 1950 Participant who is not otherwise eligible for a pension benefit hereunder who became totally disabled prior to the effective date as the result of a mine accident, after May 29, 1946, while employed in a classified job for an Employer, shall be eligible for a disability pension benefit while so disabled. A 1950 Participant shall be considered to be totally disabled as the result of a mine accident only if, by reason of such accident, he is eligible for Social Security Disability Insurance Benefits under Title II of the Social Security Act or its successor.

When a 1950 Participant who has been receiving a disability pension recovers sufficiently to become ineligible for Social Security disability benefits or is disqualified because of earnings, the Trustees shall implement procedures to determine the 1950 Participant's ability to perform classified work in the industry. The continuance of a disability pension shall be based on medical evidence that supports the 1950 Participant's inability to be employed in classified work in the industry. If such 1950 Participant is medically certified able to perform classified work in the industry, he will no longer be eligible for a disability pension.

34

D.    Nonduplication

(1)    A 1950 Participant shall be entitled to receive a pension under only one of the foregoing paragraphs of this Article VIII.

(2)    Any person who (a) retires on or before December 31, 1975, (b) at the time of retirement is entitled to, or upon attaining age 55 would be entitled to, a pension benefit under the 1950 Pension Plan prior to its merger with this Plan, and (c) is again employed for at least 250 hours in a classified job for an Employer after December 31, 1975, shall, upon his subsequent retirement (or, if later, upon attaining age 55), be eligible for a pension only under Article II of this Plan.

E.    Employment for Vesting Purposes

For all purposes of this Article VIII, if any 1950 Participant's signatory service shall be less than the total of his years of employment in the coal industry after May 28, 1946 for Employers then signatory to the bituminous coal wage agreement then in effect (hereinafter referred to as "employment" for purposes of this Article), and if such 1950 Participant has at least three years of such employment after December 31, 1970, then such years of employment shall be used for purposes of any eligibility requirement of minimum signatory service under this Article in place of years of signatory service. Years of employment shall be computed by giving credit for one year of employment for any year for which the 1950 Participant completed 1,000 hours of employment; provided that no credit shall be given for any year in which the Participate completed less than 1,000 hours of employment; and provided further that (a) all years of employment before age 22 shall be disregarded, and (b) years of employment prior to any break in service shall be disregarded to the maximum extent permissible under Section 203(b)(3) of ERISA. The provisions of this paragraph shall be interpreted and construed in accordance with the requirements of ERISA and the regulations issued thereunder.

F.    Commencement, Suspension and Termination of Pensions

Payment of pensions shall be subject to the following:

(1)    The first payment on all pensions shall be made for the month following the month in which the 1950 Participant becomes eligible for a pension in accordance with Article VIII, but not earlier than the month following the month in which an application is received by the Funds.

(2)    The last payment shall be for the month in which the 1950 Pensioner dies.

(3)    Pension payments shall be payable on the first day of each month at the 1950 Pensioner's last address of record.

(4)    Pension payments shall be suspended for any month in which the 1950 Pensioner is employed, subsequent to commencement of such payments, in the bituminous coal industry, in the same trade or craft (trade or craft shall mean the coal mining industry), and in the same geographic area covered by this Plan. The provisions of this paragraph shall be interpreted in accordance with any regulations issued pursuant to Section 203(a)(3)(B) of ERISA.

(5)    Any 1950 Participant who continues to be employed by an Employer after his retirement shall not be entitled to receive pension benefits under this Plan until such time as he is no longer employed by an Employer.

## ARTICLE IX – 1950 PENSIONERS - AMOUNT OF PENSION AND DEATH BENEFIT

A.    1950 Participants With 20 or More Years of Service

The pension payable to a 1950 Participant who is

(1)    entitled to receive a pension under Article VIII(A) hereof, or

(2)    entitled to receive a pension under Article VIII(B) hereof and has at least twenty (20) years of Credited Service, including the required amount of signatory service as set forth in Article X(C)(4) hereof, shall be $425 per month.

B.    1950 Participants With Less Than 20 Years of Service

As of February 1, 1988, the monthly pension payable under this Plan to a 1950 Participant who

(1)    is entitled to receive a pension under Article VIII(B) hereof, and

(2)    has more than ten (10) but less than twenty (20) years of signatory service, shall be an amount computed by multiplying $250 by a fraction, the numerator of which shall be the years of signatory service (to the nearest 1/4 year) credited to such 1950 Participant and the denominator of which shall be 20. The monthly pension is increased by $15 effective January 1, 1998, by $15 effective January 1, 2002, by $15 effective January 1, 2007, and by $5 effective January 1, 2009.

36

C.     Disability Pensions

As of July 1, 2011, the monthly pension payable under this Plan to a 1950 Participant entitled to receive a pension under Article VIII(C) hereof shall be $267.50.

D.     Pensions Under Article VIII(E)

The monthly pension payable under this Plan to a 1950 Participant entitled to receive a pension under Article VIII(E) hereof shall be an amount computed by multiplying $250 by a fraction, the numerator of which shall be the years of signatory service (to the nearest 1/4 year) credited to such 1950 Participant and the denominator of which shall be 20. The monthly pension is increased effective February 1, 1988 by $30 per month, with a second increase of $10 per month effective February 1, 1990. The monthly pension is increased by $15 effective January 1, 1998, by $15 effective January 1, 2002, by $15 effective January 1, 2007, and by $5 effective January 1, 2009.

E.     Death Benefit for 1950 Pensioners

(1)     Except as otherwise provided herein, a death benefit shall be paid for any 1950 Pensioner whose death occurs on or after July 1, 2011 and who either (1) is receiving pension payments under this Trust and is eligible for health benefits under the 1992 UMWA Benefit Plan, the UMWA 1993 Benefit Plan, or a plan maintained by an employer pursuant to section 9711 of the Internal Revenue Code, or (2) has made application for and is eligible to receive such payments and benefits. The death benefit shall be equal to $8,500 for such 1950 Pensioner with dependents at the time of his death, and $7,000 for such 1950 Pensioner without dependents at the time of his death. Effective July 1, 2013 the death benefit shall be equal to $10,000 for such 1950 Pensioner with dependents at the time of his death, and $8,500 for such 1950 Pensioner without dependents at the time of his death. Notwithstanding any other provision herein, this Plan amendment providing for increases in the death benefit shall be effective July 1, 2013.

(2)     For purposes of this section, the term "dependent" shall mean any person described in (a) through (e), below, as of the date of the death of the 1950 Pensioner. A person shall be considered to have been a dependent of a 1950 Pensioner if such 1950 Pensioner and his spouse provided support of a regular and substantial nature to such person.

(a)     a spouse who is living with or being supported by the 1950 Pensioner;

(b)     an unmarried dependent child of the 1950 Pensioner who has not attained age 22;

37

(c) a parent of a 1950 Pensioner or of a 1950 Pensioner's spouse, if the parent has been dependent upon and living in the same household (residence) as the 1950 Pensioner for a continuous period of at least one year;

(d) an unmarried dependent grandchild of a 1950 Pensioner or of a 1950 Pensioner's spouse who has not attained age 22, and is living in the same household (residence) with such 1950 Pensioner; and

(e) a dependent child (of any age) of a 1950 Pensioner or of a 1950 Pensioner's spouse who is mentally retarded or who becomes disabled prior to attaining age 22, and such disability is continuous, and who is either living in the same household with such 1950 Pensioner or is confined to an institution for care or treatment.

(3) The death benefit provided under this section shall not be payable for any 1950 Pensioner who was an eligible beneficiary described in section 9703(f) of the Internal Revenue Code of 1986, as amended by the Coal Industry Retiree Health Benefit Act of 1992, whose death occurs on or after February 1, 1993.

F.    One-Time Single Sum Payment Based on Prior Plan Amendment

(1) Any 1950 Pensioner not described in paragraph (2) and who is not receiving a pension pursuant to Article VIII(E), whose pension is in pay status as of October 31, 2011 shall receive a one-time single sum payment of $580, to be issued by November 1, 2011.

(2) Any 1950 Pensioner whose disability pension pursuant to Article VIII C is in pay status as of October 31, 2011 shall receive a one-time single sum payment of $455, to be issued by November 1, 2011.

(3) Any widow of a miner whose Widow's Pension pursuant to Article XI is in pay status as of October 31, 2011, shall receive a one-time single sum payment of $455, to be issued by November 1, 2011.

(4) Any such 1950 Participant whose pension pursuant to Article VIII(E) is in pay status as of October 31, 2011, shall receive a one-time single sum payment of $455, to be issued by November 1, 2011.

38

(5)     The one-time single sum payments provided for herein and under Article XII are not intended as an ongoing feature of this Plan, and the Plan shall have no obligation to provide payments of this type other than those expressly provided for above.

## ARTICLE X - CREDITED SERVICE FOR 1950 PENSIONERS

A.     Nonsignatory Service

Subject to the limitations in section C of this Article X, Credited Service is a period during which the 1950 Participant meets the requirements of subparagraphs (1), (2), (3), (4) or (5) below.  Any Credited Service shall be nonsignatory service unless it qualifies as signatory service pursuant to Article X(B) hereof.

(1)     A 1950 Participant shall receive credit for a year of service for any calendar year in which he worked, subsequent to December 31, 1936 and prior to January 1, 1976, as an employee in a job classified in the then existing bituminous coal wage agreement for an employer in the coal industry for at least 1,000 hours of service, with credit given for the next lowest 1/4 year in the event any employee works less than 1,000 hours of service as follows:

| | |
|---|---|
| 750 - 999 hours, | 3/4 year |
| 500 - 749 hours, | 1/2 year |
| 250 - 499 hours, | 1/4 year |
| 249 hours or less, | 0 |

With respect to any period of service for which records of hours of service are not available or it is not feasible in light of the administrative and cost difficulties involved to compile a record of hours of service, an applicant shall be deemed to have worked a thousand hours of service if he received wages in an amount equal to the product of (i) the lesser of 125 days or 1/2 the average number of days the bituminous mines in the United States were active, times (ii) the daily basic rate paid in the bituminous coal industry for that year; provided that for any year for which information is not available as to the average number of days the mines were active, the available data for the nearest year next preceding shall be used; provided further that if an applicant earned less than the minimum amount required for a year of service, credit for service shall be given to the next lowest 1/4 year in the manner indicated with respect to hours of service.

(2)     A 1950 Participant shall receive credit for a year of service for any calendar year in which he worked, prior to January 1, 1937, as an employee in a job classified in the then existing coal wage agreement for an employer in the bituminous coal industry, for a minimum of at least six (6) months during a calendar year, provided that if the applicant worked

39

less than six (6) months, credit for service shall be awarded to the next lowest one-fourth (1/4) year, based upon service in six (6) months equaling a year's service.

(3)    A 1950 Participant shall receive credit for a year of service for any calendar year in which he received state workmen's compensation payments pursuant to an award as a result of an occupational disease or injury sustained in the mine while regularly employed in a classified job under the bituminous coal wage agreement then in effect, provided, in the case of occupational disease, the 1950 Participant had been so employed by an Employer signatory to the Wage Agreement then in effect for at least ten (10) years after May 28, 1946 and prior to January 1, 1976. Credit shall be given up to a maximum of four (4) years service credit from date of injury, or from the date of last employment in case of occupational disease, provided the 1950 Participant did not work regularly (earned at least $200 per month) during the compensable period. Benefits awarded pursuant to the Federal Coal Mine Health and Safety Act of 1969 shall be deemed "state workmen's compensation payments" within the meaning of this section, only if the miner was last regularly employed in the coal industry after the enactment date of the Act, December 30, 1969, in a classified job under the bituminous coal wage agreement then in effect, and had been so employed by an operator signatory to the agreement for at least ten (10) years after May 28, 1946 and prior to January 1, 1976.

(4)    A 1950 Participant shall receive credit for a year of service for any year in which he rendered service as an employee of the United Mine Workers of America in the coal industry immediately following regular employment in a classified job under the bituminous coal wage agreement then in effect; provided that the 1950 Participant returned to work in a classified job within twelve (12) months after the date of his last employment by the United Mine Workers of America; and provided further that the 1950 Participant is not covered by the pension or retirement plan of the United Mine Workers of America. Service credit for such period shall be computed in the same manner as credit is computed for service prior to 1937, as described in paragraph 2 hereof.

(5)    A 1950 Participant shall receive credit for a year of service for any calendar year in which he served in the military service of the United States in any war, national emergency, or international police action, immediately following regular employment in a classified job under the bituminous coal wage agreement then in effect, provided that credit for such service shall be limited to the original period of enlistment or obligated military service; and provided further that the 1950 Participant returned to work in a classified job within twelve (12) months after his date of separation from the military service, unless he was precluded from doing so by service connected sickness, accident, or other disability, and returns to work in a classified job when no longer precluded by such disability. Service credit for the period of military service shall be computed in the same manner as credit is computed for service prior to 1937, as described in paragraph 2 above.

40

B.    Signatory Service

Credited signatory service is:

(1)    Service as defined in paragraph A(1) hereof during which a 1950 Participant worked, after May 28, 1946 and prior to January 1, 1976, as an employee in a classified job for an Employer signatory to the bituminous coal wage agreement then in effect.

(2)    Service as defined in paragraph A(3) hereof during which a 1950 Participant received state workmen's compensation payments if such payments are pursuant to an award as a result of an occupational disease or injury awarded after May 28, 1946 and prior to January 1, 1976, and if the 1950 Participant was last regularly employed prior to such service as an employee in a classified job for an Employer signatory to the bituminous coal wage agreement then in effect.

(3)    Service as defined in paragraph A(5) hereof during which a 1950 Participant served in the military service of the United States, provided that the classified employment referred to therein (both before and after military service) is for an Employer signatory to the bituminous coal wage agreement then in effect; and provided further, however, that for military service credited after December 31, 1974 and prior to January 1, 1976, the 1950 Participant returned to work in a classified job within ninety (90) days after his date of separation from the military service or such longer period as may be allowed by law.

C.    Additional Rules Concerning Credited Service

(1)    Employment after April 1, 1971 will not constitute Credited Service under paragraph A(1) hereof unless such employment was in a classified job for an Employer.

(2)    No credit for service shall be awarded a 1950 Participant for any period in which he was directly connected with the ownership, operation or management of a mine; provided however, that in the case of any 1950 Participant who received credit for such service before July 1, 1974 under the terms of the pension plan program established under the UMWA Welfare and Retirement Fund of 1950, credit shall be awarded for any period prior to July 1, 1975, in which the 1950 Participant worked as an employee in a classified job in a mine in which he had no controlling interest, as a member of a cooperative or gangworking crew which shared the profits and losses, and which was operated under the bituminous coal wage agreement then in effect; and, provided further, that in the case of a 1950 Participant who received credit for service before July 1, 1974, under the terms of the pension plan program established under the UMWA Welfare and Retirement Fund of 1950, credit for signatory service shall be awarded for any period prior to July 1, 1975 during which such 1950 Participant worked in a classified job pursuant to an agreement to produce coal for a signatory coal company which exercised control

41

over the operation of the mine and was responsible for royalty payments on such coal produced to the 1950 Pension Trust or its predecessor.

(3) An applicant shall not be credited with more than one year of service for any calendar year by reason of any combination of the rules of this Article X.

(4) A 1950 Participant with less than ten years of signatory service shall not be entitled to receive a pension under paragraph B of Article VIII unless such 1950 Participant has at least twenty years of Credited Service, including at least the following minimum number of years of signatory service:

| Date Attains Age 55 | Years of Signatory Service Required |
|---|---|
| On or prior to December 31, 1976 | Five (5) Years |
| January 1, 1977 to December 31, 1977 | Six (6) Years |
| January 1, 1978 to December 31, 1978 | Seven (7) Years |
| January 1, 1979 to December 31, 1979 | Eight (8) Years |
| January 1, 1980 to December 31, 1980 | Nine (9) Years |
| January 1, 1981 and thereafter | Ten (10) Years |

(5) In the case of any 1950 Participant, the last day of Credited Service shall be the last day on which the 1950 Participant works as an employee in a classified job for an Employer, unless such 1950 Participant continues to accrue Credited Service pursuant to Article X(A)(3) or X(B)(2), in which case the last day of Credited Service shall be the earlier of (i) the last day for which state workmen's compensation payments are received, (ii) the date four years from the date of injury or the last day of work in classified job, or (iii) the last day prior to the time such 1950 Participant commenced regular employment in other than a classified job for an Employer during the compensable period.

42

(6)    An employee who is regularly employed in a classified job for an Employer and who performs supervisory duties on a temporary basis for not more than 120 work days during any consecutive period of 12 months shall be deemed to be employed in a classified job during the days on which he performs such supervisory duties.

## ARTICLE XI – 1950 PENSIONERS - WIDOW'S PENSION

A.    Eligibility

A Widow's Pension will be provided to eligible widows of miners who were receiving a pension under the 1950 Pension Plan (1950 Pensioners) at the time of the miner's death.

B.    Amount of Pension

The amount of such Widow's Pension shall be $175 per month.

C.    Application for Widow's Pension and Commencement and Termination of Widow's Pension

(1)    The first payment on any Widow's Pension shall be made as soon as possible after an application for Widow's Pension has been received and shall be for the first of the month following the date the 1950 Pensioner died, but in no event prior to March 1, 1982.

(2)    The last payment shall be for the month in which the widow dies or remarries.

(3)    Widow's Pension payments shall be payable on the first day of each month at the widow's last address of record.

D.    Eligible Widows

The Widow's Pension will not be effective unless the 1950 Pensioner and the spouse have been married throughout the nine-month period ending on the date of the 1950 Pensioner's death or unless such nine-month period would be waived for purposes of determining entitlement to widow's insurance benefits under the Social Security Act. Any widow who remarries subsequent to the 1950 Pensioners death shall not be eligible.

43

E.    Survivor Annuities

(1)    Joint and Survivor Annuity Option

If a 1950 Participant had at least one hour of service under the 1950 Pension Plan on or after September 2, 1974, and begins receiving his pension on or after July 1, 2011, he may elect to receive his pension in the form of a 50% joint and survivor annuity in lieu of a Widow's Pension for his qualified surviving spouse, unless the Widow's Pension to which his spouse would be entitled upon his death is greater than the amount of the survivor's annuity. If this option is elected, the pension benefit otherwise provided to the 1950 Participant shall be actuarially reduced, and 50% of such reduced pension benefit will be continued after the death of the 1950 Participant for the life of his qualified surviving spouse. The actuarial reduction of the 1950 Participant's pension benefit shall be sufficient to assure that the actuarial value of the 50% joint and survivor annuity does not exceed the actuarial value of the pension benefit that would otherwise be provided to the 1950 Participant for his lifetime. A qualified surviving spouse is a spouse who was married to the 1950 Participant throughout the 1-year period ending on the date the Participant's pension commenced, as provided in Article VIII F(1).

The period for electing the joint and survivor annuity option shall be a period of at least 30 days and no more than 180 days following the furnishing of all applicable information relating to the option, and shall not end prior to the commencement of benefits; provided, however, a 1950 Participant may elect to waive the requirement that the written explanation be provided at least 30 days before the commencement of benefits if the distribution commences more than 7 days following the furnishing of all applicable information.

(2)    Pre-Retirement Survivor Annuity

If a 1950 Participant had at least one hour of service under the 1950 Pension Plan on or after September 2, 1974, and dies on or after July 1, 2011 prior to the commencement of his pension, his eligible surviving spouse shall receive the benefit she would have received had the 1950 Participant elected such 50% joint and survivor annuity option and begun receiving his pension on the day prior to his death. An eligible surviving spouse is a spouse who was married to the 1950 Participant throughout the 1-year period ending on the date of his death..

## ARTICLE XII – MISCELLANEOUS

A.    Determination of Eligibility

The Trustees or such other named fiduciaries as may be properly designated shall have full and final determination as to all issues concerning eligibility for benefits.

B.    General

(1)    The Trustees are authorized to promulgate rules and regulations to implement this Plan, and those rules and regulations shall be binding upon all persons dealing with and Participants claiming benefits under this Plan.

(2)    No benefit payable under this Plan shall be subject in any way to alienation, sale, transfer, assignment, pledge, attachment, garnishment, execution or encumbrance of any kind, and any attempt to accomplish the same shall be void. Notwithstanding the foregoing, the Plan shall comply with any qualified domestic relations order, as that term is defined in ERISA, and with any written authorization by a Participant or beneficiary made pursuant to paragraph (19) of this section.

(3)    The Employers and the Union, by joint action, reserve the right at any time and from time to time to modify or amend in whole or in part any or all of the provisions of this instrument or to terminate this Plan, without reopening or otherwise affecting the integrity of any other provision of the Wage Agreement, by a written agreement between the Employers and the Union, provided, however, that:

(a)    this Plan shall not be amended in such manner as would cause or permit any part of the assets in the 1974 Pension Trust to be diverted to purposes other than the exclusive benefit of the Participants and their beneficiaries;

(b)    this Plan shall not be amended to deny to a Participant retroactively any benefits to which such Participant was entitled under this Plan, unless such amendment is necessary to conform this Plan to, or to satisfy the conditions of, any law, governmental regulations or ruling;

(c)    the Employers and the Union have delegated to the Trustees the authority and responsibility to make certain changes and amendments as set forth in Article XX(g)(4) of the National Bituminous Coal Wage Agreement of 2011, as amended from time to time, and any successor agreements to that specific Agreement; and

45

(d)     Any written agreement executed by the Union shall be signed by the International President.

(4)     Upon the termination of this Plan or the complete discontinuance of contributions to the 1974 Pension Trust, this Plan shall remain in force and effect for the period necessary to complete the payment of benefits in accordance with the terms of this Plan to the extent assets in the 1974 Pension Trust are available to pay such benefits.

(5)     Forfeitures arising from the operation of the Plan shall not be used to increase the benefits which otherwise would be received under this Plan.

(6)     Any Participant or beneficiary whose claim for benefits under this Plan has been denied shall be:

(a) provided with adequate notice in writing setting forth the specific reasons for such denial, written in a manner calculated to be understood by the Participant; and

(b) afforded a reasonable opportunity for a full and fair review of the decision denying the claim by an appropriate named fiduciary or a person properly designated to carry out such responsibility.

(7)     The Trustees are hereby authorized to allocate fiduciary responsibilities in any manner permitted pursuant to section 405(c) of ERISA and to appoint an investment manager or managers as permitted by section 402(c) of ERISA.

(8)     Contributions to the 1974 Pension Trust to fund the benefits under this Plan shall be paid solely by the Employers in accordance with Article XX of the National Bituminous Coal Wage Agreement of 2011, as amended from time to time, and any successor agreements to that specific Agreement.

(9)     In the event that this Plan merges or consolidates with, or transfers some or all of its assets or liabilities to, any other plan, no Participant or beneficiary herein shall, solely on account of merger, consolidation or transfer, be entitled to an accrued benefit immediately following such event which is less than the benefit to which such Participant or beneficiary would have been entitled immediately preceding such event. In the event that this Plan transfers some of its assets and liabilities to another plan, the assets transferred shall bear the same proportion to the total Plan assets as the liabilities transferred bear to the total Plan liabilities, but in no event shall the amount of assets transferred exceed the liabilities transferred. When such transfers are to a single employer plan, they shall be accomplished in accordance with Section 4232(f) of ERISA.

46

(10)    In the event that an Employer fails to make the contributions to the Plan required by Article XX of the National Bituminous Coal Wage Agreement of 2011, interest (calculated at a rate established by the Trustees at the beginning of each calendar year) shall accrue from the date due until the date on which payment is made. If the Trustees file suit to collect unpaid contributions, plus accrued interest, and a judgment is entered by the courts in favor of the Trustees, the judgment entered shall provide for an additional amount equal to the accrued interest as liquidated damages.

(11)    Upon the termination or partial termination of the Plan, the rights of all affected Participants to benefits accrued to the date of such termination or partial termination, are nonforfeitable to the extent required by law or to the extent provided for under the National Bituminous Coal Wage Agreement of 2011.

(12)    Except as otherwise provided herein, it shall be unlawful for any part of the assets held pursuant to this Plan, other than such part as is required to pay taxes and administrative expenses, to be used for, or diverted to, purposes other than for the sole and exclusive benefit of the Participants of the Plan except that in the case of a contribution which is made by an Employer by a mistake of fact, or law (other than a mistake relating to Plan qualification), such mistaken contribution may be returned to the Employer within six months after the Trustees determine that the contribution was mistakenly made.

(13)    To the extent not inconsistent with the provisions hereof, the Trustees shall comply with the further requirements imposed upon them by and shall have the further powers contained in Article XX, Sections (e), (f), and (g) of the National Bituminous Coal Wage Agreement of 2011, as amended from time to time, and any successor agreements to that specific Agreement.

(14)    This instrument and the 1974 Pension Trust shall be construed, regulated and administered in accordance with Federal law, and, to the extent not preempted or inconsistent with such Federal law, the laws of the District of Columbia.

(15)    Any action of the Employers which may, or must, be taken hereunder may be taken only by BCOA. Any action which must be taken in writing shall be signed by the President of BCOA. In the event that BCOA ceases to exist, or in the event that more than 50% of the tonnage membership of BCOA on the Effective Date of the 2011 Wage Agreement has withdrawn prior to the time when BCOA is required or permitted to take action under this Article, then such action may be taken by a majority vote, based on tonnage, of existing Employers who were BCOA members on the Effective Date of the 2011 Wage Agreement.

(16)    Any Employer who employed any Participant eligible for coverage under, or who received or receives benefits under, the 1974 Pension Plan, or any Employer who was or

47

is required to make, or who has made or makes contributions to the 1974 Pension Plan and Trust, is obligated and required to comply with the terms and conditions of the 1974 Pension Plan and Trust, as amended from time to time, including, but not limited to, making the contributions required under the National Bituminous Coal Wage Agreement of 1978 as amended from time to time and any successor agreements thereto, including, but not limited to, the National Bituminous Coal Wage Agreement of 2011.

(17)    The Employers, the Union and the Trustees shall fully cooperate to obtain all necessary rulings and do all other acts appropriate to ensure that the 1974 Pension Plan and Trust are qualified under Section 401 of the Internal Revenue Code, and that contributions are deductible under Section 404 of the Internal Revenue Code.

(18)    Notwithstanding any other provision of this Plan to the contrary, a distribution of benefits shall commence to a participant not later than the April 1 of the calendar year following the calendar year in which the Participant attains age 70 ½ and shall be distributed over the life of such Participant or over the lives of such Participant and his surviving spouse, in accordance with Section 401(a)(9) of the Internal Revenue Code and any regulations promulgated thereunder. In the event that the Participant dies before distributions have commenced hereunder, the surviving spouse shall begin to receive a distribution of the benefit, if any, to which such spouse is entitled no later than the date on which the participant would have attained age 70 ½ and shall be distributed over the life of such surviving spouse. With respect to distributions from the Plan made on and after January 1, 2003, the Plan will apply the minimum distribution requirements of Section 401(a)(9) of the Code in accordance with Treasury Regulations Sections 1.401(a)(9)-1 through 1.401(a)(9)-9 that were issued on April 17, 2002 and June 15, 2004. Required distributions shall be made regardless of whether a Participant files an application for benefits.

(19)    Any Participant or beneficiary whose benefit is in pay status may voluntarily authorize the Trustees to check-off an amount from his or her monthly benefit for remittance to the UMWA of Union membership dues, including assessments, initiation fees, credit union, voluntary COMPAC contributions and other voluntary deductions, provided that any such arrangement must be terminable by the Trustees upon reasonable notice, must be revocable by the Participant at any time upon reasonable notice to the Trustees, and either:

(a)    such arrangement must not permit any Participant or beneficiary to check-off an amount exceeding 10% of his or her monthly benefit; or

(b)    the designated recipient must file a written acknowledgement that it has no enforceable right in or to any Plan benefit or portion thereof (except to the extent of payments actually received pursuant to the terms of the arrangement); and an agreement for such check-off is in effect between the Plan and the Union. Any check-off authorization must be in

48

writing, must be voluntary and must comply in all respects with the requirements of the Internal Revenue Code of 1986, as amended, ERISA, the Labor Management Relations Act of 1947, as amended, and any other applicable law.

(20)    (a)    Notwithstanding any provision of the plan to the contrary that would otherwise limit a distributee's election under this part, a distributee may elect, at the time and in the manner prescribed by the Trustees, to have any portion of an eligible rollover distribution paid directly to an eligible retirement plan specified by the distributee in a direct rollover.

(b)    An "eligible rollover distribution" is an eligible rollover distribution within the meaning of Section 402(c)(4) of the Code and, effective August 1, 2009, where applicable, Section 402(c)(11) of the Code, except that an "eligible rollover distribution" does not include:

(i)    Any distribution that is one of a series of substantially equal periodic payments (not less frequently than annually) made for the life (or life expectancy) of the distributee or the joint lives (or joint life expectancies) of the distributee and the distributee's designated beneficiary, or for a specified period of ten (10) years or more;

(ii)    Any distribution to the extent such distribution is required under Section 401(a)(9) of the Code;

(iii)    The portion of any distribution that is not includible in gross income (determined without regard to the exclusion for net unrealized appreciation with respect to employer securities); and

(iv)    Any distribution which is made on account of hardship.

(c)    Effective January 1, 2002, an "eligible retirement plan" is an individual retirement account described in Section 408(a) of the Code, an individual retirement annuity described in Section 408(b) of the Code, an annuity plan described in Section 403(a) of the Code, an annuity contract described in Section 403(b) of the Code and an eligible plan under Section 457(b) of the Code which is maintained by a state, political subdivision of a state, or any agency or instrumentality of a state or political subdivision of a state and which agrees to separately account for amounts transferred into such plan from this Plan, or a qualified trust described in Section 401(a) of the Code, that accepts the eligible rollover distribution. For purposes of the direct rollover provisions in subparagraph (e) of this section of the Plan, a portion of a distribution shall not fail to be an "eligible rollover distribution" merely because the portion consists of after-tax employee contributions which are not includible in gross income.

49

However, such portion may be paid only to an individual retirement account or annuity described in Section 408(a) or (b) of the Code, to a qualified defined contribution plan described in Section 401(a) or 403(a) of the Code, or to a tax-sheltered annuity described in Section 403(b) of the Code that agrees to separately account for amounts so transferred, including separately accounting for the portion of such distribution which is includible in gross income and the portion of such distribution which is not so includible. Effective January 1, 2008, an eligible retirement plan includes a Roth IRA described in Section 408A of the Code, provided the eligible rollover distribution is considered a "qualified rollover contribution" under Section 408A(e) of the Code. Effective August 1, 2009, in the case of an eligible rollover distribution to the designated beneficiary of the Participant who is not the surviving spouse of the Participant, an eligible retirement plan is an individual retirement account or individual retirement annuity.

(d)     A "distributee" includes a Pensioner, a surviving spouse under Article VI, a qualified surviving spouse receiving a benefit under Article VII, and a widow receiving a Widow's Pension pursuant to Article XI. In addition, a Pensioner's surviving spouse and the Pensioner's spouse or former spouse who is an alternate payee under a qualified domestic relations order, as defined in Section 414(q) of the code, are distributees with regard to the interest of the spouse or former spouse. A "distributee" includes an individual who is a designated beneficiary of the Participant and who is not the surviving spouse of the Participant, in accordance with the provisions of Section 402(c)(11) of the Code.

(e)     A "direct rollover" is a payment by the Plan to the eligible retirement plan specified by the distributee.

ARTICLE XIII - PARTICIPANTS COVERED BY A SUCCESSOR PLAN

The following individuals shall cease to be Participants in the Plan and shall not be entitled to benefits hereunder (with respect to Credited Service prior to December 6, 1977):

(1)     A Participant in this Plan who retired prior to December 6, 1977, if the Participant is entitled to a pension under a plan qualified under Section 401(a) of the Internal Revenue Code and established by an employer pursuant to an agreement with the UMWA which is a successor agreement to the Western Surface Coal Wage Agreement of 1975, provided that the pension is at least as great as the pension due under the terms of this Plan in effect on December 5, 1977;

(2)     A Participant in this Plan prior to December 6, 1977, who on or after December 6, 1977, is an employee of a employer which is signatory with the UMWA to a successor agreement to the Western Surface Coal Wage Agreement of 1975, if the Participant becomes a participant in a pension plan qualified under Section 401(a) of the Internal Revenue Code established by such employer pursuant to such agreement, provided that the plan gives credit for

participation, vesting and Credited Service prior to December 6, 1977, determined under the terms of this Plan in effect on December 5, 1977.

## ARTICLE XIV – EMPLOYER WITHDRAWAL LIABILITY

A.    As soon as practicable after an Employer's complete or partial withdrawal, the Trustees shall calculate and demand payment of withdrawal liability in accordance with Section 4219 of ERISA.

B.    The Trustees shall adopt (and modify as appropriate) a reasonable interest assumption used to calculate the value of unfunded vested benefits under the Plan which will be uniformly applicable to withdrawals by all Employers.

C.    The amount of unfunded vested benefits allocable to an Employer that withdraws from the Plan is the product of --

(1)    the unfunded vested benefits of the Plan as of the end of the Plan year preceding the Plan year in which the Employer withdraws, less the value as of the end of such year of all outstanding claims for withdrawal liability which can reasonably be expected to be collected from Employers withdrawing before such year; multiplied by

(2)    a fraction -    (a) the numerator of which is the total number of hours worked for which amounts were required to be contributed by the Employer under the Plan for the last 5 Plan years ending before the withdrawal, and

(b)    the denominator of which is the total number of hours worked for which amounts were required to be contributed under the Plan by all Employers for the last 5 Plan years ending before the withdrawal, decreased by the number of any hours worked for which amounts were required to be contributed to the Plan during those Plan years by Employers who withdrew from the Plan during those Plan years.

(3)    "Hours worked for which amounts were required to be contributed" counted for one Plan year may not be counted for any other Plan year.

D.    For purposes of determining whether a withdrawal has occurred and for purposes of assessing withdrawal liability under this Article, all employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single Employer and all such trades and businesses as a single Employer. (The preceding sentence shall not be deemed to preclude assessing liability under any other applicable law.)

51

E.     Payment of withdrawal liability must begin within 60 days, notwithstanding any request for review or appeal of the determination of the amount of such liability, after the date on which the Trustees notify the Employer of the amount of withdrawal liability. Annual payments are to be made in twelve (12) equal installments, due on the 10th day of each month.

F.     If payment is not made when due, interest on the payment shall accrue from the due date until the date on which the payment is made. Interest on delinquent payment of withdrawal liability shall be payable at the rate established by the PBGC pursuant to Section 4219(c)(6). Default will occur if the Employer fails to make payment when due and then fails to make payment within 60 days after receiving written notice from the Trustees of such failure, or as otherwise determined pursuant to Section 4219(c)(5).

G.     If any Employer defaults on payment (as determined pursuant to Section 4219(c)(5)), the Trustees shall require immediate payment of the outstanding amount of withdrawal liability, plus accrued interest on the total outstanding liability from the due date of the first payment which was not timely made. If the Trustees file suit to collect the outstanding balance of withdrawal liability, plus accrued interest, and a judgment is entered by the court in favor of the Trustees, the judgment entered shall provide for an additional amount equal to 20% of the outstanding amount of withdrawal liability as liquidated damages. The Trustees shall have the authority to promulgate rules regarding default and an arbitration procedure.

H.     An Employer is entitled to prepay the outstanding amount of any unpaid withdrawal liability, plus accrued interest, if any, in whole or in part, without penalty. However, if the pre-payment is made pursuant to a withdrawal which is later determined to be part of a withdrawal described in Section 4219(c)(l)(D) of ERISA, the withdrawal liability of the Employer shall not be limited to the amount of pre-payment.

I.     In the event that this Plan terminates, an Employer's obligation to make payments under this Article ceases at the end of the Plan year in which the assets of this Plan (exclusive of withdrawal liability claims) are sufficient to meet all obligations of this Plan, as determined by the PBGC.

J.     In conformance with Section 4208(c) of ERISA, in any Plan year following an Employer's partial withdrawal under Section 4205(a)(l) of ERISA, when the number of contribution base units with respect to which the Employer has an obligation to contribute for such year equals or exceeds 130% of the number of contribution base units with respect to which the Employer had an obligation to contribute in the partial withdrawal year, the amount of the Employer's partial withdrawal liability payment for such year shall be reduced pro rata, in accordance with PBGC regulations.

52

K.     The presumptive partial withdrawal rules in Section 4205(a) and (b) of ERISA shall apply to this Plan.

L.     A complete or partial withdrawal of an Employer (hereinafter in this section referred to as the "seller") under this Plan does not occur solely because, as a result of a bona fide, arm's-length sale of assets to an unrelated party (hereinafter in this section referred to as the "purchaser"), the seller ceases covered operations or ceases to have an obligation to contribute for such operations, if --

(1)     the purchaser is, or becomes at the time of the sale, signatory to the Wage Agreement or any other collective bargaining agreement entered into with the United Mine Workers of America which provides that contributions at the same rate as contributions required under the Wage Agreement shall be made to this Plan;

(2)     the purchaser has an obligation to contribute to this Plan with respect to the operations for substantially the same employees and the same number of contribution base units for which the seller had an obligation to contribute to this Plan;

(3)     the purchaser provides to the Plan for a period of 5 plan years commencing with the first plan year beginning after the sale of assets, a bond or escrow deposit meeting the requirements of Section 4204 (a)(1)(B). If the Plan is in reorganization, the amount of such bond or escrow deposit shall be twice the amount provided in Section 4204 (a)(1)(B).

(4)     the contract for sale provides that, if the purchaser withdraws in a complete withdrawal, or a partial withdrawal with respect to operations, during such first 5 Plan years, the seller is secondarily liable for any withdrawal liability the seller would have had to this Plan with respect to the operations (but for this section) if the liability of the purchaser with respect to this Plan is not paid.

If the purchaser --

(1)     withdraws before the last day of the fifth plan year beginning after the sale, and

(2)     fails to make any withdrawal liability payment when due, because of a complete or partial withdrawal, then the seller shall pay to this Plan an amount equal to the payment that would have been due from the seller but for this section.

If all, or substantially all, of the seller's assets are distributed, or if the seller is liquidated before the end of the 5 plan year period described above, then the seller shall provide a bond issued by a corporate surety company that is an acceptable surety for purposes of Section 412 of ERISA, or

53

an amount held in escrow by a bank or similar financial institution satisfactory to the Trustees, in an amount equal to the present value of the withdrawal liability the seller would have had but for this paragraph.

If only a portion of the seller's assets are distributed during such period, then a bond or escrow shall be required, in accordance with rules established by the Trustees, to the extent consistent with PBGC regulations.

The liability of the party furnishing a bond or escrow under the above paragraph shall be reduced, upon payment of the bond thereof.

For the purposes of this section, the liability of the purchaser shall be determined as if the purchaser had been required to contribute to this Plan in the year of the sale and the 4 plan years preceding the sale based on the same number of hours worked for which amounts were required to be contributed by the seller for such operations for such 5 plan years.

M.    Special Rules Following Merger

a.    Liability for a withdrawal occurring on June 30, 2007 will be calculated under the terms of the 1950 Pension Plan and the 1974 Pension Plan as they existed prior to that date, consistent with 29 C.F.R. §§ 4211.31(d), 4211.37.

b.    Notwithstanding the foregoing, the amount of unfunded vested benefits allocable to an Employer that withdraws from the Plan on or after July 1, 2007 is the sum of the Employer's proportional share, if any, of the unamortized amount of the Plan's unfunded vested benefits for the plan year ending June 30, 2007 (determined under 29 C.F.R. § 4211.34 (b)) and the Employer's proportional share, if any, of the unamortized amount of the unfunded vested benefits arising after the plan year ending June 30, 2007 (as determined under 29 C.F.R. § 4211.34 (c), except using "hours worked for which amounts were required to be contributed" instead of amount of contributions or amounts required to be contributed in determining the Employer's proportional share, and using a fifteen year amortization period, as permitted in 29 C.F.R. § 4211.36(c)(2)).

N.    Definitions

a.    For purposes of this Article XIV, "hours worked for which amounts were required to be contributed" means all hours for which the Employer actually owed contributions to the Plan as well as all hours for which the Employer would have owed contributions to the Plan had the contribution rate been greater than 0¢ per hour.

54

b.    For purposes of Section 4219(c)(1)(C)(i)(I) and any other provision of ERISA or this Plan requiring the use of contribution base units, for any withdrawal occurring on or after July 1, 2003, the term "contribution base units" shall have the same meaning as "hours worked for which amounts were required to be contributed."

APPENDIX A

<u>1974 PENSIONERS</u>

ACTUARIAL EQUIVALENCE FACTORS FOR DEFERRED VESTED
RETIREMENT BENEFITS COMMENCING PRIOR TO AGE 62

The following factors are to be multiplied by the full accrued benefit payable commencing at normal
retirement age 62 to yield the equivalent benefit payable commencing at the indicated age:

| AGE Years | Months | Actuarial Equivalence Factor | AGE Years | Months | Actuarial Equivalence Factor |
|---|---|---|---|---|---|
| 55 | 0 | .522 | 56 | 0 | .569 |
| | 1 | .526 | | 1 | .573 |
| | 2 | .529 | | 2 | .577 |
| | 3 | .533 | | 3 | .582 |
| | 4 | .537 | | 4 | .586 |
| | 5 | .541 | | 5 | .590 |
| | 6 | .545 | | 6 | .595 |
| | 7 | .549 | | 7 | .599 |
| | 8 | .553 | | 8 | .604 |
| | 9 | .557 | | 9 | .608 |
| | 10 | .561 | | 10 | .612 |
| | 11 | .565 | | 11 | .617 |
| 57 | 0 | .621 | 58 | 0 | .680 |
| | 1 | .626 | | 1 | .685 |
| | 2 | .631 | | 2 | .691 |
| | 3 | .636 | | 3 | .696 |
| | 4 | .641 | | 4 | .702 |
| | 5 | .646 | | 5 | .707 |
| | 6 | .651 | | 6 | .713 |
| | 7 | .655 | | 7 | .718 |
| | 8 | .660 | | 8 | .724 |
| | 9 | .665 | | 9 | .729 |
| | 10 | .670 | | 10 | .735 |
| | 11 | .675 | | 11 | .740 |
| 59 | 0 | .746 | 60 | 0 | .820 |
| | 1 | .752 | | 1 | .827 |
| | 2 | .758 | | 2 | .834 |
| | 3 | .765 | | 3 | .841 |
| | 4 | .771 | | 4 | .848 |

|    |    |       |    |   |       |
|----|----|-------|----|---|-------|
|    | 5  | .777  |    | 5 | .855  |
|    | 6  | .783  |    | 6 | .863  |
|    | 7  | .789  |    | 7 | .870  |
|    | 8  | .796  |    | 8 | .877  |
|    | 9  | .802  |    | 9 | .884  |
|    | 10 | .808  |    | 10| .891  |
|    | 11 | .814  |    | 11| .898  |
| 61 | 0  | .905  | 62 | 0 | 1.000 |
|    | 1  | .913  |    |   |       |
|    | 2  | .920  |    |   |       |
|    | 3  | .928  |    |   |       |
|    | 4  | .936  |    |   |       |
|    | 5  | .944  |    |   |       |
|    | 6  | .952  |    |   |       |
|    | 7  | .960  |    |   |       |
|    | 8  | .968  |    |   |       |
|    | 9  | .976  |    |   |       |
|    | 10 | .984  |    |   |       |
|    | 11 | .992  |    |   |       |

Actuarial Basis: 95% of 1959-61 U.S. Total Male Population
Mortality Table at 5% Interest.

57

APPENDIX B

TABLE OF PERCENTAGES TO BE APPLIED
AGAINST PENSION PAYABLE TO PARTICIPANT
UNDER JOINT AND SURVIVOR ANNUITIES

| AGE OF SPOUSE* | AGE OF PARTICIPANT* | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 55 % | 56 % | 57 % | 58 % | 59 % | 60 % | 61 % | 62 % |
| 50 | 85.1 | 84.2 | 83.3 | 82.3 | 81.2 | 80.2 | 79.1 | 77.9 |
| 51 | 85.6 | 84.7 | 83.7 | 82.7 | 81.7 | 80.7 | 79.6 | 78.5 |
| 52 | 86.0 | 85.1 | 84.2 | 83.2 | 82.2 | 81.2 | 80.1 | 79.0 |
| 53 | 86.5 | 85.6 | 84.7 | 83.7 | 82.8 | 81.7 | 80.7 | 79.6 |
| 54 | 86.9 | 86.1 | 85.2 | 84.3 | 83.3 | 82.3 | 81.2 | 80.1 |
| 55 | 87.4 | 86.6 | 85.7 | 84.8 | 83.8 | 82.8 | 81.8 | 80.7 |
| 56 | 87.9 | 87.1 | 86.2 | 85.3 | 84.4 | 83.4 | 82.4 | 81.3 |
| 57 | 88.3 | 87.5 | 86.7 | 85.8 | 84.9 | 84.0 | 83.0 | 81.9 |
| 58 | 88.8 | 88.0 | 87.2 | 86.4 | 85.5 | 84.5 | 83.6 | 82.6 |
| 59 | 89.3 | 88.5 | 87.7 | 86.9 | 86.0 | 85.1 | 84.2 | 83.2 |
| 60 | 89.7 | 89.0 | 88.3 | 87.4 | 86.6 | 85.7 | 84.8 | 83.8 |
| 61 | 90.2 | 89.5 | 88.8 | 88.0 | 87.2 | 86.3 | 85.4 | 84.5 |
| 62 | 90.7 | 90.0 | 89.3 | 88.5 | 87.7 | 86.9 | 86.0 | 85.1 |

* Age to nearest birthday.

Pension payable to qualified surviving spouse pursuant to Article VII (A) or XI (E)(1) will be equal to 50% of the Participant's Pension as reduced in accordance with the above Table. The benefit payable to a qualified surviving spouse under Article VII (B) will be equal to 75% of the 1974 Participant's Pension reduced in accordance with the above table.

IN WITNESS WHEREOF, the Employers and the Union, pursuant to proper authority, have caused this instrument, effective December 6, 1974, and amended as of July 1, 2011, to be signed by their proper officers or representatives in Washington, D.C. on this _27th_ day of _September_, 2011.

UNITED MINE WORKERS OF AMERICA

BITUMINOUS COAL OPERATORS' ASSOCIATION, INC.

_Cecil E. Roberts_
International President

_Daniel M. Young_
President

Accepted by:

Dated: __10/25/11__

_Michael H. Holland_
Trustee

Dated: __10/25/11__

_Michael Buckner_
Trustee

Dated: __10/25/11__

_B V Hyler_
Trustee

Dated: __10/25/11__

_Steven F. Schaab_
Trustee

59

INTERNAL REVENUE SE     .CE

P.O. BOX 13163 RM. 615
BALTIMORE, MD 21203

PLAN NAME   UNITED MINE WORKERS OF AMERICA
            1974 PENSION PLAN

BOARD OF TRUSTEES UNITED WORKERS
OF AMERICA
2021 K STREET NW
WASHINGTON, DC 20006

CASE NO 52634902EP
CONTROL DATE    11-24-76
FORM NO       5303
EMP ID NO 52-9999999
PLAN NO        002
FILE NO 520012910

DATE OF THIS LETTER
SEP     1977

Dear Applicant:

Based on the information supplied, we have made a favorable determination on your application identified above. Please keep this letter in your permanent records.

Continued qualification of the plan will depend on its effect in operation under its present form. (See section 1.401-1(b)(3) of the Income Tax Regulations.) The status of the plan in operation will be reviewed periodically.

The enclosed Publication 794 describes some events that could occur after you receive this letter that would automatically nullify it without specific notice from us. The publication also explains how operation of the plan may affect a favorable determination letter, and contains information about filing requirements.

This letter relates only to the status of your plan under the Internal Revenue Code. It is not a determination regarding the effect of other Federal or local statutes.

Please see Form 5616, enclosed, which is an integral part of this determination letter.

Sincerely yours,

Gerald D. Portney
DISTRICT DIRECTOR

Enclosures:
Publication 794
Form 5616

FORM 5869 (REV. 4-77)

CONFIDENTIAL                        1974PLAN_002911

| Form. **5616** May 1976 | partment of the Treasury - Internal Revenue S    e **Enclosure to Favorable Determination Letter** | | Case Number 5363490₂EP |
|---|---|---|---|

| Date Adopted or Amended *DECEMBER  6, 1974* *JUNE    9, 1977* | Person to Contact *FRANK J. WILHELM* | Telephone Number *301-962-3427* |
|---|---|---|

For your information, we have listed the following items that may apply to your plan, including some which may cause a plan to become disqualified in operation. If no items* are checked, none apply to your plan.

☒ C.  This determination is not an indication that the Internal Revenue Service is in any way passing on the actuarial soundness of the plan or on the reasonableness of the actuarial computations.

☐ D.  This determination letter is conditioned upon your adoption of the proposed amendments submitted in your letter dated                     . Please submit a signed and dated copy of the amendments within 30 days from the date of this letter.

☐ E.  This determination letter is conditioned upon your adoption of the proposed amendments submitted in your representative's letter dated                     . Please submit a signed and dated copy of the amendments within 30 days from the date of this letter.

☐ F.  This plan is considered as applying only to employees who can retire and obtain benefits during the term for which it is drawn; no other employees are considered covered. Therefore, the provision of section 404 of the Internal Revenue Code will be applied only to covered employees.

☐ G.  The trust, not having been created or organized in the United States, is not a qualified trust under section 401(a) and is not exempt under section 501(a) of the Internal Revenue Code. Based on the information you submitted, however, we have determined that the trust is part of a plan which meets the requirements of section 401(a) in all other respects and that it would qualify for exemption under section 501(a) except for the fact that it is created or organized outside the United States. Therefore, distributions to beneficiaries will be taxable as though made through an exempt trust, as provided in section 402(c). Deductions for contributions made by the employer, who is a domestic corporation or resident of the United States, are allowable as provided in section 404(a)(4) of the Code.

☐ H.  This determination letter is not applicable beginning with any year in which discrimination prohibited by section 401(a)(4) of the Internal Revenue Code arises because of the years of service weighing factor applied in allocating employer contributions. (See Rev. Rul. 68-653, 1968-2 C.B. 177.)

☐ J.  Your plan does not consider total compensation for purposes of computing benefits. This provision may, in operation, discriminate in favor of employees who are stockholders, officers, or highly compensated. If this discrimination occurs, your plan will not remain qualified. (See Rev. Rul. 69-503, 1969-2 C.B. 94.)

☐ K.  This determination applies to tax years beginning after

☒ L.  We have sent a copy of this letter to your representative as indicated in the power of attorney.

☐ M.

If you have any questions, please contact the person whose name and telephone number are shown on the top of this form and refer to the EIN-Plan Number and File Folder Number in the heading of the letter.

*Checkbox code letters are for Internal Revenue Service use.                     Form **5616** (5-76)

**CONFIDENTIAL**                     **1974PLAN_002912**

**U.S. DEPARTMENT OF LABOR**

Pension and Welfare Benefit Programs

Washington, D.C. 20216



To:  Administrators of Employee Pension
     and Welfare Benefit Plans

The Employee Retirement Income Security Act of 1974 (ERISA) requires administrators of <u>employee pension benefit plans</u> (pension, profit sharing and other plans that provide retirement income to employees or result in a deferral of income by employees for periods extending to the termination of covered employment or beyond), and <u>employee welfare benefit plans</u> (medical, surgical, hospital, sickness, accident, disability, death, unemployment, vacation, apprenticeship, day care centers, scholarship funds, prepaid legal services, etc.) to meet certain reporting and disclosure requirements.  Within 120 days after a new plan comes into existence, plan administrators are to file a plan description with the Secretary of Labor on Form EBS-1.  A summary plan description must be filed with the Secretary of Labor and furnished each plan participant and beneficiary.  An exception to the foregoing is that a Form EBS-1 need not be filed with the Secretary of Labor for a non-trusteed welfare plan with fewer than 100 partici-pants.

To obtain a copy of Plan Description Form EBS-1 or information about the summary plan description and other reporting and disclosure requirements of ERISA, contact the nearest Area Office of the Labor Department's Labor-Management Services Administration (see list on reverse side).

Administrator
Pension and Welfare
Benefit Programs
U.S. Department of Labor

LMSA 645 (4/77)

**CONFIDENTIAL**

# Favorable Determination Letter

Publication 794
(Revised November 1976)

## Operational Features which Affect the Qualified Status of a Plan and Plan Reporting Requirements

### Part I. Significance of a Favorable Determination Letter

An employer may use a favorable determination letter as a basis for deducting on the income tax return the contributions to a plan. The qualification of a plan is determined from the information in the written plan document and supporting information submitted by the employer, and indicates that the features of the plan conform with the requirements of Internal Revenue Code Section 401(a). But it is the actual operation of the plan that governs its continued qualification.

A plan qualifies in operation if it is maintained according to the terms and limitations on which a favorable determination letter was issued. However, many conditions can develop during operation that are inconsistent with the features in the written plan document, and they may jeopardize the plan's qualification. The following items are examples of the more common operational features that adversely affect a favorable determination.

**Coverage Requirements.** If coverage is based on the percentage requirement of Section 410(b)(1)(A) of the Code, and this requirement is not met after the issuance of the favorable determination letter, the taxpayer may not rely on the letter.

Similarly, if coverage is based on the requirement of Section 410(b)(1)(B) of the Code and the coverage of employees in the lower and middle compensation ranges is reduced materially in any subsequent year from that in the application, a favorable determination letter may not apply.

A plan will be considered as meeting these coverage requirements during the whole taxable year if on any one day of each quarter it satisfies the requirements.

**Allocation of Forfeitures.** If employee turnover results in the allocation of forfeitures principally to the benefit of officers, shareholders, and highly compensated employees, a favorable determination will not apply.

**Amendments to the Plan.** A Revenue Ruling can also adversely affect a favorable determination letter but only for years after the Ruling is issued. Hence, all plans must be amended to comply with relevant Rulings. The amendment must be effective not later than the first day of the first taxable year beginning after the Ruling is published.

### Part II. Reporting Requirements

Each plan administrator or employer who maintains an employee benefit plan must file an annual return/report with both the Internal Revenue Service and the Department of Labor. The forms developed for this purpose are Form 5500 (Corporate or Keogh plan with 100 or more participants), Form 5500-C (Corporate or Keogh plan with fewer than 100 participants, none of whom is an owner-employee), and Form 5500-K (Keogh plan with fewer than 100 participants and at least one owner-employee). The return/report is published in a package which includes the necessary attachments as well as filing requirements and instructions.

CONFIDENTIAL

JA 001068

INTERNAL REVENUE SERVICE

P.O. Box 13163, Room 615
Baltimore, MD 21203

| | |
|---|---|
| Case Number: | 52912002LP |
| C rol Date: | 04-23-79 |
| Form Number: | 5303 |
| Employer ID Number: | 52-7777777 |
| Plan Number: | 002 |
| File Number: | 520012910 |

Plan    United Mine Workers of America
Name:   1974 Pension Plan

DATE OF THIS LETTER

United Mine Workers of America
Board of Trustees
2021 K Street, N.W.
Washington, D.C.  20006

NOV 1 3 1979

Dear Applicant:

Based on the information supplied, we have made a favorable determination on your application identified above. Please keep this letter in your permanent records.

Continued qualification of the plan will depend on its effect in operation under its present form. (See section 1.401-1(b)(3) of the Income Tax Regulations.) The status of the plan in operation will be reviewed periodically.

The enclosed Publication 794 describes some events that could occur after you receive this letter that would automatically nullify it without specific notice from us. The publication also explains how operation of the plan may affect a favorable determination letter, and contains information about filing requirements.

This letter relates only to the status of your plan under the Internal Revenue Code. It is not a determination regarding the effect of other Federal or local statutes.

Please see Form 5616, enclosed, which is an integral part of this determination letter.

Sincerely yours,

Donald L. Brickman

DISTRICT DIRECTOR

Enclosures:
Publication 794
Form 5616

FORM 5869 (REV 4-77)

CONFIDENTIAL

| Form. **5616**<br>(Rev. 4-78) | Department of the Treasury - Internal Revenue Service<br>**Enclosure to Favorable Determination Letter** | | Case Number<br>*5291200?5* |
|---|---|---|---|
| Date Adopted or Amended<br>*JUNE 1, 1978* | Person to Contact<br>*FRANKLIN J. WILHELM* | Telephone Number<br>*301-962-3650* | |

For your information, we have listed the following items that may apply to your plan, including some which may cause a plan to become disqualified in operation. If no items* are checked, none apply to your plan. Please also see Publication 794, which is reprinted on the back of this form.

☒ **C.** This determination is not an indication that the Internal Revenue Service is in any way passing on the actuarial soundness of the plan or on the reasonableness of the actuarial computations.

☐ **D.** This determination letter is conditioned upon your adoption of the proposed amendments submitted in your letter dated              . The adoption of the proposed amendments should be made on or before the date prescribed by the regulations under section 401(b) of the Internal Revenue Code.

☐ **E.** This determination letter is conditioned upon your adoption of the proposed amendments submitted in your representative's letter dated              . The adoption of the proposed amendments should be made on or before the date prescribed by the regulations under section 401(b) of the Internal Revenue Code.

☐ **F.** This plan is considered as applying only to employees who can retire and obtain benefits during the term for which it is drawn; no other employees are considered covered. Therefore, the provision of section 404 of the Internal Revenue Code will be applied only to covered employees.

☐ **G.** The trust, not having been created or organized in the United States, is not a qualified trust under section 401(a) and is not exempt under section 501(a) of the Internal Revenue Code. Based on the information you submitted, however, we have determined that the trust is part of a plan which meets the requirements of section 401(a) in all other respects and that it would qualify for exemption under section 501(a) except for the fact that it is created or organized outside the United States. Therefore, distributions to beneficiaries will be taxable as though made through an exempt trust, as provided in section 402(c). Deductions for contributions made by the employer, who is a domestic corporation or resident of the United States, are allowable as provided in section 404(a)(4) of the Code.

☐ **H.** This determination letter is not applicable beginning with any year in which discrimination prohibited by section 401(a) (4) of the Internal Revenue Code arises because of the years of service weighing factor applied in allocating employer contributions. (See Rev. Rul. 68-653, 1968-2 C.B. 177.)

☐ **J.** Your plan does not consider total compensation for purposes of computing benefits. This provison may, in operation, discriminate in favor of employees who are stockholders, officers, or highly compensated. If this discrimination occurs, your plan will not remain qualified. (See Rev. Rul. 69-503, 1969-2 C.B. 94.)

☐ **K.** This determination applies to tax years beginning after

☒ **L.** We have sent a copy of this letter to your representative as indicated in the power of attorney.

☒ **M.** *THE ATTACHED LETTER SUPERSEDES OUR PRIOR LETTER ISSUED NOVEMBER 13, 1979.*

If you have any questions, please contact the person whose name and telephone number are shown above and refer to the EIN-Plan Number and File Folder Number in the heading of the letter.

*Checkbox code letters are for Internal Revenue Service use.

**CONFIDENTIAL**

**1974PLAN_002916**

## Labor-Management Services Administration Area Offices

ATLANTA, Georgia  30309
1365 Peachtree St., N.E.
(404) 881-4090

BOSTON, Massachusetts  02108
110 Tremont St.
(617) 223-6736

BUFFALO, New York  14202
111 West Huron St.
(716) 846-4861

CHICAGO, Illinois  60604
175 W. Jackson Blvd.
(312) 353-7264

CLEVELAND, Ohio  44199
1240 East 9th St.
(216) 522-3855

DALLAS, Texas  75202
555 Griffin Square Bldg.
(214) 749-2886

DENVER, Colorado  80294
1961 Stout St.
(303) 837-5061

DETROIT, Michigan  48226
231 W. Lafayette St.
(313) 226-6200

HONOLULU, Hawaii  96850
300 Ala Moana
(808) 546-8984

KANSAS CITY, Missouri  64106
911 Walnut St.
(816) 374-5261

LOS ANGELES, California  90012
300 N. Los Angeles St.
(213) 688-4975

MIAMI, Florida  33169
111 N.W. 183rd St.
(305) 350-4611

MINNEAPOLIS, Minnesota  55401
110 S. 4th Street
(612) 725-2292

NASHVILLE, Tennessee  37203
1808 West End Bldg.
(615) 251-5906

NEWARK, New Jersey  07102
744 Broad St.
(201) 645-3016

NEW ORLEANS, Louisiana  70130
600 South St.
(504) 589-6173

NEW YORK, New York  10007
26 Federal Plaza
(212) 264-1973

PHILADELPHIA, Pennsylvania  19106
601 Market St.
(215) 597-4961

PITTSBURGH, Pennsylvania  15222
1000 Liberty Ave.
(412) 644-2925

ST. LOUIS, Missouri  63101
210 N. 12th Blvd.
(314) 425-4691

SAN FRANCISCO, California  94105
211 Main St.
(415) 556-2030

HATO REY, Puerto Rico  00918
Carlos Chardon St.
(809) 753-4096

SEATTLE, Washington  98174
909 First Ave.
(206) 442-5216

WASHINGTON, D.C.  20036
1111 20th St., N.W.
(202) 254-6510

JA 001071

INTERNAL REVENUE SERVICE
P.O. BOX 13163 Rm. 515
BALTIMORE, MD 21203

PLAN UNITED MINE WORKERS OF AMERICA
NAME 1950 PENSION PLAN
1974

UNITED MINE WORKERS OF AMERICA
BOARD OF TRUSTEES
2021 K STREET NW
WASHINGTON, DC 20006

```
CASE NO   52912002EP
CONTROL DATE   04-23-79
FORM NO           5303
EMP ID NO  52-7777777
PLAN NO            002
FILE NO   520012910
```
DATE OF THIS LETTER

**NOV 13 1979**

Dear Applicant:

Based on the information supplied, we have made a favorable determination on your application identified above. Please keep this letter in your permanent records.

Continued qualification of the plan will depend on its effect in operation under its present form. (See section 1.401-1(b)(3) of the Income Tax Regulations.) The status of the plan in operation will be reviewed periodically.

The enclosed Publication 794 describes some events that could occur after you receive this letter that would automatically nullify it without specific notice from us. The publication also explains how operation of the plan may affect a favorable determination letter, and contains information about filing requirements.

This letter relates only to the status of your plan under the Internal Revenue Code. It is not a determination regarding the effect of other Federal or local statutes.

Please see Form 5616, enclosed, which is an integral part of this determination letter.

Sincerely yours,

*Donald L. Brihan*

DISTRICT DIRECTOR

Enclosures:
Publication 794
Form 5616

FORM 5869 (REV. 4-77)

**CONFIDENTIAL**

**1974PLAN_002918**

| Form **5616** (Rev. 4-78) | Department of the Treasury - Internal Revenue Service | | Case Number |
|---|---|---|---|
| | **Enclosure to Favorable Determination Letter** | | 5291/2002 ᴾ |
| Date ~~Adopted or~~ Amended | Person to Contact | Telephone Number | |
| JUNE 1, 1978 | FRANKLIN J. WILHELM | 301-962-3650 | |

For your information, we have listed the following items that may apply to your plan, including some which may cause a plan to become disqualified in operation. If no items* are checked, none apply to your plan. Please also see Publication 794, which is reprinted on the back of this form.

☒ C.  This determination is not an indication that the Internal Revenue Service is in any way passing on the actuarial soundness of the plan or on the reasonableness of the actuarial computations.

☐ D.  This determination letter is conditioned upon your adoption of the proposed amendments submitted in your letter dated            . The adoption of the proposed amendments should be made on or before the date prescribed by the regulations under section 401(b) of the Internal Revenue Code.

☐ E.  This determination letter is conditioned upon your adoption of the proposed amendments submitted in your representative's letter dated            . The adoption of the proposed amendments should be made on or before the date prescribed by the regulations under section 401(b) of the Internal Revenue Code.

☐ F.  This plan is considered as applying only to employees who can retire and obtain benefits during the term for which it is drawn; no other employees are considered covered. Therefore, the provision of section 404 of the Internal Revenue Code will be applied only to covered employees.

☐ G.  The trust, not having been created or organized in the United States, is not a qualified trust under section 401(a) and is not exempt under section 501(a) of the Internal Revenue Code. Based on the information you submitted, however, we have determined that the trust is part of a plan which meets the requirements of section 401(a) in all other respects and that it would qualify for exemption under section 501(a) except for the fact that it is created or organized outside the United States. Therefore, distributions to beneficiaries will be taxable as though made through an exempt trust, as provided in section 402(c). Deductions for contributions made by the employer, who is a domestic corporation or resident of the United States, are allowable as provided in section 404(a)(4) of the Code.

☐ H.  This determination letter is not applicable beginning with any year in which discrimination prohibited by section 401(a)(4) of the Internal Revenue Code arises because of the years of service weighing factor applied in allocating employer contributions. (See Rev. Rul. 68-653, 1968-2 C.B. 177.)

☐ J.  Your plan does not consider total compensation for purposes of computing benefits. This provision may, in operation, discriminate in favor of employees who are stockholders, officers, or highly compensated. If this discrimination occurs, your plan will not remain qualified. (See Rev. Rul. 69-503, 1969-2 C.B. 94.)

☐ K.  This determination applies to tax years beginning after

☒ L.  We have sent a copy of this letter to your representative as indicated in the power of attorney.

☐ M.

If you have any questions, please contact the person whose name and telephone number are shown above and refer the EIN-Plan Number and File Folder Number in the heading of the letter.

For Internal Revenue Service use.

Form 5616 (Rev. 4

**CONFIDENTIAL**

U.S. DEPARTMENT OF LABOR
LABOR-MANAGEMENT SERVICES ADMINISTRATION
Pension and Welfare Benefit Programs
Washington, D.C. 20216



To:  Administrators of Employee Pension
     and Welfare Benefit Plans


The Employee Retirement Income Security Act of 1974 (ERISA) requires
administrators of employee pension benefit plans (pension, profit
sharing and other plans that provide retirement income to employees
or result in a deferral of income by employees for periods extending
to the termination of covered employment or beyond), and employee
welfare benefit plans (medical, surgical, hospital, sickness, accident,
disability, death, unemployment, vacation, training, scholarship funds,
prepaid legal services, etc.) to meet certain reporting and disclosure
requirements. Within 120 days after a new plan comes into existence,
plan administrators are to file a plan description with the Secretary
of Labor on Form EBS-1.  A summary plan description also must be filed
with the Secretary of Labor and furnished each plan participant and
beneficiary within 120 days after the establishment of a plan.  However,
certain fully insured welfare plans with fewer than 100 participants
are exempt from the requirement to file with the Secretary a Form EBS-1
and a summary plan description.

To obtain a copy of Plan Description Form EBS-1 or information about
the summary plan description and other reporting and disclosure require-
ments of ERISA, contact the nearest Area Office of the Labor Department's
Labor-Management Services Administration (see list on reverse side).

Ian D. Lanoff
Administrator
Pension and Welfare
Benefit Programs
U.S. Department of Labor


LMSA 645 (5/78)


**CONFIDENTIAL**                    **1974PLAN_002920**

Department of the Treasury
Internal Revenue Service

BX 13163, RM 615, ATT CH: EP/EO DIV          In reply refer to: 52015052
BALTIMORE, MD  21203               AUG. 10, 1982     LTR 835C      9029
                                   52-1050282


BOARD OF TRUSTEES UNITED MINE
WORKERS OF AMERCA 1974 PENSION TRUS
2021 K STREET NW
WASHINGTON, DC  20006


District Office Code and
Case Serial Number: 52209501EP
Name of Plan: United Mine Workers Of American
              1974 Pension Plan
Application Form: 5303
Date Amended: June 7, 1981
Employer Identification Number: 52-1050282
Plan Number: 002
File Number: 520012910

Dear Applicant:

Based on the information supplied, we have made a favorable
determination on your application identified above.  Please keep
this letter in your permanent records.

Continued qualification of the plan will depend on its effect in
operation under its present form.  (See section 1.401-1(b)(3) of the
Income Tax Regulations.)  The status of the plan in operation will be
reviewed periodically.

The enclosed document describes some events that could occur after
you receive this letter that would automatically nullify it without
specific notice from us.  The document also explains how operation of
the plan may affect a favorable determination letter, and contains
information about filing requirements.

This letter relates only to the status of your plan under the
Internal Revenue Code.  It is not a determination regarding the
effect of other Federal or local statutes.

We have sent a copy of this letter to your representative as
indicated in the power of attorney.

This determination also applies to the amendments dated March
26,1982 and June 29, 1982.

If you have any questions, please contact F. Wilhelm at
301-962-3650.

                              Sincerely yours,

Department of the Treasury
Internal Revenue Service

52015052

AUG. 10, 1982      LTR 835C      9029
52-1050282

BOARD OF TRUSTEES UNITED MINE
WORKERS OF AMERCA 1974 PENSION TRUS
2021 K STREET NW
WASHINGTON, DC   20006

District Director

Enclosure(s):
Publication 794

1974PLAN_002922

Department of the Treasur
Internal Revenue Service
BX 13163, RM 615, ATT CH, EP/EO DIV
BALTIMORE  MD  21203-0000

In reply refer to:  52130063
MAY  13, 1986   LTR 835C
52-1050282P

02996

BOARD OF TRUSTEES UNITED MINE WORKE
 RS OF AMERICA 1974
2021 K STREET NW
WASHINGTON  DC  20006


District Office Code and
Case Serial Number: 525224016 EP
Name of Plan: United Mine Workers Of America 1974
             Pension Plan
Application Form: 5303
Date Amended: Feb. 07, 1985
Employer Identification Number: 52-1050282
Plan Number: 002
File Number: 520012910

Dear Applicant:

Based on the information supplied, we have made a favorable
determination on your application identified above.  Please keep
this letter in your permanent records.

Continued qualification of the plan will depend on its effect in
operation under its present form.  (See section 1.401-1(b)(3) of the
Income Tax Regulations.)  The status of the plan in operation will be
reviewed periodically.

The enclosed document describes some events that could occur after
you receive this letter that would automatically nullify it without
specific notice from us.  The document also explains how operation of
the plan may affect a favorable determination letter, and contains
information about filing requirements.

This letter relates only to the status of your plan under the
Internal Revenue Code.  It is not a determination regarding the
effect of other Federal or local statutes.

This determination does not indicate that the Internal Revenue
Service is in any way passing on the actuarial soundness of the plan
or on the reasonableness of the actuarial computations.

We have sent a copy of this letter to your representative as
indicated in the power of attorney.

If you have any questions, please contact R d morris at
488-3100.

Department of the Treasury
Internal Revenue Service

```
                                                     52130063
                          MAY  13, 1986    LTR 835C
                          52-1050282P
                                                       02997
```

BOARD OF TRUSTEES UNITED MINE WORKE
 RS OF AMERICA 1974
2021 K STREET NW
WASHINGTON  DC  20006

Sincerely yours,

District Director

Enclosure(s):
Publication 794
Publication OPWBP 515

**CONFIDENTIAL**                                    **1974PLAN_002924**

Internal Revenue Se ce          Department o .he Treasury

District                 Baltimore District
Director

▷ MAY 0 1 1990                          Person To Contact:
*Board of Trustees United*              EP/EO Tax Examiner
*mine workers of America 1974*
*Pension Trust*                         Telephone Number:
*2021 K street NW*                      (301) 962-6058
*Washington, DC 20006*
                                        Refer Reply to:
                                        EP/EO:TPA
                                        Room 1618

                                        Date: *May 1, 1990*


Dear Sir/Madam:

You recently submitted a request for a corrected favorable determination
letter for the plan sponsor identified below.  Enclosed is a copy of the
corrected letter and, if applicable, a copy for the Power of Attorney of
record.

If you have any further questions regarding this letter, you may contact
the Tax Examiner identified below.


                              Sincerely,



                              Tax Examiner
                              EP/EO Taxpayer Assistance Unit



Sponsor(s)

    _____

    _____

    _____

internal Revenue Service
District Director

epartment of the Treasury

31 HOPKINS PLAZA
BALTIMORE, MD  21201-0000

Date:  MAY 0 1 1990

BOARD OF TRUSTEES UNITED MINE
  WORKERS OF AMERICA 1974 PENSION
  TRUST
2021 K STREET NW
WASHINGTON, DC  20006

Employer Identification Number:
  52-1050282
File Folder Number:
  520012910
Person to Contact:
  FRED A. HANDELMAN
Contact Telephone Number:
  (301) 962-3645
Plan Name:
  UNITED MINE WORKERS OF AMERICA 1974
  PENSION PLAN
Plan Number: 002

Dear Applicant:

    Based on the information supplied, we have made a favorable determination
on your application identified above.  Please keep this letter in your perma-
nent records.

    Continued qualification of the plan will depend on its effect in operation
under its present form.  (See section 1.401-1(b)(3) of the Income Tax Regula-
tions.)  The status of the plan in operation will be reviewed periodically.

    The enclosed document describes the impact of Notice 86-13 and some events
that could occur after you receive this letter that would automatically nullify
it without specific notice from us.  The document also explains how operation
of the plan may affect a favorable determination letter, and contains informa-
tion about filing requirements.

    This letter relates only to the status of your plan under the Internal
Revenue Code.  It is not a determination regarding the effect of other Federal
or local statutes.

    This determination is subject to your adoption of the proposed amendments
submitted in your or your representative's letter dated August 25, 1989.  The
proposed amendments should be adopted on or before the date prescribed by the
regulations under Code section 401(b).

    We have sent a copy of this letter to your representative as indicated in
the power of attorney.

    This determination letter is applicable for the amendment(s) adopted on
May 16, 1988.

    The form of the plan satisfies those requirements of the Tax Reform Act of
1986 and the other laws, regulations, revenue rulings, and notices listed in
section 4.01 of Rev. Proc. 88-42, 1988-35 I.R.B. 27, that are effective for
plan years beginning before 1989.

Letter 835(DO/CG)

**CONFIDENTIAL**                                    **1974PLAN_002926**

-2-

BOARD OF TRUSTEES UNITED MINE


If you have any questions concerning this matter, please contact the person whose name and telephone number are shown above.

Sincerely yours,

District Director

Enclosures:
Publication 794
OPWBP 515

Letter 835(DO/CG)

CONFIDENTIAL

1974PLAN_002927

-3-

BOARD OF TRUSTEES UNITED MINE


This letter corrects the one that we previously sent to
you dated Nov. 14, 1989 .

In accordance with procedures previously announced, this is not a
determination regarding the plan's compliance with any provisions of the
Tax Reform Act of 1986 (Public Law 99-514) unless specifically addressed
in this letter.  When the Service announces the availability of rulings
on these provisions, a separate application and user fee will be required to
to receive such a determination.

Letter 835(DO/CG)

CONFIDENTIAL                1974PLAN_002928

**Internal Revenue Service**
**District Director**

artment of the Treasury

31 HOPKINS PLAZA
BALTIMORE, MD  21201-0000

Date: MAY 0 1 1990

BOARD OF TRUSTEES UNITED MINE
 WORKERS OF AMERICA 1974 PENSION
 TRUST
C/O C FREDERICK OLIPHANT III
655 15TH STREET NW
WASHINGTON, DC  20005

Employer Identification Number:
 52-1050282
File Folder Number:
 520012910
Person to Contact:
 FRED A. HANDELMAN
Contact Telephone Number:
 (301) 962-3645
Plan Name:
 UNITED MINE WORKERS OF AMERICA 1974
 PENSION PLAN
Plan Number: 002


Dear Applicant:

    Based on the information supplied, we have made a favorable determination
on your application identified above.  Please keep this letter in your perma-
nent records.

    Continued qualification of the plan will depend on its effect in operation
under its present form.  (See section 1.401-1(b)(3) of the Income Tax Regula-
tions.)  The status of the plan in operation will be reviewed periodically.

    The enclosed document describes the impact of Notice 86-13 and some events
that could occur after you receive this letter that would automatically nullify
it without specific notice from us.  The document also explains how operation
of the plan may affect a favorable determination letter, and contains informa-
tion about filing requirements.

    This letter relates only to the status of your plan under the Internal
Revenue Code.  It is not a determination regarding the effect of other Federal
or local statutes.

    This determination is subject to your adoption of the proposed amendments
submitted in your or your representative's letter dated August 25, 1989.  The
proposed amendments should be adopted on or before the date prescribed by the
regulations under Code section 401(b).

    We have sent a copy of this letter to your representative as indicated in
the power of attorney.

    This determination letter is applicable for the amendment(s) adopted on
May 16, 1988.

    The form of the plan satisfies those requirements of the Tax Reform Act of
1986 and the other laws, regulations, revenue rulings, and notices listed in
section 4.01 of Rev. Proc. 88-42, 1988-35 I.R.B. 27, that are effective for
plan years beginning before 1989.

Letter 835(DO/CG)

**CONFIDENTIAL**                    1974PLAN_002929

-2-

BOARD OF TRUSTEES UNITED MINE


If you have any questions concerning this matter, please contact the person whose name and telephone number are shown above.

Sincerely yours,

District Director

Enclosures:
Publication 794
OPWBP 515

Letter 835(DO/CG)

CONFIDENTIAL

1974PLAN_002930

-3-

BOARD OF TRUSTEES UNITED MINE


This letter corrects the one that we previously sent to
you dated Nov. 14, 1989 .

In accordance with procedures previously announced, this is not a
determination regarding the plan's compliance with any provisions of the
Tax Reform Act of 1986 (Public Law 99-514) unless specifically addressed
in this letter.  When the Service announces the availability of rulings
on these provisions, a separate application and user fee will be required to
to receive such a determination.

Letter 835(DO/CG)

CONFIDENTIAL                1974PLAN_002931

JA 001085

**Internal Revenue Service**
**District Director**

Department of the Treasury

31 HOPKINS PLAZA
BALTIMORE, MD  21201-0000

Date: NOV 1 4 1989

BOARD OF TRUSTEES UNITED MINE
 WORKERS OF AMERICA 1974 PENSION
 TRUST
2021 K STREET NW
WASHINGTON, DC  20006

Employer Identification Number:
  52-1050282
File Folder Number:
  520012910
Person to Contact:
  FRED A. HANDELMAN
Contact Telephone Number:
  (301) 962-3645
Plan Name:
 UNITED MINE WORKERS OF AMERICA 1974
 PENSION PLAN
Plan Number: 002

Dear Applicant:

     Based on the information supplied, we have made a favorable determination
on your application identified above.  Please keep this letter in your perma-
nent records.

     Continued qualification of the plan will depend on its effect in operation
under its present form.  (See section 1.401-1(b)(3) of the Income Tax Regula-
tions.)  The status of the plan in operation will be reviewed periodically.

     The enclosed document describes the impact of Notice 86-13 and some events
that could occur after you receive this letter that would automatically nullify
it without specific notice from us.  The document also explains how operation
of the plan may affect a favorable determination letter, and contains informa-
tion about filing requirements.

     This letter relates only to the status of your plan under the Internal
Revenue Code.  It is not a determination regarding the effect of other Federal
or local statutes.

     This determination is subject to your adoption of the proposed amendments
submitted in your or your representative's letter dated August 25, 1989.  The
proposed amendments should be adopted on or before the date prescribed by the
regulations under Code section 401(b).

     We have sent a copy of this letter to your representative as indicated in
the power of attorney.

     This determination letter is applicable for the amendment(s) adopted on
May 16, 1988.

RECEIVED
NOV 16 1989
GENERAL
ACCOUNTING

Letter 835(DO/CG)

**CONFIDENTIAL**

-2-

BOARD OF TRUSTEES UNITED MINE

    If you have any questions concerning this matter, please contact the person whose name and telephone number are shown above.

Sincerely yours,

*Phil Brand*

District Director

Enclosures:
Publication 794
OPWBP 515

Letter 835(DO/CG)

CONFIDENTIAL                                    1974PLAN_002933



Department of the Treasury
**Internal Revenue Service**

Publication 794
(Rev. November 1986)

# Favorable Determination Letter

## Introduction

This publication explains the effect of the Tax Reform Act of 1986 upon your determination letter, points out some operational features that may affect the qualified status of your employee benefit plan, and provides information on the reporting requirements for your plan.

## Tax Reform Act of 1986

The following paragraph describes the basis on which your determination letter was issued. It is an integral part of your letter.

The provisions of Notice 86–13 apply to your plan. This notice states that determination letters issued to you consider only the law in effect before the passage of the Tax Reform Act of 1986. However, any qualification requirements as changed by the new law that have been considered after this notice was issued will be specifically stated on the determination letter.

## How to Use a Favorable Determination Letter

A favorable determination letter provides the employer with a basis for deducting contributions to an employee benefit plan. Whether a plan qualifies is determined from the information in the written plan document and the supporting information submitted by the employer. A favorable determination letter indicates that the terms of the plan conform to the requirements of section 401(a) of the Internal Revenue Code.

**Amendments to the plan.** A favorable determination letter may no longer apply if there is a change in a statute, regulation, or revenue ruling applicable to the qualification of the plan. However, the determination letter will continue to apply for years before the effective date of the statute, regulation, or revenue ruling. If the letter no longer applies to the plan, the plan must be amended to comply with the new requirements to maintain its qualified status.

Generally, if a regulation changes, the amendment must be adopted by the end of the first plan year beginning after the adoption date of the regulation. Generally, if a revenue ruling changes, the amendment must be adopted by the end of the first plan year beginning after the publication date of the revenue ruling. The amendment must be effective not later than the first day of the first plan year beginning after the revenue ruling is published. However, if certain requirements are satisfied, the amendment may be adopted retroactively after the close of that year. For further information on retroactive amendments, see Rev. Rul. 82–66, 1982–1 C.B. 61.



## Plan Must Qualify in Operation

Generally, a plan qualifies in operation if it is maintained according to the terms on which the favorable determination letter was issued. However, conditions may develop in operation that do not follow the written plan document, and they may jeopardize the plan's qualification. Examples of common operational features that adversely affect a favorable determination are:

**Not meeting coverage requirements.** If a plan satisfies the coverage requirements of section 410, when the favorable determination letter is received, by meeting either the percentage test under section 410(b)(1)(A) or the classification test under section 410(b)(1)(B), but the plan fails to meet the coverage requirements in operation, the letter will no longer apply to the plan. The letter will cease to apply when the defect in coverage arises.

A plan is considered as meeting these requirements for the whole plan year if it meets the requirements on at least one day of each quarter of that year.

**Allocation of forfeitures.** If employee turnover results in the allocation of forfeitures principally to officers, shareholders, and highly compensated employees, a favorable determination letter will cease to apply.

## Reporting Requirements

Most plan administrators or employers who maintain an employee benefit plan must file an annual return/report with the Internal Revenue Service. The following forms should be used for this purpose:

**Form 5500EZ**—generally for a "One-Participant Plan," which is a plan that covers only: (1) an individual, or an individual and his or her spouse who wholly own a business, whether incorporated or not; or (2) partner(s) in a partnership or the partner(s) and the partner's spouse. If Form 5500EZ cannot be used, the one–participant plan should use Form 5500–C or 5500–R, whichever applies.

**Form 5500**—for a pension benefit plan with 100 or more participants at the beginning of the plan year.

**Form 5500–C**—for a pension benefit plan with more than one but fewer than 100 participants at the beginning of the plan year.

**Form 5500–R**—for a pension benefit plan with more than one but fewer than 100 participants at the start of a plan year for which Form 5500–C is not filed.

**Note.** Keogh (H.R. 10) plans are required to file an annual return even if the only participants are owner-employees. The term "owner-employee" includes a partner who owns more than 10% interest in either the capital or profits of the partnership. This applies to both contribution and defined benefit plans.

**When to file.** Forms 5500 and 5500EZ must be filed annually. Form 5500–C must be filed for (i) the initial plan year, (ii) the year a final return/report would be filed, and (iii) at three-year intervals. Form 5500–R must be filed in the years when 5500–C is not filed. However, 5500–C will be accepted in place of 5500–R. For more information, see Publication 1048, *Filing Requirements for Employee Benefit Plans.*
**Disclosure.** The Internal Revenue Service will process the returns and provide the Department of Labor and the Pension Benefit Guaranty Corporation with the necessary information and copies of the returns on microfilm for disclosure purposes.

**U.S. Department of Labor**      Pension and Welfare Benefits Administration
Washington, D.C. 20210



TO:  ADMINISTRATORS OF EMPLOYEE PENSION
     AND WELFARE BENEFIT PLANS


The Employee Retirement Income Security Act of 1974 (ERISA)
requires administrators of <u>employee pension benefit plans</u>
(pension, profit sharing and other plans that provide retire-
ment income to employees or result in a deferral of income by
employees for periods extending to the termination of covered
employment or beyond), and <u>employee welfare benefit plans</u>
(medical, surgical, hospital, sickness, accident, disability,
death, unemployment, vacation, training, scholarship funds,
prepaid legal services, etc.) to meet certain reporting and
disclosure requirements.  Within 120 days after a new plan
comes into existence, plan administrators are to file a
summary plan description (SPD) with the Secretary of Labor.
A summary plan description also must be provided to each
plan participant and beneficiary within 120 days after the
establishment of a plan.  However, certain fully insured
welfare plans with fewer than 100 participants are exempt
from the requirement to file a summary plan description with
the Secretary.

For further information about the summary plan description
and other reporting and disclosure requirements of ERISA,
contact the nearest Area Office of the Labor Department's
Pension and Welfare Benefits Administration.  (see list on
reverse side).


Alan D. Lebowitz
Deputy Assistant Secretary
 for Program Operations


                              PWBA 515  (Rev.6-88)


**CONFIDENTIAL**                        **1974PLAN_002935**

# MILLER & CHEVALIER

CHARTERED

METROPOLITAN SQUARE

655 FIFTEENTH STREET, N. W.

SUITE 900

WASHINGTON, D. C. 20005-5701

(202) 626-5800

WRITER'S DIRECT LINE

(202) 626-5978

November 17, 1989

JOHN S. NOLAN
JOHN M. BIXLER
CLARENCE T. KIPPS, JR.
PHILIP S. NEAL
ROBERT L. MOORE, II
DONALD B. CRAVEN
PHILLIP L. MANN
A. JOHN GABIG
DENNIS R. BEDELL
JOHN LLOYD RICE
JAY L. CARLSON
MARK L. EVANS
HOMER E. MOYER, JR.
LEONARD BICKWIT, JR.
F. BROOK VOGHT
FREDERICK H. ROBINSON
JOHN B. MAGEE
EMMETT B. LEWIS
CRAIG D. MILLER
ROBERT K. HUFFMAN
ALEXANDER ZAKUPOWSKY, JR.
JEFFREY H. HOWARD
GERALD GOLDMAN
C. FREDERICK OLIPHANT III
RONALD D. AUCUTT
EDWIN A. JAMES
ALAN R. YUSPEH
JAMES A. BENSFIELD
TERRY BANCROFT DOWD
THOMAS O. JOHNSTON
JAMES P. TUITE
CATHERINE T. PORTER
JOANNE THOMAS ASBILL
ALAN C. BROWN
DAVID B. CUBETA
THOMAS W. MAHONEY, JR.

ANNE E. MORAN
SCOTT E. PICKENS
PATRICIA J. SWEENEY
GRANT D. ALDONAS
JAMES B. ALTMAN
CATHERINE CURTISS
J. BRADFORD ANNWYLL
PETER T. BEACH
FRANCES J. HENDERSON
SERENA G. SIMONS
WILLARD L. BOYD III
F. SCOTT FARMER
CATHERINE VEIHMEYER HUGHES
MARY LOU SOLLER
KEVIN C. DWYER
HAL L. GANN
KEVIN L. KENWORTHY
PAUL L. GLENCHUR
ROBIN L. GREENHOUSE
CHRISTOPHER S. RIZEK
KATHRYN BUCHER
DANIEL F. DANELLO
THOMAS D. DINACKUS
CATHERINE L. CREECH
ANTHONY F. SHELLEY *
KENDALL W. DAINES *
PHILIP J. FERREAU *
WILLIAM M. McGLONE *
BARBARA H. DELICH *
MICHAEL R. GILES *
HARRY A. FRANKS, JR.*
JEAN A. CHMIELEWSKI *
PATRICIA A. MILLETT *
ANSLEY T. MOSES *
AHMAD A. PIRASTEH *

* NOT ADMITTED IN THE DISTRICT OF COLUMBIA

ROBERT N. MILLER
1879-1968
STUART CHEVALIER
1879-1956

DAVID W. RICHMOND
JAMES T. AKRE
BARRON K. GRIER
RAPHAEL SHERFY
WALTER D. HAYNES
COUNSEL

CABLE: MILCHEV
TELECOPIER: (202) 628-0858
                      628-0859
                      628-0861
TELEX: 440250

Glenda S. Finch, Esquire
Senior Associate Counsel
UMWA Health and Retirement Funds
2021 K Street, NW
Washington, DC  20006

           Re:   1974 Pension Plan Amendments

Dear Glenda:

        The IRS has issued a favorable determination letter
on the 1974 Pension Plan.  The letter, however, is conditioned
upon the adoption of the attached amendment to Article
VII.C(1) of the Plan.  The purpose of the amendment is to
clarify that the Plan's election period for waivers of joint
and survivor annuities complies with current law.

        To maintain the Plan's qualified status, the
attached amendment must be adopted within the statutory period
set forth in section 401(b) of the Code.  The regulations
under section 401(b) specify that the remedial amendment
period ends 91 days after the date in which the IRS issues the
determination letter.  Treas. Reg. § 1.401(b)-1(d)(3).  In the
present case, the period will expire on February 13, 1990.

        The determination letter and the proposed amendment
are attached.  Please call me if you have any further
questions.

                          Sincerely yours,

                          Cathy Creech

                          Catherine L. Creech

Enclosures

**Internal Revenue Service**
**District Director**

Department of the Treasury

31 HOPKINS PLAZA
BALTIMORE, MD  21201-0000

Date:  NOV 1 4 1989

BOARD OF TRUSTEES UNITED MINE
  WORKERS OF AMERICA 1974 PENSION
  TRUST
C/O C FREDERICK OLIPHANT III
655 15TH STREET NW
WASHINGTON, DC  20005

Employer Identification Number:
  52-1050282
File Folder Number:
  520012910
Person to Contact:
  FRED A. HANDELMAN
Contact Telephone Number:
  (301) 962-3645
Plan Name:
  UNITED MINE WORKERS OF AMERICA 1974
  PENSION PLAN
Plan Number: 002

Dear Applicant:

    Based on the information supplied, we have made a favorable determination
on your application identified above.  Please keep this letter in your perma-
nent records.

    Continued qualification of the plan will depend on its effect in operation
under its present form.  (See section 1.401-1(b)(3) of the Income Tax Regula-
tions.)  The status of the plan in operation will be reviewed periodically.

    The enclosed document describes the impact of Notice 86-13 and some events
that could occur after you receive this letter that would automatically nullify
it without specific notice from us.  The document also explains how operation
of the plan may affect a favorable determination letter, and contains informa-
tion about filing requirements.

    This letter relates only to the status of your plan under the Internal
Revenue Code.  It is not a determination regarding the effect of other Federal
or local statutes.

    This determination is subject to your adoption of the proposed amendments
submitted in your or your representative's letter dated August 25, 1989.  The
proposed amendments should be adopted on or before the date prescribed by the
regulations under Code section 401(b).

    We have sent a copy of this letter to your representative as indicated in
the power of attorney.

    This determination letter is applicable for the amendment(s) adopted on
May 16, 1988.

Letter 335(DO/CG)

**CONFIDENTIAL**                    1974PLAN_002937

PROPOSED AMENDMENT TO THE UMWA 1974 PENSION PLAN

The first sentence of ARTICLE VII.C(1) shall be amended to read as follows:

> The "election period" in the case of an election to waive the Joint and Survivor Annuity described in Paragraph A shall be the 90-day period ending on the date of the commencement of benefits.

JOHN S. NOLAN
JOHN M. BIXLER
CLARENCE T. KIPPS, JR.
PHILIP S. NEAL
ROBERT L. MOORE, II
DONALD B. CRAVEN
PHILIP L. MANN
A. JOHN GABIG
DENNIS P. BEDELL
JOHN LLOYD RICE
JAY L. CARLSON
MARK L. EVANS
HOMER E. MOYER, JR.
LEONARD BICKWIT, JR.
F. BROOK VOGHT
FREDERICK H. ROBINSON
JOHN B. MAGEE
EMMETT B. LEWIS
CRAIG D. MILLER
ROBERT K. HUFFMAN
ALEXANDER ZAKUPOWSKY, JR.
PAUL W. OOSTERHUIS
JEFFREY H. HOWARD
C. FREDERICK OLIPHANT III
RONALD D. AUCUTT
EDWIN A. JAMES
ALAN R. YUSPEH
JAMES A. BENSFIELD
TERRY BANCROFT DOWD
THOMAS D. JOHNSTON
JAMES P. TUITE
CATHERINE T. PORTER
JOANNE THOMAS ASBILL
ALAN C. BROWN
DAVID B. CUBETA
THOMAS W. MAHONEY, JR.

ANNE E. MORAN
SCOTT E. PICKENS
PATRICIA J. SWEENEY
GRANT D. ALDONAS
JAMES B. ALTMAN
CATHERINE CURTISS
J. BRADFORD ANWYLL
MARTIN SCULLY, JR.
PETER T. BEACH
FRANCES J. HENDERSON
SERENA G. SIMONS
WILLARD L. BOYD III
F. SCOTT FARMER
CATHERINE VEINMEYER HUGHES
KEVIN C. DWYER
HAL L. GANN
KEVIN L. KENWORTHY
LINDA E. BENFIELD
PAUL L. GLENCHUR*
ROBIN L. GREENHOUSE
CHRISTOPHER S. RIZEK
KATHRYN BUCHER
DANIEL F. DANELLO
THOMAS D. DINACKUS
ROSEANN M. CUTRONE
CATHERINE L. CREECH*
ANTHONY F. SHELLEY*
KENDALL W. DAINES*
PHILIP J. FERNEAU*
WILLIAM M. McGLONE*
BARBARA H. DELICH*
MICHAEL R. GILES*
HARRY A. FRANKS, JR.*
JEAN A. CHMIELEWSKI*
PATRICIA A. MILLETT*
ANSLEY T. MOSES*

* NOT ADMITTED IN THE DISTRICT OF COLUMBIA

MILLER & CHEVALIER

CHARTERED

METROPOLITAN SQUARE

655 FIFTEENTH STREET, N. W.

SUITE 900

WASHINGTON, D. C. 20005-5701

———

(202) 626-5800

WRITER'S DIRECT LINE

(202) 626-5978

ROBERT N. MILLER
1879-1956

DAVID W. RICHMOND
NUMA L. SMITH, JR.
CHARLES T. AKRE
BARRON K. GRIER
RAPHAEL SHERFY
WALTER D. HAYNES
COUNSEL

CABLE: MILCHEV
TELECOPIER: (202) 628-0851
628-0868

TELEX: 440250

July 26, 1989

Andree M. St. Martin, Esquire
Assistant General Counsel
UMWA Health and Retirement Funds
2021 K Street, N.W.
Washington, D.C.  20006

Dear Andree:

    We received today the enclosed letter from the District Office requesting additional information on the 1974 Pension Plan. We will examine the reviewer's comments and speak with you soon as to our proposed response.

Sincerely yours,

Catherine L. Creech

Enclosure

Internal Revenue Service                          Department of the Treasury
District Director                                          9A 001098

31 HOPKINS PLAZA
BALTIMORE, MD  21201-0000

Date:  7/25/89

BOARD OF TRUSTEES UNITED MINE
 WORKERS OF AMERICA 1974 PENSION
 TRUST
C/O C FREDERICK OLIPHANT III
655 15TH STREET NW
WASHINGTON, DC  20005

OMB Clearance Number:
   1545-0534
Employer Identification Number:
   52-1050282
File Folder Number:
   520012910
Person to Contact:
   FRED A. HANDELMAN
Contact Telephone Number:
   (301) 962-3645
Plan Name:
 UNITED MINE WORKERS OF AMERICA 1974
 PENSION PLAN
Plan Number: 002

Refer Reply to:
   EP:7111:FH
Response Date:
   August 11, 1989

Dear Applicant:

    We are considering your request for a determination letter for the plan
identified above. However, we need the information or amendments specified on
the enclosed list before we can continue processing your request.

    Please submit the information or amendments by the response date. If we
do not hear from you within that time, we may process your application on the
basis of the information you have already supplied us. This could result in a
determination that your plan is not qualified for favorable tax treatment.

    If you have any questions concerning this matter or cannot meet the
response date, please contact the person whose name and telephone number are
shown above. When you send any information we requested or if you write to
us with questions about this letter, please provide your telephone number and
the most convenient time for us to call if we need more information.

    Please mail the information requested in this letter to the following
address:

                Internal Revenue Service
                EP/EO Division
                Group 7111
                P.O. Box 13163
                Baltimore, MD  21203

                                          Letter 1196(DO/CG)

CONFIDENTIAL                    1974PLAN_002940

-2-

BOARD OF TRUSTEES UNITED MINE


Thank you for your cooperation.

Sincerely yours,

Employee Plans Specialist

Enclosure:
List of Data Needed

Letter 1196(DO/CG)

CONFIDENTIAL                    1974PLAN_002941

-3-

BOARD OF TRUSTEES UNITED MINE


We have sent a copy of this letter to your representative as indicated
in the power of attorney.

Section  -?- of the plan should be amended to provide that if
distribution has commenced before the participant's death, the remaining
interest will be distributed at least as rapidly as under the method of
distribution being used as of the date of the participant's death.  IRC
section 401(a)(9)(B)(i).

Section  7 of the plan should be amended to provide
for the spousal consent for the election of a specific non-spouse
beneficiary or any subsequent changes of beneficiaries.
Regs. 1.401(a)-11T Q-25.

Section  7 of the plan should be amended to provide that
written consent of the participant and the participant's spouse must be
obtained not more than 90 days before the commencement of the distribution of
any part of an accrued benefit, except for the exception in Regs.
1.417(e)-1T(d) and 1.417(e)-1T(b)(4).

Plan section 1A(5) states that a participant needs a 1,000 hours of service to
participate in the plan.  Therefore the following amendments are needed.

For purposes of eligibility to participate, section  -?- of the
plan should be amended to specify the computation period to be used
for determining years of eligibility service.  DOL Regs. sections
2530.200b-1(a) and 2530.202-2.

Section  -?- of the plan should be amended to credit an employee
with a year of service for eligibility purposes if the employee completes
at least 1000 (870 or 750) hours of service in an eligibility computation
period.  IRC section 410(a)(3)(A) and DOL Regs. sections 2530.200b-1 and
2530.202.

For purposes of eligibility to participate, section  -?- of the
plan should be amended to provide that the initial eligibility computation
period used to determine whether an employee completes a year of service
will be a 12-consecutive month period beginning with the employment
commencement date.  DOL Regs. sections 2530.202-2(a) and (e).

If the eligibility computation periods after the initial eligibility
computation period are to be based on other than anniversaries
of employment, section  -?- of the plan should be amended
to provide that such succeeding computation periods will begin with
the plan year which includes the first anniversary of an employee's
employment commencement date, in which case an employee will be
credited with a year of eligibility service in each computation
period that he completes at least 1000 (870 or 750) hours of service.
IRC section 410(a)(3)(A).


Letter 1196(DO/CG)

-4-

**BOARD OF TRUSTEES UNITED MINE**


Section  -?- of the plan should be amended to provide that once an
employee, otherwise eligible, meets the statutory age and service requirements,
such employee will participate in the plan not later than the earlier of the
first day of the first plan year after such employee has met the statutory
requirements, or 6 months after the day such requirements are met.  IRC
section 410(a)4 and Regs. sections 1.410(a)-4(b) and 1.410(a)-7(c)(3).

Letter 1196(DO/CG)

**CONFIDENTIAL**            1974PLAN_002943



INTERNAL REVENUE SERVICE
DISTRICT DIRECTOR
31 HOPKINS PLAZA
BALTIMORE, MD  21201-0000

DEPARTMENT OF THE TREASURY

RECEIVED

MAY 2 8 1996
TRUSTEES OFFICE

RECEIVED

MAY 3 0 199(

OFFICE OF THE
GENERAL COUNSEL

Date:   MAY 2 1 1996

BOARD OF TRUSTEES UNITED MINE
 WORKERS OF AMERICA 1974 PENSION
 TRUST
4455 CONNECTICUT AVE., N.W.
WASHINGTON, DC  20008

Employer Identification Number:
   52-1050282
File Folder Number:
   521052609
Person to Contact:
   EP/EO CUSTOMER SERVICE UNIT
Contact Telephone Number:
   (410) 962-6058
Plan Name:
   UNITED MINE WORKERS OF AMERICA 1974
   PENSION PLAN
Plan Number: 002

Dear Applicant:

    We have made a favorable determination on your plan, identified above,
based on the information supplied.  Please keep this letter in your permanent
records.

    Continued qualification of the plan under its present form will depend
on its effect in operation.  (See section 1.401-1(b)(3) of the Income Tax
Regulations.)  We will review the status of the plan in operation periodically.

    The enclosed document explains the significance of this favorable
determination letter, points out some features that may affect the qualified
status of your employee retirement plan, and provides information on the
reporting requirements for your plan.  It also describes some events that
automatically nullify it.  It is very important that you read the publication.

    This letter relates only to the status of your plan under the Internal
Revenue Code.  It is not a determination regarding the effect of other federal
or local statutes.

    This determination letter is applicable for the amendment(s) adopted on
June 24, 1994.

    This determination letter is also applicable for the amendment(s) adopted
on June 27, 1995.

    This plan satisfies the minimum coverage and nondiscrimination require-
ments of sections 410(b) and 401(a)(4) of the Code because the plan benefits
only collectively bargained employees or employees treated as collectively
bargained employees.

    This letter is issued under Rev. Proc. 93-39 and considers the amendments
required by the Tax Reform Act of 1986 except as otherwise specified in this
letter.

    This letter may not be relied upon with respect to whether the plan
satisfies the qualification requirements as amended by the Uruguay Round
Agreements Act, Pub. L. 103-465.

Letter  835 (DO/CG)

-2-

BOARD OF TRUSTEES UNITED MINE

If you have questions concerning this matter, please contact the person whose name and telephone number are shown above.

Sincerely yours,

District Director

Enclosures:
Publication 794

CONFIDENTIAL

Internal Revenue Service

Department of the Treasury

Index No.: 402.00-00

Washington, DC 20224

Person to Contact:

Mr. Donald E. Pierce, Jr.
Trustees of the United Mine
Workers 1950 and 1974
Pension Trusts
4455 Connecticut Ave., N.W.
Washington, DC 20008

Rosamond Ferber
Telephone Number:

(202) 622-8053
Refer Reply to:

CP:E:EP:T:1
Date:

OCT 13 1995

LEGEND

Plan X:   United Mine Workers of America 1950 Pension Trust

Plan Y:   United Mine Workers of America 1974 Pension Trust

M:        United Mine Workers of America

L:        Bituminous Coal Operators' Association

Dear Mr. Pierce:

     This is in response to your request for rulings dated
October 21, 1994, submitted by your authorized representative, as
supplemented by letter dated March 20, 1995.  Your request
concerns whether certain supplemental payments paid from Plan X
and Plan Y to retired participants or their surviving spouses are
eligible rollover distributions under section 402(c)(4) of the
Internal Revenue Code (the "Code").  In connection with your
request, your authorized representative submitted the facts and
representations described below.

     Plan X and Plan Y (collectively, the "Plans") are multi-
employer, defined benefit pension plans that provide pension
benefits to retired participants pursuant to collectively
bargained wage agreements negotiated between M and L.  Over
299,000 employees participate in the Plans, with approximately
115,000 participants and beneficiaries currently receiving
benefits under the Plans.  The Plans are funded solely through
employer contributions.  Plan X and Plan Y each have favorable
determination letters issued by a Key District Office of the
Internal Revenue Service in 1989 and 1990, respectively, under
section 401(a) of the Code.

     Plan X covers participants who retired prior to December 31,
1975, and their surviving spouses.  Under Plan X, retired
participants with 20 years of service receive a monthly life
annuity of $375, or $4,500 annually, while retired miners with
between 10 and 20 years of service receive a lesser monthly
annuity.  Qualifying disabled participants receive a monthly

-2-

Trustees for the United Mine Workers
  Pension Plans

disability annuity benefit of $217.50 for life, provided the participant remains disabled. Surviving spouses receive a monthly life annuity of $125, as long as the spouse does not remarry. A life annuity is the only payment option provided, and normal retirement age is age 55 under Plan X. Substantially all of the life annuities under Plan X are paid to retirees who have attained age 70 and 1/2 or who would have attained age 70 and 1/2 if they were still living.

Plan Y covers participants who retired or will retire on or after December 31, 1975, and their surviving spouses. A retired participant under Plan Y receives a monthly pension for life beginning at age 62, equal to the participant's total months of credited service multiplied by the dollar benefit amount. The dollar benefit amount ranges from $26.50 to $41.50, depending on the total number of years of service and the period in which the service is credited. Under this formula, a participant who retired in 1989 at age 62 with 30 years of service receives a monthly annuity of approximately $600, or $7,200 annually; a similarly situated retiree with fewer years of service receives a lesser amount.

Participants under Plan Y who become disabled prior to normal retirement receive a disability pension calculated in a similar manner, but which is in no event less than a $200 monthly benefit. Surviving spouses of qualifying participants receive an annuity for the life of the spouse equal to 75 percent of the participant's pension. The only mode of payment available under Plan Y is a life annuity. Over one-third of the retirees under Plan Y are over age 70 and 1/2.

Effective December 16, 1993, M and L entered into a wage agreement (the "1993 Agreement"), a new five-year wage agreement that is effective through August 1, 1998. Under the 1993 Agreement, certain pension supplements ("Pension Supplements") are paid under the 1950 and 1974 Plans annually for three years to retirees or their surviving spouses whose benefits are in pay status. The amount of the Pension Supplements are $500 for retirees, $375 for surviving spouses, and $290 for disabled participants. After three years, the Pension Supplements may be renewed pursuant to a reopener provision in the 1993 Agreement. These supplements, as well as adjustments in the monthly annuity, have also been provided by the Plans under prior wage agreements. Pension Supplements for 1993 and 1994 have already been paid to retirees or their spouses under the Plans.

The 1993 Agreement also provides that during the five-year period the Agreement is in effect, certain retirees under Plan Y who are under the age of 65 will receive annual supplements

-3-

Trustees for the United Mine Workers
 Pension Plans

("Social Security Supplements") of $1,000. The Social Security
Supplements are paid to retired participants who are entitled to
pension benefits under Plan Y and surviving spouses, including
spouses receiving survivor annuities under Plan Y and spouses not
entitled to a survivor annuity because the participant was not
vested at the time of death. The Social Security Supplements are
paid only to individuals participating in a specified health
plan, and are intended to assist in meeting health expenses not
covered under the health plan; however, participants receiving
these supplements are not required to use the payments to cover
such expenses. In all cases, the Social Security Supplements do
not exceed the unreduced old-age insurance benefit under Social
Security.

    Based on the foregoing facts and representations, you
request the following rulings: (1) The Pension Supplements paid
to retirees under Plan X and Plan Y are not "eligible rollover
distributions" under section 402(c)(4) of the Code; (2) the
Social Security Supplements paid under Plan Y are properly
treated as social security supplements as defined under section
411(a)(9) and, accordingly, are not eligible rollover
distributions under section 402(c)(4); and (3) the Pension
Supplements and Social Security Supplements are periodic payments
under sections 3405(e)(2) and 72.

    Section 402(c)(4) of the Code generally provides that the
term "eligible rollover distribution" does not include any
distribution that is one of a series of substantially equal
periodic payments (not less frequently than annually) made over
the life (or life expectancy) of the employee or the joint lives
(or joint life expectancies) of the employee and the employee's
designated beneficiary, or for a specified period of at least ten
years. This section further provides that the term also does not
include a distribution required under section 401(a)(9).

    Section 1.402(c)-2, Q&A-5(a) of the federal Income Tax
Regulations (the "regulations") provides that whether a series of
payments is a series of substantially equal periodic payments
over a specified period is determined at the time the payments begin,
and by following the principles of section 72(t)(2)(A)(iv) of the
Code, without regard to contingencies or modifications that have
not yet occurred.

    Section 1.402(c)-2, Q&A-5(c) of the regulations provides
that if the amount of the payments changes so that subsequent
payments are not substantially equal to prior payments, a new
determination must be made as to whether the remaining payments
are substantially equal periodic payments made over the requisite
period.

**CONFIDENTIAL**                    **1974PLAN_002946**

-4-

Trustees for the United Mine Workers
 Pension Plans

Section 1.402(c)-2, Q&A-5(b) of the regulations provides
that for purposes of determining whether payments are
substantially equal, social security supplements as defined under
section 411(a)(9) of the Code are disregarded. A series of
payments that are not substantially equal solely because the
amount of each payment is reduced upon attainment of social
security retirement age (or upon commencement of social security
early retirement, survivor or disability benefits) will also be
treated as substantially equal as long as the reduction in the
actual payments is level and does not exceed the applicable
social security benefit.

Section 1.411(a)-7(c)(4)(ii) of the regulations defines a
social security supplement under section 411(a)(9) of the Code as
a benefit for participants that commences and terminates before
the age when participants are entitled to unreduced old-age
insurance benefits under Title II of the Social Security Act and
that does not exceed the amount of such old-age insurance
benefit.

Section 1.402(c)-2, Q&A-6(a) of the regulations provides
that a payment is treated as independent of the payments in a
series of substantially equal payments, and thus not part of the
series, if the payment is substantially larger or smaller than
the other payments in the series. An independent payment is an
eligible rollover distribution if it is not otherwise excepted
from the definition of eligible rollover distribution.

Section 1.402(c)-2, Q&A-6(b)(2) of the regulations provides
that a supplemental payment from a defined benefit plan to
annuitants, for example, retirees or beneficiaries, will be
treated as part of a series of substantially equal payments,
rather than as an independent payment, provided that:  (1) the
supplement is a benefit increase for annuitants; (2) the amount
of the supplement is determined in a consistent manner for all
similarly situated annuitants; (3) the supplement is paid to
annuitants who are otherwise receiving payments that would
constitute substantially equal periodic payments; and (4) the
aggregate supplement is less than or equal to the greater of ten
percent of the annual rate of payment for the annuity, or $750
(or any higher amount prescribed by the Commissioner in revenue
rulings, notice and other published guidance).

Section 3405(e)(2) of the Code defines a "periodic payment"
as meaning a designated distribution which is an annuity or
similar periodic payment.

Section 3405(e)(1) of the Code generally defines the term
"designated distribution" as meaning any distribution or payment

-5-

Trustees for the United Mine Workers
Pension Plans

under an employer deferred compensation plan, with certain
exceptions not applicable here.

Section 35.3405-1, Q&A-9 of the Employment Tax Regulations
defines a periodic payment as including an annuity payment, which
this section defines as a series of payments payable over a
period greater than one year and taxable under section 72 as
amounts received as an annuity.

Clearly, the monthly life annuities paid to retirees and
surviving spouses under the Plans constitute a series of
substantially equal periodic payments. The Pension Supplements
are only payable in connection with the payment of the life
annuities to retirees or their surviving spouses and are designed
to augment the value of the life annuities. The amount of the
Pension Supplements is $500 for all annuitants, and the
supplements are paid from defined benefit plans. Based on these
facts, the Pension Supplements are treated as part of a series of
substantially equal periodic payments made over the requisite
period under section 402(c)(4) of the Code.

In addition, the Social Security Supplements paid under Plan
Y commence and terminate before the employee or surviving spouse
attains social security retirement age, and are no greater in
amount than the old-age insurance benefit provided by Social
Security. Thus, the Social Security Supplements are also
considered to be part of a series of substantially equal periodic
payments made over the specified period under section 402(c)(4).

As indicated above, the Pension Supplements and Social
Security Supplements are periodic payments for purposes of
sections 72(t) and 402(c)(4). Thus, they are also periodic
payments within the meaning of section 3405(e)(2) of the Code.

Accordingly, based on the above facts and representations,
we conclude that: (1) the Pension Supplements paid to retirees
under Plan X and Plan Y are not eligible rollover distributions
within the meaning of section 402(c)(4) of the Code; (2) the
Social Security Supplements paid under Plan Y are properly
treated as social security supplements under section 411(a)(9),
and accordingly, are not eligible rollover distributions within
the meaning of section 402(c)(4); and (3) the Pension Supplements
and Social Security Supplements are periodic payments within the
meaning of sections 72 and 3405(e)(2).

These rulings are based on the assumption that Plan X and
Plan Y are qualified under section 401(a) of the Code.

-6-

Trustees for the United Mine Workers
 Pension Plans

     A copy of this letter is being sent to your authorized
representative pursuant to a power of attorney on file in this
office.

                              Sincerely,

                              (Signed) John Swieca
                              John Swieca
                              Chief, Employee Plans
                              Technical Branch 1

Enclosures:
     Notice of Intention to Disclose
     Deleted copy of letter

cc:  C. Frederick Oliphant III
     Miller & Chevalier, Chartered
     655 15th St., N.W.
     Washington, DC  20005

RECEIVED

INTERNAL REVENUE SERVICE
P. O. BOX 2508
CINCINNATI, OH  45201

JAN 23 2004          DEPARTMENT OF THE TREASURY

OFFICE OF THE
GENERAL COUNSEL

Employer Identification Number:
  52-1050282
DLN:
  17007183000002

Date:        JAN 1 2 2004

BOARD OF TRUSTEES UMWA 1974 PENSION
 TRUST
2121 K ST NW STE 350
WASHINGTON, DC  20037

Person to Contact:
  AUDREY M PETIT          ID# 11017
Contact Telephone Number:
  (877) 829-5500
Plan Name:
  UNITED MINE WORKERS OF AMERICA 1974
  PENSION PLAN
Plan Number: 002

Dear Applicant:

    We have made a favorable determination on the plan identified above based
on the information you have supplied.  Please keep this letter, the application
forms submitted to request this letter and all correspondence with the Internal
Revenue Service regarding your application for a determination letter in your
permanent records.  You must retain this information to preserve your reliance
on this letter.

    Continued qualification of the plan under its present form will depend
on its effect in operation.  See section 1.401-1(b)(3) of the Income Tax
Regulations.  We will review the status of the plan in operation periodically.

    The enclosed Publication 794 explains the significance and the scope of
this favorable determination letter based on the determination requests
selected on your application forms.  Publication 794 describes the information
that must be retained to have reliance on this favorable determination letter.
The publication also provide examples of the effect of a plan's operation on
its qualified status and discusses the reporting requirements for qualified
plans.  Please read Publication 794.

    This letter relates only to the status of your plan under the Internal
Revenue Code.  It is not a determination regarding the effect of other federal
or local statutes.

    This determination letter is applicable for the amendment(s) executed
on February 18, 2002.

    This determination letter is also applicable for the amendment(s) dated
on December 18, 2003.

    Issues arising from the amendment of a defined benefit plan's benefit
formula to convert that formula into a cash balance type benefit formula are
under study, and this determination letter does not express an opinion on any
of these issues.  A cash balance type formula generally defines a benefit for
each employee by reference to a single-sum amount, such as 10 percent of final
average pay times years of service, or the amount of the employee's

Letter  835 (DO/CG)

CONFIDENTIAL                    1974PLAN_002952

-2-

BOARD OF TRUSTEES UMWA 1974 PENSION

hypothetical account balance.

    This letter considers the changes in qualification requirements made by the Uruguay Round Agreements Act, Pub. L. 103-465, the Small Business Job Protection Act of 1996, Pub. L. 104-188, the Uniformed Services Employment and Reemployment Rights Act of 1994, Pub. L. 103-353, the Taxpayer Relief Act of 1997, Pub. L. 105-34, the Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, and the Community Renewal Tax Relief Act of 2000, Pub. L. 106-554.

    This letter may not be relied on with respect to whether the plan satisfies the requirements of section 401(a) of the Code, as amended by the Economic Growth and Tax Relief Reconciliation Act of 2001, Pub. L. 107-16.

    The requirement for employee benefits plans to file summary plan descriptions (SPD) with the U.S. Department of Labor was eliminated effective August 5, 1997.  For more details, call 1-800-998-7542 for a free copy of the SPD card.

    If you have questions concerning this matter, please contact the person whose name and telephone number are shown above.

                        Sincerely yours,

                        *Paul T. Shultz*

                        Paul T. Shultz
                        Director,
                        Employee Plans Rulings & Agreements

Enclosures:
Publication 794

INTERNAL REVENUE SERVICE
P. O. BOX 2508
CINCINNATI, OH  45201

DEPARTMENT OF THE TREASURY

Date:   JUL 1 9 2012

BOARD OF TRUSTEES, UMWA 1974
PENSION TRUST
2121 K STREET NW, SUITE 350
WASHINGTON, DC  20037

Employer Identification Number:
  52-1050282
DLN:
  209254000
Person to Contact:
  PATRICE THOMPSON          ID# 52050
Contact Telephone Number:
  (404) 338-8191
Plan Name:
  UNITED MINE WORKERS OF AMERICA 1974
  PENSION PLAN
Plan Number: 002

Dear Applicant:

    We have made a favorable determination on the plan identified above based
on the information you have supplied.  Please keep this letter, the application
forms submitted to request this letter and all correspondence with the Internal
Revenue Service regarding your application for a determination letter in your
permanent records.  You must retain this information to preserve your reliance
on this letter.

    Continued qualification of the plan under its present form will depend
on its effect in operation.  See section 1.401-1(b)(3) of the Income Tax
Regulations.  We will review the status of the plan in operation periodically.

    The enclosed Publication 794 explains the significance and the scope of
this favorable determination letter based on the determination requests
selected on your application forms.  Publication 794 describes the information
that must be retained to have reliance on this favorable determination letter.
The publication also provides examples of the effect of a plan's operation on
its qualified status and discusses the reporting requirements for qualified
plans.  Please read Publication 794.

    This letter relates only to the status of your plan under the Internal
Revenue Code.  It is not a determination regarding the effect of other federal
or local statutes.

    This determination letter gives no reliance for any qualification change
that becomes effective, any guidance published, or any statutes enacted, after
the issuance of the Cumulative List (unless the item has been identified in the
Cumulative List) for the cycle under which this application was submitted.

    This letter may not be relied on after the end of the plan's first
five-year remedial amendment cycle that ends more than 12 months after the
application was received. This letter expires on January 31, 2015. This letter
considered the 2008 Cumulative List of Changes in Plan Qualification
Requirements.

    This determination letter is applicable for the amendment(s) executed

Letter 2002 (DO/CG)

-2-

BOARD OF TRUSTEES, UMWA 1974

on 07/28/09 & 06/28/07.

   This determination letter is also applicable for the amendment(s) dated on 08/15/06 & 06/29/05.

   This determination letter is applicable to our review of the working copy of the plan and the associated amendments submitted with your application.

   The information on the enclosed addendum is an integral part of this determination.  Please be sure to read and keep it with this letter.

   If you have questions concerning this matter, please contact the person whose name and telephone number are shown above.

                                        Sincerely,



                                        Andrew E. Zuckerman
                                        Director, EP Rulings & Agreements

Enclosures:
Publication 794
Addendum

                                                        Letter 2002 (DO/CG)

CONFIDENTIAL
                                                        1974PLAN_002955

-3-

BOARD OF TRUSTEES, UMWA 1974

This determination letter does not provide reliance for any portion(s) of the document that incorporates the terms of an auxiliary agreement (collective bargaining, reciprocity and/or participation agreement), unless the exact language of the section(s) that is being incorporated by reference to the auxiliary agreement has been appended to the document.

This determination letter also applies to the Trust dated 02/07/07.

Letter 2002 (DO/CG)

**CONFIDENTIAL**

1974PLAN_002956

INTERNAL REVENUE SERVICE                    DEPARTMENT OF THE TREASURY
P. O. BOX 2508
CINCINNATI, OH  45201

Date:    NOV 1 2 2015

Employer Identification Number:
   52-1050282
DLN:
   17007030078005
Person to Contact:

BOARD OF TRUSTEES UNITED MINE            DWAYNE T MASON         ID# 31037
 WORKERS OF AMERICA 1974 PENSION         Contact Telephone Number:
2121 K STREET NW SUITE 350                  (513) 263-4750
WASHINGTON, DC  20037                    Plan Name:
                                            UNITED MINE WORKERS OF AMERICA 1974
                                            PENSION PLAN
                                         Plan Number: 002

Dear Applicant:

Based on the information you provided, we are issuing this favorable
determination letter for your plan listed above.  However, our favorable
determination only applies to the status of your plan under the Internal
Revenue Code and is not a determination on the effect of other federal or local
statutes.  To use this letter as proof of the plan's status, you must keep this
letter, the application forms, and all correspondence with us about your
application.

Your determination letter does not apply to any qualification changes that
become effective, any guidance issued, or any statutes enacted after the dates
specified in the Cumulative List of Changes in Plan Requirements (the
Cumulative List) for the cycle you submitted your application under, unless the
new item was identified in the Cumulative List.

Your plan's continued qualification in its present form will depend on its
effect in operation (Section 1.401-1(b)(3) of the Income Tax Regulations).  We
may review the status of the plan in operation periodically.

You can find more information on favorable determination letters in Publication
794, Favorable Determination Letter, including:

        The significance and scope of reliance on this letter,
        The effect of any elective determination request in your application
        materials,
        The reporting requirements for qualified plans, and
        Examples of the effect of a plan's operation on its qualified status.

You can get a copy of Publication 794 by visiting our website at
www.irs.gov/formspubs or by calling 1-800-TAX-FORM (1-800-829-3676) to request
a copy.

This determination letter applies to the amendments dated on
9/27/11 & 12/31/12.

We made this determination on the condition that you adopt the proposed

                                                          Letter 5274

**CONFIDENTIAL**                                    **1974PLAN_002957**

-2-

BOARD OF TRUSTEES UNITED MINE

amendments you submitted in your letter dated 10/19/2015, on or
before the date the Income Tax Regulations provide under Section 401(b) of the
Internal Revenue Code.

You can't rely on this letter after the end of the plan's first five-year
remedial amendment cycle that ends more than 12 months after we received the
application.  This letter expires on January 31, 2020.  This letter considered
the 2013 Cumulative List of Changes in Plan Qualification Requirements.

The information on the enclosed addendum is an integral part of this
determination.  Please be sure to read it and keep it with this letter.

If you submitted a Form 2848, Power of Attorney and Declaration of
Representative, or Form 8821, Tax Information Authorization, with your
application and asked us to send your authorized representative or appointee
copies of written communications, we will send a copy of this letter to him or
her.

If you have any questions, you can contact the person listed at the top of this
letter.

                              Sincerely,

                              Karen D. Truss
                              Director, EP Rulings & Agreements

Addendum


Letter 5274

CONFIDENTIAL                    1974PLAN_002958

- 3 -

BOARD OF TRUSTEES UNITED MINE

This determination letter does not apply to any portions of the document that incorporate the terms of an auxiliary agreement (collective bargaining, reciprocity, or participation agreement), unless you append to the plan document the exact language of the sections that you incorporated by reference.

Letter 5274

**CONFIDENTIAL**                                          1974PLAN_002959

**Internal Revenue Service**
District Director

⌐epartment of the Treasury

United Mine Workers
Name of Plan: of America 1974
Pension Plan

Application Form:
4577
Date Adopted ⬛⬛⬛⬛⬛⬛⬛:
12-06-74
Employer Identification Number:

Date: APR 0 6 1976

Plan Number:

▷            United Mine Workers of America
              1974 Pension Trust
              c/o Philip S. Neal, Esquire
              Miller & Chevalier
              1700 Pennsylvania Avenue, N.W.
              Washington, D. C.  20006

District Office Code and
    Case Serial Number:
501349
File Number:

Person to Contact:
F. Wilhelm
Contact Telephone Number:
301-962-3645

   Based on the information supplied, we have made a favorable determination on
your application identified above. Please keep this letter in your permanent
records.

   Continued qualification of the plan will depend on its effect in operation
under its present form. (See section 1.401-1(b)(3) of the Income Tax Regulations.)
The status of the plan in operation will be reviewed periodically.

   The enclosed Publication 794 describes some events that could occur after you
receive this determination letter that would automatically nullify it without
specific notice from us. The publication also explains how operation of the plan
may affect a favorable determination letter. The information about filing
requirements in Publication 794 is being revised, and the public will soon be
notified about the revised requirements.

   This letter relates only to the status of your plan under the Internal
Revenue Code. It is not a determination regarding the effect of other Federal or
local statutes.

   If you have any questions, please contact the person whose name and telephone
number are shown above.

   (See paragraph on reverse side)          Sincerely yours,

                                            District Director

Enclosure:
Publication 794
cc: United Mine Workers of America
      1974 Pension Trust
      2021 K. Street, N.W.
      Washington, D. C.  20006

31 Hopkins Plaza, Baltimore, Md. 21201                    Form L-325 (Rev. 7-75)

**CONFIDENTIAL**                                    **1974PLAN_002910**

LAW OFFICES OF

## MILLER & CHEVALIER

1700 PENNSYLVANIA AVENUE, N. W.

WASHINGTON, D. C. 20006

AREA CODE 202
223-2626

ROBERT N. MILLER
1879-1968

STUART CHEVALIER
1879-1956

DAVID W. RICHMOND
CHARLES T. AKRE
NUMA L. SMITH, JR.
BARRON K. GRIER
JOHN S. NOLAN
FRED W. PEEL
RAPHAEL SHERFY
JOHN M. BIXLER
CLARENCE T. KIPPS, JR.
JAMES F. GORDY
PHILIP S. NEAL
MILTON F. BROWN, JR.
ROBERT L. MOORE, II

A. JOHN GABIG
CHARLES J. MONAHAN
DENNIS P. BEDELL
ROBERT D. HEYDE
EWING EVERETT
MALCOLM JOHNSON
JAMES K. JEANBLANC
JOHN LLOYD RICE
GARY G. QUINTIERE
JAMES W. MIDGLEY
EDWARD A. LENZ
F. BROOK VOGHT
FREDERICK H. ROBINSON

June 10, 1975

Ian Lanoff, Esquire
General Counsel
United Mine Workers of America
  Welfare and Retirement Funds
2021 K Street, N. W.
Washington, D. C. 20006

Dear Ian:

Enclosed is a photocopy of a ruling issued to the Trustees on June 9, 1975, which was promised on November 25, 1974. The ruling holds that the 1950 and 1974 Pension Plans and Trusts are covered by the special legislation contained in ERISA to permit the Plans to qualify under Code §401(a).

Now we can apply to the District Director for appropriate determination letters.

Sincerely,

Philip S. Neal

Enclosure
cc: Messrs. Danziger, Ahern, Farmer,
        Hester, Miller

Phone Contact:  A. Pipkin
Phone Number :  202-964-4456



**Internal Revenue Service**

Washington, DC 20224

Date JUN 9 1975 | In reply refer to.
| E:EP:T:5

Harry Huge, Chairman
C. W. Davis, Trustee, Board of Trustees
of the United Mine Workers of America
Welfare and Retirement Fund
202 K Street, N. W.
Washington, D. C.  20006

Gentlemen:

You have requested a ruling to the effect that the retire-
ment program contained in the National Bituminous Coal Wage
Agreement of 1974 constitutes a continuation of the plan
described in section 404(c) of the Internal Revenue Code as
amended by the Employee Retirement Income Security Act of 1974
(the Act).  A conference was held with your representatives
on November 25, 1974.  Based on the information submitted and
representations made at the conference, you were advised by
a letter of that date that the Internal Revenue Service was
prepared to issue such a ruling.  On February 6, 1975, Mr.
Philip S. Neal, your authorized representative, submitted
additional information in support of your request.

On May 29, 1946, the National Bituminous Wage Agreement
was established to provide welfare and retirement benefits for
employees of the bituminous coal producing industry.  The
agreement evolved into the United Mine Workers of America Wel-
fare and Retirement Fund of 1950 (1950 Fund) which has continued
in existence through 1974.  Mine operators who are signatories
to the agreement make monthly contributions to the Fund in the
form of royalties on a per ton of coal produced basis.

In 1953, the Internal Revenue Service determined that the
1950 Fund was not a qualified pension plan and, therefore, not
a tax exempt trust under the predecessors of sections 401(a)
and 501(a) of the Code.  Among the reasons for this holding
was the fact that pension trust assets were commingled with
assets which provided welfare benefits to plan participants
in a single trust.

-2-

United Mine Workers of America

As a result of the Service's determination, Congress enacted section 404(c) of the Internal Revenue Code of 1954, which generally permitted the mine operators to deduct their contributions to the Fund as ordinary and necessary business expenses.  The 1950 Fund operated in this manner until 1971 when, pursuant to instructions from the UMWA and participating employers, the Trustees proposed a restructure of the Fund in order to obtain tax exemption for the trust, and to continue the deductibility of contributions to the Fund by mine operators.  Thus, it was proposed to reorganize the 1950 Fund to provide for 1) the adoption of a Pension Plan which would qualify under section 401(a), and conversion of the 1950 Fund to a Pension Trust which would qualify for exemption from taxation under section 501(a), and 2) the establishment of a new Welfare Fund which would qualify for tax exemption under section 501(c) as an organization described in section 501(c)(9).  Under this arrangement, it was anticipated that the deductibility for contributions to the Welfare Fund would continue as ordinary and necessary business expenses, and that the deductibility for contributions to the Pension Trust would be governed by section 404(a) of the Code.

Upon the request for a determination as to the qualified status of the restructured Fund as proposed, the Service determined that it was unable to rule favorably due to the Fund's coverage of certain employees.  Under the 1950 Fund, benefits were provided not only for employees of participating employers, but also for employees of non-signatories to the 1950 Agreement, and several self-employed individuals. Since the proposed Fund contemplated coverage of the same employees, the Service questioned whether the proposed plan would satisfy the exclusive benefit requirement of section 401(a), and the requirements under section 401(d) with respect to self-employed individuals.

These questions were resolved by the enactment of section 2007 of the Act which amended section 404(c) of the Code. The effect of this provision is to treat all individuals who were participants under the UMWA plan prior to July 1, 1974 as employees of signatories to the UMWA contract, including self-employed individuals and employees of non-signatories.

**CONFIDENTIAL**                    1974PLAN_002901

-3-

United Mine Workers of America

On December 6, 1974, the restructure of the Fund was accomplished when the UMWA and the mine operators entered into the National Bituminous Coal Wage Agreement of 1974. Article XX of the agreement established four separate trusts, the United Mine Workers of America 1950 Pension Plan and Trust, the United Mine Workers of America 1974 Pension Plan and Trust, the United Mine Workers of America 1950 Benefit Trust, and the United Mine Workers of America 1974 Benefit Trust.  This ruling is concerned only with the 1950 and 1974 Pension Plans and Trusts.

You indicate that the qualification and exemption of the 1950 Pension Plan and Trust and the 1974 Pension Plan and Trust can be obtained only if they are considered to be the plan described by the provisions of section 404(c) of the Code, as amended by ERISA.  In order to be covered by section 404(c), the 1950 and 1974 Pension Plans and Trusts must constitute plans "established prior to January 1, 1954, as a result of an agreement between employee representatives and the United States during a period of Government operation, under seizure powers, of a major part of the productive facilities of the industry under which such employer is engaged."  Therefore, you specifically request a ruling to the effect that the 1950 and 1974 Pension Plans and Trusts represent a continuation of the 1950 Fund.

In support of your request, you cite section (a) of Article XX of the 1974 Wage Agreement which provides that the newly established 1950 and 1974 Pension Plans and Trusts and Benefit Trusts "shall be a continuation of the UMWA Welfare and Retirement Fund of 1950."  Under the new arrangement, the 1950 Pension Plan and Trust will succeed to all assets and assume all liabilities of the 1950 Fund. Contributions will continue to be made on a royalty basis.

Generally, the 1950 Pension Plan and Trust will cover all participants who retire from employment prior to December 31, 1975, and the 1974 Pension Plan and Trust will cover all current employees eligible to participate who retire after December 31, 1975.  Participants who retire under the terms of the 1974 Pension Plan and Trust will be given past service credit for service prior to execution of the 1974

CONFIDENTIAL

-4-

United Mine Workers of America

Agreement.  In addition, upon discharge of all its obligations,
the 1950 Pension Trust shall terminate and transfer any re-
maining assets to the 1974 Pension Trust.  Thus, you argue
that the establishment of the 1950 and 1974 Pension Plans
and Trusts does not result in the termination of the 1950
Fund, but rather represents a continuation of the program
instituted in 1950. See section 1.401-6(b) of the Income Tax
Regulations.

You refer to the legislative history of section 404(c)
as further evidence that the 1950 and 1974 Pension Plans and
Trusts are continuations of the 1950 Fund, and are described
by that Code provision as amended by ERISA.  You emphasize
that the purpose of amending section 404(c) was to permit
the 1950 Fund to attain tax exempt status by reorganizing
into separate pension and welfare trusts.  In support of
this contention, you cite House Rept. 93-807 which states,

> "It has been called to the committee's attention
> that changes in the coal mining industry and in
> the administration of the welfare and pension
> trust have made it desirable to establish two
> separate trusts--one for the payment of welfare
> benefits and the second for the payment of retire-
> ment benefits.  Your committee believes that this
> is a desirable objective and that the pension
> trust should be allowed to satisfy the requirements
> for qualification of pension plans in order to
> obtain the favorable tax benefits associated
> therewith." (At pp. 166-167.)

You concluded that Congress anticipated the restructure
of the 1950 Fund, and provided for its coverage under section
404(c) of the Code.  You note that prior to the enactment of
ERISA, section 404(c)(1) provided for the payment of "medical,
hospital care and pensions" (emphasis supplied), which de-
scribed the structure of the combined pension and welfare
arrangement of the 1950 Fund.  However, section 404(c)(1),
as amended by ERISA, applies to contributions paid by an em-
ployer "under a plan under which contributions are held in
trust for the purpose of paying...medical, hospital care or
pensions (emphasis supplied), which describes the separate
arrangement established on December 6, 1974.



-5-

United Mine Workers of America

Based on the information presented, we find that the
newly established 1950 and 1974 Pension Plans and Trusts
were intended to continue the benefits provided by the UMWA
Welfare and Retirement Fund of 1950.  This intent is spe-
cifically expressed in the plan, and is further evidenced by
the provisions relating to coverage, contributions, benefits
and succession of assets. In addition, we find support in
your contention that Congress amended 404(c) in contemplation
of the reorganization of the 1950 Fund.  Accordingly, we
conclude that the 1950 Pension Plan and Trust, and the 1974
Pension Plan and Trust represent a continuation of the
United Mine Workers of America Welfare and Retirement Fund
of 1950, and therefore constitute a plan described in section
404(c) of the Code.

With regard to the second issue raised by your ruling
request, questions as to the qualified status of the plan
under section 401 of the Code and applicability of section
401(b) are matters within the jurisdiction of the Baltimore
district office.  Therefore, we are not expressing
any opinion with respect to this issue.

A copy of this letter is being sent to Mr. Philip S.
Neal in accordance with a power of attorney on file in this
office.

Sincerely yours,

Fred J. Ochs
Director, Employee Plans Division

Phone Contact:  A.     pkin
Phone Number :  202-964-4456

**Internal Revenue Service**
Washington, DC 20224
Date: JUN 9  1975  | In reply refer to:
                  | E:EP:T:5

Harry Huge, Chairman
C. W. Davis, Trustee, Board of Trustees
of the United Mine Workers of America
Welfare and Retirement Fund
2021 K Street, N. W.
Washington, D. C.  20006

Gentlemen:

You have requested a ruling to the effect that the retirement program contained in the National Bituminous Coal Wage Agreement of 1974 constitutes a continuation of the plan described in section 404(c) of the Internal Revenue Code as amended by the Employee Retirement Income Security Act of 1974 (the Act). A conference was held with your representatives on November 25, 1974. Based on the information submitted and representations made at the conference, you were advised by a letter of that date that the Internal Revenue Service was prepared to issue such a ruling. On February 6, 1975, Mr. Philip S. Neal, your authorized representative, submitted additional information in support of your request.

On May 29, 1946, the National Bituminous Wage Agreement was established to provide welfare and retirement benefits for employees of the bituminous coal producing industry. The agreement evolved into the United Mine Workers of America Welfare and Retirement Fund of 1950 (1950 Fund) which has continued in existence through 1974. Mine operators who are signatories to the agreement make monthly contributions to the Fund in the form of royalties on a per ton of coal produced basis.

In 1953, the Internal Revenue Service determined that the 1950 Fund was not a qualified pension plan and, therefore, not a tax exempt trust under the predecessors of sections 401(a) and 501(a) of the Code. Among the reasons for this holding was the fact that pension trust assets were commingled with assets which provided welfare benefits to plan participants in a single trust.

-2-

United Mine Workers of America

As a result of the Service's determination, Congress
enacted section 404(c) of the Internal Revenue Code of 1954,
which generally permitted the mine operators to deduct
their contributions to the Fund as ordinary and necessary
business expenses. The 1950 Fund operated in this manner
until 1971 when, pursuant to instructions from the UMWA and
participating employers, the Trustees proposed a restructure
of the Fund in order to obtain tax exemption for the trust,
and to continue the deductibility of contributions to the
Fund by mine operators. Thus, it was proposed to reorganize
the 1950 Fund to provide for 1) the adoption of a Pension
Plan which would qualify under section 401(a), and con-
version of the 1950 Fund to a Pension Trust which would
qualify for exemption from taxation under section 501(a),
and 2) the establishment of a new Welfare Fund which would
qualify for tax exemption under section 501(c) as an organi-
zation described in section 501(c)(9). Under this arrangement,
it was anticipated that the deductibility for contributions
to the Welfare Fund would continue as ordinary and necessary
business expenses, and that the deductibility for contributions
to the Pension Trust would be governed by section 404(a) of
the Code.

Upon the request for a determination as to the qualified
status of the restructured Fund as proposed, the Service
determined that it was unable to rule favorably due to the
Fund's coverage of certain employees. Under the 1950 Fund,
benefits were provided not only for employees of participating
employers, but also for employees of non-signatories to the
1950 Agreement, and several self-employed individuals.
Since the proposed Fund contemplated coverage of the same
employees, the Service questioned whether the proposed plan
would satisfy the exclusive benefit requirement of section
401(a), and the requirements under section 401(d) with
respect to self-employed individuals.

These questions were resolved by the enactment of
section 2007 of the Act which amended section 404(c) of the
Code. The effect of this provision is to treat all individuals
who were participants under the UMWA plan prior to July 1,
1974 as employees of signatories to the UMWA contract,
including self-employed individuals and employees of non-
signatories.

CONFIDENTIAL                    1974PLAN_002906

-3-

United Mine Workers of America

On December 6, 1974, the restructure of the Fund was accomplished when the UMWA and the mine operators entered into the National Bituminous Coal Wage Agreement of 1974. Article XX of the agreement established four separate trusts, the United Mine Workers of America 1950 Pension Plan and Trust, the United Mine Workers of America 1974 Pension Plan and Trust, the United Mine Workers of America 1950 Benefit Trust, and the United Mine Workers of America 1974 Benefit Trust.  This ruling is concerned only with the 1950 and 1974 Pension Plans and Trusts.

You indicate that the qualification and exemption of the 1950 Pension Plan and Trust and the 1974 Pension Plan and Trust can be obtained only if they are considered to be the plan described by the provisions of section 404(c) of the Code, as amended by ERISA.  In order to be covered by section 404(c), the 1950 and 1974 Pension Plans and Trusts must constitute plans "established prior to January 1, 1954, as a result of an agreement between employee representatives and the United States during a period of Government operation, under seizure powers, of a major part of the productive facilities of the industry under which such employer is engaged."  Therefore, you specifically request a ruling to the effect that the 1950 and 1974 Pension Plans and Trusts represent a continuation of the 1950 Fund.

In support of your request, you cite section (a) of Article XX of the 1974 Wage Agreement which provides that the newly established 1950 and 1974 Pension Plans and Trusts and Benefit Trusts "shall be a continuation of the UMWA Welfare and Retirement Fund of 1950."  Under the new arrangement, the 1950 Pension Plan and Trust will succeed to all assets and assume all liabilities of the 1950 Fund. Contributions will continue to be made on a royalty basis.

Generally, the 1950 Pension Plan and Trust will cover all participants who retire from employment prior to December 31, 1975, and the 1974 Pension Plan and Trust will cover all current employees eligible to participate who retire after December 31, 1975.  Participants who retire under the terms of the 1974 Pension Plan and Trust will be given past service credit for service prior to execution of the 1974

CONFIDENTIAL

-4-

United Mine Workers of America

Agreement. In addition, upon discharge of all its obligations, the 1950 Pension Trust shall terminate and transfer any remaining assets to the 1974 Pension Trust. Thus, you argue that the establishment of the 1950 and 1974 Pension Plans and Trusts does not result in the termination of the 1950 Fund, but rather represents a continuation of the program instituted in 1950. See section 1.401-6(b) of the Income Tax Regulations.

You refer to the legislative history of section 404(c) as further evidence that the 1950 and 1974 Pension Plans and Trusts are continuations of the 1950 Fund, and are described by that Code provision as amended by ERISA. You emphasize that the purpose of amending section 404(c) was to permit the 1950 Fund to attain tax exempt status by reorganizing into separate pension and welfare trusts. In support of this contention, you cite House Rept. 93-807 which states,

> "It has been called to the committee's attention
> that changes in the coal mining industry and in
> the administration of the welfare and pension
> trust have made it desirable to establish two
> separate trusts--one for the payment of welfare
> benefits and the second for the payment of retire-
> ment benefits. Your committee believes that this
> is a desirable objective and that the pension
> trust should be allowed to satisfy the requirements
> for qualification of pension plans in order to
> obtain the favorable tax benefits associated
> therewith." (At pp. 166-167.)

You concluded that Congress anticipated the restructure of the 1950 Fund, and provided for its coverage under section 404(c) of the Code. You note that prior to the enactment of ERISA, section 404(c)(1) provided for the payment of "medical, hospital care and pensions" (emphasis supplied), which described the structure of the combined pension and welfare arrangement of the 1950 Fund. However, section 404(c)(1), as amended by ERISA, applies to contributions paid by an employer "under a plan under which contributions are held in trust for the purpose of paying...medical, hospital care or pensions (emphasis supplied), which describes the separate arrangement established on December 6, 1974.

-5-

United Mine Workers of America

Based on the information presented, we find that the
newly established 1950 and 1974 Pension Plans and Trusts
were intended to continue the benefits provided by the UMWA
Welfare and Retirement Fund of 1950.  This intent is spe-
cifically expressed in the plan, and is further evidenced by
the provisions relating to coverage, contributions, benefits
and succession of assets. In addition, we find support in
your contention that Congress amended 404(c) in contemplation
of the reorganization of the 1950 Fund.  Accordingly, we
conclude that the 1950 Pension Plan and Trust, and the 1974
Pension Plan and Trust represent a continuation of the
United Mine Workers of America Welfare and Retirement Fund
of 1950, and therefore constitute a plan described in section
404(c) of the Code.

With regard to the second issue raised by your ruling
request, questions as to the qualified status of the plan
under section 401 of the Code and applicability of section
401(b) are matters within the jurisdiction of the Baltimore
district office.  Therefore, we are not expressing
any opinion with respect to this issue.

A copy of this letter is being sent to Mr. Philip S.
Neal in accordance with a power of attorney on file in this
office.

Sincerely yours,

Fred J. Ochs
Director, Employee Plans Division

CONFIDENTIAL    1974PLAN_002909

JA 001125

# NATIONAL BITUMINOUS COAL
# WAGE AGREEMENT OF 1974

**Effective December 6, 1974**



*Section (b)* **Classification Requirement**

Within sixty (60) days of his employment or within sixty (60) days of the effective date of this Agreement, whichever is earlier, each new Employee—unless prohibited by law—shall be classified in a regular, recognized occupation. Failure to so classify such new Employee will result in automatic classification at the rate which is the highest rate for any work performed during the period since he was employed and has not been classified. Nothing in this section, however, shall be understood to require double manning of jobs or prevent return of an Employee to his usual classification following temporary assignment to another job.

*Section (c)* **Temporary Assignments**

Every reasonable effort shall be made to keep an Employee at work on the job duties normally and customarily a part of his regular job, and to minimize to the extent practicable the amount of temporary assignments of particular individuals to other jobs. However, where a senior Employee has expressed a desire to improve his ability to perform a job to which he wishes to be promoted, to the extent practicable, he shall be given a preference in filling temporary assignments in regard to that job.

*Section (d)* **Protection Against Discrimination**

In no case may the Employer make a temporary assignment for the purpose of disciplining or discriminating against an Employee.

*Section (e)* **Compensation for Temporary Assignments**

When an Employee works on another job on a temporary basis, he shall be compensated for the entire shift at the higher of his

82

regular rate or the rate of the job to which he is temporarily assigned. This section shall not be construed to apply to Employees whose regular job duties include the relief of other Employees for short periods of time which do not exceed thirty (30) minutes for each occurrence during the basic workday. For such relief periods, however, the Employee providing relief shall be paid the higher rate.

### Article XX—HEALTH AND RETIREMENT BENEFITS

*Section (a)* **General Purpose**

This Article makes provision for pension, health and other benefits for Employees covered by this Agreement, and for former Employees who were covered under the United Mine Workers of America Welfare and Retirement Fund of 1950 ("1950 Fund"), and for the spouses and dependents of such Employees. The benefits to be provided are as set forth under separate plans and trusts described in Section (b) and (c) of this Article.

A summary of the benefits to be provided appears immediately following this Article.

For purposes of this Article, the 1950 Pension Plan and Trust, the 1974 Pension Plan and Trust, the 1950 Benefit Plan and Trust and the 1974 Benefit Plan and Trust and each of them shall be a continuation of the UMWA Welfare and Retirement Fund of 1950 (hereinafter the 1950 Fund) provided that:

(1) The 1950 Pension Trust shall be solely responsible for all indebtedness, accounts payable, claims, causes of action and other liabilities (except as provided in (2) below) incurred or arising prior to December 6, 1974, and shall likewise be entitled and shall succeed to all assets held in trust

83

by the 1950 Fund and all assets due the 1950 Fund on said date and to all rights heretofore accruing to or exercisable by the 1950 Fund;

(2) For all participants covered by the 1974 Pension Plan and Trust, the 1974 Pension Trust shall assume the liabilities for pensions including those arising out of past service credits attributable to employment prior to December 6, 1975.

Each participant and beneficiary shall be entitled only to the pension benefits provided in and paid from either the 1950 Pension Plan and Trust or the 1974 Pension Plan and Trust, and each participant, beneficiary and dependent shall be entitled only to the benefits provided in and paid from either the 1950 Benefit Trust or the 1974 Benefit Trust.

The general purpose of the plans established by this Article shall be to provide health care for working and retired miners and their dependents; pensions for miners upon their retirement; and health care and financial support for eligible disabled miners, miners' widows and surviving dependents as provided by each of the Trusts and Plans established under this Article.

It is agreed that the Trusts established in this Article are irrevocable Trusts created pursuant to, and within the scope of, Section 302(c) of the Labor-Management Relations Act, 1947, and they shall endure as long as the purposes for their creation shall exist.

### Section (b) 1950 Plans and Trusts

Effective December 6, 1974, the name of the 1950 Fund is changed to the United Mine Workers of America 1950 Pension Trust ("1950 Pension Trust"). The 1950 Pension Trust is incorporated by reference and made a part of this Agreement. The

84

terms of the 1950 Fund are hereby amended by substituting the terms of the 1950 Pension Trust and of the United Mine Workers of America 1950 Pension Plan ("1950 Pension Plan"). The 1950 Pension Plan is incorporated by reference and made a part of this Agreement. The pensions to be paid from the 1950 Pension Trust are as set forth in the 1950 Pension Plan.

Effective December 6, 1974, there is established a benefit plan and trust, which trust shall be known as the United Mine Workers of America 1950 Benefit Plan and Trust ("1950 Benefit Trust"). The 1950 Benefit Trust is incorporated by reference and made a part of this Agreement. The 1950 Benefit Trust provides health and other benefits, not including pension benefits, and the terms and conditions under which those benefits will be provided are as set forth in the plan under the 1950 Benefit Trust.

Upon the discharge of all its obligations, any remaining assets in either the 1950 Benefit Trust or the 1950 Pension Trust shall, upon termination of such Trusts, be transferred to the 1974 Benefit or Pension Trusts, respectively.

### Section (c) 1974 Plans and Trusts

(1) Effective December 6, 1974, there is established a pension trust to be known as the United Mine Workers of America 1974 Pension Trust ("1974 Pension Trust"), which is incorporated by reference and made a part of this Agreement. The pensions to be paid from the 1974 Pension Trust are as set forth in the United Mine Workers of America 1974 Pension Plan ("1974 Pension Plan"), which is incorporated by reference and made a part of this Agreement. This Plan is a continuation of the pension program of the 1950 Fund and is effective December 6, 1974.

85

JA 001128

JA 001129



# NATIONAL BITUMINOUS COAL
# WAGE AGREEMENT OF 1978

### Effective March 27, 1978

any work performed during the period since he was employed and has not been classified. Nothing in this section, however, shall be understood to require double manning of jobs or prevent return of an Employee to his usual classification following temporary assignment to another job.

### Section (c)  Temporary Assignments

Every reasonable effort shall be made to keep an Employee at work on the job duties normally and customarily a part of his regular job, and to minimize to the extent practicable the amount of temporary assignments of particular individuals to other jobs. However, where a senior Employee has expressed a desire to improve his ability to perform a job to which he wishes to be promoted, to the extent practicable, he shall be given a preference in filling temporary assignments in regard to that job.

### Section (d)  Protection Against Discrimination

In no case may the Employer make a temporary assignment for the purpose of disciplining or discriminating against an Employee.

### Section (e)  Compensation for Temporary Assignments

When an Employee works on another job on a temporary basis, he shall be compensated for the entire shift at the higher of his regular rate or the rate of the job to which he is temporarily assigned. This section shall not be construed to apply to Employees whose

regular job duties include the relief of other Employees for short periods of time which do not exceed thirty (30) minutes for each occurrence during the basic workday. For such relief periods, however, the Employee providing relief shall be paid the higher rate.

## Article XX—HEALTH AND RETIREMENT BENEFITS

### Section (a)  General Purpose

This Article makes provision for pension, health and other benefits for Employees covered by this Agreement, and for former Employees who were covered under the United Mine Workers of America Welfare and Retirement Fund of 1950 ("1950 Fund"), and for the spouses and dependents of such Employees. The benefits to be provided are as set forth under separate plans and trusts referred to in Sections (b) and (c) of this Article.

A general description of the benefits to be provided appears immediately following this Article.

For purposes of this Article, the 1950 Pension Plan and Trust, the 1974 Pension Plan and Trust, the 1950 Benefit Plan and Trust and the 1974 Benefit Plan and Trust and each of them shall be a continuation of the benefit program established under the UMWA Welfare and Retirement Fund of 1950 (hereinafter the 1950 Fund) provided that:

(1) The 1950 Pension Trust shall be solely responsible for all indebtedness, accounts payable, claims, causes of action and other liabilities (except as pro-

vided in (2) below) incurred or arising prior to December 6, 1974, and shall likewise be entitled and shall succeed to all assets held in trust by the 1950 Fund and all assets due the 1950 Fund on said date and to all rights heretofore accruing to or exercisable by the 1950 Fund;

(2) For all participants covered by the 1974 Pension Plan and Trust, the 1974 Pension Trust has assumed the liabilities for pensions including those arising out of past service credits attributable to employment prior to December 6, 1975.

Each participant and beneficiary shall be entitled only to the pension benefits provided in and paid from either the 1950 Pension Plan and Trust or the 1974 Pension Plan and Trust and each participant, beneficiary and dependent shall be entitled only to the benefits provided in and paid from the 1950 Benefit Trust, the 1974 Benefit Trust, or the individual benefit plans referred to in Section (c).

The general purpose of the plans referred to in this Article shall be to provide health care for working and retired miners and their dependents; pensions for miners upon their retirement; health care and financial support for eligible disabled miners; and financial support for surviving spouses and surviving dependents provided by each of the Trusts and Plans referred to in this Article.

Except as otherwise specifically set forth in this Article, it is agreed that the Trusts referred to in this Article are irrevocable Trusts created pursuant to, and within the scope of, Section

302(c) of the Labor-Management Relations Act, 1947, and shall endure as long as the purposes for their creation shall exist.

*Section (b)*   **1950 Plans and Trusts**

The United Mine Workers of America 1950 Pension Trust ("1950 Pension Trust") is incorporated by reference and made a part of this Agreement. The terms of the 1950 Fund have heretofore been amended by substituting the terms of the 1950 Pension Trust and of the United Mine Workers of America 1950 Pension Plan ("1950 Pension Plan"). The 1950 Pension Plan is incorporated by reference and made a part of this Agreement. The pensions to be paid from the 1950 Pension Trust are as set forth in the 1950 Pension Plan.

The United Mine Workers of America 1950 Benefit Plan and Trust ("1950 Benefit Trust") is incorporated by reference and made a part of this Agreement. The 1950 Benefit Trust provides health and other benefits, not including pension benefits, and the terms and conditions under which those benefits will be provided are as set forth in the plan under the 1950 Benefit Trust.

Upon the discharge of all its obligations, any remaining assets in either the 1950 Benefit Trust or the 1950 Pension Trust shall, upon termination of such Trusts, be transferred to the 1974 Benefit or Pension Trusts, respectively.

*Section (c)*   **1974 Plans and Trusts**

(1) The United Mine Workers of America 1974 Pension Trust ("1974 Pension Trust") is incorporated by reference and made a part of this Agree-

JA 001132

JA 001133

# NATIONAL BITUMINOUS COAL WAGE AGREEMENT OF 1981

## Effective June 7, 1981



Art. XX

ity to perform a job to which he wishes to be promoted, to the extent practicable, he shall be given a preference in filling temporary assignments in regard to that job.

### Section (d)  Protection Against Discrimination

In no case may the Employer make a temporary assignment for the purpose of disciplining or discriminating against an Employee.

### Section (e)  Compensation for Temporary Assignments

When an Employee works on another job on a temporary basis, he shall be compensated for the entire shift at the higher of his regular rate or the rate of the job to which he is temporarily assigned. This section shall not be construed to apply to Employees whose regular job duties include the relief of other Employees for short periods of time which do not exceed thirty (30) minutes for each occurrence during the basic workday. For such relief periods, however, the Employee providing relief shall be paid the higher rate.

## Article XX—HEALTH AND RETIREMENT BENEFITS

### Section (a)  General Purpose

This Article makes provision for pension, health and other benefits for Employees covered by this Agreement, and for former Employees who were covered under the United Mine Workers of America Welfare and Retirement Fund of 1950 ("1950 Fund"), and for the spouses and dependents of such Employees. The benefits to be provided are as set forth under separate plans and trusts referred to in Sections (b) and (c) of this Article.

A general description of the benefits to be provided appears immediately following this Arti-

80

Art. XX

cle. The specific provisions of the plans will govern in the event of any inconsistencies between the general description and the plans.

For purposes of this Article, the 1950 Pension Plan and Trust, the 1974 Pension Plan and Trust, the 1950 Benefit Plan and Trust and the 1974 Benefit Plan and Trust and each of them shall be a continuation of the benefit program established under the UMWA Welfare and Retirement Fund of 1950 (hereinafter the 1950 Fund) provided that:

(1) The 1950 Pension Trust shall be solely responsible for all indebtedness, accounts payable, claims, causes of action and other liabilities (except as provided in (2) below) incurred or arising prior to December 6, 1974, and shall likewise be entitled and shall succeed to all assets held in trust by the 1950 Fund and all assets due the 1950 Fund on said date and to all rights heretofore accruing to or exercisable by the 1950 Fund;

(2) For all participants covered by the 1974 Pension Plan and Trust, the 1974 Pension Trust has assumed the liabilities for pensions including those arising out of past service credits attributable to employment prior to December 6, 1975.

Each participant and beneficiary shall be entitled only to the pension benefits provided in and paid from either the 1950 Pension Plan and Trust or the 1974 Pension Plan and Trust and each participant, beneficiary and dependent shall be entitled only to the benefits provided in and paid from the 1950 Benefit Trust, the 1974 Benefit Trust, or the individual benefit plans referred to in Section (c).

The general purpose of the plans referred to in this Article shall be to provide health care for working and retired miners and their dependents; pensions for miners upon their retirement; health care and financial support for eligible disabled miners; and financial support for surviving

81

Art. XX

spouses and surviving dependents provided by each of the Trusts and Plans referred to in this Article.

Except as otherwise specifically set forth in this Article, it is agreed that the Trusts referred to in this Article are irrevocable Trusts created pursuant to, and within the scope of, Section 302(c) of the Labor-Management Relations Act, 1947, and shall endure as long as the purposes for their creation shall exist.

### Section (b) 1950 Plans and Trusts

The United Mine Workers of America 1950 Pension Trust ("1950 Pension Trust") is incorporated by reference and made a part of this Agreement. The terms of the 1950 Fund have heretofore been amended by substituting the terms of the 1950 Pension Trust and of the United Mine Workers of America 1950 Pension Plan ("1950 Pension Plan"). The 1950 Pension Plan is incorporated by reference and made a part of this Agreement. The pensions to be paid from the 1950 Pension Trust are as set forth in the 1950 Pension Plan.

The United Mine Workers of America 1950 Benefit Plan and Trust ("1950 Benefit Trust") is incorporated by reference and made a part of this Agreement. The 1950 Benefit Trust provides health and other benefits, not including pension benefits, and the terms and conditions under which those benefits will be provided are as set forth in the plan under the 1950 Benefit Trust.

Upon the discharge of all its obligations, any remaining assets in either the 1950 Benefit Trust or the 1950 Pension Trust shall, upon termination of such Trusts, be transferred to the 1974 Benefit or Pension Trusts, respectively.

### Section (c) 1974 Plans and Trusts

(1) The United Mine Workers of America 1974 Pension Trust ("1974 Pension Trust") is incorporated by reference and made a part of this

82

Art. XX

Agreement. The pensions to be paid from the 1974 Pension Trust are as set forth in the United Mine Workers of America 1974 Pension Plan ("1974 Pension Plan"), which is incorporated by reference and made a part of this Agreement. This Plan is a continuation of the pension program of the 1950 Fund and was effective December 6, 1974.

(2) The 1974 Benefit Plan and Trust ("1974 Benefit Trust") is incorporated by reference and made a part of this Agreement. The 1974 Benefit Trust provides certain health and other benefits, not including pension benefits, and the terms and conditions under which those benefits will be provided are as set forth in the plan under the 1974 Benefit Trust and under the terms of this Article.

(3)(i) Each signatory Employer shall establish and maintain an Employee benefit plan to provide, implemented through an insurance carrier(s), health and other non-pension benefits for its Employees covered by this Agreement as well as pensioners, under the 1974 Pension Plan and Trust, whose last signatory classified employment was with such Employer. The benefits provided by the Employer to its eligible Participants pursuant to such plans shall be guaranteed during the term of this Agreement by that Employer at levels set forth in such plans. Such plans shall also include that each signatory Employer continue to make the death benefit payments in pay status as of December 5, 1977, for deceased Employees and pensioners under the 1974 Pension Plan whose last signatory classified employment was with such Employer, in the same manner and in the same amounts as previously provided for in the 1974 Benefit Plan and Trust. The plans established pursuant to this subsection are incorporated by reference and made a part of this Agreement, and the terms and conditions under which the health and other non-pension benefits

83

JA 001136



NATIONAL BITUMINOUS COAL
WAGE AGREEMENT OF 1984

JA 001138

Art. XIX

## Article XIX—CLASSIFICATION

### Section (a) Working in Classification

An Employee shall normally be assigned to duties customarily involved with his regular classified job in accordance with the following principles.

### Section (b) Classification Requirement

Within sixty (60) days of his employment or within sixty (60) days of the effective date of this Agreement, whichever is earlier, each new Employee—unless prohibited by law—shall be classified in a regular, recognized occupation. Failure to so classify such new Employee will result in automatic classification at the rate which is the highest rate for any work performed during the period since he was employed and has not been classified. Nothing in this section, however, shall be understood to require double manning of jobs or prevent return of an Employee to his usual classification following temporary assignment to another job.

### Section (c) Temporary Assignments

Every reasonable effort shall be made to keep an Employee at work on the job duties normally and customarily a part of his regular job, and to minimize to the extent practicable the amount of temporary assignments of particular individuals to other jobs. However, where a senior Employee has expressed a desire to improve his ability to perform a job to which he wishes to be promoted, to the extent practicable,

106

Art. XX

he shall be given a preference in filling temporary assignments in regard to that job.

### Section (d) Protection Against Discrimination

In no case may the Employer make a temporary assignment for the purpose of disciplining or discriminating against an Employee.

### Section (e) Compensation for Temporary Assignments

When an Employee works on another job on a temporary basis, he shall be compensated for the entire shift at the higher of his regular rate or the rate of the job to which he is temporarily assigned. This section shall not be construed to apply to Employees whose regular job duties include the relief of other Employees for short periods of time which do not exceed thirty (30) minutes for each occurrence during the basic workday. For such relief periods, however, the Employee providing relief shall be paid the higher rate.

## Article XX—HEALTH AND RETIREMENT BENEFITS

### Section (a) General Purpose

This Article makes provision for pension, health and other benefits for Employees covered by this Agreement, and for former Employees who were covered under the United Mine Workers of America Wel-

107

Art. XX

Agreement. This Plan is a continuation of the pension program of the 1950 Fund and was effective December 6, 1974.

(2) The 1974 Benefit Plan and Trust ("1974 Benefit Trust") is incorporated by reference and made a part of this Agreement. The 1974 Benefit Trust provides of certain health and other benefits, not including pension benefits, and the terms and conditions under which those benefits will be provided are as set forth in the plan under the 1974 Benefit Trust and under the terms of this Article.

(3) (i) Each signatory Employer shall establish and maintain an Employee benefit plan to provide, implemented through an insurance carrier(s), health and other non-pension benefits for its Employees covered by this Agreement as well as pensioners, under the 1974 Pension Plan and Trust, whose last signatory classified employment was with such Employer. The benefits provided by the Employer to its eligible Participants pursuant to such plans shall be guaranteed during the term of this Agreement by that Employer and shall also at levels set forth in such plans. Such plans shall also include that each signatory Employer continue to make the death benefit payments in pay status as of December 5, 1977, for deceased Employees and pensioners under the 1974 Pension Plan whose last signatory classified employment was with such Employer, in the same manner and in the same amounts as previously provided for in the 1974 Benefit Plan and Trust.

111

---

Art. XX

of the 1950 Fund have heretofore been amended by substituting the terms of the 1950 Pension Trust and of the United Mine Workers of America 1950 Pension Plan ("1950 Pension Plan"). The 1950 Pension Plan is incorporated by reference and made a part of this Agreement. The pensions to be paid from the 1950 Pension Trust are as set forth in the 1950 Pension Plan.

The United Mine Workers of America 1950 Benefit Plan and Trust ("1950 Benefit Trust") is incorporated by reference and made a part of this Agreement. The 1950 Benefit Trust provides health and other benefits, not including pension benefits, and the terms and conditions under which those benefits will be provided are as set forth in the plan under the 1950 Benefit Trust.

Upon the discharge of all its obligations, any remaining assets in either the 1950 Benefit Trust or the 1950 Pension Trust shall, upon termination of such Trusts, be transferred to the 1974 Benefit or Pension Trusts, respectively.

Section (c)   1974 Plans and Trusts

(1) The United Mine Workers of America 1974 Pension Trust ("1974 Pension Trust") is incorporated by reference and made a part of this Agreement. The pensions to be paid from the 1974 Pension Trust are as set forth in the United Mine Workers of America 1974 Pension Plan ("1974 Pension Plan"), which is incorporated by reference and made a part of this

110

---

Art. :

senio
name

Secti
WI
whicl
work
todia
from
empl
ing o
(1)
with
the E
has st
the s
to be
the i
recal
for p
(2)
servi
the I
perfo
recal
mine
locat
secti
on th

JA 001140

NATIONAL BITUMINOUS COAL
WAGE AGREEMENT OF 1988

.t. XX

## Article XX—HEALTH AND RETIREMENT BENEFITS

*Section (a)   General Purpose*

This Article makes provision for pension, health and other benefits for Employees covered by this Agreement, and for former Employees who were covered under the United Mine Workers of America Welfare and Retirement Fund of 1950 ("1950 Fund"), and for the spouses and dependents of such Employees. The benefits to be provided are as set forth under separate plans and trusts referred to in Sections (b) and (c) of this Article.

A general description of the benefits to be provided appears immediately following this Article. The specific provisions of the plans will govern in the event of any inconsistencies between the general description and the plans.

For purposes of this Article, the 1950 Pension Plan and Trust, the 1974 Pension Plan and Trust, the 1950 Benefit Plan and Trust and the 1974 Benefit Plan and Trust and each of them shall be a continuation of the benefit program established under the UMWA Welfare and Retirement Fund of 1950 (hereinafter the 1950 Fund) provided that:

(1) The 1950 Pension Trust shall be solely responsible for all indebtedness, accounts payable, claims, causes of action and other liabilities (except as provided in (2) below) incurred or arising prior to De-

120

Art. XX

cember 6, 1974, and shall likewise be entitled and shall succeed to all assets held in trust by the 1950 Fund and all assets due the 1950 Fund on said date and to all rights heretofore accruing to or exercisable by the 1950 Fund;

(2) For all participants covered by the 1974 Pension Plan and Trust, the 1974 Pension Trust has assumed the liabilities for pensions including those arising out of past service credits attributable to employment prior to December 6, 1975.

Each participant and beneficiary shall be entitled only to the pension benefits provided in and paid from either the 1950 Pension Plan and Trust or the 1974 Pension Plan and Trust and each participant, beneficiary and dependent shall be entitled only to the benefits provided in and paid from the 1950 Benefit Trust, the 1974 Benefit Trust, or the individual benefit plans referred to in Section (c).

The general purpose of the plans referred to in this Article shall be to provide health care for working and retired miners and their dependents; pensions for miners upon their retirement; health care and financial support for eligible disabled miners; and financial support for surviving spouses and surviving dependents provided by each of the Trusts and Plans referred to in this Article.

Except as otherwise specifically set forth in this Article, it is agreed that the Trusts referred to in this Article are irrevocable Trusts created pursuant to, and

121

. . XX

## Article XX—HEALTH AND RETIREMENT BENEFITS

*Section (a)   General Purpose*

This Article makes provision for pension, health and other benefits for Employees covered by this Agreement, and for former Employees who were covered under the United Mine Workers of America Welfare and Retirement Fund of 1950 ("1950 Fund"), and for the spouses and dependents of such Employees. The benefits to be provided are as set forth under separate plans and trusts referred to in Sections (b) and (c) of this Article.

A general description of the benefits to be provided appears immediately following this Article. The specific provisions of the plans will govern in the event of any inconsistencies between the general description and the plans.

For purposes of this Article, the 1950 Pension Plan and Trust, the 1974 Pension Plan and Trust, the 1950 Benefit Plan and Trust and the 1974 Benefit Plan and Trust and each of them shall be a continuation of the benefit program established under the UMWA Welfare and Retirement Fund of 1950 (hereinafter the 1950 Fund) provided that:

(1) The 1950 Pension Trust shall be solely responsible for all indebtedness, accounts payable, claims, causes of action and other liabilities (except as provided in (2) below) incurred or arising prior to De-

120

Art. XX

cember 6, 1974, and shall likewise be entitled and shall succeed to all assets held in trust by the 1950 Fund and all assets due the 1950 Fund on said date and to all rights heretofore accruing to or exercisable by the 1950 Fund;

(2) For all participants covered by the 1974 Pension Plan and Trust, the 1974 Pension Trust has assumed the liabilities for pensions including those arising out of past service credits attributable to employment prior to December 6, 1975.

Each participant and beneficiary shall be entitled only to the pension benefits provided in and paid from either the 1950 Pension Plan and Trust or the 1974 Pension Plan and Trust and each participant, beneficiary and dependent shall be entitled only to the benefits provided in and paid from the 1950 Benefit Trust, the 1974 Benefit Trust, or the individual benefit plans referred to in Section (c).

The general purpose of the plans referred to in this Article shall be to provide health care for working and retired miners and their dependents; pensions for miners upon their retirement; health care and financial support for eligible disabled miners; and financial support for surviving spouses and surviving dependents provided by each of the Trusts and Plans referred to in this Article.

Except as otherwise specifically set forth in this Article, it is agreed that the Trusts referred to in this Article are irrevocable Trusts created pursuant to, and

121

JA 001144

JA 001145

NATIONAL BITUMINOUS COAL
WAGE AGREEMENT OF 1993

Art. XX

job to which he is temporarily assigned. This section shall not be construed to apply to Employees whose regular job duties include the relief of other Employees for short periods of time which do not exceed thirty (30) minutes for each occurrence during the basic workday. For such relief periods, however, the Employee providing relief shall be paid the higher rate.

## Article XX—HEALTH AND RETIREMENT BENEFITS

*Section (a)  General Purpose*

This Article makes provision for pension, health and other benefits for Employees covered by this Agreement, and for former Employees who were covered under the United Mine Workers of America Welfare and Retirement Fund of 1950 ("1950 Fund"), and for the spouses and dependents of such Employees. The benefits to be provided are as set forth under separate plans and trusts referred to in Sections (b) and (c) of this Article.

A general description of the benefits to be provided appears immediately following this Article. The specific provisions of the plans will govern in the event of any inconsistencies between the general description and the plans.

Pursuant to the Coal Industry Retiree Health Benefit Act of 1992 (the "Coal Act"), the health benefits (and in some cases the death benefits) provided to re-

142

Art. XX

tirees who were age and service eligible as of February 1, 1993, and who actually retire by September 30, 1994, are guaranteed by an Act of Congress. The Coal Act, which was enacted with the active support of the United Mine Workers of America and the BCOA, requires responsible employers to provide and pay for these benefits for life. Although, under certain circumstances, employers are permitted to adopt cost containment and managed care programs, the levels of benefits provided to retirees and dependents covered by the Coal Act are fixed by law, and may not be changed by any employer.

Benefits under the Coal Act are provided either by the employer who was providing those benefits on February 1, 1993, or by two newly-created Funds: the United Mine Workers of America Combined Benefit Fund and the United Mine Workers of America 1992 Benefit Plan. Those benefits are not governed by this Agreement.

For purposes of this Article, the 1950 Pension Plan and Trust and the 1974 Pension Plan and Trust shall be a continuation of the benefit program established under the UMWA Welfare and Retirement Fund of 1950 (hereinafter the 1950 Fund).

Each participant and beneficiary shall be entitled only to the pension benefits provided in and paid from either the 1950 Pension Plan and Trust or the 1974 Pension Plan and Trust and each participant, beneficiary and dependent shall be entitled only to

143

JA 001147

# NATIONAL BITUMINOUS COAL WAGE AGREEMENT OF 1998

JA 001149

Art. XIX

## Article XIX—CLASSIFICATION

*Section (a)*  **Working in Classification**

An Employee shall normally be assigned to duties customarily involved with his regular classified job in accordance with the following principles.

*Section (b)*  **Classification Requirement**

Within sixty (60) days of his employment or within sixty (60) days of the Effective Date of this Agreement, whichever is earlier, each new Employee—unless prohibited by law—shall be classified in a regular, recognized occupation. Failure to so classify such new Employee will result in automatic classification at the rate which is the highest rate for any work performed during the period since he was employed and has not been classified. Nothing in this section, however, shall be understood to require double the manning of jobs or prevent return of an Employee to his usual classification following temporary assignment to another job.

*Section (c)*  **Temporary Assignments**

Every reasonable effort shall be made to keep an Employee at work on the job duties normally and customarily a part of his regular job, and to minimize to the extent practicable the amount of temporary assignments of particular individuals to other jobs. However, where a senior Employee has expressed a

138

Art. XX

desire to improve his ability to perform a job to which he wishes to be promoted, to the extent practicable, he shall be given a preference in filling temporary assignments in regard to that job.

*Section (d)*  **Protection Against Discrimination**

In no case may the Employer make a temporary assignment for the purpose of disciplining or discriminating against an Employee.

*Section (e)*  **Compensation for Temporary Assignments**

When an Employee works on another job on a temporary basis, he shall be compensated for the entire shift at the higher of his regular rate or the rate of the job to which he is temporarily assigned. This section shall not be construed to apply to Employees whose regular job duties include the relief of other Employees for short periods of time which do not exceed thirty (30) minutes for each occurrence during the basic workday. For such relief periods, however, the Employee providing relief shall be paid the higher rate.

## Article XX—HEALTH AND RETIREMENT BENEFITS

*Section (a)*  **General Purpose**

This Article makes provision for pension, health and other benefits for Employees covered by this

139

JA 001150

JA 001151



NATIONAL BITUMINOUS COAL
WAGE AGREEMENT OF 2002



# TABLE OF CONTENTS

|  | Page |
|---|---|
| Article I - ENABLING CLAUSE | 1 |
| **Article IA - SCOPE AND COVERAGE** | 3 |
| Section (a)  Work Jurisdiction | 3 |
| Section (b)  Exemptions Clause | 4 |
| Section (c)  Supervisors Shall Not Perform Classified Work | 5 |
| Section (d)  Management of the Mines | 5 |
| Section (e)  Union's Rights | 5 |
| Section (f)  Application of This Contract to the Employer's Coal Lands | 6 |
| Section (g)  Contracting and Subcontracting | 6 |
| Section (h)  Leasing, Subleasing and Licensing Out of Coal Lands | 8 |
| Section (i)  Construction Work | 8 |
| **Article II - JOB OPPORTUNITY AND BENEFIT SECURITY (JOBS)** | 9 |
| A  Non-Signatory Operations of the Signatory Employer | 10 |
| B  Lessee-Licensee | 13 |
| C  Coordination of Employment Obligations Under the JOBS Program | 17 |
| D-1  Employer-Wide Panel Rights to Signatory Operations | 18 |
| D-2  Exhaustion of Employer Panel | 18 |
| D-3  Monitoring of Job Selections | 18 |
| E  UMWA-BCOA Training and Education Fund | 21 |
| F  Skills Training | 24 |
| G  UMWA-BCOA Labor Management Positive Change Process ("LMPCP") | 26 |
| H  UMWA-BCOA Labor Management Policy Committee | 36 |
| I  UMWA-BCOA Resolution of Disputes Trust | 38 |

i

Art. XX

shall not be construed to apply to Employees whose regular job duties include the relief of other Employees for short periods of time which do not exceed thirty (30) minutes for each occurrence during the basic workday. For such relief periods, however, the Employee providing relief shall be paid the higher rate.

## Article XX—HEALTH AND RETIREMENT BENEFITS

*Section (a) General Purpose*

This Article makes provision for pension, health and other benefits for Employees covered by this Agreement, and for former Employees who were covered under the United Mine Workers of America Welfare and Retirement Fund of 1950 ("1950 Fund"), and for the spouses and dependents of such Employees. The benefits to be provided are as set forth under separate plans and trusts referred to in Sections (b) and (c) of this Article.

A general description of the benefits to be provided appears immediately following this Article. The specific provisions of the plans will govern in the event of any inconsistencies between the general description and the plans.

Pursuant to the Coal Industry Retiree Health Benefit Act of 1992 (the "Coal Act"), the health benefits (and in some cases the death benefits) provided to retirees who were age and service eligible as of February 1, 1993,

140

Art. XX

and who actually retired by September 30, 1994, are guaranteed by an Act of Congress. The Coal Act, which was enacted with the active support of the United Mine Workers of America and the BCOA, requires responsible employers to provide and pay for these benefits for life. Although, under certain circumstances, employers are permitted to adopt cost containment and managed care programs, the levels of benefits provided to retirees and dependents covered by the Coal Act are fixed by law, and may not be changed by any employer.

Benefits under the Coal Act are provided either by the employer who was providing those benefits on February 1, 1993, or by two newly-created Funds: the United Mine Workers of America Combined Benefit Fund and the United Mine Workers of America 1992 Benefit Plan. Those benefits are not governed by this Agreement.

For purposes of this Article, the 1950 Pension Plan and Trust and the 1974 Pension Plan and Trust shall be a continuation of the benefit program established under the UMWA Welfare and Retirement Fund of 1950 (hereinafter the 1950 Fund).

Each participant and beneficiary shall be entitled only to the pension benefits provided in and paid from either the 1950 Pension Plan and Trust or the 1974 Pension Plan and Trust and each participant, beneficiary and dependent shall be entitled only to the benefits provided in and paid from the 1993 Benefit Trust, or the individual benefit plans referred to in Section

141

JA 001154

JA 001155

NATIONAL BITUMINOUS COAL
WAGE AGREEMENT OF 2007

Art. XX

shall not be construed to apply to Employees whose regular job duties include the relief of other Employees for short periods of time which do not exceed thirty (30) minutes for each occurrence during the basic workday. For such relief periods, however, the Employee providing relief shall be paid the higher rate.

### Article XX—HEALTH AND RETIREMENT BENEFITS

*Section (a)* **General Purpose**

This Article makes provision for pension, health and other benefits for Employees covered by this Agreement, and for former Employees who were covered under the United Mine Workers of America Welfare and Retirement Fund of 1950 ("1950 Fund"), and for the spouses and dependents of such Employees. The benefits to be provided are as set forth under separate plans and trusts referred to in Sections (b) and (c) of this Article.

A general description of the benefits to be provided appears immediately following this Article. The specific provisions of the plans will govern in the event of any inconsistencies between the general description and the plans.

Pursuant to the Coal Industry Retiree Health Benefit Act of 1992 (the "Coal Act"), the health benefits (and in some cases the death benefits) provided to retirees who were age and service eligible as of February 1, 1993,

140

Art. XX

and who actually retired by September 30, 1994, are guaranteed by an Act of Congress. The Coal Act, which was enacted with the active support of the United Mine Workers of America and the BCOA, requires responsible employers to provide and pay for these benefits for life. Although, under certain circumstances, employers are permitted to adopt cost containment and managed care programs, the levels of benefits provided to retirees and dependents covered by the Coal Act are fixed by law, and may not be changed by any employer.

Benefits under the Coal Act are provided either by the employer who was providing those benefits on February 1, 1993, or by two newly-created Funds: the United Mine Workers of America Combined Benefit Fund and the United Mine Workers of America 1992 Benefit Plan. Those benefits are not governed by this Agreement.

For purposes of this Article, the 1950 Pension Plan and Trust and the 1974 Pension Plan and Trust shall be a continuation of the benefit program established under the UMWA Welfare and Retirement Fund of 1950 (hereinafter the 1950 Fund).

Each participant and beneficiary shall be entitled only to the pension benefits provided in and paid from either the 1950 Pension Plan and Trust or the 1974 Pension Plan and Trust and each participant, beneficiary and dependent shall be entitled only to the benefits provided in and paid from the 1993 Benefit Trust, or the individual benefit plans referred to in Section

141

Art. XX

(c). An individual that is entitled to health benefits from a plan maintained pursuant to the Coal Act will receive benefits from such plan, and not from a plan maintained pursuant to this Article. In addition, an individual that is entitled to death benefit coverage from the United Mine Workers of America Combined Benefit Fund shall not be entitled to death benefit coverage from any plan maintained pursuant to this Article.

The general purpose of the plans referred to in this Article shall be to provide health care for working and retired miners and their dependents; pensions for miners upon their retirement; health care and financial support for eligible disabled miners; and financial support for surviving spouses and surviving dependents provided by each of the Trusts and Plans referred to in this Article.

Except as otherwise specifically set forth in this Article, it is agreed that the Trusts referred to in this Article are irrevocable Trusts created pursuant to, and within the scope of, Section 302(c) of the Labor-Management Relations Act, 1947, and shall endure as long as the purposes for their creation shall exist.

*Section (b)* **1950 Pension Plan and Trust**

(1) The United Mine Workers of America 1950 Pension Trust ("1950 Pension Trust") is incorporated by reference and made a part of this Agreement. The United Mine Workers of America 1950 Pension Plan (the "1950 Pension Plan") is incorporated by refer-

142

ence and made a part of this Agreement. The pensions to be paid from the 1950 Pension Trust are as set forth in the 1950 Pension Plan.

(2) Pursuant to the requirements of the Coal Act, the United Mine Workers of America 1950 Benefit Plan and Trust ("1950 Benefit Trust") and the United Mine Workers of America 1974 Benefit Plan and Trust (the "1974 Benefit Trust") were merged into the United Mine Workers of America Combined Benefit Fund (the "Combined Fund"). The Combined Fund is governed by the terms of the Coal Act, and is not maintained pursuant to this Article. Health benefits for individuals who would be eligible for benefits under the 1950 Benefit Plan but for the passage of the Coal Act and who are not entitled to benefits under the Coal Act will be provided by the 1993 Benefit Fund during the term of this Agreement.

(3) Upon the discharge of all its obligations, any remaining assets in the 1950 Pension Trust shall, upon termination of such Trust, be transferred to the 1974 Pension Trust.

*Section (c)* **1974 Pension Plan and Trust, 1993 Benefit Plan and Trust, and Employer Benefit Plans**

(1) The United Mine Workers of America 1974 Pension Trust ("1974 Pension Trust") is incorporated by reference and made a part of this Agreement. The pensions to be paid from the 1974 Pension Trust are

143

JA 001158

JA 001159

ational Bituminous Coal
age Agreement of 2011

## Art. XIX

## Article XIX—CLASSIFICATION

### Section (a)  Working in Classification

An Employee shall normally be assigned to duties customarily involved with his regular classified job in accordance with the following principles.

### Section (b)  Classification Requirement

Within sixty (60) days of his employment or within sixty (60) days of the effective date of this Agreement, whichever is earlier, each new Employee—unless prohibited by law—shall be classified in a regular, recognized occupation. Failure to so classify such new Employee will result in automatic classification at the rate which is the highest rate for any work performed during the period since he was employed and has not been classified. Nothing in this section, however, shall be understood to require double manning of jobs or prevent return of an Employee to his usual classification following temporary assignment to another job.

### Section (c)  Temporary Assignments

Every reasonable effort shall be made to keep an Employee at work on the job duties normally and customarily a part of his regular job, and to minimize to the extent practicable the amount of temporary assignments of particular individuals to other jobs. However, where a senior Employee has expressed a desire to improve his ability to perform a job to which he wishes to be promoted, to the extent practicable, he shall be

142

## Art. XX

given a preference in filling temporary assignments in regard to that job.

### Section (d)  Protection Against Discrimination

In no case may the Employer make a temporary assignment for the purpose of disciplining or discriminating against an Employee.

### Section (e)  Compensation for Temporary Assignments

When an Employee works on another job on a temporary basis, he shall be compensated for the entire shift at the higher of his regular rate or the rate of the job to which he is temporarily assigned. This section shall not be construed to apply to Employees whose regular job duties include the relief of other Employees for short periods of time which do not exceed thirty (30) minutes for each occurrence during the basic workday. For such relief periods, however, the Employee providing relief shall be paid the higher rate.

## Article XX—HEALTH, RETIREMENT AND OTHER BENEFITS

### Section (a)  General Purpose

This Article makes provision for pension, health and other benefits for Employees covered by this Agreement, and for former Employees who were covered under the United Mine Workers of America Welfare

143

A.

and Retirement Fund of 1950 ("1950 Fund"), and for the spouses and dependents of such Employees. The benefits to be provided are as set forth under separate plans and trusts referred to in Sections (b) and (c) of this Article.

A general description of the benefits to be provided appears immediately following this Article. The specific provisions of the plans will govern in the event of any inconsistencies between the general description and the plans.

Pursuant to the Coal Industry Retiree Health Benefit Act of 1992 (the "Coal Act"), the health benefits (and in some cases the death benefits) provided to retirees who were age and service eligible as of February 1, 1993, and who actually retired by September 30, 1994, are guaranteed by an Act of Congress. The Coal Act, which was enacted with the active support of the United Mine Workers of America and the BCOA, requires responsible employers to provide and pay for these benefits for life. Although, under certain circumstances, employers are permitted to adopt cost containment and managed care programs, the levels of benefits provided to retirees and dependents covered by the Coal Act are fixed by law, and may not be changed by any employer. Employers signatory to this Agreement agree to and will amend their Individual Employer Plan established pursuant to the Coal Act to eliminate any earnings limit that currently applies to eligibility for a Health Card.

Art. XX

Benefits under the Coal Act are provided either by the employer who was providing those benefits on February 1, 1993, or by two newly-created Funds: the United Mine Workers of America Combined Benefit Fund and the United Mine Workers of America 1992 Benefit Plan. Those benefits are not governed by this Agreement.

For purposes of this Article, the 1974 Pension Plan and Trust shall be a continuation of the benefit program established under the UMWA Welfare and Retirement Fund of 1950 (hereinafter the 1950 Fund), and is the surviving plan following the merger of the 1974 Pension Plan and Trust and the United Mine Workers of America 1950 Plan and Trust.

Each participant and beneficiary shall be entitled only to the pension benefits provided in and paid from the 1974 Pension Plan and Trust and each participant, beneficiary and dependent shall be entitled only to the benefits provided in and paid from the 1993 Benefit Trust, or the individual benefit plans referred to in Section (c). An individual that is entitled to health benefits from a plan maintained pursuant to the Coal Act will receive benefits from such plan, and not from a plan maintained pursuant to this Article. In addition, an individual that is entitled to death benefit coverage from the United Mine Workers of America Combined Benefit Fund shall not be entitled to death benefit coverage from any plan maintained pursuant to this Article.

The general purpose of the plans referred to in this Article shall be to provide health care for working and

JA 001162



National Bituminous Coal
Wage Agreement of 2016

Art. XIX

### Section (b).  Classification Requirement

Within sixty (60) days of his employment or within sixty (60) days of the effective date of this Agreement, whichever is earlier, each new Employee—unless prohibited by law—shall be classified in a regular, recognized occupation. Failure to so classify such new Employee will result in automatic classification at the rate which is the highest rate for any work performed during the period since he was employed and has not been classified. Nothing in this section, however, shall be understood to require double manning of jobs or prevent return of an Employee to his usual classification following temporary assignment to another job.

### Section (c)   Temporary Assignments

Every reasonable effort shall be made to keep an Employee at work on the job duties normally and customarily a part of his regular job, and to minimize to the extent practicable the amount of temporary assignments of particular individuals to other jobs. However, where a senior Employee has expressed a desire to improve his ability to perform a job to which he wishes to be promoted, to the extent practicable, he shall be given a preference in filling temporary assignments in regard to that job.

### Section (d)   Protection Against Discrimination

In no case may the Employer make a temporary assignment for the purpose of disciplining or discriminating against an Employee.

124

Art. XX

### Section (e)   Compensation for Temporary Assignments

When an Employee works on another job on a temporary basis, he shall be compensated for the entire shift at the higher of his regular rate or the rate of the job to which he is temporarily assigned. This section shall not be construed to apply to Employees whose regular job duties include the relief of other Employees for short periods of time which do not exceed thirty (30) minutes for each occurrence during the basic workday. For such relief periods, however, the Employee providing relief shall be paid the higher rate.

## Article XX—HEALTH, RETIREMENT AND OTHER BENEFITS

### Section (a)   General Purpose

This Article makes provision for pension, health and other benefits for Employees covered by this Agreement, and for former Employees who were covered under the United Mine Workers of America Welfare and Retirement Fund of 1950 ("1950 Fund"), and for the spouses and dependents of such Employees. The benefits to be provided are as set forth under separate plans and trusts referred to in Sections (b) and (c) of this Article.

A general description of the benefits to be provided appears immediately following this Article. The spe-

125

Art. XX

cific provisions of the plans will govern in the event of any inconsistencies between the general description and the plans.

Pursuant to the Coal Industry Retiree Health Benefit Act of 1992 (the "Coal Act"), the health benefits (and in some cases the death benefits) provided to retirees who were age and service eligible as of February 1, 1993, and who actually retired by September 30, 1994, are guaranteed by an Act of Congress. The Coal Act, which was enacted with the active support of the United Mine Workers of America and the BCOA, requires responsible Employers to provide and pay for these benefits for life. Although, under certain circumstances, Employers are permitted to adopt cost containment and managed care programs, the levels of benefits provided to retirees and dependents covered by the Coal Act are fixed by law, and may not be changed by any Employer. Employers signatory to this Agreement agree to and will amend their Individual Employer Plan established pursuant to the Coal Act to eliminate any earnings limit that currently applies to eligibility for a Health Card.

Benefits under the Coal Act are provided either by the Employer who was providing those benefits on February 1, 1993, or by two newly-created Funds: the United Mine Workers of America Combined Benefit Fund and the United Mine Workers of America 1992 Benefit Plan. Those benefits are not governed by this Agreement.

126

Art. XX

For purposes of this Article, the 1974 Pension Plan and Trust shall be a continuation of the benefit program established under the UMWA Welfare and Retirement Fund of 1950 (hereinafter the 1950 Fund), and is the surviving plan following the merger of the 1974 Pension Plan and Trust and the United Mine Workers of America 1950 Plan and Trust.

Each participant and beneficiary shall be entitled only to the pension benefits provided in and paid from the 1974 Pension Plan and Trust and each participant, beneficiary and dependent shall be entitled only to the benefits provided in and paid from the 1993 Benefit Trust, or the individual benefit plans referred to in Section (c). An individual that is entitled to health benefits from a plan maintained pursuant to the Coal Act will receive benefits from such plan, and not from a plan maintained pursuant to this Article. In addition, an individual that is entitled to death benefit coverage from the United Mine Workers of America Combined Benefit Fund shall not be entitled to death benefit coverage from any plan maintained pursuant to this Article.

The general purpose of the plans referred to in this Article shall be to provide health care for working and retired miners and their dependents; pensions for miners upon their retirement; health care and financial support for eligible disabled miners; and financial support for surviving spouses and surviving dependents provided by each of the Trusts and Plans referred to in this Article.

127

Department of the Treasury



Assistant Commissioner
**Internal Revenue Service**
Washington, DC 20224

Harry Huge, Chairman,
C. W. Davis, Trustee,
Board of Trustees of the
United Mine Workers of America
Welfare and Retirement Fund
2021 K Street, Northwest
Washington, D.C.  20006

November 25, 1974

Gentlemen:

In your letter dated November 25, 1974, a copy of which
is attached, you have requested the Internal Revenue Service
to rule on two questions.  You have represented in such letter
that the execution of the National Bituminous Coal Wage
Agreement of 1974 ("1974 Agreement") will be delayed if these
rulings are not issued, creating a hardship for the beneficiaries
of the trust as well as the public.  You have submitted as an
enclosure to such letter a copy of the November 25, 1974,
draft of Article XX, Health and Retirement Benefits, a copy
of which is also attached.  In addition, we have discussed this
matter with Mr. N. Barr Miller, Mr. Phillip S. Neal, and
Mr. Stephen L. Hester, in their capacities as representatives
of the Bituminous Coal Operators Association, Inc., you as
trustees, and the United Mine Workers of America, respectively.

On the basis of these attached documents and the above-
mentioned representation and discussions, this is to notify
you that the Internal Revenue Service is prepared to rule
that the 1950 Pension Plan and Trust and the 1974 Pension Plan
and Trust, as more fully described and referred to in the
attached November 25, 1974, draft of Article XX, Health and
Retirement Benefits, are a sufficient continuation of the United
Mine Workers of America Welfare and Retirement Fund of 1950
to come within the provisions of Section 404(c) of the
Internal Revenue Code of 1954, as amended by the Employee
Retirement Income Security Act of 1974, Pub. L. No. 93-406.
Such a ruling, when prepared, will be issued to you.

- 2 -

You have also requested the Internal Revenue Service to rule that the parties to the 1974 Agreement will be permitted such extensions as are reasonably necessary, pursuant to Section 401(b) of the Internal Revenue Code of 1954, to retroactively amend the 1950 Pension Plan and Trust and the 1974 Pension Plan and Trust to conform to the requirements of Section 401(a) of the Internal Revenue Code of 1954. This is to notify you that the Internal Revenue Service will not issue such a ruling; however, we understand that our failure to so rule will not delay the execution of the 1974 Agreement.

Sincerely yours,

Lawrence B. Gibbs
Assistant Commissioner (Technical)

UNITED MINE WORKERS OF AMERICA
WELFARE AND RETIREMENT FUND

2021 K STREET, NORTHWEST

WASHINGTON, D.C. 20006

BOARD OF TRUSTEES

HARRY HUGE, CHAIRMAN
C.W. DAVIS, TRUSTEE
PAUL R. DEAN, TRUSTEE

November 25, 1974

725-8300

Commissioner of Internal Revenue
Washington, D.C.

Dear Sir:

Enclosed is a copy of proposed Article XX of the National Bitumi-
nous Coal Wage Agreement of 1974 (1974 Agreement). The pension bene-
fits under the United Mine Workers of America Welfare and Retirement
Fund of 1950 (hereinafter the "Fund") will be continued under the
1950 Pension Plan and Trust and the 1974 Pension Plan and Trust
established in Article XX.

The execution of the National Bituminous Coal Wage Agreement of
1974 will be delayed if these rulings are not issued, creating a
hardship for the beneficiaries of the trust as well as the public.

Your rulings are requested as follows:

1.  The 1950 Pension Plan and the 1974 Pension Plan
referred to above will be part of a plan described
in Section 404(c) of the Internal Revenue Code of
1954 if Article XX is adopted in the form attached
hereto.

2.  The parties to the 1974 Agreement will be permitted
such extensions as are reasonably necessary, pursuant
to Section 401(b) of the Internal Revenue Code of 1954,
to retroactively amend the 1954 Plan and the 1974 Plan
to conform to the requirements of Section 401(a) of
the Internal Revenue Code of 1974.

Respectfully submitted,

Harry Huge

C.W. Davis

Joint Proposal
Revised: 11/25/74

ARTICLE XX:  HEALTH AND RETIREMENT BENEFITS

Section (a)  General Purpose

This Article makes provision for pension, health and other benefits for employees covered by this Agreement, and for former employees who were covered under the United Mine Workers of America Welfare and Retirement Fund of 1950 ("1950 Fund"), and for the spouses and dependents of such employees.  The benefits to be provided are as set forth under separate plans and trusts described in Section (b) and (c) of this Article.

A summary of the benefits to be provided appears immediately following this Article.

For purposes of this Article, the 1950 Pension Plan and Trust, the 1974 Pension Plan and Trust, the 1950 Benefit Trust and the 1974 Benefit Trust and each of them shall be a continuation of the UMWA Welfare and Retirement Fund of 1950 (hereinafter the 1950 Fund) provided that:

(1) The 1950 Pension Trust shall be solely responsible for all indebtedness, accounts payable, claims, causes of action and other liabilities (except as provided in (2) below) incurred or arising prior to November   , 1974, and shall likewise be entitled and shall succeed to all assets held in Trust by the 1950 Fund and all assets due the 1950 Fund on said date and to all rights heretofore accruing to or exercisable by the 1950 Fund;

CONFIDENTIAL

1974PLAN_002879

- 2 -

(2) For all participants covered by the 1974 Pension Plan and
    Trust, the 1974 Pension Trust shall assume the liabilities
    for pensions including those arising out of past service
    credits attributable to employment prior to November   , 1975.

Each participant and beneficiary shall be entitled only to the
pension benefits provided in and paid from either the 1950 Pension
Plan and Trust or the 1974 Pension Plan and Trust, and each participant,
beneficiary and dependant shall be entitled only to the benefits pro-
vided in and paid from either the 1950 Benefit Trust or the 1974
Benefit Trust.

The general purpose of the plans established by this Article shall
be to provide health care for working and retired miners and their
dependents; pensions for miners upon their retirement; and health care
and financial support for eligible disabled miners, miners' widows
and surviving dependents as provided by each of the Trusts and Plans
established under this Article.

It is agreed that the Trusts established in this Article are ir-
revocable Trusts created pursuant to, and within the scope of, Section
302(c) of the Labor-Management Relations Act, 1947, and they shall
endure as long as the purposes for their creation shall exist.

CONFIDENTIAL                    1974PLAN_002880

- 3 -

## Section (b) 1950 Plans and Trusts

Effective November   , 1974, the name of the 1950 Fund is changed to the United Mine Workers of America 1950 Pension Trust ("1950 Pension Trust"). The 1950 Pension Trust is incorporated by reference and made a part of this Agreement. The terms of the 1950 Fund are hereby amended by substituting the terms of the 1950 Pension Trust and of the United Mine Workers of America 1950 Pension Plan ("1950 Pension Plan"). The 1950 Pension Plan is incorporated by reference and made a part of this Agreement. The pensions to be paid from the 1950 Pension Trust are as set forth in the 1950 Pension Plan.

Effective November   , 1974, there is established a benefit plan and trust, which trust shall be known as the United Mine Workers of America 1950 Benefit Plan and Trust ("1950 Benefit Trust"). The 1950 Benefit Trust is incorporated by reference and made a part of this Agreement. The 1950 Benefit Trust provides health and other benefits, not including pension benefits, and the terms and conditions under which those benefits will be provided are as set forth in the plan under the 1950 Benefit Trust.

Upon the discharge of all its obligations, any remaining assets in either the 1950 Benefit Trust or the 1950 Pension Trust shall, upon termination of such Trusts be transferred to the 1974 Benefit or Pension Trusts, respectively.

CONFIDENTIAL

- 4 -

Section (c) 1974 Plans and Trusts

(1) Effective November   , 1974, there is established a pension trust to be known as the United Mine Workers of America 1974 Pension Trust ("1974 Pension Trust"), which is incorporated by reference and made a part of this Agreement. The pensions to be paid from the 1974 Pension Trust are as set forth in the United Mine Workers of America 1974 Pension Plan ("1974 Pension Plan"), which is incorporated by reference and made a part of this Agreement. This Plan is a continuation of the pension program of the 1950 Fund and is effective November   , 1974.

(2) Effective November   , 1974, there is established a benefit plan and trust, which trust shall be known as the United Mine Workers of America 1974 Benefit Plan and Trust ("1974 Benefit Trust"). The 1974 Benefit Trust is incorporated by reference and made a part of this Agreement. The 1974 Benefit Trust provides health and other benefits, not including pension benefits, and the terms and conditions under which those benefits will be provided are as set forth in the plan under the 1974 Benefit Trust.

CONFIDENTIAL

1974PLAN_002882

- 5 -

## Section (d)  Contributions by Employers

(1)  During the life of this Agreement, for the periods of time indicated below, each signatory Employer engaged in the production of coal shall contribute to the Trusts established in this Article the amounts specified below based on cents per ton on each ton of two thousand (2,000) pounds of bituminous coal produced by such Employer for use or for sale, and, in addition, each signatory Employer (including those engaged in the production of coal and those not engaged in the production of coal) shall contribute to the Trusts established in the Article the amounts specified below based on cents per hour worked by each of the Employer's employees who perform classified work under this Agreement:

(i)  Into the 1950 Pension Trust: for the period beginning November    , 1974, and ending November    , 1975, 56.0¢ per ton on each such ton; for the period beginning November    , 1975, and ending November    , 1976, 52.4¢ per ton on each such ton; and for the period beginning November    , 1976, and ending when this Agreement is terminated, 55.4¢ per ton on each such ton;

(ii)  Into the 1950 Benefit Trust: for the period beginning November    , 1974, and ending November    , 1975, 18.0¢ per ton on each such ton; for the period beginning November    , 1975, and ending November    , 1976, 18.0¢ per ton on each such ton; and for the period beginning November    , 1976, and ending when this Agreement is terminated, 19.0¢ per ton on each such ton;

CONFIDENTIAL

- 6 -

(iii)  Into the 1974 Pension Trust: for the period beginning
November   , 1974, and ending November   , 1975, 19.2¢ per hour
on each such hour worked; for the period beginning November   ,
1975, and ending November   , 1976, 7.6¢ per ton on each such ton,
plus 63.0¢ per hour on each such hour worked; and for the period
beginning November   , 1976, and ending when this Agreement is
terminated, 7.6¢ per ton on each such ton, plus 66.0¢ per hour
on each such hour worked; and

(iv)  Into the 1974 Benefit Trust:  for the period beginning
November   , 1974, and ending November   , 1975, 70.8¢ per hour
on each such hour worked; for the period beginning November   ,
1975, and ending November   , 1976, 77.0¢ per hour on each such
hour worked; and for the period beginning November   , 1976, and
ending when this Agreement is terminated, 88.0¢ per hour on each
such hour worked;

(v)  In the event that the 1950 Pension Trust, the 1950
Benefit Trust, the 1974 Pension Trust and the 1974 Benefit Trust
are not established on the date that any contributions become
payable under this Agreement, such contributions shall be
paid to the 1950 Fund.

In addition to the contributions indicated above, during the life
of the Agreement, each signatory Employer shall, for the periods of
time indicated below, contribute to the Trusts established in this
Article in the amounts shown below based on cents per ton on each ton
of two thousand (2,000) pounds of bituminous coal after production
by another operator, procured or acquired by such Employer for use or

CONFIDENTIAL

- 7 -

for sale on which contributions to the appropriate Trusts as provided
for in this Article have not been made (amounts shown below include
cents per hour worked contributions converted to tonnage equivalents):

(i)  Into the 1950 Pension Trust: for the period beginning
November   , 1974, and ending November   , 1975, 56.0¢ per ton
on each such ton; for the period beginning November   , 1975, and
ending November   , 1976, 52.4¢ per ton on each such ton; and for
the period beginning November   , 1976, and ending when this
Agreement is terminated, 55.4¢ per ton on each such ton;

(ii)  Into the 1950 Benefit Trust: for the period beginning
November   , 1974, and ending November   , 1975, 18.0¢ per ton on
each such ton; for the period beginning November   , 1975, and
ending November   , 1976, 18.0¢ per ton on each such ton; and
for the period beginning November   , 1976, and ending when
this Agreement is terminated, 19.0¢ per ton on each such ton;

(iii)  Into the 1974 Pension Trust: for the period beginning
November   , 1974, and ending November   , 1975, 9.4¢ per ton on
each such ton; for the period beginning November   , 1975, and
ending November   , 1976, 38.0¢ per ton on each such ton; and
for the period beginning November   , 1976, and ending when
this Agreement is terminated, 38.9¢ per ton on each such ton; and

(iv)  Into the 1974 Benefit Trust: for the period beginning
November   , 1974, and ending November   , 1975, 34.8¢ per ton on
each such ton; for the period beginning November   , 1975, and

– 8 –

ending November    , 1976, 37.2¢ per ton on each such ton; and for
the period beginning November    , 1976 and ending when this
Agreement is terminated, 41.7¢ per ton on each such ton.

(v)  In the event that the 1950 Pension Trust, the 1950 Benefit
Trust, the 1974 Pension Trust and the 1974 Benefit Trust are not
established on the date that any contributions become payable under
this Agreement, such contributions shall be paid to the 1950 Fund.

The parties hereto mutually agree that, if at any time during the
term of this Agreement a court or tribunal of competent jurisdiction
determines by a final decision that is not appealable that the provision
appearing in the paragraph just preceding is invalid or in violation of
the National Labor Relations Act, 1947, as amended, or other federal
or state law, the parties shall, at the option of and upon demand by
the Union, without affecting the integrity of any other provision of
this section or any other provision of the National Bituminous Coal
Wage Agreement, meet and engage in good faith negotiations to agree
upon a clause to be inserted into this Agreement in replacement of
the provision found invalid or unlawful.

Definition of Hours Worked

Hours of work for purposes of Employer contributions to the various
Health and Retirement Trusts shall include all hours worked, or fractions
thereof, by employees in a classified job covered by this Agreement.
Hours actually worked for which a premium pay of any type is provided
shall be treated for purposes of Employer contributions to the Trusts

CONFIDENTIAL

- 9 -

as though worked on a straight-time basis. Reporting pay for hours
not actually worked shall not be included for the purpose of making
Employer contributions to the Trusts.

At any time during the term of this Wage Agreement, the Employers
and the Union may agree upon a reallocation of contributions to be
paid under the respective subdivisions (i) and (ii) in this Section,
which will increase the cents per ton to be contributed into the 1950
Pension Trust and correspondingly will decrease the cents per ton to
be contributed by the Employers into the 1950 Benefit Trust, or which
will decrease the cents per ton to be contributed into the 1950 Pension
Trust and correspondingly will increase the cents per ton to be con-
tributed by the Employers into the 1950 Benefit Trust, provided that
notice shall be given to the contributing Employers of the cents per
ton to be allocated to each such Trust at least 30 days prior to the
date the contributions become due and owing to the respective Trusts,
subject to the following terms and conditions:

(a)  No monies previously paid into or due and owing to
either Trust nor any assets of either Trust shall be trans-
ferred to the other Trust;

(b)  No decrease in the cents per ton to be contributed to
the 1950 Pension Trust shall be adopted which can reasonably be
expected to cause the 1950 Pension Trust and Pension Plan to fail
to meet the minimum funding standards set forth in Section 302
of Title I, Subtitle B, Part 3, of ERISA or Section 1013 of

CONFIDENTIAL

- 10 -

Title II, Subtitle A, Part I of ERISA, or to satisfy any applicable provisions of the Internal Revenue Code of 1954, including Sections 401 and 501 of said Code;

(c) No increase in the cents per ton to be contributed to the 1950 Pension Trust shall be adopted which will increase the contributions of the Employers to such Trust to an amount in excess of those amounts which, for Federal income tax purposes, are fully deductible by said Employers when paid into such Trust, pursuant to the provisions of the Internal Revenue Code of 1954;

(d) No reallocation of the contributions to be paid to the two Trusts shall be made which will increase the total combined contributions required by this Article to be made by the Employers to those two Trusts; and

(e) No decrease in the cents per ton to be contributed to the 1950 Benefit Trust shall be adopted which will result in any substantial reduction of the benefits currently provided in the 1950 Benefit Trust, nor shall any change in the cents per ton to be contributed to the 1950 Benefit Trust be adopted which will cause the contributions of the Employers to such Trust not to be fully deductible as paid or accrued under the applicable provisions of the Internal Revenue Code of 1954.

(2) The Trustees are hereby directed to establish a royalty rate or rates for bituminous coal which is recovered from slurry ponds, sludge piles, and other coal refuse, which is sold during the life of

- 11 -

this Agreement, and such royalty rate will be paid on each ton of such coal recovered for use or for sale. Royalty rates currently being paid for coal recovered from slurry ponds, sludge piles and other coal refuse shall remain in effect unless and until changed by the Trustees. All royalties payable by Employers pursuant to this paragraph shall be divided among the 1950 Benefit Trust, the 1974 Benefit Trust, the 1950 Pension Trust and the 1974 Pension Trust in proportion to the total contribution paid to each such Trust by all Employers for the month preceding the month in which such royalty is due and payable.

(3) The obligation under this Section of any Employer signatory hereto shall be to contribute the amounts specified in this Section.

(4) The obligation to make payments to the Trusts specified in this Article shall become effective on the dates specified in the respective Subdivisions (i) through (v) of this Section, and the first payments are to be made on the 10th day of each month after such specified dates, and thereafter continuously on the 10th day of each succeeding calendar month.

(5) It shall be the duty of each of the Employers signatory hereto to keep current said payments due to the Trusts, and to furnish to the International Union, United Mine Workers of America and to the Trustees of those Trusts a monthly statement showing on a mine-by-mine basis the full amounts due hereunder and the tons of coal produced, procured or acquired for use or for sale and the hours worked with respect to which the amounts are payable. Payments to those Trusts shall be made by check, payable as appropriate, to:

> "Trustees of the United Mine Workers of America 1950 Pension Trust"
> "Trustees of the United Mine Workers of America 1950 Benefit Trust"
>
> "Trustees of the United Mine Workers of America 1974 Pension Trust"
> "Trustees of the United Mine Workers of America 1974 Benefit Trust"

- 12 -

The Trustees are hereby authorized to require each signatory Employer to make payment of all contributions to the 1950 Benefit Trust, the 1974 Benefit Trust, the 1950 Pension Trust and the 1974 Pension Trust by a single check made payable in such manner as may be specified by the Trustees.

(6) Payments shall be delivered or mailed to the office of the Trusts currently located at 2021 K Street, N. W., Washington, D. C., 20006, or as otherwise designated by the Trustees of those Trusts.

(7) Failure of any Employer signatory hereto to make full and prompt payments to the Trusts specified in this Article in the manner and on the dates herein provided shall be deemed a violation of this Agreement. This obligation of each Employer signatory hereto, which is several and not joint, to so pay such sums shall be a direct and continuing obligation of said Employer during the life of this Agreement and it shall be deemed a violation of this Agreement, if any mine, preparation plant or other facility to which this Agreement is applicable shall be sold, leased, subleased, assigned, or otherwise disposed of for the purpose of avoiding any of the obligations hereunder.

(8) Each Employer agrees to give proper notice to the President of the local union at the mine by the 18th day of each month that the Employer has made the required payment to the Trusts for the previous month, as required by this Article, or is delinquent in such payment, such notice to set forth the amount paid to the Trusts, or the amount of the delinquency, the tonnage produced and the hours worked with respect to the mine or mines under the jurisdiction of such local union.

(9) Title to all the monies paid into and/or due and owing to the Trusts specified in this Article shall be vested in and remain exclusively in the Trustees of those Trusts. It is the intention of

CONFIDENTIAL

- 13 -

the parties hereto that those Trusts shall constitute irrevocable trusts and that no benefits or money payable from those Trusts shall be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance or charge, and that any attempt so to anticipate, alienate, sell, transfer, assign, pledge, encumber or charge the same shall be void.

(10)  It is understood that the individual employees of Employers agree, through their representative, the United Mine Workers of America, to surrender any personal or individual right to or interest in monies paid or required to be paid to the Trusts pursuant to this Agreement (which monies might otherwise have been paid for wages or other benefits to such employees), in consideration of the benefit which is provided by the pooling of such monies into common funds to be applied to the benefit of the designated beneficiaries pursuant to the Trust instruments.

(11)  Any judgment obtained by the Trustees of the Trusts established pursuant to this Agreement for a default giving rise to damages accruing to more than one of the Trusts established hereunder shall be allocated by the Trustees among such Trusts in proportion to the amounts owing to each which gave rise to such judgment.

CONFIDENTIAL

– 14 –

Section (e)  Responsibilities and Duties of Trustees

(1)  Each Trust shall be administered by a Board of three Trustees, one of whom shall be appointed by the Employers; one of whom shall be appointed by the Union; and one of whom shall be a neutral party, selected by the other two.  The Trustees, or their duly appointed successors, shall serve for the duration of the Agreement and as long thereafter as the proper continuation and administration of the Trusts shall require.  The representative of the Employers on the Board of Trustees shall be C. W. Davis, Bluefield, West Virginia; the representative of the Union on said Board of Trustees shall be Harry Huge, Washington, D. C.; and Paul R. Dean, Washington, D. C., is appointed as the neutral Trustee.  Said three Trustees so named and designated shall constitute the Board of Trustees to administer the Trusts.

(2)  It is the intent and purpose of the contracting parties that full cooperation shall be given by each of them to one another, to the Trustees provided for under this Article, and to all affected mine workers, to the eventual coordination and development of policies and working agreements necessary or advisable for the effective operation of the Trusts and Plans.

(3)  Action which may be required by the Employers in connection with any matter hereunder, including but not limited to the appointment of a successor Trustee, may be taken by those Employers who are parties to this Agreement, and authorization, approval or ratification of Employers representing fifty-one per cent (51%) or more of the total contributions made to the Trusts during the calendar year (or such shorter period which may have elapsed after the effective date of this Agreement) previous to that in which the action is taken shall be sufficient and shall bind all Employers.

- 15 -

(4) All covenants, rights and obligations accruing to the Trusts, and Benefit Plans, and the Trustees of the Pension and Benefit Trusts and Plans, and all breaches, violations and/or defaults of any provision of this Article pertaining to the Trusts and Plans, the Trust Agreements, or Pension Plans, shall be enforced by the Trustees, at their discretion, through any and all available legal means, without first exhausting the grievance and arbitration procedures set forth in this Agreement, and such Trustees shall determine whether any provision of this Article pertaining to the Trusts and Plans, the Trust Agreements or Pension Plans has been breached, violated or is in default.

CONFIDENTIAL

- 16 -

Section (f)  Audits, Reports and Notices

(1)  It is agreed by the contracting parties that annual independent
audits of the Trusts shall be made by independent certified public
accountants to be designated by the Trustees of the Trusts.  A statement
of the results of such audits shall be sent to the contracting parties
and shall be made available upon written request to any working or
retired miner or to any beneficiary either by mail or at the principal
office of the Trusts, or at such other place as may be designated by
the Trustees.

(2)  If the Trustees determine that there is reasonable cause to
question the accuracy of the sums paid under Section (d) of this Article,
or of any verification thereof made by an Employer for a given monthly
or annual period, the Employer shall, upon written request by the
Trustees, make available for inspection and/or copying at reasonable
times and places to a representative of the Trustees, those records
which are necessary to verify the accuracy of the sums paid.

(3)  A complete accounting, on a mine-by-mine basis, of contributions
received by the Trusts under this Article shall be furnished by the
Trustees, at least on a quarterly basis, to the International Union.
Such an accounting will also be supplied to the District and Local
offices of the Union with respect to the mine or mines under their
jurisdiction.  Such accountings shall include tonnages of coal produced
and hours worked with respect to which contributions were paid, together
with an identification of any period or periods in which contributions

CONFIDENTIAL

- 17 -

were delinquent, showing the amounts of such delinquencies. The Trustees shall take such action as they deem appropriate to collect any such delinquencies, and shall advise the International Union and the appropriate Districts and Locals of the Union, on at least a monthly basis, of such delinquencies, as long as such delinquencies continue.

(4) Upon the written request of any International, District or Local officer of the Union, the Trustees shall make available within seven days of receipt of such request an up-to-date accounting of contributions made and delinquencies outstanding, in respect to any mine or related facility with respect to which such officer has union jurisdiction.

- 18 -

Section (h)  Administration of Trusts

(1)  Each Employer shall make available to the Trustees within
a reasonable time such information as the Trustees may determine to
be reasonably required for the purpose of administering the Trusts
and Plans.

(2)  The Trustees shall respond to all written requests for in-
formation, applications, and other communications from beneficiaries
within 15 working days from their receipt at the office of the Trusts.
A response from the Trustees may be either a telephonic communication
or a letter acknowledging receipt of such communication from the
beneficiary.  A pension application must be initially approved or
denied within 12 weeks of the receipt of the application.  The fore-
going shall not apply in the event of delays caused by conditions
beyond the control of the Trustees.

(3)  Within six months after the effective date of this Agreement,
the Trustees shall develop a suitable plan for policing and monitoring
the rolls of those entitled to benefits from the Trusts.  On at least
a quarterly basis, the Trustees shall have available a complete listing
of current beneficiaries, identified by UMWA district and local union
jurisdiction, if applicable.  The Trustees shall promptly investigate
and determine the eligibility or ineligibility of any beneficiary whose
right to receive benefits from the Trusts has been challenged by an
Officer of the International, District or Local Union or by any
Employer.  In the event that a beneficiary or beneficiaries shall be

- 19 -

determined to be ineligible for health care or other benefits, the Trustees shall take prompt action to correct the situation.

(4) Within six months after the effective date of this Agreement, the Trustees shall conduct a comprehensive review of procedures for monitoring covered medical expenses and shall report to the contracting parties with respect to insuring an effective system of cost controls, especially regarding any fees charged by physicians, hospitals, clinics, pharmacists or others which appear to be excessive. The Trustees shall take such steps as they deem appropriate to improve such procedures, and shall report to the contracting parties on such activities regularly thereafter, at least annually.

(5) The Trustees are authorized, upon approval by the Employers and the Union, to make such changes in the Plans and Trusts hereunder as they may deem to be necessary or appropriate.

They are also authorized and directed, after adequate notice and consultation with the Employers and Union, to make such changes in the Plans and Trusts hereunder, including any retroactive modifications or amendments, which shall be necessary:

(a) to conform the terms of each Plan and Trust to the requirements of ERISA, or any other applicable federal law, and the regulations issued thereunder;

(b) to obtain determination letters from the Internal Revenue Service that the two Pension Plans will each meet the requirements of Section 401 of the Internal Revenue Code

- 20 -

and the Trusts thereunder will be exempt under Section 501(a) of such Code and that the two Benefit Trusts will be exempt under Section 501(c)(9) of such Code;

(c)  to establish the deductibility for income tax purposes of any and all contributions made by signatory operators to the Pension Trusts and Benefits Trusts as paid or incurred; or

(d)  to comply with all applicable court or government decisions or rulings.

CONFIDENTIAL

1974PLAN_002898

# № 18·1140

№ 18-1408 (Cross-Appeal)

## United States Court Of Appeals For The Second Circuit

THE NEW YORK TIMES COMPANY,

*Plaintiff-Appellant-Cross-Appellee,*

v.

NEWSPAPER AND MAIL DELIVERERS'-PUBLISHERS' PENSION FUND, AND

THE BOARD OF TRUSTEES OF THE
NEWSPAPER AND MAIL DELIVERERS'- PUBLISHERS' PENSION FUND,

*Defendants-Appellees-Cross-Appellants.*

ON APPEAL FROM THE U.S. DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR THE PENSION BENEFIT GUARANTY CORPORATION AS *AMICUS CURIAE* SUPPORTING CROSS-APPELLANTS

JUDITH STARR, *General Counsel*
ISRAEL GOLDOWITZ, *Deputy General Counsel*
JON CHATALIAN, *Acting Assistant General Counsel*
JOHN GINSBERG, *Attorney*

PENSION BENEFIT GUARANTY CORPORATION
1200 K Street, N.W.
Washington, DC  20005-4026
(202) 326-4020, ext. 3714 (telephone)
(202) 326-4112 (facsimile)
ginsberg.john@pbgc.gov

# TABLE OF CONTENTS

INTEREST OF THE *AMICUS CURIAE* .......................................................... 1

STATEMENT OF THE CASE ..................................................................... 4

    Legal Background ............................................................................ 4

    The Present Controversy .................................................................. 9

ARGUMENT ....................................................................................... 15

    THE DISTRICT COURT COMMITTED REVERSIBLE ERROR
    BY FAILING TO APPLY THE STATUTORY PRESUMPTION IN
    FAVOR OF THE PLAN AND IMPERMISSIBLY SHIFTING THE
    BURDEN OF PROOF ON THE REASONABLENESS OF
    ACTUARIAL ASSUMPTIONS ................................................................. 15

    I.    The district court correctly held that MPPAA does not require
        a plan's actuary to value vested benefits for withdrawal liability
        purposes using her funding interest assumption, which should
        have resulted in a decision in favor of the Fund ............................ 15

    II.   The district court failed to apply MPPAA's presumption that
        the plan actuary's determination of the plan's unfunded vested
        benefits was correct, impermissibly shifted the burden of proof
        from the Times to the Fund, and, in so doing, contradicted its
        correct holding that the funding interest assumption need
        not be applied .................................................................... 23

CONCLUSION ..................................................................................... 32

Case 1:18-cv-01905-CJN   Document 28   Filed 06/10/19   Page 1196 of 1367
Case 18-1500, Document 46, 11/07/2018, 2426453, Page 34-96

JA 001191

# TABLE OF AUTHORITIES

Cases

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ............................................... 30

*Bazemore v. Friday,*
    478 U.S. 385, 106 S. Ct. 3000, 92 L. Ed. 2d 315 (1986) .................... 30

*Beck v. PACE International Union,*
    551 US. 96 (2007) ................................................ 2

*Board of Trustees, Michigan United Food & Commercial Workers*
    *Union v. Eberhard Foods, Inc.,* 831 F.2d 1258 (6th Cir. 1987) ............. 18

*Citrus Valley Estates, Inc. v. C.I.R.,*
    49 F.3d 1410 (9th Cir. 1995) ...................................... 17

*Chicago Truck Drivers, Helpers & Warehouse Workers Union (Independent)*
    *Pension Fund v. CPC Logistics, Inc.,* 698 F.3d 346 (7th Cir. 2012) ......... 17, 21, 22

*Chicago Truck Drivers, Helpers & Warehouse Workers Union (Independent)*
    *Pension Fund v. Louis Zahn Drug Company,* 890 F.2d 1405 (7th Cir. 1989) ....... 30

*Combs v. Classic Coal Corporation,*
    No. 84-1562, 1990 WL 66583 (D.C.C. Apr. 6, 1990) ...................... 25

*Combs v. Classic Coal Corporation,*
    931 F.2d 96 (D.C. Cir. 1991) .................................. 23, 24, 25

*Concrete Pipe & Product of California, Inc. v. Construction Laborers Trust for*
    *Southern California,* 508 U.S. 602 (1993) .................... 4, 14, 19, 20, 24, 30

*Huber v. Casablanca Industries, Inc.,*
    916 F.2d 85 (3d Cir. 1990) ...................................... 17

*Hughes Aircraft Co. v. Jacobson,*
    525 U.S. 432 (1999) .............................................. 4

Case 1:18-cv-01905-CJN   Document 28   Filed 06/10/19   Page 1197 of 1367
Case 18-1500, Document 41, 11/07/2019, 2420653, Page 11-97 of 97

JA 001192

*ILGWU National Retirement Fund v. Levy Brothers Frocks, Inc.*,
    846 F.2d 879 (2d Cir. 1988) ..................................................................7, 25

*In re U.S. Airways Group, Inc.*,
    303 B.R. 784 (Bankr. E.D. Va. 2003) ......................................... 11, 27

*Keith Fulton & Sons v. New England Teamsters & Trucking Industry Pension Fund*,
    762 F.2d 1137 (1st Cir. 1985) ..........................................................24

*Manhattan Ford Lincoln, Inc. v. UAW Local 259 Pension Fund*,
    No. 17-5076, 2018 U.S. Dist. LEXIS 111969 (D.N.J. July 3, 2018), *appeal
    dismissed by stipulation*, No. 18-2709 (3d Cir. Oct. 9, 2018) ............16, 17, 21, 22

*Masters, Mates & Pilots Pension Plan v. USX Corporation*,
    900 F.2d 727 (4th Cir. 1990) ............................................................18

*Mead Corporation v. Tilley*,
    490 U.S. 714 (1989) ........................................................................2

*Mertens v. Hewitt Associates*,
    508 U.S. 248 (1993) ........................................................................2

*Milwaukee Brewery Workers' Pension Plan v. Joseph Schlitz Brewing Co.*,
    513 U.S. 414 (1995) ......................................................................17

*Nachman Corporation v. Pension Benefit Guaranty Corporation*,
    446 U.S. 359 (1980) ........................................................................2

*National Retirement Fund v. Metz Culinary Management, Inc.*,
    No. 16-CV-2408, 2017 WL 1157156 (S.D.N.Y. Mar. 27, 2017) ....................27

*Perkin-Elmer Corporation v. Computervision Corporation*,
    732 F.2d 888 (Fed. Cir. 1984) ..........................................................30

*Plan Board of Sunkist Retirement Plan v. Harding & Leggett, Inc.*,
    463 F. App'x 702 (9th Cir. 2011) ......................................................27

*Rhoades, McKee & Boer v. United States*,
    43 F.3d 1074 (6th Cir. 1995) ............................................................17

*Russello v. United States,*
    464 U.S. 16, 104 S. Ct. 296, 78 L. Ed. 2d 17 (1983) .......................................... 18

*Santa Fe Pacific Corporation v. Central States, Southeast & Southwest Areas*
    *Pension Fund,* 22 F.3d 725 (7th Cir. 1994) ........................................................ 25

*SUPERVALU, Inc. v. Board of Trustees of Southwest Pennsylvania & West*
    *Maryland Area Teamsters & Employers Pension Fund,*
    500 F.3d 334 (3d Cir. 2007) ............................................................................... 25

*Trustees of the Pressman Local 72 Industry Pension Fund v. Judd & Detweiler, Inc.,*
    736 F. Supp. 1351 (D. Md. 1988) ................................................................ 19, 22

*United States v. Naftalin,*
    441 U.S. 768 (1979) ........................................................................................... 18

*Vinson & Elkins v. C.I.R.,*
    7 F.3d 1235 (5th Cir. 1993) ............................................................................... 17

*Wachtell, Lipton, Rosen & Katz v. C.I.R.,*
    26 F.3d 291 (2d Cir. 1994) ................................................................................ 17


U.S. Code

Title 26
    Section 404(a)(1)(A) .......................................................................................... 17
    Section 412 .......................................................................................................... 5
    Section 412(c)(3)(1988 & 1994) .............................................................. 17, 20, 22
    Section 412(c)(9)(1976 & Supp. III 1980) ........................................................ 18
    Section 431 ........................................................................................................... 5
    Section 431(c)(3) ........................................................................................... 8, 15
    Section 431(c)(7) ..................................................................................... 6, 18, 29
    Section 432 ........................................................................................................... 2
    Section 4971 ......................................................................................................... 5
    Section 6059 ......................................................................................................... 6
    Section 7701(a)(35) ..................................................................................... 5, 29

Title 29
    Section 186(c)(5) ................................................................................................. 4
    Section 1001a(a)(4)(A) ....................................................................................... 25

Section 1002(16)(B)(iii) ..................................................................... 4
Section 1002(34) ................................................................................. 4
Section 1002(35) ................................................................................. 4
Section 1082(c)(3) ........................................................................ 20, 22
Section 1084(c)(3) .......................................................................... 8, 15
Section 1084(c)(7)(A) ................................................................ 6, 18, 29
Section 1085 ....................................................................................... 2
Section 1103(a) .................................................................................. 4
Section 1241 .................................................................................. 5, 29
Section 1242 .................................................................................. 5, 29
Sections 1301-1461 ............................................................................ 1
Section 1301(a)(3) .............................................................................. 4
Section 1301(a)(18) ........................................................................... 11
Section 1302(b)(1) .............................................................................. 3
Section 1321 ....................................................................................... 4
Section 1322a ................................................................................. 2, 7
Section 1322b .................................................................................... 2
Section 1361 ....................................................................................... 2
Section 1362(a) ................................................................................ 11
Section 1362(b) ................................................................................ 11
Section 1381(a) .................................................................................. 7
Section 1383(a) .................................................................................. 6
Section 1393(a) .................................................................................. 8
Section 1393(a)(1) ............................................................................ 15
Section 1401(a)(1) .............................................................................. 9
Section 1401(a)(2) .............................................................................. 9
Section 1401(a)(3)(B) ................................................................... 10, 23
Section 1401(a)(3)(B)(i) .................................................................... 30
Section 1401(b)(2) ............................................................................ 13
Section 1401(c) ................................................................................. 30
Section 1431 ....................................................................................... 2
Section 1461 ....................................................................................... 7

## Other Authorities

20 C.F.R. §§ 901.0-.72 ................................................................... 5, 29

26 C.F.R. § 301.6059-1 ....................................................................... 6

29 C.F.R. pt. 4221 .............................................................................. 9

29 C.F.R. § 4281.13 ................................................................................................ 12

29 C.F.R. Pt. 4044 ............................................................................................... 11

Multiemployer Pension Plan Amendments Act of 1980, Pub. L. No. 96-364,
94 Stat. 1208.................................................................................................. 1

Pension Protection Act of 2006, Pub. L. No. 109-280, 120 Stat. 780 ........ 20, 22

Valuation of Benefits, Mortality Assumptions,
70 Fed. Reg. 72205 (Dec. 2, 2005) ............................................................ 11, 27

Actuarial Standard of Practice,
http://www.actuarialstandardsboard.org/standards-of-practice/.............5, 29

Actuarial Standard of Practice No. 27 §§ 3.8.3, 3.9 (Sept. 2013 ed.),
*available at* http://www.actuarialstandsboard.org/wp-content
/uploads/2014/02/asop027_172.pdf .......................................................... 6

Actuarial Standard of Practice No. 27 § 3.6
(Sept. 2007 ed. Updated May 1, 2011).................................................... 25

Actuarial Standard of Practice No. 27 § 3.6 (Sept. 2013 ed.) .............................. 25

H.R. Rep. No. 96-869, pt. 1 (1980),
*as reprinted in* 1980 U.S.C.C.A.N. 2918, 2935 .................................... 26

Eric J. Magnuson & David F. Herr, Federal Appeals Jurisdiction
and Practice § 5:3 (2018 ed. 2017)............................................................ 30

Fed. R. App. P. 29 (a) ............................................................................................. 3

Amy Gallo, *A Refresher on Net Present Value*, Harv. Bus. Rev.
(Nov. 19, 2014), https://hbr.org/2014/11/a-refresher-on-net-
present-value.............................................................................................10

Judith Mazo & Susan Lee, *Multiemployer Pension Plan Withdrawal
Liability*, 23 Ben. L. J., no. 4, 2010 ...................................................... 25

Case 1:18-cv-01905-CJN    Document 28    Filed 06/10/19    Page 1201 of 1367
Case 18-1506, Document 44, 11/07/2018, 2420653, Page37 of 91

JA 001196

PBGC, FY2017 Projections Report 1, 7 (May 31, 2018),
    https://www.pbgc.gov/sites/default/files/fy-2017-
    projections-report.pdf ........................................................................................2


PBGC Opin. Ltr. 86-24 (1986),
    https://www.pbgc.gov/sites/default/files/legacy/
    docs/oplet/86-24.pdf ......................................................................................15

Case 1:18-cv-01905-CJN   Document 28   Filed 06/10/19   Page 1202 of 1367
Case 18-1506, Document 41, 11/07/2018, 2426853, Page 4 of 91

JA 001197

## INTEREST OF THE *AMICUS CURIAE*

This case presents issues under the Multiemployer Pension Plan Amendments Act of 1980 ("**MPPAA**"), Pub. L. No. 96-364, 94 Stat. 1208.  The Pension Benefit Guaranty Corporation ("**PBGC**") is the federal agency responsible for administering Title IV of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), 29 U.S.C. §§ 1301-1461 (2012 & Supp. V 2018),[1] including provisions of MPPAA at issue.

ERISA is a "comprehensive and reticulated statute"[2] and "enormously complex and detailed."[3]  As a unanimous Supreme Court said in *Beck v. Pace Int'l Union*, PBGC's views on the interpretation of Title IV of ERISA—expressed in that case as *amicus curiae*—warrant deference, "for 'to attempt to answer these questions without the views of the agencies responsible for enforcing ERISA, would be to embar[k] upon a voyage without a compass.'"[4]

PBGC insures the payment of pension benefits to participants in insolvent

---

[1]   Unless otherwise specified, all citations to the United States Code refer to the 2012 edition and 2018 supplement.  Parallel cites to ERISA are omitted.

[2]   *Nachman Corp. v. Pension Benefit Guaranty Corp.*, 446 U.S. 359, 361 (1980).

[3]   *Mertens v. Hewitt Associates*, 508 U.S. 248, 262 (1993).

[4]   *Beck v. PACE Int'l Union*, 551 U.S. 96, 104 (2007) (quoting *Mead Corp. v. Tilley*, 490 U.S. 714, 722, 725-726 (1989)).

Case 1:18-cv-01905-CJN   Document 28   Filed 06/10/19   Page 1203 of 1367
Case 18-1905, Document 44, 11/07/2018, 2426953, Page30 of 41

JA 001198

multiemployer defined-benefit pension plans.[5]  Coverage extends to some ten million participants in some 1,400 multiemployer plans.  About one quarter of those plans are in "critical" status and must adopt a rehabilitation plan that may include reduced benefit accruals and increased employer contributions, and some 130 are expected to become insolvent within twenty years unless they reduce benefits to sustainable levels.[6]

The district court disregarded the statutory burden of proof in an employer's challenge to actuarial assumptions used to determine its liability upon withdrawal from a multiemployer plan.  Affirmance would likely increase the cost and uncertainty of arbitration and litigation over withdrawal liability, contrary to the statutory design. That in turn would tend to hasten plan insolvency, triggering PBGC's guarantee and participants' loss of benefits above the guaranteed level.

As an agency of the United States, PBGC may file an *amicus curiae* brief without leave of Court.[7]  Through its independent litigating authority, PBGC may represent itself.[8]

---

[5]  *See* 29 U.S.C. §§ 1322a, 1322b, 1361, 1431.

[6]  *See* 26 U.S.C. § 432; 29 U.S.C. § 1085; PBGC, *FY2017 Projections Report* 1, 7 (May 31, 2018), https://www.pbgc.gov/sites/default/files/fy-2017-projections-report.pdf.

[7]  *See* Fed. R. App. P. 29(a).

[8]  *See* 29 U.S.C. § 1302(b)(1).

Case 1:18-cv-01905-CJN   Document 28   Filed 06/10/19   Page 1204 of 1367
Case 19-1905, Document 44, 11/07/2019, 2428933, Page11 of 41

JA 001199

# STATEMENT OF THE CASE

## Legal Background

A multiemployer plan is a defined benefit pension plan to which more than one employer is required to contribute and that is maintained pursuant to one or more collective bargaining agreements.[9]  A multiemployer plan provides benefits for employees of all contributing employers.  Multiemployer plans allow employers to provide portable pensions with advantageous cost- and risk-sharing mechanisms, which helps ensure a trained labor force.[10]

A multiemployer plan is administered by a board of trustees, half appointed by labor and half by management, with a tie-breaker mechanism.[11]  Plan assets must be held in trust.[12]  The board of trustees is the "plan sponsor."[13]

In a defined benefit pension plan, retirement benefits are defined by the plan— usually as a fixed amount or percentage of pay times years of service—rather than as the balance of a participant's individual account, as in a defined contribution plan. The employer therefore bears the shortfall risk.[14]

---

[9]   29 U.S.C. §§ 1301(a)(3), 1321.

[10]   *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 605-07 (1993).

[11]   *See* 29 U.S.C. § 186(c)(5).

[12]   *See* 29 U.S.C. § 1103(a).

[13]   *See* 29 U.S.C. § 1002(16)(B)(iii).

[14]   *See* 29 U.S.C. § 1002(34)-(35); *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432,

Multiemployer plans are funded by employer contributions, withdrawal liability payments (described below), and returns on investment of plan assets. A contributing employer's liability for contributions is determined by its collective bargaining agreement. That agreement provides the employer's contribution rate and defines the contribution base unit (such as an hour of service by an employee). The employer's liability for contributions is determined by multiplying its contribution rate by the number of contribution base units.

Multiemployer plans are subject to statutory minimum funding standards.[15] If those standards are not met, contributing employers are generally subject to an excise tax.[16]

Determining the minimum funding for a "plan year" (typically a calendar year) requires a determination of the present value of future liabilities for benefits and of the costs of plan administration. Each multiemployer plan must retain an enrolled actuary, who is subject to regulatory and professional standards,[17] to prepare an

_____

439-40 (1999).

[15]   *See* 26 U.S.C. §§ 412, 431.

[16]   *See* 26 U.S.C. § 4971.

[17]   *See* 29 U.S.C. §§ 1241-42; 26 U.S.C. § 7701(a) (35); 20 C.F.R. §§ 901.0-.72; Actuarial Standards of Practice, http://www.actuarialstandardsboard.org/standards-of-practice/.

annual valuation of the plan's liabilities,[18] and to annually calculate the total amount of contributions necessary to avoid a funding deficiency for the plan year.[19]  That minimum funding amount is reported to the Internal Revenue Service.[20]

To value future benefit liabilities, the actuary must make certain assumptions, including turnover (*i.e.*, how many participants will vest in their benefits and in what amounts), and retirement age and mortality (*i.e.*, how long participants and their beneficiaries will receive benefits).  The actuary also assumes an interest rate, which she uses to discount future plan liabilities to the present dollar equivalent ("**Funding Interest Assumption**").  The actuary may select a Funding Interest Assumption that reflects anticipated average investment returns on plan assets, considering the plan's investment policy.[21]

An employer completely withdraws from a multiemployer plan when it permanently ceases to have an obligation to contribute to the plan or to have operations covered by the plan.[22]  The plan remains liable for the benefits of the

---

[18]  *See* 26 U.S.C. § 431(c)(7); 29 U.S.C. § 1084(c)(7)(A).

[19]  *See* 26 U.S.C. § 6059; 26 C.F.R. 301.6059-1.

[20]  *See id.*

[21]  *See* Actuarial Standard of Practice No. 27 ("**ASOP 27**") §§ 3.8.3, 3.9 (Sept. 2013 ed.), http://www.actuarialstandardsboard.org/wp-content/uploads/2014/02/asop027_172.pdf.

[22]  *See* 29 U.S.C. § 1383(a).

withdrawn employer's employees.  ERISA protects plan participants and contributing employers by imposing withdrawal liability on the withdrawn employer.[23]  Because withdrawal liability is a source of plan funds, it also protects PBGC's multiemployer-plan insurance fund, which covers benefit payments upon plan insolvency.[24]  That insurance fund is projected to become insolvent by 2026.[25]

ERISA also imposes withdrawal liability on an employer that partially withdraws, which occurs when there is a 70% decline in the employer's contribution base units or a partial cessation of the employer's contribution obligation.[26]

Withdrawal liability is an employer's share of the plan's unfunded vested benefits.[27]  "Unfunded vested benefits" means the value of vested benefits minus the value of plan assets.[28]

The plan's enrolled actuary determines the present value of vested benefits.  To do so, the actuary must use actuarial assumptions, as when she values benefit liabilities in determining the plan's minimum funding.

---

[23]  *See* 29 U.S.C. § 1381(a); *ILGWU Nat'l Ret. Fund v. Levy Bros. Frocks, Inc.*, 846 F.2d 879, 880-81 (2d Cir. 1988).

[24]  29 U.S.C. §§ 1322a, 1461.

[25]  PBGC, *FY2017 Projections Report* 1-2, 10-12 (May 31, 2018), https://www.pbgc.gov/sites/default/files/fy-2017-projections-report.pdf

[26]  *See* 29 U.S.C. §§ 1381, 1385.

[27]  *See* 29 U.S.C. § 1381(b)(1).

[28]  *See* 29 U.S.C. § 1393(c).

Separate legal standards govern the actuary's selection of actuarial assumptions for determining withdrawal liability and minimum funding.  Under section 4213(a) of ERISA, a plan's actuary must value the plan's unfunded vested benefits for withdrawal liability purposes based on:

> (1) actuarial assumptions and methods which, *in the aggregate, are reasonable* (taking into account the experience of the plan and reasonable expectations) and which, in combination, offer the actuary's best estimate of anticipated experience under the plan, or
>
> (2) actuarial assumptions and methods set forth in [PBGC] regulations for purposes of determining an employer's withdrawal liability.[29]

Until PBGC promulgates a regulation providing actuarial assumptions and methods that may be used under section 4213(a)(2), section 4213(a)(1) supplies the operative standard.

A plan's actuary must value the plan's liabilities for minimum funding purposes based on actuarial assumptions and methods:

> *each of which is reasonable* (taking into account the experience of the plan and reasonable expectations), and . . . which, in combination, offer the actuary's best estimate of anticipated experience under the plan."

26 U.S.C. § 431(c)(3); 29 U.S.C. § 1084(c)(3) (the "**Funding Assumptions Standard**") (emphasis added).

---

[29]   29 U.S.C. § 1393(a) (emphasis added).

Case 18-1905, Document 44, 11/27/2018, 2420939, Page96 of 41

## The Present Controversy

The Newspapers & Mail Deliverers'-Publishers' Pension Fund is a multiemployer plan maintained pursuant to collective bargaining agreements between the Newspaper and Mail Deliverers Union of New York and Vicinity and several newspaper publishers.  The plan is sponsored and administered by a joint board of trustees.  We will refer to both the plan and its board of trustees as the "**Fund**."

The New York Times Co. (the "**Times**") is a contributing employer to the Fund.

The Fund notified the Times that it had twice partially withdrawn from the Fund, in successive plan years ending May 31, 2012, and May 31, 2013.  The Fund assessed withdrawal liability of $25.7 million for the first partial withdrawal and $7.8 million for the second.[30]

Withdrawal liability disputes are subject to mandatory arbitration under ERISA section 4221, conducted under "fair and equitable procedures . . . promulgated by [PBGC]."[31]  In such a proceeding,

> the determination of a plan's unfunded vested benefits is presumed correct unless [the employer] shows by a preponderance of the evidence that—

---

[30]  A.28-32.  "**A.__**" refers to the Times's Appendix, ECF Nos. 37-38. "**SA.__**" refers to the Times's Special Appendix, ECF No. 36. "**FA.__**" refers the Fund's Supplemental Appendix, ECF No. 58.

[31]  29 U.S.C. § 1401(a)(1)-(2); *see* 29 C.F.R. pt. 4221.

(i)   the actuarial assumptions and methods used were in the aggregate, unreasonable (taking into account the experience of the plan and reasonable expectations), or

(ii)  the plan's actuary made a significant error in applying the actuarial assumptions or methods.

29 U.S.C. § 1401(a)(3)(B).

The Times initiated arbitration, disputing its withdrawal liability assessments on several grounds, including that: (1) section 4213(a)(1) requires that, in determining withdrawal liability, vested benefits be valued using the plan actuary's Funding Interest Assumption; and (2) because the Fund's actuary assumed an interest rate lower than her Funding Interest Assumption, the Fund's unfunded vested benefits and the Times's withdrawal liability were overstated.[32]

In assessing the Times's withdrawal liability, the Fund relied on a valuation of the Fund's unfunded vested benefits prepared by enrolled actuary Rosana Egan ("**Egan**") of The Segal Company ("**Segal**"), who valued the Fund's vested benefits using the "**Segal Method**."[33]

Under the Segal Method: (1) vested benefits in excess of the value of plan assets are valued using the actuary's Funding Interest Assumption, and (2) vested

---

[32]  FA.112-15; A.58-63.  Using a lower discount rate to value future payments results in a higher present value.  *See* Amy Gallo, *A Refresher on Net Present Value*, Harv. Bus. Rev. (Nov. 19, 2014), https://hbr.org/2014/11/a-refresher-on-net-present-value.

[33]  SA.17-18; A.33-35.

benefits covered by the value of plan assets are valued using interest assumptions prescribed by PBGC under 29 C.F.R. Pt. 4044 ("**PBGC Close-Out Rates**").[34]  That blend of interest assumptions (the "**Segal Blend**") yielded, in this case, an average interest assumption of approximately 6.5%.[35]  Egan's Funding Interest Assumption was 7.5%.[36]

PBGC Close-Out Rates are used for valuing the liabilities of a terminated single-employer plan, which affects employer liability to PBGC for the plan's unfunded benefit liabilities.[37]  PBGC values liabilities based on the average market price of a life annuity, which PBGC determines from a quarterly survey of insurance companies.  Valuing benefits using PBGC Close-Out Rates and the other actuarial assumptions described in 29 C.F.R. pt. 4044 approximates the cost of purchasing annuities to cover those benefits.[38]  Those assumptions must also be used to value

---

[34]  A.29

[35]  *Id.*

[36]  *Id.*  Because of the leveraging effect of discounting over long periods, the 100-basis-point difference resulted in a 33% increase in the Times's withdrawal liability, according to the Times's expert.  A.144.

[37]  *See* 29 U.S.C. §§ 1301(a)(18); 1362(a)-(b).

[38]  *See* Valuation of Benefits; Mortality Assumptions, 70 Fed. Reg. 72205, 72205-06 (Dec. 2, 2005); *In re U.S. Airways Grp., Inc.*, 303 B.R. 784, 788-89 (Bankr. E.D. Va. 2003).  Annuity prices are based on returns on high-quality corporate bonds.  *See id.* at 795.  When interest rates are high, as in the 1980s, PBGC Close-Out Rates are relatively high.  Currently, they are relatively low.

benefits in multiemployer plans terminated because all employers have withdrawn.[39]

In the arbitration, the Fund called Egan, who testified that her use of the Segal Method is appropriate. She explained that, while contributing employers bear risk of plan investments underperforming the long-term average rate of return reflected in her Funding Interest Assumption (in that they may be called upon to increase their contributions), a withdrawn employer bears no such risk. It settles its liability once and for all in the fixed amount of its withdrawal liability. Therefore, it is appropriate to use PBGC Close-Out Rates, which approximate the market price of annuities, to value the funded portion of vested benefits (*i.e.*, the portion for which the plan could afford to purchase annuities).[40]

The Fund also called Dr. Ethan Kra, another enrolled actuary and a Fellow in the Society of Actuaries, as an expert witness. He opined that Egan's assumptions were reasonable in the aggregate.[41] The Times called Darren French, an enrolled actuary and an Associate in the Society of Actuaries, who asserted that only the Funding Interest Assumption was permissible, and who did not testify as to whether Egan's assumptions were reasonable in the aggregate.[42]

---

[39] *See* 29 C.F.R. § 4281.13.

[40] FA.28-29; A.35.

[41] FA.53, 118, 131-32; A.36.

[42] A.127 *et seq.* Mr. French is now employed as an actuary by the PBGC. He was

Case 1:18-cv-01905-CJN   Document 28   Filed 06/10/19   Page 1213 of 1367
Case 18-1455, Document 44, 11/07/2018, 2425955, Page30 of 43

JA 001208

Arbitrator Mark L. Irvings found that Egan's actuarial assumptions were, in the aggregate, reasonable.[43]  He rejected the Times's argument that Egan's interest rate assumption violated ERISA, stating "the settled law is that the use of the Segal Blend is consistent with the requirements of [section 4213(a) of ERISA]."[44]  He noted that more than 250 multiemployer plans use the Segal Blend, including some plans not advised by Segal, that plans have done so for decades, and that "thousands of withdrawal liability assessments have been issued using the Segal Blend."[45]  He wrote:

> The consideration of a risk-free rate is within the range of actuarial reasonableness for an estimate of the anticipated experience under the plan. Particularly given investment results in recent years and the shrinking and endangered newspaper sector, protecting the Fund against the very real possibility that investment returns will be below what has been projected, is hardly unreasonable.

A.62.

When arbitration of a withdrawal liability dispute is complete, a party may bring an action to enforce, vacate, or modify the arbitral award.[46]  The Times sued to, *inter alia*, vacate that part of the arbitral award regarding Egan's interest rate assumption,

---

walled off from participation in this case.

[43]   A.58-63.

[44]   A.62.

[45]   A.34-35, 60.

[46]   *See* 29 U.S.C. § 1401(b)(2).

Case 1:18-cv-01905-CJN   Document 28   Filed 06/10/19   Page 1214 of 1367
Case 18-1490, Document 44, 11/27/2018, 2428933, Page121 of 141

JA 001209

and for an order directing the Fund to recalculate the Times's withdrawal liability.[47]

District Judge Robert W. Sweet rejected the Times's argument that use of the Segal Blend was legally impermissible under section 4213(a)(1): "Insofar as the Times wishes to argue that use of different interest rates in different contexts is always impermissible as a matter of law, that argument fails.  Both the ERISA provisions and *Concrete Pipe [& Prod. of California, Inc. v. Constr. Laborers Pension Tr. for S. California*, 508 U.S. 602 (1993)] . . . indicate otherwise.").[48]

Judge Sweet nevertheless held that Arbitrator Irvings clearly erred in concluding that Egan's use of the Segal Blend satisfied section 4213(a)(1) "in this instance," because "Egan's testimony before the Arbitrator was that a 7.5% percent [*sic*] assumption was her 'best estimate of how the . . . Fund's assets . . . will on average perform over the long term."[49]  He ordered the Fund to recalculate the Times's withdrawal liability using the Fund's 7.5% Funding Interest Assumption.

The Fund, as cross-appellant, seeks reversal of the District Court's decision on Egan's use of the Segal Blend.

---

[47]   Complaint ¶¶ 51, 63-84 & 1st request for relief, No. 17-6178 (S.D.N.Y. Aug. 15, 2017), ECF No. 1.

[48]   SA.43-45.

[49]   SA.45-49.

Case 1:18-cv-01905-CJN   Document 28   Filed 06/10/19   Page 1215 of 1367
Case 18-1905, Document 44, 11/07/2018, 2420933, Page22 of 41

JA 001210

# ARGUMENT

## THE DISTRICT COURT COMMITTED REVERSIBLE ERROR BY FAILING TO APPLY THE STATUTORY PRESUMPTION IN FAVOR OF THE PLAN AND IMPERMISSIBLY SHIFTING THE BURDEN OF PROOF ON THE REASONABLENESS OF ACTUARIAL ASSUMPTIONS.

**I.  The district court correctly held that MPPAA does not require a plan's actuary to value vested benefits for withdrawal liability purposes using her funding interest assumption, which should have resulted in a decision in favor of the Fund.**

Section 4213(a)(1) is similar, but not identical, to the Funding Assumptions Standard.  Both require "actuarial assumptions and methods . . . which, in combination, offer the actuary's best estimate of anticipated experience under the plan."  But while the Funding Assumptions Standard requires that the actuarial assumptions and methods used in determining a plan's minimum funding *each* be reasonable,[50] section 4213(a)(1) requires that the actuarial assumptions and methods used to determine withdrawal liability be reasonable *in the aggregate*.[51]

The Times contended: (1) that, because of the similarity of those two statutory standards, section 4213(a)(1) implicitly requires that withdrawal liability be determined using the plan actuary's Funding Interest Assumption (the "**Statutory Similarity Argument**"); and (2) that the Supreme Court "squarely held" in *Concrete Pipe* that

---

[50]  *See* 26 U.S.C. § 431(c)(3); 29 U.S.C. § 1084(c)(3).

[51]  *See* 29 U.S.C. § 1393(a)(1)

section 4213(a)(1) so requires.[52]  Judge Sweet correctly rejected both contentions,[53] as did the district court in *Manhattan Ford Lincoln, Inc. v. UAW Local 259 Pension Fund*, No. 17-5076, 2018 U.S. Dist. LEXIS 111969, at *31-48 (D.N.J. July 3, 2018), *appeal dismissed by stipulation,* No. 18-2709 (3d Cir. Oct. 9, 2018).[54]

The Statutory Similarity Argument is premised on two invalid propositions.

*First,* the Statutory Similarity Argument is valid only if section 4213(a)(1) sets a standard for the interest rate assumption considered in isolation.  But by its terms, section 4213(a)(1) applies to actuarial assumptions and methods only "in the aggregate" and "in combination."

*Second*, the Statutory Similarity Argument depends on the proposition that "actuarial assumptions and methods . . . , in combination, offer the actuary's best estimate of anticipated experience under the plan" means that the interest rate assumption must offer the actuary's best estimate of the long-term average rate of return on plan assets.  That proposition is inconsistent with precedent.  Courts have construed that requirement as "basically procedural in nature and . . . principally designed to ensure that the chosen assumptions actually represent the actuary's own

---

[52]  Times's Mem. in Supp. of M.S.J. at 24-25, No. 17-6178 (S.D.N.Y. Sept. 15, 2017), ECF No. 20.

[53]  SA.43-45 ("Both the ERISA provisions and *Concrete Pipe* . . . indicate otherwise.").

[54]  PBGC opined in 1986 that section 4213 does not require an actuary to use her funding assumptions.  *See* PBGC Opin. Ltr. 86-24 (1986), https://www.pbgc.gov/sites/default/files/legacy/docs/oplet/86-24.pdf.

judgment rather than the dictates of plan administrators or sponsors." *Wachtell, Lipton, Rosen & Katz v. C.I.R.*, 26 F.3d 291, 296 (2d Cir. 1994); *accord Citrus Valley Estates, Inc. v. C.I.R.,* 49 F.3d 1410, 1414-15 (9th Cir. 1995); *Rhoades, McKee & Boer v. United States*, 43 F.3d 1071, 1074-75 (6th Cir. 1995); *Vinson & Elkins v. C.I.R.*, 7 F.3d 1235, 1238 (5th Cir. 1993).  Those decisions addressed the "actuary's best estimate" requirement under a predecessor Funding Assumptions Standard.[55]  Courts have similarly construed the "actuary's best estimate" requirement under section 4213(a)(1).[56]

---

[55]  The decisions followed a wave of IRS audits of defined benefit pension plans.  At the time, both single- and multiemployer plans were subject to similar minimum funding requirements.  The statutory minimum funding standard required "actuarial assumptions and methods . . . which, in combination, offer the actuary's best estimate of anticipated experience under the plan."  *See* 26 U.S.C. § 412(c)(3) (1988 & 1994). Section 404 of the Internal Revenue Code limits tax-deductible contributions and requires that the actuarial assumptions used to determine maximum deductible contributions be those used for minimum funding.  *See* 26 U.S.C. § 404(a)(1)(A).  The IRS disallowed deductions of plan contributions because, the IRS asserted, the plan actuary's interest assumption was lower than his "best estimate of anticipated experience under the plan" and therefore overstated deductible contributions.

[56]  *See Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Pension Fund v. CPC Logistics, Inc.*, 698 F.3d 346, 357 (7th Cir. 2012) (Posner, J.) ("[T]he plan's resolution directing Segal to switch from one method of estimating the interest rate to another and back again . . . violated the 'best estimate' requirement, which exists to maintain the actuary's independence."); *Manhattan Ford Lincoln, Inc. v. UAW Local 259 Pension Fund*, No. 17-5076, 2018 U.S. Dist. LEXIS 111969, at *51-55 (D.N.J. July 3, 2018); *see also Huber v. Casablanca Indus., Inc.*, 916 F.2d 85, 90-93 (3d Cir. 1990), *abrogated on other grounds by Milwaukee Brewery Workers' Pension Plan v. Joseph Schlitz Brewing Co.*, 513 U.S. 414 (1995) (upholding arbitrator's finding that actuary's valuation of plan assets for withdrawal liability purposes, "did not represent the best estimates of the actuary"

If Congress had wanted to require valuation of vested benefits for withdrawal liability purposes based on funding assumptions, Congress could easily have said so. "'The short answer is that Congress did not write the statute that way.'"[57]  Rather, its use of disparate language in the same statute—here, in the Funding Assumptions Standard and section 4213(a)(1)—is presumed to be intentional.[58]

Section 4213(b)(1) does provide that, "for purposes of determining an employer's withdrawal liability . . . , the plan actuary may . . . rely on the most recent complete actuarial valuation used for purposes of section 412 of title 26 [the minimum funding standard] and reasonable estimates for the interim years of the unfunded vested benefits."[59]  Courts have held that section 4213(b)(1) may *permit* use of funding assumptions for withdrawal liability purposes but *only if* the assumptions are reasonable for withdrawal liability purposes.[60]

---

but "had its genesis in the Board of Trustees . . . and has an objective . . . of inflating the withdrawal liability . . . .")

[57]  *Russello v. United States*, 464 U.S. 16, 23 (1983) (quoting *United States v. Naftalin*, 441 U.S. 768, 773 (1979)).

[58]  *See id.*

[59]  When section 4213(b)(1) was enacted, ERISA's minimum funding provisions required a triennial actuarial valuation.  *See* 26 U.S.C. § 412(c)(9) (1976 & Supp. III 1980).  Now an annual valuation is required.  *See* 26 U.S.C. § 431(c)(7); 29 U.S.C. § 1084(c)(7)(A).

[60]  *See Masters, Mates & Pilots Pension Plan v. USX Corp.*, 900 F.2d 727, 731-32 (4th Cir. 1990); *Bd. of Trs., Michigan United Food & Commercial Workers Union v. Eberhard Foods, Inc.*, 831 F.2d 1258, 1262 (6th Cir. 1987); *Trs. of the Pressman Local 72 Indus. Pension Fund*

The Times incorrectly asserted that, in *Concrete Pipe,* the Supreme Court "squarely h[eld] that actuaries must employ the same rate in both [the withdrawal liability and funding] contexts."[61]  The issue was whether the section 4221(a)(3)(B) presumption (that the actuary's determination of the plan's unfunded vested benefits was correct) shielded the actuary's assumptions from effective review in arbitration, denying the employer a neutral forum in violation of the Due Process Clause.[62]  In holding that presumption constitutional, the Court reasoned that "the assumptions and methods used in calculating withdrawal liability are selected in the first instance not by the trustees [of the plan], but by the plan actuary," who, as a "trained professional[] subject to regulatory standards," "is not, like the trustees, vulnerable to suggestions of bias or its appearance."[63]  To the extent that risk of bias remained despite actuaries' professional independence and the regulatory standards governing their profession, that risk was limited by the "necessity for applying the same assumptions and methods in more than one context"—that is, in determinations of both minimum funding and withdrawal liability.

---

*v. Judd & Detweiler, Inc.*, 736 F. Supp. 1351, 1354-55 (D. Md. 1988).

[61]   Times's Mem. in Supp. of M.S.J. at 25, No. 17-6178 (S.D.N.Y. Sept. 15, 2017), ECF No. 20.

[62]   *See Concrete Pipe*, 508 U.S. 602 at 631-36.

[63]   *Id.*

At the time *Concrete Pipe* was decided, the Funding Assumption Standard used the same language as section 4213(a)(1).[64]  "The use of the same language to describe the actuarial assumptions and methods to be used in these different contexts tends to check the actuary's discretion in each of them," although "the assumptions used by the [p]lan . . . *may be 'supplemented by several actuarial assumptions unique to withdrawal liability.'*"[65]  Concrete Pipe had:

> not shown that any method or assumption unique to the calculation of withdrawal liability is so manipulable as to create a significant opportunity for bias to operate, and arguably the most important assumption (in fact, the only actuarial assumption or method that Concrete Pipe attacks . . .) is the critical interest rate assumption that must be used for other purposes as well.

*Concrete Pipe*, 508 U.S. at 633.

The Times extracted from the Supreme Court's reasoning that the interest rate assumption must be the same (ignoring what the Court said about supplemental actuarial assumptions unique to withdrawal liability).  At least two courts have agreed with Judge Sweet, however, that *Concrete Pipe* does not require a plan's actuary to use

---

[64]   Prior to the Pension Protection Act of 2006, Pub. L. No. 109-280, 120 Stat. 780, ERISA's standard for the actuarial assumptions and methods that multiemployer plans used to value benefit liabilities for minimum funding purposes was identical to the section 4213(a)(1) standard.  *See* 29 U.S.C. § 1082(c)(3); 26 U.S.C. § 412(c)(3) (1988 & 1994).

[65]   *Concrete Pipe*, 508 U.S. at 632-33 (quoting plan's brief) (emphasis added).

the same interest rate in withdrawal liability and funding determinations.  *See Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Pension Fund v. CPC Logistics, Inc.*, 698 F.3d 346 (7th Cir. 2012); *Manhattan Ford*, 2018 U.S. Dist. LEXIS 111969, at *31-36.

In *CPC Logistics*, the plan's actuary had used the Segal Method to calculate withdrawal liability.  But Segal became concerned that withdrawal liability assessments might be susceptible to challenge if *Concrete Pipe* were interpreted to mean that determination of withdrawal liability using any interest assumption but the Funding Interest Assumption violated section 4213(a)(1).  Segal told plan trustees that they could direct the plan's actuary to use his Funding Interest Assumption to calculate withdrawal liability, but that Segal actuaries stood by the Segal Blend as their best estimate of anticipated experience under the plan in the withdrawal-liability context.[66] Plan trustees directed the actuary to use the funding rate from 1996 until 2004, when they directed reversion to the Segal Blend.  CPC Logistics's withdrawal liability was greater than it would have been had the Segal Blend been used consistently.[67]

The arbitrator ruled that use of the Funding Interest Assumption failed to satisfy section 4213(a)(1) based on the actuary's testimony that Segal Blend was at all times his "best estimate of anticipated experience under the plan" in the withdrawal-

---

[66]  *See CPC Logistics*, 698 F.3d at 354.

[67]  *See id.* at 355.

liability context.  The district court upheld the arbitrator's ruling.

The Seventh Circuit affirmed.  Judge Posner, writing for the Seventh Circuit, dismissed the proposition that, following *Concrete Pipe*, an interest assumption that was the plan actuary's "best estimate of anticipated experience under the plan" in the withdrawal-liability context must be the same as his Funding Interest Assumption.  "[T]he Court [in *Concrete Pipe*] had indicated that 'supplemental' assumptions that might cause the rates to diverge were permissible."[68]

Section 4213(a)(1) and the Funding Assumptions Standard themselves diverged in 2006,[69] after the withdrawal at issue in *CPC Logistics*.  That reinforces the correctness of the Seventh Circuit's conclusion.[70]

Having correctly held that neither the statute nor the case law supports the Times' argument that the actuarial assumptions for funding and withdrawal liability must be identical, Judge Sweet should have held the Times to its burden of showing

---

[68]  *Id.* at 354-55 ; *see also Trs. of the Pressman Local 72 Indus. Pension Fund v. Judd & Detweiler, Inc.*, 736 F. Supp. 1351, 1356-57 (D. Md. 1988) (concluding that other actuarial assumptions may have borne on the actuary's interest assumption—which was, the withdrawn employer argued, unreasonably low—and on the reasonableness of the actuarial assumptions in the aggregate).

[69]  *See supra* note 64.

[70]  *See also Manhattan Ford*, 2018 WL 3528310, at *16 ("The language . . . quoted from *Concrete Pipe* rested on the proposition that ERISA used entirely "identical language" to describe the actuarial assumptions and methods that must be used in the "different contexts" of withdrawal liability and minimum funding . . . . In 1993, when *Concrete Pipe* was decided, that was true. . . .  *Concrete Pipe*'s discussion of the "identical" statutes must now, post-2006, be taken with a grain of salt.")

that the Fund's actuarial assumptions were unreasonable in the aggregate.  Instead, he

entirely disregarded the statutory presumption, and thereby committed reversible

error.

## II.   The district court failed to apply MPPAA's presumption that the plan actuary's determination of the plan's unfunded vested benefits was correct, impermissibly shifted the burden of proof from the Times to the Fund, and, in so doing, contradicted its correct holding that the funding interest assumption need not be applied.

Under section 4221(a)(3)(B) of ERISA, in a withdrawal liability dispute, the

actuary's determination of the plan's unfunded vested benefits is presumed correct

unless a party contesting the determination shows by a preponderance of the evidence

that :

> (i) the actuarial assumptions and methods used in the determination were, in the aggregate, unreasonable (taking into account the experience of the plan and reasonable expectations), or

> (ii) the plan's actuary made a significant error in applying the actuarial assumptions or methods.

29 U.S.C. § 1401(a)(3)(B).

The D.C. Circuit has described the policy underlying the presumption:

> Actuarial valuations are based upon and reflect the experience of the plan, the professional judgment of the actuary, and the theories and expectations to which the actuary ascribes.  Great differences of opinion exist as to actuarial methods.  Congress, therefore, created the statutory presumption in favor of withdrawal determinations expressly to forestall endless disputes "over technical actuarial matters with respect to which there are often several equally 'correct approaches.'" S. 1076, The

- 22 -

> Multiemployer Pension Plan Amendments Act of 1980:
> Summary and Analysis of Consideration, 98th Cong., 2d
> Sess. 21 (1980). In the absence of this presumption,
> "employers could effectively nullify their obligation by . . .
> forcing the plan sponsor to prove every element involved in
> making an actuarial determination." H.R. Rep. No. 869, pt.
> I, 96th Cong., 2d Sess. 1, 86, reprinted in 1980
> [U.S.C.C.A.N.] 2918, 2954.

*Combs v. Classic Coal Corp.*, 931 F.2d 96, 99-100 (D.C. Cir. 1991); *accord Keith Fulton & Sons, Inc. v. New England Teamsters & Trucking Indus. Pension Fund*, 762 F.2d 1137, 1143 & n.7 (1st Cir. 1985).

The Supreme Court has described the employer's burden of proof:

> [A]n employer's burden to overcome the presumption in
> question (by proof by a preponderance that the actuarial
> assumptions and methods were in the aggregate
> unreasonable) is simply a burden to show that *the combination
> of methods and assumptions employed in the calculation would not have
> been acceptable to a reasonable actuary*. . . . The employer merely
> has a burden to show that an apparently unbiased
> professional, whose obligations tend to moderate any
> claimed inclination to come down hard on withdrawing
> employers, has based a calculation on *a combination of methods
> and assumptions that falls outside the range of reasonable actuarial
> practice*.

*Concrete Pipe*, 508 U.S. at 635 (emphases added).

That range is fairly wide. Actuaries serving multiemployer plans apply either:

(1) the Funding Interest Assumption, (2) PBGC Close-Out Rates, or (3) the Segal

Method.[71] (PBGC's description of the range of actuarial practice is not an endorsement of any particular practice.)

The Actuarial Standards Board issues Standards of Practice governing the actuarial profession. Actuarial Standard of Practice No. 27, entitled "Selection of Economic Assumptions for Measuring Pension Obligations," provides that: (1) the economic assumptions selected by the actuary should be reasonable; and (2) to be reasonable, an assumption must be "appropriate for the purpose of the measurement."[72] One purpose of withdrawal liability "is to protect the other employers in the multi-employer plan from having to pay for" the withdrawn employer's share of unfunded vested benefits.[73]

---

[71] *See Combs v. Classic Coal Corp.*, No. 84-1562, 1990 WL 66583, at *3 n. 5 (D.D.C. Apr. 6, 1990), *aff'd*, 931 F.2d 96 (D.C. Cir. 1991) (describing those "three schools of thought among actuaries with respect to the selection of interest rate assumptions"); *see also* Judith Mazo & Susan Lee, *Multiemployer Pension Plan Withdrawal Liability*, 23 Ben. L. J., no. 4, 2010, at 36, 40 (describing Funding Interest Assumption and Segal Method as the "two main methodologies").

[72] ASOP 27 § 3.6 (Sept. 2013 ed.), http://www.actuarialstandardsboard.org/wp-content/uploads/2014/02/asop027_172.pdf; *see also* ASOP 27 § 3.6 (Sept. 2007 ed. updated May 1, 2011), http://www.actuarialstandardsboard.org/wp-content/uploads/2014/10/asop027_145.pdf ("[F]or some purposes, . . . the discount rate [used to value plan liabilities] may be selected independently of the plan's investment return assumption. . . . The purpose of the measurement is a primary factor.").

[73] *Santa Fe Pac. Corp. v. Cent. States, Se. & Sw. Areas Pension Fund*, 22 F.3d 725, 726-27 (7th Cir. 1994); *accord SUPERVALU, Inc. v. Bd. of Trs. of Sw. Pa. & W. Md. Area Teamsters & Employers Pension Fund*, 500 F.3d 334, 337 (3d Cir. 2007); *see also* 29 U.S.C. § 1001a(a)(4)(A); *cf. ILGWU Nat'l Ret. Fund v. Levy Bros. Frocks*, 846 F.2d 879, 881 (2d

Case 1:18-cv-01905-CJN   Document 28-7   Filed 06/10/19   Page 1226 of 1367
Case 18-1903, Document 44, 11/07/2018, 2429933, Page98 of 141

JA 001221

Egan and Dr. Kra testified that, while contributing employers bear risk of plan investments underperforming the long-term average rate of return reflected in the Funding Interest Assumption (in that they may be called upon to increase their contributions), a withdrawn employer bears no such risk. It settles its liability once and for all in the fixed amount of its withdrawal liability.[74] Dr. Kra testified:

> [T]he withdrawing employer is given a final number with no risk. If the investments underperform, you cannot go back to that withdrawing employer with another bill. If the investment is outperforming, the withdrawing employer gets no credit.... [I]t is a final settlement of an obligation to provide for certain benefits.... [A]ll of the ongoing employers share in the upside, share in the downside. If the fund underperforms, they pay more. If the fund overperforms, they pay less. They take the risk, they take the benefit.[75]

Some actuaries, including Dr. Kra, therefore believe that the withdrawn employer should be treated as purchasing a fixed rate of return rather than participating with the plan in its investment portfolio, with the attendant risk or

---

Cir. 1988) ("The purpose of withdrawal liability 'is to relieve the funding burden on remaining employers and to eliminate the incentive to pull out of a plan which would result if liability were imposed only on a mass withdrawal by all employers.'") (quoting H.R. Rep. No. 96-869, pt. 1, at 67 (1980), *as reprinted in* 1980 U.S.C.C.A.N. 2918, 2935).

[74] *See* FA.28 (Egan's testimony), FA.53-55, 61 (Dr. Kra's testimony); *see also* FA.127-28 (Dr. Kra's Expert Report); A.35-36 (Arbitrator's Interim Opin & Award).

[75] FA.53-54. Judge Sweet's statement (at SA.47-48) that the Times's ceasing to bear investment risk is offset by its ceasing to benefit from any upside ignores the thrust of the testimony that a risk premium goes to those who take risk.

- 25 -

Case 1:18-cv-01905-CJN   Document 28   Filed 06/10/19   Page 1227 of 1367
Case 18-1963, Document 46, 11/27/2018 2420033, Page4 of 41

JA 001222

reward.[76]  The market price of a life annuity contract—that is, the price insurance

companies charge to assume a pension-benefit-like liability—is the market price of a

fixed rate of return.  PBGC close-out assumptions approximate that market price.[77]

As the withdrawn employer is relieved of investment risk, it forgoes any risk

premium.

Egan testified that it is appropriate to use the Segal Method, under which

PBGC Close-Out Rates are used in valuing the funded portion of vested benefits (for

which the plan could afford to purchase annuities).[78]  Many actuaries agree with her.[79]

Dr. Kra opined that Egan's assumptions were reasonable in the aggregate.[80]

The Times's expert asserted that only the Funding Interest Assumption was

permissible and did not testify as to whether Egan's assumptions were reasonable in

the aggregate.[81]

---

[76]  *See id.*; *cf. Plan Bd. of Sunkist Ret. Plan v. Harding & Leggett, Inc.*, 463 F. App'x 702, 703 (9th Cir. 2011) (affirming district court decision upholding withdrawal liability assessment based on PBGC Close-Out Rates); *Nat'l Ret. Fund v. Metz Culinary Mgmt., Inc.*, No. 16-CV-2408, 2017 WL 1157156, at *3 (S.D.N.Y. Mar. 27, 2017) (noting calculation of withdrawal liability using PBGC Close-Out Rates by actuary from Horizon Actuarial Services LLC).

[77]  *See supra* note 38 and accompanying text.

[78]  FA.28-29; A.35.

[79]  *See supra* note 45 and accompanying text.

[80]  FA.53, 118, 131-32; A.36.

[81]  *See* A.127 *et seq.*

Given the record, it is not surprising that Arbitrator Irvings concluded that the Times had not met its burden of proof.[82]

Perhaps recognizing the difficulty of meeting its statutory burden of proof, given the range of accepted actuarial practice, the Times attempted to sidestep the section 4221(a)(3)(B) presumption by arguing that section 4213(a)(1) requires a plan's actuary to value vested benefits for determination of withdrawal liability using his or her Funding Interest Assumption,[83] and therefore that Egan's use of the Segal Blend in determining the Times's withdrawal liability was "*legally* 'unreasonable,'" and her actuarial assumptions "were tainted 'in the aggregate.'"[84]

Judge Sweet accepted the Times's reframing of its burden of proof. He stated the issue on review as whether "the Segal Blend's use was reasonable in the aggregate."[85] He concluded that Arbitrator Irvings had clearly erred in finding that it was.[86] He reasoned:

> Egan's testimony before the Arbitrator was that a 7.5%

---

[82] *See* A58-63 (concluding that Egan's actuarial assumptions were, in the aggregate, reasonable).

[83] *See* Times's Mem. in Supp. of M.S.J. at 24, 26, No. 17-6178 (S.D.N.Y. Sept. 15, 2017), ECF No. 20 ("[I]nconsistency is impermissible as a matter of law. . . . [A] plan actuary must use for withdrawal liability purposes the same discount rate that she uses for minimum funding purposes.")

[84] Times's Reply in Supp. of M.S.J. at 13 n. 4, No. 17-6178 (S.D.N.Y. Nov. 3, 2017), ECF No. 29.

[85] SA.46.

[86] SA.46-49.

Case 18-1408, Document 44, 11/07/2018, 2426919, Page36 of 41

> percent [*sic*] assumption was her "best estimate of how the Pension Fund's assets . . . will on average perform over the long term." . . .   If 7.5% was the Fund actuary's "best estimate," it strains reason to see how the Segal Blend, a 6.5% rate derived by blending that 7.5% "best estimate" assumption with lower, no-risk PBGC bond rates [*sic*], can be accepted as [her best estimate of] the anticipated plan experience.  This is especially when [*sic*] the blend includes interest rates for assets not included in the Fund's portfolio.

SA.46-47.

That reasoning implies that Judge Sweet accepted the two flawed propositions necessary to the Times's Statutory Similarity Argument: (1) that section 4213(a)(1) sets a standard for the interest rate assumption considered in isolation; (2) that section 4213(a)(1)'s requirement that the "actuarial assumptions and methods . . . , in combination, offer the actuary's best estimate of anticipated experience under the plan" means that the interest rate assumption must offer the actuary's best estimate of the long-term average rate of return on plan assets.[87]  In doing so, he contradicted his own correct holding that funding and withdrawal liability interest assumptions need not be identical.

Moreover, the issue is not whether "the Segal Blend's use was reasonable in the aggregate," but whether "the actuarial assumptions and methods used in the determination were, in the aggregate, *unreasonable* (taking into account the experience

---

[87]  *See supra* pp. 15-16.

of the plan and reasonable expectations).”[88]  That is, *the Times* had the burden of

showing that Egan based her calculation of unfunded vested benefits “on a

combination of methods and assumptions that falls outside the range of reasonable

actuarial practice.”[89]  Section 4221(a)(3)(B) requires that the employer meet a

preponderance-of-the-evidence burden on that issue, implying that it is a question of

fact.  ERISA requires a court reviewing the arbitrator’s award to review the

arbitrator’s findings of fact for clear error.[90]

Judge Sweet failed to take the section 4221(a)(3)(B) presumption into account.

Determining whether a factfinder erred implicates the burden of proof that the

factfinder was required to apply.[91]  Judge Sweet could conclude that Arbitrator Irvings

---

[88]  29 U.S.C. § 1401(a)(3)(B)(i) (emphasis added).

[89]  *Concrete Pipe*, 508 U.S. at 635.

[90]  *See* 29 U.S.C. § 1401(c); *Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Louis Zahn Drug. Co.*, 890 F.2d 1405, 1411 (7th Cir. 1989).

[91]  *See Bazemore v. Friday*, 478 U.S. 385, 397-98 (1986) (holding that district court’s determination that plaintiff had not proven racial discrimination by a preponderance is reviewed for clear error); *Perkin-Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 893 (Fed. Cir. 1984) (affirming denial of defendant’s motion for judgment notwithstanding the verdict in a patent infringement action, holding: “Where . . . there is a verdict of validity, the question is . . . whether the challenger’s evidence so met the burden [to overcome the presumption of a patent’s validity by proving invalidity by clear and convincing evidence] that reasonable jurors could not have concluded that the challenger failed to overcome that burden.”); Eric J. Magnuson & David F. Herr, Federal Appeals Jurisdiction and Practice § 5:3 (2018 ed. 2017); *cf. Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) (“[T]he inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive

Case 1:18-cv-01905-CJN   Document 28   Filed 06/10/19   Page 1231 of 1367
Case 18-1405, Document 44, 11/07/2018, 2420933, Page98 of 94

JA 001226

clearly erred only if the arbitral record showed that the Times had proven, by a
preponderance of the evidence, that the combination of actuarial assumptions and
methods that Egan used in determining the Times's withdrawal liability was "outside
the range of reasonable actuarial practice."

Judge Sweet's opinion does not address that issue.  Judge Sweet did not apply,
nor even mention, the presumption of correctness required by section 4221(a)(3)(B).
He reached his own conclusion about the reasonableness of Egan's actuarial
assumptions and methods, without reference to whether they were outside the range
of reasonable actuarial practice.  That was reversible error.

---

evidentiary standard of proof that would apply at the trial on the merits.").

# CONCLUSION

For the foregoing reasons, the Court should reverse the district court's decision

on the interest rate assumption.

November 7, 2018                Respectfully submitted,


                                 /s/ John Holland Ginsberg
                                JUDITH STARR, *General Counsel*
                                ISRAEL GOLDOWITZ, *Deputy General Counsel*
                                JON CHATALIAN, *Acting Assistant General Counsel*
                                JOHN GINSBERG, *Attorney*

                                PENSION BENEFIT GUARANTY CORPORATION
                                1200 K Street, N.W.
                                Washington, DC  20005-4026
                                (202) 326-4020, ext. 3714 (telephone)
                                (202) 326-4112 (facsimile)
                                ginsberg.john@pbgc.gov

# <u>CERTIFICATE OF COMPLIANCE</u>

I, John Holland Ginsberg, hereby certify, that the Brief for the Pension Benefit Guaranty Corporation as *Amicus Curiae* Supporting Cross-Appellants complies with the type-volume limitation as set forth in Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this brief contains 6,973 words. The Brief complies with the typeface requirement of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point, Garamond font.

Dated: November 7, 2018                             /s/ John Holland Ginsberg
                                                                   John Holland Ginsberg

Case 1:18-cv-01905-CJN   Document 28   Filed 06/10/19   Page 1234 of 1367
Case 18-1905, Document 44, 11/07/2018, 2420939, Page91 of 91

JA 001229

# CERTIFICATE OF SERVICE

I, John Holland Ginsberg, certify that on November 7, 2018, a true and correct

copy of the Brief for the Pension Benefit Guaranty Corporation as *Amicus Curiae*

Supporting Cross-Appellants was served via the Court's ECF system and by a third-

party carrier on:

Ronald E. Richman, Esq.
Max Garfield, Esq.
Adam B. Gartner, Esq.
Schulte Roth & Zabel LLP
919 Third Avenue
New York, NY 10022
*Defendant-Appellee/Cross-Appellant Newspaper and Mail
Deliverers'-Publishers' Pension Fund and its Trustees*

Evan Miller, Esq.
Mark Christopher Savignac, Esq.
Jones Day
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
*Plaintiff-Appellant/Cross-Appellee The New York Times Company*


                                            /s/ John Holland Ginsberg
                                            John Holland Ginsberg



# ACTUARIAL STANDARDS BOARD

Actuarial Standard
of Practice
No. 4

Revised Edition

# Measuring Pension Obligations and
Determining Pension Plan Costs or Contributions

Developed by the
Pension Committee of the
Actuarial Standards Board

Adopted by the
Actuarial Standards Board
December 2013

Doc. No. 173



EXHIBIT
3

**ASOP No. 4—Doc. No. 173**

T A B L E   O F   C O N T E N T S

Transmittal Memorandum                                                                iv

**STANDARD OF PRACTICE**

Section 1.  Purpose, Scope, Cross References, and Effective Date                     1
    1.1     Purpose                                                          1
    1.2     Scope                                                            1
    1.3     Cross References                                                 2
    1.4     Effective Date                                                   2

Section 2.  Definitions                                                             2
    2.1     Actuarial Accrued Liability                                      2
    2.2     Actuarial Cost Method                                            2
    2.3     Actuarial Present Value                                          3
    2.4     Actuarial Present Value of Projected Benefits                    3
    2.5     Actuarial Valuation                                              3
    2.6     Actuarially Determined Contribution                              3
    2.7     Amortization Method                                              3
    2.8     Contribution Allocation Procedure                                3
    2.9     Cost Allocation Procedure                                        3
    2.10    Expenses                                                         3
    2.11    Funded Status                                                    3
    2.12    Immediate Gain Actuarial Cost Method                             3
    2.13    Market-Consistent Present Value                                  4
    2.14    Measurement Date                                                 4
    2.15    Normal Cost                                                      4
    2.16    Output Smoothing Method                                          4
    2.17    Participant                                                      4
    2.18    Periodic Cost                                                    4
    2.19    Plan Provisions                                                  4
    2.20    Prescribed Assumption or Method Set by Another Party             4
    2.21    Prescribed Assumption or Method Set by Law                       4
    2.22    Spread Gain Actuarial Cost Method                                4

Section 3.  Analysis of Issues and Recommended Practices                            5
    3.1     Overview                                                         5
    3.2     General Procedures                                               5
    3.3     Purpose of the Measurement                                       6
         3.3.1  Projection or Point-in-Time                               6
         3.3.2  Uncertainty or Risk                                       6
    3.4     Measurement Date Considerations                                  6
         3.4.1  Information as of a Different Date                         6
         3.4.2  Events after the Measurement Date                          7
         3.4.3  Adjustment of Prior Measurement                            7

**ASOP No. 4—Doc. No. 173**

| | | | |
|---|---|---|---|
| 3.5 | Plan Provisions | | 7 |
| | 3.5.1 | Adopted Changes in Plan Provisions | 7 |
| | 3.5.2 | Proposed Changes in Plan Provisions | 8 |
| | 3.5.3 | Plan Provisions that are Difficult to Measure | 8 |
| 3.6 | Data | | 8 |
| | 3.6.1 | Participants | 8 |
| | 3.6.2 | Hypothetical Data | 9 |
| 3.7 | Other Information from the Principal | | 9 |
| 3.8 | Actuarial Assumptions | | 9 |
| 3.9 | Asset Valuation | | 9 |
| 3.10 | Measuring the Value of Accrued or Vested Benefits | | 9 |
| 3.11 | Market-Consistent Present Values | | 10 |
| 3.12 | Relationship Between Asset and Obligation Measurement | | 10 |
| 3.13 | Actuarial Cost Method | | 10 |
| 3.14 | Allocation Procedure | | 11 |
| | 3.14.1 | Consistency Between Contribution Allocation Procedure and the Payment of Benefits | 11 |
| | 3.14.2 | Implications of Contribution Allocation Procedure or Funding Policy | 12 |
| 3.15 | Approximations and Estimates | | 12 |
| 3.16 | Volatility | | 12 |
| 3.17 | Evaluation of Assumptions and Methods | | 13 |
| | 3.17.1 | Prescribed Assumption or Method Set by Another Party | 13 |
| | 3.17.2 | Evaluating Prescribed Assumption or Method | 13 |
| | 3.17.3 | Inability to Evaluate Prescribed Assumption or Method | 14 |
| Section 4. | Communications and Disclosures | | 14 |
| 4.1 | Communication Requirements | | 14 |
| 4.2 | Disclosure about Prescribed Assumptions or Methods | | 17 |
| 4.3 | Additional Disclosures | | 17 |
| 4.4 | Confidential Information | | 17 |

**APPENDIX**

Appendix—Comments on the Second Exposure Draft and Responses                18

**ASOP No. 4—Doc. No. 173**

December 2013

**TO:**    Members of Actuarial Organizations Governed by the Standards of Practice of the Actuarial Standards Board and Other Persons Interested in Measuring Pension Obligations and Determining Pension Plan Costs or Contributions

**FROM:**    Actuarial Standards Board (ASB)

**SUBJ:**    Actuarial Standard of Practice (ASOP) No. 4

This document contains the final version of a revision of ASOP No. 4, *Measuring Pension Obligations and Determining Pension Plan Costs or Contributions.*

Background

The ASB provides coordinated guidance for measuring pension and retiree group benefit obligations through the series of ASOPs listed below.

1.    ASOP No. 4, *Measuring Pension Obligations and Determining Pension Plan Costs or Contributions*;

2.    ASOP No. 6, *Measuring Retiree Group Benefit Obligations*;

3.    ASOP No. 27, *Selection of Economic Assumptions for Measuring Pension Obligations*;

4.    ASOP No. 35, *Selection of Demographic and Other Noneconomic Assumptions for Measuring Pension Obligations*; and

5.    ASOP No. 44, *Selection and Use of Asset Valuation Methods for Pension Valuations*.

First Exposure Draft

The first exposure draft of this ASOP was issued in January 2012 with a comment deadline of May 31, 2012. Seventeen comment letters were received and considered in developing modifications that were reflected in the second exposure draft.

Second Exposure Draft

The second exposure draft of this ASOP was issued in December 2012 with a comment deadline of May 31, 2013. The Pension Committee carefully considered the thirteen comment letters received. Key changes made to the final standard in response to comment letters received on the second exposure draft include the following:

iv

### ASOP No. 4—Doc. No. 173

1.  Section 4.1(k) was revised to remove the requirement for the actuary to make a disclosure if the unfunded actuarial accrued liability is expected to increase at any time during the amortization period. This section was also revised to clarify that a description of an amortization base includes the outstanding amortization balance, the amortization payment included in the periodic cost or actuarially determined contribution, and the remaining amortization period.

2.  Language in section 4.1(q) was clarified to state that related disclosures are not required for funded status measurements prescribed by federal law or regulation.

3.  Section 4.4 regarding confidential information was added to remove potential confusion regarding the interrelationship of this standard and Precept 9 of the *Code of Professional Conduct*.

In addition, a number of other changes were made to the text. Please see the appendix for a detailed discussion of the comments received and the reviewers' responses.

Key Changes from Current Standard

Key changes from the version of ASOP No. 4 adopted May 2011 include the following:

***Disclosure of Funded Status***
Sections 4.1(p) and 4.1(q) contain new disclosure requirements related to a plan's funded status.

***Disclosure of Rationale for Changes in Cost or Contribution Allocation Procedure***
Section 4.1(t) contains new disclosure requirements for a change in the cost or contribution allocation procedure.

***Assessment of Contribution Allocation Procedure or Funding Policy***
Section 4.1(m) contains new disclosure requirements related to the implications of the contribution allocation procedure or plan sponsor's funding policy on future expected plan contributions and funded status.

***Prescribed Assumptions or Methods***
The definition of prescribed assumption or method (section 2.16 in the current standard) has been revised to address prescribed assumptions or methods set by another party or set by law (sections 2.19 and 2.20).

***Plan Provisions that are Difficult to Measure***
Section 3.5.3 provides guidance to the actuary who needs to measure plan provisions that are difficult to appropriately measure using traditional valuation procedures.

ASOP No. 4 is intended to accommodate the concepts of financial economics as well as traditional actuarial practice.

JA 001235

## ASOP No. 4—Doc. No. 173

The Pension Committee thanks everyone who took the time to contribute comments and suggestions on the exposure drafts.

The Pension Committee thanks former committee members Thomas B. Lowman, Tonya B. Manning, and Frank Todisco for their assistance with drafting this ASOP.

The ASB voted in December 2013 to adopt this standard.

JA 001236

### ASOP No. 4—Doc. No. 173

Pension Committee of the ASB

Gordon C. Enderle, Chairperson
Mita D. Drazilov, Vice Chairperson

| | |
|---|---|
| C. David Gustafson | Alan N. Parikh |
| Fiona E. Liston | Mitchell I. Serota |
| A. Donald Morgan, IV | Judy K. Stromback |
| Chris Noble | Virginia C. Wentz |

Actuarial Standards Board

Robert G. Meilander, Chairperson

| | |
|---|---|
| Beth E. Fitzgerald | Thomas D. Levy |
| Alan D. Ford | Patricia E. Matson |
| Patrick J. Grannan | James J. Murphy |
| Stephen G. Kellison | James F. Verlautz |

*The ASB establishes and improves standards of actuarial practice. These ASOPs identify what the actuary should consider, document, and disclose when performing an actuarial assignment. The ASB's goal is to set standards for appropriate practice for the U.S.*

ASOP No. 4—Doc. No. 173

# MEASURING PENSION OBLIGATIONS
## AND DETERMINING PENSION PLAN COSTS OR CONTRIBUTIONS

### STANDARD OF PRACTICE

### Section 1. Purpose, Scope, Cross References, and Effective Date

1.1   Purpose—This actuarial standard of practice (ASOP) provides guidance to actuaries when performing actuarial services with respect to measuring obligations under a pension plan and determining **periodic costs** or **actuarially determined contributions** for such plans. Throughout this standard, the terms "plan" or "pension plan" refer to a defined benefit pension plan. Other actuarial standards of practice address actuarial assumptions and asset valuation methods. This standard addresses broader measurement issues, including **cost allocation procedures** and **contribution allocation procedures**. This standard provides guidance for coordinating and integrating all of the elements of an **actuarial valuation** of a pension plan.

1.2   Scope—This standard applies to actuaries when performing actuarial services with respect to the following tasks in connection with a pension plan:

a.   measurement of pension obligations. Examples include determinations of **funded status**, assessments of solvency upon plan termination, market measurements and measurements for use in pricing benefit provisions;

b.   assignment of the value of plan obligations to time periods. Examples include **actuarially determined contributions**, **periodic costs**, and **actuarially determined contribution** or **periodic cost** estimates for potential plan changes;

c.   development of a **cost allocation procedure** used to determine **periodic costs** for a plan;

d.   development of a **contribution allocation procedure** used to determine **actuarially determined contributions** for a plan;

e.   determination as to the types and levels of benefits supportable by specified cost or contribution levels; and

f.   projection of pension obligations, **periodic costs** or **actuarially determined contributions,** and other related measurements. Examples include cash flow projections and projections of a plan's **funded status**.

Throughout this standard, any reference to selecting actuarial assumptions, **actuarial cost methods**, asset valuation methods, and **amortization methods** also includes giving advice on selecting actuarial assumptions, **actuarial cost methods**, asset valuation methods, and **amortization methods**. In addition, any reference to developing or modifying a **cost allocation procedure** or **contribution allocation procedure** includes giving advice on developing or modifying a **cost allocation procedure** or **contribution allocation procedure**.

This standard does not apply to actuaries when performing services with respect to individual benefit calculations, individual benefit statement estimates, annuity pricing, nondiscrimination testing, and social insurance programs as described in section 1.2, Scope, of ASOP No. 32, *Social Insurance* (unless an ASOP on social insurance explicitly calls for application of this standard).

This standard does not require the actuary to evaluate the ability of the plan sponsor or other contributing entity to make contributions to the plan when due.

If the actuary departs from the guidance set forth in this standard in order to comply with applicable law (statutes, regulations, and other legally binding authority) or for any other reason the actuary deems appropriate, the actuary should refer to section 4.

1.3    Cross References—When this standard refers to the provisions of other documents, the reference includes the referenced documents as they may be amended or restated in the future, and any successor to them, by whatever name called. If any amended or restated document differs materially from the originally referenced document, the actuary should consider the guidance in this standard to the extent it is applicable and appropriate.

1.4    Effective Date—-This standard will be effective for any actuarial work product with a **measurement date** on or after December 31, 2014.

<h3 style="text-align:center">Section 2. Definitions</h3>

The terms below are defined for use in this actuarial standard of practice.

2.1    Actuarial Accrued Liability—The portion of the **actuarial present value of projected benefits** (and **expenses**, if applicable), as determined under a particular **actuarial cost method** that is not provided for by future **normal costs**. Under certain **actuarial cost methods**, the **actuarial accrued liability** is dependent upon the actuarial value of assets.

2.2    Actuarial Cost Method—A procedure for allocating the **actuarial present value of projected benefits** (and **expenses**, if applicable) to time periods, usually in the form of a **normal cost** and an **actuarial accrued liability**. For purposes of this standard, a pay-as-you-go method is not considered to be an **actuarial cost method**.

ASOP No. 4—Doc. No. 173

2.3    Actuarial Present Value—The value of an amount or series of amounts payable or receivable at various times, determined as of a given date by the application of a particular set of actuarial assumptions with regard to future events, observations of market or other valuation data, or a combination of assumptions and observations.

2.4    Actuarial Present Value of Projected Benefits—The **actuarial present value** of benefits that are expected to be paid in the future, taking into account the effect of such items as future service, advancement in age, and anticipated future compensation (sometimes referred to as the "present value of future benefits").

2.5    Actuarial Valuation—The measurement of relevant pension obligations and, when applicable, the determination of **periodic costs** or **actuarially determined contributions**.

2.6    Actuarially Determined Contribution—A potential payment to the plan as determined by the actuary using a **contribution allocation procedure**. It may or may not be the amount actually paid by the plan sponsor or other contributing entity.

2.7    Amortization Method—A method under a **contribution allocation procedure** or **cost allocation procedure** for determining the amount, timing, and pattern of recognition of the unfunded **actuarial accrued liability**.

2.8    Contribution Allocation Procedure—A procedure that uses an **actuarial cost method**, and may include an asset valuation method, an **amortization method**, and an **output smoothing method**, to determine the **actuarially determined contribution** for a plan. The procedure may produce a single value, such as **normal cost** plus an amortization payment of the unfunded **actuarial accrued liability**, or a range of values, such as the range from the ERISA minimum required contribution to the maximum tax-deductible amount.

2.9    Cost Allocation Procedure—A procedure that uses an **actuarial cost method**, and may include an asset valuation method and an **amortization method**, to determine the **periodic cost** for a plan (for example, the procedure to determine the net periodic pension cost under accounting standards).

2.10    Expenses—Administrative or investment expenses borne or expected to be borne by the plan.

2.11    Funded Status—Any comparison of a particular measure of plan assets to a particular measure of plan obligations.

2.12    Immediate Gain Actuarial Cost Method—An **actuarial cost method** under which actuarial gains and losses are included as part of the unfunded **actuarial accrued liability** of the pension plan, rather than as part of the **normal cost** of the plan.

3

2.13  Market-Consistent Present Value—An **actuarial present value** that is estimated to be consistent with the price at which benefits that are expected to be paid in the future would trade in an open market between a knowledgeable seller and a knowledgeable buyer. The existence of a deep and liquid market for pension cash flows or for entire pension plans is not a prerequisite for this present value measurement.

2.14  Measurement Date—The date as of which the values of the pension obligations and, if applicable, assets are determined (sometimes referred to as the "valuation date").

2.15  Normal Cost—The portion of the **actuarial present value of projected benefits** (and **expenses**, if applicable) that is allocated to a period, typically twelve months, under the **actuarial cost method**. Under certain **actuarial cost methods**, the **normal cost** is dependent upon the actuarial value of assets.

2.16  Output Smoothing Method—A method used by the actuary to adjust the results of a **contribution allocation procedure** to reduce volatility.

2.17  Participant—An individual who satisfies the requirements for participation in the plan.

2.18  Periodic Cost—The amount assigned to a period using a **cost allocation procedure** for purposes other than funding. This may be a function of plan obligations, **normal cost**, **expenses**, and assets. In many situations, **periodic cost** is determined for accounting purposes.

2.19  Plan Provisions—The relevant terms of the plan document and any relevant administrative practices known to the actuary.

2.20  Prescribed Assumption or Method Set by Another Party—A specific assumption or method that is selected by another party, to the extent that law, regulation, or accounting standards gives the other party responsibility for selecting such an assumption or method. For this purpose, an assumption or method set by a governmental entity for a plan that such governmental entity or a political subdivision of that entity directly or indirectly sponsors is deemed to be a **prescribed assumption or method set by another party**.

2.21  Prescribed Assumption or Method Set by Law—A specific assumption or method that is mandated or that is selected from a specified range or set of assumptions or methods that is deemed to be acceptable by applicable law (statutes, regulations, or other legally binding authority). For this purpose, an assumption or method set by a governmental entity for a plan that such governmental entity or a political subdivision of that entity directly or indirectly sponsors is not deemed to be a **prescribed assumption or method set by law**.

2.22  Spread Gain Actuarial Cost Method—An **actuarial cost method** under which actuarial gains and losses are included as part of the current and future **normal costs** of the plan.

ASOP No. 4—Doc. No. 173

Section 3.  Analysis of Issues and Recommended Practices

3.1     Overview—Measuring pension obligations and determining **periodic costs** or **actuarially determined contributions** are processes in which the actuary may be required to make judgments or recommendations on the choice of actuarial assumptions, **actuarial cost methods**, asset valuation methods, **amortization methods**, and **output smoothing methods**.

The actuary may have the responsibility and authority to select some or all actuarial assumptions, **actuarial cost methods**, asset valuation methods, **amortization methods**, and **output smoothing methods**. In other circumstances, the actuary may be asked to advise the individuals who have that responsibility and authority. In yet other circumstances, the actuary may perform actuarial calculations using **prescribed assumptions or methods set by another party** or **prescribed assumptions or methods set by law**.

ASOP No. 27, *Selection of Economic Assumptions for Measuring Pension Obligations*, and ASOP No. 35, *Selection of Demographic and Other Noneconomic Assumptions for Measuring Pension Obligations*, provide guidance concerning actuarial assumptions. ASOP No. 44, *Selection and Use of Asset Valuation Methods for Pension Valuations*, provides guidance concerning asset valuation methods. ASOP No. 4 addresses broader measurement issues including **cost allocation procedures** and **contribution allocation procedures**, and provides guidance for coordinating and integrating all of these elements of an **actuarial valuation** of a pension plan. In the event of a conflict between the guidance provided in ASOP No. 4 and the guidance in any of the aforementioned ASOPs, ASOP No. 4 governs.

3.2     General Procedures—When measuring pension obligations and determining **periodic costs** or **actuarially determined contributions**, the actuary should perform the following general procedures:

a.     identify the purpose of the measurement (section 3.3);

b.     identify the **measurement date** (section 3.4);

c.     identify **plan provisions** applicable to the measurement and any associated valuation issues (section 3.5);

d.     gather data necessary for the measurement (section 3.6);

e.     obtain from the principal other information necessary for the purpose of the measurement (section 3.7);

f.     select actuarial assumptions (section 3.8);

g.     select an asset valuation method, if applicable (section 3.9);

**ASOP No. 4—Doc. No. 173**

h.    consider how to measure accrued or vested benefits, if applicable (section 3.10);

i.    consider how to measure **market-consistent present values**, if applicable (section 3.11);

j.    reflect how plan or plan sponsor assets as of the **measurement date** are reported, if applicable (section 3.12);

k.    select an **actuarial cost method**, if applicable (section 3.13);

l.    select a **cost allocation procedure** or **contribution allocation procedure**, if applicable (section 3.14);

m.    assess the implications of the **contribution allocation procedure** or plan sponsor's funding policy, if applicable (section 3.14);

n.    consider the use of approximations and estimates (section 3.15);

o.    consider the sources of significant volatility, if applicable (section 3.16); and

p.    evaluate **prescribed assumptions and methods set by another party**, if applicable (section 3.17).

3.3    Purpose of the Measurement—When measuring pension obligations and determining **periodic costs** or **actuarially determined contributions**, the actuary should reflect the purpose of the measurement. Examples of measurement purposes are **periodic costs, actuarially determined contribution** requirements, benefit provision pricing, comparability assessments, withdrawal liabilities, benefit plan settlements, **funded status** assessments, market value assessments, and plan sponsor mergers and acquisitions.

3.3.1    Projection or Point-in-Time—The actuary should consider whether assumptions or methods need to change for measurements projected into the future compared to point-in-time measurements.

3.3.2    Uncertainty or Risk—In conjunction with the related guidance in ASOP No. 41, the actuary should consider the uncertainty or risk inherent in the measurement assumptions and methods and how the actuary's measurement treats such uncertainty or risk.

3.4    Measurement Date Considerations—When measuring pension obligations and determining **periodic costs** or **actuarially determined contributions** as of a **measurement date**, the actuary should address the following:

3.4.1    Information as of a Different Date—The actuary may estimate asset and **participant** information at the **measurement date** on the basis of information as

6

<u>ASOP No. 4—Doc. No. 173</u>

of a different date. In these circumstances, the actuary should make appropriate adjustments to the data. Alternatively, the actuary may calculate the obligations as of a different date and then adjust the obligations to the **measurement date** (see section 3.4.3 for additional guidance). In either case, the actuary should determine that any such adjustments are reasonable in the actuary's professional judgment, given the purpose of the measurement.

3.4.2   <u>Events after the Measurement Date</u>—Events known to the actuary that occur subsequent to the **measurement date** and prior to the date of the actuarial communication should be treated appropriately for the purpose of the measurement. Unless the purpose of the measurement requires the inclusion of such events, they may, but need not, be reflected in the measurement.

3.4.3   <u>Adjustment of Prior Measurement</u>—The actuary may adjust the results from a prior measurement in lieu of performing a new detailed measurement if, in the actuary's professional judgment, such an adjustment would produce a reasonable result for purposes of the measurement. To determine whether such an adjustment would produce a reasonable result, the actuary should consider items such as the following, if known to the actuary:

a.   changes in the number of **participants** or the demographic characteristics of that group;

b.   length of time since the prior measurement;

c.   differences between actual and expected contributions, benefit payments, **expenses**, and investment performance;

d.   changes in economic and demographic expectations; and

e.   changes in **plan provisions**.

When adjusting obligations from a prior **measurement date**, the actuary should consider whether the assumptions used to determine the obligations should be revised.

3.5   <u>Plan Provisions</u>—When measuring pension obligations and determining **periodic costs** or **actuarially determined contributions**, the actuary should reflect all significant **plan provisions** known to the actuary as appropriate for the purpose of the measurement. However, if in the actuary's professional judgment, omitting a significant **plan provision** is appropriate for the purpose of the measurement, the actuary should disclose the omission in accordance with section 4.1(d).

3.5.1   <u>Adopted Changes in Plan Provisions</u>—Unless contrary to applicable law (statutes, regulations, and other legally binding authority), the actuary should reflect **plan provisions** adopted on or before the **measurement date** for at least the portion of

7

**ASOP No. 4—Doc. No. 173**

the period during which those provisions are in effect. **Plan provisions** adopted after the **measurement date** may, but need not, be reflected.

3.5.2 <u>Proposed Changes in Plan Provisions</u>—The actuary should reflect proposed changes in **plan provisions** as appropriate for the purpose of the measurement.

3.5.3 <u>Plan Provisions that are Difficult to Measure</u>—Some **plan provisions** may create pension obligations that are difficult to appropriately measure using traditional valuation procedures. Examples of such **plan provisions** include the following:

    a.    gain sharing provisions that trigger benefit increases when investment returns are favorable but do not trigger benefit decreases when investment returns are unfavorable;

    b.    floor-offset provisions that provide a minimum defined benefit in the event a **participant's** account balance in a separate plan falls below some threshold;

    c.    benefit provisions that are tied to an external index, but subject to a floor or ceiling, such as certain cost of living adjustment provisions and cash balance crediting provisions; and

    d.    benefit provisions that may be triggered by an event such as a plant shutdown or a change in control of the plan sponsor.

For such **plan provisions**, the actuary should consider using alternative valuation procedures, such as stochastic modeling, option-pricing techniques, or deterministic procedures in conjunction with assumptions that are adjusted to reflect the impact of variations in experience from year to year. When selecting alternative valuation procedures for such **plan provisions**, the actuary should use professional judgment based on the purpose of the measurement and other relevant factors.

The actuary should disclose the approach taken with any **plan provisions** of the type described in this section, in accordance with section 4.1(i).

3.6 <u>Data</u>—With respect to the data used for measurements, including data supplied by others, the actuary should refer to ASOP No. 23, *Data Quality*, for guidance.

3.6.1 <u>Participants</u>—The actuary should include in the measurement all **participants** reported to the actuary, except in appropriate circumstances where the actuary may exclude persons such as those below a minimum age/service level. When appropriate, the actuary may include employees who might become **participants** in the future.

**ASOP No. 4—Doc. No. 173**

3.6.2 <u>Hypothetical Data</u>—When appropriate, the actuary may prepare measurements based on assumed demographic characteristics of current or future plan **participants**.

3.7 <u>Other Information from the Principal</u>—The actuary should obtain from the principal other information, such as accounting policies or funding elections, necessary for the purpose of the measurement.

3.8 <u>Actuarial Assumptions</u>—The actuary should refer to ASOP Nos. 27 and 35 for guidance on the selection of actuarial assumptions.

3.9 <u>Asset Valuation</u>—The actuary should refer to ASOP No. 44 for guidance on the selection and use of an asset valuation method.

3.10 <u>Measuring the Value of Accrued or Vested Benefits</u>—Depending on the scope of the assignment, the actuary may measure the value of any accrued or vested benefits as of a **measurement date**. The actuary should consider the following when making such measurements:

a.    relevant **plan provisions** and applicable law (statutes, regulations, and other legally binding authority);

b.    the status of the plan (for example, whether the plan is assumed to continue to exist or be terminated);

c.    the contingencies upon which benefits become payable, which may differ for ongoing-basis and termination-basis measurements;

d.    the extent to which **participants** have satisfied relevant eligibility requirements for accrued or vested benefits and the extent to which future service or advancement in age may satisfy those requirements;

e.    whether or the extent to which death, disability, or other ancillary benefits are accrued or vested;

f.    whether the **plan provisions** regarding accrued benefits provide an appropriate attribution pattern for the purpose of the measurement (for example, following the attribution pattern of the **plan provisions** may not be appropriate if the plan's benefit accruals are significantly backloaded); and

g.    if the measurement reflects the impact of a special event (such as a plant shutdown or plan termination), factors such as the following:

1.    the effect of the special event on continued employment;

2.    the impact of the special event on **participant** behavior due to factors such

9

**ASOP No. 4—Doc. No. 173**

as subsidized payment options;

3.    **expenses** associated with a potential plan termination, including transaction costs to liquidate plan assets; and

4.    changes in investment policy.

3.11    <u>Market-Consistent Present Values</u>—If the actuary calculates a **market-consistent present value**, the actuary should do the following:

a.    select assumptions based on the actuary's observation of the estimates inherent in market data in accordance with the guidance in ASOP Nos. 27 and 35, depending on the purpose of the measurement; and

b.    reflect benefits earned as of the **measurement date**.

In addition, the actuary may consider how benefit payment default risk or the financial health of the plan sponsor affects the calculation.

3.12    <u>Relationship Between Asset and Obligation Measurement</u>—The actuary should reflect how plan or plan sponsor assets as of the **measurement date** are reported. For example, if the plan or plan sponsor assets have been reduced to reflect a lump sum paid, the lump sum or the related annuity value should be excluded from the obligation.

3.13    <u>Actuarial Cost Method</u>—When assigning **periodic costs** or **actuarially determined contributions** to time periods in advance of the time benefit payments are due, the actuary should select an **actuarial cost method** that meets the following criteria:

a.    The period over which **normal costs** are allocated for a **participant** should begin no earlier than the date of employment and should not extend beyond the last assumed retirement age. The period may be applied to each individual **participant** or to groups of **participants** on an aggregate basis.

When a plan has no active **participants** and no **participants** are accruing benefits, a reasonable **actuarial cost method** will not produce a **normal cost** for benefits. For purposes of this standard, an employee does not cease to be an active **participant** merely because he or she is no longer accruing benefits under the plan.

b.    The attribution of **normal costs** should bear a reasonable relationship to some element of the plan's benefit formula or the **participant's** compensation or service. The attribution basis may be applied on an individual or group basis. For example, the **actuarial present value of projected benefits** for each **participant** may be allocated by that **participant's** own compensation or may be allocated by the aggregated compensation for a group of **participants**.

ASOP No. 4—Doc. No. 173

c.    **Expenses** should be considered when assigning **periodic costs** or **actuarially determined contributions** to time periods. For example, the **expenses** for a period may be added to the **normal cost** for benefits or **expenses** may be reflected as an adjustment to the investment return assumption or the discount rate. As another example, **expenses** may be reflected as a percentage of pension obligation or **normal cost**.

d.    The sum of the **actuarial accrued liability** and the **actuarial present value** of future **normal costs** should equal the **actuarial present value of projected benefits** and expenses, to the extent **expenses** are included in the **actuarial accrued liability** and normal cost. For purposes of this criterion, under a **spread gain actuarial cost method**, the sum of the actuarial value of assets and the unfunded **actuarial accrued liability**, if any, shall be considered to be the **actuarial accrued liability**.

3.14    Allocation Procedure—When selecting a **cost allocation procedure** or **contribution allocation procedure**, the actuary should consider factors such as the timing and duration of expected benefit payments and the nature and frequency of plan amendments. In addition, the actuary should consider relevant input received from the principal, such as a desire for stable or predictable **periodic costs** or **actuarially determined contributions**, or a desire to achieve a target funding level within a specified time frame.

3.14.1    Consistency Between Contribution Allocation Procedure and the Payment of Benefits—In some circumstances, a **contribution allocation procedure** may not be expected to produce adequate assets to make benefit payments when they are due even if the actuary uses a combination of assumptions selected in accordance with ASOP Nos. 27 and 35, an **actuarial cost method** selected in accordance with section 3.13 of this standard, and an asset valuation method selected in accordance with ASOP No. 44.

Examples of such circumstances include the following:

a.    a plan covering a sole proprietor with funding that continues past an expected retirement date with payment due in a lump sum;

b.    using the aggregate **actuarial cost method** for a plan covering three employees, in which the principal is near retirement and the other employees are relatively young; and

c.    a plan amendment with an amortization period so long that overall plan **actuarially determined contributions** would be scheduled to occur too late to make plan benefit payments when due.

When selecting a **contribution allocation procedure**, the actuary should select a **contribution allocation procedure** that, in the actuary's professional judgment, is consistent with the plan accumulating adequate assets to make benefit payments

11

when due, assuming that all actuarial assumptions will be realized and that the plan sponsor or other contributing entity will make **actuarially determined contributions** when due.

In some circumstances, the actuary's role is to determine the **actuarially determined contribution**, or range of **actuarially determined contributions**, using a **contribution allocation procedure** that the actuary did not select. If, in the actuary's professional judgment, such a **contribution allocation procedure** is significantly inconsistent with the plan accumulating adequate assets to make benefit payments when due, assuming that all actuarial assumptions will be realized and that the plan sponsor or other contributing entity will make **actuarially determined contributions** when due, the actuary should disclose this in accordance with section 4.1(l).

3.14.2 <u>Implications of Contribution Allocation Procedure or Funding Policy</u>—The actuary should qualitatively assess the implications of the **contribution allocation procedure** or plan sponsor's funding policy on the plan's expected future contributions and **funded status**. For purposes of this section, contributions set by law or by a contract, such as a collective bargaining agreement, constitute a funding policy. In making this assessment, the actuary may presume that all actuarial assumptions will be realized and the sponsor (or other contributing entity) will make contributions anticipated by the **contribution allocation procedure** or funding policy. The actuary's assessment required by this section should be disclosed in accordance with section 4.1(m).

3.15 <u>Approximations and Estimates</u>—The actuary should use professional judgment to establish a balance between the degree of refinement of methodology and materiality. The actuary may use approximations and estimates where circumstances warrant. Following are some examples of such circumstances:

a.   situations in which the actuary reasonably expects the results to be substantially the same as the results of detailed calculations;

b.   situations in which the actuary's assignment requires informal or rough estimates; and

c.   situations in which the actuary reasonably expects the amounts being approximated or estimated to represent only a minor part of the overall pension obligation, **periodic cost**, or **actuarially determined contribution**.

3.16 <u>Volatility</u>—If the scope of the actuary's assignment includes an analysis of the potential range of future pension obligations, **periodic costs**, **actuarially determined contributions**, or **funded status**, the actuary should consider sources of volatility that, in the actuary's professional judgment, are significant. Examples of potential sources of volatility include the following:

a.  plan experience differing from that anticipated by the economic or demographic assumptions, as well as the effect of new entrants;

b.  changes in economic or demographic assumptions;

c.  the effect of discontinuities in applicable law (statutes, regulations, and other legally binding authority) or accounting standards, such as full funding limitations, the end of amortization periods, or liability recognition triggers;

d.  the delayed effect of smoothing techniques, such as the pending recognition of prior experience losses; and

e.  patterns of rising or falling **periodic cost** expected when using a particular **actuarial cost method** for the plan population.

When analyzing potential variations in economic and demographic experience or assumptions, the actuary should exercise professional judgment in selecting a range of variation in these assumptions (while maintaining internal consistency among these assumptions, as appropriate) and in selecting a methodology by which to analyze them, consistent with the scope of the assignment.

3.17  Evaluation of Assumptions and Methods—An actuarial communication should identify the party responsible for each material assumption and method. Where the communication is silent about such responsibility, the actuary who issued the communication will be assumed to have taken responsibility for that assumption or method.

3.17.1  Prescribed Assumption or Method Set by Another Party—The actuary should evaluate whether a **prescribed assumption or method set by another party** is reasonable for the purpose of the measurement, except as provided in section 3.17.3. The actuary should be guided by Precept 8 of the *Code of Professional Conduct*, which states, "An Actuary who performs Actuarial Services shall take reasonable steps to ensure that such services are not used to mislead other parties." For purposes of this evaluation, reasonable assumptions or methods are not necessarily limited to those the actuary would have selected for the measurement.

3.17.2  Evaluating Prescribed Assumption or Method—When evaluating a **prescribed assumption or method set by another party**, the actuary should determine whether the prescribed assumption or method significantly conflicts with what, in the actuary's professional judgment, would be reasonable for the purpose of the measurement. If, in the actuary's professional judgment, there is a significant conflict, the actuary should disclose this conflict in accordance with section 4.2(a).

**ASOP No. 4—Doc. No. 173**

3.17.3 <u>Inability to Evaluate Prescribed Assumption or Method</u>—If the actuary is unable to evaluate a **prescribed assumption or method set by another party** without performing a substantial amount of additional work beyond the scope of the assignment, the actuary should disclose this in accordance with section 4.2(b).

<u>Section 4.  Communications and Disclosures</u>

4.1    <u>Communication Requirements</u>—Any actuarial communication prepared to communicate the results of work subject to this standard should comply with the requirements of ASOP Nos. 23, 27, 35, 41, and 44. In addition, such communication should contain the following disclosures when relevant and material. An actuarial communication can comply with some, or all, of the specific requirements of this section by making reference to information contained in other actuarial communications available to the intended users (as defined in ASOP No. 41), such as an annual **actuarial valuation** report.

a.    a statement of the intended purpose of the measurement and a statement to the effect that the measurement may not be applicable for other purposes;

b.    the **measurement date;**

c.    a description of adjustments made for events after the **measurement date** under section 3.4.2;

d.    an outline or summary of the **plan provisions** included in the **actuarial valuation**, a description of known changes in significant **plan provisions** included in the **actuarial valuation** from those used in the immediately preceding measurement prepared for a similar purpose, and a description of any significant **plan provisions** not included in the **actuarial valuation**, along with the rationale for not including such significant **plan provisions;**

e.    the date(s) as of which the **participant** and financial information were compiled;

f.    a summary of the **participant** information;

g.    if hypothetical data are used, a description of the data;

h.    a description of any accounting policies or funding elections made by the principal that are pertinent to the measurement;

i.    a description of the methods used to value any significant benefit provisions described in section 3.5.3 such that another actuary qualified in the same practice area could make an objective appraisal of the reasonableness of the actuary's work as presented in the actuarial report;

14

j.    a description of the **actuarial cost method** and the manner in which **normal costs** are allocated, in sufficient detail to permit another actuary qualified in the same practice area to assess the significant characteristics of the method (for example, how the **actuarial cost method** is applied to multiple benefit formulas, compound benefit formulas, or benefit formula changes, where such **plan provisions** are significant);

k.    a description of the **cost allocation procedure** or **contribution allocation procedure** including a description of **amortization methods** and any pay-as-you-go funding (i.e., the intended payment by the plan sponsor of some or all benefits when due). The actuary should disclose the outstanding amortization balance, the amortization payment included in the **periodic cost** or **actuarially determined contribution**, and the remaining amortization period for each amortization base along with a disclosure if the unfunded **actuarial accrued liability** is not expected to be fully amortized. For purposes of this section, the actuary should assume that all actuarial assumptions will be realized and **actuarially determined contributions** will be made when due;

l.    a statement indicating that the **contribution allocation procedure** is significantly inconsistent with the plan accumulating adequate assets to make benefit payments when due, if applicable in accordance with section 3.14.1;

m.    a qualitative description of the implications of the **contribution allocation procedure** or plan sponsor's funding policy on future expected plan contributions and **funded status** in accordance with section 3.14.2. The actuary should disclose the significant characteristics of the **contribution allocation procedure** or plan sponsor's funding policy, and the significant assumptions used in the assessment;

n.    a description of the types of benefits regarded as accrued or vested if the actuary measured the value of accrued or vested benefits, and, to the extent the attribution pattern of accrued benefits differs from or is not described by the **plan provisions**, a description of the attribution pattern;

o.    a description of whether and how benefit payment default risk or the financial health of the plan sponsor was included, if a **market-consistent present value** measurement was performed;

p.    **funded status** based on an **immediate gain actuarial cost method** if the actuary discloses a **funded status** based on a **spread gain actuarial cost method**. The **immediate gain actuarial cost method** used for this purpose should be disclosed in accordance with section 4.1(j);

q.    if applicable, a description of the particular measures of plan assets and plan obligations that are included in the actuary's disclosure of the plan's **funded status**. For **funded status** measurements that are not prescribed by federal law or

ASOP No. 4—Doc. No. 173

regulation, the actuary should accompany this description with each of the following additional disclosures:

1.      whether the **funded status** measure is appropriate for assessing the sufficiency of plan assets to cover the estimated cost of settling the plan's benefit obligations;

2.      whether the **funded status** measure is appropriate for assessing the need for or the amount of future contributions; and

3.      if applicable, a statement that the **funded status** measure would be different if the measure reflected the market value of assets rather than the actuarial value of assets.

r.      a statement, appropriate for the intended users, indicating that future measurements (for example, of pension obligations, **periodic costs**, **actuarially determined contributions**, or **funded status** as applicable) may differ significantly from the current measurement. For example, a statement such as the following could be applicable:  "Future actuarial measurements may differ significantly from the current measurements presented in this report due to such factors as the following:  plan experience differing from that anticipated by the economic or demographic assumptions; changes in economic or demographic assumptions; increases or decreases expected as part of the natural operation of the methodology used for these measurements (such as the end of an amortization period or additional cost or contribution requirements based on the plan's funded status); and changes in plan provisions or applicable law."

In addition, the actuarial communication should include one of the following:

1.      if the scope of the actuary's assignment included an analysis of the range of such future measurements, disclosure of the results of such analysis together with a description of the factors considered in determining such range; or

2.      a statement indicating that, due to the limited scope of the actuary's assignment, the actuary did not perform an analysis of the potential range of such future measurements;

s.      a description of known changes in assumptions and methods from those used in the immediately preceding measurement prepared for a similar purpose. For assumption and method changes that are not the result of a **prescribed assumption or method set by another party** or a **prescribed assumption or method set by law**, the actuary should include an explanation of the information and analysis that led to those changes. The explanation may be brief but should be pertinent to the plan's circumstances;

16

t.    a description of all changes in **cost allocation procedures** or **contribution allocation procedures** that are not a result of a **prescribed assumption or method set by law**, including the resetting of an actuarial asset value. The actuary should disclose the reason for the change and the general effects of the change on relevant **periodic cost, actuarially determined contribution, funded status**, or other measures, by words or numerical data, as appropriate. The disclosure of the reason for the change and the general effects of the change may be brief but should be pertinent to the plan's circumstances;

u.    a description of adjustments of prior measurements used under section 3.4.3; and

v.    if, in the actuary's professional judgment, the actuary's use of approximations and estimates could produce results that differ materially from results based on a detailed calculation, a statement to this effect.

4.2    <u>Disclosure about Prescribed Assumptions or Methods</u>—The actuary's communication should state the source of any prescribed assumptions or methods.

With respect to **prescribed assumptions or methods set by another party**, the actuary's communication should identify the following, if applicable:

a.    any **prescribed assumption or method set by another party** that significantly conflicts with what, in the actuary's professional judgment, would be reasonable for the purpose of the measurement (section 3.17.2); or

b.    any **prescribed assumption or method set by another party** that the actuary is unable to evaluate for reasonableness for the purpose of the measurement (section 3.17.3).

4.3    <u>Additional Disclosures</u>—The actuary should also include the following, as applicable, in an actuarial communication:

a.    the disclosure in ASOP No. 41, section 4.3, if the actuary states reliance on other sources and thereby disclaims responsibility for any material assumption or method set by a party other than the actuary; and

b.    the disclosure in ASOP No. 41, section 4.4, if, in the actuary's professional judgment, the actuary has otherwise deviated materially from the guidance of this ASOP.

4.4    <u>Confidential Information</u>—Nothing in this standard is intended to require the actuary to disclose confidential information.

**ASOP No. 4—Doc. No. 173**

**Appendix**

**Comments on the Second Exposure Draft and Responses**

The second exposure draft of this revision of ASOP No. 4, *Measuring Pension Obligations and Determining Pension Plan Costs or Contributions,* was issued in December 2012 with a comment deadline of May 31, 2013. Thirteen comment letters were received, some of which were submitted on behalf of multiple commentators, such as by firms or committees. For purposes of this appendix, the term "commentator" may refer to more than one person associated with a particular comment letter. The Pension Committee carefully considered all comments received, and the ASB reviewed (and modified, where appropriate) the proposed changes.

Summarized below are the significant issues and questions contained in the comment letters and the responses to each.

The term "reviewers" includes the Pension Committee and the ASB. Unless otherwise noted, the section numbers and titles used below refer to those in the second exposure draft.

| GENERAL COMMENTS | |
|---|---|
| Comment | Most commentators supported the practice of bolding defined terms and indicated that it increased the readability of the standard. One commentator indicated that it was distracting. One commentator suggested the use of hyperlinks instead of bolding. |
| Response | The reviewers agree with the commentators who supported bolding and retained the style. The use of hyperlinks is being considered by the ASB for future ASOPs. |
| Comment | One commentator expressed the desire that the actuarial profession should seek to move its ASOPs closer to "best practice," which would seem to be a higher standard than the "appropriate practice" described in ASOP No. 1. |
| Response | The reviewers note that, as described in ASOP No. 1, the ASB establishes standards of appropriate practice. |
| Comment | Several commentators suggested that finalization of ASOP No. 4 be delayed until ASOP No. 6 is finalized. |
| Response | The comment period for ASOP No. 6 has expired. Language in ASOP Nos. 4 and 6 is being coordinated. In finalizing ASOP No. 4, the reviewers considered the comments on ASOP No. 6. |
| Comment | One commentator suggested that the reviewers re-examine all the guidance in ASOP No. 4 in light of issuance of the guidance issued in ASOP No. 1, *Introductory Actuarial Standard of Practice*, particularly with respect to use of the terms of construction such as "should," "should consider," etc. |
| Response | The reviewers agree and made changes throughout the document to make it consistent with the terms of construction in ASOP No. 1. |

18

**ASOP No. 4—Doc. No. 173**

| | |
|---|---|
| Comment | One commentator expressed concern about the coordination of guidance between ASOP Nos. 4, 6, and 27. The commentator noted that all three ASOPs were under review at the time and suggested that the ASB take more time to coordinate guidance on assumptions for pension and retiree group benefits actuarial work. |
| Response | The reviewers appreciate the concern but feel that the guidance in ASOP No. 4 is appropriate. Considerable time has been spent coordinating the three standards, but the reviewers feel that value gained by spending more time to restructure the standards does not outweigh the value lost by further delaying updated guidance. |
| Comment | One commentator suggested that the term "liability" should only be used when market-consistent assumptions are used for the measurement. |
| Response | While the reviewers agree that the use of the term "liability" has created confusion regarding actuarial work products, the reviewers note that the term "liability" is used as part of a phrase—"actuarially accrued liability"—that is defined in the ASOP. |
| **SECTION 1. PURPOSE, SCOPE, CROSS REFERENCES, AND EFFECTIVE DATE** | |
| **Section 1.1, Purpose** | |
| Comment | One commentator suggested changing "performing professional services" to "rendering actuarial services" throughout the standard. |
| Response | The reviewers agree that "actuarial services" is the appropriate term and made this change throughout the standard. |
| **Section 1.2, Scope** | |
| Comment | One commentator suggested that, absent clarification that the purpose of the measurement is strictly for determining the impact on budgeting contributions, the ASOP should require that the actuary use the market value of benefits for the calculations anticipated by the actuarial services described in section 1.2(a) and the actuarial services described in section 1.2(e). |
| Response | The reviewers believe that market-consistent present value calculations can be appropriate for use in a wide range of measurement purposes, but that requiring this calculation would be inappropriate. |
| Comment | One commentator suggested changing "departs" to "deviates" in the final paragraph of this section. |
| Response | The reviewers note that this is commonly used language in the standards and made no change. |
| **SECTION 2. DEFINITIONS** | |
| Comment | Several commentators suggested that the term "plan obligations" should be defined as this term is used in the title of the standard and throughout the standard. |
| Response | The reviewers believe that the common understanding of this term is sufficient for the purposes of the standard and made no changes. |
| Comment | One commentator suggested adding a definition for the "aggregate cost method." |
| Response | The reviewers note this term is only used in an example and believe that defining this commonly understood term would not improve the guidance provided in this standard. |
| Comment | One commentator suggested adding a definition of "plan" to section 2 and noted that the term "pension plan" was used occasionally in the ASOP. |
| Response | The reviewers note that in section 1.1. the term "plan" refers to a defined benefit pension plan and believe that further defining the term in not necessary. The reviewers adjusted language in section 1.1 to include "pension plan." |

ASOP No. 4—Doc. No. 173

| Section 2.2, Actuarial Cost Method | |
|---|---|
| Comment | One commentator suggested that this definition should be modified to include the unit credit actuarial cost method. |
| Response | The reviewers believe the definition as written already includes the unit credit actuarial cost method. Therefore, no change was made. |
| **Section 2.3, Actuarial Present Value** | |
| Comment | One commentator suggested that the definition of "actuarial present value" make explicit reference to financial discounting, including the application of survivorship and discount rate assumptions. Another commentator suggested that the definition be revised to incorporate discounting. |
| Response | The reviewers believe the current language is sufficiently clear and made no change. |
| **Section 2.4, Actuarial Present Value of Projected Benefits** | |
| Comment | One commentator suggested that the definition be expanded to explicitly include open group models. |
| Response | The reviewers believe that the definition does not preclude open group models and, therefore, no change was necessary. |
| Comment | One commentator suggested that the definition be revised to incorporate discounting. |
| Response | The reviewers believe the current language is sufficiently clear and made no change. |
| **Section 2.6, Amortization Method** | |
| Comment | One commentator suggested that the definition of "amortization method" should not include the amortization period, and that the period over which the unfunded actuarial accrued liability is amortized should be defined separately. |
| Response | The reviewers believe the amortization period is appropriately part of the amortization method and did not make this change. |
| **Section 2.7, Contribution** | |
| Comment | One commentator indicated that the definition of contribution as a potential contribution determined by the actuary is contrary to the common meaning and potentially misleading. |
| Response | The reviewers agree and changed the term from "contribution" to "actuarially determined contribution" throughout this standard where appropriate. |
| **Section 2.8, Contribution Allocation Procedure** | |
| Comment | One commentator suggested that an asset valuation method and an amortization method be added as potential components of a contribution allocation procedure. Another commentator suggested that an output smoothing method (for example, a collar method that restricts the annual change in the contribution rate) be added as a potential component of a contribution allocation procedure or at least referred to in sections 3.14 and 4.1(k). Another commentator suggested that the "contribution allocation procedure" definition should be modified to accommodate other approaches such as direct smoothing or forecast valuations using funding targets. |
| Response | The reviewers added an asset valuation method, an amortization method, and an output smoothing method as potential components of a contribution allocation procedure in section 2.8. The reviewers believe the current language allows for a forecast valuation using funding targets to be a contribution allocation procedure. |

### ASOP No. 4—Doc. No. 173

| Comment | One commentator suggested adding "(and sometimes referred to as a funding method)" to this definition because the term "funding method" is defined in IRS Regulations and is a commonly used term. |
|---|---|
| Response | The reviewers note that in practice the term "funding method" is often used synonymously with "contribution allocation procedure" and "actuarial cost method." The IRS defines "funding method" to have the same meaning as "actuarial cost method" as defined in ERISA. However, the definition of "actuarial cost method" in this standard differs from the definition of "actuarial cost method" in ERISA, because of the exclusion of "pay-as-you-go" as an actuarial cost method in this standard. Therefore, to avoid any confusion, the reviewers did not include the term "funding method" in the definition section of the ASOP. |

**Section 2.10, Cost Allocation Procedure**

| Comment | One commentator suggested that an asset valuation method and an amortization method be added as potential components of a cost allocation procedure. |
|---|---|
| Response | The reviewers agree and made the change. |

**Section 2.11, Expenses**

| Comment | One commentator suggested that the standard refer to expenses "paid directly" by the plan rather than "borne" by the plan to distinguish between investment expenses that are paid directly and indirectly. Another commentator expressed concern about using the word "expenses" in the definition and suggested alternative wording. |
|---|---|
| Response | The reviewers believe the recognition of indirect expenses inherent in investment returns may be appropriate. The reviewers also believe the current language, which is unchanged from earlier versions of ASOP No. 4, is sufficiently clear as is. The reviewers made no change to the language. |

**Section 2.14, Market Consistent Present Value**

| Comment | One commentator suggested slight modifications to the definition to indicate less purity than the current definition suggests. One commentator felt the definition would generally exclude most liability measurements since some readers could interpret "consistent with the price" as "equal to the price." |
|---|---|
| Response | The reviewers agree and made a slight modification to the definition. |
| Comment | Two commentators suggested that the term "market value" was a more appropriate term than "market-consistent present value." |
| Response | The reviewers note that no uniformly-accepted definition of "market value" of liability exists in the pension actuarial community and believe that the term "market-consistent present value" is an appropriate term. The reviewers also note that "market value" may be considered a subset of "market-consistent present value." |
| Comment | One commentator felt the definition was based on the economic value model whereby market participants operate to eliminate arbitrage opportunities. The commentator stated that there is no evidence that market participants use the economic value model in evaluating the finances of companies that sponsor defined benefit plans and that the standard should not include a definition that has no market evidence to support it. |
| Response | The reviewers note that the definition points to market buyers and sellers without regard to any economic theory or model. The reviewers believe the definition is appropriate and made no change. |

21

## ASOP No. 4—Doc. No. 173

| Section 2.18, Plan Provisions | |
|---|---|
| Comment | One commentator suggested that the standard define administrative practices and require the actuary to take reasonable measures to determine the existence of any administrative practices that could affect a measurement of pension obligations. |
| Response | The reviewers believe that the term "administrative practices" is well understood by pension practitioners and is clearly part of the definition of plan provisions. The reviewers made no change. |

| Section 2.19, Prescribed Assumption or Method Set by Another Party; and Section 2.20, Prescribed Assumption of Method Set by Law | |
|---|---|
| Comment | One commentator noted that sometimes the standard refers to assumptions "prescribed by" or "selected by" another party and suggested that the standard consistently use "set by" as this term is used in these definitions. |
| Response | The reviewers believe the existing language is sufficiently clear and made no change in response to this comment. |

| SECTION 3. ANALYSIS OF ISSUES AND RECOMMENDED PRACTICES | |
|---|---|

| Section 3.2, General Procedures | |
|---|---|
| Comment | One commentator suggested that this section be modified to explicitly require the actuary to select all three components of a cost/contribution allocation procedure (actuarial cost method, asset valuation method, and amortization method). |
| Response | The reviewers note that a cost/contribution allocation procedure may or may not include an asset valuation method and amortization method and, therefore, made a change to the stem of this section to indicate that the actuary should perform the general procedures listed, "as applicable." |

| Section 3.3, Purpose of the Measurement | |
|---|---|
| Comment | One commentator said that the term "market value assessment" in the list of examples of measuring pension obligations was unfamiliar and confusing. |
| Response | The reviewers believe this term is sufficiently clear and note that this example of a measurement purpose does not provide guidance. Therefore, no change was made. |

| Section 3.3.1, Anticipated Needs of Intended Users | |
|---|---|
| Comment | One commentator indicated that this section implied that the actuary should know what the needs of the principal are. The commentator suggested alternative wording by adding "to the extent such needs are known." Another commentator questioned the purpose of this section. |
| Response | The reviewers agree and have removed section 3.3.1. |

| Section 3.3.3, Risk or Uncertainty | |
|---|---|
| Comment | One commentator suggested that the reference to ASOP No. 41 was not helpful and should be deleted. Another commentator suggested that the guidance be expanded by requiring the actuary to consider whether risk or uncertainty should be addressed in the actuary's communication. The commentator suggested additional language to this effect. |
| Response | The reviewers changed the wording to more accurately describe the relationship between this section and the guidance in ASOP No. 41, but believe that the reference to ASOP No. 41 will be helpful to actuaries and retained it. The reviewers did not believe the additional language regarding the actuary's communication was necessary in this standard and made no change. |

| Section 3.4.2, Events After the Measurement Date | |
|---|---|
| Comment | One commentator suggested slightly modified language to this section. |
| Response | The reviewers agree and made the suggested change. |

ASOP No. 4—Doc. No. 173

| Section 3.4.3, Adjustment of Prior Measurement | |
|---|---|
| Comment | One commentator suggested changing the language in the second sentence from, "To determine whether adjustment is appropriate" to "To determine if an adjustment would produce a reasonable result." |
| Response | The reviewers agree and made the change. |

| Section 3.5.3, Other Valuation Issues | |
|---|---|
| Comment | One commentator suggested that the reference to "plan provisions in which future benefits vary asymmetrically with future economic or demographic experience" was overly broad. Another commentator suggested the deletion of the two sentences beginning with "For example, if the purpose…" because they seemed educational and could be misinterpreted as recommended practice. Another commentator suggested alternative language for these two sentences. Another commentator stated that these two sentences were too specific and one-sided. |
| Response | The reviewers agree with the commentators and made changes to the section to better describe the intended scope and deleted the example in the two sentences. |
| Comment | Several commentators indicated that the change of control of a plan sponsor may prove to be a significant factor in the valuation, if the actuary has reason to believe a change in control is possible and should be included in examples of plan provisions that are difficult to measure. |
| Response | The reviewers agree and retained this item as an example in 3.5.3(d). |

| Section 3.7, Other Information from the Principal | |
|---|---|
| Comment | One commentator suggested changes to the wording to more appropriately describe the intended examples. |
| Response | The reviewers agree and made the suggested change. |

| Section 3.10, Measuring the Value of Accrued or Vested Benefits | |
|---|---|
| Comment | One commentator suggested that standard should restrict the actuary from using a risky discount rate to measure the present value of accrued or vested benefits unless such a measurement is prescribed. |
| Response | The reviewers believe that certain measurement purposes may require the use of a discount rate other than a risk-free discount rate and, therefore, made no change. |

| Section 3.11, Market-Consistent Present Values | |
|---|---|
| Comment | One commentator stated that the entire discussion of market-consistent present value measurements seemed to be inadequate and a little off-base. In addition, the commentator indicated that the importance given to market values of obligations in this second exposure draft was significantly diminished from earlier versions and suggested that such diminishment of guidance in this area continues the possibility of incurring significant professional reputational risk.<br><br>Another commentator stated that the application of market-consistent present values to pension obligations is insufficiently developed for articulation of requirements relating to those calculations. |
| Response | The reviewers believe that the requirements of this section are appropriate and are sufficiently broad to encompass a wide range of evolving practice, and retained the section with minor changes. |
| Comment | One commentator said the reference to benefits being traded in an open market was too restrictive and suggested that additional, more general/vague concepts be included in the ASOP. |
| Response | The reviewers believe that the guidance provides room for the actuary to apply professional judgment and made no change. The reviewers note that the revised guidance in ASOP No. 27 includes some of the concepts requested by this commentator. |

**ASOP No. 4—Doc. No. 173**

| | |
|---|---|
| Comment | One commentator noted that lump sum interest rates and annuity purchase rates are uncorrelated with a plan sponsor's credit rating and, therefore, the financial health of a plan sponsor should not affect a market-consistent present value. |
| | One commentator suggested that this section should require that the market value of pension cash flows be consistent with the value of market traded cash flows (for example, bonds, strips, swaps) that are similar to the pension cash flows in amount, timing and probability of payment. The commentator indicated that the actuary should (not "may" as proposed in the exposure draft) "consider how benefit payment default risk or the financial health of the plan sponsor affects the calculation." In addition to the credit-worthiness of the party or parties obliged to make good on the pension promise, the commentator suggested that a valuation needs to reflect (a) collateralization from segregated plan assets, and (b) that pension payments may have a de facto higher standing in bankruptcy than unsecured unfunded pension liabilities. |
| Response | The reviewers note that market-consistent measurements can serve several measurement purposes, only one of which is determining the present value of a settlement through lump sums or estimating the cost of an annuity. The guidance states that the actuary may consider how the sponsor's financial health affects the calculation. The reviewers believe the guidance provides the actuary with enough flexibility to treat a sponsor's financial health in a manner consistent with the purpose of the measurement and made no change. |
| Comment | One commentator suggested softening the guidance by indicating that if an actuary calculates a market-consistent present value, the actuary "should consider doing the following" rather than "should do the following." |
| Response | The reviewers believe that the current language provides reasonable guidance for calculation of market-consistent present values. |
| Comment | One commentator read section 3.11(b) as implying that a market value calculation only applies to an accrued benefit-type cash flow (for example, accumulated benefit obligation (ABO)). The commentator wanted to know if this was intended by the drafters of the standard. |
| Response | The reviewers intend that market-consistent present values only reflect benefits earned as of the measurement date; the benefits valued in an ABO measurement are one example of benefits earned as of the measurement date. |
| **Section 3.13, Actuarial Cost Method** | |
| Comment | One commentator suggested changing "last assumed retirement age" to "last assumed retirement date." |
| Response | The reviewers did not believe that this proposed change significantly improved the longstanding language included in prior versions of ASOP No. 4 and made no change. |
| Comment | One commentator stated that administrative expenses are rarely correlated to investment returns and, therefore, should not be reflected in the investment return assumption. |
| Response | The reviewers believe the treatment of administrative expenses described in the standard may be appropriate in some circumstances and left this language unchanged. |
| Comment | One commentator suggested combining the last two sentences of section 3.13(c) and suggested alternative wording. |
| Response | The reviewers did not believe that this proposed change significantly improved the existing language and made no change. |
| **Section 3.14.1, Consistency Between Contribution Allocation Procedure and the Payment of Benefits** | |
| Comment | One commentator suggested changing "may not necessarily produce" with "may not be expected to produce." |
| Response | The reviewers agreed that the suggested wording more accurately described the intended meaning and made the suggested change. |

### ASOP No. 4—Doc. No. 173

| | |
|---|---|
| Comment | One commentator argued that an impractical burden is imposed on the actuary by the requirement for disclosure when in the actuary's professional judgment, a contribution allocation procedure prescribed by law or selected by another party is significantly inconsistent with accumulation of sufficient assets to pay benefits when due, and the requirement should be deleted. |
| Response | The reviewers believe that this longstanding disclosure requirement is an important responsibility of a pension actuary and the requirement was retained. |
| Comment | One commentator requested that a definition of the term "when due" be added. |
| Response | The reviewers believe this concept is sufficiently clear and made no change. |
| **Section 3.14.2, Implications of Contribution Allocation Procedure** | |
| Comment | One commentator argued that this section should be deleted because of potential ambiguity about the funding policy to be evaluated, and because the required assessment may be burdensome. |
| Response | The reviewers agree that sponsor funding policies may be ambiguous. The reviewers note that the actuary is required to disclose the material characteristics of the contribution allocation procedure or plan sponsor's funding policy used in the assessment of a contribution allocation procedure. The reviewers believe that this qualitative assessment is appropriate and made no change. |
| Comment | Another commentator suggested language to clarify the use of anticipated contributions set in law or by a contract accommodate the situation where the funding policy is not known. |
| Response | The reviewers agree and made changes to the language in section 3.14.2 to clarify that contributions set by law or by a contract constitute a funding policy. |
| **Section 3.16, Volatility** | |
| Comment | One commentator felt that the example in 3.16(e), describing rising or falling costs as a result of using a particular actuarial cost method for the plan population, was an example of expected change but not of volatility. |
| Response | The reviewers believe that this section includes all sources of volatility including expected changes, and made no change. |
| Comment | One commentator suggested adding "as appropriate" to the requirement to maintain internal consistency among assumptions. |
| Response | The reviewers agree that latitude should be given to the actuary's professional judgment in analyzing potential variations and made the suggested change. |
| **Section 3.17, Evaluation of Assumptions and Methods** | |
| Comment | One commentator suggested deleting the word "material" from this paragraph and stated that the actuary should identify the party responsible for all assumptions, regardless of their likely materiality. |
| Response | The reviewers note that section 2.6 of ASOP No. 1 provides that "The guidance in ASOPs need not be applied to immaterial items," and made no change. |
| **Section 3.17.1, Prescribed Assumption or Method Set by Another Party** | |
| Comment | One commentator suggested deleting the reference to Precept 8 and suggested alternative wording for the last sentence. |
| Response | The reviewers note that both the reference to Precept 8 and the current wording of the last sentence are found in the current version of ASOP No. 4. The reviewers believe the reference to Precept 8 remains appropriate. The reviewers do not believe that the proposed change significantly improves the language included in the current version of ASOP No. 4, and made no change. |

**ASOP No. 4—Doc. No. 173**

| Section 3.17.3 Inability to Evaluate Prescribed Assumption or Method | |
|---|---|
| Comment | One commentator requested deletion of "a substantial amount" because the expansion of the actuary's assignment should be left to the discretion of the actuary and the principal. |
| Response | The reviewers believe the actuary should use professional judgment to determine what constitutes a substantial amount of additional work based on the scope of the assignment and made no change. |
| **SECTION 4. COMMUNICATIONS AND DISCLOSURES** | |
| Comment | One commentator said that the standard should require the actuary to disclose a low-risk market-consistent measurement. |
| Response | The reviewers discussed this topic at length, and did not support adding this requirement to the standard. Therefore, no change was made. |
| Comment | One commentator suggested changing "when relevant and material" to "when applicable, relevant, and material" in the opening paragraph and deleting "if applicable" from affected subparagraphs. |
| Response | The reviewers did not add "applicable" to the opening paragraph but did revise the language of several subparagraphs in response to this comment. |
| **Section 4.1(d)** | |
| Comment | One commentator suggested language to clarify to which prior measurement assumptions should be compared. |
| Response | The reviewers agree that the suggested change clarified the intent of the section and made the change. |
| **Section 4.1(f)** | |
| Comment | One commentator requested clarification in the form of examples of how to satisfy the requirement to disclose a summary of the participant information. The commentator also indicated that the standard should be clear that in no event, is the actuary required to disclose, directly or indirectly, personal information on individual participants. |
| Response | The reviewers believe the level of detail in the current guidance regarding disclosure of participant information is reasonable and made no change. In response to the second comment, the reviewers added a new section 4.4 to reiterate the confidentiality concept in Precept 9 of the *Code of Professional Conduct* to address this concern regarding disclosure of confidential information. |
| **Section 4.1(i)** | |
| Comment | One commentator suggested language to clarify that the description of methods be sufficient to permit appraisal by another actuary qualified in the same practice area. |
| Response | The reviewers agree and made the change. |
| **Section 4.1(j)** | |
| Comment | One commentator suggested that the scope of this disclosure requirement be limited and that the guidance specify the level of detail of the required disclosure. The commentator also suggested replacing "material" with "significant" to avoid conflict with ASOP No. 1. |
| Response | The reviewers note that the exposure draft does not substantively alter the disclosure requirement from the current standard and believe that the scope and specificity of the requirement are appropriate. The reviewers made the suggested change to use "significant," but made no other changes. |

### ASOP No. 4—Doc. No. 173

| Section 4.1(k) | |
|---|---|
| Comment | One commentator requested clarification of what is meant by "a description of amortization methods and amortization bases," specifically whether it required disclosure of specific amortization base amounts. |
| Response | The reviewers clarified the language to indicate a description of amortization bases includes a description of the outstanding balance, the amortization payment included in the periodic cost or actuarially determined contribution, and remaining amortization period for each amortization base. |
| Comment | Several commentators expressed concerns about the proposed requirement to disclose if the unfunded actuarial accrued liability is expected to grow at any time because the amount of work required significantly outweighs the benefit of the disclosure. |
| Response | The reviewers agree with the commentators' concerns and modified the requirements in this section. |
| **Section 4.1(l)** | |
| Comment | One commentator suggested that this subparagraph be expanded to indicate the extent to which this requirement applies to a plan when another party, for example the PBGC, will pay all benefits when due immediately after the plan assets are insufficient to do so. |
| Response | The reviewers believe the language is clear that the requirement applies to the plan absent the benefit payment guarantee of any other external party, and made no change. |
| **Section 4.1(m)** | |
| Comment | Most commentators indicated that requiring disclosure of a qualitative assessment of the implication of the contribution allocation policy was preferable to requiring disclosure of a quantitative assessment and generally supported this requirement, but several commentators expressed concern about additional work and increased professional risk. |
| Response | The reviewers believe the amount of work necessary for a qualitative assessment is justified by the benefit received and made no change. |
| Comment | One commentator requested inclusion of examples of what constitutes a qualitative description of the implications of the contribution allocation procedure or sponsor funding policy on the future expected contributions or funded status. |
| Response | The reviewers want actuaries to rely on their professional judgment in applying this section. Inclusion of examples may create reliance on sample language, which could be inappropriate for any specific situation. |
| Comment | One commentator suggested that the phrase "the actuary should assume that all assumptions will be realized" should be included in this section with the clarification that it means that assumptions will remain the same. |
| Response | The reviewers note that that actuary may or may not assume that all assumptions will remain the same. The language was changed to require the actuary to disclose the significant assumptions used in the assessment. Section 3.14.2 already allowed the actuary to presume all actuarial assumptions will be realized in making the assessment. |
| Comment | One commentator suggested that some short-term quantitative assessments may be beneficial, particularly for public sector and multiemployer plans. |
| Response | The reviewers note that the appropriate pension practice conveyed by the guidance issued is applicable to all areas of pension practice, not just to certain areas. Hence, the reviewers made no change. |
| Comment | One commentator suggested that the expected percentage increase in the unfunded accrued liability for the year following the measurement date should be included in the required disclosure. |
| Response | The reviewers believe that a qualitative assessment is appropriate and made no change. |

ASOP No. 4—Doc. No. 173

| | |
|---|---|
| Comment | One commentator suggested language that "none of the disclosures under section 4.1 are intended to compel the actuary to forecast valuation results where such a forecast is beyond the scope of the assignment." |
| Response | The reviewers note that the requirements of a qualitative assessment are up to the professional judgment of the actuary and made no change. |

**Section 4.1(o)**

| | |
|---|---|
| Comment | One commentator indicated that the disclosure requirement in this section was unclear as written. |
| Response | The reviewers agree and revised the language to clarify the intent. |
| Comment | One commentator stated that the financial health of the plan sponsor is irrelevant to the extent not reflected in the potential benefit payment default risk. |
| Response | The reviewers agree that an adjustment for financial health may not be necessary for the purposes of all such measurements, but that in any event, if such an adjustment is made, it should be disclosed. |
| Comment | One commentator indicated that this disclosure requirement (how the benefit payment default risk or the financial health of the plan sponsor was included in the measurement) was not consistent with section 3.11. The commentator also indicated that this information may not be available and asked if it was a deviation of the standard to disclose that it was not included. |
| Response | The reviewers note that if the actuary did not reflect payment default risk in a market-consistent present value measurement, the actuary's disclosure should reflect that fact. The reviewers also note that section 3.11 states the actuary may consider default risk, and it is not a deviation from the standard for the actuary to not make such considerations if it is appropriate for the purpose of the measurement. |

**Section 4.1(q)**

| | |
|---|---|
| Comment | One commentator requested that the section be revised to explicitly state that where a particular disclosure of funded status is required by statutes, regulations, accounting standards or other binding authority, the content and format required by such authority controls. |
| Response | The reviewers believe that the requested modification to the section provided too broad an exemption, but did revise the language to specifically exclude funded status measurements that are prescribed by federal law or regulation from the requirements of the section. |
| Comment | One commentator requested that the requirements of the section be replaced by a requirement to disclose the purpose of the measurement. |
| Response | The reviewers believe that the suggested replacement would not adequately serve the purpose of the section and left the existing requirements. |
| Comment | One commentator suggested changing the language in section 4.1(q)(2) from "the need for future contributions" to "the amount of any anticipated future contributions." |
| Response | The reviewers agreed and made changes to the language. |

**Section 4.1(r)**

| | |
|---|---|
| Comment | One commentator suggested that language be added to clarify that actuarial forecasts outside the scope of an annual valuation are not required by the standard. |
| Response | The reviewers believe that this concept is sufficiently clear and made no change. |

**Section 4.1(s) and Section 4.1(t)**

| | |
|---|---|
| Comment | Regarding section 4.1(s), one commentator suggested that the actuary should not be required to disclose confidential information when disclosing an explanation of the information and analysis that led to an assumption change. |
| Response | The reviewers added section 4.4 to indicate that nothing in the standard is intended to require the actuary to disclose confidential information. |

## ASOP No. 4—Doc. No. 173

| | |
|---|---|
| Comment | One commentator objected to the requirements of these sections as potentially conflicting with the confidentiality of client information and as being burdensome. |
| Response | The reviewers added section 4.4 to clarify that nothing in the standard is intended to require disclosure of confidential information. The reviewers believe the disclosure requirements are appropriate and note that the disclosure may be brief. |
| **Section 4.1(v)** | |
| Comment | One commentator suggested changes to clarify the intended disclosure requirement. |
| Response | The reviewers agree and modified the language accordingly. |
| **Section 4.2, Disclosure about Prescribed Assumptions or Methods** | |
| Comment | One commentator thought that it was inappropriate for the proposed language of section 4.2 to expand the disclosure requirements beyond the disclosure requirements under ASOP No. 41 when assumptions or methods are prescribed. |
| Response | The reviewers disagree and made no change. The reviewers note the expanded disclosure requirements are only applicable to prescribed assumptions or methods set by another party. |



# ACTUARIAL STANDARDS BOARD

**Actuarial Standard of
Practice No. 27**

**Revised Edition**

# Selection of Economic Assumptions for Measuring Pension Obligations

**Developed by the
Pension Committee of the
Actuarial Standards Board**

**Adopted by the
Actuarial Standards Board
September 2013**

**Doc. No. 172**

# TABLE OF CONTENTS

Transmittal Memorandum    iv

## STANDARD OF PRACTICE

Section 1.  Purpose, Scope, Cross References, and Effective Date    1
    1.1    Purpose    1
    1.2    Scope    1
    1.3    Cross References    2
    1.4    Effective Date    2

Section 2.  Definitions    2
    2.1    Inflation    2
    2.2    Measurement Date    2
    2.3    Measurement Period    2
    2.4    Merit Adjustments    2
    2.5    Prescribed Assumption or Method Set by Another Party    2
    2.6    Prescribed Assumption or Method Set by Law    3
    2.7    Productivity Growth    3

Section 3.  Analysis of Issues and Recommended Practices    3
    3.1    Overview    3
    3.2    Identification of Economic Assumptions Used in the Measurement    3
    3.3    General Selection Process    3
    3.4    Relevant Data    4
    3.5    Other General Considerations    4
        3.5.1    Adverse Deviation or Plan Provisions That Are Difficult to Measure    4
        3.5.2    Materiality    4
        3.5.3    Cost of Using Refined Assumptions    4
        3.5.4    Rounding    4
        3.5.5    Changes in Circumstances    5
        3.5.6    Views of Experts    5
    3.6    Selecting a Reasonable Assumption    5
        3.6.1    Reasonable Assumption Based on Future Experience or Market Data    5
        3.6.2    Range of Reasonable Assumptions    6
    3.7    Selecting an Inflation Assumption    6
        3.7.1    Data    6
        3.7.2    Select and Ultimate Inflation Rates    6
    3.8    Selecting an Investment Return Assumption    6
        3.8.1    Data    7
        3.8.2    Components of the Investment Return Assumption    7
        3.8.3    Measurement-Specific Considerations    7
        3.8.4    Multiple Investment Return Rates    9
    3.9    Selecting a Discount Rate    10
    3.10    Selecting a Compensation Increase Assumption    10

| | | |
|---|---|---|
| 3.10.1 | Data | 11 |
| 3.10.2 | Measurement-Specific Considerations | 11 |
| 3.10.3 | Multiple Compensation Increase Assumptions | 12 |
| 3.11 | Selecting Other Economic Assumptions | 12 |
| 3.11.1 | Social Security | 13 |
| 3.11.2 | Cost-of-Living Adjustments | 13 |
| 3.11.3 | Rate of Payroll Growth | 13 |
| 3.11.4 | Growth of Individual Account Balances | 13 |
| 3.11.5 | Variable Conversion Factors | 13 |
| 3.12 | Consistency among Economic Assumptions Selected by the Actuary for a Particular Measurement | 13 |
| 3.13 | Prescribed Assumption(s) | 14 |

| | |
|---|---|
| Section 4. Communications and Disclosures | 14 |
| 4.1    Communications | 14 |
| 4.1.1    Assumptions Used | 14 |
| 4.1.2    Rationale for Assumptions | 14 |
| 4.1.3    Changes in Assumptions | 15 |
| 4.1.4    Changes in Circumstances | 15 |
| 4.2    Disclosure about Prescribed Assumptions or Methods | 15 |
| 4.3    Additional Disclosures | 15 |
| 4.4    Confidential Information | 16 |

**APPENDIXES**

| | |
|---|---|
| Appendix 1—Background and Current Practices | 17 |
| Background | 17 |
| Current Practices | 17 |
| Appendix 2—Comments on the Second Exposure Draft and Responses | 19 |
| Appendix 3—Arithmetic and Geometric Returns | 26 |
| Appendix 4—Selected References for Economic Data and Analyses | 30 |

**ASOP No. 27—September 2013**

September 2013

**TO:**      Members of Actuarial Organizations Governed by the Standards of Practice of the Actuarial Standards Board and Other Persons Interested in the Selection of Economic Assumptions for Measuring Pension Obligations

**FROM:**   Actuarial Standards Board (ASB)

**SUBJ:**   Actuarial Standard of Practice (ASOP) No. 27

This document contains the final version of a revision of ASOP No. 27, *Selection of Economic Assumptions for Measuring Pension Obligations.*

Background

The ASB provides coordinated guidance for measuring pension and retiree group benefit obligations through the series of ASOPs listed below.

1.      ASOP No. 4, *Measuring Pension Obligations and Determining Pension Plan Costs or Contributions*;

2.      ASOP No. 6, *Measuring Retiree Group Benefit Obligations*;

3.      ASOP No. 27, *Selection of Economic Assumptions for Measuring Pension Obligations*;

4.      ASOP No. 35, *Selection of Demographic and Other Noneconomic Assumptions for Measuring Pension Obligations*; and

5.      ASOP No. 44, *Selection and Use of Asset Valuation Methods for Pension Valuations.*

First Exposure Draft

The first exposure draft of this ASOP was issued in January 2011, with a comment deadline of April 30, 2011. Twenty comment letters were received and considered in developing modifications reflected in the second exposure draft.

Second Exposure Draft

The second exposure draft of this ASOP was issued in January 2012 with a comment deadline of May 31, 2012. The Pension Committee carefully considered the fifteen comment letters received. Changes made to the final standard in response to these comment letters include the following:

1.      Section 3.5.1, Adverse Deviation or Other Valuation Issues, was revised to note that an actuary may determine that it is appropriate to adjust the economic assumptions when valuing plan provisions that are difficult to measure, as discussed in ASOP No. 4. Additionally, the title of this section was revised to Adverse Deviation or Plan Provisions That Are Difficult to Measure.

2.      Section 3.6, Selecting a Reasonable Assumption, was revised to describe an economic assumption as reasonable if (among other criteria) it has no significant bias (the exposure draft used the word "unbiased").

3.      Section 4.1.1, Assumptions Used, was revised to require that each significant assumption be disclosed.

4.      The first clause of the fourth paragraph of section 1.2, Scope, was removed because it contained guidance that was not useful.

5.      Section 4.1.3, Changes in Assumptions, was revised to remove the word "nonprescribed" from the first sentence.

6.      The language in Section 4.2 and Section 4.3 was revised to clarify how these sections dovetail with ASOP No. 41.

7.      Section 4.4 was added to remove confusion regarding the interrelationship of this standard and Precept 9 of the *Code of Professional Conduct*.

8.      Defined terms now appear in bold type. Bold type was exposed for comment with the second exposure draft of ASOP No. 4 and was well received.

In addition, a number of clarifying changes were made to the text. Please see appendix 2 for a detailed discussion of the comments received and the reviewers' responses.


Summary of Key Changes from the Previous Version of ASOP No. 27

The following are the four key changes from the previous version of ASOP No. 27 included in this version of ASOP No. 27:

1.      This version clarifies that economic assumptions can be based either on the actuary's estimate of future experience or on the actuary's observations of the estimates inherent in market data, depending upon the purpose of the measurement.

2.      The guidance regarding the reasonability of an economic assumption has been changed from the "best-estimate range" standard.

3.      This version requires disclosing the rationale used in selecting each nonprescribed economic assumption or any changes made to nonprescribed economic assumptions.

JA 001271

4.    The guidance now distinguishes between prescribed assumptions or methods set by law and prescribed assumptions or methods set by another party. The language in section 4.2 and section 4.3 was revised to incorporate this distinction and to clarify how these sections dovetail with ASOP No. 41.

ASOP No. 27 is intended to accommodate the concepts of financial economics as well as traditional actuarial practice.

The Pension Committee thanks everyone who took the time to contribute comments and suggestions on the exposure drafts.

The Pension Committee thanks former committee members Thomas B. Lowman, Tonya B. Manning, and Frank Todisco for their assistance with drafting this ASOP.

The ASB voted in September 2013 to adopt this standard.

JA 001272

Pension Committee of the ASB

Gordon C. Enderle, Chairperson
Mita D. Drazilov, Vice Chairperson

| | |
|---|---|
| C. David Gustafson | Alan N. Parikh |
| Fiona E. Liston | Mitchell I. Serota |
| A. Donald Morgan IV | Judy K. Stromback |
| Christopher F. Noble | Virginia C. Wentz |

Actuarial Standards Board
Robert G. Meilander, Chairperson

| | |
|---|---|
| Beth E. Fitzgerald | Thomas D. Levy |
| Alan D. Ford | Patricia E. Matson |
| Patrick J. Grannan | James J. Murphy |
| Stephen G. Kellison | James F. Verlautz |

*The ASB establishes and improves standards of actuarial practice. These ASOPs identify what the actuary should consider, document, and disclose when performing an actuarial assignment. The ASB's goal is to set standards for appropriate practice for the U.S.*

## ACTUARIAL STANDARD OF PRACTICE NO. 27

# SELECTION OF ECONOMIC ASSUMPTIONS FOR MEASURING PENSION OBLIGATIONS

## STANDARD OF PRACTICE

### Section 1.  Purpose, Scope, Cross References, and Effective Date

1.1    <u>Purpose</u>—This standard does the following:

a.    provides guidance to actuaries in selecting (including giving advice on selecting) economic assumptions—primarily investment return, discount rate, post-retirement benefit increases, **inflation**, and compensation increases—for measuring obligations under defined benefit pension plans;

b.    supplements the guidance in Actuarial Standard of Practice (ASOP) No. 4, *Measuring Pension Obligations and Determining Pension Plan Costs or Contributions*, that relate to the selection and use of economic assumptions; and

c.    supplements the guidance in ASOP No. 6, *Measuring Retiree Group Benefit Obligations*, that relate to the selection and use of economic assumptions.

1.2    <u>Scope</u>—This standard applies to the selection of economic assumptions to measure obligations under any defined benefit pension plan that is not a social insurance program, as described in section 1.2, Scope, of ASOP No. 32, *Social Insurance* (unless ASOPs on social insurance explicitly call for application of this standard). Measurements of defined benefit pension plan obligations include calculations such as funding valuations or other assignment of plan costs to time periods, liability measurements or other actuarial present value calculations, and cash flow projections or other estimates of the magnitude of future plan obligations. Measurements of pension obligations do not generally include individual benefit calculations, individual benefit statement estimates, or nondiscrimination testing.

To the extent that the guidance in this standard may conflict with ASOP Nos. 4 or 6, ASOP Nos. 4 or 6 will govern. If a conflict exists between this standard and applicable law (statutes, regulations, and other legally binding authority), the actuary should comply with applicable law.

If the actuary departs from the guidance set forth in this standard in order to comply with applicable law or for any other reason the actuary deems appropriate, the actuary should refer to section 4.

The actuary should use the guidance set forth in this standard whenever the actuary has an obligation to assess the reasonableness of a prescribed assumption. The actuary's obligations with respect to prescribed assumptions are governed by ASOP Nos. 4, 6, and 41, *Actuarial Communications*, which address prescribed assumptions and methods.

Throughout this standard, any reference to selecting economic assumptions also includes giving advice on selecting economic assumptions. For instance, the actuary may provide advice on selecting economic assumptions under US GAAP or Governmental Accounting Standards even though another party is ultimately responsible for selecting these assumptions. This standard applies to the actuarial advice given in such situations, within the constraints imposed by the relevant accounting standards.

1.3    Cross References—When this standard refers to the provisions of other documents, the reference includes the referenced documents as they may be amended or restated in the future, and any successor to them, by whatever name called. If any amended or restated document differs materially from the originally referenced document, the actuary should consider the guidance in this standard to the extent it is applicable and appropriate.

1.4    Effective Date—This standard will be effective for any actuarial work product with a **measurement date** on or after September 30, 2014.

## Section 2.  Definitions

The terms below are defined for use in this actuarial standard of practice.

2.1    Inflation—General economic **inflation**, defined as price changes over the whole of the economy.

2.2    Measurement Date—The date as of which the value of the pension obligation is determined (sometimes referred to as the "valuation date").

2.3    Measurement Period—The period subsequent to the **measurement date** during which a particular economic assumption will apply in a given measurement.

2.4    Merit Adjustments—The rates of change in an individual's compensation attributable to personal performance, promotion, seniority, or other individual factors.

2.5    Prescribed Assumption or Method Set by Another Party—A specific assumption or method that is selected by another party, to the extent that law, regulation, or accounting standards gives the other party responsibility for selecting such an assumption or method. For this purpose, an assumption or method selected by a governmental entity for a plan that such governmental entity or a political subdivision of that entity directly or indirectly sponsors is a **prescribed assumption or method set by another party**.

2.6    Prescribed Assumption or Method Set by Law—A specific assumption or method that is mandated or that is selected from a specified range or set of assumptions or methods that is deemed to be acceptable by applicable law (statutes, regulations, and other legally binding authority). For this purpose, an assumption or method selected by a governmental entity for a plan that such governmental entity or a political subdivision of that entity directly or indirectly sponsors is not a **prescribed assumption or method set by law**.

2.7    Productivity Growth—The rates of change in a group's compensation attributable to the change in the real value of goods or services per unit of work.

## Section 3.  Analysis of Issues and Recommended Practices

3.1    Overview—Pension obligation values incorporate assumptions about pension payment commencement, duration, and amount. They also require discount rates to convert future expected payments into present values. Some of these assumptions are economic assumptions covered under ASOP No. 27 and some are noneconomic assumptions covered under ASOP No. 35, *Selection of Demographic and Other Noneconomic Assumptions for Measuring Pension Obligations*. In order to measure a pension obligation, the actuary will need to select or evaluate assumptions underlying the obligation.

3.2    Identification of Economic Assumptions Used in the Measurement—The actuary should consider the following factors when identifying the types of economic assumptions to use for a specific measurement:

a.    the purpose of the measurement;

b.    the characteristics of the obligation to be measured (**measurement period**, pattern of plan payments over time, open/closed group, materiality, volatility, etc.); and

c.    materiality of the assumption to the measurement (see section 3.5.2).

The types of economic assumptions used to measure obligations under a defined benefit pension plan may include **inflation**, investment return, discount rate, compensation increases, and other economic factors such as Social Security, cost-of-living adjustments, rate of payroll growth, growth of individual account balances, and variable conversion factors.

3.3    General Selection Process—After identifying the economic assumptions to be used for the measurement, the actuary should follow the general process set forth below for selecting each economic assumption for a specific measurement:

a.    identify components, if any, of the assumption;

3

b.      evaluate relevant data (section 3.4);

c.      consider factors specific to the measurement;

d.      consider other general factors (section 3.5); and

e.      select a reasonable assumption (section 3.6).

After completing these steps for each economic assumption, the actuary should review the set of economic assumptions for consistency (section 3.12) and make appropriate adjustments if necessary.

3.4    Relevant Data—To evaluate relevant data, the actuary should review appropriate recent and long-term historical economic data. The actuary should not give undue weight to recent experience. The actuary should consider the possibility that some historical economic data may not be appropriate for use in developing assumptions for future periods due to changes in the underlying environment. Appendix 4 lists some generally available sources of economic data and analyses.

3.5    Other General Considerations—The following issues should be addressed when applicable:

3.5.1    Adverse Deviation or Plan Provisions That Are Difficult to Measure—Depending on the purpose of the measurement, the actuary may determine that it is appropriate to adjust the economic assumptions to provide for considerations such as adverse deviation or plan provisions that are difficult to measure, as discussed in ASOP No. 4. Any such adjustment made should be disclosed in accordance with section 4.1.1.

3.5.2    Materiality—The actuary should consider the balance between refined economic assumptions and materiality. The actuary is not required to use a particular type of economic assumption or to select a more refined economic assumption when in the actuary's professional judgment such use or selection is not expected to produce materially different results.

3.5.3    Cost of Using Refined Assumptions—The actuary should consider the balance between refined economic assumptions and the cost of using refined assumptions. For example, actuaries working with small plans may prefer to emphasize the results of general research to comply with this standard. However, they are not precluded from using relevant plan-specific facts.

3.5.4    Rounding—Taking into account the purpose of the measurement, materiality, and the cost of using refined assumptions, the actuary may determine that it is appropriate to apply a rounding technique to the selected economic assumption. In such cases, the rounding technique should be unbiased.

3.5.5    Changes in Circumstances—The **economic assumptions** selected should reflect the actuary's knowledge as of the **measurement date**. However, the actuary may learn of an event occurring after the **measurement date** that would have changed the actuary's selection of an **economic assumption**. (For example, a collective bargaining agreement ratified after the **measurement date** may lead the actuary to change the compensation increase assumption that otherwise would have been selected.) If appropriate, the actuary may reflect this change as of the **measurement date**.

3.5.6    Views of Experts—Economic data and analyses are available from a variety of sources, including representatives of the plan sponsor and administrator, investment advisors, economists, and other professionals. When the actuary is responsible for selecting or giving advice on selecting economic assumptions within the scope of this standard, the actuary may incorporate the views of experts but the selection or advice should reflect the actuary's professional judgment.

3.6    Selecting a Reasonable Assumption—Each economic assumption selected by the actuary should be reasonable. For this purpose, an assumption is reasonable if it has the following characteristics:

a.    It is appropriate for the purpose of the measurement;

b.    It reflects the actuary's professional judgment;

c.    It takes into account historical and current economic data that is relevant as of the **measurement date**;

d.    It reflects the actuary's estimate of future experience, the actuary's observation of the estimates inherent in market data, or a combination thereof; and

e.    It has no significant bias (i.e., it is not significantly optimistic or pessimistic), except when provisions for adverse deviation or plan provisions that are difficult to measure are included and disclosed under section 3.5.1, or when alternative assumptions are used for the assessment of risk.

3.6.1    Reasonable Assumption Based on Future Experience or Market Data—The actuary should develop a reasonable economic assumption based on the actuary's estimate of future experience, the actuary's observation of the estimates inherent in market data, or a combination thereof. Examples of how the actuary may observe estimates inherent in market data include the following:

a.    comparing yields on **inflation**-indexed bonds to yields on equivalent non-**inflation**-indexed bonds as a part of estimating the market's expectation of future **inflation**;

    b.    comparing yields on bonds of different credit quality to determine market credit spreads;

    c.    observing yields on U.S. Treasury debt of various maturities to determine a yield curve free of credit risk; and

    d.    examining annuity prices to estimate the market price to settle pension obligations.

The items listed above, as well as other market observations or prices, include estimates of future experience as well as other considerations. For example, the difference in yields between **inflation**-linked and non-**inflation**-linked bonds may include premiums for liquidity and future **inflation** risk in addition to an estimate of future **inflation**. The actuary may want to adjust estimates based on observations to reflect the various risk premiums and other factors (such as supply and demand for tradable bond or debt securities) that might be reflected in market pricing.

3.6.2    <u>Range of Reasonable Assumptions</u>—The actuary should recognize the uncertain nature of the items for which assumptions are selected and, as a result, may consider several different assumptions reasonable for a given measurement. The actuary should also recognize that different actuaries will apply different professional judgment and may choose different reasonable assumptions. As a result, a range of reasonable assumptions may develop both for an individual actuary and across actuarial practice.

3.7    <u>Selecting an Inflation Assumption</u>—If the actuary is using an approach that treats **inflation** as an explicit component of other economic assumptions or as an independent assumption, the actuary should follow the general process set forth in section 3.3 to select an **inflation** assumption.

3.7.1    <u>Data</u>—The actuary should review appropriate **inflation** data. These data may include consumer price indices, the implicit price deflator, forecasts of **inflation**, yields on government securities of various maturities, and yields on nominal and **inflation**-indexed debt.

3.7.2    <u>Select and Ultimate Inflation Rates</u>—The actuary may assume select and ultimate **inflation** rates in lieu of a single **inflation** rate. Select and ultimate **inflation** rates vary by period from the **measurement date** (for example, **inflation** of 3% for the first 5 years following the **measurement date** and 4% thereafter).

3.8    <u>Selecting an Investment Return Assumption</u>—The investment return assumption reflects the anticipated returns on the plan's current and, if appropriate for the measurement, future assets. This assumption is typically constructed by considering various factors including, but not limited to, the time value of money; **inflation** and **inflation** risk;

illiquidity; credit risk; macroeconomic conditions; and growth in earnings, dividends, and rents.

In developing a reasonable assumption for these factors and in combining the factors to develop the investment return assumption, the actuary may consider a broad range of data and other inputs, including the judgment of investment professionals.

3.8.1   Data—The actuary should review appropriate investment data. These data may include the following:

   a.   current yields to maturity of fixed income securities such as government securities and corporate bonds;

   b.   forecasts of **inflation**, GDP growth, and total returns for each asset class;

   c.   historical and current investment data including, but not limited to, real and nominal returns, the **inflation** and **inflation** risk components implicit in the yield of **inflation**-protected securities, dividend yields, earnings yields, and real estate capitalization rates; and

   d.   historical plan performance.

The actuary may also consider historical and current statistical data showing standard deviations, correlations, and other statistical measures related to historical or future expected returns of each asset class and to **inflation**. Stochastic simulation models or other analyses may be used to develop expected investment returns from this statistical data.

3.8.2   Components of the Investment Return Assumption—The investment return assumption can be developed using various methods consistent with the guidance set forth in this standard, including combining estimated components of the assumption. Where the assumption is determined as the result of a combination of two or more components or factors, the actuary should ensure that the combination of these factors is logically consistent.

3.8.3   Measurement-Specific Considerations—The actuary should address factors specific to each measurement in selecting an investment return assumption. Examples of such factors are as follows:

   a.   Investment Policy—The plan's investment policy may include the following:  (i) the current allocation of the plan's assets; (ii) types of securities eligible to be held (diversification, marketability, social investing philosophy, etc.); (iii) a stationary or dynamic target allocation of plan assets among different classes of securities; and (iv) permissible ranges for each asset class within which the investment manager is authorized to make investment decisions. The actuary should consider

7

whether the current investment policy is expected to change during the **measurement period**.

b.    Effect of Reinvestment—Two reinvestment risks are associated with traditional, fixed income securities: (i) reinvestment of interest and normal maturity values not immediately required to pay plan benefits, and (ii) reinvestment of the entire proceeds of a security that has been called by the issuer.

c.    Investment Volatility—Plans investing heavily in those asset classes characterized by high variability of returns may be required to liquidate those assets at depressed values to meet benefit obligations. Other investment risks may also be present, such as default risk or the risk of bankruptcy of the issuer.

d.    Investment Manager Performance—Anticipating superior (or inferior) investment manager performance may be unduly optimistic (or pessimistic). The actuary should not assume that superior or inferior returns will be achieved, net of investment expenses, from an active investment management strategy compared to a passive investment management strategy unless the actuary believes, based on relevant supporting data, that such superior or inferior returns represent a reasonable expectation over the **measurement period**.

e.    Investment and Other Administrative Expenses—Investment and other administrative expenses may be paid from plan assets. To the extent such expenses are not otherwise recognized, the actuary should reduce the investment return assumption to reflect these expenses.

f.    Cash Flow Timing—The timing of expected contributions and benefit payments may affect the plan's liquidity needs and investment opportunities.

g.    Benefit Volatility—Benefit volatility may be a primary factor for small plans with unpredictable benefit payment patterns. It may also be an important factor for a plan of any size that provides highly subsidized early-retirement benefits, lump-sum benefits, or supplemental benefits triggered by corporate restructuring or financial distress. In such plans, the untimely liquidation of securities at depressed values may be required to meet benefit obligations.

h.    Expected Plan Termination—In some situations, the actuary may expect the plan to be terminated at a determinable date. For example, the actuary may expect a plan to terminate when the owner retires, or a frozen plan to terminate when assets are sufficient to provide all accumulated plan benefits. In these situations, the investment return assumption may reflect

a shortened **measurement period** that ends at the expected termination date.

i.    Tax Status of the Funding Vehicle—If the plan's assets are not kept in a tax-exempt fund, income taxes may reduce the plan's investment return. Taxes may be reflected by an explicit reduction in the total investment return assumption or by a separately identified assumption.

j.    Arithmetic and Geometric Returns—The use of a forward looking expected arithmetic return as an investment return assumption will produce a mean accumulated value. The use of a forward looking expected geometric return as an investment return assumption will produce an accumulated value that generally converges to the median accumulated value as the time horizon lengthens. The actuary should consider the implications of a forward looking expected arithmetic return and a forward looking expected geometric return when constructing an investment return assumption.

In some instances, the actuary will collect forward looking expected returns by asset class from external sources. The actuary should take appropriate steps to determine the time horizon, the price **inflation,** and the expenses reflected in the expected returns. In addition, the actuary should take steps to determine the type of forward looking expected returns collected from external sources (i.e., forward looking expected geometric returns or forward looking expected arithmetic returns) and that they are used appropriately. For example, when determining a forward looking expected geometric return for an entire portfolio, the actuary generally should not take the weighted average of the forward looking expected geometric return for each of the asset classes. In this instance, to determine the forward looking expected geometric return for an entire portfolio, the actuary should take the weighted average of the forward looking expected arithmetic return for each of the asset classes and adjust such determination to reflect the variance of the entire portfolio.

Appendix 3 includes general background on arithmetic and geometric returns.

3.8.4    <u>Multiple Investment Return Rates</u>—The actuary may assume multiple investment return rates in lieu of a single investment return rate. Two examples are as follows:

a.    Select and Ultimate Investment Return Rates—Assumed investment return rates vary by period from the **measurement date** (for example, returns of 8% for the first 10 years following the **measurement date** and 6% thereafter). When assuming select and ultimate investment return

rates, the actuary should consider the relationships among **inflation**, interest rates, and market appreciation (depreciation).

b.    Benefit Payments Covered by Designated Current or Projected Assets—One investment return rate is assumed for benefit payments covered by designated current or projected plan assets on the **measurement date**, and a different investment return rate is assumed for the balance of the benefit payments and assets.

3.9    Selecting a Discount Rate—A discount rate is used to calculate the present value of expected future plan payments. A discount rate may be a single rate or a series of rates, such as a yield curve. The actuary should consider the purpose of the measurement as a primary factor in selecting a discount rate. Some examples of measurement purposes are as follows:

a.    Contribution Budgeting—An actuary evaluating the sufficiency of a plan's contribution policy may choose among several discount rates. The actuary may use a discount rate that reflects the anticipated investment return from the pension fund. Alternatively, the actuary may use a discount rate appropriate for defeasance, settlement or market-consistent measurements.

b.    Defeasance or Settlement—An actuary measuring a plan's present value of benefits on a defeasance or settlement basis may use a discount rate implicit in annuity prices or other defeasance or settlement options.

c.    Market-Consistent Measurements—An actuary making a market-consistent measurement may use a discount rate implicit in the price at which benefits that are expected to be paid in the future would trade in an open market between a knowledgeable seller and a knowledgeable buyer. In some instances, that discount rate may be approximated by market yields for a hypothetical bond portfolio whose cash flows reasonably match the pattern of benefits expected to be paid in the future. The type and quality of bonds in the hypothetical portfolio may depend on the particular type of market-consistent measurement.

The present value of expected future pension payments may be calculated from the perspective of different parties, recognizing that different parties may have different measurement purposes. For example, the present value of expected future payments could be calculated from the perspective of an outside creditor or the entity responsible for funding the plan. The outside creditor may desire a discount rate consistent with other measurements of importance to the creditor even though those other measurements may have little or no importance to the entity funding the plan.

3.10    Selecting a Compensation Increase Assumption—Compensation is a factor in determining participants' benefits in many pension plans. Also, some actuarial cost methods take into account the present value of future compensation. Generally, a participant's compensation will increase over the long term in accordance with **inflation**,

**productivity growth**, and **merit adjustments**. The assumption used to measure the anticipated year-to-year change in compensation is referred to as the compensation increase assumption. It may be a single rate, it may vary by age or service, or it may vary over future years.

When selecting a compensation increase assumption, the actuary should address the following factors:

3.10.1 <u>Data</u>—The actuary should review available compensation data. These data may include the following:

    a.    the plan sponsor's current compensation practice and any anticipated changes in this practice;

    b.    current compensation distributions by age or service;

    c.    historical compensation increases and practices of the plan sponsor and other plan sponsors in the same industry or geographic area; and

    d.    historical national wage increases and **productivity growth**.

The actuary should consider available plan-sponsor-specific compensation data, but the actuary should carefully weigh the credibility of these data when selecting the compensation increase assumption. For small plans or recently formed plan sponsors, industry or national data may provide a more appropriate basis for developing the compensation increase assumption.

3.10.2 <u>Measurement-Specific Considerations</u>—The actuary should consider factors specific to each measurement in selecting a specific compensation increase assumption. Examples of such factors are as follows:

    a.    Compensation Practice—The plan sponsor's current compensation practice and any contemplated changes may affect the compensation increase assumption, at least in the short term. For example, if pension benefits are a function of base compensation and the plan sponsor is changing its compensation practice to put greater emphasis on incentive compensation, future growth in base compensation may differ from historical patterns.

    b.    Competitive Factors—The level and pattern of future compensation changes may be affected by competitive factors, including competition for employees both within the plan sponsor's industry and within the geographical areas in which the plan sponsor operates, and global price competition. Unless the **measurement period** is short, the actuary should not give undue weight to short-term patterns.

    c.    Collective Bargaining—The collective bargaining process impacts the level and pattern of compensation changes. However, it may not be appropriate to assume that future contracts will provide the same level of compensation changes as the current or recent contracts.

    d.    Compensation Volatility—If certain elements of compensation, such as bonuses and overtime, tend to vary materially from year to year, or if aberrations exist in recent compensation amounts, then volatility should be taken into account. In some circumstances, this may be accomplished by adjusting the base amount from which future compensation elements are projected (for example, the projected bonuses might be based on an adjusted average of bonuses over the last 3 years). In some other circumstances, an additional assumption regarding an expected increase in pay in the final year of service may be used.

    e.    Expected Plan Freeze or Termination—In some situations, as stated in section 3.8.3(h), the actuary may expect the plan to be frozen or terminated at a determinable date. In these situations, the compensation increase assumption may reflect a shortened **measurement period** that ends at the expected termination date.

3.10.3 <u>Multiple Compensation Increase Assumptions</u>—The actuary may use multiple compensation increase assumptions in lieu of a single compensation increase assumption. Three examples are as follows:

    a.    Select and Ultimate Assumptions—Assumed compensation increases vary by period from the **measurement date** (for example, 4% increases for the first 5 years following the **measurement date**, and 5% thereafter) or by age or service.

    b.    Separate Assumptions for Different Employee Groups—Different compensation increases are assumed for two or more employee groups that are expected to receive different levels or patterns of compensation increases.

    c.    Separate Assumptions for Different Compensation Elements—Different compensation increases are assumed for two or more compensation elements that are expected to change at different rates (for example, 5% bonus increases and 3% increases in other compensation elements).

3.11 <u>Selecting Other Economic Assumptions</u>—In addition to **inflation**, investment return, discount rate, and compensation increase assumptions, the following are some of the types of economic assumptions that may be required for measuring certain pension obligations. The actuary should follow the general process described in section 3.3 to select these assumptions. The selected assumptions should also satisfy the consistency requirement of section 3.12.

3.11.1 <u>Social Security</u>—Social Security benefits are based on an individual's covered earnings, the OASDI contribution and benefit base, and changes in the cost of living. Changes in the OASDI contribution and benefit base are determined from changes in national average wages, which reflect the change in national productivity and **inflation**.

3.11.2 <u>Cost-of-Living Adjustments</u>—Plan benefits or limits affecting plan benefits (including the Internal Revenue Code (IRC) section 401(a)(17) compensation limit and section 415(b) maximum annuity) may be automatically adjusted for **inflation** or assumed to be adjusted for **inflation** in some manner (for example, through regular plan amendments). However, for some purposes (such as qualified pension plan funding valuations), the actuary may be precluded by applicable laws or regulations from anticipating future plan amendments or future cost-of-living adjustments in certain IRC limits.

3.11.3 <u>Rate of Payroll Growth</u>—As a result of terminations and new participants, total payroll generally grows at a different rate than does a participant's salary or the average of all current participants combined. As such, when a payroll growth assumption is needed, the actuary should use an assumption that is consistent with but typically not identical to the compensation increase assumption. One approach to setting the payroll growth assumption may be to reduce the compensation increase assumption by the effect of any assumed merit increases. The actuary should apply professional judgment in determining whether, given the purpose of the measurement, the payroll growth assumption should be based on a closed or open group and, if the latter, whether the size of that group should be expected to increase, decrease, or remain constant.

3.11.4 <u>Growth of Individual Account Balances</u>—Certain plan benefits have components directly related to the accumulation of real or hypothetical individual account balances (for example, so-called floor-offset arrangements and cash balance plans). See ASOP No. 4 for further guidance regarding these types of benefits.

3.11.5 <u>Variable Conversion Factors</u>—Measuring certain pension plan obligations may require converting from one payment form to another, such as converting a projected individual account balance to an annuity, converting an annuity to a lump sum, or converting from one annuity form to a different annuity form. The conversion factors may be variable (for example, recalculated each year based on a stated mortality table and interest rate equal to the yield on 30-year Treasury bonds).

3.12 <u>Consistency among Economic Assumptions Selected by the Actuary for a Particular Measurement</u>—With respect to any particular measurement, each economic assumption selected by the actuary should be consistent with every other economic assumption selected by the actuary for the **measurement period**, unless the assumption, considered individually, is not material, as provided in section 3.5.2. A number of factors may

13

interact with one another and may be components of other economic assumptions, such as **inflation**, economic growth, and risk premiums. In some circumstances, consistency may be achieved by using the same **inflation**, economic growth, and other relevant components in each of the economic assumptions selected by the actuary.

Consistency is not necessarily achieved by maintaining a constant difference between one economic assumption and another. For each **measurement date**, the actuary should reevaluate the individual assumptions and the relationships among them, and make appropriate adjustments.

Assumptions selected by the actuary need not be consistent with prescribed assumptions, which are discussed in section 3.13.

3.13    Prescribed Assumption(s)—The actuary should use the guidance set forth in this standard whenever the actuary has an obligation to assess the reasonableness of a prescribed assumption. The actuary's obligations with respect to prescribed assumptions are governed by section 4.2 of this ASOP and by ASOP Nos. 4, 6, or 41 as applicable, which address prescribed assumptions and methods.

### Section 4.  Communications and Disclosures

4.1    Communications—Any actuarial report prepared to communicate the results of work subject to this standard should contain the following disclosures with respect to economic assumptions:

4.1.1    Assumptions Used—The actuary should describe each significant assumption used in the measurement and whether the assumption represents an estimate of future experience, the actuary's observation of the estimates inherent in market data, or a combination thereof. Sufficient detail should be shown to permit another qualified actuary to assess the level and pattern of each assumption.

Depending on a particular measurement's circumstances, the actuary may give information about specific interrelationships among the assumptions (for example, investment return: 8% per year, net of investment expenses and including **inflation** at 3%). The description should also include a disclosure of any explicit adjustment made in accordance with section 3.5.1 for adverse deviation or plan provisions that are difficult to measure as discussed in ASOP No. 4.

4.1.2    Rationale for Assumptions—The actuary should disclose the information and analysis used in selecting each economic assumption that has a significant effect on the measurement. The disclosure may be brief but should be pertinent to the plan's circumstances. For example, the actuary may disclose any specific approaches used, sources of external advice, and how past experience and future expectations were considered. The disclosure may reference any actuarial

experience report or study performed, including the date of the report or study. This section is not applicable to **prescribed assumptions or methods set by another party** nor is it applicable to **prescribed assumptions or methods set by law**.

4.1.3  <u>Changes in Assumptions</u>—The actuary should disclose any changes in the economic assumptions from those previously used for the same type of measurement. The general effects of the changes should be disclosed in words or by numerical data, as appropriate. For assumptions that were not prescribed, the actuary should include an explanation of the information and analysis that led to the changes.

The disclosure may be brief but should be pertinent to the plan's circumstances. The disclosure may reference any actuarial experience report or study performed, including the date of the report or study.

4.1.4  <u>Changes in Circumstances</u>—The actuary should refer to ASOP No. 41 for communication and disclosure requirements regarding changes in circumstances known to the actuary that occur after the **measurement date** and that would affect economic assumptions selected as of the **measurement date**.

4.2  <u>Disclosure about Prescribed Assumptions or Methods</u>—The actuary's communication should state the source of any prescribed assumptions or methods.

With respect to **prescribed assumptions or methods set by another party**, the actuary's communication should identify the following, if applicable:

a.  any **prescribed assumption or method set by another party** that significantly conflicts with what, in the actuary's professional judgment, would be reasonable for the purpose of the measurement (section 3.13); or

b.  any **prescribed assumption or method set by another party** that the actuary is unable to evaluate for reasonableness for the purpose of the measurement (section 3.13).

4.3  <u>Additional Disclosures</u>—The actuary should also include the following, as applicable, in an actuarial communication:

a.  the disclosure in ASOP No. 41, section 4.3, if the actuary states reliance on other sources and thereby disclaims responsibility for any material assumption or method set by a party other than the actuary; and

b.  the disclosure in ASOP No. 41, section 4.4, if, in the actuary's professional judgment, the actuary has otherwise deviated materially from the guidance of this ASOP.

<u>**ASOP No. 27—September 2013**</u>

4.4    <u>Confidential Information</u>—Nothing in this standard is intended to require the actuary to disclose confidential information.

JA 001289

## Appendix 1

### Background and Current Practices

*Note*:  This appendix is provided for informational purposes but is not part of the standard of practice.

<u>Background</u>

Economic assumptions have a significant effect on any pension obligation measurement. Small changes of 25 or 50 basis points in these assumptions can change the measurement by several percentage points or more. Assumptions such as compensation increases or cash balance crediting rates are often used to determine projected benefit streams for valuation purposes. The discount rate assumption, arguably the most critical economic assumption in determining a pension obligation, is used to determine the discounted present value of all benefit streams that are part of such obligation measurement.

Historically, actuaries have used various practices for selecting economic assumptions. For example, some actuaries have looked to surveys of economic assumptions used by other actuaries, some have relied on detailed research by experts, some have used highly sophisticated projection techniques, and many actuaries have used a combination of these.

The first decade of the 21st century contained a significant amount of debate inside and outside the actuarial profession regarding the measurement of pension obligations. Much of the debate centered on the economic assumptions actuaries use to measure these obligations. The decade also saw the emergence of a financial economic viewpoint on pension obligations. Applying financial economic theory to the measurement of pension obligations has been controversial and has produced a significant amount of debate in the actuarial profession.

<u>Current Practices</u>

The actuary's discretion over economic assumptions has been curtailed in many situations. In the private single employer plan arena, the IRS, PBGC, and FASB have promulgated rulings that have limited or effectively removed an actuary's judgment regarding the discount rate used for current-year funding or accounting. Actuaries can still set other economic assumptions, such as compensation increases, inflation, or fixed income yields.

For plans other than private single-employer plans (for example, church plans, multiemployer plans, public plans), the discount rate for current-year funding requirements may or may not be prescribed by other entities. Funding valuations for these types of plans often use a discount rate related to the expected return on plan assets. In practice, this discount rate (return on asset) assumption may be set by the legislative body, plan sponsor, a governing board of trustees, or the actuary. The actuary may advise the plan sponsor about the selection of the discount rate.

As in the single-employer situation, the actuary may have discretion over other economic assumptions used to measure obligations for plans other than private single-employer plans.

Alternatively, the actuary may be in an advisory position, helping the legislative body, plan sponsor, or governing board of trustees select the assumptions.

The focus on solvency in the private single-employer plan arena has come along with prescribed economic assumptions that are linked to capital market indices. Actuaries practicing in this area are becoming accustomed to changing assumptions frequently. In nonprescribed situations, practice is still dependent upon the individual actuary. Many actuaries change assumptions infrequently, while other actuaries reevaluate the assumptions as of each measurement date and change economic assumptions more frequently. In the public plan arena, many entities perform assumption reviews every few years, and these reviews may or may not lead to assumption adjustments.

In preparing calculations for purposes other than current-year plan valuations, actuaries often use economic assumptions that are different from those used for the current-year valuation.

ASOP No. 27—September 2013

## Appendix 2

## Comments on the Second Exposure Draft and Responses

The second exposure draft of this proposed revision of this ASOP, *Selection of Economic Assumptions for Measuring Pension Obligations*, was issued in January 2012 with a comment deadline of May 31, 2012. Fifteen comment letters were received. Some of the letters were submitted on behalf of multiple commentators, such as by firms or committees. For purposes of this appendix, the term "commentator" may refer to more than one person associated with a particular comment letter. The Pension Committee carefully considered all comments received, and the ASB reviewed (and modified, where appropriate) the proposed changes.

Summarized below are the significant issues and questions contained in the comment letters and the responses to each. Also, unless otherwise noted, the section numbers and titles used in appendix 2 refer to those in the second exposure draft.

| SECTION 1. PURPOSE, SCOPE, CROSS REFERENCES, AND EFFECTIVE DATE ||
|---|---|
| **Section 1.1, Purpose** ||
| Comment | One commentator suggested adding inflation to the list of economic assumptions covered by the standard. |
| Response | The reviewers agree and made the addition. |
| Comment | One commentator expressed concern about the coordination of guidance between ASOP Nos. 4, 6, and 27. The commentator noted that all three ASOPs are under review and suggested that the ASB take more time to coordinate guidance on assumptions for pension and retiree group benefits actuarial work. |
| Response | The reviewers appreciate the concern but feel that the overall guidance in ASOP No. 27 is appropriate. Considerable time has been spent coordinating the three standards, but the reviewers feel that value gained by spending more time to restructure the standards does not outweigh the value lost by further delaying updated guidance. |
| Comment | One commentator suggested that the ASB use ASOP No. 27 to clarify that mastery of pension practice is not the same as mastery of retiree group benefit practice (or vice versa). |
| Response | The reviewers believe that ASOP No. 27 is not an appropriate place to restate the Qualification Standards and made no change. |
| **Section 1.2, Scope** ||
| Comment | One commentator suggested that the term "social insurance" be defined. Another commentator suggested that non-discrimination testing should be specifically excluded from the scope of the standard. Another commentator suggested adding "or designated authority" to plan sponsor. Another commentator suggested different wording for the second and third paragraphs of this section. |
| Response | The reviewers agree with these suggestions and changed this section to more clearly define social insurance and exclude non-discrimination testing from the scope. Language was also changed regarding provision of advice by the actuary relative to assumptions selected by another party. |
| SECTION 2. DEFINITIONS ||
| **Section 2.2, Measurement Date** ||
| Comment | One commentator suggested changing this definition to "valuation date." |
| Response | The reviewers believe the current definition is adequate and made no change. |

ASOP No. 27—September 2013

| Section 2.5, Prescribed Assumption; and Section 4.2, Additional Disclosures | |
|---|---|
| Comment | Several commentators thought that the proposed language of section 2.5 and 4.2 expanded the disclosure requirements under ASOP No. 41 when assumptions are selected by another party. |
| Response | The reviewers agree but believe these changes are appropriate and are consistent with ASOP No. 4. |

## SECTION 3. ANALYSIS OF ISSUES AND RECOMMENDED PRACTICES

| Section 3.3, General Considerations | |
|---|---|
| Comment | One commentator requested examples for this section. |
| Response | The reviewers believe that the guidance provided by this section is adequate without examples and made no change. |

| Section 3.4, Relevant Data | |
|---|---|
| Comment | One commentator requested clarification of what constituted "appropriate" recent and long-term historical economic data. |
| Response | The reviewers believe that "appropriate" is a matter of professional judgment and depends on the circumstances of the situation. |
| Comment | One commentator suggested that we delete references to giving undue weight to recent experience and historical data. Another commentator suggested language changes designed to balance historical and recent experience. |
| Response | The reviewers believe that the guidance provided is sufficient and made no change. |

| Section 3.5.1, Adverse Deviation | |
|---|---|
| Comment | Several commentators suggested that the term "adverse deviation" be replaced by the terms "conservative" or "conservatism" as there exists a body of legal precedents using the terms. Other commentators suggested that the term be defined or revised. Other commentators supported the use of "adverse deviation." Another commentator suggested adding language to section 3.8.3 permitting reduction in the investment return assumption for "gain-sharing" provisions. |
| Response | The reviewers believe that the adverse deviation language is clear and that the current language permits actuaries to use professional judgment on this issue and thus made no change. However, the reviewers believe that the same principles could apply when valuing plan provisions that are difficult to measure, such as plans with "gain-sharing" provisions, and added guidance for selection of assumptions for this purpose to this section. |

| Section 3.5.4, Rounding | |
|---|---|
| Comment | One commentator suggested that the standard require the selected assumption to be tested for reasonableness after rounding and the rounding convention to be disclosed. Another commentator questioned the need for including guidance on rounding in the standard. |
| Response | The reviewers believe that the current level of guidance is appropriate and made no change. |

| Section 3.5.5, Changes in Circumstances | |
|---|---|
| Comment | Several commentators suggested that the guidance be strengthened by indicating that assumptions should be changed only after the measurement date when appropriate and when permitted. |
| Response | The reviewers believe that the guidance provided is sufficient and made no change. |

| Section 3.5.6, Views of Experts | |
|---|---|
| Comment | One commentator suggested removing "accountants" from the sources of economic data and analyses. Another commentator suggested that the language of this section permitting the actuary to incorporate the views of experts be strengthened to require the actuary to incorporate the views of experts. |
| Response | The reviewers agree and removed "accountants." The reviewers also changed the language in this section to clarify the guidance provided, but the new language does not require the actuary to incorporate the views of experts. |
| Comment | One commentator suggested that more guidance be provided with respect to how an actuary can use views of experts and how to document this process. |
| Response | The reviewers believe that the guidance provided by this section is sufficient and not overly prescriptive, and therefore made no change. |

| Section 3.6, Selecting a Reasonable Assumption | |
|---|---|
| Comment | Several commentators indicated a preference for the changes made to this exposure draft versus the "no gain/loss" concept included in the first exposure draft. One commentator suggested that the language be strengthened to require that an assumption is considered to be reasonable "if and only if" it satisfies the five characteristics set forth in the section. Another commentator was disappointed to see removal of a range definition, particularly for the selection of an investment return assumption. This commentator suggested development of a narrower range than the range in the existing standard such as geometric mean plus or minus one standard deviation. |
| Response | The reviewers believe that the current language in the proposed exposure draft provides adequate guidance and made no change. |
| Comment | One commentator proposed alternative language to take into account forecast economic data. |
| Response | The reviewers believe that the current language provides adequate guidance and made no change. |
| Comment | Several commentators suggested alternative wording for this section, including adding the phrase "in the actuary's judgment" and modification of the parenthetical language addressing what is considered to be "unbiased." |
| Response | The reviewers agree and changed the language to include "significant" bias. The reviewers note that the actuary's professional judgment is part of the definition of a reasonable assumption in section 3.6(b). |

| Section 3.6.1, Reasonable Assumption Based on Future Experience or Market Data | |
|---|---|
| Comment | Several commentators indicated that the list of how an actuary may observe estimates from financial data was not exhaustive and the items listed should be prefaced with "such as." One commentator suggested a language change to paragraph (a) and another commentator suggested language changes to the last paragraph. |
| Response | The reviewers note that the language in the stem of 3.6.1 refers to the items in the list as examples and believes that this adequately addresses the non-exhaustive nature of the list. The reviewers modified the language of this section in response to the alternative language suggestions. |

| Section 3.6.2, Range of Reasonable Assumptions | |
|---|---|
| Comment | One commentator indicated that the language wasn't clear regarding whether an actuary could use different economic assumptions for different projects. Several other commentators addressed this same issue by suggesting language changes. |
| Response | The reviewers agree and modified the language. |
| Comment | One commentator stated this section did not seem appropriate for a standard. |
| Response | The reviewers disagree and made no change. |

ASOP No. 27—September 2013

| Section 3.7, Selecting an Inflation Assumption | |
|---|---|
| Comment | One commentator suggested that sections 3.7 through 3.11 be addressed in a study note rather than in an actuarial standard. |
| Response | The reviewers disagree and made no change. |
| **Section 3.8, Selecting an Investment Return Assumption** | |
| Comment | One commentator suggested modifying and expanding the language of section 3.8.1, Data, to include additional data to consider. |
| Response | The reviewers believe that the current language is sufficient and made no change. |
| **Section 3.8.3, Measurement Specific Considerations** | |
| Comment | Several commentators suggested that the items listed in this section be considered examples of measurement specific factors to consider, not an exhaustive list each of which should be considered. One commenter suggested including two additional measurement specific considerations: a) input from investment professionals and b) special considerations for plans with gain-sharing (or similar) provisions. Another commentator suggested adding a section on investment horizon to the list of examples. Another commentator suggested adding a section on inputs from investment professionals. |
| Response | The reviewers agree with the first suggestion and have now described the items as "examples." Since these are examples, the reviewers did not feel it necessary to include the additional suggested considerations. |
| Comment | Several commentators suggested that the standard consider known or possible future changes in the investment policy. Another commentator suggested that the standard provide specific guidance when the investment policy may change during the measurement period according to pre-defined criteria, such as funded status. |
| Response | The reviewers believe that section 3.8.3 (a) provides appropriate guidance regarding future changes in investment policy. The reviewers changed the language to permit consideration of a stationary or dynamic asset allocation. The reviewers believe the changes made provide adequate guidance in the situation where the dynamic asset allocation strategy may change according to pre-defined criteria. |
| Comment | One commentator stated that most actuaries are not qualified to set investment assumptions and should be required to consult with investment professionals. |
| Response | The reviewers agree that investment consultants may be an appropriate source of information for actuaries who do not feel qualified to set investment assumptions and note that use of external sources is mentioned in the standard. The reviewers do not believe that ASOP No. 27 is the appropriate place to establish qualification standards. |
| Comment | One commentator suggested that the language should be strengthened to require compelling evidence that superior or inferior returns have been achieved. Another commentator suggested alternative wording for this section. |
| Response | The reviewers made a small change to the language to make the intent clearer. |
| Comment | One commentator suggested defining investment expenses and comment that sometimes it is difficult to determine such expenses. |
| Response | The reviewers believe that the existing language is clear and made no change. |
| Comment | One commentator indicated that this section fails to provide guidance to the actuary regarding how benefit volatility affects the investment return selection process. |
| Response | The reviewers believe that the current language is appropriate and made no change. |

## ASOP No. 27—September 2013

| Section 3.8.3(j), Arithmetic and Geometric Returns | |
|---|---|
| Comment | Several comments were received regarding the guidance on arithmetic and geometric returns. Some commentators were pleased with the guidance. Several commentators said that all or parts of this section belong in a practice note or in the appendix. Two commentators said that the terms "arithmetic mean" and "geometric mean" should be defined. One commentator suggested that the last sentence of the first paragraph should say that the actuary "may," not "should," consider implications of forward looking returns. One commentator said that the attachment of "forward-looking" to arithmetic mean or geometric mean is a new financial concept and should be defined. |
| Response | The reviewers believe that the current language strikes an appropriate balance of all the considerations raised and made no changes. |
| Comment | One commentator argued that the harmonic mean investment return is a more appropriate rate for discounting pension obligations than either the arithmetic or geometric mean return. |
| Response | The reviewers believe that the guidance in section 3.8.3 and the discussion in appendix 3 will help pension actuaries use the expected investment return estimates most commonly provided by investment professionals in the selection of an investment return assumption and made no changes. |
| Comment | One commentator suggested adding a reference list of recommended reading on this subject to the appendix. |
| Response | The reviewers believe that additional details on arithmetic and geometric returns beyond appendix 3 are better placed in a practice note. |
| Comment | One commentator said that the standard should not draw a line between the actuary and an investment consultant by stating that the actuary will receive capital market assumptions from an investment consultant. |
| Response | The reviewers agree and made changes to the language. |
| Section 3.8.4, Multiple Investment Return Rates | |
| Comment | One commentator suggested that examples include benefit payments covered by current or projected plan assets. |
| Response | The reviewers agree and added "projected" assets to the second example of how multiple investment return rates could be used. |
| Section 3.9, Selecting A Discount Rate | |
| Comment | Two commentators suggested that the language be better coordinated with the types of present values then anticipated under ASOP No. 4. One commentator suggested a complete re-write of the section using the concept of present value types that was contained in the exposure draft of ASOP No. 4 issued in January 2012. |
| Response | The reviewers made changes to this section to make it consistent with the market-consistent concepts in the anticipated revision of ASOP No. 4. The reviewers note that the anticipated revision of ASOP No. 4 no longer contains the concept of present value types. |
| Comment | One commentator opined that the guidance should not say that a discount rate is used to measure present values since present values are a measurement in themselves. Instead, the guidance should indicate that a discount rate is used to determine or calculate present values. |
| Response | The reviewers agreed and made changes to the language. |
| Comment | One commentator stated that the examples in this section provided too much guidance on measurements if they are just examples of measurement purposes. |
| Response | The reviewers believe that language in the examples does not restrict the actuary in making measurements appropriate to the measurement's purpose and made no change. |

ASOP No. 27—September 2013

| Comment | One commentator suggested that the section be expanded to include a description of a current market measurement approach and an expected cost measurement approach. The commentator also suggested an expanded list of measurement purpose examples. |
|---|---|
| Response | The reviewers believe that guidance regarding measurement approaches belongs in ASOP No. 4 and will consider this comment in its work on ASOP No. 4. The reviewers note that the list of examples is not exhaustive and believe that the current guidance is sufficient, and made no change. |
| Comment | One commentator suggested that the section be re-written. Key comments include the following:<br><br>• The language should be based on the principle that discount rates are measurements of portfolio returns. The commentator pointed out that this principle would support both traditional and financial economic practice.<br>• The draft implies that discount rates are specified first and then present values are calculated using those discount rates. The commentator suggested that the guidance acknowledge that present values can be observed first and implied discount rates can then be determined or not determined at all if the actuary does not want to use a deterministic discount rate.<br>• The commentator felt the guidance was inadequate because it focuses solely on deterministic discount rates and deterministic present values. The commentator suggested that using deterministic discount rates and deterministic present values is an actuarial assumption that should be disclosed and also suggested that the standard should make room for stochastic present values to exist. |
| Response | The reviewers believe that the section as drafted supports traditional and financial economic practice and does not preclude the actuary from using observed present values if desired. The reviewers note that the concept of stochastic present values has not been discussed widely in the pension profession but that the use of stochastic values is not precluded. The reviewers made no change to the guidance. |
| Comment | One commentator suggested that the list of examples be amended to acknowledge the emerging frequency of participant contributions to retiree health benefit plans and to make a distinction between sponsor and participant contributions. |
| Response | The reviewers note that the list of examples is not exhaustive and believe that the current guidance is sufficient and made no change. |
| **Section 3.10, Selecting a Compensation Increase Assumption** | |
| Comment | One commentator suggested renaming this section "Selecting a Compensation Change Assumption." |
| Response | The reviewers believe the current language is appropriate and made no change. |
| **Section 3.10.1, Data** | |
| Comment | One commentator suggested adding "relevant" to the requirement to review available compensation data in section 3.10.1. |
| Response | The reviewers believe the current language provides clear guidance and made no change. |
| **Section 3.10.2, Measurement-Specific Considerations** | |
| Comment | One commentator suggested removing the example in section 3.10.2(c) since it did not add value. |
| Response | The reviewers agree and removed the example. |
| **Section 3.11.3, Rate of Payroll Growth** | |
| Comment | One commentator suggested changing the title of this section to "Rate of Payroll Change." |
| Response | The reviewers believe the current language to be appropriate and made no change. |

ASOP No. 27—September 2013

| Section 3.12, Consistency among Economic Assumptions Selected by the Actuary for a Particular Measurement | |
|---|---|
| Comment | One commentator suggested adding an exception to the language for circumstances where there will not be consistency. |
| Response | The reviewers believe this is adequately covered in the last sentence of section 3.12, but changed the title of this section to make it clear that consistency applies to a particular measurement. |
| **Section 3.13, Prescribed Assumption(s)** | |
| Comment | One commentator stated that the term "principles" is not defined and causes the first sentence of this section to be misleading and unnecessary. |
| Response | The reviewers agreed and substituted the term "guidance" for principles. |
| **Section 3.14, Changing Assumptions** | |
| Comment | One commentator suggested deleting the second sentence of this section. |
| Response | The reviewers agree and deleted the entire section. |
| **SECTION 4. COMMUNICATIONS AND DISCLOSURES** | |
| **Section 4.1, Communications** | |
| Comment | One commentator suggested that the guidance in section 4.1 be clarified to apply to reports and not to all actuarial communications. |
| Response | The reviewers agree and made the change. |
| **Section 4.1.1, Economic Assumptions** | |
| Comment | One commentator suggested that disclosure should be for "explicit" adjustments for adverse deviations and that the general requirement to describe each economic assumption be limited to each "material" economic assumption. Another commentator suggested moving the last sentence of this section to section 4.1.2 |
| Response | The reviewers agree with the suggestion to require disclosure of explicit adjustments for adverse deviations (and for plan provisions that are difficult to measure) and made changes to the language. The reviewers do not believe that moving the last sentence to section 4.1.2 is appropriate. |
| **Section 4.1.2, Rationale for Assumptions; and Section, 4.1.3, Changes in Assumptions** | |
| Comment | One commentator objected to the extra work not requested by the Principal resulting from these sections. Another commentator indicated that this was an impractical expansion of the standards and suggested that instead of "should" disclose the standard specify that the actuary "should consider" disclosing the rationale. |
| Response | The reviewers believe that, in spite of the possible drawbacks of requiring disclosure of assumption rationale, the proposed language will lead to a more thorough actuarial assumption-setting process. The reviewers note that the guidance indicates that the rationale can be brief and the actuary can reference a previously published work product and made no change. |
| Comment | One commentator suggested that the section provide a disclosure exception when the Principal instructs the actuary not to disclose certain information. |
| Response | The reviewers note that in such an instance the actuary can deviate from guidance as long as the actuary makes the disclosures required in ASOP No. 41, section 4.4. |
| Comment | One commentator felt the language in this section could be interpreted to require the actuary to disclose confidential information. This interpretation conflicts with Precept 9 of the *Code of Professional Conduct* and would provide conflicting guidance to the actuary. |
| Response | The reviewers understand the concern and added section 4.4 to avoid confusion. |

ASOP No. 27—September 2013

**Appendix 3**

**Arithmetic and Geometric Returns**

## A. Introduction

One of the most important assumptions an actuary uses in measuring pension obligations is the discount rate. The exposure draft of ASOP No. 27 issued in January 2011 included the following question in transmittal memorandum:

> "4. Do you agree that the guidance on arithmetic and geometric returns is appropriate? Should the consequences of the use of geometric or arithmetic returns be disclosed?"

Given the wide range of responses received to the above question, the Pension Committee of the Actuarial Standards Board determined that the inclusion of some educational material regarding arithmetic and geometric returns in ASOP No. 27 would be beneficial. The following material is not meant to be an exhaustive discussion of the matter. It is meant to give the actuary some direction regarding the considerations that may be employed in determining whether the use of arithmetic or geometric returns is more appropriate in the selection of a discount rate. In many circumstances, as with the selection of other assumptions, the purpose of the measurement is one of the most important determinants.

The use of a *forward looking expected geometric return* as a discount rate will produce a present value that generally converges to the median present value as the time horizon lengthens (i.e., if the actuary determines a funding obligation using the *forward looking expected geometric return* to discount the obligation to produce a present value, it is expected that in the limiting case there will be enough money to fund the obligation 50% of the time). The use of a *forward looking expected arithmetic return* as a discount rate will generally produce a *mean* present value (i.e., there will be no expected actuarial gains and/or losses).

This appendix should not be construed as a preference for any particular present value measurements over others (for example, market-consistent present value measurements or measurements using a discount rate reflecting anticipated investment return).

## B. Looking Back Versus Looking Forward

The discount rate used in the measurement of a pension obligation is a forward-looking assumption. While the actuary may use some historical results in establishing expectations regarding the future, the discount rate reflects an expectation of events to come, not events that have already occurred.

One of the more confusing aspects of the debate regarding arithmetic and geometric returns is as follows:

(a) determining whether we are talking about using historical results to establish forward looking (i.e., future) expectations, or

(b) determining whether we are talking about whether a *forward looking expected geometric return* or *forward looking expected arithmetic return* is a more appropriate discount rate

Note that a *forward looking expected geometric return* is not synonymous with compounding. That is, both a *forward looking expected geometric return* and a *forward looking expected arithmetic return* would be used in a compounding nature.

## C. An Example

The following example illustrates the use of a *forward looking expected arithmetic return* to produce a *mean* present value. Assume that an asset class is expected to have a 50% probability of earning a return of 30% and a 50% probability of earning a return of 0% for each of the next two years and that these returns are the only possible outcomes. (The *forward looking expected arithmetic return* in this example would be 15%.) The chart below illustrates the totality of possible investment results for an initial $1,000 investment placed in this asset class:



The expected ending wealth values and a derivation of the *forward looking expected geometric return* is presented below:

| Ending Wealth | | | | Rate of Return | | | |
|---|---|---|---|---|---|---|---|
| $1,690 | × 1/4 | = | $ 422.50 | $\left[\left[\dfrac{\$1,690}{\$1,000}\right]^{\frac{1}{2}} - 1\right]$ | × | 1/4 | = 7.50% |
| $1,300 | × 2/4 | = | $ 650.00 | $\left[\left[\dfrac{\$1,300}{\$1,000}\right]^{\frac{1}{2}} - 1\right]$ | × | 1/2 | = 7.01% |
| $1,000 | × 1/4 | = | $ 250.00 | $\left[\left[\dfrac{\$1,000}{\$1,000}\right]^{\frac{1}{2}} - 1\right]$ | × | 1/4 | = 0.00% |
| Expected Value = | | | $1,322.50 | | | | 14.51% |

The *forward looking expected geometric return* in this example is 14.51%. The question then becomes what discount rate would take the expected value of $1,322.50 at the end of year 2 and produce a present value of $1,000? The answer is shown below:

$$\text{Mean PV Rate of Return} \quad = \quad \left[\left[\frac{\$1,322.50}{\$1,000.00}\right]^{\frac{1}{2}} 1\right] \quad = \quad 15\%$$

which is the *forward looking expected arithmetic return*. Note however in this simple example, that if the actuary funded an obligation that is expected to be $1,322.50 at the end of year two with a one-time payment of $1,000 at the beginning of year 1, there would be insufficient funds at the end of year 2 three-quarters of the time.

## D. Capital Market Assumptions from External Sources

In many instances, the actuary will collect capital market assumptions from external sources in order to determine the *forward looking expected arithmetic return* and/or the *forward looking expected geometric return*. The capital market assumptions can be broadly classified into the following categories:

(a)    expected returns by asset class;

(b)    standard deviations by asset class; and

(c)    correlation coefficients between asset classes.

With respect to expected returns by asset class, some external sources report *forward looking expected arithmetic returns*, some report *forward looking expected geometric returns* and some report both. It is important to understand what type of return was collected as well as the future time horizon to which the expected returns apply.

ASOP No. 27—September 2013

In general, a *forward looking expected geometric return* for an asset class can be approximated by taking the *forward looking expected arithmetic return* and subtracting one-half of the variance of the asset class[1].

If the actuary is trying to determine the *forward looking expected arithmetic return* for an entire portfolio from individual asset classes, this can be accomplished by taking the appropriate weightings from the individual asset classes' *forward looking expected arithmetic returns.* However, if the actuary is trying to determine the *forward looking expected geometric return* for an entire portfolio from individual asset classes, this <u>cannot</u> be accomplished by taking the appropriate weightings from the individual asset classes' *forward looking expected geometric returns.* In approximating the *forward looking expected geometric return* for the entire portfolio, the actuary would first determine the *forward looking expected arithmetic return* for the entire portfolio and then subtract one-half of the variance of the entire portfolio.

---

[1] <u>Investments</u>, Bodie, Kane and Marcus, 2005, p. 864.

### Appendix 4

### Selected References for Economic Data and Analyses

The following list of references is a representative sample of available sources. It is not intended to be an exhaustive list.

1.    General Comprehensive Sources

      a.    Kellison, Stephen G. *The Theory of Interest*. 3rd ed. Colorado Springs, CO:  McGraw-Hill, 2008.

      b.    *Statistics for Employee Benefits Actuaries*. Committee on Retirement Systems Practice Education, and the Pension and Health Sections, Society of Actuaries. Updated annually.

      c.    *Stocks, Bonds, Bills, and Inflation (SBBI)*. Chicago, IL:  Ibbotson Associates. Annual Yearbook, market results 1926 through previous year.

2.    Recent Data, Various Indexes, and Some Historical Data

      a.    *Barron's National Business and Financial Weekly*. Dow Jones and Co., Inc. Available on newsstands and by subscription.

      b.    U.S. Bureau of the Census. *Statistical Abstract of the United States*. http://www.census.gov/compendia/statab/

      c.    U.S. Department of Labor, Bureau of Labor Statistics. *Consumer Price Index*. http://www.bls.gov/cpi/

      d.    U.S. Federal Reserve Weekly Statistical Release H.15. Interest rate information for selected Treasury securities. http://www.federalreserve.gov/releases/h15/

      e.    U.S. House of Representatives, Committee on Ways and Means. *Green Book: Background Material and Data on Programs within the Jurisdiction of the Committee* http://greenbook.waysandmeans.house.gov/

      f.    U.S. Social Security Administration. *Social Security Bulletin*. http://www.ssa.gov/policy/docs/ssb/

      g.    *The Wall Street Journal*. Daily periodical. Available on newsstands and by subscription.

<u>**ASOP No. 27—September 2013**</u>

3.    Forecasts

a.    *Blue Chip Financial Forecasts*. Capital Publications, Inc., P.O. Box 1453, Alexandria, VA 22313-2053. March and October issues contain long-range forecasts for interest rates and inflation.

b.    Congressional Budget Office's economic forecast. The forecast projects three-month Treasury Bill rates, 10-year Treasury Note rates, CPI-U, gross domestic product, and unemployment rates. http://www.cbo.gov/publication/43907

Case 1:18-cv-01905-CJN   Document 28   Filed 06/10/19   Page 1309 of 1367
Case 19-1116, Document 61-1, 10/31/2018, 2412573, Page19 of 91

JA 001304



No. 91-904

In The

# Supreme Court of the United States

October Term 1992

CONCRETE PIPE AND PRODUCTS
OF CALIFORNIA, INC.,

*Petitioner,*

vs.

CONSTRUCTION LABORERS PENSION TRUST
FOR SOUTHERN CALIFORNIA,

*Respondent,*

On Writ Of Certiorari To The
United States Court Of Appeals
For The Ninth Circuit

JOINT APPENDIX
VOLUME II, PAGES 217-433

DENNIS R. MURPHY        JOHN S. MILLER, JR.
JAMES M. NELSON*        EVERITT G. BEERS*

DIEPENBROCK, WULFF, PLANT   COX, CASTLE & NICHOLSON
& HANNEGAN                  2049 Century Park East
300 Capitol Mall, Suite 1700   Twenty-Eighth Floor
Post Office Box 3034        Los Angeles, CA 90067-3284
Sacramento, CA 95812-3034   Telephone: (310) 277-4222
Telephone: (916) 444-3910   *Counsel for Respondent*
*Counsel for Petitioner*

*Counsel of Record

Petition For Certiorari Filed December 3, 1991
Certiorari Granted May 26, 1992

**Add.82**

Case 1:18-cv-01905-CJN   Document 28   Filed 06/10/19   Page 1310 of 1367
Case 19-1895, Document 9-1, 2019, 2112573, Page313 of 451

JA 001305

Add.83

378

**AMERICAN ARBITRATION ASSOCIATION**

| | |
|---|---|
| In the Matter of Arbitration | ) |
| Between | ) No. |
| CONSTRUCTION LABORERS | ) 72-621-0001-87 |
| PENSION TRUST FOR | ) MEPPA [sic] |
| SOUTHERN CALIFORNIA | ) |
| and | ) |
| CONCRETE PIPE AND | ) |
| PRODUCTS COMPANY OF | ) |
| CALIFORNIA | ) |

DECISION AND AWARD

of

KENNETH M. SCHWARTZ
Arbitrator

Dated: August 16, 1988

Introduction

This is the second phase of a bifurcated arbitration proceeding between Construction Laborers Pension Trust Fund for Southern California ("Trust") and Concrete Pipe and Products Company of California ("Concrete Pipe"). This proceeding was conducted pursuant to an order of the United States District Court for the Central District of California and was in accord with Section 4221 of the Multi-Employer Pension Plan Amendments Act of 1980

379

(MEPPA) [sic]. The hearing was held in Los Angeles, California, in the offices and under the auspices of the American Arbitration Association on February 18, 1988.

Counsel appearing for the Trust were Cox, Castle & Nicholson, by Everett G. Beers, Esq.

Counsel appearing for Concrete Pipe were Diepenbrock, Wulff, Plant & Hannegan, by James M. Nelson, Esq.

The dispute between the parties arose out of the attempts of the Trust to seek an award upholding its assessment of withdrawal liability on Concrete Pipe in the principal amount of $268,168.81.

The first phase of the arbitration hearing was held in Los Angeles, California, on June 25, 1987. As a result of said hearing, this Arbitrator issued his Award on August 27, 1987, at which time he concluded that the withdrawal of Concrete Pipe was covered by MEPPA [sic] and that Concrete Pipe would be liable for payment of its share of unfunded vested liability of the Trust Pension Plan when it withdrew from the Plan in 1981.

In this second phase of this proceeding, the issue to be resolved by the Arbitrator is the amount of withdrawal liability due the Trust based upon the applicable law.

I

Facts Pertinent to Resolution of the
Amount of Withdrawal Liability

The parties to this proceeding had entered into a stipulation of facts in the District Court proceeding

Case 1:18-cv-01905-CJN   Document 28   Filed 06/10/19   Page 1311 of 1367
Case 18-1140, Document 57-4, 10/31/2018, 2422973, Page20 of 31

JA 001306

380

docketed as *Construction Laborers Pension Trust For South-
ern California v. Concrete Pipe of California,* Case No. CV
82-5184.

For purposes of convenience, the relevant paragraphs
of said stipulation are summarized and set forth below:

Concrete Pipe is a California corporation doing busi-
ness within the Central District of California; the Trust is
an expressed Trust organized under the Labor-Manage-
ment Relations Act of 1947, as amended; that said Trust is
an express Trust formed under a Trust Agreement entered
into among the Southern California District Council of
Laborers ("Union") and several multi-Employer associa-
tions; that said Trust primarily covers employees in the
building and construction industry and is managed by a
Board of Trustees, half of whom are selected by the Union
and the other half selected by the multi-Employer asso-
ciations.

The Trust derives revenues from Employer contribu-
tions made by Employers bound to Collective Bargaining
Agreements with the Union; these Collective Bargaining
Agreements require signatory Employers to make contri-
butions to the Trust for each hour worked by employees
within the bargaining units covered by the Collective
Bargaining Agreements involved.

Cen-Vi-Ro and the Union (as well as the affiliated
Local 220 located in Bakersfield) were signatories to such
a Collective Bargaining Agreement prior to November 30,
1976, covering terms and conditions of work (including
Trust coverage) of employees represented by Local 220 at
the Shafter Plant.

**Add.84**

381

On and before November 30, 1976, a plant for the
manufacture of concrete pipe located at Shafter, Califor-
nia, was owned by Cen-Vi-Ro and as of December 1, 1976,
this plant became owned by Concrete Pipe and has been
owned by it at all times since that date.

On December 1, 1976, and thereafter, Concrete Pipe
honored the terms of the Collective Bargaining Agree-
ment between Cen-Vi-Ro and the Union which expired in
1978. On November 27, 1978, Concrete Pipe entered into a
new Collective Bargaining Agreement with the Union
which likewise provided for contributions to the Trust for
each hour worked by employees within the bargaining
unit covered by the Collective Bargaining Agreement.
This Agreement contained provisions in respect to the
appropriate notices to be given by the parties to each
other in respect to terminating the Agreement.

Pursuant to the Trust Fund contribution provisions of
the new Agreement signed by the Union and Concrete
Pipe on November 27, 1978, and the Trust Fund contrib-
uting provisions of the Agreement between Cen-Vi-Ro
and the Union that Concrete Pipe had honored since
December 1, 1976, Concrete Pipe had paid the Trust
$102,656.68.

On April 21, 1981, the Union sent the appropriate
notice of reopening of the Labor Agreement for negotia-
tions, as did Concrete Pipe likewise on May 1, 1981.

For reasons not material to this phase of the proceed-
ings, negotiations broke down resulting in an impasse
between the parties.

Case 1:18-cv-01905-CJN   Document 28   Filed 06/10/19   Page 1312 of 1367
Case 19-1195, Document 61, 10/31/2019, 2712973, Page1 812 of 131

JA 001307

382

On August 17, 1979, Concrete Pipe ceased production at the Shafter Plant.

For hours worked in May 1980, Concrete Pipe contributed $48.60 to the Trust. That was the last contribution of Concrete Pipe to the Trust.

On January 20, 1982, the Trust notified Concrete Pipe of its alleged withdrawal liability of $268,168.81 and demanded payment with a prescribed schedule.

Concrete Pipe has not made any payment on the alleged withdrawal.

Concrete Pipe has not been financially incapable of paying any scheduled benefit to any of its beneficiaries.

The Trust has been informed by its independent actuary, The Martin E. Segal Company, Inc., that as of December 31, 1981, it had an aggregate unfunded vested liability of $532,621,400; that as of December 31, 1980, it had an unfunded vested liability of $514,181,200; and that as of December 31, 1979, it had an unfunded vested liability of $493,322,600. (The stipulation shows as of December 31, 1979, an aggregate unfunded vested liability in the amount of $532,621,400, whereas Exhibit "F" to the stipulation, entitled "Report on Employer Withdrawal Liability," shows in Section II, entitled "The Plan's Withdrawal Liability Pools," the amount as of December 31, 1979, to be $493,392,600.) (Emphasis mine)

No shareholder, officer, director, agent or representative of Concrete Pipe has, during the period from 1976 to the present date, had any participation in:

(a)  the investment decisions pertaining to the assets of the Trust;

383

(b)  the decisions of the Trust to adjust Pension Benefit levels;

(c)  the decisions affecting the Trust's administrative costs; or

(d)  the selection of actuarial assumptions or methods upon which Concrete Pipe's asserted withdrawal liability has been calculated.

The Trust's decisions are made by the Trustees. At no time did Concrete Pipe choose to apply for membership or belong to any of the multi-Employer Associations who select one-half of the Trustees on the Board of Trustees, nor had Concrete Pipe ever been denied membership in said Associations.

II

Contentions of the Parties

A.  Concrete Pipe contends that:

1.  The actuarial assumptions and methods used in computing its withdrawal liability were not reasonable in the aggregate; moreover, the computations contained significant errors in the application of the actuarial assumption used, such as:

(a)  accrual of contributions from other Employers in assessing Concrete Pipe's withdrawal liability;

(b)  incorrect application of Trust's own actuarial standards in computing the withdrawal liability; and

Add.85

Add.86

Case 18-1140, Document 57-4, 10/31/2018, 2422973, Page22 of 31

384

(c)   use of actuarial assumptions which are unreasonable when considered individually and result in the over-all actuarial assumptions and methods being unreasonable in the aggregate.

2.   Presumption contained in 29 U.S.C. Section 1401 that the decisions by the Trust and the Trust Fund's actuary are presumed correct result in an unconstitutional deprivation of due process. Further, that the preponderance of the evidence establishes that the withdrawal liability determination is clearly erroneous.

3.   There are reasonable actuarial assumptions which can be applied to this case which would result in reducing the withdrawal liability to $41,523.15.

B.   The Trust contends that:

1.   The two-tiered Segal method of calculating the Trust's unfunded vested liability was based in the aggregate, on reasonable actuarial assumptions, and therefore the Trust's determination of the amount of withdrawal liability should be upheld.

2.   The Trust's actuarial assumptions made in accounting for unrecorded past service credit were reasonable, having been based on an objective and statistically significant survey.

3.   Requiring a withdrawing Employer to pay the same share of the Plan's unfunded vested liability (exclusive of interest) regardless of whether it pays in a lump sum or in installments is reasonable.

4.   The presumption in favor of the Trust that requires a withdrawing Employer to carry

385

the burden of proof that Trust's determinations are unreasonable is simply a constitutional allocation of burden of proof to Employer in withdrawal liability cases; hence, in order to defeat Trust's calculations, Concrete Pipe has burden of showing that the determination was "unreasonable or clearly erroneous."

5.   When Concrete Pipe purchased Cen-Vi-Ro and continued its obligation to contribute to the Trust, Concrete Pipe inherited Cen-Vi-Ro's contribution history; hence, is liable for the full share of withdrawal liability, plus accrued interest.

III

Analysis, Discussion and Conclusions

A.   Constitutionality of 29 U.S.C. § 1401(a)(3)(A).

Concrete Pipe has raised the question of the constitutionality of the presumption in 29 U.S.C. Section 1401(a)(3)(A). The argument made is that the section is void because it "unconstitutionally" violates Concrete Pipe and Products' right to an impartial decisionmaker, and, hence, its right to procedural due process of law.

While the arguments made by counsel for Concrete Pipe are thought provoking, nonetheless, this Arbitrator, shares the view of counsel for the Trust as to what the Arbitrator's role is in this proceeding. It is clear that the question of constitutionality of statutory provisions should be adjudicated in court proceedings. As pointed out by the court in *Republic Industries v. Central*

JA 001309

Case 18-1140, Document 57-4, 10/31/2018, 2422973, Page23 of 31

**Add.87**

386

*Pennsylvania Teamsters Pension Fund*, 693 F.2d 290, 296 (3rd Cir. 1982):

> "[T]he legislature could not have intended to defeat separation of powers principles by allowing an administrative tribunal to review the constitutional validity of a statute – a function reserved for the judiciary. It would be unconstitutional, therefore, to compel the arbitrator to review the facial constitutionality of MPPA [sic]."

It should be noted that the matter of the constitutionality of the statutory provision of ERISA presumption was upheld by the Ninth Circuit Court of Appeals in the case of *Board of Trustees of the Western Conference of Teamsters Pension Trust Fund v. Thompson Building Materials*, 749 F.2d 1396; *cert. denied*, 471 U.S. 1054. It is recognized that the Third Circuit in the case of *United Retail & Wholesale Employees Teamsters Union Local No. 115 Pension Plan v. Yahn & McDonnell, Inc.*, 787 F.2d 128, held the presumption of correctness to be unconstitutional. Notwithstanding the *Yahn* case, the law in California, being in the Ninth Circuit, is as stated in the *Thompson* case, *supra*, decision, namely, that the provisions of Section 1401 are constitutional.

This Arbitrator is fully in accord with the decision of the court in the *Republic Industries* case, *supra*; hence, believes that the issue of constitutionality of the statute is for the Federal Courts and not the Arbitrator.

387

B. Whether Concrete Pipe When it Purchased Cen-Vi-Ro's Business and Continued Cen-Vi-Ro's Obligation to Continue to the Trust, Inherited Cen-Vi-Ro's Contribution History and, Hence, Became Liable for its Full Share of Withdrawal Liability of $268,168.61, Plus Accrued Interest.

The Trust contends that Concrete Pipe inherited the contribution history for 1976, the year in which it purchased Cen-Vi-Ro and is, therefore, liable for its full share of withdrawal liability as indicated herein. The Trust relies upon the express words found in the statute in Section 1384(b) in support for its position. Said Section provides:

> "[T]he liability of the purchaser shall be determined as if the purchaser had been required to contribute to the plan in the year of the sale and the 4 plan years preceding the sale the amount the seller was required to contribute for such operations for such 5 plan years."

The argument by the Trust is that, in the instant case, Concrete Pipe inherited the contribution history for 1976, the year in which the purchase took place.

Furthermore, the Trust argues, even if the express words of MEPPA [sic] did not so provide, Concrete Pipe would nevertheless be liable under the labor law "successorship doctrine."

The reliance of the Trust on Section 1384, in the opinion of the Arbitrator, is misplaced.

The provisions of MEPPA [sic] as they relate to withdrawal liability of employers withdrawing from multi-employer pension plans is applicable to all employers

Case 18-1140, Document 57-4, 10/31/2018, 2422973, Page24 of 31

**Add.88**

388

withdrawing from such plans on or after September 26, 1980. Under the provisions of the Act, the employer who withdraws from the plan is liable to the plan for the employer's allocable share of the plan's unfunded vested benefits. The unfunded vested benefits are defined as the difference between the assets of the trust and the current discounted value of all vested benefits eventually to be paid participants.

The Purchase and Sale Agreement between Cen-Vi-Ro and Concrete Pipe negotiated in 1976 is obviously not in compliance with the provisions of 29 U.S.C. Section 1384, for purposes of shifting the liability from the seller to the purchaser. The Purchase Agreement having been entered more than four (4) years prior to the enactment of the statute, there was no way for the parties to anticipate the statutory provisions. The Purchase and Sale Agreement did not provide for or require the purchaser to contribute to the Trust; nor did it compel the purchaser to post a bond or ensure that Cen-Vi-Ro was secondarily liable for withdrawal liability in the event Concrete Pipe withdraws as is provided for in 29 U.S.C. Section 1384.

Concrete Pipe's contention that Congress provided by statute in Section 1384 an exclusive mechanism for shifting liability as described herein has much merit.

In *Continental Inc. and Bakery Workers Pension Fund*, 5 EBC 1326, at 1336, Arbitrator Mittelman concluded that silence of the statute with respect to the pre-MEPPA [sic] sales of assets "is not an invitation to arbitral and judicial creativity" and that it must be regarded as "evidence of congressional intent to preclude its application." It is a conclusion with which this Arbitrator agrees.

389

An analysis of Section 1384 regarding conditions under which a seller's obligation to contribute and its contribution history is spelled out in the Section: In December 1982, the PBGC concluded that this section of the statute provided the exclusive method by which a seller may avoid withdrawal liability by transferring its obligation to an arms-length purchaser.

In the *Continental* case, *supra*, at 1337, the Arbitrator states, "One simply must assume, in the absence of even a glimmer in the legislative history of the Act indicating an assumption or belief that other principles of successorship might be applicable, that Congress intended and believes that Section 4204 provided the exclusive method of and criteria for applying successorship principles to *bona fide* arms-length sales of assets cases."

Hence, the refusal of Congress to provide for an automatic transfer of withdrawal liability must be construed to preclude the transfer of Cen-Vi-Ro withdrawal liability to Concrete Pipe.

The language found in *Massachusetts Mutual Life Insurance Company v. Russell*, 473 U.S. 134 (1985), may very well be depositive of the issue, where the Court held:

"We are reluctant to tamper with an enforcement scheme crafted with such evident care as the one in ERISA. As we stated in *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 19, 62 L.Ed.2d 146, 100 Supreme Court 242 (1979): '[W]here a statute expressly provides a particular remedy or remedies, a court must be chary of

390

reading others into it.' [Cite omitted] 'The presumption that a remedy was deliberately omitted from a statute is strongest when Congress has enacted a comprehensive legislative scheme, including an integrated system of procedures for enforcement.' [Cite omitted]" 473 U.S. 148.

The second contention of the Trust relates to the labor law doctrine of successorship.

Concrete Pipe points out, and properly so, that the only published decisions which have discussed the applicability of the "successor employer doctrine" as it relates to withdrawal liability have been rejected. The cases cited by Concrete Pipe in support of its contention of the inapplicability of the "successorship doctrine" are: *Richland Industries Ltd v. Robins,* 617 F.Supp. 639 (N.D. Illinois 1985); *Paperworkers Local 286 Pension Plan and Kardon Industries, Inc.,* 6 EBC 2398 (1985); *Superior Pocahontas Inc. v. Island Creek Coal Co.,* 657 F.Supp. 796 (S.D. W.Va. 1987).

The Trust's contention in respect to the "successorship doctrine" finds no support in court cases. The following citation from the *Massachusetts Mutual Life Insurance Company v. Russell* case, *supra,* 473 U.S. at 146, " . . . the assumption of inadvertent omission is rendered especially suspect upon close consideration of ERISA's interlocking, interrelated and independent remedial scheme which is in turn part of a comprehensive and reticulated statute," makes it clear that Congress did not intend to imply a remedy not specifically spelled out in the statute.

In the labor law field, the successorship cases relied upon by the Trust are: *John Wiley & Sons v. Livingston,* 376 U.S. 543 (1964); *NLRB v. Burns International Security*

391

*Services, Inc.,* 406 U.S. 272 (1972); *Golden State Bottling Co. v. NLRB,* 414 U.S. 168 (1973); *Howard Johnson Co. v. Hotel Employees,* 417 U.S. 249 (1974), as well as the *Fall River Dyeing and Finishing Corp. v. NLRB,* 96 L.Ed.2d 22 (1987).

The court in the above-cited cases basically held that if it finds the employer to be a successor, then the successor assumes the obligation of bargaining collectively with the employees' representative which, of course, is quite different from assuming the Collective Bargaining Agreement of its predecessor.

For Concrete Pipe in order to be liable for the obligations of Cen-Vi-Ro, it would have to be shown that Cen-Vi-Ro, at the time of the transfer, had such an obligation in the first instance. To reiterate, the transfer of ownership took place in 1976, long before the enactment of MEPPA [sic]. Since Cen-Vi-Ro had no such withdrawal liability at the time of the transfer of ownership, no such transfer of liability to Concrete Pipe could take place.

In summary, since contractual liabilities under the successorship doctrine, as enunciated in *John Wiley & Sons v. Livingston, supra,* and *Golden State Bottling Co. v. NLRB, supra,* and others cited, are not applicable since the court did not require the parties to abide by the terms and conditions of the Labor Agreement, to which it had not agreed (unless it could be shown that the employer had actual notice and could have protected himself against such liability). In any event, for the reasons enunciated in *Richland Industries Ltd., supra,* it is concluded that the cases governing successor employers in labor cases have no application in ERISA cases.

Add.89

Case 18-1140, Document 57-4, 10/31/2018, 2422973, Page26 of 31

392

As was pointed out in the *Richland Industries* case, at page 641, "A new employer, in other words, may be a successor for some purposes and not for others." The court further states, "In particular, Section 1384 of ERISA clearly establishes that a purchaser of assets may not be held liable for the seller's contribution history, absent a special arrangement with the seller by which the purchaser voluntarily assumes the liability."

It is clear that there could have been no voluntary arrangement between the seller, Cen-Vi-Ro, and the purchaser, Concrete Pipe, since neither party in 1976 was aware of a liability which was in the future to be known as withdrawal liability.

Accordingly, it is concluded that based upon the reasoning above, Concrete Pipe did not inherit the one-year contribution history of Cen-Vi-Ro when Concrete Pipe acquired ownership of the plant in 1976; hence, it is not liable for the share of withdrawal liability which was included by the Trust in its original calculation.

The contention by the Trust that the issue of Cen-Vi-Ro's contribution was not timely raised is without merit. There is sufficient evidence in the record to show that the issue was raised at least in 1982 and thereafter. In the instant phase, the ultimate issue to be resolved is the *amount* of Concrete Pipe's withdrawal liability to the Trust; accordingly, the matter of Cen-Vi-Ro's contribution is properly before the Arbitrator.

In its Closing Brief, the Trust has attached as Exhibit A the monetary consequence of a holding that one year of contribution be eliminated by recomputing the withdrawal liability. The adjusted withdrawal liability, taking

393

into account the exclusion of the one year of Cen-Vi-Ro contribution history, reduces the withdrawal liability of Concrete Pipe to $190,465.57. Incidentally, Concrete Pipe, in its Reply Brief of May 27, 1988, acknowledges the correctness of the amount as recomputed.

## C. Were Actuarial Assumptions and Methods Reasonable in the Aggregate?

The statutory standards for reviewing the correctness of the actuarial calculations and assumptions are set out in 29 U.S.C. 1393(a) (1) and 1401(a) (3).

Section 1393(a) (1) provides, in pertinent part:

"Withdrawal Liability under this part shall be determined by each Plan on the basis . . . actuarial assumptions, which, in the aggregate are reasonable taking into account the experience and reasonable expectations) and which, in combination, offer the actuary's best estimate of anticipated experience under the Plan."

Further, Section 1401(a)(3) provides:

"(A) For purposes of any proceeding under this section, any determination made by a Plan sponsor under Sections 1381 through 1399 of this title and Section 1405 of this title is presumed correct unless the party contesting the determination shows by a preponderance of the evidence that the determination was unreasonable or clearly erroneous.

"(B) In the case of the determination of a Plan's unfunded vested benefits for a Plan year, the determination is presumed correct unless a

Case 18-1140, Document 57-4, 10/31/2018, 2422973, Page27 of 31

**Add.91**

394

party contesting the determination shows by a preponderance of the evidence that –

> "(i) the actuarial assumptions and methods used in the determination were, in the aggregate, unreasonable (taking into account the experience of the Plan and reasonable expectations), or
>
> "(ii) the Plan's actuary made a significant error in applying the actuarial assumptions or methods."

In the case of *Michigan UFCW/Food Employers Pension Fund v. Eberhard Foods, Inc.*, 831 F.2d 1258 (6th Cir. 1987), the court upheld the Arbitrator's decision that the interest rate (6%) was not unreasonable. It held:

> "The burden of proof is on the employer. In meeting the burden, the test is not which withdrawal determination is the most reasonable but rather whether the challenged determination is unreasonable or clearly erroneous."

In recognizing the fact that actuaries may have different opinions, the court in *Eberhard, supra,* stated, at page 1261:

> "As the First Circuit observed in *Keith Fulton & Sons v. New England Teamsters,* 762 F.2d 1137 (1st Cir. 1985), the actual determination of withdrawal liability is not an exact science and therefore there is a range of reasonable actuarial determination of withdrawal liability [citation] Eberhard's actuary acknowledged this point, stating, 'I don't think there is a single answer as to reasonableness.' [citation] The statute does not anticipate that the actuary will always choose the figure the court would choose as the most reasonable from among the range. Rather,

395

the only requirement is that in every case the actuarial determination will fall within the range of reasonableness . . . taking into account the unique characteristics of the Fund."

As pointed out by the Trust, all the Circuits with the exception of the Third Circuit in *United Retail v. Yahn,* 787 F.2d 128 (3rd Cir. 1986), have upheld and enforced the presumption.

In the intant case, the Martin E. Segal Company, the Trust's actuary, in calculating withdrawal liability used a method which takes into account a withdrawing employer's contributions to the Trust for a period of ten (10) years relative to the contributions of all other employers. The withdrawing employer is responsible for a proportional share of the Trust's "unfunded vested benefits" as that term is defined in Section 4213(c), i.e., as the value of nonforfeitable benefits under the Plan, less the value of assets of the Plan.

The Martin E. Segal Company has developed through the years a method which provides for two distinct interest rates. The method is sometimes referred to herein as the "two-tiered" method. The rates used under the Segal method are (1) the interest rates published by the PBGC for single employer plan terminations, and (2) the interest rate used by a pension plan for its funding valuation.

As between the two rates, the PBGC rate is fairly high while the rate for funding the Plan is relatively low.

What this method does is to provide for a blending of the two rates to arrive at the value of the nonforfeitable benefits.

JA 001314

To the extent that the market value on hand covers the liability, the investment return developed by the PBGC for single employer terminations would be applicable to determine the coverage provided by those current assets. In the instant case, as of December 31, 1980, and December 31, 1981, the corresponding investment return assumptions were 9.25% and 8.50%

To the extent the unfunded vested liability cannot be covered by the current assets (as is the case herein, where only one-third of the liability could be covered by the current assets), the remaining liability is determined by using the investment return rate of 6.0%, which is the same investment return rate assumption used by the Trust for funding purposes.

The explanation made by the Trust actuary is simply that hypothetically the current assets could be converted into cash and immediately invested to insure the payments of benefits in the future.

As should be pointed out, the investments on hand at the PBGC rates would not be sufficient to cover the liability for vested benefits and as a result thereof, the Trust actuary was required to make his "best estimate" based upon a long-range investment return. The Trust actuary made it clear that while PBGC rates could be applied to "money on hand," those rates could not be applied where funds are not available since there is no way to "lock in" a rate to funds which may be available in the future.

The Trust actuary in making his best estimate as to the future investment return based his estimate taking into account (a) historical long-term investment rates,

and (b) the Trust's own personal investment history. In doing so, the Trust actuary took into account the ten (10) year period from 1971-1980 and determined the *average* return for the period to be 6.85%. With that history in mind, the Trust actuary determined the 6.0% rate, which is the funding rate, to be reasonable taking into account further the melding of the PBGC rates of 9.25% and 8.50%. As can be seen, the melded rate is very close to the historical performance of the Trust.

Concrete Pipe in asserting the "two-tiered" rate was unreasonable called as its expert actuary witness Mr. Jon L. King. Mr. King is an enrolled actuary (Co. Exh. 13), and is presently employed as manager of Buck Consultants' Los Angeles office. He has been employed as a consulting actuary by Buck since 1986. King testified that his experience in pension plans has been limited to single-employer pension plans. Also, that Buck Consultants has no clients in California among the multi-employer pension funds.

King stated that he had reviewed the data upon which the actuary assumptions were made in the instant case and determined that there were three assumptions that concerned him: (1) the net income assumption, (2) unrecorded past credit assumption, and (3) lastly, the interest rate assumption. King allowed that the first two assumptions had minimal impact, so he focused on the interest rate assumption in coming to the conclusion that it was "unreasonable in the aggregate."

King further testified that he looked at "economic realities" in his analysis, "rather than looking at what assumptions are being used for this and that purpose by

Case 18-1140, Document 57-4, 10/31/2018, 2422973, Page28 of 31

Add.92

Case 18-1140, Document 57-4, 10/31/2018, 2422973, Page29 of 31

Add.93

398

other actuaries." King pointed out that he doesn't believe in following the "herd" (of actuaries).

In support of King's contention of the interest rate assumption being too low, King used his firm's published interest rates, entitled "Buck Forward Rates," which are a set of interest rates derived from the actual marketplace for risk-free United States securities, i.e., treasury bills and U. S. Government bonds and notes.

King expressed the opinion that he did not believe the assumptions used for funding were applicable to withdrawal liability cases and that not only was the interest rate assumption too low, but that the PBGC interest for single employer terminations was too low as well.

The standard that Mr. King would apply in consideration of whether the interest rate assumption was unreasonable or not would be that if it met the interest rate of the "Buck Forward Rates," it would be reasonable; otherwise, not.

It is interesting to note that King was unable to state any multi-employer pension fund which has used the "Buck Forward Rates" method.

It is noteworthy to point out the lack of expertise King has in respect to multi-Employer Pension Funds. There is a real difference between a multi-Employer Pension Fund and a single Employer Fund. In multi-Employer Funds, in a withdrawal situation, there is an ongoing continuation of the Plan. The employees of the withdrawing Employer are not dropped as participants of the Plan, but will continue to remain participants until such time as they are eligible for retirement benefits.

399

Further, notwithstanding the withdrawal of the Employer, the continuing Employers must continue their contributions to the Plan and the withdrawing Employer's obligation to the Plan must be balanced against the obligation of the Employers continuing to make contributions. In the termination of a single Employer plan, obligations to all plan participants are fixed and paid as of a certain date.

During his testimony in respect to reasonableness, King refers to the realities of the marketplace and competitive rates.

Actuaries, for the most part, agree that a funding valuation is not an exact science and, accordingly, there does not appear to be any one answer in defining "reasonableness." That being the case, the standards in the statutes, the court cases, as well as arbitrators' decisions, must be looked to in determining whether the facts in each case come within the parameters of the term "reasonable." In the *Eberhard* case, *supra*, the court upheld the Arbitrator's decision that the interest rate (6%) was *not* unreasonable.

While the actuary witness testifying for Concrete Pipe concludes that the Segal method in the determination of interest rate assumptions are unreasonable, he ignores 29 U.S.C. 1393(a)(I) of ERISA which mandates that the actuary take into account the experience of the plan and reasonable expectations. This the Segal Company has done in coming up with its best estimate.

Concrete Pipe's actuary concludes that the "two-tiered" method used in the computation of the withdrawal liability and the interest rate assumption used for

Case 18-1140, Document 57-4, 10/31/2018, 2422973, Page30 of 31

Add.94

400

funding, as well as the PBGC rate, are "unreasonable in the aggregate."

The specific Segal method of using the interest rate assumption and the PBGC rates of interest comprising a blended rate have been the subject of numerous Arbitrator decisions.

Arbitrator William Hannan, in *Joy Mfg. Co.*, 5 EBC at 1135 (Feb. 1984), stated, "When we take into consideration that the 'blended rate' is a combination of the funding rate and the higher PBGC rate, we have an applicable rate which produces a withdrawal liability lower than the not unreasonable rate which most actuaries would have calculated . . . "

In *Ellis and Construction Laborers Pension Trust*, 5 EBC at 1175-76 (Feb. 1984), Arbitrator Martin Zimring upheld the use of the Segal formula as to blending of rates.

Walter Slater, the Arbitrator in *J. L. Denio, Inc. and Operating Engineers Pension Trust*, 8 EBC at 1990 (June 1987), states, "The boundaries of reasonableness appear to be PBGC rates on the high side and funding valuation rates on the low side. Somewhere in between we find such as the Segal Company's blend."

Concrete Pipe has the burden of rebutting the presumption of Section 1401 of ERISA and establishing by a preponderance of the evidence that the determination of the Plan sponsor was unreasonable. This they did not do.

401

## IV

### Conclusion

It is concluded, therefore, that Concrete Pipe has failed to carry the burden of overcoming the statutory presumption by a preponderance of the evidence.

## V

### Attorneys' Fees and Costs

Each party in this proceeding has requested that the legal expense, in the event of a successful result, be assessed against the other party. The Arbitrator does not feel justified in allocating either party's legal expense to the other. Both parties have acted in good faith and have diligently and professionally urged their respective positions; hence, each party will bear its own legal expenses and costs.

## AWARD

At the outset of this phase of the arbitration proceedings, the parties agreed that the Arbitrator, after having taken evidence, hearing arguments as well as studying the briefs filed, would determine the money amount of the withdrawal liability due the Trust from Concrete Pipe and Products Company of California and render an appropriate award. Based upon the reasons aforesaid stated, the award is as follows:

1. Concrete Pipe and Products Company of California has failed to show by a preponderance of the evidence that, in the aggregate, the actuarial assumptions and methods used by

Case 18-1140, Document 57-4, 10/31/2018, 2422973, Page31 of 31

Add.95

402

the Trust in the determination of Concrete Pipe and Products Company of California were unreasonable.

2. Concrete Pipe and Products Company of California is not liable for the one-year contribution history of Cen-Vi-Ro which was included in the Trust's original calculation.

3. Concrete Pipe and Products Company of California is liable for withdrawal liability of $190,465.57, plus accrued interest, to the Trust which the Trust acknowledges is the calculation of the liability using the same actuarial assumptions and methods as were applicable in the original calculation, except that the one-year contribution history of Cen-Vi-Ro is eliminated.

4. The Arbitrator's fees and expenses together with the administrative fees of the American Arbitration Association shall be shared equally by the parties. Each party shall bear its own costs and legal expenses.

/s/ Kenneth M. Schwartz
KENNETH M. SCHWARTZ, Arbitrator

Dated:  August 16, 1988

403

DENNIS R. MURPHY
JEFFREY OWENSBY
DIEPENBROCK, WULFF, PLANT & HANNEGAN
300 Capitol Mall, Suite 1700
P.O. Box 3034
Sacramento, CA 95812-3034
(916) 444-3910

Attorneys for Plaintiff
Concrete Pipe and Products
Company of California

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| CONCRETE PIPE AND PRODUCTS COMPANY OF CALIFORNIA, a California Corporation, | ) ) ) ) ) | No. 88-05759LTL(Tx) |
| Plaintiff, | ) | ACTION PURSUANT TO 29 U.S.C. § 1401(b)(2) TO VACATE AND/OR MODIFY ARBITRATOR'S AWARD |
| v. | ) | |
| CONSTRUCTION LABORERS PENSION TRUST FUND FOR SOUTHERN CALIFORNIA, | ) ) ) ) ) | |
| | ) | (Filed Sep. 26, 1988) |
| Defendant. | ) ) | |

JURISDICTION AND VENUE

1. This court has jurisdiction pursuant to 28 U.S.C. § 1331, 29 U.S.C. § 186(c), 29 U.S.C. § 1401 and 29 U.S.C. § 1451.

Pension Benefit Guaranty Corporation

86-24

October 31, 1986

REFERENCE:
 [*1]  4213 Actuarial Assumptions
4213(c) Actuarial Assumptions.  Unfunded Vested Benefits - Definition

OPINION:

This is in response to your request for the opinion of the Pension Benefit Guaranty Corporation (PBGC) as to the proper method of determining withdrawal liability under the Employee Retirement Income Security Act of 1974 (ERISA) in the case of a multiemployer pension plan that provides optional ancillary benefits in addition to the basic benefits. Specifically, you ask what actuarial assumptions should be used to determine the amount of unfunded vested benefits on which withdrawal liability is based, and whether the calculation of unfunded vested benefits should take into account "vested" ancillary benefits and assets "attributable" to them.

The ancillary benefits in question are provided only for the employees of employers that make specified payments to the plan in addition to the contributions required of them to support the basic benefits. However, we understand that the ancillary benefits are payable from the same general fund as the basic benefits.

The term "unfunded vested benefits" is defined in section 4213(c) of ERISA as the value of nonforfeitable benefits under the plan,  [*2]  less the value of the assets of the plan.  The term "nonforfeitable benefit" is defined in section 4001(a)(8) of ERISA.  Although that provision does not explicitly mention either basic or ancillary benefits, it is the PBGC's opinion that the term is intended to apply only to basic benefits.  Therefore, ancillary benefits, whether "vested" or not, should not be taken into account in determining unfunded vested benefits.  On the other hand, where all plan assets are in a single fund for the payment of all benefits, there is no basis for excluding any part of the assets from the determination of unfunded vested benefits.  The full amount of plan assets, whether derived from contributions for basic benefits or from additional payments made for ancillary benefits, is to be subtracted from the value of nonforfeitable (basic) benefits to arrive at unfunded vested benefits.

You indicate that the plan has been computing unfunded vested benefits for withdrawal liability purposes using the PBGC's interest assumption for terminated trusteed single-employer plans and question whether this is appropriate, since these assumptions "are not for multiemployer plans and . . . generate lower liabilities," [*3]  and since the assumptions are not the same as those used for purposes of section 412 of the Internal Revenue Code of 1954 (the Code).

There is no requirement that the actuarial assumptions used to determine withdrawal liability be the same as those used for purposes of section 412 of the Code.  Section 4213(b) of ERISA states merely that

[i]n determining the unfunded vested benefits of a plan for purposes of determining an employer's withdrawal liability . . ., the plan actuary may . . . rely on the most recent complete actuarial valuation used for purposes of section 412 of the . . .  Code . . . .

(Emphasis supplied.) This is a permissive, not a mandatory, provision.  Thus, the fact that the assumptions used to compute withdrawal liability are not the same as those used under section 412 of the Code does not of itself make those assumptions improper.

Section 4213(a) of ERISA permits the PBGC to issue regulations prescribing actuarial assumptions to be used in calculating withdrawal liability.  No such regulations have been issued.  In the absence of such regulations, section 4213(a) requires simply that

[w]ithdrawal liability . . . shall be determined by each plan on the [*4]  basis of . . . actuarial assumptions and methods which, in the aggregate, are reasonable (taking into account the experience of the plan and reasonable expectations) and which, in combination, offer the actuary's best estimate of anticipated experience under the plan . . . .

The PBGC is not in a position to advise actuaries what assumptions are appropriate in each individual case. In particular, the PBGC cannot advise you whether and, if so, how the actuarial assumptions used to determine withdrawal liability under the plan should take into account the plan's experience in receiving and making payments under its ancillary benefit provisions and expectations about its anticipated experience.

    If you have any further questions about this matter, you may call Deborah C. Murphy of the PBGC's Corporate Policy and Regulations Department at 202-778-8850.

    Edward R. Mackiewicz
General Counsel

# HEINONLINE

Citation:
Legislative History of the Multiemployer Pension Plan
Amendments Act of 1980 :  P.L. 96-364 : 94 Stat. 1208 :
September 26, 1980. (1980).
Provided by:
Venable Libraries

Content downloaded/printed from *HeinOnline*

Wed Jan 24 15:45:49 2018

-- Your use of this HeinOnline PDF indicates your acceptance
   of HeinOnline's Terms and Conditions of the license
   agreement available at http://heinonline.org/HOL/License

-- The search text of this PDF is generated from
   uncorrected OCR text.

 Use QR Code reader to send PDF to
your smartphone or tablet device

Case 1:18-cv-01905-CJN    Document 28    Filed 06/10/19    Page 1326 of 1367

JA 004321

of the bill, a 30-day extension was sought and finally agreed to.

I suppose it is a good thing that extension took place, since the managers of the bill have done much patchup work on it since then. Senators may not realize that this bill has been amended, altered, changed, and otherwise fiddled with no less than 335 times since it was reported out of the Labor Committee; 335 changes have been made in the bill that we almost passed 30 days ago.

This is the bill that was not even available to be put in front of Senators around the markup table in the Labor Committee. The record shows that Senator SCHWEIKER railed up and down about how silly it was to try to mark up a bill with less than one-half of it in front of him.

Yet the markup pressed on, with Senator SCHWEIKER being admonished about how hard staff had worked on the bill and about how every word had been gone over time after time and that it was nearly perfect.

Nearly perfect except for the 335 changes that staff made in it in the past 30 days, that is. And I am told they have a raft of additional amendments today.

Where do these amendments come from? Well, certainly, several of them are quite technical in nature, only changing a word here or there, or changing an "and" to an "or" and such. In fact over 300 such little improvements were suggested by no less than the Pension Benefit Guaranty Corporation, the Internal Revenue Service, and the Treasury Department.

Mr. President, I wish only to make a simple point. The U.S. Senate can ill afford to legislate in this sloppy manner. No bill for markup. No committee report. No 3-day rule for Senators to consider this legislation.

We are constantly told, "Let staff handle this." or "Staff will study this and work out the details." Well, I am very happy that we have such an able staff working on this bill. It is a shame they cannot vote for it or against it, because they are about the only ones who know what is in it. It is also too bad that staff will not be held responsible by the pensioners if this bill does not work. But we know who will be held responsible.

We acted in a similar hurry-up manner when ERISA was passed in 1974. I was in the other body at the time, but I recall well the rush Congress was in to pass a law to protect pensioners from loss of their pensions.

Well, today we are scared to death at the possibility that the legislation might actually go into effect. It is so bad, so ill conceived as far as multiemployer plans go, that enactment of that legislation would bankrupt the system.

And yet, here we go again. Fumbling half blind through a bill.

How many Senator who are not on the Labor Committee or the Finance Committee have not had a chance to even see a clean copy of this bill yet, much less a committee report.

They will be expected to vote on this bill today, too.

Mr. President, I considered offering another 30-day extension in lieu of passing this bill today, but I decided not to do that. While the bill might be improved during this extra time, it also might get loaded down with even more additions and amendments than are in it already.

We need this bill badly. Mostly because we fouled up in 1974, but we still need it badly. But we have had plenty of time to get a clean copy of the bill and we have had plenty of time to get a committee report published.

It is a bad way to do business. If business did business this way there would not be anybody in business.●

Mr. ROBERT C. BYRD. Mr. President, with the passage of the Employee's Retirement Income Security Act (ERISA) of 1974, pensions became a legal, not simply a moral obligation. As part of ERISA, Congress established an insurance program to guarantee the pension benefits of workers and retirees whose pension plans terminate, for whatever reason, without sufficient assets to pay due benefits. This insurance program would cover most private, domestic pension plans. From the beginning, Congress made the insurance mandatory for single-employer plans, while it was discretionary in the case of multiemployer plans.

Congress delayed the effective date of mandatory insurance coverage of multiemployer plans so that the effect of such terminations could be thoroughly studied. The mandatory insurance date has been delayed four times, and the issue of terminations has been comprehensively reviewed.

The legislation before the Senate today is the product of 3 years of hard work by the administration, the Congress—where it fell under the jurisdiction of four committees—and numerous private sector interest groups representing both business and labor.

The bill has reached the Senate floor only after long and complicated negotiations. It has been a difficult task to construct the rather unusually broad coalition of labor and management that now supports this legislation. I want to commend Senator WILLIAMS, chairman of the Labor and Human Resources Committee, and Senator LONG, chairman of the Finance Committee, for their leadership in guiding this complex and controversial bill through their respective committees and developing a measure that both committees support.

I also wish to express my appreciation to the distinguished Senator from New York, Mr. JAVITS, because he, along with Senator PELL, played a constructive role in reaching a compromise on the bill, and thereby expediting its passage.

The economics of multiemployer pension plans demonstrate why the bill is critical to the more than 8 million workers and retirees covered by these plans. While multiemployer pension benefits are generally modest, for many recipients they mean the difference between poverty and minimal financial security.

The most serious threat to the payment of benefits under a multiemployer pension plan is an unexpected drop in employment covered by the plan. When employment drops, a smaller base of employees is supporting an increasing number of retired workers. Therefore, a major decline in an industry—whether the result of technological change, foreign competition, or altered consumer patterns—induces plan insolvency unless employers increase their rate of contributions. When an industry substantially declines, many employers are unable to increase their contributions. ERISA prepares for such situations by using various safety nets. Thus, although all of the bill's provisions are important and necessary to strengthening private pension plans, the heart of the legislation is financial assistance for plans approaching bankruptcy, to insure that retirees continue to receive essential benefits.

COAL: THE UMWA 1950 PENSION PLAN

With regard to ERISA, we in the Congress have a particular obligation to the pensioners under the United Mine Workers of America 1950 retirement plan. When Congress extended the effective date of mandatory insurance for multiemployer pension plans in the midst of the 1977–78 contract negotiations between the United Mine Workers and the Bituminous Coal Operators Association, an already difficult situation was exacerbated. While current miners are assured of retirement benefits, those who retired under the 1950 plan are not. The extension was a major factor behind the prolonged deadlock in those contract negotiations, and, unfortunately the deadlock resulted in the suspension of pension benefits for the 1950 plan retirees.

The legislation before the Senate should promote the continuation and strengthening of the UMWA 1950 plan. As one who is deeply concerned that retirees' benefit plans remain sound and secure—particularly for the UMWA multiemployer pension plans that provide economic security for thousands of West Virginia coal miners—I want to express my appreciation to Senator BENTSEN for his tireless efforts to insure that the bill included special provisions to encourage the continuation of the 1950 plan. I want to commend my dear friend, Mr. RANDOLPH, for the leading role he played as a member of the Labor and Human Resources Committee in structuring the basic legal framework needed for the plan.

I am encouraged that both the United Mine Workers and the Bituminous Coal Operators Association have closely cooperated on this legislation. Such coordination of efforts indicates a maturing industry and union—each willing to shoulder its responsibilities to provide a stable source of energy for the Nation. Final passage of the pension reform legislation, coupled with other changes of importance to the coal industry that have recently been finalized in other legislation, should help guarantee safe and secure pensions for retired miners.

It is my hope that the 1981 and future coal contract negotiations will be more manageable now that the disruptive issue of the 1950 plan has been removed from the bargaining table. The Nation can ill afford another devisive confron-

# HEINONLINE

Citation:
Legislative History of the Multiemployer Pension Plan
Amendments Act of 1980 :  P.L. 96-364 : 94 Stat. 1208 :
September 26, 1980. (1980).
Provided by:
Venable Libraries

Content downloaded/printed from *HeinOnline*

Mon Jan 29 22:54:43 2018

-- Your use of this HeinOnline PDF indicates your acceptance
   of HeinOnline's Terms and Conditions of the license
   agreement available at http://heinonline.org/HOL/License

-- The search text of this PDF is generated from
   uncorrected OCR text.



Use QR Code reader to send PDF to
your smartphone or tablet device

Case 1:18-cv-01905-CJN    Document 28    Filed 06/10/19    Page 1328 of 1367

JA 004323

return of a contribution within 6 months after the plan administrator determines that the contribution was made by a mistake of fact or law (other than a mistake relating to whether the plan is described in section 401 (a) or the trust which is part of such plan is exempt from taxation under section 501 (a)).".

(c) The amendment made by this section shall take effect on January 1, 1975, except that in the case of contributions received by a collectively bargained plan maintained by more than one employer before the date of enactment of this Act, any determination by the plan administrator that any such contribution was made by mistake of fact or law before such date shall be deemed to have been made on such date of enactment.

SEC. 412. STUDIES BY PENSION BENEFIT GUARANTY CORPORATION AND SECRETARY OF LABOR.

(a)(1) The Pension Benefit Guaranty Corporation shall conduct a separate study with respect to—

(A) the advantages and disadvantages of establishing a graduated premium rate schedule under section 4006 of the Employee Retirement Income and Security Act of 1974 which is based on risk, and

(B) the necessity of adopting special rules in cases of union-mandated withdrawal from multiemployer pension plans.

(2) The Corporation shall report to the Congress the results of the studies conducted under paragraph (1), including its recommendations with respect thereto.

(b)(1) The Secretary of Labor shall study the feasibility of requiring collective bargaining on both the issues of contributions to, and benefits from, multiemployer plans.

(2) The Secretary shall submit a report on the study conducted under paragraph (1) to the Congress within 3 years of the date of the enactment of this Act.

SEC. 413. STUDY BY GENERAL ACCOUNTING OFFICE; HEARINGS REQUIRED.

(a)(1) The Comptroller General of the United States shall conduct a study of the effects of the amendments made by, and the provisions of, this Act on—

(A) participants, beneficiaries, employers, employee organizations, and other parties affected by this Act, and

(B) the self-sufficiency of the fund established under section 4005 of the Employee Retirement Income Security Act of 1974 with respect to benefits guaranteed under section 4022A of such Act, taking into account the financial conditions of multiemployer plans and employers.

(2)(A) The Comptroller General shall report to the Congress no later than June 30, 1985, the results of the study conducted under paragraph (1), including his recommendations with respect thereto.

(B) The report submitted under subparagraph (A) shall be made available to the public.

(b) In conducting the study under subsection (a)(1), the Comptroller General shall consult with the Committees on Finance and Labor and Human Resources of the Senate and the Committees on Education and Labor and Ways and Means of the House of Representatives.

(c) The committees described in subsection (b) shall conduct hearings on the report and recommendations submitted under subsection (a)(2).

Mr. WILLIAMS. Mr. President, I ask unanimous consent that the following staff be granted the privilege of the floor during the consideration of this measure and during all rollcall votes thereon: Steve Sacher, Gary Ford, Peter Turza, Mike Goldberg, Irene Linton, Mildred Dunmore, Susan Painter, Luther Washington, Letitia Chambers, Joan Wilson,

Denniese Medlin, Darryl Anderson, Harriet Bramble, Gerald Lindrew, and Tom Altmeyer.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. WILLIAMS. Mr. President, the legislation we are about to consider, the Multiemployer Pension Plan Amendments Act of 1980, enjoys extremely broad support. The legislation was jointly referred to the Labor and Human Resources Committee and the Finance Committee, and in each committee the vote to report the bill favorably was unanimous. In the Labor and Human Resources Committee, those voting in favor of reporting the bill, in addition to myself, included Senators RANDOLPH, PELL, KENNEDY, CRANSTON, RIEGLE, METZENBAUM, SCHWEIKER, JAVITS, HATCH, and HUMPHREY.

The bills approved by the Finance Committee and our committee were fundamentally the same.

Following the markups in our committees, we and our staffs worked together to resolve the differences between our two bills. The Labor and Human Resources Committee and the Finance Committee have now coalesced around a compromise bill, and we offer that bill jointly for consideration by the Senate.

Before discussing the pressing need for this legislation and its key provisions, I want to mention the contributions of those Members who have been so helpful in bringing this measure to fruition.

I pay special tribute to Senator JAVITS, whose dedication to the objective of pension reform and creative approach to solving problems has had a major impact on this legislation. Senator SCHWEIKER also played a vital role in producing a fair and workable bill.

Great credit is also due Senator LONG and his colleagues on the Finance Committee, especially Senator BENTSEN.

The Employee Retirement Income Security Act of 1974, known as ERISA, established a program to guarantee the payment of pension benefits under private pension plans. The Pension Benefit Guaranty Corporation was created to administer this program. When Congress passed ERISA, it deferred mandatory insurance coverage of multiemployer pension plans because we felt that not enough was known about the plans to design a fair and workable guarantee program.

The PBGC was given discretionary authority to guarantee benefits under multiemployer plans so that it could accumulate experience and expertise in dealing with multiemployer plans. However, the PBGC's experience in the past 5 years indicates that the provisions of current laws relating to multiemployer plans are not workable. Current law creates an incentive for employers to withdraw from multiemployer plans, shifting the burden of funding the plans to other employers or the PBGC.

Multiemployer plans usually cover employees working in an industry in a specific geographic area. Such plans are advantageous to employees because, unlike most single employer plans, employees retain pension credit when moving from one participating employer to another.

In addition, they usually provide benefits to employees even though their employer withdraws from the plan.

However, the decline of the industry covered by a plan can pose a serious threat to the solvency of multiemployer plans. Industry decline, whether caused by technological change, foreign competition, or changes in patterns of consumption, can cause the insolvency of a multiemployer plan just as it can cause the insolvency of employers that contribute to the plan.

There is a common belief that multiemployer plans are in serious financial trouble because the plan trustees have acted irresponsibly, or have promised excessively high benefits. This is simply not true. The PBGC made an in-depth study of multiemployer plans in 1978 and the results are instructive. The truth is that financially troubled plans do not offer high benefits—they usually offer very low benefits. Further, these troubled plans have usually not granted any benefit increases in the recent past. For example, there is one plan which offers a retirement benefit of only $30 a month—which can hardly be called excessive. Unfortunately, employment in the industry has decreased so much that employers who contribute to the plan must pay $2,500 per year for each active employee.

I think this case illustrates the nature and extent of the problems facing multiemployer plans in declining industries. Nobody is trying to avoid responsibility for funding benefits or plotting how to dump their plans onto the PBGC. The trustees have held the line on benefits, the employers are shouldering an enormous financial burden, and active workers see a large portion of the compensation package directed to a pension plan that promises very low benefits. But the parties' efforts are not enough to solve these problems.

We passed ERISA in order to encourage the growth and maintenance of private pension plans. Six years of experience demonstrates that the provisions of current law encourage plan termination. For example, employers who withdraw from a multiemployer plan more than 5 years before the plan terminates, escape any liability for unfunded benefits. But employers who remain with plans are forced to pay not only for the benefits of their own employees, but also for the retirees who worked for employers who withdrew. Obviously, the present system encourages employers to abandon a weak plan at the first sign that the industry is in trouble.

In order to carry out the policy of protecting the interests of participants and beneficiaries and encouraging the growth and maintenance of multiemployer plans, the bill makes some important changes in current law. Unavoidable insolvency will be the only insurable event, rather than plan termination. Plan termination will still be possible, but employers must continue to fund the plan.

In addition, in order to remove incentives for employers to withdraw from multiemployer plans, the bill imposes withdrawal liability on withdrawing em-

Case 1:18-cv-01905-CJN  Document 28  Filed 06/10/19  Page 1329 of 1367

JA 001324

ployers. There are special withdrawal provisions that address the specific problems of plans in the construction industry and the entertainment industry.

The bill includes a presumptive rule for determining the share of a plan's unfunded liabilities that is allocated to a withdrawn employer, but allows a plan, within limits, to adopt a different rule. The committees have also provided rules which will insure that plans treat all employers in an evenhanded fashion.

In order to balance the needs of employers and the plan, this compromise bill limits the liability of employers that are bankrupt or undergoing liquidation. Also, the compromise provides a special "deductible" rule that benefits employers whose withdrawal liability is relatively small.

As a final relief measure, the bill provides a 20-year cap on employer withdrawal liability payments. However, relief measures are not available when all the employers have abandoned the plan in a "mass withdrawal."

As I have stated, the committees wish to promote the financial health of all multiemployer plans. The bill generally requires multiemployer plans to fund benefit increases over 30 years. These are the same requirements that apply to single-employer plans. Also, the bill identifies plans that are headed for financial trouble and places them in "reorganization." These plans must satisfy tougher funding requirements designed to keep the plan solvent.

Of course, the committees realize that increased funding requirements can burden the employers. A special provision phases-in the stricter funding rules, and plans with large numbers of retirees are given a special credit against funding requirements.

All of these elements of this legislation—faster funding of benefits, a process of "reorganization" for financially troubled plans, withdrawal liability for employers that leave plans, and the change of the insurable event from plan termination to plan insolvency—are essential to the success of the program. However, the most important aspect of this legislation is that it provides a substantial guarantee of the pension benefits of American workers covered by multiemployer plans. I emphasize in this regard that the premium payments that support this guarantee are raised entirely from the pension plans that benefits from the program. No general revenues are used to finance the program.

Mr. President, the provisions of current law will automatically go into effect in the very near future, and mandatory coverage under current law will seriously injure the stability of the multiemployer pension plan system. It is therefore imperative that we enact this long overdue reform legislation before this threat becomes reality. The 8 million workers covered under multiemployer plans are entitled to an effective, workable pension insurance system.

Mr. President, Mr. JAVITS, whom I mentioned earlier, has been certainly one of the most creative forces here and one of the most productive forces behind ERISA and our response to this

situation that involves multiemployer plans. It is a pleasure to work with the Senator on these plans.

(Mr. BUMPERS assumed the chair.)

Mr. JAVITS. Mr. President, I reciprocate exactly as Senator WILLIAMS said, that our original creative partnership brought ERISA into being. I think succeeding generations will show it to be a blessing to millions upon millions of workers. It now covers some 30 million workers and the plan assets involved are estimated at close to $300 billion—a colossal investment fund. I thank him for the cooperation which he has now extended over all of these years—about 6 years, taking into consideration this bill.

I also express my appreciation to Senator BENTSEN of Texas and Senator NELSON of Wisconsin for their distinguished and invaluable cooperation as members of the Committee on Finance in respect of their jurisdiction, which is also embodied in this bill as it originally was passed and as it now comes before the Senate.

I thank Senator LONG for two things, his cooperation and participation as chairman of the Committee on Finance, and Senator DOLE for comparable cooperation as ranking member. I also thank both of them for having expressed a certain confidence in us whom I have already named to work out the finite details of this highly complex legislation.

Mr. President, also, because our staffs are so important and I would rather do this at the beginning than at the end, I express my appreciation for the work of Senator WILLIAMS' staff, Steve Sacher and Gary Ford, and of my staff, Peter Turza, and our labor counsel, Don Zimmerman, now also having an assistant in David Dunn.

We now come to the Senate, Mr. President, with a single ERISA bill, jointly approved by the Senate Labor and Human Resources Committee, chaired by Senator WILLIAMS, and by the Senate Finance Committee, chaired by Senator LONG. In connection with members of that committee, I also express my appreciation to Senator SCHWEIKER, who took my place as ranking member of the Senate Labor and Human Resources Committee, for his cooperation in bringing out this bill and for his confidence in Senator WILLIAMS and myself in respect thereof.

The bill before us, the Multiemployer Pension Plan Amendments Act, was approved by the Senate Labor Committee on March 24 and June 27 of this year and by the Committee on Finance on June 12 and July 24, and is the product of almost 3 years of hard work and close interaction among the administration, the Congress, and numerous interested groups from the private sector.

When, with Senator WILLIAMS, I developed ERISA, enacted by Congress in 1974, we realized that there was some uncertainty about the impact of title IV of the original bill, which dealt with plan termination on multiemployer plans. Because we realized what a difficult problem that was, where the liability upon a whole group of employers could, for reasons often beyond the control of any one of those employers, be imposed upon

others of the employers in a multiemployer plan, and realized that certain types of business had to have multiemployer plans—a very striking example, of course, being the building industry—we deferred the mandatory insurance coverage for this type of plan—to wit, the effective date of such coverage—until January 1, 1978. During the interim period, the Pension Benefit Guaranty Corporation (PBGC) was to use its discretion to cover terminations that occurred prior to that date.

On August 4, 1977, I announced that I had information that a number of multiemployer plans intended to terminate on or about January 1, 1978, thereby shifting possibly hundreds of millions of dollars of liability to the PBGC insurance system. On that day, I introduced S. 2019 which would have postponed the mandatory coverage date for 1 year until January 1, 1979. The legislation which was eventually enacted in late 1977 (Public Law 95–214) delayed the effective date until July 1, 1979 (see Oversight of ERISA, 1977: Hearings on S. 2125 before the Subcommittee on Labor of the Senate Human Resources Committee, 95th Cong., 1st sess. (1977) ). It also directed the PBGC to prepare a comprehensive study of multiemployer plan termination insurance by July 1, 1978.

The PBGC engaged in a full-scale reappraisal of title IV's applicability to multiemployer plans and after extensive discussions and interaction with interested parties across the country, issued a report on July 1, 1978 containing new ideas and options for redesigning the multiemployer plan termination insurance program. On that date, the PBGC also released a status report on contingent employer liability insurance.

On February 27, 1979, the PBGC issued legislative policy recommendations for consideration by the Congress. These recommendations were later embodied in Senate legislative text on May 3, 1979, when, at the request of the administration, Senators WILLIAMS, LONG, and I introduced S. 1076 (H.R. 3904). Hearings on this administration bill were held by the Senate Labor Committee on June 26 and 27, 1979 (see Multiemployer Pension Plan Amendments Act of 1979: Hearings on S. 1076 before the Senate Committee on Labor and Human Resources, 96th Cong., 1st sess. (1979) ). In order to give the Congress additional time to study and shape the legislation, H.R. 3915 was enacted to delay the mandatory coverage date from July 1, 1979 to May 1, 1980. Two additional delay bills were subsequently enacted.

Then began our effort to deal with the problem which I have already described.

We had a first text of what we are now trying to do on May 3, 1979, when Senator WILLIAMS, Senator LONG, and I introduced S. 1076, which is the precursor of the bill which is before us today.

Subsequently, there were extensions of the time within which insurance would be applicable up to and including July 31, 1980, hence the urgency of our consideration of this measure becomes significant.

Now, it has been properly said that this is a very complicated bill and, in-

JA 001325

96th Congress }
2d Session }
COMMITTEE PRINT

# S. 1076

# THE MULTIEMPLOYER PENSION PLAN AMENDMENTS ACT OF 1980:

## SUMMARY AND ANALYSIS OF CONSIDERATION

PREPARED BY THE

COMMITTEE ON LABOR AND
HUMAN RESOURCES
UNITED STATES SENATE



APRIL 1980

Printed for the use of the
Committee on Labor and Human Resources

U.S. GOVERNMENT PRINTING OFFICE
61-181 O          WASHINGTON : 1980

action that is reasonable in light of the circumstances of the transaction. An abusive reduction in the contribution base occurring a considerable period of time after the transaction should not escape operation of the rule, but neither should an unavoidable reduction occurring a shorter period of time after the transaction result in liability if the plan is not significantly harmed.

(e) *De Minimis Rule (proposed ERISA section 4201(d))*.—The bill includes a de minimis rule that forgives withdrawal or partial withdrawal liability that is less than a prescribed amount. The purpose of the de minimis rule is to provide relief to smaller employers where the amount forgiven is quite small relative to the total unfunded benefit obligations of the plan.

The de minimis rule under the bill provides that an employer that withdraws or partially withdraws is not liable to the plan if the liability it would otherwise have had is less than the greater of $25,000, or 0.75 percent of the plan's unfunded benefit obligations up to $200,000. Generally, the plan is authorized to reduce or eliminate the de minimis rule or to increase the $25,000 figure as high as $100,-000. However, the bill mandates a de minimis rule in the case of a withdrawal due to the death of a sole proprietor. In this case, there is no withdrawal liability if the amount of liability that would otherwise be owed is less than the lesser of $25,000 or 0.75 percent of the plan's unfunded benefit obligations or, even if this rule is not satisfied, if there would be no liability under another de minimis rule applicable to the withdrawal, for instance a plan de minimis rule of general applicability.

The Committee notes that the de minimis rule does not operate to forgive any liability if the total amount of liability exceeds the de minimis amount. For example, if the de minimis amount for a withdrawal from a plan is $25,000 and an employer's liability is calculated as $27,000, the employer owes the full $27,000 in withdrawal liability to the plan.

(f) *"Free Look" Rule (proposed ERISA section 4201(d))*.—The Committee has provided a rule designed to make it easier for multiemployer plans to attract new employers. Under this rule, when several conditions are satisfied, an employer may leave a multiemployer plan after a specified period, roughly two bargaining cycles, without incurring withdrawal or partial withdrawal liability. The applicable conditions are:

1. the employer was first obligated to make plan contributions after the date of enactment of the bill;

2. the employer was not required to make plan contributions for more than the lesser of six consecutive plan years preceding the date of withdrawal or the number of years required for vesting under the plan;

3. for each plan year for which contributions by the employer were required, the required contributions were less than 2 percent of all employer contributions to the plan for the plan year; and

4. the employer did not previously have the benefit of this exception with respect to the plan.

In addition, the exception would apply only if the plan is amended to provide for its application, the plan provides that benefits of participants accrued on the basis of service before the employer was required to contribute to the plan will not be payable if the employer ceases contributions to the plan, and the ratio of plan assets to benefit payments during the plan year preceding the first plan year for which the employer was required to make plan contributions was at least 8 to 1.

Neither the "free look" rule nor the de minimis rule applies in the case of a mass withdrawal from the multiemployer plan, as defined by the bill. In addition, neither rule applies in the case of withdrawal from certain plans in the coal industry unless the plan has been amended to provide that one or both of the rules apply.

(g) *Amount and Payment of Withdrawal Liability (proposed ERISA sections 4201(e)–(g), (i))*.—Sections 4201(e), (f) and (g) prescribe rules for determining the gross amount of an employer's withdrawal liability, and section 4201(i) prescribes the amount and duration of an employer's periodic liability payments. In effect, because section 4201(i) provides that the maximum annual payment is equal to the employer's average contribution over the last 5 years and that liability payments shall be made over no more than 20 years, it acts as a ceiling on the amount of liability that an employer owes. The Committee believes that the 20-year cap on periodic payments does not appreciably reduce the protection afforded the insurance system, participants and other employers. It supports the combination of the 20-year cap with a periodic payment based on past contributions as a way of making both the maximum amount of liability and the annual amount required to be paid toward that liability easily predictable by employers.

Section 4201(e) prescribes the general presumptive rule for determining an employer's gross withdrawal liability. The rule is "presumptive" in the sense that a plan is generally permitted to adopt a different rule in accordance with section 4201(f), but the presumptive rule applies unless and until the plan elects another rule. The key feature of the presumptive rule is that it would not impose on an employer that was not a contributor to the plan in plan years ending before February 28, 1979, any liability for benefit obligations for those plan years ending before February 28, 1979. A "new employer would be liable only for a share of the changes in the plan's unfunded benefit obligations during the years that it contributed to the plan. The Committee includes this rule to help multiemployer plans attract new employers. In addition, these earlier liabilities are "written down" at a rate of 5 percent each plan year ending on or after February 28, 1979. This reduction approximates the rate at which a typical plan is actually funding these liabilities and gives credit to employers that remain with the plan for their contributions towards those liabilities.

The bill prescribes alternative allocation methods that a plan may adopt in lieu of the presumptive method. The first alternative, described in section 4201(g)(2), is similar to the presumptive rule. However, unlike the presumptive rule, a newly entering employer's withdrawal liability would be based on the aggregate change in unfunded benefit obligations with respect to all plan years ending

on or after February 28, 1979, not just on the change in unfunded benefit obligations in plan years for which an employer was required to contribute to the plan.

Under both the presumptive rule and the first alternative, a particular employer's share of the plan's liabilities in the years for which that employer is responsible is proportional to the employer's share of total contributions to the plan during a specified period.

The second alternative method makes no distinction between pre- and post-effective date liabilities. A withdrawing employer is responsible for a share of the total unfunded benefit obligations in the plan as of the end of the plan year in which the employer withdraws. The second alternative, like the preceding methods, determines a particular employer's share of liabilities based upon its share of contributions to the plan. At the request of both management and labor in the coal industry, this method is the presumptive method for certain plans in that industry.

The third alternative is significantly different. Rather than determining withdrawal liability based upon the amount of or change in total unfunded benefit obligations and an employer's share of plan contributions during a specified period, the method bases withdrawal liability upon the portion of the plan's unfunded benefit obligations that is actually attributable to service of plan participants with the employer. In addition, a share of the plan's unfunded benefit obligations that are not attributable to any present employer is also allocated to the employer. An employer's withdrawal liability would then be determined as the sum of the portion of the plan's unfunded benefit obligations that is attributable to a plan participant's service with the employer and the portion of "unattributable obligations" that is allocated to the employer.

The bill authorizes the PBGC to prescribe by regulation a procedure by which a plan may adopt other methods for determining withdrawal liability, subject to approval by the PBGC. The PBGC, before approving any such method, would be required to determine that the method would not significantly increase the risk of loss to the PBGC. In addition, the PBGC would be authorized to prescribe standard approaches for alternative methods for which approval would either not be necessary or would be necessary only under a modified procedure. Any such alternative method would be required to allocate to employers all of the plan's unfunded benefit obligations.

In determining an employer's withdrawal liability under any prescribed method, if the method specifies the use of a five-year period in the numerator or denominator of a fraction, the plan could provide instead for the use of a period of more than five, but not more than ten plan years, unless PBGC regulations provide otherwise.

Under section 4201(h)(1) of the bill, an employer is relieved of withdrawal liability to the extent that unfunded benefit obligations are transferred out of the plan incidental to the employer's withdrawal and the employer continues to have an obligation to fund those benefits.

Also, the bill would provide that in the event that all employers withdraw from a terminated insolvent plan that would have been eligible for an overburden funding credit in the plan year

In order to shield employers who continue contributing to insolvent plans from ever-increasing funding requirements because of a declining contribution base, section 4243(e) provides that for plan years after the expiration of all relevant collective bargaining agreements in effect when the plan became insolvent, the valuation contribution base is the current contribution base for the plan year preceding the first year in which the plan is insolvent. This definitional change is operative through section 4243(b)(1) and permits an insolvent plan to keep the same valuation contribution base throughout its insolvency. Assuming the plan's actual contribution base continues to decline, the fractional reduction in the minimum contribution requirement pursuant to section 4243(b)(1) will increase annually so that the insolvent plan's funding relief grows annually. This provision is intended to prevent funding increases resulting from contribution base declines but is not intended to prevent increases resulting from experience or actuarial losses.

The bill would also provide a "safe harbor" under which plans receiving a minimum level of employer contributions for a plan year would be deemed to have met the minimum contribution requirements. The minimum level would be reached where the rate of employer contributions is equal to the sum of (1) the rate that would apply in the absence of the minimum contributions requirement and (2) five percent of the rate in clause (1) multiplied by the number of years that the plan is in reorganization. However, the safe harbor would generally not apply to a plan if a plan amendment adopted after the date of enactment of the reorganization funding requirement increases benefits with respect to service prior to the date the amendment is adopted.

At the request of both management and labor in the coal industry, the Committee has included a special provision applicable to the 1950 United Mine Workers Pension Plan ("1950 Plan"). Under the provision, employers in that plan have the benefit of the "safe harbor" rule whether or not benefits are increased, as long as when an increase is effective, the plan's funding complies with a special funding standard that substantially exceeds even the minimum contribution requirement.

The 1950 Plan is composed solely of retirees and inactive separated participants, has a strong contribution base, and will be fully funded by 1986 at current funding levels. Under these circumstances, it is desirable to permit a benefit increase without removing the protection afforded against unanticipated declines in the contribution base. The exception made in this case should not increase the risk of loss to the PBGC or participants with respect to the 1950 Plan.

In order for the 1950 Plan to qualify for the safe-harbor rule when benefits are increased, several conditions must be met. The amortization schedule for existing benefits must be maintained. This would require completion of the funding for 1974 benefit levels by 1986 and for the July 1978 benefit improvements by 1990. In addition, the funding level for any benefit increase must be set so that funding is projected to be completed in no more than 12 years, or if less, the average number of years remaining in the expected lives of persons receiving benefits.

32

Finally, in any year following the benefit increase, the contribution rate must be increased at least five percent, or, if less, the amount necessary to maintain the required accelerated funding schedules. If benefits are increased after 1986 and the liabilities for the 1974 benefit levels have not been fully funded, the employers will lose the safe-harbor rule. The Committee notes that in order to continue to qualify for the safe-harbor, whenever benefits are increased, the amortization schedules that apply to prior benefit levels must be fully satisfied and the funding completed within the allotted period.

(f) *Adjustments in Accrued Benefits (Bill section 104; proposed ERISA section 4244)*.—With very limited exceptions, plan amendments are not permitted under present law to reduce benefits already accrued by an employee. However, in the case of a multiemployer plan in reorganization, the bill would permit plan amendments to reduce accrued benefits attributable to employer contributions under certain circumstances. The accrued benefits that are subject to reduction are those which are not eligible for guarantee by the PBGC because they have not met the "five-year" requirement of section 4022A (b).

The Committee views the authority under section 4244 to reduce or eliminate certain accrued benefits as a special, limited waiver of ERISA's general prohibition against accrued benefit reductions. The only benefit reductions authorized by this section are those contained in plan amendments. The Committee wishes to emphasize that benefit reductions under this section are optional and not required. The responsible parties may determine that if benefit cuts are necessary, benefits should not be reduced as far as the law permits or that benefits should be reduced in steps rather than all at once. The Committee intends that any benefit reduction under this section that does not comply fully with the preconditions established under this section is void.

The conditions which must be met in order for a plan's accrued benefits to be reduced are as follows:

(1) a six month notice must be given to plan participants and beneficiaries, contributing employers, and affected employee organizations communicating certain information about the implications of reorganization;

(2) under Treasury Department regulations—

(i) accrued benefits of inactive participants may not be reduced to a greater extent proportionally than accrued benefits overall are reduced;

(ii) benefits under the plan attributable to employer contributions other than accrued benefits (such as death benefits or health benefits) and the rate of future benefit accruals must be decreased at least as much as accrued benefits of inactive participants are decreased; and

(iii) if the reduction in accrued benefits takes the form of a change in the mode of benefit or the requirements for benefit entitlements, the reduction may not affect benefits in pay status on the effective date of the amendment or benefits of any participants who has reached, or is within five years of, normal retirement age on the effective date of the amendment.

118

*(G) The corporation may prescribe by regulation other methods which a plan may adopt for allocating assets to determine the employer's withdrawal liability for unfunded benefit obligations attributable to service with the employer and to determine the employer's share of unfunded benefit obligations not attributable to service with employers who have an obligation to contribute under the plan in the plan year in which the employer withdraws.*

*(5)(A) The corporation shall prescribe by regulation a procedure by which a plan may, by amendment, adopt any other alternative method for determining an employer's liability under this section, subject to the approval of the corporation based on its determination that adoption of the method by the plan would not significantly increase the risk of loss to plan participants and beneficiaries or to the corporation.*

*(B) The corporation may prescribe by regulation standard approaches for alternative methods, other than those set forth in the preceding paragraphs of this subsection, which a plan may adopt under subparagraph (A), for which the corporation may waive or modify the approval requirements of subparagraph (A). Any alternative method shall provide for the allocation of all of a plan's unfunded benefit obligations among employers who have an obligation to contribute under the plan.*

*(C) Unless the corporation by regulation provides otherwise, a plan may be amended to provide that a period of more than 5 but not more than 10 plan years may be used for determining the numerator and denominator of any fraction which is used under any method authorized under this section for determining an employer's liability under this section.*

*(g)(1) The method of calculating withdrawal liability set forth in subsection (f)(3) shall be the method for calculating withdrawal liability under a plan to which section 404(c) of the Internal Revenue Code of 1954 applies, or a continuation of such a plan, unless the plan is amended to adopt another method authorized under subsection (e) or (f).*

*(2) Subsection (d) shall not apply with respect to the withdrawal of an employer from a plan described in paragraph (1) unless the plan is amended to provide that subsection (d) applies.*

*(h)(1) In the case of a transfer of liabilities to another plan maintained by a withdrawing employer incident to the employer's withdrawal or partial withdrawal, the withdrawing employer's liability under this section shall be reduced in an amount equal to the actuarial present value, as of the end of the last plan year ending on or before the date of the withdrawal, of the transferred unfunded, benefit obligations.*

*(2) In the case of a withdrawal following a merger of multiemployer plans, subsection (c), (f), or (g), whichever is applicable shall be applied in accordance with regulations prescribed by the corporation, except that, if a withdrawal occurs in the first plan year beginning after a merger of multiemployer plans, liability under this section shall be determined as if each of the multiemployer plans had remained separate plans.*

*(3)(A) For purposes of determining the liability of an employer for a full withdrawal from a plan that terminates while insolvent*

"(B) The corporation may prescribe by regulation standard approaches for alternative methods, other than those set forth in the preceding paragraphs of this subsection, which a plan may adopt under subparagraph (A), for which the corporation may waive or modify the approval requirements of subparagraph (A). Any alternative method shall provide for the allocation of all of a plan's unfunded benefit obligations among employers who have an obligation to contribute under the plan.

"(C) Unless the corporation by regulation provides otherwise, a plan may be amended to provide that a period of more than 5 but not more than 10 plan years may be used for determining the numerator and denominator of any fraction which is used under any method authorized under this section for determining an employer's liability under this section.

"(g)(1) The method of calculating withdrawal liability set forth in subsection (f)(3) shall be the method for calculating withdrawal liability under a plan to which section 404(c) of the Internal Revenue Code of 1954 applies, or a continuation of such a plan, unless the plan is amended to adopt another method authorized under subsection (e) or (f).

"(2) Subsection (d) shall not apply with respect to the withdrawal of an employer from a plan described in paragraph (1) unless the plan is amended to provide that subsection (d) applies.

"(h)(1) In the case of a transfer of liabilities to another plan maintained by a withdrawing employer incident to the employer's withdrawal or partial withdrawal, the withdrawing employer's liability under this section shall be reduced in an amount equal to the actuarial present value, as of the end of the last plan year ending on or before the date of the withdrawal, of the transferred unfunded benefit obligations.

"(2) In the case of a withdrawal following a merger of multiemployer plans, subsection (e), (f), or (g), whichever is applicable, shall be applied in accordance with regulations prescribed by the corporation, except that if a withdrawal occurs in the first plan year beginning after a merger of multiemployer plans, liability under this section shall be determined as if each of the multi-employer plans had remained separate plans.

"(3)(A) For purposes of determining the liability of an employer for a full withdrawal from a plan that terminates while insolvent under section 4245, the plan's unfunded benefit obligations shall be reduced by an amount equal to the sum of all overburden credits applied in determining the plan's accumulated funding deficiency for all plan years perceding the first plan year in which the plan is insolvent, plus interest thereon.

"(B) The provisions of this paragraph apply only if—

"(i) the plan would have been eligible for the overburden funding credit in the plan year commencing immediately prior to the date of enactment of the Multiemployer Pension Plan Amendments Act of 1980 had section 4243 been effective in that plan year, and

"(ii) the corporation determines that the reduction of unfunded benefit obligations under subparagraph (A) would not significantly increase the risk of loss to the corporation."

# HEINONLINE

Citation:
Legislative History of the Multiemployer Pension Plan
Amendments Act of 1980 :  P.L. 96-364 : 94 Stat. 1208 :
September 26, 1980. (1980).

Content downloaded/printed from *HeinOnline*

Thu Jun  6 06:56:35 2019

-- Your use of this HeinOnline PDF indicates your
 acceptance of HeinOnline's Terms and Conditions
 of the license agreement available at
 https://heinonline.org/HOL/License

-- The search text of this PDF is generated from
  uncorrected OCR text.



Use QR Code reader to send PDF
to your smartphone or tablet device

JA 001334





## Review of Operations

The 18 months between July 1977 and December 1978 saw the longest coal strike in the nation's history. The strike began on December 6, 1977, with the expiration of the 1974 coal wage agreements, and ended nearly four months later with the signing of agreements that substantively redefined the Funds' role.

The National Bituminous Coal Wage Agreement, which settled the strike, was signed on March 27, 1978. The National Coal Mine Construction Agreement was signed on April 6, 1978. While these two agreements maintained the pension plans established by the 1974 agreements, they shifted administration of the health plan covering the largest number of mining families from the Funds to individual companies. The employers who had been signatory to the 1974 Western Surface Coal Wage Agreement signed separate agreements in December 1977 providing for both pension and health plans administered by individual companies. The provisions of the agreements as they affect the four trust funds which comprise the UMWA Health and Retirement Funds are the focus of this report.

The 1978 wage agreements have resulted in a substantial reduction in the Funds' beneficiary population. Of the four trust funds, the 1974 Benefit Trust has experienced the most fundamental change. Upon expiration of the 1974 agreements it was the largest trust, with 600,000 beneficiaries. The 1974 Benefit Trust now covers approximately 1,000 persons, making it the smallest trust fund.

The change in the 1974 Benefit Trust's beneficiary population reflects the provisions of the 1978 wage agreements. The construction and coal wage agreements stipulate that active mine workers and their dependents are to receive health and death benefits through insurance plans administered by their employers. Retired mine workers covered by the 1974 Pension Plan, and their survivors and dependents, also receive health and death benefits through company-administered plans; these benefits are provided by the last company signatory to a UMWA contract which employed the mine worker in a classified job.

The only miners currently eligible for coverage by the 1974 Benefit Plan are those who are retired (under the 1974 Pension Plan) or disabled and last worked in classified jobs for signatory companies which are no longer in business. Eligible survivors and dependents of these miners are also covered by the 1974 Benefit Plan. If a company is no longer in business—but has a legal successor that is signatory to a UMWA wage agreement—the successor is responsible for providing benefits for the mine workers and any eligible dependents.

From March 27, 1978 through May 31, 1978, the 1974 Benefit Plan continued to cover certain active mine workers. Eligible present and past employees of companies signatory to the 1978 wage agreements which opted to establish their own health and life insurance plans immediately ceased to be beneficiaries of the 1974 Benefit Plan on March 27, 1978. Eligible employees of companies which instead opted to have their health and life insurance plans go into effect on June 1, 1978 remained beneficiaries of the 1974 Benefit Plan during the interim lasting through May 31, 1978; eligible dependents and survivors of present and past employees of these companies also remained beneficiaries of the 1974 Benefit Plan during this interim period. By June 1, 1978, however, all companies signatory to the 1978 wage agreements had instituted health and life insurance plans of their own.

The new agreements also increased the royalties from which most income is derived for three of the four trust funds. Contribution rates continue to be based on a combination of tonnage mined and man-hours worked. Under the 1978 coal wage agreements, signatory employers contribute to the 1950 Pension Trust 95¢ for every ton of coal mined, as compared to 55.4¢ per ton and 7¢ per hour worked when the 1974 agreements expired. The 1950 Benefit Trust now receives 35¢ per ton, as compared to 19¢ per ton and 3¢ per hour worked under the 1974 agreements. The 1974 Pension Trust is paid 75¢ per hour worked and 8.5¢ per ton, in contrast to the 66¢ per hour worked and 7.6¢ per ton it received upon expiration of the 1974 agreements.

The 1978 wage agreements specify that signatory employers are to contribute 2¢ per man-hour worked to the 1974 Benefit Trust. This trust received 78¢ per hour under the 1974 agreements. The decreased royalty rate reflects the signatory employers' direct assumption of the responsibility of providing health and death benefits to the majority of the beneficiaries previously covered through the 1974 Benefit Trust. (Signatory companies which opted to establish health and life insurance plans effective June 1, 1978 were required to pay 102.5¢ per hour worked from March 27 through April 26, and 88¢ per hour worked from April 27 through May 31.)

Another notable aspect of the 1978 agreements is the guarantee that pension, health and death benefits will remain fixed throughout the three-year term of the agreements.

### Events Preceding Signing of the 1978 Wage Agreements

The period between July 1977 and March 1978 was one of financial difficulty for three of the four trust funds. The Funds projected that if the level of health benefits were to be maintained, the 1950 Benefit Trust would have a cash flow deficit of $10.2 million by the time the 1974 agreements expired on December 6, 1977.

Under prior agreements, the health benefit plans directed the Funds' trustees to suspend or reduce benefits to levels which, in their judgment, could be paid from the trusts' assets in the event the assets became insufficient to maintain the level of benefits. In keeping with this provision, cost-sharing measures were introduced on July 1, 1977. These measures applied to benefits provided by both the 1950 Benefit Trust and the 1974 Benefit Trust.

While the cost-sharing program was in effect, beneficiaries of both the 1950 Benefit Plan and the 1974 Benefit Plan were required to pay the first $250 of bills for stays in inpatient facilities, plus 40 percent of bills for professional services, up to a maximum of $500 per family. To assure equitable treatment of all classes of beneficiaries, all payments made by the Funds during the cost-sharing period were on a fee-for-service basis. Previously, about half of all outpatient services were furnished by providers with whom the Funds had made prepayment arrangements.

Meanwhile, the 1950 Pension Plan was in an increasingly precarious financial position. The 1950 Pension Trust exhausted its reserves by mid-summer of 1977, making it necessary for the Funds to secure a bridge loan to cover pension payments made on September 1, 1977. This loan was repaid as soon as the employers' contributions for August production were received by the Funds in mid-September. The remaining revenue, $11.5 million, was $8 million short of the amount needed to pay pensions in October. Therefore, a second short-term loan was secured.

In late November, the trustees officially advised the United Mine Workers of America, the Bituminous Coal Operators' Association and all beneficiaries of the 1950 Benefit Plan and the 1974 Benefit Plan that the Funds could not pay for any health care received on or after December 6, 1977 in the event of a strike. The trustees also advised beneficiaries of the 1950 Pension Plan that if coal production ceased on December 6, the trust might not have the assets to pay all or even part of January pensions.

Throughout the summer and fall, the Funds took steps to curtail administrative expenditures. Six satellite field offices were closed at the end of the summer, resulting in a $250,000 annual saving. A hiring freeze was instituted in early fall. All but essential purchases of supplies and printing were postponed, as was travel among Funds offices. Telephone use by Funds personnel was restricted.

The signing of the new western agreements in December prompted the closing of three additional Funds offices in Denver, Colorado; Price, Utah; and Raton, New Mexico. This move on the part of the Funds reflected the fact that employees of the western surface operators would thereafter receive health and pension benefits through plans administered by the companies.

As deliberations continued between the coal operators and the UMWA, the financial situation of the Funds worsened. All health benefits were suspended on the day the strike started. January pension checks were mailed to 80,600 beneficiaries of the 1950 Pension Plan; this proved to be the last payment made until April. The 1950 Benefit Trust missed death benefit payments for 7,100 beneficiaries. The 1974 Pension Trust continued to have the means to meet all payments. The 6,500 beneficiaries of the 1974 Pension Plan received full pensions throughout the strike.

In late February, it was announced that as of March 1, 1978, the Medicare Bureau would terminate the arrangement which had permitted the Funds to reimburse health care providers directly for services covered by Part B of Medicare. Since 1966, the Funds had been designated a Group Practice Prepayment Plan (GPPP) under Medicare, an arrangement which had enabled Funds beneficiaries to avoid dealing directly with the Medicare system.

JA 001338





JA 001340

### Provisions of the 1978 Wage Agreements

The signing of the new coal wage agreements enabled the Funds to resume providing health and death benefits and, with the assistance of companies belonging to the Bituminous Coal Operators' Association, to secure a $49 million loan used to make up the February, March and April payments missed by the 1950 Pension Plan. The negotiations which resulted in new agreements also resulted in amendments to the documents specifying the Funds' responsibilities with regard to pension and health benefits; these documents specify precisely what benefits are to be provided by the Funds and to whom they are to be provided. The following is a summary of the major changes incorporated in the amended plan documents.

● **Health benefits.** The Funds now administer a health program covering approximately 210,000 persons: 1,000 of these persons are covered by the 1974 Benefit Plan; the remainder are beneficiaries of the 1950 Benefit Plan.

Both the 1950 Benefit Plan and the 1974 Benefit Plan are defined benefit plans. The plan documents spell out that the purpose of the plans is to provide the benefits defined in the documents. The benefits defined in the amended 1950 Benefit Plan are identical to those defined in the amended 1974 Benefit Plan. The 1978 wage agreements stipulate that the benefits defined in the plan documents are guaranteed for the three-year contract period.

The amended plan documents require co-payments on the part of Funds beneficiaries. A $5 co-payment is required for all visits to physicians for medical care, up to an annual maximum of $100 per family. A $5 co-payment is also required for each 30-day supply of a prescription drug, up to an annual maximum of $50 per family. There are three co-payment years during the term of the 1978 coal wage agreements: the first begins March 27, 1978 and ends March 26, 1979; the second begins March 27, 1979 and ends March 26, 1980; the third begins March 27, 1980 and ends March 26, 1981.

Participating lists specifying which health care providers are authorized to provide service to Funds beneficiaries have been

eliminated. As amended, the plan documents specify that beneficiaries may go to any hospital accredited by the Joint Commission on Accreditation of Hospitals or to any non-accredited hospital approved by the Funds' trustees. Prescription drugs may be obtained at any drug store, and medical care may be furnished by any licensed physician. In some instances, medical care may be provided by other appropriately trained and licensed health care professionals working under physicians' supervision.

In two respects, the amended plan documents broaden medical coverage. Beneficiaries may now receive benefits up to specified levels for routine vision care examinations, eyeglasses and contact lenses once every two years. In addition, benefits are now provided for Federal legend drugs prescribed for treatment of acute illnesses; formerly, only drugs prescribed for treatment of specified chronic conditions were covered.

● **Death benefits.** The 1978 wage agreements stipulate that active and retired mine workers whose health benefits are provided

through employer-administered plans also receive life insurance benefits through employer plans. The Funds provide death benefits only upon the death of pensioners eligible for health benefits under the provisions of either the 1950 Benefit Plan or the 1974 Benefit Plan.

Death benefits for Funds beneficiaries are $2,500 for survivors of pensioners, and $2,000 payable to the estates of pensioners who are not survived by any eligible dependents. The method of paying death benefits has been changed. Previously, they were paid in installments; they are now paid as lump sums.

● **Pension benefits.** The provisions of the 1950 Pension Plan and the 1974 Pension Plan were improved by the 1978 wage agreements.

Under the 1950 Pension Plan, retirement pensions were increased from a maximum of $250 to a maximum of $275, effective April 1, 1978. Mine workers who receive disability pensions under the 1950 Pension Plan will, over the term of the 1978 agreements, have their benefits increased from $125 to $137.50 per month.

| Comparison of Benefits for Funds Beneficiaries | | |
|---|---|---|
| | 1977 | 1978 through term of agreements |
| 1950 Pension Plan pensions | up to $250 | up to $275 |
| 1974 Pension Plan pensions | up to $530 with 40 years of service at age 62 | up to $570 with 40 years of service at age 62 |
| 1950 Pension Plan disability pensions, and 1974 Pension Plan minimum disability pensions | $125 | up to $137.50 for those who retired before March 27, 1978; up to $135 for those who retired on or after March 27, 1978 |
| Pensions for surviving spouses of eligible 1974 Plan pensioners | 50 percent of mine workers' pensions | same |
| Death benefits for dependent survivors of pensioners | $2,500 paid in installments | $2,500 paid in lump sum |
| Vision care program | eye exams and coverage of corrective lenses only after cataract surgery | routine eye exams and coverage of corrective lenses |
| Prescription drug benefits for acute illnesses | none | full coverage |

JA 001341

486

## Reorganization of the Funds







JA 001343





JA 001344



United Mine Workers of America 1950 Pension Trust

| Statements of Net Assets (Deficiency) Available for Plan Benefits | June 30, 1978 | June 30, 1977 |
|---|---|---|
| **Assets** | | |
| Investments and cash (Note 2) | | |
| Cash, primarily interest-bearing accounts in 1977 | $      67,000 | $   5,802,000 |
| Short-term investments at cost plus interest earned | 20,420,000 | 16,282,000 |
| | 20,487,000 | 22,084,000 |
| Receivables | | |
| Accrued contributions from signatory employers | 30,978,000 | 23,531,000 |
| For investments sold | | 3,053,000 |
| Accrued interest and dividends | | 80,000 |
| Furniture and equipment at cost less accumulated depreciation of $534,000 in 1977 (Note 7) | | 527,000 |
| Other assets | | 3,000 |
| | 51,465,000 | 49,278,000 |
| **Liabilities** | | |
| Bank loan (Note 4) | 48,965,000 | |
| Bank drafts | 22,029,000 | 19,917,000 |
| Due to other Trusts | 1,550,000 | 375,000 |
| Medicare Part "B" arrangement (Note 5) | | 438,000 |
| Accounts payable and accrued expenses | 677,000 | 671,000 |
| Pension benefits approved but not paid | 649,000 | 1,031,000 |
| | 73,870,000 | 22,432,000 |
| Commitments and contingencies (Note 6) | | |
| **Net assets (deficiency) available for plan benefits** | $ (22,405,000) | $  26,846,000 |

| Statements of Operations and Changes in Net Assets | Year Ended June 30, 1978 | Year Ended June 30, 1977 |
|---|---|---|
| **Revenue** | | |
| Contributions from signatory employers (Note 3) | $190,195,000 | $229,332,000 |
| Interest and dividend income | 706,000 | 1,142,000 |
| Other | 61,000 | |
| | 190,962,000 | 230,474,000 |
| **Expenses** | | |
| Benefits | | |
| Medical care (Note 5) | | 176,000 |
| Pensions | 237,048,000 | 233,203,000 |
| Administration (Note 2) | 3,165,000 | 3,566,000 |
| | 240,213,000 | 236,945,000 |
| Excess of expenses over revenue | (49,251,000) | (6,471,000) |
| Net realized and unrealized depreciation of investments | | (1,172,000) |
| Pension and other benefits applicable to prior years paid as a result of settlement of litigation (Note 6) | | (103,000) |
| Decrease in net assets | (49,251,000) | (7,746,000) |
| **Net assets (deficiency) available for plan benefits** | | |
| Beginning of year | 26,846,000 | 34,592,000 |
| End of year | $ (22,405,000) | $  26,846,000 |

JA 001346

**Notes to Financial Statements for the 1950 Pension Trust June 30, 1978 and 1977**

**1.
The 1950 Pension Trust**

The 1950 Pension Trust ("Trust") is an irrevocable trust established by the National Bituminous Coal Wage Agreement of 1974 ("1974 Agreement"), which became effective December 6, 1974. Pursuant to that Agreement, the National Bituminous Coal Wage Agreement of 1978 and the National Coal Mine Construction Agreement of 1978, the Trust provides pension benefits to eligible individuals retiring before January 1, 1976.

As of June 30, 1977 (the most recent data available), the present value of benefits payable in the future was computed at approximately $1,800,000,000 by actuaries for the Trust. Such benefits are primarily funded by contributions of employers signatory to the Agreements which are based on negotiated amounts per hour worked by employees, per ton of bituminous coal produced for use or sale, and per ton of coal which such employers acquire from other operators on which contributions have not been made (see Note 3). These Agreements are subject to expiration on or after March 27, 1981. Accordingly, the extent of future contributions is dependent on the continuation of such Agreements or the periodic negotiation of new agreements. Future contributions are also dependent upon any applicable requirements of Federal law.

Upon the complete discontinuance of contributions to the Trust, the Trust shall remain in effect for the period necessary to complete the payment of benefits in accordance with the terms of this Trust to the extent assets in the 1950 Pension Trust are available to pay such benefits and subject to any applicable requirements of Federal law concerning employer liability. The signatory employers have guaranteed the benefits provided by the 1950 Pension Trust during the term of the present coal wage Agreements.

The Trust is exempt from Federal income tax under Section 501(a) of the Internal Revenue Code.

**2.
Significant Accounting Policies**

The Trust is charged for administrative services provided to it and other irrevocable trusts established pursuant to the 1974 and 1978 Agreements. Administrative expenses applicable solely to the Trust have been directly charged. Other administrative expenses are allocated to each trust in accordance with a formula.

Marketable investments are recorded at market value; unrealized gains or losses on such investments are included in operations of each period. Short-term investments are recorded at cost plus interest earned which approximates market value.

**3.
Reallocation of Contributions from Signatory Employers**

On October 5, 1976, the settlors of the 1974 Agreement authorized a reallocation of the total contributions specified in the 1974 Agreement. The effect of the reallocation amounted to an approximate $7,006,000 and $31,964,000 increase in contributions to the Trust during fiscal years 1978 and 1977, respectively.

**4.
Bank Loan**

On April 12, 1978, the Trust obtained a demand loan with interest payable monthly at a rate of 110 percent of prime (prime at June 30, 1978 was 9.0 percent). On November 28, 1978, the Trust converted the balance outstanding at that time of $33,965,000 into a term loan, payable in 18 equal monthly installments beginning April 30, 1979. The loan is secured by the guarantee of certain signatory companies.

**5.
Medicare Part "B" Arrangement**

The 1950 Fund paid for the medical costs of its beneficiaries who were eligible for health insurance under Part "B" of Supplemental Medical Insurance Benefits for the Aged prior to December 6, 1974 and is entitled to reimbursement for those medical costs allowable under the insurance program and certain related costs of administration. In connection with an audit for the

period from June 30, 1972 to December 6, 1974, the Department of Health, Education and Welfare questioned the extent to which certain medical benefit charges were reimbursable to the Funds. The total liability of the Trust, determined to be $438,000 and paid during fiscal year 1978, was included in the June 30, 1977 financial statements.

**6.
Litigation**

As a result of the settlement of litigation challenging certain pension eligibility rules, the Trust was required to pay pension benefits to eligible plaintiffs. Amounts expensed in connection with the litigation aggregated $12,000 in 1978 and $134,000 in 1977, of which $103,000 in 1977 was retroactive benefits applicable to prior years.

There are several legal actions against the Trust (including four class actions) challenging certain pension eligibility rules. The courts in these class actions have not certified classes, and the Trust has no basis on which to reasonably estimate the size of the classes or the potential liability. However, if plaintiffs were to prevail in one or more of these cases, a significant liability would exist. The Trust is pursuing settlement negotiations in two of the class actions.

A clinic has made claim against the Funds for approximately $1.6 million plus 8 percent interest alleging an oral agreement that the clinic would be paid the difference between retainer contract amounts paid and fee-for-service charges for delivery of health services. If plaintiffs were to recover all or part of the amount claimed, the liability would be divided among the 1950 Pension Trust, the 1950 Benefit Trust and the 1974 Benefit Trust; but the allocation of liability among the three Trusts cannot be predicted accurately until the theory of recovery upon which plaintiffs would prevail is known. The Trusts deny that they have any liability to the plaintiffs.

The Trustees of the Funds have brought suit against two coal companies for unpaid contributions owed to the Funds pursuant to the provision of the 1974 National Bituminous Coal Wage Agreement which

required signatory employers to make contributions to the Funds based on coal purchased or acquired from other operators on which contributions to the Funds have not previously been made. In response, the companies allege, among other things, that certain provisions of the coal wage Agreement are inconsistent with antitrust law. If the Funds prevail, total contributions of approximately $1.5 million will be subject to collection. Due to the early stage of the litigation and other factors, the outcome of the litigation is uncertain and no amounts receivable relating to the litigation are included in the financial statements.

If the Funds are unsuccessful in this litigation, other companies may seek refund of previously collected contributions under the coal wage Agreement of 1978, which through June 30, 1978 aggregate $1.5 million for the 1950 Pension Trust. However, to the extent benefit continuation would be threatened, the coal wage Agreement of 1978 requires signatory employers to reform the Agreement to provide other means of funding benefits.

Other litigation pending against the Trust, in the opinion of management and legal counsel, will not result in any substantial liability to the Trust.

### 7. Trust Administration

Prior to August 1, 1977 the 1950 Pension Trust was responsible for administration of the United Mine Workers of America Health and Retirement Funds. Effective August 1, 1977 administration was transferred to the 1974 Pension Trust. As a result, the 1974 Pension Trust purchased furniture and equipment at its depreciated value of $523,000 and other administrative assets amounting to $51,000 from the 1950 Pension Trust. Obligations under leases for office space and equipment and under the employees' pension plan were also transferred to the 1974 Pension Trust.

### Report of Independent Accountants

To the Trustees and Participants
United Mine Workers of America
1950 Pension Trust

We have examined the statements of net assets (deficiency) available for plan benefits of the United Mine Workers of America 1950 Pension Trust as of June 30, 1978 and 1977, and the related statements of operations and changes in net assets for the years then ended. Our examinations were made in accordance with generally accepted auditing standards and accordingly included such tests of the accounting records and such other auditing procedures as we considered necessary in the circumstances, including confirmation of cash and investments owned at June 30, 1978 and 1977 by correspondence with the depository and custodian.

Our examinations were confined to the accounting records of the Trust and did not extend to an examination of the accounting records of the contributing employers to ascertain whether proper contributions had been made based on hours worked and coal produced and acquired.

As described in Note 6, the Trust is involved in litigation, the outcome of which is not presently determinable. Accordingly, no provision for any liability or additional income that may result has been made in the financial statements. The effects of other litigation and claims pending at June 30, 1977 which have been resolved are included in the 1978 financial statements.

In our opinion, subject to the effect of such adjustments, if any, as might have been required had the outcome of the uncertainties referred to in the preceding paragraph been known, the financial statements examined by us present fairly the financial position of the United Mine Workers of America 1950 Pension Trust at June 30, 1978 and 1977, and the results of its operations and the changes in its net assets for the years then ended, in conformity with generally accepted accounting principles consistently applied.

Price Waterhouse & Co.
Washington, D.C.
December 27, 1978

United Mine Workers of America 1950 Benefit Trust

| Statements of Net Assets (Deficiency) Available for Plan Benefits | June 30, 1978 | June 30, 1977 |
|---|---|---|
| **Assets** | | |
| Investments and cash | | |
| Cash | | $    3,000 |
| Short-term investments at cost plus interest earned | $ 18,057,000 | |
| | 18,057,000 | 3,000 |
| Receivables | | |
| Accrued contributions from signatory employers | 11,413,000 | 8,259,000 |
| Due from other Trusts | 38,000 | |
| Prepayments to providers for medical services | 53,000 | 527,000 |
| | 29,561,000 | 8,789,000 |
| **Liabilities** | | |
| Bank loan | | 4,969,000 |
| Bank drafts | 2,987,000 | 8,774,000 |
| Due to other Trusts | | 287,000 |
| Accounts payable and accrued expenses | 1,087,000 | 1,006,000 |
| Medicare Part "B" arrangement (Note 3) | 5,129,000 | 1,344,000 |
| Accrued medical benefits (Notes 2 and 5) | 20,156,000 | 15,948,000 |
| Death benefits approved but not paid | 788,000 | 616,000 |
| Bank overdraft | 176,000 | |
| | 30,323,000 | 32,944,000 |
| Commitments and contingencies (Notes 3 and 6) | | |
| **Net assets (deficiency) available for plan benefits** | $    (762,000) | $(24,155,000) |

| Statements of Operations and Changes in Net Assets | Year Ended June 30, 1978 | Year Ended June 30, 1977 |
|---|---|---|
| **Revenue** | | |
| Contributions from signatory employers (Note 4) | $ 90,643,000 | $ 85,424,000 |
| Interest income | 464,000 | 118,000 |
| | 91,107,000 | 85,542,000 |
| **Expenses** | | |
| Benefits | | |
| Medical care (Notes 2 and 3) | 48,279,000 | 82,115,000 |
| Death | 12,919,000 | 14,254,000 |
| | 61,198,000 | 96,369,000 |
| Administration (Notes 2 and 3) | 6,516,000 | 4,616,000 |
| | 67,714,000 | 100,985,000 |
| Increase (decrease) in net assets | 23,393,000 | (15,443,000) |
| **Net assets (deficiency) available for plan benefits** | | |
| Beginning of year | (24,155,000) | (8,712,000) |
| End of year | $    (762,000) | $(24,155,000) |

Notes to Financial Statements for the 1950 Benefit Trust
June 30, 1978 and 1977

**1.**
**The 1950 Benefit Trust**

The 1950 Benefit Trust ("Trust") is an irrevocable trust established by the National Bituminous Coal Wage Agreement of 1974 ("1974 Agreement"), which became effective December 6, 1974. Pursuant to that Agreement and the National Bituminous Coal Wage Agreement of 1978 and the National Coal Mine Construction Agreement of 1978, the Trust provides eligible individuals and their eligible dependents with medical care and death benefits.

Benefits of the Trust are primarily funded by contributions of employers signatory to the Agreements which are based on negotiated amounts per hour worked by employees, per ton of bituminous coal produced for use or sale, and per ton of coal which such employers acquire from other operators on which contributions have not been made (see Note 4). The Agreements are subject to termination on or after March 27, 1981. Accordingly, contributions of signatory employers as well as further liabilities after that date are dependent on the continuation of such Agreements or the periodic negotiation of new agreements.

Benefits provided prior to March 27, 1978 were subject to suspension or reduction in the event the assets of the 1950 Benefit Trust became insufficient to pay the benefits provided under the plan. The signatory employers have guaranteed the health benefits provided by the 1950 Benefit Trust during the term of the present coal wage Agreements.

The Trust is exempt from Federal income tax under Section 501(c)(9) of the Internal Revenue Code.

**2.**
**Significant Accounting Policies**

**Administrative Expenses**
The Trust is charged for administrative services provided to it and other irrevocable trusts established pursuant to the 1974 Agreement. Administrative expenses applicable solely to the Trust have been directly charged. Other administrative expenses are allocated to each trust based upon a formula.

**Investments**

Marketable investments are recorded at market value; unrealized gains or losses on such investments are included in operations of each period. Short-term investments are recorded at cost plus interest earned, which approximates market value.

**Accrued Medical Benefits**

The accrued medical benefit liability represents estimates of amounts due for medical services provided prior to the end of each fiscal year. The amount at June 30, 1977 is net of $5,631,000, estimated to be reimbursable under Medicare Part "B" arrangements. In estimating the liability at June 30, 1978 management considers historical experience and includes estimates of changes in utilization related to changes in the beneficiary population, cost-sharing arrangements in effect during the year, and the temporary suspension of benefits. Accordingly, determination of the liability involves subjective judgments.

**3.**
**Medicare Part "B" Arrangement**

Prior to March 1, 1978 the Trust paid the medical costs of its beneficiaries who were eligible for health insurance under Part "B" of Supplemental Medical Insurance Benefits for the Aged and is entitled to reimbursement for those medical costs allowable under the insurance program and certain related costs of administration.

These reimbursements, which have been recorded as reductions of medical care benefits ($12,202,000 in 1978 and $27,945,000 in 1977) and administrative expenses ($630,000 in 1978 and $1,879,000 in 1977), are subject to audit by the Department of Health, Education and Welfare. In connection with an audit, the Department of Health, Education and Welfare (HEW) questioned the extent to which certain medical benefit charges from fiscal years 1972 through 1977 are reimbursable to the Funds. The total liability of the Trust for the period December 6, 1974 through June 30, 1977, determined to be $611,000, was included in the 1977 financial statements. Subsequent to February 28, 1978 the Trust reimburses the beneficiaries or providers only for those costs which are not paid by Medicare less any co-payment specified in the 1978 Agreement.

At June 30, 1978 all years except fiscal years 1977 and 1978 had been audited by HEW. For fiscal years 1977 and 1978, the net payable relating to the Medicare Part "B" arrangements represents management's preliminary estimates of the amount payable to Medicare. However, since the Trust's claim has not been finalized and is subject to audit by HEW, management cannot determine the amount which will ultimately be payable on final settlement of these open years.

**4.**
**Reallocation of Contributions from Signatory Employers**

On October 5, 1976, the settlors of the 1974 Agreement authorized a reallocation of the total contributions specified in the 1974 Agreement. The effect of the reallocation amounted to an approximate $3,002,000 and $17,826,000 increase in contributions to the Trust during fiscal years 1978 and 1977, respectively.

Pursuant to the terms of an agreement dated September 15, 1977 between the Bituminous Coal Operators' Association, Inc. and the United Mine Workers of America, the Trustees of the Funds were directed to distribute contributions to the 1950 Benefit Trust and the 1974 Benefit Trust on the following basis:

**1.**
Contributions distributed by the Trustees each month to the 1950 Benefit Trust shall be the greater of (a) the amount of 19 cents per ton and 3 cents per hour worked, or (b) the amount required to bring the accrued net assets of that Trust as of the beginning of each month to an amount estimated to be sufficient to provide the level of benefits payable from such Trusts as set by the Trustees effective July 1, 1977.

**2.**
Contributions which would have been distributed by the Trustees each month to the 1974 Benefit Trust, pursuant to the October 5, 1976 Memorandum of Agreement, shall be reduced by the amount that contributions distributed to the 1950 Benefit Trust exceed the amount of 19 cents per ton and 3 cents per hour worked.

Notwithstanding the foregoing, the distribution of contributions to the 1950 Benefit Trust in any month shall not be in an amount which would reduce the accrued

net assets, as of the beginning of the month, of the 1974 Benefit Trust to less than 105 percent of the amount estimated as needed to provide the level of benefits payable from such Trust as set by the Trustees effective July 1, 1977, nor shall the benefits payable from such Trust exceed that level.

This agreement expired when the 1978 Agreement commenced. Pursuant to the terms of this agreement, the Trust received approximately $22,350,000 from the 1974 Benefit Trust during fiscal year 1978.

**5.**
**Certain Provisions of 1978 Agreement**

During the period from December 6, 1977, the expiration date of the 1974 Agreement, and March 26, 1978, the effective date of the coal wage Agreement of 1978, benefits were terminated. The coal wage Agreement of 1978 provided, however, that (a) up to a maximum of $18,000,000 of the employer contributions pursuant to the 1978 Agreement may be used to pay for health services actually performed on claims accrued up to and including December 5, 1977. As of June 30, 1978 the Trust had not required any of the contributions received pursuant to the 1978 Agreement to pay for claims arising on or before December 5, 1977; (b) the Trustees are authorized to pay death benefits for deaths occurring between and including December 6, 1977 and March 26, 1978; and (c) up to $2,000,000 of future contributions to the 1950 Benefit Trust may be utilized by the Trustees for the sole purpose of funding the return of deductibles and co-payments actually paid no later than January 6, 1978 by participants and beneficiaries of the Trust for claims incurred between July 1, 1977 and December 5, 1977. The Trust has determined that $1,249,000 is owed to beneficiaries as reimbursement and has included this amount in the June 30, 1978 accrued medical liability.

**6.**
**Litigation**

A suit was filed by two widows on behalf of themselves and an alleged class of similarly situated persons. The plaintiffs seek a declaration that they are entitled to permanent health care coverage under the terms

of the 1950 Benefit Plan and Trust. If plaintiffs were to prevail, a significant potential liability does exist; but the number of additional beneficiaries and the amount of the liability cannot be determined.

A clinic has made claim against the Funds for approximately $1.6 million plus 8 percent interest alleging an oral agreement that the clinic would be paid the difference between retainer contract amounts paid and fee-for-service charges for delivery of health services. If plaintiffs were to recover all or part of the amount claimed, the liability would be divided among the 1950 Pension Trust, the 1950 Benefit Trust and the 1974 Benefit Trust; but the allocation of liability among the three Trusts cannot be predicted accurately until the theory of recovery upon which plaintiffs would prevail is known. The Trusts deny that they have any liability to the plaintiffs.

The Trustees of the Funds have brought suit against two coal companies for unpaid contributions owed to the Funds pursuant to the provision of the 1974 National Bituminous Coal Wage Agreement which required signatory employers to make contributions to the Funds based on coal purchased or acquired from other operators on which contributions to the Funds have not previously been made. The companies allege, among other things, that certain provisions of the coal wage agreement are inconsistent with antitrust law. If the Funds prevail, total contributions of approximately $1.5 million will be subject to collection. Due to the early stage of the litigation and other factors, the outcome of the litigation is uncertain and no amounts receivable relating to the litigation are included in the financial statements.

If the Funds are unsuccessful in this litigation, other companies may seek refund of previously collected contributions under the coal wage Agreement of 1978, which through June 30, 1978 would aggregate $550,000 for the 1950 Benefit Trust. However, to the extent benefit continuation would be threatened, the coal wage Agreement of 1978 requires signatory employers to reform the Agreement to provide other means of funding benefits.

Other litigation pending against the Trust, in the opinion of management and legal counsel, will not result in any substantial liability to the Trust.

**Report of Independent Accountants**

To the Trustees and Participants
United Mine Workers of America
1950 Benefit Trust

We have examined the statements of net assets (deficiency) available for plan benefits of the United Mine Workers of America 1950 Benefit Trust as of June 30, 1978 and 1977, and the related statements of operations and changes in net assets for the years then ended. Our examinations were made in accordance with generally accepted auditing standards and accordingly included such tests of the accounting records and such other auditing procedures as we considered necessary in the circumstances, including confirmation of cash and investments owned at June 30, 1978 and 1977 by correspondence with the depository and custodian.

Our examinations were confined to the accounting records of the Trust and did not extend to an examination of the accounting records of the contributing employers to ascertain whether proper contributions had been made based on hours worked and coal produced and acquired.

As described in Note 3, certain reimbursable costs claimed in connection with the Trust's Medicare arrangements for fiscal years 1977 and 1978 are subject to audit and adjustment by the Department of Health, Education and Welfare. At this time, management is unable to determine the effect on the liability recorded at June 30, 1978 which may result from the negotiation of a settlement of these open years. In addition, as described in Note 6, the Trust is involved in litigation, the outcome of which is not presently determinable. Accordingly, no provision for any liability or additional income that may result from these matters has been made in the 1978 financial statements. The effects of other litigation and claims pending at June 30, 1977 which have been resolved are included in the 1978 financial statements.

In our opinion, subject to the effect of such adjustments, if any, as might have been required had the outcome of the uncertainties referred to in the preceding paragraph been known, the financial statements examined by us present fairly the financial position of the United Mine Workers of America 1950 Benefit Trust at June 30, 1978 and 1977, and the results of its operations and the changes in its net assets for the years then ended, in conformity with generally accepted accounting principles consistently applied.

Price Waterhouse & Co.
Washington, D.C.
December 27, 1978

United Mine Workers of America 1974 Pension Trust

| Statements of Net Assets Available for Plan Benefits | June 30, 1978 | June 30, 1977* |
|---|---|---|
| **Assets** | | |
| Investments and cash (Note 2) | | |
| Cash | $ 48,000 | |
| Short-term investments at cost plus interest earned | 104,799,000 | $136,845,000 |
| Short-term investment fund at market (cost of $49,140,000 in 1978) | 51,460,000 | |
| U.S. Government securities at market (cost of $69,671,000 in 1978) | 67,599,000 | |
| Corporate bonds at market (cost of $61,790,000 in 1978 and $69,633,000 in 1977) | 67,450,000 | 71,391,000 |
| Corporate stocks at market (cost of $156,860,000 in 1978 and $106,438,000 in 1977) | 160,164,000 | 108,286,000 |
| Real estate equity fund at estimated value (cost of $14,500,000 in 1978 and $12,400,000 in 1977) | 16,444,000 | 12,400,000 |
| | 467,964,000 | 328,922,000 |
| Receivables | | |
| Accrued contributions from signatory employers | 19,986,000 | 19,810,000 |
| Accrued interest and dividends | 3,748,000 | 1,696,000 |
| For investments sold | 170,000 | 1,024,000 |
| Due from other Trusts | 1,430,000 | 340,000 |
| Furniture and equipment at cost less accumulated depreciation of $547,000 in 1978 | 494,000 | |
| Other assets | 55,000 | |
| | 493,847,000 | 351,792,000 |
| **Liabilities** | | |
| Bank drafts | 4,178,000 | 2,394,000 |
| For investments purchased | 18,086,000 | 3,867,000 |
| Pension benefits approved but not paid | 528,000 | 384,000 |
| Accounts payable and accrued expenses | 733,000 | 440,000 |
| | 23,525,000 | 7,085,000 |
| Commitments and contingencies (Notes 4, 5 and 6) | | |
| **Net assets available for plan benefits** | $470,322,000 | $344,707,000 |

* Reclassified for comparative purposes

JA 001352

| Statements of Operations and Changes in Net Assets | Year Ended June 30, 1978 | Year Ended June 30, 1977 |
|---|---|---|
| **Revenue** | | |
| Contributions from signatory employers (Note 3) | $147,063,000 | $202,837,000 |
| Interest and dividend income | 19,409,000 | 12,474,000 |
| | 166,472,000 | 215,311,000 |
| **Expenses** | | |
| Pensions | 38,103,000 | 25,180,000 |
| Administration (Notes 2 and 4) | 3,398,000 | 2,835,000 |
| | 41,501,000 | 28,015,000 |
| Excess of revenue over expenses | 124,971,000 | 187,296,000 |
| Net realized and unrealized appreciation of investments | 644,000 | 134,000 |
| Increase in net assets | 125,615,000 | 187,430,000 |
| **Net assets available for plan benefits** | | |
| Beginning of year | 344,707,000 | 157,277,000 |
| End of year | $470,322,000 | $344,707,000 |

**Notes to Financial Statements for the 1974 Pension Trust June 30, 1978 and 1977**

**1.**
**The 1974 Pension Trust**

The 1974 Pension Trust ("Trust") is an irrevocable trust established by the National Bituminous Coal Wage Agreement of 1974 ("1974 Agreement"), which became effective December 6, 1974. Pursuant to that Agreement, the National Bituminous Coal Wage Agreement of 1978 and the National Coal Mine Construction Agreement of 1978, the Trust provides pension benefits to eligible individuals who retire after December 31, 1975.

As of June 30, 1977 (the most recent data available), the present value of vested benefits payable in the future was computed at approximately $2,200,000,000 by actuaries for the Trust. Such benefits are primarily funded by contributions of employers signatory to the Agreements which are based on negotiated amounts per hour worked by employees, per ton of bituminous coal produced for use or sale, and per ton of coal which such employers acquire from other operators on which contributions have not been made (see Note 3). The Agreements are subject to expiration on or after March 27, 1981. Accordingly, future contributions of signatory employers are dependent on the continuation of such Agreements or the periodic negotiation of new agreements. Future contributions are also dependent upon any applicable requirements of Federal law.

Upon the complete discontinuance of contributions to the Trust, the Trust shall remain in force and effect for the period necessary to complete the payment of benefits in accordance with the terms of this Trust to the extent assets in the 1974 Pension Trust are available to pay such benefits and subject to any applicable requirements of Federal law concerning employer liability. However, the signatory employers have guaranteed the pension benefits provided by the 1974 Pension Trust during the term of the present coal wage Agreements.

The Trust is exempt from Federal income tax under Section 501(a) of the Internal Revenue Code.

| 93D CONGRESS *2d Session* | HOUSE OF REPRESENTATIVES | REPORT 93–779 |
| --- | --- | --- |

## PRIVATE PENSION TAX REFORM

FEBRUARY 5, 1974.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

Mr. ULLMAN, from the Committee on Ways and Means, submitted the following

# REPORT

together with

## SUPPLEMENTAL VIEWS

[To accompany H.R. 12481]

The Committee on Ways and Means, to whom was referred the bill (H.R. 12481), to amend the Internal Revenue Code of 1954 to provide pension reform, having considered the same, report favorably thereon without amendment and recommend that the bill do pass.

## I. INTRODUCTION AND SUMMARY

H.R. 12481, as reported by the Committee on Ways and Means, deals with the tax aspects of making pension, profit sharing, and stock bonus plans fairer and more effective in providing retirement income for employees who have spent their careers in useful and socially productive work.

Your committee, in reporting this bill, anticipates that it will, in the House action, become a part of a broader bill dealing with retirement plans generally. It is expected that this bill will be combined with a version of H.R. 2, reported by the Committee on Education and Labor. This bill and the bill reported by the Committee on Education and Labor, are expected to jointly deal with participation, vesting, and funding with respect to pension plans. In these areas, this bill has been worked out in close coordination with the version of the bill expected from the Committee on Education and Labor to be sure that the general standards provided in these three areas are the same. Because of the expected coordination between your committee's bill and that of the Education and Labor Committee, no action is taken in this bill to deal with the general subjects of fiduciary standards, plan termination insurance, and reporting and disclosure, which are dealt with in H.R. 2.

This bill deals only with qualified plans and provides for enforcement with respect to retirement plans through the Internal Revenue

164

### 9. RETROACTIVE REMEDIAL CHANGES TO QUALIFIED PLANS

Employers may now retroactively cure defects in employee benefit plans (which do not meet the requirements for tax qualification) by making remedial amendments by the 15th day of the third month after the end of the taxable year of the employer in which a plan is newly established. Retroactive remedial changes however may not be made with respect to plan amendments.

The time allowed for remedial changes may be too short for a plan to be cured to qualify as of the year in which it is established. This occurs because many plans are established at the end of the year and thus only 2½ months are available to cure a plan. Additionally, plan amendments (which may be as significant as newly established plans) may not be retroactively cured. As a result of these limitations, plans may not be qualified, to the detriment of employers and employees.

The bill provides that retroactive remedial amendments may be adopted to cure a plan regardless of whether failure occurs on establishing a new plan or because of an amendment to an existing plan. The bill also extends the time to adopt a retroactive remedial amendment to the time (including extensions) for filing the employer's return for the taxable year for which the plan or amendment was adopted or put into effect, or to a later time designated by the Service. It is expected that the regulations will provide for extension for reasonable cause, such as the filing of a bona fide request for a determination by the Service that a plan or plan amendment is qualified.

This provision is to become effective on the date of enactment.

### 10. RULES FOR CERTAIN NEGOTIATED PLANS

*Present law*

Under present law, special rules are provided for contributions paid by an employer to a plan providing welfare and pension benefits if the plan was established before 1954 as a result of an agreement between a union and the Government during a period of Government operation of the major part of the productive facilities of the industry in which the employer is engaged (sec. 404(c)). Under this provision, contributions are not deductible under the deferred compensation provisions of the code but are deductible solely under section 162 as trade or business expenses. Present law also provides that this provision is to have no effect with respect to contributions to a trust on or after any date on which the trust is exempt from tax under section 501(a).

*General reasons for change*

This provision was enacted in recognition of the special circumstances surrounding the establishment of the United Mine Workers Welfare and Pension Plan Trust, i.e., the fact that the plan was negotiated during a period that the U.S. Government was a party to the agreement establishing the plan and was in control of a substantial number of the coal mines in the country.

It has been called to the committee's attention that changes in the coal mining industry and in the administration of the welfare and

pension trust have made it desirable to establish two separate trusts—one for the payment of welfare benefits and the second for the payment of retirement benefits. Your committee believes that this is a desirable objective and that the pension trust should be allowed to satisfy the requirements for qualification of pension plans in order to obtain the favorable tax benefits associated therewith. Of course, the plan would also have to meet the standards relating to coverage, vesting and funding provided in this bill.

Your committee is aware that a number of recent court cases have required the coverage and payment of pension benefits to individuals whose participation in a qualified pension plan would cause the pension plan to be disqualified. Accordingly, your committee believes that rules should be provided so that the pension plan may qualify without forcing the plan administrator to relitigate issues which have been resolved by the courts.

*Explanation of provision*

In order to facilitate the restructuring of the welfare and pension plan into two separate plans, your committee's bill provides special rules in the case of any individual who, before July 1, 1974, was a participant in the United Mine Workers Plan. First, an individual who was self-employed (within the meaning of sec. 401(c)(1)) such as a coal hauler is to be treated with respect to his service under the plan as not a self-employed individual but as an employee of a participating employer under the plan. This provision will enable the plan to meet the requirement of being a plan of an employer for the exclusive benefit of his employees with respect to certain self-employed individuals who have traditionally been covered under the plan. Second, in order to be certain that the self-employed individuals covered under the plan do not establish separate H.R. 10 plans on their own behalf, the bill provides that earnings derived from service covered by the plan are not to be treated as being earned income (within the meaning of sec. 401(c)(2)). Third, an individual who was a participant before July 1, 1974, is to be treated as an employee of a participating employer under the plan for service covered under the plan before July 1, 1975. This provision is designed to enable non-participating employers whose employees were covered under the plan to agree to become participating employers and thus maintain coverage for their employees. Of course, individuals who retire prior to July 1, 1975, are to be treated as if they were employed by a participating employer even though the employer does not agree to become a participating employer or if the employer is no longer in existence.

The bill further provides that section 277 (relating to deductions incurred by certain membership organizations in transactions with members) is not to apply to any trust described in section 404(c). This provision is added to enable the welfare trust to pay benefits to members and deduct the payments from any investment income it may have. Since questions have been raised as to the scope of section 277, your committee concluded that it could not wait until resolution of this issue because it is felt that there is great urgency for the Mine Workers to make the desired changes in their Welfare and Pension Plan. Your committee's decision is not to be construed as any indication as to the

166

scope of section 277 and its applicability to other non-exempt trusts which may be paying similar types of benefits to its members. Similarly, it is not to be construed to furnish any indication regarding the applicability of section 277 to the United Mine Workers plan prior to the effective date of the new provision. Instead, this decision should be viewed as a further attempt to effectuate the policy which led the Congress to enact section 404(c).

Since the desire of the United Mine Workers is to establish the pension plan as a qualified plan under section 401(a), the bill provides that section 404(c) is not to apply to the pension plan once it becomes a qualified plan except for the purpose of determining which individuals are to be treated as employees of a participating employer under the plan.

*Effective date*

The amendments made by this section of the bill are to apply to taxable years ending on or after June 30, 1972.

## V. EFFECT ON REVENUES OF THE BILL AND VOTE OF THE COMMITTEE IN REPORTING THE BILL

In compliance with clause 7 of rule XIII of the Rules of the House of Representatives, the following statement is made relative to the effect on revenues of this bill. Apart from the revenue effect of the minimum vesting and funding provisions, the bill is expected to decrease revenues by about $460 million a year after the provisions become fully effective (approximately 3 years in the future) but at 1973 levels of income. The new minimum vesting standards could involve a revenue loss of possibly as much as $265 million a year after 1975 but probably the revenue loss will be only about half this amount. Data are not available which would make a reliable estimate as to the revenue impact of the new minimum funding requirements. It is believed, however, that the revenue effect in this case will be relatively modest. The Treasury Department agrees with this statement.

In compliance with clause 27(b) of rule XI of the Rules of the House of Representatives, the following statement is made relative to the vote by the committee on the motion to report the bill. The bill was ordered reported by a voice vote.

## VI. SUPPLEMENTAL VIEWS OF HON. JAMES C. CORMAN AND HON. SAM GIBBONS

We share the hope and expectation of the other Ways and Means Committee members that H.R. 12481 will provide real protection for the pension rights of working Americans. Further, we hope this bill will place some limits on the amount of money which can be set aside for retirement, with special tax treatment, by high-income persons.

However, we would be remiss if we did not point out that this legislation is by no means the final answer to the vast array of issues relating to the pension system. In fact, there is a great and pressing need

RETIREMENT INCOME SECURITY **ACT**
P.L. 93–406

EMPLOYEE RETIREMENT INCOME SECURITY
ACT OF 1974

*P.L. 93–406, see page 935*

House Report (Education and Labor Committee) No. 93–533,
Oct. 2, 1973 [To accompany H.R. 2]

House Report (Ways and Means Committee) No. 93–807,
Feb. 21, 1974 [To accompany H.R. 12855]

Senate Report (Labor and Public Welfare Committee) No. 93–127,
Apr. 18, 1973 [To accompany S. 4]

Senate Report (Finance Committee) No. 93–383, Aug. 21, 1973
[To accompany S. 1179]

House Conference Report No. 93–1280, Aug. 12, 1974
[To accompany H.R. 2]

Senate Conference Report No. 93–1090, Aug. 13, 1974
[To accompany H.R. 2]

Cong. Record Vol. 120 (1974)

DATES OF CONSIDERATION AND PASSAGE

House February 28, August 20, 1974

Senate March 4, August 22, 1974

The House and Senate Reports and the House Conference
Report are set out.

HOUSE REPORT NO. 93–533

THE Committee on Education and Labor, to whom was referred the bill (H.R. 2) to revise the Welfare and Pension Plans Disclosure Act, having considered the same, report favorably thereon with an amendment and recommend that the bill, as amended, do pass. The amendment substitutes all after the enacting clause and inserts a substitute text which appears in italic type in the reported bill.

I. Synopsis

The Employee Benefit Security Act as reported by the Committee is designed to remedy certain defects in the private retirement system which limit the effectiveness of the system in providing retirement income security. The primary purpose of the bill is the protection of individual pension rights, but the committee has been constrained to recognize the voluntary nature of private retirement plans. The relative improvements required by this Act have been weighed against the additional burdens to be placed on the system. While modest cost increases are to be anticipated when the Act becomes effective, the adverse impact of these increases have been minimized. Additionally, all

## RETIREMENT INCOME SECURITY ACT
### P.L. 93-406

making remedial amendments by the 15th day of the third month after the end of the taxable year of the employer in which a plan is newly established. Retroactive remedial changes however may not be made with respect to plan amendments.

The time allowed for remedial changes may be too short for a plan to be cured to qualify as of the year in which it is established. This occurs because many plans are established at the end of the year and thus only 2½ months are available to cure a plan. Additionally, plan amendments (which may be as significant as newly established plans) may not be retroactively cured. As a result of these limitations, plans may not be qualified, to the detriment of employers and employees.

The bill provides that retroactive remedial amendments may be adopted to cure a plan regardless of whether failure occurs on establishing a new plan or because of an amendment to an existing plan. The bill also extends the time to adopt a retroactive remedial amendment to the time (including extensions) for filing the employer's return for the taxable year for which the plan or amendment was adopted or put into effect, or to a later time designated by the Service. It is expected that the regulations will provide for extension for reasonable cause, such as the filing of a bona fide request for a determination by the Service that a plan or plan amendment is qualified.

This provision is to become effective on the date of enactment.

### 10. RULES FOR CERTAIN NEGOTIATED PLANS

*Present law*

Under present law, special rules are provided for contributions paid by an employer to a plan providing welfare and pension benefits if the plan was established before 1954 as a result of an agreement between a union and the Government during a period of Government operation of the major part of the productive facilities of the industry in which the employer is engaged (sec. 404(c)). Under this provision, contributions are not deductible under the deferred compensation provisions of the code but are deductible solely under section 162 as trade or business expenses. Present law also provides that this provision is to have no effect with respect to contributions to a trust on or after any date on which the trust is exempt from tax under section 501(a).

*General reasons for change*

This provision was enacted in recognition of the special circumstances surrounding the establishment of the United Mine Workers Welfare and Pension Plan Trust, i.e., the fact that the plan was negotiated during a period that the U.S. Government was a party to the agreement establishing the plan and was in control of a substantial number of the coal mines in the country.

It has been called to the committee's attention that changes in the coal mining industry and in the administration of the welfare and pension trust have made it desirable to establish two separate trusts—one for the payment of welfare benefits and the second for the payment of retirement benefits. Your committee believes that this is a desirable objective and that the pension trust should be allowed to satisfy the requirements for qualification of pension plans in order to obtain the

3 U S Cong & Adm News '74—48

JA 001359

LEGISLATIVE HISTORY

# INTERNAL REVENUE CODE OF 1954

## CONFERENCE REPORT

House Report No. 2543, July 26, 1954 [To accompany H. R. 8300]

STATEMENT OF THE MANAGERS ON THE PART OF
THE HOUSE

The managers on the part of the House at the conference on the disagreeing votes of the two Houses on the amendments of the Senate to the bill (H.R. 8300) to revise the internal revenue laws of the United States, submit the following statement in explanation of the effect of the action agreed upon by the conferees and recommended in the accompanying conference report:

The following Senate amendments made technical, clerical, clarifying, or conforming changes (including changes made necessary to conform to the Excise Tax Reduction Act of 1954, Public Law 324, 83d Cong.): 1, 4, 5, 6, 8, 9, 10a, 11, 12(4), 14, 15, 16, 17, 18, 20, 21, 22, 23(1), 23(2), 23(4), 25, 26, 27, 30, 33, 34, 37, 41, 41a, 42, 43(2), 44(2), 47(1), 52, 53, 54, 56, 57a, 64, 65, 66, 67b, 68, 70, 72, 73, 74, 74a, 76a, 90, 91, 93(2), 94, 95, 101, 102(1), 102a(1), 103, 104, 105, 106, 111, 112, 113, 114, 115, 117(2), 118, 129, 130, 131, 132, 133, 134, 135, 136, 137, 138, 139, 140, 141a, 142, 143, 144, 145, 146, 154, 155, 156a, 158, 160, 161, 164, 168, 170, 173, 183, 184, 185, 185a, 187, 188, 189, 190, 191, 192, 193, 194, 199, 200, 201, 202, 203, 204, 205, 206, 213, 214, 215, 216, 217, 219, 220, 220a, 221, 222, 223, 224, 225, 226, 229, 230, 231, 232, 232b, 233, 234, 235, 236, 237, 239, 240, 241, 242, 243, 249, 250, 255, 256, 257, 260, 270, 271b, 273a, 274, 275, 276, 278, 279, 281a, 282, 283, 284, 285, 286, 287, 288, 289, 290–301, 302–326, 327(1), 327(3), 327(4), 328, 329, 330, 331, 333–347, 348(1), 349(1), 349(2), 349 (4), 350(2), 351, 353, 354, 355, 356, 357(2), 358–403, 405, 406, 406a, 408, 409, 410, 411, 412, 413, 413a, 414, 415, 416, 417(3), 420, 421, 422, 423, 425, 426, 427, 428, 429, 430, 432, 433, 434, 435, 437, 438, 439, 440, 441, 442, 443, 444, 445, 448, 450, 451, 452, 454, 455, 458, 459, 460, 461, 462, 463, 464, 465, 466, 467, 468, 469, 471, 472, 473, 476, 480, 481, 482, 483, 484, 485, 489, 490, 491, 492, 493, 500, 504, 505(1), 509, 512, 513, 514, 516, 517, 519, 520, 522, 523, 525, 527, 529, 531, 532, 533, 534, 536, 538, 539, 540, 542, 543, 544, 547, 549, and 553. With respect to these amendments (1) the House either recedes or recedes with amendments which are technical, clerical, clarifying, or conforming in nature, or (2) the Senate recedes in order to conform to other action agreed upon by the committee of conference.

Amendments Nos. 2 and 3: Under the House bill, the benefits of full income splitting were extended to those taxpayers who could qualify as "head of family." In order to qualify, a taxpayer must have supported a son, daughter, father, mother, brother, or sister, or certain relatives of his wife if she were dead and he had not remarried. It was not necessary for such dependents to live in the taxpayer's household in order to qualify him as head of family.

5280

## INTERNAL REVENUE CODE OF 1954

The Senate amendment contained a provision, which was not in the House bill, providing that if contributions are paid by an employer under a plan under which (1) such contributions are held in a welfare trust providing at least (a) payments for medical or hospital care for employees and their families and dependents and (b) pensions on retirement or death of employees, and (2) such plan is established prior to January 1, 1954, as a result of an agreement between employee representatives and the Government of the United States during a period of Government operation under seizure powers of a major part of the productive facilities of the industry in which such employer is engaged, then such contributions shall be deductible under section 162 (relating to trade or business expenses) (sec. 404(c) of the Senate amendment). The enactment of this provision is not intended to have any effect on the interpretation of the 1939 Code.

The expression in the Senate amendment "as a result of an agreement" is intended primarily to cover a trust established under the terms of such an agreement. It will also include a trust established under a plan of an employer, or group of employers, who are in competition with the employers whose facilities were seized by reason of producing the same commodity, and who would therefore be expected to establish such a trust as a reasonable measure to maintain a sound position in the labor market producing the commodity. Thus, for example, if a trust was established under such an agreement in the bituminous coal industry, a similar trust established about the same time in the anthracite coal industry would be covered by this provision.

If any such trust becomes qualified for exemption under section 501(a), the deductibility of contributions by an employer to such trust on or after the date of such qualification would no longer be governed by this provision, even though the trust may later lose its exemption under section 501(a).

The Senate amendment contained a provision which was also in the House bill preserving for employers a carryover of unused deductions and contributions in excess of deductible amounts for taxable years to which part I of subchapter D does not apply and which would have been deductible in later years if section 23(p) of the 1939 Code, providing for such carryovers, were continued in effect in taxable years to which such part applies (sec. 404(d) of Senate amendment). However, the House bill was changed by the Senate amendment by adding a sentence which will insure that duplicate deductions will not be allowed.

The House recedes with a clerical amendment and with the amendment to section 402(e) relating to certain plan terminations.

Amendments Nos. 84, 85, 86, 87, and 88: These amendments make clerical and conforming changes in section 421 of the House bill, relating to restricted stock options, and the following substantive changes in such section:

(1) The issuance of a new option, or the assumption of an old option, by the employer corporation, or a parent or subsidiary of such corporation, as a result of certain corporate reorganizations or liquidations will not be treated as a modification of the option, provided the

5303

JA 001361

S. REP. 83-1622, S. Rep. No. 1622, 83RD Cong., 2ND Sess.
1954, 1954 U.S.C.C.A.N. 4621, 1954 WL 6064 (Leg.Hist.)
P.L. 83-591, INTERNAL REVENUE CODE OF 1954

SENATE REPORT NO. 83-1622

(To accompany H.R. 8300)
April 5, 1954

**\*4621  Senate Committee Report**

|                                                                      | Page |
|----------------------------------------------------------------------|------|
| **Finance Committee Report**..........................................................................................................| **4623** |
| **Detailed Discussion of Technical Provisions of the Bill**.......................................................................| **4785** |

   This Report was prepared by the Senate Finance Committee to accompany H.R. 8300 "A Bill to Revise the Internal Revenue Laws of the United States". It is being supplied you, herewith, in advance of the Bill, so that United States Code Congressional and Administrative News readers may acquaint themselves with the proposed changes in the Revenue Laws

   The House Ways and Means Committee Report was published in the U. S. Code Congressional and Administrative News April 5, 1954. The Conference Report, and the text of the Bill as finally approved will be supplied promptly as they become available.

**TABLE OF CONTENTS**

**PART I-GENERAL EXPLANATION**

|      |                                                                       | Page |
|------|-----------------------------------------------------------------------|------|
| I.   | General Statement........................................................| 4629 |
| II.  | Revenue Effects...........................................................| 4631 |
| III. | Tax on Individuals and Corporations................................| 4633 |
|      | A. Combination of normal tax and surtax (sec. 1)........................| 4633 |
|      | B. Head of family (sec. 2).................................................| 4633 |
|      | C. Corporate income-tax rate (sec. 11)..................................| 4635 |
| IV.  | Credits Against Tax......................................................| 4635 |
|      | A. Dividends received by individuals (secs. 34 and 116)................| 4635 |
|      | B. Retirement income credit (sec. 37)...................................| 4637 |
| V.   | Deductions in Arriving at Adjusted Gross Income.......................| 4638 |
|      | A. Transportation expenses (sec. 62(2) (C))............................| 4638 |

**(2) Changes made by committee**

Your committee made no change in this provision.

**\*4687  D. Distributions in Employer Securities (sec. 402 (a) (1) and (3) (B))**

**(1) House changes accepted by committee**

Existing law, in certain cases, postpones tax on the gain on employer securities distributed by an employees' trust.

The House bill and your committee's bill continue the present treatment.

**(2) Changes made by committee**

Present law and the House bill define securities of the employer to include, for example, securities of another corporation more than 50 percent of the stock of which is owned by the employer. Cases have been brought to the attention of the committee where two corporations each own exactly 50 percent of the stock of a third corporation and, therefore, the stock of the third corporation cannot qualify as employer securities. Relief is granted in such cases by changing the "more than 50 percent" ownership requirement to "50 percent or more" which is done in section 421(d) (2) and (3) which defines employer securities for purposes of the rules relating to restricted employee stock options. As under present law, the stock option definition is applied for purposes of employee trust distributions.

**E. Certain Negotiated Plans (sec. 404 (c))**

**(1) House changes accepted by committee**

The House bill did not make explicit provision in this area.

**(2) Changes by committee**

Under present law, certain plans established as a result of negotiation with unions do not constitute qualified plans because they do not segregate pension funds from funds used for other purposes and do not satisfy other rules required for qualification. This may have the result of denying employers deductions for contributions to such plans because present law, which is retained by your committee, does not allow deductions for contributions to nonqualified plans where employees' rights are forfeitable.

Your committee feels that this denial of deductions for employer contributions is inequitable where a negotiated plan was established during a period of Government operation. Your committee's bill therefore provides that employers shall be entitled to deduct as business expenses contributions made to plans established before January 1, 1954, which are result of an agreement between employee representatives and the United States Government during a period of Government seizure and operation of most of the productive facilities of the industry. This provision does not appear in the House bill.

**F. Foreign Situs Trust (sec. 402 (c) and 404 (a) (4))**

**(1) House changes accepted by committee**