**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

UNITED MINE WORKERS OF AMERICA
1974 PENSION PLAN, et al.,

*Plaintiffs*,

v.

ENERGY WEST MINING COMPANY,

*Defendant*.

Civil Action No. 1:18-cv-01905 (CJN)

---

## MEMORANDUM OPINION

Plaintiffs United Mine Workers of America 1974 Pension Plan (the "1974 Plan" or "Plan") and several of its trustees seek to enforce an arbitration award against Defendant Energy West Mining Company. *See generally* Compl., ECF No. 1. Energy West counterclaims, petitioning the Court to vacate or modify the award. *See generally* Countercl., ECF No. 8. The Court agrees with the Plan that the arbitrator's award should not be disturbed, and therefore grants summary judgment to the Plan, denies it to Energy West, and orders Energy West to comply with the terms of the award.

### I.   Background

Energy West once operated a coal mine in Huntington, Utah and employed about 180 miners to staff it. *See* Def.'s Mem. in Supp. of Energy West's Mot. for Summ. J. ("Def.'s Mot.") at 4, ECF No. 29-1. As is standard among coal mining companies, Energy West entered into a series of collective bargaining agreements with the United Mine Workers of America ("UMWA"), the prevailing coal miners' union. *See* Pls.' Mem. of P. & A. in Supp. of its Mot. for Summ. J. to Enforce Arb. Award ("Pls.' Mot.") at 7, ECF No. 32-1; Parties' Joint Stipulation

of Facts ("Joint Stipulation") ¶ B.3, Joint App'x (J.A.) 419, ECF No. 28.  A provision of those

agreements required Energy West to contribute to the Union's 1974 Pension Plan, the multi-

employer plan that has covered most coal miners in the United States since the enactment of the

Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001–1461, as

amended by the Multiemployer Pension Plan Amendments Act of 1980, Pub. L. No. 96-364, 94

Stat. 1208 (1980).  *See* Pls.' Mot. at 7.  "The contributions made by employers participating in

such a multiemployer plan are pooled in a general fund available to pay any benefit obligation of

the plan."  *Concrete Pipe & Prods. of Calif., Inc. v. Constr. Laborers Pension Tr. for S. Calif.*,

508 U.S. 602, 605 (1993).  "An employee obtains a vested right to secure benefits upon

retirement after accruing a certain length of service for [any] participating employers."  *Id.* at

606.

Since 2014, the Plan has retained United Actuarial Services ("UAS") to assist in

administering the Plan's finances.  Joint Stipulation ¶¶ B.10–11, J.A. 420.  One of United's

duties is to prepare an annual valuation report, which assesses the Plan's financial health and

estimates the performance of its investment portfolio for the coming year.  *Id.* ¶ B.8; *see also*

UAS's UMWA 1974 Pension Plan Actuarial Valuation Report for Plan Year Commencing July

1, 2015 ("2015 Valuation"), J.A. 556–630.  United employee William Ruschau, the Plan's

enrolled actuary, prepared the valuation reports for the years 2014 and 2015.  *See generally* 2015

Valuation; UAS's UMWA 1974 Pension Plan Actuarial Valuation Report for Plan Year

Commencing July 1, 2014 ("2014 Valuation"), J.A. 730–803; William Ruschau Dep. 33:20–

36:4, J.A. 432.  He categorized the Plan as being in "critical and declining status" under the

Pension Protection Act of 2006, Pub. L. No. 109-280, 120 Stat. 780 (2006), as amended by the

Multiemployer Pension Reform Act of 2014, Pub. L. No. 113-235, div. O, 128 Stat. 2130, 2773–

882 (2014).  By 2015, Ruschau anticipated that the Plan will likely be insolvent by 2022.  2015

Valuation at J.A. 571; Joint Stipulation ¶ B.7, J.A. 420.

As part of his calculations, Ruschau assumed that the Plan's investments would achieve a

net rate of return of 7.5% in the 2015 plan year—the same rate Plan actuaries had projected in

previous years.  2015 Valuation at J.A. 565.  Ruschau based that assumption on a host of factors,

including the Plan's historical performance; in fact, the Plan's actual rate of return for 2014–

2015 was 7.31%—not far off the mark.  *Id.*; *see also id.* at 566 (charting the Plan's "Historical

Rates of Net Investment Return").  The 7.5% assumed rate of return was a critical piece in

determining whether the Plan could expect to experience a funding shortfall in the coming year,

and therefore whether participating employers would be on the hook to make extra contributions

to keep the Plan afloat.  *See* Def.'s Mot. at 8; 29 U.S.C. § 1084 (setting "[m]inimum funding

standards for multiemployer plans").

That same year, Energy West shut down its coal-mining operations and withdrew from

the Plan.  Joint Stipulation ¶ C.6, J.A. 421.  When an employer withdraws from a multiemployer

pension plan, "the employer is liable to the plan in [an] amount" commonly known as its

"withdrawal liability."  29 U.S.C. § 1381(a).  In short, the Plan must calculate the employer's

share of the Plan's "unfunded vested benefits," which is "the difference between the present

value of the pension fund's assets and the present value of its future obligations to employees

covered by the pension plan."  *Chicago Truck Drivers, Helpers and Warehouse Workers Union

(Indep.) Pension Fund v. CPC Logistics, Inc.*, 698 F.3d 346, 347 (7th Cir. 2012) (Posner, J.).

The withdrawing "employer must pay [its] share to the fund . . . so that the plan can pay the

employer's share of the plan's unfunded vested benefits as those benefits come due in the future."

*Id.* at 348.

The Plan asked Ruschau to compute Energy West's withdrawal liability.  *See* Def.'s Mot. at 5.  Ruschau first determined that, as of June 30, 2015, the Plan had over $3.8 billion in assets.  *See* Pls.' Emp'r Withdrawal Liability Notice and Demand, and Req. for Info., under 29 U.S.C. § 1399 ("Liability Notice") at J.A. 552.  He then calculated that the present value of the Plan's future obligations to participating employees—the cost of benefits it was obligated eventually to pay out—stood at over $9.5 billion.  *Id.*  To reach that figure, Ruschau assumed that the Plan's assets would grow at the Pension Benefit Guarantee Corporation's (PBGC) assumed rate for annuities (2.71% for the first twenty years and 2.78% thereafter)—not the 7.5% rate of return he had used in his 2015 Valuation for the Plan's expected rate of return on its investments.  *Id.*; *see also* 2015 Valuation at J.A. 613.  The resulting calculations showed a funding shortfall of over $5.7 billion.  Liability Notice at J.A. 552.

Ruschau then calculated that, based on the number of hours Energy West employees had worked over the previous five-year period in comparison with the total number of hours worked by all employees participating in the plan, Energy West was responsible for just over two percent of the total, yielding a withdrawal liability of $115,119,099.34.  *Id.* at J.A. 551.  The Plan gave Energy West the option of paying a lump sum up front or paying in monthly installments of $247,251.12 that would last indefinitely.[1]  *Id.* at J.A. 542.

Energy West balked at those numbers and took the Plan to arbitration.  Def.'s Mot. at 6.  The Parties submitted two questions for Arbitrator Mark L Irvings to decide:

---

[1] Under ERISA, the monthly installment payments are capped so that the withdrawing employer's installment payments roughly reflect what it was paying monthly before withdrawal.  *See* 29 U.S.C. § 1399(c)(1)(C).  In addition, in most circumstances, ERISA imposes a twenty-year cap on installment payments, regardless of the total liability.  *See id.* § 1399(c)(1)(B).  But as discussed below, the Plan takes the position that that twenty-year cap does not apply to it.  *See* Section III.B, *infra*.

> 1.  Whether the actuarial assumptions used . . . to calculate Energy West's withdrawal liability were unreasonable in the aggregate . . . ?
>
> 2.  Whether the UMWA 1974 Pension Plan is exempt from the 20-year cap on withdrawal liability installment payments set forth in [29 U.S.C. § 1399(c)(1)(B)]?

Award at J.A. 1.  Energy West first argued that it was unreasonable as a matter of law for Ruschau to have used one rate (7.5%) to estimate the fund's expected return on investments and a much lower rate (2.71%–2.78%) to estimate the contributions required for Energy West to fund future benefits for its employees.  Arb. Tr. Day 1 20:11–21:19, J.A. 78–79.  Energy West argued in the alternative that even if the rates need not be identical, the stark difference between the two rates Ruschau selected caused his calculations to be unreasonable under ERISA.  *Id.*  Second, Energy West contended that the Plan was no longer subject to any exemption from the 20-year cap on installment payments because of changes in its tax consideration that removed it from the set of multiemployer pension plans that Congress exempted from the cap decades ago.  *Id.* 21:20–24:14, J.A. 79–82.

Irvings conducted two days of hearings in late 2017.  Award at J.A. 1.  As to the question of reasonable discount rates, Irvings reviewed Ruschau's deposition testimony about how he had computed Energy West's withdrawal liability.  *Id.* at J.A. 13; *see also* Ruschau Dep. at J.A. 423–69.  Irvings then heard testimony and considered an expert report from Scott Hittner, an actuary and consultant testifying on behalf of Energy West.  *See* Arb. Tr. Day 1 35:14–171:1, J.A. 93–229; *see also* Hittner's Expert Report, J.A. 523–39.  Hittner explained that, in his opinion, when an actuary selects a discount rate for use in calculating an employer's withdrawal liability, "the best measure . . . is a market[-]consistent discount rate" akin to the prevailing rates for bond trading.  Arb. Tr. Day 1 59:19–62:8, J.A. 117–20.  Because the 1974 Plan is in critical status and is projected to become insolvent in the next decade, Hittner suggested, "[a] market[-]consistent

discount rate would necessarily have to reflect those factors" and would therefore need to be
*higher* to account for the Plan's low creditworthiness. *Id.* 67:16–70:7, J.A. 125–28.

In other words, Hittner opined that because Ruschau knew that the Plan was going to stop
paying out benefits in 2022 (or reduce retirees' entitlements), it made little sense to use a low
discount rate and thereby make Energy West pay a premium to exit the Plan. *Id.* 76:7–77:12,
J.A. 134–35. Using the low PBGC rate, in Hittner's view, was akin to purchasing an annuity
from a reputable insurance company with very little chance of default—nothing like purchasing
benefits from a pension plan that was likely to default in only a few years. *Id.* 83:21–84:16, J.A.
141–42. Hittner asserted that the use of a low discount rate, rather than the 7.5% minimum-
funding rate, overstated the Plan's unfunded vested liabilities by 141%, or $3.4 billion. *Id.* 72:7–
20, J.A. 130; 78:19–79:4, J.A. 136–37. He believed that the proper discount rate would have
been somewhere in the range of 6.0%–6.5%. Hittner's Report ¶ 26, J.A. 532–33. But on cross-
examination, Hittner admitted that guidance from the national Actuarial Standards Board permits
the use of annuity-like rates (such as the PBGC rates) when calculating withdrawal liability:

> Q:  . . . The guidance says that the actuary may consider a rate
> implicit in annuity prices.  You've already agreed that the PBGC
> rates are a proxy for annuity prices.  So, are you saying it was
> unreasonable for the plan's actuary to follow this guidance from the
> [Actuarial Standards of Practice (ASOP)]?
>
> A:  I don't think it was inappropriate for the actuary to follow the
> guidance of the ASOP, but in my expert opinion, it would be more
> appropriate to consider a market[-]consistent measure that is
> reflective of the 1974 Plan's ability to continue to pay benefits
> relative to the rates that are implicit in the PBGC or the—the rates
> implicit in the annuity prices that are reflected in the PBGC interest
> rates.
>
> Q:  Okay.  When you say you agreed that it was not inappropriate
> for the plan's actuary to follow this guidance, would you agree that
> it was then not unreasonable for the actuary to follow this guidance?

> A:  It was not unreasonable for the actuary to follow the guidance,
> but, again, the rates implicit in annuity prices I don't think—in my
> view, are not the most appropriate basis for setting the discount rate.

Arb. Tr. Day 1 148:9–149:12, J.A. 206–07; *see also* Actuarial Standards Board, ASOP No. 4,

Measuring Pension Obligations and Determining Pension Plan Costs or Contributions (2013),

J.A. 1230–65; Actuarial Standards Board, ASOP No. 27, Selection of Economic Assumptions

for Measuring Pension Obligations (2013), J.A. 1266–1303.

Dr. Ethan Kra, himself an actuary, submitted an expert report and testified on the Plan's

behalf.  Arb. Tr. Day 2 179:9–269:18, J.A. 286–369; *see also* Kra's Expert Report, J.A. 470–

522.  He testified that, in his opinion, Hittner's proposed method of pegging withdrawal-liability

discount rates to prevailing rates in the bond markets "flies in the face of widely accepted

actuarial practice."  Arb. Tr. Day 2 191:21–192:5, J.A. 298–99.

> It is not in the literature. . . .  I don't believe any fund in the United
> States . . . uses this method.  I have not heard of anyone proposing
> it.  I've not heard it discussed at any actuarial meetings.   In
> committees, task forces, . . . this approach was never broached,
> never came up in any of the discussions at the practice council or at
> the pension committee in all the years that I sat on [it].

*Id.* 192:1–22, J.A. 299.  Kra also testified that Hittner's method would create perverse incentives

for employers because as a fund approaches insolvency, the discount rate for any one

withdrawing employer would go up in order to account for the plan's impending default.  *Id.*

199:4–203:21, J.A. 306–10.  Employers would therefore compete to be the next-to-last

participant out the door, because that employer's withdrawal-liability discount rate would be so

high that the employer would owe next to nothing upon withdrawal.  *Id.*  The last employer,

however, would then be stuck holding the bag, responsible for funding all future benefits—even

if the fund were to cut back on benefits and restructure, effectively extending insolvency out into

the future.  *Id.*  Kra testified that such an actuarial method was inconsistent with actuarial

guidance and practice, as well as the governing statutes.  *Id.*

In his August 7, 2018 award, Arbitrator Irvings concluded that Ruschau's assumptions

underlying his calculation of Energy West's withdrawal liability were not unreasonable and that

there is no cap on Energy West's installment payments.  Award at J.A. 50–56.  He therefore

upheld both the Plan's calculation of Energy West's withdrawal liability and its conclusion that

the installment payments would continue indefinitely.  *Id.* at J.A. 56.

The Plan filed this suit one year later, seeking to enforce the award.  *See generally*

Compl. (citing 29 U.S.C. §§ 1401(b)(2), (3)).  Energy West answered and filed a counterclaim in

which it asked the Court to correct the arbitrator's alleged legal errors and either vacate and

remand to the arbitrator or modify the award.  *See generally* Countercl. (citing 29 U.S.C.

§ 1401(b)(2)).  The Parties filed Cross-Motions for Summary Judgment on the same issues they

submitted for arbitration:  whether the actuarial assumptions were unreasonable and whether the

number of installments Energy West must pay to satisfy its withdrawal liability is capped.  *See*

*generally* Pls.' Mot. for Summ. J. to Enforce Arb. Award, ECF No. 32; Def.'s Mot. for Summ.

J., ECF No. 29.

## II.    Legal Standard

ERISA requires the use of arbitration to resolve disputes between multiemployer pension

plans and participating employers.  29 U.S.C. § 1401(a)(1).  For the purposes of arbitration, "any

determination made by a plan sponsor under [the provisions governing calculation of withdrawal

liability] is presumed correct unless the party contesting the determination shows by a

preponderance of the evidence that the determination was unreasonable or clearly erroneous."

*Id.* § 1401(a)(3)(A).  The statute permits the parties to go to court "to enforce, vacate, or modify

the arbitrator's award." *Id.* § 1401(b)(2). "Any arbitration proceedings . . . shall . . . be conducted in the same manner, subject to the same limitations . . . , and enforced in United States courts as an arbitration proceeding carried out under [the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*]" *Id.* § 1401(b)(3).

The Parties dispute exactly what the statute requires the Court to do in reviewing the award. The Plan contends that the Court should apply the deferential standard of the Federal Arbitration Act, which permits the Court to overturn the arbitrator's award only if it was the product of corruption, fraud, or undue means or if the arbitrator exceeded his authority. Pls.' Mot. at 19 (citing 9 U.S.C. § 10(a)). By empowering federal courts to enforce arbitral awards "as an arbitration proceeding carried out under [the Federal Arbitration Act]," ERISA's plain text might seem to comport with the Plan's arguments. 29 U.S.C. § 1401(b)(3).

But that's not how courts have interpreted the statute. The Plan points to a single sentence in a 1984 D.C. Circuit case that merely restates the statute's language. *See* Pls.' Mot. at 19 (citing *Wash. Star Co. v. Int'l Typographical Union Negotiated Pension Plan*, 729 F.2d 1502, 1505 (D.C. Cir. 1984) ("The court must enforce the arbitrator's decision in accordance with the United States Arbitration Act, 9 U.S.C. §§ 1–14, which authorizes only limited review." (citing 29 U.S.C. § 1401(b)(3)))). And subsequent D.C. Circuit opinions (as well as those from every other circuit to consider the issue) make clear that "the district court[s] also ha[ve] the duty of determining 'whether applicable statutory law has correctly been applied and whether the findings comport with the evidence.'" *Combs v. Classical Coal Corp.*, 931 F.2d 96, 102 (D.C. Cir. 1991) (quoting *I.A.M. Nat'l Pension Fund Benefit Plan C v. Stockton TRI Indus.*, 727 F.2d 1204, 1207 n. 7 (D.C. Cir. 1984)); *see also* Pls.' Mot. at 19 n.3 (collecting cases from other circuits). In fact, *Combs* dealt with the exact same question of reasonableness of actuarial

assumptions applied to withdrawal liability, and there was no question there that the district court had correctly reached the question (and overturned the award). *Combs*, 931 F.2d at 102.

Under that framework, the Court therefore reviews the two issues presented to the arbitrator, to the extent that they involve questions of law, *de novo. Id.* As to questions of fact, the arbitrator's findings are presumed to be correct but are rebuttable by "a clear preponderance of the evidence." 29 U.S.C. § 1401(c). And the ultimate question is whether Energy West can "show[ ] by a preponderance of the evidence that the determination [of withdrawal liability] was unreasonable or clearly erroneous." *Id.* § 1401(a)(3)(A).

## III.   Analysis

Energy West makes roughly the same arguments here that it made in arbitration. It first asserts that, as a matter of law, an actuary cannot select a withdrawal-liability discount rate that is different from a plan's minimum-funding rate—at least not without a compelling justification. Def.'s Mot. at 7–13. Alternatively, Energy West argues that even if there is no legal requirement that the two rates be identical, Ruschau's selection of the low PBGC rate was inconsistent with the statute either because it did not take the right factors into account or because the difference between the rates was so great as to make the selection altogether unreasonable. *Id.* at 13–16. Energy West also contends that the provision exempting certain plans from the 20-year cap on installment payments does not apply to the 1974 Plan as it exists today. *Id.* at 16–22.

### A.   Ruschau's Actuarial Assumptions Were Not Unreasonable

It is undisputed that, as of 2015, the Plan's assets were less valuable than its liabilities— the future benefits promised to participating employees and their families. Liability Notice at J.A. 552. Therefore, if an employer like Energy West wished to withdraw from the Plan, the employer was required to contribute some amount of money to cover future unfunded liabilities

for its own employees whose benefits have vested and that the Plan will need to pay in the future.  29 U.S.C. § 1399.

ERISA imposes detailed requirements for how to conduct an employer withdrawal and calculate the employer's withdrawal liability.  *See id.* §§ 1381–1405.  It is the duty of the "plan sponsor" (here, the Plan's joint board of trustees, *see id.* § 1301(a)(10)(A)) to calculate the liability.  *Id.* § 1382.  As noted above, the Plan calculated Energy West's withdrawal liability at $115,119,099.34.  Liability Notice at J.A. 541.  To get there, Ruschau, the Plan's actuary, determined the employer's proportional share of unfunded liabilities and assumed that Energy West's contribution would grow at a rate of 2.71%–2.78%, the PBGC's default rates for annuities.  *Id.* at J.A. 552.  Energy West does not argue that the actuary miscalculated the proportions—that is, that it was responsible for roughly two percent of the Plan's total unfunded vested benefits.  It also agrees that Ruschau analyzed several appropriate factors when estimating the Plan's future liabilities, such as "[r]etirement rates; termination rates; [the] percentage [of employees who are] married; spouse age difference; . . . mortality; [and] expenses."  William Ruschau Dep. 23:7–9, J.A. 429.  The only issue is whether it was reasonable for Ruschau to have employed a withdrawal-liability discount rate (again, 2.71%–2.78%) that differed significantly from the Plan's minimum-funding rate (7.5%).  If Ruschau had used 7.5% for both numbers, as Energy West argues he was required to do, Energy West's withdrawal liability would have been considerably smaller—somewhere in the neighborhood of $40 million, because assuming a higher rate of return requires a smaller contribution at the outset.  Def.'s Mot. at 3.

The difference turns on the assumptions Ruschau used in his calculations.  To come up with the Plan's anticipated performance rate for the purpose of assessing minimum-funding requirements, Ruschau took into account the Plan's past performance, along with the various

factors listed above.  *See* Ruschau Dep. 23:4–10, J.A. 429.  But to get the withdrawal-liability

discount rate, he selected "a reasonable risk[-]free interest rate that would be appropriate to settle

the obligations." *Id.* 24:6–8, J.A. 429.  That's equivalent to buying "an annuity to fully settle up

the plan's obligations." *Id.* 24:12–13, J.A. 429.  In other words, rather than use the Plan's

existing experiential data, Ruschau essentially looked at the market rate for an annuity to get a

defined output—the amount needed to cover Energy West's share of future benefit payments.

*Id.* 24:4–25:10, J.A. 429–30.

The reasoning behind that methodology is simple.  An employer that continues to

participate in a plan must make contributions based on the number of hours its employees work

in a given year, but if the plan's investments do not achieve the expected rate of return because

of a downturn in market conditions, the employer is obligated to make additional contributions to

compensate for the funding shortfall.  *Id.* 64:12–22, J.A. 439.  But withdrawing employers avoid

that risk—once they've exited, their obligations remain the same no matter what happens in the

market.  *Id.*  As a result, actuaries tend to adjust the discount rate down to account for the

absence of future risk for the withdrawing employer.  *Id.*  Ruschau admitted that he did not factor

in the Plan's historical performance in setting the withdrawal-liability discount rate because that

data would have no bearing on Energy West's withdrawal from the Plan going forward.  *See id.*

at 21–30, J.A. 428–30.  Ruschau instead chose the PBGC's rates because its "interest

assumptions were a reasonable proxy for risk[-]free interest rates." *Id.* at 39:1–6, J.A. 433.

Energy West makes two separate arguments that Ruschau's actuarial assumptions were

"unreasonable" as the term is used in the statute.  First, it relies on a creative reading of two

subsections of the statute and dicta in a Supreme Court opinion for the proposition that actuaries

must use the same rates for both numbers as a matter of law, at least absent some justification for

the deviation.[2]  *See* Def.'s Mot. at 7–13.  Second, even if the rates need not be identical, it argues

that the low discount rate for its withdrawal liability was unreasonable because it did not

represent "the actuary's best estimate" or "tak[e] into account the experience of the plan," *id.*

(quoting 29 U.S.C. § 1393(a)(1)), but was rather a default PBGC rate.  *See* Def.'s Mot. at 13–16.

### 1.      The Rates Need Not Be Identical

Energy West compares two nearly identical subsections in ERISA to argue that both

subsections require the same results.  *See* Def.'s Mot. at 7–13.  It first looks to ERISA's

requirements for how to calculate an employer's withdrawal liability—the provisions most

directly relevant here—stating that actuaries should rely on

> actuarial assumptions and methods which, *in the aggregate*, are
> reasonable (taking into account the experience of the plan and
> reasonable expectations) and which, in combination, offer the
> actuary's best estimate of anticipated experience under the plan . . . .

29 U.S.C. § 1393(a)(1) (emphasis added).  Following those guidelines, Ruschau selected the

PBGC rates of 2.71%–2.78%.  Ruschau Dep. 24:6–8, J.A. 429.

Energy West then points to similar language in the ERISA provision that guides the

actuary's calculation of the Plan's minimum-funding rate, which (again) determines whether

participating employees must make excess contributions in any given year to maintain solvency.

*See* Def.'s Mot. at 8 (citing 29 U.S.C. § 1084).  That subsection states that

> [a]ctuarial assumptions must be reasonable.  For purposes of this
> section, all costs, liabilities, rates of interest, and other factors under

---

[2] Several statements in Energy West's briefs suggest the argument that the law *always* requires
the two rates to be identical.  *See, e.g.*, Def.'s Mot. at 9 ("In simple terms, the actuary is free to
choose the discount rate assumption, but once chosen, *must use* the same rate consistently for
both minimum funding and withdrawal liability purposes." (emphasis added)).  But Energy West
hedged this argument at the hearing by stating that "you can have a difference, but the actuary
has to justify why that difference is."  Tr. 5:4–5, ECF No. 39.

> the plan shall be determined on the basis of actuarial assumptions and methods—
>
> (A) *each of which* is reasonable (taking into account the experience of the plan and reasonable expectations), and
>
> (B) which, in combination, offer the actuary's best estimate of anticipated experience under the plan.

29 U.S.C. § 1084(c)(3) (emphasis added).  When calculating the minimum-funding rate under that guidance, actuaries must analyze plan performance to date, the investment portfolio, and various other factors affecting the Plan's finances to determine how much money employers must contribute in the coming year.  *Id.*  It was this process that led Ruschau to project that the Plan's investments would achieve a 7.5% rate of return during the 2014 and 2015 plan years. *See* 2015 Valuation at J.A. 565–66, 570, 613–19.

The only textual difference between the two subsections is that *each* of the assumptions must be reasonable in the minimum-funding rate context, 29 U.S.C. § 1084(c)(3), while the assumptions must be reasonable *in the aggregate* to get the withdrawal-liability discount rate, *id.* § 1393(a)(1).  If that's the case, Energy West contends, shouldn't the same input in both calculations yield the same output?  *See* Def.'s Mot. at 8–9.  And if that's so, the argument goes, then the stark difference between Ruschau's two rates must, as a matter of law, be incorrect.  *Id.*

At first glance, language in a Supreme Court opinion seems to support that contention.  In *Concrete Pipe*, an employer attacked the entire statutory construct on due process grounds, arguing that submitting to arbitration under standards that were deferential to the plan deprived it of a fair hearing in the first instance.  508 U.S. at 615.  The Court rejected that argument because the employer got a fair shake in front of the arbitrator—the fact that the employer had the burden of proof to show that the calculations were unreasonable did not deprive it of due process.  *Id.* at 635–36.  As relevant here, the Court pointed to various statutory provisions, such as the actuary's

calculation of the withdrawal-liability discount rate, to show that there were procedural checks in place to cabin the plan's discretion in calculating the withdrawal liability at the outset. *Id.* at 631–33.  The Court pointed out that not only is the actuary an independent professional governed by industry standards, but the actuary also has to pick interest rates that might benefit one party in some areas but hurt it in others, so there isn't really an opportunity to rig the system in favor of the plan. *Id.*  For instance, because the subsections governing minimum-funding and withdrawal-liability calculations employ nearly identical language, one might conclude that "[u]sing different assumptions for different purposes could very well be attacked as presumptively unreasonable both in arbitration and on judicial review, . . . because the use of assumptions overly favorable to the fund in one context will tend to have offsetting unfavorable consequences in other contexts." *Id.* at 633 (internal quotation omitted).

Energy West seizes on that language.  It points out that Ruschau selected two different rates even though the statutory subsections governing the selection of those rates are nearly identical.  *See* Def.'s Mot. at 9–10.  In its view, Ruschau's calculations "cannot be the actuary's best estimate because the actuary cannot have two best estimates of plan experience, one for minimum funding at 7.5% and one for withdrawal liability at the PBGC rates." *Id.* at 10.  Energy West argues that by selecting two separate rates, both of which are favorable to the Plan, Ruschau disregarded the checks that Congress included to ensure that the Plan's assessments of liability would not unnecessarily burden employers. *Id.*

But the very next sentence in the Supreme Court's opinion dispels any notion that the two rates must be the same as a matter of law:  "This point is not significantly blunted by the fact that the assumptions used by the Plan in its other calculations may be supplemented by several actuarial assumptions unique to withdrawal liability." *Concrete Pipe*, 508 U.S. at 633 (internal

quotation omitted). The Court seems to have assumed that the discount rate for withdrawal liability could differ materially from the minimum-funding rate because the circumstances are different. The statutory text (as it exists today) bears that out, requiring only that the assumptions underlying the selection of withdrawal-liability discount rates be reasonable "in the aggregate." 29 U.S.C. § 1393(a)(1).[3] That gives actuaries some room to maneuver. *Concrete Pipe's* own use of permissive language reinforces that point. *See* 508 U.S. at 633 ("Using different assumptions . . . *could very well* be attacked . . . ." (emphasis added)).

Energy West points to two other recent opinions it believes support its position, but neither does. In *New York Times Company v. Newspaper and Mail Delivers'-Publishers' Pension Fund*, the court vacated an arbitral award upholding the use of the "Segal Blend," an actuarial method that blends a plan's minimum-funding rate and PBGC annuity rates to compute the withdrawal-liability discount rate. 303 F. Supp. 3d 236, 251–56 (S.D.N.Y. 2018), *appeals voluntarily dismissed*, Nos. 18-1140, 18-1408 (2d Cir. Oct. 16, 2019). The employer there argued that, under *Concrete Pipe*, the two rates must be identical as a matter of law. *Id.* at 253–54. After a careful review of the Supreme Court's statements in *Concrete Pipe*, Judge Sweet rejected that argument, concluding that *Concrete Pipe's* language "does not mean . . . that deviation is, at all times, impermissible by law." *Id.* at 254 (citing *Chicago Truck Drivers*, 698 F.3d at 355). Likewise, in the other decision on which Energy West relies, the court not only rejected the employer's argument that the two rates must be identical, it *upheld* the use of the

---

[3] As Energy West notes, the language in the two subsections was identical when the Supreme Court decided *Concrete Pipe*. *See* Def.'s Mot. at 8 n.2. At that time, subsection 1084(c)(3) (then subsection 1082(c)(3)) also contained the "in the aggregate" language. *See Concrete Pipe*, 508 U.S. at 632; 29 U.S.C. § 1082(c)(3) (1988). Congress amended the subsection (and renumbered it) in 2006 to require each of the actuary's assumptions in the minimum-funding context to be reasonable, removing the "aggregate" language. *See* Def.'s Mot. at 8 n.2; *see also* § 102(a), 120 Stat. at 862. The amendment does not meaningfully affect the Court's analysis here.

Segal Blend (which necessarily causes the two rates to diverge) as reasonable in that instance. *See Manhattan Ford Lincoln, Inc. v. UAW Local 259 Pension Fund*, 331 F. Supp. 3d 365, 386–93 (D.N.J. 2018), *appeal voluntarily dismissed*, No. 18-2709 (3d Cir. Oct. 9, 2018).

In sum, nothing in ERISA's text or in *Concrete Pipe* requires that the minimum-funding rate and withdrawal-liability discount rate be the same, and Energy West has pointed to no case in which a court came to the opposite conclusion.  And to the extent that Energy West argues that an actuary must merely justify his choices, that argument is subsumed into the question of whether the actuary's assumptions are reasonable.

### 2.    The Weight of the Evidence Supports the Arbitrator's Conclusions

Because the two rates may deviate from one another, Energy West must demonstrate that Ruschau's actuarial assumptions were unreasonable "in the aggregate" or did not "offer the actuary's best estimate of anticipated experience under the plan."  29 U.S.C. § 1393(a)(1).

### a.    Reasonable Assumptions

To recap the evidence, the arbitrator reviewed Ruschau's deposition testimony and took reports and heard testimony from two expert witnesses:  Scott Hittner (for Energy West) and Ethan Kra (for the Plan).  *See generally* Arb. Trs., J.A. 58–418.  Kra testified that Ruschau's methodology was appropriate, citing (1) the reasonableness of using risk-free annuity proxy rates in exchange for relieving an employer of any future risk, Kra's Report ¶¶ 44–45, J.A. 484–85; (2) the use by many multiemployer plans of similar rates, Arb. Tr. Day 2 218:14–219:8, J.A. 325–26; (3) the fact that no fund uses Hittner's proposed method, *id.* 192:9–193:2, J.A. 192–93; and (4) the perverse incentives that Hittner's method would create for employers to withdraw as a plan neared insolvency, putting all liability on the last employer left in the room and permitting the others to depart without paying much of anything, *id.* 200:16–203:21, J.A. 307–10.

Hittner, in contrast, criticized Ruschau's methods, arguing that although there was no need for the two rates to be identical (contradicting Energy West's argument discussed above), the PBGC rates were unreasonably low because the Plan is set to become insolvent in 2022. Arb. Tr. Day 1 76:7–77:12, J.A. 134–35. Hittner argued that Ruschau instead should have taken the fact of the Plan's impending insolvency into account and assessed its creditworthiness accordingly, yielding a discount rate of 6.0%–6.5%. *See* Hittner's Report ¶¶ 25–26, J.A. 532–33. But on cross-examination, Hittner admitted that Ruschau's methodology comported with professional standards. Arb. Tr. Day 1 148:9–149:12, J.A. 206–07; *see also* ASOP No. 27, J.A. 1266–1303. He also admitted that many other funds use similar methods, and he struggled to name funds that follow his method. Arb. Tr. Day 1 148:9–149:12, J.A. 206–07. Moreover, although he testified that the use of PBGC rates was "not the most appropriate" method, he acknowledged that it was "reasonable:"

> Q:  Okay.  When you say you agreed that it was not inappropriate for the plan's actuary to follow [ASOP] guidance, would you agree that it was then not unreasonable for the actuary to follow this guidance?
>
> A:  *It was not unreasonable for the actuary to follow the guidance*, but, again, the rates implicit in annuity prices I don't think—in my view, are not the most appropriate basis for setting the discount rate.

*Id.* 149:3–12, J.A. 207 (emphasis added).

Irvings's award focused intently on the expert testimony. *See* Award at J.A. 49–53. Emphasizing the statutory burden of proof, which required Energy West to "show[] by a preponderance of the evidence that the [Plan's] determination was unreasonable or clearly erroneous," 29 U.S.C. § 1401(a)(3)(A), Irvings homed in on Hittner's admissions of the reasonableness of Ruschau's assumptions:

> While Hittner opined that it would have been more appropriate for Ruschau to increase the discount rate used to compute withdrawal

liability to account for the impending insolvency of the Plan, he acknowledged in sworn testimony that the assessment of withdrawal liability is a settlement of an employer's pension obligations. He said it was proper for an actuary to select different interest[] rates, depending on the particular purpose. He stated that it was not inappropriate for Ruschau to have followed the guidance of ASOP No. 27 Section 3.9(b), which states that an actuary may use a discount rate implicit in annuity prices when measuring the present value of benefits for defeasance or settlement purposes. Hittner also confirmed that the PBGC rates are a reasonable proxy for annuity prices, and he never suggested Ruschau had misstated what the PBGC rates were at the time of Energy West's withdrawal[-]liability calculation. Finally, while still insisting that a market[-]consistent measure would have been the more appropriate rate, Hittner ultimately conceded that "*It was not unreasonable for the actuary to follow the [ASOP No. 27] guidance*[ ]. . .[ .]" Given the statutory burden of proof, this conclusion by Energy West's own expert is fatal to its claim.

Award at J.A. 49–50. Irvings went on to point to various ERISA provisions that support the practice of using risk-free rates for withdrawal liability and to Kra's undisputed expert testimony explaining why that practice is consistent with both ERISA and actuarial professional standards. *Id.* at 50–53.

On judicial review of an arbitral award, ERISA creates a "presumption, rebuttable only by a clear preponderance of the evidence, that the findings of fact made by the arbitrator were correct." 29 U.S.C. § 1401(c). Arbitrator Irvings determined, based largely on Hittner's admission that Ruschau's methods were reasonable, that the selection of the PBGC rates was permissible in this instance. Award at J.A. 49–50. To be sure, "[u]sing differing assumptions for different purposes could very well be attacked as presumptively unreasonable." *Concrete Pipe*, 508 U.S. at 633 (quotation and alterations omitted). But considering the evidence in the record, especially the fact that Energy West's own expert conceded that Ruschau's assumptions were reasonable in light of industry standards, the Court cannot conclude that Energy West has rebutted the presumption that Irvings's findings were correct.

b.    The "Best Estimate" Test

Once its own expert admitted that Ruschau's method was reasonable, Energy West had to

switch gears.  Rather than attacking the use of PBGC rates as unreasonable *per se*, Energy West

pointed to the rest of subsection 1393(a)(1), which requires not only that the assumptions and

methods be reasonable "in the aggregate," but also that they "tak[e] into account the experience

of the plan and reasonable expectations" and "in combination, offer the actuary's best estimate of

anticipated experience under the plan."  29 U.S.C. §1393(a)(1).  Energy West argued (and

renews the argument here) that the use of a default PBGC rate, by definition, cannot serve as the

"actuary's best estimate of anticipated experience under the plan," *id.*, because it pays no regard

to the Plan's unique characteristics and investment portfolio.  Award at J.A. 34–35 (summarizing

Energy West's position); *see also* Def.'s Mot. at 13–15 (reiterating argument).

A few months after the arbitration hearings but before Irvings issued his award, Judge

Sweet issued his opinion in *New York Times.  See generally* 303 F. Supp. 3d 236.  In that case

(which also reviewed one of Arbitrator Irvings's decisions, *see* Award at J.A. 44), despite

rejecting the employer's argument that *Concrete Pipe* mandated identical minimum-funding and

withdrawal-liability discount rates, the court nevertheless overturned Irvings's conclusion that

the actuary's use of the Segal Blend method in that instance was reasonable.  *See N.Y. Times*,

303 F. Supp. 3d at 251–56.  The fund there used a 7.5% minimum-funding rate of return, so the

actuary blended it with the PBGC rates and calculated that the appropriate withdrawal-liability

discount rate was 6.5% (nearly four percentage points higher than the rates at issue here).  *Id.* at

255.  After the arbitrator decided that using the Segal Blend was *permitted*, he did not further

opine on whether it represented the actuary's "best estimate" of the plan's "anticipated

experience," as the statute requires.  *Id.*  The court reversed on that basis and remanded to the

arbitrator to consider the question in the first instance.[4]  *Id.*  Energy West relied heavily on *New York Times* before the arbitrator, and in its briefs here, to support its position that the selection of PBGC rates, which do not take into account the Plan's characteristics at all, is an even greater mistake than using the Segal Blend, which at least uses the Plan's own minimum-funding rate as one of its primary inputs.  Award at J.A. 41–42; Def.'s Mot. at 13–15.

The Plan responds that *New York Times* is an outlier because every other case to have considered the issue (or related issues) has concluded that blended rates are reasonable so long as it was the *actuary*, not the plan's trustees, who chose to use them.  *See* Award at J.A. 42–43 (summarizing the Plan's position); *see also* Pls.' Opp'n to Def.'s Mot. for Summ. J. to Vacate Arb. Award ("Pls.' Opp'n") at 16–18, 26, ECF No. 33.  Indeed, several circuits have concluded that "the best estimate test is procedural, as opposed to substantive, in nature."  *Vinson & Elkins v. Comm'r.*, 7 F.3d 1235, 1238 (5th Cir. 1993) (interpreting identical language in 26 U.S.C. § 412(c)(3)).  That's because ERISA and other statutes that use the phrase "refer[] to the *actuary's* best estimate, which implies a procedural approach.  One goal of such an inquiry would be to determine whether assumptions truly came from the plan actuary or whether they were instead chosen by plan management for tax planning or cash flow purposes."  *Id.* (citing *Huber v. Casablanca Indus., Inc.*, 916 F.2d 85, 93 (3d Cir. 1990)); *see also Chicago Truck Drivers*, 698 F.3d at 354–57 (upholding arbitrator's decision to overturn withdrawal-liability determination because the plan "direct[ed the actuary] to switch from one method of estimating

---

[4] Energy West argues that the *New York Times* court "found that the 1.0% deviation [between the minimum-funding and withdrawal-liability discount rates] was unreasonable and in violation of ERISA."  Def.'s Mot. at 12.  But that's not what the opinion says; the court merely held that the arbitrator failed to consider whether the deviation was reasonable, so the court could not uphold the award.  303 F. Supp. 3d at 255–56.  It did not reach the question of whether the deviation was ultimately correct.  *Id.*

the interest rate to another [and then directed it to switch back, thus] compound[ing] the damage
to [the employer], and also violat[ing] the 'best estimate' requirement, which exists to maintain
the actuary's independence."); *Citrus Valley Estates, Inc. v. Comm'r.*, 49 F.3d 1410, 1415 (9th
Cir. 1995) ("plan funding decisions . . . must represent the actuary's professional judgment, not
the tax-motivated wishes of plan sponsors or administrators[,] . . . [and] plan actuaries must live
up to national professional, ethical and technical standards which help to minimize the risk of
untoward advice."); *Rhoades, McKee & Boer v. United States*, 43 F.3d 1071, 1075 (6th Cir.
1995) ("[T]he best estimate test is procedural only, and does not place a second substantive
hurdle in the path of actuarial assumptions."); *Wachtell, Lipton, Rosen & Katz v. Comm'r*, 26
F.3d 291, 295–96 (2d Cir. 1994) (upholding actuarial decision to choose conservative estimates
in selecting funding rates and using the same rate across 41 different plans against IRS's charge
that actuary didn't make specific findings as to each plan's anticipated performance).

 Looking for an example in which a court has given substantive meaning to the "best
estimate" language, Energy West cites *National Retirement Fund v. Metz Culinary Management,
Inc.*, which considered the question of whether an actuary's modifications to prior assumptions
can apply retroactively to modify withdrawal liabilities calculated months earlier.  No. 16-CV-
2408, 2017 WL 1157156 (S.D.N.Y. Mar. 27, 2017).  In *Metz*, the fund's actuary calculated the
2013 withdrawal-liability discount rate at 7.25%, effective December 31, 2012.  *Id.* at *3.  The
fund then hired a new actuarial firm for plan year 2014, but it did not update its withdrawal rate
as of December 31, 2013.  *Id.*  Metz, a participating employer, transmitted its intent to withdraw
from the fund on May 16, 2014, with the understanding that, in the absence of any new rates, the
fund would calculate Metz's withdrawal liability using the previous year's 7.25% rate.  *Id.* at *4.
The new actuary finally selected its plan year 2014 discount rate a few weeks after Metz

announced its withdrawal from the fund, abandoning the previous firm's assumptions and

choosing a PBGC rate of 3% for the first twenty years and 3.31% thereafter.  *Id.* at *3.  The fund

calculated Metz's withdrawal liability retroactively using the new rate, thereby increasing Metz's

withdrawal liability nearly fourfold over what it would have been under the old rate.  *Id.* at *4.

 An arbitrator vacated the retroactive application of the lower discount rate and reinstated

the earlier calculation, concluding that in the absence of a timely determination of the 2014

discount rate, the previous assumptions remained valid and applied to any withdrawals that

occurred before the fund modified its assumptions.  *Id.*  But the district court reversed, holding

that because section 1393(a)(1) requires actuaries to use their "best estimate of anticipated

experience under the plan," the arbitrator was wrong to conclude that the fund should have used

an old rate that did not take into account the fund's experience during 2013.  *Id.* at *6.  In the

district court's view,

> to satisfy Section [1393], actuaries must take into account the full experience of the plan, develop reasonable expectations, and ultimately provide their *best* estimate of unfunded vested benefits in light of the plan's experience and the actuary's reasonable expectations.  An actuary can only do so by incorporating data from the entirety of the most recent preceding plan year.  In no universe is carrying over assumptions from a prior plan year without *any* examination or analysis as to their continued viability and reasonableness an actuary's "best estimate."  Yet the Arbitrator concluded precisely that.  An actuary may ultimately conclude that the prior plan year's assumptions continue to be reasonable in light of all of the available data, but she must affirmatively reach that conclusion in order for the assumptions to qualify as such.

*Id*.  Moreover, the court found no evidence that the actuary who calculated the 2013 discount rate

intended for it to apply in 2014 or that ERISA barred retroactive application of actuarial

assumptions.  *Id.* at *8–12.  The court vacated the award.  *Id.* at 13.

 From that language, Energy West argues that because the default PBGC rates Ruschau

selected do not take into account the 1974 Pension Plan's experience *at all*, the rates cannot meet

section 1393's strict criteria.  *See* Def.'s Mot. at 14–15.  There are several problems with this

argument.  For one, *Metz* dealt with whether stale assumptions remain valid in the absence of a

new determination—an issue that does not exist here, as there is no contention that the Plan

failed to update its default-rate assumptions for plan year 2015.  As well, the fund in *Metz*

transitioned from a discount rate of 7.25% (likely near its minimum-funding rate) *to* a PBGC

default rate that excluded the fund's unique characteristics and experience—the exact move that

Energy West protests here as improper under the statute but which the court there concluded *was*

appropriate, or at least could be, in the right circumstances.  *See Metz*, 2017 WL 1157156 at *3.

But perhaps most importantly, after briefing concluded here, the Second Circuit reversed

the district court's judgment.  *See Nat'l Retirement Fund v. Metz Culinary Mgmt., Inc.*, 946 F.3d

146 (2d Cir. 2020).  It found no reason to believe that section 1393 requires updated assumptions

each year, and that "[a]bsent a change by a Fund's actuary before the Measurement Date [in that

case, December 31, 2013], the existing assumptions and methods remain in effect."  *Id.* at 151.

> Were it otherwise, the selection of an interest rate assumption after
> the Measurement Date would create significant opportunity for
> manipulation and bias.  Nothing would prevent trustees from
> attempting to pressure actuaries to assess greater withdrawal
> liability on recently withdrawn employers . . . .  Actuaries unwilling
> to yield to trustees' preferred interest rate assumptions can be
> replaced by others less reticent.

*Id.*

That result comports with the holdings of the Second Circuit and other courts that have

interpreted section 1393's language about the "actuary's best estimate" as being procedural

rather than substantive in nature.  Unlike in *Metz*, Energy West does not contend that Ruschau

failed to make an affirmative decision about the assumptions he thought proper to use, nor that

the 1974 Pension Plan's trustees improperly influenced Ruschau or deprived him of his

professional independence.  Energy West therefore cannot rely on the statute's "best estimate"

test to assail Ruschau's selection of the discount rate.  And unlike in *New York Times*, where there was no evidence in the arbitral record about whether the divergence between the minimum-funding rate and the PBGC rate was either the actuary's best estimate or whether it was reasonable, *see* 303 F. Supp. 3d at 255–56, here there is ample evidence supporting Arbitrator Irvings's reasoned consideration of both issues.

To be sure, the huge gap that results from Ruschau's choice of such different discount rates does give the Court some pause.  Many cases with similar legal issues involve either smaller differences between the two rates or much smaller differences between the withdrawal-liability calculations, at least in absolute terms.  For example, in *Metz*, the potential withdrawal liabilities were approximately $250,000 and just under $1,000,000, respectively.  2017 WL 1157156 at *4.  In *Manhattan Ford Lincoln*, the possible liabilities were either $0 or $2.55 million.  331 F. Supp. 3d at 372–75.  And in *New York Times*, the dispute was over whether to use the 7.5% minimum-funding rate or the 6.5% Segal-Blended rate.  303 F. Supp. 3d at 251.

Here, in contrast, the use of low PBGC rates (2.71%–2.78%) results in a difference of nearly five percentage points, *see* Def.'s Mot. at 12–13, and because the discount rate is the single most influential factor affecting the calculation of withdrawal liability, the absolute difference is about $75 million.  *See id.* at 3.[5]  Nevertheless, the record before the arbitrator supports his conclusion that Ruschau's methods comported with professional guidelines, that his assumptions were reasonable in the aggregate, and that his calculations represented his own best

---

[5] The Court also notes that in *Metz*, the Second Circuit discussed the fund's shift from using the minimum-funding rate to using PBGC default rates and expressed concern that such a move was exactly the sort of event that *Concrete Pipe* warned might be "presumptively unreasonable."  946 F.3d at 151–52 (quoting *Concrete Pipe*, 508 U.S. at 632–33).  But unlike in *Metz*, because there is no evidence that the Plan's trustees exerted undue influence on Ruschau by pressuring him to apply a low rate to Energy West's withdrawal, *see* Award at J.A. 53–54, *Concrete Pipe* does not compel the Court to reverse the award here.

estimate, free from undue interference by interested parties.  The Court therefore cannot overturn Arbitrator Irvings's judgment under 29 U.S.C. § 1393.

**B.      The 1974 Plan is Not Subject to the 20-Year Cap on Installment Payments**

In an effort to curb excessive withdrawal penalties, Congress permitted withdrawing employers to pay either an up-front lump sum or installments roughly equal to what the employer was paying monthly while participating in the plan.  *See* 29 U.S.C. § 1399(c)(1)(C). Moreover, the statute limits the payment of installments to twenty years—the employer is released from its obligations thereafter, regardless of its remaining balance.  *Id.* § 1399(c)(1)(B). If that provision applied here, then Energy West would end up paying only about $59.3 million over twenty years.  But in response to extraordinarily targeted lobbying, Congress created a carve-out that exempts a single multiemployer plan from nearly every general provision designed to limit employers' liability, including the 20-year cap.  The Plan argues, and Arbitrator Irvings agreed, that this carve-out applies to it.

This issue arises out of the unique history of labor relations in the coal industry.  When a post-War breakdown in collective bargaining between the union and mining companies threatened to bring about a nationwide strike, President Truman seized control of all mines and directed the Secretary of the Interior to broker a deal.  *See E. Enters. v. Apfel*, 524 U.S. 498, 504– 05 (1998) (citing Exec. Order 9728, 11 Fed. Reg. 5,593 (May 23, 1946)).  Among other benefits for coal miners, the agreement led to the creation of the UMWA Welfare and Retirement Plan of 1950 ("UMWA 1950 W&R Plan").  *See id.* at 506.  Congress included a provision in the Internal Revenue Code of 1954 carving out certain tax deductions for any plan that was "established prior to January 1, 1954, as a result of an agreement between employee representatives and the Government of the United States during a period of Government operation, under seizure powers, of a major part of the productive facilities of the industry in which such employer is

engaged."  Pub. L. No. 83-591, § 404(c)(2), 68A Stat. 1, 141–42 (1954) (codified at 26 U.S.C.

§ 404(c)(2) (1958)).  Only one plan then in existence fit that description:  the UMWA 1950

W&R Plan.  The same language remains today.  *See* 26 U.S.C. § 404(c)(2) (2018).

After Congress passed ERISA in 1974, the unions and the employers split the UWMA

1950 W&R Plan into four separate parts:  the 1950 Pension Plan, the 1974 Pension Plan, the

1950 Benefit Plan, and the 1974 Benefit Plan.  *E. Enters.*, 524 U.S. at 509.  Miners who retired

prior to 1976 fell into the 1950 plans, while miners who were still active as of January 1, 1976

(or who entered the industry thereafter) were covered by the 1974 plans.  *Id.*  But because the

plans were already underfunded within a few years of the split, the unions and employers jointly

lobbied Congress (as part of the 1980 Multiemployer Pension Plan Amendments Act) to exclude

the plans from certain provisions otherwise included in ERISA, including the 20-year cap.  *See*

Award at J.A. 6.  Among those exclusions, Congress included the following language:

> (1) The method of calculating an employer's allocable share
> of unfunded vested benefits set forth in subsection (c)(3) shall be the
> method for calculating an employer's allocable share of unfunded
> vested benefits under *a plan to which section 404(c) of title 26, or a
> continuation of such a plan*, applies, unless the plan is amended to
> adopt another method authorized under subsection (b) or (c).
>
> (2)  Sections 1384, 1389, 1399(c)(1)(B), and 1405 of this title shall
> not apply with respect to the withdrawal of an employer from a plan
> described in paragraph (1) unless the plan is amended to provide that
> any of such sections apply.

29 U.S.C. § 1391(d) (emphasis added).  The 20-year cap on installment payments contained in

subsection 1399(c)(1)(B) thus does not apply in the event of an employer's withdrawal from "a

plan to which section 404(c) of title 26, *or a continuation of such a plan*, applies."  *Id.* (emphasis

added).  As described above, 26 U.S.C. § 404(c) only applies to one plan that was ever in

existence, the UMWA 1950 W&R Plan.  The question, therefore, is how to interpret the second

clause in the quoted phrase:  what constitutes "a continuation" of the 1950 W&R Plan?  *Id.*

Beyond the statute's text, there are only a few other authorities that give clues as to how to answer that question. Arbitrator Irvings first looked to the text of the 1974 collective bargaining agreement that split the 1950 W&R Plan into four separate benefit and pension plans (and subsequent amendments)—that agreement "expressly provided that the 1950 Pension Plan and the 1974 Pension Plan are a continuation of the 1950 W&R Fund." Award at J.A. 5; *see also* Amendments to UMWA 1974 Pension Trust Articles of Incorporation (Dec. 31, 2012), J.A. 804 ("The 1974 Pension Plan and Trust is a continuation of the benefit program established under the UMWA Welfare and Retirement Fund of 1950 . . . .").

Irvings also looked to the IRS's own determination. *See* Award at J.A. 5–6. Shortly after the employers and unions agreed to split up the UMWA 1950 W&R Plan, they asked the IRS for a determination as to whether the government would continue to treat the successor plans as it had the 1950 W&R Plan for tax purposes. *Id.* The IRS responded "that the 1950 Pension Plan and Trust[] and the 1974 Pension Plan and Trust represent a continuation of the [1950 W&R Plan] and therefore constitute a plan described in section 404(c) of the [Tax] Code." Award at J.A. 6 (quoting IRS Determination Ltr. of Jun. 9, 1975, J.A. 1115–19).

Third, Irvings discussed the four known judicial decisions that have had occasion to consider whether the 1974 Pension Plan is a continuation of the 1950 W&R Plan—all four opinions support the conclusion that it is. *See* Award at 7–9. In *Combs v. Adkins & Adkins Coal Co., Inc.*, 597 F. Supp. 122, 127–28 (D.D.C. 1984), the Court considered whether a withdrawing employer should have its liability reduced under the *de minimis* rule in 29 U.S.C. § 1389(a)(2). *Id.* It concluded that the employer could not take advantage of the rule because subsection 1391(d) states that the rule does not apply to continuations of plans listed in 26 U.S.C. § 404(c) and that the 1974 Plan is such a continuation. *Id.* (citing *Short v. United Mineworkers of Am.*

*1950 Pension Tr.*, 728 F.2d 528, 531 (D.C. Cir. 1984)).  In *Calvert & Youngblood Coal Company v. UMWA 1950 Pension Trust*, a court concluded that a withdrawing employer was not eligible for liability limitations contained in 29 U.S.C. § 1405, which again are exempted for continuations of section 404(c) plans under § 1391(d).  No. CV 82-P-1070-S, 1985 WL 9436, at *4–5 (N.D. Ala. Feb. 7, 1985).  Later that year, the court reached the same conclusion in *Combs v. Western Coal Corp.*, 611 F. Supp. 917, 922 (D.D.C. 1985) (citing *Combs*, 597 F. Supp. at 128).  Finally, in *Spring Branch Mining Company, Inc. v. UMWA 1950 Pension Trust & 1950 Pension Plan*, a court upheld the constitutionality of exempting the 1950 and 1974 Plans from many of the employer-friendly liability limitations, briefly commenting on the relationship between the 1950 W&R Plan and the continuation plans under section 404(c).  691 F. Supp. 973, 986 & n.5 (S.D. W.Va. 1987).  No court seems to have reached a contrary conclusion.

Fourth, Irvings looked to a later statute that used the same terms.  *See* Award at J.A. 9.  The Coal Industry Retiree Health Benefit Act of 1992 ("the Coal Act"), which created health benefits for coal workers, defined the term "1974 UMWA Pension Plan" as "a pension plan described in section 404(c) (or a continuation thereof), participation in which is substantially limited to individuals who retired in 1976 and thereafter."  *Id.* (quoting Pub. L. No. 102-486, Tit. XIX, Subtit. C, § 9701(a)(3), 106 Stat. 2776, 3038 (1992) (codified at 26 U.S.C. § 9701(a)(3)).

Energy West attempted before the arbitrator to downplay the relevance of those authorities by positing a novel theory of how to interpret section 1391(d)'s carve-outs as they apply today—and it renews that same argument here.  *See* Award at J.A. 36–37; Def.'s Mot. at 16–22.  Energy West's argument is hardly clear, but it appears first to argue that section 404(c) has its own carve-out.  *Id.*  As stated above, Congress included section 404 when it passed the

Internal Revenue Code of 1954, creating special tax treatment for the 1950 W&R Plan.  § 404(c),

68A Stat. at 141–42.  The full text of the subsection, as it stood then, read:

> (c)  Certain negotiated plans.
>
> If contributions are paid by an employer—
>
> (1)  under a plan under which such contributions are held in trust for the purpose of paying (either from principal or income or both) for the benefit of employees and their families and dependents at least medical or hospital care, and pensions on retirement or death of employees; and
>
> (2)  such plan was established prior to January 1, 1954, as a result of an agreement between employee representatives and the Government of the United States during a period of Government operation, under seizure powers, of a major part of the productive facilities of the industry in which such employer is engaged,
>
> such contributions shall not be deductible under this section nor be made nondeductible by this section, but the deductibility thereof shall be governed solely by section 162 (relating to trade or business expenses).  *This subsection shall have no application with respect to amounts contributed to a trust on or after any date on which such trust is qualified for exemption from tax under section 501(a).*

26 U.S.C. § 404(c) (1958) (emphasis added).  When Congress amended the section in 1974 as

part of ERISA, it struck the italicized sentence above and appended the following language at the

end of the subsection:

> For purposes of this chapter and subtitle B, in the case of any individual who before July 1, 1974, was a participant in a plan described in the preceding sentence—
>
> (A)  such individual, if he is or was an employee within the meaning of section 401(c)(1), shall be treated (with respect to service covered by the plan) as being an employee other than an employee within the meaning of section 401(c)(1) and as being an employee of a participating employer under the plan,
>
> (B)  earnings derived from service covered by the plan shall be treated as not being earned income within the meaning of section 401(c)(2), and

(C)   such   individual   shall   be   treated   as   an employee of   a
participating   employer   under   the   plan   with   respect   to   service
before July 1, 1975, covered by the plan.

Section 277 (relating to deductions incurred by certain membership
organizations in transactions with members) does not apply to any
trust described in this subsection. *The first and third sentences of
this subsection shall have no application with respect to amounts
contributed to a trust on or after any date on which such trust is
qualified for exemption from tax under section 501(a).*

ERISA, Pub. L. No. 93-406, § 2008(A), 88 Stat. 829, 993–94 (1974) (emphasis added).

According to Energy West, the italicized sentence at the end of the 1974 amendment

indicates that the subsection's first sentence, which provides special tax rules that only ever

applied to the 1950 Plan, was supposed to be temporary because it stops applying once a "trust is

qualified for exemption from tax under section 501(a)."  Def.'s Mot. at 19.  Energy West

supports this reading by looking to the legislative history, which contains indications that the

1974 Pension Plan intended to qualify for a tax exemption as soon as possible. *See id.* (quoting

H.R. Rep. No. 93-779, at 166 (1974), J.A. 1356 ("Since the desire of the United Mine Workers is

to establish the pension plan as a qualified plan under section 401(a), the bill provides that

section 404(c) is not to apply to the pension plan once it becomes a qualified plan except for the

purpose of determining which individuals are to be treated as employees of a participating

employer under the plan.").

Sure enough, the 1974 Plan qualified for tax exemption under sections 401(a) and 501(a)

in 1976. *See* IRS Determination Ltr. of Apr. 6, 1975, J.A. 1113.  By Energy West's account,

therefore, once the 1974 Plan qualified under subsection 501(a), it no longer fell within the scope

of section 404(c) and was therefore no longer a "continuation" of the 1950 W&R Plan. *See*

Def.'s Mot. at 19–22.  Therefore, Energy West appears to contend (although again its argument

is difficult to discern) that the ERISA carveouts do not apply to the 1974 Plan as it exists today,

31

so the 20-year cap on installment payments contained in 29 U.S.C. § 1399(b)(1)(C) limits

Energy West's withdrawal liability. *Id.* It thereby attempts to distinguish the text of the 1974

collective bargaining agreement (and all subsequent amendments), the IRS's 1975 determination

letter, the cases from the 1980s, and the definition from the 1992 Coal Act as outdated authorities

that had no reason to consider whether section 404(c) still applied to the 1974 Plan. *Id.*

      Arbitrator Irvings rejected this argument—and for good reason. *See* Award at J.A. 54–

56. Whether the 1974 Plan is subject to the tax provisions laid out in section 404(c) has nothing

to do with whether it remains a "continuation of" a plan described in that subsection, namely the

1950 W&R Plan. Indeed, the "continuation" language does not itself appear in section 404(c),

which on its face applies only to the 1950 W&R Plan—a pension plan that no longer exists in its

own right. In fact, that language first appeared in legislation Congress passed *after* the 1974

Pension Plan qualified for tax exemptions under 26 U.S.C. §§ 401 and 501. Congress only

added subsection 1391's "continuation" language in 1980 as part of the Multiemployer Pension

Plan Amendments Act. *See* 94 Stat. at 1232. With those considerations in mind, the references

in ERISA have nothing to do with tax; they seem to use the phrase "a plan described in § 404(c),

or a continuation thereof" as shorthand to refer to all coal mining pension plans, to which they

deny various non-tax benefits like the 20-year cap at issue here. 29 U.S.C. §§ 1391(d),

1399(c)(1)(B). As the Plan points out, if Congress had meant in 1980 to refer only to plans that

were still subject to tax consideration under section 404(c), it would have been referring to a null

set: the 1950 W&R Plan no longer existed by then, and the 1950 and 1974 Pension Plans had

qualified for new tax characterizations. *See* Tr. 28:1–24. That seems unlikely (if not an

inappropriate method of statutory interpretation).

Using the "continuation" language to refer to all coal pension plans also fits with the definition contained in the Coal Act, which clearly refers to the 1974 UMWA Pension Plan as "a pension plan described in section 404(c) (or a continuation thereof)." 26 U.S.C. § 9701(a)(3). To be sure, as Energy West argues, the substantive provisions of the Coal Act, which have to do with health benefits for miners, do not govern the issues here. *See* Def.'s Reply Mem. in Supp. of Energy West Mining Co.'s Mot. for Summ. J. ("Def.'s Reply") at 19–20, ECF No. 31. But the use of the same "continuation" language in legislation passed more than a decade after the 1974 Plan transitioned to a new tax status is further evidence that Congress used the phrase to refer to a closed set of multiemployer pension plans that includes the 1974 Plan.

Energy West attempts to dismiss the language's inclusion in the definition section as a one-off mistake that "was not carefully considered." *Id.* But while these Motions were pending, Congress incorporated the Coal Act's definition (codified at 26 U.S.C. § 9701(a)(3)) and renewed its usage of the "continuation" language in new legislation:

> (H) 1974 UMWA PENSION PLAN DEFINED.—For purposes of this paragraph, the term '1974 UMWA Pension Plan' has the meaning given the term in section 9701(a)(3) of the Internal Revenue Code of 1986, but without regard to the limitation on participation to individuals who retired in 1976 and thereafter.

Bipartisan Am. Miners Act of 2019, Pub. L. No. 116-94, div. M, § 102(H), 133 Stat. 2534, 3094 (2019) (to be codified at 30 U.S.C. § 1232). Any effort to distinguish the Coal Act's definition as outdated or as sloppy draftsmanship, *see* Def.'s Reply at 19–20, is thus unconvincing.

Energy West's remaining arguments are unavailing. It contends that the statutory provisions were the result of targeted lobbying in the 1970s to address concerns the coal industry and unions had then but that do not apply now. *See* Def.'s Mot. at 20. But that's a policy argument, suggesting that the Court should read certain union-friendly provisions out of the United States Code because economic conditions have changed since those provisions became

law.  Energy West may make that argument to Congress, but the Court has no authority to amend

the law on Energy West's behalf.  Energy West also points out that the IRS determination letter

confirming that the 1974 Plan is a continuation of the 1950 Plan is now 45 years old and that the

Plan has never asked for a new determination (likely because the one it has in hand is favorable

to it).  *Id.* at 21–22.  But as noted above, the Plan's current tax status is irrelevant to whether it

falls within ERISA's provisions creating special rules for the coal industry.

Arbitrator Irvings correctly held that the 1974 Pension Plan is a "continuation of" the

1950 W&R Plan for the purposes of 29 U.S.C. § 1391(d).  Therefore, Energy West is ineligible

for the 20-year cap on withdrawal contributions under subsection 1399(c)(1)(B).

## IV.     Conclusion

Energy West has not demonstrated that Ruschau's actuarial assumptions and methods

were unreasonable under ERISA's provisions governing the calculation of Energy West's

withdrawal liability from the 1974 Pension Plan.  Energy West's own expert admitted as much.

And because there were no allegations that the Plan's trustees exerted improper influence on the

actuary, the evidence supports Irvings's finding that the calculation was the actuary's best

estimate of the Plan's experience and performance.  Finally, Arbitrator Irvings correctly found

that Energy West in ineligible for a statutory cap on the number of installment payments it owes

to satisfy its liability.  Accordingly, it is

**ORDERED** that Energy West's Motion for Summary Judgment is **DENIED** and the

Plan's Motion for Summary Judgment is **GRANTED**.  An order will be released

contemporaneously with this Memorandum Opinion.

DATE:  May 22, 2020

CARL J. NICHOLS
United States District Judge